No. 22-13410
(Consolidated with Nos: 22-14099-HH, 23-10387-J)

# In the United States Court of Appeals
## for the Eleventh Circuit

DONALD J. TRUMP,
*Plaintiff-Appellant*,

ALINA HABBA, MICHAEL T. MADAIO, HABBA MADAIO & ASSOCIATES;
PETER TICKTIN, JAMIE ALAN SASSON, and THE TICKTIN LAW GROUP,
*Appellants*,

versus

HILLARY R. CLINTON, DEMOCRATIC NATIONAL COMMITTEE,
HFACC, INC., DNC SERVICES CORPORATION, PERKINS COIE, LLC, *et al*.,
*Defendants-Appellees*.

On appeal from the Southern District of Florida
Case No. 2:22-cv-14102-DMM
Hon. Donald M. Middlebrooks, U.S. District Judge

**APPENDIX FOR PLAINTIFF-APPELLANT AND APPELLANTS
VOLUME I OF III**

Jesse R. Binnall
Jared J. Roberts
Binnall Law Group, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
(703) 888-1943

*Counsel for Appellants*

## CASE NOS. 22-13410, 22-14099, 23-10387

## APPENDIX INDEX

| **Document Description** | **District Ct. Document/Tab #** |
|---|---|

### VOLUME I

District Court Docket Sheet
Southern District of Florida (Ft Pierce)
Case No. 2:22-cv-14102-DMM ............................................. Dkt.

Complaint for Damages and Demand for Trial by Jury
(03/24/2022) ............................................................ 1

### VOLUME II

Amended Complaint for Damages and Demand for Trial by Jury
(06/21/2022) ............................................................ 177

Order
(06/23/2022) ............................................................ 188

Order on the Parties' Proposed Joint Stipulation Regarding
Response Time to Amended Complaint
(07/01/2022) ............................................................ 200

### VOLUME III

Declaration of Alina Habba, Esq. .................................... 237-1

Exhibit A – Federal Election Commission First General
Counsel's Report ................................................... 237-2

Order on Motions to Dismiss
(09/08/2022) ............................................................ 267

i

| **Document Description** | **District Ct. Document/Tab #** |
|---|---|
| Notice of Civil Appeal (10/11/2022) .......................................................................... | 272 |
| Order Granting Motion for Sanctions (11/10/2022) .......................................................................... | 284 |
| Notice of Civil Appeal (12/09/2022) .......................................................................... | 291 |
| Order on Sanctions (01/19/2023) .......................................................................... | 302 |
|    Exhibit A – Summary Chart | 302-1 |
| Notice of Civil Appeal (02/06/2023) .......................................................................... | 308 |

# TAB DKT

APPEAL,CLOSED,PMH,STAYED

# U.S. District Court
## Southern District of Florida (Ft Pierce)
### CIVIL DOCKET FOR CASE #: 2:22-cv-14102-DMM

| | |
|---|---|
| Trump v. Clinton et al | Date Filed: 03/24/2022 |
| Assigned to: Judge Donald M. Middlebrooks | Date Terminated: 03/13/2023 |
| Referred to: Magistrate Judge Patrick M. Hunt | Jury Demand: Plaintiff |
| Case in other court:  USCA, 22-11955-J | Nature of Suit: 470 Racketeer/Corrupt |
| USCA, 22-13410-J | Organization |
| USCA, 22-13791-J | Jurisdiction: Federal Question |
| USCA, 22-14099-J | |
| USCA, 23-10387-J | |
| USCA, 23-10536-J | |
| Cause: 18:1962 Racketeering (RICO) Act | |

**Plaintiff**

**Donald J. Trump**                                    represented by    **Jamie Alan Sasson**
Ticktin Law Group PA
600 W Hillsboro Boulevard
Suite 220
Deerfield Beach, FL 33441-1610
954-978-8950
Email: Serv513@LegalBrains.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jared Joseph Roberts**
717 King Street
Suite 300
Alexandria, VA 22314
5852970202
Email: jared@binnall.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alina Habba**
Habba Madaio & Associates LLP
1430 US Highway 206 Suite 240
Bedminster, NJ 07921
908-869-1188
Email: ahabba@habbalaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Garrett Edward Kesl**
The Ticktin Law Group
270 SW Natura Ave

Deerfield Beach, FL 33441
9545706757
Email: gkesl@legalbrains.com
*ATTORNEY TO BE NOTICED*

**Michael T. Madaio**
Habba Madaio & Associates LLP
1430 US Highway 206 Suite 240
Bedminster, NJ 07921
908-869-1188
Email: mmadaio@habbalaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Peter David Ticktin**
Ticktin Law Group PA
600 W Hillsboro Boulevard
Suite 220
Deerfield Beach, FL 33441-1610
954-570-6757
Fax: 954-570-6760
Email: pt@legalbrains.com
*ATTORNEY TO BE NOTICED*

V.

<u>Appellant</u>

**Alina Habba**                                    represented by  **Jared Joseph Roberts**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

<u>Appellant</u>

**Michael T Madaio**

<u>Appellant</u>

**Habba Madaio & Associates**                      represented by  **Jared Joseph Roberts**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

<u>Appellant</u>

**Peter Ticktin**

<u>Appellant</u>

**Jamie A Sasson**

<u>Appellant</u>

**The Ticktin Law Group**                          represented by  **Garrett Edward Kesl**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**Hillary R. Clinton**                        represented by  **David E. Kendall**
Williams & Connolly
725 12th Street NW
Washington, DC 20005-3901
202-434-5000
Email: dkendall@wc.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David Oscar Markus**
Markus/Moss PLLC
40 N.W Third Street
Penthouse 1
Miami, FL 33128
305-379-6667
Fax: 305-379-6668
Email: dmarkus@markuslaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Katherine M. Turner**
Williams & Connolly, LLP
725 Twelfth Street, NW
Wasington, DC 20005
202-434-5487
Email: kturner@wc.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael J. Mestitz**
Williams & Connolly LLP
725 12th Street NW
Washington, DC 20005
202-434-5000
Email: mmestitz@wc.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**Democratic National Committee**            represented by  **Gerald Edward Greenberg**
Gelber Schachter & Greenberg PA
One Southeast Third Avenue
Suite 2600
Miami, FL 33131-1715
305-728-0950
Fax: 305-728-0951
Email: ggreenberg@gsgpa.com

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Maximillian Feldman**
Kaplan Hecker & Fink LLP
350 5th Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883
Email: mfeldman@kaplanhecker.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Roberta A. Kaplan**
Kaplan Hecker & Fink LLP
350 5th Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883
Email: rkaplan@kaplanhecker.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shawn G. Crowley**
Kaplan Hecker & Fink LLP
350 5th Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883
Email: scrowley@kaplanhecker.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**HFACC, Inc.**                    represented by **Paola Pinto**
Schertler Onorato Mead & Sears, LLP
555 - 13th Street, NW
Suite 500 West
Washington
Washington, DC 20004
202-763-5298
Fax: 202-628-4177
Email: ppinto@schertlerlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert P. Trout**
Schertler Onorato Mead & Sears
555 13th Street, N.W. Suite 500 West
Washington, DC 20004
(202) 628-4199
Email: rtrout@schertlerlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DNC Services Corporation** represented by **Gerald Edward Greenberg**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Maximillian Feldman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Roberta A. Kaplan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shawn G. Crowley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Perkins Coie, LLC** represented by **Eleni S. Kastrenakes Howard**
Akerman LLP
777 South Flagler Drive
Suite 1100, West Tower
West Palm Beach, FL 33401
561-273-5578
Fax: 561-651-1514
Email:
eleni.kastrenakeshoward@akerman.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**F. Joseph Warin**
Gibson Dunn & Crutcher LLP
1050 Connecticut Avenue NW
Washington, DC 20036-5306
202-887-3609
Fax: 530-9608
Email: fwarin@gibsondunn.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Geoffrey M. Sigler**
Gibson Dunn & Crutcher LLP
1050 Connecticut Avenue NW
Washington, DC 20036-5306
202-955-8500
Fax: 467-0539
Email: gsigler@gibsondunn.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Howard Jay Harrington**

Akerman LLP
50 North Laura Street, Suite 3100
Jacksonville, FL 32202
9045988617
Email: jay.harrington@akerman.com
*ATTORNEY TO BE NOTICED*

**Katherine Moran Meeks**
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Email: kmeeks@gibsondunn.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy E. Hart**
Gibson, Dunn & Crutcher, LLP
200 Park Avenue
New York, NY 10166
Email: nhart@gibsondunn.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Michael Sussman**                represented by    **Michael S. Bosworth**
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 916-1221
Email: Michael.Bosworth@lw.com
*TERMINATED: 07/01/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael F. Houlihan**
Latham & Watkins LLP
200 Clarendon Street
Boston, MA 02116
(617) 880-4642
Email: Michael.Houlihan@lw.com
*TERMINATED: 03/28/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Roberto Martinez**
Colson Hicks Eidson
255 Alhambra Circle
Penthouse
Coral Gables, FL 33134-2351
305-476-7400
Fax: 476-7444
Email: bob@colson.com
*ATTORNEY TO BE NOTICED*

**Sean M. Berkowitz**
Latham & Watkins LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
312-876-7700
Email: sean.berkowitz@lw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephen P. Barry**
Latham & Watkins LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200
Email: Stephen.Barry@lw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zachary Andrew Lipshultz**
Colson Hicks Eidson
255 Alhambra Circle
Coral Gables, FL 33134
3054767400
Email: zach@colson.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Marc Elias**                                        represented by   **April A. Otterberg**
Jenner & Block LLP
353 N Clark Street
Chicago, IL 60654-3456
312-222-9350
Email: aotterberg@jenner.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eugene K. Pettis**
Haliczer Pettis & Schwamm PA
100 SE 3rd Avenue
7th Floor
Fort Lauderdale, FL 33394
954-523-9922
Fax: 954-522-2512
Email: cmarr@hpslegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Reid J. Schar**
Jenner & Block LLP
353 N Clark Street
Chicago, IL 60654-3456
312-222-9350

Email: rschar@jenner.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Debbie Wasserman Schultz**                    represented by **Gerald Edward Greenberg**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Maximillian Feldman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Roberta A. Kaplan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shawn G. Crowley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Charles Halliday Dolan Jr.**                    represented by **Jonathan Edward Levine**
Levine & Associates, PLLC
5311 Lee Highway
Arlington, VA 22207
703-525-2668
Fax: 703-525-8393
Email: jonathan.levine@levinepllc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**George R.A. Doumar**
Mahdavi, Bacon, Halfhill & Young, PLLC
11350 Random Hills Road, Suite 700
Fairfax, VA 22030
(703) 352-1300
Email: gdoumar@doumarmartin.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jake Sullivan**                    represented by **Brian L. Stekloff**
Wilkinson Stekloff LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
(202) 847-4030
Email: bstekloff@wilkinsonstekloff.com

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah E. Neuman**
Wilkinson Stekloff LLP
2001 M Street, NW, 10th Floor
Washington, DC 20036
(202) 847-4000
Email: sneuman@wilkinsonstekloff.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William R. Barzee**
Courthouse Center
40 NW Third Street
Penthouse 1
Miami, FL 33128
305-374-3998
Fax: 305-374-3985
Email: williambarzee@barzeeflores.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**John Podesta**                    represented by **Paola Pinto**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert P. Trout**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Robert E. Mook**                  represented by **Andrew J. Ceresney**
Debevoise & Plimpton LLP
66 Hudson Boulevard
New York, NY 10001
212-909-6000
Email: aceresney@debevoise.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Isabela M. Garcez**
Debevoise & Plimpton LLP
66 Hudson Boulevard
New York, NY 10001
212-909-6000
Email: imgarcez@debevoise.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Wendy B. Reilly**
Debevoise & Plimpton LLP

66 Hudson Boulevard
New York, NY 10001
212-909-6000
Email: wbreilly@debevoise.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William R. Barzee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Phillipe Reines**

**Defendant**

**Fusion GPS**                    represented by **Joshua Levy**
Levy Firestone Muse LLP
900 17th Street NW, Suite 1200
Washington, DC 20006
202-845-3215
Email: jal@levyfirestone.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin P. Crenny**
Levy Firestone Muse LLP
900 17th Street NW, Suite 1200
Washington, DC 20006
202-845-3215
Email: kcrenny@levyfirestone.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel Clattenburg**
Levy Firestone Muse LLP
900 17th Street NW, Suite 1200
Washington, DC 20006
202-845-3215
Email: rmc@levyfirestone.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Adam Seth Fels**
Fridman Fels & Soto, PLLC
150 Alhambra Cir Ste 715
Ste 715
Ste 750
Coral Gables, FL 33134
786-338-8272
Email: afels@ffslawfirm.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Glenn Simpson**                                          represented by **Joshua Levy**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin P. Crenny**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel Clattenburg**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Adam Seth Fels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Peter Fritsch**                                          represented by **Joshua Levy**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin P. Crenny**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel Clattenburg**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Adam Seth Fels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Nellie Ohr**                                          represented by **Benjamin Peacock**
31 West 52nd Street
New York, NY 10019
212-878-8000
Email:
benjamin.peacock@cliffordchance.com

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua Berman**
Clifford Chance US LLP
2001 K Street, NW
Washington, DC 20006
202-912-5000
Email: joshua.berman@cliffordchance.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Adam Seth Fels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bruce Ohr**                    represented by **Benjamin Peacock**
                                 (See above for address)
                                 *LEAD ATTORNEY*
                                 *PRO HAC VICE*
                                 *ATTORNEY TO BE NOTICED*

                                 **Joshua Berman**
                                 (See above for address)
                                 *LEAD ATTORNEY*
                                 *PRO HAC VICE*
                                 *ATTORNEY TO BE NOTICED*

                                 **Adam Seth Fels**
                                 (See above for address)
                                 *ATTORNEY TO BE NOTICED*

**Defendant**

**Orbis Business Intelligence, Ltd.**     represented by **Enjolique Aytch Lett**
                                 Greenberg Traurig P.A.
                                 333 S.E. 2nd Avenue
                                 Suite 4400
                                 Miami, FL 33131
                                 305-579-0640
                                 Fax: 305-579-0717
                                 Email: Lette@gtlaw.com
                                 *LEAD ATTORNEY*
                                 *ATTORNEY TO BE NOTICED*

                                 **Akiesha Renee Gilcrist Sainvil**
                                 Greenberg Traurig, P.A
                                 333 S.E. 2nd Avenue
                                 Suite 4400
                                 Miami, FL 33131
                                 305-579-0597
                                 Fax: 305-579-0717

Email: saim.vlka@gtlaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Christopher Steele**

**Defendant**

**Igor Danchenko**                    represented by **Franklin G. Monsour , Jr.**
Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, NY 10019
212-506-3512
Email: fmonsour@orrick.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Diana Marie Fassbender**
Orrick
1152 15th Street NW
Washington, DC 20005
202-339-8533
Fax: 202-339-8400
Email: dszego@orrick.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Neustar, Inc.**                    represented by **Alexandria N Epps**
Quilling SElander Lownds Winslett and
Moser
6900 North Dallas Parkway, Suite 800
Plano, TX 75024
214-560-5463
Fax: 214-871-2111
Email: aepps@qslwm.com
*TERMINATED: 05/23/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer Olmedo-Rodriguez**
Buchanan Ingersoll
2 S Biscayne Blvd.
Suite 1500
Miami, FL 33131
305-347-4080
Fax: 347-4089
Email: jennifer.olmedo-
rodriguez@bipc.com
*ATTORNEY TO BE NOTICED*

**Samantha L. Southall**
Buchanan Ingersoll & Rooney, P.C.
50 South 16th Street, Suite 3200

Two Liberty Place
Philadelphia, PA 19102
(215) 665-3884
Email: samantha.southall@bipc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Rodney Joffe**          represented by    **Edward Soto**
Weil Gotshal & Manges
1395 Brickell Avenue
Suite 1200
Miami, FL 33131
305-577-3177
Fax: 374-7159
Email: edward.soto@weil.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven Tyrrell**
Weil, Gotshal & Manges LLP
2001 M St. NW #600
Washington, DC 20036
Email: steven.tyrrell@weil.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**James Comey**
*TERMINATED: 07/21/2022*

**Defendant**

**Peter Strzok**
*TERMINATED: 07/21/2022*

**Defendant**

**Lisa Page**
*TERMINATED: 07/21/2022*

**Defendant**

**Kevin Clinesmith**      represented by    **Noah Hy Brozinsky**
*TERMINATED: 07/21/2022*                                KaiserDillon PLLC
1099 14th Street NW
8th Floor West
Washington, DC 20005
202-640-6585
Email: nbrozinsky@kaiserdillon.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Muha**
KaiserDillon PLLC
1099 14th St. NW, 8th Floor West

Washington, DC 20005
202-640-2850
Email: CMuha@Kaiserdillon.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William Pittard**
KaiserDillon PLLC
1099 14th St. NW, 8th Floor West
Washington, DC 20005
202-640-2850
Email: WPittard@Kaiserdillon.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Andrew McCabe**
*TERMINATED: 07/21/2022*

<u>**Defendant**</u>

**John Does 1 through 10**
*said names being fictitious and unknown
entities*

<u>**Defendant**</u>

**ABC Corporations 1 through 10**
*said names being fictitious and unknown
entities*

<u>**Defendant**</u>

**United States Of America**                  represented by   **Anthony Erickson-Pogorzelski**
950 Pennsylvania Avenue NW                                     US Attorney's Office
Washington, DC 20530                                          Civil
                                                              99 NE 4th Street
                                                              Suite 335
                                                              Miami, FL 33132
                                                              305-961-9296
                                                              Fax: 305-530-7139
                                                              Email: anthony.pogorzelski@usdoj.gov
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Stephen R. Terrell**
                                                              United States Department of Justice
                                                              Civil Division, Torts Branch
                                                              PO Box 888
                                                              Washington, DC 20044
                                                              202-353-1651
                                                              Email: Stephen.Terrell2@usdoj.gov
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Adam Schiff**
*TERMINATED: 08/18/2022*

<u>**Defendant**</u>

**Rod Rosenstein**
*TERMINATED: 08/18/2022*

<u>**Defendant**</u>

**Neustar Security Services**                    represented by    **Allison S. Eisen**
                                                                   Williams & Connolly LLP
                                                                   680 Maine Avenue, S.W.
                                                                   Washington, DC 20024
                                                                   202-434-5000
                                                                   Email: aeisen@wc.com
                                                                   *LEAD ATTORNEY*
                                                                   *PRO HAC VICE*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **James Evans Gillenwater**
                                                                   Greenberg Traurig LP
                                                                   333 SE 2nd Ave.
                                                                   Suite 4400
                                                                   Miami, FL 33131
                                                                   3055790767
                                                                   Email: gillenwaterj@gtlaw.com
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **John M. McNichols**
                                                                   Williams & Connolly LLP
                                                                   680 Maine Avenue, S.W.
                                                                   Washington, DC 20024
                                                                   202-434-5000
                                                                   Email: jmcnichols@wc.com
                                                                   *LEAD ATTORNEY*
                                                                   *PRO HAC VICE*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Kathryn E. Garza**
                                                                   Williams & Connolly LLP
                                                                   680 Maine Avenue, S.W.
                                                                   Washington, DC 20024
                                                                   202-434-5000
                                                                   Email: kgarza@wc.com
                                                                   *LEAD ATTORNEY*
                                                                   *PRO HAC VICE*
                                                                   *ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**United States Of America**                    represented by    **Stephen R. Terrell**
950 Pennsylvania Avenue NW                                         (See above for address)
Washington, DC 20530                                              *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

| Date Filed | # | Select all / clear | Docket Text |
|---|---|---|---|
| 03/24/2022 | 1<br>1.8 MB | ☐ | COMPLAINT against All Defendants. Filing fees $ 402.00. IFP Filed, filed by DONALD J TRUMP. No Motion for IFP filed. (Attachments: # 1 Summon(s), # 2 Summon(s), # 3 Summon(s), # 4 Summon(s), # 5 Summon(s), # 6 Summon(s), # 7 Summon(s), # 8 Summon(s), # 9 Summon(s), # 10 Summon(s), # 11 Summon(s), # 12 Summon(s), # 13 Summon(s), # 14 Summon(s), # 15 Summon(s), # 16 Summon(s), # 17 Summon(s), # 18 Summon(s), # 19 Summon(s), # 20 Summon(s), # 21 Summon(s), # 22 Summon(s), # 23 Summon(s), # 24 Summon(s), # 25 Summon(s), # 26 Summon(s), # 27 Summon(s), # 28 Summon(s), # 29 Civil Cover Sheet) (Ticktin, Peter) (Attachment 24 replaced on 3/28/2022) (kpe). Images for docket entries 1 -24, 1 -25, 1 -26, 1 -27 and 1 -28 are removed pursuant to 12 Order. (Entered: 03/24/2022) |
| 03/24/2022 | 2 | | Clerks Notice of Judge Assignment to Judge Donald M. Middlebrooks.<br><br>Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge Shaniek M. Maynard is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent.<br><br>Pro se (NON-PRISONER) litigants may receive Notices of Electronic Filings (NEFS) via email after filing a Consent by Pro Se Litigant (NON-PRISONER) to Receive Notices of Electronic Filing. The consent form is available under the forms section of our website. (ebz) (Entered: 03/24/2022) |
| 03/24/2022 | 3 | | Clerks Notice to Filer re: Summons(es) cannot be issued. The filing fee has not been paid. (ebz) (Entered: 03/24/2022) |
| 03/24/2022 | 4 | | Clerks Notice to Filer re: Electronic Case. Filing fees not paid. Filer is instructed to file a Notice of Compliance of Filing Fee, and electronically pay the correct fees of $402.00 within 24 hours of this notice. (jua) (Entered: 03/24/2022) |
| 03/24/2022 | 5 | | Notice of Compliance of Filing Fee $402.00, receipt number AFLSDC-15504826, Electronic Civil Case Filing re 4 Clerks Notice to Filer re: Electronic Case (Ticktin, Peter) (Entered: 03/24/2022) |
| 03/24/2022 | 6<br>248.9 KB | ☐ | Bar Letter re: Admissions sent to attorney Alina Habba and Michael T. Madaio, mailing date March 24, 2022, (pt) (Entered: 03/24/2022) |
| 03/24/2022 | 7<br>37.2 KB | ☐ | STRICKEN Summons Issued as to All Defendants. (ail) Modified per DE 12 ORDER on 3/28/2022 (ebz). (kpe). Image for docket entry 7 removed pursuant to 12 Order. (Entered: 03/24/2022) |
| 03/25/2022 | 8<br>161.5 KB | ☐ | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Michael T. Madaio. Filing Fee $ 200.00 Receipt # AFLSDC-15508333 by Donald J. Trump. Responses due by 4/8/2022 (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Ticktin, Peter) (Entered: 03/25/2022) |
| 03/25/2022 | 9<br>148.0 KB | ☐ | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Alina Habba. Filing Fee $ 200.00 Receipt # AFLSDC-15508371 by Donald J. Trump. Responses due by |

| | | | |
|---|---|---|---|
| | | | 4/8/2022 (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Ticktin, Peter) (Entered: 03/25/2022) |
| 03/25/2022 | 10 | ☐ 211.3 KB | MOTION to redact addresses from DE 1-24, 1-25, 1-26, 1-27, 1-28, and 7 p.24-28 re 1 Complaint,, 7 Summons Issued by United States Of America. Attorney Anthony Erickson-Pogorzelski added to party United States Of America(pty:dft). (Attachments: # 1 Text of Proposed Order)(Erickson-Pogorzelski, Anthony) (Entered: 03/25/2022) |
| 03/25/2022 | 11 | ☐ 114.9 KB | ORDER OF RECUSAL. Magistrate Judge Shaniek M. Maynard recused. Case reassigned to Magistrate Judge Ryon M. McCabe for all further proceedings. Signed by Magistrate Judge Shaniek M. Maynard on 3/25/2022. *See attached document for full details.* (vjk) (Entered: 03/28/2022) |
| 03/25/2022 | 14 | | CASE REFERRED to Magistrate Judge Ryon M. McCabe, pursuant to DE 11 (mr1) (Entered: 03/29/2022) |
| 03/28/2022 | 12 | ☐ 19.5 KB | ORDER GRANTING MOTION TO REDACT re 10 Motion. The Clerk of Court is directed to STRIKE and REMOVE docket entries 1-24, 1-25, 1-26, 1-27, 1-28 and 7 from the record. Plaintiff SHALL FILE redacted copies of docket entries 1-24, 1-25, 1-26, 1-27, 1-28 and 7 on or before March 29, 2022. Signed by Judge Donald M. Middlebrooks on 3/28/2022. *See attached document for full details.* (ebz) (Entered: 03/28/2022) |
| 03/28/2022 | 13 | | CLERK'S NOTICE of Compliance by removing images from docket entries 1 -24, 1 -25, 1 -26, 1 -27, 1 -28 & 7 pursuant to 12 Order. (kpe) (Entered: 03/28/2022) |
| 03/29/2022 | 15 | | PAPERLESS ORDER granting 8 and 9 Motions to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorneys Michael T. Madaio and Alina Habba. Signed by Judge Donald M. Middlebrooks on 3/29/2022. (kal) (Entered: 03/29/2022) |
| 03/30/2022 | 16 | ☐ 9.1 MB | NOTICE by United States Of America re 12 Order on Motion for Miscellaneous Relief, *Joint Filing of Redacted Copies* (Attachments: # 1 Text of Proposed Order, # 2 Exhibit Redacted copy of docket entries 1-24 - 1-28, # 3 Exhibit Redacted copy of docket entry 7) (Erickson-Pogorzelski, Anthony) (Entered: 03/30/2022) |
| 03/30/2022 | 17 | ☐ 9.1 MB | Joint MOTION to redact addresses from companion case by United States Of America. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit, # 3 Exhibit) (Erickson-Pogorzelski, Anthony) (Entered: 03/30/2022) |
| 03/30/2022 | 18 | | PAPERLESS ORDER denying as moot 17 the Parties' Joint Notice of Filing Redacted Copies of Summonses and Motion to Otherwise Redact Addresses from the Court's Public Record. The United States has moved to redact the addresses of five named former FBI employees from the docket in Case No. 22-cv-14101. Docketing staff from the clerk's office has advised my chambers that Case No. 22-cv-14101 was opened in error, and accordingly the addresses for all Defendants have now been removed from that docket. Signed by Judge Donald M. Middlebrooks on 3/30/2022. (kal) (Entered: 03/30/2022) |
| 03/30/2022 | 19 | ☐ 111.1 KB | NOTICE of filing letter by Phillp Roy Mohler. (ebz) (Entered: 04/01/2022) |
| 04/04/2022 | 20 | ☐ 290.9 KB | Letter from Philip Mohler (lbc) (Entered: 04/04/2022) |

| 04/04/2022 | [21](#)<br>154.8 KB | Plaintiff's MOTION to Disqualify Judge *Donald M. Middlebrooks* by Donald J. Trump. (Ticktin, Peter) (Entered: 04/04/2022) |
|---|---|---|
| 04/04/2022 | [22](#)<br>846.9 KB | SUMMONS (Affidavit) Returned Executed on [1](#) Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Marc Elias served on 4/4/2022, response/answer due 4/25/2022. (Attachments: # [1](#) Affidavit Affidavit of Service of Process on Marc Elias) (Ticktin, Peter) (Entered: 04/04/2022) |
| 04/06/2022 | [23](#)<br>628.1 KB | SUMMONS (Affidavit) Returned Executed on [1](#) Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Debbie Wasserman Schultz served on 4/4/2022, response/answer due 4/25/2022. (Attachments: # [1](#) Affidavit Affidavit of Service of Process on Debbie Wasserman)(Ticktin, Peter) (Entered: 04/06/2022) |
| 04/06/2022 | [24](#)<br>853.8 KB | SUMMONS (Affidavit) Returned Executed on [1](#) Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Robert E. Mook served on 4/5/2022, response/answer due 4/26/2022. (Attachments: # [1](#) Affidavit Affidavit of Service of Process on Robert E Mook) (Ticktin, Peter) (Entered: 04/06/2022) |
| 04/06/2022 | [25](#)<br>833.4 KB | SUMMONS (Affidavit) Returned Executed on [1](#) Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Igor Danchenko served on 3/30/2022, response/answer due 4/20/2022. (Attachments: # [1](#) Affidavit Affidavit of Service of Process on Igor Danchenko) (Ticktin, Peter) (Entered: 04/06/2022) |
| 04/06/2022 | [26](#)<br>801.1 KB | SUMMONS (Affidavit) Returned Executed on [1](#) Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Democratic National Committee served on 4/5/2022, response/answer due 4/26/2022. (Attachments: # [1](#) Affidavit Affidavit of Service of Process on Democratic National Commitee)(Ticktin, Peter) (Entered: 04/06/2022) |
| 04/06/2022 | [27](#)<br>786.9 KB | SUMMONS (Affidavit) Returned Executed on [1](#) Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Charles Halliday Dolan Jr. served on 3/30/2022, response/answer due 4/20/2022. (Attachments: # [1](#) Affidavit Affidavit of Service of Process Charles Halliday Dolan Jr.)(Ticktin, Peter) (Entered: 04/06/2022) |
| 04/06/2022 | [28](#)<br>389.0 KB | STRICKEN SUMMONS (Affidavit) Returned Executed on [1](#) Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Andrew McCabe served on 4/5/2022, response/answer due 4/26/2022. (Attachments: # [1](#) Affidavit Affidavit of Service of Process on Andrew McCabe)(Ticktin, Peter) Modified on 4/26/2022 (ebz). (Main Document 28 replaced on 4/26/2022 (ebz). (Attachment 1 replaced on 4/26/2022) (ebz). (Entered: 04/06/2022) |
| 04/06/2022 | [29](#)<br>70.0 KB | ORDER OF RECUSAL. Magistrate Judge Ryon M. McCabe recused. Case reassigned to Magistrate Judge Bruce E. Reinhart as Paired Magistrate Judge for all further proceedings. Signed by Magistrate Judge Ryon M. McCabe on 4/6/2022. *See attached document for full details.* (jmd) (Entered: 04/06/2022) |
| 04/06/2022 | [30](#)<br>154.5 KB | ORDER denying [21](#) Motion to Disqualify Judge. Signed by Judge Donald M. Middlebrooks on 4/6/2022. *See attached document for full details.* (gm1) (Entered: 04/06/2022) |
| 04/11/2022 | [31](#)<br>641.9 KB | SUMMONS (Affidavit) Returned Executed on [1](#) Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. |

| | | | |
|---|---|---|---|
| | | | Trump. Peter Fritsch served on 4/6/2022, response/answer due 4/27/2022. (Attachments: # 1 Affidavit Affidavit of Service of Process)(Ticktin, Peter) (Entered: 04/11/2022) |
| 04/11/2022 | 32 | ☐ 801.1 KB | SUMMONS (Affidavit) Returned Executed on 1 Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. DNC Services Corporation served on 4/5/2022, response/answer due 4/26/2022. (Attachments: # 1 Affidavit Affidavit of Service of Process)(Ticktin, Peter) (Entered: 04/11/2022) |
| 04/13/2022 | 33 | ☐ 675.6 KB | SUMMONS (Affidavit) Returned Executed on 1 Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Perkins Coie, LLC served on 4/6/2022, response/answer due 4/27/2022. (Attachments: # 1 Affidavit Affidavit of Service of Process)(Ticktin, Peter) (Entered: 04/13/2022) |
| 04/13/2022 | 34 | ☐ 854.2 KB | SUMMONS (Affidavit) Returned Executed on 1 Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Nellie Ohr served on 3/31/2022, response/answer due 4/21/2022. (Attachments: # 1 Affidavit Affidavit of Service of Process on Nellie Ohr) (Ticktin, Peter) (Entered: 04/13/2022) |
| 04/13/2022 | 35 | ☐ 852.0 KB | SUMMONS (Affidavit) Returned Executed on 1 Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Bruce Ohr served on 3/31/2022, response/answer due 4/21/2022. (Attachments: # 1 Affidavit Affidavit of Service of Process on Bruce Ohr) (Ticktin, Peter) (Entered: 04/13/2022) |
| 04/14/2022 | 37 | ☐ 163.5 KB | Letter from Phillp Mohler. (ebz) (Entered: 04/15/2022) |
| 04/14/2022 | 38 | ☐ 180.1 KB | Letter from Phillp Mohler. (ebz) (Entered: 04/15/2022) |
| 04/15/2022 | 36 | ☐ 795.0 KB | SUMMONS (Affidavit) Returned Executed on 1 Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. John Podesta served on 4/13/2022, response/answer due 5/4/2022. (Attachments: # 1 Affidavit Affidavit of Service of Process on John Podesta) (Ticktin, Peter) (Entered: 04/15/2022) |
| 04/15/2022 | 39 | ☐ 137.7 KB | ORDER REFERRING CASE AND SETTING TRIAL DATE: (Jury Trial set for 5/8/2023 09:00 AM in Fort Pierce Division before Judge Donald M. Middlebrooks., Calendar Call set for 5/3/2023 01:15 PM in West Palm Beach Division before Judge Donald M. Middlebrooks), ORDER REFERRING CASE to Magistrate Judge Bruce E. Reinhart to conduct a Scheduling Conference. Signed by Judge Donald M. Middlebrooks on 4/15/2022. *See attached document for full details.* (ebz)<br><br>**Pattern Jury Instruction Builder -** To access the latest, up to date changes to the 11th Circuit Pattern Jury Instructions go to https://pji.ca11.uscourts.gov or click here. (Entered: 04/15/2022) |
| 04/18/2022 | 40 | ☐ 324.1 KB | Unopposed MOTION for Extension of Time to File Response/Reply/Answer as to 1 Complaint,,, by Neustar, Inc.. Attorney Alexandria N Epps added to party Neustar, Inc.(pty:dft). (Attachments: # 1 Text of Proposed Order)(Epps, Alexandria) (Entered: 04/18/2022) |
| 04/18/2022 | 41 | ☐ 169.9 KB | Certificate of Other Affiliates/Corporate Disclosure Statement by Neustar, Inc. identifying Corporate Parent TransUnion, Other Affiliate T. Rowe Price Group, |

| 04/19/2022 | 42 | | PAPERLESS ORDER granting 40 Defendant Neustar, Inc.'s Unopposed Motion for Extension of Time. Defendant Neustar, Inc. seeks a 30-day extension of its deadline to respond to the Complaint, citing the extensive nature of the Complaint and the need for additional time to review relevant documents. I find good cause to grant the Motion. Accordingly, the deadline for Defendant Neustar, Inc. to respond to the Complaint is extended to **May 20, 2022**. Signed by Judge Donald M. Middlebrooks on 4/19/2022. (kal) (Entered: 04/19/2022) |
| --- | --- | --- | --- |
| 04/19/2022 | 43 ☐ 794.8 KB | | SUMMONS (Affidavit) Returned Executed on 1 Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Glenn Simpson served on 4/5/2022, response/answer due 4/26/2022. (Attachments: # 1 Affidavit Affidavit of Service of Process on Glenn Simpson) (Ticktin, Peter) (Entered: 04/19/2022) |
| 04/19/2022 | 44 ☐ 791.5 KB | | SUMMONS (Affidavit) Returned Executed on 1 Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Michael Sussman served on 4/5/2022, response/answer due 4/26/2022. (Attachments: # 1 Affidavit Affidavit of Service of Process on Michael Sussmann)(Ticktin, Peter) (Entered: 04/19/2022) |
| 04/19/2022 | 45 ☐ 372.7 KB | | STRICKEN SUMMONS (Affidavit) Returned Executed on 1 Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Kevin Clinesmith served on 4/5/2022, response/answer due 4/26/2022. (Attachments: # 1 Affidavit Affidavit of Service of Process on Kevin Clinesmith)(Ticktin, Peter) Modified on 4/26/2022 (ebz). (Main Document 45 replaced on 4/26/2022) (ebz). (Attachment 1 replaced on 4/26/2022) (ebz). (Entered: 04/19/2022) |
| 04/20/2022 | 46 ☐ 792.0 KB | | SUMMONS (Affidavit) Returned Executed on 1 Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Fusion GPS served on 4/5/2022, response/answer due 4/26/2022. (Attachments: # 1 Affidavit Affidavit of Service of Process on Fusion GPS) (Ticktin, Peter) (Entered: 04/20/2022) |
| 04/20/2022 | 47 ☐ 250.9 KB | | MOTION for Extension of Time extension to 05/23/2022 to file responsive pleading by Charles Halliday Dolan Jr.. Attorney Jonathan Edward Levine added to party Charles Halliday Dolan Jr.(pty:dft). Responses due by 5/4/2022 (Attachments: # 1 Proposed Order)(Levine, Jonathan) (Entered: 04/20/2022) |
| 04/20/2022 | 48 ☐ 148.0 KB | | NOTICE of Attorney Appearance by David Oscar Markus on behalf of Hillary R. Clinton. Attorney David Oscar Markus added to party Hillary R. Clinton(pty:dft). (Markus, David) (Entered: 04/20/2022) |
| 04/20/2022 | 49 ☐ 394.2 KB | | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for David E. Kendall. Filing Fee $ 200.00 Receipt # AFLSDC-15575147 by Hillary R. Clinton. Responses due by 5/4/2022 (Attachments: # 1 Certification, # 2 Text of Proposed Order) (Markus, David) (Entered: 04/20/2022) |
| 04/20/2022 | 50 ☐ 292.2 KB | | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Michael J. Mestitz. Filing Fee $ 200.00 Receipt # BFLSDC-15575169 by Hillary R. Clinton. Responses due by 5/4/2022 (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Markus, David) (Entered: 04/20/2022) |

| 04/20/2022 | 51 | ☐ 247.3 KB | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Katherine M. Turner. Filing Fee $ 200.00 Receipt # BFLSDC-15575178 by Hillary R. Clinton. Responses due by 5/4/2022 (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Markus, David) (Entered: 04/20/2022) |
| 04/20/2022 | 52 | ☐ 149.5 KB | Defendant's MOTION to Dismiss with Prejudice 1 Complaint,,, by Hillary R. Clinton. Responses due by 5/4/2022 (Markus, David) (Entered: 04/20/2022) |
| 04/20/2022 | 53 | ☐ 134.1 KB | NOTICE of Attorney Appearance by Diana Marie Fassbender on behalf of Igor Danchenko. Attorney Diana Marie Fassbender added to party Igor Danchenko(pty:dft). (Fassbender, Diana) (Entered: 04/20/2022) |
| 04/20/2022 | 54 | ☐ 325.0 KB | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Franklin Monsour Jr.. Filing Fee $ 200.00 Receipt # AFLSDC-15575603 by Igor Danchenko. Responses due by 5/4/2022 (Attachments: # 1 Text of Proposed Order) (Fassbender, Diana) (Entered: 04/20/2022) |
| 04/20/2022 | 55 | ☐ 287.8 KB | MOTION for Extension of Time to File Response/Reply/Answer as to 1 Complaint,,, by Igor Danchenko. (Attachments: # 1 Text of Proposed Order) (Fassbender, Diana) (Entered: 04/20/2022) |
| 04/21/2022 | 56 | ☐ 847.5 KB | ACKNOWLEDGEMENT of Service on 1 Complaint by Donald J. Trump. NO proof of service attached. (Ticktin, Peter). Modified on 4/21/2022 (lbc). (Entered: 04/21/2022) |
| 04/21/2022 | 57 | | PAPERLESS ORDER granting 47 Defendant Charles Halliday Dolan's Unopposed Motion for Extension of Time. Defendant Dolan's deadline to respond to Plaintiff's Complaint was April 20, 2022. (DE 27 ). Defendant seeks a 30-day extension of this deadline, citing the extensive nature of the Complaint and that Defendant Dolan "is sorting through issues of legal representation." (DE 47 ). I find good cause to grant the Motion. Accordingly, Defendant Dolan's deadline to respond to the Complaint is extended to **May 23, 2022**. Signed by Judge Donald M. Middlebrooks on 4/21/2022. (kal) Modified signature date on 4/21/2022 (pcs). (Entered: 04/21/2022) |
| 04/21/2022 | 58 | | PAPERLESS ORDER granting 49 , 50 , 51 , and 54 Motions to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorneys David E. Kendall, Michael J. Mestitz, Katherine M. Turner, and Franklin Monsour Jr. Signed by Judge Donald M. Middlebrooks on 4/21/2022. (kal) (Entered: 04/21/2022) |
| 04/21/2022 | 59 | | PAPERLESS ORDER granting 55 Defendant Igor Danchenko's Motion for Extension of Time. Defendant Danchenko's deadline to respond to Plaintiff's Complaint was April 20, 2022. (DE 25 ). Defendant Danchenko seeks an extension until May 20, 2022, citing that he "requires additional time" to evaluate the extensive Complaint. (DE 55 ). I find good cause to grant the Motion. Accordingly, Defendant Danchenko's deadline to respond to the Complaint is extended to **May 20, 2022**. Signed by Judge Donald M. Middlebrooks on 4/21/2022. (kal) (Entered: 04/21/2022) |
| 04/21/2022 | 60 | ☐ 93.4 KB | NOTICE of Attorney Appearance by Adam Seth Fels on behalf of Bruce Ohr, Nellie Ohr. Attorney Adam Seth Fels added to party Bruce Ohr(pty:dft), Attorney Adam Seth Fels added to party Nellie Ohr(pty:dft). (Fels, Adam) (Entered: 04/21/2022) |

| 04/21/2022 | 61<br>97.0 KB | ☐ | NOTICE of Attorney Appearance by Eugene K. Pettis on behalf of Marc Elias. Attorney Eugene K. Pettis added to party Marc Elias(pty:dft). (Pettis, Eugene) (Entered: 04/21/2022) |
|---|---|---|---|
| 04/21/2022 | 62<br>317.0 KB | ☐ | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Benjamin Peacock. Filing Fee $ 200.00 Receipt # AFLSDC-15579823 by Bruce Ohr, Nellie Ohr. Responses due by 5/5/2022 (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Fels, Adam) (Entered: 04/21/2022) |
| 04/21/2022 | 63<br>96.7 KB | ☐ | NOTICE of Attorney Appearance by Eugene K. Pettis on behalf of Marc Elias (Pettis, Eugene) (Entered: 04/21/2022) |
| 04/21/2022 | 64<br>390.9 KB | ☐ | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Joshua Berman. Filing Fee $ 200.00 Receipt # AFLSDC-15579833 by Bruce Ohr, Nellie Ohr. Responses due by 5/5/2022 (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Fels, Adam) (Entered: 04/21/2022) |
| 04/21/2022 | 65<br>225.7 KB | ☐ | Unopposed MOTION for Extension of Time to File Response/Reply/Answer by Nellie Ohr. (Attachments: # 1 Text of Proposed Order)(Fels, Adam) (Entered: 04/21/2022) |
| 04/21/2022 | 66<br>282.5 KB | ☐ | MOTION to Expedite by Donald J. Trump. (Attachments: # 1 Text of Proposed Order Order on Plaintiff's Motion for Enlargement of Time to File Amended Complaint)(Ticktin, Peter) (Entered: 04/21/2022) |
| 04/22/2022 | 67<br>60.4 KB | ☐ | NOTICE of Attorney Appearance by Roberto Martinez on behalf of Michael Sussman. Attorney Roberto Martinez added to party Michael Sussman(pty:dft). (Martinez, Roberto) (Entered: 04/22/2022) |
| 04/22/2022 | 68<br>39.0 KB | ☐ | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for April A. Otterberg. Filing Fee $ 200.00 Receipt # AFLSDC-15581774 by Marc Elias. Responses due by 5/6/2022 (Attachments: # 1 Certification April Otterberg Certification Pursuant to Rule 4(b), # 2 Text of Proposed Order Order Granting Motion to Appear Pro Hac Vice)(Pettis, Eugene) (Entered: 04/22/2022) |
| 04/22/2022 | 69<br>42.4 KB | ☐ | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Reid J. Schar. Filing Fee $ 200.00 Receipt # AFLSDC-15581858 by Marc Elias. Responses due by 5/6/2022 (Attachments: # 1 Certification Reid J. Schar Certification Pursuant to Rule 4(b), # 2 Text of Proposed Order Order Granting Motion to Appear Pro Hac Vice)(Pettis, Eugene) (Entered: 04/22/2022) |
| 04/22/2022 | 70 | | PAPERLESS ORDER granting 65 Defendant Nellie Ohr's Unopposed Motion for Extension of Time. Defendant Nellie Ohr's deadline to respond to Plaintiff's Complaint is April 21, 2022. (DE 34 ). Defendant Nellie Ohr requests a 20-day extension of this deadline, citing the extensive nature of the Complaint. I find good cause to grant the Motion. Accordingly, Defendant Nellie Ohr's deadline to respond to the Complaint is extended to **May 11, 2022**. Signed by Judge Donald M. Middlebrooks on 4/22/2022. (kal) (Entered: 04/22/2022) |
| 04/22/2022 | 71<br>93.6 KB | ☐ | NOTICE of Attorney Appearance by Adam Seth Fels on behalf of Peter Fritsch, Fusion GPS, Glenn Simpson. Attorney Adam Seth Fels added to party Peter Fritsch(pty:dft), Attorney Adam Seth Fels added to party Fusion GPS(pty:dft), |

Attorney Adam Seth Fels added to party Glenn Simpson(pty:dft) (Fels, Adam) (Entered: 04/22/2022)

| 04/22/2022 | 72 | ☐ 171.0 KB | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Joshua A. Levy. Filing Fee $ 200.00 Receipt # AFLSDC-15582082 by Peter Fritsch, Fusion GPS, Glenn Simpson. Responses due by 5/6/2022 (Fels, Adam) (Entered: 04/22/2022) |
| 04/22/2022 | 73 | ☐ 176.0 KB | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Rachel Clattenburg. Filing Fee $ 200.00 Receipt # AFLSDC-15582090 by Peter Fritsch, Fusion GPS, Glenn Simpson. Responses due by 5/6/2022 (Fels, Adam) (Entered: 04/22/2022) |
| 04/22/2022 | 74 | ☐ 198.4 KB | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Kevin P. Crenny. Filing Fee $ 200.00 Receipt # AFLSDC-15582106 by Peter Fritsch, Fusion GPS, Glenn Simpson. Responses due by 5/6/2022 (Fels, Adam) (Entered: 04/22/2022) |
| 04/22/2022 | 75 | ☐ 3.8 KB | NOTICE of Attorney Appearance by Eleni S. Kastrenakes Howard on behalf of Perkins Coie, LLC. Attorney Eleni S. Kastrenakes Howard added to party Perkins Coie, LLC(pty:dft). (Kastrenakes Howard, Eleni) (Entered: 04/22/2022) |
| 04/22/2022 | 76 | ☐ 140.4 KB | NOTICE of Attorney Appearance by William R. Barzee on behalf of Robert E. Mook. Attorney William R. Barzee added to party Robert E. Mook(pty:dft). (Barzee, William) (Entered: 04/22/2022) |
| 04/22/2022 | 77 | ☐ 136.7 KB | NOTICE of Attorney Appearance by Gerald Edward Greenberg on behalf of Democratic National Committee. Attorney Gerald Edward Greenberg added to party Democratic National Committee(pty:dft). (Greenberg, Gerald) (Entered: 04/22/2022) |
| 04/22/2022 | 78 | ☐ 137.8 KB | NOTICE of Attorney Appearance by Gerald Edward Greenberg on behalf of DNC Services Corporation. Attorney Gerald Edward Greenberg added to party DNC Services Corporation(pty:dft). (Greenberg, Gerald) (Entered: 04/22/2022) |
| 04/22/2022 | 79 | ☐ 4.1 KB | Corporate Disclosure Statement by Perkins Coie, LLC (Kastrenakes Howard, Eleni) (Entered: 04/22/2022) |
| 04/22/2022 | 80 | ☐ 14.9 KB | MOTION for Extension of Time to File Response/Reply/Answer as to 1 Complaint,,, by DNC Services Corporation, Democratic National Committee, Marc Elias, Peter Fritsch, Fusion GPS, Robert E. Mook, Perkins Coie, LLC, Glenn Simpson, Michael Sussman. (Attachments: # 1 Text of Proposed Order on Defendants' Motion for Extension of Time)(Kastrenakes Howard, Eleni) (Entered: 04/22/2022) |
| 04/23/2022 | 81 | ☐ 139.7 KB | NOTICE of Attorney Appearance by Gerald Edward Greenberg on behalf of Debbie Wasserman Schultz. Attorney Gerald Edward Greenberg added to party Debbie Wasserman Schultz(pty:dft). (Greenberg, Gerald) (Entered: 04/23/2022) |
| 04/23/2022 | 82 | ☐ 258.8 KB | Agreed MOTION for Extension of Time to File Response/Reply/Answer as to 1 Complaint,,, by Debbie Wasserman Schultz. (Attachments: # 1 Text of Proposed Order Granting DWS Motion for Extension to Respond to Complaint) (Greenberg, Gerald) (Entered: 04/23/2022) |

| 04/25/2022 | 83 | | "Plaintiff's Expedited Motion for an Extension of Time to File an Amended Complaint as a Matter of Course or to Response [sic] to Hillary Clinton's Motion to Dismiss." Plaintiff's Certificate of Conferral indicates that "[a]n email was sent to all counsel on record" and that Plaintiff's counsel "called David Kendall and left a message," but that no response was received at the time Plaintiff filed the Motion. This does not satisfy the conferral requirements of this court's Local Rules. As such, I cannot discern whether the requested relief is opposed. In the interest of ruling on Plaintiff's Motion without unnecessary delay I will expedite briefing. Therefore, if any Defendant opposes the Motion, they must file a response **on or before April 27, 2022** explaining their position. Signed by Judge Donald M. Middlebrooks on 4/25/2022. (kal) (Entered: 04/25/2022) |
|---|---|---|---|
| 04/25/2022 | 84 | ☐ 1.1 MB | MOTION To redact addresses from public record and preclude further filing of the addresses on the public record by United States Of America. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit Redacted copy of docket entry 28, # 3 Exhibit Redacted copy of docket entry 28-1, # 4 Exhibit Redacted copy of docket entry 45, # 5 Exhibit Redacted copy of docket entry 45-1)(Erickson-Pogorzelski, Anthony) (Entered: 04/25/2022) |
| 04/25/2022 | 85 | | PAPERLESS ORDER granting 62 , 64 , 68 , 69 , 72 , 73 , and 74 Motions to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorneys Benjamin Peacock, Joshua Berman, April A. Otterberg, Reid J. Schar, Joshua A. Levy, Rachel Clattenburg, and Kevin P. Crenny. Signed by Judge Donald M. Middlebrooks on 4/25/2022. (kal) (Entered: 04/25/2022) |
| 04/25/2022 | 86 | | PAPERLESS ORDER granting 80 Defendants Perkins Coie LLP, Michael Sussman, Marc Elias, the Democratic National Committee and DNC Services Corp. (DNC), Robert E. Mook, Fusion GPS, Glenn Simpson, and Peter Fritsch's (collectively, "Defendants") Unopposed Motion for Extension of Time. Defendants seek an extension of time until May 11, 2022 for each to serve their respective responsive pleading or motion directed to the Complaint, citing the voluminous nature of Plaintiff's Complaint. I find good cause to grant the Motion. (DE 80 ). Accordingly, Defendants' deadline to respond to Plaintiff's Complaint is extended to **May 11, 2022**. Signed by Judge Donald M. Middlebrooks on 4/25/2022. (kal) (Entered: 04/25/2022) |
| 04/25/2022 | 87 | | PAPERLESS ORDER granting 82 Defendant Debbie Wasserman Schultz's Agreed Motion to Extend Time to Respond to Complaint. Defendant's deadline to respond to Plaintiff's Complaint is April 25, 2022. (DE 23 ). She seeks to extend this deadline until May 11, 2022, citing the voluminous nature of Plaintiff's Complaint. I find good cause to grant the Motion. (DE 82 ). Accordingly, Defendant's deadline to respond to Plaintiff's Complaint is extended to **May 11, 2022**. Signed by Judge Donald M. Middlebrooks on 4/25/2022. (kal) (Entered: 04/25/2022) |
| 04/25/2022 | 88 | ☐ 319.8 KB | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for George R.A. Doumar. Filing Fee $ 200.00 Receipt # AFLSDC-15586857 by Charles Halliday Dolan Jr.. Responses due by 5/9/2022 (Attachments: # 1 Text of Proposed Order) (Levine, Jonathan) (Entered: 04/25/2022) |
| 04/25/2022 | 89 | ☐ 112.4 KB | STRICKEN RESPONSE to Motion re 66 MOTION to Expedite filed by Hillary R. Clinton. Replies due by 5/2/2022. (Markus, David) Modified per DE |

101 NOTICE TO STRIKE on 4/28/2022 (ebz) (Entered: 04/25/2022)

| 04/25/2022 | 99 | | Clerks Notice to Filer re 89 Response to Motion. **Login/Signature Block Violation**; CORRECTIVE ACTION REQUIRED - The name of attorney e-filing this document via their CM/ECF login does not match the name of attorney on the signature block of the document. The name used for login must match the typed name on signature block of the document. This filing is a violation of Section 3J(1) of CM/ECF Admin Procedures and Local Rule 5.1(b). Filer must File a Notice of Striking, then refile document pursuant to CM/ECF Admin Procedures and Local Rules. (ebz) (Entered: 04/27/2022) |
|---|---|---|---|
| 04/26/2022 | 90 | ☐ 287.0 KB | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Shawn G. Crowley. Pay.gov Agency Tracking ID FLSDC-AFLSDC-15589054. Filing Fee $ 200.00 by DNC Services Corporation, Democratic National Committee, Debbie Wasserman Schultz. Responses due by 5/10/2022 (Attachments: # 1 Text of Proposed Order Granting PHV of Shawn G. Crowley)(Greenberg, Gerald) (Entered: 04/26/2022) |
| 04/26/2022 | 91 | ☐ 114.0 KB | NOTICE of Attorney Appearance by Edward Soto on behalf of Rodney Joffe. Attorney Edward Soto added to party Rodney Joffe(pty:dft). (Soto, Edward) (Entered: 04/26/2022) |
| 04/26/2022 | 92 | ☐ 236.0 KB | Unopposed MOTION for Extension of Time to File Response/Reply/Answer as to 1 Complaint,,, by Rodney Joffe. (Attachments: # 1 Text of Proposed Order) (Soto, Edward) (Entered: 04/26/2022) |
| 04/26/2022 | 93 | ☐ 321.5 KB | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Steven Tyrrell. Filing Fee $ 200.00 Receipt # AFLSDC-15589786 by Rodney Joffe. Responses due by 5/10/2022 (Attachments: # 1 Text of Proposed Order)(Soto, Edward) (Entered: 04/26/2022) |
| 04/26/2022 | 94 | | PAPERLESS ORDER granting 88 and 90 Motions to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorneys George R.A. Doumar and Shawn G. Crowley. Signed by Judge Donald M. Middlebrooks on 4/26/2022. (kal) (Entered: 04/26/2022) |
| 04/26/2022 | 95 | ☐ 72.3 KB | ORDER GRANTING SECOND MOTION TO REDACT. The United States' Second Motion to Redact DE 84 Motion is GRANTED IN PART AND RULING IS RESERVED IN PART. The Motion is GRANTED to the extent that it seeks redaction of the documents nowin the court file. Accordingly, the Clerk of Court is directed to STRIKE and REMOVE Docket Entries 28, 28-1, 45, and 45-1 from the record. These items shall be substituted with the redacted versions filed by the government. On or before April 28, 2022, Plaintiff SHALL RESPOND to that portion of the United States' Motion which sets forth a suggested procedure for handling future improper disclosures of addresses in court documents. Signed by Judge Donald M. Middlebrooks on 4/26/2022. *See attached document for full details.* (ebz) (Entered: 04/26/2022) |
| 04/26/2022 | 96 | ☐ 194.2 KB | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Christopher Muha. Filing Fee $ 200.00 Receipt # AFLSDC-15591802 by Kevin Clinesmith. Attorney Noah Hy Brozinsky added to party Kevin Clinesmith(pty:dfth). Responses due by 5/10/2022 (Attachments: # 1 Text of Proposed Order Proposed Order)(Brozinsky, Noah) (Entered: 04/26/2022) |

| 04/26/2022 | 97<br>196.2 KB | ☐ | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for William Pittard. Filing Fee $ 200.00 Receipt # AFLSDC-15591820 by Kevin Clinesmith. Responses due by 5/10/2022 (Attachments: # 1 Text of Proposed Order Proposed Order William Pittard)(Brozinsky, Noah) (Entered: 04/26/2022) |
|---|---|---|---|
| 04/26/2022 | 98<br>184.8 KB | ☐ | Defendant's MOTION for Extension of Time to File Response/Reply/Answer as to 45 Summons Returned Executed, by Kevin Clinesmith. (Attachments: # 1 Text of Proposed Order Proposed Order)(Brozinsky, Noah) (Entered: 04/26/2022) |
| 04/27/2022 | 100<br>82.0 KB | ☐ | NOTICE of Change of Address, Email or Law Firm Name by Noah Hy Brozinsky (Brozinsky, Noah) (Entered: 04/27/2022) |
| 04/27/2022 | 101<br>143.8 KB | ☐ | NOTICE of Striking 89 Response to Motion filed by Hillary R. Clinton by Hillary R. Clinton (Markus, David) (Entered: 04/27/2022) |
| 04/27/2022 | 102<br>144.9 KB | ☐ | RESPONSE to Motion re 66 MOTION to Expedite filed by Hillary R. Clinton. Replies due by 5/4/2022. (Markus, David) (Entered: 04/27/2022) |
| 04/27/2022 | 103<br>7.8 KB | ☐ | NOTICE of Attorney Appearance by Howard Jay Harrington on behalf of Perkins Coie, LLC. Attorney Howard Jay Harrington added to party Perkins Coie, LLC(pty:dft). (Harrington, Howard) (Entered: 04/27/2022) |
| 04/27/2022 | 104 | | PAPERLESS ORDER granting 92 Defendant Rodney Joffe's Unopposed Motion for Extension of Time. Defendant Joffe's deadline to respond to the Complaint is May 11, 2022. Defendant Joffe seeks a nine-day extension until May 20, 2022, citing the extensive nature of the Complaint and that more time will allow an opportunity to coordinate with counsel for other Defendants to minimize duplication. I find good cause to grant the Motion. Accordingly, Defendant Joffe's deadline to respond to the Complaint is extended to **May 20, 2022**. Signed by Judge Donald M. Middlebrooks on 4/27/2022. (kal) (Entered: 04/27/2022) |
| 04/27/2022 | 105 | | PAPERLESS ORDER granting 93 , 96 , and 97 Motions to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorneys Steven Tyrrell, Christopher Muha, and William Pittard. Signed by Judge Donald M. Middlebrooks on 4/27/2022. (kal) (Entered: 04/27/2022) |
| 04/27/2022 | 106<br>16.5 KB | ☐ | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for F. Joseph Warin. Filing Fee $ 200.00 Receipt # AFLSDC-15595561 by Perkins Coie, LLC. Responses due by 5/11/2022 (Attachments: # 1 Certification of Attorney F. Joseph Warin, # 2 Text of Proposed Order on Motion to Appear Pro Hac Vice)(Kastrenakes Howard, Eleni) (Entered: 04/27/2022) |
| 04/27/2022 | 107<br>16.8 KB | ☐ | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Geoffrey M. Sigler. Filing Fee $ 200.00 Receipt # AFLSDC-15595563 by Perkins Coie, LLC. Responses due by 5/11/2022 (Attachments: # 1 Certification of Attorney Geoffrey M. Sigler, # 2 Text of Proposed Order on Motion to Appear Pro Hac Vice)(Kastrenakes Howard, Eleni) (Entered: 04/27/2022) |
| 04/27/2022 | 108<br>16.8 KB | ☐ | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Katherine Moran Meeks. Filing Fee $ 200.00 Receipt # AFLSDC-15595567 by Perkins Coie, LLC. Responses due by 5/11/2022 (Attachments: # 1 Certification of Attorney |

| | | | |
|---|---|---|---|
| | | | Katherine Moran Meeks, # 2 Text of Proposed Order on Motion to Appear Pro Hac Vice)(Kastrenakes Howard, Eleni) (Entered: 04/27/2022) |
| 04/27/2022 | 109 | ☐ 16.4 KB | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Nancy E. Hart. Filing Fee $ 200.00 Receipt # AFLSDC-15595571 by Perkins Coie, LLC. Responses due by 5/11/2022 (Attachments: # 1 Certification of Attorney Nancy E. Hart, # 2 Text of Proposed Order on Motion to Appear Pro Hac Vice)(Kastrenakes Howard, Eleni) (Entered: 04/27/2022) |
| 04/27/2022 | 110 | ☐ 29.8 KB | ORDER GRANTING DEFENDANT KEVIN E. CLINESMITH'S MOTION TO EXTEND RESPONSE DEADLINE re 98 Motion for Extension of Time to File Response/Answer to a Complaint or Other Case Initiating Document Kevin Clinesmith. Response/Answer due 6/27/2022. Signed by Judge Donald M. Middlebrooks on 4/27/2022. *See attached document for full details.* (ebz) (Entered: 04/28/2022) |
| 04/28/2022 | 111 | ☐ 27.5 KB | ORDER GRANTING PLAINTIFF'S EXPEDITED MOTION FOR AN EXTENSION OF TIME re 66 Motion to Expedite. Amended Complaint due by 6/20/2022. Responses due by 6/20/2022 Signed by Judge Donald M. Middlebrooks on 4/28/2022. *See attached document for full details.* (ebz) (Entered: 04/28/2022) |
| 04/28/2022 | 112 | ☐ 188.3 KB | RESPONSE in Opposition re 84 MOTION To redact addresses from public record and preclude further filing of the addresses on the public record filed by Donald J. Trump. Replies due by 5/5/2022. (Ticktin, Peter) (Entered: 04/28/2022) |
| 04/29/2022 | 113 | | PAPERLESS ORDER granting 106 , 107 , 108 , and 109 Motions to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorneys F. Joseph Warin, Geoffrey M. Sigler, Katherine Moran Meeks, and Nancy E. Hart. Signed by Judge Donald M. Middlebrooks on 4/29/2022. (kal) (Entered: 04/29/2022) |
| 04/29/2022 | 114 | ☐ 119.9 KB | REPLY IN SUPPORT OF UNITED STATES OF AMERICA'S UNOPPOSED SECOND re 84 MOTION To redact addresses from public record and preclude further filing of the addresses on the public record filed by United States Of America. (Erickson-Pogorzelski, Anthony) Modified text on 4/29/2022 (ebz). (Entered: 04/29/2022) |
| 04/29/2022 | 115 | ☐ 315.9 KB | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Maximillian Feldman. Filing Fee $ 200.00 Receipt # AFLSDC-15602245 by DNC Services Corporation, Democratic National Committee, Debbie Wasserman Schultz. Responses due by 5/13/2022 (Attachments: # 1 Text of Proposed Order Granting PHV of Maximillian Feldman.)(Greenberg, Gerald) (Entered: 04/29/2022) |
| 05/02/2022 | 116 | ☐ 1.2 MB | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Wendy B. Reilly. Filing Fee $ 200.00 Receipt # AFLSDC-15604719 by Robert E. Mook. Responses due by 5/16/2022 (Attachments: # 1 Certification, # 2 Text of Proposed Order) (Barzee, William) (Entered: 05/02/2022) |
| 05/02/2022 | 117 | ☐ 1.2 MB | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Isabela M. Garcez. Filing Fee $ 200.00 Receipt # AFLSDC-15604840 by Robert E. Mook. |

| | | | |
|---|---|---|---|
| | | | Responses due by 5/16/2022 (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Barzee, William) (Entered: 05/02/2022) |
| 05/02/2022 | 118 | ☐ 1.2 MB | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Andrew J. Ceresney. Filing Fee $ 200.00 Receipt # AFLSDC-15604897 by Robert E. Mook. Responses due by 5/16/2022 (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Barzee, William) (Entered: 05/02/2022) |
| 05/03/2022 | 119 | | STRICKEN MOTION to Intervene by Jimmy Smith. (ebz) Modified per DE 126 Order on 5/5/2022 (ebz). (Entered: 05/03/2022) |
| 05/03/2022 | 120 | ☐ 311.4 KB | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Robert P. Trout. Filing Fee $ 200.00 Receipt # AFLSDC-15609103 by HFACC, Inc., John Podesta. Attorney Paola Pinto added to party HFACC, Inc.(pty:dft), Attorney Paola Pinto added to party John Podesta(pty:dft). Responses due by 5/17/2022 (Attachments: # 1 Text of Proposed Order)(Pinto, Paola) (Entered: 05/03/2022) |
| 05/03/2022 | 121 | | PAPERLESS ORDER granting 115 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorney Maximillian Feldman. Signed by Judge Donald M. Middlebrooks on 5/3/2022. (kal) (Entered: 05/03/2022) |
| 05/03/2022 | 122 | | PAPERLESS ORDER granting 116 , 117 , and 118 Motions to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorneys Wendy B. Reilly, Isabela M. Garcez, and Andrew J. Ceresney. Signed by Judge Donald M. Middlebrooks on 5/3/2022. (kal) (Entered: 05/03/2022) |
| 05/04/2022 | 123 | | PAPERLESS ORDER Setting Status Conference: a Status Conference Re: Scheduling/Deadlines/Procedural Matters is hereby set for **6/2/2022 at 2:00 PM** in the West Palm Beach Division before Magistrate Judge Bruce E. Reinhart. Counsel shall be prepared to discuss the scheduling of the Rule 16 conference. The June 2nd Status Conference will be held in Courtroom 2 of the U.S. Courthouse located at 701 Clematis Street in West Palm Beach, Florida. Anyone may attend the status conference in person. In the alternative, counsel may appear remotely via Zoom. The Court will email the Zoom link to counsel in advance of the conference. Only counsel will be permitted to attend the status conference via Zoom. Members of the public or press may listen to the audio of the conference using the following telephone link: Dial by your location: +1 669 254 5252 US (San Jose) +1 646 828 7666 US (New York) +1 551 285 1373 US +1 669 216 1590 US (San Jose) Meeting ID: 160 751 8992; Passcode: 717319. Find your local number: https://www.zoomgov.com/u/aeEkZDMCbU. Signed by Magistrate Judge Bruce E. Reinhart on 5/4/2022. (hk02) (Entered: 05/04/2022) |
| 05/04/2022 | 124 | ☐ 202.0 KB | MOTION TO DISMISS 1 Complaint,,, FOR FAILURE TO STATE A CLAIM by John Podesta. Responses due by 5/18/2022 (Pinto, Paola) (Entered: 05/04/2022) |
| 05/04/2022 | 125 | | PAPERLESS ORDER granting 120 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing |

for Attorney Robert P. Trout. Signed by Judge Donald M. Middlebrooks on 5/4/2022. (kal) (Entered: 05/04/2022)

| 05/05/2022 | 126 [☐ 16.6 KB] | ORDER STRIKING MOTION TO INTERVENE re 119 Motion to Intervene filed by Jimmy Smith. Signed by Judge Donald M. Middlebrooks on 5/5/2022. *See attached document for full details.* (ebz) (Entered: 05/05/2022) |
| --- | --- | --- |
| 05/05/2022 | 127 [☐ 318.4 KB] | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Roberta A. Kaplan. Filing Fee $ 200.00 Receipt # AFLSDC-15616626 by DNC Services Corporation, Democratic National Committee, Debbie Wasserman Schultz. Responses due by 5/19/2022 (Attachments: # 1 Text of Proposed Order Granting PHV of Roberta A. Kaplan)(Greenberg, Gerald) (Entered: 05/05/2022) |
| 05/06/2022 | 128 [☐ 398.6 KB] | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Stephen Barry. Filing Fee $ 200.00 Receipt # AFLSDC-15618815 by Michael Sussman. Responses due by 5/20/2022 (Attachments: # 1 Certification, # 2 Text of Proposed Order) (Martinez, Roberto) (Entered: 05/06/2022) |
| 05/06/2022 | 129 | PAPERLESS ORDER granting 127 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorney Roberta A. Kaplan. Signed by Judge Donald M. Middlebrooks on 5/6/2022. (kal) (Entered: 05/06/2022) |
| 05/06/2022 | 130 [☐ 404.9 KB] | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Sean Berkowitz. Filing Fee $ 200.00 Receipt # AFLSDC-15618873 by Michael Sussman. Responses due by 5/20/2022 (Attachments: # 1 Certification, # 2 Text of Proposed Order) (Martinez, Roberto) (Entered: 05/06/2022) |
| 05/06/2022 | 131 [☐ 399.0 KB] | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Michael Bosworth. Filing Fee $ 200.00 Receipt # AFLSDC-15618882 by Michael Sussman. Responses due by 5/20/2022 (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Martinez, Roberto) (Entered: 05/06/2022) |
| 05/06/2022 | 132 [☐ 398.0 KB] | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Michael Houlihan. Filing Fee $ 200.00 Receipt # AFLSDC-15618905 by Michael Sussman. Responses due by 5/20/2022 (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Martinez, Roberto) (Entered: 05/06/2022) |
| 05/09/2022 | 133 [☐ 46.0 KB] | NOTICE of Attorney Appearance by William R. Barzee on behalf of Jake Sullivan. Attorney William R. Barzee added to party Jake Sullivan(pty:dft). (Barzee, William) (Entered: 05/09/2022) |
| 05/09/2022 | 134 [☐ 438.0 KB] | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Brian L. Stekloff. Filing Fee $ 200.00 Receipt # AFLSDC-15622123 by Jake Sullivan. Responses due by 5/23/2022 (Attachments: # 1 Certification, # 2 Text of Proposed Order) (Barzee, William) (Entered: 05/09/2022) |
| 05/09/2022 | 135 [☐ 435.0 KB] | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Sarah E. Neuman. Filing Fee $ 200.00 Receipt # AFLSDC-15622146 by Jake Sullivan. Responses due |

| | | | by 5/23/2022 (Attachments: # 1 Certification, # 2 Text of Proposed Order) (Barzee, William) (Entered: 05/09/2022) |
|---|---|---|---|
| 05/09/2022 | 136 | | PAPERLESS ORDER granting 128 , 130 , 131 , and 132 Motions to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorneys Stephen Barry, Sean Berkowitz, Michael Bosworth, and Michael Houlihan. Signed by Judge Donald M. Middlebrooks on 5/9/2022. (kal) (Entered: 05/09/2022) |
| 05/10/2022 | 137 ☐ 324.1 KB | | Unopposed MOTION for Extension of Time to File Response/Reply/Answer as to 124 MOTION TO DISMISS 1 Complaint,,, FOR FAILURE TO STATE A CLAIM by Donald J. Trump. (Attachments: # 1 Text of Proposed Order) (Ticktin, Peter) (Entered: 05/10/2022) |
| 05/10/2022 | 138 | | PAPERLESS ORDER granting 134 and 135 Motions to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorneys Brian L. Stekloff and Sarah E. Neuman. Signed by Judge Donald M. Middlebrooks on 5/10/2022. (kal) (Entered: 05/10/2022) |
| 05/11/2022 | 139 ☐ 257.0 KB | | MOTION to Dismiss with Prejudice 1 Complaint,,, by Peter Fritsch, Fusion GPS, Glenn Simpson. Responses due by 5/25/2022 (Fels, Adam) (Entered: 05/11/2022) |
| 05/11/2022 | 140 ☐ 102.9 KB | | Defendant's Certificate of Other Affiliates/Corporate Disclosure Statement - NONE disclosed by Fusion GPS (Fels, Adam) (Entered: 05/11/2022) |
| 05/11/2022 | 141 ☐ 213.3 KB | | MOTION TO DISMISS 1 Complaint,,, FOR FAILURE TO STATE A CLAIM *and Memorandum of Law in Support* by DNC Services Corporation, Democratic National Committee, Debbie Wasserman Schultz. Responses due by 5/25/2022 (Greenberg, Gerald) (Entered: 05/11/2022) |
| 05/11/2022 | 142 ☐ 107.7 KB | | Corporate Disclosure Statement by DNC Services Corporation, Democratic National Committee (Greenberg, Gerald) (Entered: 05/11/2022) |
| 05/11/2022 | 143 ☐ 2.6 MB | | Defendant's MOTION TO DISMISS 1 Complaint,,, FOR FAILURE TO STATE A CLAIM *Perkins Coie LLP's Motion to Dismiss Under Federal Rule 12(B)(6) and Incorporated Memorandum of Law* by Perkins Coie, LLC. Responses due by 5/25/2022 (Attachments: # 1 Exhibit 1 (Excerpts from IG Report)) (Kastrenakes Howard, Eleni) (Entered: 05/11/2022) |
| 05/11/2022 | 144 ☐ 206.8 KB | | MOTION to Dismiss with Prejudice 1 Complaint,,, by Nellie Ohr. Responses due by 5/25/2022 (Fels, Adam) (Entered: 05/11/2022) |
| 05/11/2022 | 145 ☐ 308.0 KB | | MOTION to Dismiss with Prejudice 1 Complaint,,, by Robert E. Mook. Responses due by 5/25/2022 (Barzee, William) (Entered: 05/11/2022) |
| 05/11/2022 | 146 ☐ 256.0 KB | | MOTION to Dismiss with Prejudice 1 Complaint,,, by Michael Sussman. Responses due by 5/25/2022 (Martinez, Roberto) (Entered: 05/11/2022) |
| 05/11/2022 | 147 ☐ 153.9 KB | | MOTION to Dismiss with Prejudice 1 Complaint,,, *UNDER FEDERAL RULE 12(B)(6)* by Marc Elias. Responses due by 5/25/2022 (Attachments: # 1 Exhibit Mueller Report)(Pettis, Eugene) (Entered: 05/11/2022) |
| 05/12/2022 | 148 | | PAPERLESS ORDER granting 137 Plaintiff's Unopposed Motion for an Extension of Time to Respond to Defendant John Podesta's Motion to Dismiss (DE 124 ). For the same reasons articulated in my Order granting Plaintiff's Motion for an Extension of Time to Respond to Defendant Hillary Clinton's Motion to Dismiss (DE 111 ), Plaintiff's Motion (DE 137 ) is granted. Signed by Judge Donald M. Middlebrooks on 5/12/2022. (kal) (Entered: 05/12/2022) |

| | | | |
|---|---|---|---|
| 05/16/2022 | [149](#)<br>186.8 KB | ☐ | MOTION TO DISMISS [1](#) Complaint,,, FOR FAILURE TO STATE A CLAIM by HFACC, Inc.. Responses due by 5/31/2022 (Pinto, Paola) (Entered: 05/16/2022) |
| 05/16/2022 | [150](#)<br>135.8 KB | ☐ | STRICKEN Corporate Disclosure Statement by HFACC, Inc. (Pinto, Paola) Modified per DE [154](#) NOTICE TO STRIKE on 5/18/2022 (ebz). (Entered: 05/16/2022) |
| 05/16/2022 | [151](#)<br>338.0 KB | ☐ | Unopposed MOTION for Extension of Time to File Response/Reply/Answer as to [143](#) Defendant's MOTION TO DISMISS [1](#) Complaint,,, FOR FAILURE TO STATE A CLAIM *Perkins Coie LLP's Motion to Dismiss Under Federal Rule 12(B)(6) and Incorporated Memorandum of Law*, [141](#) MOTION TO DISMISS [1](#) Complaint,,, FOR FAILURE TO STATE A CLAIM *and Memorandum of Law in Support*, [146](#) MOTION to Dismiss with Prejudice [1](#) Complaint,,, , [144](#) MOTION to Dismiss with Prejudice [1](#) Complaint,,, , [145](#) MOTION to Dismiss with Prejudice [1](#) Complaint,,, , [147](#) MOTION to Dismiss with Prejudice [1](#) Complaint,,, *UNDER FEDERAL RULE 12(B)(6)*, [139](#) MOTION to Dismiss with Prejudice [1](#) Complaint,,, by Donald J. Trump. (Attachments: # [1](#) Text of Proposed Order)(Ticktin, Peter) (Entered: 05/16/2022) |
| 05/16/2022 | 152 | | Clerks Notice to Filer re [150](#) Certificate of Other Affiliates/Corporate Disclosure Statement. **Login/Signature Block Violation**; CORRECTIVE ACTION REQUIRED - The name of attorney e-filing this document via their CM/ECF login does not match the name of attorney on the signature block of the document. The name used for login must match the typed name on signature block of the document. This filing is a violation of Section 3J(1) of CM/ECF Admin Procedures and Local Rule 5.1(b). Filer must File a Notice of Striking, then refile document pursuant to CM/ECF Admin Procedures and Local Rules. (ebz) (Entered: 05/17/2022) |
| 05/17/2022 | 153 | | PAPERLESS ORDER granting [151](#) Plaintiff's Unopposed Motion for Extension of Time. Plaintiff seeks an extension of time to respond to the recently filed Motions to Dismiss in this matter (DE [139](#) , DE [141](#) , DE [143](#) , DE [144](#) , DE [145](#) , DE [146](#) , DE [147](#) ). For the same reasons articulated in my Order granting Plaintiff's Motion for Extension of Time to Respond to Defendant Hillary Clinton's Motion to Dismiss (DE [111](#) ), Plaintiff's Motion (DE [151](#) ) is granted. In the interest of efficiency, I will also *sua sponte* extend Plaintiff's deadline to respond to Defendant HFACC's Motion to Dismiss (DE [149](#) ), and any future motions to dismiss filed by the Defendants, until **June 20, 2022**. Signed by Judge Donald M. Middlebrooks on 5/17/2022. (kal) (Entered: 05/17/2022) |
| 05/17/2022 | [154](#)<br>133.4 KB | ☐ | NOTICE of Striking [150](#) Certificate of Other Affiliates/Corporate Disclosure Statement filed by HFACC, Inc. by HFACC, Inc. (Pinto, Paola) (Entered: 05/17/2022) |
| 05/17/2022 | [155](#)<br>135.8 KB | ☐ | Corporate Disclosure Statement by HFACC, Inc. (Pinto, Paola) (Entered: 05/17/2022) |
| 05/20/2022 | [156](#)<br>427.5 KB | ☐ | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Samantha L. Southall, Esquire. Filing Fee $ 200.00 Receipt # AFLSDC-15656205 by Neustar, Inc.. Attorney Jennifer Olmedo-Rodriguez added to party Neustar, Inc.(pty:dft). Responses due by 6/3/2022 (Attachments: # [1](#) Exhibit A - Certification of Samantha L. Southall, # [2](#) Exhibit B - Proposed Order)(Olmedo-Rodriguez, Jennifer) (Entered: 05/20/2022) |

| | | | |
|---|---|---|---|
| 05/20/2022 | 157 | 406.5 KB | MOTION TO DISMISS 1 Complaint,,, FOR FAILURE TO STATE A CLAIM *and Memorandum of Law* by Rodney Joffe. Responses due by 6/3/2022 (Attachments: # 1 Exhibit A - Trump Declaration)(Soto, Edward) (Entered: 05/20/2022) |
| 05/20/2022 | 158 | 161.8 KB | STIPULATED MOTION for Substitution of Counsel. Substituting Jennifer Olmedo-Rodriguez, Esquire for Alexandria N. Epps by Neustar, Inc.. Responses due by 6/3/2022 (Olmedo-Rodriguez, Jennifer) (Entered: 05/20/2022) |
| 05/20/2022 | 159 | 1.5 MB | MOTION TO DISMISS 1 Complaint,,, FOR FAILURE TO STATE A CLAIM *and Incorporated Memorandum of Law in Support* by Igor Danchenko. Responses due by 6/3/2022 (Attachments: # 1 Exhibit 1 - Inspector General Report)(Fassbender, Diana) (Entered: 05/20/2022) |
| 05/20/2022 | 160 | 353.8 KB | MOTION TO DISMISS 1 Complaint,,, FOR FAILURE TO STATE A CLAIM by Neustar, Inc.. Responses due by 6/3/2022 (Olmedo-Rodriguez, Jennifer) (Entered: 05/20/2022) |
| 05/23/2022 | 161 | | PAPERLESS ORDER granting 156 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorney Samantha L. Southall. Signed by Judge Donald M. Middlebrooks on 5/23/2022. (kal) (Entered: 05/23/2022) |
| 05/23/2022 | 162 | 108.6 KB | MOTION TO DISMISS 1 Complaint,,, FOR FAILURE TO STATE A CLAIM by Charles Halliday Dolan Jr.. Responses due by 6/6/2022 (Levine, Jonathan) (Entered: 05/23/2022) |
| 05/23/2022 | 163 | 4.1 MB | MOTION TO DISMISS 1 Complaint,,, 162 MOTION TO DISMISS 1 Complaint,,, FOR FAILURE TO STATE A CLAIM FOR FAILURE TO STATE A CLAIM *Memorandum In Support of Motion to Dismiss* by Charles Halliday Dolan Jr.. Responses due by 6/6/2022 (Attachments: # 1 Exhibit Dolan Declaration, # 2 Exhibit Danchenko Indictment)(Levine, Jonathan) (Entered: 05/23/2022) |
| 05/23/2022 | 164 | 70.9 KB | ORDER GRANTING MOTION FOR SUBSTITUTION OF COUNSEL. ORDER granting 158 Motion for Substitution of Counsel. Attorney Jennifer Olmedo-Rodriguez added. Attorney Alexandria N Epps representing Neustar, Inc. (Defendant) terminated. Signed by Judge Donald M. Middlebrooks on 5/23/2022. *See attached document for full details.* (amb) (Entered: 05/24/2022) |
| 05/25/2022 | 165 | 229.1 KB | MOTION to Dismiss with Prejudice 1 Complaint,,, by Jake Sullivan. Responses due by 6/8/2022 (Barzee, William) (Entered: 05/25/2022) |
| 05/31/2022 | 166 | 117.2 KB | Joint MOTION Adjourn Status Conference re 123 Order Setting Status Conference,,,, by Hillary R. Clinton. (Markus, David) (Entered: 05/31/2022) |
| 05/31/2022 | 167 | | PAPERLESS ORDER denying 166 the parties' Joint Motion to Adjourn the Status Conference to be held on 6/2/22. Signed by Magistrate Judge Bruce E. Reinhart on 5/31/2022. (hk02) (Entered: 05/31/2022) |
| 06/01/2022 | 168 | 60.2 KB | NOTICE of Attorney Appearance by Zachary Andrew Lipshultz on behalf of Michael Sussman. Attorney Zachary Andrew Lipshultz added to party Michael Sussman(pty:dft). (Lipshultz, Zachary) (Entered: 06/01/2022) |
| 06/02/2022 | 169 | 110.4 KB | NOTICE OF UNAVAILABILITY by Donald J. Trump for dates of June 2nd to June 6th; August 3rd to August 8th and August 18th to August 31st of 2022 (Sasson, Jamie) (Entered: 06/02/2022) |

| 06/02/2022 | 170 | | PAPERLESS Minute Entry for proceedings held before Magistrate Judge Bruce E. Reinhart: Status Conference held on 6/2/2022. Total time in court: 30 minutes. Court Reporter: Pauline Stipes, 561-803-3434 / Pauline_Stipes@flsd.uscourts.gov. (hk02) (Entered: 06/02/2022) |
|---|---|---|---|
| 06/03/2022 | 171 <br> 480.9 KB | ☐ | MOTION to Reconsider Judge Middlebrooks' Order re 126 Order Striking by Jimmy Smith. (Address Updated) (ebz) Modified text on 6/3/2022 (ebz). (Entered: 06/03/2022) |
| 06/06/2022 | 172 <br> 100.0 KB | ☐ | ORDER DENYING MOTION FOR RECONSIDERATION re 171 Motion for Reconsideration by Jimmy Smith. Signed by Judge Donald M. Middlebrooks on 6/6/2022. *See attached document for full details.* (ebz) (Entered: 06/06/2022) |
| 06/07/2022 | 173 <br> 43.2 KB | ☐ | Notice of Appeal re 126 Order Striking by Jimmy Smith. FILING FEE: (NOT PAID). Within fourteen days of the filing date of a Notice of Appeal, the appellant must complete the Eleventh Circuit Transcript Order Form regardless of whether transcripts are being ordered [Pursuant to FRAP 10(b)]. For information go to our FLSD website under Transcript Information. (apz) (Entered: 06/10/2022) |
| 06/07/2022 | | | Transmission of Notice of Appeal, Order under appeal and Docket Sheet to US Court of Appeals re 173 Notice of Appeal, Notice has been electronically mailed. (apz) (Entered: 06/10/2022) |
| 06/10/2022 | 174 <br> 293.2 KB | ☐ | CLERK'S NOTICE of Mailing Transcript Information Form to Jimmy Smith re 173 Notice of Appeal. (apz) (Entered: 06/10/2022) |
| 06/14/2022 | 175 | | PAPERLESS ORDER Setting a Status Conference for 7/6/2022 at 2:00 PM in West Palm Beach Division before Magistrate Judge Bruce E. Reinhart. <br><br> The July 6th Status Conference will be held in Courtroom 2 of the U.S. Courthouse located at 701 Clematis Street in West Palm Beach, Florida. Anyone may attend the status conference in person. In the alternative, counsel may appear remotely using Zoom using the same link previously provided. Only counsel will be permitted to attend the status conference via Zoom. Members of the public or press may listen to the audio of the conference using the following telephone link: <br><br> Dial by your location: +1 669 254 5252 US (San Jose) +1 646 828 7666 US (New York) +1 551 285 1373 US +1 669 216 1590 US (San Jose) Meeting ID: 160 751 8992; Passcode: 717319. Find your local number: https://www.zoomgov.com/u/aeEkZDMCbU. Signed by Magistrate Judge Bruce E. Reinhart on 5/4/2022. (hk02) (Entered: 05/04/2022) Signed by Magistrate Judge Bruce E. Reinhart on 6/14/2022. (hk02) (Entered: 06/14/2022) |
| 06/17/2022 | 176 <br> 163.5 KB | ☐ | Acknowledgment of Receipt of NOA from USCA re 173 Notice of Appeal, filed by Jimmy Smith. Date received by USCA: 6/10/22. USCA Case Number: 22-11955-J. (vjk) (Entered: 06/21/2022) |
| 06/21/2022 | 177 <br> 949.4 KB | ☐ | AMENDED COMPLAINT against ABC Corporations 1 through 10, Kevin Clinesmith, Hillary R. Clinton, James Comey, DNC Services Corporation, Igor Danchenko, Democratic National Committee, Charles Halliday Dolan Jr., Marc Elias, Peter Fritsch, Fusion GPS, HFACC, Inc., Rodney Joffe, John Does 1 through 10, Andrew McCabe, Robert E. Mook, Neustar, Inc., Bruce Ohr, Nellie Ohr, Orbis Business Intelligence, Ltd., Lisa Page, Perkins Coie, LLC, John |

| | | | |
|---|---|---|---|
| | | | Podesta, Phillipe Reines, Debbie Wasserman Schultz, Glenn Simpson, Christopher Steele, Peter Strzok, Jake Sullivan, Michael Sussman, United States Of America, Adam Schiff, Rod Rosenstein, filed by Donald J. Trump. (Ticktin, Peter) (Entered: 06/21/2022) |
| 06/21/2022 | 178 | ☐ 25.8 KB | NOTICE of Filing Proposed Summons(es) by Donald J. Trump re 177 Amended Complaint/Amended Notice of Removal,, filed by Donald J. Trump (Ticktin, Peter) (Entered: 06/21/2022) |
| 06/21/2022 | 179 | | STRICKEN NOTICE of Filing Proposed Summons(es) by Donald J. Trump re 177 Amended Complaint/Amended Notice of Removal,, filed by Donald J. Trump (Ticktin, Peter) Modified per DE 214 Order on 7/11/2022 (ebz). Modified text on 7/11/2022 (ebz). (Entered: 06/21/2022) |
| 06/21/2022 | 180 | | Clerks Notice to Filer re 177 Amended Complaint. **Parties Not Added**; ERROR - The Filer failed to add all parties from the amended complaint. Filer is instructed to file a Notice of Entry of Parties Listed into CM/ECF and add the additional parties. (ebz) (Entered: 06/22/2022) |
| 06/22/2022 | 181 | ☐ 39.5 KB | Summons Issued as to Rod Rosenstein, Adam Schiff. (Attachments: # 1 Stricken and Removed)(ebz) Modified on 6/28/2022 (ls). (per DE # 191 ) (Entered: 06/22/2022) |
| 06/22/2022 | 182 | ☐ 102.4 KB | Notice of Entry of Parties Listed on 177 Amended Complaint/Amended Notice of Removal,, into CM/ECF. NOTE: New Filer(s) will appear twice, since they are also a new party in the case. New Filer(s)/Party(s): Neustar Security Services. (Ticktin, Peter) (Entered: 06/22/2022) |
| 06/22/2022 | 183 | ☐ 15.8 KB | NOTICE of Filing Proposed Summons(es) by Donald J. Trump re 177 Amended Complaint/Amended Notice of Removal,, filed by Donald J. Trump (Ticktin, Peter) (Entered: 06/22/2022) |
| 06/22/2022 | 184 | ☐ 39.5 KB | Summons Issued as to Neustar Security Services. (ebz) (Entered: 06/22/2022) |
| 06/22/2022 | 185 | | PAPERLESS Order Cancelling the Status Conference previously scheduled for July 6, 2022. Signed by Magistrate Judge Bruce E. Reinhart on 6/22/2022. (hk02) (Entered: 06/22/2022) |
| 06/22/2022 | 186 | ☐ 210.1 KB | ORDER OF RECUSAL. Magistrate Judge Bruce E. Reinhart recused. Case reassigned to Magistrate Judge William Matthewman for all further proceedings. Signed by Magistrate Judge Bruce E. Reinhart on 6/22/2022. *See attached document for full details.* (jmd) (Entered: 06/22/2022) |
| 06/22/2022 | 187 | ☐ 35.9 KB | ORDER. In light of the Amended Complaint, Defendants' currently pending Motions to Dismiss, listed below, are DENIED AS MOOT: 52 Motion to Dismiss; 124 Motion to Dismiss for Failure to State a Claim; 139 Motion to Dismiss; 141 Motion to Dismiss for Failure to State a Claim; 143 Motion to Dismiss for Failure to State a Claim; 144 Motion to Dismiss; 145 Motion to Dismiss; 146 Motion to Dismiss; 147 Motion to Dismiss; 149 Motion to Dismiss for Failure to State a Claim; 157 Motion to Dismiss for Failure to State a Claim; 159 Motion to Dismiss for Failure to State a Claim; 160 Motion to Dismiss for Failure to State a Claim; 162 Motion to Dismiss for Failure to State a Claim; 163 Motion to Dismiss for Failure to State a Claim; 165 Motion to Dismiss. Signed by Judge Donald M. Middlebrooks on 6/22/2022. *See attached document for full details.* (ebz) (Entered: 06/23/2022) |
| 06/23/2022 | 188 | ☐ 26.8 KB | ORDER. The Court has reviewed Plaintiff's Amended Complaint. To the extent that the allegations against certain Defendants, and therefore the arguments |

relied on by those Defendants in support of dismissal, remain unchanged, and in the interest of reducing costs in this action, Defendants are advised that they may readopt their prior Motions to Dismiss if they so choose. Moreover, to the extent that the various Defendants seek to raise the same arguments, they are encouraged to consolidate their responses where appropriate. Signed by Judge Donald M. Middlebrooks on 6/23/2022. *See attached document for full details.* (ebz) (Entered: 06/23/2022)

| | | | |
|---|---|---|---|
| 06/24/2022 | [193](#) | ☐ 102.7 KB | MOTION for Leave to Appeal in forma pauperis by Jimmy Smith. (apz) (Entered: 06/28/2022) |
| 06/24/2022 | [194](#) | ☐ 113.5 KB | TRANSCRIPT INFORMATION FORM by Jimmy Smith re [173](#) Notice of Appeal. No Transcript Requested. (apz) (Entered: 06/28/2022) |
| 06/27/2022 | [189](#) | ☐ 301.4 KB | Unopposed MOTION to Redact the Address of Rod Rosenstein, a Former Employee of the Department of Justice, from the Public Record re [181](#) Summons Issued by Donald J. Trump. (Attachments: # [1](#) Text of Proposed Order)(Ticktin, Peter) Modified Text on 6/27/2022 (ls). (Entered: 06/27/2022) |
| 06/27/2022 | [190](#) | ☐ 177.4 KB | ORDER OF RECUSAL. Magistrate Judge William Matthewman recused. Case reassigned to Magistrate Judge Alicia O. Valle for all further proceedings. Signed by Magistrate Judge William Matthewman on 6/27/2022. *See attached document for full details.* (jmd) (Entered: 06/27/2022) |
| 06/28/2022 | [191](#) | ☐ 45.9 KB | ORDER granting [189](#) Unopposed Motion to Redact the Address of Rod Rosenstein, a Former Employee of the Department of Justice re [181](#) Summons Issued. Directing Clerk of Court to Strike and Remove Docket Entry 181-1 from the record. Plaintiff's Redacted Version due 7/1/2022. Signed by Judge Donald M. Middlebrooks on 6/28/2022. *See attached document for full details.* (ls) (Entered: 06/28/2022) |
| 06/28/2022 | [192](#) | ☐ 36.9 KB | ORDER Requiring Status Report: Status Report due by 7/1/2022. Signed by Judge Donald M. Middlebrooks on 6/28/2022. *See attached document for full details.* (ls) (Entered: 06/28/2022) |
| 06/29/2022 | [195](#) | ☐ 271.3 KB | SUMMONS (Affidavit) Returned Executed on [1](#) Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. James Comey served on 4/1/2022, response/answer due 4/22/2022. (Attachments: # [1](#) Exhibit Proof of Service on James Comey, # [2](#) Exhibit Email from Samuel Hendrix accepting service on behalf of James Comey)(Ticktin, Peter) (Entered: 06/29/2022) |
| 06/30/2022 | [196](#) | ☐ 135.8 KB | SUMMONS (Affidavit) Returned Executed on [1](#) Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. (Attachments: # [1](#) Affidavit Affidavit of Service of Process)(Ticktin, Peter) (Entered: 06/30/2022) |
| 06/30/2022 | [197](#) | ☐ 275.6 KB | SUMMONS (Affidavit) Returned Executed on [177](#) Amended Complaint/Amended Notice of Removal,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Rod Rosenstein served on 6/28/2022, response/answer due 7/19/2022. (Attachments: # [1](#) Affidavit Proof of service and Email confirming service of Amended Complaint)(Ticktin, Peter) (Entered: 06/30/2022) |
| 06/30/2022 | [198](#) | ☐ 281.3 KB | SUMMONS (Affidavit) Returned Executed on [177](#) Amended Complaint/Amended Notice of Removal,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Adam Schiff served on 6/28/2022, response/answer due 7/19/2022. (Attachments: # [1](#) Affidavit |

| | | | Affidavit of Service of Process and Email from Douglas Letter accepting service)(Ticktin, Peter) (Entered: 06/30/2022) |
|---|---|---|---|
| 06/30/2022 | 199 | ☐ 140.6 KB | STIPULATION re 177 Amended Complaint/Amended Notice of Removal,, *Joint Stipulation Regarding Response Time to Amended Complaint* by Hillary R. Clinton (Attachments: # 1 Text of Proposed Order)(Markus, David) (Entered: 06/30/2022) |
| 06/30/2022 | 200 | ☐ 93.8 KB | ORDER ON THE PARTIES' PROPOSED JOINT STIPULATION REGARDING RESPONSE TIME TO AMENDED COMPLAINT re 199 Stipulation, is DENIED Signed by Judge Donald M. Middlebrooks on 6/30/2022. *See attached document for full details.* (ebz) (Entered: 07/01/2022) |
| 07/01/2022 | 201 | ☐ 432.6 KB | SUMMONS (Affidavit) Returned Executed on 177 Amended Complaint/Amended Notice of Removal,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Neustar Security Services served on 6/29/2022, response/answer due 7/20/2022. (Attachments: # 1 Affidavit Affidavit of Service of Process on Neustar Security Services)(Ticktin, Peter) (Entered: 07/01/2022) |
| 07/01/2022 | 202 | ☐ 88.5 KB | Unopposed MOTION to Withdraw as Attorney by Michael S. Bosworth for / by Michael Sussman. Responses due by 7/15/2022 (Attachments: # 1 Text of Proposed Order)(Martinez, Roberto) (Entered: 07/01/2022) |
| 07/01/2022 | 203 | ☐ 145.2 KB | MOTION for Extension of Time to File Response/Reply/Answer as to 177 Amended Complaint/Amended Notice of Removal,, by Hillary R. Clinton. (Attachments: # 1 Text of Proposed Order)(Markus, David) (Entered: 07/01/2022) |
| 07/01/2022 | 204 | | PAPERLESS ORDER granting in part 203 Defendant Hillary Rodham Clinton's Motion for Extension of Time to Respond to Plaintiff's Amended Complaint, filed on behalf of Defendants. Defendant Clinton requests a two-week extension of Defendants' deadline to respond to Plaintiff's Amended Complaint (DE 177 ), citing that the intervening Fourth of July holiday has complicated communications among the various defense counsel in this matter. Plaintiff does not oppose the relief requested. Based on the holiday, and in the interest of allowing Defendants to file a streamlined Motion, I find good cause to grant Defendant Clinton's Motion in part. Accordingly, Defendants' deadline to respond to the Amended Complaint is extended to **July 14, 2022**. Signed by Judge Donald M. Middlebrooks on 7/1/2022. (jnk) (Entered: 07/01/2022) |
| 07/01/2022 | 205 | ☐ 175.1 KB | Unopposed MOTION for Extension of Time to File Response/Reply/Answer as to 177 Amended Complaint/Amended Notice of Removal,, by United States Of America. (Attachments: # 1 Text of Proposed Order)(Erickson-Pogorzelski, Anthony) (Entered: 07/01/2022) |
| 07/01/2022 | | | Set/Reset Response/Answer Due Deadline: ABC Corporations 1 through 10 response/answer due 7/14/2022; Kevin Clinesmith response/answer due 7/14/2022; Hillary R. Clinton response/answer due 7/14/2022; James Comey response/answer due 7/14/2022; DNC Services Corporation response/answer due 7/14/2022; Igor Danchenko response/answer due 7/14/2022; Democratic National Committee response/answer due 7/14/2022; Charles Halliday Dolan Jr. response/answer due 7/14/2022; Marc Elias response/answer due 7/14/2022; Peter Fritsch response/answer due 7/14/2022; Fusion GPS response/answer due 7/14/2022; HFACC, Inc. response/answer due 7/14/2022; Rodney Joffe response/answer due 7/14/2022; John Does 1 through 10 response/answer due 7/14/2022; Andrew McCabe response/answer due 7/14/2022; Robert E. Mook |

| | | | response/answer due 7/14/2022; Neustar Security Services response/answer due 7/14/2022; Neustar, Inc. response/answer due 7/14/2022; Bruce Ohr response/answer due 7/14/2022; Nellie Ohr response/answer due 7/14/2022; Orbis Business Intelligence, Ltd. response/answer due 7/14/2022; Lisa Page response/answer due 7/14/2022; Perkins Coie, LLC response/answer due 7/14/2022; John Podesta response/answer due 7/14/2022; Phillipe Reines response/answer due 7/14/2022; Rod Rosenstein response/answer due 7/14/2022; Adam Schiff response/answer due 7/14/2022; Debbie Wasserman Schultz response/answer due 7/14/2022; Glenn Simpson response/answer due 7/14/2022; Christopher Steele response/answer due 7/14/2022; Peter Strzok response/answer due 7/14/2022; Jake Sullivan response/answer due 7/14/2022; Michael Sussman response/answer due 7/14/2022; United States Of America response/answer due 7/14/2022. Per DE 204 Order. (ebz) (Entered: 07/01/2022) |
|---|---|---|---|
| 07/01/2022 | 206 | ☐ 186.6 KB | ORDER DENYING NON-PARTY JIMMY SMITH'S MOTION FOR LEAVE TO APPEAL IN FORMA PAUPERIS re 193 Motion for Leave to Appeal in forma pauperis. Signed by Judge Donald M. Middlebrooks on 7/1/2022. *See attached document for full details.* (ebz) (Entered: 07/01/2022) |
| 07/01/2022 | 207 | ☐ 119.9 KB | ORDER GRANTING MOTION TO WITHDRAW AS COUNSEL. Michael Bosworth's Unopposed Motion for Leave to Withdraw as Counsel for Defendant Michael Sussman (DE 202) is GRANTED. Notice of Termination delivered by US Mail to Michael Bosworth. Signed by Judge Donald M. Middlebrooks on 7/1/2022. *See attached document for full details.* (ebz) (Entered: 07/01/2022) |
| 07/01/2022 | 208 | ☐ 205.5 KB | STATUS REPORT *Pursuant to Court's Order on June 28, 2022* by Donald J. Trump (Ticktin, Peter) (Entered: 07/01/2022) |
| 07/01/2022 | 209 | ☐ 52.2 KB | ORDER OF RECUSAL. Magistrate Judge Alicia O. Valle recused. Case reassigned to Magistrate Judge Jared M. Strauss for all further proceedings. Signed by Magistrate Judge Alicia O. Valle on 7/1/2022. *See attached document for full details.* (bms) (Entered: 07/01/2022) |
| 07/01/2022 | 210 | ☐ 173.2 KB | ORDER OF RECUSAL. Magistrate Judge Jared M. Strauss recused. Case reassigned to Magistrate Judge Patrick M. Hunt for all further proceedings. Signed by Magistrate Judge Jared M. Strauss on 7/1/2022. *See attached document for full details.* (bms) (Entered: 07/05/2022) |
| 07/05/2022 | 211 | ☐ 128.9 KB | ORDER GRANTING IN PART NON-PARTY UNITED STATES' MOTION FOR ENLARGEMENT OF TIME. The United States' Motion for Enlargement of Time DE 205 is GRANTED IN PART. It is granted insofar as the deadline for the Original Federal Defendants to respond to the Amended Complaint (DE 177) is extended to July 14, 2022. It is denied in all other respects. Signed by Judge Donald M. Middlebrooks on 7/5/2022. *See attached document for full details.* (ebz) (Entered: 07/05/2022) |
| 07/08/2022 | 212 | ☐ 281.7 KB | REDACTION to 179 Notice of Filing Proposed Summons(es) *Unopposed Motion to Redact Notice of Filing Proposed Summons* by Donald J. Trump (Attachments: # 1 Text of Proposed Order Proposed Order)(Ticktin, Peter) (Entered: 07/08/2022) |
| 07/09/2022 | 213 | ☐ 132.2 KB | NOTICE of Attorney Appearance by James Evans Gillenwater on behalf of Neustar Security Services. Attorney James Evans Gillenwater added to party Neustar Security Services(pty:dft). (Gillenwater, James) (Entered: 07/09/2022) |

| 07/11/2022 | 214 | | PAPERLESS ORDER granting 212 Plaintiff's Unopposed Motion to Redact the Notice of Filing Proposed Summons. The Clerk of Court is directed to **STRIKE AND REMOVE** Docket Entry 179 from the record. Signed by Judge Donald M. Middlebrooks on 7/11/2022. (kal) (Entered: 07/11/2022) |
|---|---|---|---|
| 07/11/2022 | 215 | ☐ 150.8 KB | Unopposed MOTION for Leave to File Excess Pages *in Motion to Dismiss First Amended Complaint* by Perkins Coie, LLC. (Kastrenakes Howard, Eleni) (Entered: 07/11/2022) |
| 07/11/2022 | 216 | | PAPERLESS ORDER granting 215 Defendants Perkins Coie, LLP, Rodney Joffe, Neustar, Inc., and Charles Halliday Dolan, Jr.'s Unopposed Motion for Leave to Exceed Page Limit. The Moving Defendants represent that the twenty-one served non-federal defendants intend to file a Joint Motion to Dismiss the First Amended Complaint and request thirty-five additional pages to do so. Based on the voluminous nature of the Complaint and the Court's interest in a unified response, I find good cause to grant the Motion. Accordingly, the served non-federal defendants may file a Joint Motion to Dismiss **not to exceed 55 pages**. Signed by Judge Donald M. Middlebrooks on 7/11/2022. (jnk) (Entered: 07/11/2022) |
| 07/12/2022 | 217 | ☐ 363.5 KB | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for John M. McNichols. Filing Fee $ 200.00 Receipt # AFLSDC-15781263 by Neustar Security Services. Responses due by 7/26/2022 (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Gillenwater, James) (Entered: 07/12/2022) |
| 07/12/2022 | 218 | ☐ 362.7 KB | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Kathryn E. Garza. Filing Fee $ 200.00 Receipt # AFLSDC-15781307 by Neustar Security Services. Responses due by 7/26/2022 (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Gillenwater, James) (Entered: 07/12/2022) |
| 07/12/2022 | 219 | ☐ 360.5 KB | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Allison S. Eisen. Filing Fee $ 200.00 Receipt # AFLSDC-15781318 by Neustar Security Services. Responses due by 7/26/2022 (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Gillenwater, James) (Entered: 07/12/2022) |
| 07/12/2022 | 220 | | PAPERLESS ORDER granting 217 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorney John M. McNichols. Signed by Judge Donald M. Middlebrooks on 7/12/2022. (jnk) (Entered: 07/12/2022) |
| 07/12/2022 | 221 | | PAPERLESS ORDER granting 218 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorney Kathryn E. Garza. Signed by Judge Donald M. Middlebrooks on 7/12/2022. (jnk) (Entered: 07/12/2022) |
| 07/12/2022 | 222 | | PAPERLESS ORDER granting 219 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorney Allison S. Eisen. Signed by Judge Donald M. Middlebrooks on 7/12/2022. (jnk) (Entered: 07/12/2022) |
| 07/12/2022 | 223 | ☐ 143.9 KB | SUMMONS (Affidavit) Returned Executed on 177 Amended Complaint/Amended Notice of Removal,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Lisa Page served on 7/7/2022, response/answer due 7/28/2022. (Attachments: # 1 Affidavit |

Affidavit of Service of Process on Lisa Page (Ticktin, Peter) (Entered: 07/12/2022)

| 07/14/2022 | 224 □ 908.8 KB | MOTION to Substitute Party *(Comey, McCabe, Clinesmith, Page, and Strzok)* ( Responses due by 7/28/2022), MOTION to Dismiss for Lack of Jurisdiction 177 Amended Complaint/Amended Notice of Removal,, by United States Of America. Attorney Stephen R. Terrell added to party United States Of America(pty:dft), Attorney Stephen R. Terrell added to party United States Of America(pty:dft). (Attachments: # 1 Exhibit A - Westfall Act Certification, # 2 Exhibit B - Crum Declaration, # 3 Text of Proposed Order, # 4 Certification of Service)(Terrell, Stephen) (Entered: 07/14/2022) |
|---|---|---|
| 07/14/2022 | 225 □ 1.0 MB | MOTION to Dismiss for Lack of Jurisdiction 177 Amended Complaint/Amended Notice of Removal,, by Charles Halliday Dolan Jr.. Responses due by 7/28/2022 (Attachments: # 1 Exhibit Second Declaration) (Levine, Jonathan) (Entered: 07/14/2022) |
| 07/14/2022 | 226 □ 47.5 KB | MOTION TO DISMISS 177 Amended Complaint/Amended Notice of Removal,, FOR FAILURE TO STATE A CLAIM by Hillary R. Clinton. Responses due by 7/28/2022 (Attachments: # 1 Exhibit)(Markus, David) (Entered: 07/14/2022) |
| 07/14/2022 | 227 □ 157.7 KB | MOTION to Dismiss for Lack of Jurisdiction 177 Amended Complaint/Amended Notice of Removal,, by Rodney Joffe. Responses due by 7/28/2022 (Soto, Edward) (Entered: 07/14/2022) |
| 07/14/2022 | 228 □ 190.0 KB | Defendant's MOTION to Dismiss with Prejudice 177 Amended Complaint/Amended Notice of Removal,, by Neustar, Inc.. Responses due by 7/28/2022 (Olmedo-Rodriguez, Jennifer) (Entered: 07/14/2022) |
| 07/15/2022 | 229 □ 194.0 KB | SUMMONS (Affidavit) Returned Executed on 177 Amended Complaint/Amended Notice of Removal,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Peter Strzok served on 7/2/2022, response/answer due 7/25/2022. (Attachments: # 1 Affidavit Affidavit of Service of Process on Peter Strzok)(Ticktin, Peter) (Entered: 07/15/2022) |
| 07/20/2022 | 230 □ 93.3 KB | NOTICE by United States Of America re 181 Summons Issued, 197 Summons Returned Executed, 198 Summons Returned Executed, *of Receipt of Service of Summonses and Amended Complaint* (Terrell, Stephen) (Entered: 07/20/2022) |
| 07/21/2022 | 231 □ 290.3 KB | MOTION for Extension of Time to File Response/Reply/Answer as to 226 MOTION TO DISMISS 177 Amended Complaint/Amended Notice of Removal,, FOR FAILURE TO STATE A CLAIM , 227 MOTION to Dismiss for Lack of Jurisdiction 177 Amended Complaint/Amended Notice of Removal,, , 228 Defendant's MOTION to Dismiss with Prejudice 177 Amended Complaint/Amended Notice of Removal,, , 225 MOTION to Dismiss for Lack of Jurisdiction 177 Amended Complaint/Amended Notice of Removal,, by Donald J. Trump. (Attachments: # 1 Text of Proposed Order Proposed Order on Plaintiff's Motion for Extension of Time)(Ticktin, Peter) (Entered: 07/21/2022) |
| 07/21/2022 | 232 | PAPERLESS ORDER granting in part 231 Plaintiff's Motion for Extension of Time. Plaintiff's deadline to respond to Defendants' Motions to Dismiss (DEs 224 , 225 , 226 , 227 , 228 ) is July 28, 2022. He seeks a two-week extension of this deadline, citing the "complex nature of the case" and counsels' other trials the week of July 25, 2022. Defendants also seek leave to file a 55-page response to Defendant Clinton's Motion to Dismiss (DE 226 ). I find good |

| | | | |
|---|---|---|---|
| | | | cause to allow Plaintiff the same number of pages I allowed Defendants. Accordingly, Plaintiff's Motion is granted with respect to his request to file a 55-page response. As to an extension of time, Plaintiff's Motion is granted only in part. Based on counsels' upcoming trials, I find good cause to extend Plaintiff's deadline to respond to **August 4, 2022**. But because the arguments in the recently-filed Motions to Dismiss are largely the same as those raised in Defendants' previous motions, a longer extension is not warranted. Signed by Judge Donald M. Middlebrooks on 7/21/2022. (jnk) (Entered: 07/21/2022) |
| 07/21/2022 | 233 | ☐ 612.3 KB | MOTION to Continue re 39 Scheduling Order,,, Order Referring Case to Magistrate Judge,, by Donald J. Trump. Responses due by 8/4/2022 (Attachments: # 1 Exhibit Affidavit of Peter Ticktin in Support of Motion to Extend Trial Date as Exhibit "A", # 2 Exhibit Plaintiff's Proposed Scheduling Report as Exhibit "B", # 3 Exhibit Plaintiff's Proposed Scheduling Order, as Exhibit "C")(Ticktin, Peter) (Entered: 07/21/2022) |
| 07/21/2022 | | | Set/Reset Deadlines/Hearings as to 225 MOTION to Dismiss for Lack of Jurisdiction 177 Amended Complaint/Amended Notice of Removal,, , 226 MOTION TO DISMISS 177 Amended Complaint/Amended Notice of Removal,, FOR FAILURE TO STATE A CLAIM , 227 MOTION to Dismiss for Lack of Jurisdiction 177 Amended Complaint/Amended Notice of Removal,, , 224 MOTION to Substitute Party *(Comey, McCabe, Clinesmith, Page, and Strzok)* MOTION to Dismiss for Lack of Jurisdiction 177 Amended Complaint/Amended Notice of Removal,, , 228 Defendant's MOTION to Dismiss with Prejudice 177 Amended Complaint/Amended Notice of Removal,, . Per DE 232 Order. Responses due by 8/4/2022 (ebz) (Entered: 07/21/2022) |
| 07/21/2022 | 234 | ☐ 59.4 KB | ORDER SUBSTITUTING PARTIES. The United States' Motion to Substitute and Dismiss DE 224 is GRANTED IN PART and I will DEFER RULING IN PART. It is granted with respect to the United States' substitution argument, and I will defer ruling on the United States' dismissal argument. The United States is SUBSTITUTED as defendant for James Corney, Andrew McCabe, Peter Strzok, Lisa Page, and Kevin Clinesmith. Defendants James Corney, Andrew McCabe, Peter Strzok, Lisa Page, and Kevin Clinesmith are DISMISSED from this action. Signed by Judge Donald M. Middlebrooks on 7/21/2022. *See attached document for full details.* (ebz) (Entered: 07/22/2022) |
| 07/22/2022 | 235 | ☐ 39.4 KB | RESPONSE in Opposition re 233 MOTION to Continue re 39 Scheduling Order,,, Order Referring Case to Magistrate Judge,, filed by Hillary R. Clinton. Replies due by 7/29/2022. (Markus, David) (Entered: 07/22/2022) |
| 07/22/2022 | 236 | ☐ 61.7 KB | ORDER DENYING MOTION TO EXTEND TRIAL DATE re 233 Motion to Continue. Signed by Judge Donald M. Middlebrooks on 7/22/2022. *See attached document for full details.* (ebz) (Entered: 07/22/2022) |
| 08/04/2022 | 237 | ☐ 7.1 MB | MEMORANDUM in Opposition re 226 MOTION TO DISMISS 177 Amended Complaint/Amended Notice of Removal,, FOR FAILURE TO STATE A CLAIM by Donald J. Trump. (Attachments: # 1 Exhibit 1, Declaration of Alina Habba, Esquire, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D) (Ticktin, Peter) (Entered: 08/04/2022) |
| 08/04/2022 | 238 | ☐ 420.6 KB | MEMORANDUM in Opposition re 224 MOTION to Substitute Party *(Comey, McCabe, Clinesmith, Page, and Strzok)* MOTION to Dismiss for Lack of Jurisdiction 177 Amended Complaint/Amended Notice of Removal,, by Donald |

J. Trump. (Attachments: # 1 Text of Proposed Order)(Tickner, Peter) (Entered: 08/04/2022)

**TAB 1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.


DONALD J. TRUMP,

                    Plaintiff,

v.

HILLARY R. CLINTON, HFACC, INC.,
DEMOCRATIC NATIONAL COMMITTEE,
DNC SERVICES CORPORATION, PERKINS
COIE, LLC, MICHAEL SUSSMANN, MARC
ELIAS, DEBBIE WASSERMAN SCHULTZ,
CHARLES HALLIDAY DOLAN, JR., JAKE
SULLIVAN, JOHN PODESTA, ROBERT E.
MOOK, PHILLIPE REINES, FUSION GPS,
GLENN SIMPSON, PETER FRITSCH,
NELLIE OHR, BRUCE OHR, ORBIS
BUSINESS INTELLIGENCE, LTD.,
CHRISTOPHER STEELE, IGOR DANCHENKO,
NEUSTAR, INC., RODNEY JOFFE, JAMES
COMEY, PETER STRZOK, LISA PAGE,
KEVIN CLINESMITH, ANDREW MCCABE,
JOHN DOES 1 THROUGH 10 (said
names being fictios and unknown persons), and
ABC CORPORATIONS 1 THROUGH 10 (said
names being fictitious and unknown entities),

                    Defendants.

_____/


## **COMPLAINT FOR DAMAGES AND DEMAND FOR TRIAL BY JURY**

The Plaintiff, Donald J. Trump, by and through his undersigned counsel, hereby serves his

suit against the Defendants, Hillary R. Clinton, HFACC, Inc., the Democratic National Committee,

DNC Services Corporation, Perkins Coie, LLC, Michael Sussmann, Marc Elias, Debbie

Wasserman Schultz, Charles Halliday Dolan, Jr., Jake Sullivan, John Podesta, Robert E. Mook,

Phillipe Reines, Fusion GPS, Glenn Simpson, Peter Fritsch, Nellie Ohr, Bruce Ohr, Orbis Business Intelligence, Ltd., Christopher Steele, Igor Danchenko, Neustar, Inc., Rodney Joffe, James Comey, Peter Strzok, Lisa Page, Kevin Clinesmith, Andrew McCabe, John Does 1 through 10 (said names being fictious and unknown persons), and ABC Corporations 1 through 10 (said names being fictitious and unknown entities) and alleges as follows:

### Introduction

1.    In the run-up to the 2016 Presidential Election, Hillary Clinton and her cohorts orchestrated an unthinkable plot – one that shocks the conscience and is an affront to this nation's democracy.  Acting in concert, the Defendants maliciously conspired to weave a false narrative that their Republican opponent, Donald J. Trump, was colluding with a hostile foreign sovereignty.  The actions taken in furtherance of their scheme—falsifying evidence, deceiving law enforcement, and exploiting access to highly-sensitive data sources - are so outrageous, subversive and incendiary that even the events of Watergate pale in comparison.

2.    Under the guise of 'opposition research,' 'data analytics,' and other political stratagems, the Defendants nefariously sought to sway the public's trust.  They worked together with a single, self-serving purpose: to vilify Donald J. Trump.  Indeed, their far-reaching conspiracy was designed to cripple Trump's bid for presidency by fabricating a scandal that would be used to trigger an unfounded federal investigation and ignite a media frenzy.

3.    The scheme was conceived, coordinated and carried out by top-level officials at the Clinton Campaign and the DNC—including 'the candidate' herself—who attempted to shield her involvement behind a wall of third parties.[1]  To start, the Clinton Campaign and the DNC enlisted the assistance of their shared counsel, Perkins Coie, a law firm with deep Democrat ties, in the

---

[1] U.S. Dep't of Justice, Office of the Inspector General, Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation at 96 (2019) (hereinafter "IG Report").

hopes of obscuring their actions under the veil of attorney-client privilege.  Perkins Coie was

tasked with spearheading the scheme to find—or fabricate—proof of a sinister link between

Donald J. Trump and Russia.  To do so, Perkins Coie launched parallel operations: on one front,

Perkins Coie partner Marc Elias led an effort to produce spurious 'opposition research' claiming

to reveal illicit ties between the Trump Campaign and Russian operatives; on a separate front,

Perkins Coie partner Michael Sussmann headed a campaign to develop misleading evidence of a

bogus 'back channel' connection between e-mail servers at Trump Tower and a Russian-owned

bank.

      4.     Marc Elias, in his mission to obtain derogatory anti-Trump 'opposition research,'

commissioned Fusion GPS, an investigative firm, and its co-founders, Peter Fritsch and Glenn

Simpson, and directed them to dredge up evidence—actual or otherwise—of collusion between

Trump and Russia.  Fritsch and Simpson, in turn, enlisted the assistance of Orbis Ltd. and its

owner, Christopher Steele, to produce a series of reports purporting to contain proof of the

supposed collusion.  Of course, the now fully debunked collection of reports, known as the "Steele

Dossier," was riddled with misstatements, misrepresentations and, most of all, flat out lies.  In

truth, the Steele Dossier was largely based upon information provided to Steele by his primary

sub-source, Igor Danchenko, who was subsequently indicted for falsifying his claims.  Even more

damning, Danchenko had close ties to senior Clinton Campaign official, Charles Halliday Dolan,

Jr., who knowingly provided false information to Danchenko, who relayed it to Steele, who

reported it in the Steele Dossier and eagerly fed the deceptions to both the media and the FBI.  This

duplicitous arrangement existed for a singular self-serving purpose – to discredit Donald J. Trump

and his campaign.

      5.     At the same time, Michael Sussmann, in his hunt for damaging intel against the

Trump Campaign, turned to Neustar, Inc., an information technology company, and one of its top executives, Rodney Joffe, a fervent anti-Trumper who had recently been promised a high-ranking position with the Clinton Administration, to exploit their access to non-public data in search of a secret "back channel" connection between Trump Tower and Alfa Bank. When it was discovered that no such channel existed, the Defendants resorted to truly subversive measures – hacking servers at Trump Tower, Trump's private apartment, and, most alarmingly, the *White House*. This ill-gotten data was then manipulated to create a misleading "inference" and submitted to law enforcement in an effort to falsely implicate Donald J. Trump and his campaign.[2] All of these acts were carried out in coordination with the Clinton Campaign and the DNC, at the behest of certain Democratic "VIPs."[3]

6.        While their multi-pronged attack was underway, the Defendants seized on the opportunity to publicly malign Donald J. Trump by instigating a full-blown media frenzy. Indeed, the Clinton Campaign and DNC—admittedly on a "mission" to "raise the alarm" about their contrived Trump-Russia link[4]—repeatedly fed disinformation to the media and shamelessly promoted their false narratives. All the while, Hillary Clinton, Jake Sullivan, Debbie Wasserman Schultz, and others did their best to proliferate the spread of those dubious and false claims through press releases, social media, and other public statements.

7.        The fallout from the Defendants' actions was not limited to the public denigration of Trump and his campaign. The Federal Bureau of Investigation (FBI)—relying on the Defendants' fraudulent evidence—commenced a large-scale investigation and expended precious

---

[2] Indictment at ¶ 23 (ECF Doc. No. 1), *United States v. Sussmannn*, case no. 1:21-cr-00582-CRC, District of Columbia (Sept. 16, 2021) (hereinafter the "Sussmann Indictment").

[3] *Id.* ¶ 10.

[4] Jennifer Palmieri (former Clinton Campaign Communications Director), *The Clinton campaign warned you about Russia. But nobody listened to us.*, The Washington Post, March 24, 2017.

time, resources and taxpayer dollars looking into the spurious allegation that the Trump Campaign had colluded with the Russian Government to interfere in the 2016 presidential election.  The effects of this unfounded investigation were prolonged and exacerbated by the presence of a small faction of Clinton loyalists who were well-positioned within the Department of Justice and the FBI – James Comey, Andrew McCabe, Peter Strzok, Lisa Page, Kevin Clinesmith, and Bruce Ohr. These government officials were willing to abuse their positions of public trust to advance the baseless probe to new levels, including obtaining an extrajudicial FISA warrant and instigating the commencement of an oversight investigation headed by Special Counsel Robert Mueller. As a result, Donald J. Trump and his campaign were forced to expend tens of millions of dollars in legal fees to defend against these contrived and unwarranted proceedings. Justice would ultimately prevail – following a two-year investigation, Special Counsel Mueller went on to exonerate Donald J. Trump and his campaign with his finding that there was no evidence of collusion with Russia.

8.      The full extent of the Defendants' wrongdoing has been steadily and gradually exposed by Special Counsel John Durham, who has been heading a DOJ investigation into the origins of the Trump-Russia conspiracy.  To date, he has already issued indictments to Sussmann and Danchenko, among others, for proffering false statements to law enforcement officials.  As outlined below, these 'speaking' indictments not only implicate many of the Defendants named herein but also provide a great deal of insight into the inner-workings of the Defendants' conspiratorial enterprise.  Based on recent developments and the overall direction of Durham's investigation, it seems all but certain that additional indictments are forthcoming.

9.      In short, the Defendants, blinded by political ambition, orchestrated a malicious conspiracy to disseminate patently false and injurious information about Donald J. Trump and his campaign, all in the hopes of destroying his life, his political career and rigging the 2016

Presidential Election in favor of Hillary Clinton.  When their gambit failed, and Donald J. Trump

was elected, the Defendants' efforts continued unabated, merely shifting their focus to

undermining his presidential administration. Worse still, the Defendants continue to spread their

vicious lies to this day as they unabashedly publicize their thoroughly debunked falsehoods in an

effort to ensure that he will never be elected again.  The deception, malice, and treachery

perpetrated by the Defendants has caused significant harm to the American people, and to the

Plaintiff, Donald J. Trump, and they must be held accountable for their heinous acts.

<b><u>Jurisdiction and Venue</u></b>

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that

claims which arise under the laws of the United States, and this court has supplemental jurisdiction

of the additional claims pursuant to 28 U.S.C. § 1367(a) as they all are so related to the federal

questions that they form part of the same case or controversy.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because at least

one Defendant and the Plaintiff reside in this District and a substantial part of the events or

omissions giving rise to the Plaintiffs' claims occurred in this District.   In this regard, the

publications of injurious falsehoods were intended to occur in the Southern District of Florida, and

they did occur in the Southern District of Florida.

<b><u>The Parties</u></b>

12.     The Plaintiff, Donald J. Trump, the 45th President of the United States of America,

is a private citizen who is *sui juris* and he resides in the State of Florida in the Southern District of

Florida.

13.     The Defendant, Hillary R. Clinton (hereinafter "Clinton"), is a resident of the State

of New York and is *sui juris.*  She was the Democratic nominee for the 2016 Presidential Election.

Clinton's acts and omissions as identified in this lawsuit arise out of or relate to her conduct in

6

and/or affecting, among other jurisdictions, Florida.

14.     The Defendant, HFACC, Inc. (hereinafter the "Clinton Campaign"), is a corporation with its principal place of business in New York and doing business all over the United States, including in the Southern District of Florida.  The Clinton Campaign's acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida.

15.     The Defendant, the Democratic National Committee is a national committee, as defined by 52 U.S.C. § 30101, with its principal place of business in Washington, D.C.  The Democratic National Committee is registered with the FEC as the DNC Services Corp./Dem. Services Corp, and it operates through the Defendant, the DNC Services Corporation.  In turn, the DNC Services Corporation is a District of Columbia not-for-profit corporation, with its principal place of business in Washington, D.C.  The Democratic National Committee undertakes most of its business and financial activities through the DNC Services Corporation (hereinafter, the Democratic National Committee and the DNC Services Corporation are collectively referred to as the "DNC").  The DNC operates and conducts substantial and continuous business in the State of Florida.  The DNC's acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida.

16.     The Defendant, Perkins Coie, LLP (hereinafter "Perkins Coie"), is an international law firm with its headquarters in Seattle, Washington.  Perkins Coie has a registered agent in Tallahassee, Florida, and does substantial, continuous business in Florida generally and in the Southern District of Florida specifically.  Perkins Coie's acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida.

17.     The Defendant, Michael Sussmann (hereinafter "Sussmann"), is a resident of

United States, and is *sui juris*.  He is an attorney and a former agent and/or employee of Perkins Coie and, at all relevant times herein, was acting within the scope of his employment with Perkins Coie.  Sussmann's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

18.     The Defendant, Debbie Wasserman Schultz (hereinafter "Schultz") is a resident of the State of Florida and is *sui juris*.  She served as Chairperson of the DNC from May 2011 until the date of her resignation on July 28, 2016.  Schultz's acts and omissions as identified in this lawsuit arise out of or relate to her conduct in and/or affecting, among other jurisdictions, Florida.

19.     The Defendant, Charles Halliday Dolan, Jr.  (hereinafter "Dolan"), is a resident of the United States, and is *sui juris*.  With respect to the 2016 Clinton Campaign, Dolan actively campaigned and participated in calls and events as a volunteer on behalf of Hillary Clinton. Dolan's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

20.     The Defendant, Jake Sullivan (hereinafter "Sullivan"), is a resident of the United States, and is *sui juris*.  He was Chief Foreign Policy Advisory for the 2016 Clinton Campaign and, at all relevant times herein, was acting within the scope of his employment with the Clinton Campaign. Currently, Sullivan is serving as National Security Advisor for the Biden Administration.  Sullivan's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

21.     The Defendant, John Podesta (hereinafter "Podesta"), is a resident of the United States, and is *sui juris*.  He was Chairman for the 2016 Clinton Campaign and, at all relevant times herein, was acting within the scope of his employment with the Clinton Campaign.  Podesta's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting,

among other jurisdictions, Florida.

22.     The Defendant, Robert E.  Mook (hereinafter "Mook"), is a resident of the United States and served as the campaign manager for the 2016 Clinton Campaign.  At all relevant times herein, was acting within the scope of his employment with the Clinton Campaign.  Mook's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting among other jurisdictions, Florida.

23.     The Defendant, Phillipe Reines (hereinafter "Reines"), is a resident of the United States, and is *sui juris*.  He served as a long-time former communications advisor to Hillary Clinton and, at all relevant times herein, was acting within the scope of his employment with the Clinton Campaign.  Reines' acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting among other jurisdictions, Florida.

24.     The Defendant, Marc Elias (hereinafter "Elias"), is a resident of Washington D.C. and is *sui juris*.  He is an attorney and a former employee and/or agent of Perkins Coie, the DNC and the Clinton Campaign and, at all relevant times herein, was acting within the scope of his employment and/or agency of Perkins Coie.  Elias's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

25.     The Defendant, Fusion GPS, is a Delaware limited liability company which represents that it provides research, strategic intelligence, and due diligence services to corporations, law firms, and investors worldwide, and is headquartered in Washington D.C.  Fusion GPS's acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida.

26.     The Defendant, Glenn Simpson (hereinafter "Simpson"), is a principal and co-founder of Fusion GPS, is a resident of the United States, and is *sui juris*.  Simpson's acts and

omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

27.     The Defendant, Peter Fritsch (hereinafter "Fritsch"), is a principal and co-founder of Fusion GPS, is a resident of Florida, and is *sui juris*.  Fritsch's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

28.     The Defendant, Nellie Ohr (hereinafter "Mrs. Ohr"), is a resident of the United States, and is *sui juris*.  At all relevant times, she was an employee of Fusion GPS and was acting within the scope of her employment with Fusion GPS.  Mrs. Ohr's acts and omissions as identified in this lawsuit arise out of or relate to her conduct in and/or affecting, among other jurisdictions, Florida.

29.     The Defendant, Bruce Ohr (hereinafter "Mr. Ohr"), is a resident of the United States, and is *sui juris*.  At all relevant times, Bruce Ohr was a United States Department of Justice official.  Mr. Ohr's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

30.     The Defendant, Orbis Business Intelligence Ltd. (hereinafter "Orbis Ltd."), is a London, England-based intelligence consultancy firm.  Orbis Ltd.'s acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida.

31.     The Defendant, Christopher Steele (hereinafter "Steele"), is a principal and founder of Orbis Ltd., a resident of the United Kingdom, and is *sui juris*.  Steele's acts and omissions as identified in this lawsuit were all done in the scope of his employment with Orbis, Ltd., and arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

10

32.     The Defendant, Igor Danchenko (hereinafter "Danchenko"), at all times relevant to this Complaint, was a citizen of the Russian Federation and was lawfully in the United States. Danchenko resided in Washington, D.C.  and Virginia and is *sui juris.*  At all relevant times, Danchenko was a contractor for Orbis Ltd. and was acting within the scope of his agency with Orbis Ltd. Danchenko's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

33.     The Defendant, Neustar, Inc.  (hereinafter "Neustar"), is an information technology company with its headquarters in Sterling, Virginia.  Neustar's acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida.

34.     The Defendant, Rodney Joffe (hereinafter "Joffe"), is a resident of the United States, and is *sui juris.*  Joffe is a former executive of Neustar and, at all relevant times herein, was acting within the scope of his employment with Neustar.  Joffe's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

35.     The Defendant, James Comey (hereinafter "Comey"), is a resident of the United States, and is *sui juris.* Comey was the 7th Director of the Federal Bureau of Investigation from 2013 to May 2017. Comey's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

36.     The Defendant, Peter Strzok (hereinafter "Strzok"), is a resident of the United States, and is *sui juris.*  At all relevant times, Strzok was an agent of the Federal Bureau of Investigation.  Strzok's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida .

37.    The Defendant, Lisa Page (hereinafter "Mrs. Page"), is a resident of the United States, and is *sui juris.*  At all relevant times Mrs. Page was an attorney for the Federal Bureau of Investigation.  Mrs. Page's acts and omissions as identified in this lawsuit arise out of or relate to her conduct in and/or affecting, among other jurisdictions, Florida .

38.    The Defendant, Kevin Clinesmith (hereinafter "Clinesmith"), is a resident of the United States, and is *sui juris.* At all relevant times, Clinesmith was an attorney for the Federal Bureau of Investigation. Clinesmith's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida .

39.    The Defendant, Andrew McCabe (hereinafter, "McCabe"), is a resident of the United States, and is *sui juris.* McCabe was the Deputy Director of the Federal Bureau of Investigation from 2016 to March of 2018.  McCabe's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida

40.    The Defendants, John Does 1 through 10, are individuals whose identities are presently unknown to the Plaintiff, including, but not limited to, journalists, publishers, editors, investigators, state or federal officials, co-conspirators, officers, employees, agents, managers, owners, principals and/or other duly authorized individuals who caused or contributed to the incident or incidents for which the Plaintiff seeks damages, and/or are vicariously and/or otherwise liable for the acts, commissions, or other culpable conduct of those who did cause or contribute to the incidents alleged.

41.    The Defendants, ABC Corporations 1 through 10, are corporate entities presently unidentifiable to the Plaintiff, including, but not limited to, media companies, publication companies, editorial companies, municipalities, state or federal agencies, law enforcement authorities, investigative agencies, political organizations, political affiliates, private firms and/or

other duly authorized corporate or governmental entities who caused or contributed to the incident

or incidents for which the Plaintiff seeks damages, and/or are vicariously and/or otherwise liable

for the acts, commissions, or other culpable conduct of those who did cause or contribute to the

incidents alleged.

**Statement of Facts**

**The DNC and the Clinton Campaign
Become One**

42.     On April 12, 2015, Clinton declared her candidacy for President of the United

States.  Clinton sought the nomination of the Democratic Party.

43.     Shortly thereafter, in April 2015, the Clinton Campaign retained Perkins Coie, a

law firm with longstanding ties to the Democratic Party, as its general counsel.[5]

44.     It was clear from the early days of the Democratic primaries that the DNC—which

according to its own rules, is required to "maintain impartiality and evenhandedness" during the

Democratic Primary nominating process—was backing Clinton and favored her as the preferred

Democratic nominee.[6]

45.     For example, in a confidential, inter-office DNC memorandum dated May 26, 2015

(the "DNC Memo"), which only came to light after the DNC servers were hacked by an individual

using the name "Guccifer 2.0," it was noted that the DNC sought to "provide a contrast between

the GOP field and HRC" and that it would "[u]se specific hits to muddy the waters around ethics,

transparency and campaign finance attacks on HRC."[7]

46.     Notably, the DNC Memo also stated that, in order to "muddy the waters" around

---

[5] Indictment at ¶ 10.
[6] DNC Charter and Bylaws, Art.  5 § 4.
[7] Complaint, Ex.  A (ECF Doc.  No.  8), *Wilding v.  DNC Services Corp., et al.*, case no.  0:16-cv-61511-WJZ, Southern District of Florida (July 13, 2016).

Clinton's perceived vulnerabilities as a candidate, the DNC had outlined a plan to "damage Republican presidential candidates' credibility with voters by looking for targeted opportunities to undermine their specific messaging." The DNC Memo also discussed "opposition research" and a strategy to "utilize the research to place highly targeted hits" against Republican candidates.[8]

47.     Around that same time, as later disclosed through a WikiLeaks release of confidential DNC documents, Schultz, the head of the DNC, stated in an e-mail that Clinton's Democratic competitor, Bernie Sanders, "isn't going to be president."

48.     Furthermore, Donna Brazile, then vice-chair of the DNC, said in criticism of Schultz: "She hadn't been very interested in controlling the party – she let Clinton's headquarters in Brooklyn do as it desired so she didn't have to inform the party officers how bad the situation was."

49.     In or around mid-2015, in an effort to foster greater coordination and cohesion with Clinton and the Clinton Campaign, the DNC retained the same law firm, Perkins Coie, to serve as its general counsel.

50.     Two of Perkins Coie's senior partners, Elias and Sussmann, were largely responsible for handling the firm's representation of the DNC and the Clinton Campaign in their legal, political, and other affairs. Elias, in particular, was designated as "General Counsel" for both the DNC and the Clinton Campaign.

51.     In or around August 2015, Elias and Sussmann negotiated a Joint Fund-Raising Agreement between their two clients, the DNC and the Clinton Campaign.

52.     The Joint Fund-Raising Agreement was nothing more than a thinly veiled effort to align the interests and operations of the DNC and the Clinton Campaign by giving the Clinton

---

[8] *Id.*

14

Campaign control over the DNC, an organization that was supposed to remain impartial.

53.     Specifically, the Joint Fund-Raising Agreement—which was entered into months before Clinton won the Democratic nomination—specified that, in exchange for raising money and investing in the DNC, the Clinton Campaign would control the DNC's finances, strategy, and all the money raised.   Her campaign had the right of refusal on who would be the party communications director, and it would make final decisions on all the other staff.   The DNC also was required to consult with the campaign about all other staffing, budgeting, data, analytics, and mailings.[9]

54.     Given the intimate ties between the DNC and the Clinton Campaign, and the amount of control that Clinton exerted over both, it was clear that the organizations' interests were aligned and they shared a common purpose: get Clinton elected President by any means necessary.

**The Clinton Campaign and DNC Conspire
With Their Attorneys, Perkins Coie, to Frame
Republican Candidate Donald J. Trump**

55.     On June 16, 2015, Donald J. Trump announced his candidacy for President and sought the Republican nomination.

56.     Seeking to thwart Trump's campaign and to diminish the likelihood of him winning the election, the Clinton Campaign and the DNC devised a nefarious scheme to discredit, delegitimize and defame him by proliferating a false narrative that Donald J. Trump and his campaign were actively colluding with Russia to interfere in the 2016 Presidential Election.

57.     This plot was conceived and funded by Clinton, the Clinton Campaign, and DNC and would require the participation, cooperation and assistance of many individuals and entities acting in concert with one another to willfully carry out numerous tortious and criminal acts.   The

---

[9] Donna Brazile, *Hacks: The Inside Story of the Break-ins and Breakdowns that Put Donald Trump in the White House*, November 7, 2017.

Defendants had a meeting of minds and a common objective: to irreparably harm Trump's ability to get elected and to end his political career.

58.     To start, the Clinton Campaign and the DNC enlisted the assistance of their joint attorneys, Perkins Coie.

59.     The Clinton Campaign and the DNC chose Perkins Coie to oversee and coordinate their plan for a specific purpose – they anticipated that conspiring with their legal counsel would help conceal their dealings under the shroud of attorney-client privilege.  However, attorney-client privilege is wholly inapplicable to the pertinent discussions between these parties – not only were the communications between the DNC/Clinton Campaign and Perkins Coie non-legal in nature, they were also in furtherance of criminal and fraudulent wrongdoing.

60.     Specifically, the Clinton Campaign and the DNC directed Perkins Coie to coordinate a two-pronged plan to publicly and falsely denigrate Donald J. Trump, with Elias and Sussmann each leading parallel operations to wrongly implicate him as colluding with Russia.

61.     On one front, Elias would work with Fusion GPS and a host of others to develop a dossier, based on lies and misinformation purporting to show an incriminating link between Trump and Russia, which would be used to mislead law enforcement officials and ignite a media frenzy.

62.     On a separate front, Sussmann would commission the information technology company, Neustar, to brazenly hack servers from highly-sensitive locations—including Donald J. Trump's private residence, Trump Tower, and, most shockingly, the White House—to uncover proprietary data that could then be manipulated to give the impression that Trump was engaged in illegitimate business with a Russian bank, Alfa Bank.

**Elias Recruits Fusion GPS and Others
to Manufacture a Falsified Set of
Reports Known as the Steele Dossier**

63.    To effectuate the first phase of the Defendants' conspiracy—involving the creation

of an incriminating dossier—the DNC and the Clinton Campaign would require the services of an

investigative firm to dredge up derogatory 'opposition research' on Donald J. Trump and, to the

extent there was none, to manufacture it.

64.    At all relevant times, Fusion GPS was a private investigative firm specializing in

politics.  It was founded in 2011 by former *Wall Street Journal* employees Glenn Simpson and

Peter Fritsch.[10]

65.    On March 1, 2016, Fritsch sent an e-mail to a "senior figure in the Democratic

Party" and conveyed his belief that Trump "had to be stopped."  The Democratic contact responded

by stating "Yes.  Let's talk."[11]

66.    The "senior figure in the Democratic Party" arranged for Fritsch and Simpson to

meet with Elias.  The meeting took place on April 20, 2016, in Washington D.C.[12]

67.    In or around April 2016, on behalf of and at the direction of the Clinton Campaign

and the DNC, Elias and Perkins Coie retained Fusion GPS.

68.    In particular, Fusion GPS was hired to perform 'opposition research' for the Clinton

Campaign and the DNC.

69.    The Clinton Campaign and the DNC were well aware that Fusion GPS had a well-

documented history of employing a 'scorched earth' strategy wherein the company would produce

---

[10] See generally Glenn Simpson and Peter Fritsch, *Crime in Progress: Inside the Steele Dossier and the Fusion GPS Investigation of Donald Trump* (hereinafter "*Crime in Progress*").
[11] Glenn Simpson and Peter Fritsch, *Crime in Progress: Inside the Steele Dossier and the Fusion GPS Investigation of Donald Trump* ("*Crime in Progress*"), p.  55.
[12] *Id.*  at 56.

false and/or misleading dossiers to be spread through the media to damage his opportunity to win an election.

70.     The Clinton Campaign, the DNC, Perkins Coie and Fusion GPS each understood that Fusion GPS's true task was to prepare a fraudulent "dossier" that could be used to falsely implicate Donald J. Trump to derail his campaign, ruining his opportunity to be elected and if elected to then interfere with his ability to properly serve as President of the United States by inducing criminal investigations of Donald J. Trump.

71.     The Clinton Campaign and the DNC funneled funds through Perkins Coie to finance Fusion GPS's research.  Fusion GPS would then report to the Perkins Coie attorney, Elias, the results of its "investigation."[13]

72.     In fact, Simpson and Fritsch reported *only* to Elias and did "not have any contact with the campaign brass." [14]

73.     As Fritsch and Simpson recounted in their book, the relationship was set up that way for a specific reason; per Elias, Fusion GPS was walled-off from the Clinton Campaign and the DNC for "legal reasons: If Fusion's communications were with a lawyer, they could be considered privileged and kept confidential."[15]

74.     At or around that time, Nellie Ohr was an employee of Fusion GPS, where her role was to conduct extensive opposition research on Donald J. Trump's family members and campaign aides.

75.     Mrs. Ohr's husband, Bruce Ohr, was an Associate Deputy Attorney General with the DOJ. Mrs. Ohr had also been previously employed with the DOJ.

---

[13] *Id.* at 57.
[14] *Id.*
[15] *Id.*

76.     The Clinton Campaign, the DNC, Perkins Coie, and Fusion GPS knew that this close relationship with a high-ranking DOJ official would be of great value in effectuating their plot – they understood that Mr. Ohr would be instrumental in lending credibility to the Steele Dossier by having Mr. Ohr serve as a seemingly trustworthy intermediary to disseminate it through government channels such as the FBI and the DOJ.

77.     To develop the dossier, the Clinton Campaign, the DNC, Perkins Coie and Fusion GPS turned to Orbis Ltd., a private intelligence firm, and its owner, Christopher Steele, a former British intelligence officer.

78.     Orbis Ltd. was chosen to partake in the scheme based on the ties between one of its analysts, Danchenko, and an individual with intimate ties to the Clinton Campaign and one its close associates, Dolan.

a.  Danchenko, a Russian citizen, had been working as a contractor/analyst with Orbis Ltd. Since 2011, focusing primarily on Russian and Eurasian geo-political matters.[16]

b.  Dolan, then an employee of public relations firm, Kglobal, was a longtime participant in Democratic politics, having previously served as chairman of the DNC, state chairman of former President Bill Clinton's 1992 and 1996 presidential campaigns, adviser to Clinton's 2008 presidential campaign, and having been appointed by Clinton to two four-year terms on an advisory commission at the U.S. State Department.  With respect to the 2016 Clinton campaign, Dolan actively campaigned and participated in calls and events as a volunteer on behalf of the Clinton Campaign.[17]

---

[16] Danchenko Indictment ¶ 16.
[17] *Id.* ¶ 19.

79.     In late April 2016, Danchenko began having discussions with Dolan about a potential business collaboration between Orbis Ltd. and Kglobal to create a "dossier" to smear Donald J. Trump and to disseminate the false accusations to the media.  Those discussions reflected that Danchenko and Dolan had exchanged information regarding each other's backgrounds and professional activities, including Danchenko's work for Orbis Ltd, and Steele:[18]

     c.   On or about April 29, 2016, Danchenko sent an email to Dolan indicating that Danchenko had passed a letter to Steele on behalf of Dolan and intended to set up a meeting between the two.[19]

     d.   That same day, Danchenko sent an email to Dolan outlining certain work that Danchenko was conducting with Orbis Ltd. The email attached an Orbis Ltd. Report titled "Intelligence Briefing Note, 'Kompromat' and 'Nadzor' in the Russian Banking Sector."[20]

     e.   On or about June 10, 2016, Dolan sent an email to a U.S.-based acquaintance which reflected that Dolan and Danchenko had become colleagues and were exchanging information.  In describing Danchenko, Dolan stated: "He is too young for KGB.  But I think he worked for FSB.[21]  Since he told me he spent two years in Iran.  And when I first met him he knew more about me than I did.  [winking emoticon]."

80.     In or about June 2016, Fusion GPS officially retained Orbis Ltd. and Steele to find "links between Russia and the then Republican candidate. . .  Donald J. Trump."  When no such

---

[18] *Id.* ¶ 23.
[19] Danchenko Indictment ¶ 24.
[20] *Id.* ¶ 25.
[21] The Federal Security Service of the Russian Federation, commonly referred to as the "FSB," is the principal security agency of Russia and the principal successor agency to the KGB.

evidence was found, the directive shifted to manipulating the truth and developing a false narrative that Donald J. Trump was colluding with Russia.[22]

    a.   In taking on this assignment, Steele was aware that "Democratic Party associates" were paying for his and Fusion GPS's "research," and that "the ultimate client" was "the leadership of the Clinton presidential campaign."[23]

    b.   Critically, Steele has testified that "the candidate"—Hillary Clinton—was "aware of [his] reporting."[24]

    c.   Furthermore, Steele shared the common goal of the Defendants' overarching conspiracy: he "was desperate that Donald Trump not get elected" and he "was passionate about [Donald J. Trump] not being president."[25]

81.    Soon thereafter—at the direction of Clinton, the Clinton Campaign, the DNC, Perkins Coie, and Fusion GPS—Orbis Ltd. and Steele, with the assistance of Mook, Nellie Ohr, Danchenko Dolan, and others, began preparing approximately seventeen anti-Trump memoranda known collectively as the "Steele Dossier" or simply the "Dossier."

82.    Just after the Dossier was published, Podesta met Simpson to compare notes on Russia meddling in the election.[26]

83.    Robby Mook, manager of the Clinton Campaign, has denied having knowledge of who funded the Dossier.  However, Elias testified he sent the bills from Fusion GPS to Mook.[27]

---

[22] *Id.*
[23] IG Report at 96; *see also* Tr.  of Christopher Steele Deposition at 162-163 (Mar.  18, 2020), *Aven v.  Orbis* (2020) EWHC 1812 (QB) ("Q: . . .  in early July . . .  who did you think the ultimate client was? A: I thought it was the campaign . . .  Q: You knew it was the leadership of the Clinton presidential campaign, didn't you? A: I believed it was the campaign, yes.  Q: The leadership of the Clinton campaign? A: Fine, the leadership of the campaign.")
[24] FBI Notes at 96; *see also* Tr.  of Steele Dep.  at 163 (emphasis added).
[25] Bruce Ohr Transcribed Interview 124, Aug.  28, 2918.
[26] https://www.shiftfrequency.com/podesta-illegal-spying-on-trump/
[27] https://townhall.com/tipsheet/mattvespa/2020/05/12/did-hillary-clintons-campaign-manager-know-about-trump-dossier-dem-lawyer-says-he-sent-receipts-n2568625

84.     The Dossier was intended to not only harm Trump's candidacy, but more importantly, it was fabricated to induce the FBI to commence an investigation into alleged ties between Russia and Donald J. Trump, the Trump Campaign, and the Trump Organization.

85.     In drafting the Dossier, Steele purported to rely upon numerous sources who contributed information and prevarications to him.

86.     Several of the alleged sources named in the Dossier have refuted, under oath, that they provided any of the purported information contained in the Dossier to Steele:

  d.  Olga Galkina, a Russian citizen who was referenced as "sub-source 3" in the Dossier, stated that she was never a source or sub-source to Steele, and, in fact, never even met him.[28]

  e.  Alexey Dundich, a Russian citizen who was referenced as "sub-source 4" in the Dossier, stated that he never was a source of information, and never even met Steele.[29]

  f.  Petr Avan, a Russian citizen who was referenced in the Dossier, denies the allegations contained in the Dossier and states that its contents are false.[30]

87.     The primary source for the information provided in the Dossier was Steele's analyst, Danchenko.

88.     From May 2016 through December 2016, Danchenko assembled and provided to Steele purported information that Steele would, in turn, rely upon to draft the Dossier.

89.     During that same time, Danchenko had numerous meetings, communications and

---

[28] Declaration of Olga Aleksandrovna Galkina dated June 8, 2021 (ECF Doc. No. 153-8), *Fridman, et al. v. Bean LLC a/k/a Fusion GPS, et al.*, case no. 17-2041-RJL, District of Columbia (June 21, 2021).
[29] Declaration of Alexey Sergeyevich Dundich dated May 13, 2021 (ECF Doc. No. 153-4), *Fridman, et al. v. Bean LLC a/k/a Fusion GPS, et al.*, case no. 17-2041-RJL, District of Columbia (June 21, 2021).
[30] Witness Statement of Petr Aven dated October 2, 2020, *Aven v. Orbis* (2020) EWHC 1812 (QB).

interactions with Dolan.

90.     Certain information contained in the Dossier, which Danchenko provided to Steele, mirrors and/or reflects information that Dolan had conveyed to Danchenko.

91.     For example, an allegation contained in Report 80 of the Dossier, claiming that Donald J. Trump had previously engaged in "salacious sexual activity" in the Presidential Suite at a Moscow hotel, was derived from Dolan:

> g.   Dolan had stayed at the Moscow hotel in June 2016, and, during that trip, he participated in, among other things: 1) a meeting with the general manager of the Moscow hotel and a female hotel staff member, (2) a lunch with a Staff Member and other members of the Moscow hotel staff and (3) a tour of the Moscow hotel, including the Presidential Suite.

> h.   Thereafter, Dolan told Danchenko that he learned from a hotel staffer that Trump had stayed in the Presidential Suite and engaged in "salacious sexual activity."

> i.   References to the Moscow hotel, the Presidential Suite, and a hotel manager and other staff would all later appear in the Dossier, which included absurd allegations that Trump participated in "sexual or salacious activity."

> j.   Dolan ultimately admitted that no one at the hotel mentioned anything to him about Trump's supposed "sexual or salacious" activity.

92.     Another allegation, contained in Report 111 of the Dossier, claiming that the Russian government withdrew a Russian from his job at the Russian Embassy in Washington, D.C. due to fears relating to the diplomat's purported role in meddling in the U.S. Presidential Election, had clearly originated from Dolan:

> [S]peaking separately to [a] compatriot, a senior Russian [Ministry of Foreign Affairs] official reported that as a prophylactic measure,

> a leading Russia diplomat, [Russian Diplomat-1), had been withdrawn from Washington on short notice because Moscow feared his heavy involvement in the US presidential election operation, including the so-called veterans' pensions ruse (reported previously), would be exposed in the media there. His replacement, [Russian Diplomat-2] however was clean in this regard.

93.    This allegation bore substantial similarities to information that Dolan received during the 2016 time period.

94.    Moreover, Dolan was undoubtedly a source for an allegation in the Dossier regarding Paul Manafort's departure from the Trump Campaign:

> S/he said it was true that the Ukraine corruption revelations had played a part in this, but also, several senior players close to TRUMP had wanted [Paul Manafort] out, primarily to loosen his control on strategy and policy formulation. Of particular importance in this regard was Paul Manafort's] predecessor as campaign manager, [Campaign Staff Member-1-], who hated [Paul Manafort] personally and remained close to TRUMP with whom he discussed the presidential campaign on a regular basis.

95.    The above allegation contained information that Dolan provided to Danchenko is in response to a specific request. In particular, on August 19. 2016, Danchenko emailed Dolan to inquire as to any "thought, rumor, or allegation" about Paul Manafort.

96.    Thereinafter, on August 20, 2016. Dolan emailed Danchenko the following:

> I had a drink with a GOP friend of mine who knows some of the players and got some of what is in this article, which provides even more detail. She also told me that [Campaign Staff Member-1], who hates [Paul Manafort] and still speaks to Trump regularly played a role. He is said to be doing a happy dance over it.

97.    Later that same day, Danchenko replied to Dolan, expressing his appreciation for the information, adding that their "goals clearly coincided" with respect to gathering derogatory information about Trump.

98.    Moreover, an allegation contained in an undated Dossier report described a "well-

developed conspiracy of cooperation" between Donald J. Trump, the Trump Campaign, and senior

Russian officials, claiming:

> Speaking in confidence to a compatriot in late July 2016, [Source E], an ethnic Russian close associate of Republican US presidential candidate Donald Trump, admitted that there was a well-developed conspiracy of co-operation between them and the Russian leadership. This was managed on the Trump side by the Republican candidate's Campaign manager, [Paul Manafort], who was using foreign policy advisor, [Carter Page], and others as intermediaries. The two sides had a mutual interest in defeating Democratic presidential candidate Hillary Clinton, whom President PUTIN apparently both hated and feared.

99.     This allegation would ultimately be offered in support of four FISA applications

targeting former Trump Campaign associate Carter Page.

100.     An additional allegation contained in the Dossier indicated that Russian diplomatic

staff in Washington, D.C., New York, and Miami were paying U.S.-based cyber actors to conduct

operations against the Democratic Party and Clinton.

**Sussmann Recruits Neustar to Lead a
Cyberattack Against the Trump Campaign**

101.     While Elias was conspiring with Fusion GPS, Orbis, Steele and others to create the

Dossier, Sussmann—at the direction of the Clinton Campaign and the DNC—was heading another

aspect of the Defendants' conspiracy: a plot to exploit sensitive data sources and falsify evidence

to manufacture ties between Donald J. Trump and a Russian bank.

102.     To put this plan in motion, the Clinton Campaign, DNC, and Perkins Coie required

the assistance of a technology company with the expertise and access to sensitive non-public data

which could be exploited for their nefarious purposes.

103.     At all relevant times, Neustar was an information technology company founded in

1998, which offers various internet-related information, data and analytics services, including

Domain Name System ("DNS") resolution services, to its customers.[31]

104.　Far from apolitical, Neustar and its employees have long been aligned with the Democratic Party.　In 2016 alone, 100% of congressional campaign donations from Neustar employees went to Democrats.

105.　At all relevant times, Joffe was an executive of Neustar and had an ownership interest in at least two additional technology companies, Dissect Cyber Inc. ("Dissect Cyber") and Zetalytics LLC ("Zetalytics").[32]

106.　Joffe was in communication with high-ranking officials of the Clinton Campaign and/or the DNC in the lead-up to the 2016 Presidential Election.

107.　During that time, Joffe was "tentatively offered the top [cybersecurity] job by the Democrats" in the event Clinton won the presidency.　He stated that he "definitely would not take the job under Trump."[33]

108.　Perkins Coie and Sussmann, in particular, frequently served as outside counsel for Neustar; in this regard, Neustar was a significant source of revenue for Perkins Coie.[34]

109.　In or around July 2016, Perkins Coie and Sussmann, acting on behalf of the Clinton Campaign and the DNC, tasked Neustar, under the direction of its executive, Joffe, to exploit its information gathering services and their access to non-public data to dredge up any information, data or records that could show any wrongdoing by Donald J. Trump, the Trump Campaign or the Trump Organization.

110.　Thereafter, Neustar, led by Joffe, initiated a search for proof of a secret "back

---

[31] Sussmann Indictment ¶ 12.
[32] *Id.; see also* Charlie Savage and Adam Goldman, *Trump Server Myster Produces Fresh Conflict*, The New York Times, September 30, 2021, https://www.nytimes.com/2021/10/01/us/politics/trump-alfa-bank-indictment.html.
[33] *Id.*　¶ 15.
[34] Sussmann Indictment ¶ 14.

channel" between Donald J. Trump or the Trump Organization and Alfa Bank; when it became

clear that no such back channel existed, Neustar and Joffe shifted their focus to fabricating

evidence to invent proof of the supposed "back channel."

111.    On or about August 20, 2016, Joffe and his researchers manipulated a sales form

on two different websites, faking the other's email address to make them "appear to communicate

with each other.  . ."

112.    Joffe believed that this fake "inference" was believable enough that "Hillary's

opposition research and whatever professional gov[ernments] and investigative journalists are also

digging [would] come up with the same things[.]"

113.    On or about the same date, Joffe clarified in an email that the "task" he had been

"given" by Perkins Coie, the Clinton Campaign, and the DNC was "indeed broad" and further

stated, in part:

> Being able to provide evidence of *anything* that shows an attempt
> to behave badly in relation to this, the VIPs would be happy.  They're
> looking for a true story that could be used as the basis for closer
> examination.

114.    On or about August 21, 2016, Joffe emailed his team of researchers, urging them

to push forward with their anti-Trump research, which he claimed would "give the base of a very

useful narrative."

115.    In that same e-mail, Joffe admitted that the connection between Trump and Alfa

Bank was merely a "red herring" with no factual basis that should be "ignored."

116.    Despite this knowledge, Sussmann and Joffe began to draft, review, and revise a

"White Paper" summarizing the allegations—which they knew to be false—of a tie between

Donald J. Trump and Alfa Bank.

117.    All the time Sussmann spent drafting his 'white papers,' as with all his time spent

working with Neustar, Fusion GPS, and all of his acts in furtherance of the Defendants' conspiracy, were billed to the Clinton Campaign.

118.    On or about August 27, 2016, Joffe sent the white paper, on which Sussmann had been working, to his team with the following comment:

> Please read as if you had no prior knowledge or involvement, and you were handed this document as a security expert (NOT a DNS expert) and were asked: Is this plausible as an explanation?' NOT to be able to say that this is, without doubt, fact, but to merely be plausible.  Do NOT spend more than a short while on this (If you spend more than an hour you have failed the assignment).  Hopefully less.  :)

119.    On or about the same date, one of Joffe's researchers replied, stating that the white paper achieved Joffe's objective, but noting that the paper "smartly" avoided discussing weaknesses or "holes" in the paper's hypothesis.

120.    On or about September 15, 2016, one of the recipients of the question responded to Joffe, stating, in part, that the "paper's conclusion was plausible" in the "narrow scope" defined by Joffe.

121.    On or about September 16, 2016, one of Joffe's team confirmed that Sussmann would convey the false information to the FBI regarding the supposed connection between Donald J. Trump and Alfa Bank, with the plan to deceive.

122.    In addition, in furtherance of his efforts with Sussmann and Elias to disseminate false allegations regarding Trump, Joffe also exploited his access—which he had through multiple companies, including Neustar, Dissect Cyber, and Zetalytics—to unlawfully search, gather and mine internet data, including non-public and proprietary data, to obtain derogatory information on

Donald J. Trump.[35]

    a. The purpose of obtaining such data was to create an "inference" and "narrative" regarding Trump's purported ties to Russia.[36]

    b. Those actions were directed by and/or done at the behest of certain "VIPs" of the Clinton Campaign and Perkins Coie.[37]

    c. Those "VIPs" include Clinton, Sullivan, Elias and/or Sussmann.

123.    Among other things, Neustar, Joffe and their associates—at the direction of Clinton, the Clinton Campaign and the DNC — exploited access to non-public and proprietary internet data, including without limitation, domain name system (DNS) internet traffic, of: (i) a healthcare provider; (ii) Trump Tower; (iii) Donald Trump's private apartment in Central Park West, and (iv) the Executive Office of the President of the United States (EOP).[38]

    k. In doing so, Joffe and Neustar intentionally accessed, without authorization or in excess of any authorization, the computers, servers, and/or other sensitive data sources at the above-stated facilities.

    l. Furthermore, Joffe and Neustar stole trade secrets, in the form of proprietary, sensitive and confidential data, information, and knowledge, from the above-stated facilities.

124.    With regard to the EOP, Joffe and Neustar had come to access and maintain dedicated servers for the EOP as part of a highly sensitive arrangement whereby Neustar provided DNS resolution services to the EOP.[39]

---

[35] Sussmann Indictment ¶¶ 21-23; *see also* Motion to Inquire into Potential Conflicts of Interest ¶ 4 (ECF Doc. No. 35), *United States v. Sussmann*, case no. 1:21-cr-00582-CRC, District of Columbia (Feb. 11, 2022) (hereinafter "Sussmann Conflict Motion").

[36] Sussmann Indictment ¶ 23.

[37] *Id.* ¶ 22-23; *see also* Sussmann Conflict Motion ¶¶ 4-5.

[38] *Id.*

[39] *Id.*

125.     Joffe and Neustar exploited this arrangement by, among other things, mining the EOP's DNS traffic and other data for the purpose of gathering derogatory information about Donald J. Trump.

126.     In addition, Joffe, Neustar, and their associates queried their holdings of non-public internet data against a lengthy list of more than 9,000 IP addresses, 3,000 internet domains, and 60 e-mail addresses and domains that related to Donald J. Trump, the Trump Organization, and numerous Trump associates, in their search for derogatory information.

**As the Presidential Race Takes Form,**
**The Steele Dossier Is Used To**
**Mislead Federal Law Enforcement**

127.     The Republican National Committee ("RNC") held its presidential nominating convention from July 18 through July 21, 2016, wherein Donald J. Trump was nominated as the Republican Nominee for President of the United States in the 2016 election.

128.     On July 26, 2016, Clinton won the nomination of the Democratic Party to be its presidential candidate for the 2016 Presidential Election.

129.     That very same day, a briefing from the U.S. intelligence community warned that it had intercepted communications concerning the "alleged approval by Hillary Clinton. . . of a proposal from one of her foreign policy advisors to vilify Donald Trump by stirring up a scandal claiming interference by Russian security services."[40]

130.     With the stage set and the election cycle underway, the Defendants put their plan into action.

131.     Specifically, the Defendants began feeding false information to federal law

---

[40] Letter from John Ratcliffe, Dir.  of Nat'l Intelligence, to Sen.  Lindsey Graham, Chairman, S.  Comm.  on the Judiciary (Sept.   29, 2020), https://www.judiciary.senate.gov/imo/media/doc/09-29-20_Letter%20to%20Sen.%20 Graham_Declassification%20of%20FBI's%20Crossfire%20Hurricane%20Investigations_20- 00912_U_SIGNEDFINAL.pdf.

enforcement authorities, while simultaneously spreading those same lies through the media.  All

in an effort to cast malicious aspersions on Donald J. Trump, the Trump Campaign, and the Trump

Organization

132.    The opening salvo occurred in early-to-mid July 2016, when Steele—a paid FBI

informant—began sending his dossier memoranda to the FBI, knowing that they contained false

information on Donald J. Trump purporting to show compromising ties to Russia.[41]

133.    On the morning of July 31, 2016, Steele met with Nellie Ohr and Bruce Ohr, at

which time Steele discussed his work on the Steele Dossier. Bruce Ohr was already aware at that

time that Steele was "sharing his information with the Clinton campaign."[42]

134.    On that same day, the FBI opened a Foreign Agents Registration Act ("FARA")

investigation, known as Operation Crossfire Hurricane ("Crossfire Hurricane"), into whether

individuals associated with the Trump Campaign were witting of and/or coordinating activities

with the Russian government.

135.    Among others at the FBI, Crossfire Hurricane was led by FBI Deputy Assistant

Director Peter Strzok, FBI Director James Comey, and FBI Deputy Director, Andrew McCabe,

with involvement and assistance from, among others, FBI Special Counsel Lisa Page and FBI

attorney Kevin Clinesmith.

    a.    Text messages between Strzok and FBI Special Counsel Lisa Page, who were

        engaged in an illicit affair during that time, reveal that both of them had an utter

        disdain for the subject of their investigation, Donald J. Trump, and were

        determined to ensure that Hillary Clinton won the 2016 presidential election.

    b.    For example, on August 8, 2016, Page texted Strzok, "[Trump's] not ever going

---

[41] *Id*. at ¶ 2; *see also* IG Report.
[42] S. REP. NO. 116-290, vol. 5, at 909–10.

to become president right? Right?!." Strzoke replied, "No. No he's not. We'll stop it."

c. The text messages also contained reference to an "insurance policy" that was being cultivated by Strzok, Page, McCabe, Comey and others at the FBI, in the event that Trump were to win the election:

d. For instance, on August 15, 2016, Strzok texted Page: I want to believe the path you threw out for consideration in Andy's (Andrew McCabe, Deputy Director of the FBI) office that there's no way Trump gets elected—but I'm afraid we can't take that risk. It's like an insurance policy in the unlikely event you die before you're 40 … *"*

e. This reference to an "insurance policy" reveals that Strzok and Page intended to ensure that, if Donald. J. Trump did indeed win the presidential election, that he would be quickly removed from office or, at a minimum, unable to effectively govern.

136.    By August 16, 2016, the FBI had opened individual cases under the Crossfire Hurricane umbrella as to four United States individuals, Carter Page, George Papadopoulos, Paul Manafort, and Michael Flynn.

137.    Three of these individuals, Page, Papadopoulous, and Manafort, were associated with the Trump Campaign.

138.    The focus of Crossfire Hurricane quickly became to obtain a FISA warrant, authorizing the spying and electronic surveillance of Carter Page, a foreign policy advisor with the Trump Campaign.

139.    To surveil an American citizen, the FISA requires that there be probable cause that

the target is an "agent of a foreign power" who is "knowingly engag[ing]…in clandestine intelligence activities." In short, to legitimately obtain a FISA warrant against Carter Page, the FBI had to demonstrate that he was a Russian agent who was knowingly engaging in intelligence activities on behalf of Russia.

140.    In August 2016, Bruce Ohr met with Andrew McCabe and Lisa Page and briefed them on the false accusation contained in the Steele Dossier, particularly those concerning Carter Page.

141.    On September 19, 2016, Steele provided reports from the Steele Dossier to the FBI, which contained false information regarding Carter Page and his purported ties to Russia.

142.    Thereafter, the FBI applied for four (4) separate FISA warrants as to Carter Page.

143.    In doing so, the FBI relied substantially on the Dossier as a means of establishing probable cause that Carter Page was a witting agent of the Russian Federation.

144.    Indeed, McCabe would later testify before Congress, behind closed doors, in December 2017, that, if not for the Steele Dossier, no FISA warrant would have been issued.[43]

145.    Each of the FISA applications set forth the FBI's assessment that Carter Page was a knowing agent of Russia and further alleged—in reliance on the Dossier—that Carter Page was part of a "well-coordinated conspiracy of co-operation between the Trump Campaign and the Russian government."

146.    The FBI ultimately obtained a total of four court approved FISA applications targeting Carter Page, which authorized intrusive electronic surveillance of him from in or about October 2016 through in or about September 2017.

147.    The first application was approved on October 21, 2016 ("FISA #1"), and three

---

[43] 120919-examination.pdf (justice.gov) at fn. 264.

renewal applications were approved on January 12, 2017 ("FISA # 2"), April 7, 2017 ("FISA # 3"), and June 29, 2017 ("FISA # 4").

148.    The FISA applications were reviewed by numerous FBI agents, FBI attorneys, and National Security Division (NSD) attorneys and, as required by law, was ultimately certified by then FBI Director James Comey and approved by then Deputy Attorney General Sally Yates.[44]

149.    In fact, no probable cause existed and there was no truth to any of the allegations against Carter Page, Donald J. Trump, or the Trump Campaign.

150.    Strzok was directly involved in the decision to open Crossfire Hurricane and the four FISA applications.  Additionally, "the documentation opening each of the four individual investigations was approved by Strzok."[45]

151.    Furthermore, Comey and Sally Yates approved the first renewal application. Comey and then Acting Attorney General Dana Boente approved the second renewal.  Acting FBI Director Andrew McCabe and then Deputy Attorney General (DAG) Rod Rosenstein approved the third renewal.[46]

152.    McCabe received regular briefings on the progress of Crossfire Hurricane and discussed the investigation with Comey at regular briefings.[47]

153.    Clinesmith was assigned to provide legal support to FBI personnel working on Crossfire Hurricane. Clinesmith worked with the National Security Division of the United States Department of Justice to prepare the FISA applications to obtain authority from the United States Foreign Intelligence Surveillance Court.[48]

---

[44] *Id*. (Page 6)
[45] *Id* at 349
[46] *Id.* at *7*
[47] 120919-examination.pdf (justice.gov) (Page 69)
[48] *See generally* Indictment, *United States v.  Clinesmith*, case no.  1:20-cr-00165-JEB, District of Columbia (Aug. 14, 2020) (hereinafter, "Clinesmith Indictment").

154.     While 'assisting' the FBI, Clinesmith doctored an email with the Central Intelligence Agency. Clinesmith communicated with the CIA regarding whether Carter Page was a source. [49]

155.     Clinesmith took the email he received and added the words "not a source" and provided the doctored email to the FBI.[50]

156.     Ohr had regular contact with the Crossfire Hurricane team and provided them with information that appeared in the FBI interview Report Form (FD-302).

157.     James Comey was the Director of the FBI and his actions in this capacity allowed the false Trump-Russia collusion narrative to continue to thrive.

158.     Comey personally signed three FISA applications to spy on Carter Page, with the Dossier serving as part of the basis for the warrant requests.

159.     Comey was aware, or should have been aware, that there was no evidentiary basis for the FISA applications and that the Steele Dossier was not a credible source:

   a.   *The Washington Times* reported that it had obtained a three page highly classified memo from September 2016, in which the CIA informed then FBI Director James Comey, that the Clinton Campaign was planning to blame "collusion" between Trump and the Russian government.  The memo shows that Comey was advised by the CIA of what the Clinton campaign had been doing.  Comey was advised of the fact that the Clinton campaign was setting up Donald J. Trump, weeks after the FBI had opened the Crossfire Hurricane investigation into alleged collusion.  That information was a red flag to the FBI and it was ignored, as Comey was aligned with the Clinton Campaign.

---

[49] *Id.*
[50] *Id.*

b.   Comey admitted in December, 2018, during his testimony before the House Judiciary Committee, that prior to signing the FISA application to obtain the warrant to conduct surveillance on Carter Page, that he was aware that the fake Dossier, authored by Steele, was financed by the Clinton Campaign and the DNC, or as he referred to them, "political actors, who opposed Donald J. Trump." Yet, none of that information was disclosed in the FISA applications in October, 2016, or on any of the renewals.

c.   Moreover, Comey during his testimony before the House Judiciary Committee disclosed that when he met with Donald J, Trump in January 2017, in Trump Tower, to brief him on the Dossier, that he failed to inform the incoming President, about who financed the document, despite, the fact that Comey was well aware that it was financed by Hillary Clinton via the DNC and the Clinton Campaign through Perkins Coie.

d.   Comey intentionally withheld that information from Donald J. Trump, as well as in the FISA applications, themselves. Comey not only withheld that information from Donald J. Trump and the FISA Court, so that the scheme could be hidden, but he also pushed back, on behalf of the FBI, requests from Donald J, Trump to investigate the origins of the "salacious material" i.e.: the Dossier. As such, Comey confirmed that he did not tell Donald J. Trump, during his briefing that the Dossier had been paid for by his political opponents, mainly Hillary Clinton, the Clinton Campaign, and the DNC, via the Perkins Coie law firm.

160.   Comey utilized the Steele Dossier as purported evidence to sign FISA documents to conduct surveillance on Carter Page, when he knew that the Dossier was discredited, and failed

36

to advise the FISA court.

161.    Comey failed to tell the FISA court that the Dossier was reportedly funded by the Clinton Campaign and the DNC and compiled by Fusion GPS.

162.    Comey failed to tell the FISA court that the Dossier he relied upon to request a warrant to monitor Carter Page was a product of the Fusion GPS

163.    Comey relied on the Dossier to monitor Carter Page, even though months later he called the information in the Dossier salacious and unverified.

164.    Comey relied on the Dossier, even though the FBI determined the document was only minimally corroborated.

**The Defendants Spread Their False**
**Narrative Through the Media While**
**Sussmann Makes False Statements to**
**Law Enforcement**

165.    At the same time that the FBI's unfounded investigation was underway, the Defendants were also spreading disinformation through the media in their effort of igniting a media frenzy.

166.    Their coordinated efforts at or around that time included, without limitation, the following acts:

  a.   On September 1, 2016, Sussmann met with a reporter to discuss the false Trump-Alfa Bank connection; the reporter would later write an article about the topic.

  b.   On September 12, 2016, Sussmann spoke with Elias, via phone, regarding Sussmann's efforts to communicate with one newspaper on the allegations about Alfa Bank; Sussmann and Elias.  Each billed the call to the Clinton Campaign.

  c.   On September 21, 2016, Steele, Fritsch, and Simpson met with numerous members of the media in Washington D.C., including reporters from *The New York Times*,

*The Washington Post*, *New Yorker*, *Yahoo News*, and *CNN*, to discuss their investigative findings of an alleged "sinister relationship" between Donald J. Trump and Russia, including the "possible coordination of members of Donald J. Trump's campaign team and Russian government officials."[51]

d. In mid-October 2016, Steele again met with reporters of *The New York Times*, *The Washington Post*, and *Yahoo News* and provided additional briefings of his supposed findings concerning a Trump-Russia connection.[52]

167.    The next phase of the plan involved Sussmann meeting with the FBI to provide false evidence and information and to continue their efforts to intentionally mislead federal law enforcement authorities.

168.    In the lead-up to Sussmann's meeting with the FBI, there were numerous meetings between Sussmann and Elias, Neustar, and/or Fusion GPS, all of which were billed to the Clinton Campaign and/or the DNC, including, but not limited to the following:

a. On or about July 29, 2016, Sussmann and Elias met with personnel from Fusion GPS in Elias' office; Sussmann billed his time for this meeting to the Clinton Campaign under the category "General Political Advice"[53] with the billing description "meeting with Elias, others regarding [] confidential project."

b. In early August 2016, Sussmann met with Steele to advise him of a potential connection between Trump Tower and the Russian Alfa Bank; his time was billed to the Clinton Campaign.[54]

---

[51] *Crime in Progress* at 110; *see also* IG report at 105.

[52] *Id.* at 117.

[53] For all of Sussmann's other billing entries cited herein that he billed to the Clinton Campaign, he similarly billed his time to the Clinton Campaign under the category "General Political Advice."

[54] Tr. of Interview at 74–75, H. Permanent Select Comm. on Intelligence Interview of Michael Sussmann (Dec. 18, 2017), https://www.dni.gov/files/HPSCI_Transcripts/2020-05-04-Michael_Sussmann-MTR_Redacted.pdf; Tr. of Steele Dep. at 1–2.

    c.   On about August 12, 2016, Sussmann met with Elias and Joffe in Elias' office; the meeting was billed to the Clinton Campaign with the billing description "confidential meetings with Elias, others."

    d.   On or about August 17, 2016, Sussmann had a conference call with Elias and Joffe; his time was billed to the Clinton Campaign with the billing description "telephone conference with Joffe."

    e.   On or about August 19, 2016, Sussmann had another meeting with Elias and Joffe; Sussmann billed his time to the Clinton Campaign with the billing description stating, in part, "confidential meeting with Elias, others[.]"

    f.   On or about August 20, 2016, Sussmann met with a representative of Fusion GPS and communicated with the media; he billed his time to the Clinton Campaign with the billing description, "Meeting with consultant and Elias; revisions to White Paper; meeting with expert; meeting with expert and reporter; follow up meeting with reporter; conversations with Elias."

169.    On or about September 15, 2016, just four days before Sussmann's meeting with the FBI, Elias exchanged emails with Sullivan, as well as the Clinton Campaign's manager and communications director, concerning the plot to falsely connect Donald J. Trump to the Russian bank, Alfa Bank, by disseminating the lies to the media.[55]

170.    On or about September 19, 2016, Sussmann met with the FBI General Counsel at FBI Headquarters in Washington D.C. to convey his allegations of the connection between Donald J. Trump and the Russian bank.

171.    During this meeting, the following, in substance and in part, took place:

---

[55] Sussmann Indictment ¶ 25.

a.  Sussmann stated falsely that he was not acting on behalf of any client, which led the FBI General Counsel to understand that Sussmann was conveying the allegations as a good citizen and not as an advocate for any client.

b.  Sussmann stated that he had been approached by multiple cyber experts concerning the Russian bank connections allegations; Sussmann provided the names of three cyber experts, but did not name or mention Neustar, Joffe, the Clinton Campaign, or any other person or company referenced above.

c.  Sussmann described the allegations of a secret Trump Organization server that was in communication with the Russian bank, including that the Russian bank had used a TOR exit node located at a healthcare company to communicate with the Trump Organization.

d.  Sussmann stated that media outlets were in possession of information about the Trump Organization's secret server, and that a story would be published on Friday of that week.

e.  Sussmann provided to the FBI General Counsel two thumb drives and hard copy papers, which contained and comprised the following: (i) the aforementioned white paper that Sussmann had assisted in drafting, entitled *White Paper #1 AuditableV3*, which contained no date or author's name; (ii) a white paper drafted by a researcher, which was entitled, *White Paper Comments: Time Series Analysis of Recursive Queries*, dated September 19, 2016, and contained no author's name; (iii) white paper drafted by Fusion GPS regarding the Russian Bank and its parent company, which contained no date or author's name; and (iv) eight files containing the Russian Bank data and other purported data and information relating to the

mail.trump-email.com domain.

172.    Sussmann reported the Trump-Alfa Bank connection, as though it was real, and lied

to the FBI General Counsel, by falsely stating that he was not acting on behalf of any client, when

he was specifically there at the behest of Clinton, the Clinton Campaign, and the DNC.  In fact, he

billed the Clinton Campaign for his efforts, as he had with all of his actions taken in furtherance

of the Defendants' conspiracy.

173.    Sussmann's statement to the FBI General Counsel that he was not acting on behalf

of any client was knowingly and intentionally false.  In truth, and as Sussmann well knew, he and

his firm, Perkins Coie, had been acting on behalf of and in coordination with four specific clients,

*i.e.,* Neustar, Clinton, the Clinton Campaign, and the DNC in assembling and conveying his

allegations.

174.    Sussmann billed his meeting with the FBI General Counsel to the Clinton

Campaign with the billing description, "work and communications regarding confidential project."

175.    Sussmann concealed and failed to disclose, among other things, that, (i) he had

spent time drafting one of the white papers he provided to the FBI General Counsel and billed that

time to the Clinton Campaign, and (ii) Fusion GPS, which at the time was also acting as a paid

agent of the Clinton Campaign and the DNC, drafted another of those white papers.

176.    Sussmann's lies and omissions were material because, among other reasons, they

misled the FBI General Counsel and other FBI personnel concerning the political nature of his

work and deprived the FBI of information that might have permitted it more fully to assess and

uncover the origins of the relevant data and technical analysis, including the identities and

motivations of Sussmann's clients.

177.    Had the FBI uncovered the origins of the relevant data and analysis, it would have

learned, among other things, that (i) in compiling and analyzing the Alfa Bank allegations, Joffe had exploited his access to non-public data at multiple internet companies to conduct opposition research concerning Donald J. Trump; (ii) in furtherance of these efforts, Joffe had enlisted, and was continuing to enlist, the assistance of researchers at a U.S.-based university who were receiving and analyzing internet data in connection with a pending federal government cybersecurity research contract; and (iii) Sussmann, Elias, Perkins Coie, Joffe, and Neustar had coordinated, and were continuing to coordinate with representatives and agents of the Clinton Campaign and the DNC, with regard to the data and written materials that Sussmann gave to the FBI and the media.

178.    Immediately, after the aforementioned September 19, 2016, meeting, the FBI General Counsel spoke with the Assistant Director of the FBI's Counterintelligence Division. During their conversation, the FBI General Counsel conveyed the substance of his meeting with Sussmann.  The Assistant Director took contemporaneous handwritten notes which reflect, in substance, the above-referenced statements by Sussmann and stated, among other things: "Michael Sussmann – Atty: Perkins Coie, LLP not doing this for any client."

179.    In the days following Sussmann's meeting with the FBI General Counsel, and as a result of that meeting, the FBI opened an investigation of the Trump-Alfa Bank allegations.

180.    The FBI's investigation of these allegations nevertheless concluded that there was insufficient evidence to support the allegations of a secret communications channel with the Russian bank.  In particular, and among other things, the FBI's investigation revealed that the email server at issue was not owned or operated by the Trump Organization but rather, had been administered by a mass marketing email company that sent advertisements for Trump hotels and hundreds of other clients.

181.    Moreover, demonstrating that Sussmann carried out the aforementioned work on behalf of his clients, Sussmann continued in the weeks following this meeting to coordinate with Joffe, Elias, and Fusion GPS, to disseminate the Russian bank allegations to the media.

182.    For example, on or about October 10, 2016, Sussmann emailed a reporter a link to an opinion article which asserted, in substance and in part, that investigative reporters had not published as many stories regarding Donald J. Trump as other media outlets.

183.    In or about late October 2016, approximately one week before the 2016 U.S. Presidential Election, multiple media outlets reported that U.S. government authorities had received and were investigating allegations concerning a purported secret channel of communications between the Trump Organization and a particular Russian bank, Alfa Bank.

184.    One of these articles, published by the *New Yorker* on October 8, 2016, stated:

> Examining records for the Trump domain, Max's group discovered
> D.N.S. lookups from a pair of servers owned by Alfa Bank, one of
> the largest banks in Russia.  Alfa Bank's computers were looking up
> the address of the Trump server nearly every day.  There were
> dozens of lookups on some days and far fewer on others, but the
> total number was notable: between May and September, Alfa Bank
> looked up the Trump Organization's domain more than two
> thousand times.  "We were watching this happen in real time—it
> was like watching an airplane fly by," Max said.  "And we thought,
> Why the hell is a Russian bank communicating with a server that
> belongs to the Trump Organization, and at such a rate?"

185.    On or about October 31, 2016, eight days before the 2016 Presidential Election, Sullivan put out a written campaign statement that claimed that Trump and the Russians had set up a "secret hotline" through Alfa Bank and that "federal authorities" were investigating "this direct connection between Trump and Russia." He portrayed the shocking discovery as the work of independent experts—"computer scientists"—without disclosing their attachment to Hillary Clinton or the Clinton Campaign.  The full statement was as follows:

> [T]his could be the most direct link yet between Donald Trump and Moscow. Computer scientists have apparently uncovered a covert server linking the Trump Organization to a Russian-based bank. This secret hotline may be the key to unlocking the mystery of Trump's ties to Russia. It certainly seems the Trump Organization felt it had something to hide, given that it apparently took steps to conceal the link when it was discovered by journalists. This line of communication may help explain Trump's bizarre adoration of Vladimir Putin and endorsement of so many pro-Kremlin positions throughout this campaign. It raises even more troubling questions in light of Russia's masterminding of hacking efforts that are clearly intended to hurt Hillary Clinton's campaign. We can only assume that federal authorities will now explore this direct connection between Trump and Russia as part of their existing probe into Russia's meddling in our elections.

186.   Sullivan was acting in the scope and authority of his employment with the Clinton Campaign when he made this false statement, which was made with the intention of harming Trump and his campaign.

187.   Elias, acting in the scope and authority of the Clinton Campaign, assisted Sullivan with the statement, as evidenced by his billing entries submitted to the Clinton Campaign.

188.   On the same day, Clinton published the same false and damaging statements to the public through her Twitter account, wherein she included a photograph of Sullivan's statement along with her own commentary: "Computer scientists have apparently uncovered a covert server linking the Trump Organization to a Russian-based bank."[56]

189.   A second tweet from Clinton on that same day said that it was "time for Trump to answer serious questions about his ties to Russia." It also included a graphic stating the following:

> 1. Donald Trump has a secret server. (Yes, Donald Trump.) 2. It was set up to communicate privately with a Putin-tied Russian bank called Alfa Bank. 3. When a reporter asked about it, they shut it down. 4. One week later, they created a new server with a different

---

[56] Hillary Clinton (@HillaryClinton), Twitter (Oct. 31, 2016, 8:36 PM), https://twitter.com/hillaryclinton/status/793250312119263233?lang=en.

name for the same purpose.[57]

190.    Clinton made these statements despite her awareness that they were patently false and that neither Donald J. Trump nor the Trump Organization had any ties to Alfa-bank.  She was driven by a pathological need to stop Trump from ever entering the White House irrespective of the damage and national discord it would cause.

191.    The Defendant, John D.  Podesta, Hillary Clinton's campaign chairman, also pushed the false Trump-Russia allegations.  After Wikileaks released internal Clinton campaign emails, Podesta told reporters on October 11, 2016, that "I've been involved in politics for nearly five decades.  This definitely is the first campaign that I've been involved in which I've had to tangle with Russian intelligence agencies who seem to be doing everything they can on behalf of our opponent."

192.    He then stated, without even a shred of evidence that "I think it is a reasonable assumption to, or at least a reasonable conclusion, that Mr.  Stone had advance warning, and the Trump campaign had advance warning about what Assange was going to do."[58]

193.    On November 9, 2016, in spite the Defendants' collective efforts, Trump won the 2016 Presidential Election.

194.    Despite his victory, the Defendants' efforts continued unabated.

195.    In mid-November 2016, Glenn Simpson met personally with Bruce Ohr, at his request, to discuss Fusion GPS's findings regarding Russia and the election.

196.    Mr. Ohr concealed this meeting from the Department of Justice; he was later

---

[57] Hillary Clinton (@HillaryClinton), Twitter (Oct.  31, 2016, 7:32 PM),
https://twitter.com/HillaryClinton/status/793234169576947712?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed
%7Ctwterm%5E793234169576947712%7Ctwgr%5E%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fthenationalde
sk.com%2Fnews%2Famericas-news-now%2Ftweets-by-hillary-clinton-allegedly-support-accusations-her-
campaign-paid-to-spy-on-trump-donald-president-emails-russia-john-durham-michael-susmann
[58] https://time.com/4528049/hillary-clinton-john-podesta-emails-hackers-russia/

45

reprimanded and demoted for doing so.

197.    On December 10, 2016, Glenn Simpson provided a thumb drive to Bruce Ohr containing most of the reports comprising the Steele Dossier. Ohr, in turn, provided the thumb drive to the FBI.

198.    Ten days later, on December 20, 2016, Bruce Ohr provided a second thumb drive to the FBI, containing anti-Trump "opposition research" reports prepared by his wife, Nellie Ohr, in her capacity as a Fusion GPS employee.

199.    Over time, the FBI attempted to investigate, vet, and analyze the Dossier, but ultimately was not able to confirm or corroborate most of their substantive allegations.

200.    In the context of those efforts, the FBI learned that Danchenko, a Russian analyst, had served as a central source of information contained in the Dossier.

201.    From January 2017 through November 2017, the FBI conducted numerous interviews with Danchenko (collectively the "Interviews") concerning, among other things, the information that Danchenko had provided to Steele for the Dossier.

202.    During the course of these Interviews, Danchenko plainly admitted that he had "zero" corroboration for the key allegations that he had contributed to the Dossier.

203.    In addition, as alleged in further detail below, Danchenko repeatedly lied to FBI agents during his Interviews.

204.    First, Danchenko falsely stated that he never communicated with Charles Halliday Dolan, Jr, a claim which was patently false.

205.    In fact, Danchenko and Dolan had been in frequent communication since at least April 2016, had gone on a trip together, and had attended numerous meetings and conferences together.

206.    The disclosure of Danchenko's relationship with Dolan would have been incredibly relevant to the FBI's understanding of the contents of the Dossier:

    a.   At all relevant times, Dolan has long held deep ties to the Democratic Party operative and has been a close associate of and adviser to Hillary Clinton.

    b.   As a result, Dolan frequently interacted with senior Russian Federation leadership whose names would later appear in the Dossier, such as Putin spokesman Dmitry Peskov and then-Russian ambassador to the US Sergey Kislyak.

    c.   Also, in 2006, the Kremlin signed a deal with Ketchum, the PR firm where Dolan served as vice president for public affairs.  As part of that agreement, Ketchum was to handle global public relations for the Russian government as well as the state-owned energy company Gazprom.

207.    In fact, as detailed above, many of the allegations contained in the Dossier came *directly from* Dolan, who had conveyed them to Danchenko who, in turn, reported them to Steele.

208.    Dolan 's role as a contributor of information to the Dossier was highly relevant and material to the FBI's evaluation of those reports because:

    a.   Dolan maintained pre-existing and ongoing relationships with numerous persons named or described in the Dossier, including one of Danchenko's Russian sub-sources,

    b.   Dolan maintained historical and ongoing involvement in Democratic politics, which bore upon Dolan's reliability, motivations, and potential bias as a source of information for the Dossier, and

    c.   Danchenko gathered some of the information contained in the Dossier at events in Moscow organized by Dolan and others that Danchenko attended at Dolan's

invitation.   Certain allegations that Danchenko provided to Steele, and which

appeared in the Dossier, mirrored and/or reflected information that Dolan himself

also had received through his own interactions with Russian nationals.

209.    On or about January 13, 2017, Dolan replied to an email sent by a U.S.-based person

discussing a recent news article regarding the Dossier, wherein Dolan stated:

> [] I've been interviewed by the Washington Post and the London
> Times -three times over the last two days over the Steele Dossier on
> Trump and I know the Russian agent who made the report (He used
> to work for me).  My client in [Foreign Country] [Business] has been
> accused of being the party that organized the hacking.  Presently
> speaking with the barrister in London who is filing a brief against
> Steele has been unmasked as the man behind an explosive dossier
> about US president-elect Donald Trump.  Also in conversation with
> former British Ambassador who knows Steele.  Quite right -Oh what
> a boring life.

210.    At that time, Danchenko was not publicly known to be a source for Steele.

211.    On March 16, 2017, Danchenko informed the FBI that he believed the source in the

above-referenced allegations referred, at least in part, to the Chamber President.  He repeated these

claims in subsequent interviews on or about March 16, 2017, May 18, 2017, October 24, 2017,

and November 2, 2017.

212.    Meanwhile, Sussmann and Joffe continued to play their part in the Defendants'

grand conspiracy.

213.    Through late 2016 and early 2017, Joffe and a researcher continued to compile

additional information and data regarding the Alfa Bank allegations and gathered other purported

data allegedly involving Donald J. Trump's related computer networks which they claimed tied

him to Russia.

214.    Around that time, Sussmann began arranging a meeting with the Central

Intelligence Agency (CIA) to continue spreading his lies.

215.    On or about February 9, 2017, Sussmann met with two CIA employees at a location outside the District of Columbia.

216.    At the meeting, the following, in substance and in part, occurred:

    a.   Sussmann stated falsely – as he previously had stated to the FBI General Counsel that he was "not representing a particular client." In truth and in fact, and as Sussmann had acknowledged to the Former Employee just days earlier, Sussmann was indeed representing a client.

    b.   Sussmann disclosed that Perkins Coie, was active in representing several Democratic Party causes and officer-holders, including both the DNC and Clinton. Sussmann stated, however, that such work was unrelated to his reasons for contacting the CIA.

    c.   Sussmann discussed and described the updated allegations, including new details concerning the Russian Bank allegations that he had not provided to the FBI General Counsel.

    d.   Sussmann provided to the CIA employees (i) several white papers, and (ii) multiple data files containing purported DNS data, ranging from 2016 through early 2017.

217.    As he had done in his prior meeting with the FBI, Sussmann—acting on behalf of the Clinton Campaign and the DNC—again lied to and intentionally mislead federal law enforcement officials in furtherance of the Defendants' scheme.

218.    That Sussmann was acting on behalf of, and in coordination with, the Clinton Campaign and the DNC when he made his false statements to the FBI and the CIA was confirmed in December 2017, when Sussmann testified under the penalty of perjury before the House

Permanent Select Committee on Intelligence:

> Q: [] When you decided to engage the two principals, one, [the FBI General Counsel] in September, and the general counsel of [Agency-2] in December, you were doing that **on your own volition,** based on information another client provided you. Is that correct?

> [Sussman]: No.

> Q: So what was – so did your client direct you to have those conversations?

> [Sussman]: Yes.

> Q: Okay. And your client also was witting of you going to [the CIA] in February to disclose the information that individual had provided you?

> [Sussman]: **Yes**

> [ . .. ]

> Q: Okay. I want to ask you, so you mentioned that **your client directed you** to have these engagements with the FBI and [redacted] and to disseminate the information that client provided you. Is that correct?

> [Sussmann]: [] [W]e had a conversation, as lawyers do with their clients, about client needs and objectives and the best course to take for a client. And so it may have been a decision that we came to together. I mean, I don't want to imply that I was sort of directed to do something against my better judgment, or that we were in any sort of conflict, but this was -- I think it's most accurate to say it was done on behalf of my client.

219.    Meanwhile, the Defendants' continued their campaign of spreading disinformation through the media.

220.    On March 7, 2017, Mook acknowledged during a Fox & Friends appearance, that there was a wiretap of Russian officials in contact with associates of President Trump, and that surveillance may have been conducted on Trump computers as well.

221.    In October of 2017, Podesta went on Twitter and accused Donald J. Trump of

"running a "big lie campaign" centered on the investigation into Russian meddling in the U.S. election."[59]

**A String of Federal Investigations
Clear Donald J. Trump and
Uncover the Defendants' Illicit Conspiracy**

222.    On May 9, 2017, Comey was fired from his position of Director of the FBI.

223.    Shortly thereafter, in the wake of his firing, Comey took retaliatory action against Donald J. Trump.

224.    During his time with the FBI, Comey had documented several of his interactions with Donald J. Trump in a series of memos. After he was no longer an employee of the FBI, Comey intentionally shared these memos with one of his lawyer friends, who he directed to leak to a *New York Times* reporter who had been reporting on the Russia conspiracy theory.

225.    The leak was investigated by the Office of the Inspector General (IG) which, in an August 2019 report, faulted Comey for the "unauthorized disclosure of sensitive investigative information, obtained during the course of FBI employment, in order to achieve a personally desired outcome."[60]

226.    The outcome that Comey desired—per his own admission to Congress—was to "prompt" the appointment of a special counsel to investigate Donald J, Trump' alleged conspiracy with the Russian movement.

227.    The IG's report noted that Comey had "set a dangerous example" by "release[ing] sensitive information" to "create public pressure for official action."

228.    Comey was successful in getting the special master appointed, due to his unlawful

---

[59] https://www.yahoo.com/news/trump-behind-apos-big-lie-164719959.html
[60] Report of Investigation of Former Federal Bureau of Investigation Director James Comey's Disclosure of Sensitive information and Handling of Certain Memoranda, Office of the Inspector General, Oversight and Review Division 19-02, August 2019, https://oig.justice.gov/reports/2019/o1902.pdf (hereinafter, the "IG Report (Aug. 2019).

leaking of information, even though Comey didn't have enough evidence to pursue it in his own official capacity.

229.   In May 2017, Robert Mueller was appointed as Special Counsel to "oversee the previously-confirmed FBI investigation of Russian government efforts to influence to 2016 Presidential Election and related matters."[61]

230.   Strzok, the leader of the Russia probe, texted Lisa Page in May 2017 that he was reluctant to join Mueller's probe and leave his senior FBI post because he feared "there's no big there, there."[62]

231.   In addition, in May 2017, Page told Representative John Ratcliffe "it still existed in the scope of possibility that there would be literally nothing" to connect Trump and Russia, no matter what Mueller or the FBI did."

232.   On March 22, 2019, Special Counsel Robert Mueller concluded his 22-month investigation and submitted his confidential report entitled "Report on the Investigation into Russian Interference in the 2016 Presidential Election" (the "Mueller Report") to Attorney General William Barr.

233.   The Mueller Report demonstrated that, after a two-year long investigation coming on the heels of a year-long FBI investigation, the Special Counsel found no evidence that Donald J. Trump or his campaign ever colluded with the Russian government to undermine the 2016 election.

234.   Specifically, Special Counsel Mueller "did not find that the Trump campaign, or anyone associated with it, conspired or coordinated with the Russian government in these efforts,

---

[61] Appoint of Special Counsel (press release), US Department of Justice, May 17, 2017, https://www.justice.gov/opa/pr/appointment-special-counsel.
[62] Lisa Page bombshell: FBI couldn't prove Trump-Russia collusion before Mueller appointment | The Hill

despite multiple efforts from Russian-affiliated individuals to assist the Trump campaign."[63]

235.    In March of 2019, shortly after the Muller Report determined there was no evidence of collusion, Reines went on Fox News and continued to accuse Donald J. Trump falsely.

236.    Reines debated with Mollie Hemingway who told Reines that the conspiracy was over and Reines responded: "You saying it on FOX doesn't make it so.  He's under investigation by 17 other entities including the Southern District of New York."[64]

237.    Starting in or around 2019, two additional probes were launched to investigate the origins of the FBI's Crossfire Hurricane.

238.    First, the Office of the Inspector General performed a review to determine whether the Crossfire Hurricane investigation was adequately predicated and whether the FBI had acted on false and misleading information.

239.    Through this investigation, the IG uncovered numerous deficiencies with the FBI's conduct.

240.    In a report dated December 9, 2019, the IG identified "at least 17 significant errors or omissions in the Carter Page FISA applications, and many additional errors in the Woods Procedure."[65]

241.    Thereafter, on January 23, 2020, the DOJ formally admitted to the FISC that, with respect to at least the last two warrant applications, "if not earlier, there was insufficient predication to establish probable cause to believe that [Dr.] Page was acting as an agent of a foreign power."

242.    The FISC has also issued several rulings finding that FISA warrants contained material omissions and misstatements, lacked candor, and/or that the warrants were not lawfully

---

[63] Letter from AG William Barr, March 24, 2019.
[64] https://www.realclearpolitics.com/video/2019/03/24/mollie_hemingway_vs_philippe_reines_on_mueller_its_important_to_understand_philippe_its_over.html#!
[65] IG Report (12/19).

obtained:

    a.  In an Order dated December 17, 2019, the FISC stated: "The frequency with which representations made by FBI personnel turned out to be unsupported or contradicted by information in their possession, and with which they withheld information detrimental to their case, calls into question whether information contained in other FBI applications is reliable."

    b.  In an Order dated January 7, 2020, the FISC stated: "The Court understands the government to have concluded, in view of the material misstatements and omissions, that the Court's authorizations were not valid.

    c.  In an Order dated March 5, 2020, the FISC stated: "There is thus little doubt that the government breached its duty of candor to the Court with respect to those applications [involving Carter Page]."

    d.  In an Order dated June 25, 2020, the FISC stated: "The government acknowledges that there were material omissions, and the Court has found violations of the government's duty of candor, in all four applications [regarding Carter Page]."

243.    In light of these admissions, as well as the obvious questions about the legitimacy of Crossfire Hurricane, Attorney General William Barr assigned John Durham, the United States Attorney for the District of Connecticut, to lead an investigation on behalf of the Department of Justice into Crossfire Hurricane.

244.    Thereafter, on October 19, 2020, Barr officially appointed Durham to serve as Special Counsel and to continue his investigation into the origins of Crossfire Hurricane.

245.    On September 16, 2021, less than a year into his investigation, Durham indicted Sussmann for one count of making a false statement to a federal law enforcement in violation of

18 U.S.C. § 1001(a)(2) for, on September 19, 2016, "stat[ing] to the General Counsel of the FBI that Sussmann was not acting on behalf of any client in conveying the particular allegations concerning [Donald J. Trump], when in truth, and in fact, and as [Sussmann] well knew, he was acting on behalf of specific clients, namely, [Joffe] and the Clinton Campaign."[66]

246.     On November 3, 2021, Durham indicted Danchenko for five separate counts of violating 18 U.S.C. § 1001(a)(2) for making false statements to a law enforcement officials:[67]

e.   Count One alleges that Danchenko violated 18 U.S.C. § 1001(a)(2) on June 15, 2017 when he "denied to agents of the FBI that he had spoken with [Dolan] about any material contained in the [Steele Dossier], when in truth and in fact, and as the defendant well knew, [Dolan] was the source for an allegation contained in the [Steele Dossier] dated August 22, 2016 and was otherwise involved in the events and information described in the reports."[68]

f.   Count Two alleges that Danchenko violated 18 U.S.C. § 1001(a)(2) on March 16, 2017 when he "stated to agents of the FBI that he received a late July 2016 telephone call from an individual who Danchenko believed was 'probably' Chamber President-1, when in truth and in fact, and as [Danchenko] well knew, Chamber President-1 never called Danchenko."[69]

g.   Count Three alleges that Danchenko violated 18 U.S.C. § 1001(a)(2) on May 18, 2017 when he "stated to agents of the FBI that he 'was under the impression' that a late July 2016 telephone call that he received was from Chamber President-I,

---

[66] Indictment at 27, *United States v. Sussmann*, case no. 1:21-cr-00582-CRC, District of Columbia (Sept. 16, 2021) (hereinafter, "Sussmann Indictment").
[67] *See generally* Indictment, *United States v. Danchenko*, case no. 1:21-cr-00245-AJT, Eastern District of Virginia (Nov. 3, 2021) (hereinafter, Danchenko Indictment")
[68] *Id.* at 37.
[69] *Id.*

when in truth and in fact, and as the defendant well knew, Chamber President-I never called Danchenko."[70]

h.  Count Four alleges that Danchenko violated 18 U.S.C. § 1001(a)(2) on October 24, 2017 when he "stated to agents of the FBI that he believed that he spoke to Chamber President-I on the telephone on more than one occasion, when in truth and in fact, and as the defendant well knew, Danchenko never spoke to Chamber President-I."[71]

i.  Count Five alleges that Danchenko violated 18 U.S.C. § 1001(a)(2) on November 16, 2017 when he "stated to agents of the FBI that he believed that he had spoken to Chamber President-I on the telephone, when in truth and in fact, and as the defendant well knew, Danchenko never spoke to Chamber President-I."[72]

247.  On December 17, 2021, Durham filed a motion to inquire into potential conflicts of interests in Danchenko's criminal case, notifying the court to a potential conflict of interest since Danchenko's defense counsel also represents the Clinton Campaign, noting that "the interests of the Clinton Campaign and [Danchenko] could potentially diverge in connection with any plea discussions, pre-trial proceedings, hearings, trial, and sentencing proceedings."

248.  In the motion, Durham also confirms that his office is actively investigating the Clinton Campaign for its role in the subject matter of this action, stating that "[a]reas of inquiry that may become relevant . . . include topics such as (1) the Clinton Campaign's knowledge or lack of knowledge concerning the veracity of information in the Company Reports sourced by the defendant, (2) the Clinton Campaign's awareness or lack of awareness of the defendant's

---

[70] *Id.* at 38.
[71] *Id.*
[72] *Id.*

collection methods and sub-sources, (3) meetings or communications between and among the

Clinton Campaign, U.S. Investigative Firm-1, and/or U.K.  Person-1 regarding or involving the

defendant, (4) the defendant's knowledge or lack of knowledge regarding the Clinton Campaign's

role in and activities surrounding the Company Reports, and (5) the extent to which the Clinton

Campaign and/or its representatives directed, solicited, or controlled the defendant's activities."

He further noted that "the Clinton Campaign and [Danchenko] each might have an incentive to

shift blame and/or responsibility to the other party for any allegedly false information that was

contained within the Company Reports and/or provided to the FBI."[73]

249.    On January 25, 2022, in a discovery-related motion in the Sussmann criminal case,

it was revealed that Durham has already questioned a "former employee of the Clinton Campaign"

and has served document requests and/or subpoenas on the Clinton Campaign and a "political

organization" – likely the DNC.[74]

250.    On February 11, 2022, Durham filed a motion to inquire into potential conflicts of

interest in the Sussmann case.  Notably, in reference to Neustar and Joffe's exploitation of non-

public data in connection with the Defendants' conspiracy, Durham states that "among the Internet

data [Joffe] and his associates exploited was domain name system ("DNS")  Internet traffic

pertaining to (i) a particular healthcare provider, (ii) Trump Tower, (iii) Donald Trump's Central

Park West apartment building, and (iv) the Executive Office of the President of the United States

("EOP"),"  and  specifically  notes  that  "[Joffe]  and  his  associates  exploited  [a  sensitive]

arrangement [with the EOP] by mining the EOP's DNS traffic and other data for the purpose of

---

[73] *See generally* Motion to Inquire into Potential Conflicts of Interest (ECF Doc.  No.35), *United States v.  Danchenko*,
case no.  1:21-cr-00245-AJT, Eastern District of Virginia (Dec.  17, 2021).
[74] *See* Government's Discovery Update and Request for Additional Time to Produce Residual Discovery Materials,
*United States v.  Sussmann*, case no.  1:21-cr-00582-CRC, District of Columbia (Jan.  25, 2022).

gathering derogatory information about Donald Trump."[75]

**The Defendants' Malicious Conspiracy**
**Remains Active to This Day**

251.    The Defendants' collective effort to falsely implicate and publicly denigrate Donald J. Trump has not ceased and, in fact, the Defendants continue to proliferate the injurious falsehood that Donald J. Trump colluded with Russia to this very day.

252.    Fusion GPS, Simpson, Fritsch, and Steele continued their collective mission to fabricate evidence and disparage Donald J. Trump with it, well after Trump won the 2016 election.

253.    Since 2017, The Democracy Integrity Project ("TDIP") has paid Fusion GPS, Steele and their associates more than $3.8 million to continue their 'opposition research' against Donald J. Trump and to continue pushing the false Trump-Russia narrative.

254.    In particular, TDIP has paid $3.3 million to Fusion GPS; $250,000 to "Walsingham Partners Ltd.," a London-based firm owned by Steele and his partner, Christopher Burrows; nearly $130,000 to "Edward Austin Ltd." a London-based intelligence consultancy operated by Edward Baumgartner, a Fusion GPS contractor; and $148,000 to the law firm Zuckerman Spaeder, which has represented Fusion GPS in a variety of Dossier-related legal matters.

255.    Philippe Reines has continued to insist that Donald J. Trump colluded with Russia.

256.    On, April 16, 2018, Reines tweeted "yes collusion, yes collusion, yes collusion" in response to an article titled: 'Breaking: Trump puts the brake on new Russian sanctions, reversing Haley's announcement.'

257.    Debbie Wasserman Schultz has also continued to maintain that Donald J. Trump

---

[75] *See generally* Motion to Inquire into Potential Conflicts of Interest (ECF Doc. No.35), *United States v. Sussmann*, case no. 1:21-cr-00582-CRC, District of Columbia (Feb. 11, 2022).

colluded with Russia.

258.    For instance, on May 10, 2019, Schultz appeared on MSNBC and boldly announced

that there were "clear indications" that Donald J. Trump colluded with Russia.  She went on to

state:

> You know, what's so disturbing is that Donald Trump is so lacking
> in confidence about his ability to actually get elected without the
> help of a foreign power, and particularly a foreign adversary, that
> they will go to any lengths and that he will instruct and allow his
> colleagues and allies to go to any lengths to be able to secure his
> success in an election.[76]

259.    Likewise, Clinton has continued to drum up the false Trump-Russia narrative in the

hopes of damaging Trump's political career.

260.    For example, on June 16, 2021, Clinton appeared on MSNBC's *Morning Joe* show

and again attempted to reinforce the debunked Trump-Russia story—of which she led the effort to

manufacture and is no doubt aware is false—when she stated to MSNBC's audience, which

included the general public of the State of Florida and the rest of the United States: "We don't

have Trump as spokesperson for Putin, anymore."  "After disastrous Trump presidency, in which

he gave Putin a green light to do whatever he wanted to do, once Trump was elected, of course..."

261.    On February 16, 2022, in response to media reports concerning the filing of

Durham's February 11, 2022 motion, Clinton tweeted that "Trump & Fox are desperately spinning

up a fake scandal to distract from his real ones.  So it's a day that ends in Y.  The more his misdeeds

are exposed, the more they lie.  For those interested in reality, here's a good debunking of their

latest nonsense."[77]

262.    These are but a few of the recent examples of the Defendants' ongoing efforts to

---

[76]https://www.realclearpolitics.com/video/2019/05/11/wasserman_schultz_trump_clearly_colluded_with_russia_and
_engaged_in_obstructed_justice_to_cover_it_up.html
[77] https://twitter.com/HillaryClinton/status/1494036101572575232.

maintain their conspiracy to spread injurious falsehoods against Donald J. Trump.

263.    As a direct and proximate cause of the Defendants' actions, Trump has sustained significant injuries and damages including, but not limited to, expenses in the form of defense costs, legal fees and related expenses incurred in connection with his efforts to defend against the Defendants' tortious actions, false accusation, and overall fraudulent scheme to discredit and delegitimize him, the Trump Campaign and Administration, and the Trump Organization and the various federal investigations and official proceedings that arose therefrom, which to date is in an amount no less than twenty-four million dollars ($24,000,000) and continuing to accrue, as well as the loss of existing and future business opportunities.[78]

264.    It was a goal of the Defendants' conspiracy, and indeed a foreseeable and natural consequence of the same, that this substantial economic harm would befall Trump.  The Plaintiff does not claim nor seek any compensation for damage to his reputation, but rather, he seeks damages for the cost of dealing with the legal issues and political issues, which he was required to spend to redress the injurious falsities which were propounded by the Defendants, and all other losses incurred due to the tortious conduct of the Defendants.

265.    All precedent acts and requirements have been done or have been waived by the Defendants.

266.    The Plaintiff was required to retain the attorneys named below to bring this action and to pay them reasonable attorneys' fees.

**Count I**
**RICO**
**(18 U.S.C. § 1962(C))**
*(Against Clinton, Clinton Campaign, DNC, Perkins Coie, Elias, and Sussmann)*

---

[78] The different opportunities which evaporated are too many to list, but as an example, Donald J. Trump has been banned from different social media platforms, including Twitter.  Most of this was due to the misinformation campaign waged by Hillary Clinton, whereby truth was deemed false and lies were deemed to be truth.

267.     The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

268.     The Defendants, Clinton, the Clinton Campaign, the DNC, Perkins Coie, Elias, and Sussmann (collectively, the "RICO Defendants") are all "persons" within the meaning of 18 U.S.C. § 1961(3).

<b>The RICO Enterprise</b>

269.     At all relevant times, the RICO Defendants, Clinton, the Clinton Campaign, the DNC, Perkins Coie, Elias, and Sussmann, constituted an association in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. § 1961(4).

270.     The members of the Enterprise are a group of persons associated together for the common purpose of carrying on an ongoing enterprise; specifically, the Enterprise had a common, unlawful goal of dismantling the Plaintiff's political career and/or impeding his ability to effectively govern through fraudulent, deceptive, and criminal means, including, but not limited to, falsely implicating the Plaintiff, the Trump Campaign, and the Trump Administration as colluding with Russia.

271.     By virtue of the RICO Defendants' professional relationships and frequent business collaborations, the Enterprise had an existence and legitimate business and political purpose separate and apart from the racketeering activity itself.

272.     Since the Enterprise's activities had a significant effect on the 2016 presidential race, and affected fundraising and electoral spending, the Enterprise affected interstate and foreign commerce.

273.     The Enterprise was formed as early as April 2015 and remains ongoing and continuing to the present day.

274.     Considering the nature of the RICO Defendants' longstanding political and

professional relationship, the continuing nature of Clinton's political career, her ever-present political rivalry with Plaintiff, and the nature of the Enterprise's goals, the longevity of the Enterprise is sufficient to permit the RICO Defendants to pursue the Enterprise's ongoing goal of damaging the Plaintiffs' political career with the continuing proliferation, and/or threat of proliferation, of disinformation, obstruction of justice, and other unlawful tactics intended to damage the Plaintiff's political career and to impede his ability to effectively govern.

275.    The members of the Enterprise have longstanding inter-relationships rooted in their political and professional connections, in addition to common control, ongoing business dealings, and mutual interest and participation in common activities and dealings.

276.    The Enterprise has, or at all relevant times had, an organized, clearly delineated, ongoing organizational framework and command structure for carrying out its objectives: the Clinton Campaign and the DNC were at all relevant times mutually controlled by Clinton, who worked in tandem with their joint counsel, Perkins Coie, whose partners, Sussmann, and Elias, simultaneously served as general counsel for the Clinton Campaign and the DNC.

277.    No RICO Defendant has withdrawn, or otherwise dissociated itself, from the Enterprise.

**Predicate Acts**

278.    Section 1961(1) of RICO also provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1832 (relating to theft of trade secrets) and 18 U.S.C. §§ 1503 and/or 1512 (obstruction of justice).  As set forth herein, in furtherance of the scheme to defraud the Plaintiff, the RICO Defendants engaged in numerous acts in violation of 18 U.S.C. § 1832 and 18 U.S.C. § 1503 and/or 1512, including, without limitation, as set forth herein.

279.    Each RICO Defendant has conducted and participated in, directly or indirectly, the

management, conduct and/or operation of the Enterprise and its affairs through a pattern of racketeering activity including acts indictable under 18 U.S.C. § 1832 (theft of trade secrets) and 18 U.S.C. § 1503, and/or 1512 (obstruction of justice).

280.   The RICO Defendants have consistently and regularly committed acts of racketeering activity spanning from at least April 2015.  These multiple acts shared a common or related purpose, goal, result, participants, victims, and methods of commission.

281.   Beginning in or around April 2015, the RICO Defendants engaged in wide-ranging and fraudulent scheme to concoct a false narrative that the Plaintiff and his campaign were colluding with Russia to undermine the 2016 Presidential Election.

282.   The RICO Defendants, through their deceptive and fraudulent conduct intended to mislead law enforcement, the media, and the public at large and to impede, obstruct and falsely provoke federal investigations against the Plaintiff, the Trump Campaign, and the Trump Administration.

283.   In furtherance of this scheme, the Defendants committed multiple related acts, each of which constitutes an act of racketeering activity, and which, collectively, constitute a pattern of racketeering activity.

### *Theft of Trade Secrets (18 U.S.C. § 1832)*

284.   In violation of 18 U.S.C. § 1832(a)(5), the RICO Defendants conspired with Neustar and Joffe, on at least two occasions, abused and exploited access to non-public and highly sensitive data sources and/or servers, and acquired obtained in excess of authorization and/or stole proprietary, sensitive and confidential internet data, records and/or information, including without limitation, DNS internet traffic data pertaining to Plaintiff, including data originating from his servers located at his private New York residence and those located at Trump Tower and used in

connection with his business, The Trump Organization LLC, a company involved in interstate commerce, and stole trade secrets in violation of 18 U.S.C. § 1832 (theft of trade secrets).

285.    DNS internet traffic data houses highly proprietary, sensitive and confidential data. For example, among other things, an analysis of raw DNS data could reveal a comprehensive view into an individual or a company's website traffic, e-mail traffic, webmail traffic, chat messaging, in addition to the types of technology, hardware, software, programs, securities and processes being utilized by the servers.

286.    The RICO Defendants conspired with Neustar and Joffe to exploit access to non-public data sources and/or servers and unlawfully acquire, steal and exploit sensitive, proprietary and confidential internet data, including without limitation, DNS information, traffic, and/or data originating from computers and/or servers (i)  located at Plaintiff's private apartment in Central Park West in New York and belonging to the Plaintiff; and (ii) located at Trump Tower and belonging to The Trump Organization, in which Plaintiff has an ownership interest (collectively, with the computers and/or servers house in Plaintiff's private apartment, "Plaintiff's Servers).

287.    By conspiring to illegally access the above-mentioned information and data, the RICO Defendants, through Neustar and Joffe, were able to obtain proprietary, sensitive, and/or confidential information and data including, among other things, the number and frequency of e-mail communications between the Plaintiff's Servers and other third party servers, the number and frequency of website visits to third party websites by the Plaintiff's Servers, the number and frequency of webmail interactions between the Plaintiff's Servers and other third party servers, and the number and frequency of chat messaging interactions between the Plaintiff's Servers and other third party servers, as well as information pertaining to the types of technology, hardware, software, programs, securities and processes being utilized by Plaintiff's Servers.

288.     This information and data revealed highly proprietary, sensitive, and confidential knowledge, including insight into Plaintiff's and The Trump Organization's business dealings, financial dealings, communications, future and current plans, techniques, patterns, methods, processes, and procedures, as well as identification of their corporate partners, political associates, clients, and vendors.

289.     This proprietary, sensitive and confidential information, data and/or knowledge constitutes trade secrets within the meaning of 18 U.S.C. § 1839(3) where they constitute business and/or political methods, techniques, processes, procedures and programs that are both protected from disclosure by the Plaintiff and derive significant economic value from not generally being known to or ascertainable by others, including the RICO Defendants, who can obtain economic value from disclosure or use of such information.

290.     The Plaintiff and The Trump Organization restricts access to their proprietary, sensitive and confidential information and data, including DNS data,  even within their own personnel and prevents unauthorized access to such records by digital or electronic means.

291.     The Plaintiff and The Trump Organization further protects against theft and disclosure of such information by third parties by the requirement of executed non-disclosure agreements prior to providing any such access.

292.     The Plaintiff's confidential records were misappropriated by Defendants within the meaning of 18 U.S.C. § 1839(5), where the Plaintiff's records were acquired by the RICO Defendants, through their conspiracy with Neustar and Joffe, without the Plaintiff's authorization and through Defendants' acts of espionage or other improper means conducted by electronic or other means.

293.     The RICO Defendants conspired to violate the Defend Trade Secrets Act, 18 U.S.C.

§ 1832(a)(1), by assisting, aiding, and abetting Neustar and Joffe in obtaining Plaintiff's proprietary, sensitive and confidential information and data by fraud, artifice, and deception and, thereafter, stealing, appropriating, taking, carrying away, and concealing the theft of Plaintiff's confidential records with intent to convert Plaintiff's confidential records, which are related to products sold in interstate and foreign commerce, to Defendants' own benefit, while knowing and intending that such misappropriation would injure the Plaintiff.

294.    Each of the RICO Defendants were aware of, and active participants in, the conspiracy for Neustar and Joffe's to violate the Defend Trade Secrets Act, 18 U.S.C. § 1832, and each of the RICO Defendants committed at least one act in furtherance of this goal.

295.    The RICO Defendants' actions constitute a conspiracy to steal trade secrets in violation of 18 U.S.C. § 1832(a)(5).

### *Obstruction of Justice (18 U.S.C. §§ 1503, 1512)*

296.    The RICO Defendants, through and using the Enterprise, engaged in, and continues to engage in, a coordinated effort to destroy the Plaintiff's political career and impede his ability to effectively govern as President of the United States.  This coordinated effort amounts to a set of related predicate acts with similar purposes, results, and methods, which included acts in violation of 18 U.S.C. § 1503 and/or 1512 (obstruction of justice).

297.    On one or more occasions, the RICO Defendants, knowingly and deliberately provided falsified, altered and misleading records, including the White Papers and the Dossier, to law enforcement officials and made false statements to law enforcement officials, including the FBI and CIA, with the intention of obstructing, impeding, influencing and/or impairing their investigations into alleged Russian collusion, and/or conspired with others to carry out these acts.

298.    On September 19, 2016, Sussmann met with FBI officials in Washington D.C., at

which time he, among other things: (i) made false statements to FBI officers, including that he was acting on behalf of any client; (ii) provided falsified, altered and/or misleading records, including the White Papers, to FBI officials; (iii) withheld and/or concealed pertinent information, including without limitation the true nature of the White Papers, his work with Neustar and Joffe, the falsity of the purported link between Trump Tower and Alfa Bank, and the existence of the Enterprise and its overarching conspiracy to create a false narrative of Trump-Russia collusion.

299.    On September 19, 2016, Sussmann met with FBI officials in Washington D.C., at which time he, among other things: (i) made false statements to FBI officials, including that he was not acting on behalf of any client; (ii) provided falsified, altered and/or misleading records, including (1) *White Paper #1 AuditableV3,* (2) *White Paper Comments: Time Series Analysis of Recursive Queries,* (3) a white paper drafted by Fusion GPS regarding a purported Trump-Alfa Bank connection, and (4) eight files containing falsified, altered, and/or curated data and information relating to Alfa Bank, Trump Tower, and the mail.trump-email.com domain, to FBI officials; (iii) withheld and/or concealed pertinent information, including, without limitation, that he was acting on behalf of his clients, Clinton, the Clinton Campaign, the DNC, and in furtherance of the Enterprise, the falsified and/or misleading nature of the White Papers and the other documents that he was handing over, the true nature of his work with Neustar and Joffe, the falsity of the purported link between Trump Tower and Alfa Bank, and the existence of the Enterprise and its overarching conspiracy to create a false narrative of Trump-Russia collusion.

300.    Sussmann's conduct in connection with his September 19, 2016 meeting with the FBI corruptly obstructed, influenced, and impeded and/or endeavored to obstruct, influence or impede the due administration of justice and/or one or more official proceeding(s), namely Crossfire Hurricane and/or other ongoing investigations by the FBI, the DOJ, the CIA, and/or the

IG, and therefore constituted a violation of 18 U.S.C. §§ 1503 and/or 1512.

301.    On February 9, 2017, Sussmann met with CIA officials at a location outside of Washington D.C., at which time he, among other things: (i) made false statements to CIA officials, including that he was not representing a particular client; (ii) provided falsified, altered and/or misleading records, including the White Papers and multiple data files containing purported DNS data, ranging from 2016 through early 2017, to CIA officials; (iii) withheld and/or concealed pertinent information, including, without limitation, that he was acting on behalf of his clients, Clinton, the Clinton Campaign, the DNC, and in furtherance of the Enterprise, the falsified and/or misleading nature of the White Papers and the other documents that he was handing over, the true nature of his work with Neustar and Joffe, the falsity of the purported link between Trump Tower and Alfa Bank, and the existence of the Enterprise and its overarching conspiracy to create a false narrative of Trump-Russia collusion.

302.    Sussmann's actions on February 9, 2017 corruptly obstructed, influenced, and impeded and/or endeavored to obstruct, influence or impede the due administration of justice, and/or one or more official proceedings, namely, ongoing investigations by the CIA, the FBI, the IG, and/or the DOJ and therefore constituted a violation of 18 U.S.C. §§ 1503 and/or 1512.

303.    The other RICO Defendants, Clinton, Clinton Campaign, DNC, Perkins Coie, and Elias, had a meeting of the minds, common intent, were aware of, and conspired with Sussmann in the commission of the above-mentioned violations of 18 U.S.C. § 1512, including, without limitation, his conduct in connection with his meeting with the FBI on September 19, 2016 and his meeting with the CIA on February 9, 2017, and each of the other RICO Defendants committed an overt act in furtherance of said violation(s), and the RICO Defendants conspired to commit the above-named acts in furtherance of the overarching conspiracy to denigrate the Plaintiff and to

derail his political career.

304.    Therefore, the actions of the RICO Defendants, Clinton, Clinton Campaign, DNC, Perkins Coie, and Elias, constituted a conspiracy to obstruct justice in violation of 18 U.S.C. § 1512(k).

305.    By virtue of the foregoing, Sussmann, and the other RICO Defendants, willfully, knowingly, deliberately and corruptly obstructed, influenced, and impeded and/or endeavored to obstruct, influence or impede the due administration of justice, and/or one or more official proceedings, including, but not limited to, Crossfire Hurricane and/or other investigations by the FBI, the CIA, the IG, and the DOJ.

306.    In addition, the RICO Defendants conspired with Fusion GPS, Fritsch, Simpson, Orbis Ltd., Steele, and Danchenko to produce the Steele Dossier, which contained falsified, misleading and inaccurate representations about the alleged Trump-Russia connection, and which they knew would be provided to law enforcement, including without limitation the FBI, the DOJ and the CIA, for the purpose of corruptly obstructing, influenced, and impeding and/or endeavoring to obstruct, influence or impede one or more official proceedings, including, but not limited to, Crossfire Hurricane and/or other investigations by the FBI, the CIA, the IG, and the DOJ, in violation of 18 U.S.C. § 1512.

307.    In addition, the RICO Defendants conspired with Danchenko in connection with his conduct in making various false statements and misrepresentations to the FBI in violation of 18 U.S.C. § 1512, including, but not limited to:

    a.  On June 15, 2017, Danchenko stated, at the direction of and in coordination with the RICO Defendants, that he had not spoken with Dolan about any material contained in the Dossier. This statement was patently false, as Danchenko used

the information provided by Dolan as a source for allegations made in the Dossier.

b. On March 16, 2017, May 18, 2017, October 24, 2017, and November 16, 2017, Danchenko, at the direction of and in coordination with the RICO Defendants, directly lied about the sources relied upon in compiling the Dossier.

308.   The RICO Defendants had a meeting of the minds, common intent, were aware of, and conspired with Fusion GPS, Fritsch, Simpson, Orbis Ltd., Steele, and Danchenko in connection with the commission of the above-mentioned violations of 18 U.S.C. § 1512, including, without limitation, the scheme to produce and fraudulently disseminate the Steele Dossier and Danchenko's various false statements to law enforcement, and each of the other RICO Defendants committed an overt act in furtherance of said violations, and the RICO Defendants conspired to commit the above-named acts in furtherance of the overarching conspiracy to denigrate the Plaintiff and to derail his political career.

309.   Therefore, the actions of the RICO Defendants constituted a conspiracy to obstruct justice in violation of 18 U.S.C. § 1512(k).

310.   Based on the foregoing, the RICO Defendants' actions constituted at least two separate violations of 18 U.S.C. §§ 1503 and/or 1512.

311.   All of Defendants' actions in violation of 18 U.S.C. § 1832 occurred after May 11, 2016 and, therefore, qualify as predicate acts pursuant to the 2016 amendment federal RICO statute.

### Damages

312.   The Plaintiff has been injured in his business and property as a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(c).

313.   As a direct and proximate result of Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory,

special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.

314.    Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' actions and the various federal investigations and/or official proceedings which arose therefrom, in addition to the loss of existing and future business opportunities for himself, the Trump Campaign, and the Trump Organization LLC.

315.    All of these injuries were sustained within, and were the result of conduct occurring within the United States.

316.    The Plaintiff is entitled to recover, pursuant to Title 18 United States Code § 1964(c), treble damages in the amount to be determined by offer of proof at time of trial.  The Plaintiff is also entitled to recover attorneys' fees and costs of this litigation, as well as damages arising from lost profits and/or lost business opportunities attributable to the activities engaged in by defendants committed in furtherance of the Enterprise.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Hillary Clinton, HFACC, Inc., the Democratic National Committee, Perkins Coie, LLP, Michael Sussmann, and Marc Elias for damages, including Compensatory and Treble damages, costs, attorneys' fees, and such further and other relief as this honorable Court may deem just and proper.

**Count II**
**RICO Conspiracy**
**(18 U.S.C. § 1962(D))**

*(Against Clinton, Clinton Campaign, DNC, Perkins Coie, Sussmann, Dolan, Sullivan, Podesta, Mook, Reines, Elias, Fusion GPS, Simpson, Fritsch, Nellie Ohr, Bruce Ohr, Orbis Ltd., Steele, Danchenko, Neustar, and Joffe)*

317.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

318.    Defendants, Clinton, the Clinton Campaign, DNC, Perkins Coie, Sussmann, Dolan, Sullivan, Podesta, Mook, Reines, Elias, Fusion GPS, Simpson, Fritsch, Nellie Ohr, Bruce Ohr, Orbis Ltd., Steele, Danchenko, Neustar, and Joffe (the "RICO Conspiracy Defendants")*,* are all "persons" within the meaning of 18 U.S.C. § 1961(3).

319.    The RICO Conspiracy Defendants conspired with each other to violate 18 U.S.C. § 1962(C) and knowingly agreed, conspired and acted in concert for the express purpose of injuring the Plaintiff's political career and/or impeding his ability to effectively govern through a pattern of racketeering activity.

320.    The RICO Conspiracy Defendants knew that they were engaged in a conspiracy to commit the predicate acts, including theft of trade secrets (18 U.S.C. § 1832) and obstruction of justice (18 U.S.C. §§ 1503 and/or 1512), and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern racketeering activity.  This conduct constitutes conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

321.    Each of the RICO Conspiracy Defendants knew about and agreed to facilitate the Enterprise's scheme to fraudulently concoct a scheme to damage the Plaintiff's political career and undermine his ability to effectively govern as the President of the United States through the wrongful acts identified herein.  It was part of the conspiracy that the RICO Conspiracy Defendants

would commit a pattern of racketeering activity in the conduct of the affairs of the enterprise, including the acts of racketeering as set forth herein.

322.    No RICO Conspiracy Defendant has withdrawn, or otherwise dissociated itself, from the conspiracy at issue or the other conspirators.

323.    As a direct and proximate result of RICO Conspiracy Defendants' actions, the Plaintiff has been injured in his business and property has suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.

324.    Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' actions and the various federal investigations and/or official proceedings arose therefrom.

325.    The Plaintiff is entitled to recover, pursuant to Title 18 United States Code § 1964(c), treble damages in the amount to be determined by offer of proof at time of trial.  The Plaintiff is also entitled to recover attorneys' fees and costs of this litigation, as well as damages arising from lost profits and/or lost business opportunities attributable to the activities engaged in by defendants committed in furtherance of the Enterprise.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Michael Sussmann, Perkins Coie, LLP, Hillary R.  Clinton, HFACC, Inc., the Democratic National Committee, the DNC Services Corporation, Charles Halliday Dolan, Jr., Jake Sullivan, John Podesta, Perkins Coie, LLP, Marc Elias, Fusion GPS, Glenn Simpson, Peter Fritsch, Nellie Ohr, Bruce Ohr, Orbis Business

Intelligence, Ltd., Christopher Steele, Igor Danchenko, Neustar, Inc., Rodney Joffe, Robert Mook, Philippe Reines, James Comey, Peter Strzok, Lisa Page, Kevin Clinesmith, Andrew McCabe, John Does 1 through 10, said names being fictious and unknown persons, and ABC Corporations 1 through 10, said names being fictitious and unknown entities, for damages, including compensatory and treble damages, costs, attorneys' fees, and such further and other relief as this Court may deem just and proper.

**Count III**
**Injurious Falsehood**
**(18 U.S.C. § 2701-12)**
*(Against Clinton, Sullivan, Schultz, Danchenko, Sussmann, and Steele)*

326.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

327.    As detailed at length herein, on multiple occasions the Defendants, Clinton, Joffe, Sussmann, Steele, Sullivan, and Schultz, made, disseminated and/or published false and damaging statements concerning the Plaintiff, specifically that he was colluding with Russia and its President Vladimir Putin.

328.    At all relevant times, the Defendants acted with actual malice, as they knew that the Plaintiff was not colluding with Russia or, at a minimum, acted with reckless abandon as to the truth of whether the Plaintiff had colluded with Russia; despite said knowledge, the Defendants conspired to disseminate false information and spread a false narrative in an attempt to ruin the Plaintiff.

329.    These individual Defendants, Clinton, Sullivan, Schultz, Danchenko, Sussmann, and Steele, made, disseminated, and/or published the false and damaging statements to third parties, including, but not limited to, government authorities, media outlets, and the general public.

330.    Clinton, Sullivan, and Schultz, among other things, falsely and deliberately

published false and damaging statements about the Plaintiff and his purported ties with Russia and promoted their false allegations through the media.

331.    In turn, the media heavily reported their allegations story as true, making it appear as if the Plaintiff had colluded with the Russian government, despite the falsity of their claims.

332.    Sullivan, among other things, issued a press release on October 31, 2016, on behalf of Clinton and the Clinton Campaign, in made false and damaging claims about the Plaintiff:

> [T]his could be the most direct link yet between Donald Trump and Moscow.  Computer scientists have apparently uncovered a covert server linking the Trump Organization to a Russian-based bank. This secret hotline may be the key to unlocking the mystery of Trump's ties to Russia.  It certainly seems the Trump Organization felt it had something to hide, given that it apparently took steps to conceal the link when it was discovered by journalists.  This line of communication may help explain Trump's bizarre adoration of Vladimir Putin and endorsement of so many pro-Kremlin positions throughout this campaign.  It raises even more troubling questions in light of Russia's masterminding of hacking efforts that are clearly intended to hurt Hillary Clinton's campaign.  We can only assume that federal authorities will now explore this direct connection between Trump and Russia as part of their existing probe into Russia's meddling in our elections.

333.    Clinton, personally, also published the same false and damaging statements to the public, through her Twitter account on October 31, 2016, and to media outlets.

334.    Clinton continues to publish the false and damaging allegations to media outlets.

335.    For example, on June 16, 2021, Hillary Clinton appeared on the Morning Joe show on MSNBC and stated to the general public of the State of Florida, and the rest of the United States: "We don't have Trump as spokesperson for Putin, anymore."  "After disastrous Trump presidency, in which he gave Putin a green light to do whatever he wanted to do, once Trump was elected, of course."

336.    Schultz has also published numerous false and damaging statements about the

Plaintiff and his alleged collusion with Russia.

337.    For example, she told CNN's Erin Burnett on "OutFront", that reported contacts between President Donald J. Trump's campaign aides and Russia amounted to collusion.   Schultz told the reporter, "[W]ith every passing day, it gets more and more disturbing, and more and more evidence that there was collusion."  "Donald Trump should be the first person asking for one, but since I think he likely was part of it, it's not surprising that hasn't happened."

338.    Danchenko, among other things, submitted falsified evidence to the FBI and published false and damaging statements orally to the FBI.

339.    Sussmann, among other things, submitted falsified evidence to the FBI, DOJ and CIA and published false and damaging statements orally to the FBI.

340.    Steele, among other things knowingly maintained and published to third parties, including, but not limited to the FBI, the false series of reports referred to as the "Steele Dossier."

341.    The individual Defendants knew that the statements were false at the time they made then and also knew or should have known that said statements would damage the Plaintiff's lawful property interests.

342.    As a direct and proximate result of the individual Defendants' unlawful conduct, the Plaintiff has suffered and will continue to suffer economic losses and irreparable injuries.

343.    As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.

344.    Among other things, the Plaintiff was forced to incur expenses Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be

76

in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom.

345.    The Plaintiff does not claim nor seek any compensation for damage to his reputation, but rather, he seeks damages for the cost of dealing with the legal issues and political issues, which he was required to spend to redress the injurious falsities which were propounded by the Defendants, and all other losses incurred due to the tortious conduct of the Defendants.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Hillary Clinton, Jake Sullivan, Debbie Wasserman Schultz, Michael Sussmann, Christopher Steele, and Igor Danchenko, and for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

<u>**Count IV**</u>
**Conspiracy to Commit Injurious Falsehood**
*(Against Clinton, Clinton Campaign, DNC, Perkins Coie, Sussmann, Dolan, Sullivan, Podesta, Schultz, Mook, Reines, Elias, Fusion GPS, Simpson, Fritsch, Nellie Ohr, Bruce Ohr, Orbis Ltd., Steele, Danchenko, Neustar, and Joffe)*

346.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

347.    The Defendants had a meeting of minds to harm the Plaintiff by making false and damaging statements regarding the Plaintiff's alleged collusion with the Russian government, and its President Vladimir Putin, and then disseminating the false and damaging statements by publishing them to third parties, including, but not limited to, government authorities, media outlets, and the general public, in an attempt to cause harm to the Plaintiff.

348.     As such, the Defendants conspired to commit unlawful acts by unlawful means. They had different roles, where some actors, such as Danchenko, Dolan, Steele, and Joffe, were involved in the fabrication of supposed facts to put into the Dossier, and later helped to foist it upon the FBI, while others were more involved with the publishing of the allegations to the media and general public, and still others were more involved in feeding false information federal authorities.

349.     Each of the Defendants executed one or more acts in furtherance of the conspiracy, as detailed in this Complaint, and committed overt acts to harm the Plaintiff in furtherance of the conspiracy.

350.     In this regard, the Defendants conspired to create a false narrative that that the Plaintiff was colluding with Russia through their dissemination of false and damaging statements.

351.     At all relevant times, the Defendants acted with actual malice, as they knew that the Plaintiff was not colluding with Russia or, at a minimum, acted with reckless abandon as to the truth of whether the Plaintiff had colluded with Russia; despite said knowledge, the Defendants conspired to disseminate false information and spread a false narrative in an attempt to ruin the Plaintiff.

352.     Despite this knowledge, that no evidence existed of the collusion, the Defendants further conspired to publish the false information to third parties, such as the FBI, other governmental agencies, the news-media outlets, and the U.S. population, in an attempt to smear the Plaintiff's to harm his chance of being elected and properly administrating his office of President of the United States.

353.     As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damage, including but not limited to, actual,

compensatory, special, incidental, and consequential damage in addition to costs of defense and attorneys' fees.

354.     Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities.

355.     The Plaintiff does not claim nor seek any compensation for damage to his reputation, but rather, he seeks damages for the cost of dealing with the legal issues and political issues, which he was required to spend to redress the injurious falsities which were propounded by the Defendants, and all other losses incurred due to the tortious conduct of the Defendants.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Michael Sussmann, Perkins Coie, LLP, Hillary R. Clinton, HFACC, Inc., the Democratic National Committee, the DNC Services Corporation, Debbie Wasserman Schultz, Charles Halliday Dolan, Jr., Jake Sullivan, John Podesta, Perkins Coie, LLP, Marc Elias, Fusion GPS, Glenn Simpson, Peter Fritsch, Bruce Ohr, Nellie Ohr, Orbis Business Intelligence, Ltd., Christopher Steele, Igor Danchenko, Neustar, Inc., Rodney Joffe, Robert Mook, Philippe Reines, John Does 1 through 10, said names being fictious and unknown persons, and ABC Corporations 1 through 10, said names being fictitious and unknown entities, for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

## Count V
## Malicious Prosecution
*(Against Sussmann, Elias, Danchenko, Fritsch, Simpson, Nellie Ohr, Steele, Joffe, Comey, McCabe, Strzok, Page, and Clinesmith)*

356.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

357.    The Defendants, Sussmann, Elias, Danchenko, Fritsch, Simpson, Nellie Ohr, Steele and Joffe, willfully and knowingly misled FBI and DOJ officials with the intention of inducing the FBI to commence an investigation of the Plaintiff and his alleged collusion with Russia.

358.    The Defendants, Sussmann, Elias, Danchenko, Fritsch, Simpson, Nellie Ohr, Steele and Joffe, concocted a scheme to denigrate the Plaintiff and by so doing, to cause harm to his campaign, and, in the course of carrying out this scheme, conspired to feed false and/or misleading information to the FBI and the DOJ, which prompted the FBI to commence an investigation.

359.    The Defendants, Sussmann, Elias, Danchenko, Fritsch, Simpson, Nellie Ohr, Steele and Joffe, were the legal cause of the commencement of the FBI's investigation into the Plaintiff in that they, among other things, engaged in efforts to falsify information, documents, and/or evidence, such as the Dossier and the white papers, provided said false information, documents and/or evidence to the FBI and the DOJ, made false and/or misleading statements to the FBI and the DOJ concerning, among other things, the facts and circumstances of the development of the Dossier and the white papers, the credibility of their evidence and sources, the individuals and entities behind the Dossier and white papers, and other facts relevant to the Defendants' plot to falsely implicate the Plaintiff.

360.    As a direct and proximate results of the Defendants' efforts, on July 31, 2016, the FBI launched a Foreign Agents Registration Act ("FARA") investigation, known as Crossfire Hurricane, to determine whether individual(s) associated with the Plaintiff and his campaign were

witting of and/or coordinating activities with the Russian government.

361.   In acting to bring forth the false information to commence the investigation by the FBI for the express purpose of harming the Plaintiff, the Defendants acted with malicious intent.

362.   The Defendants, Sussmann, Elias, Danchenko, Fritsch, Simpson, Nellie Ohr, Steele and Joffe, acted with actual malice, as they knew that the Plaintiff was not colluding with Russia or, at a minimum, acted with reckless abandon as to the truth of whether the Plaintiff had colluded with Russia; despite said knowledge, the Defendants conspired to disseminate false information and spread a false narrative in an attempt to ruin the Plaintiff.

363.   Subsequent to the commencement of Crossfire Hurricane, additional Defendants who were well-position within the FBI, Comey, McCabe, Strzok, Page, and Clinesmith, were the legal cause of the continuation of the FBI's investigation and the commencement of extrajudicial FISA surveillance of the Plaintiff and his administration in that they, among other things, engaged in efforts to falsify evidence, information and/or documents, such as an e-mail correspondence regarding Carter Page that was submitted in furtherance of FISA application(s); relied upon knowingly false information including, without limitation, the White Papers and the Steele Dossier, which the Defendants were aware was not credible and was funded by the Clinton Campaign and the DNC; withheld pertinent and material information from FISA applications and in submissions, communications, and correspondences with judges, law enforcement officials, supervisors, superiors, and other government officials; made false and/or misleading statements to the FISC, Congress, and/or the Plaintiff, who at the time was sitting President of the United States; and otherwise misled as to the credibility of the evidence supporting their investigation, the individuals and entities behind the Dossier and white papers, and other facts relevant to the evidentiary basis for Crossfire Hurricane, the FISA applications, the Mueller investigation, and

other related investigations regarding the alleged Trump-Russia connection.

364.    In acting to falsely maintain and continue the investigation(s) by the FBI and the DOJ for the express purpose of harming the Plaintiff, the Defendants, Comey, McCabe, Strzok, Page, and Clinesmith, acted with malicious intent.

365.    The Defendants, Comey, McCabe, Strzok, Page, and Clinesmith, acted with actual malice, as they knew that the Plaintiff was not colluding with Russia or, at a minimum, acted with reckless abandon as to the truth of whether the Plaintiff had colluded with Russia, and they knew that Crossfire Hurricane lacked a legitimate evidentiary basis and was based on a false and contrived premise; despite said knowledge, the Defendants conspired to continue the baseless investigations, to obtain FISA warrants in excess of their lawful authority, and to proliferate the spread of the Defendants' false narrative.

366.    As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.

367.    Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities for himself, the Trump Campaign, and the Trump Organization LLC.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter

a Judgment for Donald J. Trump and against the Defendants, Michael Sussmann, Peter Fritsch,

Glenn Simpson, Christopher Steele, Nellie Ohr, Igor Danchenko, Rodney Joffe, James Comey,

Andrew McCabe, Peter Strzok, Lisa Page, and Kevin Clinesmith for compensatory damages,

Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

<u>**Count VI**</u>
**Conspiracy to Commit Malicious Prosecution**
(*Against Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson, Fritsch, Steele, Ohr,
Danchenko, Joffe, Podesta, Mook, Reines, Comey, McCabe, Strzok, Page, and Clinesmith*)

368.    The Plaintiff avers the allegations contained in the preceding paragraphs and

incorporates them in this count, as if set forth at length herein.

369.    The Defendants, Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson,

Fritsch, Steele, Ohr, Danchenko, and Joffe, had a meeting of minds and a common plan to induce

the FBI and/or the Department of Justice through deceptive means into commencing an unfounded

investigation into the Plaintiff's alleged collusion with the Russian government, Vladimir Putin,

and other government officials.

370.    The Defendants, Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson,

Fritsch, Steele, Ohr, Danchenko, and Joffe, conspired to cause the FBI's investigation to be

commenced, and continue forward, by, among other things, falsifying information, documents,

and evidence, such as the Dossier and the white papers, providing said falsified information,

documents, and evidence to the FBI and the DOJ, and making false and/or misleading statements

to the FBI and the DOJ concerning, among other things, the facts and circumstances of the

development of the Dossier and the white papers, the credibility of their evidence and sources, the

individuals and entities behind the Dossier and White Papers, and other facts relevant to the

Defendants' plot to falsely implicate the Plaintiff.

371.    The Defendants, Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson,

Fritsch, Steele, Ohr, Danchenko, and Joffe, concocted a scheme to denigrate the Plaintiff and tarnish his harm his chance of becoming elected and then to properly and effectively administrate his office of President of the United States.  In the course of carrying out this scheme, they conspired to feed false and/or misleading information to the FBI and the DOJ which prompted the FBI to commence an investigation.

372.    The Defendants, Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson, Fritsch, Steele, Ohr, Danchenko, and Joffe, conspired to do an unlawful act by unlawful means.

373.    The Defendants, Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson, Fritsch, Steele, Ohr, Danchenko, and Joffe, acted with actual malice, as they knew that the Plaintiff was not colluding with Russia or, at a minimum, acted with reckless abandon as to the truth of whether the Plaintiff had colluded with Russia; despite said knowledge, the Defendants conspired to disseminate false information and spread a false narrative in an attempt to ruin the Plaintiff.

374.    Moreover, in conspiring to bring forth the false information to commence the investigation by the FBI for the express purpose of harming the Plaintiff, the Defendants, Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson, Fritsch, Steele, Ohr, Danchenko, and Joffe, acted with malicious intent.

375.    Subsequent to the commencement of Crossfire Hurricane, additional Defendants who were well-positioned within the FBI, Comey, McCabe, Strzok, Page, and Clinesmith, conspired to continue the FBI's investigation and to commence an extrajudicial FISA surveillance of the Plaintiff and his administration in that they, among other things, conspired to falsify evidence, information and/or documents, such as an e-mail correspondence regarding Carter Page that was submitted in furtherance of FISA application(s); conspired to rely upon knowingly false information including, without limitation, the White Papers and the Steele Dossier, which the

Defendants were aware was not credible and was funded by the Clinton Campaign and the DNC; conspired to withhold pertinent and material information from FISA applications and in submissions, communications, and correspondences with judges, law enforcement officials, supervisors, superiors, and other government officials; conspired to make false and/or misleading statements to the FISC, Congress, and/or the Plaintiff, who at the time was sitting President of the United States; and otherwise conspired to mislead as to the credibility of the evidence supporting their investigation, the individuals and entities behind the Dossier and white papers, and other facts relevant to the evidentiary basis for Crossfire Hurricane, the FISA applications, the Mueller investigation, and other related investigations regarding the alleged Trump-Russia connection.

376.   In conspiring to falsely maintain and continue the investigation(s) by the FBI and the DOJ for the express purpose of harming the Plaintiff, the Defendants, Comey, McCabe, Strzok, Page, and Clinesmith, acted with malicious intent.

377.   The Defendants, Comey, McCabe, Strzok, Page, and Clinesmith, acted with actual malice, as they knew that the Plaintiff was not colluding with Russia or, at a minimum, acted with reckless abandon as to the truth of whether the Plaintiff had colluded with Russia, and they knew that Crossfire Hurricane lacked a legitimate evidentiary basis and was based on a false and contrived premise; despite said knowledge, the Defendants conspired to continue the baseless investigations, to obtain FISA warrants in excess of their lawful authority, and to proliferate the spread of the Defendants' false narrative.

378.   Each of the above-named Defendants executed several acts in furtherance of the conspiracy, as detailed at length in this Complaint, and committed overt acts to harm the Plaintiff in the furtherance of the conspiracy.

379.   As a direct and proximate result of the Defendants' actions, the Plaintiff has

suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.

380.   As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damage, including but not limited to, actual, compensatory, special, incidental, and consequential damage in addition to costs of defense and attorneys' fees.

381.   Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Hillary Clinton, Michael Sussmann, Debbie Wasserman Schultz, Charles Halliday Dolan, Jr., Jake Sullivan, Marc Elias, Glenn Simpson, Peter Fritsch, Christopher Steele, Nellie Ohr, Igor Danchenko, and Rodney Joffe, John Podesta, Robert Mook, Philippe Reines, James Comey, Andrew McCabe, Peter Strzok, Lisa Page, and Kevin Clinesmith for compensatory damages, Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

### Count VII
### Computer Fraud and Abuse Act
### (18 U.S.C. § 1030)
*(Against Neustar, Joffe, DNC, Clinton Campaign, Clinton, Perkins Coie, Sussmann)*

382.   The Plaintiff avers the allegations contained in the preceding paragraphs and

incorporates them in this count, as if set forth at length herein.

383.    The computers belonging to the Executive Office of the President of the United States are non-public, belonging to a department or agency of the United States, are exclusively for the use of the United States Government and are involved in interstate and foreign commerce and communications.

384.    The computers belonging to the Trump Organization LLC, located at Trump Tower, are involved in interstate and foreign commerce and communication and, therefore, are protected computers under 18 U.S.C. § 1030(e)(2).

385.    The Defendants' conduct as alleged herein violated 18 U.S.C. §§ 1030(a)(2), 1030(a)(3), 1030(a)(4), and/or 1030(a)(6).

386.    The Defendants, Neustar and Joffe, knowingly, intentionally and unlawfully accessed and/or exceeded their authority to access the computers at the Executive Office of the President of the United States and thereby obtained and used valuable, sensitive and/or proprietary information and data from those computers in violation of 18 U.S.C. § 1030(a)(2)(B), 1030(a)(2)(C), and 1030(a)(3).

387.    Such information and data include, but are not limited to, non-public, sensitive, confidential, classified and/or proprietary internet data, DNS records, techniques, processes, procedures and programs.

388.    Neustar and Joffe also knowingly, intentionally, and unlawfully accessed and/or exceeded their authority to access computers belonging to the Trump Organization LLC, located at the Trump Tower, and thereby obtained and used valuable, sensitive and/or proprietary information and data from those computers in violation of 18 U.S.C. § 1030(a)(2)(C).

389.    Such information and data include, but are not limited to, non-public, sensitive,

confidential and/or proprietary internet data, DNS records, business methods, techniques, processes, procedures and programs.

390.    As detailed at length herein, the Defendants, the DNC, the Clinton Campaign, Clinton, Perkins Coie, and Sussmann conspired with Neustar and Joffe in their commission of the above-stated acts, in violation of 18 § U.S.C. 1030(b).

391.    As a direct and proximate result of the DNC, the Clinton Campaign, Clinton, Perkins Coie, Sussmann, Neustar, and Joffe's violations of 18 U.S.C. § 1030, the Plaintiff has been injured and has sustained a loss in excess of $5,000.

392.    Among other things, the Defendants obtained valuable, sensitive, proprietary and confidential data and information pertaining to the Plaintiff, which they manipulated, falsified and altered for nefarious purposes, and, in addition, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' actions and the various federal investigations and/or official proceedings arose therefrom

393.    The acts of the above-mentioned Defendants which violated 18 U.S.C. § 1030 were not discoverable until September 16, 2021, upon the disclosure of said acts described in the indictment of Michael Sussmann in *United States v. Sussmann*, case no. 1:21-cr-00582-CRC, United States District Court, District for Columbia.

394.    As a direct and proximate result of the Defendant's actions, the Plaintiff has suffered, and continues to suffer, significant damage, including but not limited to, actual, compensatory, special, incidental, and consequential damage, including, among other things, the cost of investigating and responding to the unauthorized access, defending himself against federal

investigations, harm to his business, and loss of trade secrets and/or other proprietary, sensitive or valuable information and data, entitling the Plaintiff to compensatory relief under 18 U.S.C. § 1030(g).

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Neustar, Inc., Rodney Joffe, Perkins Coie, LLP, Michael Sussmann, HFACC, Inc., the Democratic National Committee, the DNC Services Corporation, and Hillary Clinton for compensatory damages, Punitive damages, costs, attorneys' fees, and such further and other relief as this honorable Court may deem just and proper.

### Count VIII
### Theft of Trade Secrets
### (18 U.S.C. § 1830-32)
*(Against Neustar, Joffe, Perkins Coie, Sussmann, Clinton Campaign, DNC, and Clinton)*

395.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

396.    The Plaintiff owns and possesses certain non-public, proprietary, sensitive and confidential information and data, including without limitation, DNS data.

397.    DNS internet traffic data houses highly proprietary, sensitive and confidential data. For example, among other things, an analysis of raw DNS data could reveal a comprehensive view into an individual or a company's website traffic, e-mail traffic, webmail traffic, chat messaging, in addition to the types of technology, hardware, software, programs, securities and processes being utilized by the servers.

398.    Neustar and Joffe, at the direction of Perkins Coie, Sussmann, Clinton Campaign, DNC, and Clinton, exploited access to non-public data sources and/or servers, and unlawfully acquired, stole and exploited sensitive, proprietary and confidential internet data, including without limitation, DNS information, traffic, and/or data originating from computers and/or

servers: (i)located at Plaintiff's private apartment in Central Park West in New York and belonging to the Plaintiff; and (ii) located at Trump Tower and belonging to The Trump Organization, in which Plaintiff has an ownership interest (collectively, with the computers and/or servers house in Plaintiff's private apartment, "Plaintiff's Servers").

399.   Joffe and Neustar exploited their access to non-public data to, among other things, mine DNS traffic and other data from Plaintiff's Servers for the purpose of gathering derogatory information about the Plaintiff.

400.   In doing so, Joffe and Neustar intentionally accessed, without authorization, Plaintiff's Servers.

401.   By illegally accessing the above-mentioned information and data, the Neustar and Joffe, were able to obtain proprietary, sensitive, and/or confidential information and data including, among other things, the number and frequency of e-mail communications between the Plaintiff's Servers and other third party servers, the number and frequency of website visits to third party websites by the Plaintiff's Servers, the number and frequency of webmail interactions between the Plaintiff's Servers and other third party servers, and the number and frequency of chat messaging interactions between the Plaintiff's Servers and other third party servers, as well as information pertaining to the types of software, programs, securities and processes being utilized by Plaintiff's Servers.

402.   This information and data revealed highly proprietary, sensitive, and confidential knowledge, including insight into Plaintiff's and The Trump Organization's business dealings, financial dealings, communications, future and current plans, techniques, patterns, methods, processes, and procedures, as well as identification of their corporate partners, political associates, clients, and vendors.

403.    This proprietary, sensitive and confidential information, data and/or knowledge constitutes trade secrets within the meaning of 18 U.S.C. § 1839(3) where they constitute business and/or political methods, techniques, processes, procedures and programs that are both protected from disclosure by the Plaintiff and derive significant economic value from not generally being known to or ascertainable by others, including the Defendants, who can obtain economic value from disclosure or use of such information.

404.    The Plaintiff and The Trump Organization restricts access to their proprietary, sensitive and confidential information and data, including DNS data, even within their own personnel and prevents unauthorized access to such records by digital or electronic means.

405.    The Plaintiff and The Trump Organization further protects against theft and disclosure of such information by third parties by the requirement of executed non-disclosure agreements prior to providing any such access.

406.    Defendants, Neustar and Joffe, violated the Defend Trade Secrets Act, 18 U.S.C. § 1832(a)(1), by knowingly obtaining the Plaintiff's confidential records by fraud, artifice, and deception and, thereafter, stealing, appropriating, taking, carrying away, and concealing the theft of the Plaintiff's confidential records with intent to convert the Plaintiff's confidential records, which are related to products sold in interstate and foreign commerce, to the Defendants' own benefit, while knowing and intending that such misappropriation would injure the Plaintiff.

407.    Defendants, Perkins Coie, Sussmann, Clinton Campaign, DNC, and Clinton, conspired with Neustar and Joffe to commit the above-named acts in furtherance of the overarching conspiracy to denigrate and spread injurious falsehoods to harm the Plaintiff's political career and to impede his ability to effectively govern.

408.    Defendants, Perkins Coie, Sussmann, Clinton Campaign, DNC, and Clinton,

conspired with Neustar and Joffe to violate the Defend Trade Secrets Act, 18 U.S.C. § 1832(a)(1), by assisting, aiding, and abetting Neustar and Joffe in obtaining Plaintiff's proprietary, sensitive and confidential information and data by fraud, artifice, and deception and, thereafter, stealing, appropriating, taking, carrying away, and concealing the theft of Plaintiff's confidential records with intent to convert Plaintiff's confidential records, which are related to products sold in interstate and foreign commerce, to Defendants' own benefit, while knowing and intending that such misappropriation would injure the Plaintiff

409.    Each of the Defendants, Perkins Coie, Sussmann, Clinton Campaign, DNC, and Clinton, were aware of, and active participants in, the conspiracy for Neustar and Joffe's to violate the Defend Trade Secrets Act, 18 U.S.C. § 1832, and each of the RICO Defendants committed at least one act in furtherance of this goal.

410.    The Plaintiff's confidential records were misappropriated by Defendants within the meaning of 18 U.S.C. § 1839(5), where the Plaintiff's records were acquired by the Defendants, through unlawful and deceptive acts, without the Plaintiff's authorization and through Defendants' acts of espionage or other improper means conducted by electronic or other means.

411.    The theft of the protected trade secrets has damaged the Plaintiff.

412.    The actions of Defendants, Neustar and Joffe, constitute theft of trade secrets in violation of 18 U.S.C. § 1832(a)(1).

413.    The actions of Defendants, Perkins Coie, Sussmann, Clinton Campaign, DNC, and Clinton, constitute a conspiracy to steal trade secrets in violation of 18 U.S.C. § 1832(a)(5).

414.    As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damage, including but not limited to, actual, compensatory, special, incidental, and consequential damage in addition to costs of defense and

attorneys' fees.

415.   Among other things, the Plaintiff was forced to incur, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' actions and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Neustar, Inc., Rodney Joffe, Perkins Coie, LLP, Michael Sussmann, HFACC, Inc., the Democratic National Committee, the DNC Services Corporation, and Hillary Clinton, for compensatory damages, Punitive damages, costs, attorneys' fees, and such further and other relief as this Court may deem just and proper.

<u>**Count IX**</u>
**Stored Communications Act**
**(18 U.S.C. 2701-12)**
*(Against Neustar and Joffe)*

416.   The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

417.   The Defendants, Neustar and Joffee, on one or more occasions willfully and intentionally accessed, without authorization or in excess of any authorization, facilities through which an electronic communication is provided.

418.   Neustar and Joffee obtained unauthorized access to or, at a minimum, exceeded their authorization to access, numerous facilities through which an electronic communication is provided, including, but not limited to: (i) the computers, networks and/or servers of the Plaintiff's private New York residence; (ii) the computers, networks and/or servers of the Executive Office

of the President of the United States; and (iii) the computers, networks and/or servers of the Trump

Organization LLC, specifically located at Trump Tower (collectively, the "Computers").

419.    Neustar and Joffe obtained wire or electronic communications from the

Computers that were in electronic storage in such systems.

420.    The Plaintiff was aggrieved as a direct and proximate result of Neustar and Joffe's

actions, and was caused to suffer significant damage, entitling him to an award for monetary relief

under 18 U.S.C. § 2707(c).

421.    The violations of Neustar and Joffe were willful and intentional, thereby warranting

an award of punitive damages under 18 U.S.C. § 2707(c).

422.    Moreover, in conspiring to bring forth the false information to commence the

investigation by the FBI for the express purpose of harming the Plaintiff, the Defendants, Clinton,

Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson, Fritsch, Steele, Ohr, Danchenko, and Joffe,

acted with malicious intent.

423.    The Plaintiff also seeks an award for attorneys' fees and costs as permitted pursuant

to 18 U.S.C. § 2707(c)

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter

a Judgment for Donald J. Trump and against the Defendants, Neustar, Inc.  and Rodney Joffe, for

compensatory damages, punitive damages, costs, attorneys' fees, and such further and other relief

as this Court may deem just and proper.

### Count X
**Agency**
*(Against Clinton)*

424.    The Plaintiff avers the allegations contained in the preceding paragraphs and

incorporates them in this count, as if set forth at length herein.

425.    Clinton, acting as a principal, used the law firm, Perkins Coie, and the Clinton Campaign as her agents to act on her behalf to carry out the plot against Trump to assure that he would be falsely implicated as colluding with a hostile foreign sovereignty.

426.    Specifically, the Clinton Campaign and the DNC under Clinton's direction put into place a scheme to hire dishonest operatives to put together a collection of lies and innuendo about the Plaintiff and shop it to the FBI.  The statements that were disseminated were knowingly false and damaging.

427.    Clinton directed the DNC and the Clinton Campaign to also retain Perkins Coie, LLP to find proof of a sinister link between Trump and Russia in the lead-up to the 2016 Presidential Election.

428.    The Clinton Campaign and the DNC, under the direction of Hillary Clinton, directed its law firm, Perkins Coie, to hire an outside intelligence firm, Fusion GPS to dig up dirt on the Plaintiff's alleged connections with Russia in 2016.  They paid Fusion GPS approximately $10 million to produce and propagate a false narrative that the Plaintiff had colluded with the Russians.

429.    Clinton attempted to shield her involvement through a barricade of agents working on her behalf.

430.    Once retained Perkins Coie, was tasked with spearheading the mission to find or fabricate proof of a sinister link between Trump and Russia in the lead-up to the 2016 Presidential Election.

431.    The Clinton Campaign also secured Joffe and his company Neustar, Inc.  to help Clinton achieve her goal.

432.    During the lead-up to the 2016 Presidential Election, the Clinton Campaign retained Perkins Coie to perform "opposition research" on the Trump Campaign.

433.    Perkins Coie did not provide legal services to the Defendants, but instead, was commissioned to dig up whatever dirt they could on the Plaintiff, and to the extent there was none, to manufacture it.

434.    Perkins Coie, acting with the knowledge and direction of the Clinton Campaign, then proceeded to proliferate a false narrative that the Trump Campaign was actively colluding with Russian operatives to subvert the 2016 Presidential Election.

435.    Sussmann and Elias, while working for Perkins Coie, and working on behalf of the Clinton Campaign, worked with Joffe and attempted to find any such wrongdoing by the Plaintiff.

436.    Sussmann advised the media and others, falsely and knowingly claiming to demonstrate the existence of a secret communications channel between the Trump Organization and Alfa Bank.  In this regard, Sussmann invoiced the Clinton Campaign for his communications with Joffe and Elias.

437.    Sussmann was also advising the Clinton Campaign in connection with cybersecurity issues, and Perkins Coie, acted as the Clinton Campaign's General Counsel.

438.    Joffe used his access at multiple organizations to gather and mine public and non-public Internet data regarding Trump and his associates, with the goal of creating a "narrative" regarding the candidate's ties to Russia."

439.    Joffe later shared certain results of those data searches and analysis with Sussmann so that Sussmann, in turn, could provide them to the media and the FBI.

440.    Clinton was fully aware of the plan and hired and instructed the necessary parties to make it happen.

441.    Moreover, employees of Perkins Coie, Elias and Sussmann had multiple conferences regarding their work and billed the Clinton Campaign for these meetings.

442.    All of the abovementioned acts were committed by Perkins Coie under the instruction and for the benefit of Hillary Clinton and the Clinton Campaign.

443.    The agents, the Clinton Campaign and Perkins, Coie, LLP, were not acting outside of the instructions of the principal when committing the above-mentioned acts because they were hired for the sole purpose of digging up or manufacturing information on the Plaintiff.

444.    Sussmann, and his firm, Perkins Coie were always acting on behalf of and in coordination with the Clinton Campaign, in assembling and conveying Sussmann's allegations.

445.    Additionally, all of Sussmann's recorded time and work relating to the Russian Bank were billed to the Clinton Campaign.

446.    Clinton is liable as a principal for all of the acts her agents committed against the Plaintiff at her request and for her benefit.

447.    As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damage, including but not limited to, actual, compensatory, special, incidental, and consequential damage in addition to costs of defense and attorneys' fees.

448.    Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities.

449.    The Plaintiff does not claim nor seek any compensation for damage to his reputation, but rather, he seeks damages for the cost of dealing with the legal issues and political

issues, which he was required to spend to redress the injurious falsities which were propounded by the Defendants, and all other losses incurred due to the tortious conduct of the Defendants.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, Hillary Clinton, for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

### Count XI
### Respondeat Superior/Vicarious Liability
*(Against Perkins Coie)*

450.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

451.    Under the doctrine of respondeat superior, the Defendant, Perkins Coie, is vicariously responsible for the torturous conduct of its agents, servants, representatives, employees and/or contractors.

452.    Specifically, under the doctrine of respondeat superior, Perkins Coie is responsible for the tortious actions that its employees, Sussmann and Elias, committed.

453.    Elias and Sussmann were two of Perkins Coie's senior partners responsible for representing the DNC.  The senior partners negotiated the Joint Fund-Raising Agreement between the DNC and the Clinton Campaign in which Hillary Clinton would be permitted to control the party's finances, strategy, and utilize the money that the DNC raised.

454.     Sussmann and Joffe engaged in efforts with Elias and individuals acting on behalf of the Clinton Campaign to manufacture evidence of wrongdoing by the Plaintiff and the existence of a secret communications channel between the Trump Organization and Alfa Bank.

455.    Sussmann reported the Alfa Bank connection as though it was real and lied to the

FBI General Counsel in that he falsely stated that he was not acting on behalf of any client, when he was specifically there at the behest of Clinton, the Clinton Campaign, and the DNC. In fact, he invoiced the Clinton Campaign for his efforts.

456.    From in or about late July through in or about mid-August 2016, Sussmann, Joffe, and Elias coordinated and communicated about the Plaintiff's involvement with Alfa Bank. Sussmann and Perkins Coie invoiced the Clinton Campaign for that conspiratorial meeting.

457.    Elias and Sussmann perpetrated lies about the Plaintiff and falsified evidence. Elias and Sussmann committing these egregious acts while working for a client of their firm. The DNC and the Clinton Campaign hired Perkins Coie and Sussmann and Elias to complete the work as a part of their job.

458.    At all material times, the above-named employees were all acting within the scope of their employment, performing work for their employer at the time of the tortious conduct, and therefore are responsible for the actions of their employees.

459.    As a direct and proximate result of the torturous actions by agents, servants, representatives, employees and/or contractors, as alleged above, Perkins Coie is vicariously liable to the Plaintiff, as he suffered losses due to the actions of the employees who were working within the scope of their employment.

460.    As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damage, including but not limited to, actual, compensatory, special, incidental, and consequential damage in addition to costs of defense and attorneys' fees.

461.    Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and

continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities for himself, the Trump Campaign, and the Trump Organization LLC.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, Perkins Coie, LLP, for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

## Count XII
### Respondeat Superior/Vicarious Liability
*(Against the DNC)*

462.     The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

463.     Under the doctrine of respondeat superior, the Defendant, the DNC, is vicariously responsible for the torturous conduct of its agents, servants, representatives, employees and/or contractors.

464.     Specifically, under the doctrine of respondeat superior, the DNC is responsible for the tortious actions committed by its chairperson, Schultz, and other members and employees.

465.     At all material times, the above-named employees were all acting within the scope of their employment, performing work for their employer at the time of the tortious conduct, and therefore are responsible for the actions of their employees.

466.     As a direct and proximate result of the torturous actions by agents, servants, representatives, employees and/or contractors, as alleged above, the DNC is vicariously liable to

the Plaintiff, as he suffered losses due to the actions of the employees who were working within the scope of their employment.

467.    Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, the Democratic National Committee, the DNC Services Corporation, for Compensatory damages, Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

### Count XIII
**Respondeat Superior/Vicarious Liability**
*(Against the Clinton Campaign)*

468.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

469.    Under the doctrine of respondeat superior, the Defendant, the Clinton Campaign, vicariously responsible for the torturous conduct of its agents, servants, representatives, employees and/or contractors.

470.    Specifically, under the doctrine of respondeat superior, the Clinton Campaign is responsible for the tortious actions committed by its campaign manager, communications director, and foreign policy advisor.

471.    On or about September 15, 2016, Elias exchanged emails with the Clinton

Campaign's campaign manager, communications director, and foreign policy advisor concerning the plot to falsely connect Donald J. Trump to a Russian bank.

472.    At all material times, the above-named employees were all acting within the scope of their employment, performing work for their employer at the time of the tortious conduct, and therefore are responsible for the actions of their employees.

473.    As a direct and proximate result of the torturous actions by agents, servants, representatives, employees and/or contractors, as alleged above, the Clinton Campaign is vicariously liable to the Plaintiff, as he suffered losses due to the actions of the employees who were working within the scope of their employment.

474.    Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, HFACC Inc., for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

### Count XIV
### Respondeat Superior/Vicarious Liability
*(Against Fusion GPS)*

475.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

476.    Under the doctrine of respondeat superior, the Defendant, Fusion GPS is vicariously

responsible for the torturous conduct of its agents, servants, representatives, employees and/or contractors.

477.   Specifically, under the doctrine of respondeat superior, Fusion GPS is responsible for the tortious actions committed by its employees, Fritsch and Simpson.

478.   Elias, in his mission to obtain derogatory anti-Trump 'opposition research,' commissioned Fusion GPS, and its co-founders, Fritsch and Simpson, and directed them to dredge up evidence—legitimate or otherwise, true or otherwise, of collusion between the Plaintiff and Russia.

479.   Fritsch and Simpson, in turn, enlisted the assistance of Orbis Ltd and its owner, Steele, to produce a series of reports setting forth damning evidence of the supposed collusion between the Plaintiff and Russia.

480.   Moreover, the efforts of Ohr to pass the knowingly false Dossier through her husband to the Department of Justice, while she was in the full-time employment of Fusion GPS also leads to the liability of Fusion GPS.

481.   The now-debunked collection of reports, known as the "Steele Dossier" or simply the "Dossier," was riddled with misstatements, misrepresentations and flat out lies.  As it turns out, the Dossier was largely based upon information provided to Steele by his primary sub-source, Danchenko, who admittedly fabricated his claims.

482.   Danchenko had close ties to senior Clinton Campaign official Dolan, who knowingly provided false information to Danchenko, who relayed it to Steele, who reported it in his Dossier and fed it to the FBI and the media.

483.   Fritsch and Simpson were hired and working for their company Fusion GPS when they fabricated research and evidence.

484.   At all material times, the above-named employees were all acting within the scope of their employment, performing work for their employer at the time of the tortious conduct, and therefore are responsible for the actions of their employees.

485.   As a direct and proximate result of the torturous actions by agents, servants, representatives, employees and/or contractors, as alleged above, Fusion GPS is vicariously liable to the Plaintiff, as he suffered losses due to the actions of the employees who were working within the scope of their employment.

486.   Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, Fusion GPS, for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

### Count XV
### Respondeat Superior/Vicarious Liability
(*Against Orbis Business Intelligence Ltd*)

487.   The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

488.   Under the doctrine of respondeat superior, the Defendant, Orbis, vicariously responsible for the torturous conduct of its agents, servants, representatives, employees and/or contractors.

489.    Specifically, under the doctrine of respondeat superior, Orbis is responsible for the tortious actions committed by its employee, Steele.

490.    Fritsch and Simpson enlisted the assistance of Orbis Ltd and its owner, Steele, to produce a series of reports setting forth damning evidence of the supposed collusion between the Plaintiff and Russia.

491.    The now-debunked collection of reports, known as the "Steele Dossier" or simply the "Dossier," was riddled with misstatements, misrepresentations and flat out lies.  As it turns out, the Dossier was largely based upon information provided to Steele by his primary sub-source, Danchenko, who admittedly fabricated his claims.

492.    Danchenko had close ties to senior Clinton Campaign official, Dolan, who knowingly provided false information to Danchenko, who relayed it to Steele, who reported it in his Dossier and fed it all the way back up the chain.

493.    Fusion GPS was hired to create the fabricated Dossier and Steele was working for the company when he created it.

494.    At all material times, the above-named employees were all acting within the scope of their employment, performing work for their employer at the time of the tortious conduct, and therefore are responsible for the actions of their employees.

495.    As a direct and proximate result of the tortious actions by agents, servants, representatives, employees and/or contractors, as alleged above, Orbis is vicariously liable to the Plaintiff, as he suffered losses due to the actions of the employees who were working within the scope of their employment.

496.    As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damage, including but not limited to, actual,

compensatory, special, incidental, and consequential damage in addition to costs of defense and attorneys' fees.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, Orbis Business Intelligence Ltd., for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

### Count XVI
### Respondeat Superior/Vicarious Liability
*(Against Neustar)*

497.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

498.    Under the doctrine of respondeat superior, the Defendant, Neustar vicariously responsible for the torturous conduct of its agents, servants, representatives, employees and/or contractors.

499.    Specifically, under the doctrine of respondeat superior, Neustar is responsible for the tortious actions committed by its employee, Joffe.

500.    The Clinton Campaign secured Neustar, Inc.  which is run by Joffe, to help Hillary Clinton achieve her goal.

501.     Sussmann and Elias, while working for Perkins Coie, LLP, and working on behalf of the Clinton Campaign, worked with Joffe and attempted to find wrongdoing by the Plaintiff or the Trump Organization.

502.    Sussmann advised the media and others, falsely and knowingly claiming to demonstrate the existence of a secret communications channel between the Trump Organization and Alfa Bank.  In this regard, Sussmann invoiced the Clinton Campaign for his Communications

with Joffe and Elias.

503.    Sussmann was also advising the Clinton Campaign in connection with cybersecurity issues, and Perkins Coie, acted as the Clinton Campaign's General Counsel.

504.    Joffe used his access at multiple organizations to gather and mine public and non-public Internet data regarding Trump and his associates, with the goal of creating a "narrative" regarding the candidate's ties to Russia."

505.    Joffe later shared certain results of those data searches and analysis with Sussmann so that Sussmann, in turn, could provide them to the media and the FBI.

506.    Joffe was working and acting on behalf of Neustar when he attempted to find wrongdoing and fabricated facts and evidence.

507.    At all material times, the above-named employees were all acting within the scope of their employment, performing work for their employer at the time of the tortious conduct, and therefore are responsible for the actions of their employees.

508.    As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damage, including but not limited to, actual, compensatory, special, incidental, and consequential damage in addition to costs of defense and attorneys' fees.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, Neustar, Inc., for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

## **Jury Demand**

The Plaintiff hereby demands a trial by jury of all issues so triable.

Dated:  March 24, 2022

Respectfully submitted by:

**THE TICKTIN LAW GROUP**
270 SW Natura Avenue
Deerfield Beach, Florida 33441
Telephone: (561) 232-2222


 /s/ Pete*r Ticktin*
PETER TICKTIN, ESQUIRE
Florida Bar No. 887935
JAMIE ALAN SASSON, ESQUIRE
Florida Bar No. 10802
SHAINA VANMEHREN, ESQUIRE
Florida Bar No. 1025180
Our Matter No.: 22-0062

and

**HABBA MADAIO & ASSOCIATES LLP**
1430 US Highway 206
Suite 240
Bedminster, New Jersey 07921
ALINA HABBA, ESQUIRE **(Upon Anticipated Admission *Pro Hac Vice*)**
New Jersey Bar No. 018592010
MICHAEL T. MADAIO, ESQUIRE **(Upon Anticipated Admission *Pro Hac Vice*)**
New Jersey Bar No. 070752013