# Nos. 22-13410-H, 22-14099-H, 23-10387-H, 23-13177-H

## In the United States Court of Appeals for the Eleventh Circuit

DONALD J. TRUMP,
*Plaintiff-Appellant*,

ALINA HABBA, MICHAEL T. MADAIO, HABBA MADAIO & ASSOC.;
PETER TICKTIN, JAMIE SASSON, and THE TICKTIN LAW GROUP,
*Appellants,*

versus

HILLARY R. CLINTON, DEMOCRATIC NATIONAL COMMITTEE,
HFACC, INC., DNC SERVICES CORP., PERKINS COIE, LLC, JOHN
PODESTA, ROBERT MOOK, DEBBIE WASSERMAN SCHULTZ,
FUSION GPS, GLENN SIMPSON, PETER FRITSCH, NELLIE OHR,
BRUCE OHR, IGOR DANCHENKO, RODNEY JOFFE, NEUSTAR
SECURITY SERVICES, NEUSTAR INC., ORBIS BUSINESS
INTELLIGENCE LTD., and CHARLES DOLAN,
*Defendants-Appellees*.

On appeal from the United States District Court
for the Southern District of Florida

## APPELLANTS' INITIAL BRIEF

JESSE R. BINNALL
JARED J. ROBERTS
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
(703) 888-1943

RICHARD C. KLUGH
RICHARD C. KLUGH, P.A.
40 N.W. 3rd Street, PH1
Miami, Florida 33128
(305) 536-1191

*Counsel for Appellants*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Appellants file this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1.

ABC Corporations

Aytch, Enjolique Dion

Barry, Stephen

Barzee, William R.

Berkowitz, Sean M.

Berman, Joshua Adam

Binnall, Jesse R.

Bosworth, Michael S.

Brozinsky, Noah

Ceresney, Andrew J.

Clattenburg, Rachel

Clinesmith, Kevin

Clinton, Hillary R.

Comey, James

***Trump, et al. v. Clinton, et al.*, Case No. 22-13410-H, *et al.*
Certificate of Interested Persons (cont'd)**

Crenny, Kevin P.

Crowley, Shawn Geovjian

Danchenko, Igor

Democratic National Committee

DNC Services Corporation

Does' John

Dolan, Jr., Charles Halliday

Doumar, George R.A.

Eisen, Allison

Elias, Marc

Epps, Alexandra N.

Erickson-Pogorzelski, Anthony

Fassbender, Diana Marie

Feldman, Maximillian

Fels, Adam Seth

Fritsch, Peter

Fusion GPS

***Trump, et al. v. Clinton, et al.***, **Case No. 22-13410-H,** *et al.*
**Certificate of Interested Persons (cont'd)**

Garcez, Isabela M.

Garza, Kathryn E.

Gillenwater, James E.

Gonzalez, Juan Antonio

Greenberg, Gerald Edward

Habba, Alina

Habba Madaio & Associates

Harrington, Howard J.

Hart, Nancy

HFAAC, Inc.

Houlihan, Michael F.

Hunt, Patrick, Honorable

Janda, Sean R.

Joffe, Rodney

Kaplan, Roberta A.

Kastrenakes, Eleni Sevasti

Kendall, David Evan

***Trump, et al. v. Clinton, et al.***, **Case No. 22-13410-H,** *et al.*
**Certificate of Interested Persons (cont'd)**

Kiyonaga, Paul Y.

Klauber, Debra

Letter, Douglas

Levine, Jonathan Edward

Levy, Joshua

Lipshultz, Zachary Andrew

Madaio, Michael T.

Markus, David Oscar

Martinez, Roberto

McCabe, Andrew

McCarthy, John

McNichols, John Marcus

Meeks, Katherine Moran

Mestitz, Michael

Middlebrooks, Hon. Donald M.

Monsour, Jr., Franklin George

Mook, Robert E.

***Trump, et al. v. Clinton, et al.***, **Case No. 22-13410-H**, *et al.*
**Certificate of Interested Persons (cont'd)**

Muha, Christopher

Neuman, Sarah E.

Neustar Security Services

Neustar, Inc.

Ohr, Bruce

Ohr, Nellie

Olmedo-Rodriguez, Jennifer

Orbis Business Intelligence, Ltd.

Otterberg, April A.

Page, Lisa

Peacock, Benjamin

Perkins Coie, LLC

Pettis, Eugene K.

Pinto, Paola

Pittard, William

Podesta, John

Reines, Phillipe

***Trump, et al. v. Clinton, et al.***, **Case No. 22-13410-H**, *et al.*
**Certificate of Interested Persons (cont'd)**

Reilly, Wendy B.

Roberts, Jared Joseph

Rosenstein, Rod

Sainvil, Akiesha Renee Gilcrist

Salzman, Joshua M

Sasson, Jamie Alan

Schar, Reid J.

Schiff, Adam

Schultz, Deborah Wasserman

Sigler, Geoffrey M.

Simpson, Glenn

Soto, Edward

Southall, Samantha

Steele, Christopher

Stekloff, Brian L.

Strzok, Peter

Sullivan, Jake

*Trump, et al. v. Clinton, et al.*, Case No. 22-13410-H, *et al.*
Certificate of Interested Persons (cont'd)

Sussman, Michael

Terrell, Stephen R.

The Ticktin Law Group

Ticktin, Peter David

Touhey, James G.

Trout, Robert P.

Trump, Donald J.

Turner, Katherine M.

Tyrrell, Steven

United States of America

Warin, Francis Joseph

Neustar, Inc. is a wholly owned subsidiary of TransUnion, which is a publicly traded entity at NYSE:TRU.

## STATEMENT REGARDING ORAL ARGUMENT

Appellants believe oral argument would assist the Court in deciding the issues presented by this appeal. The district court's dismissal of the amended complaint rests on unduly narrow readings of federal criminal statutes constituting predicate acts for RICO violations, erroneous theories for rejecting statutory and other equitable tolling of limitations periods, and the district court's extra-record investigations of and adverse opinions about the Plaintiff and his counsel, whom the district court sanctioned despite the showing of full support for the amended complaint's claims in federal criminal indictments and grand jury proceedings, including the final report resulting from a years-long Department of Justice Special Counsel investigation. The issues merit oral argument.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS . . . . . . . . . . . . . . . . . . . C1

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . i

TABLE OF CITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . xvi

STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Course of Proceedings, Disposition in the District Court

    and Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Standards of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I.    The District Court Erred in Dismissing the Amended

    Complaint Where it Stated Valid Claims and Suffered from No

    Pleading Impropriety, and Further Erred by Denying Leave to

    Amend . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.    Dismissal premised on a "shotgun pleading" theory was

        procedurally and substantively infirm . . . . . . . . . . . . . . . . 10

B.    The RICO claims, injurious falsehood claims, and malicious prosecution conspiracy allegation adequately stated claims for relief . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    1.    Plaintiff properly alleged RICO and RICO conspiracy violations . . . . . . . . . . . . . . . . . . . . . . . . 18

        a.    The enterprise existed . . . . . . . . . . . . . . . . . . . 19

        b.    Obstruction of justice and conspiracy to obstruct justice are predicate acts. . . . . . . . . . 21

        c.    Wire fraud is a predicate act . . . . . . . . . . . . . . 25

        d.    Continuity established a pattern . . . . . . . . . . . 29

        e.    Defendants violated section 1962(d) . . . . . . . . 32

        f.    Plaintiff alleged qualifying harm from RICO violations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    2.    The district court erred in dismissing Plaintiff's claims of injurious falsehood and related conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

    3.    The district court erred in dismissing Plaintiff's claim of malicious prosecution conspiracy . . . . . . . . 40

C.  Jurisdiction over Joffe, Dolan, and Orbis was valid given RICO'S nationwide service of process and Defendants' requisite minimum contacts with the forum, with no showing of undue inconvenience . . . . . . . . . . . . . . . . . . . . .  40

II.  The District Court Erred in Finding the Amended Complaint Time Barred . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

A.  Plaintiff's claims were equitably tolled . . . . . . . . . . . . . . .  43

B.  Plaintiff's claims were tolled by pending litigation . . . . . .  50

III.  The District Court Erred in Imposing Sanctions Against Appellants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  57

A.  Imposition of sanctions under the district court's inherent authority violated due process and was an abuse of discretion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  58

B.  Lack of fair notice was an abuse of discretion . . . . . . . . .  59

C.  Denial of Plaintiff's evidentiary hearing request was an abuse of discretion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  63

D.  The district court abused its discretion in finding that appellants acted in bad faith . . . . . . . . . . . . . . . . . . . . . . .  64

iv

E.  The district court improperly considered litigation not before it and otherwise displayed personal or political bias . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  73

F.  The district court improperly awarded Defendants' attorney's fees and other fees . . . . . . . . . . . . . . . . . . . . . . . .  75

G.  Award of Rule 11 sanctions to Dolan was an abuse of discretion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  78

H.  The district court erred in discounting the Durham Report, a truly extraordinary circumstance warranting reconsideration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  80

IV.  The District Court Abused its Discretion Denying Disqualification and Dismissing the Disqualification Motion . .  84

A.  The district court had jurisdiction to disqualify itself . . . .  84

B.  The district court abused its discretion in ruling that appellants' motion to disqualify lacked merit . . . . . . . . . .  86

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  92

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . .  93

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  92

## TABLE OF CITATIONS

**Cases**

\* *Agency Holding Corp. v. Malley-Duff & Assoc.*,

    483 U.S. 143 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Akkasha v. Bloomingdales, Inc.*, No. 17-CIV-22376,

    2020 WL 6820879 (S.D. Fla. July 20, 2020),

    report and recommendation adopted,

    2020 WL 6820878 (S.D. Fla. Sept. 14, 2020) . . . . . . . . . . . . 68, 72

*Alix v. McKinsey & Co.*, 23 F.4th 196 (2d Cir. 2022) . . . . . . . . . . . . . . 28

*Alyeska Pipeline Service Co. v. Wilderness Society*,

    421 U.S. 240 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

\* *American Dental Ass'n v. Cigna Corp.*,

    605 F.3d 1283 (11th Cir. 2010) . . . . . . . . . . . . . . . . . . . . 25, 31, 32

*American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974) . . . . . . 43, 50

*Amlong & Amlong, P.A. v. Denny's, Inc.*,

    500 F.3d 1230 (11th Cir. 2007) . . . . . . . . . . . . . . . . . . . . 7, 63, 68

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) . . . . . . . . . . . . . . . . . . . . . . . . 1, 17

*Avirgan v. Hull*, 932 F.2d 1572 (11th Cir. 1991) . . . . . . . . . . . . . . . . . 18

*Bankers Mortgage Co. v. United States*, 423 F.2d 73 (5th Cir. 1970) . . 81

* *Barnes v. Dalton*, 158 F.3d 1212 (11th Cir.1998) . . . . . . . . . .  64, 65, 75

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) . . . . . . . . . . . . . .  17

*Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Fla.*,

      140 F.3d 898 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  86

*Bothmann v. Harrington*, 458 So.2d 1163 (Fla. 3d DCA 1984) . . . . . .  38

* *Boyle v. United States*, 556 U.S. 938 (2009) . . . . . . . . . . . . . . . .  17, 19

* *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) . . . .  28, 35

*Bryant v. Dupree*, 252 F.3d 1161 (11th Cir. 2001) . . . . . . . . . . . . . . . .  12

*Byrne v. Nezhat*, 261 F.3d 1075 (11th Cir. 2001) . . . . . . . . . . . . . . . . .  13

* *Campos v. City of Naples*, 202 Fed.Appx. 381 (11th Cir. 2006) . . . . .  64

*Carmouche v. Tamborlee Management, Inc.*,

      789 F.3d 1201 (11th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

* *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) . . . . . .  59, 61, 62, 63, 77

*Clinton v. Jones,* 520 U.S. 681 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . .  47

*Corcel Corp. v. Ferguson Enters.*, Inc.,

      551 Fed.Appx. 571 (11th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . .  35

*Davis v. Carl*, 906 F.2d 533 (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . .  79

*Davis v. Jones*, 506 F.3d 1325 (11th Cir. 2007) . . . . . . . . . . . . . . . . . . .  87

*Diversified Numismatics, Inc. v. City of Orlando*,

    949 F.2d 382 (11th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

\* *Donaldson v. Clark*, 819 F.2d 1551 (11th Cir. 1987) . . . . . . .  58, 59, 78

*Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505 (11th Cir. 1988) . . . . . 26

*Durrett v. Jenkins Brickyard, Inc.*, 678 F.2d 911 (11th Cir.1982) . . . . 64

\* *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*,

    561 F.3d 1298 (11th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Fridovich v. Fridovich,* 598 So. 2d 65 (Fla. 1992) . . . . . . . . . . . . . . . . 39

*Gianelli v. Schoenfeld*, 2021 WL 4690724 (E.D. Cal. Oct. 7, 2021) . . . 50

*Griffin v. Swim-Tech Corp.*, 722 F.2d 677 (11th Cir. 1984) . . . . . . . . . 81

*Gust, Inc. v. Alphacap Ventures, LLC,*

    905 F.3d 1321 (Fed. Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989) . . . . . . . . . . . .  22, 30

*Hamm v. Members of Bd. of Regents of State of Fla.*,

    708 F.2d 647 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

*Harvey v. CNN, Inc.*, 48 F.4th 257 (4th Cir. 2022) . . . . . . . . . . . . . . . . 73

*Hill v. Morehouse Med. Assocs., Inc.*,

    2003 WL 22019936 (11th Cir. Aug. 15, 2003) . . . . . . . . . . . . . . . . 26

*Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992) . . . . . . . . . . . 34

*Horgan v. Felton*, 123 Nev. 577 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*In re Beard*, 811 F.2d 818 (4th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . 85

*In re Evergreen Sec., Ltd.*, 570 F.3d 1257 (11th Cir. 2009) . . . . . . . . . 86

*In re Fundamental Long Term Care, Inc.*,

    81 F.4th 1264 (11th Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re Gen. Elec. Sec. Litig.*,   2021 WL 2688695

    (S.D.N.Y. Jun. 30, 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

*In re Managed Care Litig.*, 298 F.Supp.2d 1259 (S.D. Fla. 2003) . . . . 32

\* *In re Mroz*, 65 F.3d 1567 (11th Cir. 1995) . . . . . . . . . . . . . . . . . 7, 59. 63

*In re Ruben,* 825 F.2d 977 (6th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . 59

*Indus. Risk Insurers v. M.A.N. Gutehoffriungshutte GmbH,*

    141 F.3d 1434 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Irwin v. Department of Veterans Affairs,* 498 U.S. 89 (1990) . . . . . . . . 43

*Jackson v. Astrue*, 506 F.3d 1349 (11th Cir. 2007) . . . . . . . . . . . . . . . . 7

*Jackson v. Bank of America, N.A.*,

    898 F.3d 1348 (11th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . 11, 13

*Jackson v. BellSouth Telecom.*, 372 F.3d 1250 (11th Cir. 2004) . . . . . . 29

*Johnson v. 27th Avenue Caraf, Inc.,* 9 F.4th 1300 (11th Cir. 2021) . . . 73

*Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251 (11th Cir. 2003) . . . 60

*LaGrasta v. First Union Sec. Inc.*, 358 F.3d 840 (11th Cir. 2004) . . . .  43

\* *Leh v. Gen. Petroleum Corp.*, 382 U.S. 54 (1965) . . . . . . . . .  51, 52, 57

*Lehman v. Lucom*, 727 F.3d 1326 (11th Cir. 2013) . . . . . . . . . . . . . . .  47

*Lewis v. Lhu*, 696 F.Supp. 723 (D.D.C. 1988) . . . . . . . . . . . . . . . . . .  28

*LFoundry Rousset, SAS v. Atmel Corp.*,

    690 Fed.Appx. 748 (2d Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . .  87

*Liteky v. United States*, 510 U.S. 540 (1994) . . . . . . . . . . . . . . . . . . .  87

*Lomax v. Ruvin*, 476 Fed.Appx. 175 (11th Cir. 2012) . . . . . . . . . . . . .  87

\* *Lozano v. Montoya Alvarez*, 572 U.S. 1 (2014) . . . . . . . . . . . . . . .  44, 81

*McDonough v. City of Homestead*, No. 22-12637,

    2023 WL 3035215 (11th Cir. Apr. 21, 2023) . . . . . . . . . . . . . . . . .  11

*McDonough v. City of Homestead*,

    771 Fed.Appx. 952 (11th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . .  12

*Magnifico v. Villanueva,* 783 F.Supp.2d 1217 (S.D. Fla. 2011) . . . . . .  31

*Massengale v. Ray*, 267 F.3d 1298 (11th Cir. 2001) . . . . . . . . . . . . . .  79

*Mid Atlantic Telecom., Inc. v. Long Distance Serv., Inc.*,

    18 F.3d 260 (4th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

\* *Minn. Mining & Mfg. Co. v. New Jersey Wood Finishing Co.*,

    381 U.S. 311 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  51

x

*Mock v. Bell Helicopter Textron, Inc.,*

    373 Fed.Appx. 989 (11th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . 14

*Moorer v. Demopolis Waterworks & Sewer Bd.,*

    374 F.3d 994 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Nixon v. Fitzgerald*, 457 U.S. 731 (1982) . . . . . . . . . . . . . . . . . . . . . 45, 46

*Obert v. Rep. W. Ins. Co.*, 190 F.Supp.2d 279 (D.R.I. 2002) . . . . . . . . 85

*O'Neal v. Allstate Indem. Ins. Co. Inc.,*

    2021 WL 4852222 (11th Cir. Oct. 19, 2021) . . . . . . . . . . . . . . . . . 73

*Pace v. DiGuglielmo*, 544 U.S. 408 (2005) . . . . . . . . . . . . . . . . . . . . . . 44

*Peer v. Lewis*, 606 F.3d 1306 (11th Cir. 2010) . . . . . . . . . . . . . . . . . . . 60

*Pelletier v. Zweifel*, 921 F.2d 1465 (11th Cir.1991) . . . . . . . . . . . . . . . 13

*Pension Fund Mid Jersey Trucking Industry v. Omni Funding,*

    687 F.Supp. 962 (D.N.J. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Pinson v. JPMorgan Chase Bank, Nat'l Ass'n,*

    942 F.3d 1200 (11th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Pres. Petrified Forrest v. Renzi,*

    2014 WL 530574 (D. Ariz. Feb. 12, 2013) . . . . . . . . . . . . . . . . . . . 51

*Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539 (5th Cir. 2001) . 28

*Prou v. Giarla*, 62 F.Supp.3d 1365 (S.D. Fla. 2014) . . . . . . . . . . . . . . 41

*Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340 (11th Cir. 2016) . . . . . . . . .  18

*Riddle v. Egensperger*, 266 F.3d 542 (6th Cir. 2001) . . . . . . . . . . . .  59, 77

*Roadway Express, Inc. v. Piper*, 447 U.S. 752 (1980) . . . . . . . . . . . . .  59

*Rodriguez-Vilanova v. Stryker Corp.*,

      987 F.Supp.2d 153 (D.P.R. 2013) . . . . . . . . . . . . . . . . . . . . . . . . .  86

*Secs. Indus. Ass'n v. Clarke*, 898 F.2d 318 (2d Cir. 1990)     . . . . . .  72

*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985) . . . . . . . . . . . . . .  17

*Sensley v. Albritton*, 385 F.3d 591 (5th Cir. 2004) . . . . . . . . . . . . . . . .  86

*Summit Props. v. Hoechst Celanese Corp.*,

      214 F.3d 556 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

*Taylor v. Haynes Burns*, 2013 WL 12329822

      (D.N.M. Jul 26, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  85

*Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275 (11th Cir. 2005) . .  43

*Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307 (11th Cir. 2000) . . . . .  8

*Trump v. Comm. On Ways & Means*,

      391F.Supp.3d 93 (D.D.C. 2019) . . . . . . . . . . . . . . . . . . . . . . . .  46, 47

*Trump v. Vance*, 140 S.Ct. 2412 (2020) . . . . . . . . . . . . . . . . . . . . . .  46, 81

*United States v. Barton*, 909 F.3d 1323 (11th Cir. 2018) . . . . . . . . . . .  67

\* *United States v. Bradley*,  644 F.3d 1213 (11th Cir. 2011) . . . . .  26, 27

xii

*United States v. Carey*, 929 F.3d 1092 (9th Cir. 2019) . . . . . . . . . . . .  90

*United States v. Chafin*, 808 F.3d 1263 (11th Cir. 2015) . . . . . . . . . .  24

*United States v. Church*, 955 F.2d 688 (11th Cir. 1992) . . . . . . . . . . .  16

*United States v. Conforte*, 624 F.2d 869, 880 (9th Cir. 1980) . . . . . . .  85

*United States v. Cooley*, 1 F.3d 985 (10th Cir. 1993) . . . . . . . . . . . . . .  85

*United States v. Fonseca-Machado*, 53 F.3d 1242 (11th Cir. 1995) . . .  42

*United States v. Hameen*, 2023 WL 2571011,

      No. 3:18-cr-115 (M.D. Fla. Mar. 20, 2023) . . . . . . . . . . . . . . . . . .  87

*United States v. Kelly*, 888 F.2d 732 (11th Cir. 1989) . . . . . . . . . . . . . .  91

*United States v. Pendergraft*, 297 F.3d 1198 (11th Cir. 2002) . . . . . . .  27

*United States v. Phillips*, 664 F.2d 971 (5th Cir. Unit B 1981) . . . . . .  25

\* *United States v. Ronda*, 455 F.3d 1273 (11th Cir. 2006) . . . . . . .  22, 23

*United States v. Ronga*, 682 Fed.Appx. 849 (11th Cir. 2017) . . . . . . . .  23

*United States v. Stinson*, 729 Fed.Appx. 891 (11th Cir. 2018) . . . . . . .  80

*United States v. Sylvestri*, 409 F.3d 1311 (11th Cir. 2005) . . . . . . . . . .  32

*United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016) . . . . . . . . .  26

\* *United States v. Veal*, 153 F.3d 1233 (11th Cir. 1998) . . . . . . . . .  22, 24

*United States v. Wong*, 575 U.S. 402 (2015) . . . . . . . . . . . . . . . . . .  44, 50

*Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291 (11th Cir. 2018)    10, 11, 12

\* *Young v. United States*, 535 U.S. 43 (2002) . . . . . . . . . . . . . . . . . . . .   43

*Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321 (1971). . . . . .   51

## Statututory and Other Authority

U.S. Const., art. II, §§ 1, 3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   45

15 U.S.C. § 12–27 (Clayton Act)  . . . . . . . . . . . . . . . . . . . . . .   41, 43, 50

15 U.S.C. § 16(i)  . . . . . . . . . . . . . . . . . . . . . . . . . . .   50, 51, 52, 53, 57

18 U.S.C. § 1343. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22, 29

18 U.S.C. § 1512(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22, 23, 24

18 U.S.C. § 1515(a)(3)(A),(C),(D) . . . . . . . . . . . . . . . . . . . . . . . . . .   23

18 U.S.C. § 1961(RICO Act) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

18 U.S.C. § 1961(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

18 U.S.C. § 1961(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

18 U.S.C. § 1961(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

18 U.S.C. § 1962(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4, 18

18 U.S.C. § 1962(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4, 32, 34

18 U.S.C. § 1964(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   34

28 U.S.C. § 455. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   84, 85, 97, 91

28 U.S.C. § 1927. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6, 60, 64

Fla. Stat. § 95.11(4)(g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   48

Fed. R. Civ. P. 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20, 26

Fed. R. Civ. P. 11 . . . . . . . . . . . . . . . . . . . .   2, 6, 59, 60, 61, 62, 63, 78, 79

Fed. R. Civ. P. 12(b)(6)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42, 43

Fed. R. Civ. P. 60(b) . . . . . . . . . . . . . . . . . . . . . .   2,6, 8, 9, 13, 49, 80, 81, 84

Am. Bar Assoc. 2020 Model Code of Judicial Conduct, R. 2.9(C)

*In the Matter of DNC Services Corp., et al.*, Federal Election

　　Commission, MURs 7291, 7331 and 7449 . . . . . . . . . . . . . . . . .   52

U.S. Dept. of Justice, Office of Special Counsel John H. Durham,

　　*Report on Matters Related to Intelligence Activities and*

　　*Investigations Arising Out of the 2016 Presidential Campaigns*

　　(May 12, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6, *passim*

## STATEMENT OF JURISDICTION

The district court had jurisdiction of this case pursuant to 28 U.S.C. § 1331 because of federal questions regarding federal statutory violations. The court of appeals has jurisdiction over this consolidated appeal pursuant to 28 U.S.C. § 1291, which gives the courts of appeals jurisdiction over all final decisions of the district courts of the United States. Appellants Donald J. Trump, Alina Habba, Michael T. Madaio, Habba Madaio & Associates; Peter Ticktin, Jamie Alan Sasson, and the Ticktin Law Group timely appealed on October 11, 2022, December 9, 2022, February 6, 2023, and September 27, 2023 (DE:272, 291, 308, 344) from the final orders entered on September 8, 2022 (DE:267) (order of dismissal), November 10, 2022 and January 19, 2023 (DE:284, 302) (sanctions orders), and September 15, 2023 (DE:343) (order denying Fed. R. Civ. P. 60(b) relief), that dispose of all claims between the parties to this cause.

xvi

## STATEMENT OF THE ISSUES

1.     Whether the district court's dismissal of Plaintiff's complaint with prejudice must be reversed because the district court misconstrued, and adopted an unduly narrow reading of, federal obstruction of justice and other federal criminal statutory predicates for RICO violations; erroneously concluded the claims failed to satisfy *Twombley/Iqbal* proof-plausibility standards, despite pinpoint-documented factual support and relevant governmental findings; prejudicially relied, sua sponte, on partisan political views and unwarranted assumptions about President Trump, his lawyers, and the Defendants, prematurely reaching the merits of complaint allegations, including regarding Plaintiff's financial injuries and need for judicial relief; misapplied the "shotgun pleading" doctrine procedurally and substantively; and erroneously denied Plaintiff leave to amend.

2.     Whether the district court erred in dismissing the complaint as untimely and concluding, without a hearing, that Plaintiff's role as President from 2017–21—including during Executive Branch-led criminal and related investigations into Defendants' wrongful actions—did not warrant any equitable tolling.

1

3.    Whether the sanctions imposed on the theory of inherent powers and under Rule 11's limited scope were procedurally and substantively erroneous and rested on speculation that Plaintiff was not seeking civil financial relief but merely a political interest and that his counsel lacked a good faith basis and legal support for claims premised on undisputed and corroborated facts.

4.    Whether the district court erred in denying Plaintiff's request for Fed. R. Civ. P. 60(b) relief where the Durham Report detailed federal grand jury proceedings establishing the complaint's merits and where the district court's premise for denying leave to amend—that Plaintiff could not cure any perceived pleading defect because the claims were unfounded—cannot stand in light of the Durham Report's findings.

5.    Whether the district court judge erred in failing to recuse and in denying the motion to disqualify where the judge's rulings—including sua sponte proposing sanctions against Plaintiff and his counsel, discounting entirely the Durham Report, resolving without notice disputed factual allegations, and relying on extra-record sources tainted by the very misconduct the complaint alleged—were clear departures from precedent

and confirmed deep-seated antagonism toward and disdain for President Trump, his political activity, and his counsel.

## STATEMENT OF THE CASE

### Course of Proceedings, Disposition in the District Court, and Statement of Facts

Plaintiff-Appellant President Donald J. Trump filed the 16-count original complaint, DE:1, on March 24, 2022, alleging Defendants' coordinated efforts to harm Plaintiff through criminal predicate actions, including multifaceted obstructions of justice. On July 21, 2022, President Trump filed an amended complaint, DE:177, with detailed allegations supported by citations to the public record, alleging that beginning during the 2016 national election, Defendants conspired to falsely manufacture evidentiary presentations submitted to federal law enforcement to misdirect the course of federal criminal and related investigations including the "Crossfire Hurricane" investigation begun July 2016, which, until Defendants' criminal obstruction, had not targeted President Trump personally.

Defendant's false submissions were intended to and did distort federal proceedings by claiming President Trump coordinated with, and was compromised by, malign Russian government actors. Defendants' lies

could not receive public credence unless they were given the imprimatur of the FBI through a criminal investigation and subsequent grand jury proceedings. Defendants—having strong links to government instrumentalities that could make an FBI investigation credible—broke a clear barrier in the otherwise all's-fair game of politics; they obstructed justice by wasting government resources, falsifying evidence, and at all costs, harming Plaintiff personally, causing his business interests to suffer in ways that amounted to fraud.

The coordination and organization of the Defendants' scheme, combining to utilize government connections and access to key elements of the Department of Justice in Defendants' wrongful enterprise to fraudulently weaponize federal law enforcement against a political foe while concealing their actions, constituted an undisputed factually-supported basis for the amended complaint. The amended complaint included pinpoint citations to documentary support and adequately stated RICO,[1] RICO conspiracy, and related claims.[2]  DE:177.

---

[1]  Racketeer Influenced and Corrupt Organization ("RICO") Act, 18 U.S.C. § 1962(c), (d).

[2]  The amended complaint alleged additional claims not relevant to this appeal.

The amended complaint alleged that, to accomplish Defendants' objective, the law firm of Perkins Coie led efforts going beyond opposition research on Plaintiff in order to develop false information connecting his campaign to a Russian bank, DE:177:¶ 3, while Appellee Clinton, her campaign, the Democratic National Committee ("DNC"), and lawyers for both, employed Fusion GPS, an investigative firm, to produce the Steele Dossier, a collection of falsified deleterious claims which Defendants provided to the FBI.  DE:177:¶4.  Upon Defendants' transmission of this false information, the FBI modified its intensive long-term investigations into Plaintiff's campaign, including grand jury and FISA court proceedings. DE:177:¶7.

On September 8, 2022, the district court dismissed with prejudice all claims as barred by the statute of limitations as well as for failure to state a claim and lack of subject matter or personal jurisdiction over certain Defendants and sua sponte suggested that sanctions against Plaintiff and his counsel were warranted. DE:267. The dismissal was with prejudice as to the non-federal Defendants (the Appellees in this matter).  DE:267:65. On November 10, 2022, the district court granted Defendant Dolan's sanctions motion, ordering payment of $66,274.23. DE:284. On October 31,

2022, multiple Defendants moved to recover attorneys' fees pursuant to Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, the Defend Trade Secrets Act, and the district court's inherent powers. DE:280. On January 19, 2023, the district court granted attorneys' fees in the amount of $937,989.39, using only its inherent powers and without holding a hearing. DE:302.

Plaintiff and his counsel timely appealed the rulings. On May 12, 2023, Special Counsel John Durham issued his report on the intelligence activities and investigations arising out of the 2016 presidential campaigns.[3] Durham, assigned to the matter first while still U.S. Attorney for the District of Connecticut in April 2019, was appointed in February 2020 as Special Counsel by Attorney General Barr to ensure the propriety and independence of the investigation.  Appellants requested, and this Court ordered, a stay to permit Appellants to present to the district court this newly-disclosed evidence showing the plausible, non-frivolous nature of the amended complaint. DE:81, 108.

On remand, the district court denied Fed. R. Civ. P. 60(b) relief, DE:331, 343, and dismissed Appellants' motion for disqualification based

---

[3]  Investigation of Special Counsel John Durham, Attorney General Order No. 4878-2020 (Dec. 19, 2020). DE:177:¶ 611(b).

on bias, stating that it lacked jurisdiction and alternatively denying it.

DE:335, 342.

## Standards of Review

This Court reviews *de novo* dismissal of a complaint for failure to state a claim, "'accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff." *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003). Dismissal for failure to satisfy the statute of limitations likewise is reviewed *de novo*. *Jackson v. Astrue*, 506 F.3d 1349, 1352 (11th Cir. 2007). Dismissal of a complaint for lack of personal jurisdiction is reviewed *de novo*. *Carmouche v. Tamborlee Management, Inc.*, 789 F.3d 1201, 1203 (11th Cir. 2015).

A district court's sanctions determination is reviewed for abuse of discretion, including for clear error of judgment or application of the wrong legal standard. *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1237–38 (11th Cir. 2007); *In re Mroz*, 65 F.3d 1567, 1571 (11th Cir. 1995).

Denial of a motion for disqualification is reviewed for abuse of discretion, *In re Fundamental Long Term Care, Inc.*, 81 F.4th 1264, 1319 (11th Cir. 2023), as is denial of a motion for reconsideration under Fed. R.

Civ. P. 60(b). *Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1317 (11th Cir. 2000).

## SUMMARY OF THE ARGUMENT

The district court unreasonably departed from precedent to dismiss with prejudice the factually- and legally-sound amended complaint and to sanction President Trump and his attorneys, including:

- unduly narrowing the plain scope of applicable obstruction, conspiracy, and fraud statutes, contrary to this Court's and Supreme Court holdings that lying to FBI agents to misdirect a federal investigation constitutes obstruction of justice, that federal judicial and grand jury actions constitute official proceedings, and that to constitute fraud, misrepresentations causing financial harm need not be directed to the victim, but instead may be directed to persons whose reliance on the fraud proximately harms the victim;

- relying on shotgun pleading grounds Defendants deliberately refrained from asserting and that were inapplicable given the multi-faceted, multi-predicate RICO and related claims;

- rejecting, without a hearing, statutory and other equitable tolling arguments—where filing the complaint during his presidency was

8

inconsistent with President Trump's official role and responsibilities and would risk interfering with then-active federal investigations of the wrongdoing—and failing to engage in an act-specific analysis of the limitations issue;

- expressing a fixed antipathy to Plaintiff and his right to obtain relief, while sua sponte engaging in selective extra-record review to assert unfounded disparagement of President Trump and his counsel; and

- unreasonably discounting grand jury indictments and, in denying Fed. R. Civ. P. 60(b) relief, governmental findings in the Durham Report that showed the amended complaint met the requisite proof plausibility standard.

## ARGUMENT

**I.  THE DISTRICT COURT ERRED IN DISMISSING THE AMENDED COMPLAINT WHERE IT STATED VALID CLAIMS AND SUFFERED FROM NO PLEADING IMPROPRIETY, AND FURTHER ERRED BY DENYING LEAVE TO AMEND.**

> ### A.  Dismissal premised on a "shotgun pleading" theory was procedurally and substantively infirm.

The district court abused its discretion in dismissing the amended complaint with prejudice under the shotgun pleading doctrine, DE:267:7-8, where, contrary to governing authority, Plaintiff was never afforded prior notice of and a chance to remedy this asserted non-merits deficiency.  This Court has ruled that a plaintiff must be given an opportunity to replead to correct shotgun pleadings:

> [W]e hold the following: When a litigant files a shotgun pleading, is represented by counsel, and fails to request leave to amend, a district court must sua sponte give him one chance to replead before dismissing his case with prejudice on non-merits shotgun pleading grounds.

*Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1296 (11th Cir. 2018). Moreover, "[i]n the repleading order, the district court should explain how the offending pleading violates the shotgun pleading rule so that the party may properly avoid future shotgun pleadings." *Id.*

The district court failed to comply with these clear requirements, erroneously depriving Plaintiff of the chance to remedy a non-merits pleading deficiency. *Id.; see also Jackson v. Bank of America, N.A.*, 898 F.3d 1348, 1358 (11th Cir. 2018) ("In dismissing a shotgun complaint for noncompliance with Rule 8(a), a district court must give the plaintiff 'one chance to remedy such deficiencies.'") (citing *Vibe Micro*, 878 F.3d at 1295); *McDonough v. City of Homestead*, No. 22-12637, 2023 WL 3035215, *2 (11th Cir. Apr. 21, 2023) (not reported) (same).

Defendants' motions to dismiss did not challenge the original complaint on shotgun-pleading grounds, DE:52, 124, 139, 141,143–47, 149, 157, 159–60, 162–63, 165, nor did the district court issue any ruling prior to Plaintiff's voluntary filing of the amended complaint indicating any concern of pleading deficiency.[4] Rather, upon Plaintiff's voluntary filing of the amended complaint, the district court denied the Defendants' motions to dismiss the original complaint as moot. DE:187. When Defendants thereafter moved to dismiss the amended complaint, DE:225–28, 260, the

---

[4] One defendant noted in a footnote that as to the claims pertaining to that defendant and its related party the district court could sua sponte dismiss on shotgun pleading grounds. DE:160:7 n. 8. That footnoted reference was not made a ground for dismissal in the text of the motion, and litigation on the original motions ended when the amended complaint was filed. No other defendant joined in the Neustar footnote at any time.

district court, for the first time, found the claims deficient as shotgun pleadings, and proceeded to dismiss the amended complaint with prejudice. DE:267:7 (citing *Vibe Micro*, but failing to acknowledge that its holding required that Plaintiff have an opportunity to correct non-merits shotgun-pleading defect).

That the district court relied on alternative bases for dismissal does not remedy the legal error in depriving Plaintiff the requisite opportunity to correct the technical shotgun-pleading deficiencies in accordance with this Court's requirements. The district court's conclusion that granting leave to amend would be "futile," regardless of "technical pleading" deficiencies, was improper, where Plaintiff set forth adequate claims for relief, *see* § I(B) *infra*. In failing to afford Plaintiff even a single chance to replead, particularly where he lacked prior notice of the shotgun-pleading infirmity, the district court abused its discretion, compelling reversal. *See Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) (reversing dismissal of amended complaint with instructions to grant leave to amend, where—as here—"it cannot be said that the plaintiffs failed to correct defects of which they had notice"). *See also McDonough v. City of Homestead*, 771 Fed.Appx. 952, 954 (11th Cir. 2019) (citing *Moorer v.*

12

*Demopolis Waterworks & Sewer Bd.*, 374 F.3d 994, 996–97 (11th Cir. 2004)) (application of incorrect legal standard or clear error of judgment constitutes abuse of discretion).

The district court further premised, in significant part, both its imposition of sanctions and denial of Rule 60(b) relief on the shotgun nature of the pleadings, DE:343:5, 6, 12, 15, relying on cases whose circumstances differ critically from those here, where there was no adequate prior notice of the purported shotgun-pleading deficiency. DE:343:12 (*citing Jackson v. Bank of America, N.A.*, 898 F.3d 1348, 1358 (11th Cir. 2018) (defendants' motion for a more definite statement on shotgun-pleading grounds afforded plaintiffs notice and "as complete an explanation" of pleading defects as plaintiffs "could have asked for"); *Byrne v. Nezhat*, 261 F.3d 1075, 133 n. 115 (11th Cir. 2001) (sanctions upheld in singular context where "vast resources" had been expended and litigation had advanced well into discovery); *Pelletier v. Zeifel*, 921 F.2d 1465, 1522 (11th Cir. 1991) (prior warnings of sanctionable conduct by two judges, including in a special examiner's report, overcame district court's error in failing to allow plaintiff to correct shotgun pleadings by repleading).

13

Defendants here did not move for a more definite statement nor—with the exception of an ambiguous footnote reference as to the limited claims against Neustar—did any motions to dismiss challenge the original complaint on shotgun-pleading grounds, much less explain in full why the pleadings were infirm on that basis and how they should be corrected. Neustar's reference, buried in a footnote and not otherwise set forth in the motion as a ground for dismissal, was not adopted or mentioned by any other Defendant as to any count of the original complaint or amended complaint, and as this Court has explained, is not a cognizable form of argument, much less a basis on which to rest dismissal with prejudice. *See, e.g., Mock v. Bell Helicopter Textron, Inc.*, 373 Fed.Appx. 989, 992 (11th Cir. 2010) (argument made only in footnote was waived); *see also Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*, 942 F.3d 1200, 1209 n.5 (11th Cir. 2019) (claim raised in footnote deemed abandoned; "We do not ordinarily consider arguments raised in passing in one footnote rather than the body of the brief."). Neustar's unelaborated aside in a footnote that cited only the possibility of a sua sponte dismissal on shotgun-pleading grounds *as to the Neustar allegations*, and not repeated elsewhere in its motion or aopted in any other filing by any

14

Defendant prior to or after the filing of the amended complaint, is patently inadequate to support the district court's with-prejudice ruling (much less its untenable sanctions analysis).

To the contrary, the remaining Defendants sought dismissal on different grounds, affording no notice, much less any explanation, of a shotgun pleading deficiency as to the claims or allegations that did not involve Neustar. After the amended complaint was filed, when Neustar for the first time moved its footnote reference into the body of a motion to dismiss and actually asserted it as a requested ground for relief on conspiracy allegations as to Neustar, no other Defendant adopted Neustar's position, thereby affirmatively waiving such an argument.

That virtually all of the Defendants refrained from asserting a shotgun pleading objection is consistent with the conclusion that the concerns raised by shotgun pleadings were not present in Plaintiff's amended complaint. And Defendants' tactics reflect a strategic decision that precluded Defendants' reliance on the waived argument as a basis for imposition of sanctions. The amended complaint's length and detailed support helped to inform and narrow the scope of the charges, rather leaving allegations scattershot and hard to pin down—the problem that

shotgun pleadings present.  Here, nearly all of the claims revolved around a single composite of facts applicable to the RICO counts, the injurious falsehood counts, and the malicious prosecution counts—the core of the amended complaint was that false evidence and allegations were made to federal investigative agencies in the course of federal investigations and official proceedings to cause both financial injury and potential unjust criminal prosecution and related expense.  That core set of facts applied to the other counts of the amended complaint.  Neustar's singular shotgun-pleading concern was that the conspiracy charges and other accusations *directed to Neustar* were not properly pled, but this claim found its way into the actual grounds of a Neustar motion only after the complaint, as amended, was filed.

In general, the shotgun pleading of RICO allegations in criminal cases is common and necessary given the need to explain the scope and operation of the enterprise.  *See United States v. Church*, 955 F.2d 688, 700 (11th Cir. 1992) (explaining propriety of telling "full story of [the conspiracy] which was charged in the indictment as a RICO predicate act"). The mere prolixity of the amended complaint and its recognition that the general allegations had specific relevance to each charge did not make

it a shotgun pleading, even had the issue been timely raised by Defendants.

## B. The RICO claims, injurious falsehood claims, and malicious prosecution conspiracy allegation adequately stated claims for relief.

A complaint that affords "fair notice" of the nature of the claims for relief and their underlying grounds is sufficient. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A plaintiff must set forth "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when Plaintiff pleads factual content that allows the court to draw the reasonable inference that Defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). Plaintiff satisfied this threshold.

The civil RICO statute must be "liberally construed to effectuate its remedial purposes." *Boyle v. United States*, 556 U.S. 938, 944 (2009). RICO is an "aggressive initiative" for fighting crime. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498 (1985).

A RICO claim comprises three elements: "(1) a violation of 18 U.S.C. § 1962; (2) injury to business or property; and (3) that the violation caused

the injury." *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991). Plaintiff properly alleged a claim premised on Defendants' violation of subsections (c) and (d) of the RICO statute, resulting in injury to plaintiff's business and property.

**1.    Plaintiff properly alleged RICO and RICO conspiracy violations.**

As alleged in the amended complaint, Defendants Clinton, Clinton Campaign, DNC, Perkins Coie, Elias, Sussmann, Fusion GPS, and Joffe engaged in a pattern of racketeering activity that violated President Trump's rights. 18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Section 1962(c) includes four elements: "(1) [defendants] operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two racketeering acts." *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1348 (11th Cir. 2016).

a.    *The enterprise existed.*

An enterprise is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An "association in-fact" enterprise consists of "any union or group of individuals associated in fact although not a legal entity." *Id*. This encompasses any "group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle*, 556 U.S. at 944.

To establish the existence of an association in-fact enterprise, a plaintiff must show its three structural features: "[1] a purpose, [2] relationships among those associated with the enterprise, and [3] longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id*. at 946. Plaintiff adequately pleaded each of these features.

First, Plaintiff identified the enterprise's purpose as the "common, unlawful goal of corruptly and wrongfully harming Plaintiff's political reputation, damaging his electability for the 2016 Presidential Election and subsequent elections, impeding his ability to govern effectively, and otherwise sabotaging his political career through deceptive, criminal and fraudulent means, including, but not limited to, falsely implicating

19

Plaintiff, the Trump Campaign, and the Trump Administration as colluding with Russia." DE:177:¶ 531.

The amended complaint plausibly alleged that each RICO Defendant shared this goal, as well as the enterprise's common purpose, and knew about its racketeering activities. *See, e.g.,* DE:177:¶¶ 535, 568–69, 572–73, 577, 621–27; *see also* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). The amended complaint alleged numerous facts on this point, detailing the relationship among the RICO Defendants and their illegal purpose. *See, e.g.,* DE:177:¶¶ 102, 162–63, 165, 196, 175–84, 195–97, 199, 206, 224, 242, 245–54, 307 (Clinton); ¶¶ 50, 59, 239, 307 (DNC); ¶¶ 76–83, 98, 124, 136–39, 172, 307 (Perkins Coie, Elias, and Sussmann); ¶¶ 72, 76, 95, 176, 239, 244, 273 (Fusion GPS); ¶¶ 132, 136–41, 172, 187–88, 309–11, 324 (Joffe).

Notably, the Durham Report emphasizes the enterprise's existence. Specifically, it discusses how the Clinton Campaign hired Perkins Coie, which hired Fusion GPS to perform "opposition research" on President Trump. Durham-Report:11-12. Fusion GPS then hired Steele, and his firm, Orbis Business Intelligence, Ltd. ("Orbis"). *Id.* Steele then used Danchenko

as his primary source, who received information from Dolan. Durham-Report:13-15. Orbis was responsible for paying Danchenko. Durham-Report:128. Further, it was Bruce Ohr who introduced Steele to the FBI. Durham-Report:109. Simpson, who worked with Fusion GPS, was also involved in working on this project with Bruce Ohr. Durham-Report:116. And Nellie Ohr helped draft reports as well. Durham-Report:180-181.

Additionally, the Durham Report discusses how Sussman, a Perkins Coie attorney, worked with Joffe, to create a "narrative" to tie President Trump to Russia involving Alfa Bank. Durham-Report:16-17. Elias was also involved in this, sending updates to Clinton, Sullivan, Podesta, and Mook. Durham-Report:266. Indeed, the purpose of these relationships was solely to create a false connection between President Trump and Russia to harm him.

      b.    *Obstruction of justice and conspiracy to obstruct justice are predicate acts.*

A "pattern of racketeering activity" requires "at least two acts of racketeering activity, ... the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." 18 U.S.C. §

1961(5). "[A]cts of racketeering activity" include "any act which is indictable under any of the [enumerated statutory provisions]." 18 U.S.C. § 1961(1). *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 236 (1989) ("acts of racketeering activity" are known as "predicate acts"). The amended complaint alleged Defendants obstructed justice in violation of 18 U.S.C. § 1512 and committed wire fraud in violation of 18 U.S.C. § 1343. The district court erred in assessing Plaintiff's obstruction claims when it concluded (1) an official proceeding was required and (2) Defendants' conduct did not violate 18 U.S.C. § 1512(b)(3).

Section 1512(b)(3) criminalizes "misleading conduct toward another person, with intent to ... hinder, delay or prevent the communication to a law enforcement officer ... relating to the commission or possible commission of a federal offense." 18 U.S.C. § 1512(b)(3). This provision "criminalizes the transfer of misleading information which actually relates to a potential federal offense." *United States v. Ronda*, 455 F.3d 1273, 1288 (11th Cir. 2006) (citing *United States v. Veal*, 153 F.3d 1233, 1252 (11th Cir. 1998)). Importantly, § 1512(b)(3) "does not require that a defendant's misleading conduct relate in any way either to an 'official proceeding' or even to a particular ongoing investigation." *Id.* at 1288; *see also* 18 U.S.C.

§ 1512(b)(3) (language "official proceeding" not contained in section (b)(3)). Section 1512(b)(3) applies broadly to "ensur[e] that transfers of information to federal law enforcement officers and judges relating to the possible commission of federal offenses be truthful and unimpeded." *Id.* at 1286.

Plaintiff alleged the RICO Defendants plotted to mislead and defraud federal authorities, made numerous false and misleading statements to federal law enforcement officers, withheld relevant information, and provided falsified materials, including spoofed and "user created" data, various 'white papers' with deceptive analysis, and the now-discredited and fraudulent Steele Dossier. *See, e.g.*, DE:177:¶¶ 94–123, 172-194, 204–25, 297–311. These actions constitute predicate acts violating § 1512(b)(3). *Ronda*, 455 F.3d at 1290 ("The fabrication of evidence to mislead federal investigators violates § 1512(b)(3)."); *United States v. Ronga*, 682 Fed.Appx. 849, 855 (11th Cir. 2017) (noting § 1512(b)(3) "criminalizes attempts to provide misleading information or inhibit truthful information from being transferred."); *see also* 18 U.S.C. 1515(a)(3)(A),(C),(D) ("[M]isleading conduct" is defined to include "knowingly making a false statement" and "knowingly submitting or

inviting reliance on a writing or recording that is false, forged, altered, or otherwise lacking in authenticity ... [or] other object that is misleading in a material respect.").

The district court erred when it found the statements made to law enforcement officials do not apply. DE:267:33. In *Veal*, this Court found the language in § 1512(b)(3) is broad and "another person" can encompass state investigators. 153 F.3d at 1246, *rev'd on other grounds*, *United States v. Chafin*, 808 F.3d 1263, 1273–74 (11th Cir. 2015). Notably, in *Veal*, the misleading statement concerned matters such as a torn garment that falsely implied the victim had resisted arrest. *Id.* at 1246 n. 16. Communicating misleading information to federal law enforcement officials about a Presidential candidate regarding election crimes, and an investigation of criminality in relation thereto, similarly violates § 1512(b)(3). The district court's insistence in the instant case on a preclusively high bar for obstruction fails to comport with existing statutory and case authority. The amended complaint's allegations of Defendants' communication of misleading information to federal law enforcement officials adequately identified predicate acts of obstruction of justice under § 1512(b)(3) and, at DE:177:569, 574–75, a further predicate

act: *conspiracy* to obstruct justice under § 1512(k). *See United States v. Phillips*, 664 F.2d 971, 1015 (5th Cir. Unit B 1981) ("Conspiracy may properly be alleged as a predicate act of racketeering under RICO when it involves any of the substantive offenses listed" under § 1961.).

Strongly supporting the claims of obstruction of justice predicates, the Durham Report discusses how the Steele Reports—which contained false information—were provided to the FBI, and the FBI even relied on them. Durham-Report:123. It was the Reports that "would form the foundation for the narrative that a U.S. presidential campaign was actively engaged in 'a well-developed conspiracy of co-operation' with a foreign adversary." Durham-Report:160. Further, Sussman gave the false Alfa Bank information to the FBI and the CIA. Durham-Report:16-17, 267–70.

> c.    *Wire fraud is a predicate act.*

The district court erred in concluding that Plaintiff did not adequately plead wire fraud and lacked standing to assert this claim. DE:267:38.  Wire fraud takes place "when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the ... wires in furtherance of that scheme." *American Dental Ass'n v.*

*Cigna Corp.*, 605 F.3d 1283 (11th Cir. 2010). Further, a defendant "schemes to defraud" where "he schemes to 'depriv[e] [someone] of something of value by trick, deceit, chicane or overreaching.'" *United States v. Takhalov*, 827 F.3d 1307, 1312–13 (11th Cir. 2016) (citation omitted). "All that is necessary is that the scheme to cause the deprivation of money or property "be reasonably calculated to deceive; the intent element of the crime is shown by the existence of the scheme." *United States v. Bradley*, 644 F.3d 1213, 1239 (11th Cir. 2011).

While wire fraud must be pled with particularity, Fed. R. Civ. P. 9(b), this rule "must not abrogate the concept of notice pleading." *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988). Thus, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Further, courts apply Rule 9(b) less stringently when specific "factual information [about the fraud] is peculiarly within Defendant's knowledge or control." *Hill v. Morehouse Med. Assocs., Inc.*, 2003 WL 22019936, *3 (11th Cir. Aug. 15, 2003) (citing *United States v. Blue Cross Blue Shield of. Ga. Inc.*, 755 F.Supp. 1040, 1052 (S.D. Ga. 1990)).

The amended complaint identified 33 wire transmissions, including statements, documents, and/or misrepresentations made by each RICO Defendant as part of the enterprise's fraudulent scheme.  DE:177:¶ 583(f), (j), (q)–(r), (u)–(y), (aa)–(bb), (ee)–(gg) (Clinton); ¶¶ 583(d)–(e), (dd) (DNC); ¶¶ 583(j)–(m) (Perkins Coie); ¶ 583(j) (Elias); ¶¶ 583(k), (m) (Sussmann); ¶¶ 583(a)–(c), (n)–(p), (s)–(t), (x) (Fusion GPS). Plaintiff pled each wire transmission with particularity, including specifying the time, place and maker of each transmission.

The district court also erred in narrowing the scheme's aim to *taking* property, where the statute applies also to *depriving* someone of property. *Bradley*, 644 F.3d at 1240 (stating a "'scheme to defraud' … signifies the deprivation of something of value by trick, deceit, chicane or overreaching") (quoting *United States v. Pendergraft*, 297 F.3d 1198, 1208–09 (11th Cir. 2002)).

Plaintiff properly alleged the RICO Defendants sought to deprive him of property identified as including loss of political and/or business reputation, business opportunities, competitive position, business revenue, goodwill, and/or contractual relations. DE:177:578. These losses constitute 'deprivation of property' within the context of a wire fraud claim. *See, e.g.,*

*Mid Atlantic Telecom., Inc. v. Long Distance Serv., Inc.*, 18 F.3d 260, 264 (4th Cir. 1994) (recognizing "lost customers and lost revenue" as valid wire fraud injury); *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 565 (5th Cir. 2001) (recognizing "injuries to competitive position" as valid wire fraud injury) (citing *Summit Props. v. Hoechst Celanese Corp.*, 214 F.3d 556, 561 (5th Cir. 2000)); *Alix v. McKinsey & Co.*, 23 F.4th 196, 204–06 (2d Cir. 2022) (loss of potential clients and contractual relations is cognizable RICO injury); *Lewis v. Lhu*, 696 F.Supp. 723, 727 (D.D.C. 1988) (reputational damages); *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 649–50 (2008) (recognizing "lost valuable liens" as valid wire fraud injury, and that misrepresentations about a rival business to the latter's customers and suppliers, resulting in financial loss, constitutes a pattern of mail fraud).

Importantly, while Defendants transmitted the specified fraudulent statements to the media and law enforcement, Plaintiff was their target. Plaintiff's loss was thus "a foreseeable result of *someone's* reliance on the misrepresentation." *Bridge*, 553 U.S. at 656 (emphasis in original). Plaintiff's allegations of reputational harm likewise fall within the scope of the wire fraud statute. *Lewis*, 696 F.Supp. at 727 (recognizing

28

reputational damages as valid wire fraud injury). These allegations set forth a plausible claim that the RICO defendants committed the predicate act of wire fraud in violation of 18 U.S.C. § 1343.

The Durham Report provides a basis for wire fraud as well. It discusses how Steele and Fusion GPS provided the Steele Reports to Yahoo! News. Durham-Report:122–23. And how Sussman and Fusion GPS provided information on the false Alfa Bank story to "various news organizations and were pressing reporters to write articles about the alleged secret communications channel." Durham-Report:17.

### d.    Continuity established a pattern.

"To successfully allege a pattern of racketeering activity, Plaintiffs must allege: (1) Defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a continuing nature." *Jackson v. BellSouth Telecom.*, 372 F.3d 1250, 1264 (11th Cir. 2004).

As detailed above, multiple continuing predicate acts occurred within the last ten years. Moreover, these predicate acts were related to the enterprise's purpose of damaging Plaintiff and his Presidential campaign.

In her 2017 memoir, *What Happened*, Hillary Clinton claimed the supposed Russia collusion—the narrative theme used for Defendant's alleged wrongdoing and which has now been disproven by the governing investigations, including the Durham Report—contributed to her loss. Defendant Clinton continues to sell copies of this book (available on Amazon), reflecting the continuity (and gains to Defendants) from the predicate acts that deprived Plaintiff of money and property.

Continuity is a "closed and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989). To plead an open-ended continuity, a plaintiff must allege an enterprise poses a continuing threat, showing "the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future" or "the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *H.J. Inc.*, 492 U.S. at 242. Here, Plaintiff pleaded the RICO Defendants planned and executed an ongoing scheme to falsely allege harmful, reputation-damaging assertions of near-treason. This is public knowledge, and will likely continue beyond the present.

30

To plead closed-ended continuity, a plaintiff must allege that the defendants engaged in a "series of related predicates extending over a substantial period of time." *American Dental Ass'n*, 605 F.3d at 1291. Plaintiff's wire fraud claim spans years of wrongdoing, commencing May 14, 2016, when Fusion GPS began deceiving a Slate journalist, Franklin Foer, into writing an article about the purported Trump-Alfa Bank connection (which article was the eventual subject of a Clinton press release and numerous misleading Clinton tweets), DE:177:¶ 583(a), and continuing through February 16, 2022, when Defendant Clinton deliberately attempted to mislead the public and further the enterprise's fraudulent scheme by tweeting that Plaintiff was trying to invent a "fake scandal" to distract from "real ones." DE:177:¶ 583(gg).

The last known act of obstruction of justice occurred on November 16, 2017, when the RICO Defendants conspired with Defendants Steele and Danchenko to make false statements and misrepresentations to the FBI. This 18-month timeframe sufficiently satisfies the continuity requirement. *See Magnifico v. Villanueva,* 783 F.Supp.2d 1217, 1229 (S.D. Fla. 2011).

Plaintiff properly pled both types of continuity, and the district court's assertion that Plaintiff did not establish a pattern of racketeering activity was erroneous.

e.  *Defendants violated section 1962(d).*

Plaintiff properly pled the requisite elements of a RICO conspiracy claim under 18 U.S.C. § 1962(d), where the amended complaint alleged facts showing that Defendants "agreed to participate directly or indirectly in the affairs of an enterprise through a pattern of racketeering activity." *In re Managed Care Litig.*, 298 F.Supp.2d 1259, 1280 (S.D. Fla. 2003). A plaintiff can establish a RICO conspiracy "(1) by showing that Defendant agreed to the overall objective of the conspiracy; or (2) by showing that Defendant agreed to commit two predicate acts." *American Dental Assn.*, 605 F.3d at 1293 (citation omitted). Circumstantial evidence applies, including "inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *United States v. Sylvestri*, 409 F.3d 1311, 1328 (11th Cir. 2005). Plaintiff alleged facts showing that Defendants agreed to and committed at least two predicate acts, including obstruction of justice and wire fraud, and conspired participate in the

enterprise through a pattern of prohibited activity, resulting in harm to Plaintiff's business and property, as follows:

- Steele collected biased and false information and provided it to Fusion to prevent Plaintiff from winning the 2016 Presidential election and drive an FBI investigation of Plaintiff. He later provided false information to the FBI. DE:177:¶¶ 95, 99, 105, 226, 233, 239, 272–73, 291.

- Danchenko aided Steele in his false Dossier and developed a close relationship with Dolan. DE:177:¶¶ 109, 331, 335, 488.

- Sullivan, a high-ranking Clinton campaign official, helped direct Joffe's data mining and convey the false Russia collusion narrative to the media. DE:177:¶¶ 141, 165–67, 265, 313.

- Podesta was the Clinton campaign chairman and, like Sullivan, pushed the false Russia collusion narrative to the media. DE:177:¶¶ 276, 313, 496, 498–501.

- Clinton made numerous actionable misrepresentations while having responsibility for and management of Clinton campaign members' participation in the enterprise.  DE:177:¶ 583(f), (j), (q)–(r), (u)–(y), (aa)–(bb), (ee)–(gg).

- Mook was the Clinton campaign manager who met with Elias, Podesta, and Sullivan to coordinate the false Russia collusion narrative. DE:177:¶¶ 247–48, 252.

- Reines spread the same lies. DE:177:¶¶ 463, 497.

- Nellie and Bruce Ohr, former DOJ employees, lent credibility to the fraudulent Steele Dossier, serving as intermediaries to help prepare and disseminate it to the FBI and DOJ. DE:177:¶¶ 88–89, 103, 169–70, 284–86.

- Neustar Inc. and Neustar Security Services extracted non-public data at the behest of Joffe on Trump and/or Alfa Bank on multiple occasions. DE:177:¶¶ 185–86, 328.

- Sussman and Joffe made false statements to law enforcement and submitted false or misleading 'white papers.' DE:177:305–08.

Plaintiff sufficiently stated a claim under § 1962(d).

   *f. Plaintiff alleged qualifying harm from RICO violations.*

RICO provides a private cause of action for "[a]ny person injured in his business or property by reason of a violation of Section 1962 of this chapter." 18 U.S.C. § 1964(c). To have standing under Section 1964(c), a

34

civil RICO plaintiff must show: (1) his alleged harm qualifies as an injury to his business or property; and (2) the harm was "by reason of" the RICO violation, including showing proximate causation. *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992). Contrary to the district court, DE:267:43, Plaintiff satisfied both requirements.

"Proximate cause ... is a flexible concept that does not lend itself to 'a black-letter rule that will dictate the result in every case.'" *Bridge*, 553 U.S. at 654 (citation omitted). To plead causation under RICO, a plaintiff must allege "some direct relation" between the injury asserted and the injurious conduct. *Corcel Corp. v. Ferguson Enters.*, Inc., 551 Fed.App'x 571, 576 (11th Cir. 2014). Plaintiff need only plead that Defendants' "conduct was a substantial factor in the sequence of responsible causation." *Id.*

The amended complaint asserted that, "[a]s a direct and proximate result of the RICO Defendants' racketeering activity described herein, numerous unfounded investigations, including the FBI's Crossfire Hurricane investigation and its full-field Alfa Bank investigation, numerous congressional investigations, and Special Counsel investigations were fraudulently diverted and abused; countless false, damaging, and

defamatory articles and media stories of all types (television, radio, internet, etc.) were published, resulting in the widespread dissemination of false, damaging and defamatory accusations of Plaintiff's purported collusion with Russia which became an ongoing headline story that irreparably, unjustly and permanently tarnished Plaintiff's political reputation." DE:177:¶ 614.

The amended complaint further alleged that Plaintiff suffered at least *nine* independent and distinct harms to his business and property, including: (i) "loss of political ... reputation"; (ii) "loss of ... business reputation"; (iii) "loss of existing and future business opportunities"; (iv) "loss of competitive position"; (v) "loss of business revenue"; (vi) "loss of goodwill"; (vii) "loss of trade secrets"; (viii) "loss of contractual relations"; and (ix) "defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the RICO Defendants' actions and the various federal investigations and/or official proceedings which arose therefrom." DE:177:¶¶ 615–16.

Additionally, the amended complaint provided facts indicating Defendants' conduct and misleading statements to the media led or contributed to and misdirected federal investigations, which in turn led to

Plaintiff's injuries. *See, e.g.*, DE:177:¶ 158 (alleging Steele began sending Dossier to FBI on July 5, 2016), ¶ 204–14, 343 (alleging Alfa Bank's 'full field investigation' launched four days after Sussmann met with Jim Baker), ¶ 226 (alleging Inspector General Michael Horowitz's finding that Steele Dossier was used to grant FISA court warrants).

The Durham Report found the FBI could not identify any evidence of collusion between Russia and Trump aside from the Steele Dossier's false allegations, which derived from Danchenko. Durham-Report:10–11. The Steele Dossier, in part, misdirected and sustained multiple federal investigations. Durham-Report:10–11. 18.

Plaintiff properly asserted standing under RICO by showing Defendants caused injury to his business and property, and gave rise to special damages in the form of legal fees. The order dismissing his RICO claims with prejudice should therefore be reversed.

## 2.  The District Court Erred in Dismissing Plaintiff's Claims of Injurious Falsehood and Related Conspiracy.

The amended complaint, in asserting facts showing Defendants purveyed knowing, malicious falsehoods to Plaintiff's economic and reputational detriment, properly set forth a cause of action for injurious

37

falsehood. This claim has five elements: (1) a falsehood; (2) published or communicated to a third party; (3) Defendant knew the falsehood would likely induce others not to deal with Plaintiff; (4) the falsehood played a material and substantial part in inducing others not to deal with Plaintiff; and (5) special damages. *See Bothmann v. Harrington*, 458 So. 2d 1163, 1168 (Fla. 3d DCA 1984).

The district court erred in finding: (1) the statute of limitations ruled out most of the statements, except for two made by Clinton, (2) Plaintiff was not injured because he expressly decided to forgo reputational damages, and damage to his political career is not an injury to property, (3) Plaintiff failed to plead that the statements were false, and (4) the First Amendment protects Defendants' statements. DE:267:43-49.

First, as discussed in section II(A)(1) *infra*, Plaintiff's claims were equitably tolled. Still, Defendant Clinton made two statements within the limitations period. DE:267:45.

Second, Plaintiff alleged that through Defendants' lies, he had "been injured in his business and property and has incurred and will continue to incur, significant damages, losses, and deprivation of tangible and intangible property." DE:177:¶ 664; *see Horgan v. Felton*, 170 P.3d 982,

988 (Nev. 2007) (legal fees incurred by plaintiff to respond to injurious falsehoods also constitute actionable damages).

Third, Plaintiff properly alleged the statements were knowingly false. DE:177:¶¶ 501, 583, 673, 676, 689. The amended complaint enumerates how interstate wire facilities were used to perpetuate the unlawful scheme, including several false statements and false communications sent to the media. DE:177:¶¶ 583.

The amended complaint satisfies the additional elements, as well, in alleging that Defendants "knew that Plaintiff was not colluding with Russia, or at a minimum, acted with reckless abandon as to the truth of whether the Plaintiff had colluded with Russia," and that, despite this knowledge, the Defendants "conspired to disseminate false information and spread a false narrative in an attempt to ruin the Plaintiff." DE:177:¶¶ 673.

Fourth, the First Amendment does not protect Defendants' statements because, as Plaintiff properly pled, they were made with actual malice. DE:177:¶¶ 635-652 (alleging, in ¶ 636, that, at all relevant times, Defendants knew that the Plaintiff "was not colluding with Russia, or, at a minimum, acted with reckless abandon as to the truth of whether the

Plaintiff had colluded with Russia"). *See also Fridovich v. Fridovich,* 598 So. 2d 65, 69 (Fla. 1992) ("[T]here is no benefit to society or the administration of justice in protecting those who make intentionally false and malicious defamatory statements.").

Because Plaintiff properly stated a claim for injurious falsehood, the order dismissing this claim should be reversed.

### 3.    The district court erred in dismissing Plaintiff's claim of malicious prosecution conspiracy.

The district court ruled that because no prosecution resulted from the Defendants' conduct, despite their extreme efforts in that regard, no claim for malicious prosecution could stand. But that ruling did not account for the malicious prosecution conspiracy count, where the allegations showed an illegal combination to cause prosecution of the Plaintiff.

### C.    Jurisdiction over Joffe, Dolan, and Orbis was valid given RICO'S nationwide service of process and Defendants' requisite minimum contacts with the forum, with no showing of undue inconvenience.

Under 18 U.S.C. § 1965(b), there is nationwide service of process for RICO claims. The district court erred in finding § 1965(b)

40

inapplicable—because, contrary to the dismissal order, Plaintiff properly pled RICO claims, including as to these Defendants. Furthermore, these defendants had minimum contacts with the United States and failed to demonstrate that the chosen forum would be "so gravely difficult and inconvenient that [they] will be at a severe disadvantage in comparison to Plaintiff." *Prou v. Giarla*, 62 F.Supp.3d 1365, 1373 (S.D. Fla. 2014). Joffe—a Virginia resident who was promised a high-level position in the Clinton Administration, Dolan—an active participant in the Clinton campaign and active participant in Democratic Party politics since the 1990s, and Orbis—which contracted with and worked for several U.S.-based companies with the intention of influencing the Presidential election—were properly served. DE:177:¶¶ 5, 94-105.

## II.    THE DISTRICT COURT ERRED IN FINDING THE AMENDED COMPLAINT TIME BARRED AND THE STATUTE OF LIMITATIONS SHOULD BE DEEMED TOLLED.

The Supreme Court has adopted a four-year statute of limitations for RICO claims. *Agency Holding Corp. v. Malley-Duff & Assoc.*, 483 U.S. 143, 146 (1987) (incorporating the express four-year statute of limitations from the Clayton Act,15 U.S.C. §§ 12-17). This Court has determined that the

41

four-year civil RICO limitations period runs from when the injury was or should have been discovered. *Lehman v. Lucom*, 727 F.3d 1326, 1330 (11th Cir. 2013). In this case, injuries from Defendants' individual and jointly undertaken criminal and tortious conduct were discovered at the latest, according to the district court, by on or about October 27, 2017.

The district court's statute of limitations decision: misapplied Fed. R. Civ. P.12(b)(6) requirements for such a dismissal; failed to properly address equitable tolling given the unique responsibilities of Plaintiff in discharging his constitutional duties and historically-unprecedented events occurring during his term; and wrongly discounted tolling based on the initiation and pendency of government enforcement actions.

Historically, courts have expressed a preference for lawsuits being determined on the merits by a jury rather than by motion to dismiss a complaint. That is especially true where, as in this case, there are identifiable issues effectively implicating the statute of limitations that should be left to a judicial determination following an evidentiary hearing or by a jury at trial. *See, e.g., United States v. Fonseca-Machado*, 53 F.3d 1242, 1243 (11th Cir. 1995) (whether the statute of limitations is tolled is a question of fact). Recognizing these fundamental principles, this Court

42

has determined that a "statute of limitations bar is an affirmative defense, and plaintiff[s] are not required to negate an affirmative defense in [their] complaint." *LaGrasta v. First Union Sec. Inc.*, 358 F.3d 840, 845 (11th Cir. 2004) (quotation omitted). Moreover, a Rule 12(b)(6) dismissal on limitations grounds is appropriate only where "it is apparent from the face of the complaint that the claim is time-barred." *Id.* (internal quotation marks omitted). As the district court recognized here, this requires that at the motion to dismiss stage, an action can only be excluded on statute of limitation grounds "if it appears beyond a doubt that plaintiff can prove no set of facts that toll the statute." DE:267:23 (citing *Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288 n. 13 (11th Cir. 2005)). In this case, the limitations issues could not be fairly determined from the face of the amended complaint, and Plaintiff was wrongfully denied the opportunity to prove facts showing of the statute of limitations.

## A.    Plaintiff's claims were equitably tolled.

Limitations periods are customarily subject to equitable tolling. *Young v. United States*, 535 U.S. 43, 49-50 (2002); *Irwin v. Department of Veterans*, 498 U.S. 89, 95 (1990). Importantly, the Clayton Act's limitations period may be equitably tolled notwithstanding that statute's "shall be

43

forever barred" language. *United States v. Wong*, 575 U.S. 402, 413-14 (2015) (citing *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 559 (1974)). Given that the RICO Act's limitations statute is borrowed from the Clayton Act, the doctrine of equitable tolling likewise applies to RICO claims.

Equitable tolling "pauses the running of, or 'tolls,' a statute of limitations when a litigant has [1] pursued his rights diligently but [2] some extraordinary circumstance prevents him from bringing a timely action." *Lozano v. Montoya Alvarez*, 572 U.S. 1, 10 (2014) (citing *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). Plaintiff's circumstances meet these requirements.

Plaintiff was inaugurated on January 20, 2017, and remained in office until January 20, 2021. During these four years, he was subjected continually to attacks challenging the legitimacy of his presidency, including criminal investigations targeting either him or his campaign staff; multiple impeachment proceedings; plans by his Attorney General to secretly record Plaintiff and potentially invoke the 25th Amendment to terminate his presidency; a worldwide pandemic, COVID, the likes of which the world had not seen in a century; and a myriad of other domestic

and international issues that consumed his time, despite his ability to work without much sleep. These extraordinary, historically-unprecedented circumstances compellingly merit equitable tolling. He could not, and should not, have been burdened with the additional obligation of devoting his time and energies to preparing and filing this lawsuit during his time in office. Nor should this lawsuit have been filed during the term of his presidency, given that it may have interfered with, and would have been perceived as an effort to influence, the outcome of ongoing investigations, including the Mueller and Durham Investigations.

The Supreme Court recognizes that the President occupies a unique position in the constitutional scheme, *Nixon v. Fitzgerald* 457 U.S. 731, 749 (1982), and in that capacity, has an overarching duty both to "preserve, protect, and defend the Constitution" and to take care that the laws be faithfully executed. U.S. Const. art. II, §§ 1, 3. As the Supreme Court cautioned in *Nixon*, "[b]ecause of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of the government." *Id.*

In rejecting Plaintiff's invocation of equitable tolling, the district court did not, and could not, dispute the cautions of the *Nixon* Court. Instead, the district court relied on Plaintiff's filing of other lawsuits in his individual capacity—e.g., *Trump v. Vance*, 140 S.Ct. 2412 (2020); *Trump v. Mazars*, 140 S.Ct. 2019 (2020); *Trump v. Comm. on Ways & Means*, 391 F.Supp3d 93 (D.D.C. 2019)—in concluding there were no exceptional circumstances preventing Plaintiff's timely filing in this case. However, the district court failed to perceive the critical difference between those lawsuits, *which were filed to vindicate significant governmental and constitutional interests* arising *from the Presidential role*, and the present suit, which is instead *personal* in nature.

*Trump v. Vance* challenged a state-issued grand jury subpoena. As the Supreme Court recognized, it was not a private lawsuit brought to protect or promote personal interests, but one implicating the Supremacy Clause in seeking to resolve a dispute between a State's interest in pursuing criminal investigation and a President's Article II interest in performing his duties without interference. *Id.* at 2420.[5]

---

[5] *See also Trump v. Vance*, 140 S.Ct. at 2434 (Thomas, J., dissenting) ("If the President could show that 'his duties as chief magistrate demand his whole time for national objects,' *United States v. Burr*, 25 F. Cas. 30,34 (No. 14,692 ) (CC Va 1807) (Marshall, C.J.), he is entitled to relief from

*Trump v. Mazars,* challenging whether Congress exceeded its authority in issuing four subpoenas seeking the President's financial information, likewise entailed a constitutional issue. 140 S.Ct. at 2029–31 (recognizing the "dispute represents a significant departure from the historical practice [of compromise] between Congress and the President"). Similarly, *Trump v. Comm. on Ways & Means* was filed not to advance personal interests, but to enhance the separation of powers by protecting the Office of the President against unconstitutional encroachment by the Legislative Branch. 391 F.Supp.3d at 96.

Nor does *Clinton v. Jones*, 520 U.S. 681 (1997), foreclose equitable tolling in this case. While rejecting a categorical rule for staying an action against the President during his term, the Supreme Court acknowledged that "the high respect owed to the office of the Chief Executive ... should inform the conduct of the entire proceeding," stressing that whether a specific case warrants exceptional treatment is more appropriately the subject of the exercise of traditional discretion than an interpretation of

---

enforcement of the subpoena); *id.* at 2439 (Alito, J., dissenting) (noting the "much deeper significance" of the case: "While the decision will, of course, have a direct effect on President Trump, what the Court holds today will also affect all future Presidents—which is to say, it will affect the Presidency, and that is a matter of great and lasting importance to the nation.").

the Constitution. *Id.* at 706–07. The Supreme Court in *Clinton* further noted that "especially in cases of extraordinary public moment [a plaintiff] may be required to submit to delay … if public welfare or convenience will thereby be promoted." *Id.* at 707.[6]

At the very least, discovery, and not just a hearing, was needed to reach the merits of the equitable tolling factors.  Because the amended complaint was filed within 14 months of the end of his term, tolling for the term of his Presidency would negate the running of the statute as to each claim in the amended complaint, for which the shortest limitations period was two years *See* Fla. Stat. § 95.11(4)(g) (two year period for injurious falsehood claims; four-year period for injurious falsehood conspiracy). Moreover, the Presidential business factors necessarily included the potential for constitutional confusion and perceived interference had the suit been filed during Plaintiff's Presidency, which itself constituted an exceptional circumstance disregarded by the district court.

---

[6]  In rejecting a categorical tolling rule, the Court relied in part on the then-uniqueness of civil litigation involving the President. "If the past is any indication it seems unlikely that a deluge of such litigation will ever engulf the Presidency." *Clinton*, 520 U.S. at 702. The validity of that observation has most certainly eroded over time.

Notably, Plaintiff as part of his official role had to address Defendants' false allegations throughout his Presidential term. And the Durham Report—discounted by the district court on Plaintiff's motion for Fed. R. Civ. P. 60(b) relief—ultimately found Defendants' allegations to be baseless, as Plaintiff's amended complaint alleges. As the Durham Report confirms, "neither U.S. law enforcement nor the Intelligence Community appears to have possessed any actual evidence of collusion in their holdings at the commencement of the Crossfire Hurricane investigation." Durham-Report:8. The Durham Report concludes that the FBI acted without evaluating the reliability of the information it received. Durham-Report:9. The Report concludes that if the FBI had investigated properly, it would have been clear that President Trump and his campaign were not involved with Russia. *Id*.

In denying Rule 60(b) relief, the district court wrongly held that "nothing in the Durham Report changes [its prior orders]." DE:343:17. At the same time, the district court refused to review the Report despite the possibility that it could have changed the case. DE:343:1.

If Plaintiff, during his term in office, had tried to take any action on the matters that Special Counsel John Durham was specially tasked to

49

handle beginning in 2019, and did not resolve until after Plaintiff's term ended, it would have looked like Plaintiff was interfering with law enforcement functions. The same is true of the Mueller investigation. Given these extraordinary circumstances, he could not pursue any additional claims while he was President.

### B.    Plaintiff's claims were tolled by pending litigation.

In addition to equitable tolling, two government actions tolled this matter under 15 U.S.C. § 16(i). As discussed above, the Supreme Court has incorporated the Clayton Act limitations statute into RICO. *See Wong*, 575 U.S. at 403 (citing *American Pipe*, 414 U.S. at 559); *see also Rotella v. Wood*, 528 U.S. 549, 557-58 (2000). The tolling effect of Clayton Act § 16(i) is triggered when any "civil or criminal proceeding [] instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws," begins. *Id.* The district court erred in failing to conclude that Clayton Act tolling applies in this case. DE:267:28.

Several courts have confirmed that § 16(i)'s tolling provision applies to RICO actions. *See, e.g.*, *Pension Fund Mid Jersey Trucking Industry v. Omni Funding*, 687 F.Supp. 962, 965 (D.N.J. 1988); *Gianelli v. Schoenfeld*,

2021 WL 4690724, *6 (E.D. Cal. Oct. 7, 2021); *Pres. Petrified Forrest v. Renzi*, 2014 WL 530574, *3–4 (D. Ariz. Feb. 12, 2013).

An action under 15 U.S.C. § 16(i) is generally considered to commence upon the filing of an indictment or complaint. *See, e.g., Leh v. Gen. Petroleum Corp.*, 382 U.S. 54, 59–63 (1965) (giving tolling effect from when government filed complaint); *Minn. Mining & Mfg. Co. v. New Jersey Wood Finishing Co.*, 381 U.S. 311, 313 (1965) (giving tolling effect from date FTC filed enforcement action). When applicable, § 16(i) "tolls the statute of limitations against all participants in a conspiracy which is the object of a government suit, whether or not they are named as defendants or conspirators therein." *Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321, 336 (1971).

Defendants here argued, and the district court accepted, that § 16(i) was inapplicable because there were no government actions founded on the specific RICO predicate acts alleged. DE:267:28. As Plaintiff pointed out, however, at least four distinct proceedings were based on a theory similar to the RICO action, including: (1) a Federal Election Commission ("FEC") case; (2) *United States v. Michael Sussmann*, D.D.C. No. 21-cr-00582 (indictment); (3) *United States v. Danchenko*, D.D.C. No. 21-cr-00245

(indictment); and (4) *United States v. Clinesmith*, D.D.C. No. 20-cr-00165 (indictment and conviction). *See generally* DE:177:¶¶ 482–87, 528–43, 611. The district court failed to recognize that § 16(i)'s express language requires only that a prior proceeding be "based in whole or in part on any matter complained of" in the instant proceeding. A "private plaintiff is not required to allege that the same means were used to achieve the same objectives of the same conspiracies by the same Defendants ... [r]ather, effect must be given to the broad terms of the statute itself—'based in whole or in part on any matter complained of.'" *Leh*, 382 U.S. at 59.

Plaintiff needed only to show "the matters complained of in the government suit bear a real relation to the private plaintiff's claim for relief." *Id.*; *see also Minn. Mining*, 381 U.S. at 323 (Section 16(i) "provides for tolling as long as the private claim is based 'in part on any matter complained of' in the government proceedings."). To make this determination, courts look to "a comparison of the two complaints on their face." *Leh*, 382 U.S. at 65.

First, the FEC commenced an enforcement action against the DNC and the Clinton Campaign. *In the Matter of DNC Services Corp./Democratic National Committee, et al.*, MURs 7291, 7331, 7449

("FEC Action"). The Supreme Court has interpreted § 16(i) broadly to encompass federal administrative proceedings. *Minn. Mining*, 381 U.S. at 321–22 (FTC-initiated proceeding qualified, based on holding that § 16(i) limitation provision is tolled by Commission proceedings to same extent and in same circumstances as by DOJ actions, giving effect to policy objectives underlying § 16(i)).

In the FEC action, the First General Counsel's Report (the "FEC Complaint"), filed April 10, 2019, *see generally* DE:237.2; DE:177:21 ¶83(f); DE:177:104–05 ¶¶ 470–79, alleged the DNC and Clinton Campaign "failed to file accurate disclosure reports when they mischaracterized the payee and purpose of certain disbursements disclosed as made to Perkins Coie LLP for legal services, when in fact the payments were passed through to the research firm Fusion GPS for the purpose of opposition research and should have been disclosed as such." DE:237.2:1. The FEC complaint discusses involvement of many of the prominent Defendants in this action, including Perkins Coie, Elias, Mook, Fusion GPS, Simpson, and Steele.

The facts alleged in the FEC complaint overlapped significantly with those alleged in Plaintiff's amended complaint, specifically, the construction of the enterprise, Defendants' agreement to participated in

the affairs of the enterprise, the RICO Defendants' actions to support the enterprise's goals, their collective efforts to conceal the illicit arrangement by misreporting the relationship between the DNC/the Clinton Campaign and Fusion GPS and funneling funds through Perkins Coie, and Defendants' knowledge of it.

For example, the FEC complaint described how the Clinton Campaign and DNC worked through their joint general counsel, Perkins Coie, who worked with Fusion GPS, to retain Steele and Orbis, performing opposition research on Plaintiff and leading a media smear campaign against him. DE:237:20–30. It describes how "Steele drafted a series of memoranda based on the information he gathered (*i.e.*, the dossier) and provided the memoranda, intermittently, to Fusion, which in turn shared some of the information therein ... with Perkins Coie, which in turn shared some of the information with [the Clinton Campaign and the DNC]." DE:237:39; *compare generally with* DE:177.

The significant overlap between the FEC complaint and Plaintiff's amended complaint qualifies the FEC action as a "civil or criminal proceeding ... instituted by the United States" tolling the RICO statute of limitations. Accordingly, the statute was suspended on April 10, 2019,

when the FEC action was filed, and remained in place when the original complaint was filed on March 24, 2022.

The United States commenced *Sussman*, a criminal case, on September 16, 2021. The *Sussman* indictment overlaps with the Alfa Bank-related allegations in the amended complaint and outlines many of the facts surrounding Defendants Sussman and Joffe's coordinated efforts to falsely implicate Plaintiff, including Sussmann's meetings, conferences, and communications with other RICO Defendants and billing of his time to the Clinton Campaign and DNC. *Compare* DE:237.3:¶¶ 4, 9, 14, 19–20, 24–39, *and* DE:177:¶¶ 175–84, 195–97, 206, 224, 242, as well as allegations regarding Sussmann's attempts to leak the false allegations through the media. *Compare* DE:237.3:¶¶ 1, 2, 22, 25, 34–37, *and* DE:177:¶¶ 174–76, 184, 191, 232. Read together, the Sussmann indictment and the amended complaint make clear Sussmann and Joffe's false statements to the FBI and CIA and submission of so-called 'white papers' containing false and misleading information demonstrating repeated episodes of obstruction of justice under 18 U.S.C. § 1512—the same RICO predicate acts the amended complaint alleged.

Moreover, the indictment includes Sussmann's proffer of false statements to the FBI and the CIA, *compare* DE:237.3:¶¶ 3–7, 24–28, 30–33, 39–46; *and* DE:177:¶¶ 172, 198, 204–17, 297–311; and Sussmann's drafting of various misleading and falsified 'white papers' which were ultimately provided to the FBI and the CIA, c*ompare* DE:237.3:¶¶ 24, 26–27, 30, *and* DE:177:¶¶ 172, 184, 193–94, 198, 201, 204–17, 297–311.

The *Sussmann* indictment includes many references to other RICO Defendants, alleging they all worked together to carry out a joint conspiracy. DE:237.4, *United States v. Sussmann*, D.D.C. No. 1:21-cr-00582-CR, Doc:61:19 (Gov't mot. in limine, April 4, 2022, stating "evidence, public information, and expected testimony clearly establishes by a preponderance of evidence that [Sussmann] and [Joffe] worked in concert with each other and with agents of the Clinton Campaign to research and disseminate the [Alfa Bank] allegations"); *id.* at 32 (noting a "common plan and mutual coordination among" Fusion GPS, Joffe, Sussmann, and the Clinton Campaign).

The *Clinesmith* prosecution (and conviction), involving the intentional alteration of an email by the FBI attorney defendant, and the *Danchenko* prosecution involving his false statements that likewise

56

supported obstruction of justice claims were also pending during the term of office of President Trump. *See* DE:177:482–87, 611.

"Suspension of the running of the statute of limitations pending resolution of the government action may not be made to turn on whether the United States is successful in proving the allegations of its complaint." *Leh*, 382 U.S. at 65. Therefore, even though Sussmann was acquitted, *Sussmann* qualifies as a "civil or criminal proceeding ... instituted by the United States" tolling Plaintiff's RICO statute of limitations from the date of its filing—September 16, 2021—through the case's termination after the filing of this action.

Accordingly, whether through equitable tolling or 15 U.S.C. § 16(i), Plaintiff's RICO action was timely filed, and the district court's ruling on the statute of limitations should be reversed.

## III.  THE DISTRICT COURT ERRED IN IMPOSING SANCTIONS AGAINST APPELLANTS.

The arguments above amply demonstrate that Plaintiff advanced legitimate, good faith arguments. The district court made a clear error and abused its discretion in finding that Appellants acted in bad faith, and in imposing almost $1 million in inherent authority sanctions. Additionally,

the district court abused its discretion in granting Fed. R. Civ. P. 11 sanctions to Defendant Dolan.

## A.    Imposition of sanctions under the district court's inherent authority violated due process and was an abuse of discretion.

On January 19, 2023, the district court issued sanctions under its inherent authority, on behalf of 18 Defendants. DE:302. Sanctions issued under a court's inherent authority trigger due process protections of fair notice and hearing—protections that were not afforded here. *See Donaldson v. Clark*, 819 F.2d 1551, 1559–60 (11th Cir. 1987). Fair notice—a fundamental due process requirement, even for basic Rule 11 sanctions—provides litigants an opportunity to correct or otherwise address supposedly offending behavior, to amend deficient pleadings, or to understand the reasoning behind a court's belief that they might have acted in bad faith. *Id.* In this case, the district court did not even hint at imposing $1 million sanctions until its order granting dismissal of the entire case.

Not only did the district court abuse its discretion by violating due process, it also made clear errors of judgment in its politicized analysis and

conclusions, including findings of bad faith and references to Plaintiff's litigation in other courts.

## B.    Lack of fair notice was an abuse of discretion.

Fair notice is a fundamental due process requirement, even for basic Rule 11 sanctions. *See Donaldson*, 819 F.2d at 1559–60. This protection is particularly important where the court issues sanctions under its inherent powers. They are a drastic remedy with potential for abuse, and "must be exercised with restraint and discretion." *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980); *In re Mroz*, 65 F.3d at 1575 (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 41 (1991)). "Due process requires that the attorney (or party) be given fair notice that his conduct may warrant sanctions and the reasons why." *In re Mroz*, 65 F.3d at 1576.

When imposing sanctions, "[a] district judge should not await the aggregation of what he considers multiple acts of misconduct and then levy an aggregated sanction without at least warning the attorneys at the time of each act or reserving decision upon timely requests by opposing counsel." *Riddle v. Egensperger*, 266 F.3d 542, 556 (6th Cir. 2001) (citing *In re Ruben,* 825 F.2d 977, 990 (6th Cir. 1987)).

59

In this case, neither the district court nor any of the Defendants provided any notice to Appellants of their intent to seek sanctions before the end of the case. Notably, when these Defendants (other than Dolan) moved for sanctions, they conceded Rule 11 sanctions were not available under the safe-harbor provision. DE:280:1 n.1. Pursuant to that provision, "a party cannot delay serving its Rule 11 motion until conclusion of the case." *Peer v. Lewis*, 606 F.3d 1306, 1313 (11th Cir. 2010). Instead, Defendants asked for sanctions under three other theories—28 U.S.C. § 1927, the court's inherent authority, and the Defend Trade Secrets Act—while also suggesting that the court could impose Rule 11 sanctions on its own initiative. DE:280:1.

If the court acts on its own under Rule 11, without a properly noticed Rule 11 motion from a party, it must meet a higher standard—akin to contempt—while also providing sufficient notice. *Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251, 1255 (11th Cir. 2003).

Here, the district court declined to impose Rule 11 sanctions on its own initiative, in all likelihood because Rule 11 was "backward looking, limited to pleading and motion abuse." DE:302:6. Nevertheless, the district court's sanctions order is basically an attack on the amended complaint,

60

its factual allegations, and legal theories. The district court essentially conducted a Rule 11 analysis and used its inherent authority analysis to circumvent the notice required.

In *Chambers,* the Supreme Court contemplated that use of the court's inherent power of sanctions at the end of litigation could be an impermissible "end run" around the notice requirements of Rule 11. *Id.*, 501 U.S. at 56. Under the extreme facts of that case, the Court did not find the use of inherent judicial power to impose sanctions was an abuse of discretion, where the sanctioned parties had received numerous, timely warnings from the court and opposing party that their conduct was sanctionable, yet they persisted in litigation behavior deemed unethical and abusive, subjecting them to multiple contempt proceedings. *Id.* at 37–39. Ultimately, because of this repeated conduct and the repeated warnings on the record, the district court issued a sanctions award of $996,644.65, in part on the basis of its inherent authority. *Id.* at 40. The Supreme Court upheld the use of the district court's inherent power to impose these sanctions in part because the repeated warnings constituted adequate notice. *Id.* at 56.

By contrast, no warning, notice, or opportunity to cure was given to Plaintiff or Plaintiff's attorneys in the instant case. The district court, despite citing *Chambers* in its sanctions orders, failed to acknowledge and adhere to the critical notice requirements of Rule 11 recognized by the Supreme Court in that decision.  Instead, the district court, in  imposing sanctions under the purported rubric of its inherent authority, engaged in an end-run around Rule 11's notice requirement, in defiance of essential procedural fairness.

The district court tacitly admits, as it must, that there was no mention of sanctions on the record until the issuance of its order of dismissal on September 8, 2022. Further, Defendants' various motions to dismiss did not deal with or reference sanctions. By the time any mention of sanctions was made, save for Dolan's Rule 11 sanctions notice, litigation in this matter had concluded. DE:302:3.

The only conduct to which the district court voiced any objection was an interview of Appellant Habba by news host Sean Hannity on September 10, 2022. *Id.* This interview, however, occurred *after* the amended complaint was dismissed and the litigation had ended.  The September 8th order did not offer any fair notice that Appellants could be sanctioned.

There is one sentence at the end of the order stating, "I reserve jurisdiction to adjudicate issues pertaining to sanctions." DE:267:65. Appellant Habba did not know this would apply to constitutionally-protected speech in a media interview, especially when she discussed facts later found plausible in the government's Durham Report. She was certainly not "reiterat[ing] misrepresentations upon which this lawsuit was based." DE:302:3.

After dismissal of the case, there was no way to adqeuately confront and refute the supposed bad faith findings emanating from the dismissal order itself. This is the very reason for the notice requirements of Rule 11, and presumably why the district court chose to invoke its far more drastic remedy of inherent authority sanctions.

## C. Denial of Plaintiff's evidentiary hearing request was an abuse of discretion.

The district court also erred by not holding a hearing, which is a due process violation when issuing sanctions under the court's inherent authority. *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1306 n.6 (11th Cir. 2009) (citing *Chambers* as requiring hearings before issuing sanctions); *In re Mroz*, 65 F.3d at 1576 (remanding for evidentiary hearing on finding of bad faith); *accord Amlong*, 500 F.3d at

1242 (requiring a hearing for attorneys threatened with § 1927 sanctions). This is exemplified in *Campos v. City of Naples*, which reversed the imposition of sanctions without a hearing. 202 Fed.Appx. 381, 385 (11th Cir. 2006).

In this case, Appellants expressly requested an evidentiary hearing. DE:285:13–14. Given the reputation of a law firm and its attorneys were at stake, it was wrong to refuse to hold an evidentiary hearing before imposing such significant sanctions. Therefore, this Court should reverse the district court's inherent sanctions order from January 19, 2023. In the alternative, this Court should remand this case to a different judge (as described below) for an evidentiary hearing on sanctions, to present evidence making both the legal and factual assertions plausible.

## D.   The district court abused its discretion in finding that Appellants acted in bad faith.

The district court also erred in finding Appellants acted in bad faith. Before a court imposes sanctions against a lawyer under its inherent power, it must find the lawyer's conduct "constituted or was tantamount to bad faith." *Durrett v. Jenkins Brickyard, Inc*., 678 F.2d 911, 918 (11th Cir.1982); *see also Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir.1998)

("The key to unlocking a court's inherent power is a finding of bad faith."). "A finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent. A party also demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." *Barnes*, 158 F.3d at 1214 (internal quotations omitted).

Here, the district court's bad faith finding centered on its conclusion that Appellants filed a shotgun pleading to "serve a political purpose" and that the pleading contained false allegations that were foreclosed by existing law. DE:302:3, 6–14. The district court spent nine pages of its order giving what it considers examples of Appellants' "shotgun pleading." *Id.* The claims by Plaintiff, however, are extremely complicated and the attacks against him unprecedented. Even the most disciplined complaint would need to contain substantial allegations. And, given the number of people and organizations who targeted Plaintiff, the number of Defendants is not evidence of bad faith. Each was alleged to have been involved in the unprecedented attacks and conspiracy alleged in the amended complaint.

Realistically, every complaint claiming an interwoven RICO claim is bound to include some "shotgun" elements. The district court made no

attempt to separately analyze the counts for shotgun defects, and therefore failed to show any intelligibility defect as a result. It was an abuse of discretion for the district court to find that the amended complaint was a shotgun pleading, much less that it indicated bad faith, in a case as far-reaching as this one.  Nor, given that dismissal with prejudice was premised on theories at odds with procedural requirements imposed by this Court, was it appropriate to impose such sanctions, particularly in the absence of a timely claim by Defendants.

Additionally, Appellants did not knowingly make any false allegations or recklessly disregard truth or falsity in any pleadings. The amended complaint had citations supporting the factual contentions and Appellants intended to rely on discovery to further expand them. Moreover, they largely amended the complaint to address the real-time developments in the facts alleged. *See, e.g.*, DE:177:¶¶ 17–18, 22–24, 30–32, 43, 59, 64–65, 91, 105–06, 122, 137, 140–46, 172–82, 187–89, 280.

Appellants emphatically stated in their opposition to sanctions that they "engaged in good-faith efforts to substantiate the veracity of the allegations contained in the amended complaint by sourcing to various authorities supporting the underlying facts," and they "pursued every

66

avenue of research which was available to them to verify the facts as understood and legitimately believed by them." DE:285:11. An evidentiary hearing would have solidified Appellants' good faith basis for pleading each fact in this litigation. Instead, the district court improperly weighed the evidence on its own without meaningful input from the parties.  In finding that Plaintiff's counsel was wrong to say the Mueller investigation exonerated Plaintiff of the bogus Russia collusion allegations, the district court noted Mueller's comment that there was no exoneration on every possible *obstruction*  allegation—the very type of obstruction raised as predicate acts in this case.  *See* apnews.com/article/donald-trump-ap-top-news-crime-politics-north-america-94323cfc164c4759ba6bf84ad2a46203 ("The special counsel said the absence of a conclusion *on obstruction* should not be mistaken for exoneration.") (emphasis added).  The procedural unfairness of imposing sanctions on counsel for taking the same point of view as that literally stated by Mr. Mueller can hardly be overstated.

The deference owed to a trial court is based on its ability to conduct fact-finding and evaluate testimony and evidence required on abuse of discretion review. *See United States v. Barton*, 909 F.3d 1323, 1327, 1330–32, 1336 (11th Cir. 2018) (emphasizing, in case where district court

67

had conducted two-day, fact-intensive evidentiary hearing, that deference owed to district court's resulting fact-finding was particularly significant); *see also Amlong*, 500 F.3d at 1244–45 (noting that where district court judge did not conduct evidentiary hearing on bad faith, she could not reject magistrate judge's finding that there was none without conducting another evidentiary hearing). In this case, the district court conducted no such fact-finding.

The newly-released Durham Report highlights the district court's many clear errors of judgment. While the Report was not available to the district court at the time, many of its facts had been publicly reported and were included in the amended complaint. Additionally, they could have been further explained or supported in an evidentiary hearing. Instead, the district court called many of these allegations "absurd," "frivolous" or mere "political narrative," despite the requirement to accept well-pleaded allegations as true. *Akkasha v. Bloomingdales, Inc.*, No. 17-CIV-22376, 2020 WL 6820879, \*2 (S.D. Fla. July 20, 2020), report and recommendation adopted, 2020 WL 6820878 (S.D. Fla. Sept. 14, 2020) (citation omitted). The Durham Report underscores that the claims made

in the amended complaint were not only plausible but likely, and certainly not sanctionable.

For example, the district court called it "implausible" and "categorically absurd" that federal defendant Comey would have conspired with Appellee Clinton to harm Plaintiff, a blatant mischaracterization of the allegations in the amended complaint. DE:302:10; DE:177:¶¶161–70 (alleging that on the day FBI opened Crossfire Hurricane investigation, Clinton Campaign coordinated with media to set narrative that Plaintiff was colluding with Russia, in effort to "stir up a scandal"). The Durham Report, however, found that at least some high-level FBI actors central to the opening and continuation of the Crossfire Hurricane investigation had a "clear predisposition" against Plaintiff. Durham-Report:47. This was, of course, public knowledge. The FBI rapidly opened its investigation into Plaintiff's campaign, during the height of his campaign for President against Appellee Clinton, despite "not possess[ing] any intelligence showing that anyone associated with the Trump campaign was in contact with Russian intelligence officers at any point during the campaign." Durham-Report:59. In fact, the Report determined the FBI's investigation

significantly relied on leads from Plaintiff's political opponents. Durham-Report:18. Again, this was public knowledge.

It is now clear, based on the Durham Report, that Comey was actually aware of intelligence on a Clinton campaign plan to smear Plaintiff by associating him with Vladimir Putin, as early as August 3, 2016, three days after the FBI opened the Crossfire Hurricane investigation. Durham-Report:85. Based on the timeline of events, Comey likely knew about this prior to opening Crossfire Hurricane, because (1) the CIA had received intelligence of the Clinton scheme in late July, (2) that intelligence was provided to and reviewed personally by CIA Director Brennan, (3) on July 28, 2016, Brennan briefed President Obama on "intelligence relevant to the 2016 presidential election," and (4) the next morning, July 29, 2016, Brennan briefed Comey on his meeting with the President. Durham-Report:84. While Brennan was non-committal in testimony about whether he discussed the Clinton intelligence at that meeting and with Comey on July 29, 2020, it is plausible that he did. *Id*. Much of this was alleged in the amended complaint. *See* DE:177:¶¶ 161–70.

The district court called it "categorically absurd" that Comey would conspire with Clinton, given Comey's announcements before the 2016 election. Nevertheless, the Durham Report found the FBI treated candidates Trump and Clinton differently. Specifically, the FBI acted considerably more favorably to Clinton's campaign than to Plaintiff's. Durham-Report:68–81. The FBI provided defensive briefings to the Clinton campaign, but not to the Trump campaign. Durham-Report:298. Again, the district court did not need the Durham Report to understand these mostly public facts pled in the amended complaint, and therefore it was wrong to find the claims "categorically absurd." DE:302:10. Instead, the district court relied on its own personal views, evidenced by dismissing any significance of the Report.

Next, the district court noted that the Crossfire Hurricane investigation was opened "for an authorized purpose" and "with adequate factual predication." DE:302:16. But the Durham Report states that the FBI opened its Crossfire Hurricane investigation without "any actual evidence of collusion." Durham-Report:8. Further, at least some actors central to Crossfire Hurricane had a "clear predisposition" against

Plaintiff. Durham-Durham-Report:47. Accordingly, much of the Durham Report's content corroborates Plaintiff's factual claims.[7]

The amended complaint is supported by existing precedent or, at a minimum, presents a compelling argument for the extension of existing law as to the RICO predicates. Appellants put forth good faith, reasonable bases for the claims. At the very least, the case law is unsettled or there was a reasonable request for an extension of the law. "When assessing the frivolity of a non-prevailing [party's] case, courts 'view the evidence in the light most favorable to [that party].'" *Akkasha,* 2020 WL 6820879, *2 (citation omitted). "When the applicable law is unsettled, attorneys may not be sanctioned merely for making reasonable arguments for interpreting the law." *Gust, Inc. v. Alphacap Ventures, LLC*, 905 F.3d 1321, 1329 (Fed. Cir. 2018) (citing *Secs. Indus. Ass'n v. Clarke*, 898 F.2d 318, 321–22 (2d Cir. 1990)).

Here, the district court largely relied on its dismissal order in determining Appellants' claims were frivolous. DE:302:19. As discussed

---

[7] For example, the district court ignored the well-known FBI partners, Agents Sztrok and Page, who held positions in 2016 on a branch just one level below the top level of the FBI, while harboring such a predisposition against Plaintiff as to plan an "insurance policy' of adverse FBI action. *See* DE:177:385.

above, however, Appellants presented good faith arguments that the statute of limitations had not yet run on the claims, which were otherwise adequately pled. Even if plaintiffs fail to state a claim after "a district court grants leave to amend a complaint and later finds, as it often does, that an amended complaint continues to fail to state a claim, the typical outcome is dismissal of the amended complaint, not an award of sanctions against the litigant and his counsel." *Harvey v. CNN, Inc.*, 48 F.4th 257, 280 (4th Cir. 2022).

## E.    The district court improperly considered litigation not before it and otherwise displayed personal or political bias.

The district court improperly punished Plaintiff for engaging in litigation outside of the Southern District of Florida. It cited two opinions from this Court to justify considering President Trump's litigation in other forums, but these cases are inapposite. DE:302:21. In *Johnson v. 27th Avenue Caraf, Inc.*, the court analyzed only the "similar cases brought by these men." 9 F.4th 1300, 1313–14 (11th Cir. 2021). Specifically, Appellants in *27th Avenue* developed a scheme centered on similar facts to secure multiple settlements. *27th Avenue*, 9 F.4th at 1313–14. In *O'Neal v. Allstate*, the court looked at litigation initiated by a *pro se* plaintiff

73

responsible for "'relitigating imagined disputes that have already been dismissed in another forum' and moving for sanctions against any person or entity who dares to oppose his frivolous claims." 2021 WL 4852222, *5 (11th Cir. Oct. 19, 2021).

Here, the district court cited four other cases in which Plaintiff is or was involved. All four cases are focused on different issues with distinct factual grounds and each was brought for different, good faith reasons. As the district court acknowledged, all four of these cases were still pending in some capacity before each respective court. For the district court to say these cases were frivolous, "using the courts as a stage set for political theater and grievance," DE:302:34, before the cases' final adjudication, highlights a bias against Plaintiff, any case he brings to any court, and any attorney representing him.

Further, and injudiciously, the order called Plaintiff a "mastermind of strategic abuse of the judicial process." DE:302:6. Despite the requirement to accept the factual allegations in the amended complaint as true, the district court said it was implausible and a "story without regard to facts." DE:302:10. The district court even called Plaintiff's attempts to clear his name of defamation by the media a "shameless attack on a

freedom essential to democracy" and "bully[ing] journalists." DE:302:24. Frankly, if the district court had such strong political reservations, as described below, recusal was warranted.[8]

### F.    The district court improperly awarded Defendants' attorney's fees and other fees.

The amount of the sanctions awarded was inappropriate. In its January 19, 2023, sanctions order, the district court awarded Defendants all attorney's fees. DE:302:45. The "American Rule" prohibits the shifting of attorney's fees in most cases. *See Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 259 (1975). An exception allows federal courts to exercise their inherent power to impose such fees as a sanction when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. *Id.* at 258–59. The exception generally applies when a party practices a fraud upon the court, delays or disrupts the litigation, or hampers enforcement of a court order. *See Barnes,* 158 F.3d at 1214.

---

[8]    Notably, for several years, mainstream media outlets have relentlessly, published a seemingly endless series of false allegations of Russia collusion.  Seeking relief against those whose lies were the foundation for these allegations is not bullying and goes to the heart of what a private action for relief is about.

Here, Appellants did not cause any delays or disrupt the litigation. In fact, the opposite is true. Appellants consented to each request for an extension or similar accommodation to the more than thirty Defendants. When it was determined an amended complaint would need to be filed, Appellants filed a motion seeking to extend the deadline to amend to allow for a consolidated motion to dismiss that would save time and costs for all defense counsel involved.

In its June 23, 2022 order, the district court specifically noted it had "reviewed Plaintiff's Amended Complaint" and encouraged the Defendants "to the extent that the allegations against certain Defendants, and therefore the arguments relied on by those Defendants in support of dismissal, remain unchanged, and in the interest of reducing costs in this action, Defendants are advised they may readopt their prior Motions to Dismiss if they so choose." DE:188. In a subsequently filed order, the district court noted the amended complaint "did not significantly alter the allegations as to most Defendants, and the arguments in support of dismissal of the Complaint should therefore be substantially similar to the arguments in support of dismissal of Plaintiff's original Complaint." DE:200.

Despite the district court's urging them to "readopt" their prior arguments, Defendants proceeded to bill a similar amount of time to put forth what has been described by the court as "substantively identical arguments in support of dismissal [as the] earlier round of briefing." DE:267:63. In other words, Defendants claim to have incurred nearly $500,000 to craft a response to the amended complaint that was essentially the same as their prior response.

The costs incurred by Defendants do not have a legitimate financial nexus to the filing of the amended complaint. At a minimum, Defendants made no effort to mitigate their damages. *See Riddle v. Egensperger*, 266 F.3d 542, 556 (6th Cir. 2001) ("[D]efendants made a tactical decision to participate in a scorched earth approach rather than to mitigate their damages. It is now too late to change course."). Shockingly, the district court chose to punish Appellants for Defendants' conduct.

Regardless, fees should have never been awarded. Appellants' conduct throughout this litigation was civil and accommodating to all. Appellants never approached the bad faith, vexatious, wanton, or oppressive behavior found where fees were awarded, such as *Chambers*. The district court's sanctions order should be reversed.

### G.    Award of Rule 11 sanctions to Dolan was an abuse of discretion.

The order granting Dolan's Rule 11 sanctions motion was improper where the Durham Report confirms the material factual allegations of the amended complaint—including Dolan's knowing provision of false information to Danchenko for Steele's use in order to harm Plaintiff and his Presidential campaign—and where, further, no evidentiary hearing was held despite the court's conclusory, unsubstantiated finding that the amended complaint's allegations lacked credibility.    DE:284. *See Donaldson*, 819 F.2d at 1561.  As the Durham Report shows, Plaintiff's claims had significant factual support, while Dolan misrepresented his role to the district court.

The facts confirmed by the Durham Report included Dolan's frequent meetings with Russian official Galinka, who believed Dolan's role in the Clinton Campaign was significant, asking him to deliver a message directly to Clinton and emailing him that if Clinton became President, Dolan would take her to the State Department, and Galinka's admission she discussed the Steele Reports with Dolan—all of which belied Dolan's original statement denying he discussed politics with Galinka—and

showed Dolan's connections to key sources of the Steele Dossier, including

Danchenko. Durham-Report:148–49, 171–72. These, among many other

facts in the Durham Report—*see, e.g.,* Durham-Report:137-39, 144–145,

148 (identifying Dolan's longtime significant role in elective Democratic

politics, including in both Bill and Hillary Clinton's prior Presidential

campaigns; and suggesting Dolan was the source of salacious sexual

activity rumors regarding Plaintiff published by Steele),

Durham-Report:137, 138, 152, 172 (Steele specifically named Dolan as a

Dossier source; while Dolan claimed never to have met Steele, "[c]uriously"

he was in Cyprus the same time Dolan was meeting with Galinka and

others there; Dolan also admitted fabricating information, regarding Paul

Manafort's firing, that he provided to Danchenkko and included in the

Steele Dossier)—demonstrate Plaintiff's good faith basis for the amended

complaint's allegations against Dolan, precluding Rule 11 sanctions. *See*

*Massengale v. Ray*, 267 G.3d 1298, 1301 (11th Cir. 2001). *See also Indus.*

*Risk Insurers v. M.A.N. Gutehoffriungshutte GmbH*, 141 F.3d 1434, 1448

(11th Cir. 1998); *Davis v. Carl*, 906 F.2d 533, 538 (11th Cir. 1990) ("Rule

11 is intended to deter claims with *no* factual or legal basis at all; creative

claims, coupled even with ambiguous or inconsequential facts, may merit

dismissal, but not punishment.") (emphasis in original); ); *United States v. Stinson*, 729 Fed.Appx. 891, 900 n.7 (11th Cir. 2018) ("[S]anctions may not be imposed unless a particular allegation is utterly lacking in support.").  Because that threshold standard was not met, the award of sanctions to Dolan was an abuse of discretion, meriting reversal.

## H. The District Court Erred in Discounting the Durham Report, a Truly Extraordinary Circumstance Warranting Reconsideration.

The district court wrongly concluded that "nothing in the Durham Report changes [its prior orders]." DE:343:17. The Durham Report undermines the core premises of those orders and qualifies under Rule 60(b) as a basis for reconsideration.

Under Rule 60(b), a district court may grant relief from a final judgment or order "for any [] reason that justifies relief." Fed. R. Civ. P. 60(b)(6). Here, the district court erred in holding that, because Appellants' motion lacked "merit," there was nothing extraordinary that would warrant relief under Rule 60(b)(6). DE:343:16.

Far from lacking merit, the Durham Report substantially refutes the district court's essential findings and assumptions. As this Court has held, "[t]he provisions of this rule must be carefully interpreted to preserve the

80

delicate balance between the sanctity of final judgments and the 'incessant command of the court's conscience that justice be done in light of *all* the facts.'" *Griffin v. Swim-Tech Corp.*, 722 F.2d 677, 680 (11th Cir. 1984) (quoting *Bankers Mortgage Co. v. United States*, 423 F.2d 73, 77 (5th Cir. 1970)) (emphasis in original). When considering *all* the facts, Appellants' requested relief under Rule 60(b) was warranted.

The district court erred in finding the Durham Report's demonstration that a federal investigation of the relevant conduct was ongoing during the presidential term of office does not provide a basis for tolling the statute of limitations. DE:343:10–11 (doubling down on dismissal order's mischaracterizations of *Trump v. Vance*, etc., as mere private lawsuits, rather than actions vindicating Executive Branch interests). As discussed above, a litigant is entitled to equitable tolling when they have [1] pursued his rights diligently but [2] some extraordinary circumstance prevents him from bringing a timely action." *Lozano*, 572 U.S. at 11. The Durham Report confirms that the FBI opened an investigation into President Trump without "any actual evidence," through agents with hostile feelings toward President Trump. Durham-Report:8–9. Further, if President Trump had filed these suits while

President, it would have been damaging to his public reputation, caused confusion in the Executive Branch, and potential constitutional confusion. Our nation has never faced these extraordinary circumstances before and the President was correct to avoid them, as emphasized in the Durham Report.

Second, the district court held that its sanctions orders were still proper because:

- Complaint was a shotgun pleading

- Complaint allegedly mischaracterized government documents (when it did not, even as to the Ratcliffe letter, wrongly asserted by the district court to involve debunked information, a far cry from the *false* information conveyed by Defendants)

- Appellants' legal conclusions were foreclosed

- No good faith basis for extending the law

- Complaint filed for an improper basis

- Complaint incorrectly cited (immaterial) facts

- President Trump's alleged misuse of the courts. DE:343:12–16.

Refuting each in turn:

- The complaint was not a shotgun pleading, the RICO claims have a great deal of complexity, and in any event, dismissal with prejudice on that ground was unwarranted.

- The complaint gave cited to and offered reasonable interpretations of all government documents, and the Durham Report proved the plausibility of the interpretations.

- The claims are viable, resting on standard RICO predicates, and the Durham Report solidifies the showing of the credibility and applicability of those claims.

- Any suggestion that President Trump filed this case for an improper purpose treats him in a manner that disregards fundamental rights and ignores the very real harm Defendants' conduct caused him, as outlined in the Durham Report. It also evidences why disqualification is necessary.

- Expressing an erroneous view of immaterial facts is not a basis for sanctions. *In re Gen. Elec. Sec. Litig.*, 2021 WL 2688695, *7 (S.D.N.Y. Jun. 30, 2021).

- The district court's conclusion that President Trump has abused any judicial system is improper and peculiar to a prejudgment of

Plaintiff's personal motivations that is beyond the scope of civil litigation, much less in the absence of discovery and development of the evidentiary record supporting the claims.

Therefore, based on the Durham Report, there were, in fact, extraordinary circumstances warranting Fed. R. Civ. P. 60(b) relief, and the district court abused its discretion rejecting the arguments premised on the factual confirmation and revelations of the Durham Report.

## IV. THE DISTRICT COURT ABUSED ITS DISCRETION DENYING DISQUALIFICATION AND DISMISSING THE DISQUALIFICATION MOTION.

Pursuant to 28 U.S.C. § 455, "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." The district court's conduct certainly qualifies under this standard. Therefore, the district court should have recused itself before ruling on Appellants' request for an indicative ruling on Rule 60(b) relief.

### A. The district court had jurisdiction to disqualify itself.

The district court erred in ruling it did not have jurisdiction to grant Appellants' motion to disqualify. DE:342:3–4. This holding is contrary to the

purpose of disqualification, which is to ensure fair proceedings and avoid tainting the judicial process.

According to the statute, a judge *shall* disqualify himself when "he has a personal bias or prejudice concerning a party." 28 U.S.C. § 455(b) (emphasis added). The statute further elaborates, "[n]o justice, judge, or magistrate judge shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b)." 28 U.S.C. § 455(e). As courts within the Tenth Circuit have found, "a judge has a continuing duty to recuse before, during, or, in some circumstances, after a proceeding, if the judge concludes that sufficient factual grounds exist to cause an objective observer reasonably to question the judge's impartiality." *Taylor v. Haynes Burns*, 2013 WL 12329822, *2 (D.N.M. Jul 26, 2013) (quoting *United States v. Cooley*, 1 F.3d 985, 992 (10th Cir. 1993)). Moreover, a judge has a duty to disqualify themselves when necessary and need not wait for a motion to disqualify. *United States v. Conforte*, 624 F.2d 869, 880 (9th Cir. 1980); *see also Obert v. Rep. W. Ins. Co.*, 190 F.Supp.2d 279, 284 (D.R.I. 2002) (holding that a judge should not wait for a party to move for disqualification because "[i]t is the judge's duty to ensure that his or her presence does not taint the process of justice or the integrity of the United States Courts."); *In re Beard*, 811 F.2d

85

818, 827 (4th Cir. 1987) (holding that "[d]isqualification is required if a reasonable factual basis exists for doubting the judge's impartiality."); *Rodriguez-Vilanova v. Stryker Corp.*, 987 F.Supp.2d 153, 157 (D.P.R. 2013) (holding that "a federal judge has a duty to sit where not disqualified which is equally as strong as the duty to not sit where disqualified.") (quoting *Sensley v. Albritton*, 385 F.3d 591, 598 (5th Cir. 2004)).

Thus, disqualification is not a duty that dissipates upon appeal. It is a continuing duty to ensure fair proceedings, and it is a requirement to ensure fair proceedings at all stages of litigation.

### B.    The district court abused its discretion in ruling that Appellants' motion to disqualify lacked merit.

The district court held that Appellants' motion lacked merit simply because the case itself was frivolous. DE:342:5–8. This, however, does not address "whether a disinterested observer fully informed of the facts would entertain a significant doubt as to the judge's impartiality." *Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Fla.*, 140 F.3d 898, 912 (11th Cir. 1998) (citing *Diversified Numismatics, Inc. v. City of Orlando*, 949 F.2d 382, 385 (11th Cir. 1991)). This standard is "designed to promote the public's confidence in the impartiality and integrity of the judicial process." *In re Evergreen Sec.,*

*Ltd.*, 570 F.3d 1257, 1263 (11th Cir. 2009) (quoting *Davis v. Jones*, 506 F.3d 1325, 1332 n.12 (11th Cir. 2007)). Thus, "[a] federal judge *must* disqualify [himself] if [his] 'impartiality might reasonably be questioned.'" *Lomax v. Ruvin*, 476 Fed. App'x 175, 176 (11th Cir. 2012) (emphasis added).

The district court's orders reflect "a partisan zeal." *Hamm v. Members of Bd. of Regents of State of Fla.*, 708 F.2d 647, 651 (11th Cir. 1983). The orders' politically-charged characterizations smack of partisanship and reasonably call into question that court's impartiality to a disinterested observer. The Supreme Court has been clear: "[W]hat matters is not the reality of bias or prejudice but its appearance." *Liteky v. United States*, 510 U.S. 540, 555–56 (1994) (interpreting 28 U.S.C. § 455). Disqualification was required. *See also United States v. Hameen*, 2023 WL 2571011, No. 3:18-cr-115-MMH-JBT, *2 (M.D. Fla. March 20, 2023) (citing *LFoundry Rousset, SAS v. Atmel Corp.*, 690 Fed.Appx. 748, 750 (2d Cir. 2017)).

President Trump's amended complaint clearly outlined the harm that Defendants' conduct caused him in an inherently complicated case. The district court, however, disregarded all of this, characterizing the lawsuit as "hyperbole," "settling of scores and grievances," a "political manifesto," a lawsuit being used to "advance a political narrative," and a "deliberate attempt

87

to harass." DE:267:5, 64; DE:302:7, 10. The district court made further comments reflecting brazen bias, such as that President Trump only added a certain defendant because he takes "delight[] in insulting" him. DE:284:17.

Further, the district court seemingly took on the role of advocate for Defendants, stating, "[O]pposing [President Trump's] presidential campaign" does not amount to real loss, and going out of its way in the dismissal order to suggest that sanctions might be proper. DE:302:48, 65. Continuing, the district court implied that sanctions were not enough, and Ms. Habba should be penalized by the Bar. DE:284:18. The district court impugned President Trump's character in its comments on this and other unrelated lawsuits, deriding President Trump's claims as "dishonest" and an attempt to "bully." DE:302:24.

The district court also called one of President Trump's claims against James Comey, "categorically absurd." DE:284:10. This improperly discounts many allegations in the amended complaint supported by the public record and further corroborated in the Durham Report. The district court also went outside the record on this point, claiming that Comey's "announcement on [Clinton's] 2016 campaign" precludes any possibility that he conspired with Defendant Clinton to damage Trump. That announcement was entirely outside

the record and not argued by any of the parties; the order improperly injected speculations about that statement into the facts of the case. Regardless, it is not "categorically absurd" to interpret James Comey's actions in closing the Clinton email investigation as calculated to do minimal damage to Clinton's presidential campaign, while preserving a façade of impartiality and providing cover to Attorney General Loretta Lynch (remembered for the infamous 2016 Clinton tarmac meeting that suggested access to and influence over DOJ investigations). Nor is it "categorically absurd" to believe that James Comey's investigation of Trump based on "salacious and unverified" allegations of collusion with Russia, while ignoring intelligence of a Clinton plan to falsely link Donald Trump with Vladimir Putin, was part of a scheme to do maximum damage to the Trump Campaign, and later his presidency.

The order again went outside the record and made conclusions about unrelated lawsuits in other states and courts in which President Trump is a plaintiff, to reach the conclusion that President Trump has a "pattern of misusing the courts to serve political purposes." DE:302:21. The cases cited for this bold accusation, however, had not even been fully adjudicated, and it was wholly improper for the district court to assume President Trump's subjective intent for participating in them. The district court commented on a defamation

lawsuit against the Pulitzer Prize Board, accusing President Trump of "us[ing] the courts to bully journalists as part of a dishonest and futile attempt to rewrite history" and that the lawsuit "is a shameless attack on a freedom essential to democracy." DE:302:24. Based on these characterizations, the district court sanctioned President Trump and his counsel nearly $1 million, without taking evidence, and declining Appellants' request for a hearing.

The district court's reference to information and material outside the record was improper and created the appearance of bias. *See United States v. Carey*, 929 F.3d 1092, 1106 (9th Cir. 2019) (citations omitted) ("We do, however, caution judicial officers against similar uses of extrajudicial material. The magistrate judge in Carey's case served as a trier of fact, and we note that jurors who sit in that same capacity are directed to 'not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it,' and if they do, 'turn away and report it . . . as soon as possible.' The American Bar Association places similar restrictions on judges."); *see also* Am. Bar Assoc. 2020 Model Code of Judicial Conduct, R. 2.9(C) ("A judge shall not investigate facts in a matter independently, and shall consider only the evidence presented and any facts that may properly be judicially noticed.").

It was also improperly biased for the district court to comment that "Mr. Trump's lawyers saw no professional impediment or irony in relying upon Russian intelligence as the good faith basis for their allegation." DE:302:8 n.6 (wrongly equating reliance on real intelligence from foreign sources with reliance on falsely-manufactured intelligence). This was in reference to paragraph 369 of the amended complaint, and the allegation that Clinton and her campaign concocted the Russia collusion narrative to damage Trump and distract from her own scandals. While the Durham Report demonstrates this, it was well-known at the time of the district court's ruling that the Clinton campaign bought and paid for the Steele Dossier. The district court's contempt for President Trump and his counsel was palpable.

Importantly, Section 455 "requires judges to resolve any doubts they may have in favor of disqualification." *United States v. Kelly*, 888 F.2d 732, 744 (11th Cir. 1989). Thus, any doubt that there could be bias required the district court to recuse itself. Impartiality is critical in the administration of justice. Even the appearance of impartiality undermines the trust of litigants and of the public in our justice system. This is why Plaintiff asked for disqualification. DE:335:5. Therefore, to the extent this Court vacates any of the district court's orders, and remands this case to the district court, Appellants respectfully request reassignment of the case to a new district judge.

## CONCLUSION

In light of the foregoing, Appellants respectfully request this Court vacate the district court's orders dismissing the amended complaint with prejudice, imposing sanctions, and denying disqualification, and remand the case with instructions for reassignment to a another district judge.

Respectfully submitted,

Jesse R. Binnall
Jared J. Roberts
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
Phone: (703) 888-1943
Fax: (703) 888-1930
jesse@binnall.com
jared@binnall.com

RICHARD C. KLUGH, P.A.
40 N.W. 3rd Street, PH1
Miami, Florida 33128
Phone: (305) 536-1191
Fax: (305) 536-2170
rklugh@klughlaw.com

By:    *Richard C. Klugh*
       Richard C. Klugh

*Counsel for President Donald J. Trump, Alina Habba, Michael T. Madaio, Habba Madaio & Associates, Peter Ticktin, Jamie Sasson, and The Ticktin Law Group*

## CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 5(c)(1), as well as 11th Cir. R. 32-4, and pursuant to the Court's November 27, 2023 Order, granting an extension to the word count to 18,000 words because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), it contains 17,570 words. Undersigned counsel certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word Perfect in 14-point Century Schoolbook font.

*Richard C. Klugh*
Richard C. Klugh

## CERTIFICATE OF SERVICE

I certify that on February 27, 2024, the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record and that requisite copies of the brief were mailed to the Court.

*Richard C. Klugh*
Richard C. Klugh