# Nos. 22-13410-H, 22-14099-H, 23-10387-H, 23-13177-H

## In the United States Court of Appeals for the Eleventh Circuit

DONALD J. TRUMP,
*Plaintiff-Appellant*,

ALINA HABBA, MICHAEL T. MADAIO, HABBA MADAIO & ASSOC.;
PETER TICKTIN, JAMIE SASSON, and THE TICKTIN LAW GROUP,
*Appellants,*

versus

HILLARY R. CLINTON, DEMOCRATIC NATIONAL COMMITTEE,
HFACC, INC., DNC SERVICES CORP., PERKINS COIE, LLC, JOHN
PODESTA, ROBERT MOOK, DEBBIE WASSERMAN SCHULTZ,
FUSION GPS, GLENN SIMPSON, PETER FRITSCH, NELLIE OHR,
BRUCE OHR, IGOR DANCHENKO, RODNEY JOFFE, NEUSTAR
SECURITY SERVICES, NEUSTAR INC., ORBIS BUSINESS
INTELLIGENCE LTD., and CHARLES DOLAN,
*Defendants-Appellees*.

On appeal from the United States District Court
for the Southern District of Florida

## APPELLANTS' APPENDIX (Volume 2 of 2)

JESSE R. BINNALL
JARED J. ROBERTS
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
(703) 888-1943

RICHARD C. KLUGH
RICHARD C. KLUGH, P.A.
40 N.W. 3rd Street, PH1
Miami, Florida 33128
(305) 536-1191

*Counsel for Appellants*

# APPENDIX

## Volume 1

District Court Docket Sheet ...................................................................... DS

Amended Complaint ................................................................................ 177

Certificate of Service

## Volume 2

Order Granting Motions to Dismiss ......................................................... 267

Order Granting Dolan Motion for Sanctions ........................................... 284

Order Granding Joint Motion for Sanctions ............................................ 302

Motion for Indicative Ruling on Fed. R. Civ. P. 60(b) Motion ............................. 331

Motion for Disqualification ..................................................................... 335

Order Denying Motion for Disqualification ............................................. 342

Order Denying Motion for Indicative Ruling ........................................... 343

Certificate of Service

267

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 22-CV-14102-MIDDLEBROOKS

DONALD J. TRUMP,

     Plaintiff,

v.

HILLARY R. CLINTON, et al.,

     Defendants.

_____/

<u>**ORDER ON MOTIONS TO DISMISS**</u>

THIS CAUSE comes before the Court on Defendants' various Motions to Dismiss. (DE 224; DE 225; DE 226; DE 227; DE 228; DE 256; DE 260). Plaintiff has responded to them all. (DE 237; DE 238; DE 239; DE 240; DE 241; DE 262; DE 265). Defendants replied. (DE 249; DE 250; DE 251; DE 252; DE 258). For the reasons explained below, the United States' Motions to Dismiss (DE 224; DE 256), Defendants Charles Halliday Dolan, Jr., Rodney Joffe, and Orbis Business Intelligence, Ltd.'s Motions to Dismiss (DE 225; DE 227; DE 260), and the Defendants' Joint Motion to Dismiss Under Rule 12(b)(6) (DE 226) are granted, and Plaintiff's Amended Complaint (DE 177) is dismissed in its entirety.

I.      **BACKGROUND**

Plaintiff initiated this lawsuit on March 24, 2022, alleging that "the Defendants, blinded by political ambition, orchestrated a malicious conspiracy to disseminate patently false and injurious information about Donald J. Trump and his campaign, all in the hopes of destroying his life, his political career and rigging the 2016 Presidential Election in favor of Hillary Clinton." (DE 177, Am. Compl. ¶ 9). On this general premise, Plaintiff brings a claim for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), predicated on the theft of trade secrets,

obstruction of justice, and wire fraud (Count I). He additionally brings claims for: injurious falsehood (Count III); malicious prosecution (Count V); violations of the Computer Fraud and Abuse Act ("CFAA") (Count VII); theft of trade secrets under the Defend Trade Secrets Act of 2016 ("DTSA") (Count VIII); and violations of the Stored Communications Act ("SCA") (Count IX). The Amended Complaint also contains counts for various conspiracy charges and theories of agency and vicarious liability. (Counts II, IV, VI, and X–XVI).

Plaintiff's theory of this case, set forth over 527 paragraphs in the first 118 pages of the Amended Complaint, is difficult to summarize in a concise and cohesive manner. It was certainly not presented that way. Nevertheless, I will attempt to distill it here.

The short version: Plaintiff alleges that the Defendants "[a]cting in concert . . . maliciously conspired to weave a false narrative that their Republican opponent, Donald J. Trump, was colluding with a hostile foreign sovereignty." (Am. Compl. ¶ 1). The Defendants effectuated this alleged conspiracy through two core efforts. "[O]n one front, Perkins Coie partner Mark Elias led an effort to produce spurious 'opposition research' claiming to reveal illicit ties between the Trump campaign and Russian operatives." (*Id.* ¶ 3). To that end, Defendant Hillary Clinton and her campaign, the Democratic National Committee, and lawyers for the Campaign and the Committee allegedly hired Defendant Fusion GPS to fabricate the Steele Dossier. (*Id.* ¶ 4). "[O]n a separate front, Perkins Coie partner Michael Sussman headed a campaign to develop misleading evidence of a bogus 'back channel' connection between e-mail servers at Trump Tower and a Russian-owned bank." (*Id.*). Clinton and her operatives allegedly hired Defendant Rodney Joffe to exploit his access to Domain Name Systems ("DNS") data, via Defendant Neustar, to investigate and ultimately manufacture a suspicious pattern of activity between Trump-related servers and a Russian bank with ties to Vladimir Putin, Alfa Bank. (*Id.* ¶ 3). As a result of this "fraudulent

evidence," the Federal Bureau of Investigations ("FBI") commenced "several large-scale investigations," which were "prolonged and exacerbated by the presence of a small faction of Clinton loyalists who were well-positioned within the Department of Justice"—Defendants James Comey, Andrew McCabe, Peter Strzok, Lisa Page, Kevin Clinesmith, and Bruce Ohr. (*Id.* ¶ 7). And while this was ongoing, the Defendants allegedly "seized on the opportunity to publicly malign Donald J. Trump by instigating a full-blown media frenzy." (*Id.* ¶ 6). As a result of this "multi-pronged attack," Plaintiff claims to have amassed $24 million in damages.[1] (*Id.* ¶ 527).

Defendants now move to dismiss the Amended Complaint as "a series of disconnected political disputes that Plaintiff has alchemized into a sweeping conspiracy among the many individuals Plaintiff believes to have aggrieved him." (DE 226 at 1). They argue that dismissal is warranted because Plaintiff's claims are both "hopelessly stale"—that is, foreclosed by the applicable statutes of limitations—and because they fail on the merits "in multiple independent respects." (*Id.* at 2). As they view it, "[w]hatever the utilities of [the Amended Complaint] as a fundraising tool, a press release, or a list of political grievances, it has no merit as a lawsuit." (*Id.*). I agree. In the discussion that follows, I first address the Amended Complaint's structural deficiencies. I then turn to subject matter jurisdiction and the personal jurisdiction arguments raised by certain Defendants. Finally, I assess the sufficiency of the allegations as to each of the substantive counts.

## II.    DISCUSSION

First, the pleading itself. A complaint filed in federal court must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(1). Each allegation must be simple, concise, and direct. Each claim must be stated in numbered paragraphs,

---

[1] This figure includes fees amassed in bringing the present action. (Am. Compl. ¶ 527).

and each numbered paragraph limited as far as practicable to a single set of circumstances. Fed. R. Civ. P. 10.

Plaintiff's Amended Complaint is 193 pages in length, with 819 numbered paragraphs. It contains 14 counts, names 31 defendants, 10 "John Does" described as fictitious and unknown persons, and 10 "ABC Corporations" identified as fictitious and unknown entities. Plaintiff's Amended Complaint is neither short nor plain, and it certainly does not establish that Plaintiff is entitled to any relief.

More troubling, the claims presented in the Amended Complaint are not warranted under existing law. In fact, they are foreclosed by existing precedent, including decisions of the Supreme Court. To illustrate, I highlight here just two glaring problems with the Amended Complaint. There are many others. But these are emblematic of the audacity of Plaintiff's legal theories and the manner in which they clearly contravene binding case law. First, the Amended Complaint's answer to the Defendants' Motion to Dismiss the original Complaint, wherein Defendants noted the lack of predicate RICO offenses, was to add another predicate offense—wire fraud. The Amended Complaint alleges that the Defendants "engaged in a calculated scheme to defraud the news media, law enforcement, and counterintelligence officials for the purpose of proliferating a false narrative of collusion between Trump and Russia." (Am. Compl. ¶ 577). Not only does Plaintiff lack standing to complain about an alleged scheme to defraud the news media, but his lawyers ignore the Supreme Court's holdings that the federal wire fraud statute prohibits only deceptive schemes to deprive the victim of money or property. It is necessary to show not only that a defendant engaged in deception, but that an object of the fraud was *property*. *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020); *Cleveland v. United States*, 531 U.S. 12, 26 (2000). Likewise, the Amended Complaint, like its predecessor, fails to account for the Supreme Court's requirement that to

4

obstruct justice there must be a nexus to a judicial or grand jury proceeding. *United States v. Aquilar*, 515 U.S. 593, 599 (1995); *see also United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011).

Many of the Amended Complaint's characterizations of events are implausible because they lack any specific allegations which might provide factual support for the conclusions reached. For instance, the contention that former FBI director James Comey, senior FBI officials, and Deputy Attorney General Rod Rosenstein "overzealously targeted" Plaintiff and conspired to harm him through appointment of special counsel are strikingly similar to the conclusory and formulaic allegations found deficient in the seminal Supreme Court case of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). What the Amended Complaint lacks in substance and legal support it seeks to substitute with length, hyperbole, and the settling of scores and grievances.

Plaintiff has annotated the Amended Complaint with 293 footnotes containing references to various public reports and findings. He is not required to annotate his Complaint; in fact, it is inconsistent with Rule 8's requirement of a short and plain statement of the claim. But if a party chooses to include such references, it is expected that they be presented in good faith and with evidentiary support. Unfortunately, that is not the case here.

Two examples illustrate this. Paragraph 3 of the Amended Complaint states in part: "[t]he scheme was conceived, coordinated and carried out by top-level officials at the Clinton Campaign, and the DNC—including 'the candidate' herself—who attempted to shield her involvement behind a wall of third parties." To support that statement, footnote 1 cites the U.S. Department of Justice Office of the Inspector General, Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation at 96 (2019) ("Inspector General's Report" or "IG Report"). I went to page 96 of the Inspector General's Report looking for support for Plaintiff's conclusory

and argumentative statement but found none. The Inspector General's Report is referenced throughout the Amended Complaint (*see* Am. Compl. ¶¶ 426, 427, 465–69, fns. 155–56, 158–60, 246), in support of Plaintiff's claim that senior officials of the FBI and Department of Justice conspired to harm him through a baseless investigation. However, the Amended Complaint fails to acknowledge that the Inspector General's Report, while acknowledging deficiencies, reached the following ultimate conclusion:

> The decision to open the Crossfire Hurricane Investigation was made by the FBI's then Counterintelligence Division (CD) Assistant Director (AD) E.W. "Bill" Priestap, and reflected consensus reached after multiple days of discussions and meetings among senior FBI officials. We conclude AD Priestap's exercise of discretion in opening the investigation was in compliance with Department and FBI policies, and we did not find documentary or testimonial evidence that political bias or improper motivations influenced his decision—we found that Crossfire Hurricane was opened for an authorized investigative purpose and with sufficient factual predicate.

IG Report at 410. Plaintiff and his lawyers are of course free to reject the conclusion of the Inspector General. But they cannot misrepresent it in a pleading.

Likewise, the Amended Complaint cites copiously to the indictment of Michael Sussmann and a substantial portion of the Amended Complaint contains its allegations. (*See* Am. Compl. fns. 58, 60, 66, 67, 69, 101, 107–11, 114, 120–21, 124–35, 138, 139, 206, 210, 214, 259). Exhibits and testimony from the trial are also included. (*See id.* ns.5, 17, 31, 59, 61, 64, 65, 67, 70, 75–77, 90–92, 98, 99, 101–06, 112, 115, 117–19, 122, 123, 136, 137, 140–47, 157, 171–82, 187–89, 215, 231, 267, 268). But nowhere does the Amended Complaint mention Mr. Sussmann's acquittal. *See United States v. Sussmann*, No. 21-cr-582 (D.D.C.) In presenting a pleading, an attorney certifies that it is not being presented for any improper purpose; that the claims are warranted under the law; and that the factual contentions have evidentiary support. *See* Fed. R. Civ. P. 11. By filing the Amended Complaint, Plaintiff's lawyers certified to the Court that, to the best of their knowledge,

"the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law," and that "the factual contentions have evidentiary support[.]" Fed. R. Civ. P. 11(b)(2). I have serious doubts about whether that standard is met here.

The sprawling nature of the Amended Complaint and the number of defendants makes analysis difficult to organize. I will endeavor to examine each count, separately referencing individual defendants where appropriate.

### A.    The Pleading

#### 1.   Shotgun Pleading

As I have already alluded, Plaintiff's pleading contains glaring structural deficiencies. I would be remiss to not expound upon these further before I set out to evaluate the substantive viability of Plaintiff's claims.

Plaintiff's Amended Complaint is a quintessential shotgun pleading, and "[c]ourts in the Eleventh Circuit have little tolerance for shotgun pleadings." *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018). Such pleadings waste judicial resources and are an unacceptable form of establishing a claim for relief. *Id.*; *Strategic Income Fund, LLC v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295–96 & ns. 9, 10 (11th Cir. 2002).

The Eleventh Circuit has generally identified four categories of shotgun pleadings: (1) one "containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint[;]" (2) one that is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action[;]" (3) "one that . . . [does] not separat[e] into a different count each cause of action or claim for relief[;]" and (4) one that "assert[s] multiple

claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions or which of the defendants the claim is brought against." *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1321–23 (11th Cir. 2015) (citations omitted).

To say that Plaintiff's 193-page, 819-paragraph Amended Complaint is excessive in length would be putting things mildly. And to make matters worse, the Amended Complaint commits the "mortal sin" of incorporating by reference into every count all the general allegations and all the allegations of the preceding counts. *See id.* at 1323; *see also Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001). Such a format hopelessly complicates any effort to untangle what facts apply to which claims or defendants. For example, Count XIV, entitled "Respondeat Superior, Vicarious Liability" names Fusion GPS but realleges all of the 785 preceding paragraphs then, in conclusory fashion, the Amended Complaint contends that "[as] a direct and proximate result of the torturous [sic] actions by agents, servants, representatives, employees and/or contractors as alleged above, Fusion GPS is vicariously liable to plaintiff[.]" (Am. Compl. ¶ 796). By incorporating all preceding paragraphs by reference, "each count is replete with factual allegations that could not possibly be material to that specific count, and any allegations that are material are buried beneath innumerable pages of rambling irrelevancies." *See Magluta*, 256 F.3d at 1284; *Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1332 (11th Cir. 1998) ("These general allegations [incorporated by reference into each count] operated as camouflage, obscuring the material allegations of [Plaintiff's] claims and necessarily implying that all the allegations were material to each claim.").

## 2. *Fictitious Defendants*

The Amended Complaint also contains impermissible fictitious-party pleading. "As a general matter, fictitious-party pleading is not permitted in federal court." *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010); Fed. R. Civ. P. 10(a) ("The title of the complaint must name all the parties."). A limited exception exists: "when the plaintiff's description of the defendant is so specific as to be 'at the very worst, surplusage.'" *Id.* (quoting *Dean v. Barber*, 951 F.2d 1210, 1215–16 (11th Cir. 1992)).

Plaintiff's Amended Complaint does not describe the fictitious defendants with the requisite specificity to proceed against them in this fashion. He describes the John Doe defendants as "journalists, publishers, editors, investigators, state or federal officials, co-conspirators, officers, employees, agents, managers, owners, principals and/or other duly authorized individuals who caused or contributed to the incident or incidents for which the Plaintiff seeks damages[.]" (Am. Compl. ¶ 44). He describes the ABC corporations as "media companies, publication companies, editorial companies, municipalities, state or federal agencies, law enforcement authorities, investigative agencies, political organizations, political affiliates, private firms and/or other duly authorized corporate or governmental entities who caused or contributed to the incident or incidents for which the Plaintiff seeks damages[.]" (*Id.* ¶ 45). These descriptions do nothing to specifically identify the John Doe individuals or ABC corporations. *See Richardson*, 598 F.3d 734 (holding that "identif[ying] [a] defendant as 'John Doe (Unknown Legal Name), Guard, Charlotte Correctional Institute' . . . was insufficient to identify the defendant among the many guards employed at CCI. . ."). As a result, the fictitious individual and corporate defendants are dismissed without prejudice.

### B.    Subject Matter Jurisdiction (United States)

I turn next to the United States' argument that this Court lacks subject matter jurisdiction over Plaintiff's claims against it, as "[i]t is axiomatic that a court may not proceed at all in a case unless it has jurisdiction." *Crawford v. F. Hoffman-La Roche Ltd.*, 267 F.3d 760, 764 (11th Cir. 2001) (citing *Ex Parte McCardle*, 7 Wall. 506, 514 (1868)). "[A] federal district court may not dismiss a case on the merits by hypothesizing subject-matter jurisdiction." *Id.* "Hypothetical jurisdiction produces nothing more than a hypothetical judgment—which comes to the same thing as an advisory opinion, disapproved by th[e] [Supreme Court] from the beginning." *Steel Co. v. Citizens for a Better Env.*, 523 U.S. 83, 101 (1998).

The United States argues that this Court lacks subject matter jurisdiction over Plaintiff's claims against it under the doctrine of sovereign immunity. Fed. R. Civ. P. 12(b)(1). To invoke the limited waiver of sovereign immunity contained in the Federal Tort Claims Act ("FTCA"), a plaintiff must first administratively present his claim to the appropriate federal agency -- here, the FBI, the House of Representatives, and the Department of Justice. *See* 28 U.S.C. §§ 1346(b)(1), 2675(a). The United States argues that Plaintiff has not done so, and accordingly his claims are not administratively exhausted. (DE 224 at 2; DE 256 at 2). "Absent a waiver, sovereign immunity shields the federal government and its agencies from suit. Sovereign immunity is jurisdictional in nature. Indeed, 'the terms of [the United States'] consent to be sued in any court define that court's jurisdiction to entertain the suit.'" *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) (citation omitted) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)).

Plaintiff argues that the United States should not be substituted for Defendants James Comey, Andrew McCabe, Kevin Clinesmith, Peter Strzok, Lisa Page, Adam Schiff, and Rod

Rosenstein (collectively, the "Federal Defendants"), and that the exhaustion requirement in the FTCA is therefore inapplicable. He appears to concede that, in the event the United States is the proper party, Plaintiff has not exhausted his administrative remedies, and he suggests that I should dismiss without prejudice to allow Plaintiff to pursue those remedies. (DE 238 at 13).

Because a delegate of the Attorney General certified that the Federal Defendants were acting within the scope of their employment, the United States was substituted for them as an "automatic consequence" of the Westfall Act certification. *See S.J. & W. Ranch, Inc. v. Lehtinen*, 913 F.2d 1538, 1543 (11th Cir. 1990). The certification is not dispositive for purposes of substitution, but it constitutes *prima facie* evidence that the employees were acting within the scope of their employment. *See id.* Plaintiff bears "the burden of altering the status quo by proving that the employee acted outside the scope of employment[.]" *Id.* He must allege specific facts establishing that the Federal Defendants exceeded the scope of their employment. *Jacobs v. Vrobel*, 724 F.3d 220, 220 (D.C. Cir. 2013).

Plaintiff has not met that burden here, and the United States therefore remains the proper party to this litigation. *See Osborn v. Haley*, 549 U.S. 225, 252 (2007) (explaining that the United States remains the defendant "unless and until the district court determines that the federal officer originally named as defendant was acting outside the scope of his employment."). To determine whether a federal officer was acting within the scope of his or her employment, the FTCA instructs the district court to apply "the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b)(1), not the law of the state where the alleged tort had its "operative effect," *Richards v. United States*, 369 U.S. 1, 10 (1962). Here, the Parties agree that Plaintiff's claims against the Federal Defendants involve actions related to Crossfire Hurricane and the FISA

11

application processes undertaken during that investigation, which took place in the District of Columbia. (*See* DE 224 at 7; DE 238 at 6).

Under District of Columbia law, an employee's conduct falls within the scope of his or her employment if: (1) "it is of the kind he [or she] is employed to perform"; (2) "it occurs substantially within the authorized time and space limits"; and (3) "it is actuated, at least in part, by a purpose to serve" the employer. *Jacobs*, 724 F.3d at 221 (internal quotation marks omitted). The Circuit Court for the District of Columbia "appl[ies] [this] test 'very expansively,' and, in essence, "ask[s] 'whether the defendant merely was on duty or on the job when committing the alleged tort.'" *Allaithi v. Rumsfeld*, 753 F.3d 1327, 1330 (D.C. Cir. 2014) (quoting *Harbury v. Hayden*, 522 F.3d 413, 422 n.4 (D.C. Cir. 2008)).

Beginning with the first prong, "[t]o qualify as conduct of the kind an employee was to perform, his or her actions must either have been of the same general nature as that authorized or incidental to the conduct authorized." *Allaithi*, 757 F.3d at 1332 (internal quotation, alteration marks, and emphasis omitted). The focus is on "the type of act" performed by the employee, not its "wrongful character." *Jacobs*, 724 F.3d at 221–22. The former FBI Federal Defendants and Defendant Rosenstein all satisfy this element because counterintelligence operations and FISA surveillance are all activities of the FBI and the Department of Justice. *See* E.O. 12333 § 1.14 (Dec. 4, 1981), *amended by* E.O. 13284 (Jan. 23, 2003), E.O. 13355 (Aug. 27, 2004), and E.O. 13470 (July 30, 2008) (assigning to the Director of the FBI, under the Attorney General, oversight and supervision for conducting and coordinating counterintelligence activities within the United States); *see also* 28 C.F.R. § 0.85(d) (same). The same is true of Defendant Schiff. Plaintiff's allegations pertain to Defendant Schiff's actions as a member and chair of the House Permanent Select Committee on Intelligence, which investigated whether Plaintiff or his campaign colluded

with the Russian government in the 2016 election. Defendant Schiff's statements relating to the

investigation fell squarely within the scope of his employment. Speaking to the press about public

policy concerns falls within the scope of the duties of a member of Congress. *See Wuterich v.

Murtha*, 562 F. 3d 375 (D.C. Cir. 2009); *Council on American Islamic Relations v. Ballenger*,

444 F. 3d 659 (D.C. Cir. 2006). *Accord Does 1-10 v. Haaland*, 973 F. 3d 591 (6th Cir. 2020);

*Williams v. United States*, 71 F. 3d 502 (5th Cir. 1995); *Operation Rescue Nat'l v. United States*,

147 F. 3d 68 (5th Cir. 1998).[2]

Next, the challenged conduct needs to be "substantially within the authorized time and

space limits[.]" *Jacobs*, 774 F.3d at 221 (internal quotation omitted). Plaintiff's Amended

Complaint contains no allegations that any of the Federal Defendants' actions occurred outside

the "time and space limits" of their official government work. Because the Westfall Act

certification provides *prima facie* evidence that the Federal Defendants were acting within the

scope of their employment, and because Plaintiff has not alleged sufficient facts to rebut this

evidence, this factor also favors substitution.

Finally, the actions taken by the Federal Defendants must be "actuated, at least in part,

by a purpose to serve" the United States. *Jacobs*, 774 F.3d at 221. The Federal Defendants here

acted in furtherance of an approved and authorized counterintelligence operation. *See* IG Report

at 410 (concluding that "[t]he decision to open the Crossfire Hurricane Investigation was made

by the FBI's then Counterintelligence Division (CD) Assistant Director (AD) E.W. "Bill"

---

[2] In his Response, Plaintiff argues that Mr. Schiff's actions were outside the scope of his duties because his statements disclosed confidential information of the House Select Committee on Intelligence. However, the Amended Complaint does not plausibly allege or even suggest that Mr. Schiff disclosed any confidential information. But even if it were to be assumed Mr. Schiff divulged confidential information, that would not change the scope of employment determination here. *See Wilson v. Libby*, 535 F. 3d 697, 710 (D.C. Cir. 2008) (disclosure of identity of CIA agent was not outside scope of employment).

Priestap, and reflected consensus reached after multiple days of discussions and meetings among senior FBI officials" and that "AD Priestap's exercise of discretion in opening the investigation was in compliance with Department and FBI policies[.]"). Plaintiff's conclusory allegations to the contrary are belied by the material cited in his own Amended Complaint. As such, substitution of the United States for the Federal Defendants was proper under the Westfall Act.

Because the United States is the proper party to this action, Plaintiff was required to exhaust his administrative remedies before bringing his claim in this Court under the FTCA. He didn't, and he doesn't claim that he did. I therefore lack jurisdiction to consider Plaintiff's claims against the United States, and Plaintiff's claims against the United States are dismissed without prejudice.

## C.     Personal Jurisdiction

### 1.  Legal Standard

In addition to challenging the sufficiency of Plaintiff's allegations to state substantive claims, three defendants, Charles Halliday Dolan, Jr., Rodney Joffe, and Orbis Business Intelligence, Ltd.[3] also challenge this Court's exercise of personal jurisdiction over them. Federal Rule of Civil Procedure 12(b)(2) permits dismissal when the court lacks personal jurisdiction over a defendant.  *See* Fed. R. Civ. P. 12(b)(2). "A plaintiff seeking to establish personal jurisdiction over a nonresident defendant 'bears the initial burden of alleging in the complaint sufficient facts

---

[3] I note that Defendant Neustar, Inc. also filed a separate Motion to Dismiss, asserting not that this Court lacks personal jurisdiction over it but that it is not a proper party and should be dropped pursuant to Federal Rule of Civil Procedure 21. (DE 228). Its argument is based on transactions in late December 2021 through which TransUnion, LLC acquired Neustar, Inc.'s marketing, fraud, and communications solutions business and Neustar Security Services, LLC ("NSS") began operating as an independent security business. (*Id.* at 3–4). Neustar, Inc. contends that NSS is the proper party, and Plaintiff added NSS as a party in the Amended Complaint. Ultimately, though, I need not decide whether Neustar, Inc. or NSS is the proper party because none of Plaintiff's claims survive against either party.

to make out a *prima facie* case of jurisdiction.'" *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013) (quoting *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009)) (italics added). The Eleventh Circuit has described the standard for satisfying the *prima facie* case as the presentation of "enough evidence to withstand a motion for directed verdict." *See, e.g., Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990).

"When a defendant challenges personal jurisdiction 'by submitting affidavit evidence in support of its position, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction.'" *Mosseri*, 736 F.3d at 1350 (quoting *Madara*, 916 F.3d at 1514). At that stage, "the plaintiff is required to substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof, and not merely reiterate the factual allegations in the complaint." *Polski Linie Oceaniczne v. Seasafe Transp. A/S*, 795 F.2d 968, 972 (11th Cir. 1986) (internal citation omitted). I must "accept[] as true all unchallenged facts in the plaintiff's complaint." *AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, 1364 (11th Cir. 2021). "To the extent that 'the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, [I] must construe all reasonable inferences in favor of the plaintiff.'" *Id.* at 1364 (quoting *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249 (11th Cir. 2010)). However, I need only consider "specific factual declarations within the affiant's personal knowledge," and not "statements . . . [which] are in substance legal conclusions." *Posner v. Essex Ins. Co. Ltd.*, 178 F.3d 1209, 1215 (11th Cir. 1999) (per curiam).

To exercise personal jurisdiction over a defendant, "the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *Carmouche v. Tamborlee Mgmt., Inc.*, 789 F.3d 1201, 1203 (11th Cir. 2015). "Only if both prongs of the analysis are satisfied may a

federal or state court exercise personal jurisdiction over a nonresident defendant." *Madara*, 916

F.2d at 1514 (citations omitted).

Florida's long-arm statute provides two ways in which a defendant can be subject to

personal jurisdiction. *Carmouche*, 789 F.3d at 1203–04. "[F]irst, section 48.193(1)(a) lists acts that

subject a defendant to specific personal jurisdiction--that is, jurisdiction over suits that arise out of

or relate to a defendant's contacts with Florida." *Id*. at 1204 (citing Fla. Stat. § 48.193(1)(a)).

"[S]econd, section 48.193(2) provides that Florida courts may exercise general personal

jurisdiction—that is, jurisdiction over any claims against a defendant, whether or not they involve

the defendant's activities in Florida—if the defendant engages in 'substantial and not isolated

activity' in Florida." *Id*. (emphasis omitted) (quoting § 48.193(2)).

"If there is a basis for the assertion of personal jurisdiction under the state statute, [I] next

determine whether sufficient minimum contacts exist to satisfy the Due Process Clause of the

Fourteenth Amendment so that 'maintenance of the suit does not offend traditional notions of fair

play and substantial justice.'" *Madara*, 916 F.2d at 1514 (quoting *Int'l Shoe Co. v. Washington*,

326 U.S. 310, 316 (1945)) (additional citations omitted). The minimum contacts sufficient to

comport with Due Process differ when assessing the exercise of "general (sometimes called all-

purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction." *See Ford Motor

Co. v. Mont. Eighth Jud. Dist. Ct*., 141 S. Ct. 1017, 1024 (2021). The general jurisdiction provision

of Florida's long-arm statute "extends to the limits on personal jurisdiction imposed by the Due

Process Clause of the Fourteenth Amendment." *Fraser v. Smith*, 594 F.3d 842, 846 (11th Cir.

2010). Therefore, when assessing this Court's exercise of general jurisdiction, "[I] need only

determine whether the . . . exercise of jurisdiction . . . would exceed constitutional bounds." *Id*.

2. *Discussion*

Plaintiff contends that this Court may constitutionally exercise personal jurisdiction over Defendants Dolan, Joffe, and Orbis for two reasons: first, because 18 U.S.C. § 1965(b) authorizes nationwide service of process for RICO claims, and second, even if it didn't, the Defendants had sufficient minimum contacts with the state of Florida for the exercise of personal jurisdiction over them. Because I have concluded that Plaintiff has failed to state a claim under RICO, as more fully set forth below, Plaintiff may not rely on § 1965(b) to establish personal jurisdiction over these Defendants. *See infra* section III(D)(1). I therefore need not address this argument further.

That leaves Plaintiff's minimum contacts argument. To exercise personal jurisdiction over Defendants, the exercise of jurisdiction must be both appropriate under Florida's long-arm statute—either because there is general jurisdiction over Defendants or because Plaintiff's claims arise out of or relate to their contacts with Florida—and in accordance with the Due Process Clause of the Fourteenth Amendment. Plaintiff does not argue that general jurisdiction exists over these Defendants, so I need not address that prong of the Florida statute. Instead, under both the Florida long-arm statute and the Due Process Clause, I must determine whether the Defendants had sufficient minimum contacts with the forum state. "The proper focus of the . . . inquiry in intentional-tort cases is 'the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore,* 571 U.S. 277, 291 (2014) (citing *Calder v. Jones*, 465 U.S. 783, 788 (1984)).

I outline Plaintiff's allegations as to each Defendants' contacts with the forum state—which are tellingly sparse—below. I then discuss the ways that Plaintiff misunderstands the applicable law with respect to the constitutional exercise of personal jurisdiction over non-resident defendants, which render Plaintiff's allegations insufficient for the exercise of personal jurisdiction over Defendants Dolan, Joffe, and Orbis.

#### i.   Dolan

Plaintiff argues that Defendant Dolan has sufficient contacts with Florida for this Court's exercise of personal jurisdiction over him because he "provid[ed] false information to Igor Danchenko, which information was subsequently used in the Steele [D]ossier" and "assisted his co-conspirators in creating a document which was published throughout the world," including the state of Florida. (DE 241 at 5). According to Plaintiff, this document "harmed both the Plaintiff, Donald J. Trump, and residents of the state of Florida" such that this Court may properly exercise jurisdiction over Defendant Dolan. (*Id.*).

#### ii.   Joffe

Next, Defendant Joffe. Plaintiff argues that this Court may exercise jurisdiction over Defendant Joffe because he "accessed information, which he should never have accessed, in an attempt to provide Sussmann with information to present to the FBI and to include with the dossier created by Christopher Steele" and that this information led to the publication of documents "read and published within the state of Florida." (DE 239 at 5).

#### iii.   Orbis

Finally, Orbis. Plaintiff contends that this Court may exercise personal jurisdiction over Defendant Orbis because Defendant Orbis's "conduct was targeted at many high-level U.S. based actors – including a presidential candidate and eventual sitting president, top-ranking federal law enforcement officials, and major U.S. media outlets – coupled with the pervasive, negative impact that Defendant's actions had upon the country as a whole." (DE 262 at 4). Plaintiff further argues that he has "sufficiently plead[] that Defendant [Orbis] participated in a RICO conspiracy with other co-conspirators that caused harm in the state of Florida" particularly "the DNC and Perkins

Coie [who] both maintain a continuous presence in the state of Florida, and [who] commissioned the creation of the Dossier." (DE 262 at 5).

### iv.  Analysis

To determine whether this Court may exercise personal jurisdiction over Defendants, I must consider whether Florida's long-arm statute provides for specific jurisdiction. Under Florida's long-arm statute, specific jurisdiction can only be exercised over a defendant in causes of action that "aris[e] from" a list of enumerated acts. § 48.193(1)(a). And Florida's long-arm statute is strictly construed. *Sculptchair, Inc., v. Century Arts, Ltd.*, 94 F.3d 623, 627 (11th Cir. 1996) (applying Florida law). If the long-arm statute applies, I must then consider whether the exercise of specific jurisdiction over Defendants would comport with Due Process (as this constitutional standard is analyzed within the context of a specific jurisdiction analysis). *Carmouche*, 789 F.3d at 1203.

Plaintiff argues that "[i]t is irrelevant that [Defendants] [have] never traveled or conducted business in Florida" because the conduct "directly led to the dissemination of false information within Florida that harmed the Plaintiff." (DE 239; DE 241). According to Plaintiff, the fact that Defendants conveyed information that "led to the dissemination of false information within Florida" combined with the fact that they "knew that Florida is a state in the United States which was an important one" is sufficient to confer jurisdiction over Defendants under the "effects" test recognized in *Calder v. Jones*, 465 U.S. at 789. (*Id.* at 8). Plaintiff appears to rely on Florida Statute § 48.193(1)(a)(2), which provides for specific jurisdiction over a defendant for "committing a tortious act within the [s]tate." However, "[i]n Florida, before a court addresses the question of whether specific jurisdiction exists under the long-arm statute, the court must determine 'whether the allegations of the complaint state a cause of action." *PVC Windoors, Inc. v. Babbitbay Beach*

*Const., N.V.*, 598 F.3d 802, 808 (11th Cir. 2010) (citing *Wendt v. Horowitz*, 822 So.2d 1252, 1260

(Fla. 2002)); *see also 8100 R.R. Ave. Realty Trust v. R.W. Tansill Constr. Co.*, 638 So.2d 149, 151

(Fla. 4th DCA 1994) ("Since the only support in the record for [Plaintiff's] argument is the

complaint, we must of necessity determine whether it states a cause of action in tort, in order to

determine jurisdiction."). This is because, for the Court to have jurisdiction over a defendant for a

tort committed in Florida, a plaintiff must have alleged sufficient facts to make out a claim that the

tort actually occurred. As set forth *infra* at Section D, none of the torts alleged in Plaintiff's

Complaint survive Rule 12(b)(6) scrutiny. And without these predicate torts, this Court does not

have jurisdiction over Defendants under § 49.193(1)(a)(2) of Florida's long-arm statute.

To the extent that Plaintiff is attempting to rely on some provision other than

§ 49.193(1)(a)(2) to confer personal jurisdiction over the Defendants, Plaintiff has still failed to

plead facts sufficient to do so. "It is undisputed that no part of [Defendants'] course of conduct

occurred in [Florida]." *Walden*, 571 U.S. at 288. Thus, Plaintiff's argument focuses on the

"effects" of Defendants' conduct to confer jurisdiction over them under *Calder*, which requires a

plaintiff to establish that a tort was: (1) intentional; (2) aimed at the forum state; and (3) caused

harm that the defendant should have anticipated would be suffered in the forum state. *Louis Vuitton

Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1356 (11th Cir. 2013). Here, Plaintiff has not alleged

that Defendants "aimed" any conduct at Florida or could reasonably have anticipated that Plaintiff

would be harmed in Florida, particularly in light of the fact that Plaintiff was a resident of New

York at the time of the occurrences giving rise to Plaintiff's claims. Knowledge that Florida is a

state in the United States does not equate to knowledge that Defendants' actions will have

consequences in Florida. If that were the case, there would be nationwide personal jurisdiction

over almost all claims arising in the United States. Such is clearly not contemplated by Florida's long-arm statute, and I therefore reject Plaintiff's argument.

Plaintiff's *Keaton* argument fairs no better. In *Keaton v. Hustler Magazine, Inc.*, the Supreme Court held that New Hampshire had jurisdiction over a magazine publisher in a libel action where the publisher sold "some 10 to 15,000 copies of [the magazine] in th[e] [forum state] each month." 465 U.S. 770, 772 (1984). Through these repeated and continuous sales of the magazine, the Court concluded that the defendant "ha[d] continuously and deliberately exploited the [forum state] market" and it was therefore reasonable for the defendant to "anticipate being haled into court there in a libel action based on the contents of its magazine." *Id.* at 781 (citation omitted). There are no allegations in the Amended Complaint that outline any contacts with any Defendant that rise anywhere near this level. There are no allegations in the Amended Complaint of any repeated and continuous efforts by any Defendant to avail themselves of Florida or its laws.

For these reasons, I conclude that this Court may not exercise personal jurisdiction over Defendants Dolan, Joffe, or Orbis[4] consistent with the Florida long-arm statute. And because I have determined that no basis exists to assert specific jurisdiction over Defendants under Florida's long-arm statute, I need not consider whether the exercise of specific jurisdiction would satisfy the Due Process Clause. *See Melgarejo v. Pycsa Panama, S.A.*, 537 F. App'x. 852, 862, (11th Cir. 2013) ("Because the district court properly concluded there is no [statutory] basis for specific jurisdiction . . . we do not reach the second question of the personal jurisdiction analysis—whether such an exercise of personal jurisdiction would be constitutional."); *see also Madara*, 916 F.2d at

---

[4] Because I have concluded that this Court does not have personal jurisdiction over Defendant Orbis, I do not reach Defendant Orbis's arguments under Rule 12(b)(4) and 12(b)(5) for insufficient process and service of process.

1514 ("Only if both prongs of the analysis are satisfied may a federal . . . court exercise personal jurisdiction over a nonresident defendant."). Thus, these Defendants are dismissed from this lawsuit.

### D.    Failure to State a Claim

Now for the allegations themselves. A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of the allegations in a complaint. *See* Fed. R. Civ. P. 12(b)(6). In assessing legal sufficiency, courts are bound to apply the pleading standard articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). That is, "a complaint must . . . contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570).

At this stage, a court must construe the complaint in the light most favorable to the plaintiff and accept as true all the plaintiff's factual allegations. *See Christopher v. Harbury*, 536 U.S. 403, 406 (2002); *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007). However, pleadings that "are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. A pleading that offers "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235–36 (3d ed. 2004)). Federal Rule of Civil Procedure 8(a)(2) requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.

### 1.   *RICO & RICO Conspiracy (Counts I and II)*

Defendants first assert that Plaintiff's RICO claims should be dismissed as both (1) barred by the statute of limitations and (2) inadequately pled and thus substantively deficient.

### i.   *Statute of Limitations*

"[A] Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate . . . if it is apparent from the face of the complaint that the claim is time-barred." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845–46 (11th Cir. 2004) (quotation marks omitted). This essentially requires a plaintiff to plead himself out of the cause of action alleged in the complaint. *See Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288 n.13 (11th Cir. 2005) (explaining that an action should only be dismissed on statute of limitations grounds at the motion to dismiss stage "if it appears beyond a doubt that Plaintiff[] can prove no set of facts that toll the statute.") (internal quotation omitted).

Defendants argue that Plaintiff has so pled himself out here. The statute of limitations for civil RICO actions and conspiracy to commit RICO violations is four years from when the injury was or should have been discovered. *See Lehman v. Lucom*, 727 F.3d 1326, 1330 (11th Cir. 2013); *Agency Holding Corp v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987). Plaintiff was therefore required to file his lawsuit no later than October 2021, according to Defendants. Defendants argue that Plaintiff's own tweets, of which they urge I take judicial notice, demonstrate that he was on notice of his purported claims, at the very latest, by October 2017. At least one circuit has concluded that a district court may take judicial notice of tweets.[5] *See Hawaii v. Trump*,

---

[5] Plaintiff's tweets included, *inter alia*, the following declarations that appear directly on point to his claims in the instant litigation:

> It now turns out that the phony allegations against me were put together by my political opponents and a failed spy afraid of being sued…. Totally made up facts

859 F.3d 741, 773 n.14 (9th Cir.) (taking judicial notice of Plaintiff's tweets), *vacated on other grounds*, 138 S. Ct. 377 (2017).[6] And at least one other circuit has held that it is proper to take judicial notice of a blogger's online blog posts. *See Mirlis v. Greer*, 952 F.3d 51, 63 n. 11 (2d Cir. 2020).

Federal Rule of Evidence 201 permits a court to "judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *see also Paez v. Sec., Florida Dep't of Corrs.*, 947 F.3d 649, 651 (11th Cir. 2020). "A court may take judicial notice of appropriate adjudicative facts at any stage in a proceeding[.]" *Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC*, 369 F.3d 1197, 1204 (11th Cir. 2004) (citing Fed. R. Evid. 201(f)). But taking judicial notice of facts under Federal Rule of Evidence 201 is "a highly limited process" which

---

by sleazebag political operatives, both Democrats and Republicans – FAKE NEWS! Russia says nothing exists. Probably… released by "Intelligence" even knowing there is no proof, and never will be. My people will have a full report on hacking within 90 days!

Donald J. Trump (@realDonaldTrump), Twitter (Jan. 13, 2017).

Never seen such Republican ANGER & UNITY as I have concerning the lack of investigation on Clinton made Fake Dossier (now $12,000,000?) …. … the Uranium to Russia deal, the 33,000 plus deleted Emails, the Comey fix and so much more. Instead they look at phony Trump/Russia . . . . . . . "collusion," which doesn't exist. The Dems are using this terrible (and bad for our country) Witch Hunt for evil politics, but the R's . . . . . . are now fighting back like never before. There is so much GUILT by Democrats/Clinton, and now the facts are pouring out. DO SOMETHING!

Donald J. Trump (@realDonald Trump), Twitter (Oct. 29, 2017).

[6]At least two district courts have reached the same conclusion regarding tweets. *See Rock the Vote v. Trump*, No. 20-cv-06021, 2020 WL 6342927, at *4 n.2 (N.D. Cal. Oct. 29, 2020); *United States v. Flynn*, 507 F.Supp. 2d 116, 126 n.6 (D.D.C. 2020).

"bypasses the safeguards which are involved with the usual process of proving facts by competent evidence in district court." *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997).

The Eleventh Circuit has not addressed the propriety of taking judicial notice of tweets or other social media, however it has taken judicial notice of some internet sources. *See Ga. Ass'n of Latino Elected Officials, Inc. v. Gwinnett Cnty. Bd. of Registration and Elections*, 36 F.4th 1100, 1123 (11th Cir. 2022) (taking judicial notice of information on a website); *R.S.B. Ventures, Inc. v. F.D.I.C.*, 514 Fed. App'x 853, 856 (11th Cir. 2013) (same). But other circuits that have considered the issue have found it appropriate. *See Hawaii v. Trump*, 859 F.3d at 773 n.14 (tweets); *Mirlis v. Greer*, 952 F.3d at 63 n.11 (blog posts). Moreover, Plaintiff's tweets appear to fall within the category of information that this Circuit has recognized as appropriate for taking judicial notice: facts that are not subject to reasonable dispute from sources whose accuracy cannot reasonably be questioned. *See Paez*, 947 F.3d at 651. The Parties do not dispute that Plaintiff made the statements in the tweets, nor do they dispute that Twitter accurately depicts the tweets; indeed, both Parties have relied on tweets in this litigation—Plaintiff in his Amended Complaint, and Defendants in their Motion to Dismiss. Thus, taking judicial notice of Plaintiff's tweets—not for the truth of their contents but for what they reveal about Plaintiff's knowledge—appears consistent with Eleventh Circuit caselaw, and Plaintiff has not opposed Defendants' request. I therefore find it appropriate to take judicial notice of Plaintiff's tweets.

I note, though, that even without Plaintiff's tweets, the allegations in Plaintiff's Amended Complaint demonstrate that Plaintiff was aware of the basis of his claims since at least 2017. Although the tweets provide further support, they are not essential to my ruling on the RICO statute of limitations.

Plaintiff argues that his claims are timely and that, even if they aren't, they should be equitably tolled for the duration of his presidential term. I begin with the text of the Amended Complaint. The RICO predicates alleged to exist in the Amended Complaint—the creation and circulation of the Steele Dossier and initiation of the Crossfire Hurricane Investigation (obstruction of justice); the data mining of DNS data (theft of trade secrets), and false statements to law enforcement and the media (wire fraud)—are said to have commenced in the summer and fall of 2016. *See, e.g.*, Am. Compl. ¶¶ 140, 158, 218. The Steele Dossier is alleged to have been initially furnished in June 2016 and provided to the FBI between July and October 2016, then published by the media in January 2017. The Trump-Alfa Bank server information resulting from the data mining was widely circulated by the media and Clinton campaign in October 2016, and the statements identified as being misleading to law enforcement and the media occurred between September 2016 and October 2017. *See, e.g.*, Am. Compl. ¶¶ 150, 152, 154, 156, 158, 165, 166, 191, 192, 217, 227, 229, 268, 274, 292. These allegations compel only one logical conclusion: that Plaintiff was aware of the factual basis underlying his RICO claims since at least October 2017, if not earlier. It is not reasonable or plausible to conclude that, despite the allegations in the Amended Complaint that numerous prominent media outlets ran stories on the theory underlying Plaintiff's claims as early as 2016, which were shared by his political opponent in the 2016 presidential election, Plaintiff was not aware of his claims until the Sussmann indictment was returned in September 2021. And indeed, Plaintiff does not appear to meaningfully dispute that he knew of his claims since that time. Instead, he argues that the statute of limitations for his RICO claims should be tolled, either because he was President, under the Clayton Act, because of fraudulent concealment, or under the discovery rule. I address each argument in turn.

First, Plaintiff's equitable tolling argument. In short, Plaintiff argues that it is "in the interests of justice to accommodate . . . [his] right to assert a meritorious claim when equitable circumstances have prevented a timely filing." (DE 237 at 16, quoting *Cocke v. Merrill Lynch & Co.*, 817 F.2d 1559, 1561 (11th Cir. 1987)). He argues that his duties as President interfered with his ability to timely file the instant lawsuit. But, for the reasons discussed below, Plaintiff's claims are not meritorious, and most are completely lacking any evidentiary support as required by the Federal Rules. *See* Fed. R. Civ. P. 11. Moreover, Plaintiff's presidency evidently did not deter him from filing other lawsuits in his personal capacity during the duration of his term in elected office. *See, e.g., Trump v. Vance*, 140 S. Ct. 2412, 2420 (2020) (suit brought by "[t]he President, acting in his personal capacity," to enjoin enforcement of a subpoena); *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2028 (2020) (suit brought by "the President in his personal capacity" to challenge subpoenas); *Trump v. Comm. on Ways & Means*, 391 F. Supp. 3d 93, 95 (D.D.C. 2019) (suit brought by Plaintiff "in his personal capacity"). Plaintiff cites *Clinton v. Jones*, 520 U.S. 681 (1997) for support, but the Supreme Court in that case arrived at the opposite conclusion than that which Plaintiff urges: it *rejected* a stay of litigation during President Clinton's term and concluded that his engagement in civil litigation would *not* unduly interfere with his presidential duties. *See* 520 U.S. at 708–10. I therefore agree with Defendants that Plaintiff's conduct while in office "belies any claim that the equities require his novel theory of tolling," which Plaintiff is unable to support with any relevant legal authority.

Plaintiff next argues that his RICO and RICO conspiracy claims are timely under the Clayton Act, which provides for the tolling of private suits "[w]henever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations *of any of the antitrust laws*[.]" 15 U.S.C. § 16(i) (emphasis added). Defendants contend that this provision is

inapplicable for two reasons: first, because this is not an antitrust action, and second, because Plaintiff has not identified any civil or criminal proceeding instituted by the United States to punish a RICO violation. It appears to be an open question whether the Clayton Act's tolling provision applies in RICO actions. Plaintiff cites a handful of out-of-circuit and non-binding district court cases holding as much, *see, e.g., Pension Fund Mid Jersey Trucking Indus. v. Omni Funding*, 687 F. Supp. 962, 965 (D.N.J. 1988), while Defendants argue that the RICO statute lacks any indication of an intent to include a specialized tolling provision *a la* the Clayton Act. I need not resolve the question though, because without any civil or criminal proceeding instituted by the United States to prevent, restrain, or punish a RICO violation, Plaintiff's claims would not be subject to tolling even if RICO did contain a provision analogous to the Clayton Act. None of the proceedings Plaintiff identifies in his Response were directed at a RICO violation. (*See* DE 237 at 9–12). Indeed, the Government has not instituted any proceedings to punish a RICO violation, nor any RICO predicate act relating to the circumstances giving rise to this litigation. Without any government proceeding initiated to prevent, restrain, or punish a RICO violation or RICO predicate act, there can be no statutory tolling under this theory.

Plaintiff also argues that the statute of limitations on his RICO claims should be tolled because the RICO Defendants attempted "to fraudulently conceal their wrongdoing." (DE 237 at 26). "Under the fraudulent concealment doctrine, even when a claim has already accrued, a plaintiff may benefit from equitable tolling in the event that the defendant took specific steps to conceal her activities from the plaintiff." *Fedance v. Harris*, 1 F. 4th 1278, 1283 (11th Cir. 2021). It requires that a plaintiff show "that he neither knew nor, in the exercise of due diligence, could reasonably have known of the offense." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 195–96 (1997). "The defendant must have actively concealed facts such that the plaintiff remained 'ignoran[t] of

a potential claim,' not 'merely ignoran[t] of evidence.'" *Fedance*, 1 F. 4th at 1287 (rejecting tolling).

Both the Amended Complaint and Plaintiff's tweets belie any argument that his claims should be equitably tolled under the doctrine of fraudulent concealment. To invoke this doctrine, Plaintiff must have been "ignoran[t]" of a potential claim because of the Defendants' efforts to conceal their activities from him. But, since at least 2017, Plaintiff has known about the facts underlying his claims—that the Steele Dossier was allegedly "put together by [his] political opponents and a failed spy afraid of being sued," "Clinton made," and connected to "the Comey fix" and "phony Trump/Russia . . . collusion." Plaintiff cannot in good faith claim to have had no knowledge of a claim that he broadcasted to his social media followers nearly five years ago. Plaintiff is not entitled to statutory tolling under this doctrine.

Plaintiff's third attempt to avoid a statute of limitations bar is the discovery rule. Under this rule, "accrual is delayed until plaintiff has 'discovered'" his injury. *Fedance*, 1 F.4th at 1285 (citing *Gabelli v. SEC*, 568 U.S. 442, 449 (2013)). Plaintiff asserts that the Amended Complaint includes "three subsets of categories" of damages that reset the clock on his RICO Claim: (1) "attorneys' fees and costs of defense" related to "numerous federal investigations"; (2) "losses Plaintiff sustained to his business and political reputation"; and (3) "loss of trade secrets." (DE 237 at 16).

With respect to the first and second categories, Plaintiff asserts that his legal expenses and harm to his business and political reputation "were incurred between September 2017 and 2020, in connection with the Mueller Investigation" and that "the true extent of this portion of Plaintiff's injuries was not discoverable until April 2018 at the earliest," and that this renders his RICO claims timely. (DE 237 at 28). Plaintiff misunderstands the law. "[T]he statute of limitations commences

to run[] when the wrongful act or omission results in damages" and a "cause of action accrues *even though the full extent of the injury is not then known or predictable*." *Wallace v. Kato,* 549 U.S. 384, 391 (emphasis added). Thus, Plaintiff's concession that he was damaged beginning in September 2017 means that the clock began ticking despite that Plaintiff did not yet appreciate the "true extent" of his injuries.

Plaintiff's third category of damages also fails to save these time barred claims. He argues that he "was not aware that his sensitive, confidential, and proprietary data had been stolen and misappropriated until September 16, 2017, when these 'revelations were exposed for the first time in the Sussman indictment and/or subsequent motions filed by Special Counsel John Durham.'" (DE 237 at 16 (citing Am. Compl. ¶ 146)). But the release of DNS information, as more fully explained below, on which Plaintiff's claims are predicated, was public in October 2016. (Am. Compl. ¶¶ 124–30, 253–77). I therefore find that Plaintiff's RICO claims are time barred.

### ii. Failure to State a Claim

But even if Plaintiff's RICO claims were timely, they still fail on the merits at every step of the analysis. Under RICO, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c). "To recover, a civil plaintiff must establish that a defendant (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two racketeering acts." *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1348 (11th Cir. 2016) (citation omitted). Further, the plaintiff must establish "(1) the requisite injury to 'business or property,' and (2) that such injury was 'by reason of' the substantive RICO violation." *Id.* (citation omitted). "[T]he RICO statute provides that its terms are to be liberally

construed to effectuate its remedial purposes." *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020) (citation omitted).

Defendants argue that Counts I and II of the Amended Complaint fail to satisfy any of these elements. I agree. While Plaintiff's failure to satisfy any one of the RICO elements is sufficient to grant Defendants' Motion, for the sake of completeness I address them all below.

### a.   Predicate Acts

Plaintiff's RICO claims first fail because the Amended Complaint lacks allegations pertaining to any plausible predicate act, let alone two valid predicate acts. "[A]bsent any valid predicate acts, [the plaintiff] cannot state a claim for RICO violations." *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1068 (11th Cir. 2007) (citation omitted). Plaintiff purports to identify three predicate acts: obstruction of justice, theft of trade secrets, and wire fraud. None survive judicial scrutiny.

### i.   Obstruction of Justice

Obstruction of justice does not supply Plaintiff with a valid predicate act because Plaintiff does not identify any "official proceedings" that Defendants allegedly obstructed.

Perplexingly, Plaintiff appears to argue that the Defendants obstructed investigation Crossfire Hurricane *by contributing to the initiation* of Crossfire Hurricane. That Defendants could have obstructed a proceeding by initiating it defies logic. In any event, Crossfire Hurricane does not qualify as an "official proceeding" within the meaning of the statute, and Plaintiff does not point to any other "official proceeding" to satisfy this element of an obstruction of justice predicate act.

The federal witness tampering statute Plaintiff cites, 18 U.S.C. § 1512, provides for criminal penalties for "[w]hoever corruptly . . . alters, destroys, mutilates, or conceals a record,

document, or other object . . . with the intent to impair the object's integrity or availability for use in an official proceeding," or who "otherwise obstructs, influences, or impedes any official proceeding." 18 U.S.C. § 1521(c). Under the statute, "official proceedings" are limited to federal judicial cases or proceedings before Congress or a federal agency. *Id.* § 1515(a). Investigations that do not result in charges are not "official proceedings" within the meaning of the statute.[7] *See United States v. Young*, 916 F.3d 368, 384 (4th Cir. 2019) (FBI investigation is insufficient); *United States v. Ermoian¸* 752 F.3d 1165, 1171–72 (9th Cir. 2013) (same).

Alternatively, Plaintiff argues that he has sufficiently pled obstruction of justice under § 1512(b)(3), which criminalizes "misleading conduct toward another person, with intent to . . . hinder, delay or prevent the communication to a law enforcement officer . . . relating to the commission or possible commission of a federal offense." 18 U.S.C. § 1512(b)(3). Specifically, Plaintiff points to the following purported misrepresentations: (1) certain reports within the Steele Dossier, which Defendant Steele[8] allegedly provided to the FBI (Am. Compl. ¶¶ 158, 169); (2) Sussmann's statement to the FBI that he was not acting "on behalf of a client or company"[9] when he conveyed information suggesting a suspicious pattern of activity between Trump servers

---

[7] Plaintiff cites *United States v. Grubb*, 11 F.3d 426 (4th Cir. 1993), as supporting the contrary position: that an FBI investigation *is* sufficient to support an obstruction of justice charge. But that case doesn't say so, and it actually hurts Plaintiff's position. There, the Fourth Circuit held that "an obstruction of justice prosecution cannot rest solely on the allegation or proof of perjury; rather, what must additionally be proven is that the false statements given, in some way, *either obstructed or were intended to obstruct the due administration of justice.*" (emphasis added). The Amended Complaint is wholly devoid of any allegation that the Defendants' purported actions, even accepting them as true, obstructed justice.

[8] I note that Defendant Steele is not a RICO Defendant.

[9] Plaintiff's heavy reliance on the Sussmann indictment throughout his Amended Complaint is curious given that Sussmann was acquitted by a unanimous jury of making a false statement to the FBI, a fact which Plaintiff fails even to acknowledge anywhere in the pleading.

and Alfa Bank (*Id.* ¶¶ 204–14), and (3) the "deceptive analysis" of the Trump-Alfa Bank activity supposedly contained in white papers Sussmann provided to the FBI (*Id.* ¶ 206). Notably absent from the Amended Complaint, though, is any allegation that any Defendant interfered with law enforcement with respect to the commission or possible commission of any federal offense. Plaintiff endeavors to significantly broaden this provision to criminalize the dissemination of *any* purportedly misleading information, regardless of any connection to some federal offense. (*See* DE 237 at 27–28). He argues that because Defendants "made numerous false and misleading statements to federal law enforcement officers, withheld pertinent and relevant information, and provided falsified and fabricated materials and records," they violated § 1512(b)(3), even though their statements did not concern a federal offense. (*Id.*). But that is not what the statute says, and Plaintiff may not misconstrue it in this way. Even accepting Plaintiff's allegations as true, perjury and falsifying documents are not RICO predicate acts. *See* 18 U.S.C. § 1961(1). Moreover, this obstruction provision proscribes engaging in misleading conduct toward another person to hinder, delay, or *prevent communication to a law enforcement officer*—not statements made *to* law enforcement officers themselves. For these reasons, Plaintiff cannot rely on obstruction of justice to supply a predicate act for his RICO claim.

### ii.   Theft of Trade Secrets

Plaintiff alleges that the RICO Defendants stole proprietary "internet data, records and/or information," including "DNS internet traffic data pertaining to Plaintiff, including data originating from" Plaintiff's servers. (Am. Compl. ¶¶ 544–57).

Before turning to the substance of this claim, a brief overview of DNS, or "Domain Name Service," is first necessary. DNS is a "distributed computing system" or "engine" comprised of "computing and communication entities that are geographically distributed throughout the world."

U.S. Dep't of Commerce, Nat'l Inst. Of Standards & Tech, *Secure Domain Name System (DNS)*

*Deployment Guide*, iii, 2-1, 2-2 (Sept. 2013) (hereinafter "NIST Report");[10] *see Akamai Techs.*

*Inc. v. Cable & Wireless Internet Svcs., Inc.*, 344 F.3d 1186, 1188 (Fed. Cir. 2003) ("The DNS is

administered by a separate network of computers [or "servers"] distributed throughout, and

connected to, the Internet"). DNS acts as a translator of domain names to IP addresses and vice

versa. *See* NIST Report at iii, 2-1. Here's how it generally works: internet users access websites

via domain names, such as flsd.uscourts.gov. NIST Report at 2-1. Computers speak in a different

language—Internet Protocol ("IP") addresses. *Id.* When a user types in a domain name, the

computer must "resolve" the domain name into an IP address. Paul Schmitt et. al., *Oblivious DNS:*

*Practical Privacy for DNS Queries*, Proceedings of the Applied Networking Research Workshop

17 (2019).[11] The user's computer tells the DNS resolver the domain name the user wishes to visit,

and this DNS server looks up the corresponding IP address and relays back that information. NIST

Report at 2-1. Here, I use a website search as an example, but this same process occurs with any

internet communication, including emails. *See* Paul Schmitt, *supra*, at 17.

---

[10] Defendants request that I take judicial notice of the NIST Report. Courts may take judicial notice
of adjudicative facts that "[are] not subject to reasonable dispute" either because they are
"generally known" or "can be accurately and readily determined from sources whose accuracy
cannot reasonably be questioned." Fed. R. Evid. 201(b). A basic understanding of DNS is
necessary to the resolution of this Motion, and the accuracy of this governmental resource cannot
reasonably be questioned. *See Kremen v. Cohan*, 337 F.3d 1024, 1033 n.10 (9th Cir. 2003) (citing
Federal Rule of Evidence 201(b) as supportive of the fact that the court may consider extra-record
facts regarding DNS on a motion for summary judgment). Furthermore, I view this request as
unopposed, given Plaintiff's failure to contest it or question the authenticity of this source. (*See
generally* DE 237).

[11] Defendants additionally cite this source and thus implicitly request that I take judicial notice of
certain facts contained therein. Again, Plaintiff does not contest the propriety of considering this
source at this stage, (*See* DE 237 at 30–31), and I therefore view this lack of opposition as tacit
agreement.

"DNS data is meant to be public." NIST Report at iii, 1.1, 2.3; *see also id.* at ES-1 ("Because [DNS] is an infrastructure system for the global internet . . . the data should be accessible to any entity."). Those who operate the DNS resolvers, generally internet service providers but also other third-parties, "can see all of the DNS queries that a user issues" and can associate DNS queries with the IP address of the computer that sent the query. Paul Schmitt, *supra*, at 17.

Turning now to Plaintiff's theft of trade secrets claim under DTSA, the following elements must be pled: "[1] the defendant must intend to convert proprietary information to the economic benefit of anyone other than the owner; [2] the proprietary information must be a trade secret; [3] the defendant must knowingly steal, take without authorization, or obtain by fraud or deception trade secret information; [4] the defendant must intend or know that the offense would injure the owner of the trade secret; and [5] the trade secret must be related to a product that is in interstate or foreign commerce." *United States v. Smith*, 22 F.4th 1236, 1243 (11th Cir. 2022) (citing 18 U.S.C § 1832(a)(1)).

For one, Plaintiff has not alleged facts that bring the DNS internet traffic at issue within the statutory definition of a "trade secret."[12] Plaintiff suggests that because DNS data could reveal a compilation of sensitive information about him, it is a trade secret.[13] (DE 237 at 31). That is

---

[12] I reject Plaintiff's suggestion that I may not consider at this stage whether certain information constitutes a trade secret. (DE 237 at 30). Although true that whether something constitutes a trade secret is generally a fact question, whether the Plaintiff bringing such a claim has sufficiently plead the existence of a trade secret, as that term is statutorily defined, is permissibly assessed at the motion to dismiss stage. *See Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 906 (3d Cir. 2021) (analyzing whether the plaintiff sufficiently plead a trade secret on review of a motion to dismiss, and noting that "information alleged to be a misappropriated trade secret must be identified with enough specificity to place a defendant on notice of the bases for the claim being made against it"); *see also Kairam v. West Side GI, LLC*, 793 F. App'x 23, 28 (2d Cir. 2019) (affirming dismissal of trade secret claim in part for failure to allege economic value).

[13] It is also worth noting that the vast majority of allegedly sensitive information DNS data could or does reveal, according to Plaintiff, is not alleged to have been stolen by Defendants here. (*See*

incorrect. To constitute a "trade secret," as that term is statutorily defined, "the owner [must have] taken reasonable measures to keep such information secret" and the information must "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. 1839(3). Critically, Plaintiff fails to allege that he or anyone else could or did derive *economic* value from information regarding the frequency with which his computers interacted with certain other computers. *See Kairam v. West Side GI, LLC*, 793 F. App'x 23, 28 (2d Cir. 2019) (affirming dismissal of DTSA claim in part for failure to allege how the purported trade secret derives independent economic value from nondisclosure). He alleges that such data has *political* value and that Clinton, as his political rival, sought it for political purposes. (Am. Compl. ¶ 138). But this does not suffice to plausibly allege a trade secret, which must derive economic value from nondisclsoure.

Even if DNS data is a trade secret, Plaintiff has not plausibly alleged that he has a protectable interest in it. DNS data is public, *see* NIST Report at 2-1 to 2-2, a fact which Plaintiff does not contest. (*See* DE 237 at 31). Nevertheless, he suggests that because that data "*originat[ed]* from his servers" or that "DNS internet traffic data "*pertain[ed]* to him," it belongs to him.[14]  (*Id.*

---

Am. Compl. ¶ 548) (e.g., "client lists . . . techniques, patterns, methods, processes, and procedures"). Plaintiff does not, for example, allege that the DNS data revealed a proprietary client list that Defendants then stole. What DNS data *could* reveal as a theoretical matter is irrelevant for purposes of this motion. And the fact that Plaintiff alleges a list of boilerplate buzzwords is of no matter. My focus is, as it must be, on Plaintiff's non-conclusory allegations. The theory Plaintiff pled is that the theft of DNS internet traffic revealing interactions between his servers and other servers constitutes theft of trade secrets.

[14] Plaintiff's ownership theory is further flawed in that he alleges that he owns DNS data that was obtained from EOP servers (during a time in which Plaintiff was not even in office (*See* Am. Compl. ¶¶ 143–144)) and the Trump Organization, both of which are nonparties to this litigation. *See Vill. Of Alington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977) ("The plaintiff must show that he himself is injured by the challenged action of the defendant"); *Sierra v. City of*

¶ 544) (emphasis added). Recall that DNS is a distributed internet-based computing system comprised of geographically distributed infrastructure. Indeed, Plaintiff repeatedly describes DNS data as "internet data" or "internet traffic." (Am. Compl. ¶¶ 141–42, 491, 544–46, 708). It is thus implausible that Plaintiff owns "DNS internet data" just because it pertains to him or because his servers sent it into the DNS infrastructure. *See* 18 U.S.C. § 1839(4) (defining "owner" as "a person or entity in whom . . . rightful legal or equitable title to, or license in, the trade secret is reposed." 18 U.S.C. § 1839(4)). Nor does *Kremen v. Cohen* lend Plaintiff any support. Contrary to Plaintiff's contention (DE 237 at 31–32), *Kremen* did not address ownership rights in DNS data, it addressed ownership rights in a domain name, which is not at issue here. 337 F.3d 1024, 1030–31 (9th Cir. 2003). Plaintiff thus has not alleged that he owned DNS lookup data pertaining to him.

Nor does Plaintiff allege that Defendants "st[ole]" the DNS data from Plaintiff, or "t[ook] [it] without authorization, or obtain[ed] [it] by fraud or deception." *Smith*, 22 F.4th at 1243 (citing 18 U.S.C. § 1832(a)). To the contrary, Neustar allegedly provides DNS resolution services and Joffe had permission to access DNS data through Neustar. (Am. Compl. ¶¶ 126, 130, 142, 143–44, 491). Joffe allegedly obtained the DNS internet traffic pertaining to Plaintiff by "mining" the data sources he had authority to access, which does not equate to theft. (*Id.* ¶ 130, 134, 140–42, 491). For the foregoing reasons, Plaintiff has not stated a cognizable theft of trade secrets claim.

iii.   Wire Fraud

Plaintiff's Amended Complaint added a new purported predicate act: wire fraud. However, this predicate act also fails for at least two reasons. First, to plead fraud, Plaintiff must satisfy the heightened pleading requirements of Rule 9(b); that is, Plaintiff must specify with precision

---

*Hallandale Beach*, 996 F.3d 1110, 1124–25 (11th Cir. 2021) (Newsom, J., concurring) (explaining that a plaintiff may only sue for injury to the government in a *qui tam* action).

exactly why any allegedly fraudulent statements were false and how they mislead him. *See Crawford's Auto Ctr., Inc. v. State Farm Mut. Auto. Ins. Co.*, 945 F.3d 1150, 1159 (11th Cir. 2019). Plaintiff has not done so. (*See* Am. Compl. ¶ 583(a)–(c),(j),(m)–(p)). Conclusory allegations that Plaintiff has suffered "loss of competitive position, . . . loss of business revenue, loss of goodwill, loss of trade secrets, and/or loss of contractual relations" fall woefully short of Rule 9(b)'s particularity requirement. Plaintiff does not specify in what way he has lost any competitive position or goodwill attributable to Defendants' actions, and, as explained *supra* he has not explained how he has lost any trade secrets.

Second, Plaintiff's Amended Complaint fails to successfully allege wire fraud as a predicate act because Plaintiff does not allege that "an object of the[] dishonesty was to *obtain* . . . money or property." *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020) (emphasis added). The federal wire fraud statute prohibits "only deceptive schemes to deprive the victim of money or property"—not "all acts of dishonesty." *Id.* With this predicate act, Plaintiff tries to fit a square peg into a round hole. The alleged harm Plaintiff describes to his "political and/or business reputation" is not the type of harm the wire fraud statute remediates. *See United States v. Wheeler*, 16 F.4th 805, 820 (11th Cir. 2021). "Damage to reputation is generally considered personal injury and thus is not an injury to 'business or property' within the meaning of 18 U.S.C. § 1964(c)." *Hamm v. Rhone-Poulenc Rorer Pharms., Inc.*, 187 F.3d 941, 954 (8th Cir. 1999) (collecting cases).

Nor does "misreporting" payments to Fusion GPS in campaign finance reports qualify as wire fraud. Violations of federal campaign finance laws are not RICO predicate offenses. *See Ayres v. Gen. Motors Corp.*, 243 F.3d 514, 522 (11th Cir. 2000) (holding that violations of the federal Safety's Act disclosure requirements could not be prosecuted as wire fraud under the civil RICO

statute). Plaintiff's Amended Complaint is devoid of any allegation that Defendants obtained money or property or deprived anyone else of it. Thus, wire fraud is not a viable predicate act.

b.   Pattern

Plaintiff has also failed to plausibly allege a pattern of racketeering activity, and this further precludes him from stating a RICO claim. "To successfully allege a pattern of racketeering activity, plaintiffs must charge that: (1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a *continuing* nature." *Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1264 (11th Cir. 2004) (emphasis in original) (citations omitted). "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 1265 (citation omitted).

For the reasons previously discussed, Plaintiff has failed to plausibly allege that Defendants committed any one predicate act, let alone two or more within a ten-year time span. But even if any of his predicate acts were viable, Plaintiff has not alleged any facts to plausibly suggest that they are either related to one another, or that the acts are of a continuing nature.

A party can allege closed-ended continuity "by proving a series of related predicates extending over a substantial period of time." *Jackson*, 372 F.3d at 1265. Plaintiff has not done so here. The predicate acts he alleges occurred over an approximately six-month time period around the 2016 election: (1) the alleged theft of trade secrets between July 2016 and "early 2017," (Am. Compl. ¶¶ 134, 140, 298, 321); (2) the alleged witness tampering between September 2016 and February 2017, (*id.* ¶¶ 205, 218, 304, 561–65); and (3) the alleged wire fraud between May and October 2016, (*id.* ¶ 581(a)–(y)). The Eleventh Circuit has rejected allegations of closed-ended

continuity when the supposed pattern of racketeering activity lasted less than nine months, and other circuits impose even stricter requirements. *See Jackson*, 372 F.3d at 1266 (collecting cases); *Halvorssen v. Simpson*, 807 F. App'x 26, 31 (2d Cir. 2020) (noting two-year "minimum" for closed-ended continuity). Thus, the activity Plaintiff alleges did not run long enough to satisfy the requirements for demonstrating closed-ended continuity.

Plaintiff's "pattern" allegations fail for another reason: there is no closed-ended continuity where "the RICO allegations concern only a single scheme with a discrete goal." *Jackson*, 372 F.3d at 1267; *see also Ferrell v. Durbin*, 311 F. App'x 253, 257 (11th Cir. 2009) ("[S]ingle schemes with a specific objective and a natural ending point can almost never present a threat of continuing racketeering activity."). But that is exactly what Plaintiff alleges here: that the Defendants shared a single, time-limited objective "to vilify Donald J. Trump" in connection with his 2016 campaign and presidency. (Am. Compl. ¶ 2). Plaintiff even identified a "deadline" for this *singular* objective: "Election Day." (*Id.* ¶ 533).

The Amended Complaint is also devoid of any allegations that demonstrate open-ended continuity. To allege open-ended continuity, a plaintiff must show that "the alleged acts were part of the defendants' regular way of doing business, or that the illegal acts threatened repetition in the future." *Jackson*, 372 F.3d at 1267 (quotation marks omitted). There are no such allegations in the Amended Complaint. That Plaintiff may run for office again in 2024 is not sufficient to suggest that Defendants will commit any predicate acts in the future; such a proposition is far too speculative and cannot be plausibly inferred from the allegations. Plaintiff argues that "[g]iven the RICO Defendants' history, there is a significant risk that they will resort to engaging in 'theft of trade secrets, obstruction of justice, and other unlawful tactics'" to oppose Plaintiff's future presidential bid. But, for the reasons explained above, there is no evidence, and Plaintiff has not

alleged any facts to support, that the Defendants committed any predicate acts in the past; thus, Plaintiff's attempt to rely on Defendants' "history" to establish open-ended continuity falls short.

### c. Enterprise

An "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]" 18 U.S.C. § 1961(4). "[T]he existence of an enterprise is an element distinct from the pattern of racketeering activity and 'proof of one does not necessarily establish the other.'" *Boyle*, 556 U.S. at 947 (footnote and citation omitted); *see also id.* ("[I]f the phrase is used to mean that the existence of an enterprise may never be inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity, it is incorrect. . . . [E]vidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'" (citation omitted)). In addition, a RICO enterprise is "a continuing unit that functions with a common purpose." *Boyle v. United States*, 446 U.S. 938, 948 (2009). "[T]he relevant 'purpose' in an association-in-fact enterprise is the members' shared purpose of engaging in *illegal activity*." *Al-Rayes v. Willingham*, 914 F.3d 1302, 1308 (11th Cir. 2019) (emphasis added).

Defendants argue that the RICO Defendants "shared a purpose that was not only legitimate, but constitutionally protected: opposing Plaintiff, the Republic candidate, in the 2016 presidential election." (DE 226 at 8 (citing Am. Compl. ¶¶ 2, 9)). Plaintiff contends that this is not so, and that the Defendants' purpose was "corruptly and wrongfully harming Plaintiff's political reputation, damaging his electability for the 2016 Presidential Election and subsequent elections, impeding his ability to effectively govern, and otherwise sabotaging his political career through deceptive, criminal and fraudulent means, including, but not limited to, falsely implicating Plaintiff, the

Trump Campaign, and the Trump Administration as colluding with Russia." (DE 237 at 19 (citing Am. Compl. ¶ 531)). But Plaintiff's assertions that the Defendants acted "through deceptive, criminal, and fraudulent means" is a legal conclusion that is not entitled to the presumption of truth at the motion to dismiss stage. Plaintiff offers nothing plausible in support to suggest that Defendants had an *illegal* purpose or an intent to commit racketeering acts. These allegations fail for the same reasons the conclusory allegations of discrimination failed in *Iqbal*: they are "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. Moreover, neither politically opposing Plaintiff, disliking Plaintiff, nor engaging in political speech about Plaintiff that casts him in a negative light is illegal. Without an illegal purpose plausibly alleged in the Amended Complaint, Plaintiff has failed to allege a RICO enterprise.

### d.  RICO Standing

Finally, Defendants argue that Plaintiff has failed to adequately allege RICO standing—an injury directly caused by a predicate racketeering act. To state a claim for RICO, a plaintiff must allege both an injury to the plaintiff's business or property and "some direct relation between the injury asserted and the injurious conduct alleged." *Hemi Grp. v. City of New York*, 559 U.S. 1, 9 (2010) (citation omitted). "A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient." *Id.* Similarly, that an injury was "foreseeable" is not enough; instead, "the injury must be direct." *Ray v. Spirit Airlines*, 836 F.3d 1340, 1349 (11th Cir. 2016).

Plaintiff contends that he has alleged RICO standing because the Amended Complaint points to "at least nine independent and distinct harms to his business and property," which include: (i) "loss of political []reputation"; (ii) "loss of business reputation"; (iii) "loss of existing and future business opportunities"; (iv) "loss of competitive position"; (v) "loss of business revenue"; (vi) loss of goodwill"; (vii) "loss of trade secrets"; (viii) "loss of contractual relations"; and

(ix) "defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the RICO Defendants' actions and the various federal investigations and/or official proceedings which arose therefrom." (Am. Compl. ¶¶ 615–16). Missing from the Amended Complaint, though, is any allegation directly connecting Defendants' conduct to any of these harms. Plaintiff has not alleged facts of any specific business opportunities, revenue, or goodwill lost because of Defendants' actions. Without any such allegations, Plaintiff has not, and cannot, show that any of these harms were the direct result of any racketeering activity. For this reason, I agree that Plaintiff has failed to allege facts that establish RICO standing.

### 2. *Injurious Falsehood & Conspiracy to Commit Injurious Falsehood (Counts III and IV)*

As with Plaintiff's RICO claims, Defendants argue the Plaintiff's injurious falsehood claims should be dismissed as both barred by the applicable statute of limitations and as substantively failing on the merits. I agree on both grounds.

The statute of limitations for injurious falsehood under Florida law is two years from publication. *See Wagner, Nugent, Johnson, Roth, Romano, Erikson & Kupfer, P.A. v. Flanigan*, 629 So.2d 113, 114–115 (Fla. 1993); Fla. Stat. § 95.11(4)(g). And the statute of limitations for conspiracy to commit injurious falsehood is four years from the date of injury. *See Davis v. Monahan*, 832 So.3d 708, 709 (Fla. 2002). The statute of limitations on most of the statements Plaintiff identifies ran long ago. (*See, e.g.*, Am. Compl. ¶¶ 268–69) (Clinton's tweets dated October 31, 2016); (*id.* ¶ 265) (Sullivan's campaign statement dated October 31, 2016); (*id.* ¶ 503) (Wasserman Schultz's MSNBC interview on May 10, 2019).

Since the initial Complaint was filed in this court on March 24, 2022, the two-year statute would have expired on March 24, 2020. (DE 1). The statement attributed to Defendant Sullivan is alleged to have occurred on October 31, 2016. (Am. Compl. ¶ 265). Defendant Podesta's statement

was made October 11, 2016 (*Id.* ¶ 276) and October of 2017 (*Id.* ¶ 496).[15] Defendant Sussmann is

alleged to have met with a New York Times reporter on September 1, 2016 (*Id.* ¶ 191), the FBI on

September 19, 2016 (*Id.* ¶ 205), and employees of the CIA on February 9, 2017 (*Id.* ¶ 304). While

Defendant Danchenko is named in Count III, the Amended Complaint does not attribute any

statement to him about Plaintiff, injurious or otherwise. The Amended Complaint alleges that

Defendant Danchenko was an analyst for the Steele Dossier and provided information to him from

May 16 through December 2016 (*Id.* ¶¶ 109-110), had meetings and communications during that

time with Defendant Dolan (*Id.* ¶¶ 111, 112, 114, 118, 119, 120), and was interviewed by the FBI

from January 2017 through November 2017 (*Id.* ¶¶ 330–337).

Defendant Steele, a resident of the United Kingdom, is alleged to have drafted a dossier

about Plaintiff, the first report of which was furnished June 20, 2016. (*Id.* ¶¶ 110, 147). Defendant

Steele, described in the Amended Complaint as a paid FBI informant, began sending the dossier

to the FBI on July 5, 2016 (*Id.* ¶ 158), and September 19, 2016 (*Id.* ¶ 226), met with members of

the news media on September 21, 2016, FBI agents and a State Department official on October 3

and October 11, 2016 (*Id.* ¶¶ 233-234), and a reporter for Mother Jones on October 31, 2016 (*Id.*

¶ 272). A copy of Defendant Steele's dossier was then provided to Senator John McCain in early

2016, who provided a copy to Defendant FBI director Comey on December 9, 2016. (*Id.* ¶¶ 290,

291). Copies of the dossier were leaked to the press, and it was published in full by Buzzfeed on

January 10, 2017 (*Id.* ¶¶ 292, 294, 295). Despite all of these references to Defendant Steele

scattered throughout the Amended Complaint, none specifically attribute any false statement about

---

[15] Mr. Podesta is not named in Count III but is named in Count IV, the conspiracy to commit injurious falsehood claim.

Plaintiff to him. All of these activities are alleged to have occurred well outside the statute of limitations for injurious falsehood.

The Amended Complaint does allege statements by Defendants Clinton and Schiff that would fall within the two-year statute of limitations. With respect to Defendant Clinton, the Amended Complaint attributes the following statements made on June 16, 2021: (1) "We don't have Trump as spokesperson for Putin anymore"; and (2) "After [a] disastrous Trump presidency, in which he gave Putin a green light to do whatever he wanted to do, once Trump was elected of course." (*Id.* ¶ 520). [16] And as to Defendant Schiff, Plaintiff points to: (1) a March 24, 2019 episode of ABC's This Week where Defendant Schiff "called it congresses [sic] duty to expose e [sic] Trump's relationship with Russia"; (2) CNN's State of the Union on May 9, 2020, where Defendant Schiff "claimed . . . there was 'more than circumstantial evidence' that Donald Trump's 2016 presidential campaign colluded with Russia"; and (3) on April 16, 2021 on MSNBC's The Last Word, Defendant Schiff stated that the "Trump campaign was passing strategic polling and strategic information to a Russian intelligence agent" and "[n]ot just any Russian intelligence, but the same ones that tried to help [Plaintiff] win the 2016 election, what most people would call collusion." (*Id.* ¶¶ 511, 513, 514). But while perhaps not barred by the statute of limitations, these statements by Defendants Clinton and Schiff nevertheless do not constitute injurious falsehood for the reasons explained below.

---

[16] In the multitude of paragraphs preceding Count III, the Amended Complaint references two other statements by Defendant Clinton. (Am. Compl. at ¶¶ 521–22). In the February 16, 2022 tweet, she is responding to a statement by Plaintiff directed at her campaign, which is discussed in the Vanity Fair article she attaches. In the quotation from the Financial Times article, she does not reference Plaintiff and is answering a question about the direction of the Democratic Party. These do not appear to relate to the Russia allegations, and they are therefore not relevant to the claims in Plaintiff's Amended Complaint.

Under Florida law, "[a] group of torts recognized under the collective title of 'injurious falsehood' . . . 'is the intentional interference with another's economic relations.'" *Salit v. Ruden McCloskey, Smith Schuster & Russel, P.A.*, 742 So.2d 381, 386 (Fla. 4th DCA 1999) (quoting *Procacci v. Zacco*, 422 So.2d 425, 426 (Fla. 4th DCA 1981)). A claim for injurious falsehood involves the publication of a false statement that is "harmful to the interests" of others and results in their "pecuniary loss." *Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146, 1153 (11th Cir. 2011) (quoting Restatement (Second) of Torts, § 623A (1977)). The Eleventh Circuit has explained that the fundamental difference between a claim for defamation and one for injurious falsehood is that the former protects the reputation of an injured party, while the latter protects that party's *property interests*. *Id.* at 1154.

The elements of the tort of injurious falsehood are: (1) a falsehood, (2) published or communicated to a third party, (3) the defendant knew that the falsehood would likely induce others not to deal with the plaintiff, (4) the falsehood does play a material and substantial part in inducing others not to deal with the plaintiff, and (5) special damages. *Bothmann v. Harrington,* 458 So. 2d 1163, 1168 (Fla. 3d DCA 1984). Damages for injurious falsehood are "restricted to [loss] which results directly and immediately from the falsehoods' effect on the conduct of third persons and the expenses incurred to counteract the publication." *Id.* at 1170 (citing Restatement (Second) of Torts Section 633 (1977)). Damages recognizable are also limited to a plaintiff's realized pecuniary losses. *Salit,* 742 So.2d at 387; *Collier County Pub. Co., Inc. v. Chapman,* 318 So 2d. 492, 495 (Fla. 2d DCA 1975). Special damages pled must be foreseeable and normal consequences of the alleged wrongful conduct, and the conduct must be a substantial factor in bringing about the losses. In addition, under Federal Rule 9(g), "[i]f an item of special damages is

claimed, it must be specifically stated." *See Browning v. Clinton,* 292 F.3d 235, 245 (D.C. Cir. 2002); *Erick Bowman Remedy Co. v. Jersen Salsbery Labs,* 17 F.2d 255, 261 (8th Cir. 1926).

Plaintiff expressly disclaims any recovery for reputational damage. (Am. Compl. ¶ 656). Instead, he "seeks damages for the cost of dealing with the legal issues and political issues, which he was required to spend to redress the injurious falsities . . . ." (*Id.* ¶ 666). He says he has been injured in his business and property and has "incurred and will[] incur significant damages, losses, and deprivation of tangible and intangible property, including but not limited to loss of political and/or business reputation, loss of business opportunities, loss of competitive position, loss of business revenue, loss of goodwill, loss of trade secrets, and/or loss of contractual relations." (*Id.* ¶ 654). Finally, he claims to have been forced to incur expenses in excess of $24,000,000 in the form of defense costs, legal fees, and related expenses incurred "in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings that arose therefrom." (*Id.* ¶ 655).

While Plaintiff's decision to forego a claim for damage to personal reputation is perhaps understandable, the choice of injurious falsehood as a cause of action, with its focus on property interests, is a poor fit. The Supreme Court has held that political office is not a property or contract right. *Taylor v. Beckham,* 178 U.S. 548, 577 (1900) ("[P]ublic offices are mere agencies or trusts, and not property as such . . . [T]he nature of the relation of a public officer to the public is inconsistent with either a property or a contract right."); *see also Snowden v. Hughes,* 321 U.S. 1, (1944) ("More than forty years ago this Court determined that an unlawful denial . . . of a right to state political office is not a denial of a right of property or of liberty secured by the due process clause."). Because Plaintiff does not have a property or contract right to political office, attacks on his fitness for such a role do not constitute trade libel. And even if they did, Plaintiff does not

plausibly allege that any supposed falsehoods actually damaged his political career: as Plaintiff

knows, he—not Defendant Clinton—won the 2016 presidential election.

The allegations of the Amended Complaint also fall far short of stating a claim for injurious

falsehood in other respects. First, apart from boilerplate conclusory language that Plaintiff

"suffer[ed] economic losses" and "has been injured in his business and property," it is not alleged

that any statement was made for the purpose of interference with Plaintiff's property or economic

interests. (*See* Am. Compl. ¶¶ 653–54). The crux of Plaintiff's grievances is that Defendants

allegedly conspired "to cripple Trump's initial bid for presidency and tarnish his electability for

future elections[.]" (*Id.* at ¶ 2). But opposing Plaintiff's presidential campaign does not amount to

a realized pecuniary loss. Statements to law enforcement or comments made in a political

campaign are not intended to induce others not to deal with Plaintiff or his business, or to cause

direct or immediate financial loss. The damages sought are not recoverable and there is a lack of

any allegation tying Plaintiff's claim for attorneys' fees "directly or immediately" to any alleged

falsehood.

The Amended Complaint also fails to allege falsity,[17] that any falsehood impacted third

parties' desire to deal with him or resulted in pecuniary loss, or special damages. "The special

damage rule requires the plaintiff to establish pecuniary loss that has been realized or liquidated,

as in the case of specific lost sales." *Salit*, 742 So.2d at 388. It requires proof that the pecuniary

loss is directly attributed to defendants' conduct and not some other factor. *See Funny Cide*

*Ventures, LLC v. Miami Herald Publ'g Co.*, 955 So.2d 1241, 1246 (Fla. 4th DCA 2007). And

---

[17] Plaintiff's conclusory allegations that "Defendants . . . made, disseminated and/or published false and damaging statements concerning Plaintiff, specifically that he was colluding with Russia and its President Vladimir Putin" are not sufficient under *Twombly* absent some allegations explaining the basis for Plaintiff's falsity claim.

special damages must be "specifically stated" in the complaint. Fed. R. Civ. P. 9(g). The Amended

Complaint lacks this "crucial element." *Salit*, 742 So.2d at 388.

Moreover, many of the statements that Plaintiff characterizes as injurious falsehoods

qualify as speech plainly protected by the First Amendment. Some are statements of opinion based

upon Plaintiff's four years in office.[18] *See From v. Tallahassee Democrat, Inc.*, 400 So.3d 52, 57

(Fla. 1st DCA 1981). Others are "part of the conventional give-and-take in our economic and

political controversies[.]" *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*,

418 U.S. 264, 284 (1974); *see also Horsley v. Feldt*, 304 F.3d 1125, 1131 (11th Cir. 2002).

Because Plaintiff has failed to allege the essential elements of an injurious falsehood claim,

this count must be dismissed. And as for Count IV, the conspiracy allegations are formulaic,

conclusory, and implausible. Moreover, "the gist of a civil action for conspiracy is not conspir[ing]

itself but the civil wrong which is done pursuant to the conspiracy and which results in damage to

the plaintiff." *Balcor Property Mgmt. v. Ahronovitz*, 634 So.2d 277, 279 (Fla. 4th DCA) (quoting

*Berger v. Levin*, 231 So.2d 875, 877 (Fla. 3d DCA 1970)). Without the underlying injurious

falsehood claim, there can be no conspiracy to commit injurious falsehood.

---

[18] In paragraphs 647 and 648 of the Amended Complaint, Plaintiff alleges that Defendant Wasserman-Schultz published numerous false and damaging statements about Plaintiff and his alleged collusion with Russia. "For example, she told CNN's Erin Burnett on 'Out Front' that reported contacts between President Donald J. Trump's campaign aides and Russia amounted to collusion." Defendant Wasserman-Schultz told the reporter: "[W]ith every passing day, it gets more and more disturbing and more and more evidence that there was collusion" and "Donald Trump should be the first person asking for one but since I think he was likely part of it, it's not surprising that hasn't happened." No date is provided, and from the context it appears the interview probably occurred before the appointment of Special Counsel Robert Mueller in May 2017, and outside the statute of limitations. In any event, for the reasons stated above concerning the necessary elements of injurious falsehood, the Amended Complaint does not state a claim against Defendant Wasserman-Schultz.

3. *Malicious Prosecution & Conspiracy to Commit Malicious Prosecution (Count V and VI)*

In Count V, Plaintiff sues: his own Deputy Attorney General, Rod Rosenstein; former Director at the FBI, James Comey; former Deputy Director of the FBI, Andrew McCabe; lawyers for the FBI, Kevin Clinesmith and Lisa Page; an official with the Department of Justice, Bruce Ohr, and his wife Nellie Ohr; and an FBI agent, Peter Stzok, for malicious prosecution. But Plaintiff was never prosecuted.[19]

In order to prevail in a malicious prosecution action, a plaintiff must establish (1) an original criminal or civil judicial proceeding against the plaintiff was commenced or continued; (2) the defendant was the legal cause of the proceeding against the plaintiff; (3) the termination of the proceeding constituted a *bona fide* termination in favor of the plaintiff; (4) there was an absence of probable cause for the proceeding; (5) there was malice on the part of the defendant, and (6) the plaintiff suffered damage as a result of the proceeding. *Alamo Rent-A-Car v. Mancusi*, 632 So.2d 1352, 1354 (Fla 1994); *see also DeMartini v Town of Gulf Stream,* 942 F.3d 1277, 1309 (11th Cir. 2019) (listing elements). "The failure of a plaintiff to establish any one of these six elements is fatal to a claim of malicious prosecution." *Alamo*, 632 So.2d at 1354.

The Amended Complaint fails to allege that any criminal or civil complaint has been commenced against Plaintiff, that the Defendants were the legal cause of such a proceeding, or that there has been a *bona fide* termination in his favor. Plaintiff appears to be basing this claim on his allegations that Defendants "induced or conspired to induce the Crossfire Hurricane investigation," as well as certain "extrajudicial surveillance," "the Mueller investigation," and "other related investigations regarding the Trump-Russia Connection." (*See* Am. Compl. ¶¶ 669–

---

[19] Because there was no prosecution from which the statute of limitations could accrue, I do not address a statute of limitations argument with respect to this claim.

71, 680–82, 674). But the tort is for malicious prosecution, not malicious investigation. These investigations, therefore, do not amount to a "judicial proceeding" because none is a civil or criminal lawsuit, and "[a]n action for malicious prosecution . . . [can] never occur outside the context of *litigation.*" *Fischer v. Debrincat*, 169 So.3d 1204, 1209 (Fla. 4th DCA 2015) (emphasis added). Plaintiff attempts to argue otherwise, but his argument lacks support. He cites *Caplan v. Johnson*, 414 F.2d 615, 618 (5th Cir. 1969), but that case did not hold that there exists a cause of action for malicious prosecution absent some criminal or civil proceeding. Instead, it held that "[a]rrest is not an essential element for malicious prosecution under Florida law"—but a judicial proceeding still is. *Id.* at 618.

In addition to failing to identify any judicial proceeding that satisfies the first element of a malicious prosecution action, the Amended Complaint also fails to allege the second and fourth elements—namely, that Defendants were the legal cause of the judicial proceeding and that the alleged proceeding suffered from an absence of probable cause. Indeed, the Inspector General report cited by Plaintiff compels the opposite conclusion; in it, the Department of Justice Inspector General concluded that the FBI operated Crossfire Hurricane "for an authorized purpose" and "with adequate factual predication" that had nothing to do with any Defendant. *See* IG Report at 347. Further, the Inspector General Report specifically explained that the investigation was not predicated on DNC information or the Steele Dossier, but on a tip from a friendly foreign government. *Id.* Of course, Plaintiff is free to disagree with the conclusions of the Inspector General's Report. But, as I have already cautioned, he may not misrepresent it in a pleading, and he certainly may not misconstrue it in an attempt to offer support for this ill-fated claim.

The Amended Complaint also fails to satisfy the third element of a malicious prosecution claim. "That element is satisfied by either a favorable decision on the merits or a *bona fide*

termination of the proceedings," that is, "a good faith nollo prosequi or declination to prosecute." *Union Oil of Cal. V. Watson*, 468 So.2d 349, 353 & n.3 (Fla. 3d DCA 1985). Plaintiff does not, and cannot, allege that Crossfire Hurricane or the Mueller investigation were terminated in his favor. While it is true that the Report states that it does not affirmatively conclude Plaintiff committed a crime, it also "does not exonerate him." Office of Special Counsel, U.S. Dep't of Justice, 2 *Report on the Investigation into Russian Interference in the 2016 Presidential Election* 1–2 (2019) (citing Am. Compl. ¶ 460). This conclusion was neither "on the merits" nor "favorable" toward Plaintiff. *See Union Oil of Cal. v. Watson*, 468 So.2d 349, 353 & n.3 (Fla. 3d DCA 1985).

For these reasons, Count V is dismissed with prejudice. And for the reasons discussed *supra* section III(D)(2), the conspiracy claim, Count VI, must also be dismissed. *See Balcor,* 634 So.2d at 279. An allegation of conspiracy to commit malicious prosecution is properly dismissed where the underlying claim for malicious prosecution is not actionable. *Buchanan v. Miami Herald Publishing Co.*, 206 So.2d 465 (3d DCA 1968). Count VI is also dismissed with prejudice.

### 4.   Computer Fraud and Abuse Act (Count VII)

The CFAA is a criminal anti-hacking statute with a civil cause of action. *See* 18 U.S.C. § 1030(g). Plaintiff alleges that Neustar and Joffe, conspiring with other Defendants, accessed "internet data" and "DNS records" from computers belonging to the Executive Office of the President ("EOP") and the Trump Organization, and did so with a "nefarious purpose." (Am. Compl. ¶¶ 694–700). The CFAA claim is not only time barred, but it fails to state a substantive claim for relief.

The statute of limitations on a civil CFAA claim is "2 years [from] the act complained of or the date of the discovery of the damage." 18 U.S.C. § 1030(g). Based on Plaintiff's allegations, the limitations period commenced on October 31, 2016 or, at the latest, early November 2016.

Plaintiff alleges the following: on October 31, 2016, "eight days before the 2016 Presidential Election," *Slate* published an article on the Trump-Alfa Bank connection based on DNS lookup data, titled: "Was a Trump Server Communicating with Russia?" (Am. Compl. ¶ 261 & n.185). On the same date, Sullivan published a written campaign statement reiterating the contents of the Trump-Alfa Bank server story, attributing the "discovery [to] the work of independent experts—'computer scientists'" and noting that "'federal authorities' were investigating 'this direct connection between Trump and Russia.'" (*Id.* ¶ 265). Also on the same date, Clinton published two tweets relaying that a "covert server" linking Trump and Alfa Bank was discovered by "computer scientists." (*Id.* ¶¶ 268–269). Moreover, the Trump-Alfa Bank server connection allegedly continued to receive public attention; Plaintiff alleges that on October 8, 2018, a *New Yorker* article profiled Joffe's DNS lookup information. (*Id.* ¶¶ 324–26). Per Plaintiff's allegations, the information about the DNS lookup data purportedly connecting Plaintiff to Alfa Bank was circulating publicly, including by Clinton and her campaign, mere days before the presidential election. Plaintiff's conclusory allegation that the offense was not discoverable until September 2021 would require me to infer that Plaintiff lacked knowledge of the Trump-Alfa Bank server story not just when the press and his political rival publicized it mere days before the presidential election, but throughout his presidency. (Am. Compl. ¶¶ 146, 704). That is implausible, and it is belied by his more specific factual allegations, as above-described.

The Second Circuit addressed and rejected the argument Plaintiff raises—that his claim did not begin to accrue until he discovered the identity of the offender. (DE 237 at 17–18). Holding that a CFAA claim begins to accrue when the Plaintiff learns of the alleged violation even if the offender's identity is unknown, the Second Circuit explained: "if a plaintiff cannot discover the hacker's identity within two years of the date []he discovers the damage or violation, [his] claims

under the CFAA . . . will be untimely." *Sewell v. Bernardin*, 795 F.3d 337, 342 (2d Cir. 2015).[20] That Plaintiff did not know the name of the "computer scientist" or "computer expert" who allegedly obtained the DNS data does not excuse his failure to investigate and identify the offender during the limitations period. *See id.* The CFAA claim is thus time barred.

But even if timely filed, this claim would still be subject to dismissal. The Amended Complaint suffers from at least two fundamental substantive flaws, which I address in turn.

First, Plaintiff has not alleged unlawful access to a computer within the meaning of the CFAA. All of the subsections alleged in the Amended Complaint, §§ 1030(a)(2), (a)(3) and (a)(4),[21] require the alleged perpetrator to have accessed a protected computer "without authorization." Subsections (a)(2) and (a)(4) also prohibit accessing a protected computer by "exceed[ing] authorized access." A computer user "without authorization" is one who accesses a computer the user has no permission to access whatsoever—an "outside hacker[]." *Van Buren v. United States*, 141 S. Ct. 1648, 1658 (2021). To "exceed authorized access" is "to access a computer with authorization and to use such access to obtain information in the computer that the access is not entitled so to obtain." § 1030(e)(6). Meaning, a computer user who "exceeds authorized access" has permission to access the computer, but "exceed[s] the parameters of authorized access by entering an area of the computer . . . such as files, folders, or databases . . . to

---

[20] Plaintiff puzzlingly cites to *Sewell* with respect to his statute of limitations argument for the SCA, despite that *Sewell* contradicts his argument with respect to his CFAA claim (and also with respect to his SCA claim, as addressed further below). (DE 237 at 17). Perhaps Plaintiff failed to recognize the Second Circuit's statute of limitations analysis applied to the CFAA as well as the SCA. Whatever the reason, all Parties cite *Sewell* as persuasive authority. (DE 226 at 7; DE 237 at 17).

[21] Subsection (a)(6), which Plaintiff also cites, proscribes trafficking in "passwords or similar information through which [certain] computer[s] may be accessed without authorization." (Am. Compl. ¶ 696). A claim under § 1030(a)(6) fails for the additional reason that Plaintiff alleges no trafficking of passwords or anything of the like.

which [that] authorization does not extend"—an "inside hacker[]." *Van Buren*, 141 S. Ct. at 1658 (citation and internal quotation marks omitted). Neither type of unauthorized access is alleged.

Plaintiff does not plausibly allege that any EOP or Trump Organization computer was hacked. Plaintiff argues that because he *alleged* that the access was unlawful, his CFAA claim "is viable on this basis alone." (DE 237 at 54). That is simply incorrect. Labeling access as "unlawful" or as "hacking" are legal conclusions which are not entitled to the presumption of truth at the motion to dismiss stage. *Ashcroft*, 556 U.S. at 678–79. Looking to Plaintiff's factual allegations for support of this legal conclusion, I find none. Plaintiff alleges that Joffe and Neustar "exploited" their permissions to gain access to DNS data, which is "internet data," using their own computers and other data sources they had permission to access, but did so with "nefarious purposes." (*E.g., id.* ¶¶ 125, 130, 142) ("Joffe had access to numerous data sources through his various positions with Neustar," including to "domain name system (DNS) internet traffic," which the Defendants "exploited for their nefarious purposes"); (*id.* ¶ 144) ("Joffe and Neustar exploited this arrangement [to provide DNS resolution services to the EOP] by . . . mining EOP's DNS traffic for the purpose of gathering derogatory information on [Plaintiff]."); (*see also id.* ¶¶ 125–130, 134, 142–45, 240, 212, 327, 491). There is no external hacking alleged, and so a "without authorization" theory necessarily fails.

An "exceeds authorized access" theory fares no better. Plaintiff's theory of violation—that Defendants accessed information they were entitled to access but did so with a nefarious purpose (*id.* ¶¶ 134, 140–46)—is squarely foreclosed by *Van Buren*. *See* 141 S. Ct. at 1662 (holding that a user does not "exceed authorized access" when he accesses a database with authorization but does so "for an improper purpose"). Plaintiff points to his allegations that Defendants obtained information that was "off limits" to them, but he misreads *Van Buren*. What must be "off limits"

is the area of the computer from which the information was obtained, not the information itself. *Id.* Post-*Van Buren*, misuse of a computer system that a user is entitled to access is not an actionable CFAA claim.

Second, Plaintiff does not allege any recoverable "loss." *See* 18 U.S.C. § 1030((4)(A)(i)(I), (g). The CFAA defines "loss" to include: (1) "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system or information to its condition prior to the offense" and (2) "any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Id.* § 1030(e)(11); *see Brown Jordan*, 846 F.3d at 1174 (finding that either or both categories may suffice). Furthermore, the "loss" must amount to at least $5,000 in a one-year period. 18 U.S.C. § 1030(c)(a)(4)(A)(i)(I).

Here, Plaintiff primarily alleges losses incurred as a result of what he contends is improper use of the information obtained. (Am. Compl. ¶¶ 703, 705) (claiming losses for "defense costs" and "legal fees" related to "the various federal investigations and/or official proceedings that arose therefrom" and "harm to his business, and loss of trade secrets and/or other proprietary" data). But the CFAA does not provide for recovery of legal expenses, lost profits or other consequential damages untethered to a service interruption or restoration and/or response effort. *See* 18 U.S.C. 1030(e)(11). That makes sense, given that the CFAA prohibits unauthorized *access* to a computer, not misuse of information obtained therefrom. *See Van Buren*, 141 S. Ct. at 1659–60. Plaintiff's single reference to "the cost of investigating and responding to the unauthorized access" is conclusory and unsupported by factual allegations. (*See* Am. Compl. ¶ 705). Absent recoverable damages, there can be no CFAA claim.

The remaining CFAA Defendants—the DNC, the Clinton Campaign, Clinton, Perkins Coie and Susmann—are alleged to have conspired with Joffe and Neustar in violation of 18 U.S.C.

§ 1030(b). (Am. Compl. ¶ 701). Because Plaintiff states no cognizable CFAA claim against Joffe or Neustar, he likewise states no claim against the remaining Defendants.

### 5. *Theft of Trade Secrets (Count VIII)*

Plaintiff fails to state a cognizable trade secrets claim under the DTSA, as explained *supra*. This claim is also untimely. The statute of limitations for a civil DTSA claim is three years from the date "on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d). As previously explained, Plaintiff alleges that the DNS traffic data pertaining to him was made public, and circulated by his political rival, on October 31, 2016—eight days before the presidential election. (Am. Compl. ¶¶ 261–69). Any allegation that Plaintiff was unaware that the DNS traffic had been allegedly stolen at or around that time is implausible and contradicted by the above-cited allegations. At a bare minimum, "by the exercise of reasonable diligence" Plaintiff should have discovered the alleged offense by late October or early November 2016. The limitations period on Plaintiff's civil DTSA claim ran on October 31, 2019 or at the latest, early November 2019.

### 6. *Stored Communications Act (Count IX)*

So too is Plaintiff's claim under the Stored Communications Act ("SCA") time barred. The limitations period for a SCA claim is two years "after the date upon which the claimant first discovered or had reasonable opportunity to discover the violation." 18 U.S.C. § 2707(f). As this claim is also premised on the DNS lookup data (*See* Am. Compl. ¶¶ 728–30), Plaintiff had more than a "reasonable opportunity to discover the violation" in late October to early November 2016. The Second Circuit's opinion in *Sewell*, which Plaintiff cites as persuasive authority (DE 237 at 17), is again helpful here, but not for the reason Plaintiff contends. "If a plaintiff cannot discover the hacker's identity within two years of the date [he] discovers the damage or violation, [his]

claims under the . . . SCA will be untimely." *Sewell*, 795 F.3d at 342. The statute of limitations therefore expired on October 31, 2018, or at the latest, early November 2018.

Even notwithstanding the timeliness issue, Plaintiff's SCA claim would still be subject to dismissal.  The wrong Plaintiff alleges here does not fit neatly, if at all, within the SCA. This is a statute typically applied to protect electronic communications, like emails, stored by network or internet service providers in remote centralized facilities, or by similar entities storing communications by similar means. *In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d 589, 609 (9th Cir. 2020); *see Garcia v. City of Laredo, Tex.*, 702 F.3d 788, 792 (5th Cir. 2012) ("telephone companies, Internet or e-mail service providers, and bulletin board services."). Congress recognized that neither the Fourth Amendment nor existing federal statutes adequately protected individual privacy rights in electronic communications stored in such a manner, and thus "the [SCA] [protects] intrusions into individual privacy arising from illicit access to  . . . 'remote computing operations and large data banks that store e-mails.'" *Hately v. Watts*, 917 F.3d 770, 782 (4th Cir. 2019); *see In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 145 (3d Cir. 2015); *Garcia*, 702 F.3d at 791.

With that background in mind, the SCA states that "[a]nyone who 'intentionally accesses without authorization a facility through which an electronic communication service is provided; or . . .  intentionally exceeds an authorization to access that facility; and thereby obtains . . . access to a wire or electronic communication while it is in electronic storage in such system' is liable[.]" *Brown Jordan*, 846 F.3d at 1175 (quoting 18 U.S.C. § 2701(a)). The elements of a SCA claim are thus: (1) access "without authorization" or "exceed[ing] an authorization" to access (2) a "facility" (3) that provides an "electronic communication service" (4) thereby obtaining a "wire or electronic communication" (5) while the communication is in "electronic storage." *Id.*; 18 U.S.C. § 2701(a).

At bottom, the SCA prohibits "'hacking' into electronic communication facilities," *Walker v. Coffey*, 956 F.3d 163, 169 (3d Cir. 2020), and in that respect it bears similarities both to the text and congressional goals of the CFAA. *United States v. Cioni*, 649 F.3d 276, 282 (4th Cir. 2011).

One notable difference, though, is that the SCA prohibits unauthorized access specifically to a "facility through which an electronic communication service is provided[.]" *Id.* (quoting 18 U.S.C. § 2701(a)). An "electronic communication service" is "any service which provides users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). Although not statutorily defined, "facility" has been interpreted in this Circuit to include "the physical means or equipment for doing something." *Brown Jordan*, 846 F.3d at 1177 n.4 (citation and internal quotation marks omitted). Numerous courts of appeal have interpreted this to mean equipment and structures of internet service providers and similar entities providing communications services, and not personal devices. *See In re Google Inc.*, 806 F.3d at 147 ("In this context, 'facility' is a term of art denoting where network service providers store private communications"); *United States v. Steiger*, 318 F.3d 1039, 1049 (11th Cir. 2003) (finding that the SCA does not apply to "hacking" into a personal computer because the computer did not "maintain[] any 'electronic communication service,'" but could apply to "information stored with [the complaining party's] Internet service provider" (citing 18 U.S.C. § 2510(15)); *Garcia*, 702 F.3d at 792 ("[T]he relevant 'facilities' that the [SCA] is designed to protect are not computers that *enable* the use of an electronic communication service, but instead are facilities that are *operated by* electronic communication service providers and used to store and maintain electronic storage." (citation and internal quotation marks omitted) (emphasis in original)).

Plaintiff alleges that here, such facilities include the "computers, networks and/or servers" of his personal residence, the EOP, and Trump Organization. (Am. Compl. ¶ 729). Based on the

foregoing, Plaintiff's personal devices are not a qualifying facility. *See, e.g.*, *Garcia*, 702 F.3d at 793. Nor can I plausibly infer from the overbroad invocation of "computers, networks and/or servers" that such devices of the EOP and Trump Organization are equipment through which electronic communication services are provided, akin to a centralized remote data bank operated by an internet service provider or the like. In fact, Plaintiff's allegations indicate that the servers/computers at issue, i.e., the computers from which the DNS queries originated, are "computers that *enable* the use of an electronic communication service," which are not covered by the SCA, and not "facilities that are *operated by* electronic communication service providers and used to store and maintain electronic storage." *See Garcia*, 702 F.3d at 792 (citation and internal quotation marks omitted) (emphasis in original). Plaintiff is correct that cloud-based email programs, like Microsoft 365, could be a "facility," *Brown Jordan*, 846 F.3d at 1177 n.4, but that is of no help to him; Plaintiff does not allege that any Defendant accessed his emails through a cloud-based email program.

The SCA claim further fails on the "electronic storage" element. There are no nonconclusory allegations that the electronic communications at issue were in "electronic storage" in such "facilities" when accessed. (*See* Am. Compl. ¶ 730). "[E]lectronic storage" is defined as "temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof" and "any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17). Temporary storage incidental to transmission means storing communications "temporarily pending delivery." *Garcia*, 702 F.3d at 793. Storage for backup purposes would be, for example, the storage by a communications provider of an unread email, at least until the recipient receives it and opens it on a local device. *Vista Marketing, LLC v. Burkett*, 812 F.3d 954, 964 (11th Cir.

2016). Plaintiff does not include any non-conclusory allegations that the "electronic communications" (i.e., DNS internet traffic) were in "electronic storage" in a "facility" (i.e., the computers/networks/servers of the Trump Organization and EOP) *at all*, let alone temporarily pending or incidental to delivery or for backup purposes. *See In re Facebook, Inc.*, 956 F.3d at 608–09 (finding that URLs are not in electronic storage when a search is being processed). Plaintiff's boilerplate language mentioning the statutory phrase "electronic storage" does not suffice. (Am. Compl. ¶ 730).

Defendants raise two additional points: first, they contend DNS lookup data is not an "electronic communication," *see* 18 U.S.C. § 2511(12), and second, electronic communications that are "readily accessible to the general public" are exempt from liability, *Id.* § 2511(2)(g)(i). Plaintiff does not dispute the public nature of this data, and it would appear difficult to maintain an SCA claim based on public internet data. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1200 (2022) ("Congress wanted to protect electronic communications that are configured to be private." (citation omitted)). Most often though, the communications at issue in SCA claims are emails. *See, e.g.*, *Vista Mktg.*, 812 F.3d at 963–64; *Brown Jordan*, 846 F.3d at 1175. But novel claims have been brought, albeit perhaps not successfully, based on other purported communications. *See In re Facebook Inc.*, 956 F.3d at 608–09 (rejecting an SCA claim premised on URL searches and noting that such an application "would stretch [the SCA's] application beyond its [congressionally-intended] limits"). The instant claim premised on DNS internet traffic is certainly novel. Cognizant of the stage of this proceeding, and given that the SCA claim is dismissible on several other grounds, I decline to reach these further questions.

61

*7. Agency and Respondeat Superior (Counts X, XI, XII, XIII, XIV, XV, and XVI)*

Count X, entitled "Agency," purports to state a claim against Defendant Clinton. Following 172 pages and 734 numbered paragraphs, Plaintiff claims "Clinton is liable as a principal for all of the acts her agents committed against the Plaintiff at her request and for her benefit." (Am. Compl. ¶ 757).

There is no free-standing independent cause of action in Florida for agency. *See, e.g., Barabe v. Apax Partners Eur. Managers, Ltd.*, 359 F. App'x 82, 84 (11th Cir. 2009). Agency can be a theory of liability. But in order for a principal to be held liable for the actions of an agent, a plaintiff must allege an independent wrong. Under Florida law, ultimate facts that establish either actual or apparent agency for the wrong of another must be pled. *Goldschmidt v. Holman*, 571 So.2d 422, 423 (Fla. 1990). Count X reflects the high-water mark of shotgun pleading and is accordingly dismissed. And it is dismissed with prejudice, as none of the underlying claims survive for which, even if properly plead, Defendant Clinton could be held liable under an agency theory.

Counts XI through XVI purport to state claims against Perkins Coie, the DNC, the Clinton Campaign, Fusion GPS, Orbis Business Intelligence, Ltd., Neustar, Inc., and/or Neustar Security Services for Respondeat Superior/Vicarious Liability. But under Florida law, respondeat superior, like agency, is a doctrine of liability, not itself a cause of action. *See Turner Murphy Co. v. Specialty Constructors, Inc.*, 659 So.2d 1243, 1244 (Fla. 1st DCA 1995). Therefore no independent cause of action exists against any of the named Defendants.

In any event, each of these Defendants has also been named in the counts along with their employees or agents. In an action against an employer for the actions of the employee based on the theory of vicarious liability or respondeat superior, the plaintiff must show liability on the part of the employee. If the employee is not liable, the employer is not either. *Mallory v. O'Neil*, 69

So.2d 313, 315 (Fla. 1954); *see also Tsuji v. Fleet*, 326 So.3d 143, 148 (Fla. 1st DCA 2021) (explaining that "a plaintiff may not hold an employer liable until the employee is found to be liable."). Since the Amended Complaint fails to state a claim against the employees or alleged agents of the entities named in Counts XI–XVI, the claims brought pursuant to this doctrine fail on this basis too.

### E.    Amendment

Finally, a note about amendment. Plaintiff requests that, in the event I "find[] the Complaint inadequate in any respect," I grant him leave to amend pursuant to Federal Rule of Civil Procedure 15(a).[22] Defendants argue that "[a]ny further amendment would be futile and serve only to give Plaintiff a platform for rehashing tired rivalries from the 2016 election." *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005).

It is true that under Rule 15 "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). But a district court need not allow amendment "where amendment would be futile." *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001). It is not simply that I find the Amended Complaint "inadequate in any respect"; it is inadequate in nearly *every* respect. Defendants presented substantively identical arguments in support of dismissal in the earlier round of briefing on Plaintiff's original Complaint. (*See* DEs 52, 124, 139, 141, 143, 144, 145, 146, 147, 149, 157, 159, 160, 163, 165). But despite this briefing, Plaintiff's Amended Complaint failed to

---

[22] As an initial matter, Plaintiff's request is procedurally improper and, on that basis alone, I need not consider it. "Filing a motion is the proper method to request leave to amend a complaint." *Long v. Satz*, 181 F.3d 1275, 1279 (11th Cir. 1999) (citing Fed. R. Civ. P. 7(b)(1)). In addition, a motion for leave to amend must attach or set forth the substance of the proposed amendment. *Id.* "Where a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly." *Rosenberg v. Gould*, 554 F.3d 962, 967 (11th Cir. 2009) (quoting *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1222 (11th Cir. 1999)) (internal quotation marks omitted).

cure any of the deficiencies. Instead, Plaintiff added eighty new pages of largely irrelevant allegations that did nothing to salvage the legal sufficiency of his claims. The inadequacies with Plaintiff's Amended Complaint are not "merely issues of technical pleading," as Plaintiff contends, but fatal substantive defects that preclude Plaintiff from proceeding under any of the theories he has presented. At its core, the problem with Plaintiff's Amended Complaint is that Plaintiff is not attempting to seek redress for any legal harm; instead, he is seeking to flaunt a two-hundred-page political manifesto outlining his grievances against those that have opposed him, and this Court is not the appropriate forum.

Fundamentally, Plaintiff cannot state a RICO claim without two predicate acts, and, after two attempts, he has failed to plausibly allege even one. Plaintiff cannot state an injurious falsehood claim without allegations of harm to his property interests. And Plaintiff cannot state a malicious prosecution claim without a judicial proceeding, but he unsuccessfully attempts to misconstrue, misstate, and misapply the law to do so anyway. Moreover, Plaintiff's statutory claims premised on the DNS data rest on a misconstruction of the conduct those laws proscribe and the harms they remediate. Because Plaintiff was unable to cure his Complaint even with all its shortcomings clearly laid out for him, and because most of Plaintiff's claims are not only unsupported by any legal authority but plainly foreclosed by binding precedent as set forth by the Supreme Court and the Eleventh Circuit, I find that amendment would be futile and that this case should be dismissed with prejudice as to the Defendants that have raised merits arguments.

## III.   CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that:

(1) The United States' Motions to Dismiss Under Federal Rule 12(b)(1) (DE 224; DE 256) are **GRANTED**.

(2) Defendants Charles Halliday Dolan, Jr. and Rodney Joffe's Motions to Dismiss for Lack of Personal Jurisdiction (DE 225; DE 227) are **GRANTED**.

(3) Defendant Orbis Business Intelligence, Ltd.'s Motion to Dismiss (DE 260) is **GRANTED**.

(4) Defendants Hillary Clinton, HFACC, Inc., John Podesta, Robert Mook, Jake Sullivan, DNC, DNC Services Corporation, Debbie Wasserman Schultz, Perkins Coie LLP, Marc Elias, Michael Sussman, Charlies Halliday Dolan, Jr., Fusion GPS, Glenn Simpson, Peter Fritsch, Nellie Ohr, Bruce Ohr, Igor Danchenko, Rodney Joffe, Neustar Security Services, and Neustar, Inc.'s Joint Motion to Dismiss Under Federal Rule 12(b)(6) (DE 226) is **GRANTED**.

(5) Plaintiff's Motions to Set Aside the Government's Certification (DE 238; DE 265) are **DENIED**.

(6) Plaintiff's Amended Complaint (DE 177) is **DISMISSED WITH PREJUDICE** as to the Non-Federal Defendants under Rule 12(b)(6) and **WITHOUT PREJUDICE** as to the United States under Rule 12(b)(1).

(7) I reserve jurisdiction to adjudicate issues pertaining to sanctions.

**SIGNED** in Chambers at West Palm Beach, Florida, this 8th day of September, 2022.

Donald M. Middlebrooks
United States District Judge

cc:     Counsel of Record

284

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE No. 22-14102-CV-MIDDLEBROOKS

DONALD J. TRUMP,

      Plaintiff,

v.

HILLARY R. CLINTON, et al.,

      Defendants.

_____/

## <u>ORDER GRANTING MOTION FOR SANCTIONS</u>

Defendant Charles Dolan has moved for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure.  Upon review of the motion (DE 268), Plaintiff's response (DE 270) and Defendant's reply (DE 276), and for the reasons explained below, the motion is granted.  Accordingly, sanctions shall be awarded jointly and severally against Alina Habba, Michael T. Madaio, Habba Madaio & Associates, Peter Ticktin, Jamie Alan Sasson, and The Ticktin Law Group.

## I. BACKGROUND

<u>The Complaint</u>.  In March 2022, Charles Dolan was among 29 defendants initially sued by Mr. Trump.  (DE 1).  He was identified as a former chairman of the DNC, a senior official in the Clinton Campaign, and a close associate of and advisor to Hillary Clinton.  The Complaint alleged that in April 2016, Mr. Dolan participated in discussions about the creation of a "dossier" to smear Mr. Trump and disseminate false accusations to the media (Compl. ¶ 79), and at the direction of Ms. Clinton assisted in preparation of the dossier (Compl. ¶ 81).  According to the Complaint, an allegation contained within the dossier that Mr. Trump engaged in salacious sexual activity in a

Moscow hotel was derived from Mr. Dolan.  (Compl. ¶ 91).  Mr. Dolan was sued for RICO

conspiracy (Count II), conspiracy to commit injurious falsehood (Count IV), and conspiracy to

commit malicious prosecution (Count VI).

The Warning Letter.  On May 31, 2022, counsel for Mr. Dolan wrote the attorneys for Mr.

Trump.  They warned:

1.  That Mr. Dolan had no role in any conspiracy related to the Steele dossier.

2.  That Mr. Dolan was not a source for the allegations of sexual activity.

3.  That Mr. Dolan had not been in contact with any defendant other than Igor Danchenko,
    and that Mr. Dolan's contacts with Mr. Danchenko involved business interests and help for
    a conference in Moscow.

4.  That Mr. Dolan had never been chairman of the DNC.

5.  That Ms. Clinton was on record through a spokesperson as stating she had no recollection
    of Mr. Dolan.

(DE 268-1).

The letter requested that Mr. Dolan not be named as a defendant in any forthcoming

Amended Complaint.  The letter further warned that if he were to be named, or if he was not

dropped from the original Complaint, Rule 11 sanctions would be sought.

The Amended Complaint.  On June 21, 2022, Plaintiff filed an Amended Complaint, as

had been expected.  It ballooned to 193 pages, 819 paragraphs and 31 defendants.  With respect to

Mr. Dolan, the allegations remained essentially the same.  But in the Amended Complaint, Mr.

Dolan was identified somewhat more vaguely as the former chairman of a "national Democratic

political organization." (Am. Compl. ¶ 96).  Elsewhere, he was described as a "senior Clinton

Campaign Official." (Am. Compl. ¶ 4).  Moreover, and somewhat inexplicably, Mr. Dolan was

identified in the Amended Complaint as a citizen and resident of New York, despite a declaration

that Mr. Dolan had provided to Plaintiff's lawyers explaining that Mr. Dolan was a resident of

2

Virginia.  (Am. Compl. ¶ 20; DE 268-2).

The Sanctions Motion and Memorandum.  On July 15, 2022, Mr. Dolan served on Mr. Trump's lawyers a motion seeking sanctions pursuant to Rule 11.  The motion pointed out that the change in Mr. Dolan's purported title from "former chairman of the DNC" in the original Complaint to "former chairman of a national Democratic political organization," in the Amended Complaint did not solve the problems identified in the warning letter because Mr. Dolan had *never* been the chairman of *any* such organization.  The motion further explained that Mr. Dolan's role in the Clinton Campaign was limited to knocking on doors as a volunteer.  The motion also stated that Mr. Dolan had never been a resident of New York, that Mr. Dolan had told Plaintiff's lawyers so, and that the allegations of the Amended Complaint to that effect demonstrated a lack of diligence over something easily checked.

Mr. Dolan's motion for sanctions went on to place the Trump lawyers on notice of a critical failure in their claims, warning them that the Danchenko Indictment referenced throughout the Amended Complaint not only failed to support their allegations against Mr. Dolan but contradicted them.  That warning continues to be unheeded.

## II. ANALYSIS

Rule 11 of the Federal Rules of Civil Procedure states in pertinent part:

> (b) *Representations to the Court*. By presenting to the court a pleading, written motion, or other paper – whether by signing, filing, submitting, or later advocating it – an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any improper purpose such as to harass, cause unnecessary delay, or needlessly increase the costs of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law or for establishing

new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

Fed. R. Civ. P. 11(b)(1)-(3).

"Rule 11 deters attorneys and litigants from clogging federal courts with frivolous filings. It also rewards litigants who admit their mistakes within a 21-day safe harbor period—and penalizes those who refuse." *Huggins v. Lueder, Larkin & Hunter, LLC*, 39 F. 4th 1342, 1344 (11th Cir. 2022). The Eleventh Circuit requires a "two-step inquiry as to (1) whether the party's claims are objectively frivolous; and (2) whether the person who signed the pleadings should have been aware they were frivolous." *Baker v. Alderman*, 158 F.3d 516, 524 (11th Cir. 1998).

Rule 11 sanctions are properly assessed (1) when a party files a pleading that has no reasonable factual basis; (2) when the party files a pleading that is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law; or (3) when the party files a pleading in bad faith for an improper purpose. *Massengale v. Ray*, 267 F.3d 1298, 1301 (11th Cir. 2001) (citing *Worldwide Primates, Inc. v. McGreal*, 87 F.3d 1252, 1254 (11th Cir. 1996)).

Here, all three are true. In Section A of this Order, I explain why the Amended Complaint lacked a reasonable factual basis as to the allegations against Defendant Dolan. Then, in Section B, I explain why Plaintiff's legal arguments contained no reasonable chance of success. I have already done so, at great length and in great detail, in my Order granting Defendants' Motion to Dismiss. But I reiterate those fatal flaws here as relevant to the distinct Rule 11 inquiry. Finally, in Section C, I find that Plaintiff filed his pleadings for an improper purpose.

A.      **Factual Contentions**

I will start with the factual contentions. "'Rule 11 stresses the need for some prefiling

inquiry.'" *Mike Ousley Prods, Inc. v. WJBF-TV*, 952 F.2d 380, 382 (11th Cir. 1992).  As such, it "imposes 'an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing,' and 'the applicable standard is one of reasonableness under the circumstances.'" *Walther v. McIntosh*, 572 F. App'x 881, 883 (11th Cir. 2014) (quoting *Bus. Guides, Inc. v. Chromatic Commc'ns Enter., Inc.*, 498 U.S. 533, 551 (1991)); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 47 (1991) ("Rule 11 . . . imposes an objective standard of reasonable inquiry . . . . "); *Turner v. Sungard Bus. Sys., Inc*., 91 F.3d 1418, 1422 (11th Cir. 1996) ("'[A] litigant's obligations with respect to the contents . . . [of pleadings or motions] . . . are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit.'" (quoting Fed. R. Civ. P. 11(b)-(c), advisory committee's note to 1993 amendment)).  The Rule "is 'aimed at curbing abuses of the judicial system.'" *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 397 (1990).

The pleadings in this case contained factual allegations that were either knowingly false or made in reckless disregard for the truth. The following examples are indicative.

When suing someone it helps to know where they live, as this can have subject matter or personal jurisdiction significance.  In this case for instance, Mr. Dolan argued that he engaged in no activities in Florida that made him susceptible to suit here.  He filed an affidavit stating under oath that he lived in Virginia.  His lawyers advised Mr. Trump's lawyers of that.  Moreover, the summons in this case indicated an Arlington, Virginia address (DE 27) and the return of service indicated he was served there (DE 27-1)  Yet the Amended Complaint alleged that Mr. Dolan was a resident of New York.  The Trump lawyers' answer:

> [I]t must be noted that Charles Dolan is an incredibly common name, and Plaintiff's counsel's traditional search methods identified

> countless individuals with said name across the country, many of
> whom reside in New York.

(DE 270 at 10).  While alone not of great significance, this response reflects the cavalier attitude

towards facts demonstrated throughout the case.  Plaintiff's narrative centered around the idea that

Ms. Clinton orchestrated "a malicious conspiracy to disseminate patently false and injurious

information about Donald J. Trump and his campaign, all in the hopes of destroying his life, his

political career and rigging the 2016 Presidential Election . . . . "  (Compl. ¶ 9).  To advance this

narrative, Plaintiff first described Mr. Dolan as chairman of the DNC (Compl. ¶ 78), then chairman

of a national Democratic political organization (Am. Compl. ¶ 96), a senior Clinton Campaign

official (*Id.* ¶ 4), and "an individual with intimate ties to the Clinton Campaign and one of its close

associates." (*Id.* ¶ 96).  The Amended Complaint alleges that Mr. Dolan engaged in a course of

racketeering activity involving theft of trade secrets, obstruction of justice, and wire fraud (*Id.* ¶

621); conspired to make false statements about Mr. Trump (*Id.* ¶ 658); and conspired to induce the

FBI and DOJ to maliciously prosecute him (*Id.* ¶¶ 680-82).

Mr. Dolan's lawyers advised the Trump team that Mr. Dolan had never been the chairman

of the DNC, or any other national Democratic political organization, was never a senior Clinton

Campaign official, that Ms. Clinton had indicated she did not know him, and that his involvement

in the campaign was limited to serving as a volunteer, knocking on doors in New Hampshire in

the last week of the campaign.  But Plaintiff's narrative remained unchanged.

Mr. Trump's lawyers claim "nearly all" of the allegations against Mr. Dolan were sourced

directly from the Indictment brought against Igor Danchenko by special counsel John Durham.

(DE 270-2 at 6).  But this is simply not so.  As was the practice throughout the Amended

Complaint, Plaintiff cherry-picked portions which supported his narrative while ignoring those

that undermined or contradicted it.[1]  Mr. Trump's lawyers persisted in this misrepresentation after being warned by the sanctions motion, and they doubled down on this falsehood in their response to the motion.

I routinely tell juries that an indictment brought by the government is only an accusation, nothing more.  It is not proof of guilt or anything else.  *See* Eleventh Circuit Pattern Jury Instructions, Preliminary Instruction – Criminal Cases (2022).  Here, Mr. Dolan was not the subject of the Indictment, but a fact witness.  The allegations pertaining to his involvement with Mr. Danchenko should have been the starting point for a pre-suit investigation by Plaintiff, not the end.

Even more telling are the portions of the Indictment ignored by Plaintiff.  The Indictment alleges that Mr. Dolan and others were planning a business conference to be held in Moscow on behalf of businessmen seeking to explore investments in Russia.  (DE 270-2 ¶ 21).  Mr. Danchenko was introduced to Mr. Dolan in connection with business activities.  (*Id*. ¶ 18).

Significantly the Indictment alleges two other facts relevant to and, if true, fatal to Plaintiff's claim of conspiracy.

> According to [Mr. Dolan], individuals affiliated with the Clinton Campaign did not direct, and were not aware of, the aforementioned meetings and activities with Danchenko and other Russian nationals.
>
> ***
>
> According to [Mr. Dolan], he [Mr. Dolan] was not aware at the time of the specifics of Danchenko's 'project against Trump,' or that Danchenko's reporting would be provided to the FBI.

---

[1] The "sourced directly" claim is untrue.  For example, the Indictment says: "In or about April 2016, Danchenko and [Mr. Dolan] engaged in discussions regarding potential business collaboration between PR Firm-1 and UK Investigative Firm-1 on issues related to Russia." (DE 270-2 ¶ 23).  The Amended Complaint, however, states: "In late April 2016 Danchenko began having discussions with Dolan about a potential business collaboration between Orbis Ltd. and Kglobal to create a 'dossier' to smear Donald J. Trump and to disseminate the false accusations to the media." (Am. Compl. ¶ 96(c)).

(*Id*. ¶¶ 36, 52).

And with regard to the allegation about sexual activity, the Indictment alleges that Mr. Dolan and another individual were given a tour of a Moscow hotel in June 2016, told that Mr. Trump had previously stayed in the Presidential suite, and according to both Mr. Dolan and the other individual, the staff member who gave the tour did not mention any sexual or salacious activity. (*Id*. ¶¶ 60-61). The Indictment does <u>not</u> allege that the information concerning sexual activity was provided by Mr. Dolan.

The May 31, 2022 warning letter told the Trump lawyers that Mr. Dolan had been questioned by the FBI on multiple occasions, that the Danchenko Indictment detailed his contacts with Mr. Danchenko but did not indicate he "discussed any sexual rumors with Mr. Danchenko -- because he did not." (DE 268-1 at 2). The Indictment confirms that Mr. Dolan spoke to the FBI, and not only was he not charged with any falsehood, but his statements are included within the Indictment. The Indictment contradicts rather than supports Plaintiff's allegations against Mr. Dolan. Far from being "sourced directly" and cited "word-for-word," (DE 270 at 5), Plaintiff's use of the Indictment is nothing short of a deliberate disregard of the truth or falsity of their claims. This is a textbook example of sanctionable conduct under Rule 11.

Rather than express any regret, Plaintiff doubled down on his claims: "Plaintiff's allegation that Defendant was the source of the salacious sexual activity rumor has a legitimate factual basis and is based upon a well-reasoned theory that may well be proven correct during the [Office of Special Counsel's] upcoming trial of Danchenko." (DE 270 at 10).

It was never to be. In the Danchenko trial, Mr. Dolan was called as a witness by the government about matters unrelated to the Ritz Carlton rumors. The government never alleged that Mr. Dolan was a source for the Ritz Carlton story. *See* Order, *United States v. Igor Y.*

8

*Danchenko*, Case No. 21-cr-00245-AJT at 5 (Oct. 4, 2022).  And Mr. Danchenko was ultimately acquitted by the jury.

In short, I find that Mr. Trump's lawyers were warned about the lack of foundation for their factual contentions, turned a blind eye towards information in their possession, and misrepresented the Danchenko Indictment they claim as their primary support.  The lawyers failed to conduct a pre-filing inquiry into the allegations against Mr. Dolan and have continued to advance Plaintiff's false claims based upon nothing but conjecture, speculation, and guesswork.  This is precisely the conduct Rule 11 is intended to deter.  *See Cooter & Gell*, 496 U.S. at 393.

**B.**      **Legal Theories**

Rule 11 sanctions are also warranted when a plaintiff's legal theories have no reasonable chance of success and cannot be advanced as a reasonable argument to change existing law. *Massengale*, 267 F.3d at 1301.  Plaintiff's Amended Complaint is 193 pages in length, with 819 numbered paragraphs, 14 counts, and it names 31 defendants including Charles Dolan.  As I stated in my Order entered September 8, 2022 (DE 267), none of these counts stated a claim upon which relief could be granted.  Additionally, several of the defendants were not subject to personal jurisdiction, and there was not subject matter jurisdiction over the Federal Defendants.  The Amended Complaint was, in its entirety, frivolous.  Multiple substantive defects precluded Plaintiff from proceeding on any of the theories he advanced.  Mr. Dolan was named in three counts: RICO conspiracy (Count II); Conspiracy to Commit Injurious Falsehood (Count IV); and Conspiracy to Commit Malicious Prosecution (Count VI).

Starting with Count II, the RICO conspiracy: "RICO" is the acronym for the Racketeer Influenced and Corrupt Organizations Act, codified as Title IX of the Organized Crime Control Act of 1970, 18 U.S.C. §§ 1961-68.  Congress described RICO as "an act designed to prevent

known mobsters from infiltrating legitimate businesses."[2]   In addition to criminal provisions, RICO includes a civil remedy which, distilled to its essence, requires a plaintiff to prove (1) a violation of a § 1962 prohibited act; (2) injury to business or property, and (3) that the defendant's violation caused the injury.  *See RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 325 (2016).

In the RICO count of the Amended Complaint, Plaintiff realleged the previous 619 paragraphs, and it was a mystery who he intended to sue.  In the caption to Count II, he named 22 defendants but in the prayer for relief for that count 28 were named.  Added were HF ACC, Inc., the DNC Services Corporations, James Comey, Peter Strzok, Lisa Page, and Andrew McCabe. (Am. Compl. ¶ 633).  Whoever he intended to sue, Plaintiff alleged that each of them "knew about and agreed to facilitate the Enterprise's scheme to harm the Plaintiff's political career, tarnish his electability, and undermine his ability to effectively govern as the President of the United States . . . . " (Am. Compl. ¶ 627).

The RICO conspiracy claims were entirely conclusory.  Moreover, there is no standing to bring a RICO conspiracy claim unless injury resulted from violation of a substantive provision of RICO.  *See Beck v. Prupis*, 529 U.S. 494, 495 (2000); *Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146, 1152 (11th Cir. 2011).  Here Plaintiff could not state a RICO claim without two predicate acts, and he failed to plausibly allege even one.  He also failed to adequately allege standing, a pattern of racketeering activity, or the existence of an enterprise.  Moreover, the claims were barred by the statute of limitations.  In short, Plaintiff's RICO claim failed at every step of analysis.  (*See* DE 267 at 23-43).

Two Eleventh Circuit decisions are particularly relevant.  Both involve the frivolous use of

---

[2] Jed S. Rakoff & Howard W. Goldstein, RICO Civil and Criminal Law and Strategy, § 1.01, at 1-4 (2000 ed.).

civil RICO. In *Pelletier v. Zweifel*, 921 F.2d 1465 (11th Cir. 1991),[3] the Court of Appeals reversed the denial of a Rule 11 sanctions motion in a civil RICO case. Analyzing in detail the amended complaint in that case, the Court of Appeals concluded that the plaintiff failed to establish any of the required predicate acts, to show any continuing relationship or pattern of acts, or any injury flowing from those acts. *Id.* at 1496-1500. Concluding that each of the counts in the amended complaint were objectively frivolous when filed, the court found it apparent that the case was brought to harass the defendants.

> Our conclusion is buttressed by the manner in which [plaintiff] pled his case in the district court and briefed it on appeal . . . . [These] are quintessential 'shotgun' pleadings, replete with factual allegations that could not possibly be material to any of the causes of action they assert. Each count incorporates all of these factual allegations and states, further, that it is based on the conduct in the complaint attributable to [defendant] and 'those acting in concert with him.' Anyone schooled in the law who read these complaints, however, would know that many of the facts alleged could not possibly be material to all of the counts.

*Pelletier,* 921 F.2d at 1518. The appellate court found the amended complaint was conclusory, baseless and without any merit. In deciding that the claim was prosecuted in bad faith, the court rejected the thought that it might have been the "product of incompetent lawyering, and thus excusable, rather than" a tool of harassment, because the plaintiff was skilled in the law and had been warned he was likely to run afoul of Rule 11. *Id.* at 1519. The Court concluded:

> We think that imposing sanctions in this case would serve the dual

---

[3] *Pelletier* and *Byrne* (cited in the next paragraph) were abrogated on other grounds by *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 661 (2008) (holding "plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations."). I do not rely on *Pelletier* and *Byrne* as they relate to mail fraud. *See Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1358, 1360 (11th Cir. 2018) (citing *Pelletier* and *Byrne* as good law for purposes of sanctions resulting from improper pleading). A more detailed analysis of why Plaintiff lacked standing to bring his RICO claim is set forth in my Order granting Defendants' Motion to Dismiss. (DE 267 at 42-43).

> purpose of deterring the filing of frivolous claims and defenses while not chilling attorneys' legitimate enthusiasm and creativity in advancing legal and factual theories. At a time when the federal courts -- which are a scarce dispute resolution resource, indeed -- are straining under the pressure of an ever-increasing caseload, we simply cannot tolerate this type of litigation. Particularly with regard to civil RICO claims, plaintiffs must *stop and think* before filing them.

*Id*. at 1522 (emphasis in original).[4]

Similarly in *Byrne v. Nezhat*, 261 F.3d 1075 (11th Cir. 2001), the Court analyzed the elements of a RICO claim and the plaintiff's standing to raise the claim:

> Our review of the district court's award of sanctions necessarily begins with an analysis of the complaint, here the amended complaint. We note that if the facts as pled failed to state a claim for relief, it was irrelevant whether [plaintiff's counsel] conducted the requisite Rule 11 pre-filing factual investigation.

*Id*. at 1107. The court affirmed a $400,000 sanction against counsel, finding that the expansion of a simple "garden variety medical malpractice" case to include RICO and other baseless claims was frivolous from the outset and doomed to fail. *Id*. at 1115.

Aside from RICO, Plaintiff advanced other baseless claims against Mr. Dolan. In Count IV, the Amended Complaint alleged conspiracy to commit injurious falsehood. Once again, while the caption named 22 defendants, the prayer for relief named 24, adding HFACC, Inc., the DNC Services Corporation, and Debbie Wasserman Schultz. This count realleged the previous 656 paragraphs of the Amended Complaint and stated:

> Each of the Defendants executed one or more acts in furtherance of the conspiracy . . . and committed overt acts to harm the Plaintiff in furtherance of the conspiracy. In this regard, the Defendants conspired to create a false narrative that Plaintiff was colluding with

---

[4] In *Pelletier*, the Court not only reversed the district court's denial of Rule 11 sanctions and remanded for a determination of an appropriate amount, but also determined that the appeal was frivolous on the merits and awarded double costs and a reasonable attorney's fee pursuant to Rule 38 of the Federal Rules of Appellate Procedure.

Russia through their dissemination of false and damaging statements.

(Am. Compl. ¶¶ 660-61).

I sifted through all of the paragraphs of the Amended Complaint searching for an injurious falsehood. Almost all of the statements were barred by Florida's two-year statute of limitations. Moreover, none of the elements of the tort of injurious falsehood, which involves the intentional interference with property interests, were alleged. Special damages were not alleged, and the damages sought were not recoverable. And without an underlying injurious falsehood claim, a civil action for conspiracy to commit injurious falsehood does not exist. (*See* DE 267 at 43-49).

Count VI was similarly flawed. There, Plaintiff alleged that Mr. Dolan, Ms. Clinton and others conspired with the Director of the FBI, James Comey; Deputy Director McCabe; Mr. Trump's Deputy Attorney General, Rod Rosenstein; two lawyers for the FBI, Kevin Clinesmith and Lisa Page; and an FBI agent, Peter Strzok to maliciously prosecute Mr. Trump. Mr. Trump, however, was never prosecuted. He could not state a malicious prosecution claim without a judicial proceeding and a termination in his favor. The Amended Complaint misconstrued the law and misrepresented both the Mueller Report and the Department of Justice Inspector General's Report. Without an underlying malicious prosecution claim, a conspiracy to commit malicious prosecution cannot be brought. (*See* DE 267 at 50-52).

The foregoing is not an exhaustive list of the problems with Plaintiff's legal theories, but they amply demonstrate how unreasonable and meritless the claims were as they pertained to Mr. Dolan. None of the claims against him—or any other defendant for that matter—had any chance of success, and this weighs strongly in favor of imposing Rule 11 sanctions.

## C.      Improper Purpose

Not just initiated by a shotgun pleading, this was a shotgun lawsuit.  Thirty-one individuals and organizations were summoned to court, forced to hire lawyers to defend against frivolous claims.  The only common thread against them was Mr. Trump's animus.

Plaintiff deliberately misrepresented public documents by selectively using some portions while omitting other information including findings and conclusions that contradicted his narrative.  This occurred with the Danchenko Indictment, the Department of Justice Inspector General's Report for Operation Hurricane, and the Mueller Report.  It was too frequent to be accidental.

Every claim was frivolous, most barred by settled, well-established existing law. These were political grievances masquerading as legal claims.  This cannot be attributed to incompetent lawyering.  It was a deliberate use of the judicial system to pursue a political agenda.

But the courts are not intended for performative litigation for purposes of fundraising and political statements.  *See Saltany v. Reagan*, 886 F.2d 438 (D.C. Cir. 1989).[5]  It is harmful to the rule of law, portrays judges as partisans, and diverts resources that should be directed to real harms and legitimate legal claims.  The judiciary should not countenance this behavior and it should be deterred by significant sanctions.

## D.      Remedy

Federal Rule of Civil Procedure Rule 11(c) provides:

---

[5] In *Saltany*, Libyan citizens sued President Reagan, Prime Minister Thatcher and others for injuries, death and property loss sustained in a United States air strike.  The district court denied sanctions finding that although plaintiff's counsel "surely knew" the case offered no hope of success, sanctions should be denied to keep the courthouse door open to suits brought as a public statement of protest.  The D.C. Circuit reversed and directed sanctions to be imposed stating: "We do not conceive it a proper function of a federal court to serve as a forum for 'protests,' to the detriment of parties with serious disputes waiting to be heard."  *Saltany*, 886 F.2d at 439.

(1) *In General*. If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.

(2) *Motion for Sanctions* . . . If warranted, the court may award the prevailing party, the reasonable expenses, including attorney's fees, incurred for the motion.

\*\*\*

(4) *Nature of a Sanction*. A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.

Fed. R. Civ. P. 11(c).

The central purpose of Rule 11 "is to deter baseless filings in the [d]istrict [c]ourt," and "any interpretation" of the rule "must give effect to the rule's central goal of deterrence." *Cooter & Gell*, 496 U.S. at 393. The Advisory Committee Notes and Commentary ("Commentary") to the rule also emphasizes this focus: "Since the purpose of Rule 11 sanctions is to deter rather than to compensate, the rule provides that, if a monetary sanction is imposed, it should ordinarily be paid into court as a penalty." Fed. R. Civ. P. 11(b)-(c), advisory committee's note to 1993 amendment.

However, the Commentary goes on to state that under unusual circumstances, particularly where an improper purpose is found, deterrence may be ineffective unless the sanction not only requires a monetary payment but also directs some portion to be made to those injured by the violation including, if requested by motion, attorney's fees and costs directly and unavoidably

caused by the violation.

Factors to be considered in determining an appropriate sanction include:

- Whether the conduct was willful or negligent.

- Whether it was part of a pattern or an isolated event.

- Whether it affected the entire pleading, or only one particular count or defense.

- Whether the person engaged in similar conduct in other litigation.

- Whether it was intended to injure.

- What effect it had on the litigation process in time or expense.

- Whether the responsible person was trained in the law.

- What amount, given the resources of the person, would be required to deter that person from repetition.

- What amount is needed to deter similar activity by other litigants.

*Id*.

Any sanction should be no more severe than reasonably necessary to deter repetition of the conduct or comparable conduct by similarly situated persons.  A sanction should not be hollow and must not amount to mere gesture; its bite must be real.  That said, sanctions orders must not involve amounts that are so large that they fly in the face of common sense.  A sanction that a party "cannot pay does not vindicate the court's authority," nor provide deterrence.  *See Martin v. Automobili Lamborghini Exclusive Inc.*, 307 F.3d 1332, 1336 (11th Cir. 2002) (affirming but remanding joint and several sanction of one and a half million dollars for a determination of each person's liability, taking into consideration ability to pay).

The Eleventh Circuit has said that "[i]mposing a financial penalty often will be the most effective and fair means of enforcing Rule 11 and deterring baseless suits."  *Donaldson v. Clark*,

819 F.2d 1551, 1557 (11th Cir. 1987) (*en banc*).[6]

Here I find that both a financial penalty and payment of attorney's fees and costs to Mr. Dolan are necessary.

The conduct was willful, not simply negligent. Each of the prongs of Rule 11 are met. Thirty-one defendants were sued and forced to hire counsel, incurring substantial fees. Moreover, it was necessary for the United States to be substituted for the Federal Defendants and represented by the Department of Justice and U.S. Attorney's Office at taxpayer expense. The entire pleading, each of the 14 counts, was affected.

The failings of the original Complaint were basic and obvious. And when those failings were identified in motions to dismiss, the Amended Complaint simply added arguments in an attempt to skirt the RICO statute of limitations, and two more defendants were named—Mr. Trump's former deputy Attorney General, and also a California Congressman whom Mr. Trump delights in insulting. The choice of defendants, combined with the lack of any viable legal theories of liability, reflect an intention to injure rather than to redress legal harm.

Undeterred by Mr. Dolan's Rule 11 warning letter and motion, two rounds of briefing by multiple defendants, and my detailed Order identifying the deficiencies of the Amended Complaint, Ms. Habba appeared on Fox News Hannity and continued to advance Plaintiff's claims:

---

[6] In *Byrne v. Nezhat*, *supra*, a monetary sanction totaling $191,439.11 was affirmed against counsel for the inclusion of a meritless multi-count RICO claim in what should have been a simple medical malpractice claim. 261 F.3d at 1099 n.54; *see also, Ortho Pharmaceutical Corp. v. Sona Distributors*, 847 F.2d 1512, 1519 (11th Cir. 1988) (affirming monetary sanction of $35,851.55 against counsel for filing groundless motion to dismiss); *Johnson v. 27th Ave. Caraf., Inc.*, 9 F.4th 1300, 1316-18 (11th Cir. 2021) (affirming sanctions against a party including $6,000 financial penalty, reduced from $59,900 based on financial consideration, 50 hours of community service per year for three years, and an injunction against filing ADA complaints without permission from the court.).

> [W]hen you have a Clinton judge, as we did here, Judge
> Middlebrooks, who I had asked to recuse himself but insisted that
> he didn't need to, he was going to be impartial, and then he proceeds
> to write a 65-page scathing order where he basically ignored every
> factual basis which was backed up by indictments, by investigations,
> the Mueller Report, et cetera, et cetera, et cetera, not to mention
> [Special Counsel John] Durham and all the testimony we heard
> there, we get dismissed.

Transcript from FOX: Hannity, WLNR 28709447, Sept. 10, 2022.

Ms. Habba then emphasized her own role:

> I have to share with you a story, Sean, that I have not shared with
> anybody . . . The former President looked at me and he told me:
> 'You know what, Alina, you're not going to win, you can't win, just
> get rid of it, don't do the case.' And I said 'no, we have to fight, it's
> not right what happened.' And you know, he was right, and it's a
> sad day for me personally, because I fought him on it and I should
> have listened, but I don't want to lose hope in our system, I don't.
> So, you know, I'm deciding whether we're going to appeal it.

*Id*.

So who is responsible for this case and others like it? The rule of law is undermined by
the toxic combination of political fundraising with legal fees paid by political action committees,
reckless and factually untrue statements by lawyers at rallies and in the media, and efforts to
advance a political narrative through lawsuits without factual basis or any cognizable legal theory.
Lawyers are enabling this behavior and I am pessimistic that Rule 11 alone can effectively stem
this abuse. Aspects may be beyond the purview of the judiciary, requiring attention of the Bar and
disciplinary authorities. Additional sanctions may be appropriate. (DE 280). But legal filings like
those at issue here should be sanctioned under Rule 11, both to penalize this conduct and deter
similar conduct by these lawyers and others.

**CONCLUSION**

For the forgoing reasons, and having carefully considered the record, the written

submissions of the Parties, and applicable law, it is hereby **ORDERED AND ADJUDGED** that:

1. Defendant Charles Dolan's Motion for Rule 11 Sanctions (DE 268) is **GRANTED.**

2. Plaintiff's counsel Alina Habba, Michael T. Madaio, Habba Madaio & Associates, Peter Ticktin, Jamie Alan Sasson, and The Ticktin Law Group, shall jointly and severally pay a monetary sanction of $50,000 into the registry of the Court.[7]

3. Plaintiff's counsel Alina Habba, Michael T. Madaio, Habba Madaio & Associates, Peter Ticktin, Jamie Alan Sasson, and The Ticktin Law Group, shall jointly and severally pay to Charles Dolan fees and costs totaling $16,274.23.

**SIGNED** in chambers at West Palm Beach, Florida this 10th day of November, 2022.

Donald M. Middlebrooks
United States District Judge

cc:    counsel of record

---

[7] "[S]anctions must never be hollow gestures: their bite must be real." *Martin v. Automobile Lamborghini Exclusive, Inc.*, 307 F. 3d 1332, 1336 (11th Cir. 2002). But for the bite to be real it must be an amount a person can pay. *Id.* I believe the monetary sanctions imposed here are well within these lawyers' ability to pay, and therefore I have not thought it necessary to conduct an intrusive inquiry into their finances. However, should any lawyer or law firm believe that the amount would seriously jeopardize their financial status, *see, e.g., Baker v Alderman*, 158 F. 3d 516 (11th Cir. 1998), that individual or firm should file within ten (10) days of this Order, under seal, a verified statement of net worth which includes assets and liabilities. In the event of such a filing, the obligation of that lawyer or law firm will be tolled until further order of the court.

302

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE No. 22-14102-CV-MIDDLEBROOKS

DONALD J. TRUMP,

     Plaintiff,

v.

HILLARY R. CLINTON, et al.,

     Defendants.

_____/

## ORDER ON SANCTIONS

This case should never have been brought. Its inadequacy as a legal claim was evident from the start. No reasonable lawyer would have filed it. Intended for a political purpose, none of the counts of the amended complaint stated a cognizable legal claim.

Thirty-one individuals and entities were needlessly harmed in order to dishonestly advance a political narrative. A continuing pattern of misuse of the courts by Mr. Trump and his lawyers undermines the rule of law, portrays judges as partisans, and diverts resources from those who have suffered actual legal harm.

I previously granted Defendant Charles Dolan's motion for sanctions, brought pursuant to Federal Rule of Civil Procedure 11. (DE 284). Now before me is a motion seeking sanctions brought by eighteen other Defendants. Upon consideration of the Motion (DE 280), Response (DE 285) and Reply (DE 287), for the reasons that follow and also for those stated in my previous Order, sanctions are awarded.

## I.  BACKGROUND

Plaintiff initiated this lawsuit on March 24, 2022, alleging that "the Defendants, blinded by political ambition, orchestrated a malicious conspiracy to disseminate patently false and injurious

information about Donald J. Trump and his campaign, all in the hope of destroying his life, his political career, and rigging the 2016 Presidential Election in favor of Hillary Clinton." (DE 1 ¶ 9).

The next day, Alina Habba, Mr. Trump's lead counsel told Fox News' Sean Hannity:

> You can't make this up. You literally cannot make a story like this up . . . and President Trump is just not going to take it anymore. If you are going to make up lies, if you are going to try to take him down, he is going to fight you back. And that is what this is, this is the beginning of all that.[1]

She then explained on Newsmax:

> What the real goal [of the suit] is, is democracy, is continuing to make sure that our elections, continuing to make sure our justice system is not obstructed by political enemies. That cannot happen. And that's exactly what happened. They obstructed justice. They continued the false narrative . . . This grand scheme, that you could not make up, to take down an opponent. That is un-American.[2]

On April 20, 2022, less than a month after the Complaint was filed, Hillary Clinton moved for dismissal with prejudice. Her motion identified substantial and fundamental factual and legal flaws. Each of the other Defendants followed suit, pointing to specific problems with the claims against them. The problems in the Complaint were obvious from the start. They were identified by the Defendants not once but twice, and Mr. Trump persisted anyway.

Despite this briefing and the promise "to cure any deficiencies," Plaintiff's counsel filed the Amended Complaint on June 21, 2022. (DE 177). The Amended Complaint failed to cure any of the defects. *See* DE 267, Order of Dismissal (September 8, 2022). Instead, Plaintiff added eighty new pages of largely irrelevant allegations that did nothing to salvage the legal sufficiency

---

[1] Fox News, *Trump Sues Clinton, Steele for 'False Narrative' About Russian Collusion* (March 25, 2022), https://www.foxnews.com/video/6301845469001.

[2] Newsmax, *Trump Suing Hillary Clinton Over Russia Hoax*, Habba Madaio & Associates LLP – News (March 31, 2022), https://habbalaw.com/news/trump-suing-hillary-clinton-over-russia-hoax.

of his claims. (DE 267 at 64). The Amended Complaint is 193 pages in length, with 819 numbered

paragraphs, and contains 14 counts, names 31 defendants, 10 John Does described as fictitious and

unknown persons, and 10 ABC Corporations identified as fictitious and unknown entities.

On July 14, 2022, the United States moved pursuant to the Westfall Act, 28 U.S.C. § 2679

(d)(i), to substitute itself as Defendant for James Comey, Andrew McCabe, Peter Strzok, Lisa

Page, and Kevin Clinesmith. (DE 224). On July 21, 2022, I granted the motion to substitute. (DE

234).

On September 8, 2022, I dismissed the case with prejudice as to all Defendants except for

the United States.[3]  I issued a detailed and lengthy Order, which I incorporate by reference here.

(DE 267). I found that fatal substantive defects which had been clearly laid out in the first round

of briefing, precluded the Plaintiff from proceeding under any of the theories presented.  I found

that the Amended Complaint was a quintessential shotgun pleading, that its claims were foreclosed

by existing precedent, and its factual allegations were undermined and contradicted by the public

reports and filings upon which it purported to rely.  I reserved jurisdiction to adjudicate issues

pertaining to sanctions.

Undeterred by my Order and two rounds of briefing by multiple defendants, Ms. Habba

continued to advance Plaintiff's claims.  In a September 10, 2022, interview with Sean Hannity,

the host asked her "Why isn't [Hillary Clinton] being held accountable for what she did?"  Ms.

Habba's response reiterated misrepresentations on which this lawsuit was based:

> Because when you have a Clinton judge as we did here, Judge
> Middlebrooks who I had asked to recuse himself but insisted that he
> didn't need to, he was going to be impartial, and then proceeds to
> write a 65-page scathing order where he basically ignored every
> factual basis which was backed up by indictments, by investigations,

---

[3] The United States' Motion to Dismiss under Federal Rule 12(b)(i) was granted and the Amended
Complaint as to it was dismissed without prejudice.

the Mueller report, et cetera, et cetera, et cetera, not to mention Durham, and all the testimony we heard there, we get dismissed. Not only do we get dismissed, he says that this is not the proper place for recourse for Donald Trump.  He has no legal ramifications. Where what [sic] is the proper place for him?  Because the FBI won't help when you can do anything, obstruct justice, blatantly lie to the FBI, Sussmann's out, he gets acquitted, where do you go? That's the concern for me, where do you get that -- that recourse?[4]

She also indicated that, while Mr. Trump doubted the suit would succeed, she nevertheless "fought" to pursue it:

You know, I have to share with you a story, Sean, that I have not shared with anybody.  The recourse that I have at this point is obviously to appeal this to the 11th Circuit as Gregg said.  But when I brought this case and we were assigned you know, this judge and we went through the recusal process, we lost five magistrates, including Reinhart [sic] who's dealing with the boxes as we know. The former president looked at me and he told me, you know what Alina.  You're not going to win.  You can't win, just get rid of it, don't do the case.  And I said, no, we have to fight.  It's not right what happened.  And you know, he was right, and it's a sad day for me personally because I fought him on [it] and I should have listened, but I don't want to lose hope in our system.  I don't.  So, you know I'm deciding whether we're going to appeal it.[5]

Defendants now move to recover attorneys' fees and costs under Fed. R. Civ. P. 11, 28 U.S.C. § 1927, the Defend Trade Secrets Act, and/or this Court's inherent power.  (DE 280 at 1). In Part II, I find that a sanction under this Court's inherent power is appropriate.  I do so by examining Plaintiff's (and his lawyers') conduct throughout this litigation.  In Part III, I look to Plaintiff's conduct in other cases.  And in Part IV, I determine the reasonableness of Defendants' attorneys' fees and costs.

---

[4] Transcript from FOX: Hannity WLNR 28709447, Sept. 10, 2022.

[5] *Id*.

## II.    ANALYSIS OF LITIGATION CONDUCT IN THIS CASE

"'[T]ampering with the administration of justice . . . involves far more than an injury to a single litigant.  It is a wrong against the institutions set up to protect and safeguard the public.'" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) (citation omitted).  A court's inherent power includes the ability to assess attorneys' fees and costs against the client, the attorney or both when either has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id*. at 45-46.

The "inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." *Chambers*, 501 U.S. at 46.  "[I]f in the informed discretion of the Court, neither the statute nor the Rules are up to the task," the Court may safely rely on its inherent power "to sanction bad faith conduct in the course of litigation." *Id.* at 50; *see also Peer v. Lewis*, 606 F.3d 1306, 1314 (11th Cir 2010).

"The key to unlocking a court's inherent power is a finding of bad faith." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998) (citations omitted).

"The inherent-powers standard is a subjective bad faith standard." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017).  However, absent direct evidence of subjective bad faith, this standard can also be met if an attorney's conduct is "tantamount to bad faith," meaning the "attorney's conduct is so egregious that it could only be committed in bad faith." *Id.* at 1224–25 (citing *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 767 (1980)).  An attorney's conduct is "tantamount to bad faith" if he "recklessly raises a frivolous argument." *Id.* at 1225 (quoting *Barnes*, 158 F.3d at 1214).  "Recklessness alone does not satisfy the inherent powers standard," but "recklessness plus a frivolous argument suffice." *Id*.

The inherent power "is both broader and narrower than other means of imposing sanctions." *Peer*, 606 F.3d at 1314 (quoting *Chambers*, 501 U.S. at 46).  It is broader in the sense

that while other sanction mechanisms only reach certain individuals or conduct, the inherent power extends to the full range of litigation abuses. *Id*.

In my informed discretion, I find that Rule 11, 28 U.S.C. § 1927, and the Defend Trade Secrets Act are not "up to the task" of confronting the litigation abuse involved here. Rule 11 is backward looking, limited to pleading and motion abuse, and experience has shown it to be ineffective at deterrence. *See* Fed. R. Civ. P. 11, Advisory Committee Notes. Section 1927 "only applies to unnecessary filings after the lawsuit has begun." *Macort v. Prem Inc.*, 208 F. App'x 781, 786 (11th Cir. 2006). And the Defend Trade Secrets Act may only provide limited relief. The purpose of the inherent power to sanction a party is to vindicate judicial authority without resorting to contempt of court and to make the non-violating party whole. *See Chambers*, 501 U.S. at 45-46; *see also Purchasing Power, LLC*, 851 F.3d at 1223.

Here, we are confronted with a lawsuit that should never have been filed, which was completely frivolous, both factually and legally, and which was brought in bad faith for an improper purpose. Mr. Trump is a prolific and sophisticated litigant who is repeatedly using the courts to seek revenge on political adversaries. He is the mastermind of strategic abuse of the judicial process, and he cannot be seen as a litigant blindly following the advice of a lawyer. He knew full well the impact of his actions. *See Byrne*, 261 F.3d at 1121. As such, I find that sanctions should be imposed upon Mr. Trump and his lead counsel, Ms. Habba.

A. **The Case Was Initiated By A Shotgun Pleading Designed To Serve A Political Purpose.**

The deliberate use of a shotgun pleading is an abusive litigation tactic which amounts to obstruction of justice. *See Davis v. Coca Cola Bottling Co. Consol.*, 516 F.3d 955, 982 n.66 (11th Cir. 2008), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). This case involved three categories of shotgun pleadings condemned by the Eleventh Circuit: (1) a

complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint; (2) a complaint that is replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action; and (3) a complaint that asserts multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against. *See Barmapov v. Amulal*, 986 F.3d 1321, 1324 (11th Cir. 2021); *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015).

I find that the pleadings here were abusive litigation tactics. The Complaint and Amended Complaint were drafted to advance a political narrative; not to address legal harm caused by any Defendant.

The 819 paragraphs of the 186-page Amended Complaint are filled with immaterial, conclusory facts not connected to any particular cause of action. Consider the incendiary charge that Mr. Comey, the Director of the FBI, conspired with Ms. Clinton to maliciously prosecute him. Leaving aside the fact that Mr. Trump was never prosecuted, examine the allegations in the Amended Complaint pertaining to Mr. Comey. The first mention of Mr. Comey, other than identifying him as a party, was in paragraph 349: "Therefore, senior FBI officials Comey, McCabe, Page, Strzok, the DNC and Clinton orchestrated a plan to falsely accuse Flynn of colluding with Russia to protect the potential dissemination of the intimate details of their plot." The next few paragraphs pertain to the FBI's investigation of Michael Flynn, Mr. Trump's former security advisor, who was subsequently fired for lying to the Vice President and the FBI. (¶ 383). The Amended Complaint alleges that Mr. Comey "scrambled to reopen" the investigation into Mr. Flynn (¶ 356), met with Mr. McCabe to discuss the investigation (¶ 359), and decided not to notify

the incoming Trump administration of the investigation of Flynn (¶¶ 360-63).  Next, the Amended

Complaint cites a letter from the Director of National Intelligence, John Ratcliff, to Senator

Lindsey Graham:

> Ratcliff's letter stated that Clinton and her campaign conceived the
> false Russia collision [sic] story to protect Clinton's presidential bid,
> which was at the time, in trouble because of revelations about her
> illegally using a private email server to handle classified
> information.  Ratcliff confirmed in the letter that Obama, Comey
> and Strzok knew about it.

(Amended Complaint at ¶ 369).[6]

The Amended Complaint continues with allegations about a meeting between Mr. Comey,

President Obama, Vice President Biden, and Sally Yates (then a national security advisor) where

President Obama directed Mr. Comey to investigate Mr. Flynn and not inform Mr. Trump.  (*Id.* ¶¶

372-377).  The Amended Complaint alleges that Mr. Flynn was interviewed by the FBI, and that

subsequently Acting Attorney General Yates informed Mr. Trump's White House Counsel Don

McGahn that Mr. Flynn misled Vice President Pence and other administration officials about the

nature of his conversations with the Russian Ambassador.  (*Id.* ¶ 379).  The Amended Complaint

then concludes: "Ultimately, the Defendants, including Comey, McCabe, Strzok, and Page, were

successful in causing Flynn to be ousted as National Security Advisor."  (*Id.* ¶ 384).

The Amended Complaint then turns to the FBI's Crossfire Hurricane investigation and four

---

[6] This provocative allegation stirred my curiosity, so I looked up the Ratcliff letter.  The allegation
in the Amended Complaint fails to mention that the information came from a Russian intelligence
analysis and that Mr. Ratcliffe commented: "The IC (intelligence community) does not know the
accuracy of this allegation or the extent to which the Russian intelligence analysis may reflect
exaggeration or fabrication."  Letter from John Ratcliff, Dir. of Nat'l Intel., to Sen. Lindsey
Graham,         U.S.         Senate         (Sept.         29,         2020)
https://www.judiciary.senate.gov/press/rep/releases/chairman-graham-releases-information-
from-dni-ratcliffe-on-fbis-handling-of-crossfire-hurricane.         Mr. Trump's lawyers saw no
professional impediment or irony in relying upon Russian intelligence as the good faith basis for
their allegation.

court-approved FISA applications targeting Carter Page.   (*Id.* ¶¶ 385-90).   The Amended Complaint alleges:

> The FISA applications were reviewed by numerous FBI agents, FBI attorneys, and National Security Division (NSD) attorneys and, as required by law, was ultimately certified by the FBI Director James Comey and approved by then Deputy Attorney General Sally Yates.

(*Id.* ¶ 391).

From there, the Amended Complaint states: "In fact, no probable cause existed and there was no truth to any of the allegations against Carter Page, Donald J. Trump, or the Trump campaign." (*Id.* ¶ 392).

The Amended Complaint then discusses the FISA warrant application and Mr. Comey's approval of those warrants and alleges: "Mr. Comey was aware, or should have been aware, that there was no evidentiary basis for the FISA application, and that the Steele Dossier was not a credible source." (*Id.* ¶¶ 292-407).

The next mention of Mr. Comey states that on May 8, 2017, he was fired from his position as Director of the FBI.  The Amended Complaint then alleges that Mr. Comey "had documented several of his interactions with Mr. Trump in a series of memos," and that after leaving the FBI, Mr. Comey shared those memos with a friend who he directed to leak to a New York Times reporter.  (*Id.* ¶¶ 449-52).

The Amended Complaint continues:

> 453.   The outcome that Comey desired – per his own admission to Congress – was to "prompt" the appointment of a special counsel to investigate Donald J. Trump's alleged conspiracy with the Russian government.
>
> 454.   The IG's report noted that Comey had "set a dangerous example" by "releas[ing] sensitive information" to "create public pressure for official action."

455.   Comey was successful in getting the special master [sic] appointed, due to his unlawful leaking of information, even though Comey didn't have enough evidence to pursue it in his own official capacity.

456.   In May 2017, Robert Mueller was appointed as Special Counsel to "oversee the previously-confirmed FBI investigation of Russian government efforts to influence the 2016 Presidential Election and related matters."[7]

This is what the Plaintiff's lawyers considered to be the short and plain statement of the claim that Mr. Comey maliciously prosecuted Mr. Trump and conspired with Ms. Clinton to do so.  These allegations, about investigating Mr. Flynn, signing FISA warrant applications pertaining to Mr. Page, or leaking information about his interactions with Mr. Trump, do not allege that Mr. Comey initiated an investigation of Mr. Trump, much less a prosecution.  And the implausible claim that Mr. Comey conspired with Ms. Clinton, given the impact of his announcements on her 2016 campaign, not only lacks substance but is categorically absurd.

The Amended Complaint is a hodgepodge of disconnected, often immaterial events, followed by an implausible conclusion.  This is a deliberate attempt to harass; to tell a story without regard to facts.

In order to understand the scope of this abuse, multiply the above discussion by thirty-one defendants and their lawyers, forced to try to analyze and defend against the sprawling Complaints.

---

[7] In a footnote to paragraph 456, the Amended Complaint cites to the Justice Department announcement of the appointment of the Special Counsel. That statement by Deputy Attorney Rosenstein, also sued by Mr. Trump, reads in part as follows: "'My decision is not a finding that crimes have been committed or that any prosecution is warranted. I have made no such determination. What I have determined is that based upon the unique circumstances, the public interest requires me to place this investigation under the authority of a person who exercises a degree of independence from the normal chain of command.'" *See* Press Release, Office of Public Affairs, Appointment of Special Counsel, U.S. Dep't of Just., (May 17, 2017) https://www.justice.gov/opa/pr/appointment-special-counsel.

I sifted through the thread of allegations against each defendant only to find they added up to no cognizable claim.  And the pleadings were drafted in a way to disguise that fact.

In three instances the Eleventh Circuit has found shotgun pleadings, less problematic than the pleadings here, as a basis for sanctions.  *See Jackson v. bank of Am., N.A.,* 898 F.3d 1348 (11th Cir. 2018); *Byrne v. Nezhat,* 261 F.3d 1075 (11th Cir. 2001); *Pelleteir v. Zweifel,* 921 F.2d 1465 (11th Cir. 1991).

In *Jackson,* the court described the case as an "abuse of process" effectuated "by filing a multi-count, incomprehensible complaint that flouted the Federal Rules of Civil Procedure and this Circuit's well-established precedent." *Jackson*, 898 F.3d at 1348.  "By attempting to prosecute an incomprehensible pleading to judgment, the Plaintiffs obstructed the due administration of justice in the District Court." *Id.*

The facts in *Jackson* are similar, although less egregious than here.  The complaint in *Jackson* alleged fourteen causes of action and contained 109 paragraphs of allegations and each of the claims incorporated all previous allegations.  The Defendants filed a motion for more definite statement identifying the complaint as a shotgun pleading.  The Plaintiff did not oppose the motion but sought leave to file an amended complaint.  The amended complaint "swelled to twenty-three pages and 123 paragraphs, made minor changes to a number of factual allegations, added two new counts, and listed one or more Defendants in parentheses under the heading of each count . . . . " *Id.* at 1348.  The Court of Appeals stated: "[h]ere, after being put on notice by Defendants of the specific defects in their complaint, the Jacksons filed an amended complaint afflicted with the same defects . . . . " *Id.*  Stating that "[t]olerating such behavior constitutes toleration of obstruction of justice," the Court affirmed the trial judge's order dismissing the amended complaint and instructed plaintiff's counsel to show cause why he should not be ordered to pay double costs and

expenses, including attorney's fees and costs incurred in defending the appeal pursuant to Rule 38 of the Federal Rules of Appellate Procedure. *Id.* at 1357-59. The Court pointed out that the defendants had identified the deficiency and the Eleventh Circuit's precedent in their motion. "If [plaintiffs' counsel] was not aware of the precedent when he filed the [plaintiffs'] initial complaint, Defendants' motion told him all he needed to know." *Id.* at 1359. Nevertheless "he stood fast, brazenly filing a facsimile of his initial pleading." *Id.*

Similarly here, Defendant Neustar identified the shotgun pleading deficiency and the Eleventh Circuit's precedent as one of its grounds for dismissal of Mr. Trump's initial Complaint. (DE 160 at 7-8, n.8). The Defendants' joint Motion to Dismiss the Amended Complaint did likewise. (DE 226 at 46-47). The Plaintiff refused to acknowledge this clear precedent. Instead, he added 80 new pages, and new defendants (including his former Deputy Attorney General and a California Congressman) in order to rehash old grievances from the 2016 election.

The other two Eleventh Circuit opinions analyze the use of shotgun pleadings to support a frivolous RICO claim. In both, the Court found the tactic deserving of sanctions. In *Pelletier*, the Court of Appeals reversed the denial of a Rule 11 sanctions motion in a civil RICO case. *Pelletier*, 921 F.2d at 1465.[8] Analyzing in detail the amended complaint in that case, the Court of Appeals concluded that the plaintiff failed to establish any of the required predicate acts, to show any continuing relationship or pattern of acts, or any injury flowing from those acts. *Id.* at 1496-1500.

---

[8] *Pelletier* and *Byrne* were abrogated on other grounds by *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 661 (2008) (holding "plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations."). I do not rely on *Pelletier* and *Byrne* as they relate to mail fraud. *See Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1358, 1360 (11th Cir. 2018) (citing *Pelletier* and *Byrne* as good law for purposes of sanctions resulting from improper pleading). A more detailed analysis of why Mr. Trump lacked standing to bring his RICO claim is set forth in my Order granting Defendants' Motion to Dismiss. (DE 267 at 42-43).

Concluding that each of the counts in the amended complaint were objectively frivolous when filed, the Court of Appeals found it apparent that the case was brought to harass the defendants:

> Our conclusion is buttressed by the manner in which [plaintiff] pled his case in the district court and briefed it on appeal . . . . [These] are quintessential "shotgun" pleadings, replete with factual allegations that could not possibly be material to any of the causes of action they assert. Each count incorporates all of these factual allegations and states, further, that it is based on the conduct in the complaint attributable to [defendant] and "those acting in concert with him." Anyone schooled in the law who read these complaints, however, would know that many of the facts alleged could not possibly be material to all of the counts.

*Pelletier,* 921 F.2d at 1518. The appellate court found the amended complaint was conclusory, baseless and without any merit. In deciding that the claim was prosecuted in bad faith, the court rejected the thought that it might have been the "product of incompetent lawyering, and thus excusable, rather than" a tool of harassment, because the plaintiff was skilled in the law and had been warned he was likely to run afoul of Rule 11. *Id.* at 1519. The Court concluded:

> We think that imposing sanctions in this case would serve the dual purpose of deterring the filing of frivolous claims and defenses while not chilling attorneys' legitimate enthusiasm and creativity in advancing legal and factual theories. At a time when the federal courts -- which are a scarce dispute resolution resource, indeed -- are straining under the pressure of an ever-increasing caseload, we simply cannot tolerate this type of litigation. Particularly with regard to civil RICO claims, plaintiffs must *stop and think* before filing them.

*Id*. at 1522 (emphasis in original).[9]

In *Byrne*, the court affirmed a $400,000 sanction against counsel, under Rule 11, Section 1927, and the court's inherent powers, finding that the expansion of a simple "garden variety

---

[9] In *Pelletier*, the Court not only reversed the district court's denial of Rule 11 sanctions and remanded for a determination of an appropriate amount, but also determined that the appeal was frivolous on the merits and awarded double costs and reasonable attorney's fees pursuant to Rule 38 of the Federal Rules of Appellate Procedure.

medical malpractice" case to include RICO and other baseless claims was frivolous from the outset

and doomed to fail. *Byrne*, 261 F.3d at 1115.

Identifying the complaint and amended complaint in *Byrne* as shotgun pleadings, *id.* at

1106, 1129, the Court of Appeals emphasized the harm presented by the tactic and the authority

of Article III courts to control the practice through inherent powers:

> Shotgun pleadings, if tolerated, harm the court by impeding its
> ability to administer justice.  The time a court spends managing
> litigation framed by shotgun pleadings should be devoted to other
> cases waiting to be heard . . . .  Although obstruction of justice is
> typically discussed in the context of criminal contempt, the concept
> informs the rules of law—both substantive and procedural—that
> have been devised to protect the courts and litigants (and therefore
> the public) from abusive litigation tactics, like shotgun pleadings.  If
> use of an abusive tactic is deliberate and actually impedes the
> orderly litigation of the case, to-wit: obstructs justice, the perpetrator
> could be cited for criminal contempt.

*Byrne*, 261 F.3d at 1131-32, 1130 n.110 (citations omitted).

In *Byrne,* the Court pointed out that plaintiffs file shotgun pleadings and frivolous claims

to extort settlement of unmeritorious claims.  Here, although his complaint asked for damages in

excess of twenty-four million dollars, treble damages under RICO, and attorneys' fees and costs,

I do not think Mr. Trump or his lawyers actually thought the Defendants would ever agree to settle.

This suit was filed for equally improper purposes—to harass and punish, for fundraising, and to

advance a political agenda.

**B.  The Pleadings Contained Factual Allegations That Were Knowingly False Or Made With Reckless Disregard For The Truth.**

The Plaintiff consistently misrepresented and cherry-picked portions of public reports and

filings to support a false factual narrative.  Often the report or filing actually contradicted his

allegations.  It happened too often to be accidental; its purpose was political, not legal.  Factual

allegations were made without any evidentiary support in circumstances where falsity is evident.

Examples include:

 ***The Mueller Report.***  A section of the Amended Complaint is titled "A String of Federal Investigations Clear Donald J. Trump and Uncover the Defendant's Illicit Conspiracy." (Amended Complaint ¶100).  After a two-year investigation, the Special Counsel "found no evidence that Donald Trump or his campaign ever colluded with the Russian Government." (*Id.* ¶460).  The Amended Complaint further alleges that Special Counsel Mueller "went on to exonerate Donald J. Trump and his campaign with his finding that there was no evidence of collusion with Russia." (*Id.* at ¶7).  While perhaps acceptable as a cable news talking point, that allegation is neither an accurate nor fair reading of the Mueller Report.[10]

 First, the Mueller Report stated that "[i]n evaluating whether evidence about collective action constituted a crime, we applied the framework of conspiracy, not the concept of 'collusion.'"  *Mueller* Report Volume I at 8.  Second, in determining whether the conduct "amounted to a violation of federal criminal law" the question was "whether admissible evidence would probably be sufficient to obtain and sustain a conviction."  *Mueller Report* Volume I at 8.  Third, the Report found:

> [W]hile the investigation identified numerous links between individuals with ties to the Russian government and individuals associated with the Trump Campaign, the evidence was not sufficient to support criminal charges . . . . [T]he investigation established that several individuals affiliated with the Trump Campaign lied to the [Special Counsel's Office], and to Congress about their interactions with Russian-affiliated individuals and related matters.

*Mueller Report* at 9.  Fourth, with respect to obstruction of justice, the Report states: "While this

---

[10] 1 Robert S. Mueller, III, U.S. Dep't of Just., Report on the Investigation into Russian Interference in the 2016 Presidential Election (2019); 2 Robert S. Mueller, III, U.S. Dep't of Just., Report on the Investigation into Russian Interference in the 2016 Presidential Election (2019).

report does not conclude that the President committed a crime, it also does not exonerate him." Mueller Report Volume II at 2; (DE 147-1).

*Crossfire Hurricane Investigation.*  A core aspect of the Plaintiff's claim is his contention that Ms. Clinton, Mr. Comey, and others were responsible for the Crossfire Hurricane Investigation.  The Complaint and Amended Complaint copiously cite to the IG Report to support these allegations.  But the IG Report found that the FBI opened the investigation "for an authorized purpose" and "with adequate factual predication" that had nothing to do with the Defendants or the Steele Dossier.  (DE 143-1 at 347).

*Charles Dolan Allegations.*  As set forth in my Order granting Rule 11 sanctions (DE 284), the Plaintiff alleged that Mr. Dolan was a former Chairman of the DNC (Amended Complaint ¶ 96), a senior Clinton Campaign Official (*id.* ¶ 4), and "an individual with intimate ties to the Clinton Campaign and one of its close associates" (DE 177 ¶ 96).  In fact, as Mr. Dolan's lawyer told Plaintiff's counsel, he was none of those things.  It made no difference.  Despite an affidavit from Mr. Dolan saying he lived in Virginia, and the fact that service upon him occurred there, the Amended Complaint claimed he lived in New York.  The Plaintiff's lawyers' excuse: There are a lot of Dolans—some of them live in New York.  (DE 270 at 10).

The Complaint and Amended Complaint allege that Mr. Dolan was responsible for allegations in the Steele Dossier concerning salacious activity by Mr. Trump in Moscow.  Mr. Dolan's lawyers' warnings that this was untrue went unheeded.  In defending against sanctions, the Plaintiff's lawyers pointed to the Danchenko Indictment.[11]  However, the Danchenko Indictment does not support Plaintiff's claims, rather it contradicts and undermines them.

---

[11] *United States v. Danchenko*, No. 1:21-cr-00245-AJT, (E.D. Va. Nov. 3, 2021) (hereinafter "Danchenko Indictment").

*Criminal Indictments.* The Complaint and Amended Complaint rely substantially on the Sussmann,[12] Danchenko, and Clinesmith[13] Indictments. The Plaintiff alleges that "these 'speaking' indictments not only implicate many of the Defendants named herein but also provide a great deal of insight into the inner workings of the Defendants' conspiratorial enterprise. Based on the facts that have already been uncovered throughout the course of Durham's investigation, it seems all but certain that additional indictments are forthcoming." (Amended Complaint ¶ 8).

The Indictments themselves are not relevant. An untried indictment is not evidence of the conduct alleged. *See United States v. Machado,* 886 F.3d 1070 (11th Cir. 2018). A criminal indictment should be no more than the starting point for a lawyer's good faith pre-filing investigation. The danger of overreliance has been demonstrated here, in light of the acquittals of Mr. Sussmann and Mr. Danchenko. That is not to say an indictment has no significance -- a grand jury has issued it with the assistance of a lawyer for the government. But a plaintiff's good faith pre-filing inquiry cannot simply ignore the facts in an indictment that contradict and undermine his allegations while touting those he likes.

The Sussmann Indictment charged Mr. Sussmann with falsely telling the FBI's General Counsel that he was not acting on behalf of a client when he conveyed allegations about email communications between the Trump Organization and a bank affiliated with the Russian government. But the Plaintiff relied on the Indictment to support his allegations of theft of trade secrets, violations of the Computer Fraud and Abuse Act, and violations of the Stored Communications Act in Counts I, VII, VIII, and IX. (DE 177 at 119, 163, 166, 170).

---

[12] *United States v. Sussmann*, No. 1:21-cr-00582-CRC, (D.D.C. Sept. 16, 2021) (Hereinafter "Sussmann Indictment").

[13] *United States v. Clinesmith*, No. 1:20-cr-00165-JEB, (D.D.C. Aug. 14, 2020) (Hereinafter "Clinesmith Indictment").

As the Order of Dismissal points out, there are legal deficiencies in these claims.  But the Sussmann Indictment also warned the Trump lawyers of factual problems.  It specified that the communications involved "purported DNS data reflecting apparent DNS lookups between Russian Bank-1 and an email domain, 'mail l.trump-email.com.'" (Sussmann Indictment ¶ 16).  DNS data is meant to be public and as part of the infrastructure for the internet, accessible to any entity.  The Indictment further advises that the FBI determined "that the email server at issue was not owned or operated by the Trump Organization, but rather had been administered by a mass marketing email company that sent advertisements for Trump hotels and hundreds of other clients." (Sussmann Indictment ¶ 7).  The Sussmann Indictment does not support and instead contradicts the conclusory trade secret and unauthorized access allegations set forth in Plaintiff's Amended Complaint.

And as noted above, the Danchenko Indictment contains allegations that, if true, were fatal to the Plaintiff's conspiracy claims.  The Danchenko Indictment states that, according to Mr. Dolan, "individuals affiliated with the Clinton Campaign did not direct and were not aware of" Mr. Dolan's meetings and activities with Mr. Danchenko and other Russian nationals.  (Danchenko Indictment ¶ 36).  Further, it alleges that according to Mr. Dolan, he was unaware of the specifics of Mr. Danchenko's project against Trump or that Mr. Danchenko's reporting would be provided to the FBI.  (*Id.* ¶ 52).  In responding to Mr. Dolan's sanctions motion, the lawyers claimed their allegations were "directly sourced" from the Danchenko Indictment.  (DE 270 at 10).  That is plainly untrue.

***Twitter Suspension.***  To support his damages claim, Plaintiff alleged that he was "banned from different social media platforms, including Twitter" as a result of "the misinformation campaign waged by Hillary Clinton."  (Amended Complaint ¶ 524 n.277).  However, Twitter

suspended Mr. Trump on January 8, 2021—two days after the January 6th attack on the Capitol—because it determined Mr. Trump's tweets posed "the risk of further incitement of violence."[14]

Moreover, in a lawsuit Mr. Trump filed against Twitter, attempting to show state action, he alleges that "Democrat legislators" pressured Twitter to censor him and that he was banned for exercising his right of free speech. *Trump et al. v. Twitter et al.,* No. 3:21-CV-08378 (N.D. Cal. July 7, 2021) (DE 1 ¶¶ 6, 48).

The assertion that the Twitter ban was caused by misinformation by Ms. Clinton five years earlier is plainly false.

## C. The Plaintiff's Legal Theories Were Frivolous, Foreclosed By Existing Precedent.

The Plaintiff recklessly advanced claims foreclosed by existing precedent that the most basic legal research would have revealed. It was not that the Complaint and Amended Complaint were inadequate in any respect, they were inadequate in nearly every respect, even after the deficiencies had been identified in the multiple motions to dismiss. The Eleventh Circuit has squarely held that to knowingly advance frivolous claims constitutes bad faith meriting sanctions under a court's inherent powers. *Peer*, 606 F.3d at 1316 (reversing district court's failure to award sanctions under inherent powers based upon Circuit Court's finding that lawyer "knowingly pursued a frivolous claim, and thus acted in bad faith.").

I will not detail all of the failings of the Amended Complaint here. Most are identified in the Order of Dismissal. I concluded that fundamental substantive defects precluded the Plaintiff from proceeding under any of the theories he advanced.

In arguing against the imposition of sanctions, the Plaintiff attempts to defend his legal

---

[14] Twitter Inc., *Permanent Suspension of @realDonaldTrump*, Twitter Blog (Jan 8, 2021), https://blog.twitter.com/en_us/topics/company/2020/suspension.

positions.  For instance, he contends that while novel, his assertion that the RICO statute of limitations should be tolled because of the former President's duties is a compelling argument for an extension of existing law.  (DE 284 at 4).  But *Clinton v. Jones,* 520 U.S. 681 (1997), does not leave room for that argument. *See Trump v. Vance,* 140 S. Ct. 2412 (2020) (holding that President is "neither absolutely immune from state criminal subpoenas seeking his private papers nor entitled to a heightened standard of need"); *Trump v. United States*, No. 22-13005, 2022 WL 17352069 (11th Cir. 2022) (holding district court lacks equitable jurisdiction to block government investigation of former President).  That is especially true here where Mr. Trump, in his personal capacity, found time during his presidency to file other civil actions.  *See, e.g., Trump v Mazars USA, LLP,* 140 S. Ct. (2019); *Trump v Deutsche Bank AG*, 943 F.3d 627 (2d Cir. 2019); *Trump v Comm. on Ways & Means,* 391 F. Supp. 3d 93, 95 (D.D.C. 2019).

The argument that the statute of limitations should be extended because of the tolling provision of the Clayton Act is likewise frivolous.  Even were it to be applicable to RICO, none of the government proceedings identified by the Plaintiff—the Sussmann and Danchenko Indictments, or the FEC proceeding—bear any relation to RICO.  And in addition to the statute of limitations, Plaintiff's RICO claim failed at every step of the substantive RICO analysis.

The Plaintiff does not even *attempt* to respond with respect to most of the legal failings of his claims.  To reiterate a few:

- The malicious prosecution claim without a prosecution;

- The theory of personal jurisdiction based on an allegation that defendants "knew that Florida is a state in the United States which was an important one;"

- The trade secret claim without a trade secret or ownership;

- The Computer Fraud and Abuse claim foreclosed by *Van Buren v United States,* 141 S. Ct. 1648 (2021); and

- Obstruction of justice untethered to any official proceeding.

Despite its 193 pages, the Amended Complaint did not come close to stating a legal claim. That was never its intended purpose.

## III.   A PATTERN OF ABUSE OF THE COURTS.

I have explained why the totality of the problems with the Complaint, Amended Complaint, and the arguments and statements of Plaintiff's counsel show that this lawsuit was filed and prosecuted in bad faith.  But this case is part of Mr. Trump's pattern of misusing the courts to serve political purposes.  Federal courts have both the inherent power and the constitutional obligation to protect their jurisdiction from conduct that impairs their ability to carry out Article III functions. *Procop v. Strickland*, 792 F.2d 1069, 1073 (11th Cir. 1986); *see also Martin-Trigona v. Shaw*, 986 F. 2d 1384, 1388 (11th Cir. 1993) (affirming dismissal because lawsuit filed on behalf of vexatious litigant); *O'Neal v. Allstate Indem. Ins. Co. Inc.*, No. 20-14712, 2021 WL 4852222, at *6 (11th Cir. Oct. 19, 2021).

Thus, while a litigant's conduct in other cases would normally not be relevant, when the court is faced with a sanctions motion against a repeat offender, undeterred by admonitions, it has the authority to consider that litigant's outside conduct.  *See Johnson v. 27th Ave. Caraf, Inc.*, 9 F.4th 1300, 1313-14 (11th Cir. 2021) (finding district court had "inherent power to investigate the scope and extent" of litigant's misconduct that "threaten[ed] the integrity of the court."); *O'Neal*, 2021 WL 4852222, at *5 (rejecting a plaintiff's sanctions appeal, in part, because "the district court [] conducted a comprehensive examination of Plaintiff's litigation history, cited dozens of Plaintiff's past cases, concluded that only two had merit, and provided examples of past cases where Plaintiff followed an abusive strategy similar to that employed in this case . . . . ").

## A. **Trump v. Pulitzer Board**

On November 15, 2021, on behalf of Mr. Trump, Ms. Habba demanded the Pulitzer Prize Board "take immediate steps to strip the New York Times and the Washington Post of the 2018 Pulitzer Prize for National Reporting."[15] By correspondence styled "Demand Letter, Notice of Potential Litigation and Non-Spoliation of Evidence," she threatened "prompt legal action" should the prize not be withdrawn.

Then, on May 27, 2022, Mr. Trump wrote stating: "I again call on you to rescind the Prize you awarded on blatantly fake, derogatory and defamatory news. If you choose not to do so, we will see you in court."[16]

On October 13, 2022, Weber, Crabb, & Wein, P.A., another law firm representing Mr. Trump, wrote again threatening suit, claiming that in refusing to rescind the award "the Board and its members acted not only with reckless disregard for the truth, but with authentic animosity and malice toward President Trump and the desire to cause him true harm [sic]."  As such, according to these lawyers, "the members of the Board are individually liable" for damages, including punitive damages for defamation.[17]

---

[15] Demand Letter from Alina Habba, Lawyer for Former President Donald J. Trump, to Bud Kliment, Interim Administrator, The Pulitzer Prizes (Nov. 15, 2021), https://www.documentcloud.org/documents/21112616-habba-and-trump-demand-letters-to-pulitzer-prizes-board.

[16] Letter from Donald J. Trump, to Ms. Marjorie Miller, Administrator, The Pulitzer Prize (May 27, 2022).  For copy of letter see Katie Robertson, *Pulitzer Board Rejects Trump Request to Toss Out Wins for Russia Coverage*, N.Y. Times (July 18, 2022), https://www.nytimes.com/2022/07/18/business/media/pulitzer-prizes-trump.html.

[17] Letter from R. Quincy Bird and Jeremy D. Bailie, Lawyers for Donald J. Trump, to Marjorie Miller, Administrator, The Pulitzer Prize Board (Oct. 13, 2022) https://cdn.nucleusfiles.com/bf/bf8ec68a-f0b8-400d-a74b-e6c480f89c07/pulitzer-prize-board-letter-final.pdf.

A little over a week later, Mr. Trump, at a rally in Robstown, Texas, held on October 22, 2022, announced: "Within the next two weeks we're suing the Pulitzer organization to have those prizes taken back."[18]

On December 13, 2022, Mr. Trump followed up on his threat by filing a lawsuit in a state court in Okeechobee, Florida, a location with no apparent connection to Mr. Trump or any of the defendants. *Trump v. Members of the Pulitzer Prize Board et al.,* No. 22-CA-000246, (Fla. 19th Cir. Ct. Dec. 13, 2022) (hereinafter "*Trump v. Pulitzer*") (DE 1).  He sued, individually, nineteen members of the Pulitzer Prize Board alleging defamation by implication."[19]  The complaint, 29 pages, 145 paragraphs, similar to the Amended Complaint at issue here, misrepresents the findings of the Mueller Report and the origins of the Operation Crossfire investigation.   The alleged defamatory statement reads:

> A. Statement from the Pulitzer Prize Board.  The Pulitzer Prize Board has an established formal process by which complaints against winning entries are carefully reviewed.  In the last three years, the Pulitzer Board has received inquiries, including from former President Donald Trump about submissions from the New York Times and the Washington Post on Russian interference in the U.S. elections and its connections to the Trump campaign – submissions that jointly won the 2018 National Reporting Prize.
>
> These inquires prompted the Pulitzer Board to commission two independent reviews of the work submitted by those organizations to our National Reporting competition.   Both reviews were

---

[18] *See* Julia Shapero, *Trump doubles down on threats to sue Pulitzer board at Texas rally*, The Hill (Oct. 22, 2022, 11:06 PM), https://thehill.com/blogs/blog-briefingroom/3699833-trump-doubles-down-on-threats-to-sue-pulitzer-board-at-texas-rally/.

[19] Defamation by implication is "the concept that literally true statements can be defamatory where they create a false impression." *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008). (citations omitted). The Florida Supreme Court explained that "if the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts, he may be held responsible for the defamatory implication, unless it qualifies as an opinion, even though the particular facts are correct." *Id.* at 1108.

> conducted by individuals with no connection to each other.  The separate reviews converged in their conclusions: that no passages or headlines, contentions or assertions in any of the winning submissions were discredited by facts that emerged subsequent to the [2018 Pulitzer Prizes in National Reporting Stand] conferral of the prizes.

(*Trump v. Pulitzer*, DE 1 ¶ 117).

It has been said that journalism is the first draft of history.[20]  The 2018 Pulitzer Award for National Reporting honored the staffs of the New York Times and the Washington Post "[f]or deeply sourced, relentlessly reported coverage in the public interest that dramatically furthered the nation's understanding of Russian interference in the 2016 presidential election and its connection to the Trump campaign, the President-elect's transition team and his eventual administration."[21] The effort by Mr. Trump and his lawyers to use the courts to bully journalists as part of a dishonest and futile attempt to rewrite history is a shameless attack on a freedom essential to democracy. *See Mills v Alabama*, 384 U.S. 214, 218-19 (1966) ("[T]he press serves . . . as a powerful antidote to any abuses of power by government officials and a constitutionally chosen means for keeping officials elected by the people responsible to all of the people who they were selected to serve.").

### B.  Trump v. New York Attorney General

In March 2019, the New York Office of the Attorney General ("OAG") headed by Attorney General Letitia James ("AG James"), began investigating Mr. Trump and his New York business.[22]

---

[20] While first use of the phrase is debated, it is often attributed to Philip Graham, the former president and publisher of the Washington Post from a speech he gave to Newsweek reporters in 1963: "So let us today drudge on about our inescapably impossible task of providing every week a first rough draft of history that will never be completed . . . ." Katherine Graham, *Personal History* (1998).

[21] *Staffs of The New York Times and The Washington Post*, The Pulitzer Prizes, https://www.pulitzer.org/winners/staffs-new-york-times-and-washington-post.

[22] The following procedural history and underlying facts are taken from filings in the case which

(James AC ¶ 64).   The OAG initiated its investigation following Congressional testimony by Michael Cohen, "a former senior executive of the Trump Organization and Special Counsel to Mr. Trump," wherein he produced copies of Plaintiff's financial statements that allegedly *inflated* the value of his assets to obtain favorable loans and insurance coverage, while the Trump Organization simultaneously *deflated* the value of those same assets to reduce its tax burden.  (*Trump v. James*, DE 9 at 8-9).   According to Mr. Trump, the Cohen testimony was a pretext to justify the OAG Investigation, and he points to various public statements by AG James as support for his theory that the OAG is "nothing more than a weapon in [AG James's] arsenal to wage war on [Mr. Trump]."  (James AC ¶¶ 67, 76).

On August 24, 2020, the OAG commenced a special proceeding in the New York Supreme Court, New York County, to enforce subpoenas served during the Investigation.[23]   (James AC ¶ 75).   On February 17, 2022, Justice Engoron, the state-court Justice presiding over the special proceeding, denied a motion to quash filed by Mr. Trump and granted the OAG's motion to compel ("February 2022 Order").   *See People of the State of New York v. The Trump Organization, Inc.*, No. 451G85/2020, 2022 WL 489625 (Sup. Ct. N.Y. Cnty. Feb. 17, 2022).   Justice Engoron rejected the Trump Respondents'[24] argument that the OAG Investigation was based on "personal animus" and that it amounted to selective prosecution.  *See id.* at *5-6.

Justice Engoron's Order has been affirmed by the state-appellate courts in New York.  On May 26, 2022, the February 2022 Order was unanimously affirmed by the New York Appellate

---

subsequently ended up before me: *Donald J. Trump v. Letitia James*, No. 22-81780-CV-DMM (S.D. Fla.) (hereinafter "*Trump v. James*").   The amended complaint in that case is at Docket Entry 19 and is hereafter referred to as "James AC."

[23] The special proceeding is styled, *People v. The Trump Organization*, Index No. 451685/2020.

[24] Donald J. Trump, Ivanka Trump, and Donald Trump, Jr.

Division's First Department. *People by James v. Trump Org., Inc.*, 205 A.D.3d 625 (1st Dep't 2022) (affirming finding that the OAG Investigation was "lawfully initiated" and not selective prosecution). On June 14, 2022, in a two-sentence order, the New York Court of Appeals—New York's highest court—dismissed Mr. Trump's appeal. *People by James v. Trump Org., Inc.*, 38 N.Y.3d 1053 (2022) (holding that "no substantial constitutional question is directly involved.").

Simultaneously, in December 2021, Mr. Trump and the Trump Organization LLC sued AG James under 42 U.S.C. § 1983 in the United States District Court for the Northern District of New York. *Trump v. James*, No. 21-cv-1352, 2022 WL 1718951 at *1 (N.D.N.Y. May 27, 2022). Mr. Trump alleged that the OAG's investigation infringed on various of his constitutional rights. As summarized by Judge Sannes, Mr. Trump (and the Organization) asserted that AG James:

> (1) violated their Fourteenth Amendment due process rights by commencing "investigations against Plaintiffs in bad faith and without a legally sufficient basis," (2) violated their First Amendment rights by seeking to stifle Plaintiffs' free speech and retaliate against Plaintiffs based upon Mr. Trump's political views, (3) violated their Fourth Amendment rights by issuing subpoenas without any "justifiable legal or factual basis," and (4) abused process to advance her own political career and injure Mr. Trump personally and politically.

*Id*. at *4. Judge Sannes granted AG James's Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1) on the grounds of *Younger* Abstention, *id*. at *14, and stated that, in the alternative, the case would be dismissed under Rule 12(b)(6) because of *res judicata*, *id*. at *19. The Court also noted: "Plaintiffs' assertions that [AG James] conducted a 'baseless fishing expedition' and 'knowingly advanced claims that were unwarranted under existing law,' are wholly unsupported." *Id*. at *12 n.13 (citation omitted). Mr. Trump has appealed to the Second Circuit. (*Trump v. James* DE 9 at 11).

On September 21, 2022, following its Investigation, the OAG commenced an enforcement

action pursuant to New York Law §63(12) ("Enforcement Action").  (*Id*. at 12).  On November

14, 2022, following a granting of the OAG's motion for preliminary injunction, Justice Engoron

appointed the Honorable Barbara Jones, a retired federal judge, to serve as monitor of the Trump

Organization.  (*Trump v. James*, DE 9-1 at 2).  Mr. Trump appealed to the New York Appellate

Division's First Department, where it remains pending.  (*Trump v. James*, DE 9 at 13).

Then, on November 2, 2022, Mr. Trump filed a lawsuit against AG James in a Florida state

court, the Circuit Court of the Fifteenth Judicial Circuit for Palm Beach County, Florida.  (*Trump

v. James*, DE 1-1 at 11).  The following day, he posted the following on Truth Social:

> Statement by Donald J. Trump, 45th President of the United States
> of America
>
> A puppet judge of the New York Attorney General and other sworn
> enemies of President Trump and the Republican Party has just
> issued a ruling never before seen anywhere in America. It is
> Communism come to our shores.
>
> Businesses will be fleeing New York, which they already are, for
> other states and other countries. Today's ridiculous ruling by a
> politically-motivated, hand-picked judge makes it even more vital
> for courts in both New York and Florida to do the right thing and
> stop this inquisition.
>
> We have to fight back against radical tyranny and save our
> Country![25]

On November 14, 2022, Plaintiff filed an Amended Complaint and an Emergency Motion

for Temporary Injunction.  (*Trump v. James*, DE 19; DE 1-1 at 113).  Plaintiff brought three counts

against Defendant, "individually."   Count I is brought under 42 U.S.C. § 1983 for various

constitutional violations.  (James AC at 26).  Count II alleges violations of Plaintiff's rights to

---

[25]   @realDonaldTrump, Truth Social (Nov. 2, 2022, 5:51 PM),
https://truthsocial.com/@realDonaldTrump/posts/109282083674316908.

privacy and property under Florida law. (*Id*. at 31). Count III alleges violations of Plaintiff's rights as grantor and beneficiary of the Trust. (*Id*. at 35). In his Emergency Motion, Plaintiff requested a temporary injunction against Defendant, "either personally, through an agent or through any other persons acting in active concert or participation with her, from requesting, demanding, possessing or disclosing the 2020 or 2022 amendments" of Plaintiff's Trust. (*Trump v. James*, DE 1-1 at 113).

On November 16, 2022, Defendant removed the case to this Court, where it is now pending before me. (*Trump v. James*, DE 1). The James AC copies verbatim substantial portions of the dismissed New York federal action. It begins with provocative rhetoric, all too familiar:

> Extraordinary wrongdoing requires extraordinary relief. As set forth below, James has repeatedly abused her position as Attorney General for the State of New York to pursue a vendetta against President Trump, a resident of Palm Beach County, Florida, with the stated goal of destroying him personally, financially, and politically. Suffice it to say that these actions are contrary to both the Constitutions and the laws of New York and Florida and the United States Constitution.

(James AC ¶ 1).

On December 21, 2022, I denied the Emergency Motion for Temporary Injunction finding that none of the prerequisites for an injunction were met. (*Trump v. James*, DE 14). I found that Plaintiff's attempt to sidestep rulings by the New York courts by suing AG James individually rather than in her official capacity was plainly frivolous. (*Id*. at 6). I found there was no likelihood of success on the merits, no irreparable harm, and to "impede a civil Enforcement Action by the New York Attorney General would be unprecedented and contrary to the interests of the people of New York." (*Id*. at 8). I urged Mr. Trump and his lawyers to reconsider their opposition to AG James's Motion to Dismiss because "[t]his litigation has all the telltale signs of being both vexatious and frivolous." (*Id*. at n.6).

C. **Trump v. Twitter**

On July 7, 2021, Mr. Trump, Linda Cuadros, and the American Conservative Union,

individually and on behalf of the class, sued Twitter, Inc. and Jack Dorsey.  The complaint was

filed in U.S. District Court in the Southern District of Florida.  *Donald J. Trump et al. v. Twitter,*

*Inc. et al.*, No. 21-CV-22441 (S.D. Fla.) (hereinafter "*Trump v. Twitter*").[26]  The case was

subsequently transferred to the Northern District of California pursuant to Twitter's forum

selection clause.  (*Trump v. Twitter*, DE 87).

Shortly after announcing the lawsuits, Mr. Trump started sending "breaking news alert"

text messages directly to his followers including a link[27] that asked them to donate to his Save

America PAC:

> President Trump is filing a LAWSUIT against Facebook and
> Twitter for UNFAIR CENSORSHIP!  *For the NEXT HOUR we've*
> *activated a 5X-IMPACT on ALL GIFTS!*  **Please contribute**
> **IMMEDIATELY to INCREASE your impact by 500% and to**
> **get your name on the Donor List President Trump sees!**[28]

---

[26] That same day, Mr. Trump also sued YouTube, LLC; Sundar Pichai, the chief executive officer
of Google LLC and Alphabet Inc.; Facebook, Inc.; and its chief executive officer, Mark
Zuckerberg.  *See Trump et al. v. YouTube, LLC,. et al.*, No. 21-CV-22445 (S.D. Fla.) (hereinafter
"*Trump v. YouTube*"); *Trump et al. v. Facebook, Inc. et al.*, No. 21-CV-22440 (S.D. Fla.)
(hereinafter "*Trump v. Facebook*").  Both of these cases were transferred to the Northern District
of California.

[27]  The text message read, "Pres Trump: I am SUING Facebook & Twitter for
UNCONSTITUTIONAL CENSORSHIP. For a short time, 5X-IMPACT on all gifts! Donate
NOW: bit.ly/3hiWKi5."  The link in the text message brought recipients to a dynamic website
prompting them with the above request for donations.  While the website has since changed, it has
been documented in other places.  *See, e.g.*, Jake Lahut, *Trump announces lawsuits against*
*Facebook and Twitter, immediately starts fundraising off it*, Business Insider (July 7, 2021, 12:54
PM), https://www.businessinsider.com/trump-facebook-twitter-lawsuit-fundraising-immediately-
2021-7.

[28] Lahut, *supra* note 26 (showing a Tweet from Twitter User @NYTnickc including screenshots
of the text message and donation website) (emphasis in original).

Mr. Trump's primary claim in all three of the cases is that the defendants censored his speech in violation of the First Amendment to the United States Constitution. *See Trump v. Twitter*, DE 1; *Trump v. YouTube*, DE 1; *Trump v. Facebook*, DE 1. A problem with his argument is that Twitter, Facebook, and YouTube are private companies, and the First Amendment applies only to governmental abridgements of speech. *See Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019) ("[T]he Free Speech Clause prohibits only *governmental* abridgment of speech. The free-speech clause does not prohibit *private* abridgment of speech.") (emphasis in original). Mr. Trump's only viable course of action was to allege that the companies were so dominated by governmental authorities as to be considered "state actors."

With respect to Twitter, aspects of Mr. Trump's argument bear directly on the claims made against Ms. Clinton and the Defendants here. Recall that in this case, Mr. Trump's lawyers point to the suspension of his Twitter account as the only example of economic injury that he suffered and blame the suspension on disinformation by Ms. Clinton; never mind that Twitter closed Mr. Trump's account after the Jan 6th attack on the Capitol because of "the risk of further incitement of violence." (*Trump v. Twitter*, DE 21 ¶114).

But in the Twitter litigation, the Trump lawyers claim that it was Democratic members of Congress, Vice President Harris, and First Lady Michelle Obama, that "coerced" Twitter to censor Mr. Trump. (*Id.* ¶¶ 48-61).

The District Court for the Northern District of California dismissed the case in its entirety finding that "the amended complaint does not plausibly allege that Twitter acted as a government entity when it closed plaintiffs' accounts." *Trump v. Twitter Inc.*, No. 21-cv-08378-JD 2022 WL 1443233, at *7 (N.D. Cal. May 6, 2022). Appeal of the dismissal is currently pending in the Ninth Circuit. *See Trump v. Twitter, Inc.*, *et al.*, 22-cv-15961 (9th Cir.).

### D. **Trump v. CNN**

On October 16, 2019, Charles Harder, as "litigation counsel for President Donald J. Trump and Donald J. Trump for President, Inc." advised CNN that "my clients intend to file legal action against you to seek compensatory damages, treble damages, punitive damages, injunctive relief, reimbursement of legal costs, and all other available legal and equitable remedies to the maximum extent permitted by law."[29]  Claiming violation of the Lanham Act because of "misrepresentations to the public, to your advertisers, and others," the letter claimed "[n]ever in the history of this country has a President been the subject of such a sustained barrage of unfair, unfounded, unethical and unlawful attacks . . . . " *Id.*

On March 6, 2020, represented by Mr. Harder, Donald J. Trump for President, Inc. sued CNN for libel based upon an article by a contributor entitled "Soliciting dirt on your opponents from a foreign government is a crime.  Mueller should have charged Trump campaign officials with it."[30]  *Donald J. Trump for President, Inc. v. CNN Broad., Inc.*, 20-CV-01045-MLB (N.D. Ga. Mar. 6, 2020) (hereinafter "*Trump v. CNN*") (DE 1).  The district court found the complaint did not adequately plead actual malice and dismissed it with leave to amend no later than November 30, 2020.  *Trump v. CNN*, 500 F. Supp. 3d 1349, 1358 (N.D. Ga. Nov. 11, 2020).

---

[29] Demand Letter from Charles J. Harder, Lawyer for Donald J. Trump, to Jeff Zucker, President and CEO of CNN, and David Vigilante, Executive Vice President and General Counsel of CNN (Oct. 16, 2019).  For copy of letter see @michaelglassner, Twitter (Oct. 18, 2019 12:04 PM), https://twitter.com/michaelglassner/status/1185225081141772290?ref_src=twsrc%5Etfw%7Ctw camp%5Etweetembed%7Ctwterm%5E1185225081141772290%7Ctwgr%5E3343fa879f8ca95c6 fc5c5a9f5c9ac5e765d8097%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.foxnews.com% 2Fmedia%2Ftrump-legal-team-threatens-cnn-with-lawsuit-over-unfair-unfounded-unethical-and-unlawful-coverage (posting copy of letter).

[30] Larry Noble, *Soliciting dirt on your opponents from a foreign government is a crime. Mueller should have charged Trump campaign officials with it*, CNN (June 13, 2019 at 3:37 PM), https://www.cnn.com/2019/06/13/opinions/mueller-report-trump-russia-opinion-noble/index.html.

Plaintiff's counsel subsequently advised that an amended complaint would not be filed, so on December 31, 2020, the case was dismissed without prejudice for failure to comply with the Court's order. (*Trump v CNN*, DE 38).

Mr. Trump then began fundraising for another lawsuit against CNN, issuing the following appeal:

> I'm calling on my best and most dedicated supporters to add their names to stand with me in my impending lawsuit against fake news CNN . . . Add your name immediately to show your support for my upcoming lawsuit against fake news CNN.[31]

On October 3, 2022, Mr. Trump sued CNN for Defamation Per Se (Count I) and Defamation (Count II). *Trump v. Cable News Network, Inc.*, No. 22-CV-61842-AHS (S.D. Fla. Oct. 3, 2022) (hereinafter "*Trump v CNN* II"), DE 1 at 19, 24. While claiming to meet the "actual malice" standard of *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), Mr. Trump's lawyers argue it "does not—and should not—apply where the defendant is not publishing statements to foster debate, critical thinking, or [the] 'unfettered interchange of ideas' but rather seeks to participate in the political arena by offering propaganda." (*Trump v CNN* II, DE 1 ¶ 65 n.42).

Less than 24 hours later, a fundraising email from Mr. Trump proclaimed: "I am suing the Corrupt News Network (CNN) for DEFAMING and SLANDERING my name." Supporters were encouraged to contribute $5 or more.[32]

To be clear, the sanction in this case is not imposed against Mr. Trump for the Pulitzer, Twitter, or CNN litigation. Those cases are before other judges who will make their own

---

[31] Marco Margaritoff, *Trump Begs Supporters For Donations Toward 'Upcoming' CNN Lawsuit*, Yahoo News (August 6, 2022), https://news.yahoo.com/trump-begs-supporters-donations-toward-164711363.html.

[32] *See* Erik Larsen, *Trump Uses CNN Lawsuit to Raise Money*, Bloomberg (Oct. 4, 2022), https://money.yahoo.com/trump-uses-cnn-lawsuit-raise-143932468.html.

determinations.  And a decision in Mr. Trump's Florida lawsuit against the New York Attorney General, a case now pending before me, is premature.

However, this widespread and persistent conduct points to the need for deterrence in this case and helps explain why Rule 11, Section 1927, and the Defend Trade Secrets Act are not up to the task.  This is purposeful conduct, some of which occurs beyond the pleadings and even outside of the courtroom.  "[I]t is a wrong against the institutions set up to protect and safeguard the public." *Chambers*, 501 U.S. at 44.  Mr. Trump's deliberate use of a frivolous lawsuit for an improper purpose constitutes bad faith.  And the behavior is not unique, but part of a plan, or at least a playbook.  The telltale signs:

- Provocative and boastful rhetoric;

- A political narrative carried over from rallies;

- Attacks on political opponents and the news media;

- Disregard for legal principles and precedent; and

- Fundraising and payments to lawyers from political action committees.[33]

And when a ruling is adverse, accusations of bias on the part of judges—often while the litigation is ongoing.

---

[33] Mr. Trump's Save America PAC has spent $9.7 million in legal bills since 2021 according to a Washington Post review of FEC Filings.  Devin Barrett, Josh Dawsey, and Isaac Stanley-Becker, *Trump's committee paying for lawyers of key Mar-a-Lago witnesses*, The Washington Post (Dec. 5, 2022, 5:52 PM), https://www.washingtonpost.com/national-security/2022/12/05/trump-witnesses-legal-bills-pac/.  Over $2 million has reportedly been paid to Ms. Habba.  Steven Lubet, *Cassidy Hutchinson transcript reveals new low for Trump World*, The Hill (Dec 28, 2022, 8:00 AM), https://thehill.com/opinion/judiciary/3789257-cassidy-hutchinson-transcript-reveals-new-low-for-trump-world/.  Ms. Habba, in addition to her role as a lawyer, has become a senior advisor for Mr. Trump's new MAGA, political action committee.  According to a MAGA Inc. spokesperson, "whether it's on legal matters or political issues, she is more than capable to represent President Trump in a variety of venues."  Ryan King, *Trump Attorney Alina Habba joins MAGA Inc.*, Washington Examiner (Oct. 26, 2022, 9:55 AM), https://www.washingtonexaminer.com/politics/trump-attorney-alina-habba-joins-maga-inc.

But "[l]egal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper." *Bridges v. California*, 314 U.S. 252, 270 (1940).  Frivolous lawsuits should not be used as a vehicle for fundraising or fodder for rallies or social media.  Mr. Trump is using the courts as a stage set for political theater and grievance.  This behavior interferes with the ability of the judiciary to perform its constitutional duty.

## IV.   CONSEQUENCES

Having determined that sanctions are appropriate under inherent authority, I must now determine what those sanctions should be.  I find that an award of Defendants' attorneys' fees and costs is a fair and just sanction given Plaintiff's and his counsel's actions in this case.  *See Chambers*, 501 U.S. at 56-58.  What follows, then, is an analysis of what amount of fees and costs is reasonable.  *See Bynum v. Am. Airlines, Inc.*, 166 Fed. Appx. 730, 736 (5th Cir. 2006) (remanding imposition of sanctions for proof of incurred fees and expenses to determine reasonableness).

### A.  <u>Defendants' Fee Application And Plaintiff's Objections</u>

Before analyzing the reasonableness of Defendants' fee request, I will briefly explain what materials I considered in reaching my conclusions.  A fee applicant bears the burden of providing an adequate application, but the opposing party must raise clear objections for a court to rule on them.  *See Am. Civ. Liberties Union of Georgia v. Barnes*, 168 F.3d 423, 428 (11th Cir. 1999) ("'objections and proof from fee opponents' concerning hours that should be excluded must be specific and 'reasonably precise.'") (citation omitted).

Defendants request **$1,058,283.50** in fees and costs.  *See generally* Defendants' Joint Motion for Sanctions (DE 280-2) (hereinafter "Application").  The Application is a 304-page document filed in support of Defendants' fee request.  *See id.*  The Application contains eleven

34

exhibits in support of the requested fees for each set of lawyers/law firms representing (some jointly) the Defendants in this case. Each exhibit contains (1) a declaration attesting to the authenticity of the hours and rates billed, with a corresponding summary of fees based on stages of the case; (2) background information on each timekeeper that describes professional experience and credentials; and (3) time entries.

In response, Plaintiff filed largely indecipherable objections. (DE 285-1) (hereinafter "Objections"); (DE 297) (hereinafter "Corrected Objections"). I will highlight just a few of these issues. First, Plaintiff's Objections relied on an unsigned draft of the Application. *Compare* Objections at 241 (stating on Mr. Tyrrell's signature line, "draft for circulation") *with* Application at 255 (containing Mr. Tyrrell's signature). This was significant not just because it was unsigned, but because some of the calculations changed from the draft to the final Application. *Compare* Objections at 273 (Ms. Lett's declaration stating total fees under Chart C as $5,650) *with* Application at 285 (Ms. Lett's declaration stating total fees under Chart C as $9,375). In an effort to clarify the record, I *sua sponte* ordered Plaintiff to file corrected objections. (DE 292).

Plaintiff's Corrected Objections were equally unhelpful. First, Plaintiff still relies on certain draft portions of the Application. *Compare* Corrected Objections at 307 (Ms. Lett's declaration stating in all caps and yellow highlighted text "DATE" and "FILL IN RESULT OF CONFERRAL") *with* Application at 285 (Ms. Lett's declaration stating the date and result of conferral). As a result, many of the same numerical discrepancies remained. *See, e.g., id*. Second, there are multiple miscalculations. For instance, in raising line-by-line objections to Defendant Joffe's attorneys' fees, Plaintiff failed to multiply the hourly rate by the number of hours billed, making the total amount objected to uncertain. (*See* Corrected Objections at 302). I doubt that this was intentional because nowhere else in the Corrected Objections does this appear to happen.

(*See, e.g., id.* at 268). In another example, in calculating the total fees incurred by Defendant DNC, Plaintiff failed to include the $15,632.50 incurred in the third stage of the case. (*See id*. at 93) (concluding total fees incurred $170,192, rather than $185,824.50).

These errors, taken as a whole, render the entire document unreliable. I considered whether to offer Plaintiff yet another opportunity to cure his objections. Without a motion, however, I did not find it to be a fair exercise of this Court's discretion. In almost every area of law, a party waives an objection for failing to properly raise it. So too here. Thus, to the extent that Plaintiff's objections were not clearly identifiable, I did not consider them.

## B. Reasonableness Of Fees

Of the total request for fees and costs ($1,058,283.50), $14,292.39 are costs incurred for electronic legal research and $600 in *pro hac vice* filing fees. Plaintiff does not object to either.[34] (*See generally* Corrected Objections at 33-35). Filing fees are taxable costs under 28 U.S.C. § 1920. However, consistent with the finding of other courts in this Circuit and other circuit courts, costs incurred for electronic legal research are considered a component of attorneys' fees rather than costs under 28 U.S.C. § 1920. *Springer v. Convergy's Corp.*, 2006 WL 8439203 at *2 (M.D. Fla. July 7, 2006). I find the award of $14,292.39 for electronic legal research reasonable given Plaintiff's lack of objection and the sprawling nature of his claims, which while frivolous, were numerous enough to necessitate substantial legal research.

"[T]he starting point in any determination for an objective estimate of the value of a

---

[34] Plaintiff appears to object, without explanation, to Defendant Danchenko's costs incurred for electronic legal research ($6,389) as "vague." (Corrected Objections at 244). This is nonsensical and likely a mistake. "Vague," as used by Plaintiff everywhere else in his Corrected Objections refers to vague *time entries* (more on this below). Nowhere else does Plaintiff raise a "vague" objection for costs incurred for electronic legal research, which are typically barebones receipts. (*See, e.g., id*. at 301). I will overrule this objection as I can discern no basis for it.

lawyer's services is to multiply hours reasonably expended by a reasonable hourly rate." *Norman v. Hous. Auth. of City of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). "The product of these two figures is the lodestar and there is a 'strong presumption' that the lodestar is the reasonable sum the attorneys deserve." *Bivins v. Wrap It Up, Inc.*, 548 F.3d 1348, 1350 (11th Cir. 2008) (citation omitted). In determining the lodestar, "the court is to consider the 12 factors enumerated in *Johnson v. Georgia Hwy. Exp., Inc.*, 488 F.2d 714 (5th Cir. 1974)."[35] *Id*. at 1350. "After the lodestar is determined . . . the court must next consider the necessity of an adjustment for results obtained." *Norman*, 836 F.2d at 1302. And finally, "'[t]he court . . . is itself an expert on the question and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of witnesses as to value.'" *Id*. at 1303 (citation omitted).

### 1. *Reasonable Hourly Rate*

"A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Norman*, 836 F.2d at 1302. The "relevant legal community" is generally "'the place where the case is

---

[35] As summarized in *Bivins*, the 12 factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Bivins*, 548 F.3d at 1350 n.2.

filed.'" *Barnes*, 168 F.3d 437.  "More typically, the fee applicant asks for rates approximating the highest charged in the community, whereas the fee opponent generally submits evidence of the lowest rate charged in any part of the community." *Norman*, 836 F.2d at 1300.  That is not the case here.

Almost all of Defendants' attorneys seek substantially discounted rates, ranging from 28% to 66% less than the rates actually billed.  (*See, e.g.,* Application at 102).  On a sliding scale based on experience, Defendants' attorneys seek rates ranging from $255-800 for lawyers and $120-150 for paralegals.  Plaintiff objects to the total amount as "unreasonable or excessive," but he limits those objections to purported deficiencies in "billing judgment" (more on this below).  Nowhere in his response in opposition or dozens of pages of line-by-line objections does Plaintiff challenge the *rate* charged by Defendants' attorneys.

Defendant Joffe's attorneys (and paralegal) are the only ones not to have discounted their rates.  Defendant Joffe's lead attorney, Mr. Tyrrell, seeks his "ordinary non-local rates," on the grounds that he qualifies for an exception applicable to attorneys with "extensive prior experience with a particular factual situation."  (*Id.* at 252 n.1); *see also Barnes*, 168 F.3d at 438 (stating that non-local rates *may* be acceptable if attorney had "extensive prior experience with a particular factual situation," but refusing to apply that exception where no obvious savings or efficiencies resulted).  While Plaintiff does not object, I refuse to apply the *Barnes* exception where it is not obvious that Defendant Joffe's attorneys provided any significant gains in efficiencies.  *Compare* (Application at 283) (Defendant Orbis Business Intelligence Ltd.'s attorneys, who raised a successful personal jurisdiction challenge, seeking fees for about 90 hours) *with* (*id.* at 251) (Defendant Joffe's attorneys, who also raised a successful personal jurisdiction challenge, seeking fees for about 208 hours).  Moreover, Mr. Tyrell's declaration (Application at 251) speaks to *his*

purported prior knowledge, not that of Defendant Joffe's other attorneys and paralegal who also seek their non-local rates. Accordingly, in considering the *Johnson* factors, the discounted rate of the other attorneys in this case, and my own experience, I will discount Defendant Joffe's attorneys' and paralegal's fees. *See* Appendix A at 5.

I find the rest of the rates charged by Defendants' attorneys reasonable. *See generally* Appendix A. In reaching this conclusion, I considered my own experience, the *Johnson* factors, and what reasonably comparable attorneys in a similar case in this legal community might be expected to charge. Plaintiff's lack of objection further supports the reasonableness of the rates. Given that there are dozens of attorneys, I will refrain from explaining my reasoning for each and every one of them—although I have considered them all. In reference to the *Johnson* factors, I considered the complexity of the allegations leveled by Plaintiff and the skill it required to succinctly respond to each allegation with well-reasoned arguments. In my view, this case required excellent lawyering to defend against the overwhelming number of convoluted allegations and frivolous claims raised by Plaintiff. Indeed, these lawyers are some of the best in the country, and accordingly charge top dollar (as evidenced by the rates actually paid by Defendants). In their ranks are litigators that have argued, and won, several cases before the U.S. Supreme Court; served in positions of great significance in government; graduated from and taught at prestigious law schools; clerked for federal district courts, circuit courts, and the U.S. Supreme Court; and obtained victories for their clients to the tune of billions of dollars. (*See, e.g.,* Application at 9, 53, 56, 105, 209).

Having set reasonable rates for the lawyers involved (*See generally* Appendix A), I now move on to evaluating the time they spent on their work in this case.

### 2.   *Hours Reasonably Expended*

In determining the number of hours "reasonably expended," the Supreme Court requires fee applicants to exercise "billing judgment."  *Hensley*, 461 U.S. at 434 (citations and quotations omitted).  Therefore, attorneys "should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary." *Id.*  "This must necessarily mean that the hours excluded are those that would be unreasonable to bill to a client and therefore to one's adversary *irrespective of the skill, reputation or experience of counsel.*" *Norman*, 836 F.2d at 1301 (emphasis in original).  "Redundant hours generally occur where more than one attorney represents a client," but in such cases attorneys may still be compensated "if they are not unreasonably doing the same work." *Id.* at 1302.

Where—as is the case here—"fee documentation is voluminous . . . an hour-by-hour review is simply impractical and a waste of judicial resources."  *Loranger v. Stierheim*, 10 F.3d 776, 783 (11th Cir. 1994); *see also Fox v. Vice*, 563 U.S. 826, 838 (2011) (explaining that "trial courts . . . should not, become green-eyeshade accountants.  The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection.  So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time.  And appellate courts must give substantial deference to these determinations, in light of 'the district court's superior understanding of the litigation.'").  Notwithstanding, I am mindful of this Court's obligation to "produce an order on attorneys' fees that allows for 'meaningful review.'" *Barnes*, 168 F.3d at 428.

Here, the fee documentation is certainly voluminous.  *See, e.g., Padurjan v. Aventura Limousine & Transp. Serv., Inc.*, 441 Fed. Appx. 684, 687 (11th Cir. 2011) ("The more than $200,000 [the movant] seeks in attorneys' fees is indication enough that this case is voluminous.").

Defendants' Application seeks over a million dollars in fees, is 304-pages long, and includes hundreds of time entries by dozens of lawyers.

In response, Plaintiff raised line-by-line objections by way of tables at the end of each exhibit. (*See generally* Corrected Objections). The tables, while not descriptive in any meaningful way, do identify objected to entries under the following categories: block billing, duplicative, excessive, vague, and clerical. Accordingly, I will balance the aforementioned competing directives—not to attempt "auditing perfection" yet still allow for "meaningful review"—by analyzing a mostly random selection[36] of Plaintiff's "billing judgment" objections under each of his categories. The entries excerpted below serve as a representative sample of the entries that I examined and the reasoning applied therein.

### C. **Objections**

#### 1. *Block Billing*

Plaintiff's objections to block billing are largely overblown. It is true that lawyers should avoid block billing (*i.e.*, billing for several tasks in the same time entry) to, at least in this context, allow a court to ascertain the number of hours reasonably expended per task. The degree of block billing identified by Plaintiff simply does not rise to a level that merits an across-the-board cut of hours. However, I am inclined to cut back in individual cases if the block billing spanned several hours and included numerous tasks. *See, e.g., Barnes*, 168 F.3d at 429 ("The records often lump together all the tasks performed by an attorney on a given day without breaking out the time spent on each task.").

By way of example, Plaintiff objects to the following entries for block billing:

---

[36] For "block billing" and "excessive," I focused primarily on entries with unusually high amounts charged. The logic being that such entries were more likely to yield examples of improper block billing or excessive billing.

1) Review & revise defendants' draft reply brief; review Trump's opposition brief; emails re: draft reply brief.

(Application at 122) (8/10/2022, 3.9 hours, $2,145).

2) Review Trump amended complaint; review previous motions practice; review draft portion of motion to dismiss Trump amended complaint; discussion with A. Eisen re: draft motion to dismiss.

(*Id*. at 241) (6/28/2022, 5 hours, $3,500).

3) April 2022: Confer and strategize via email and telephone with counsel regarding case, initial appearances, local rules, and complaint; review complaint; review draft motion to dismiss; draft and file pro hac motions; review and file response to motion to expedite.

(*Id*. at 21) (4/1/2022, 15 hours, $9,375).

The first two examples do not merit a reduction in hours. The second tows the line, but I find that even if the timekeeper had entered those times separately, five hours would nonetheless be reasonable. This same reasoning applies to the first example *and* to all of the other objections for block billing that I looked at. The third, however, is the sort of block billing that requires a reduction in hours because it is impossible for the Court to accurately divvy up the time per task in a reasonable manner. The timekeeper for this entry is Attorney Markus. A closer look at his time entries revealed a similar pattern. I note however that as local counsel, his role was not as susceptible to itemized billing and his total hours were not substantial. But I will cut his hours by 15%. *See* Appendix A at 2.

### 2. *Duplicative*

Plaintiff's objections for "duplicative" time entries are not presented in a way that allows this Court to properly review and analyze them. Plaintiff's table simply points out entries that he believes are "duplicative" but does not say *what it duplicates*. Instead, Plaintiff leaves it up to the Court to piece together a cogent series of objections. I refuse to do so. But even when I reviewed

42

the relevant time entries with an eye for duplicative billing, I did not find any unreasonable billing that merits a cut in hours.

### 3. *Excessive*

Plaintiff objects to, among others, the following time entries as "excessive":

> 1) Review draft DNC motion to dismiss brief and share with RAK for final review

(Application at 76) (5/6/2022, 2.3 hours, $1,610).

> 2) Reviewing amended complaint; reviewing, editing draft brief.

(*Id*. at 24) (7/7/2022, 5.5 hours, $3,850).

> 3) Review & revise motion to dismiss brief re: Trump lawsuit; emails to & from I. Garcez, A. Lopez re: same

(*Id*. at 118) (5/4/2022, 2.9 hours, $1,595).

Plaintiff's objections are unconvincing.  It is no surprise that these lawyers, when responding to such an egregious example of shotgun pleadings and subsequent opposition, had to spend numerous hours thoroughly analyzing the allegations and crafting exhaustive responses.  I find these time entries, and others like it, reasonable.

### 4. *Vague*

"[T]he general subject matter of the time expenditures ought to be set out with sufficient particularity so that the district court can assess the time claimed for each activity." *Norman*, 836 F.2d at 1303.  Notwithstanding, the court can rely on "its own knowledge and experience . . . and may form an independent judgment" when determining the reasonableness of fees. *Id*.  Plaintiff objects to the following time entries as "vague":

> 1) Review complaint and continue revisions to [redacted].

(Application at 65) (4/6/2022, 4.5 hours, $3,150).

> 2) Research [redacted].

(*Id*. at 79) (5/18/2022, 1.7 hours, $637.50).

> 3) Miscellaneous communications, including with client and other counsel, regarding status of matter, ongoing coordination, and related matters; review and analyze materials re: same.

(*Id*. at 275) (7/19/2022, 1.4 hours, $1,435.50).[37]

The first and third time entries provide sufficient detail to overcome an objection for being vague. The same is true for almost all other time entries viewed under this category. Only the second time entry rises to the level of being vague. The timekeeper for the second entry is Attorney Turner. A closer look at her time entries revealed a similar pattern. While I find Attorney Turner's total hours to be relatively low, I will cut her hours by 15% to account for the handful of vague entries. *See* Appendix A at 2.

### 5. *Clerical*

Consistent with the idea that, "the hours excluded are those that would be unreasonable to bill to a client and therefore to one's adversary *irrespective of the skill, reputation or experience of counsel*," *Norman*, 836 F.2d at 1301 (emphasis in original), lawyers should not (in the interest of reducing fees) bill their clients for clerical work that a non-lawyer could just as well do.

It appears that Plaintiff's only objections under the category of "clerical" (totaling $390) is for work done by Ms. Dietrich, a "Senior Case Manager," a role akin to a paralegal. (Corrected Objections at 33-35; 56; 92). Ms. Dietrich's hourly rate is $150, a reasonable rate for paralegals. (Application at 58). Billing a client for clerical work done by a non-lawyer related to its case is completely reasonable and expected.

---

[37] This is Mr. Tyrell's non-local rate. For the reasons explained above, I am reducing it to $700. *See* Appendix A at 5.

**D.** __Adjustment Of The Lodestar__

The lodestar in this case is **$937,989.39**.  *See* Appendix A at 1.  Having determined the lodestar, the Court must next "consider the necessity of an adjustment for results obtained." *Norman*, 836 F.2d at 1302.  The Parties have not argued for an adjustment, and I do not find one to be necessary.

Relatedly, however, I find that *apportionment* of the lodestar is necessary.  The amount of fees awarded in this case, while reasonable, is substantial.  As such, joint and several liability (a presumption under Rule 11, but not here) would be inappropriate.  *Cf. Fowler v. Ritz-Carlton Hotel Co., LLC*, No. 3:10-CV-884-J-34JRK, 2016 WL 11468583, at *7 (M.D. Fla. Aug. 2, 2016) (apportioning fee based on ability to pay).  The parties that bear the brunt of the responsibility for the sanctionable conduct—Plaintiff and his lead attorney—should be jointly and severally liable for the sanction.  The Rule 11 sanctions that I imposed on the other lawyers in this case (*See* DE 284) is sufficient.  *See Gallop v. Cheney*, 667 F.3d 226, 231 (2d Cir. 2012)*, as amended* (Feb. 3, 2012) (vacating sanctions against local counsel due to level of involvement).

Accordingly, Plaintiff Donald J. Trump and Plaintiff's lead attorney—Alina Habba, and Habba Madaio & Associates—are jointly and severally liable for the total amount.

## IV.   CONCLUSION

For the forgoing reasons, and having carefully considered the record, the written submissions of the Parties, and applicable law, it is hereby **ORDERED AND ADJUDGED** that:

1.  Defendants' Joint Motion for Sanctions (DE 280) is **GRANTED.**

2.  Plaintiff Donald J. Trump and Plaintiff's lead attorney—Alina Habba and Habba Madaio & Associates—are jointly and severally liable for **$937,989.39**.[38]

**SIGNED** in chambers at West Palm Beach, Florida this 19th day of January, 2023.

Donald M. Middlebrooks
United States District Judge

cc:     counsel of record

---

[38] "[S]anctions must never be hollow gestures: their bite must be real." *Martin v. Automobile Lamborghini Exclusive, Inc.*, 307 F. 3d 1332, 1336 (11th Cir. 2002). But for the bite to be real it must be an amount a person can pay. *Id.* I believe the monetary sanctions imposed here are well within Plaintiff and Plaintiff's lawyer ability to pay, and therefore I have not thought it necessary to conduct an intrusive inquiry into their finances. However, should Plaintiff or Plaintiff's lawyer (and law firm) believe that the amount would seriously jeopardize their financial status, *see, e.g., Baker v Alderman*, 158 F. 3d 516 (11th Cir. 1998), that individual or firm should file within ten (10) days of this Order, under seal, a verified statement of net worth which includes assets and liabilities. In the event of such a filing, the obligation of that individual or law firm will be tolled until further order of the Court.

331

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

DONALD J. TRUMP,

       Plaintiff,

v.

       Case No. 2:22-cv-14102-DMM

HILLARY R. CLINTON, et al.,

       Defendants.

**PLAINTIFF'S AND PLAINTIFF'S ATTORNEYS' MOTION FOR**
**INDICATIVE RULING BASED UPON NEW EVIDENCE**

BINNALL LAW GROUP, PLLC
Jared J. Roberts (FL Bar #1036550)
Jason C. Greaves (*pro hac vice* application forthcoming)
717 King Street, Suite 200
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jared@binnall.com
jason@binnall.com

*Counsel for President Donald J. Trump, Alina Habba, Michael T. Madaio, Habba, Madaio, & Associates, Peter Ticktin, Jamie Alan Sasson, and The Ticktin Law Group*

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES ..................................................................................... ii

BACKGROUND ...................................................................................................... 1

**ARGUMENT** ......................................................................................................... 2

    1.   Fed. R. Civ. P. 60(b) Relief from this Court's Judgments is Appropriate. ........................ 2

    2.   Fed. R. Civ. P. 62.1 Allows this Court to Remedy Defendants' Malfeasance ................ 17

CONCLUSION ...................................................................................................... 18

REQUEST FOR HEARING .................................................................................. 18

CERTIFICATE OF CONFERRAL 7.1(A)(3) ...................................................... 18

CERTIFICATE OF SERVICE ............................................................................... 20

## TABLE OF AUTHORITIES

**Cases**

*Bankers Mortgage Co. v. United States,*

    423 F.2d 73, 77 (5th Cir. 1970) ...................................................................... 5

*Booker v. Singletary,*

    90 F.3d 440, 442 (11th Cir. 1996) .................................................................. 5

*Doe v. Bush,*

    261 F.3d 1037, 1064 (11th Cir. 2001) .......................................................... 20

*Forrest Creek Assoc., Ltd. v. McLean Sav. & Loan Ass'n,*

    831 F.2d 1238, 1245 (4th Cir. 1987) ............................................................ 15

*Franken v. Mukamal,*

    449 Fed. App'x 776, 779 n.2 (11th Cir. 2011) ............................................ 19

*Griffin v. Swim-Tech Corp.,*

    722 F.2d 677, 680 (11th Cir. 1984) ................................................................ 5

*Holland v. Florida,*

    560 U.S. 631, 649 (2010) ........................................................................... 5, 6

*In re Gen. Elec. Sec. Litig.,*

    2021 WL 2688695, at *7 (S.D.N.Y. Jun. 30, 2021) .................................... 15

*In re South Coast Oil Corp.,*

    566 Fed. App'x 594, 596 (9th Cir. 2014) .................................................... 15

*Jarvis v. JP Morgan Chase Bank, N.A.,*

    2010 WL 2927276, at *1 (C.D. Cal. Jul. 23, 2010) ...................................... 3

*Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.,*

    298 F.3d 600, 607 (7th Cir. 2002) ................................................................. 3

*Mahone v. Ray,*

    326 F.3d 1176, 1178 (11th Cir. 2003) ........................................................... 20

*Munoz v. United States,*

    451 Fed. App'x 818, 820 (11th Cir. 2011) ............................................ 2, 20, 21

*Nixon v. Fitzgerald,*

    457 U.S. 731, 749 (1982) ............................................................................. 6

*Pace v. DiGuglielmo,*

    544 U.S. 408, 418 (2005) ............................................................................. 5

*Schink v. Comm. of Social Security,*

    935 F.3d 1245, 1258 n.3 (11th Cir. 2019) .................................................... 3

*Toole v. Baxter Healthcare Corp.,*

    235 F.3d 1307, 1316 (11th Cir. 2000) ......................................................... 4

*Trump v. Clinton,*

    Cons. Nos. 22-13410, 22-14099, 23-10387, ECF No. 108, Order of the Court

    (11th Cir. Jul. 13, 2023) ............................................................................ 2

*United States ex rel. Dingle v. BioPort Corp.,*

    270 F. Supp. 2d 968, 972 (W.D. Mich. 2003) ............................................. 3

*United States v. MacAndrew,*

    2023 WL 196132, at *2 n.1 (D.D.C. Jan. 17, 2023) ..................................... 4

*United States v. Stinson,*

    729 Fed. App'x 891, 900 n.7 (11th Cir. 2018) ........................................... 11

*White Oak Vineyards & Winery LLC v. White Oak Spirits, LLC,*

    2015 WL 12731903, at *2 (C.D. Cal. Mar. 9, 2015) ..................................... 3

**Other Authorities**

FBI Director Testifies at Oversight Hearing Part 2, C-SPAN at 00:00:35 (Jul. 12, 2023),

https://www.c-span.org/video/?529135-4/fbi-oversight-hearing-part-2 .................................. 17, 18

John Durham Testifies on his Investigations of the FBI Part 1, C-SPAN at 01:03:07 (Jun. 21, 2023),

https://www.c-span.org/video/?528789-1/special-counsel-john-durham-testifies-investigation-

fbi-part-1 ...........................................................................................................................17

U.S. Dept. of Justice, Office of Special Counsel John H. Durham, *Report on Matters Related*

*to Intelligence Activities and Investigations Arising Out of the 2016 Presidential Campaigns*

(May 12, 2023) ......................................... 2, 5, 7, 8, 9, 11, 12, 13, 14, 15, 16, 17, 18

**Rules**

Fed. R. App. P. 12.1 ..................................................................................................................19

Fed. R. App. P. 12.1(a) ............................................................................................................20

FED. R. CIV. P. 60(b)(2) ............................................................................................................3

FED. R. CIV. P. 60(b)(6) ..........................................................................................................3, 5

Fed. R. Civ. P. 62.1(a) ..............................................................................................................19

Fed. R. Civ. P. 62.1(b) ..............................................................................................................20

Fed. R. Evid. 201(b)(2) ............................................................................................................3

Federal Rule of Civil Procedure 62.1 ....................................................................................2, 19

**U.S. Constitution**

U.S. Const. Art. II, § 1 ..............................................................................................................6

U.S. Const. Art. II, §§ 1, 3 ........................................................................................................6

The recent release of the Durham Report seismically alters the legal landscape of this case. While this Court previously held that President Donald J. Trump and his counsel made frivolous factual and legal allegations, the Durham Report corroborates many facts and allegations about which this Court expressed skepticism.[1] In fact, it bolsters several allegations that this Court seemed to dismiss as unsupported, not giving them the assumption of truth that they deserved at the motion to dismiss stage.

Notably, the Durham Report outlines the role that each RICO Defendant played to harm President Trump, and directly contradicts factual claims previously made by certain Defendants before this Court. This new evidence confirms the plausibility of President Trump's Amended Complaint and is enough to get President Trump past the motion to dismiss threshold and makes any award of sanctions inappropriate.

## BACKGROUND

This Court issued three orders in this case that are currently on appeal. First, on September 8, 2022, the Court dismissed President Trump's Amended Complaint with prejudice. Second, on November 10, 2022, the Court awarded Rule 11 sanctions to Defendant Dolan against President Trump's counsel, Alina Habba, Michael T. Madaio, Habba, Madaio, & Associates, Peter Ticktin, Jamie Alan Sasson, and The Ticktin Law Group. Third, on January 19, 2023, the Court awarded sanctions to the remaining Defendants against President Trump, Alina Habba, and Habba, Madaio, & Associates. Each of these rulings was timely appealed to the Eleventh Circuit. Dkt. Nos. 272, 291, 308. The Eleventh Circuit consolidated all three of these appeals on March 31, 2023, via an emailed order.

---

[1] The orders entered by this Court imposing sanctions against President Trump and his counsel raise reasonable questions as to the appearance of impartiality of the Court, and therefore a Motion to Disqualify is forthcoming.

On May 12, 2023, the government released the *Report on Matters Related to Intelligence Activities and Investigations Arising Out of the 2016 Presidential Campaigns* authored by Special Counsel John H. Durham ("Durham Report"), which is the most comprehensive and current report on the investigation into the origin and maintenance of the Crossfire Hurricane investigation. Given the crossover between those events and the events alleged in President Trump's Amended Complaint, the Durham Report provides new context to President Trump's prior legal and factual claims. On July 13, 2023, the Eleventh Circuit issued an order staying the consolidated appeal so that Plaintiff and Plaintiff's counsel may seek an indicative ruling from this Court. *Trump v. Clinton*, Cons. Nos. 22-13410, 22-14099, 23-10387, ECF No. 108, Order of the Court (11th Cir. Jul. 13, 2023). Accordingly, President Trump and his former counsel bring this motion to allow this Court to make an indicative ruling and regain jurisdiction over this case to consider the Durham Report in connection with President Trump's Amended Complaint.

## ARGUMENT

Pursuant to Federal Rule of Civil Procedure 62.1, a district court may consider and issue an indicative ruling on a Rule 60(b) motion while a case is pending appeal. *Munoz v. United States*, 451 Fed. App'x 818, 820 (11th Cir. 2011). Rule 60(b) provides a method for obtaining relief from a final judgment. Accordingly, Plaintiff and Plaintiff's former counsel respectfully request this Court issue an indicative ruling finding that it would grant the Rule 60(b) motion if the Eleventh Circuit remands jurisdiction of this case.

### 1. Fed. R. Civ. P. 60(b) Relief from this Court's Judgments is Appropriate.

Under Rule 60(b), a district court may grant relief from a final judgment or order when there is "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." FED. R. CIV. P. 60(b)(2). Additionally, courts may grant relief from a final judgment or order "for any other reason that justifies relief." FED. R. CIV. P. 60(b)(6).

In light of the new evidence contained in the Durham Report,[2] this Court should vacate its prior order

to dismiss pertaining to the two RICO claims and claim for injurious falsehood against Defendants

Clinton, Clinton Campaign, DNC, Perkins Coie, Sussmann, Dolan, Sullivan, Podesta, Mook, Reines,

Elias, Fusion GPS, Simpson, Fritsch, Nellie Ohr, Bruce Ohr, Orbis Ltd., Steele, Danchenko, Neustar,

Inc., Neustar Security Services, Schultz, and Joffe, and the two sanctions orders.

> When a district court considers a Rule 60(b)(2) motion, it involves a five-part test:

> "(1) the evidence must be newly discovered since the trial; (2) due diligence on the part
> of the movant to discover the new evidence must be shown; (3) the evidence must not
> be merely cumulative or impeaching; (4) the evidence must be material; and (5) the
> evidence must be such that a new trial would probably produce a new result."

*Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1316 (11th Cir. 2000). Here, the first two elements are

undoubtedly met. The Durham Report came out *after* this Court closed this case and could not have

been discovered previously.  Further, the evidence is not merely cumulative or for impeachment; it is

new evidence, developed by an investigation conducted by an agent of the United States government,

detailing Defendants' respective roles in the RICO actions and conspiracy. While Defendants may

---

[2] In determining the motion to dismiss, the Court may take judicial notice of the Durham Report because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Schink v. Comm. of Social Security*, 935 F.3d 1245, 1258 n.3 (11th Cir. 2019) (quoting Fed. R. Evid. 201(b)(2)). Courts routinely take judicial notice of government documents. *See Jarvis v. JP Morgan Chase Bank, N.A.*, 2010 WL 2927276, at *1 (C.D. Cal. Jul. 23, 2010) (holding that federal courts routinely take judicial notice of "documents available on government websites."); *Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.*, 298 F.3d 600, 607 (7th Cir. 2002) (taking judicial notice of information from FDIC's official website); *United States ex rel. Dingle v. BioPort Corp.*, 270 F. Supp. 2d 968, 972 (W.D. Mich. 2003) ("Public records and government documents are generally considered not to be subject to reasonable dispute. . . . This includes public records and government documents available from reliable sources on the Internet.") (citation omitted); *White Oak Vineyards & Winery LLC v. White Oak Spirits, LLC*, 2015 WL 12731903, at *2 (C.D. Cal. Mar. 9, 2015) (holding that "Records and reports from government agencies are the proper subject of judicial notice."). Likewise, the District of Columbia district court took judicial notice of background information in the January 6th Report because it came from a source whose accuracy cannot be reasonably questioned. *United States v. MacAndrew*, 2023 WL 196132, at *2 n.1 (D.D.C. Jan. 17, 2023).

argue that it is not new evidence and merely corroborates the Amended Complaint, the Durham Report is composed of findings from the Durham Investigation, making it new evidence.

Moreover, the Durham Report, as detailed below, is material and would likely produce a different result. This evidence corroborates facts that are key to the plausibility and probability of President Trump's claims. Therefore, the introduction of this evidence is likely to change the outcome of this case at every level of the proceedings.

Alternatively, relief is warranted under Rule 60(b)(6) due to extraordinary circumstances. *Booker v. Singletary*, 90 F.3d 440, 442 (11th Cir. 1996). "The provisions of this rule must be carefully interpreted to preserve the delicate balance between the sanctity of final judgments and the 'incessant command of the court's conscience that justice be done in light of *all* the facts.'" *Griffin v. Swim-Tech Corp.*, 722 F.2d 677, 680 (11th Cir. 1984) (quoting *Bankers Mortgage Co. v. United States*, 423 F.2d 73, 77 (5th Cir. 1970)) (emphasis in original).

a.   *Order on Motion to Dismiss*

This Court granted Defendant's motions to dismiss on September 8, 2022. In doing so, the Court dismissed all President Trump's claims on statute of limitations and merits grounds. *See generally*, Dkt. No. 267. At issue here are President Trump's two RICO claims, and his claim for injurious falsehood.

i.   Statute of Limitations

The findings of the Durham Report support President Trump's argument for equitable tolling of the statute of limitations. A plaintiff is "entitled to equitable tolling if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (citing *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). Courts have emphasized that this determination is made on a "case-by-case basis." *Id.* The Supreme Court has noted "the need for 'flexibility' [and] for avoiding 'mechanical rules'" in

making this assessment, encouraging courts to "'relieve hardships which, from time to time, arise from a hard and fast adherence' to more absolute legal rules, which, if strictly applied, threaten the 'evils of archaic rigidity.'" *Id.* (citations omitted).

Here, President Trump's circumstances satisfy both prongs. President Trump was the President of the United States from January 20, 2017, until January 20, 2021. The Supreme Court has recognized that the President "occupies a unique position in the constitutional scheme." *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982) (also noting that U.S. Const. Art. II, § 1 "establishes the President as the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity."). The President also has an overarching duty to "preserve, protect, and defend the Constitution" and to take "[c]are that the Laws be faithfully executed[.]" U.S. Const. Art. II, §§ 1, 3. In short, the President is responsible for "enforc[ing] . . . federal law," "conduct[ing] . . . foreign affairs," and "manag[ing] . . . the Executive Branch." *Nixon*, 457 U.S. at 750. For this reason, the *Nixon* court cautioned that "[b]ecause of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government." *Nixon*, 457 U.S. at 749.

During President Trump's entire term, he was forced to address allegations from a baseless investigation, largely perpetuated by Defendants. As the Durham Report now confirms, the FBI opened an investigation into President Trump without "any actual evidence." Durham Report at 8. The FBI did so swiftly, without evaluating any of the 'evidence' given to them, through agents with hostile feelings towards President Trump. *Id.* at 9. Had the FBI carefully analyzed the information given to them from persons such as Defendants, it would have realized that there was no evidence that President Trump or his campaign were colluding with Russia. *Id.* Notably, at this same time, the FBI received intelligence from a trusted source "pointing to a Clinton campaign plan to vilify Trump

by tying him to Vladimir Putin so as to divert attention from her own concerns relating to her use of a private email server." *Id.* at 10.

President Trump was fully occupied with his duties as President of the United States from January 20, 2017, until January 20, 2021. These duties included ensuring that the laws of the United States were duly executed, overseeing multiple international peace deals, and creating a thriving economy. These endeavors consumed his entire time in a way that is different and out of the control of any ordinary citizen or event.

In addition, President Trump was facing an investigation into his candidacy and his campaign instituted by, what we now know, was a partisan Department of Justice and Federal Bureau of Investigation. President Trump, as president, could have taken action against these investigators, but it may have created an appearance that he was attempting to shut down the investigation or otherwise interfering with law enforcement functions. Such an appearance would have undermined President Trump's belief in law and order and sent the wrong message to the Country. Therefore, President Trump was obligated to let these initial investigations unfold in their entirety before he could bring this suit. These extraordinary circumstances have not been faced by a Plaintiff before in this Nation. This Court is, therefore, justified in finding that the statute of limitations was equitably tolled during the pendency of this investigation.

ii.     *Merits of the RICO Claims*

The findings of the Durham Report support President Trump's RICO claims. As an initial matter, adding to President Trump's open-ended continuity claim for establishing a pattern, President Trump has since filed to run for President of the United States in 2024. Regarding the enterprise element, the Durham Report provides extensive details about how these defendants coordinated and acted toward the common goal of damaging then-candidate Trump's reputation, including his companies. *See generally* Durham Report at 92–97, 109–11, 243–82.  Specifically, the Durham Report

6

exposes Defendants' conduct in working together to formulate a false story of alleged Trump/Russia collusion. Defendant Clinton, and those working closely with her, "were seeking in 2016 to promote a false or exaggerated narrative to the public and to U.S. government agencies about Trump's possible ties to Russia." *Id.* at 82. It was Defendants Clinton, Clinton Campaign, and DNC, that funded the Steele Reports, which were filled with smears and falsehoods about President Trump and his businesses. *Id.* at 304. U.S. intelligence officials knew that the Clinton Campaign had paid for these reports, however, they still used information derived from the "Clinton Plan" to justify and maintain their investigation of Trump. *Id.* at 82.

Further, the Durham Report shows that Defendants Sussman, Fusion GPS, Perkins Coie, Elias, and Joffe, worked together to create the false Alfa Bank allegations. *Id.* at 92–97, 243–82. It took FBI cyber experts all of a day to dismantle these allegations, finding that the Alfa Bank "white papers" conclusions were not supported by the technical data, used questionable methodology, and "did not 'ring true at all.'" *Id.* at 258. Despite this, the Clinton campaign funded these Alfa Bank allegations for delivery to the media and the FBI. *Id.* at 305. As shown by the Durham Report, Defendant Sussman provided this manufactured information to James Baker at the FBI, falsely claiming to be acting "*not on behalf of a client or company*" and then increased the pressure on Baker to act on the information by telling him that media outlets would soon be reporting on it. *Id.* at 255.  Additionally, the Report found that Defendant Sussman provided misleading testimony to Congress. *Id.* at 271. This coordinated feeding of false information to government investigative agencies and the media shows that Defendants worked together for an unlawful purpose to harm President Trump.  The fact that Defendants intentionally spread misleading information to investigators and the media also helps corroborate the predicate acts for obstruction of justice, as well as wire fraud.

Further, this injury was to President Trump's business and property, as confirmed by the Durham Report. Specifically, the Steele Dossier, largely funded and supported by Defendants,

included allegations about President Trump's business dealings.[3] The Durham Report, however, found that the FBI—certainly not for lack of trying—never found corroborating evidence for the information in the Dossier. Durham Report at 13. Also, as noted, Defendants Sussman and Clinton spread the lie that The Trump Organization had secret ties to Alfa Bank, debunked in the Durham Report. *Id.* at 255–67.

Accordingly, in light of the Durham Report, President Trump pled sufficient information in his Amended Complaint to survive a motion to dismiss. Thus, President Trump respectfully requests that this Court issue an indicative ruling that the newly discovery evidence in the Durham Report is sufficient to vacate the Court's prior dismissal order of President Trump's RICO claims.

      *iii.*     *Merits of the Injurious Falsehood Claim.*

As discussed above, the Durham Report lends credence to President Trump's argument for equitable tolling of the statute of limitations. Accordingly, each of the injurious, false statements referenced in President Trump's Amended Complaint should fall within the statutory period.

The Court's remaining issues with Injurious falsehood dealt with President Trump's injury, and First Amendment concerns. *See* Dkt. No. 267 at 47–49. As described above, the Durham Report exposed the lies regarding President Trump's business dealings. Further, the Durham Report, as described below, is replete with examples of Defendants' malice against President Trump. Accordingly, given the new factual considerations of the Durham Report, this Court should vacate its order dismissing President Trump's claim for Injurious Falsehood.

---

[3] In Report 080, it is alleged that the Kremlin had "offered [Trump] various lucrative real estate development business deals in Russia," presumably through his businesses, which specializes in commercial real estate. In Report 095, there is discussion of Trump's alleged "business dealings in China and other emerging markets" which "were substantial and involved the payment of large bribes and kickbacks[.]" In Report 113, it is alleged that Trump "had paid bribes . . . to further his interests but very discreetly and only through affiliated companies, making it hard to prove."

*b.   Order Granting Defendant Dolan's Motion for Sanctions*

On November 10, 2022, this Court granted Defendant Dolan's Rule 11 motion for sanctions without an evidentiary hearing. In doing so, this Court accepted Defendant Dolan's narration of 'facts' as true, contrary to the allegations of Plaintiff's Amended Complaint. Specifically, this Court found three facts in Mr. Dolan's favor: (1) Defendant Dolan was not "intimately" involved with the Clinton Campaign and "there was no basis" for that belief, (2) Defendant Dolan was not the source of allegations against President Trump regarding salacious sexual activity in a Moscow Ritz Carlton hotel, and (3) Defendant Dolan did not engage with Mr. Danchenko to provide information for the Steele dossier. Dkt. No. 284 at 6–9. This Court found it conclusive that Defendant Dolan was not the source for the Ritz Carlton story because the government did not allege as such in Defendant Danchenko's trial. Dkt. No. 284 at 8–9.

As the Eleventh Circuit has held, however, "sanctions may not be imposed unless a particular allegation is utterly lacking in support." *United States v. Stinson*, 729 Fed. App'x 891, 900 n.7 (11th Cir. 2018). As the investigation underlying the Durham Report plainly shows, Plaintiff's claims were not lacking factual support, and the Durham Report, supported by an actual investigation, contradicts all three of this Court's factual findings.

First, while Defendant Dolan may not have been "intimately" involved with the Clinton Campaign, there was certainly a reasonable basis for thinking he was. Russian official Olga Galinka, who Defendant Dolan frequently met with, believed that Defendant Dolan played a significant role in the Clinton Campaign. When Defendant Dolan told Galinka that he was attending a reception for Hillary Clinton, Galinka asked him to deliver a message directly to Defendant Clinton. Durham Report at 148. Galinka further stated in emails that if Defendant Clinton were elected President, Defendant Dolan would take her to the State Department. *Id.* While Defendant Dolan originally stated that he did not discuss politics with Galinka, his story unraveled after Defendant Dolan was confronted with

emails and social media messages between him and Galinka. *Id.* at 149. Galinka even admitted to discussing the Steele reports with Defendant Dolan. *Id.*

Further, Defendant Dolan's role in the larger political world was not as *de minimus* as simply knocking on doors. Defendant Dolan "previously served as (i) Executive Director of the Democratic Governors Association, (ii) Virginia Chairman of former President Clinton's 1992 and 1996 presidential campaigns, and (iii) an advisor to Hillary Clinton's 2008 presidential campaign." *Id.* at 138–39. In its executive summary, the Durham Report describes Dolan as "a Virginia-based public relations professional who had previously held multiple positions and roles in the Democratic National Committee ("DNC") and the Democratic Party." *Id.* at 14. Thus, it was not a stretch to say that Defendant Dolan previously served in significant positions within the Democratic National Party apparatus.

Second, the Durham Report shows that not only was Defendant Dolan a definite source for information in the Steele Reports, but it also strongly indicates that Defendant Dolan may have been the source of salacious sexual activity rumors regarding President Trump. As the Durham Report notes, "the June 20, 2016 Steele Report reflected facts that Dolan learned during the June Planning trip to Moscow." *Id.* at 145. In June 2016, Defendant Dolan stayed at the Ritz Carlton, received a tour of the hotel, and met with senior staff, including the hotel's general manager. *Id.* Notably, on June 15, 2016, Defendant Dolan sent an email stating, "I'm in Russia making plans to be adopted in the event this mad man [Trump] gets elected." *Id.* at 144. Ultimately, the Steele dossier listed Sergei Millian and the hotel's general manager as the sources for this allegation, as well as a staffer that the hotel general manager indicated would confirm the allegations. *Id.* at 144–47. Originally, Defendant Danchenko claimed that *he* had met with both Millian and the hotel general manager and provided the allegations to Defendant Steele after those meetings. *Id.* at 146–47. The Durham Report, however, uncovered that Defendant Danchenko did not meet with Millian until July 2016, after the Steele Report included

these allegations, and Defendant Danchenko never met with the hotel's general manager. *Id.* at 147.

In fact, the only person that had met with the hotel's general manager was Defendant Dolan. *Id.*

Then, on June 17, 2016, after meeting with Defendant Dolan in Moscow, Defendant

Danchenko flew to London to meet with Defendant Steele. *Id.* at 144. And on June 20, 2016,

Defendant Steele published the false allegation of salacious sexual activity by President Trump. *Id.*

The Durham Report also described that during his interview with their office regarding these false

allegations of salacious sexual activity, Defendant Dolan was "inconsistent" and his "recollection

vacillated." *Id.* at 145.

To say that this was all just a coincidence—after Defendant Dolan made his intentions known

in email, was the only person to have met with the named sources in the June Steele Report and

displayed flustered behavior during questioning on this subject—is contrary to common sense. As the

Durham Report noted, "[i]n light of these facts, there appears to be a real likelihood that Dolan was

the actual source of much of the Ritz Carlton and Pavlov information contained in the Steele Reports."

*Id.* at 148.

Third, the Durham Report outlines Defendant Dolan's role in the crafting of the Steele

dossier. While it may be true that Defendant Dolan first became affiliated with Defendant Danchenko

to plan a conference in Moscow, his role in this conspiracy grew over time, and it was untruthful for

Defendant Dolan to claim that he had no role in the Steele dossier.

Defendant Steele specifically named Defendant Dolan as one of the sources of the dossier.

Durham Report at 137. While Defendant Dolan claims to have never met Defendant Steele,

"[c]uriously, Steele was in Cyprus at the same time Dolan was meeting with Galinka and others in

Cyprus." *Id.* at 148. Defendant Dolan further admitted that he provided information to Defendant

Danchenko that ultimately ended up in the Steele dossier regarding Paul Manafort's firing, *and that he*

*fabricated the information. Id.* at 138, 148, 152, 172. In addition, "[t]he Steele Report contained information

11

that Danchenko had gathered directly from Dolan." *Id.* at 150. Galinka told the FBI that "she provided Dolan with information that would eventually be in the Steele Reports." *Id.* at 172.

During all of this, Defendant Danchenko even emailed Defendant Dolan looking for "rumor[s]" because he was "working on a 'project against Trump'". *Id.* at 150. While Defendant Dolan has continued to maintain that he only provided (fabricated) information on Manafort's firing, the Durham Report acknowledged that allegations in the September 2016 Steele report "bore substantial similarities to information that Dolan received in May and August 2016." *Id.* at 154. In fact, on September 13, 2016, the day prior to the September Steele report, Defendant Dolan reached out to Defendant Danchenko, prompting Defendant Danchenko to travel that same day from Russia to London, where Defendant Steele was located. *Id.* Further, the information in the September Steele report came from a person that Defendant Danchenko did not even know but was in fact associated with Defendant Dolan. *Id.* As the Durham Report stated, based on Defendant Dolan's emails, he "appears to volunteer that he possesses inside information on the Steele Report allegations." *Id.* at 156.

Defendant Dolan had connections to key sources of the Steele dossier such as Dimitry Peskov, Alexey Paclov, Olga Galinka and her employer, and Defendant Danchenko, who was the "primary sub-source for the Steele Reports". *Id.* at 171–72. Defendant Dolan was in Moscow with Defendant Danchenko in October 2016, while Defendant Danchenko was actively gathering information for the Steele dossier. *Id.* at 157. Defendant Danchenko even left out material information regarding his meetings with Defendant Dolan during interviews with the FBI. *Id.* at 161. Thus, Defendant Dolan's inside knowledge, Defendant Danchenko's efforts to hide his meetings with Defendant Dolan, and Defendant Dolan's close connections with sources of the Steele dossier resulted in the Durham Report conclusion that the FBI erred when it failed to investigate or interview Defendant Dolan. *Id.* at 160. To say that a broader relationship between Defendant Dolan and Defendant Danchenko was

implausible because they were simply planning a business conference is incredible in light of the Durham Report. Indeed, Defendant Dolan and Defendant Danchenko continued to meet after the conference and met at times coincidentally close to the release of various Steele reports. *Id.* at 159.

Regarding the Amended Complaint's allegation about Defendant Dolan's job and location, while Defendant Dolan may not have held the official title of Chairman of the DNC, nor is he a resident of New York, these facts are immaterial to the Amended Complaint as a whole. As several courts have found, immaterial facts are an insufficient basis for Rule 11 sanctions. *See In re Gen. Elec. Sec. Litig.*, 2021 WL 2688695, at *7 (S.D.N.Y. Jun. 30, 2021) (holding that sanctions were not appropriate where the errors of fact played no material role in the outcome of the litigation); *Forrest Creek Assoc., Ltd. v. McLean Sav. & Loan Ass'n*, 831 F.2d 1238, 1245 (4th Cir. 1987) ("[Rule 11 sanctions] do [ ] not extend to isolated factual errors, committed in good faith, so long as the pleading as a whole remains 'well grounded in fact.'"); *In re South Coast Oil Corp.*, 566 Fed. App'x 594, 596 (9th Cir. 2014) (denying sanctions because the alleged mischaracterizations were either aggressive advocacy or immaterial to the merits of the case).

Here, the material facts pertaining to Defendant Dolan in the Amended Complaint were undoubtedly plausible as the Durham Report confirms. A reasonable inference can be drawn that Defendant Dolan knowingly fed information to Defendant Danchenko that Defendant Steele would ultimately use in an attempt to harm President Trump and his presidential campaign. Thus, Rule 11 sanctions for any alleged mischaracterizations are wholly inappropriate under this newly discovery evidence in the Durham Report. At the very least, the Durham Report, a newly released government investigation report, represents extraordinary circumstances justifying vacatur of this Court's prior order granting Defendant Dolan Rule 11 sanctions.

*c.   Second Order on Sanctions*

On January 19, 2023, this Court used its inherent authority to award sanctions to the remaining Defendants. This Court found that President Trump's Amended Complaint was frivolous "both factually and legally." Dkt. No. 302 at 6. As discussed in section 1(a) above, the findings of the Durham Report sufficiently support President Trump's legal and factual claims that the Amended Complaint should not even have been dismissed—it certainly was not sanctionable.

To begin, this Court called it "implausible" and "categorically absurd" that Defendant Comey would have conspired with Defendant Clinton to harm President Trump. Dkt. No. 302 at 10. The Durham Report, however, found that at least some high-level actors within the FBI, central to the Crossfire Hurricane investigation, had a "clear predisposition" against President Trump which was not shared in their investigation, or lack of investigation of Clinton. Durham Report at 47.

The FBI rapidly opened its investigation into President Trump's campaign, during the height of his campaign for president against Defendant Clinton, despite "not possess[ing] any intelligence showing that anyone associated with the Trump campaign was in contact with Russian intelligence officers at any point during the campaign." *Id.* at 59. In fact, the Report concluded that the FBI's investigation significantly relied on leads from President Trump's political opponents. *Id.* at 18.

Notably, it is clear, based on the Durham investigation and report, that Defendant Comey was *actually* aware of a Clinton campaign plan to smear President Trump by associating him with Vladimir Putin as early as August 3, 2016, three days after the FBI opened the Crossfire Hurricane investigation, and ignored it. *Id.* at 85. Based on the timeline of events, it is likely that Defendant Comey knew about this *prior* to opening Crossfire Hurricane, because (1) the CIA had received intelligence of the Clinton scheme in late-July, (2) that intelligence was provided to and reviewed personally by CIA Director Brennan, (3) on July 28, 2020, Brennan briefed President Obama on "intelligence relevant to the 2016 presidential election," and (4) the next morning, July 29, 2020, Brennan briefed Defendant Comey on

his meeting with the President. *Id.* at 84. While Brennan was non-committal in testimony as to whether he discussed the Clinton scheme at that meeting and with Defendant Comey on July 29, 2020, it is certainly plausible that he did. *Id.*

Indeed, while this Court called it "categorically absurd" that Defendant Comey would conspire with Defendant Clinton, given Defendant Comey's announcements before the 2016 election, the Durham Report found that there was disparate treatment in the way that the FBI handled allegations regarding candidates Trump and Clinton. Specifically, the Report found that the FBI acted considerably more favorably to Defendant Clinton's campaign than President Trump's campaign. *Id.* at 68–81. One example of this is that the FBI provided defensive briefings to the Clinton campaign, but not the Trump campaign. Durham Report at 298. Moreover, the CIA made the FBI aware, via a referral letter, of the Clinton campaign plan but the FBI declined to take action regarding this referral. *Id.* at 86–87.

Thus, it is not "implausible" or "absurd" that the Director of the FBI, Defendant Comey, conspired with Defendant Clinton, President Trump's political opponent. As exposed in the Durham Report, it was his FBI that entirely declined to investigate serious allegations about the Clinton campaign when even the CIA requested the investigation but chose to rapidly open an investigation into President Trump based on a single piece of raw, unvetted, and unverified intelligence.

Next, this Court noted that the Crossfire Hurricane investigation was opened "for an authorized purpose" and "with adequate factual predication" Dkt. No. 302 at 16. As the Durham Report clearly articulates and documents, however, the FBI opened its Crossfire Hurricane investigation without "any actual evidence of collusion." Durham Report at 8. As already discussed, at least some actors central to the Crossfire Hurricane investigation had a "clear predisposition" against President Trump. *Id.* at 47. Further, in his testimony to Congress, and in response to a question from Congressman Mike Johnson, Special Counsel Durham noted that it was "correct" that "the FBI

did not have an adequate basis on which to launch Crossfire Hurricane." John Durham Testifies on his Investigations of the FBI Part 1, C-SPAN at 01:03:07 (Jun. 21, 2023), https://www.c-span.org/video/?528789-1/special-counsel-john-durham-testifies-investigation-fbi-part-1. In fact, Special Counsel Durham stated, there was "not a legitimate basis to open [Crossfire Hurricane] as a full investigation." *Id.* at 00:42:45. Even if the investigation was opened for an authorized purpose, this does not mean that individuals intent on preventing their political opponent from becoming President could not utilize it to further their own malicious and illegal purposes.

Even FBI Director Christopher Wray acknowledged these failures in his testimony to Congress. Importantly, Director Wray noted that regarding Crossfire Hurricane, "there were failures, significant failures with respect to exculpatory information." FBI Director Testifies at Oversight Hearing Part 2, C-SPAN at 00:00:35 (Jul. 12, 2023), https://www.c-span.org/video/?529135-4/fbi-oversight-hearing-part-2. Director Wray further stated, regarding the FISA application, "certainly there were violations that were totally unacceptable and, in my view, cannot be allowed to happen again." *Id.*

In this sanctions order, the Court again referenced the allegations pertaining to Defendant Dolan. Dkt. No. 302 at 16. As noted above, however, Defendant Dolan likely played a significant role in the crafting of the Durham Report and was directly aware of Defendant Danchenko's "project."

Further, the Durham Report adds context to much of President Trump's allegations that came from the various criminal indictments. In addition to the information on Defendant Dolan, the Report discusses at length Defendant Sussman's use of President Trump's "non-public or proprietary internet data." Durham Report at 246; *see generally* Durham Report at 244–54.

Accordingly, much of the evidence from the investigation summarized in the Durham Report supports President Trump's prior claims. Given this new evidence, and the extraordinary circumstances that this Report presents, vacating this sanctions order is appropriate.

### 2. Fed. R. Civ. P. 62.1 Allows this Court to Remedy Defendants' Malfeasance.

"A party proffering newly discovered evidence may obtain an indicative ruling from a district court concerning relief from judgment pending appeal." *Franken v. Mukamal*, 449 Fed. App'x 776, 779 n.2 (11th Cir. 2011) (citing Fed. R. Civ. P. 62.1; Fed. R. App. P. 12.1). Rule 62.1 codified what the Eleventh Circuit followed for decades. In 2003, the Eleventh Circuit reversed the district court's ruling that it did not have jurisdiction to entertain a Rule 60(b) motion for reconsideration. *Mahone v. Ray*, 326 F.3d 1176, 1178 (11th Cir. 2003). In *Mahone*, the plaintiff filed a motion for reconsideration after filing their notice of appeal, alleging that the defendant engaged in fraud. *Id.* at 1179. While the district court found that it did not have jurisdiction over the plaintiff's motion, the Eleventh Circuit held that the district court may still entertain "motions on matters collateral to those at issue on appeal." *Id.* (citing *Doe v. Bush*, 261 F.3d 1037, 1064 (11th Cir. 2001)). Thus, district courts presented with a Rule 60(b) motion while the case is pending on appeal "should consider the motion and assess its merits." *Id.* at 1180.

Accordingly, the Federal Rules of Civil Procedure adopted Rule 62.1 to codify decisions such as the one in *Mahone*. *Munoz*, 451 Fed. Appx. at 819 n.1. "[T]he rule provides that a district court may "(1) defer considering the motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue." *Id.* (citing Fed. R. Civ. P. 62.1(a)). In the event a district court indicates that it would deny the motion, the movant can appeal that denial. *Id.* at 820. If the district court indicates that it "would grant the motion or that the motion raises substantial issues," then the appellate court is permitted to remand the case to the district court for further proceedings. *Id.* at 819 n.1.

Thus, Plaintiff and Plaintiff's counsel respectfully request that this Court indicate if it would grant their Rule 60(b) motion to vacate this Court's prior orders granting Defendants' motions to dismiss as to the two RICO claims and the injurious falsehood claim against Defendants Clinton,

Clinton Campaign, DNC, Perkins Coie, Sussmann, Sullivan, Podesta, Mook, Reines, Elias, Fusion GPS, Simpson, Fritsch, Nellie Ohr, Bruce Ohr, Steele, Danchenko, Neustar, Inc., and Neustar Security Services, and the two sanctions awards. If this Court states that it would grant the Rule 60(b) motion, Plaintiff and Plaintiff's counsel would promptly notify the Court of Appeals in the pending appeal of this Court's action. Fed. R. Civ. P. 62.1(b); Fed. R. App. P. 12.1(a). The Eleventh Circuit would then be able to remand the matter to this Court to vacate the judgments.

## CONCLUSION

The Durham Report is new evidence supporting many of President Trump's claims. Accordingly, Plaintiff and Plaintiff's counsel respectfully request the chance to be heard on the merits of this Court's consideration of the Durham Report and issuing an indicative ruling.

## REQUEST FOR HEARING

Given the extraordinary circumstances of this case, Plaintiffs request an oral hearing on this matter.

## CERTIFICATE OF CONFERRAL 7.1(A)(3)

The undersigned counsel conferred with all parties through their counsel in a good faith effort to resolve the issues raised in this motion but has been unable to do so.

Dated: July 27, 2023                    Respectfully submitted,

                                        /s/ Jared J. Roberts
                                        Jared J. Roberts (FL Bar #1036550)
                                        Jason C. Greaves (*pro hac vice* application
                                        forthcoming)
                                        BINNALL LAW GROUP, PLLC
                                        717 King Street, Suite 200
                                        Alexandria, VA 22314
                                        Tel: (703) 888-1943
                                        Fax: (703) 888-1930
                                        jared@binnall.com
                                        jason@binnall.com

*Counsel for President Donald J. Trump, Alina Habba, Michael T. Madaio, Habba, Madaio, & Associates, Peter Ticktin, Jamie Alan Sasson, and The Ticktin Law Group*

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2023, a copy of the foregoing was filed with the Clerk of the

Court using the Court's CM/ECF system, which will send a copy to all counsel of record.


Dated: July 27, 2023                         /s/ Jared J. Roberts
                                             Jared J. Roberts

                                             *Counsel for President Donald J. Trump, Alina*
                                             *Habba, Michael T. Madaio, Habba, Madaio, &*
                                             *Associates, Peter Ticktin, Jamie Alan Sasson, and*
                                             *The Ticktin Law Group*

335

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

DONALD J. TRUMP,

      Plaintiff,

v.

HILLARY R. CLINTON, et al.,

      Defendants.

Case No. 2:22-cv-14102-DMM

<u>**MOTION TO DISQUALIFY**</u>

BINNALL LAW GROUP, PLLC
Jared J. Roberts (FL Bar #1036550)
Jason C. Greaves (*pro hac vice* application forthcoming)
717 King Street, Suite 200
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jared@binnall.com
jason@binnall.com

*Counsel for President Donald J. Trump, Alina Habba, Michael T. Madaio, Habba, Madaio, & Associates, Peter Ticktin, Jamie Alan Sasson, and The Ticktin Law Group*

Judges are required to disqualify themselves whenever their "impartiality might be reasonably questioned." 28 U.S.C. § 455(a). Specifically, disqualification is required when the source of perceived impartiality arises from an extrajudicial source that reveals such antagonism against parties, their case, or their counsel as to make a fair judgment impossible. *Liteky v. U.S.,* 510 U.S. 540, 555-56 (1994). Importantly, the test is objective. "[W]hat matters is not the reality of bias or prejudice but its appearance." *Liteky*, 510 at 548.

Here, Plaintiff and his counsel seek disqualification because of the politically charged language in the Court's recent opinions and the extrajudicial factual research performed by the Court, at its own initiative, in coming to those decisions. Regardless of whether the Court is actually biased against a party or its counsel, such instances provide the appearance of bias. Disqualification is especially important when the case is in the public eye, as is this one. It is critical that the public can have confidence that justice is being dispensed impartially based solely upon the facts and the law, and not on any other extraneous factors.

In its recent decisions, the Court entered orders accepting Defendants' narration of the 'facts' as true, without taking evidence or even holding a hearing, while entirely discounting President Trump's allegations and punishing President Trump and his former counsel for exercising their First Amendment rights and pursuing viable legal remedies here and elsewhere. These orders even opined on the merits of ongoing cases in other jurisdictions and not before the Court. Accordingly, President Trump and his former counsel respectfully request that this Court disqualify itself from all future proceedings in this matter pursuant to 28 U.S.C. § 455, including President Trump's Rule 62.1 Motion.

## BACKGROUND

President Trump filed this lawsuit on March 24, 2022. This Court previously denied a motion to disqualify based on different grounds.

On September 8, 2022, this Court dismissed President Trump's Amended Complaint. The language and tone of the order was unfortunate. The Court called President Trump's Amended Complaint "hyperbole," a "settling of scores and grievances," and a mere "political manifesto." Dkt. No. 267 at 5, 64. The Court then went out of its way to reserve jurisdiction to impose sanctions, despite there being no sanctions motions docketed at the time. *Id.* at 65.

Next, on November 10, 2022, this Court granted Defendant Dolan's motion for sanctions under Federal Rule of Civil Procedure 11. The Court took Defendant Dolan's word that he was a simple door knocker during the 2016 election and that he had nothing to do with the Steele Dossier. *See generally* Dkt. No. 284. As borne out by the Durham Report, however, Defendant Dolan was intimately involved with the false smear campaign against President Trump. Not only was he a source for information in the discredited Steele Dossier (and appears to have also been the source for the most salacious of the Steele smears), he even admitted to fabricating information that was included in the Steele Dossier. The imposition of Rule 11 sanctions by the Court inappropriately accepted Defendant Dolan's allegations at face value over those of President Trump.

Concerningly, this Court viewed President Trump's claims as "political grievances masquerading as legal claims," and "performative litigation for purposes of fundraising and political statements." *Id.* at 14. The bias did not end there. The Court concluded that President Trump only added Schiff to the Amended Complaint because he takes "delight[] in insulting" him. *Id.* at 17. Further, for simply exercising her First Amendment rights after the disposition of the motion to dismiss, the Court called for Ms. Habba to face discipline from Bar and other disciplinary authorities. *Id.* at 18.

On January 19, 2023, this Court entered its most recent order in this case and used its inherent powers to sanction President Trump and his former counsel. In doing so, the Court made extraordinary comments about President Trump and his former counsel and included in its reasoning

information gathered by the Court outside the record and without notice to counsel. Once again, the Court penalized Ms. Habba for exercising her First Amendment rights after the case had been dismissed. *Id.* at 3. Notably, Ms. Habba's interview on Fox News was the only conduct the Court cited in this sanctions order that occurred *after* the first mention of sanctions in the dismissal order. Thus, the only supposed wrongdoing occurring after the first mention of sanctions was Ms. Habba utilizing the First Amendment. And again, failing to recognize the very real harm to President Trump, the Court determined the Amended Complaint was just to "advance a political narrative," and a "deliberate attempt to harass." *Id.* at 7, 10.

Tellingly, the Court called President Trump's claims about James Comey "categorically absurd." *Id.* at 10. This mistaken conclusion improperly discounts numerous allegations in the Amended Complaint that were supported by the public record and have been further corroborated by the findings of the Durham Report. *See* Report on Matters Related to Intelligence Activities and Investigations Arising Out of the 2016 Presidential Campaigns authored by Special Counsel John H. Durham ("Durham Report") at 68–81. As an initial matter, the Court goes outside the record on this point, claiming that Comey's "announcement on [Clinton's] 2016 campaign"[1] precludes any possibility that Comey could have conspired with Defendant Clinton to damage Trump.[2] That announcement,

---

[1] This is an obvious reference to Defendant Comey's statement regarding the closure of the FBI's investigation into Clinton. *See* Statement by FBI Director James B. Comey on the Investigation of Secretary Hillary Clinton's Use of a Personal E-Mail System (July 5, 2016), *available at* *https://www.fbi.gov/news/press-releases/statement-by-fbi-director-james-b-comey-on-the-investigation-of-secretary-hillary-clinton2019s-use-of-a-personal-e-mail-system*. In that statement, Director Comey recommends against prosecution of Clinton.

[2] The Court's reference to information and material outside the record is improper and creates the appearance of bias. *See United States v. Carey*, 929 F.3d 1092, 1106 (9th Cir. 2019) (citations omitted):

> We do, however, caution judicial officers against similar uses of extrajudicial material. The Magistrate judge in Carey's case served as a trier of fact, and we note that jurors who sit in that same capacity are directed to "not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it," and if they

and any impact from it, are entirely outside the record and not argued by any of the parties; the order improperly injected speculations about that statement into the facts of the case. Regardless, it is not "categorically absurd" to interpret James Comey's actions in closing the Clinton email investigation as calculated to do minimal damage to Clinton's presidential campaign, while preserving a façade of impartiality and providing cover to Attorney General Loretta Lynch on the heels of her tarmac meeting with Bill Clinton—regardless of the Court's feelings on the matter. Nor is it "categorically absurd" to believe that James Comey's opening of a baseless investigation of Trump based on "salacious and unverified" allegations of collusion with Russia, while ignoring intelligence of a Clinton plan to falsely link Donald Trump with Vladimir Putin,[3] was part of a scheme to do maximum damage to the Trump Campaign, and later his presidency.

The order *again* went outside the record and made conclusions about unrelated lawsuits in other states and courts in which President Trump is a plaintiff, to reach the conclusion that President Trump has a "pattern of misusing the courts to serve political purposes." Dkt. No. 302 at 21; *see also id.* at 24–25 (citing to social media posts and news articles about these cases that were outside the record, again creating the appearance of bias). The cases cited for this bold accusation, however, had

---

do, "turn away and report it . . . as soon as possible." The American Bar Association places similar restrictions on judges.

*See also* Am. Bar Assoc. 2020 Model Code of Judicial Conduct, R. 2.9(C):

A judge shall not investigate facts in a matter independently, and shall consider only the evidence presented and any facts that may properly be judicially noticed.

[3] On this point as well, the Court betrays its bias, snidely commenting that "Mr. Trump's lawyers saw no professional impediment or irony in relying upon Russian intelligence as the good faith basis for their allegation." Dkt. No. 302 at 8 n.6. This was in reference to Amended Compl. ¶ 369, and the allegation that Clinton and her campaign concocted the Russia collusion narrative to damage Trump and distract from their own scandals. While this is utterly borne out by the Durham Report, it was already well-known that the Steele Dossier was bought and paid for by the Clinton campaign. The Court's contempt for President Trump and his counsel is palpable here.

not even been fully adjudicated, and it is wholly improper for the Court to deduce President Trump's subjective intent from his participation in other litigation. For example, this Court, commenting on a defamation lawsuit against the Pulitzer Prize Board, accused President Trump of "us[ing] the courts to bully journalists as part of a dishonest and futile attempt to rewrite history" and that the lawsuit "is a shameless attack on a freedom essential to democracy." *Id.* at 24. Based upon these characterizations, this Court went on to sanction President Trump and his former counsel nearly one million dollars. In coming to its subjective determinations, not only did the Court decline to take evidence, it even declined Plaintiff's request for a hearing.

President Trump has since appealed all three decisions from this Court, which, due to the release of the Durham Report, is currently stayed in the Eleventh Circuit, pending the resolution of President Trump's Rule 62.1 Motion filed contemporaneously with this motion. Accordingly, President Trump now moves for this Court to disqualify itself from this matter, and for a new judge to decide President Trump's Rule 62.1 Motion and all future proceedings that may come before the Southern District of Florida in this case.

## ARGUMENT

The politically charged statements above and repeated citations to material outside the record create an appearance of bias and demonstrate that this is not a case over which this Court should preside. Pursuant to 28 U.S.C. § 455, "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Similarly, under the Code of Conduct for United States Judges, Canon 3(C)(1):

> A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which . . .  the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding. . . ."

Here, "the test for determining whether a judge's impartiality might reasonably be questioned is an objective one and requires asking whether a disinterested observer fully informed of the facts

would entertain a significant doubt as to the judge's impartiality." *Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Fla.*, 140 F.3d 898, 912 (11th Cir. 1998) (citing *Diversified Numismatics, Inc. v. City of Orlando*, 949 F.2d 382, 385 (11th Cir. 1991). The standard is "designed to promote the public's confidence in the impartiality and integrity of the judicial process." *In re Evergreen Sec., Ltd.*, 570 F.3d 1257, 1263 (11th Cir. 2009) (quoting *Davis v. Jones*, 506 F.3d 1325, 1332 n.12 (11th Cir. 2007)). Thus, "[a] federal judge *must* disqualify [himself] if [his] 'impartiality *might* reasonably be questioned.'" *Lomax v. Ruvin*, 476 Fed. App'x 175, 176 (11th Cir. 2012) (emphasis added).

The three orders at issue are indicative of "a partisan zeal." *Hamm v. Members of Bd. of Regents of State of Fla.*, 708 F.2d 647, 651 (11th Cir. 1983). The order's characterizations objectively appear to be partisan in origin and reasonably call into question the Court's impartiality to a disinterested observer. The Supreme Court has been clear: "… what matters is not the reality of bias or prejudice but its appearance." *Liteky,* 510 U.S. at 548 (interpreting 28 U.S.C. § 455). Thus, disqualification is appropriate.

President Trump's Amended Complaint clearly outlined the harm that Defendants' conduct caused him in an inherently complicated case. This Court, however, disregarded all of this, characterizing the lawsuit as "hyperbole," "settling of scores and grievances," a "political manifesto," a lawsuit being used to "advance a political narrative," and a "deliberate attempt to harass." Dkt. No. 267 at 5, 64; Dkt. No. 302 at 7, 10. Further, the Court seemingly took on the role of advocate for the Defendants, stating, "opposing [President Trump's] presidential campaign" does not amount to real loss, and going out of its way in the dismissal order to suggest that sanctions might be proper. *Id.* at 48, 65. Continuing to advocate, the Court implied that sanctions were not enough, and Ms. Habba should be penalized by the Bar. Dkt. No. 284 at 18.

In similar cases, wherein courts demonstrated clear bias and interposed themselves as advocates, recusal has been appropriate. *See United States v. S. Fla. Water Mgmt. Dist.*, 290 F. Supp. 2d

1356, 1360–61 (S.D. Fla. 2003) (holding that a judge's statements such as "I think [Governor] Bush is a good man and he means well, . . . But I'm afraid he fell into the hands of those who don't like the Everglades," and "[w]hen the governor signs this bill—and he will, I think, sign it—the South Florida Water Management District has got to be watched," creates "[a] reasonable interpretation . . . that Judge Hoeveler does not trust the South Florida Water Management District," therefore, disqualification was appropriate); *Crowe v. Di Manno*, 225 F.2d 652, 656–59 (1st Cir. 1955) (holding that because the trial judge repeatedly interrupted the questioning of witnesses in favor of the plaintiff and was being highly argumentative, recusal was necessary). Likewise, recusal is more than appropriate here, where the Court has made statements as to President Trump's character in commenting on this current lawsuit and other unrelated lawsuits, and became highly argumentative, calling President Trump's claims an attempt to "bully" and saying that his claims were "dishonest." Dkt. 302 at 24.

Importantly, Section 455 "requires judges to resolve any doubts they may have in favor of disqualification." *United States v. Kelly*, 888 F.2d 732, 744 (11th Cir. 1989). Thus, to the extent there is any doubt as to whether these statements demonstrate bias, this Court should still recuse itself.

Impartiality is vitally important in the administration of justice. Even the appearance of impartiality undermines the trust of litigants and of the public in our justice system. This is the reason that any doubt must be resolved in favor of recusal, and why justice cannot be done if this Court continues to preside over this matter.

## CONCLUSION

For these reasons, the Court should disqualify itself from further proceedings in this matter.

## CERTIFICATE OF CONFERRAL 7.1(a)(3)

The undersigned counsel conferred with all parties through their counsel in a good faith effort to resolve the issues raised in this motion but has been unable to do so.

Dated: August 14, 2023

Respectfully submitted,

/s/ Jared J. Roberts
Jared J. Roberts (FL Bar #1036550)
Jason C. Greaves (*pro hac vice* application
forthcoming)
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jared@binnall.com
jason@binnall.com

*Counsel for President Donald J. Trump, Alina Habba, Michael T. Madaio, Habba, Madaio, & Associates, Peter Ticktin, Jamie Alan Sasson, and The Ticktin Law Group*

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2023, a copy of the foregoing was filed with the Clerk of

the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.

Dated: August 14, 2023                          /s/ Jared J. Roberts
                                                Jared J. Roberts

                                                *Counsel for President Donald J. Trump, Alina
                                                Habba, Michael T. Madaio, Habba, Madaio, &
                                                Associates, Peter Ticktin, Jamie Alan Sasson, and
                                                The Ticktin Law Group*

342

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-14102-CV-MIDDLEBROOKS

DONALD J. TRUMP,

      Plaintiff,

v.

HILLARY R. CLINTON, et al.,

      Defendants.

_____/

### ORDER DISMISSING MOTION TO DISQUALIFY

On August 14, 2023, while an appeal was pending, and after the appeal was stayed for the purpose of seeking an indicative ruling for relief from judgment pursuant to Federal Rule of Civil Procedure 62.1, Movants filed a Motion to Disqualify. (DE 335). Given the limited remand by the Court of Appeals, I do not believe I have jurisdiction to consider the motion absent further authorization. Moreover, if the remand permits an indicative ruling, I would not grant the motion and do not believe it raises a substantial issue.

## I.    Background

On October 11, 2022, Plaintiff, Donald J. Trump appealed my order of September 8, 2022 (DE 267) granting the United States' Motions to Dismiss (DE 224, DE 256); Defendants Charles Halliday Dolan, Jr., Rodney Joffe and Orbis Business Intelligence, Ltd.'s Motions to Dismiss (DE 225, DE 227, DE 260), and the Defendants' Joint Motion to Dismiss under Rule 12(b)(6) (DE 226), and dismissing Plaintiffs' Amended Complaint (DE 177) in its entirety. Then on December 9, 2022, an appeal was noticed (DE 291) by Alina Habba, Michael T. Madaio, Peter Ticktin, Jamie A. Sasson, and the Ticktin Law Group from my Order entered November 10, 2022 granting

Charles Dolan's Motion for Sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure (DE 284).  Finally, on February 6, 2023, Alina Habba, Habba Madaio & Associates, and Donald J. Trump appealed my Order dated January 19, 2023 granting sanctions against them (DE 302). The appeals were consolidated on March 31, 2023. *See* U.S. Eleventh Circuit Court of Appeals Case no. Case No. 22-13410 ("USCA11") Document 77.

On June 9, 2023, the Appellants filed their initial brief. (USCA11 Document 83). On the same date, they filed a Motion for Judicial Notice or in the Alternative Motion for Stay in the Court of Appeals. (USCA11 Document 81).  The Appellants asked the Court of Appeals to take notice of a Report on Matters Related to Intelligence Activities and Investigations Arising Out of the 2016 Presidential Campaigns (The Durham Report) which was publicly released on May 12, 2023. (*Id.*) Alternatively, they asked the Court of Appeals to "stay all proceedings so that Appellants may promptly make a Rule 62.1 motion in the district court for an indicative ruling concerning relief from judgment pending appeal." (*Id.* at 11-12); (DE 331 at 12).  Notably, the appellants did not ask the Court of Appeals to transfer any such motion to another district judge.

On July 13, 2023, the Court of Appeals entered the following Order:

> Appellant's motion for judicial notice or to stay the appeal pending an indicative ruling from the district court is GRANTED to the extent that this Court STAYS this appeal pending Appellant seeking an indicative ruling below-within fourteen days of this Order.
>
> Appellant is DIRECTED to file status reports with this Court regarding the proceedings below on the 15th day of each month, beginning on August 15, 2023.

(USCA 11 Document 108).

On July 27, 2023, Plaintiff's and Plaintiff's Attorneys' Motion for Indicative Ruling Based on New Evidence was filed. (DE 331).  Responses in opposition to the motion were filed by several of the defendants on August 10, 2023. (DE 332, 333, and 334).

2

Then on August 14, 2023, this Motion to Disqualify was filed. (DE 335). Responses were filed on August 28, 2023, and a reply was filed on September 5, 2023. (DE 337, DE 338, DE 339).

On August 15, 2023, the Appellants filed their first Status Report pursuant to the Court of Appeals July 13, 2023 Order. (USCA 11 Document 112). While they reported the filing of the Motion for Indicative Ruling and the briefing schedule with respect to that motion, they did not report filing of the Motion to Disqualify. The Appellants have also failed to serve and file a motion to further stay the appeal within 14 days after filing the motion as required by the Eleventh Circuit Rule 12.1-1.

This is the second motion to disqualify filed by the Plaintiff/Appellants. On April 4, 2022, the Plaintiff filed a motion seeking my disqualification because I was appointed to the federal bench by former President Bill Clinton, the spouse of Defendant Hillary Clinton. (DE 21). I denied that motion, finding no legal support for his arguments. (DE 30). No appeal was taken from that Order.

II.     **Discussion**

A. **Jurisdiction**

Upon the filing of an appeal, the District Court is divested of jurisdiction over the matter. "The filing of a notice of appeal is an event of jurisdictional significance – it confers jurisdiction on the court of appeals and divest the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co.,* 459 U.S. 56, 58 (1982). Once an appeal is filed, district courts only "retain the authority to act in aid of the appeal, to correct clerical mistakes or to aid in the execution of a judgment that has not been superseded." *Showtime/The Movie Channel, Inc. v. Covered Bridge Condo. Ass'n, Inc.,* 895 F.2d 711, 713 (11th. Cir. 1990).

3

Plaintiff's Notice of Appeal on February 6, 2023, divested this court of its jurisdiction over the case. Eleventh Circuit Rule 12.1-1 permits district courts to have limited jurisdiction during an appeal only when a party files a motion in the Eleventh Circuit "to stay the appeal until the district court rules on the motion before it." 11th Cir. R. 12.1-1 (a). Parties who file motions in the district court must "within 14 days after filing the motion" follow these procedures for the district court to have jurisdiction. *Id.* Plaintiff properly followed these procedures with a motion in the Eleventh Circuit for a stay to file an indicative ruling on the potential impact of the Durham Report. (USCA11 Document 81). He did not, however, file a motion to stay the appeal for a motion to disqualify. Further, fourteen days have passed since he filed the motion to disqualify, and he has not filed a motion in the Eleventh Circuit to stay the appeal to allow me to rule on it. As a result of Plaintiff's partial adherence with these rules, the Eleventh Circuit only stayed the appeal "pending Appellant seeking an indicative ruling below." (USCA11 Document 108).

Plaintiff admits in his own briefing that the "Eleventh Circuit issued an order staying the consolidated appeal so that Plaintiff and Plaintiff's counsel may seek an indicative ruling from this Court," and that this Court now "regain[s] jurisdiction over this case to consider the Durham Report in connection with President Trump's Amended Complaint." (DE 331 at 7). Plaintiff made no such procedural showing in his Motion to Disqualify. (DE 335).

Without a full remand from the Eleventh Circuit, I perceive my jurisdiction to be limited in scope. *IOU Cent., Inc. v. Premier Metals Recovery LLC*, 594 F. Supp. 3d 1350, 1352 (D.E. Ga. 2022), appeal dismissed (11th. Cir., 2022) (finding that without a proper move to stay its appeal in accordance with Rule 12.1-1(c) the district court should have denied Plaintiff's motion for reconsideration for lack of jurisdiction). Based on the limited scope of the Eleventh Circuit Order, and Plaintiff's failure to follow the procedural rules of 12.1-1, I lack jurisdiction to hear this issue.

4

**B. Merits**

If the remand allows for an indicative ruling on the Motion to Disqualify, I would deny it.

The leading case is *Liteky v. United States*, 510 U.S. 540 (1994). There Justice Scalia wrote:

> First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. In and of themselves (*i.e.*, apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal. Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep sorted favoritism or antagonism that would make fair judgment impossible.

*Liteky*, 510 U.S. at 555 (citations omitted).

Quoting Judge Jerome Frank, he stated "[i]mpartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions." *Id.* at 551, citing *In re J.P. Linehan, Inc.*, 138 F.2d 650, 654 (2nd Cir. 1943). Of particular resonance here, he also said: "[a]lso not subject to deprecatory characterization as 'bias' or 'prejudice' are opinions held by judges as a result of what they learned in earlier proceedings. It has long been regarded as normal and proper for a judge to sit in the same case upon its remand." *Liteky,* 510 U.S. at 551.[1]

---

[1] None of the Eleventh Circuit decisions cited by movants support disqualification. *See Bivens Gardens Office Bldg. v. Barnetts Barks, Inc.,* 140 F.3d 898 (11th Cir. 1998) (judicial rulings and negative comments about Miami lawyers "fails to even approach" level to demonstrate pervasive bias and prejudice); *Hamm v. Members of Bd. Of Regents*, 708 F.2d 647 (11th Cir. 1983) (neither a trial judge's comments on lack of evidence, rulings adverse to a party, nor friction between the court and counsel constitute pervasive bias); *In re Evergreen Sec. Ltd.,* 570 F.3d 1257 (11th Cir. 2009) (affirming sanctions imposed by bankruptcy judge under inherent authority for drafting, filing and litigating a recusal motion and finding no basis for recusal). The only Eleventh Circuit

Movants complain that I "went above and beyond" the defendants' arguments and conducted "extrajudicial research."[2] This seems to be a pejorative misnomer. In my two orders on sanctions, I conducted limited independent judicial research, in every instance in response to arguments made by the Parties. I looked at judicial decisions, legal filings, and statements not subject to dispute and directly made by Mr. Trump and his lawyers. In each instance I cited the source for the information.

From their very first filing, the Defendants contended that the case was frivolous and brought for an improper purpose: "[w]hatever the utility of Plaintiff's Complaint as a fundraising

---

case which found recusal required and which movants argued excused their untimely filing was where the trial judge learned during trial of a witness whose wife was a close personal friend of the judge's wife, spoke to the witness' wife about it in chambers, and then argued with his own wife about the situation. *United States v. Kelly*, 888 F.2d 732 (11th Cir. 1989). That case has no relevance here, either on disqualification or timeliness.

[2] As legal authority for disqualification under this theory, movants cite a Ninth Circuit case, *United States v. Carey*, 929 F.3d 1092 (9th. Cir. 2019). The facts there are starkly different. A magistrate judge heard the evidence at a bench trial, took the matter under advisement, and then cited a newspaper article discussing the case and the defendant in his decision. The Ninth Circuit held that it was not an abuse of discretion to deny recusal.

In deciding sanctions under Rule 11 and under a court's inherent powers other litigation and conduct outside the courtroom is directly relevant. The Eleventh Circuit has held that a court has the inherent power to investigate the scope and extent of conduct that threatens the integrity of the administration of justice. *Johnson v. 27th Ave Caraf. Inc.,* 9 F.4th 1300, 1313 (11th Cir. 2021) (affirming sanctions upon a "serial ADA case filer having filed in the Southern District of Florida alone 26 gas pump complaints and 131 ADA complaints in a five-year period.) *See also, O'Neal v. Allstate Indem. Ins. Co.,* 2021 U.S. App. LEXIS 3125, 2021 WL 4852222 *5 (unpublished) ("[T]he district court here did the heavy lifting and documented Plaintiff's abusive tactics across numerous forums over many years."). The Eleventh Circuit itself has examined other litigation in affirming sanctions. *Martin-Trigona v. Shaw*, 986 F.2d 1384, 1386 (11th. Cir. 1993) (affirming sanctions where appellant and his son filed more than two dozens appeals in the previous ten years and stating that "[t]he clerk also reports that a search of some but not all of the files" of the Southern District of Florida revealed appellants had filed or attempted to file "at least thirteen lawsuits in that district court alone."). In determining a pattern of conduct examination of other litigation is both appropriate and necessary.

tool, a press release, or a list of political grievances, it has no merit as a lawsuit and should be dismissed with prejudice." (DE 52 at 7). Pointing to his litigation against Letitia James, the Attorney General of New York, Twitter, CNN and the New York Times, the Defendants described Mr. Trump as a serial litigant who brought cases against his perceived foes for political and fundraising purposes.  In their filings, the Plaintiff referenced the DOJ Inspector General Report on the Crossfire Hurricane Investigation, The Mueller Report, the indictments of Mr. Danchenko and Mr. Sussman, a letter from John Ratcliff to Senator Lindsey Graham, and the Justice Department announcement of the appointment of the Special Counsel.  I read all of the filings and each of the documents. I have now also had the opportunity to read the Durham Report.

The Letitia James case was filed in state court in Palm Beach County, removed to federal court, and assigned to me.  In large part the complaint was copied verbatim from that filed and dismissed in federal court in New York.  On the day after it was filed Mr. Trump posted a statement on Truth Social attacking the New York state court judge before whom the civil action being brought by A.G. James was pending.  Mr. Trump said it was vital for courts in both New York and Florida "to do the right thing and stop this inquisition."[3] I denied the Emergency Motion for Temporary Injunction because none of the prerequisites for an injunction were met, and the attempt to sidestep rulings by the New York courts by suing A.G. James personally was plainly frivolous. I also said that the litigation had all the telltale signs of being both vexatious and frivolous.

The CNN and Twitter litigations were filed in the Southern District of Florida and assigned to other judges.  In my order, I quoted the fundraising appeals made by Mr. Trump which accompanied the filings.  The Twitter complaint was also relevant to the sanctions order because

---

[3]  @realDonaldTrump, Truth Social (Nov. 2, 2022, 5:51 PM),
https://truthsocial.com/@realDonaldTrump/posts/109282083674316908.

there Mr. Trump blamed his suspension from Twitter on Democratic Members of Congress, Vice President Harris and Michelle Obama; in the Amended Complaint before me he said Ms. Clinton was responsible.

I also directly quoted the demand letters sent by Mr. Trump's lawyers, his statement announcing his intention to sue, and the complaint filed in state court in Okeechobee, Florida, against the individual members of the Pulitzer Prize Board.

Based upon the arguments of counsel, and the work I did, I came to firm conclusions and expressed them carefully in each of the three orders.  Different legal standards were applicable to the motions to dismiss and the motions for sanctions.  I did not comment on the merits of any undecided case and where cases had been decided, in whole or in part, I directly quoted from the respective orders.

The case before me was frivolous, its purpose was improper and part of a pattern of behavior harmful to the Rule of Law.  Article III judges have an obligation to protect the administration of justice from abuse.

## Conclusion

For the reasons stated above, the Motion to Disqualify (DE 335) is dismissed for lack of jurisdiction.  If the remand allows for an indicative ruling, I would deny the motion.

**SIGNED** in Chambers at West Palm Beach, Florida this 15th day of September, 2023.

Donald M. Middlebrooks
United States District Judge

cc:     Counsel of Record

343

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 22-14102-CV-MIDDLEBROOKS

DONALD J. TRUMP,

     Plaintiff,

v.

HILLARY R. CLINTON, et al.,

     Defendants.

_____/

## <u>ORDER ON MOTION FOR INDICATIVE RULING</u>

On May 12, 2023, Special Counsel John H. Durham submitted his *Report on Matters Related to Intelligence Activities and Investigations Arising Out of the 2016 Presidential Campaigns* ("Durham Report"). Plaintiff and his lawyers tout the Report as "newly discovered evidence" and they now ask me to reconsider my previous rulings. But far from "seismically alter[ing] the legal landscape of this case" (DE 331 at 6), the Durham Report changes nothing. Nor could it really. Even if the Durham Report uncovered the sort of vast conspiracy alleged by Plaintiff (it plainly did not), it would not change the many *legal* conclusions I made in the Order dismissing Plaintiff's lawsuit. And whatever the Durham Report can be said to have uncovered, for purposes of this case, it does not change my findings that Movants acted in bad faith in bringing this lawsuit and that this case exemplifies Mr. Trump's history of abusing the judicial process. Therefore, for the reasons set forth below, Plaintiff and his lawyers' Motion for Indicative Ruling Based Upon New Evidence is denied.[1]

---

[1] The Motion for Indicative Ruling was filed on July 27, 2023 by Plaintiff Donald J. Trump and his lawyers, Alina Habba; Michael T. Madaio; Habba, Madaio, & Associates; Peter Ticktin; Jamie Alan Sasson; and The Ticktin Law Group. (DE 331). The Motion is fully briefed. (DE 332; DE 333; DE 334; DE 336).

## I.      BACKGROUND

On September 8, 2022, in a 65-page Order, I dismissed Plaintiff's Amended Complaint with prejudice as to all non-Federal Defendants and without prejudice as to the United States.  (DE 267) ("MTD Order").[2]  Given the frivolous nature of the case, I reserved jurisdiction to adjudicate issues pertaining to sanctions.  On November 10, 2022, I granted Defendant Dolan's Motion for Rule 11 sanctions.  (DE 284) ("First Sanctions Order").  In the First Sanctions Order, I imposed an over $66,000 sanction on Plaintiff's lawyers, Alina Habba; Michael T. Madaio; Habba Madaio & Associates; Peter Ticktin; Jamie Alan Sasson; and The Ticktin Law Group.  On January 19, 2023, I granted eighteen other Defendants' Joint Motion for Sanctions under this Court's inherent powers.  (DE 302) ("Second Sanctions Order").  In the Second Sanctions Order, I imposed a nearly $938,000 sanction on Plaintiff Donald J. Trump and Plaintiff's lead attorney, Alina Habba and Habba Madaio & Associates.  Between late 2022 and February 2023, Plaintiff and his sanctioned lawyers ("Movants") appealed all three Orders to the Eleventh Circuit.

Pursuant to 28 C.F.R. § 600.8(c),  Special Counsel Durham submitted his Report to United States Attorney General Merrick Garland on May 12, 2023.  Durham Report at 1.  § 600.8(c) provides that "[a]t the conclusion of the Special Counsel's work, he or she shall provide the Attorney General with a confidential report explaining the prosecution or declination decisions reached by the Special Counsel."  28 C.F.R. § 600.8(c).  On May 15, 2023, Attorney General Garland made public an unclassified portion of the Report when he transmitted it to Congress.  Ltr. from AG Garland to Senate and House Judiciary Committees (May 15, 2023), https://www.justice.gov/sco-durham.

---

[2] See the MTD Order at 1-3 for a summary of Plaintiff's allegations.

United States Attorney General Barr appointed Mr. Durham as special counsel in February

2020 and in October 2020 expanded his mandate to:

> [I]nvestigate whether any . . . person or entity violated the law in connection with the intelligence, counter-intelligence, or law-enforcement activities directed at the 2016 presidential campaigns, individuals associated with those campaigns, and individuals associated with the administration of President Donald J. Trump, including but not limited to Crossfire Hurricane and the investigation of Special Counsel Robert S. Mueller, III.

Durham Report at 1-2 (citing Office ofthe Att'y Gen., Order No. 4878-2020, Appointment of

Special Counsel to Investigate Matters Related to Intelligence Activities and Investigations Arising

Out of the 2016 Presidential Campaigns ¶ (f) (Oct. 19, 2020)).  Special Counsel Durham did not

"interpret[] the Order as directing [the Special Counsel's Office] to consider the handling of the

investigation into President Trump opened by the FBI on May 16, 2017."  *Id*. at 2 n7.  Instead, he

focused on the FBI's opening and handling of the Crossfire Hurricane Investigation.  *Id*. at 7-8.

Movants requested that the Eleventh Circuit take judicial notice of the Durham Report or,

in the alternative, stay the appeal pending an indicative ruling from this Court.  The Eleventh

Circuit granted the latter.

Movants now seek an indicative ruling from this Court that—given the Durham Report—

it would "grant the Rule 60(b) motion if the Eleventh Circuit remands jurisdiction of this case."

(DE 331 at 7).  Specifically, that "this Court [would] vacate its prior order to dismiss pertaining to

the two RICO claims and claim for injurious falsehood against [the non-federal] Defendants . . .

and the two sanctions orders."  (*Id.* at 8).

## II.    LEGAL STANDARD

"A party proffering newly discovered evidence may obtain an indicative ruling from a

district court concerning relief from judgment pending appeal."  *Franken v. Mukamal*, 449 F.

App'x 776, 779 n.2 (11th Cir. 2011).  In such cases, Rule 62.1 explains that a district court may

"(1) defer considering the motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue." Fed. R. Civ. P. 62.1(a)(1)-(3).

      As is relevant here, Rule 60(b) provides that:

> On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); [or]
>
>        \*\*\*
>
> (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b)(2), (6).  The Eleventh Circuit has in turn established a five-part test for parties seeking relief under Rule 60(b)(2):

> (1) the evidence must be newly discovered since the trial; (2) due diligence on the part of the movant to discover the new evidence must be shown; (3) the evidence must not be merely cumulative or impeaching; (4) the evidence must be material; **and** (5) the evidence must be such that a new trial would probably produce a new result.

*Waddell v. Hendry Cnty. Sheriff's Off.*, 329 F.3d 1300, 1309 (11th Cir. 2003) (emphasis added).

      Moreover,  "'[n]ewly discovered evidence' under Rule 60(b) refers to evidence of facts in existence *at the time of the trial* of which the aggrieved party was excusably ignorant."  *N.L.R.B. v. Jacob E. Decker & Sons*, 569 F.2d 357, 364 (5th Cir. 1978) (emphasis added) (citation omitted)[3]; *see also Smith v. Fla. Agric. & Mech. Univ. Bd. of Trustees*, 687 F. App'x 888 (11th Cir. 2017) (citing same).  Crucially, "'[a] motion for a new trial under Rule 60(b)(2) is an extraordinary motion and the requirements of the rule must be strictly met.'  Finality is a virtue in the law."

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

*Waddell,* 329 F.3d at 1309 (citation omitted).

Rule 60(b)(6), the catchall provision, "is available only when Rules 60(b)(1) through (b)(5) are inapplicable." *Kemp v. United States*, 142 S. Ct. 1856, 1861 (2022).  In other words, "clause (6) and clauses (1) through (5) are mutually exclusive." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863 n.11 (1988).  Accordingly, "'extraordinary circumstances' are required to bring the motion within the 'other reason' language" of Rule 60(b)(6).  *Id.* (citation omitted).

## III.    DISCUSSION

The Durham Report is *not* "newly discovered evidence" because a party cannot discover something that did not exist at the time of the trial, or here, the final Orders.  Movants also do not point to a single fact in the Report that, even with due diligence, they failed to discover.  To the extent that Plaintiff can pluck out arguably favorable-sounding facts from the Report that may have some conceivable tie into his conclusory allegations, that doesn't affect the many *legal* conclusions set forth in the MTD Order.  I highlight some here:

1. "Plaintiff's Amended Complaint is a quintessential shotgun pleading, and '[c]ourts in the Eleventh Circuit have little tolerance for shotgun pleadings.' (*Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018)."  (MTD Order at 7).

2. "Because the United States is the proper party to this action, Plaintiff was required to exhaust his administrative remedies before bringing his claim in this Court under the FTCA."  (*Id.* at 14).

3. "Plaintiff has not alleged that Defendants 'aimed' any conduct at Florida or could reasonably have anticipated that Plaintiff would be harmed in Florida, particularly in light of the fact that Plaintiff was a resident of New York at the time of the occurrences giving rise to Plaintiff's claims. Knowledge that Florida is a state in the United States does not equate to knowledge that Defendants' actions will have consequences in Florida."  (*Id.* at 20).

4. "[Plaintiff's] allegations compel only one logical conclusion: that Plaintiff was aware of the factual basis underlying his RICO claims since at least October 2017, if not earlier," thus placing his RICO claims outside of the 4-year statute of limitations.  (*Id.* at 26).

5. "[T]he Government has not instituted any proceedings to punish a RICO violation, nor any RICO predicate act relating to the circumstances giving rise to this litigation.  Without any government proceeding initiated to prevent, restrain, or

punish a RICO violation or RICO predicate act, there can be no statutory tolling under [Plaintiff's Clayton Act] theory." (*Id.* at 28).

6. "Plaintiff misunderstands the law . . . . Plaintiff's concession that he was damaged beginning in September 2017 means that the clock began ticking despite that Plaintiff did not yet appreciate the 'true extent' of his injuries." (*Id.* at 29-30).

7. "Obstruction of justice does not supply Plaintiff with a valid predicate act because Plaintiff does not identify any 'official proceedings' that Defendants allegedly obstructed." (*Id.* at 31).

8. "Even accepting Plaintiff's allegations as true, perjury and falsifying documents are not RICO predicate acts." (*Id.* at 33).

9. "Even if DNS data is a trade secret, Plaintiff has not plausibly alleged that he has a protectable interest in it. DNS data is public . . . . " (*Id.* at 36).

10. "Nor does "misreporting" payments to Fusion GPS in campaign finance reports qualify as wire fraud. Violations of federal campaign finance laws are not RICO predicate offenses. *See Ayres v. Gen. Motors Corp.*, 243 F.3d 514, 522 (11th Cir. 2000) . . . . " (*Id.*).

11. "These investigations, therefore, do not amount to a 'judicial proceeding' because none is a civil or criminal lawsuit, and '[a]n action for malicious prosecution . . . [can] never occur outside the context of *litigation*.' *Fischer v. Debrincat*, 169 So.3d 1204, 1209 (Fla. 4th DCA 2015) (emphasis added)." (*Id.* at 51).

12. "That Plaintiff did not know the name of the 'computer scientist' or 'computer expert' who allegedly obtained the DNS data does not excuse his failure to investigate and identify the offender during the limitations period. *See id.* The CFAA claim is thus time barred." (*Id.* at 54).

13. "So too is Plaintiff's claim under the Stored Communications Act ('SCA') time barred." (*Id.* at 57).

14. In dismissing Count X, I explained that "[t]here is no free-standing independent cause of action in Florida for agency. *See, e.g., Barabe v. Apax Partners Eur. Managers, Ltd.*, 359 F. App'x 82, 84 (11th Cir. 2009)." (*Id.* at 62). I further explained that "Count X reflects the high-water mark of shotgun pleading and is accordingly dismissed." (*Id.*).

15. "Counts XI through XVI purport to state claims . . . for Respondeat Superior/Vicarious Liability. But under Florida law, respondeat superior, like agency, is a doctrine of liability, not itself a cause of action. *See Turner Murphy Co. v. Specialty Constructors, Inc.*, 659 So.2d 1243, 1244 (Fla. 1st DCA 1995)." (*Id.*).

I struggle to even imagine anything that the Durham Report *could* say to warrant a change in any of those conclusions—the sum of which foreclosed Plaintiff's claims and led to sanctions. And after reading all 306 single-spaced pages of the Durham Report, I am not convinced that anything it *does* say merits the extraordinary relief of granting a Rule 60(b) motion.

## A. PRELIMINARY ISSUES

Three issues merit a preliminary discussion.  First, the role of judicial notice.  Defendants, largely in response to Movants' framing of their Motion, argued that the Court must, as a threshold matter, take judicial notice of the Durham Report.  I don't think that's right.  As far as I can tell, none of the cases cited by the Parties hold as much.  This confusion seems to have arisen from the procedural posture of the appeal, where judicial notice might be the only vehicle for the Eleventh Circuit to consider the Durham Report in the first instance.

Here, we have Rule 60(b)(2).  And given that Plaintiff is seeking to turn back the clock at the motion to dismiss stage, imposing the constrained judicial notice lens makes little sense. Otherwise, nearly every Rule 60(b)(2) Motion would be accompanied by a request for judicial notice and that is simply not the case.  In my view, Movants went about this Motion in the wrong way.  Notwithstanding, for purposes of efficiency, and because it appears that the Eleventh Circuit prefers to have this Court opine on the impact of the Durham Report, I reach the Rule 60(b) motion regardless of judicial notice.

That being said, I note that no amended complaint has been proposed, bringing me to the second issue.  While seemingly not required and certainly not dispositive, Movants' failure to file a proposed amended complaint makes it increasingly difficult to assess the impact of the Durham Report.  The Durham Report, and its 306 single-spaced pages, is not a substitute for a "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2); *see also Goldstein v. MCI WorldCom*, 340 F.3d 238, 258 (5th Cir. 2003) ("As they did in crafting

their complaint, the plaintiffs [in their Rule 60(b)(2) motion] simply inundated the district court with an avalanche of material in the hopes that the court would, on its own, connect the dots between any bad act found in the material and allegations related to the single claim against [the defendants] in this case. This is not the court's burden.").

This problem is compounded by the fact that the Motion is one big smokescreen. Take the following excerpt:

> Specifically, the Durham Report exposes Defendants' conduct in working together to formulate a false story of alleged Trump/Russia collusion. Defendant Clinton, and those working closely with her, "*were seeking in 2016 to promote a false or exaggerated narrative to the public and to U.S. government agencies about Trump's possible ties to Russia*." [Durham Report] at 82.

(DE 331 at 11-12) (emphasis added). One would think that page 82 of the Durham Report contains newly discovered evidence to that effect. Not so. The full sentence from which Movants quote reads:   "*First,* the Clinton Plan intelligence itself and on its face arguably suggested that private actors affiliated with the Clinton campaign *were seeking in 2016 to promote a false or exaggerated narrative to the public and to U.S. government agencies about Trump's possible ties to Russia*." Durham Report at 82 (emphasis added).

The "Clinton Plan intelligence" refers to Russian intelligence obtained by the United States that concluded that Ms. Clinton, in 2016, approved a plan to "vilify Donald Trump by stirring up a scandal claiming interference by the Russian security services." *Id*. at 81 (citing Letter from John Ratcliffe, DNI, to Sen. Lindsay Graham (Sept. 29, 2020)). I previously faulted Plaintiff's lawyers for relying on the contents of the Ratcliffe Letter in the Amended Complaint without noting that it was based on Russian intelligence and that the Letter warns:  "The [intelligence community] does not know the accuracy of this allegation or the extent to which the Russian intelligence analysis may reflect exaggeration or fabrication."  (Second Sanctions Order at 8 n.6).

The Durham Report then goes on to explain that the *unclassified* portion of the Report—the only portion available to the Parties and this Court—discusses how U.S. officials received and acted on the "Clinton Plan intelligence." Durham Report at 83. While the *classified* portion contains "the [Special Counsel] Office's efforts to verify or refute the key claims found in this intelligence." *Id*. Thus, the Durham Report as is available and presented by Movants, does not actually contain any newly discovered evidence on this point. And so goes all of Movants' contentions as to the significance of the Report on this Court's prior Orders.

Third, and in a similar vein, Movants' fail to clearly identify "newly discovered evidence" that existed "at the time of the trial." *See Jacob E. Decker & Sons*, 569 F.2d at 364. While the underlying facts contained in the Report existed at the time of this Courts' prior orders, Special Counsel Durham's conclusions and inferences based on those facts did not. Simply put, the Durham Report itself is not "newly discovered evidence" within the meaning of Rule 60(b)(2). And the Movants do not delineate any "newly discovered" fact with that Report.

I also reject Movants' argument that "[w]hile much of the information contained within the Durham Report may have been reported in the press or asserted in legal proceedings prior to the Durham Report's release, the existence of this *same information* in a report of an official government investigation is fundamentally different and new." (DE 336 at 9) (emphasis added). That is exactly the opposite of "newly discovered evidence."

With all of that in mind, I will now address Movants' arguments as to each of the three Orders that they seek vacated.

**B. ORDER ON MOTIONS TO DISMISS**

Plaintiff seeks to revive four of the counts I dismissed: RICO (Count I), RICO Conspiracy (Count II), Injurious Falsehood (Count III), and Conspiracy to Commit Injurious Falsehood (Count IV) as to the non-federal Defendants. In the MTD Order, I dismissed all four with prejudice

because they were time barred by the statute of limitations and none stated a claim on the merits. I will now briefly outline the reasons for dismissal and, where appropriate, interject Plaintiff's arguments for why the Durham Report's "newly discovered evidence" should matter.

Starting with RICO, I held that Plaintiff's claims were time barred because the statute of limitations had run on October 2021, four years from when the injury was or should have been discovered. Plaintiff filed suit on March 24, 2022. I explained that Plaintiff's tweets and the Amended Complaint demonstrated that he was aware of the basis of his claims since at least 2017. (MTD Order at 25-26). Plaintiff never really disputed that (and doesn't now), banking instead on tolling the statute of limitations because (1) he was President, (2) a theory under the Clayton Act, (3) fraudulent concealment, or (4) the discovery rule. (*Id.* at 26). I rejected all four.

As to the first—and the *only* RICO, tolling ruling that Plaintiff seeks overturned—I held that given the several private lawsuits Plaintiff initiated during his Presidency, it "belies any claim that the equities require his novel theory of tolling . . . . " (*Id.* at 27). I also explained that *Clinton v Jones*, 520 U.S. 68 (1997), a case relied on by Plaintiff, arrived at the opposite conclusion than that which Plaintiff urged. (*Id.*).

Aside from a rehash of the same legal arguments under decades-old Supreme Court cases, Plaintiff argues that "the Durham Report now confirms, the FBI opened an investigation into President Trump without 'any actual evidence.'" (*See* DE 331 at 9-10) (citing Durham Report at 8).[4] Plaintiff then concludes that he "was obligated to let these initial investigations unfold in their

---

[4] The full sentence from which Movants quote reads:

> Indeed, based on the evidence gathered in the multiple exhaustive and costly federal investigations of these matters, including the instant investigation, *neither U.S. law enforcement nor the Intelligence Community appears to have possessed any actual evidence of collusion* in their holdings at the commencement of the Crossfire Hurricane investigation.

entirety before he could bring this suit" to avoid undermining his "belief in law and order and [sending] the wrong message to the Country."[5]  (*Id.* at 11).  I fail to see what one has to the with the other.   In any event, the purported invalidity of the investigation does not change my determination that Plaintiff could have filed suit while President.   Moreover, Special Counsel's Durham conclusion and Plaintiff's rationale does not constitute "newly discovered evidence." Seeing as Plaintiff's Rule 60(b)(2) motion as to his RICO claims fails to even get off the starting blocks, I end the inquiry here.

The story as to injurious falsehood is virtually the same.   The vast majority of the statements at issue were well outside the the the statute of limitations, March 24, 2020.  (MTD Order at 45).  Plaintiff adopts the same Rule 60(b)(2) argument rejected above to renew his equitable tolling theory.  (DE 331 at 13).  I reject it here too.  As to a handful of statements that fell within the statute of limitations, I held that Plaintiff did not state a claim for injurious falsehood because (1) attacks on his fitness for political office do not constitute trade libel; (2) even if it did, he failed to plausibly allege any damage considering he won the 2016 presidential election; (3) he did not allege that any statements were made for the purpose of interfering with his property or economic interests; (4) he did not allege that any falsehood impacted third parties' desire to deal with him or resulted in pecuniary loss, or special damages; and (5) many of the statements are protected by the First Amendment.  (MTD Order at 47-49).

---

Durham Report at 8 (emphasis added).  The Durham Report also states that "there is no question that the FBI had an affirmative obligation to closely examine" information provided by the Australian government concerning statements made by a Trump Campaign policy advisor suggesting Russia's assistance to the campaign. Durham Report at 54. Durham, however, faults the FBI for opening a full, rather than preliminary, investigation.

[5] Ironically, one lawsuit that I cited in the MTD Order (*Trump v. Vance*, 140 S. Ct. 2412, 2420 (2020)) as an example of Plaintiff's ability to file lawsuits in his personal capacity while President, involved his attempt to quash a criminal subpoena issued by the Manhattan District Attorney's Office.

In an attempt to overturn my rulings on the third and fifth points, Plaintiff argues that the Durham Report "exposed the lies regarding President Trump's business dealings" and that it is "replete with examples of Defendants' malice." (DE 331 at 13). This is a prime example of Movants' failure to cleary state what specific fact is newly discovered. However, regardless of what the Durham Report does or doesn't say, Plaintiff *still* cannot cure his failure to allege that these purported falsehoods resulted in pecuniary loss, let alone special damages. As I said in the MTD Order, the Amended Complaint lacks the "crucial element" of special damages. (MTD Order at 49) (citing *Salit v. Ruden McCloskey, Smith Schuster & Russel, P.A.*, 742 So.2d 381, 388 (Fla. 4th DCA 1999)). This alone is fatal to Plaintiff's injurious falsehood claims.[6]

### C.  SANCTIONS ORDERS

I imposed nearly $1 million in sanctions on Movants for filing, and doubling down on, a shotgun pleading that functioned as an abusive litigation tactic and was designed to further a political narrative. In doing so, I relied on three Eleventh Circuit decisions, with conduct less problematic than here, that affirmed an imposition of sanctions because of shotgun pleadings. (Second Sanctions Orders at 11) (citing *Jackson v. bank of Am., N.A.,* 898 F.3d 1348 (11th Cir. 2018); *Byrne v. Nezhat,* 261 F.3d 1075 (11th Cir. 2001); *Pelleteir v. Zweifel,* 921 F.2d 1465 (11th Cir. 1991)). I explained that cases like this are harmful to the rule of law, portray judges as partisans, and divert resources that should be directed to real harms and legitimate legal claims. (First Sanctions Order at 14).

I called Movants out for consistently misrepresenting and cherry-picking portions of public reports and filings to support a false factual narrative. (First Sanctions Order at 6-7; Second Sanctions Order at 14). To name only a few, Movants misrepresented the findings of the Special

---

[6] I considered the rest of the merits arguments as to RICO and injurious falsehood in light of Movants' supposedly "newly discovered evidence" and did not find that it changed the outcome. The MTD Order sufficiently explains why.

Counsel Robert Mueller's Report,[7] alleging, *inter alia*, that it "exonerate[d]" him.  Yet in referring to obstruction of justice, the Mueller Report said "[w]hile this report does not conclude that the President committed a crime, it also does not exonerate him."  (Second Sanctions Order at 15-16) (citation omitted).  Similarly, Movants relied heavily on the DOJ Inspector General's Report into the Crossfire Hurricane Investigation,[8] without acknowledging its conclusion that the FBI opened the investigation "for an authorized purpose" and "with adequate factual predication" that had nothing to do with the Defendants or the Steele Dossier.  (*Id*. at 16) (citation omitted).

Movants ignored the unfavorable parts of Special Counsel Durham's indictments.  *See, e.g.*, (Indictment ¶ 36, *United States v. Danchenko*, No. 21-cr-00245, (E.D. Va. Nov. 3, 2021)) ("According to [Mr. Dolan], individuals affiliated with the Clinton Campaign did not direct, and were not aware of, the aforementioned meetings and activities with Danchenko and other Russian nationals.") (emphasis omitted).  And in alleging that Plaintiff was "banned from different social media platforms, including Twitter" as a result of "the misinformation campaign waged by Hillary Clinton," (Amended Complaint ¶ 524 n.277), Movants at best made it up and at worst flatly lied.  *See* Twitter Inc., *Permanent Suspension of @realDonaldTrump*, Twitter Blog (Jan 8, 2021),[9] (suspending Mr. Trump following January 6th attack on the Capitol because his tweets posed "the risk of further incitement of violence.").

Specific to Defendant Dolan, Movants disregarded Dolan's warning that he was a resident of New York, not Virginia.  They alleged that Dolan was (1) the chairman of the DNC; (2) then

---

[7] 1 Robert S. Mueller, III, U.S. Dep't of Just., Report on the Investigation into Russian Interference in the 2016 Presidential Election (2019);  2 Robert S. Mueller, III, U.S. Dep't of Just., Report on the Investigation into Russian Interference in the 2016 Presidential Election (2019).

[8] U.S. Department of Justice Office of the Inspector General, Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation (2019).

[9] https://blog.twitter.com/en_us/topics/company/2020/suspension.

chairman of a national Democratic political organization; (2) a senior Clinton Campaign official; (3) and "an individual with initimate ties to the Clinton Campaign and one of its close associates." (Second Sanctions Order at 6) (citation omitted).  All turned out to be false, even after being told so and given an opportunity to amend.  As noted above, Movants misrepresented the Danchenko Indictment and excluded portions that directly contradicted Plaintiff's claim that Dolan conspired with Danchenko and others.  (*See id*. at 7-8).  I found that Movants failed to perform an adequate pre-filing inquiry, relying instead on conjecture, speculation, and guesswork.  (*Id*. at 9.).

Setting aside Movants' factual misrepresentations and exaggerations, I also found that Movants put forth frivolous legal theories foreclosed by existing precedent.  (First Sanctions Order at 9-13; Second Sanctions Order 19-21); *see also supra*, Intro to Part III and Part III.A.

Lastly, I found that this case is part of Mr.  Trump's pattern of misusing the courts to serve a political purpose.  The telltale signs being:

• Provocative and boastful rhetoric;

• A political narrative carried over from rallies;

• Attacks on political opponents and the news media;

• Disregard for legal principles and precedent; and

• Fundraising and payments to lawyers from political action committees.

(Second Sanctions Order at 33).  In finding that Movants acted in bad faith,  I invoked Rule 11 and this Court's inherent power to deter behavior that intereferes with the judiciary's ability to perform its constitutional duty.

The narrowness of Movants' Rule 60(b) Motion is itself indicative of why it should be denied.  Movants argue that sanctions were inappropriate because the Durham Report shows that (1) it was not "implausible" or "absurd" that then FBI Director, James Comey, conspired with Defendant Clinton; (2) the FBI opened the Crossfire Hurricane investigation without "any actual

evidence of collusion"; and (3) certain allegations about Dolan were either made on a good-faith basis or are now known to be true.  (DE 331 at 14-21).

Movants miss the point of the sanctions.  First, they completely disregard the significance of Plaintiff's shotgun pleadings and their subsequent support of the same.  In fact, it was in the context of explaining just that in the Second Sanctions Order that I concluded—after walking through Plaintiff's incoherent allegations for *four* pages—that it was categorically absurd to believe that Mr. Comey conspired with Ms. Clinton.[10]  A shotgun pleading, especially one of this length and scope, was not an academic error—it had real-world, negative consequences for Defendants and this Court.  Defendants were forced to spend an enormous amount of time and money untangling a web of largely irrelevant facts and frivolous legal conclusions.  (*See* Second Sanctions Order, Appendix A).  And this Court diverted an unusual amount of resources and time to properly adjudicate this dispute.  The Eleventh Circuit has likened a shotgun pleading of this nature to obstruction of justice.  (*See id.* at 14) (citing *Byrne*, 261 F.3d at 1131-32).  That Movants pressed on, *even after* Defendants raised the relevant Eleventh Circuit caselaw in their initial motions to dismiss, is inexcusable.  (*Id.* at 12).

Second, nothing changes my finding that Movants misrepresented and improperly exaggerated public documents.  For instance, Movants pound the table on the Durham Report's purported

---

[10] The Durham Report does not support Plaintiff's allegation either.  *See* Durham Report at 244 ("[T]he investigation [into Alfa Bank and Yotaphone allegations] assessed whether any FBI or other federal employee conspired with others to promote the allegations in order to benefit the Clinton campaign in a manner that would constitute a federal offense.  The Office's investigation did not establish sufficient evidence that any FBI official or employee knowingly and intentionally participated in a conspiracy with others to promote the allegations, to falsify government records, to obstruct justice, or to cause the FBI to open an investigation into them as part of such a conspiracy."); *id.* at 266 ("During the Sussmann trial, both Elias and Mook said that the [Hillary for America] campaign did not authorize Sussmann to take the Alfa Bank allegations to the FBI.  According to Elias and Mook, the campaign did not trust the FBI due to Comey's announcement related to the FBI's Midyear Exam investigation, regarding Hillary Clinton's use of a private e-mail server during her time as Secretary of State.").

conclusion that the FBI opened the Crossfire Hurricane investigation without any actual evidence.  But that does not change Movants' misrepresentation of the IG Report.  (*See* MTD Order at 5-6).  Movants—and especially the lawyers—have a duty of candor to the Court.  Third, Movants' frivolous legal theories remain frivolous.  The fact that Movants are not attempting to revive the vast majority of Plaintiff's claims—even though the Durham Report "seismically alters the legal landscape"—only serves to bolster the sanctions.  And fourth, considering the above, my finding that this case is part of Plaintiff's pattern of abusing the judicial system remains unchanged.

As to Dolan specifically, remember that Rule 11 sanctions are properly assessed (1) when a party files a pleading that has no reasonable factual basis; (2) when the party files a pleading that is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law; *or* (3) when the party files a pleading in bad faith for an improper purpose.  *Massengale v. Ray*, 267 F.3d 1298, 1301 (11th Cir. 2001).  I found that *all three* were met.  (Second Sanctions Order at 4).  Thus, even assuming, *arguendo*, that the Durham Report changes the analysis for the first prong, it does not (for the reasons just stated) for the rest.

Even if portions of the Durham Report constitute "newly discovered evidence," something that I seriously question, it cannot serve to retroactively cure Movants' reliance on conclusory allegations.  *See Jones v. Int'l Riding Helmets, Ltd.*, 49 F.3d 692, 694–95 (11th Cir. 1995) ("[T]he court's inquiry focuses only on the merits of the pleading gleaned from facts and law known or available to the attorney *at the time of filing* . . . . 'The court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted.'").

Given how much Movants' Motion lacks merit, I see nothing more, let alone extraordinary, that would merit relief under Rule 60(b)(6).

## IV.    CONCLUSION

Movants pursued this lawsuit in bad faith for the improper purpose of dishonestly advancing a political narrative.  As I previously explained, Mr. Trump is a prolific and sophisticated litigant who is repeatedly using the courts to seek revenge on political adversaries.  This case is straight out of that playbook.  Nothing in the Durham Report changes that.

Accordingly, it is **ORDERED and ADJUDGED** that Movants' Motion for Indicative Ruling Based Upon New Evidence (DE 331) is **DENIED.**

**SIGNED** in Chambers at West Palm Beach, Florida this 15th day of September, 2023.

Donald M. Middlebrooks
United States District Judge

cc:    Counsel of Record

17

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing appendix was served via electronic filing on the Court's ECF electronic filing platform on this 5th day of March, 2024, upon counsel of record for the Appellees.

/s/ Richard C. Klugh
Richard C. Klugh