Nos. 22-13410, 22-14099, 23-10387, & 23-13177

# In the United States Court of Appeals for the Eleventh Circuit

———————

DONALD J. TRUMP, ET AL.,
*APPELLANTS*

*v.*

HILLARY R. CLINTON, ET AL.,
*APPELLEES*

———————

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
(CASE NO. 22-CV-14102)
(THE HONORABLE DONALD M. MIDDLEBROOKS, J.)*

———————

**SUPPLEMENTAL APPENDIX TO BRIEF OF APPELLEES
VOLUME II OF III**

———————

DAVID OSCAR MARKUS
MARKUS/MOSS PLLC
*40 NW 3rd Street, PH 1
Miami, FL 33128
(305) 379-6667*

DAVID E. KENDALL
KATHERINE M. TURNER
MICHAEL J. MESTITZ
JAMES N. SASSO
WILLIAMS & CONNOLLY LLP
*680 Maine Avenue, S.W.
Washington, DC 20024
(202) 434-5000*

*Counsel for Appellee
Hillary Clinton*

*Additional Appellees' Counsel
listed in the signature block*

# TABLE OF CONTENTS

**Docket/Tab No.**

## Volume II

Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint (Aug. 4, 2022)..............................................237

Defendant Rodney Joffee's Reply in Support of His Motion to Dismiss for Lack of Personal Jurisdiction (Aug. 11, 2022)............................249

Hillary Clinton's, HFACC, Inc.'s, John Podesta's, Robert Mook's, Jake Sullivan's, DNC's, DNC Services Corporation's, Debbie Wasserman Schultz's, Perkins Coie LLP's, Marc Elias's, Michael Sussmann's, Charles Halliday Dolan, Jr.'s, Fusion GPS's, Glenn Simpson's, Peter Fritsch's, Nellie Ohr's, Bruce Ohr's, Igor Danchenko's, Rodney Joffe's, Neustar Security Services's, and Neustar, Inc.'s Reply in Support of Their Motion to Dismiss (Aug. 11, 2022) .......................250

Charles Dolan's Reply to Plaintiff's Response to Defendant Charles Halliday Dolan Jr.'s Motion to Dismiss Amended Complaint (Aug. 11, 2022) ...................................................................................251

Defendant Orbis Business Intelligence Ltd.'s Motion to Dismiss the Amended Complaint and Incorporated Memorandum of Law (Aug. 18, 2022) ...................................................................................260

Exhibit A to Orbis Motion to Dismiss:  Declaration of Christopher Burrows in Support of Defendant Orbis Business Intelligence Ltd.'s Motion to Dismiss for Insufficient Service of Process and Lack of Personal Jurisdiction (Aug. 18, 2022) ..........................................260-1

Exhibit B to Orbis Motion to Dismiss:  Summons in a Civil Action (Aug. 18, 2022) ...............................................................................260-2

Plaintiff's Memorandum of Law in Opposition to Defendant [Orbis] Business Intelligence Ltd.'s Motion to Dismiss and in Support of Cross-Motion for Alternate Service (Sept. 1, 2022) .........................262

Exhibit to Plaintiff's Memorandum:  Certification of Service Abroad of Judicial or Extrajudicial Document (Sept. 1, 2022).....................262-1

Defendant Orbis Business Intelligence Ltd.'s Reply in Support of the Motion to Dismiss the Amended Complaint (Sept. 8, 2022)............266

Charles Dolan's Memorandum in Support of His Motion for Sanctions Pursuant to Fed. R. Civ. P. 11 (Sept. 21, 2022) ............................... 268

Exhibit A to Dolan Memorandum: Rule 11 Letter to Plaintiff's Counsel (Sept. 21, 2022) ............................................................... 268-1

Exhibit B to Dolan Memorandum: Second Declaration of Charles Dolan (Sept. 21, 2022) ............................................................... 268-2

Proposed Order on Defendant Mr. Dolan's Motion for Rule 11 Sanctions (Sept. 21, 2022) ............................................................... 268-3

Praecipe (Sept. 21, 2022) ........................................................ 269

Plaintiff's Response to Defendant, Charles Halliday Dolan Jr.'s Motion for Sanctions Pursuant to Fed. R. Civ. P. 11 (Oct. 5, 2022)............ 270

Hillary Clinton's, HFACC, Inc.'s, John Podesta's, Robert Mook's, DNC's, DNC Services Corporation's, Debbie Wasserman Schultz's, Charles Halliday Dolan, Jr.'s, Fusion GPS's, Glenn Simpson's, Peter Fritsch's, Nellie Ohr's, Bruce Ohr's, Igor Danchenko's, Rodney Joffe's, Neustar Security Services's, Neustar Inc.'s, and Orbis Business Intelligence Ltd.'s Joint Motion for Sanctions (Oct. 31, 2022) ................................................................ 280

237

Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to
Dismiss the Complaint (Aug. 4, 2022)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 2:22-cv-14102-DMM


DONALD J. TRUMP,

                    Plaintiff,

v.

HILLARY R. CLINTON, HFACC, INC.,
DEMOCRATIC NATIONAL COMMITTEE,
DNC SERVICES CORPORATION, PERKINS
COIE, LLC, MICHAEL SUSSMANN, MARC
ELIAS, DEBBIE WASSERMAN SCHULTZ,
CHARLES HALLIDAY DOLAN, JR., JAKE
SULLIVAN, ADAM SCHIFF, JOHN PODESTA,
ROBERT E. MOOK, PHILLIPE REINES,
FUSION GPS, GLENN SIMPSON, PETER
FRITSCH, NELLIE OHR, BRUCE OHR, ORBIS
BUSINESS INTELLIGENCE, LTD.,
CHRISTOPHER STEELE, IGOR DANCHENKO,
NEUSTAR, INC., NEUSTAR SECURITY SERVICES,
RODNEY JOFFE, JAMES COMEY, PETER STRZOK,
LISA PAGE, KEVIN CLINESMITH, ANDREW MCCABE,
ROD ROSENSTEIN, JOHN DOES 1 THROUGH 10
(said names being fictitious and unknown persons),
and ABC CORPORATIONS 1 THROUGH 10 (said
names being fictitious and unknown entities),

                    Defendants.

_____


**PLAINITFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................iii

INTRODUCTION ............................................................................................................... 1

LEGAL ARGUMENT .......................................................................................................... 2

I.    PLAINTIFF'S CLAIMS ARE TIMELY ........................................................................ 2

   A.    EQUITABLE TOLLING IS WARRANTED FOR THE DURATION OF PLAINTIFF'S
   PRESIDENTIAL TERM ................................................................................................ 2

   B.    ALL OF PLAINTIFF'S CAUSES OF ACTION HAVE BEEN TIMELY ASSERTED... 6

      i.    Civil RICO (18 U.S.C. § 1962(c) and RICO Conspiracy (18 U.S.C. § 1964).............. 6

         a.    *The Statute of Limitations Has Been Suspended Throughout the Pendency of Related
         Criminal and Civil Proceedings* ........................................................................ 6

         b.    *Fraudulent Concealment Compels Equitable Tolling of Plaintiff's RICO Claims* ... 13

         c.    *Accrual Under the Discovery Rule* ............................................................ 14

   C.    THE REMAINING CLAIMS ARE TIMELY ............................................................ 16

         a.    *Malicious Prosecution* ........................................................................ 16

         b.    *Injurious Falsehood* .......................................................................... 17

         c.    *Computer Fraud and Abuse Act and Theft of Trade Secrets* ................................. 17

II.   THE COMPLAINT PUTS FORTH VALID AND COGNIZABLE CLAIMS AGAINST
ALL OF DEFENDANTS ..................................................................................... 18

   A.    CIVIL RICO (18 U.S.C. § 1962(C)) .................................................................. 18

      i.    Existence of an Enterprise .................................................................... 19

      ii.   Participation in the Enterprise's Affairs .................................................... 24

      iii.  Pattern of Racketeering Activity ............................................................. 27

         a.    *Obstruction of Justice (18 U.S.C. § 1512)* ............................................... 27

         b.    *Theft of Trade Secrets (18 U.S.C. § 1832)* ............................................... 29

         c.    *Wire Fraud (18 U.S.C. § 1343)* .......................................................... 33

         d.    *Continuity of the Racketeering Activity* ................................................. 36

      iv.   RICO Standing and Causation ................................................................ 40

   B.    RICO CONSPIRACY (18 U.S.C. § 1962(D)) .......................................................... 43

C.   INJURIOUS FALSEHOOD ................................................................................... 47

D.   MALICIOUS PROSECUTION .............................................................................. 50

E.   STORED COMMUNICATIONS ACT .................................................................. 52

F.   COMPUTER FRAUD & ABUSE ACT ................................................................. 53

G.   THEFT OF TRADE SECRETS (18 U.S.C. § 1832) ............................................ 55

III.   ALTERNATIVELY, PLAINTIFF SEEKS LEAVE TO AMEND THE COMPLAINT
…………………………………………………………………………………………..55

CONCLUSION.......................................................................................................................... 55

# TABLE OF AUTHORITIES

## **Cases**

*Agency Holding Corp. v. Malley-Duff & Assoc.*,
  483 U.S. 143 (1987) ....................................................................................... 6, 7

*Alachua County v. Cheshire*,
  603 So.2d 1334 (Fla. 1992) ................................................................................ 3

*Alexander Grant and Co. v. Tiffany Industries, Inc.*,
  770 F.2d 717 (8th Cir. 1985) ............................................................................ 42

*Alix v. McKinsey & Co.*,
  23 F.4th 196 (2d Cir. 2022) ................................................................... 37, 41, 42

*Al-Rayes v. Willingham*,
  2007 WL 788401 (M.D. Fla. 2007) .................................................................. 27

*American Dental Ass'n v. Cigna Corp.*,
  605 F.3d 1283 (11th Cir. 2010) ........................................................... 34, 35, 45

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ......................................................................................... 18

*Asinmaz v. Semrau*,
  42 So. 3d 955 (Fla. 4th DCA 2010) .................................................................. 48

*Baez v. Root*,
  2014 WL 1414433 (S.D. Fla., April 11, 2014) ................................................. 16

*Baggett v. Bullitt*,
  377 U.S. 360 (1964) ........................................................................................... 3

*Bailey v. Glover*,
  88 U.S. 342 (1874) ............................................................................................. 3

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ......................................................................................... 18

*Bessemer Sys. Fed. Credit Union v. Fiserv Sols.*, LLC, No. 2:19-cv-00624-RJC,
  2021 U.S. Dist. LEXIS 175153, at *30 (W.D. Pa. Sep. 15, 2021) ................... 55

*Bothmann v. Harrington*,
  458 So. 2d 1163 (Fla. 3d DCA. 1984) .............................................................. 47

*Bovino v. MacMillan*,
    28 F. Supp. 3d 1170 (D. Colo. 2014) ................................................. 52

*Boyle v. United States*,
    556 U.S. 938 (2009) .......................................................... 19, 20, 22

*Bridge v. Phoenix Bond & Indem. Co.*,
    553 U.S. 639 (2008) ...............................................................Passim

*Brooks v. BCBS of Fla., Inc.*,
    116 F.3d 1364 (11th Cir.1997) ...................................................... 35

*Brown Jordan Int'l, Inc. v. Carmicle*,
    846 F.3d 1167 (11th Cir. 2017) ................................................. 52, 55

*Capital Asset Rsch. Corp. v. Finnegan*,
    160 F.3d 683 (11th Cir. 1998) ...................................................... 32

*Caplan v. Johnson*,
    414 F.2d 615 (5th Cir. 1969) ........................................................ 50

*Chappell v. Rich*,
    340 F.3d 1279 (11th Cir. 2003) ..................................................... 18

*Chardon v. Fumero Soto*,
    462 U.S. 650 (1983) .................................................................. 7

*Cheney v. United States Dist. Court for D. C.*,
    542 U.S. 367 (2004) .................................................................. 6

*Chipanno v. Cahmpion Int'l Corp.*,
    702 F.2d 827 (9th Cir. 1983) ........................................................ 8

*Cisneros v. Petland, Inc.*,
    972 F.2 1204 ........................................................................ 22

*City of Columbia v. Omni Outdoor Adv., Inc.*,
    499 U.S. 365 (1991) ................................................................ 30

*Clark v. Bunker*,
    453 F.2d 1006 (9th Cir. 1972) ...................................................... 31

*Clinton v. Jones*,
    520 U.S. 681 (1997) .................................................................. 4

iv

*Coca–Cola Bottling Co. v. Coca–Cola Co.*,
    107 F.R.D. 288 (D.Del.1985) ....................................................... 33

*Cocke v. Merrill Lynch & Co.*,
    817 F.2d 1559 (11th Cir.1987) .................................................. 3, 5

*Compulife Software Inc. v. Newman*,
    959 F.3d 1288 (11th Cir. 2020) ....................................... 30, 32, 34

*Conley v. Gibson*,
    355 U.S. 41 (1957) ...................................................................... 18

*Corcel Corp. v. Ferguson Enters., Inc.*,
    551 F. App'x 571 (11th Cir. 2014) ......................................... 43, 45

*Cytodyne Tech., Inc. v. Biogenic Tech., Inc.*,
    216 F.R.D. 533 (M.D. Fla. 2003) ............................................... 33

*Davis v. Johnson*,
    158 F.3d 806 (5th Cir. 1998) ........................................................ 3

*Del Monte Fresh Prod. Co. v. Dole Food Co.*,
    136 F. Supp. 2d 1271 (S.D. Fla. 2001) ...................................... 30

*Digiport, Inc. v Foram Dev. BFC, LLC*,
    314 So.3d 550 (Fla. Dist. Ct. App. 2020) ................................... 32

*Domain Protection, LLC v. Sea Wasp, LLC*,
    426 F.Supp.3d 355 (E.D. Tex. 2019) ..................................... 33, 52

*Durham v. Bus. Mgmt. Assocs.*,
    847 F.2d 1505 (11th Cir. 1988) .................................................. 35

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*,
    365 U.S. 127 (1961) .................................................................... 30

*Fedance v. Harris*,
    1 F.4th 1278 (11th Cir. 2021) ................................................ 13, 15

*Foman v. Davis*,
    371 U.S. 178 (1962) .................................................................... 55

*Foudy v. Indian River*,
    845 F.3d (11th Cir. 2017) ........................................................... 13

*Fridovich v. Fridovich*,
  598 So. 2d 65 (Fla. 1992) ............................................................. 48, 49

*Gabelli v. SEC*,
  568 U.S. 442 ....................................................................................... 15

*Gianelli v. Schoenfeld*,
  2021 WL 4690724 (E.D. Cal. Oct. 7, 2021)....................................... 8

*H.J. Inc. v. Nw. Bell Tel. Co.*,
  492 U.S. 229 (1989) .................................................................... 27, 37

*Haekal v. Refco, Inc.*,
  198 F.3d 37 (2d Cir 1999) ................................................................. 3

*Hallstrom v. Tillamook County*,
  493 U.S. 20 (1989) ............................................................................. 2

*Hamilton Grp. Funding, Inc. v. Basel*,
  311 F. Supp. 3d 1307 (S.D. Fla. 2018) ........................................... 52

*Harbin v. Straub*,
  490 U.S. 536 (1989) ........................................................................... 7

*Hill v. Morehouse Med. Assocs., Inc.*,
  2003 WL 22019936 (11th Cir. Aug. 15, 2003) .......................... 35, 40

*Holland v. Florida*,
  560 U.S. 631 (2010) ........................................................................... 3

*Holmes v. Sec. Investor Prot. Corp.*,
  503 U.S. 258 (1992) ......................................................................... 41

*Horgan v. Felton*,
  123 Nev. 577, 170 P.3d 982 (2007)................................................. 47

*Hyundai Motor Am. Corp. v. North Am. Auto. Servs.*,
  2021 U.S. Dist. LEXIS 99713 at *22 (S.D. Fla. May 25, 2021) ....... 39

*Hyundai Motor Am. Corp.*,
  2021 U.S. Dist. LEXIS 99713 at *11 ............................................... 41

*In re Managed Care Litig.*,
  298 F.Supp. 1259 (S.D.FL. 2003) ................................................... 45

*Integrated Direct Mktg., LLC v. May*,
    495 S.W.3d 73 (Ark. 2016) ................................................................. 33

*Jackson v. BellSouth Telecomms.*,
    *372 F.3d 1250, 1265 (11th Cir. 2004)*, .............................. 38, 39, 40, 41

*Johnson v. Railway Exp. Agency, Inc.*,
    421 U.S. 454 (1975) .................................................................... 7, 8

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179, 189, 117 S. Ct. 1984, 1990 (1997) ............................ 6, 15

*Kremen v. Cohen*,
    337 F.3d 1024 (9th Cir 2003) ..................................................... 32, 33

*La Grasta v. First Union Sec., Inc.*,
    358 F.3d 840 (11th Cir. 2004) ............................................................ 2

*Latonik v. Fla. Dept. of Highway Safety & Motor Vehicles*,
    2014 WL 7010737 (M.D. Fla. Dec. 11, 2014) .................................... 2

*Le Maistre v. Leffers*,
    319 U.S. 561 (1948) ............................................................................ 5

*Leh v. Gen. Petroleum Corp.*,
    382 U.S. 54 (1965) .......................................................... 8, 9, 12, 13

*Lehman v. Lucom*,
    727 F.3d 1326 (11th Cir. 2013) ......................................................... 15

*Lewis v. Lhu*,
    696 F.Supp. 723 (D.D.C. 1988) .......................................... 37, 41, 42

*Lozano v. Montoya Alvarez*,
    572 U.S. 1 (2014) .............................................................................. 2

*Machules v. Dept. of Admin.*,
    523 So.2d 1132 (Fla. 1988) ............................................................... 3

*Magnifico v. Villanueva*,
    783 F. Supp. 2d 1217 (S.D. Fla. 2011) .......................................... 39, 40

*Maiz v. Virani*,
    253 F.3d 641 (11th Cir. 2001) ......................................................... 15

vii

*Mathews v. Kidder, Peabody & Co., Inc.*,
  260 F.3d 239 (3d Cir. 2001) ...................................................... 13

*Metallurgical Indus. Inc. v. Fourtek, Inc.*,
  790 F.2d 1195 (5th Cir. 1986) .................................................. 32

*Mid Atlantic Telecom, Inc. v. Long Distance Services, Inc.*,
  18 F.3d 260 (4th Cir. 1994) ........................................... 37, 41, 42

*Minnesota Min. & Mfg. Co. v. New Jersey Wood Finishing Co.*,
  381 U.S. 311 (1965) .......................................... 8, 9, 10, 12

*Mullinax v. McElhenney*,
  817 F.2d 711 (11th Cir. 1987) .................................................. 18

*Nixon v. Fitzgerald*,
  457 U.S. 731 (1982) ........................................................... 4, 5

*Nixon*,
  418 U.S. ............................................................................... 6

*Nodar v. Galbreath*,
  462 So. 2d 803 (Fla. 1984) ...................................................... 48

*Olson v. Johnson*,
  961 So. 2d 356 (Fla. 2nd DCA 2007) ........................................ 16

*P.C. Yonkers, Inc. v. Celebrations the Party Seasonal Superstore, LLC*,
  428 F.3d 504 (3d Cir. 2005) .................................................... 53

*Pace v. DiGuglielmo*,
  544 U.S. 408 (2005) ............................................................... 3

*Pelletier v. Zweifel*,
  921 F.2d 1465 (11th Cir.1991) ................................................. 34

*Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*,
  318 F.3d 1284 (11th Cir. 2003) ............................................... 34

*Pension Fund Mid Jersey Trucking Industry v. Omni Funding*,
  687 F.Supp. 962 (D.N.J., June 28, 1988) .................................... 8

*Pharmerica, Inc. v. Arledge*,
  2007 WL 865510 (M.D. Fla. March 21, 2007) .......................... 53

*Pilkington v. United Airlines*,
   112 F.3d 1532 (11th Cir.1997) ............................................................... 15

*Pres. Petrified Forrest v. Renzi*,
   2014 WL 530574, at *3-4 (D. Ariz. Feb. 12, 2013) ................................... 8

*Procter & Gamble Co. v. Amway Corp.*,
   242 F.3d 539 (5th Cir. 2001) ...................................................... 37, 41, 42

*Professional Real Estate Investors v. Columbia Pictures Industries, Inc.*,
   508 U.S. 49 (1993) ................................................................................. 30

*Ray v. Spirit Airlines, Inc.*,
   836 F.3d 1340 (11th Cir. 2016) .............................................................. 19

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993) ......................................................................... 24, 27

*Rotella v. Wood*,
   528 U.S. 549 (2000) .............................................................................. 14

*Sailboat Kev. Inc. v. Gardner*, ............................................................... 46
   378 So.2d 47, 48 (Fla. 3d DCA 1979)

*Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*,
   742 So.2d 381 (Fla. 4th DCA 1999) ................................................. 46, 47

*Schmuck v. United States*,
   489 U.S. 705 (1989) .............................................................................. 35

*SEC v. Gabelli*,
   653 F.3d 49 (2d Cir. 2011) .................................................................... 13

*Sedima, S.P.R.L. v. Imrex Co.*,
   473 U.S. 479 (1985) .............................................................................. 19

*Southern Bell Telephone & Telegraph Company v. Roper*,
   482 So. 2d 538 (Fla. 3d DCA 1986) ....................................................... 48

*Sprinkler Warehouse, Inc. v. Systematic Rain, Inc.*,
   880 N.W.2d 16 (Minn. 2016) ................................................................. 33

*State Farm Mut. Auto. Ins. Co. v. Kugler*, No.,
   2011 WL 4389915 (S.D. Fla. Sept. 21, 2011) ........................................... 2

*Steve Jackson Games, Inc. v. United States Secret Service*,
    36 F.3d 457 (5th Cir. 1994) ............................................................ 52

*Story Parchment Co. v. Paterson Parchment Co.*,
    282 U.S. 555 (1931) ...................................................................... 42

*Tello v. Dean Witter Reynolds, Inc.*,
    410 F.3d 1275 (11th Cir. 2005) ........................................................ 2

*Theofel v. Farey-Jones*,
    359 F.3d 1066 (9th Cir. 2004) ........................................................ 52

*Thomas v. Ross & Hardies*,
    9 F.Supp.2d 547 (D. Md. 1998) ...................................................... 27

*Trump v. Mazars USA LLP*,
    140 S.Ct. 2019 ............................................................................... 6

*Trump v. Vance*,
    140 S. Ct. 2412 (2020) ............................................................... 4, 5

*U.S. v. Pendergraft*,
    297 F.3d 1198 (11th Cir. 2002) ...................................................... 36

*U.S. v. Phillips*,
    477 F.3d 215 (5th Cir. 2007) ......................................................... 52

*Union Carbide & Carbon Corp. v. Nisley*,
    300 F.2d 561 (10th Cir. 1962) ......................................................... 8

*Unistar Corp. v. Child*,
    415 So. 2d 733 (Fla. 3rd DCA 1982) .............................................. 32

*United States v. Bradley*,
    644 F.3d 1213 (11th Cir. 2011) ................................................ 34, 36

*United States v. Councilman*,
    418 F.3d 67 (1st Cir. 2005) ........................................................... 52

*United States v. Friske*,
    640 F.3d 1288 (11th Cir. 2011) ...................................................... 29

*United States v. Grubb*,
    11 F.3d 426 (1993) ........................................................................ 29

*United States v. Lee*,
   919 F.3d 340 (6th Cir. 2019) ................................................................. 29

*United States v. Mintmire*,
   507 F.3d 1273 (11th Cir. 2007) ............................................................. 29

*United States v. Patterson*,
   211 F.3d 927 (5th Cir. 2000) ................................................................... 3

*United States v. Ronda*,
   455 F.3d 1273 (11th Cir 2006) ............................................................... 28

*United States v. Ronga*,
   682 Fed.Appx. 849 (11th Cir. 2017) ...................................................... 28

*United States v. Sylvestri*,
   409 F.3d 1311 (11th Cir. 2005) ............................................................. 45

*United States v. Takhalov*,
   827 F.3d 1307 (11th Cir. 2016) ............................................................. 34

*United States v. United Fruit Co.*,
   410 F.2d 553 (5th Cir. 1969) ................................................................. 33

*United States v. Veal*,
   153 F.3d 1233 (11th Cir. 1998) ............................................................. 28

*Van Buren v. United States*,
   *141 S. Ct. 1648* ............................................................................... 53, 54

*ViChip Corp. v. Lee*,
   438 F. Supp.2d 1087 (N.D. Cal. 2006.) .................................................. 53

*Wagner, Nugent, Johnson, Roth, Romano, Erikson & Kupfer, P.A. v. Flanagan*,
   629 So. 2d 113 (Fla. 1993) .................................................................... 17

*Williams v. Mohawk Indus., Inc.*,
   465 F.3d 1277 (11th Cir. 2006) ............................................................. 24

*Young v. United States*,
   535 U.S. 43 (2002) ................................................................................. 2

*Zenith Radio Corp. v. Hazeltine Research*,
   401 U.S. 321, 336, 91 S. Ct. 795, 805 (1971) ......................................... 8

## **Statutes**

15 U.S.C. § 15(b) ................................................................................................ 6
15 U.S.C. § 16(i) ......................................................................................... Passim
18 U.S.C. 1515(a)(1)(B),(C) ............................................................................. 29
18 U.S.C. 1515(a)(3)(A),(C),(D) ...................................................................... 28
18 U.S.C. § 1001(a)(2) ...................................................................................... 12
18 U.S.C. § 1030(e)(11) ..................................................................................... 55
18 U.S.C. § 1030(g) ..................................................................................... 17, 53
28 U.S.C. § 1343 ......................................................................................... 28, 34
18 U.S.C. § 1512 ........................................................................................ Passim
18 U.S.C. § 1832 ..................................................................... 27, 30, 34, 55
18 U.S.C. § 1839(3) ..................................................................................... 31, 33
18 U.S.C. § 1961-1968 ................................................................................... 6, 19
18 U.S.C. § 1961(1) ........................................................................................... 27
18 U.S.C. § 1961(4) ........................................................................................... 19
18 U.S.C. § 1961(5) ........................................................................................... 27
*18 U.S.C. § 1962(c)* ................................................................................. Passim
18 U.S.C. § 1962(D) ................................................................................... 45, 46
*18 U.S.C. § 1964* .............................................................................................. 6
18 U.S.C. § 1964(c) ........................................................................................... 41
18 U.S.C. § 2701 ............................................................................................... 51
28 U.S.C. § 515 ................................................................................................. 50
50 U.S.C. §§ 3901-4043 ...................................................................................... 5
Fla. Stat. § 95.11(3)(o) ...................................................................................... 16
Fla. Stat. § 95.11(4)(g) ...................................................................................... 17
U.S. Const. Art. II ............................................................................................... 4
§ 1030(a)(4) ...................................................................................................... 53
§ 1512 (b)(3) ..................................................................................................... 28
§ 1512 (b)(3) and § 1512 (c)(2) ........................................................................ 28
§ 1512(c)(2) ...................................................................................................... 29

## **Rules**

Fed. R. Civ. P. 9(b) ..................................................................................... 20, 35
Fed. R. Civ. P. 15(a) ......................................................................................... 55
Rule 8 ................................................................................................................ 18
Rule 8(a)(2) F. R. Civ. P .................................................................................. 18
Rule 15 of the Federal Rules of Civil Procedure ............................................. 55

## **Other Authorities**

2 U.S. Code Cong. And Admin. News ................................................................ 8

## INTRODUCTION

In their consolidated motion to dismiss, Defendants[1] are heavy on hyperbole and light on substance. Indeed, despite characterizing the Complaint as a "fundraising tool," Defendants conspicuously shy away from bona fide legal argument and largely fail to address the substance of Plaintiff's claims. Instead, they strain credibility by raising a diatribe of disingenuous arguments which gloss over pertinent facts, distort Plaintiff's legal theories, and mischaracterize operative case law. In doing so, Defendants seemingly hope to divert attention from the validity of Plaintiff's explosive claims—which are meticulously sourced and thoroughly pled—while simultaneously minimizing the reprehensible nature of the conduct outlined in the Complaint.

To start, Defendants devote a significant portion of their motion making the ill-fated argument that Plaintiff's claims are time-barred. The thrust of Defendants' argument is that, since some of the events referenced in the Complaint occurred in 2016, it follows that all relevant statutes of limitations must have expired by the time the Complaint was filed on March 24, 2022. This argument misses the mark for several reasons. First, when considering all relevant factors, such as the federal discovery rule, there is no question that each of Plaintiff's claims have been asserted within the applicable time periods. Further, Defendants fail to recognize that there are numerous unique and special factors at play which counsel in favor of an equitable tolling of all applicable statutes of limitations in Plaintiff's favor – including that Plaintiff was immersed in the diligent execution of his presidential duties during a majority of the relevant time period while Defendants were making every effort to conceal their illicit conduct. Therefore, contrary to Defendants' contention, Plaintiff's claims have been asserted in a timely fashion.

Beyond that, Defendant's motion merely consists of scattershot arguments that do nothing to dispute the merits of Plaintiff's claims. Despite their best efforts, Defendants simply cannot muster a single viable argument as to why any of the claims should be dismissed. This is because the Complaint puts forth actionable, cognizable claims which cannot conceivably be subject to dismissal at this stage of litigation. Therefore, for the reasons set forth herein, Defendants' motion must be denied in its entirety.

---

[1] All capitalized terms herein shall have the same meaning and shall be defined in the same manner and context as they appear and are pleaded in the Amended Complaint filed on June 21, 2022 (ECF Doc. No. 177) (the "Complaint").

## LEGAL ARGUMENT

## I.   <u>PLAINTIFF'S CLAIMS ARE TIMELY</u>

Plaintiff's claims have been timely asserted and are not barred by the applicable statutes of limitations. As an initial matter, a "statute of limitations bar is an affirmative defense, and plaintiff[s] [are] not required to negate an affirmative defense in [their] complaint." *La Grasta v. First Union Sec., Inc.,* 358 F.3d 840, 845 (11th Cir. 2004) (quotation omitted). At the motion to dismiss stage, an action can only be excluded on statute of limitations grounds "if it appears beyond a doubt that Plaintiffs can prove no set of facts that toll the statute." *Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288 n.13 (11th Cir. 2005) (internal quotations omitted); *see also Latonik v. Fla. Dept. of Highway Safety & Motor Vehicles,* No. 6:14-cv-1793, 2014 WL 7010737 at *2 (M.D. Fla. Dec. 11, 2014) (quoting *La Grasta*) (refusing to find claims time-barred at motion-to-dismiss stage); *State Farm Mut. Auto. Ins. Co. v. Kugler,* No. 11-80051, 2011 WL 4389915 at *13 (S.D. Fla. Sept. 21, 2011) (denying motion to dismiss RICO and state law claims, noting "perimeters of [four year] limitations period are appropriately defined by reference to the delayed discovery doctrine. . . and the doctrine of equitable tolling" and refusing to resolve on motion to dismiss).

Defendants' position that Plaintiff's claims are time-barred is misguided and contrary to the case law governing when each of the respective causes of action actually began to accrue. Furthermore, there are numerous special factors involved in the instant matter which warrant an equitable tolling of all relevant statutes of limitations in Plaintiff's favor. Therefore, for the reasons set forth herein, all of Plaintiff's causes of action are timely.

## A. EQUITABLE TOLLING IS WARRANTED FOR THE DURATION OF PLAINTIFF'S PRESIDENTIAL TERM

Given the novel circumstances at hand, an equitable tolling is warranted for the duration of time that Plaintiff was serving as President of the United States.

Statutes of limitations in civil actions are "traditional subject to equitable tolling." *Hallstrom v. Tillamook County,* 493 U.S. 20, 27 (1989) (citation omitted); *see also Young v. United States*, 535 U.S. 43, 49 (2002) (noting that statutes of limitations are "customarily subject to equitable tolling, unless tolling would be inconsistent with the text of the relevant statute.") (citations omitted); *Lozano v. Montoya Alvarez*, 572 U.S. 1, 11 (2014) (stating that courts must "presume that equitable tolling applies if the period in question is a statute of limitations[.]"). When applicable, equitable tolling "pauses the running of, or 'tolls,' a statute of limitations when. . . some extraordinary

circumstance prevents [a plaintiff] from bringing a timely action." *Lozano*, 572 U.S. at 10. In other words, "the limitations period is deemed interrupted [and] when the tolling condition or event has ended, the [plaintiff] is allowed the remainder of the limitations period in which to file his action. *Haekal v. Refco, Inc.*, 198 F.3d 37, 43 (2d Cir 1999) (citation omitted).

The doctrine of equitable tolling been "developed to permit under certain circumstances the filing of a lawsuit that otherwise would be barred by a limitations period." *Bailey v. Glover,* 88 U.S. 342 (1874). The purpose of equitable tolling is to "preserve[] a plaintiff's claims when strict application of the statute of limitations would be inequitable." *United States v. Patterson,* 211 F.3d 927, 930 (5th Cir. 2000). Accordingly, it is employed "in the interests of justice to accommodate . . . a plaintiff's right to assert a meritorious claim when equitable circumstances have prevented a timely filing." *Cocke v. Merrill Lynch & Co.,* 817 F.2d 1559, 1561 (11th Cir.1987). In this way, it "serves to ameliorate harsh results that sometimes flow from a strict, literalistic construction and application of administrative time limits contained in statutes and rules." *Machules v. Dept. of Admin.*, 523 So.2d 1132, 1134 (Fla. 1988) (citation omitted).

A plaintiff is "entitled to equitable tolling if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing. *Holland v. Florida*, 560 U.S. 631, 650 (2010); *see also Alachua County v. Cheshire,* 603 So.2d 1334, 1337 (Fla. 1992) (noting that equitable tolling is warranted when a plaintiff has "in some extraordinary way been prevented from asserting his rights."). This determination is made on a "case-by-case basis." *Id.* The Supreme Court has emphasized "the need for 'flexibility' for avoiding 'mechanical rules'" in making this assessment, encouraging courts to "'relieve hardships which, from time to time, arise from a hard and fast adherence' to more absolute legal rules, which, if strictly applied, threaten the 'evils of archaic rigidity.'" *Id.* (citations omitted). Succinctly stated, the "'flexibility' inherent in 'equitable procedure' enables courts 'to meet new situations [that] demand equitable intervention, and to accord all the relief necessary to correct . . . particular injustices.'" *Id.* (citation omitted).

Turning to the instant matter, there are a multitude of extraordinary circumstances that justify the equitable tolling of Plaintiff's statutory deadlines. Indeed, given the subject matter of the case, the prominent positions held by many of the individuals involved, and the numerous high-profile investigations, inquiries and proceedings that have preceded this action, there is no shortage of unique and exceptional factors that have prevented Plaintiff from bringing forth his claims in a more

timely manner. Without question, the most notable factor is that, for a majority of time that Defendants' actions were underway—from January 20, 2017 through January 20, 2021—Plaintiff was serving as President of the United States. As such, he was preoccupied with carrying out his eminently important presidential duties and was therefore impeded from effectively asserting his rights. This fact, on its own, warrants an equitable tolling of all relevant statutes of limitations during that span of time.

The Supreme Court has recognized that the President "occupies a unique position in the constitutional scheme." *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982). Article II of the Constitution vests the entirety of the "executive power" of the United States government in the President and provides that "the President shall be Commander in Chief of the Army and Navy of the United States." U.S. Const. Art. II; *see also Nixon*, 457 U.S. at 750 (noting that Art. II, § 1 "establishes the President as the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity."). The President also has an overarching duty to "preserve, protect, and defend the Constitution" and to take "[c]are that the Laws be faithfully executed[.]" U.S. Const. Art. II, §§ 1, 3. In short, the President is responsible for "enforc[ing] . . . federal law," "conduct[ing] . . . foreign affairs," and "manag[ing] . . . the Executive Branch." *Nixon*, 457 U.S. at 750. For this reason, the Supreme Court has consistently acknowledged that the President's responsibilities are "of unrivaled gravity and breadth," *Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020), and that "[i]n drama, magnitude, and finality his decisions so far overshadow any others that almost alone he fills the public eye and ear," *Clinton v. Jones*, 520 U.S. 681, 698 (1997). In other words, considering the vastness and importance of his duties, it can be said that a President "never adjourns." *Id.* at 713 (Breyer, J., concurring in judgment).

In view of this concern, the *Nixon* court cautioned that "[b]ecause of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government." *Nixon*, 457 U.S. at 749. The *Clinton* court echoed this sentiment, proclaiming that the President "occupies a unique office with powers and responsibilities so vast and important that the public interest demands that he devote his undivided time and attention to his public duties." *Clinton*, 520 U.S. at 697. Thus, the holdings in *Nixon* and *Clinton* both underscore the principle that "[i]ncidental to the functions confided in Article II is 'the power to perform them[] *without obstruction or impediment*.'" *Vance*, 140 S. Ct. at 2432 (citation omitted) (emphasis added).

Consistent with this reasoning, Plaintiff should be afforded an equitable tolling in the instant matter as to all applicable statutes of limitations for the duration of time that he was serving as President of the United States. Given the immense and unrelenting demands involved in serving as President, Plaintiff was simply not in a position to commence a lawsuit against Defendants during the time he was in office, particularly not one as complex and wide-spanning as the present action. As a sitting President, Plaintiff tirelessly devoted himself to serving the Nation and ensuring the well-being of the American people. Indeed, it was his obligation and duty – any other course of action would have been "to the detriment of . . . the Nation that the Presidency was designed to serve." *Nixon*, 457 U.S. at 753. It follows, therefore, that Plaintiff should not be penalized for choosing to forego his own self-interests in favor of fully and faithfully executing his duties as President.[2] It is difficult to envision a more "equitable circumstance" that requires accommodation in "the interests of justice." *Cocke,* 817 F.2d at 1561.

Moreover, not only would have it been imprudent and infeasible for Plaintiff to have filed the instant action during his presidential campaign, but it would also have been entirely inappropriate. Several of Defendants in this action—such as James Comey, Andrew McCabe, Bruce Ohr, and others—were high-ranking government officials with the Federal Bureau of Investigation (FBI) and/or the Department of Justice (DOJ) for much of the time that Plaintiff was serving as President. There were also numerous high-profile investigations and proceedings taking place during that time which related to the underlying facts and circumstances of this case. For instance, it likely would have been improper for Plaintiff—the head of the Executive Branch and most prominent member of the United States government—to sue his Executive Branch subordinates, as doing so would have been a potential conflict of interest and risked interfering with the then-ongoing investigation being carried out by Special Counsel Robert Mueller. Such an act would have also likely raised separation of powers concerns due to the potential disruption of the investigation being carried out at that time by the Select Committee on Intelligence. *See*, *e.g.*, *Cheney v. US Dist. Court for D.C.*, 542 U.S. 367, 389-390 (2004) ("'[O]ccasion[s] for constitutional confrontation between

---

[2] It is worth noting that the tolling provisions of the Servicemembers Civil Relief Act, 50 U.S.C. §§ 3901-4043, is based upon a similar premise – namely, that individuals who selflessly devote their time and energy to serving the Nation should not be punished for "dropping their affairs to answer their country's call." *Le Maistre v. Leffers*, 319 U.S. 561, 575 (1948). The President of the United States—who is the Commander and Chief of the nation's armed forces—should be afforded the same benefit.

5

the two branches' should be avoided whenever possible.") (quoting *Nixon,* 418 U.S. at 692); *see also Trump v. Mazars USA LLP*, 140 S.Ct. 2019, 2033-34 ("Congress and the President have an ongoing institutional relationship as the 'opposite and rival' political branches established by the Constitution.").

Therefore, in view of the unique circumstances presented in this case, Plaintiff respectfully requests that all applicable statutes of limitation in this action be equitably tolled from January 20, 2017 through January 20, 2021 – the four-year period during which Plaintiff was serving as President of the United States.

## B. ALL OF PLAINTIFF'S CAUSES OF ACTION HAVE BEEN TIMELY ASSERTED

Assuming *arguendo* that equitable tolling is not warranted in the instant scenario, Plaintiff's claims are timely all the same. Indeed, contrary to Defendants' contention, each of Plaintiff's claims was asserted well within the applicable statute of limitations period for the reasons set forth below.

### i.   Civil RICO (18 U.S.C. § 1962(c) and RICO Conspiracy (18 U.S.C. § 1964)

#### a.   The Statute of Limitations Has Been Suspended Throughout the Pendency of Related Criminal and Civil Proceedings

When passing the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1961-1968, Congress neglected to provide an applicable statute of limitations for causes of action arising under the statute. Thereafter, in *Agency Holding Corp. v. Malley-Duff & Assoc.*, 483 U.S. 143 (1987), the Supreme Court "borrow[ed]" the four-year statute of limitations of the Clayton Act, codified in 15 U.S.C. § 15(b), and held that it is applicable to Civil RICO claims. *Malley-Duff*, 483 'U.S. at 148. In doing so, the Court recognized that "even a cursory comparison of the two statutes reveals that the civil action provision of RICO was patterned after the Clayton Act" and acknowledged that "the Clayton Act clearly provides a far closer analogy than any available state statute, and that the federal policies that lie behind RICO and the practicalities of RICO litigation make the selection of the 4–year statute of limitations for Clayton Act actions . . . the most appropriate limitations period for RICO actions." *Id.* at 156; *see also Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 189, 117 S. Ct. 1984, 1990 (1997) ("Congress consciously patterned civil RICO after the Clayton Act."). Among other things, the Court noted that: "[b]oth RICO and the Clayton Act are designed to remedy economic injury by providing for the recovery of treble damages, costs, and attorney's fees[;] [b]oth statutes bring to bear the pressure of 'private attorneys general' on a serious

national problem for which public prosecutorial resources are deemed inadequate; [and] both statutes aim to compensate the same type of injury; each requires that a plaintiff show injury 'in his business or property by reason of' a violation." *Malley-Duff*, 483 U.S. at 150-51.

Critically, when a statute of limitations is 'borrowed' in this way, the statute is adopted *in its entirety*. In *Johnson v. Railway Exp. Agency, Inc.*, 421 U.S. 454, 463-64 (1975), the Supreme Court stated:

> Any period of limitation . . . is understood dully only in the context of the various circumstances that suspend it from running against a particular cause of action. Although any statute of limitations is necessarily arbitrary, the length of the period allowed for instituting suit inevitably reflects a value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones. In virtually all statutes of limitations the chronological length of the limitation period is interrelated with provisions regarding tolling, revival, and questions of application.

In other words, when a statute of limitations is 'adopted'—as is the case here—the tolling and suspension provisions contained in the adopted statute will likewise be carried over. *Id.*; *see also Chardon v. Fumero Soto*, 462 U.S. 650, 657 (1983) ("Because the 'chronological length of the limitation period is interrelated with provisions regarding tolling' . . . the practice of 'borrowing' state statutes of limitations "logically include[s] rules of tolling.") (citations omitted); *Harbin v. Straub*, 490 U.S. 536 (1989) ("In virtually all statutes of limitations, the chronological length of the limitation period is interrelated with provisions regarding tolling, revival, and questions of application. . . [c]ourts thus should not unravel state limitations rules unless their full application would defeat the goals of the federal statute at issue.") (citing *Johnson*, *supra*).

Critically, the Clayton Act contains a tolling provision, codified as 15 U.S.C. § 16(i), which states as follows:

> Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws, but not including an action under section 15a of this title, the running of the statute of limitations in respect to every private or State right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter[.]

The legislature's reason for including this tolling provision was to allow a potential plaintiff to "reap the benefits" of a related government proceeding by allowing the potential plaintiff to "study the [g]overnment's case, estimate his own damages, assess the strength and validity of his suit, and prepare and file his complaint." 2 U.S. Code Cong. And Admin. News, 84th Cong. 1955, at 2328,

2332; *see also Minnesota Min. & Mfg. Co. v. New Jersey Wood Finishing Co.*, 381 U.S. 311, 317 (1965) ("it is plain that in [§ 16(i)] Congress meant to assist private litigants in utilizing any benefits they might cull from government . . . actions."); *Union Carbide & Carbon Corp. v. Nisley*, 300 F.2d 561, 569 (10th Cir. 1962) (noting that the purpose of the Clayton Act's tolling provision is to "to vouchsafe the intended benefits of related government proceedings by suspending the running of the statute of limitations until the termination of the government proceedings[.]").

Indeed, several courts have already confirmed that, consistent with *Johnson v. Railway Exp. Agency, Inc,* the tolling provision of 15 U.S.C. § 16(i) applies in full force to RICO actions. *See, e.g., Pension Fund Mid Jersey Trucking Industry v. Omni Funding*, 687 F.Supp. 962, 965 (D.N.J., June 28, 1988) ("I conclude that the tolling provisions of the Clayton Act are applicable under RICO."); *Gianelli v. Schoenfeld*, 2021 WL 4690724, at *6 (E.D. Cal. Oct. 7, 2021) ("The court is willing to assume . . . that the Clayton Act's tolling provision applies to RICO claims."); *Pres. Petrified Forrest v. Renzi*, 2014 WL 530574, at *3-4 (D. Ariz. Feb. 12, 2013) ("The Court concludes that the tolling provision in 15 U.S.C. § 16(i) applies to the RICO civil enforcement provisions."). Thus, since § 16(i) is applicable to Plaintiff's RICO claims, the question turns to whether there are circumstances present that warrant tolling here.

The tolling effect of 15 U.S.C. § 16(i) is triggered upon the commencement of any "civil or criminal proceeding . . . instituted by the United States." 15 U.S.C. § 16(i). The time of commencement of a proceeding is generally considered to be the filing of an indictment or complaint. *See, e.g., Leh v. Gen. Petroleum Corp.*, 382 U.S. 54, 59-63 (1965) (giving tolling effect from the time that the government filed a complaint); *Minn. Mining & Mfg. Co*, 381 U.S. at 313 (giving tolling effect from the date the FTC filed an enforcement action); *Chipanno v. Cahmpion Int'l Corp.*, 702 F.2d 827, 832-33 (9th Cir. 1983) (giving tolling effect from the date government filed a complaint). When applicable, § 16(i) "tolls the statute of limitations against all participants in a conspiracy which is the object of a Government suit, whether or not they are named as defendants or conspirators therein." *Zenith Radio Corp. v. Hazeltine Research,* 401 U.S. 321, 336, 91 S. Ct. 795, 805 (1971). Moreover, "[s]uspension of the running of the statute of limitations pending resolution of the government action may not be made to turn on whether the United States is successful in proving the allegations of its complaint." *Leh*, 382 U.S. at 65.

Although Defendants argue that § 16(i) is inapplicable because there are no "government actions founded on the specific RICO predicate acts [] alleged" in the Complaint, Def. Mem. at 5,

they fail to recognize that the express language of the statute requires only that a prior proceeding be "based in whole or *in part* on *any matter* complained of" in the instant proceeding. 15 U.S.C. § 16(i). Indeed, to establish that a prior proceeding qualifies under § 16(i), a "private plaintiff is not required to allege that the same means were used to achieve the same objectives of the same conspiracies by the same defendants . . . [r]ather, effect must be given to the broad terms of the statute itself—'based in whole or in part on any matter complained of." *Leh*, 382 U.S. at 59. All that is required is that Plaintiff show that "the matters complained of in the government suit bear a *real relation* to the private plaintiff's claim for relief." *Id.* at 59 (emphasis added); *see also Minnesota Min. & Mfg. Co.*, 381 U.S. at 323 (stating that § 16(i) "provides for tolling as long as the private claim is based 'in part on any matter complained of' in the government proceedings."). To make this determination, courts will look towards "a comparison of the two complaints on their face." *Leh*, 382 U.S. at 65.

Here, there are three prior proceedings with subject matter that overlap significantly with the matters complained of in the instant complaint, and therefore qualify as "civil or criminal proceedings under § 16(i):

*First*, the enforcement action commenced by the Federal Election Commission (FEC) against the DNC and the Clinton Campaign, under the caption *In the Matter of DNC Services Corp./Democratic National Committee and William Q. Derrough in his official capacity as treasurer; Hillary for America and Elizabeth Jones in her official capacity as treasurer; Perkins Coie LLP; Marc Elias; Fusion GPS; Christopher Steele*, Federal Election Commission, MURs 7291, 7331 and 7449 (the "FEC Action"), qualifies as such. While § 16(i) states only that it applies to a "civil or criminal proceeding " that is "instituted by the United States," the Supreme Court has interpreted this language broadly to encompass federal administrative proceedings. Specifically, in *Minnesota Min. & Mfg. Co.*, the Court found that a proceeding initiated by the Federal Trade Commission (FTC) qualified under § 16(i). In doing so, the Court pointed to the legislative intent of § 16(i) and implied that all proceedings initiated by a federal agency would similarly qualify:

> We hold, therefore, that the limitation provision of [§ 16(i)] is tolled by Commission proceedings to the same extent and in the same circumstances as it is by Justice Department actions. In so holding we give effect to Congress' basic policy objectives in enacting [§ 16(i)]—objectives which would be frustrated should we reach a contrary conclusion and thereby deprive large numbers of private litigants of the benefits of government antitrust suits simply because those suits were pursued by

one governmental agency rather than the other." *Minnesota Min. & Mfg. Co.*, 381 U.S. at 321-322.

The operative complaint in the FEC Action, the First General Counsel's Report (the "FEC Complaint"), was filed on April 10, 2019.[3] *See generally* Declaration of Alina Habba, **Exhibit A**; *see also* Am. Compl. ¶ 83. In sum and substance, the FEC Complaint alleges that the DNC and the Clinton Campaign "failed to file accurate disclosure reports when they mischaracterized the payee and purpose of certain disbursements disclosed as made to Perkins Coie LLP for legal services, when in fact the payments were passed through to the research firm Fusion GPS for the purpose of opposition research and should have been disclosed as such." Habba Dec., **Ex. A** at 1. In addition to the DNC and the Clinton Campaign, the Complaint discusses many of the prominent Defendants in this action, including Perkins Coie, Marc Elias, Robby Mook, Fusion GPS, Glenn Simpson, Christopher Steele, and Orbis Ltd. The facts alleged in the FEC Complaint overlapped immensely with the allegations contained in Plaintiff's Complaint, particularly with regard to the construction of the Enterprise, the RICO Defendants' actions in furtherance of the Enterprise's goals, their collective efforts to conceal their illicit arrangement by misreporting the relationship between the DNC/the Clinton Campaign and Fusion GPS and funneling funds through Perkins Coie, and Defendants' knowledge of the same.

For example, the FEC Complaint describes how the Clinton Campaign and the DNC, through their joint general counsel, Perkins Coie, worked with Fusion GPS, who retained Steele and Orbis Ltd. to perform opposition research on Plaintiff and lead a media smear campaign against him. It goes on to describe how "Steele drafted a series of memoranda based on the information he gathered (i.e., the dossier) and provided the memoranda, intermittently, to Fusion, which in turn shred some of the information therein . . . with Perkins Coie, which in turn shared some of the information with [the Clinton Campaign and the DNC]." *Id.* at 38; *compare generally to* Am. Compl. It even discusses events such as Fusion GPS and Steele meeting with major media outlets to discuss the details the alleged Trump-Russia collusion, *id.* at 11 n. 37; *compare to* Am. Compl. ¶ 227, Steele providing a copy of the Dossier to the FBI, Habba Dec., **Ex. A** at 10; *compare to* Am. Compl. ¶¶ 158, 226, 651, and Steele describing the contents of the Dossier to a journalist with *Mother Jones*, Habba Dec., **Ex.**

---

[3] The First General Counsel's Report was subsequently affirmed and authorized for compulsory process by the FEC Commissioners on July 23, 2019. *See* Certification ¶ 2.a, MURs 7291 &7449 (DNC & HFA) (July 26, 2019); Am. Compl. ¶¶ 83, 471.

**A** at 10; *compare to* Am. Compl. 272-275. Given the significant overlap between the FEC Complaint and the Complaint, there is a sufficient throughline between the two actions to qualify the FEC Action as a "civil or criminal proceeding . . . instituted by the United States." Accordingly, the statute of limitations for Plaintiff's RICO claim was suspended as of the time of the filing of the FEC Complaint on April 10, 2019, and said suspension remained in place when Plaintiff's Complaint was filed on March 24, 2022.[4]

*Second,* the criminal action commenced on September 16, 2021 by the United States of America (through Special Counsel John Durham) against Michael Sussmann in the United States District Court, District of Columbia, under the caption *United States v. Michael Sussmann*, case no. 1:21-cr-00582-CRC (the "Sussmann Action") also qualifies as a "civil or criminal proceeding. . . instituted by the United States" for the purposes of § 16(i). The operative complaint in the Sussmann Action is the indictment dated September 16, 2021 (the "Sussmann Indictment"). The Sussmann Indictment is practically a word-for-word retelling of the Alfa Bank-related allegations detailed in the Complaint and outlines many of the facts surrounding the coordinated efforts between Sussmann and Joffe to falsely implicate Plaintiff as colluding in Russian, including: (i) Joffe's cyber-related efforts to mine and manipulate data to create an "inference" that Plaintiff was engaged in wrongdoing, *see* Habba Dec., **Ex. B** at ¶¶ 12-15, 21-24; *compare to* Am. Compl. at ¶¶ 135-146, 185-190; (ii) Sussmann's numerous meetings, conferences, and communications with other RICO Defendants and the billing of his time to the Clinton Campaign and the DNC, *see* Habba Dec., **Ex. B** at ¶¶ 4, 9, 14, 19, 20, 24-27, 29-39; *compare to* Am. Compl. at ¶¶ 175-184, 195-197, 206, 224, 242; (iii) Sussmann's attempts to leak the false allegations through the media, Habba Dec., **Ex. B** at ¶¶ 1, 2, 22, 25, 34-37; *compare to* Am. Compl. at ¶¶ 174-176, 184, 191, 232; (iv) Sussmann's proffering of false statements to the FBI and the CIA, Habba Dec., **Ex. B** at ¶¶ 3-7, 24, 26-28, 30-33, 39-44, 46; *compare to* Am. Compl. at ¶¶ 172, 198, 204-217, 297-311; and (v) Sussmann's drafting of the various misleading and falsified 'white papers' which were ultimately provided to the FBI and the CIA, *see* Habba Dec., **Ex. B** at ¶¶ 24, 26-27, 30; *compare to* Am. Compl. at ¶¶ 172, 184, 193-194, 198, 201, 204-217, 297-311. The Sussmann Indictment is also littered with references

---

[4] The FEC Action was resolved on February 22, 2022 by virtue of the DNC and the Clinton Campaign entering into respective Conciliation Agreements, s*ee* Am. Compl. ¶¶ 477-479; *see also* **Ex. B**, so the suspension remained effective for an additional one year after said resolution, until February 23, 2023, *see* § 16(i).

to the other RICO Defendants, including Joffe, *see* Habba Dec., **Ex. B** ¶¶ 4, 6, 12-15, 17-28, 30, 33, 38-39, members of the Clinton Campaign, *see id.* ¶¶ 4, 6, 9-11, 19-20, 24-27, 29-30, 33, 37-38, 46, Elias, *id.* ¶¶ 10, 19-22, 24-26, 33, and Fusion GPS, *id.* ¶¶ 11, 20, 22, 24, 26-27, 30,33-35, and alleges that they all worked together to carry out a joint conspiracy – a theory that was crystalized in a later filing in the action, *see* Habba Dec., **Ex. C**, The Government's Motion *In Limine* (ECF Doc. No. 61), *United States v. Sussmann*, case no. 1:21-cr-00582-CRC, District of Columbia (April 4, 2022) at 19 (stating that the "evidence, public information, and expected testimony clearly establishes by a preponderance of evidence that [Sussmann] and [Joffe] worked in concert with each other and with agents of the Clinton Campaign to research and disseminate the [Alfa Bank] allegations."); *see also id.* at 32 (noting a "common plan and mutual coordination among" Fusion GPS, Joffe, Sussmann, and the Clinton Campaign.). Unsurprisingly, the Sussmann Indictment is cited throughout the Complaint and discussed at length, while the evidence and testimony adduced at the Sussmann trial is similarly prominent. Therefore, the Sussmann Action qualifies as a "civil or criminal proceeding . . . instituted by the United States" that suspends the running of Plaintiff's RICO statute of limitations from the date of its filing—September 16, 2021—through the present.[5]

*Third,* the criminal action commenced on November 3, 2021 by the United States of America (through Special Counsel John Durham) against Igor Danchenko in the United States District Court, Eastern District of Virginia, under the caption, *United States v. Igor Danchenko*, case no. 1:21-cr-00245-AJT (the "Danchenko Action") is also a "civil or criminal proceeding. . . instituted by the United States" within the context of § 16(i). The operative complaint in the Danchenko Action is the indictment dated November 3, 2021 (the "Danchenko Indictment"). Like the Sussmann Indictment, the Danchenko Indictment provides a comprehensive overview of another portion of the Enterprise's activities – the creation of the Steele Dossier and the fraudulent, media-centric smear

---

[5] The Sussmann Action was resolved on May 31, 2022, when a decision was rendered after jury trial, *see* Def. Mem. at 12 n 12; therefore, the suspension remained effective for an additional one year after said resolution, until May 31, 2023, *see* § 16(i). Additionally, as an aside, although Sussmann was acquitted on the charge of making a false statement in violation of 18 U.S.C. § 1001(a)(2), the acquittal has no legal effect on the applicability of the tolling provision of § 16(i). *See Leh*, 382 U.S. at 65-66 ("Obviously suspension of the running of the statute of limitations pending resolution of the government action may not be made to turn on whether the United States is successful in proving the allegations of its complaint.") (citing *Minn. Mining & Mfg. Co*, 381 U.S. at 316). Nor should it, since Plaintiff was able to "reap the benefits" of the Sussmann Action as evidenced by the vast number of references in the Complaint to testimony and evidence adduced throughout the course of the Sussmann Action.

campaign headed by Fusion GPS. *See generally* Habba Dec., **Ex. D**; *compare to* Am. Compl. For the same reasons the Sussmann Action qualifies as a "civil or criminal proceeding. . . instituted by the United States," the Danchenko Action does as well. Accordingly, the Danchenko Action suspends the running of Plaintiff's RICO statute of limitations from the date of its filing—November 3, 2021—through the present.

Based on the foregoing, pursuant to the tolling provision of § 16(i), Plaintiff's RICO claims have been suspended from as early as April 2019, but no later than September 16, 2021 or, alternatively, November 3, 2021, through the present.

### b. *Fraudulent Concealment Compels Equitable Tolling of Plaintiff's RICO Claims*

The statute of limitations for Plaintiff's RICO claim must also be tolled because the RICO Defendants engaged in a concerted effort to fraudulently conceal their wrongdoing.

"Under the fraudulent concealment doctrine, even when a claim has already accrued, a plaintiff may benefit from equitable tolling in the event that the defendant took specific steps to conceal her activities from the plaintiff." *Fedance v. Harris*, 1 F.4th 1278, 1283 (11th Cir. 2021)). "Fraudulent concealment occurs when a defendant makes affirmative acts or misrepresentations 'which are calculated to, and in fact do, prevent the discovery of the cause of action,'" *Id.* at 128 (citation omitted), or "where the wrong is of such a character as to be self-concealing." *Foudy v. Indian River*, 845 F.3d 117 (11th Cir. 2017) (citation omitted). "[I]f the defendant conceals *any* element of the offense . . . the [statute of limitations] will be tolled." *Mathews v. Kidder, Peabody & Co., Inc*., 260 F.3d 239, 256 n.26 (3d Cir. 2001) (emphasis in original).

As detailed in the Complaint, the RICO Defendants engaged in a litany of affirmative acts and misrepresentations that were specifically designed to conceal the nature of their racketeering activities which, in turn, prevented Plaintiff from discovering his RICO cause of action. From the outset, the RICO Defendants organized the Enterprise in a manner that would obscure their interactions and communications, under the guise of attorney-client privilege, as evidenced by statements made by Elias himself. Am. Compl. ¶¶ 79-82, 592-595. To further cover their tracks, the RICO Defendants devised an arrangement whereby the DNC and the Clinton Campaign would funnel their payments to Fusion GPS through Perkins Coie—in violation of campaign finance laws—thereby avoiding public disclosure requirement and obfuscating the ties between the RICO Defendants. *Id.* ¶ 83-84, 470-479, 596.

Beyond that, the RICO Defendants also committed numerous fraudulent acts that served to

conceal their RICO violations. The Complaint details all of this conduct at length, but to briefly name a few: (i) Sussmann's misrepresentation to FBI General Counsel, Jim Baker, that his meeting was "not on behalf of any client; as a result of that lie, the FBI placed a "close hold" placed on Sussmann as a source, and his identity was kept confidential from all except a chosen few within the FBI; even FBI agents were not aware of Sussmann's identity until the filing of the indictment in the Sussmann Action on September 16, 2021, *id.* ¶¶ 599-600; (ii) Joffe's intentional circumvention of his FBI handler, choosing to instead feed false information directly to Special Agent Grasso while instructing him "not to disclose his identity to other people in the bureau," which led to Joffe's identity being kept as confidential source, further obscuring his wrongdoing until the filing of the indictment in the Sussmann Action on September 16, 2021, *id.* ¶¶ 601-602; and (iii) since the inception of their plan, many of the RICO Defendants have made false or misleading statements, often times under oath, in the course of congressional investigations, law enforcement and/or counter-intelligence investigations, and civil or criminal proceedings, all for the purpose of concealing their wrongdoing, *id.* ¶ 604.

Moreover, the acts described above—in addition to *all* of the predicate acts in violation of federal obstruction of justice laws (i.e., 18 U.S.C. § 1512)—are self-concealing wrongs that must be construed as acts of fraudulent concealment. *See Foudy*, 845 F.3d at 1125 ("A self-concealing wrong is one in which the clandestine nature of the activity is essential to the act itself, where a "deception, misrepresentation, trick or contrivance is a necessary step in carrying out the illegal act," not merely "separate from the illegal act and intended only to cover up the act.").

Based on the foregoing, an equitable tolling of the statute of limitations for Plaintiff's RICO claim is warranted. The tolling should run through September 16, 2021, when the Sussman Indictment was filed and Plaintiff became aware that he had a valid RICO cause of action, upon learning the identity of two of the RICO Defendants—Sussmann and Joffe—as well as discovering that the RICO Defendants had engaged in a pattern of racketeering activity, including the commission of the predicate acts of obstruction of justice and theft of trade secrets.

### c. *Accrual Under the Discovery Rule*

In determining when accrual begins for a cause of action under the civil RICO statute, courts look towards the injury discovery rule. *See generally Rotella v. Wood*, 528 U.S. 549, 560 (2000). When the injury discovery rule applies, "accrual is delayed until Plaintiff has 'discovered'" his injury. *Fedance*, 1 F.4th at 1285 (citing *Gabelli v. SEC*, 568 U.S. 442, 449 2013). Thus, the relevant

inquiry is "when the [plaintiff's] injury was or should have been discovered." *Lehman v. Lucom*, 727 F.3d 1326, 1330 (11th Cir. 2013).

Since Plaintiff's RICO claims (Counts I and II) set forth several independent injuries that Plaintiff has incurred by way of Defendants' various RICO violations, the separate accrual rule comes into play as well. Pursuant to the separate accrual rule, "if a new RICO predicate act gives rise to a new and independent injury, the statute of limitations clock will start over for the damages caused by the new act." *Lehman v. Lucom*, 727 F.3d 1326, 1331 (11th Cir. 2013) (citing *Klehr,* 521 U.S. at 190). For an injury to be considered new and independent, it must be "a new and independent act that is not merely a reaffirmation of a previous act and [i]t must inflict new and accumulating injury on Plaintiff. *Pilkington v. United Airlines,* 112 F.3d 1532, 1537–38 (11th Cir.1997)).

In the Complaint, Plaintiff sets forth nine distinct types of injuries he was caused to sustain by way of the RICO Defendants' actions, including: (i) "loss of political []reputation;" (ii) "loss of [] business reputation;" (iii) "loss of existing and future business opportunities;" (iv) "loss of competitive position;" (v) "loss of business revenue;" (vi) "loss of goodwill;" (vii) "loss of trade secrets;" (viii) "loss of contractual relations;" and (ix) "defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the RICO Defendants' actions and the various federal investigations and/or official proceedings which arose therefrom." Am. Compl. ¶¶ 615-616. For the purposes of the separate accrual rule, these injuries can be grouped into three subsets of categories, as discussed below.

The first category of damages is the attorneys' fees and costs of defense that Plaintiff was caused to incur by way of Defendants' fraudulent provocation of numerous federal investigations into his alleged collusion with Russia. All of these expenses were incurred between September 2017 and 2020, in connection with the Mueller Investigation, with the vast majority being incurred subsequent to April 2018.[6] Therefore, the true extent of this portion of Plaintiff's injuries was not discoverable until April 2018 at the earliest.

The second category of damages is the losses Plaintiff sustained to his business and political reputation as a direct result of Defendants' racketeering activity. The earliest Plaintiff could have these damages would have been on May 17, 2017 – the date of the commencement of the DOJ's criminal probe headed by Special Counsel Robert Mueller (the "Mueller Investigation"). The

---

[6] Plaintiff's legal billing records are subject to attorney-client privilege and other applicable privileges but shall be made available for in-camera inspection upon the Court's request.

Mueller Investigation was a highly publicized federal investigation which dominated the news cycle for years, severely impacted the public's perception of his presidential administration, and "irreparable, unjustly and permanently tarnished Plaintiff's political reputation." Am. Compl. ¶ 614. Thus, Plaintiff could not have been aware of the true extent of reputational damage caused by the RICO Defendants' acts until the Mueller Investigation was commenced, at the earliest.

The third category of damages is the loss of trade secrets incurred in connection with the RICO Defendants' exploitation of proprietary data belonging to Plaintiff and his business, the Trump Organization. As alleged in the Complaint, Plaintiff was not aware that his sensitive, confidential, and proprietary data had been stolen and misappropriated until September 16, 2017, when these "revelations were exposed for the first time in the Sussmann indictment and/or subsequent motions filed by Special Counsel John Durham." Am. Compl. 146.  Given the sophisticated and technical nature of the RICO Defendants' cyberattack, it would not have been plausible for Plaintiff to have discovered this injury at an earlier date.

Therefore, when coupled with the tolling considerations set forth above, Plaintiff's RICO claim has been timely asserted as to all three categories of damages.

### C. *The Remaining Claims are Timely*

#### a. *Malicious Prosecution*

The statute of limitations for malicious prosecution under Florida law is four years. *See* Fla. Stat. § 95.11(3)(o)(setting a four-year statute of limitations for "[a]n action for assault, battery, false arrest, malicious prosecution, malicious interference, false imprisonment, or any other intentional tort"). The statute of limitations begins to run when the prosecution is terminated in Plaintiff's favor. *See Olson v. Johnson*, 961 So. 2d 356, 359 (Fla. 2nd DCA 2007) ("For a cause of action for malicious prosecution, the right to maintain a suit arises upon termination of the prosecution favorably to Plaintiff."); *see also Baez v. Root*, 2014 WL 1414433 at *2 (S.D. Fla., April 11, 2014) (four-year statute of limitations applies to conspiracy claims).

Here, the Complaint alleges that Defendants engaged in conduct that was designed to—and ultimately successful in—provoking the commencement of the FBI's Crossfire Hurricane investigation, and by extension, the Mueller Investigation, which entailed more than 2,800 subpoenas, approximately 500 search warrants, and interviews of more than 500 witnesses. *See* Am. Compl. ¶¶ 459-462. These investigations culminated with the filing of the "Report on the

Investigation into Russian Interference in the 2016 Presidential Election" (the "Mueller Report") which found that there was no evidence to conclude that the Trump Campaign coordinated with Russia to influence the election. This finding was further substantiated in a letter dated March 24, 2019 wherein Attorney General William P. Barr confirmed that there was insufficient evidence to support any criminal charges against Plaintiff. As a result, these investigations were effectively "terminated in Plaintiff's favor" on March 24, 2019, thereby triggering the accrual of the four-year statute of limitations. *Olson*, 961 So. 2d at 359.

Therefore, since Plaintiff's malicious prosecution claim was filed prior to the expiration of the statute of limitations on March 24, 2023, the claim is timely.

### b. *Injurious Falsehood*

Under Florida law, the tort of defamation and the conspiracy to commit it (whether libel or slander) is subject to a two-year statute of limitations. *See* Fla. Stat. § 95.11(4)(g). *See also Wagner, Nugent, Johnson, Roth, Romano, Erikson & Kupfer, P.A. v. Flanagan*, 629 So. 2d 113, 115 (Fla. 1993). As set forth above, the statute of limitations as to each of the libelous statements at issue should be equitably tolled during the time that Plaintiff was serving as President. Moreover, many of the statements were made in the two years immediately preceding the instant filing of the Complaint. *See* Am. Compl., ¶ ¶463, 503, 512, 513, 514, 519, 520. Each and every one of these statements were false, made with actual malice, and designed to further the lie that Plaintiff coordinated with Russia to undermine the 2016 election. As such, Plaintiff has demonstrated that the defamatory statements were made and published within the statutory period.

### c. *Computer Fraud and Abuse Act, Stored Communications Act, and Theft of Trade Secrets*

The Computer Fraud and Abuse Act (CFAA) and the Stored Communications Act (SCA) both have two-year statutes of limitations, *see* 18 U.S.C. § 1030(g); 18 U.S.C. § 2701, while Theft of Trade Secrets has a three year statute of limitations, *see* 18 U.S.C. § 1832.

The federal discovery rule applies to all three of these claims. *Chappell v. Rich*, 340 F.3d 1279, 1283 (11th Cir. 2003) (CFAA); *see also, Sewell v. Bernardin*, 795 F.3d 337, 338 (2d Cir. 2015) (SCRA); *see also, Sisoian v. Int'l Bus. Machines*, 2014 WL 4161577, at *4-5 (W.D. Tex. Aug. 18, 2014) (theft of trade secrets).  Under the federal discovery rule, Plaintiff's claims accrued when it either knew or should have known both 1) that it has suffered the injury that forms the basis of his complaint, and 2) that Defendant inflicted that injury. *Mullinax v. McElhenney*, 817 F.2d 711, 716

(11th Cir. 1987). In assessing whether a plaintiff should have known of their claim, the court must determine whether facts sufficient to support a cause of action were or should have been apparent "to a person with a reasonably prudent regard for his rights." *Id.*

Here, Plaintiff did not learn of Defendants' unlawful infiltration of his computers to access sensitive, proprietary and confidential internet data until September 16, 2021, upon the filing of the Sussmann Indictment. *See* Am. Compl. ¶ 704. Plaintiff simply could not have known that its computer systems were infiltrated prior to that point. Furthermore, and as discussed at great length below, DNS data can rightfully be defined as a trade secret as it constitutes highly sensitive and confidential material which, upon release, damaged Plaintiff.  It is that discovery of damages linked to illegal computer access, that commenced the statute. Defendants have therefore failed to show that Plaintiff discovered any damage from the violation of the Computer Fraud and Abuse Act before two years of first alleging this claim.

## II.     THE COMPLAINT PUTS FORTH VALID AND COGNIZABLE CLAIMS AGAINST ALL OF DEFENDANTS

Rule 8(a)(2) F. R. Civ. P. requires a complaint to provide "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give Defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although a complaint need not include detailed factual allegations, to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when Plaintiff pleads factual content that allows the court to draw the reasonable inference that Defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556).  For the reasons set forth below, Plaintiff has satisfied the Rule 8 threshold with respect to all of the claims asserted in the Complaint.

### A.  CIVIL RICO (18 U.S.C. § 1962(C))

The civil RICO statute is an "aggressive initiative" for fighting crime which is intended to be "read broadly," *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497-98 (1985), and "liberally construed to effectuate its remedial purpose," *Boyle v. United States*, 556 U.S. 938, 944 (2009) (citing § 904(a), 84 Stat. 947, note following 18 U.S.C. § 1961). Indeed, the Supreme Court has repeatedly emphasized that the RICO statute must be viewed in context of "Congress' self-

consciously expansive language" and "approach" in passing the law. *Sedima*, 473 U.S. at 497–98.

Under § 1962(c) of the civil RICO statute, it is unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ." 18 U.S.C. § 1962(c). To prove a violation of § 1962(c), a plaintiff must show that Defendants "(1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two racketeering acts." *Ray v. Spirit Airlines, Inc.,* 836 F.3d 1340, 1348 (11th Cir. 2016). In addition, Plaintiff must establish "(1) the requisite injury to 'business or property,' and (2) that such injury was 'by reason of' the substantive RICO violation." *Id.* As set forth below, Plaintiff has sufficiently alleged all these elements and, therefore, has asserted a cognizable claim under 18 U.S.C. § 1962(c).

### i. *Existence of an Enterprise*

Pursuant to 18 U.S.C. § 1961(4), an enterprise is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." In particular, an association in-fact enterprise consists of "*any* union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (Emphasis added.) This construction is "obviously broad" and has a "wide reach." *Boyle*, 556 U.S. at 944. Indeed, the "very concept of an association in fact enterprise is expansive" and encompasses any "group of persons associated together for a common purpose of engaging in a course of conduct." *Id.* (citations omitted). In short, to establish the existence of an association in-fact enterprise, a plaintiff need only show that the enterprise has three structural features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946. Plaintiff has adequately pleaded each of these elements and has established that the Enterprise is a valid association in-fact enterprise.

*First*, Plaintiff has shown that the Enterprise had a purpose, identified with particularity as being the "common, unlawful goal of corruptly and wrongfully harming Plaintiff's political reputation, damaging his electability for the 2016 Presidential Election and subsequent elections, impeding his ability to effectively govern, and otherwise sabotaging his political career through deceptive, criminal and fraudulent means, including, but not limited to, falsely implicating Plaintiff, the Trump Campaign, and the Trump Administration as colluding with Russia." Am. Compl. ¶ 531. Further, the Complaint plausibly alleges, even proves, that each and every one of the RICO

Defendants shared this goal. Indeed, throughout the Complaint, Plaintiff affirmatively pleads that each of the RICO Defendants shared in the Enterprise's common purpose and had the requisite awareness of the Enterprise's racketeering activities. *See*, *e.g.*, *id.* ¶¶ 535, 555, 568-569, 572-573, 577, 621-627; *see also* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally"). Moreover, the Complaint sets forth a great deal of facts—which are extensively sourced and cited therein and cannot possibly be construed as being 'conclusory'—to support this position, including, without limitation, the following:

- *Clinton/Clinton Campaign*: on several occasions, U.S. intelligence officials, including CIA Director John Brennan, reported that Clinton had "approved a proposal from one of her foreign policy advisors to vilify [Plaintiff] by stirring up a scandal claiming interference by Russian security services" and that she planned to "t[ie] [Plaintiff] to Putin and the Russians' hacking of the Democratic National Committee," *id.* ¶¶ 162, 163, 196; Steele testified under oath that Clinton was "aware of [his] reporting," including the development of the fraudulent Dossier," *id.* ¶102; the Clinton Campaign was admittedly "on a mission to get the press to focus on . . . the prospect that Russia had not only hacked and stolen e-mails from the Democratic National Committee, but that it had done so to help [Plaintiff]," *id.* ¶ 165; all of Sussmann's time in furtherance of drafting his 'white papers' and making false statements to law enforcement (FBI and CIA) was billed to the Clinton Campaign, even reimbursing him for the USB drive which housed the falsified documents, *id.* ¶¶ 175-184, 195-197, 199, 206, 224, 242; Clinton and the top members of her campaign agreed to "affirmatively push" derogatory information about Plaintiff, which they knew to be false, to the media, *id.* ¶¶ 245-254; Sussmann testified under oath that the Clinton Campaign and the DNC shared his objective and specifically "direct[ed]" him to meet with the FBI and the CIA and to make false statements and provide falsified materials to both agencies, *id.* ¶ 307.

- *DNC*: DNC leadership had concocted a plan to "damage Republican presidential candidates' credibility with voters" by, among other things, "utiliz[ing] [opposition] research to place highly targeted hits" against Republican candidates, *id.* ¶50; the CFO of the Clinton Campaign admitted that the DNC was "fully under the control" of the Clinton Campaign, ," *id.* ¶59; the FEC noted the arrangement between the DNC and the Clinton Campaign was "troubling" and found that there was an "unusual degree of closeness between [the Clinton Campaign] and the DNC," *id.* ¶60; Steele testified that the DNC was "keen to see" the Steele Dossier be publicly reported by the media prior to November 18, 2016 – election day, *id.* ¶239; Sussmann testified under oath that the Clinton Campaign and the DNC shared his objective and specifically "direct[ed]" him to meet with the FBI and the CIA and to make false statements and provide falsified materials to both agencies, *id.* ¶ 307.

- *Perkins Coie/Elias/Sussmann*: Elias purposefully positioned himself as the "gatekeeper" between Fusion GPS and the Clinton Campaign/DNC for the express purpose of concealing their communications under the guise of attorney-client privilege, *id.* ¶¶ 78-82; Elias knowingly assisted in laundering the funds paid from the Clinton Campaign/DNC to Fusion GPS, *id.* ¶ 83; Elias authorized the decisions to retain Fusion GPS and Steele/Orbis Ltd., and he knew that they were being hired for illicit purposes, *id.* ¶¶ 76-82, 98, 124; Sussmann planned to engage in 'circular reporting' tactics with Joffe by simultaneously reporting false information to the FBI,

*id.* ¶¶ 136-139, 172;  Sussmann testified under oath that he had a common, shared objective with the Clinton Campaign and the DNC to meet with the FBI and the CIA and to make false statements and provide falsified materials to both agencies, *id.* ¶ 307; Elias and Sussmann participated in countless meetings with the RICO Defendants for the purposes of coordinating, planning and plotting the underlying unlawful conduct at issue in this action, *see generally id.*

- *Fusion GPS*: Simpson initiated Fusion GPS's involvement in the scheme by contacting a "senior figure in the Democratic Party" and stating that Plaintiff's presidential run "had to be stopped," *id.* ¶ 72; Simpson was aware that Fusion GPS was performing work for the DNC and Clinton Campaign, through Perkins Coie, *id.* ¶ 76; Fusion GPS recruited the assistance of Steele, who was "desperate that [Plaintiff] not get elected" and was "passionate about [Plaintiff] not being President," *id.* ¶ 95; Simpson specifically instructed Steele to include the false Alfa Bank allegations in the Steele Dossier, *id.* ¶ 176; Steele testified that the Fusion GPS wanted the Steele Dossier to become a major media story prior to election day, *id.* ¶ 239; despite knowing it was based on illegitimate information, Fritsch pressured a reporter to "do the f-cking alfa bank secret comms story" which he described as "hugely important," *id.* ¶ 244; Simpson had a meeting with a journalist wherein he "wanted [the journalist] to publish that the US Government was investigating [Plaintiff]," despite knowing the allegations were false, *id.* ¶ 273.

- *Joffe*: was offered a high-ranking government position if Clinton won the 2016 election, *id.* ¶132; sought to create a false "inference" that servers tied to Plaintiff were communicating with a Russian bank, in the hopes that "[Clinton's] opposition research and whatever professional gov[ernments] and investigative journalists are digging [would] come up with the same things," *id.* ¶187; acted at the behest of Democratic "VIPs," which can be reasonably inferred to be the other RICO Defendants, *id.* ¶¶ 141, 188; the CIA concluded that the DNS data obtained by Joffe was manipulated, specifically that it was "user created and not machine/tool generated," *id.* ¶ 309; Ankura, a private consulting firm, determined that the data was assembled and manipulated by "malicious actors," *id.* ¶¶ 310-311; Joffe claimed that it was "vitally important . . . in 2016 to make sure the [Trump-Alfa Bank] threat] . . . was known before the election," *id.* ¶ 324; Joffe planned to engage in 'circular reporting' tactics with Sussmann by simultaneously reporting false information to the FBI, *id.* ¶¶ 136-139, 172.

Defendants do not seriously dispute that Plaintiff has pleaded a legally cognizable RICO enterprise. Rather, they half-heartedly argue that the purpose of the Enterprise, as alleged, is "legitimate" and "not unlawful." Def. Mem. at 8. This argument not only disregards the specific language of the Complaint[7] and the breadth of allegations contained therein but it also ignores the plain language of the statute and the applicable case law. *See* 18 U.S.C. 1962(c) (stating that it "shall be unlawful for any person. . . associated with any enterprise. . . to conduct or participate, directly

---

[7] For instance, the Complaint alleges that the Enterprise "had a common, **unlawful** goal of **corruptly** and **wrongfully** harming Plaintiff's political reputation, damaging his electability for the 2016 Presidential Election and subsequent elections, **impeding** his ability to effectively govern, and otherwise **sabotaging** his political career through **deceptive**, **criminal** and **fraudulent** means, including, but not limited to, **falsely implicating** Plaintiff, the Trump Campaign, and the Trump Administration as colluding with Russia."). Am. Compl. ¶ 531  (emphasis added).

or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."); *see also Boyle*, 556 U.S. at 948 ("[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose."). Further, although not required, there is no question that Plaintiff has established that the Enterprise's goal is in furtherance of not only an unlawful purpose, but also a fraudulent one. *See generally Cisneros v. Petland, Inc.*, 972 F.2 1204, 1212 (explaining when it is necessary to show that a RICO enterprise has a common, fraudulent purpose). Therefore, Defendants' contention that the Enterprise is not cognizable because it has a "lawful" purpose is easily dispelled.

*Second*, the Complaint lays out the relationship of the parties in meticulous detail, setting forth the identities of the individuals and entities that comprise the Enterprise, their prior relationships and how they came to associate together, their shared purpose and common objectives, their respective roles and responsibilities in the Enterprise, their efforts to coordinate and communicate with one another, and their interrelated conduct in carrying out the Enterprise's illicit activities. Further, although not a necessary component of an association in-fact enterprise[8], the Complaint even describes the structural framework of the Enterprise and its chain of command, with Clinton, the Clinton Campaign, and the DNC serving in a leadership role, Perkins Coie overseeing and coordinating the day-to-day operations of the Enterprise, and Perkins Coie/Elias/Sussmann and Joffe each utilizing their specialized skills to lead separate, albeit interconnected, aspects of the overall scheme. *See* Am. Compl. ¶534. The Complaint also details how each member of the Enterprise had an existence separate and apart from the pattern of racketeering activities of the RICO Enterprises and how each member of the Enterprise engages in operations that are distinct from their activities on behalf of the RICO Enterprises. *See generally id.*

The Complaint further explains the frequent interactions between the various RICO Defendants and their substantial efforts to coordinate their operations and carry out the activities of the Enterprise. For instance, from June 2016 through November 2016, there were *daily* conference calls between the Clinton Campaign, the DNC, Perkins Coie, and Fusion GPS, and required attendees included Elias, Simpson, Fritsch, and Clinton Campaign lawyer Debbie Fine, *id.* ¶ 85; there were also weekly in-person meetings between Elias, Simpson, and Fritsch, *id.* ¶ 86; and there

---

[8] *See, e.g., Boyle*, 556 U.S. at 948 (stating that an association in-fact enterprise "need not have a hierarchical structure or a 'chain of command' . . . members of the group need not have fixed roles; different members may perform different roles at different times.")

were numerous meetings and conference calls involving a combination of Elias, Sussmann, Fusion GPS, Joffe, Steele, and representatives of the Clinton Campaign and/or the DNC, all of which were done for the purpose of furthering the RICO Defendants' scheme and were billed to the Clinton Campaign and/or the DNC, *see, e.g.*, *id.* ¶¶ 175-184, 195-197, 202-203, 242-245. Therefore, the Complaint extensively details the relationships among the RICO Defendants and their frequent coordination, interaction and planning.

*Third*, the facts alleged by Plaintiff clearly identify a scheme that has a sufficient longevity to carry out the Enterprise's goals. As explained in the Complaint, the Enterprise's multi-faceted goal was to: (i) "damag[e] the [Plaintiff's] electability for the 2016 Presidential Election and subsequent elections;" (ii) imped[e] [Plaintiff's] ability to effectively govern; and (iii) "sabotage[e] his political career." Am. Compl. ¶ 531. To accomplish those lofty goals, the RICO Defendants were necessarily required to engage in a complex, yearslong scheme. That is precisely what they did. Thus, contrary to Defendants' misapprehension, the Enterprise's conduct did not cease after Plaintiff was elected President. Indeed, even a cursory inspection of the Complaint reveals that a significant amount of the RICO Defendants' predicate acts took place *after* the election had already been decided in November 2016. *See, e.g.*, Am. Compl. at ¶¶ 279-341. Not only do the facts support this notion, but it is also entirely consistent with the Enterprise's goals – after Plaintiff was elected as President, the RICO Defendants remained entrenched in their efforts to "damage his electability for . . . subsequent elections" and to "imped[e] his ability to effectively govern" *Id.* ¶ 531.

Indeed, throughout their moving papers Defendants repeatedly mischaracterize Plaintiff's construction of the Enterprise, claiming that its stated goal was to get Hillary Clinton elected in 2016. To be clear, that is not what Plaintiff has alleged. As is plainly set forth in the Complaint, the Enterprise's activities were intended to *inflict harm upon Plaintiff*, not benefit Hillary Clinton. Specifically, the Complaint alleges that the RICO Defendants sought to "corruptly and wrongfully harm[] Plaintiff's political reputation, damage[e] his electability . . . imped[e] his ability to effectively govern, and otherwise sabotage[e] his political career through deceptive, criminal and fraudulent means[.]" Am. Compl. ¶ 531. In other words, the RICO Defendants sought to fraudulently tarnish Plaintiff's reputation to the point that he would be removed from the political sphere altogether. Any benefit that Clinton may have received from Plaintiff's expected downfall was merely incidental to this plot. Further, even if, as Defendants argue, one or more of the RICO Defendants' actions and motivations were related solely to the 2016 Presidential Election and

23

nothing beyond—a position that is entirely unsupported by the facts of the Complaint— it does not follow that the Enterprise, as a whole, was restricted to this single purpose. *See Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1285–86 (11th Cir. 2006) ("[T]here has never been any requirement that the 'common purpose' of the enterprise be the sole purpose of each and every member of the enterprise. . . it may often be the case that different members of a RICO enterprise will enjoy different benefits from the commission of predicate acts.").

For the foregoing reasons, Plaintiff has established that the Enterprise is a cognizable association-in-fact enterprise under the RICO statute.

### ii.   *Participation in the Enterprise's Affairs*

Under 18 U.S.C. § 1962(c), a plaintiff must show that Defendants "conduct[ed] or participate[d], directly or indirectly, in the conduct of [the RICO] enterprise's affairs through a pattern of racketeering activity[.]" 18 U.S.C. § 1962(c). "[T]o 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs . . . RICO liability is not limited to those with primary responsibility for the enterprise's affairs[] . . . [or] to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (footnote omitted). Therefore, "'to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs,' § 1962(c), one must participate in the operation or management of the enterprise itself." *Id. at 185*.

Here, the Complaint clearly establishes that each of the RICO Defendants "conduct[ed] or participat[ed], directly or indirectly," in the affairs of the Enterprise. 18 U.S.C. § 1962(c). As to each individual RICO Defendant, the Complaint alleges, in pertinent part, as follows:

- *Clinton*: exerted significant control over both the Clinton Campaign and the DNC and used this position to direct, oversee, and conduct the management of the Enterprise, *id.* ¶¶ 56-61, 534; expressly authorized dissemination of false claims to media, including *Slate, id.* ¶¶ 246-254*;* proliferated the spread of false information by republishing Sullivan's press release to her millions of followers on Twitter with additional, misleading information regarding its contents, *id.* 268, and a second tweet further spreading this false narrative, *id.* ¶ 269; in addition, based upon on the totality of evidence in the Complaint, Clinton's prominence within the Clinton Campaign and the significant control she exerted over the DNC, it is reasonable to infer that she conducted and/or participated in most, if not all, of the Enterprise's acts described herein.

- *Clinton Campaign*: funded Perkins Coie's various activities in furtherance of the Enterprise, including Sussmann's "confidential project," which it knew to be part of the Enterprise's operations, *id.* ¶¶ 14, 19, 20, 24-27, 29-39, 177; paid $180,000 to Fusion GPS to fund the Steele Dossier and other fraudulent 'opposition research,' funneled the money through

Perkins Coie, and misreported the payments to the FEC for the purpose of concealing the existence of the Enterprise, *id.* ¶ 83; authorized each and every fraudulent communication made by Fusion GPS to the media, *id.* ¶ 149; paid for the thumb drives containing the falsified Alfa Bank server data, *id.* ¶ 199; disseminated falsified Alfa Bank server data to *Slate* despite not "totally understand[ing]" the data, not being "totally confident' in its veracity, and believing it was "highly suspect," *id.* 246-254; Sullivan released an official Clinton Campaign press release regarding the Alfa Bank server allegations, which the Clinton Campaign brass knew to be false, *id.* ¶265; Sussmann testified under oath that he was directed by his clients—the Clinton Campaign and the DNC—to meet with the FBI and the CIA to make false representations and provide falsified materials, *id.* ¶ 307; conspired with Danchenko in furtherance of him making false statements to the FBI, *id.* ¶¶ 329-341.

- *DNC*: paid $777,907.97 to Fusion GPS to fund the Steele Dossier and other fraudulent 'opposition research,' funneled the money through Perkins Coie, and misreported the payments to the FEC for the purpose of concealing the existence of the Enterprise, *id.* ¶83; funded Perkins Coie's various activities in furtherance of the Enterprise, including Sussmann's "confidential project," which it knew to be part of the Enterprise's operations, *id.* ¶¶ 14, 19, 20, 24-27, 29-39, 177; authorized each and every fraudulent communication made by Fusion GPS to the media, *id.* ¶ 149; conspired with Danchenko in furtherance of him making false statements to the FBI, *id.* ¶¶ 329-341; Sussmann testified under oath that he was directed by his clients—the Clinton Campaign and the DNC—to meet with the FBI and the CIA to make false representations and provide falsified materials, *id.* ¶307.

- *Perkins Coie/Elias/Sussmann*: Perkins Coie, Elias, and Sussmann jointly serves as general counsel to the Clinton Campaign and the DNC, *id.* ¶¶ 46, 53; Elias, through Perkins Coie, oversaw the day-to-day operations of the Enterprise and served as the "gatekeeper" of communications between Clinton/the Clinton Campaign/the DNC and Fusion GPS/Joffe, *id.* ¶¶ 79-82; Elias hired Fusion GPS, authorized the hiring of Orbis Ltd. and Steele, and generally oversaw the development of the dossier and the fraudulent anti-Trump smear campaign, *id.* ¶¶ 73, 79-82, 98; Elias sought to conceal the relationship between the Clinton Campaign/the DNC and Fusion GPS through misreporting of payments, *id.* ¶¶ 83-84; Elias authorized each and every fraudulent communication made by Fusion GPS to the media, *id.* ¶ 149; Elias assisted with the drafting and preparation of Sullivan's October 31, 2016 press release concerning the false Alfa Bank server allegations, *id.* ¶267; Sussmann recruited Joffe and led the cyber-based attack against Plaintiff, *id.* ¶ 68; Sussmann drafted various misleading and falsified 'white papers' which were ultimately provided to the FBI and the CIA, *id.* ¶¶ 172, 184, 193-194, 198, 201, 204-217, 297-311; Sussmann knowingly disseminated false and derogatory information through the media, *id.* ¶¶ 174-176, 184, 191, 232; Sussmann made false representations and provided falsified information and data to the FBI, *id.* ¶¶ 172, 198, 204-217; Sussmann made false representations and provided falsified information and data to the CIA, *id.* ¶¶ 172, 198, 297-311; conspired with Danchenko in furtherance of him making false statements to the FBI, *id.* ¶¶ 329-341.

- *Fusion GPS*: spearheaded the campaign to falsely tarnish Plaintiff's reputation through the media by implicating him as colluding with Russia, *id.* ¶ 150; had numerous fraudulent interactions and communications with members of the media in an effort to have false stories published, *id.* ¶¶ 152-155, 227-231, 244, 255-252, 272-275, 287; hired Orbis Ltd. and Steele for the purposes of developing a fraudulent dossier, *id.* ¶¶ 94-97, 103-106; oversaw and

participated directed in the development of the fraudulent Steele Dossier, *id.* ¶¶ 103-106, 151; directed Steele to provide the Steele Dossier to law enforcement officials, *id.* 159; directed Steele to include the Alfa Bank allegations in the Steele Dossier, *id.* 176; directed Steele to provide the Steele Dossier to various members of the media, *id.* ¶ 151, 227; conspired with Danchenko in furtherance of him making false statements to the FBI, *id.* ¶¶ 329-341; drafted white papers involving falsified Alfa Bank server data, *id.* ¶ 561; provided a thumb drive containing the Steele Dossier to Bruce Ohr, intending for him to circulate it to law enforcement officials, *id.* ¶¶ 280-281; Simpson specifically instructed Steele to include the false Alfa Bank allegations in the Steele Dossier, *id.* ¶ 176; provided the Steele Dossier to David Kramer, knowing that he would give it to Senator John McCain, *id.* ¶ 291; continued its work of "exposing Russian interference in the 2016 Presidential Election" with The Democracy Integrity Project, for the purpose of "push[ing] the information…to policymakers on Capitol Hill, the press, and the FBI," *id.* ¶¶ 312-326.

- *Joffe*: exploited his access to non-public data sources, including DNS internet traffic, of a healthcare provider; Trump Tower; Plaintiff's private apartment in Central Park West, and the Executive Office of the President of the United States, in furtherance of his efforts to falsely implicate Plaintiff, *id.* ¶¶ 140-141; after obtaining the data, he "spoofed" the information, by disguising the origin of the computer communications, and making them appear falsely to originate from a particular IP address, *id.* ¶ 142; circumvented his FBI handler to make false representations and provided falsified information and data to an FBI special agent, *id.* ¶¶ 218-225; continued his work of "exposing Russian interference in the 2016 Presidential Election" with The Democracy Integrity Project, *id.* ¶¶ 312-326.

Moreover, Perkins Coie, Elias, and Sussmann raise the additional argument that they were merely providing "traditional legal services" and therefore cannot qualify as members of an enterprise. Def. Mem. at 39. While it is true that provision of traditional legal services, on its own, will not typically give rise to RICO liability, there is no "per se rule that one cannot operate or manage an enterprise via the provision of legal services." *Al-Rayes v. Willingham,* no. 6-cv-0362, 2007 WL 788401 * 2 (M.D. Fla. 2007). Indeed, when "the professional services provided strike at the very core of the enterprise,' it can be said that the lawyer is managing or operating the enterprise." *Id.* Here, the Complaint positions Perkins Coie, Elias and Sussmann as key players in the Enterprise, alleging that they are the "central hub that coordinated and oversaw the day-to-day operations of the Enterprise," with "Elias and Sussmann each leading parallel operations to wrongly implicate [Plaintiff] as colluding with Russia." Am. Compl. ¶¶ 68, 534. Perkins Coie, Elias, and Sussmann played a vital role in planning and carrying out the Enterprise's illicit operations, far beyond the provision of traditional legal services.

Based on the foregoing, Plaintiff has shown that each and every one of the RICO Defendants "participate[d] in the operation or management of the enterprise itself." *Reves*, 507 U.S. at 185.

### iii. *Pattern of Racketeering Activity*

A "pattern of racketeering activity" requires "at least two acts of racketeering activity, one of which occurred after the effective date of [the RICO statute] and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). "[A]cts of racketeering activity" include "any act which is indictable under any of the [enumerated statutory provisions]." 18 U.S.C. § 1961(1). These "acts of racketeering activity" are also known as "predicate acts." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 236 (1989). As described *infra*, the facts alleged in the Complaint establish that RICO Defendants committed a vast number of predicate acts, each in violation of one of the following federal statutes: (1) Obstruction of Justice, 18 U.S.C. § 1512; (2) Theft of Trade Secrets, 18 U.S.C. § 1832; and (3) Wire Fraud, 18 U.S.C. § 1343.

### a. *Obstruction of Justice (18 U.S.C. § 1512)*

The Complaint sufficiently pleads that the RICO Defendants intentionally mislead law enforcement authorities, including the FBI and the CIA, and committed numerous acts which constitute obstruction of justice in violation of 18 U.S.C. § 1512. There are two separate provisions of 18 U.S.C. § 1512 which are relevant here: § 1512 (b)(3) and § 1512 (c)(2).

First, § 1512 (b)(3) criminalizes "misleading conduct toward another person, with intent to . . . hinder, delay or prevent the communication to a law enforcement officer . . . relating to the commission or possible commission of a federal offense." 18 U.S.C. § 1512(b)(3). This provision "criminalizes the transfer of misleading information which actually relates to a potential federal offense." *United States v. Ronda*, 455 F.3d 1273, 1288 (11th Cir 2006) (citing *United States v. Veal*, 153 F.3d 1233, 1252 (11th Cir. 1998)). Importantly—despite Defendants' insistence to the contrary—§ 1512(b)(3) "*does not require that a defendant's misleading conduct relate in any way either to an 'official proceeding' or even to a particular ongoing investigation*," *id.* at 1288 (emphasis added); *see also* 18 U.S.C. § 1512(b)(3) (unlike other provisions of § 1512, the language "official proceeding" is not contained in section (b)(3)). In this way, § 1512 (b)(3) applies broadly to "ensur[e] that transfers of information to federal law enforcement officers and judges relating to the possible commission of federal offenses be truthful and unimpeded." *Id.* at 1286.

Plaintiff has alleged that the RICO Defendants engaged in a concerted plot to mislead and defraud federal authorities, including the FBI and the CIA, and made numerous false and misleading

statements to federal law enforcement officers, withheld pertinent and relevant information, and provided falsified and fabricated materials and records, including spoofed and "user created" data, various white papers with deceptive analysis of said data, and the fraudulent Steele Dossier. *See, e.g.*, Am. Compl. ¶¶ 94-123, 172-194, 204-225, 297-311. These actions, as alleged, each constitute a predicate act in violation of § 1512(b)(3). *See id.* at 1290 ("The fabrication of evidence to mislead federal investigators violates § 1512(b)(3)."); *United States v. Ronga*, 682 Fed.Appx. 849, 855 (11th Cir. 2017) (noting that § 1512(b)(3) "criminalizes attempts to provide misleading information or inhibit truthful information from being transferred."); *see also* 18 U.S.C. 1515(a)(3)(A),(C),(D) ("[M]isleading conduct" is defined to include "knowingly making a false statement" and "knowingly submitting or inviting reliance on a writing or recording that is false, forged, altered, or otherwise lacking in authenticity. . . [or] other object that is misleading in a material respect.").

Second, § 1512(c)(2) criminalizes the act of "corruptly . . . obstruct[ing], influenc[ing], or imped[ing] any official proceeding, or attempt[ing] to do so." 18 U.S.C. § 1512(c)(2). To prove a violation of this catchall provision, a plaintiff must show that Defendant "engaged in conduct which constituted a substantial step toward the commission of the crime of obstruction of an official proceeding;" that Defendant acted "'corruptly,' " *i.e.,* "with an improper purpose and to engage in conduct knowingly and dishonestly with the specific intent to subvert, impede or obstruct" the grand jury investigation; and [that the] "[t]he natural and probable effect of [Defendant's] conduct would be the interference with the due administration of justice." *United States v. Mintmire*, 507 F.3d 1273, 1289 (11th Cir. 2007).

For the same reasons set forth above, the RICO Defendants' numerous attempts to deceive federal law enforcement officials, including making false statements and providing fraudulent evidence, satisfies these elements. Moreover, while § 1512(c)(2) does require an 'official proceeding' to be involved to some extent, this requirement is met because—contrary to Defendants' contention—the FBI's Crossfire Hurricane investigation qualifies as an 'official proceeding.' *See, e.g., United States v. Lee*, 919 F.3d 340 (6th Cir. 2019) (finding that defendant's misleading acts and representations to FBI agents during preliminary investigation stage was sufficient to constitute a violation of 18 U.S.C. § 1512); *United States v. Grubb*, 11 F.3d 426 (1993) (finding that FBI investigation qualifies as proceeding for the purpose of various obstruction of justice statutes). Even if it does not, to prove a violation of § 1512(c)(2), a plaintiff must only show that "Defendant knew of or foresaw an official proceeding, and knew that his actions were likely to affect it." *United States*

*v. Friske*, 640 F.3d 1288, 1292 (11th Cir. 2011). Since the RICO Defendants were no doubt aware that their obstructive and fraudulent conduct would affect not only the Crossfire Hurricane investigation, but also the investigations carried out by the House Permanent Select Committee on Intelligence and the Department of Justice's Special Counsel investigation led by Robert Mueller—both of which were either pending or easily foreseeable when all of the predicate acts occurred—the 'official proceeding' requirement is satisfied nonetheless. *See* 18 U.S.C. 1515(a)(1)(B),(C) ("'[O]fficial proceeding' is defined to include "a proceeding before Congress" and "a proceeding before a Federal Government agency which is authorized by law.").

Moreover, Sussmann argues that his alleged conduct—making false statements to the and presenting falsified documents to federal law enforcement authorities—is protected under the *Noerr-Pennington* doctrine. However, *Noerr-Pennington* is not applicable here since these actions fall squarely within the doctrine's "sham" exception. *See*, *e.g.*, *City of Columbia v. Omni Outdoor Adv., Inc.*, 499 U.S. 365, 380 (1991) ("A 'sham' situation involves a defendant whose activities are not genuinely aimed at procuring favorable government action at all . . . not one who genuinely seeks to achieve his governmental result, but does so through improper means.") (citations omitted); *see also PREI v. Columbia Pictures*, 508 U.S. 49, 51 (1993) ("Under the sham exception, activity "ostensibly directed toward influencing governmental action" does not qualify for *Noerr* immunity if it "is a mere sham to cover. . . an attempt to interfere directly with the business relationships of a competitor.").

Therefore, the Complaint sufficiently alleges that the RICO Defendants committed numerous violations of 18 U.S.C. § 1512, all of which qualify as RICO predicate acts.

### b. *Theft of Trade Secrets (18 U.S.C. § 1832)*

Plaintiff has similarly put forth a cognizable theory that the RICO Defendants committed numerous predicate acts in violation of the Defense Trade Secrets Act, 18 U.S.C. § 1832, which criminalizes, in pertinent part, the following conduct:

> Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly . . . (1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information; or (2) without authorization . . . alters . . . transmits . . . delivers . . . communicates, or conveys such information.

In arguing that Plaintiff has failed to state an adequate violation of 18 U.S.C. § 1832, Defendants propose that Domain Name System (DNS)-related data does not fit within the definition of a trade secret under federal law. As an initial matter, this issue is not properly before the court at this time since "[w]hether a particular type of information constitutes a trade secret is a question of fact" that is inappropriate for consideration at the motion to dismiss stage. *Del Monte v. Dole*, 136 F. Supp. 2d 1271, 1292 (S.D. Fla. 2001); *see also Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1311 (11th Cir. 2020) ("[W]hether something is a trade secret is a question typically 'resolved by a fact finder after full presentation of evidence from each side.'") (citations omitted).

In any event, Plaintiff has adequately alleged that the information stolen by the RICO Defendants does indeed constitute a trade secret as the term is defined broadly to include "all forms and types of financial, business, scientific, technical, economic, or engineering information," that "derives independent economic value" that is not "readily ascertainable through proper means." 18 U.S.C. § 1839(3). To be considered a trade secret, information must have "independent economic value, actual or potential, from not being generally known." *Id.* In addition, the owner must have taken "reasonable measures" to keep the information secret. *Id.* "[N]o category of information is excluded from protection as a trade secret because of its inherent qualities." *Clark v. Bunker*, 453 F.2d 1006, 1009 (9th Cir. 1972).

Here, Plaintiff has alleged that the RICO Defendants stole and/or conspired to steal trade secrets in the form of "proprietary, sensitive and confidential internet data, records and/or information," including "data originating from his servers located at his private New York residence and those located at Trump Tower and used in connection with his business." Am. Compl. ¶ 544. Among other confidential and proprietary information, Plaintiff specifically identifies "DNS internet traffic data" as information that was stolen. As alleged in the Complaint, DNS data "reveals a comprehensive view into [Plaintiff and his company]'s website traffic, e-mail traffic, webmail traffic, chat messaging, in addition to the types of technology, hardware, software, programs, securities and processes being utilized by the server" as well as reveal his personal, political, and business-related "contacts, client lists, business dealings, financial dealings, communications, future and current plans, techniques, patterns, methods, processes, and procedures, as well as identification of their corporate partners, political associates, clients, and vendor." *Id.* ¶ 545.

Defendants do not dispute that DNS data reveals highly private and sensitive information, admitting that "'whoever operates the DNS resolver gets to see the names of all the websites' a user

visits" and that "DNS operators . . . can see all of the DNS queries that a user issues." Def. Mem. at 11 (citation omitted). With no choice but to admit this damning truth, Defendants offer up several red-herring arguments in an attempt to distract the Court from the validity of Plaintiff's claim. As set forth below, these arguments fail.

First, Defendants contend that Plaintiff's DNS records are not a trade secret because they are "public." Yet, in doing so, Defendants fail to recognize that a trade secret need not be wholly private, but rather may "exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which in unique combination, affords a competitive advantage and is a protectable secret." *Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1202 (5th Cir. 1986)). In fact, "[e]ven if *all* of the information is publicly available, a unique compilation of that information, which adds value to the information, also may qualify as a trade secret." *Digiport, Inc. v Foram Dev. BFC, LLC*, 314 So.3d 550, 553 (Fla. Dist. Ct. App. 2020) (citing *Capital Asset Rsch. Corp. v. Finnegan*, 160 F.3d 683, 686 (11th Cir. 1998)). For this reason, Florida courts have consistently confirmed that the "'distillation of' publicly available information [is] a protectable trade secret." *Compulife*, 959 F.3d at 1314. This is particularly true when the collection of information is accomplished through utilization of special technology to compile an "infeasible amount of data." *Id*. Certainly, the instant scenario—wherein it is alleged that Joffe "exploited [his] access to non-public and highly-sensitive data sources and/or servers" of Neustar and/or NSS's databases to unlawfully obtain Plaintiff's DNS data, including that he "queried the[] holdings of non-public internet data against a lengthy list of more than 9,000 IP addresses, 3,000 internet domains, and 60 e-mail address" and obtained "37 million DNS lookups" relating to Plaintiff—easily meets this standard.

Defendants' argument that Plaintiff does not "own" his DNS data is similarly misguided. Def. Mem. at 10. The question of whether that an individual has ownership rights in his DNS data was addressed by the Ninth Circuit in *Kremen v. Cohen*, 337 F.3d 1024 (9th Cir 2003). In that case, the court was grappling with the issue of whether a domain name can be considered 'property' within the context of a conversion claim. The court held in the affirmative, finding that a domain name qualifies as 'property' under the merger requirement due to its connection to DNS, which, in and of itself, is construed as a document. *Id*. at 1033-34. Specifically, the court recognized that "***DNS is a document*** (or perhaps more accurately a collection of documents) . . . [t]hat it is stored in electronic form rather than on ink and paper[.]." *Id.* and found that theft of DNS data is sufficient to support a

claim of conversion. *Id.* at 1034 (Emphasis added). The court also noted that the ever-updating nature of DNS data does not impact this analysis, noting that "[a] document doesn't cease being a document merely because it is often updated; [w]hether a document is updated by inserting and deleting particular records or by replacing an old file with an entirely new one is a technical detail with no legal significance." *Id.* at 1035.

Following the decision in *Kremen*, numerous courts have followed suit and held that DNS qualifies as a 'document.' *See, e.g., Best Carpet Values v. Google LLC*, no. 5:20-cv-047000 (N.D. Cal. Sept. 24, 2021) ("Plaintiffs' website is also connected to the DNS through its domain name... just as Kremen's domain name was connected to the DNS."); *Salonclick LLC v. Superego Management LLC*, no. 16-cv-2555 (S.D.N.Y. Jan. 18, 2017) ("Plaintiff has stated a claim for conversion of its domain name and social media accounts."); *Sprinkler Warehouse, Inc. v. Systematic Rain, Inc.*, 880 N.W.2d 16, 23 (Minn. 2016) (Internet domain name constitutes intangible personal property); *Integrated Direct Mktg., LLC v. May*, 495 S.W.3d 73, 76 (Ark. 2016) (intangible property, such as electronic data, can be converted). Most notably, in *Domain Protection, LLC v. Sea Wasp, LLC*, a decision that was later affirmed by the Fifth Circuit, the court agreed that "DNS' architectural mechanisms for storage of domain names constitute documents." *Domain Protection, LLC v. Sea Wasp, LLC*, 426 F.Supp.3d 355, 392-393 (E.D. Tex. 2019), *aff'd sub nom. Domain Protection, L.L.C. v Sea Wasp, L.L.C.*, 23 F.4th 529 (5th Cir. 2022). The court, however, took it a step further, recognizing that DNS servers collect "data, records, emails and other ***proprietary information***." *Id.* at 393 (Emphasis added). These decisions, taken together, soundly support Plaintiff's position that DNS data can contain—or, on its own, be construed as—a trade secret.

Defendant' also argue that Plaintiff's DNS data lacks "independent economic value" is similarly misguided. Defendants' fail to acknowledge that a trade secret need not be a current source of independent economic value – "*potential*" value is equally valid. 18 U.S.C. 1839(3) (Emphasis added). Defendants cannot seriously dispute that data revealing a comprehensive view into the "website traffic, e-mail traffic, webmail traffic, chat messaging, in addition to the types of technology, hardware, software, programs, securities and processes being utilized by the servers" of a presidential candidate (and, ultimately, a sitting President) and his business, do not have potential value. This is particularly true when the information was stolen from a *rival candidate*, as courts have presumed that "disclosure to a competitor is more harmful than disclosure to a noncompetitor. *Cytodyne Tech., Inc. v. Biogenic Tech., Inc.*, 216 F.R.D. 533, 536 (M.D. Fla. 2003).

Finally, Plaintiff has adequately established that the RICO Defendants intended to injure Plaintiff by stealing his DNS records. "[T]he bar for what counts as 'use' of a trade secret is generally low." *Compulife*, 959 F.3d at 1313. "There are no technical limitations on the nature of the conduct that constitutes 'use' of a trade secret. . . . [a]s a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to Defendant is a 'use.'" *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1292 (11th Cir. 2003) (quoting Restatement (Third) of Unfair Competition § cmt c. (1995)). As detailed at length in the Complaint, Plaintiff has alleged that, after obtaining Plaintiff's DNS data, the RICO Defendants "altered, spoofed and/or falsified" it to "create a misleading connection between Trump and Alfa Bank" and, thereafter, provided the falsified data to law enforcement officials, including the FBI and the CIA. Am. Compl. ¶¶ 305, 309. In other words, the RICO Defendants sought to weaponize the ill-gotten data by manipulating it in a deceptive manner to make it appear as if he were colluding with Russia, all in an effort to provoke an unfounded investigation that would tarnish his political reputation. The contention that the DNS data was falsified is supported by the investigative findings of the CIA, *id.* ¶ 309 (finding that the data was not "technically plausible," that it did not "withstand technical scrutiny," that it "contained gaps" and was "user created and not machine/tool generated"), and Ankura, "an industry-leading private technological consulting firm hired by Alfa Bank to investigate the server claims," *id.* 310 (finding that it was "likely that threat actors may ha[d] conducted some inauthentic DNS activity to force a 'connection' between Alfa-Bank and the Trump Organization").

Based on the foregoing, Plaintiff has alleged a cognizable claim of theft of trade secrets in violation of 18 U.S.C. § 1832.

### c.  *Wire Fraud (18 U.S.C. § 1343)*

The third predicate act identified in the complaint is wire fraud. "[W]ire fraud occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the . . . wires in furtherance of that scheme." *American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283 (11th Cir. 2010) (citing *Pelletier v. Zweifel*, 921 F.2d 1465, 1498 (11th Cir.1991).

As to the first element, "[t]he law in the Eleventh Circuit makes clear that a defendant 'schemes to defraud'" where "he schemes to 'depriv[e] [someone] of something of value by trick, deceit, chicane or overreaching.'" *United States v. Takhalov*, 827 F.3d 1307, 1312–13 (11th Cir. 2016). "All that is necessary is that the scheme be reasonably calculated to deceive; the intent

33

element of the crime is shown by the existence of the scheme." *United States v. Bradley*, 644 F.3d 1213, 1239 (11th Cir. 2011).

The full details of the RICO Defendant's fraudulent scheme are set forth in the Complaint and are too onerous to fully recount herein. However, to briefly summarize, the RICO Defendants "engaged in a calculated scheme to defraud the news media, law enforcement and counterintelligence officials for the purpose of proliferating a false narrative of collusion between Trump and Russia." Am. Compl. ¶ 577. In furtherance of this goal, the RICO Defendants sent a significant number of wire communications that were "intended to deceive [] journalists, reporters and/or media contacts so that they would publish false, defamatory, and inaccurate articles, stories, and/or news pieces about Plaintiff and his alleged collusion with Russia." *Id.* ¶ 586. They also sent many wire communications that were "intended to deceive [] law enforcement officials and/or counterintelligence officials to provoke them into launching one or more public investigation(s) into Plaintiff and his alleged collusion with Russia." *Id.* ¶ 587. As discussed below, the Complaint outlines thirty-three acts of wire fraud committed by the RICO Defendants, each described in precise detail. Therefore, Plaintiff has adequately pleaded the Enterprise's scheme to defraud.

As to the second element, unlike obstruction of justice and theft of trade secrets, predicate acts of wire fraud must be plead with particularity in accordance with the heightened pleading standard of FRCP 9(b). "The application of the rule, however, must not abrogate the concept of notice pleading," *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988); thus, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b). Further, courts apply Rule 9(b) less stringently when specific "factual information [about the fraud] is peculiarly within Defendant's knowledge or control." *Hill v. Morehouse Med. Assocs., Inc.*, 2003 WL 22019936, at *3 (11th Cir. Aug. 15, 2003).

To satisfy the second element, a plaintiff must allege: "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled[]; and (4) what Defendants gained by the alleged fraud." *Cigna Corp.*, 605 F.3d at 1291 (citing *Brooks v. BCBS of Fla., Inc.,* 116 F.3d 1364, 1380-81 (11th Cir.1997)). Any wire transmission that is "incident to an essential part of the scheme" is sufficient to constitute an act of wire fraud. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008). Even "innocent" transmissions—"ones that contain no false information—may supply the mailing [or wire] element." *Schmuck v. United States*, 489 U.S. 705, 715 (1989).

The Complaint easily satisfied these requirements. Plaintiff specifically identifies the precise statements, documents, and/or misrepresentations made by each and every RICO defendant in furtherance of the Enterprise's fraudulent scheme, including Clinton, *see* Am. Compl. ¶¶ 583(f), (q), (v), (w), (ee), (ff), (gg), Clinton Campaign, *see id.* ¶¶ 583(f), (j), (q), (r), (u), (v), (w), (y), (aa), (bb), DNC, *see id.* ¶¶ 583(d), (e), (dd), Perkins Coie, *see id.* ¶¶ 583(j), (k), (m), Elias, *see id.* ¶¶ 583(j), Sussmann, *see id.* ¶¶ 583(k), (m), Fusion GPS, *see id.* ¶¶ 583(a) ,(b), (c), (n), (o), (p), (s), (t), (x), and Joffe, *see id.* ¶¶ 583(g), (h), (i), (l), (z), (cc). In total, Plaintiff identifies thirty-three wire transmissions sent by the RICO Defendants in furtherance of their fraudulent scheme, and each is pleaded with the requisite particularity, including the time and place made and the identity of the actor. Plaintiff further identifies the content of the statements and the manner in which these acts were intended to mislead the intended recipients, namely, "journalists, reporters, media contacts, law enforcement officials, and counterintelligence officials." *Am. Compl.* ¶¶ 577, 578, 585-87.[9] With regard to the fraudulent statements made to "journalists, reporters and/or media contacts," Plaintiff specifies that the RICO Defendants sought to deceive them so that "they would publish false, defamatory, and inaccurate articles, stories, and/or news pieces about Plaintiff and his alleged collusion with Russia," *id.* ¶ 586; with regard to the fraudulent statements made to "law enforcement officials and/or counterintelligence officials," Plaintiff specifies that the RICO Defendants sought to deceive them for the purpose of "provoke[ing] them into launching one or more public investigation(s) into Plaintiff and his alleged collusion with Russia," *id.* ¶ 587.

Defendants attempt to argue that Plaintiff's wire fraud allegations are insufficient because their fraudulent scheme was not designed to "obtain" money or property. Def. Mem. at 13. In putting forth this argument, Defendants expose their ignorance of the guiding case law. Indeed, it is well established that a wire fraud scheme need not be designed to "obtain" property; it is equally valid when it is designed to "*deprive*" another of property. *See U.S. v. Bradley*, 644 F.3d 1213, 1240 (11th Cir. 2011) (stating that a "'scheme to defraud' . . . signifies the deprivation of something of value by trick, deceit, chicane or overreaching.") (quoting *U.S. v. Pendergraft*, 297 F.3d 1198, 1208-09 (11th Cir. 2002). Here, it has been alleged that the RICO Defendants sought to "depriv[e] Plaintiff

---

[9] To the extent Defendants argue, in passing, that Plaintiff was not the one who relied upon the fraudulent misrepresentations, it is well established that a plaintiff "need not show, either as an element of [their] claim or as a prerequisite to establishing proximate causation, that it relied on Defendant's alleged misrepresentations." *Bridge*, 553 U.S. at 661.

of tangible and/or intangible property, including, without limitation, causing loss of political and/or business reputation, loss of business opportunities, loss of competitive position, and/or loss of business revenue, loss of goodwill, loss of trade secrets, and/or loss of contractual relations." Am. Compl. ¶ 578. These types of losses are properly construed as 'deprivation of property' within the context of a wire fraud claim. *See, e.g., Mid Atlantic Telecom, Inc. v. Long Distance Services, Inc.*, 18 F.3d 260, 264 (4th Cir. 1994) (recognizing "lost customers and lost revenue" as valid wire fraud injury); *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 565 (5th Cir. 2001) (recognizing "injuries to competitive position" as valid wire fraud injury); *Alix v. McKinsey & Co.*, 23 F.4th 196, 204–06 (2d Cir. 2022) (recognizing loss of potential clients and contractual relations as cognizable RICO injury); *Lewis v. Lhu*, 696 F.Supp. 723, 727 (D.D.C. 1988) (recognizing reputational damages as valid wire fraud injury); *Bridge*, 553 U.S. at 649-650 (recognizing "lost valuable liens" as valid wire fraud injury; also, contemplating that "[if] an enterprise that wants to get rid of rival businesses mails misrepresentations about them to their customers and suppliers . . . [and] the rival businesses lose money as a result of the misrepresentations, it would certainly seem that they were injured in their business 'by reason of' a pattern of mail fraud[.]").

Therefore, wire fraud is sufficiently pleaded as a predicate act in the Complaint.

### d. *Continuity of the Racketeering Activity*

Moreover, contrary to Defendants' contention, the Complaint alleges a pattern of racketeering activity that is sufficiently continuous. Continuity is a "closed and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989). The pattern of racketeering carried out by the Enterprise, as alleged in the Complaint, meets both definitions of continuity.

First, the Complaint successfully pleads that the Enterprise's continuity is open-ended. To plead an open-ended continuity, a plaintiff must allege that an enterprise poses a continuing threat, which can be accomplished by showing that "the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future," or that "the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *H.J. Inc.*, 492 U.S. at 242. Plaintiff has done both. First, Plaintiff has shown that the racketeering acts themselves are likely to extend indefinitely into the future, particularly with respect to the acts of wire fraud, as the RICO Defendants have not relented in their efforts to tarnish Plaintiff's political reputation by perpetuating

the false narrative that he colluded with Russia. For example, many of the RICO Defendants have continued to regularly engage with the media in furtherance of their effort to corroborate the supposed Trump-Russia collusion – Clinton has publicly accused him of colluding with Russia and Putin multiple times in the past year, *see* Am. Compl. 518-522, while John Podesta (who was a member of the Clinton Campaign as all relevant times) runs *The Moscow Project*, an organization which describes itself as the "one-stop-shop for the who, what when, and where of all things Trump and Russia" and which, to this day, continues to release articles aimed at corroborating Trump-Russia collusion, *see id.* ¶¶ 498-501. Moreover, many of the RICO Defendants, including Fusion GPS, Joffe, Sussmann, and Clinton Campaign members Podesta and Sullivan, have worked with The Democracy Integrity Project (TDIP) to "continue exposing Russian Interference in the 2016 Presidential Election." The stated goal of their collective efforts is to "push the information obtained from Fusion [GPS] and Steele to policymakers on Capitol Hill, the press, and the FBI" – a clear continuation of the Enterprise's goal. The RICO Defendants' overlapping conduct is unlikely to cease anytime soon given their "longstanding interpersonal and/or professional relationships rooted in their political and professional connections, ongoing business dealings, and mutual interest and participation in common activities and dealings." *Id.* ¶ 537. Indeed, the Complaint succinctly alleges that the "potential that Plaintiff could run for President again in 2024" raises a serious threat that the Enterprise's conduct will continue for the foreseeable future as they seek to "further damage Plaintiff's electability and to ensure that he is unable to secure a victory in the 2024 Presidential Election." *Id.* ¶ 533. Given the RICO Defendants' history, there is a significant risk that they will resort to engaging in "theft of trade secrets, obstruction of justice, and other unlawful tactics" to accomplish this goal—if they have not already—since these "predicate acts or offenses are part of" the Enterprise's "regular way of doing business." *Id.* ¶ 531; *Jackson v. BellSouth Telecomms.* 372 F.3d 1250, 1265 (11th Cir. 2004*).*

Defendants strain to argue that "[t]he speculative possibility that Plaintiff may run against a *different* Democratic nominee does not suggest that *these* Defendants will engage in any future racketeering activity." Def. Mem. at 15 (emphasis in original). In so arguing, Defendants display a fundamental misunderstanding of the Enterprise's purpose, as described in the Complaint. To be clear, Plaintiff does not contend—and the Complaint does not allege—that the RICO Defendants' goal was to get Hillary Clinton elected as President in 2016. Rather, it is alleged that their purpose was—and remains to this day—to "corruptly and wrongfully harm[] Plaintiff's political reputation,

37

damage[] his electability . . . imped[e] his ability to effectively govern, and otherwise sabotage[e] his political career through deceptive, criminal and fraudulent means[.]" Am. Compl. ¶ 531. Their goal is not, and never was, tied to Hillary being the Democratic nominee; it is all about causing harm to Plaintiff, sabotaging his career, and keeping him out of office. Therefore, the Complaint adequately alleges that the Enterprise's pattern of racketeering acts is open-ended.

In the alternative, Plaintiff has also successfully pleaded closed-ended continuity. To plead closed-ended continuity, a plaintiff must allege that defendants engaged in a "series of related predicates extending over a substantial period of time." *Id.* The Eleventh Circuit has not identified a minimum duration that qualifies as a "substantial period of time," *see Jackson*, 372 F.3d at 1266–67, but courts in this district have found patterns lasting twelve months, *Hyundai Motor Am. Corp. v. North Am. Auto. Servs.*, 2021 U.S. Dist. LEXIS 99713 at *22 (S.D. Fla. May 25, 2021) (Middlebooks, J), and eighteen months, *see Magnifico v. Villanueva*, 783 F. Supp. 2d 1217, 1229 (S.D. Fla. 2011), to constitute a sufficient length of time.

Here, Plaintiff's wire fraud claim alone spans more than six years, extending from May 14, 2016, when Fusion GPS commenced their efforts to deceive a *Slate* journalist, Franklin Foer, into writing an article about the purported Trump-Alfa Bank connection (the article would eventually be written and become the subject of a Clinton Campaign press release and numerous misleading Clinton tweets), *see* Am. Compl. ¶ 583(a), through February 16, 2022, when Clinton sent another tweet that was a deliberate attempt to mislead the public and further the Enterprise's fraudulent scheme, *id.* ¶ 583(gg). Further, it is a near certainty that the RICO Defendants engaged in many more fraudulent acts between May 16, 2022, to the present, in furtherance of their scheme. For instance, as noted in the Complaint, considering that Fusion GPS, Joffe, Sussmann, and Steele, Sussmann were hired by The Democracy Integrity Project to "continue exposing Russian interference in the 2016 Presidential Election" for the purpose of "push[ing] the information . . . to policymakers on Capitol Hill, the press, and the FBI,"—efforts which "continued long after the election"—there is a reasonable presumption that the RICO Defendants' fraudulent acts run through, at the very least, the release of the *New Yorker* article, "*Was there a connection between a Russian Bank and the Trump Campaign?*" on October 8, 2018. *Id.* ¶¶ 313, 314, 324. While the particular circumstances surrounding these fraudulent acts are yet to be unearthed, any lack of particularity in this regard should not be construed against Plaintiff since this "specific factual information about the fraud is peculiarly within the [RICO Defendants'] knowledge or control." *Hill v. Morehouse*

*Med. Assocs., Inc.*, No. 02–14429, 2003 WL 22019936 at *3 (11th Cir. Aug. 15, 2003). This is particularly true when considering that the RICO Defendants' intentionally utilized attorney-client privilege as a means of concealing their fraudulent acts. By way of example, a significant portion of the fraudulent statements underpinning Plaintiff's wire fraud claim—namely, the various e-mails between Fusion and their media contacts—was determined by the court in the *U.S. v. Sussmann* matter to be protected by attorney-client privilege, and the communications were only made public due to the prosecution team unintentionally filing them as an unredacted exhibit on the public docket.[10] Therefore, Plaintiff must be afforded the opportunity to uncover the Enterprise's additional acts of fraud through the discovery process.

Regardless, even setting aside the end date of the wire fraud activity altogether, the latest act of obstruction of justice, which occurred on November 16, 2017 when the RICO Defendants conspired with Steele and Danchenko to make false statements and misrepresentations to the FBI, provides an eighteen-month timeframe that is sufficient to satisfy the continuity requirement. *See Hyudai Motor Am. Corp., supra; Magnifico*, *supra*.

Moreover, Defendants' argument that closed-ended continuity does not apply because the Enterprise has only a "single scheme with a discrete goal" is entirely without merit. *See* Def. Mem. at 15 (citing *Jackson*, 372 F.3d at 1267). The Complaint specifically outlines a "two-pronged plan" that was effectuated by the Enterprise – Elias, on one end, oversaw Fusion GPS' efforts to "spearhead the media-based smear campaign against Plaintiff," including the development of a "dossier, based on lies and misinformation purporting to show an incriminating link between Trump and Russia, which would be used to mislead law enforcement officials and ignite a media frenzy" and an otherwise "calculated scheme to defraud the news media, law enforcement and counterintelligence officials for the purpose of proliferating a false narrative of collusion between Trump and Russia"; meanwhile, on another end, Sussmann oversaw Joffe's "cyber-based, data-driven attack against Plaintiff," including efforts to "uncover proprietary data that could then be manipulated to give the impression that Trump was engaged in illegitimate business with a Russian bank, Alfa Bank." Am. Compl. ¶¶ 68, 534, 577. Thus, the RICO Defendants' goal was not singular, nor was it discrete. *See Jackson*, 372 F.3d at 1267 (noting that a "single scheme with a discrete goal"

---

[10] *See, e.g.,* Tim Pearce, *Latest Durham Drop Teaveals Starting Emails from Fusion GPS to Media Figures*, THE DAILY WIRE, https://www.dailywire.com/news/latest-durham-drop-reveals-startling-emails-from-fusion-gps-to-media-figures.

is "narrow in scope."). To the contrary, it was "extensive" and "widespread." *See Hyundai Motor Am. Corp.*, 2021 U.S. Dist. LEXIS 99713 at *11. Therefore, Defendants' argument that the Complaint only alleges a "single scheme with a discrete goal" must be disregarded.

### iv.   *RICO Standing and Causation*

RICO provides a private cause of action for "[a]ny person injured in his business or property by reason of a violation of Section 1962 of this chapter." 18 U.S.C. § 1964(c). To have standing under Section 1964(c), a civil RICO plaintiff must show: (1) that his alleged harm qualifies as an injury to his business or property; and (2) that the harm was "by reason of" the RICO violation, which requires Plaintiff to establish proximate causation. *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992). Plaintiff has easily satisfied both of these requirements.

First, the Complaint alleges that Plaintiff suffered at least nine independent and distinct harms to his business and property, including: (i) "loss of political []reputation"; (ii) "loss of [] business reputation"; (iii) "loss of existing and future business opportunities"; (iv) "loss of competitive position"; (v) "loss of business revenue"; (vi) "loss of goodwill"; (vii) "loss of trade secrets"; (viii) "loss of contractual relations"; and (ix) "defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the RICO Defendants' actions and the various federal investigations and/or official proceedings which arose therefrom." Am. Compl. ¶¶ 615-616. Of these damages, Defendants only challenge two of them—attorneys' fees and loss of business opportunities—as being inadequately pleaded. As to the remaining types of injuries, Defendants concede that they are legally cognizable damages.

With regard to the defense costs and attorneys' fees, Defendants argue, that Plaintiff has no standing to recover for attorneys' fees because—according to Defendants—he apparently did not pay the claimed fees out of his own pocket. This bald assertion is utterly false and, unsurprisingly, is made without any factual support. Instead, Defendants merely point to recent payments made by various political action committees to one of the undersigned law firms and seemingly suggest that this means that Plaintiff has not paid a single dollar towards legal fees dating back to 2015. Simply put, this argument lacks any merit and does not warrant further discussion. Plaintiff has pleaded the specific, ascertainable amount of attorneys' fees that he was caused to incur as a result of the RICO Defendants' actions. *See* Am. Compl. ¶¶ 616, 632, 655, 665, 678, 692, etc. ("Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four millions dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and

related expenses[.]"). There is no question that these expenses constitute a cognizable injury under the RICO statute. *See, e.g., Alexander Grant and Co. v. Tiffany Industries, Inc.*, 770 F.2d 717, 719 (8th Cir. 1985) (finding that attorneys' fees, defense costs, and related expenses qualify as RICO injury).

As for the loss of business opportunities, these damages are a similarly well-established RICO injury. *See, e.g., Mid Atlantic Telecom.*, 18 F.3d at 264 (recognizing "lost customers and lost revenue" as RICO injury); *Procter & Gamble Co.*, 242 F.3d at 565 (recognizing "injuries to competitive position" as RICO injury); *Alix*, 23 F.4th at 204–06 (recognizing loss of potential clients and contractual relations as RICO injury); *Lewis*, 696 F.Supp. at 727 (recognizing reputational damages as RICO injury); *Bridge*, 553 U.S. at 649-650 (recognizing "lost valuable liens" as RICO injury). Further, to the extent Defendants argue that this category of damages is too speculative, "[t]he law is well-settled that uncertainty as to amount of damages is not reason to deny a plaintiff some recovery." *Alix*, 23 F.4th at 207 (citing *Story Parchment Co. v. Paterson Parchment Co.*, 282 U.S. 555, 563-568 (1931)). Indeed, a "wrongdoer is not entitled to complaint that [damages] cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise . . . the risk of the uncertainty should be thrown upon the wrongdoer instead of the injured party." *Id.; see also Bridge*, 553 U.S. at 654-655 ("The direct-relation requirement avoids the difficulties associated with attempting to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors; prevents courts from having to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries; and recognizes the fact that directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.") (citations omitted).  Plaintiff has set forth thesehis damages with the requisite specificity but, even if he had not, this issue is not appropriately before the court at this time – at a minimum, Plaintiff must be allowed to engage in discovery to uncover the breadth of the RICO Defendants' wrongful acts which, in turn, will inform the full extent of the injuries they wrought upon Plaintiff.

Second, the causation element is also satisfied. "Proximate cause . . .is a flexible concept that does not lend itself to 'a black-letter rule that will dictate the result in every case.'" *Bridge*, 553 U.S. at 654 (citation omitted). To effectively plead causation under RICO, a plaintiff is required only to allege "some direct relation" between the injury asserted and the injurious conduct. *Corcel Corp. v.*

*Ferguson Enters., Inc.*, 551 F. App'x 571, 576 (11th Cir. 2014). It is only necessary to plead that Defendants' "conduct was a substantial factor in the sequence of responsible causation." *Id.*

Here, it is alleged that, "[a]s a direct and proximate result of the RICO Defendants' racketeering activity described herein, numerous unfounded investigations, including the FBI's Crossfire Hurricane investigation and its full field Alfa Bank investigation, numerous congressional investigations, and Special Counsel investigations were commenced; countless false, damaging, and defamatory articles and media stories of all types (televisions, radio, internet, etc.) were published, resulting in the widespread dissemination of false, damaging and defamatory accusations of Plaintiff's purported collusion with Russia which became years-long headline story that irreparable, unjustly and permanently tarnished Plaintiff's political reputation." Am. Compl. ¶ 614. This assertion is supported by the voluminous, well-sourced allegations contained in the Complaint. Indeed, throughout the Complaint, Plaintiff outlines, in meticulous detail, the various illicit acts of the RICO Defendants and how those acts were the direct and proximate cause of Plaintiff's injuries.

Defendants try to circumvent Plaintiff's well-pled allegations by cherry-picking a select few events from the nearly 200-page Complaint and attempting to distinguish the same as not causally related to Plaintiff's injuries. For instance, Defendants argue that Sussmann's misrepresentation to FBI General Counsel, Jim Baker, that he "was not acting on behalf of any client" cannot be tied to Plaintiff's injuries because Sussmann was ultimately acquitted by a jury on a related criminal charge. This argument is flawed for several reasons. First, criminal cases have an extremely high burden of proof, so an acquittal is by no means an acknowledgement of innocence. In fact, Sussmann relayed the very same to Baker in a text message—as referenced in the Complaint, *see* Am. Compl. ¶ 204— so the fact that the statement was made is not in dispute. More importantly, despite the high-profile jury trial that surrounded it, Sussmann's misrepresentation to Jim Baker is a very minor part of the RICO Defendants' wide-spanning scheme. In fact, it was not even the most noteworthy thing that happened at his meeting with Baker on September 19, 2017; he also handed over falsified records and threatened that a major media outlet would be reporting on the story imminently (omitting the fact that he had provided the story to the major media outlet) – which led to the FBI launching a "full field investigation" into the supposed Trump-Alfa Bank connections "as a direct result of Sussmann's meeting with Baker." *Id.* ¶¶ 206, 214.

Defendants also try to argue that the RICO Defendants' actions were not the driving factor in the commencement of the various FBI investigations, but the Complaint has set forth a vast

number of facts that indicate otherwise. *See, e.g.*, *id.* ¶ 158 (Steele began sending the Dossier to the FBI on July 5, 2016, mere weeks before Crossfire Hurricane was commenced); *id.* ¶ 204-214, 343 (Alfa Bank 'full field investigation' launched four days after Sussmann's meeting with Jim Baker); *id.* ¶ 226 (Inspector General Michael Horowitz's finding that Steele Dossier was relied upon in granting FISA warrants). Further, the question of which factors ultimately led to the commencement of said investigation is the epitome of a factual issue that is not appropriate for determination at this time. Moreover, Defendants' willingness to point to the IG Report as a reliable source on this issue is telling, as the same report found that the Steele Dossier played a "central and essential role in the decision by the FBI [Office of General Counsel] to support the request for FISA surveillance . . . as well as the [Department of Justice]'s ultimate decision to seek the FISA Order." *Id.* ¶ 226.

Beyond that, Defendants fail to recognize that Plaintiff's injuries are not only tied to the unfounded investigations and proceedings that were commenced by the RICO Defendants' acts – they also stem from the *yearslong* media storm that resulted from their scheme to mislead the media into publishing disparaging and damaging stories about Plaintiff. There is no question that the RICO Defendants' fraudulent communications with members of the media, intentional leaking of spurious stories, and publication of false statements and accusations, were the root cause of these damages. On this basis alone, Plaintiff has pleaded sufficient causation for a cognizable RICO injury. Nonetheless, given the widespread, multi-faceted nature of the RICO Defendants' actions, it would be a pointless endeavor to attempt to tie *each and every* one of the RICO Defendants' acts to Plaintiff's injuries. It is the conduct of the Enterprise *as a whole* that must be a "substantial factor in the sequence of responsible causation," *Corcel Corp.*, 551 F. App'x at 576. Considering the totality of the facts alleged in the Complaint, there is no question that Plaintiff has successfully made this showing.

Therefore, for the foregoing reasons, Plaintiff has successfully pleaded standing and causation under RICO.

### B. RICO CONSPIRACY (18 U.S.C. § 1962(D))

The Complaint similarly puts forth a valid claim of RICO conspiracy pursuant to 18 U.S.C. § 1962(d).

18 U.S.C. § 1962(d) provides, in pertinent part, that: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection …(c) of this section." To establish a violation of 18 U.S.C. § 1962(d), a plaintiff must allege that "the conspirators agreed to participate directly or

indirectly in the affairs of an enterprise through a pattern of racketeering activity." *In re Managed Care Litig.*, 298 F.Supp. 1259, 1280 (S.D.FL. 2003). "A plaintiff can establish a RICO conspiracy claim in one of two ways: (1) by showing that Defendant agreed to the overall objective of the conspiracy; or (2) by showing that Defendant agreed to commit two predicate acts." *American Dental Assn.*, 605 F.3d at 1293 (citation omitted). Such a claim may be shown through circumstantial evidence, including "inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *United States v. Sylvestri*, 409 F.3d 1311, 1328 (11th Cir. 2005); *see also American Dental Assn.*, 605 F.3d at  1293 (noting that a plaintiff need not offer direct evidence of a RICO agreement; existence of a conspiracy "may be inferred from the conduct of the participants.").

At the outset, the Complaint firmly establishes that each and every one of the RICO Defendants violated 18 U.S.C. § 1962(d) by agreeing to the overall objective of the Enterprise and/or agreeing to commit, at a minimum, two predicate acts. The facts, circumstances, and postulations in support of this showing are detailed at length in Section II(A)(iii)(b) above.

As for Defendants who are implicated in the RICO Conspiracy claim, but not the RICO claim, there is ample evidence to support a showing that each of them violated as 18 U.S.C. § 1962(d) as well. In particular, the following facts, as fully elucidated in the Complaint, are sufficient to infer that each of these Defendants either agreed to the overall objective of the Enterprise's conspiracy, agreed to commit at least two predicate acts, or both:

- *Steele/Orbis Ltd.*: Steele was "desperate that Donald Trump not get elected" and "was passionate about [Donald J. Trump] not being president," *id.* ¶ 95; in accepting his assignment to collect intelligence regarding a purported Trump-Russia connection, Steele was aware that "Democratic Party Associates" were paying for his and Fusion GPS's "research" and that the "ultimate client" was "the leadership of the Clinton Presidential Campaign," *id.* ¶ 99; Steele testified that "the purpose of [his] work was to prevent [Plaintiff] from becoming president," *id.* ¶ 105; Steele provided reports from the FBI which contained false information regarding Carter Page and his purported ties to Russia, *id.* ¶226; Steele met with the FBI's Crossfire Hurricane team and failed to disclose the identities of his client, thereby furthering the Enterprise's conspiracy, *id.* ¶ 233. Steele further confirmed that he shared the DNC and Clinton Campaign's goal of having the information "come to light" prior to election day, *id.* ¶239; Steele further met with a journalist from *Mother Jones*  on October 31, 2016 because he "wanted [Corn] to publish that the US Government was investigating Trump" and was "aware that Mr. Corn was likely to be publishing an article after the interview." *id.* ¶¶ 272, 273; In mid-November of 2016, Steele met with David Kramer, an affiliate of Senator John McCain,  and showed him the Dossier in the hopes that McCain would share his findings with his "colleagues on the various committees in the Senate," including "his committees in Congress, the Homeland Security Committee and the Intelligence Committee," as well as "other agencies", *id.* ¶ 291.

44

- _Danchenko:_ Danchenko served as the primary source for the information contained in the Dossier, _id._ ¶109; Danchenko, in thanking Dolan for the information he provided, stated that their "goals clearly coincided" with respect to gathering derogatory information about Trump, _id._ ¶12; during interviews with the FBI, Danchenko readily conceded that he had "zero corroboration for the key allegations he contributed to the Dossier; _id._ ¶331; Danchenko repeatedly lied to the FBI during these interviews by stated that he never communicated with Dolan in the course of providing information for the Dossier, _id._ ¶335; After Danchenko was indicted, Durham filed a motion to inquire into potential conflicts of interest in Danchenko's criminal case, as Danchenko's defense counsel also represents the Clinton Campaign, noting that "the interests of the Clinton Campaign and [Danchenko] could potentially diverge in connection with any plea discussions, pre-trial proceedings, hearings, trial, and sentencing proceedings.", _id._ ¶ 488.

- _Dolan_: has longstanding ties to the Democratic party, including a close relationship with Clinton, the Clinton Campaign and the DNC, and was closely associated with two of Steele's sub-sources, Danchenko and Olga Galinka, _id._ ¶¶ 96, 336-340; Dolan was the source of a significant portion of the false information contained in the Steele Dossier, which he provided to Danchenko who, in turn, reported it to Steele, _id._ ¶¶ 113; Dolan has admitted that the information he provided to Danchenko was false. Danchenko further acknowledged that their "goals clearly coincide" with respect to gathering derogatory information about Plaintiff and tarnishing his reputation, _id._ ¶120.

- _Sullivan_: Joffe, in exploiting and unlawfully accessing Plaintiff's data in search of a secret "back channel" between Plaintiff and Alfa Bank, explicitly acknowledged that this was done at the behest of certain "VIPS" which included Sullivan, _id._ ¶141; During the course of the Democratic National Convention, Sullivan began to "sound the alarm" about Russian interference in the 2016 election and was "on a mission to get the press to focus on... the prospect that Russia had not only hacked and stolen e-mails from the Democratic National Committee, but that it had done so to help Donald Trump and hurt Hillary Clinton." _id._ ¶165; Sullivan then set up meetings with major networks to brief them on "the nature of the connections between several members of Trump's foreign policy and political team and elements of the Russian Government or Russian-backed proxies" and how these connections allegedly created a "pretty disturbing picture." _id._ ¶167; On October 31, 2016, Sullivan put out a written campaign statement that Trump and the Russians had set up a "secret hotline" through Alfa Bank and that "federal authorities" were investigating "this direct connection between Trump and Russia" and portrayed these finding as the work of independent experts, without disclosing their connection the Clinton Campaign. _id._ ¶265; It was later revealed that Sullivan participated in meetings with The Democracy Intelligence Project ("TDIP"), along with Simpson and Fritsch, with the explicit purpose of finding ways to "raise money to continue their efforts to investigate the Russian interference in the campaign." _id._ ¶313.

- _Podesta_: Podesta affirmatively pushed the false Trump-Russia connection when he met with reporters and stated that "I've been involved in politics for nearly five decades. This definitely is the first campaign that I've been involved in which I've had to tangle with Russian intelligence agencies who seem to be doing everything they can on behalf of our opponent." _id._ ¶276; Podesta was also part of the meeting with TDIP and other senior campaign leadership to find ways to raise money to continue to investigate purported Russian interference, _id._ ¶313; Podesta accused Plaintiff on Twitter of "running a big lie campaign" centered on the investigation into Russian

meddling in the US election." *id.* ¶496; Podesta, through the Center for American Progress to establish the "Moscow Project", which was set up as a basis to continue to spread the false Russian narrative. *id.* ¶¶ 498-501.

- *Mook*: Mook, along with Elias, Podesta, Sullivan, and Palmieri about whether the campaign "should affirmatively push [the Alfa Bank allegations] to the media [.]" *id.* ¶247; In doing so, Mook readily admitted that he "wasn't totally confident in" the veracity of the information and thought it was "highly suspect." *id.* ¶248; Notwithstanding this admission, Mook then discussed with Clinton the decision to push the false Alfa Bank allegations to the media, which Clinton agreed to, *id.* ¶252.

- *Reines*: Reines served as a long-time communications advisor to Hillary Clinton and participated in the widespread dissemination of the falsehood that Plaintiff colluded with Russia to undermine the 2016 election. *id.* ¶215; For instance, on April 16, 2018, Reines tweeted "yes collusion, yes collusion, yes collusion" in response to an article discussing Plaintiff's policy decisions regarding Russian sanctions. Even after the conclusion of the Mueller investigation, Reines continued to push that the purported conspiracy was ongoing, stating "you saying it on Fox doesn't make it so," *id.* ¶463.

- *Nellie Ohr/Bruce Ohr*: Bruce Ohr served as an Associate Deputy Attorney General at the same time that his wife, Nellie Ohr, was a contractor for Fusion GPS. *id.* ¶¶88, 89. The RICO defendants exploited this relationship for the express of lending credibility to the fraudulent Dossier. *Id.* Nellie Ohr directly assisted in the compilation of the Dossier, *id.* ¶103; On July 31, Steele met with Nellie and Bruce Ohr to discuss his work on the Dossier, and Bruce Ohr was already aware that Steele was "sharing this information with the Clinton Campaign." *id.* ¶169; Notwithstanding, Bruch Ohr met with Andrew McCable and Lisa Page and briefed them on the false accusations contained in the Dossier, *id.* ¶170; Bruce Ohr testified that his wife provided him with a memory stick, which included research she performed for Fusion GPS on various Russian figures. Bruce Ohr explained that she provided this information so that he would provide it to the FBI, *id.* ¶284; Bruce Ohr concealed this meeting from the DOJ and was later disciplined for doing so, *id.* ¶286; On December 20, 2016, Bruce Ohr provided the FBI with a second hard drive to the FBI, which similarly contained reports prepared by his wife. Through their collective conduct, Crossfire Hurricane was commenced and/or continued.

- *Neustar Inc./Neustar Security Services*: Neustar was aware of, and complicit in, Joffe's commission of theft of trade secrets on several occasions, as evidenced by several e-mail communications between Joffe (or Manos Antonakakis on his behalf) and Neustar employee, Steve DeJong. *id.* ¶*185*, 328; DeJong was aware of, and actively assisted with, Joffe's exploitation of Neustar's database of private and proprietary data, *id.* ¶ 185, 186, 328.

Accepting the above allegations as true, taken with all reasonable inferences and viewed in a light most favorable to Plaintiff, there is no question that the Complaint sufficiently details and pleads that each of the above-referenced Defendants agreed to the overall objective of the RICO conspiracy or, alternatively, agreed to commit at least two predicate acts. Therefore, Plaintiff has asserted a viable claim under 18 U.S.C. § 1962(d) as to all of these Defendants.

## C.  INJURIOUS FALSEHOOD

Plaintiff has asserted a cognizable and actionable claim of injurious falsehood against z is well-supported by the allegations contained in the Complaint.

In order to sustain a claim for injurious falsehood, a plaintiff must adequately allege: (1) a falsehood; (2) published or communicated to a third party; (3) Defendant knew the falsehood would likely induce others not to deal with Plaintiff; (4) the falsehood did play a material and substantial part in inducing others not to deal with Plaintiff; and (5) special damages. *Bothmann v. Harrington*, 458 So. 2d 1163, 1168 (Fla. 3d DCA. 1984). "Plaintiff must also allege damages as a result of the communicated falsehood." *Arthrex, Inc. v. W. Coast Med. Res., LLC*, 2015 WL 12844946, at *8 (M.D. Fla. Nov. 25, 2015).

Here, Plaintiff has sufficiently pled all of these elements. The Complaint sets forth a bevy of falsehoods to mainstream media outlets, government authorities, and the general public, which were intended to create a non-existent link between Plaintiff and Russian agents. As detailed in the Complaint, all of these statements were false and all of them were published to third parties. Further, despite Defendants' transparent attempt to mischaracterize the nature of Plaintiff's allegations, the Complaint is *replete* with statements that Defendants knew that their statements were false and that they would be damaging to Plaintiff. *Id.* ¶¶ 501, 519, 583, 673, 676, 689.

Plaintiff has also alleged that Defendant's defamatory statements were designed to economically damage him ("Defendants conspired to disseminate false information and spread a false narrative in an attempt to ruin Plaintiff.) *Id.* Defendants weakly posit that Plaintiff failed to identify the "various investigations" and "official proceedings" that were spurred by the defamatory statements. However, this argument is demonstrably false and should not be countenanced by this Court. The Complaint recounts in meticulous detail the numerous proceedings that were directly instigated by Plaintiff's defamatory publications and explains that the falsehoods were spread to *both* media outlets and law enforcement officials. *See Id.* ¶¶ 157, 158, 166, 167, 172, etc. As a result, Defendants conduct is directly attributed to provoking both the unwarranted media frenzy and the unfounded investigations, including Crossfire Hurricane, the Alfa Bank investigation, and the Mueller Investigation.

Moreover, contrary to Defendants' assertion, the First Amendment does not immunize Defendants from the indisputable harm created by their publications, nor can they be simply characterized as 'political speech.' It is well established that the privilege for political speech is a

*qualified* privilege, which can be defeated by a showing that Defendants acted with actual malice. *See Fridovich v. Fridovich*, 598 So. 2d 65, 69 (Fla. 1992) ("In overcoming a qualified privilege, a plaintiff would have to establish by a preponderance of the evidence that the defamatory statements were false and uttered with common law express malice-i.e., that Defendant's primary motive in making the statements was the intent to injure the reputation of Plaintiff."); *see also Nodar v. Galbreath*, 462 So. 2d 803, 809 (Fla. 1984) ("A communication made in good faith on any subject matter by one having an interest therein, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty."). Proof of actual malice may be shown "'by proving a series of acts which, in their context or in light of the totality of surrounding circumstances, are inconsistent with the premise of a reasonable man pursuing a lawful objective, but rather indicate a plan or course of conduct motivated by spite, ill-will, or other bad motive.'" *Asinmaz v. Semrau*, 42 So. 3d 955, 958 (Fla. 4th DCA 2010).

In *Asinmaz*, the Court held, "[a] defamation based upon a completely unreasonable belief, which the party knows is without foundation, may be sufficient to infer an intent to harm." *Asinmaz*, 42 So. 3d 955, 959. Specifically, this Court found actual malice could be inferred from the "unreasonableness of [defendant's] conduct in accusing [plaintiff] of stealing her diamonds and then, without ever investigating something over which she had absolutely no expertise, filing a report with the police." *Asinmaz*, 42 So. 2d at 959. The Court further explained, "[a]t the time [defendant-customer] filed the report accusing [plaintiff-jeweler] of theft, she was aware that she did not actually know whether her accusation was true." Id. This court reasoned defendant "intended to harm [plaintiff] by getting the police involved" *Id*.

The Supreme Court of Florida scrutinizes statements made to law enforcement with particular care, because "[t]here is no benefit to society or the administration of justice in protecting those who make intentionally false and malicious defamatory statements to the police. The countervailing harm caused by the malicious destruction of another's reputation by false accusation can have irreparable consequences." *Fridovich v. Fridovich*, 598 So. 2d 65, 69 (Fla. 1992).

Plaintiff easily crosses this threshold. The Complaint meticulously describes the manner by which Defendants concocted a false narrative regarding a non-existent link between Plaintiff and the Russian Government, and then distributed these publications to law enforcement officials to spur an investigation of Plaintiff. *See* Amended Compl., ¶¶ 635–652. Therefore, Plaintiff's claim satisfies the actual malice standard and must be permitted to proceed past the pleading stage.

Furthermore, Plaintiff's injurious falsehood claim is supported by a cognizable theory of recoverable damages. Defendants fundamentally misconstrue the tort of injurious falsehood by summarily stating that Plaintiff's must fail because his injuries are not "economic" in nature. Contrary to Defendants' assertion, recovery is not limited to injuries that are economic in nature. Indeed, injurious falsehood is much more broadly applied – it is designed to redress defamatory actions which *affect* an economic interest. The gist of injurious falsehood is the "intentional interference with another's economic relations." *Salit v. Ruden*, 742 So.2d 381, 386 (Fla. 4th DCA 1999); *see also*, *Sailboat Kev. Inc. v. Gardner*, 378 So.2d 47, 48 (Fla. 3d DCA 1979) (Injurious falsehood is interchangeable with slander of title, disparagement of property, or trade libel.)

Here, the Complaint pleads that Plaintiff has "been injured in his business and property and has incurred and will continue to incur, significant damages, losses, and deprivation of tangible and intangible property, including but not limited to loss of political and/or business reputation, loss of business opportunities, loss of competitive position, loss of business revenue, loss of goodwill, loss of trade secrets, and/or loss of contractual relations." Am. Compl. ¶ 664." In addition, Plaintiff has also pled that he suffered special damages directly stemming from Defendants' injurious falsehoods. *See Salit v. Ruden*, 742 So. 2d 381, 388 (Fla. Dist. Ct. App. 1999) ("The chief characteristic of special damages is a realized loss."). Plaintiff has pled specific, ascertainable amounts of attorneys' fees that he was caused to incur as a result of Defendants' defamatory statements. *See* Am. Compl. ¶ 655 ("Plaintiff was forced to incur expenses in an amount to be determined at trial but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses[.]"). As enumerated by the Supreme Court, legal fees constitute special damages in trade libel claims such as the one asserted by Plaintiff. *Horgan v. Felton*, 123 Nev. 577, 586 (2007). Based on the foregoing, Plaintiff has asserted a legally cognizable claim for injurious falsehood against Clinton, Sullivan, Schiff, Danchenko, Sussmann, and Steele.

For these same reasons, Plaintiff has sufficiently pled his claim of conspiracy to commit injurious falsehood. The elements of a civil conspiracy are: (a) a conspiracy between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts performed pursuant to the conspiracy. *Walters v. Blankenship*, 931 So. 2d 137, 140 (Fla. Dist. Ct. App. 2006). A cause of action for civil conspiracy "requires an actionable underlying tort or wrong." *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997). As demonstrated both above and in the

49

underlying complaint, each of the above-named Defendants participated in the conspiracy to disseminate injurious falsehoods concerning Plaintiff to third parties, including "government authorities, media outlets, and the general public." *See* Am. Compl. ¶ 658. As Plaintiff has adequately pled the underlying tort, the conspiracy count must similarly survive.

### D.  MALICIOUS PROSECUTION

At the outset, it is important to note that Defendants attempt to draw an arbitrary distinction between Crossfire Hurricane and Mueller Investigation in arguing against Plaintiff's malicious prosecution claim. However, as noted in the Complaint, the Mueller Investigation is merely an extension of Crossfire Hurricane which, by and large, served the same exact purpose. Indeed, Plaintiff alleges that Defendants efforts to harm Plaintiff, Crossfire Hurricane was initially launched to investigate whether Plaintiff's campaign coordinated with Russia to undermine the 2016 election. Am. Compl., ¶ 671. Thereafter, Robert Mueller was appointed as Special Counsel to take over and "oversee" the investigation. *Id*. ¶ 456. Thus, for the purposes of Plaintiff's malicious prosecution claim, Crossfire Hurricane and the Mueller Investigation should be viewed in the same light.

To prevail in a malicious prosecution action brought under Florida law, Plaintiff must establish each of six elements: "(1) an original criminal or civil judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding against the present plaintiff in the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence of probable cause for the original proceeding; (5) there was malice on the part of the present defendant; and (6) Plaintiff suffered damage as a result of the original proceeding." *Alamo Rent-A-Car, Inc. v. Mancusi*, 632 Sfo.2d 1352, 1355 (Fla. 1994).

The Mueller Investigation qualifies as a criminal proceeding under the first element of the inquiry. By way of illustration, In *Caplan v. Johnson*, the court found that the mere issuance of the warrants was sufficient to equal the commencement of a criminal proceeding, and held that under Florida law, arrest was not an element essential to establish malicious prosecution. *Caplan v. Johnson*, 414 F.2d 615, 618 (5th Cir. 1969).  In that same vein, when the Mueller Investigation was first initiated, Acting Attorney General Rod Rosenstein issued an order appointing Robert S. Mueller as Special Counsel to investigate, among other things, whether Plaintiff colluded with the Russian government. In doing so, he invoked 28 U.S.C. § 515—which empowers the Attorney General to initiate "any kind of *legal proceeding*, civil or criminal"—to commence the proceeding. 28 U.S.C.

§ 515 (emphasis added). Furthermore, a substantial amount of litigation was carried out in furtherance of the Mueller Investigation. As referenced in Attorney General William Barr's letter dated March 24, Robert Mueller "issued more than 2,800 subpoenas, executed nearly 500 search warrants, obtained more than 230 orders for communication records, issued almost 50 orders authorizing use of pen registers, made 13 requests to foreign governments for evidence, and interviewed approximately 500 witnesses." Am. Compl. ¶ 461, n. 244. Given the magnitude and scope of the Mueller Investigation, coupled with the statutory authority under which it was commenced, there is no question that it qualifies as a 'proceeding' for the purposes Plaintiff's malicious prosecution claim.

As discussed at length above, and as detailed throughout the Complaint, Defendants were the legal cause of both Crossfire Hurricane and the subsequent Mueller Investigation Mueller Investigation. Among other things, Defendants intentionally and maliciously instigated the Mueller Investigation by providing law enforcement officials with patently false information relating to Plaintiff's supposed ties to Russia. *Id*. at ¶ 669.

Further, there was a bonafide termination of a criminal proceeding in Plaintiff's favor. On March 22, 2019, Special Counsel Robert Mueller concluded his 22-month investigation and submitted the Mueller Report to Attorney General William Barr. In the Mueller Report, Special Counsel Mueller found that there was no evidence that either Plaintiff or his campaign colluded with the Russian Government to undermine the 2016 presidential election. *Id*. at ¶¶ 459-460. Specifically, the Mueller Report stated that Mueller "did not find that the Trump campaign, or anyone associated with it, conspired or coordinated with the Russian government in these efforts, despite multiple efforts from Russian-affiliated individuals to assist the Trump campaign." *Id*. at ¶ 461. Attorney General William Barr, in a subsequent letter to Congress on March 24, 2019, confirmed Mueller's findings and terminated the proceeding. Therefore, the Mueller Report serves as veritable proof that the Mueller Investigation was terminated in Plaintiff's favor.

Plaintiff successfully pled the remaining elements of his malicious prosecution claim. As detailed in great length in the Complaint, the present collectively advanced the creation of the fraudulent Steele Dossier, the white papers, and other falsehoods that served as the basis for Crossfire Hurricane, which then culminated in the continuation of the Mueller Investigation, which had no justifiable basis. *Id*. at ¶¶ 670, 674. Finally, Plaintiff established that he suffered damages known to be in excess of $24 million dollars in the form of "defense costs legal fees, and related

expenses incurred in connection with his effort to defend against Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom." *Id.* at ¶ 678.

Based on the foregoing, Plaintiff has set forth a valid and cognizable claim for malicious prosecution. In addition, and as illustrated above, Plaintiff's conspiracy must also survive as Plaintiff has met each of the elements to satisfy the underlying tort.

### E. STORED COMMUNICATIONS ACT

Plaintiff has also asserted a claim against Defendants under the Stored Communications Act (the "SCA"). A person or entity violates the SCA when it: "(1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system." 18 U.S.C. § 2701.

Here, Plaintiff has stated an adequate SCA claim because he has alleged that Defendants intentionally and improperly exceeded their authority to access servers belonging to the EOP and Trump Organization to access non-public, proprietary, and confidential information. First, Plaintiff sufficiently alleges that the Servers were facilities through which an electronic communication service is provided. As provided in the Complaint, the facilities identified includes computer servers, networks, or systems, and provided through Plaintiff's computer or computer servers, networks, or systems, are "electronic communications" as they are "housed in, and transmitted to, servers connected to the internet." Am. Compl. ¶ 729. Moreover, the Eleventh Circuit has recognized that a facility can include the "physical means or equipment for doing something." *Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1178 n.4 (11th Cir. 2017) (rejecting defendant's argument that he did not access a facility within the meaning of the SCA based on the plain-meaning of facility as defined by the Oxford English dictionary).

Plaintiff explicitly alleges that they accessed confidential information housed in, and transmitted to, servers connected to the internet. Defendants' attempt to liken the instant scenario— involving computer servers of the White House and The Trump Organization, a billion-dollar company—to cases dealing with the infiltration of cell phones and personal hard drives is unconvincing. *See* Deft. Memo, at 28. Indeed, Plaintiff properly alleges that The Trump Organization and the White House are entire interconnected systems which house electronic communications. By infiltrating these networks, Defendants were able to cross check their own

internal data with "a lengthy list of more than 9,000 IP addresses, 3,000 internet domains, and 60 e-mail addresses and domains that related to Donald J. Trump, the Trump Organization, and numerous Trump associates." Courts have recognized that a plaintiff can state a SCA claim for these types of cloud-based facilities. *Hamilton Grp. v. Basel*, 311 F. Supp. 3d 1307, 1320 (S.D. Fla. 2018) ("The Eleventh Circuit has unequivocally stated that Microsoft 365, a cloud-based service, through which emails are sent and received, and which was the system Plaintiff used, "is a facility.")

Further, Plaintiff properly alleges both the DNS and other confidential, proprietary information which was illicitly accessed by Defendants was both held in electronic storage and constituted private data. "Authorized access, in the electronic context, typically involves consideration of 'the expected norms of intended use or the nature of the relationship established' between the holder of the communications and the authorized party." *Bovino v. MacMillan*, 28 F. Supp. 3d 1170, 1176 (D. Colo. 2014) (quoting *U.S. v. Phillips*, 477 F.3d 215, 219 (5th Cir. 2007)). It has been held that unauthorized access to DNS and related internet logging data is within the purview of the Stored Communications Act. *See*, e.g., *Domain Protection, LLC*, 426 F.Supp. at 355 ("Verisign's electronic registry is a database which stores records for domain names. Given that this database enables internet service providers and enables internet navigation by storing signals that provide for such navigation, Verisign's database falls within the ambit of the Stored Communications Act."). For this reason, the court found that Defendant service provider's conduct in "unlawfully and without authorization" assuming control of Plaintiff's DNS data and records—which were being stored in Defendant's electronic registry—had plead an adequate claim of conversion and violation of the Stored Communications Act.

Here, Defendants similarly accessed Plaintiff's servers to retrieve his non-public DNS data without his knowledge or consent. The DNS data and records squarely falls within the parameters of the SCA. *Id.* By infiltrating Plaintiff's servers and gaining access to these communications, Defendants violated the SCA and must therefore be held liable. At this early stage of pleading, Plaintiff has readily satisfied his burden to state a claim.

### F. COMPUTER FRAUD & ABUSE ACT

The Computer Fraud and Abuse Act ("CFAA") is a federal criminal statute that also authorizes civil actions for any person who suffers damage or loss by reason of a violation of the statute. 18 U.S.C. § 1030(g). To prove a claim under § 1030(a)(4), a party must demonstrate that a defendant: (1) accessed a "protected computer" (2) without authorization or by exceeding such

authorization as was granted, (3) "knowingly" and with "intent to defraud," and (4) as a result has "further[ed] the intended fraud and obtain[ed] anything of value. *Pharmerica, Inc. v. Arledge*, 2007 WL 865510 *6 (M.D. Fla. March 21, 2007).

Defendants appear to readily concede that two of these elements—access to a "protected computer" and "intent to defraud"—are met. In arguing the remaining two elements, Defendants point to *Van Buren v. United States,* 141 S. Ct. 1648 (2021), but the facts contained in *Van Buren* are readily distinguishable from the case at bar. In *Van Buren*, a police officer had accepted a bribe to run a license plate search in excess of his authorized access to the police department's computer system. In finding that the officer did not violate the CFAA, the Supreme Court noted that the language "exceeds authorized access" in the CFAA is intended to protect computers from "inside hackers - those whose access a computer with permission, but then exceed the parameters of authorized access by entering an area of the computer to which the authorization does not extend." *Id*. It further held that "an individual 'exceeds authorized access' when he accesses a computer with authorization but then obtains information located in particular areas of the computer—such as files, folders, or databases—that are *off limits* to him." *Id*. at 1662 (emphasis added).

Here, Defendants mischaracterize the allegations contained in the Complaint, claiming that Plaintiff's sole contention is that Joffe and Neustar accessed DNS data that was "already available to them." Def. Memo, 26. This argument is misleading. What Plaintiff actually alleges is that these Defendants "knowingly, intentionally and *unlawfully accessed* and/or exceeded their authority to access" the computers belonging to the EOP and those belonging to the Trump Organization. Am. Compl. ¶¶ 697-700. Plaintiff's CFAA claim is viable on this basis alone. Further, the allegations establish that Defendants exceeded their authorization by accessing data that would be otherwise "off limits" to Joffe and Neustar, namely information that reveals Plaintiff's and The Trump Organization's "contacts, client lists, business dealings, financial dealings, communications, future and current plans, techniques, patterns, methods, processes, and procedures, as well as identification of their corporate partners, political associates, clients, and vendors." *Id*. ¶713-714. Given the highly-sensitive nature of this information, it falls well within the type of "off limits" that violates the CFAA when accessed in an unauthorized manner. *Van Buren*, *supra*.

Furthermore, at this stage of litigation, Plaintiff is unable to determine the exact nature of the data that Defendants unlawfully misappropriated to harm and malign Plaintiff. Given Joffe's involvement with Neustar and the Data Companies to infiltrate, access, and misappropriate

Plaintiff's data, Plaintiff maintains a good faith basis to believe that Defendants gained access to additional 'off-limits' information not yet known to Plaintiff. Am. Compl. ¶¶ 140, 142, 546. As such, Plaintiff has alleged sufficient facts to warrant additional discovery to determine the full extent of Defendants' tortious conduct. *See Bessemer Sys. v. Fiserv Sols.*, LLC, 2021 U.S. Dist. LEXIS 175153, at *30 (W.D. Pa. Sep. 15, 2021) (finding that it would be inappropriate to dismiss Plaintiff's Complaint before discovery sheds further light on the nature of the "security review" at issue).

Plaintiff also pleads a compensable loss in relation to Defendants' violation of CFAA. The term "loss" means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offenses, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service. 18 U.S.C. § 1030(e)(11). *Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1173 (11th Cir. 2017). Further, as discussed above with regard to theft of trade secrets, Plaintiff sustained significant losses as a result of the misappropriation of Plaintiff's DNS and other proprietary data. Therefore, Plaintiff's CFAA claim has been sufficiently pled.

### G.  THEFT OF TRADE SECRETS (18 U.S.C. § 1832)

For the same reasons set forth in Section II(A)(iii)(b)—discussing theft of trade secrets as a predicate act—Plaintiff's standalone cause of action for theft of trade secrets is legally cognizable.

### III.   ALTERNATIVELY, PLAINTIFF SEEKS LEAVE TO AMEND THE COMPLAINT

Rule 15 dictates that leave to amend a pleading "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). A court should deny leave to amend a pleading only when "(1) the amendment would be prejudicial to the opposing party, (2) there has been bad faith or undue delay on the part of the moving party, or (3) the amendment would be futile." *Foman v. Davis*, 371 U.S. 178, 182 (1962). None of these circumstances are applicable here. Thus, to the extent the Court finds the Complaint inadequate in any respect, Plaintiff respectfully requests leave pursuant to Fed. R. Civ. Proc. 15(a) to serve a Second Amended Complaint, as any such inadequacies, would be merely issues of technical pleading rather than substantive defects.

### CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion in its entirety.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed this 4th day of August, 2022, with the Clerk of Court using CM/ECF, which will send a notice of electronic filing to all Parties listed on the Service List.

**THE TICKTIN LAW GROUP**
270 SW Natura Avenue
Deerfield Beach, Florida 33441
Telephone: (561) 232-2222

 /s/ Pete*r Ticktin*
PETER TICKTIN, ESQUIRE
Florida Bar No. 887935
JAMIE ALAN SASSON, ESQUIRE
Florida Bar No. 10802
Our Matter No.: 22-0062

and

**HABBA MADAIO & ASSOCIATES LLP**
1430 US Highway 206
Suite 240
Bedminster, New Jersey 07921
ALINA HABBA, ESQUIRE (*Pro Hac Vice*)
New Jersey Bar No. 018592010
MICHAEL T. MADAIO, ESQUIRE (*Pro Hac Vice*)
New Jersey Bar No. 070752013
Our Matter No.: 4500-74

249

Defendant Rodney Joffee's Reply in Support of His Motion to Dismiss
for Lack of Personal Jurisdiction (Aug. 11, 2022)

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**Case No. 2:22-cv-14102-DMM**

DONALD J. TRUMP,

               Plaintiff,

v.

HILLARY R. CLINTON, et al.,

               Defendants.

**DEFENDANT RODNEY JOFFE'S REPLY IN SUPPORT OF HIS
MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ....................................................................................................1

ARGUMENT ...............................................................................................................................2

I.    PLAINTIFF FAILS TO IDENTIFY ANY ACTION BY JOFFE TO TARGET OR
     PURPOSEFULLY CONDUCT ACTIVITIES IN FLORIDA ...........................................2

II.   PLAINTIFF CANNOT RELY ON SUPPLEMENTAL JURISDICTION TO
     ESTABLISH PERSONAL JURISDICTION ....................................................................6

III.  THERE IS NO GENUINE DISPUTE OF FACT TO WARRANT JURISDICTIONAL
     DISCOVERY ...................................................................................................................7

CONCLUSION.............................................................................................................................9

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ACLU v. City of Sarasota*,
   859 F.3d 1337 (11th Cir. 2017) ...................................................................8

*Brown v. Carnival Corp.*,
   202 F. Supp. 3d 1332 (S.D. Fla. 2016) ......................................................7

*Calder v. Jones*,
   465 U.S. 783 (1984)...............................................................................4, 5

*Carter v. Ford Motor Co.*,
   No. 19-62646-CIV, 2021 WL 1165248 (S.D. Fla. Mar. 26, 2021) .........6

*CCTV Outlet, Corp. v. Desert Sec. Sys. L.L.C.*,
   No. 17-60928-CIV, 2017 WL 5640717 (S.D. Fla. Aug. 7, 2017) ...........8

*Culverhouse v. Paulson & Co. Inc.*,
   813 F.3d 991 (11th Cir. 2016) ...................................................................8

*Farrell v. Royal Caribbean Cruises, Ltd.*,
   917 F. Supp. 2d 1248 (S.D. Fla. 2013) ......................................................8

*FR Tax Grp., LLC v. Kassover*,
   No. 17-80386-CIV, 2017 WL 6346051 (S.D. Fla. Aug. 2, 2017), *aff'd*, 723 F.
   App'x 977 (11th Cir. 2018) .......................................................................6

*Keeton v. Hustler Magazine, Inc.*,
   465 U.S. 770 (1984) (Plaintiff's Response ) .........................................4, 5

*Leon v. Continental AG*,
   301 F. Supp. 3d 1203 (S.D. Fla. 2017) ....................................................1

*Miller v. Gizmodo Media Grp., LLC*,
   383 F. Supp. 3d 1365 (S.D. Fla. 2019) .................................................3, 4

*Peruyero v. Airbus S.A.S.*,
   83 F. Supp. 3d 1283 (S.D. Fla. 2014) .......................................................7

*Riley v. Cardozo*,
   No. 3:16-cv-961-J-34MCR, 2017 WL 2799900 (M.D. Fla. June 28, 2017) ............................4

*Sovereign Offshore Servs., LLC v. Shames*,
   No. 17-CV-80172, 2017 WL 7798664 (S.D. Fla. Aug. 3, 2017)
   (Middlebrooks, J.)...................................................................................2, 5

(ii)

*Tarasewicz v. Royal Caribbean Cruises Ltd.*,
    No. 14-CIV-60885, 2015 WL 3970546 (S.D. Fla. June 30, 2015)............................................2

*Vision Media TV Grp., LLC v. Forte*,
    724 F. Supp. 2d 1260 (S.D. Fla. 2010) .............................................................................5

*Walden v. Fiore*,
    571 U.S. 277 (2014)................................................................................................2, 3, 4

*Wolf v. Celebrity Cruises, Inc.*,
    683 F. App'x 786 (11th Cir. 2017) ....................................................................................7

*Zamora Radio, LLC v. Last.fm LTD.*,
    No. 09-20940-CIV, 2011 WL 2580401 (S.D. Fla. June 28, 2011)............................................7

**Statutes**

28 U.S.C. § 1367(a) ...............................................................................................................6

**Other Authorities**

4 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure Civil
    § 1067.6 (4th ed.) .........................................................................................................7

Fed. R. Civ. P. 12(b)(2)..........................................................................................................2

Fed. R. Civ. P. 12(b)(6)..........................................................................................................1, 2

## PRELIMINARY STATEMENT

Plaintiff's Response to Rodney Joffe's Motion to Dismiss the Amended Complaint for lack of personal jurisdiction (Dkt. 239 or "Plaintiff's Response") fails to explain how the Amended Complaint, on its face, provides a legal basis for this Court to hold that Joffe is subject to personal jurisdiction under the traditional "minimum contacts" analysis. Plaintiff does nothing to establish how his allegations prove that Joffe "targeted" Florida or "purposively availed" himself of a Florida forum. Indeed, the Amended Complaint fails to identify any action by Joffe conducted in Florida or directed at Florida; rather, it wholly relies on Plaintiff's alleged injury in Florida. This is plainly insufficient to establish personal jurisdiction under the minimum contacts analysis.

Plaintiff's Response inexplicably starts with the contention that Joffe's Motion to Dismiss (Dkt. 227) should be denied because personal jurisdiction is appropriate under Section 1962(d)'s nationwide service of process provision. Plaintiff's Response at ¶¶ 4-7. But Plaintiff's argument simply misunderstands Joffe's Motion, which acknowledged that the "only plausible basis for personal jurisdiction over Joffe is" under Section 1962(d), Dkt. 227 at 1, *if and only if* his RICO claim survives Rule 12(b)(6) scrutiny. *See Leon v. Continental AG*, 301 F. Supp. 3d 1203, 1231-32 (S.D. Fla. 2017). For the reasons detailed in the Defendants' *Joint Motion to Dismiss Under Federal Rule 12(B)(6) and Incorporated Memorandum of Law*, filed on July 14, 2022 at Dkt. 226 (the "Joint Motion"), and Defendants' forthcoming Joint Reply,[1] the RICO claims cannot survive a Rule 12(b)(6) motion. Accordingly, absent a viable RICO claim, this Court should dismiss the

---

[1] Joffe joined in the Joint Motion and likewise joins in the Defendants' forthcoming response ("Joint Reply") to *Plaintiff's [sic] Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint* [Dkt. 237], which further addresses the bases for dismissal under Rule 12(b)(6).

remaining claims against Joffe under Rule 12(b)(2) because the court lacks personal jurisdiction over him.[2]

## ARGUMENT

### I.   PLAINTIFF FAILS TO IDENTIFY ANY ACTION BY JOFFE TO TARGET OR PURPOSEFULLY CONDUCT ACTIVITIES IN FLORIDA

Plaintiff's minimum-contacts analysis is grounded on the erroneous assumption that the location of Plaintiff's alleged injury is a sufficient basis to establish jurisdiction over a defendant. Plaintiff's argument, however, cannot be reconciled with governing law, as "[t]he proper focus of the 'minimum contacts' inquiry in intentional-tort cases is 'the relationship among the defendant, the forum, and the litigation.'" *Walden v. Fiore*, 571 U.S. 277, 291 (2014) (citing *Calder v. Jones*, 465 U.S. 783, 788 (1984)); *see also Sovereign Offshore Servs., LLC v. Shames*, No. 17-CV-80172, 2017 WL 7798664, at *3 (S.D. Fla. Aug. 3, 2017) (Middlebrooks, J.) (detailing *Walden* minimum contacts standard). It is axiomatic that a forum state's exercise of jurisdiction over an out-of-state defendant "must be based on intentional conduct by the defendant that creates the necessary contacts with the forum." *Walden*, 571 U.S. at 286. The "plaintiff cannot be the only link between the defendant and the forum." *Id.* at 285-86. Moreover, "a defendant's random, fortuitous, or attenuated contacts or . . . unilateral activity of a plaintiff" are likewise insufficient to support the exercise of personal jurisdiction. *Id.* For long-arm jurisdiction in Florida to comport with due process, the plaintiff must show that the defendant "purposively avail[ed himself of] the privilege of conducting activities within Florida" such that he "should reasonably anticipate being haled into court there," *Tarasewicz v. Royal Caribbean Cruises Ltd.*, No. 14-CIV-60885, 2015 WL 3970546,

---

[2] Plaintiff's remaining claims are likewise without merit and should be dismissed under Rule 12(b)(6) for the reasons detailed in the Joint Motion and Joint Reply.

at *36 (S.D. Fla. June 30, 2015) (quoting *Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1546 (11th Cir. 1993)), or that he "'targeted Florida'" or "'acted to aim [his] conduct at a Florida audience,'" *Miller v. Gizmodo Media Grp., LLC*, 383 F. Supp. 3d 1365, 1374 (S.D. Fla. 2019) (quoting *Vision Media TV Grp., LLC v. Forte*, 724 F. Supp. 2d 1260, 1266 (S.D. Fla. 2010)).

While Plaintiff's Response (at ¶¶13-15, 24-47) regurgitates rambling allegations from the Amended Complaint, he fails to allege or identify any act by Joffe targeting Florida.  The only allegations regarding acts by Joffe concern (1) his work outside Florida for his then-employer Neustar (which was not based in Florida), (2) his interactions outside Florida with his then attorney Mr. Sussmann (who was not based in Florida), and (3) his alleged actions outside of Florida to access DNS data held by certain entities (all of which are outside of Florida).  Based on these alleged out-of-state acts, involving non-Florida entities and individuals, Plaintiff futilely attempts to tie Joffe to Florida based on the alleged "effects" of the FBI investigation and published dossier which Plaintiff claims were "felt within the State of Florida" (*id*. at ¶ 15).  Specifically, Plaintiff alleges that "document[s], newspaper articles, online publications, and information about the FBI investigation", which Joffe allegedly helped instigate, were read and published within the State of Florida (*Id*.), that the investigation harmed Plaintiff as a resident of Florida, and that it also harmed "residents of the State of Florida" (*Id.*).  At bottom, these allegations fall short of establishing that Joffe engaged in intentional conduct in Florida, or conduct that was aimed at Florida.  Indeed, as in *Walden*, "[i]t is undisputed that no part of [defendant's] course of conduct occurred in [Florida]." 571 U.S. at 288.  Thus, Plaintiff cannot satisfy the minimum contacts standard.

Plaintiff's arguments relating to his alleged injury in Florida similarly are insufficient as a matter of law.  As an initial matter, there is no basis to assert that Joffe intentionally harmed Plaintiff in Florida because Plaintiff did not live there at the time of Joffe's alleged tortious

conduct. At the time of the alleged conduct (2016-2017), Plaintiff resided in New York and did not become a Florida resident until September 27, 2019. *See* Declaration of Domicile, Recorded 10/04/2019 Palm Beach County, Florida. CFN 20190364271 (ECF No. 157-1). Plaintiff's Response fails to dispute this fact. Moreover, Plaintiff's later-acquired residence (and purported injury) in Florida is merely a "'random, fortuitous'" contact that is insufficient to satisfy due process. *See Walden*, 571 U.S. at 286; *see also Riley v. Cardozo*, No. 3:16-cv-961-J-34MCR, 2017 WL 2799900, at *6 (M.D. Fla. June 28, 2017). But, even if Plaintiff did reside in Florida at the time in question (he did not), it would not permit the exercise of specific jurisdiction over Joffe because "the plaintiff cannot be the only link between the defendant and the forum." *Walden*, 571 U.S. at 285. "[M]ere injury to a forum resident is not a sufficient connection to the forum" to establish specific jurisdiction. *Id*. at 289-290.

In that regard, Plaintiff's reliance on *Calder v. Jones*, 465 U.S. 783, 789 (1984), and *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984) (Plaintiff's Response at ¶¶ 10-11), is unavailing. Plaintiff contends that *Calder* establishes that "where one state is the focal point both of the story and of the harm suffered, jurisdiction over defendants is proper in that same state based on the 'effects' of the defendants (sic) conduct in that state even though the conduct occurs in another state." Plaintiff's Response at ¶ 10. As courts within this Circuit have explained, but Plaintiff seemingly fails to recognize, the "effects" test requires that a plaintiff establish that a tort was: "(1) intentional; (2) aimed at the forum state; and (3) caused harm that the defendant should have anticipated would be suffered in the forum state." *Miller*, 383 F. Supp. 3d at 1373 (citing *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1356 (11th Cir. 2013)). Here, there is no credible suggestion that Joffe "aimed" any conduct at Florida, or should have anticipated that harm would be suffered in Florida. Indeed, as explained above, Plaintiff did not even live in Florida at

the time. *See Miller*, 383 F. Supp. 3d at 1373-1374 (dismissing complaint where there was no allegation that the defendant "targeted" Florida or had "reason to believe the 'brunt' of Plaintiff's injury would be felt in Florida").

Regarding Joffe's knowledge that his alleged actions would have an effect in Florida, Plaintiff's only response is that Joffe "knew that the . . . injurious falsehoods" would be "published throughout the United States," and "knew that Florida is a state in the United States." Plaintiff's Response at ¶ 24. This alone is insufficient to meet *Calder*'s requirements. As this Court explained in addressing a similar issue, and applying *Calder*, "mere awareness that a product will eventually enter the forum state is not enough to support the exercise of personal jurisdiction." *Sovereign Offshore Servs., LLC*, 2017 WL 7798664, at *3 (Middlebrooks, J.) (alterations adopted). This statement is equally applicable here.

Plaintiff's reliance on *Keeton* fares no better. In *Keeton*, the Supreme Court applied the traditional minimum contacts test, holding that New Hampshire had jurisdiction over Hustler magazine in a libel suit where Hustler sold "some 10 to 15,000 copies of Hustler magazine in that State each month." *Keeton*, 465 U.S. at 772. The Supreme Court reasoned that through its repeated and ongoing sales of copies of its magazine, the defendant had "continuously and deliberately exploited the New Hampshire market," and it was therefore reasonable for the defendant to "anticipate being haled into court there in a libel action based on the contents of its magazine." *Id.* at 781 (citation omitted). In other words, the Supreme Court found minimum contacts sufficient to justify jurisdiction over the defendant because the defendant's deliberate, ongoing interaction with the forum state constituted exploitation of such state's market. Unlike the allegations in *Keeton*, the Amended Complaint utterly fails to allege ongoing, deliberate acts by Joffe in Florida. *See also Vision Media TV Grp., LLC v. Forte*, 724 F. Supp. 2d 1260, 1266 (S.D. Fla. 2010)

(dismissing libel suit for lack of personal jurisdiction where there was no evidence "showing that the website at issue targeted Florida or that Defendants acted to aim their conduct at a Florida audience"); *Sovereign Offshore*, 2017 WL 7798664, at *3 n.4 ("Defendant's awareness that consumers across the nation may access his blog posts is not enough to support the exercise of personal jurisdiction." (citation omitted)).

For these reasons, Plaintiff's Amended Complaint fails to plead a basis for personal jurisdiction over Joffe under the traditional minimum contacts analysis.

## II.   PLAINTIFF CANNOT RELY ON SUPPLEMENTAL JURISDICTION TO ESTABLISH PERSONAL JURISDICTION

Plaintiff also contends that the Court should rely on the supplemental jurisdiction statute, 28 U.S.C. § 1367(a), to establish personal jurisdiction because  "Joffe is a major part of this case and not including him as a party . . . would be immensely prejudicial to the Plaintiff."  Plaintiff's Response at ¶ 17.

As an initial matter, "§ 1367 concerns subject-matter—not personal—jurisdiction." *Carter v. Ford Motor Co.*, No. 19-62646-CIV, 2021 WL 1165248, at *6 n.6 (S.D. Fla. Mar. 26, 2021).  In that regard, Plaintiff appears to be "confusing supplemental jurisdiction with pendent personal jurisdiction." *FR Tax Grp., LLC v. Kassover*, No. 17-80386-CIV, 2017 WL 6346051, at *5 (S.D. Fla. Aug. 2, 2017), *aff'd*, 723 F. App'x 977 (11th Cir. 2018).  Moreover, Plaintiff provides no legal support for his request to find *personal jurisdiction* appropriate over Joffe simply because it may exist over other parties.  As Judge Altman recently explained, "no federal circuit court of appeals has adopted this pendent-party variety of personal jurisdiction." *Carter,* 2021 WL 1165248, at *9; *see also id*. at *8 ("The Eleventh Circuit hasn't adopted the version of pendent personal jurisdiction (what we'll call pendent-party personal jurisdiction) the Plaintiffs espouse here.").

While courts have recognized that pendent personal jurisdiction permits a court to assert

personal jurisdiction over a defendant for multiple claims arising "out of the same nucleus of operative fact," they have only done so where the court also "possesse[d] personal jurisdiction over the first claim." *FR Tax Grp., LLC*, 2017 WL 6346051, at *5.  Because Plaintiff's RICO claims fail here, he cannot bootstrap personal jurisdiction over Joffe with respect to any remaining claims.  Accordingly, "the doctrine of pendent personal jurisdiction provides no basis to extend personal jurisdiction over" Joffe.  *Id.*

## III.   THERE IS NO GENUINE DISPUTE OF FACT TO WARRANT JURISDICTIONAL DISCOVERY

Without identifying any fact in dispute (there are none), or what discovery would be beneficial (none would), Plaintiff pleads for the opportunity to conduct jurisdictional discovery in the event this Court agrees that his RICO claims fail.  Plaintiff's Response at ¶¶ 20-21.  The Court should reject this request because Plaintiff has failed to meet the threshold requirement of showing that there is a genuine dispute regarding a "material jurisdictional fact."  *See Wolf v. Celebrity Cruises, Inc.*, 683 F. App'x 786, 792 (11th Cir. 2017) ("The right to jurisdictional discovery is a qualified one, available 'when a court's jurisdiction is genuinely in dispute.'" (quoting *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 730 n.7 (11th Cir. 1982)); *Brown v. Carnival Corp.*, 202 F. Supp. 3d 1332, 1346 (S.D. Fla. 2016) ("The Court does not find it necessary to provide Plaintiff with an opportunity to engage in jurisdictional discovery because there is no genuine dispute on a material jurisdictional fact to warrant jurisdictional discovery.") (quotation marks omitted); *Zamora Radio, LLC v. Last.fm LTD.*, No. 09-20940-CIV, 2011 WL 2580401, at *12 (S.D. Fla. June 28, 2011) (denying request for jurisdictional discovery "in the absence of a 'genuine dispute' on a material jurisdictional fact").[3]

---

[3] *See also, e.g., Peruyero v. Airbus S.A.S.*, 83 F. Supp. 3d 1283, 1290 (S.D. Fla. 2014) ("[J]urisdictional discovery is 'not an unconditional right that permits a plaintiff to seek facts that

Quoting *ACLU v. City of Sarasota*, 859 F.3d 1337, 1341 (11th Cir. 2017), Plaintiff suggests that this Court would "abuse[] its discretion if it completely denies [Plaintiff] jurisdictional discovery." Plaintiff's Response at ¶ 21.  But, his selective quotation tellingly omits a crucial limitation that eviscerates this argument:  As the Eleventh Circuit explained in *ACLU*, a qualified right to jurisdictional discovery exists only where jurisdictional facts are "genuinely in dispute." *ACLU*, 859 F.3d at 1340.  In that regard, "[a] 'jurisdictional question is genuinely in dispute when the court cannot resolve the issue' without additional evidence." *Farrell v. Royal Caribbean Cruises, Ltd.*, 917 F. Supp. 2d 1248, 1252 (S.D. Fla. 2013) (quoting *Eaton*, 692 F.2d at 730 n.7) (alteration adopted).  That simply is not the case here.

The Amended Complaint *on its face* fails to establish personal jurisdiction over Joffe. Moreover, in his Opposition, Plaintiff fails to identify any relevant fact relating to jurisdiction that is in dispute; instead he relies on the allegations of the Amended Complaint and claims that his alleged injury in Florida is sufficient to establish personal jurisdiction over Joffe even though Joffe had no contact with the forum.  Notably, Plaintiff also does not challenge (or even address) the fact that he *did not reside in Florida* at the time of the alleged conduct (2016-2017).  Under these undisputed facts, Joffe is not subject to personal jurisdiction. Because no jurisdictional discovery would alter this conclusion, none of it is material, and Plaintiff's request should be denied.  *See CCTV Outlet, Corp. v. Desert Sec. Sys. L.L.C.*, No. 17-60928-CIV, 2017 WL 5640717, at *4 (S.D. Fla. Aug. 7, 2017) ("Plaintiff's request for jurisdictional discovery is unavailing because further

---

would ultimately not support a showing [of] personal jurisdiction.'" (quoting *Bernardele v. Bonorino*, 608 F. Supp. 2d 1313, 1321 (S.D. Fla. 2009)); 4 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure Civil § 1067.6 (4th ed.) ("A court need not hold an evidentiary ruling to allow the plaintiff to present evidence supporting personal jurisdiction when the specific allegations of the plaintiff even if fully credited do not make a prima facie showing of jurisdiction.").

discovery is unlikely to change the Court's conclusion that personal jurisdiction is lacking.").[4]

## **CONCLUSION**

Assuming Plaintiff's RICO claims fail and statutory personal jurisdiction under Section 1962(d) is therefore unavailable, Plaintiff's remaining claims against Joffe should be dismissed because this Court otherwise lacks personal jurisdiction over him.


Dated:  August 11, 2022                                       Respectfully submitted,


                                                             */s/ Edward Soto*
                                                             Edward Soto (FBN 0265144)
                                                             **WEIL GOTSHAL & MANGES LLP**
                                                             1395 Brickell Avenue, Suite 1200
                                                             Miami, FL 33131
                                                             Telephone: (305) 577-3100

                                                             Steven A. Tyrrell, *admitted pro hac vice*
                                                             **WEIL GOTSHAL & MANGES LLP**
                                                             2001 M Street, N.W., Suite 600
                                                             Washington, D.C. 20036
                                                             Telephone: (202) 682-7000

                                                             *Counsel for Rodney Joffe*

---

[4] The Court also should deny Plaintiff's request for jurisdictional discovery in the event Defendants' Joint Motion to Dismiss on the merits is granted.  *See Culverhouse v. Paulson & Co. Inc.*, 813 F.3d 991, 994 (11th Cir. 2016) ("Because the complaint fails to state a claim, Culverhouse was also not entitled to jurisdictional discovery.")

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on August 11, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Edward Soto*
Edward Soto (FBN 0265144)
**WEIL GOTSHAL & MANGES LLP**
1395 Brickell Avenue, Suite 1200
Miami, FL 33131
Telephone: (305) 577-3100
Facsimile: (305) 374-7159

*Counsel for Rodney Joffe*

10

## 250

Hillary Clinton's, HFACC, Inc.'s, John Podesta's, Robert Mook's, Jake Sullivan's, DNC's, DNC Services Corporation's, Debbie Wasserman Schultz's, Perkins Coie LLP's, Marc Elias's, Michael Sussmann's, Charles Halliday Dolan, Jr.'s, Fusion GPS's, Glenn Simpson's, Peter Fritsch's, Nellie Ohr's, Bruce Ohr's, Igor Danchenko's, Rodney Joffe's, Neustar Security Services's, and Neustar, Inc.'s Reply in Support of Their Motion to Dismiss (Aug. 11, 2022)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Donald J. Trump,

    Plaintiff,

  v.

Hillary R. Clinton *et al.*,

    Defendants.

Civil Action No. 2:22-14102-DMM

**HILLARY CLINTON'S, HFACC, INC.'S, JOHN PODESTA'S, ROBERT MOOK'S, JAKE SULLIVAN'S, DNC'S, DNC SERVICES CORPORATION'S, DEBBIE WASSERMAN SCHULTZ'S, PERKINS COIE LLP'S, MARC ELIAS'S, MICHAEL SUSSMANN'S, CHARLES HALLIDAY DOLAN, JR.'S, FUSION GPS'S, GLENN SIMPSON'S, PETER FRITSCH'S, NELLIE OHR'S, BRUCE OHR'S, IGOR DANCHENKO'S, RODNEY JOFFE'S, NEUSTAR SECURITY SERVICES'S, AND NEUSTAR, INC.'S REPLY IN SUPPORT OF THEIR MOTION TO DISMISS**

# TABLE OF CONTENTS

Page

INTRODUCTION ......................................................................................................................1

ARGUMENT ..............................................................................................................................1

I.      PLAINTIFF'S CLAIMS ARE TIME-BARRED....................................................1

      A.     Plaintiff Is Not Entitled to Equitable Tolling..........................................2

      B.     Plaintiff's RICO and RICO-Conspiracy Claims Are Time-Barred. .......................3

           1.     Statutory Tolling Does Not Apply..............................................3

           2.     Fraudulent Concealment Does Not Apply Because Plaintiff Was Aware of His Claims..........................................................5

           3.     The Discovery Rule Does Not Toll Plaintiff's RICO Claim. .....................5

      C.     Plaintiff's Other Claims Are Time-Barred. ..........................................7

II.     EACH OF PLAINTIFF'S CLAIMS FAILS ON THE MERITS...................................7

      A.     Plaintiff's Civil RICO Claim (Count I) and Conspiracy Claim (Count II) Fail on Multiple Independent Grounds. ..............................................7

      B.     Plaintiff Has Not Stated Claims for Injurious Falsehood (Count III) and Conspiracy To Commit Injurious Falsehood (Count IV). ...................................15

      C.     Plaintiff Has Not Stated Claims for Malicious Prosecution (Count V) or for the Related Conspiracy Claim (Count VI). .......................................17

      D.     Plaintiff Has Not Stated a Claim Under the Computer Fraud and Abuse Act (Count VII)...........................................................18

      E.     Plaintiff Has Not Stated a Claim Under the Defend Trade Secrets Act (Count VIII). ............................................................19

      F.     Plaintiff Has Not Stated a Claim Under the Stored Communications Act (Count IX). .............................................................19

      G.     Plaintiff's Agency and Respondeat Superior Counts Have Been Abandoned and Should Be Dismissed (Counts X–XVI)....................................20

III.    PLAINTIFF'S REQUEST FOR LEAVE TO AMEND IS IMPROPER AND SHOULD BE DENIED. .........................................................20

CONCLUSION..........................................................................................................20

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*777 Partners LLC v. Pagnanelli*, No. 20-cv-20172, 2021 WL 2038175 (S.D. Fla. Mar. 8, 2021) ...................................................................................................................18

*Al-Rayes v. Willingham*, 914 F.3d 1302 (11th Cir. 2019)...............................................8

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..........................................................................1

*Asinmaz v. Semrau*, 42 So. 3d 955 (Fla. 4th DCA 2010) ............................................17

*Bessemer Sys. Fed. Credit Union v. Fiserv Sols.*, No. 19-cv-00624-RJC, 2021 WL 4198281 (W.D. Pa. Sept. 15, 2021) .........................................................................18

*Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167 (11th Cir. 2017).................18, 19

*Caplan v. Johnson*, 414 F.2d 615 (5th Cir. 1969)........................................................17

*Chappell v. Rich*, 340 F.3d 1279 (11th Cir. 2003).........................................................7

*Clinton v. Jones*, 520 U.S. 681 (1997)............................................................................2

*Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110 (S.D. Fla. 2021).......................17

*Credit Suisse Sec. (USA) LLC v. Simmonds*, 566 U.S. 221 (2012)................................5

*Doty v. ADT, LLC*, 20-cv-60972, 2020 WL 9071421 (S.D. Fla. Dec. 30, 2020) .........18

*Falic v. Legg Mason Wood Walker, Inc.*, 347 F. Supp. 2d 1260 (S.D. Fla. 2004) .......15

*Fedance v. Harris*, 1 F.4th 1278 (11th Cir. 2021) ..........................................................5

*Fischer v. Debrincat*, 169 So. 3d 1204 (Fla. 4th DCA 2015).......................................17

*Fridovich v. Fridovich*, 598 So. 2d 65 (Fla. 1992) ......................................................17

*Gomez v. Miami-Dade Cnty.*, 563 F. Supp. 3d 1211 (S.D. Fla. 2021) .........................20

*Hamilton Grp. Funding v. Basel*, 311 F. Supp. 3d 1307 (S.D. Fla. 2018) ...................19

*Hamm v. Rhone-Poulenc Rorer Pharms., Inc.*, 187 F.3d 941 (8th Cir. 1999) ..............13

*Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657 (1989) ..........................16

*Henry v. Examworks Inc.*, No. 20-cv-12268, 2021 WL 3440698 (11th Cir. Aug. 6, 2021)............2

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Horgan v. Felton*, 123 Nev. 577 (2007)................................................................16

*Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72 (1991).........................3

*Kelly v. United States*, 140 S. Ct. 1565 (2020) ....................................................12

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997) ....................................................5

*Kremen v. Cohen*, 337 F.3d 1024 (9th Cir. 2003)....................................................10

*Leh v. Gen. Petroleum Co.*, 382 U.S. 54 (1965) ....................................................4

*Live Face on Web, LLC v. Tweople, Inc.*, No. 14-cv-44, 2014 WL 12611359 (M.D. Fla.
    Sept. 29, 2014).............................................................................19

*Lord Abbett Mun. Income Fund, Inc. v. Tyson*, 671 F.3d 1203 (11th Cir. 2012) .........................20

*Melford v. Kahane & Assocs.*, 371 F. Supp. 3d 1116 (S.D. Fla. 2019) ..................................17

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964).....................................................16

*Pension Fund Mid Jersey Trucking Indus. v. Omni Funding Grp.*, 687 F. Supp. 962
    (D.N.J. 1988)...............................................................................4

*Pittman v. State Farm Fire & Cas. Co.*, 662 F. App'x 873 (11th Cir. 2016)..............................20

*Pro. Real Estate Invs., Inc. v. Columbia Picture Indus., Inc.*, 508 U.S. 49 (1993) ......................11

*Rajaratnam v. Motley Rice, LLC*, 449 F. Supp. 3d 45 (E.D.N.Y. 2020) ..................................13

*Reves v. Ernst & Young*, 507 U.S. 170 (1993)........................................................13

*Schwartz v. ADP, Inc.*, No. 21-cv-283, 2021 WL 5760434 (M.D. Fla. Dec. 3, 2021)................19

*Spence-Jones v. Rundle*, 991 F. Supp. 2d 1221 (S.D. Fla. 2013) ......................................12

*Taxinet Corp. v. Leon*, No. 16-cv-24266, 2018 WL 3405243 (S.D. Fla. July 12, 2018) ...............9

*Trump v. Comm. on Ways & Means*, 391 F. Supp. 3d 93 (D.D.C. 2019).................................3

*Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020) ..................................................3

*Trump v. Vance*, 140 S. Ct. 2412 (2020) ..............................................................3

*United States v. Amri*, No. 17-cr-50, 2017 WL 3262254 (E.D. Va. July 31, 2017) ...................11

## TABLE OF AUTHORITIES
(continued)

Page(s)

*United States v. Grubb*, 11 F.3d 426 (4th Cir. 1993) ....................................................12

*United States v. Lee*, 919 F.3d 340 (6th Cir. 2019) ......................................................12

*United States v. Ronda*, 455 F.3d 1273 (11th Cir. 2006) ..............................................11

*United States v. Ronga*, 682 F. App'x 849 (11th Cir. 2017) .........................................11

*United States v. Williams*, 571 F. App'x 887 (11th Cir. 2014) .....................................11

*Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039 (11th Cir. 2015) ..................................20

*Van Buren v. United States*, 141 S. Ct. 1648 (2021) ....................................................18

*VVIG, Inc. v. Alvarez*, No. 18-cv-23109, 2019 WL 5063441 (S.D. Fla. Oct. 9, 2019) ...................9

*Wallace v. Kato*, 549 U.S. 384 (2007) ......................................................................2, 6

## RULES AND STATUTES

15 U.S.C. § 16(i) ...........................................................................................................3, 4

18 U.S.C. § 1512(b)(3) ...............................................................................................10, 11

18 U.S.C. § 1512(c)(2) ....................................................................................................12

18 U.S.C. § 1962(c) ...........................................................................................................8

Fed. R. Civ. P. 8 ..............................................................................................................13

Fed. R. Civ. P. 9(b) ...................................................................................................13, 14

Fed. R. Civ. P. 9(g) .........................................................................................................16

S.D. Fla. Local Rule 15.1 ...............................................................................................20

## INTRODUCTION

Plaintiff's lengthy Opposition largely ignores the legal flaws that Defendants identified in their two rounds of motions to dismiss.  In sum, Plaintiff's allegations do not add up to any cognizable claims.  As an initial matter, his own tweets confirm his claims are untimely.  In an attempt to revive them, Plaintiff urges the Court to invent a novel Presidential tolling doctrine wholly unsupported by case law and belied by his own extracurricular litigation while in office.

Plaintiff's claims fare no better on the merits.  He simply reiterates and block-quotes allegations in the Amended Complaint ("AC"), asserting they must be adequate because they are voluminous.  But notwithstanding the density of Plaintiff's allegations, each claim is missing necessary legal predicates, devoid of well-pleaded factual allegations, or improperly based on "labels and conclusions or a formulaic recitation of the elements."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  And where Plaintiff cites cases, they are irrelevant, distinguishable, or—often—contrary to his own position.

Plaintiff's insistence (at 21) that Defendants shared a corrupt motive to harm his "political reputation" and "damag[e] his electability" exposes this suit for what it is:  an effort to exact political payback and inflict needless litigation costs on Plaintiff's perceived opponents.  But Plaintiff's political grudges are not legally cognizable claims, and nothing in the Opposition overcomes the many deficiencies that require dismissal of the AC with prejudice.

## ARGUMENT

### I.   PLAINTIFF'S CLAIMS ARE TIME-BARRED.

Plaintiff nowhere acknowledges that his own tweets prove he was on notice of his purported claims, at the very latest, by October 2017.  Despite now insisting that he could not have discovered his claims until recently, Plaintiff took to Twitter in 2017 to accuse Clinton, the Democrats, the intelligence community, and others of the very conduct at the heart of the AC:  the

alleged fabrication of the Steele Dossier and use of DNS data as part of an effort to build a supposedly false narrative of his connections to Russia.  *See* MTD 3–4.  Because Plaintiff's tweets are judicially noticeable and prove his claims are untimely, the Court should dismiss on statute-of-limitations grounds.  *Henry v. Examworks Inc.*, No. 20-cv-12268, 2021 WL 3440698, at *3 (11th Cir. Aug. 6, 2021).

### A.   Plaintiff Is Not Entitled to Equitable Tolling.

Plaintiff argues (at 2–6) that he is entitled to equitable tolling during his presidential term because "he was preoccupied with carrying out his eminently important presidential duties" and was "tirelessly . . . devoted to serving the Nation and ensuring the well-being of the American people."  *See* Opp. 4, 5.  Plaintiff failed to plead these factual predicates for his latest effort to avoid the statute of limitations.  And any such pleading would be futile, because no authority supports the "rare remedy" of equitable tolling here.  *Wallace v. Kato*, 549 U.S. 384, 396 (2007).

Indeed, the Supreme Court has held that presidential duties do *not* afford a President shelter from civil litigation.  Although Plaintiff relies on language from *Clinton v. Jones*, 520 U.S. 681 (1997), he ignores its holding.  There, the Court rejected a stay of civil litigation during President Clinton's term.  Notwithstanding the burdens of the office, the Court concluded that the President's engagement in civil litigation would not unduly interfere with his responsibilities.  *See* 520 U.S. at 708–10.  It also noted that Congress could provide the President with protections, including "*tolling* or stay of civil claims," *id.* at 709 (emphasis added), but such protection did not exist by default.  *Clinton* therefore confirms that the President enjoys neither an automatic stay of litigation against him, nor, absent Congressional action, tolling of civil claims that may exist during his term.

Plaintiff argues (at 5) that filing suits on his own behalf during his presidency "would have been 'to the detriment . . . of the Nation that the Presidency was designed to serve,'" and would

have prevented him from "fully and faithfully executing his duties as President." This unpleaded assertion is belied by historical fact: Plaintiff fails to disclose that he *did* find time during his presidency to file multiple suits "in his personal capacity." *See, e.g.*, *Trump v. Vance*, 140 S. Ct. 2412, 2420 (2020) (suit brought by "[t]he President, acting in his personal capacity," to enjoin enforcement of a subpoena); *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2028 (2020) (suit brought by "the President in his personal capacity" to challenge subpoenas); *Trump v. Comm. on Ways & Means*, 391 F. Supp. 3d 93, 95 (D.D.C. 2019) (suit brought by Plaintiff "in his personal capacity"). Plaintiff's conduct while in office belies any claim that the equities require his novel theory of tolling, which finds no support in the law or on the facts.

### B.   Plaintiff's RICO and RICO-Conspiracy Claims Are Time-Barred.

### 1.   Statutory Tolling Does Not Apply.

As Plaintiff concedes, the Clayton Act provides for tolling of private suits "[w]henever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations *of any of the antitrust laws*." 15 U.S.C. § 16(i) (emphasis added). Plaintiff pointedly ignores the critical, limiting prepositional phrase—"of the antitrust laws"—when he paraphrases the provision as providing tolling on the basis of "any civil or criminal proceeding . . . instituted by the United States." But this statutory language must be construed in light of the phrase limiting which proceedings give rise to statutory tolling. *See, e.g.*, *Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72 (1991) (construing a subject limited by a prepositional phrase). Under Section 16(i), private suits are not tolled based on "*any* civil or criminal proceeding"; instead, they are tolled only when the government brings actions to punish violations "of the antitrust laws." Such tolling would not apply based on government proceedings for violation of other, non-antitrust laws.

Thus, even assuming Congress intended to provide analogous tolling when the United States institutes any action to "prevent, restrain, or punish violations of [RICO]"—a proposition with scant support in case law or the text of the statute, *see* MTD 5 n.7—Plaintiff would be entitled to statutory tolling only if he identified a "civil or criminal proceeding . . . instituted by the United States" to punish a RICO violation—not some other alleged violation of law.

None of the suits Plaintiff identifies (at 9–13) were instituted to punish a violation of RICO or any RICO predicate act. Plaintiff relies (at 9) on *Leh v. General Petroleum Co.*, 382 U.S. 54 (1965), for the proposition that tolling applies as long as the plaintiff's suit is "based in whole or in part on any matter complained of," or bears a "real relation" to the subject matter of the government suit. But that rule applies only if the predicate under Section 16(i) is met—that is, if the government suit was a proceeding to enforce the antitrust laws (or, here, RICO). In *Leh*, the parallel government action alleged that companies had conspired to violate the Sherman Act—an antitrust violation. 382 U.S. at 60. The predicate for Section 16(i) tolling was satisfied, so the Court evaluated whether the private plaintiff's complaint was "based in whole or in part on any matter complained of" in the government's antitrust complaint. *Id.*

Here, by contrast, the government has not instituted any proceedings to punish a RICO violation, or any predicate act. No statutory tolling therefore applies, regardless of whether Plaintiff's suit bears a "real relation" to *other* proceedings. Plaintiff's three out-of-circuit district court cases are not to the contrary. There, each parallel government suit appeared to involve a RICO predicate.[1] Plaintiff urges the Court to adopt a tolling rule that not only rewrites the text of

---

[1] *See* Mot. for Jud. Notice, DE 16, *Gianelli v. Schoenfield*, No. 2:21-cv-477 (E.D. Cal. Apr. 15, 2021) (parallel government charges of money laundering and conspiracy to commit wire fraud); Compl. ¶¶ 207–10, DE 1, *Pres. Petrified Forrest v. Renzi*, No. 12-cv-8140 (D. Ariz July 12, 2012) (parallel government indictment for money laundering, wire fraud, extortion, and racketeering); *Pension Fund Mid Jersey Trucking Indus. v. Omni Funding Grp.*, 687 F. Supp. 962, 963 (D.N.J. 1988) (referring to "parallel criminal litigation").

the statute, but which would effectively render the limitations period for RICO claims so expansive as to be meaningless.

### 2. Fraudulent Concealment Does Not Apply Because Plaintiff Was Aware of His Claims.

Plaintiff next argues (at 13–14) that his RICO claim should be tolled due to supposed fraudulent concealment. But as Defendants already noted, MTD 4, "the concealment requirement is satisfied only if the plaintiff shows that he neither knew nor, in the exercise of due diligence, could reasonably have known of the offense." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 195–96 (1997). In other words, "when a limitations period is tolled because of fraudulent concealment of facts, the tolling ceases when those facts are, or should have been, discovered by the plaintiff." *Credit Suisse Sec. (USA) LLC v. Simmonds*, 566 U.S. 221, 227 (2012). The case Plaintiff himself cites reiterates this principle: "The defendant must have actively concealed facts such that the plaintiff remained 'ignoran[t] of a potential claim,' not 'merely ignoran[t] of evidence.'" *Fedance v. Harris*, 1 F.4th 1278, 1287 (11th Cir. 2021) (rejecting tolling and citing *Credit Suisse*).

Plaintiff's own tweets—which describe the Steele Dossier as "put together by my political opponents and a failed spy afraid of being sued," "Clinton made," and connected to "the Comey fix" and "phony Trump/Russia . . . collusion," *see* MTD 3–4—make that clear he was aware of the theory underlying his alleged RICO conspiracy no later than October 29, 2017, notwithstanding any supposed concealment. At most, Plaintiff's arguments (at 13–14) suggest that he may have been ignorant "of evidence," not ignorant "of a potential claim"—exactly what his own authority rejects as a basis for tolling. *See Fedance*, 1 F.4th at 1287.

### 3. The Discovery Rule Does Not Toll Plaintiff's RICO Claim.

Plaintiff asserts (at 15–16) that he alleges "three subsets of categories" of damages that supposedly reset the clock on his RICO claim: (1) "attorneys' fees and costs of defense" related

to "numerous federal investigations"; (2) "losses Plaintiff sustained to his business and political reputation"; and (3) "loss of trade secrets."

As to the first two categories—attorneys' fees and costs of defense, and harm to reputation[2]—Plaintiff asserts (at 15, 16) that he could not have been aware of "the true extent" of these injuries until late in the Mueller Investigation.  But "the statute of limitations commences to run[] when the wrongful act or omission results in damages," and a "cause of action accrues *even though the full extent of the injury is not then known or predictable*."  *Wallace*, 549 U.S. at 391 (emphasis added).  To the extent Plaintiff claims costs associated with government investigations, he concedes (at 15) those costs would have begun no later than May 2017, after the initiation of the Mueller Investigation.  To the extent Plaintiff claims reputational harms from media coverage of his alleged connection with Russia, such harms would have begun in October 2016, with the "media blitz" regarding connections between the Trump Organization and Alfa Bank.  AC ¶¶ 226–29, 261–69, 274–77.  That Plaintiff's injuries supposedly worsened over time does not delay the accrual of his claims.

Plaintiff also asserts (at 16) that he "was not aware that his sensitive, confidential, and proprietary data had been stolen and misappropriated until September 16, [2021]."[3]  But the release of DNS information, on which his claims are predicated, was public in October 2016.  AC ¶¶ 124–30, 253–77.  Plaintiff's own allegations are therefore fatal to his tolling argument.

---

[2]  The second category—damages to Plaintiff's reputation—contradicts the AC's assertion that "Plaintiff does not claim nor seek any compensation for damage to his reputation."  AC ¶ 656.

[3]  Plaintiff's Opposition says "September 16, 2017," which would render his claim untimely, but the paragraph cited in his AC says 2021.

### C.   Plaintiff's Other Claims Are Time-Barred.

Plaintiff argues (at 16) that his malicious prosecution and conspiracy claims are timely. But because Plaintiff was not prosecuted, his claims do not exist at all.  *Infra* pp. 17–18; MTD 6.

Plaintiff also asserts (at 17) that his injurious falsehood and conspiracy claims are timely based on equitable tolling, or because some statements were made within two years of his filing. With regard to the more recent statements, his claims fail for other reasons.  *See* MTD 19–22; *infra* pp. 15–17.  And by his silence, Plaintiff concedes that the statements more than two years old are time-barred if the Court (correctly) rejects his equitable tolling theory.

Finally, Plaintiff asserts (at 17–18) that his CFAA, SCA, and trade secrets claims are timely under the discovery rule.  This assertion fails for the same reason described above—the AC confirms Plaintiff was on notice of his alleged injury no later than October 2016.  *See* AC ¶ 324. Because both the CFAA and SCA have two-year limitations periods, and the trade secret claim has a three-year limitations period, these claims are untimely and must be dismissed.[4]  MTD 6–7.

## II.   EACH OF PLAINTIFF'S CLAIMS FAILS ON THE MERITS.

### A.   Plaintiff's Civil RICO Claim (Count I) and Conspiracy Claim (Count II) Fail on Multiple Independent Grounds.

***Plaintiff Has Not Alleged a RICO Enterprise.***  Plaintiff devotes six pages of his Opposition to irrelevant arguments concerning the enterprise element, Opp. 19–24, while largely ignoring Defendants' actual argument:  that Plaintiff was required—but failed—to plead a RICO enterprise with a shared purpose to engage in illegal activity.  To the extent Plaintiff addresses this point at all, his arguments lack merit.

Plaintiff first argues (at 22) that an illegal purpose is "not required."  But Plaintiff and his

---

[4]   *Chappell v. Rich*, 340 F.3d 1279 (11th Cir. 2003), is inapposite.  That case involved claims under 42 U.S.C. §§ 1983 and 1985, and has no relation to the CFAA or SCA.

campaign sang a different tune when *they* were sued as RICO defendants, arguing that "[a] RICO plaintiff must allege not just a common purpose, but an *unlawful* common purpose."  Mot. to Dismiss, DE 212, at 17, *DNC v. Russian Fed'n*, No. 18-cv-3501 (S.D.N.Y. Dec. 7, 2018); Mot. to Dismiss, DE 65, at 26, *Doe v. Trump Corp.*, No. 18-cv-9936 (S.D.N.Y. Jan. 14, 2019) (associates "must share a common purpose to engage in a particular fraudulent course of conduct.").  Plaintiff was right the first time:  a RICO plaintiff must allege an unlawful common purpose.  *See* MTD 8.

Plaintiff next argues (at 19) that he has satisfied any improper purpose requirement by alleging the "unlawful goal" of "corruptly and wrongfully harming [his] political reputation, damaging his electability . . . , impeding his ability to effectively govern, and otherwise sabotaging his political career."  But Plaintiff needs more than pejorative descriptors like "corrupt" and "wrongful" to transform lawful, constitutionally protected political goals into a "shared purpose of engaging in illegal activity."  *Al-Rayes v. Willingham*, 914 F.3d 1302, 1308 (11th Cir. 2019).

**Plaintiff Has Not Alleged Any RICO Predicate Acts.**  Plaintiff argues (at 24) that his allegations establish that each RICO Defendant "conducted or participated" in the enterprise's affairs.  But that is not sufficient:  instead, Plaintiff must show that such participation took place through "a pattern of racketeering activity," 18 U.S.C. § 1962(c), involving at least two predicate acts by each defendant, MTD 9.  His allegations do not establish a single act of trade secrets theft, witness tampering, or wire fraud, let alone a pattern of such activity by each Defendant.

<u>No Theft of Trade Secrets</u>.  Plaintiff bases his DTSA predicate act on the alleged theft of DNS data, an IP address record that is automatically generated and shared whenever a server communicates with another server.  MTD 10–11.  Plaintiff argues (at 32) that DNS data is a trade secret because it "reveals a comprehensive view" into his website and email traffic, and thus holds "potential value" to "a rival candidate."  But "potential value" in a political campaign does not

render DNS data a trade secret.  As Plaintiff concedes, the information must have "independent *economic* value," and he must take "reasonable steps" to keep it secret.  Opp. 30 (emphasis added).  Plaintiff, however, fails to allege that he has any plans to commercially exploit DNS data, that the data is a secret, or that he even owns or possesses it.  MTD 9–11.

Rather than confront these defects, Plaintiff asks the Court to punt the question of whether DNS data is a trade secret until after discovery, arguing (at 30) that "whether a particular type of information constitutes a trade secret is a question of fact."  But to survive a motion to dismiss, Plaintiff must plead facts establishing that DNS data satisfies the essential elements of a protectable trade secret.  Here, Plaintiff's allegation that DNS data *could* reveal "contacts, client lists, business dealings, financial dealings, communications" or other potentially valuable information, Opp. 30 (quoting AC ¶ 545), provides nothing more than the type of vague, conclusory description courts routinely reject as insufficient.  *See VVIG, Inc. v. Alvarez*, No. 18-cv-23109, 2019 WL 5063441, at *4 (S.D. Fla. Oct. 9, 2019) ("General allegations of 'business affairs, products, marketing systems technology, customers, end users, [and] financial affairs' . . . are insufficient" to adequately allege trade secrets); *Taxinet Corp. v. Leon*, No. 16-cv-24266, 2018 WL 3405243, at *3 (S.D. Fla. July 12, 2018) (rejecting "'broad categories of information,'" as insufficient to adequately allege trade secrets).

Further, Plaintiff does not dispute that DNS data is "public" or that companies that provide DNS resolution services have access to this information.  MTD 10–11.  He tries to get around this by asserting (at 31) that trade secrets "need not be wholly private," and that "a unique compilation" of publicly available information may qualify as a trade secret.  That is true, but unhelpful to Plaintiff.  As alleged in the AC, the only person who undertook any "compilation" or "distillation" of information was Rodney Joffe, who allegedly accessed "Neustar" databases to pull DNS data.

AC ¶¶ 35, 36, 134.  Even if this "compilation" had economic value, there is no allegation that

Plaintiff knew the compilation existed or planned to commercially exploit it, nor that he would

have any right to do so (because the compilation was not "his" in the first place).

Plaintiff likewise fails to plausibly allege he owned or possessed the DNS data.  He gets

no traction from *Kremen v. Cohen*, which involved a domain name (www.sex.com) that was

registered to the plaintiff and that had the status of property for purposes of a conversion claim

under California law.  337 F.3d 1024, 1029 (9th Cir. 2003).  The court's only passing reference to

"DNS" came in its discussion of whether the plaintiff's domain-name rights were reflected in "a

document."  *Id.* at 1034–35.  Nowhere did *Kremen*, or any other case Plaintiff cites, discuss

whether an individual DNS lookup record was *itself* proprietary in nature, and thus independently

subject to a conversion claim.  *Kremen* thus does not stand for the idea "that an individual has

ownership rights in his DNS data," Opp. 31, nor does it address whether DNS data is a trade secret.

<u>*No Obstruction of Justice*</u>.  Plaintiff argues (at 27–28) that Defendants violated the federal

witness tampering statute, 18 U.S.C. § 1512(b)(3), by making "false and misleading statements"

and providing "falsified and fabricated" records to "federal law enforcement officers."  These

alleged misrepresentations include (1) certain reports within the Steele Dossier, Opp. 28, which

Steele allegedly provided to the FBI, AC ¶ 158, 169; (2) Sussmann's statement to the FBI that he

was not acting "on behalf of a client or company" when he presented information suggesting a

suspicious pattern of activity between Trump servers and those of a notorious Russian Bank, Opp.

28 (citing AC ¶¶ 204–14); and (3) the "deceptive analysis" of the Trump–Alfa Bank activity

supposedly contained in white papers Sussmann provided to the FBI, Opp. 28 (citing AC ¶ 206).

But Steele is not a RICO Defendant, and Sussmann was acquitted by a unanimous jury of making

a false statement to the FBI—a fact Plaintiff conspicuously omits from the AC.  MTD 12 n.12.[5]

Providing false statements directly to federal agents does not, in any event, fit within the text of § 1512(b)(3), which proscribes "knowingly" engaging in "misleading conduct toward *another person*" with intent to "hinder, delay, or prevent the communication *to a law enforcement officer* . . . of information relating to the commission or possible commission of a Federal offense." 18 U.S.C. § 1512(b)(3) (emphases added).  By its plain text, this subsection requires misleading conduct "toward someone besides the investigating federal law enforcement agents themselves." *United States v. Amri*, No. 17-cr-50, 2017 WL 3262254, at *14 (E.D. Va. July 31, 2017); *see also United States v. Williams*, 571 F. App'x 887, 890–91 (11th Cir. 2014) (applying 18 U.S.C. § 1001 to statements made directly to FBI and § 1512(b)(3) to interference with third-party witness).  The cases on which Plaintiff relies are inapposite because they involve false or misleading evidence conveyed to federal law enforcement officers through third parties—*state* law enforcement officers.  *See United States v. Ronda*, 455 F.3d 1273, 1285 (11th Cir. 2006) (defendants planted evidence and made false statements to state investigators prior to a federal investigation); *United States v. Ronga*, 682 F. App'x 849, 851–52, 855 (11th Cir. 2017) (defendant police officer lied to state investigators before being federally prosecuted).  Because the AC asserts that the RICO Defendants provided misleading information directly to federal law enforcement officers, Plaintiff fails to allege conduct indictable under § 1512(b)(3).[6]

---

[5]  Plaintiff repeats his allegations elsewhere in his Opposition that Danchenko made false statements to the FBI.  *E.g.*, Opp. 25–26.  But like Sussmann, Danchenko will face trial on the 18 U.S.C. § 1001 allegations, and like Steele, Danchenko is not a RICO Defendant.

[6]  Plaintiff argues (at 29) that Sussmann's communications with federal authorities do not qualify as protected petitioning activity because they fall within the "sham" exception to the *Noerr-Pennington* doctrine.  But Plaintiff's own allegations foreclose the application of that narrow exception.  Central to Plaintiff's theory is that Sussmann and others allegedly took steps which resulted in the federal investigations that purportedly caused Plaintiff's injuries, AC ¶ 524, and "a successful effort to influence governmental action . . . certainly cannot be characterized as a sham," *Pro. Real Estate Invs., Inc. v. Columbia Picture Indus., Inc.*, 508 U.S. 49, 58 (1993).

Plaintiff separately argues that Defendants' alleged provision of false information to FBI agents violates 18 U.S.C. § 1512(c)(2), which prohibits conduct that "corruptly . . . obstructs, influences, or impedes any official proceeding." But neither of the cases Plaintiff cites supports his position that the FBI's Crossfire Hurricane investigation constitutes an "official proceeding" (it does not). *See* MTD 12. In *United States v. Grubb*, 11 F.3d 426 (4th Cir. 1993), the defendant lied to FBI agents in the context of a federal grand jury proceeding. *Id.* at 437–38. And in *United States v. Lee*, 919 F.3d 340 (6th Cir. 2019), the parties never briefed, and the court never decided, whether an FBI investigation qualifies as an official proceeding. The only issue before the court was whether the government had presented sufficient evidence of intent. *Id.* at 358–59.

*No Wire Fraud*. Plaintiff does not dispute that the federal wire fraud statute is "limited in scope to the protection of property rights." *Spence-Jones v. Rundle*, 991 F. Supp. 2d 1221, 1254 (S.D. Fla. 2013). He asserts instead (at 34) that Defendants betrayed their "ignorance" of the law by arguing that wire fraud encompasses schemes "to obtain" money or property but not schemes "to deprive" another of money or property. But this mischaracterizes the point. "Obtaining" money or property and "depriving" another of it describe the same action from the perspectives of the perpetrator (who obtains money or property) and the victim (who is deprived of it). What Plaintiff mischaracterizes as "ignorance" is actually a quote from the Supreme Court, which held that a valid wire fraud claim exists "*only if* an object of the[] dishonesty was *to obtain* . . . money or property." *Kelly v. United States*, 140 S. Ct. 1565, 1568 (2020) (emphases added).

Ultimately, this quibbling gets Plaintiff nowhere, because he has not alleged either that Defendants obtained money or property or deprived anyone else of it. Instead, Plaintiff claims (at 34, 36) that he suffered collateral damage in the form of lost "political and/or business reputation" and lost business opportunities when Defendants "defraud[ed]" reporters and law enforcement

officers with a "false narrative" that Plaintiff colluded with Russia.  But "[d]amage to reputation is generally considered personal injury and thus is not an injury to 'business or property' within the meaning of 18 U.S.C. § 1964(c)."  *Hamm v. Rhone-Poulenc Rorer Pharms., Inc.*, 187 F.3d 941, 954 (8th Cir. 1999) (collecting cases).  For that reason, "federal courts routinely and soundly reject" attempts "to spin an alleged scheme to harm a plaintiff's reputation into a RICO claim." *Rajaratnam v. Motley Rice, LLC*, 449 F. Supp. 3d 45, 73–74 (E.D.N.Y. 2020) (collecting cases).

Even if lost business opportunities stemming from reputational injury could in theory qualify as lost "property" for wire fraud purposes, Plaintiff has not identified his business injuries with the required specificity.  His conclusory allegations that he suffered "loss of competitive position, . . . loss of business revenue, loss of goodwill, loss of trade secrets, and/or loss of contractual relations" do not suffice under Rule 8's bare notice-pleading standard, let alone Rule 9(b)'s particularity standard.

**Plaintiff Has Not Pleaded a Pattern of Racketeering Activity.**  Plaintiff argues (at 37) that he has shown open-ended continuity with his allegations that Clinton engaged in political commentary concerning Plaintiff's relationship with Putin in 2019, 2021, and 2022; that former campaign official Podesta runs the Moscow Project; and that Podesta, Sussmann, Joffe, Sullivan, and Fusion GPS worked with the Democracy Integrity Project to "continue exposing Russian Interference in the 2016 election."  But none of these First-Amendment-protected political activities establishes open-ended continuity because none involves a RICO predicate act.  Nor has Plaintiff pleaded any facts from which the Court could infer that these Defendants were attempting to further "the enterprise's affairs," as opposed to "their own affairs," when they joined these disparate organizations and efforts.  *Reves v. Ernst & Young*, 507 U.S. 170, 179, 185 (1993). Podesta and Sullivan, indeed, are not alleged to be part of the RICO enterprise at all.  AC ¶ 530.

Nor has Plaintiff shown closed-end continuity, which requires "a series of related predicates extending over a substantial period of time." MTD 14. Here, the alleged predicate acts were tightly clustered around the 2016 election. *Id.* Although Plaintiff speculates (at 38) that "it is a near certainty that RICO Defendants engaged in many more fraudulent acts" through the present, he fails to describe a single one with the "particularity" he acknowledges Rule 9(b) requires. Nor is there any merit to his position (at 39) that these fraudulent acts remain unknown to him because Defendants concealed them behind the veil of attorney-client privilege; Plaintiff has not identified any conduct or communications over which privilege has been asserted.

***Plaintiff Fails To Allege RICO Standing or Causation.*** Plaintiff argues (at 40) that he pleaded "at least nine independent and distinct harms to his business and property," whereas Defendants challenged only two—attorneys' fees and loss of business opportunities. But all of Plaintiff's alleged injuries, from "loss of business revenue" to "loss of contractual relations," merely describe some variety of lost business opportunity. Opp. 40. And all suffer from the same fatal defect: Plaintiff has not specified a single example of a lost contract, lost business revenue, or loss of goodwill resulting from the alleged racketeering.

Plaintiff also has not established that the legal fees stemming from various investigations constitute an injury to business or property for purposes of the RICO statute. Plaintiff protests (at 40) that it is "false" for Defendants to assert that he "did not pay the claimed fees out of his own pocket." But candidates may use campaign funds to cover legal fees related to charges of official misconduct, and Plaintiff had the burden of pleading not only that he "incurred" these fees, but that he personally paid them. There are no such allegations.

Far from bolstering his RICO claim, Plaintiff's Opposition conclusively shows he cannot trace his alleged legal fees back to any act of racketeering. Although the AC alleges the FBI

"debunked" both the Steele Dossier and the Alfa Bank allegations no later than January 2017, AC ¶¶ 344, 444, Plaintiff now asserts (at 15) that he incurred all of his alleged legal fees "between September 2017 and 2020," incurring "the vast majority" after "April 2018."  Moreover, he attributes these fees to "the Mueller Investigation."  Opp. 15.  But the AC does not allege that the RICO Defendants are responsible for the Mueller Investigation, and the Mueller Report itself (at 1) attributes the investigation to causes having nothing to do with Defendants.  In short, Plaintiff has no basis to seek recovery of these fees from Defendants.[7]

### B.   Plaintiff Has Not Stated Claims for Injurious Falsehood (Count III) and Conspiracy To Commit Injurious Falsehood (Count IV).

With respect to the injurious falsehood claim (Count III) and the related conspiracy claim (Count IV), Plaintiff relies on a series of inapposite authorities and only highlights his failure to plead several necessary elements.

First, Plaintiff summarily asserts (at 47) that the AC identifies "a bevy of falsehoods," but does not identify what the statements are, where the Court can find them in the AC, or why they are untrue.  Nor does he address Defendants' observation that the AC's sole allegations of falsity are entirely conclusory.  *See* MTD 20.

Second, Plaintiff does not identify any harm to his "*economic* interests," *Falic v. Legg Mason Wood Walker, Inc.*, 347 F. Supp. 2d 1260, 1268 (S.D. Fla. 2004) (emphasis added), pointing only to unspecified "loss of business opportunities, loss of competitive position, loss of business revenue," and the like, Opp. 47, 49.  But the AC does not name a single business opportunity or relationship that was harmed, nor tie Defendants' statements to any economic injury.[8]

---

[7]  The RICO conspiracy claim fails for the reasons given in Defendants' motion.  MTD 19.

[8]  Plaintiff's claim (at 49) that the "Supreme Court" has held that "legal fees constitute special damages in trade libel claims" is entirely irrelevant (and non-controlling).  That appeal to the

Third, Plaintiff's response to Defendants' arguments about special damages also falls flat. He cites nothing in the AC explaining how each statement contributed to or precipitated attorney's fees, as is required to plead special damages. Instead, Plaintiff merely points the Court to the generalized allegation that he was "forced to incur expenses in an amount to be determined at trial." Opp. 49 (quoting AC ¶ 655). As already explained, *see* MTD 20–21, this does not satisfy the rule that special damages be specifically stated. *See* Fed. R. Civ. P. 9(g).

Fourth, Plaintiff's response to Defendants' First Amendment arguments is unavailing. Plaintiff relies (at 47–48) on the incorrect notion that Defendants enjoy only a "qualified privilege" to engage in political speech that may be overcome by a showing of actual malice. But Plaintiff fundamentally misunderstands the type of "malice" needed to overcome the robust First Amendment protections for political speech. Spite, "ill will," or malice in the common-law sense of the term do not suffice. *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666 (1989). Defendants have an untrammeled right to criticize Plaintiff unless he plausibly alleges *constitutional* actual malice—that is, that Defendants published a false statement of fact "with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964). And Plaintiff cannot possibly make that showing here because the statements he challenges consist of rhetorical hyperbole or political opinion not provably true or false. *See* MTD 21–22.

The case law Plaintiff cites in support of his argument does not involve the First Amendment or political speech at all, but rather addresses the question whether statements made to an investigator are subject to an absolute or qualified privilege under Florida state law. *See*

---

*Nevada* Supreme Court raised the issue whether attorney's fees had been properly awarded in a real property dispute, and was not a case in which the fees pre-dated the litigation. *See Horgan v. Felton*, 123 Nev. 577, 581 (2007).

*Fridovich v. Fridovich*, 598 So. 2d 65 (Fla. 1992).[9]  Even if the case law Plaintiff relies on did

apply, and Defendants' statements could be shown to be true or false, Plaintiff has attempted to

plead actual malice in only the vaguest of terms, which is "insufficient" to state a claim.  *Corsi v.*

*Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1123 (S.D. Fla. 2021).

### C.    Plaintiff Has Not Stated a Claim for Malicious Prosecution (Count V) or for the Related Conspiracy Claim (Count VI).

Plaintiff fails to allege malicious prosecution because he does not allege any judicial

proceeding brought "against the present plaintiff."  *Melford v. Kahane & Assocs.*, 371 F. Supp. 3d

1116, 1123–24 (S.D. Fla. 2019).  He argues (at 50) that "[t]he Mueller Investigation qualifies as a

criminal proceeding" for purposes of his malicious prosecution claim.  But he fails to identify any

authority for his proposition that an investigation that does not lead to any judicial process against

the plaintiff is somehow a "judicial proceeding."  To the contrary, Florida law is clear that "[a]n

action for malicious prosecution . . . [can] never occur outside the context of litigation."  *Fischer*

*v. Debrincat*, 169 So. 3d 1204, 1209 (Fla. 4th DCA 2015).  The only case that Plaintiff cites (at

50) is *Caplan v. Johnson*, 414 F.2d 615 (5th Cir. 1969), which is inapposite.  There, the Fifth

Circuit held that the issuance of arrest warrants can suffice for malicious prosecution.  *Caplan*,

414 F.2d at 618.  But here, no judge issued a warrant for Plaintiff's arrest, nor did the Mueller

Investigation result in any judicial process against him.

Plaintiff also fails to satisfy any of the remaining five elements of a malicious prosecution

claim.  *See* MTD 23–25.  He now argues (at 50), but fails to plausibly allege, *see* AC ¶¶ 456 &

671, that the Crossfire Hurricane investigation and Mueller Investigation are one and the same.

---

[9]  To the extent that Plaintiff focuses on statements-to-investigators case law to argue that the alleged statements made to the FBI, *see* AC ¶¶ 649–50, are not subject to First Amendment protection, the authorities are distinguishable because they involve criminal activity, not legitimate political speech.  *See Asinmaz v. Semrau*, 42 So. 3d 955, 958 (Fla. 4th DCA 2010) (reported theft of diamonds); *Fridovich*, 598 So. 2d at 66 (alleged murder).

But even were that true, Crossfire Hurricane was not a judicial proceeding, either. And Plaintiff fails plausibly to allege that Defendants caused either investigation. MTD 17, 24. Plaintiff also fails to show the Mueller Investigation terminated either "on the merits" or "favorabl[y]" to him. *Id.* at 25. With no malicious prosecution claim, the conspiracy claim also fails. *See* MTD 25.

### D. Plaintiff Has Not Stated a Claim Under the Computer Fraud and Abuse Act (Count VII).

Plaintiff's Opposition reveals that his CFAA claim fundamentally misunderstands the "without authorization" element, as well as the types of damages recoverable under the statute. *777 Partners LLC v. Pagnanelli*, No. 20-cv-20172, 2021 WL 2038175, at *4-5 (S.D. Fla. Mar. 8, 2021). Indeed, Plaintiff alleges only that certain Defendants accessed DNS data to which they had legitimate access, and the CFAA does not extend liability to individuals who "have [allegedly] improper motives for obtaining information that is otherwise available to them." *Van Buren v. United States*, 141 S. Ct. 1648, 1652, 1662 (2021); MTD 26–27. Moreover, DNS data is neither secret nor confidential, and is shared automatically with a wide array of entities.[10]

Similarly, damages under the CFAA are limited to: (1) reasonable costs associated with responding to a breach, such as "assessing the damage done" and "restoring" systems to their prior condition, and (2) revenue lost or costs incurred because of an interruption of service. *Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1174 (11th Cir. 2017); *see also 777 Partners LLC*, 2021 WL 2038175, at *5 (defining "damage" under the CFAA as "an impairment to the integrity or availability of data, a program, a system, or information"). Other types of losses, such as "lost revenue from the possible misappropriation of 'stolen' information," do not count toward the

---

[10]  Plaintiff's citation to *Bessemer Sys. Fed. Credit Union v. Fiserv Sols.*, No. 19-cv-00624-RJC, 2021 WL 4198281 (W.D. Pa. Sept. 15, 2021), is puzzling. There, the court declined to dismiss a breach of contract claim, but there was no CFAA claim before the court. And courts in this district routinely grant motions to dismiss CFAA claims. *See Doty v. ADT, LLC*, 20-cv-60972, 2020 WL 9071421, at *8 (S.D. Fla. Dec. 30, 2020).

$5,000 statutory minimum. *Schwartz v. ADP, Inc.*, No. 21-cv-283, 2021 WL 5760434, at *2 (M.D. Fla. Dec. 3, 2021) (citation omitted). Plaintiff is therefore flatly wrong when he argues (at 55) that the CFAA covers "any reasonable cost to any victim."

### E. Plaintiff Has Not Stated a Claim Under the Defend Trade Secrets Act (Count VIII).

Plaintiff relies (at 55) on the discussion of DNS information in his RICO claims to defend his trade secrets claim. But DNS information is not a trade secret. *Supra* p. 8–10; MTD 10–11.

### F. Plaintiff Has Not Stated a Claim Under the Stored Communications Act (Count IX).

Plaintiff argues (at 52) that he has stated a claim for violation of the SCA because he alleged that Defendants "intentionally and improperly exceeded their authority to access servers belonging to the EOP and Trump Organization to access non-public, proprietary, and confidential information." This argument misses the point for at least two reasons.

First, Plaintiff has not sufficiently alleged facts to support his contention that Defendants accessed "private data." As explained *supra* at 9, the information allegedly accessed—IP addresses, "internet domains," e-mail addresses, and "domains that related to Donald J. Trump, the Trump Organization, and numerous Trump associates"—is not private. Opp. 52–53; MTD 10–11. Thus, it does not fall within the purview of the SCA. *Live Face on Web, LLC v. Tweople, Inc.*, No. 14-cv-44, 2014 WL 12611359, at *3 (M.D. Fla. Sept. 29, 2014).

Second, the "facilities" identified in the AC and Opposition—"computer servers, networks or systems" belonging to the EOP and Trump Organization, not Plaintiff himself—are not covered by the SCA. *See* MTD 28–29. Plaintiff's reliance upon *Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167 (11th Cir. 2017), and *Hamilton Group Funding v. Basel*, 311 F. Supp. 3d 1307 (S.D. Fla. 2018), is unavailing. In those cases, the defendant improperly accessed and reviewed the content of password-protected emails of co-employees. They offer no support to Plaintiff's claims.

### G. Plaintiff's Agency and Respondeat Superior Counts Have Been Abandoned and Should Be Dismissed (Counts X–XVI).

Plaintiff has abandoned his agency and vicarious liability counts in the AC by failing to present any argument in support of those counts, or otherwise oppose Defendants' arguments for dismissal of those counts. *See Gomez v. Miami-Dade Cnty.*, 563 F. Supp. 3d 1211, 1218 (S.D. Fla. 2021). Those counts should also be dismissed for failure to state a claim. *See* MTD 29–30.

### III. PLAINTIFF'S REQUEST FOR LEAVE TO AMEND IS IMPROPER AND SHOULD BE DENIED.

Plaintiff cursorily requests further leave to amend in a tacked-on paragraph (at 55). But the Eleventh Circuit has rejected such contingent requests smuggled into opposition briefs, explaining that a litigant must formally move to amend and provide an explanation and proposed amendment, to state a valid request. *See, e.g.*, *Pittman v. State Farm Fire & Cas. Co.*, 662 F. App'x 873, 882–83 (11th Cir. 2016); *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1057 n.14 (11th Cir. 2015); *Lord Abbett Mun. Income Fund, Inc. v. Tyson*, 671 F.3d 1203, 1208 (11th Cir. 2012); *see also* S.D. Fla. Local Rule 15.1.

Moreover, Plaintiff has already amended once, with the benefit of Defendants' initial motions to dismiss. As the arguments in both rounds of extensive briefing demonstrate, the failings in the AC are not fixable. His claims are untimely and otherwise legally defective, and his allegations depend largely on government documents, including the Mueller Report and the IG Report on Crossfire Hurricane, whose contents he misrepresents and which no amount of discovery can change. Any motion to amend, even if properly brought, would be futile. This Court should accordingly dismiss the AC with prejudice.

### CONCLUSION

For the reasons given above and in Defendants' Motion to Dismiss, the AC should be dismissed with prejudice in its entirety.

Dated:  August 11, 2022                              Respectfully submitted,


/s/ David Oscar Markus                              /s/ David E. Kendall
David Oscar Markus                                  David E. Kendall (pro hac vice)
MARKUS/MOSS PLLC                                    Katherine M. Turner (pro hac vice)
40 NW 3rd Street, PH 1                              Michael J. Mestitz (pro hac vice)
Miami, FL 33128                                     WILLIAMS & CONNOLLY LLP
Tel:  (305) 379-6667                               680 Maine Avenue, S.W.
                                                    Washington, DC 20024
                                                    Tel:  (202) 434-5000
                                                    Fax:  (202) 434-5029
                                                    dkendall@wc.com
                                                    kturner@wc.com
                                                    mmestitz@wc.com

*Attorneys for Defendant Hillary Rodham Clinton*


/s/ Robert P. Trout
Robert P. Trout (pro hac vice)
Paola Pinto (Florida Bar Number 1013933)
SCHERTLER ONORATO MEAD & SEARS
555 13th Street, N.W.
Suite 500 West
Washington, D.C. 20004
Phone:  (202) 628-4155
rtrout@schertlerlaw.com
ppinto@schertlerlaw.com

*Attorneys for Defendants HFACC, Inc. and John Podesta*


/s/ Gerald Edward Greenberg                         /s/ Roberta A. Kaplan
Gerald Edward Greenberg                             Roberta A. Kaplan (pro hac vice)
GELBER SCHACHTER & GREENBERG PA                     Shawn G. Crowley (pro hac vice)
One Southeast Third Avenue                          Maximillian L. Feldman (pro hac vice)
Suite 2600                                          KAPLAN HECKER & FINK LLP
Miami, FL 33131-1715                                350 Fifth Avenue, 63rd Floor
Tel: (305) 728-0950                                 New York, NY 10118
ggreenberg@gsgpa.com                                Tel: (212) 763-0883
                                                    rkaplan@kaplanhecker.com
                                                    scrowley@kaplanhecker.com
                                                    mfeldman@kaplanhecker.com


*Attorneys for Defendants Democratic National Committee, DNC Services Corporation, and
Debbie Wasserman Schultz*

/s/ Eleni Kastrenakes Howard
Eleni Kastrenakes Howard (Fla. Bar No.
0073073)
Howard J. Harrington (Fla. Bar No. 0118719)
AKERMAN LLP
777 South Flagler Drive
Suite 1100, West Tower
West Palm Beach, FL 33401
Tel:  (561) 653-5000
Fax:  (561) 659-6313
eleni.kastrenakeshoward@akerman.com
jay.harrington@akerman.com

/s/ F. Joseph Warin
F. Joseph Warin (pro hac vice)
Geoffrey M. Sigler (pro hac vice)
Katherine Moran Meeks (pro hac vice)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
fwarin@gibsondunn.com
gsigler@gibsondunn.com
kmeeks@gibsondunn.com

/s/ Nancy E. Hart
Nancy E. Hart (pro hac vice)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
nhart@gibsondunn.com

*Attorneys for Perkins Coie LLP*

/s/ Eugene K. Pettis
Eugene K. Pettis (Fla. Bar #508454)
Debbie P. Klauber (Fla. Bar #55646)
HALICZER, PETTIS & SCHWAMM
One Financial Plaza
100 S.E. 3rd Ave., Seventh Floor
Fort Lauderdale, FL 33394
Tel:  (954) 523-9922

/s/ Reid J. Schar
Reid J. Schar (pro hac vice)
April A. Otterberg (pro hac vice)
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
Tel:  (312) 222-9350

*Attorneys for Defendant Marc Elias*

/s/ Roberto Martinez
Roberto Martínez (Florida Bar No. 305596)
Zachary Lipschultz (Florida Bar No. 123594)
COLSON, HICKS, EIDSON, P.A.
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Tel:  (305) 476-7400
bob@colson.com
zach@colson.com

/s/ Sean M. Berkowitz
Sean M. Berkowitz (pro hac vice)
LATHAM & WATKINS LLP
330 N. Wabash, Suite 2800
Chicago, IL 60611
Tel:  (312) 876-7700
sean.berkowitz@lw.com

/s/ Stephen P. Barry
Stephen P. Barry (pro hac vice)
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Tel:  (202) 637-2200
stephen.barry@lw.com

/s/ Michael F. Houlihan
Michael F. Houlihan (pro hac vice)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Tel:  (617) 880-4642
michael.houlihan@lw.com

*Attorneys for Defendant Michael Sussmann*

/s/ Jonathan Edward Levine
Jonathan Edward Levine (FBN 937711)
Levine & Associates, PLLC
5311 Lee Highway
Arlington, VA 22207
Tel:  (703) 525-2669

/s/ George R.A. Doumar
George R.A. Doumar (pro hac vice)
Mahdavi, Bacon, Halfhill & Young PLLC
11350 Random Hills Road, Suite 700
Fairfax, VA 22030
Tel:  (703) 352-1300

*Attorneys for Charles Halliday Dolan, Jr.*

/s/ Brian L. Stekloff
Brian L. Stekloff (pro hac vice)
Sarah E. Neuman (pro hac vice)
WILKINSON STEKLOFF LLP
2001 M Street, NW, 10th Floor
Washington, DC 20036
Tel:  (202) 847-4000
bstekloff@wilkinsonstekloff.com
sneuman@wilkinsonstekloff.com

/s/ William R. Barzee
William R. Barzee (Florida Bar No. 158720)
BARZEE FLORES
Courthouse Center, Penthouse One
40 NW Third Street
Miami, FL 33128
Tel:  (305) 374–3998
williambarzee@barzeeflores.com

*Attorneys for Defendant Jake Sullivan*

/s/ Andrew J. Ceresney
DEBEVOISE & PLIMPTON LLP
Andrew J. Ceresney (pro hac vice)
Wendy B. Reilly (pro hac vice)
Isabela M. Garcez (pro hac vice)
919 Third Avenue
New York, NY 10022
Tel:  (212) 909-6000
aceresney@debevoise.com
wbreilly@debevoise.com
imgarcez@debevoise.com

/s/ William R. Barzee
William R. Barzee (Florida Bar No. 158720)
BARZEE FLORES
Courthouse Center, Penthouse One
40 NW Third Street
Miami, FL 33128
Tel:  (305) 374-3998
williambarzee@barzeeflores.com

*Attorneys for Defendant Robert E. Mook*

/s/ Adam S. Fels
Adam S. Fels
FRIDMAN FELS & SOTO PLLC
2525 Ponce de Leon Blvd., Suite 750
Coral Gables, FL 33134
Tel:  (305) 569-7701
afels@ffslawfirm.com

/s/ Joshua A. Levy
Joshua A. Levy (pro hac vice)
Rachel Clattenburg (pro hac vice)
Kevin P. Crenny (pro hac vice)
LEVY FIRESTONE MUSE LLP
900 17th St. NW, Suite 1200
Washington, D.C. 20006
Tel:  (202) 845-3215
Fax:  (202) 595-8253
jal@levyfirestone.com
rmc@levyfirestone.com
kcrenny@levyfirestone.com

*Attorneys for Defendants Fusion GPS, Peter Fritsch, and Glenn Simpson*

/s/ Joshua Berman
Joshua Berman
CLIFFORD CHANCE US LLP
2011 K Street, NW
Washington, D.C.  20006
Tel:  (202) 912-5000
Fax:  (202) 912-6000
Joshua.Berman@CliffordChance.com

/s/ Adam Fels
Adam Fels (Florida Bar No. 0114917)
FRIDMAN FELS & SOTO, PLLC
2525 Ponce de Leon Blvd., Suite 750
Coral Gables, FL  33134
Tel:  (305) 569-7701
Afels@ffslawfirm.com

/s/ Benjamin Peacock
Benjamin Peacock
CLIFFORD CHANCE US LLP
New York, New York 10019
Tel:  (212) 878-8000
Fax:  (212) 878-8375
Benjamin.Peacock@CliffordChance.com

*Attorneys for Bruce Ohr and Nellie Ohr*

/s/ Franklin Monsour Jr.
Franklin Monsour Jr. (pro hac vice)
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
Tel:  (212) 506-3512
Fax:  (212) 506-5151
fmonsour@orrick.com

/s/ Diana Marie Fassbender
Diana Marie Fassbender (Fla Bar ID #17095)
ORRICK, HERRINGTON & SUTCLIFFE LLP
1152 15th Street N.W.
Washington, DC  20005-1706
Tel:  (202) 339-88533
Fax:  (202) 339-8500
dszego@orrick.com

*Attorneys for Igor Danchenko*

/s/ Samantha L. Southall
Samantha L. Southall (pro hac vice)
Pennsylvania Bar No. 80709
BUCHANAN INGERSOLL & ROONEY PC
50 S. 16th Street, Suite 3200
Philadelphia, PA 19102
Tel:  (215) 665 8700
Fax:  (215) 667 8760
samantha.southall@bipc.com

/s/ Jennifer Olmedo Rodriguez
Jennifer Olmedo Rodriguez (Florida Bar No. 605158)
BUCHANAN INGERSOLL & ROONEY PC
2 South Biscayne Blvd., Suite 1500
Miami, Florida 33131
Tel:  (305) 347 4080
Fax:  (305) 347 4089
jennifer.olmedo-rodriguez@bipc.com

*Attorneys for Defendant Neustar, Inc.*

/s/ John M. McNichols
John M. McNichols (pro hac vice)
Allison S. Eisen (pro hac vice)
Kathryn E. Garza (pro hac vice)
WILLIAMS & CONNOLLY LLP
680 Maine Ave, S.W.
Washington, D.C. 20024
Tel:  (202) 434-5000
Fax:  (202) 434-5029
jmcnichols@wc.com

/s/ James E. Gillenwater
James E. Gillenwater (Bar No. 1013518)
GREENBERG TRAURIG P.A.
333 SE 2nd Ave., Suite 4400
Miami, FL 33131
Tel:  (305) 579-0500
Fax:  (305) 579-0717
gillenwaterj@gtlaw.com

*Attorneys for Neustar Security Services*

/s/ Edward Soto
Edward Soto (FBN 0265144)
WEIL GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
Miami, FL 33131
Tel:  (305) 577-3100
Fax:  (305) 374-7159

/s/ Steven A. Tyrrell
Steven A. Tyrrell (pro hac vice)
WEIL GOTSHAL & MANGES LLP
2001 M Street, N.W., Suite 600
Washington, D.C. 20036
Tel:  (202) 682-7000
Fax:  (202) 857-0940

*Attorneys for Rodney Joffe*

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of August, 2022, I caused a copy of the foregoing Reply in Support of Defendants' Motion to Dismiss to be served on all counsel of record via CM/ECF. All parties required to be served have been served.

_/s/ David Oscar Markus_
David Oscar Markus

251

Charles Dolan's Reply to Plaintiff's Response to Defendant Charles
Halliday Dolan Jr.'s Motion to Dismiss Amended Complaint
(Aug. 11, 2022)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

_____

DONALD J. TRUMP,                        )
Plaintiff,                              )
                                        )
v.                                      )
                                        )       Case No. 2:22-cv-14102-DMM
HILLARY R. CLINTON, ET AL.,             )
Defendants.                             )
_____)

**CHARLES DOLAN'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT,
CHARLES HALLIDAY DOLAN JR.'S MOTION TO DISMISS AMENDED**

**COMPLAINT**

Defendant Charles Dolan, by and through counsel, files this Reply to Plaintiff's Response to his Motion to Dismiss the Amended Complaint.

Plaintiff's Amended Complaint is riddled with inaccuracies on the most basic matters, which carry over to his arguments opposing Mr. Dolan's motion to dismiss. As Plaintiff argues in his Response, "Plaintiff has established a prima facie case of personal jurisdiction against Dolan. Dolan plainly admits in his moving papers that he is a resident of New York." D.E. 241, ¶ 6, citing his own Amended Complaint, at ¶20. Mr. Dolan never states that he is a resident of New York in any papers; instead, Mr. Dolan has repeatedly affirmed that he is a Virginia resident. Plaintiff cites his own pleading to claim Mr. Dolan is not. This exemplifies Plaintiff's pleading deficiencies.

**SUMMARY**

This memorandum addresses issues within Plaintiff's Response to Mr. Dolan's Motion to Dismiss the Amended Complaint (hereinafter "Response"). D.E. 241. The Response inexplicably continues to restate obvious legal and factual inaccuracies. As to arguments for statute of limitations and failure to state a claim, Mr. Dolan joins with and adopts the consolidated reply. This memorandum addresses issues unique to Mr. Dolan within Plaintiff's Response.

1

**Plaintiff Continues to Make False Claims Despite Knowledge of Their Falsity**

### a. Mr. Dolan is Not a Resident of New York

Plaintiff now claims in his Amended Complaint ("AC") and Response without a basis and despite evidence to the contrary that Mr. Dolan is a resident of New York. AC at ¶ 20 and Response at ¶ 6. Plaintiff first makes this baseless claim in his AC in ¶ 20 despite Mr. Dolan confirming otherwise. *See* D.E. 163, Ex. 1 at ¶1. Then, Mr. Dolan, through counsel, informed Plaintiff of his error and other false statements by a Rule 11 letter and subsequent motion that was served on Plaintiff's counsel. Mr. Dolan has lived in Arlington, Virginia for many years.  Despite this notice, Plaintiff chooses to continue alleging this false statement.

### b. The Indictment Does Not Support the Claim that Mr. Dolan Met with Danchenko to "create a dossier"

Plaintiff asserts that he "relied upon the Indictment to provide the basic facts that apply to Dolan." Response at ¶ 23, citing Indictment, *United States v. Danchenko*, case no. 1:21-cr-00245-AJT, Eastern District of Virginia (Nov. 3, 2021) (hereinafter, "Indictment"). However, the Indictment does not support what Plaintiff asserts in his Response. For example, Response ¶ 31 cites the Amended Complaint which in turn cites as authority the Indictment at ¶ 23 to assert that "[i]n late April 2016, Danchenko began having discussions with Dolan about a potential business collaboration between Orbis Ltd. and Kglobal *to create a 'dossier' to smear Donald J. Trump and to disseminate the false accusations to the media*." The italicized portion is false and is not in the Indictment.

The Indictment does not support that Mr. Dolan met with Mr. Danchenko "to create a dossier," just that Mr. Dolan and Mr. Danchenko pursued business opportunities, and exchanged gossip. The activities include planning a conference, assisting with logistics and translation services, and meetings at the Russian embassy without Danchenko present. Indictment ¶¶ 23-31.

Mr. Dolan regularly consulted with Russian entities and Mr. Danchenko was also interested in this area and they worked on business together.

Throughout the Indictment and the Amended Complaint, there is no mention of Mr. Dolan having participated in an agreement with any other Defendants to do anything relating to a dossier, report, memorandum, or any other document. Mr. Dolan made Plaintiff aware of this inaccuracy in its Rule 11 letter and served motion, but Plaintiff chooses to continue alleging this false statement about the Indictment.

### c.  Mr. Dolan Was Never a Chairman of A National Democratic Organization

Plaintiff insists upon asserting that Mr. Dolan was a past Chairman of the DNC or some other national political organization and again relies upon the Indictment for support. Again, just as Mr. Dolan is not a resident of New York, Mr. Dolan was never the Chairman of a national Democratic political organization. Mr. Dolan has repeatedly informed Plaintiff that he has never been Chairman of any national political organization. Plaintiff has decided to ignore any information available to him through basic searches and information provided to him by Mr. Dolan and instead limits himself to contrary facts in the Indictment.

Mr. Dolan made Plaintiff aware of this inaccuracy in its Rule 11 letter and served motion, but Plaintiff chooses to continue alleging this false statement.

### ARGUMENT

### A.  Mr. Dolan Has Signed on to the Consolidated Reply to Plaintiff's Motion to Dismiss

Mr. Dolan adopts the arguments made in the consolidated Defendants' Joint Reply and has signed on to that motion.

**B. Plaintiff Cannot Adequately Plead Jurisdiction or State a Claim Because He Relies on Exaggerated and False Allegations**

Plaintiff focuses the beginning of his response on the personal jurisdiction requirements under the RICO statute. The key shortcoming in Plaintiff's analysis is his inability to plead true facts. Plaintiff begins his analysis on personal jurisdiction under the RICO statute by claiming that "Plaintiff has established a prima facie case of personal jurisdiction against Dolan. Dolan plainly admits in his moving papers that he is a resident of New York." Response ¶ 6. As stated above this statement is false and Plaintiff's continued use of false information to make his claim should not be tolerated.

Plaintiff then alleges jurisdiction under Florida's long-arm statute and the due process requirement of minimum contacts. As with his supplemental jurisdiction argument, addressed below, Plaintiff's entire long-arm statute argument is contained in a single sentence which states: "As the harm was incurred in the State of Florida, the tortious acts averred in the Amended Complaint, were committed in the State of Florida." Response ¶ 14. Even if true (which it is not), and this was sufficient to satisfy Florida's long-arm statute, any proper analysis must satisfy the requirements of Due Process, which Mr. Dolan's lack of contact with Florida does not do.

As to Plaintiff's argument on minimum contacts, he relies chiefly on *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770 (1984) to assert that a plaintiff can recover for nationwide damages in one suit even if the distribution of the libelous material was limited in the forum state. The facts of *Keeton* bear no resemblance to Mr. Dolan's case. Mr. Dolan is not a national publisher of any kind, did not publish or disseminate any information, or take part in any conspiracy to do so, Plaintiff does not even allege that Mr. Dolan made any defamatory publication. Plaintiff's attempt to compare Mr. Dolan to Hustler Magazine falls short.

4

Finally, Plaintiff asserts in a single paragraph and almost without explanation that "federal courts are permitted to establish supplemental jurisdiction over claims that 'form part of the same case or controversy.'" Response at ¶ 15 (citing 28 U.S.C. § 1367(a)). To this point, Plaintiff's argument in its entirety is that "Dolan's acts and omissions in this lawsuit arise out of or relate to his conduct which affects, among other jurisdictions, Florida." *Id*. This analysis does not reflect the law as it relates to supplemental jurisdiction though does reflect the care Plaintiff has shown in the pursuit of its claim.

As an initial matter, "§ 1367 concerns subject-matter—not personal—jurisdiction." Carter v. Ford Motor Co., No. 19-62646-CIV, 2021 WL 1165248, at *6 n.6 (S.D. Fla. Mar. 26, 2021). In that regard, Plaintiff appears to be "confusing supplemental jurisdiction with pendent personal jurisdiction." FR Tax Grp., LLC v. Kassover, No. 17-80386-CIV, 2017 WL 6346051, at *5 (S.D. Fla. Aug. 2, 2017), aff'd, 723 F. App'x 977 (11th Cir. 2018).

In short, "the doctrine of supplemental jurisdiction . . . permits 'federal courts to decide certain state-law claims involved in cases raising federal questions' when doing so would promote judicial economy. *United States ex rel. Brown v. BankUnited Tr. 2005-1*, 235 F. Supp. 3d 1343, 1361 (S.D. Fla. 2017) (citing *Ameritax, Ltd. v. Millennium Labs., Inc.*, 803 F.3d 518, 530 (11th Cir. 2015). Because Plaintiff cannot adequately plead jurisdiction over the RICO claims it cannot utilize the doctrine of supplemental jurisdiction to bring its other conspiracy claims against Mr. Dolan in this Court.

### C. Plaintiff Cannot State a Claim for Conspiracy Because Mr. Dolan Communicated With No Defendant Besides Mr. Danchenko

Plaintiff's allegations rely on extrapolation and unfounded speculation to concoct a cause of action against Mr. Dolan. Plaintiff fails to allege an agreement by Mr. Dolan with any other Defendant to fabricate information to induce the FBI to investigate. Mr. Dolan only had

conversations or e-mail exchanges with Defendant Danchenko, with whom he was networking and trying to do business unrelated to the issues in this case. Plaintiff's claims lack a factual basis.

For a civil conspiracy to exist, there must be some specific, concrete allegation of an agreement between two or more parties to act unlawfully. *EMI Sun Village, Inc. v. Catledge*, 779 Fed. Appx. 627, 637 (11th Cir. 2019) ("A civil conspiracy requires: (1) an agreement between two or more parties; (2) to do an unlawful act or to do a lawful act by unlawful means; (3) the doing of some overt act in pursuance of the conspiracy; and (4) damage to plaintiff as a result of the acts done under the conspiracy.")

Here, there are no allegations that Mr. Dolan communicated with any other Defendant besides Mr. Danchenko, and no allegation with any reasonable basis that Mr. Dolan and Mr. Danchenko entered into an agreement to do anything unlawful. Plaintiff's laundry list of claims about Dolan does not even attempt to connect Mr. Dolan to any alleged conspiracy; for example: that Dolan volunteered for the Clinton Campaign in 2016 and served as an advisor to the Clinton Campaign in Iowa and New Hampshire in 2008 or that "Dolan has been "a longtime participant in Democratic politics,'" could implicate lots of people in conspiracies for volunteering in the political process. *See* Response at ¶¶ 27-29. These types of allegations could implicate thousands if not millions of citizens. Mr. Dolan's lack of contact with Florida, and absence of contact with other Defendants, supports his individualized motion to dismiss.

The consolidated briefing by Defendants, which Mr. Dolan adopts amply confirms that this matter should be dismissed in its entirety. If that motion is granted Mr. Dolan's motion becomes moot.

Respectfully submitted,

/s/ George R. A. Doumar
George R.A. Doumar

6

*Admitted Pro Hac Vice*
Jonathan E. Levine, Esquire
Florida Bar No. 937711
Mahdavi Bacon Halfhill & Young, PLLC
11350 Random Hills Road, Suite 700
Fairfax, Virginia, 22030
Tel: (703) 352-1300
Fax: (703) 352-1301
Email: gdoumar@doumarmartin.com

Attorneys for Charles H. Dolan

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

Respectfully submitted,

/s/ George R. A. Doumar
George R.A. Doumar
*Admitted Pro Hac Vice*
Jonathan E. Levine, Esquire
Florida Bar No. 937711
Mahdavi Bacon Halfhill & Young, PLLC
11350 Random Hills Road, Suite 700
Fairfax, Virginia, 22030
Tel: (703) 352-1300
Fax: (703) 352-1301
Email: gdoumar@doumarmartin.com

Attorneys for Charles H. Dolan

260

Defendant Orbis Business Intelligence Ltd.'s Motion to Dismiss the
Amended Complaint and Incorporated Memorandum of Law
(Aug. 18, 2022)

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO. 2:22-CV-14102-DMM

DONALD J. TRUMP,

     Plaintiff,

v.

HILLARY R. CLINTON, et al.,

     Defendants.

_____ /

## DEFENDANT ORBIS BUSINESS INTELLIGENCE LTD.'S MOTION TO DISMISS THE AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW

ENJOLIQUÉ AYTCH LETT, ESQ.
Florida Bar No. 0104881
Email: lette@gtlaw.com
AKIESHA GILCRIST SAINVIL, ESQ.
Florida Bar No. 1003260
Email: sainvila@gtlaw.com
**GREENBERG TRAURIG, P.A.**
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717

*Attorneys for Defendant*
*Orbis Business Intelligence Ltd.*

## **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................1

FACTS RELEVANT TO THIS MOTION TO DISMISS ....................................2

      I.      The Allegations Against Orbis In the Amended Complaint Are Sparse. ...............2
      II.     Orbis Has No Meaningful Contact With Florida. ...................................................2
      III.    Orbis Has Not Been Properly Served. ....................................................................3

LEGAL STANDARD .........................................................................................4

      I.      Rule 12(b)(2): Lack of Personal Jurisdiction..........................................................4
      II.     Rule 12(b)(4) & (5): Insufficient Process & Service of Process. ...........................5
      III.    Rule 12(b)(6): Failure to State a Claim Upon Which Relief Can Be
            Granted. ..................................................................................................................6

ARGUMENT ........................................................................................................7

      I.      The Amended Complaint Should Be Dismissed As To Orbis For Lack of
            Personal Jurisdiction. .............................................................................................7

            A.     *No general jurisdiction exists over Orbis.* .................................................7
            B.     *No specific jurisdiction exists over Orbis.*...............................................9
            C.     *Federal due process considerations require dismissal.*............................13

      II.     The Amended Complaint Should Be Dismissed As Against Orbis For
            Insufficient Process and Service of Process............................................................13

            A.     *Plaintiff must show that service was properly effected against*
                 *Orbis under the Convention.*...................................................................13
             B.     *Orbis should be dismissed from this action, with prejudice, due to*
                 *insufficient process and service of process.*.............................................14
             C.     *Any further service attempts as to Orbis should be rejected.* ...................15

      III.    The Amended Complaint Is Procedurally And Substantively Deficient As
            Against Orbis. ........................................................................................................16

CONCLUSION...................................................................................................19

REQUEST FOR HEARING................................................................................19

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*,
    483 U.S. 143 (1987) ................................................................17

*Am. Dental Ass'n v. Cigna Corp.*,
    605 F.3d 1283 (11th Cir. 2010) ...........................................6

*Ashcroft v. Iqbal*,
    556 U.S. 678 (2009) ................................................6, 7, 18

*Auf v. Howard Univ. et al.*,
    No. 19-cv-22065, 2020 U.S. Dist. LEXIS 53226 (S.D. Fla. Mar. 25, 2020) ..........................13

*Barabe v. Apax Partners Eur. Managers, Ltd.*,
    359 F. App'x 82 (11th Cir. 2009) .......................................18

*Barmapov v. Amuial*,
    986 F .3d 1321,1325-26 (11th Cir. 2021) ..............................18

*Beck v. Prupis*,
    529 U.S. 494 (2000) ..........................................................18

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ..............................................6, 7, 18

*Birmingham v. RoFx.net*,
    No. 21-23472-Civ-Scola, 2022 U.S. Dist. LEXIS 94981 (S.D. Fla. May 26, 2022) .......5, 8, 11

*Bristol-Myers Squibb Co. v. Superior Court*,
    137 S. Ct. 1773 (2017) ....................................5, 7, 9, 10

*Bulpit, LLC v. DeCanio*,
    No. 2:13-cv-14119-KMM, 2013 U.S. Dist. LEXIS 202893 (S.D. Fla. June 7, 2013) ..........8, 9

*Callaway v. Kittler*,
    No. 6:13-cv-1561-Orl-22TBS, 2013 U.S. Dist. LEXIS 163700 (M.D. Fla. Oct. 29, 2013) ............................................................6

*Carmouche v. Carnival Corp.*,
    36 F. Supp. 3d 1335 (S.D. Fla. 2014), *aff'd*, 789 F.3d 1201 (11th Cir. 2015) ......................13

*Castillo v. Allegro Resort Mktg.*,
    603 F. App'x 913 (11th Cir. 2015) ................................4, 11

*Catalyst Pharms., Inc. v. Fullerton*,
    748 F. App'x 944 (11th Cir. 2018) .....................................4

*Colite Int'l Inc. v. Robert L. Lipton, Inc.*,
    No. 05-cv-60046, 2006 WL 8431505 (S.D. Fla. Jan. 20, 2006) ...........................18

*Corsello v. Lincare, Inc.*,
    428 F.3d 1008 (11th Cir. 2005) ........................................19

*Daimler AG v. Bauman*,
  571 U.S. 117 (2014) ...............................................................................7, 8, 9

*DeLuca v. Royal Caribbean Cruises, Ltd.*,
  244 F. Supp. 3d 1342 (S.D. Fla. 2017) ...................................................7

*easyGroup Ltd. v. Skyscanner, Inc.*,
  No. 20-20062-CIV-Altonaga/Goodman, 2020 WL 5500695 (S.D. Fla. Sept. 11, 2020) ..........5

*Energy Smart Indus., LLC v. Big R of Lamar, Inc.*,
  No. 11-23627-CIV-O'SULLIVAN, 2012 U.S. Dist. LEXIS 103991 (S.D. Fla.
  July 26, 2012) ..............................................................................................8

*Envt'l Mfg. Sols., LLC v. Fluid Grp., Ltd.*,
  No. 6:18-cv-156-Orl-40KRS, 2018 WL 3635112 (M.D. Fla. May 9, 2018) ...........................5

*Flexsteel Pipeline Techs., Inc. v. Bin Chen & Changchun Gaoxiang Special Pipe Co.*,
  No. 5:16cv239-MCR/GRJ, 2018 U.S. Dist. LEXIS 245865 (N.D. Fla. Feb. 27, 2018) ..........14

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*,
  141 S. Ct. 1017 (2021) ...........................................................................7, 9

*Foreign Imported Prods. & Publ'g, Inc. v. Grupo Indus. Hotelero, S.A.*,
  No. 07-22066-CIV, 2008 U.S. Dist. LEXIS 108705 (S.D. Fla. Oct. 24, 2008) ...............10, 12

*Glen v. Club Mediterranee, S.A.*,
  359 F. Supp. 2d 1352 (S.D. Fla. 2005) .................................................14

*Goforit Entm't LLC, v. Digimedia.com L.P.*,
  513 F. Supp. 2d 1325 (M.D. Fla. 2007) .............................................9, 12

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
  564 U.S. 915 (2011) ...........................................................................7, 9, 10

*Hemispherx Biopharma, Inc. v. Johannesburg Consol. Invs.*,
  553 F.3d 1351 (11th Cir. 2007) ..............................................................5

*Hollander v. Wolf*,
  No. 09-80587-CIV-RYSKAMP/VITUNAC, 2009 U.S. Dist. LEXIS 101446
  (S.D. Fla. Oct. 14, 2009) ...........................................................................6

*Internet Sols. Corp. v. Marshall*,
  557 F.3d 1293 (11th Cir. 2005) ..............................................................5

*Jackson v. Bank of Am., N.A.*,
  898 F.3d 1348 (11th Cir. 2018) ............................................................18

*La Grasta v. First Union Sec., Inc.*,
  358 F.3d 840 (11th Cir. 2004) ..............................................................17

*Lehman v. Lucom*,
  727 F.3d 1326 (11th Cir. 2013) ............................................................17

*Leon v. Cont'l AG*,
  301 F. Supp. 3d 1203 (S.D. Fla. 2017) ................................................11

iii

*Louis Vuitton Malletier, S.A. v. Mosseri*,
 736 F.3d 1339 (11th Cir. 2013) ................................................................4

*McGregor v. In Tune Music Group*,
 No. 15-62044-CIV-ZLOCH, 2016 U.S. Dist. LEXIS 190586 (S.D. Fla. Feb.
 10, 2016) ..............................................................................14, 15, 16

*Micro v. Shabanets*,
 No. 15-cv-80999, 2015 WL 11438937 (S.D. Fla. Dec. 4, 2015)...........................17

*Miller v. Berman*,
 289 F. Supp. 2d 1327 (M. D. Fla. 2003) ....................................................12

*Orient Holding v. Assicurazioni Generali SpA*,
 No. 18-80899-CIV-ROSENBERG/REINHART, 2018 U.S. Dist. LEXIS
 140892 (S.D. Fla. Aug. 17, 2018)..............................................................6

*Pardazi v. Cullman Med. Ctr.*,
 896 F.2d 1313 (11th Cir. 1990) ................................................................5

*Performance Indus. Mfg., Inc. v. Vortex Performance Pty Ltd.*,
 No. 8:18-cv-00510-T-02AAS, 2019 U.S. Dist. LEXIS 476 (M.D. Fla. Jan. 2, 2019) .........8, 9

*Posner v. Essex Ins. Co.*,
 178 F.3d 1209 (11th Cir. 1999) ...............................................................11

*R & R Games, Inc. v. Fundex Games, Ltd.*,
 No. 8:12-cv-01957-JDW-TBM, 2013 U.S. Dist. LEXIS 97621 (M.D. Fla. July
 12, 2013) ....................................................................................11

*RG Martin Invs., LLC v. Virtual Tech. Licensing, LLC*,
 No. 17-cv-80338-BLOOM/Valle, 2017 U.S. Dist. LEXIS 231300 (S.D. Fla.
 July 7, 2017)................................................................................10

*Roberts v. Benson*,
 No. 20-82383-CV-MIDDLEBROOKS/Brannon, 2021 U.S. Dist. LEXIS
 65917 (S.D. Fla. Apr. 2, 2021) ................................................................4

*Snow v. DirecTV, Inc.*,
 450 F.3d 1314 (11th Cir. 2006) ............................................................4, 11

*Steinberg v. Barclay's Nominees (Braches), Ltd.*,
 No. 04-60897-CIV-MARRA/JOHNSON, 2008 U.S. Dist. LEXIS 123948
 (S.D. Fla. Sept. 30, 20)......................................................................16

*Super Vision Int'l v. Mega Int'l Com. Bank*,
 534 F. Supp. 2d 1326 (S.D. Fla. 2008) .....................................................17

*In re Takata Airbag Prod. Liab. Litig.*,
 396 F. Supp. 3d 1101 (S.D. Fla. 2019) ..........................................5, 9, 11, 13

*Taylor v. Royal Caribbean Cruises Ltd.*,
 No. 20-CV-22161-SCOLA, 2020 WL 6826486 (S.D. Fla. Nov. 20, 2020),
 *aff'd*, 2021 WL 3502626 (11th Cir. Aug. 10, 2021).........................................6, 7

*Turi v. Stacey*,
    No. 5:13-cv-248-Oc-22PRL, 2014 U.S. Dist. LEXIS 202401 (M.D. Fla. 2014) ................... 14

*Volkswagenwerk Aktiengesellschaft v. Schlunk*,
    486 U.S. 694, 108 S. Ct. 2104 (1988) ..................................................................................... 14

*Walden v. Fiore*,
    571 U.S. 277 (2014) ................................................................................................................ 11

*Wilder v. JP. Morgan Chase Bank, N.A.*,
    No. 18-cv-20820, 2018 U.S. Dist. LEXIS 186778 (S.D. Fla. Oct. 30, 2018) ................. 17, 18

*Zippo Mfg. Co. v. Zippo Dot Com, Inc.*,
    952 F. Supp. 1119 (W.D. Pa. 1997) ....................................................................................... 12

**State Cases**

*Davis v. Monahan*,
    832 So. 2d 708 (Fla. 2002) ...................................................................................................... 17

*Westwind Limousine, inc. v. Shorter*,
    932 So. 2d 571 (Fla. 5th DCA 2006) ...................................................................................... 12

**State Statutes**

Fla. Stat. § 48.193 ......................................................................................................................... 4

Fla. Stat.§ 95.1l(p) ...................................................................................................................... 17

**Rules**

Fed. R. Civ. P. 4 ........................................................................................................................... 14

Fed. R. Civ. P. 4(f)(1) .................................................................................................................. 14

Fed. R. Civ. P. 4(h) ...................................................................................................................... 14

Fed. R. Civ. P. 4(k) ........................................................................................................................ 4

Fed. R. Civ. P. 4(l)(1) ................................................................................................................... 15

Fed. R. Civ. P. 12(b) ...................................................................................................................... 1

Fed. R. Civ. P. 12(b)(4) .................................................................................................................. 6

Fed. R. Civ. P. 12(b)(5) .................................................................................................................. 6

Defendant Orbis Business Intelligence Ltd. ("Orbis"), by and through its undersigned counsel and pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, respectfully moves to dismiss, with prejudice, the Amended Complaint for Damages [DE No. 177] (the "Amended Complaint" or "AC") filed by Plaintiff Donald J. Trump, as against Orbis, for insufficient process and service of process, lack of personal jurisdiction, and failure to state a claim. In support of the Motion, Orbis states as follows:

## INTRODUCTION

While the nearly 185-page Amended Complaint is robust in form, it is woefully lacking in substance and falls well short of the federal pleading standards. It must be dismissed as to Orbis for the following reasons. ***First***, the Amended Complaint lacks any jurisdictional allegations whatsoever, much less allegations sufficient to adequately plead personal jurisdiction against Orbis, a nonresident defendant. ***Second***, the Amended Complaint must be dismissed for insufficient service of process. Orbis, an England-based foreign defendant, must be served under the Hague Convention (the "Convention") and there is no proof that such service has occurred. Nor has Plaintiff sought assistance from the Court concerning such service, despite having ample time and resources to do so. ***Third***, the Amended Complaint is procedurally and substantively deficient, including with respect to Counts II, IV, and XV of the Amended Complaint, as detailed in the Joint Motion to Dismiss and Incorporated Memorandum of Law, [*see* DE 226], and the Joint Reply in Support of the Motion to Dismiss, [*see* DE 250], filed by the Defendants in this action on July 14, 2022 and August 11, 2022, respectively.[1] The Amended Complaint should be dismissed, with prejudice, for each of these independent, straightforward reasons.

---

[1] Defendant Orbis was not a party to this litigation at the time of the filing of the Joint Motion to Dismiss and Incorporated Memorandum of Law filed by the Defendants in this action on July 14, 2022 and had only entered the case two days prior to the filing of Defendants' Joint Reply

## FACTS RELEVANT TO THIS MOTION TO DISMISS

### I.   The Allegations Against Orbis In the Amended Complaint Are Sparse.

The original Complaint in this action was filed on March 24, 2022. (DE 1). Plaintiff filed the Amended Complaint thereafter on June 21, 2022. (DE 177). Both the Complaint and the Amended Complaint named Orbis as a defendant. (DE 1; DE 177).

In the Amended Complaint, Plaintiff alleges that, "in or about May 2016," (AC, ¶ 97), Orbis was retained by Fusion GPS "to gather intelligence regarding Russia's [efforts] to influence the US Presidential election process and the links between Russia and Trump," (AC, ¶¶ 94, 97, 292, 293). The culmination of this information, according to Plaintiff, was set forth in "a series of reports," known as the "Steele Dossier." (AC, ¶ 4). Plaintiff alleges that, in or about November or December 2016, a series of leaks by third-party individuals and media outlets caused the dossier to be disseminated publicly. (AC, ¶¶ 291, 292, 294). He does not allege that Orbis was involved in the alleged dissemination. (*See generally*, AC). Plaintiff alleges that these "acts and omissions" identified in the lawsuit "arise out of or relate to [Orbis'] conduct in and/or affecting, among other jurisdictions, Florida." (AC, ¶ 32).

### II.   Orbis Has No Meaningful Contact With Florida.

Orbis is a private limited company formed under the laws of England that specializes in corporate intelligence consultancy. (*See Declaration of Christopher Burrows in Support of*

---

in Support of the Motion to Dismiss. [DE 226 and 250]. Nevertheless, without waiving any of its arguments regarding the sufficiency of the Amended Complaint and the lack of jurisdiction this Court has over Defendant Orbis, in accordance with the Court's directive on June 23, 2022 for the defendants in this action to "consolidate . . . responses where appropriate," [*see* DE 188; *see also* DE 247], Orbis hereby adopts and fully incorporates by reference the facts, law, and arguments set forth in the Joint Motion and Joint Reply as they pertain to Counts II, IV, and XV of the Amended Complaint, along with all facts, law, and argument that the causes of action asserted in the Amended Complaint are time-barred and insufficient, and the substantive claims contained therein fail to state any cognizable cause of action.

*Defendant Orbis Business Intelligence Ltd.'s Motion to Dismiss* ("*Burrows Decl.*"), ¶ 10, *attached hereto as* **Exhibit A**). Orbis was incorporated on March 16, 2009 in London, England. (*Id.*) Orbis' sole place of business is in London, England. (*Id.*) Orbis has no offices, no employees, and no business representatives in Florida. (*Id.*, ¶ 9). Orbis does not conduct, engage in, or carry on any business or business venture in Florida, and it is not authorized or registered to carry on any business in Florida. (*Id.*) Orbis owns no real or other property in Florida nor leases any real property in Florida. (*Id.*, ¶ 12). Orbis does not have a mailing address, telephone number, or bank account in Florida. (*Id.*, ¶ 13). Orbis pays no taxes in Florida. (*Id.*, ¶ 9).

Orbis' business is generated by personal contacts and referrals, which takes place in the United Kingdom—not in the United States. (*Id.*, ¶ 11). Orbis does not advertise or conduct marketing in Florida, nor does it target Florida in any way with respect to any advertising or marketing, whether online or otherwise. (*Id.*, ¶ 14). Orbis does not provide any services in or to Florida, and does not derive any revenue or otherwise receive any income or proceeds from any services in or to Florida. (*Id.*, ¶ 15). No acts involving or relating to the creation of the dossier occurred in Florida. (*Id.*, ¶ 8). In sum, Orbis has no meaningful contact with Florida.

## III.   Orbis Has Not Been Properly Served.

On July 19, 2022, an unidentified individual arrived at Orbis' registered office located at Hopper, Williams and Bell (HWB), Highland House Mayflower Close, Chandlers Ford, Eastleigh, Hampshire SO53 4AR, UK, and indicated that he wanted to serve some documents. (*Id.*, ¶ 3; *see also* **Exhibit B** (the purported "service documents")). The individual was greeted by an office receptionist. (*Id.*) The individual did not indicate what the documents pertained to. (*Id.*) The receptionist informed the individual that she was not authorized to accept service of any documents, and that the persons authorized to accept service—Richard Hurst and Christopher

Wignall—were unavailable. (*Id.*, ¶ 4). The individual dropped the documents on the floor of Orbis'

registered office and exited the premises. (*Id.*, ¶ 5). To date, the documents in question have never

been served on those individuals registered and authorized to accept service for Orbis. (*Id.*, ¶ 6).

Plaintiff has neither filed a proof of service nor sought assistance from this Court regarding service

of process on Orbis. (*See generally Trump v. Clinton et al.*, No. 2:22-cv-14102-DMM).

## LEGAL STANDARD

The Amended Complaint should be dismissed as to Orbis on any one of three alternative

grounds—lack of personal jurisdiction, insufficient process and service of process, and failure to

state a claim.

## I.     Rule 12(b)(2): Lack of Personal Jurisdiction.

A federal district court has personal jurisdiction over a nonresident defendant only if (1)

the forum state's long-arm statute authorizes such jurisdiction under Fla. Stat. § 48.193 and (2) the

exercise of personal jurisdiction satisfies the Due Process Clause of the Fourteenth

Amendment. *See Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir.

2013); see also Fed. R. Civ. P. 4(k). "Only if both prongs of the analysis are satisfied may a federal

or state court exercise personal jurisdiction over a nonresident defendant." *Roberts v. Benson*, No.

20-82383-CV-MIDDLEBROOKS/Brannon, 2021 U.S. Dist. LEXIS 65917, at *5 (S.D. Fla. Apr.

2, 2021). Thus, where jurisdictional allegations as to nonresidents are entirely lacking or

impermissibly conclusory, the claims against them must be dismissed. *Snow v. DirecTV, Inc.*, 450

F.3d 1314, 1318 (11th Cir. 2006) (finding "vague and conclusory allegations . . . insufficient to

establish a prima facie case of personal jurisdiction"); *see also Catalyst Pharms., Inc. v. Fullerton*,

748 F. App'x 944, 946 (11th Cir. 2018) ("Vague and conclusory allegations do not satisfy" a

plaintiff's burden to "make out a prima facie case of jurisdiction"); *Castillo v. Allegro Resort*

*Mktg.*, 603 F. App'x 913, 916 (11th Cir. 2015) (affirming dismissal where plaintiff "made no specific factual allegations" as to jurisdiction) (per curiam).

The plaintiff has the burden of pleading sufficient material facts to establish a *prima facie* case of personal jurisdiction. *Birmingham v. RoFx.net*, No. 21-23472-Civ-Scola, 2022 U.S. Dist. LEXIS 94981, *3 (S.D. Fla. May 26, 2022); *Envt'l Mfg. Sols., LLC v. Fluid Grp., Ltd.*, No. 6:18-cv-156-Orl-40KRS, 2018 WL 3635112, at *4 (M.D. Fla. May 9, 2018). If, but only if, the plaintiff satisfies this threshold burden, the burden then shifts to the defendant to "raise[ ], through affidavits, documents or testimony, a meritorious challenge to personal jurisdiction." *Internet Sols. Corp. v. Marshall*, 557 F.3d 1293, 1295 (11th Cir. 2005). If the defendant successfully rebuts the plaintiff's prima facie showing of personal jurisdiction, "the burden shifts back to the plaintiff, this time requiring the plaintiff to prove-not merely allege-jurisdiction by affidavits, testimony, or other documents." *easyGroup Ltd. v. Skyscanner, Inc.*, No. 20-20062-CIV-Altonaga/Goodman, 2020 WL 5500695, at *5 (S.D. Fla. Sept. 11, 2020). Florida's "long-arm statute must be strictly construed with any doubts about applicability of the statute [being] resolved in favor of the defendant and against a conclusion that personal jurisdiction exists." *In re Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d 1101, 1140 (S.D. Fla. 2019) (internal quotation marks omitted); *see also Bristol-Myers Squibb Co.*, 137 S. Ct. at 1780 ("[T]he primary concern is the burden on the defendant." (internal quotation marks omitted)).

## II.     Rule 12(b)(4) & (5): Insufficient Process & Service of Process.

"Service of process is a jurisdictional requirement." *Hemispherx Biopharma, Inc. v. Johannesburg Consol. Invs.*, 553 F.3d 1351, 1360 (11th Cir. 2007) . Thus, in the absence of proper service of process, a court "may not exercise power over a party the complaint names as a defendant." *Id.* at 350; *see also Pardazi v. Cullman Med. Ctr.*, 896 F.2d 1313, 1317 (11th Cir.

1990) ("Service of process is a jurisdictional requirement: a court lacks jurisdiction over the person of a defendant when that defendant has not been served.").

The Federal Rules of Civil Procedure allow a defendant to move for dismissal based on insufficient process and insufficient service of process. *See* Fed. R. Civ. P. 12(b)(4) and (5); *see also Callaway v. Kittler*, No: 6:13-cv-1561-Orl-22TBS, 2013 U.S. Dist. LEXIS 163700, at *4 (M.D. Fla. Oct. 29, 2013) ("A party may seek dismissal under Rule 12 for insufficient service of process."). Once a defendant challenges the sufficiency of process, the plaintiff has the burden to establish proper service of process. *Orient Holding v. Assicurazioni Generali SpA*, No. 18-80899-CIV-ROSENBERG/REINHART, 2018 U.S. Dist. LEXIS 140892, *3-4 (S.D. Fla. Aug. 17, 2018) (citing *Hollander v. Wolf*, No. 09-80587-CIV-RYSKAMP/VITUNAC, 2009 U.S. Dist. LEXIS 101446 (S.D. Fla. Oct. 14, 2009)).

### III.    Rule 12(b)(6): Failure to State a Claim Upon Which Relief Can Be Granted.

To survive a motion to dismiss, a complaint "'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Taylor v. Royal Caribbean Cruises Ltd.*, No. 20-CV-22161-SCOLA, 2020 U.S. Dist. LEXIS 217347, at *4 (S.D. Fla. Nov. 20, 2020) (quoting *Iqbal*, 556 U.S. at 678), *aff'd*, 2021 U.S. App. LEXIS 23650 (11th Cir. Aug. 10, 2021). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted). Although "the Court must accept all the complaint's allegations as true, construing them in the light most favorable to the plaintiff," *id.*, "'allegations absent supporting facts are not entitled to

6

this presumption of veracity,'" *DeLuca v. Royal Caribbean Cruises, Ltd.*, 244 F. Supp. 3d 1342, 1345 (S.D. Fla. 2017) (citing *Iqbal*, 556 U.S. at 663). "[A] pleading that offers mere 'labels and conclusion' or 'a formulaic recitations of the elements of a cause of action' will not survive dismissal." *Taylor*, 2020 WL 6826486, at *2 (quoting *Twombly*, 550 U.S. at 555).

## ARGUMENT

**I.    The Amended Complaint Should Be Dismissed As To Orbis For Lack of Personal Jurisdiction.**

There are two types of personal jurisdiction: "general" jurisdiction and "specific" jurisdiction. *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1024-1025 (2021); *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1779-80 (2017) ("Since our seminal decision in *International Shoe*, our decisions have recognized two types of personal jurisdiction: 'general' (sometimes called 'all-purpose') jurisdiction and 'specific' (sometimes called 'case-linked') jurisdiction." (*quoting Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011))). Plaintiff does not and cannot allege either type of personal jurisdiction as to Orbis.

### A.    *No general jurisdiction exists over Orbis.*

General jurisdiction over a corporation exists only where the corporation's "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State.'" *Bristol-Myers Squibb Co.*, 137 S. Ct. at 1780 (*quoting Goodyear Dunlop Tires Operations, S.A.*, 564 U.S. at 919); *see also Ford Motor Co.*, 141 S. Ct. at 1024 ("A state court may exercise general jurisdiction only when a defendant is essentially at home in the State" (internal quotation marks omitted)); *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (same). The paradigm all-purpose forums for general jurisdiction are a corporation's place of incorporation and principal place of business. *Daimler*, 571 U.S. at 137. Only in an "exceptional case" will general jurisdiction

be available anywhere else. *Id.* ("It is one thing to hold a corporation answerable for operations in the forum State . . . [and] quite another to expose it to suit on claims having no connection whatever to the forum State.")

Orbis is not subject to general jurisdiction in Florida. Orbis was formed and incorporated under English law, and is headquartered in England with its principal place of business in England. (Burrows Decl., ¶ 10). Moreover, each one of the relevant factors show that Orbis did *not* "engage[] in a 'general course of business activity'" in Florida. Orbis (1) has no office in Florida, (*see id.*, ¶ 9); (2) is not licensed to do business in Florida, (*see id.*); (3) does not provide any services in or to Florida, (*id.*, ¶ 15).; and (4) does not derive any revenue, income, or proceeds from any services in or to Florida, (*id.*, ¶ 15). *See RoFx.net*, 2022 U.S. Dist. LEXIS 94981, *3 (finding no personal jurisdiction where "[a]bsent from the amended complaint is any mention of particular instances in which [defendant] purposefully targeted Florida consumers, communicated with persons in Florida, or otherwise 'purposefully availed' itself of the privilege of conducting business in the state); *Performance Indus. Mfg., Inc. v. Vortex Performance Pty Ltd.*, No. 8:18-cv-00510-T-02AAS, 2019 U.S. Dist. LEXIS 476, at *8 (M.D. Fla. Jan. 2, 2019) (no personal jurisdiction where defendant had no office or license to do business in Florida; "maintaining and operating a generally-accessible website that allows for shipments to" Florida was insufficient); *Bulpit, LLC v. DeCanio*, No. 2:13-cv-14119-KMM, 2013 U.S. Dist. LEXIS 202893, at *9-10 (S.D. Fla. June 7, 2013) (no personal jurisdiction where defendant had no offices in Florida, was not licensed to do business in Florida, and had no Florida customers); *Energy Smart Indus., LLC v. Big R of Lamar, Inc.*, No. 11-23627-CIV-O'SULLIVAN, 2012 U.S. Dist. LEXIS 103991, at *17 (S.D. Fla. July 26, 2012) (no personal jurisdiction where defendant's only connection to Florida was a website accessible in Florida and sales to Florida customers were de minimis).

Moreover, the fact that Orbis does not direct its marketing or advertising to, or generate

revenue from, Florida residents, (*see* Burrows Decl., ¶¶ 14-15), is yet "[a]nother important factor" that militates against personal jurisdiction. *Bulpit*, 2013 U.S. Dist. LEXIS 202893, at *9-10 (no personal jurisdiction where no directed advertising to Florida); *see also Performance Indus.*, 2019 U.S. Dist. LEXIS 476, at *12 n.5 (finding long-arm statute not satisfied where, although defendant maintained and operated a website that permitted purchase and delivery of goods by Florida consumers, there was no evidence of any significant sales in Florida); *Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d at 1141 (no personal jurisdiction where plaintiffs failed to allege defendants directed advertising and marketing of allegedly defective vehicles to Florida); *Goforit Entm't LLC, v. Digimedia.com L.P.*, 513 F. Supp. 2d 1325, 1330 (M.D. Fla. 2007) ("that Defendants' websites are equally accessible everywhere does not establish targeting of Florida").

At bottom, it cannot fairly be said, under any standard, that Orbis has the requisite "continuous and systematic" contacts with Florida that would "render [it] essentially at home" in Florida. *See Bristol-Myers Squibb Co.*, 137 S. Ct. at 1780 (*quoting Goodyear Dunlop Tires Operations, S.A.*, 564 U.S. at 919); *Ford Motor Co.*, 141 S. Ct. at 1024; *Daimler AG*, 571 U.S. at 137. There is, therefore, no basis for general jurisdiction over it. Accordingly, the Amended Complaint must be dismissed as against Orbis for lack of personal jurisdiction.

**B.**     **No specific jurisdiction exists over Orbis.**

Nor has Plaintiff sufficiently alleged specific jurisdiction. Specific jurisdiction exists when the lawsuit arises out of the defendant's contacts with that forum. *Bristol-Myers Squibb Co.*, 137 S. Ct. at 1780; *see also Ford Motor Co.*, 141 S. Ct. at 1024 ("Specific jurisdiction is different: It covers defendants less intimately connected with a State, but only as to a narrower class of claims."). "In other words, there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is

therefore subject to the State's regulation.'" *Bristol-Myers Squibb Co.*, 137 S. Ct. at 1780 (*quoting Goodyear Dunlop Tires Operations, S. A.*, 564 U.S. at 919).

"The Eleventh Circuit has adopted a three-part test to decide whether the minimum contacts requirement for purposes of specific jurisdiction has been met" – (i) "First, the contacts must be related to the plaintiff's cause of action;" (ii) "Second, the contacts must involve some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum;" and (iii) "[T]hird, the defendant's contacts with the forum must be such that the defendant should reasonably anticipate being haled into court there." *Foreign Imported Prods. & Publ'g, Inc. v. Grupo Indus. Hotelero, S.A.*, No. 07-22066-CIV, 2008 U.S. Dist. LEXIS 108705, at *21 (S.D. Fla. Oct. 24, 2008).

Here, Plaintiff alleges "Orbis Ltd.'s acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida." (AC, ¶ 32). The crux of those contacts, as it pertains to Orbis, is Orbis' involvement in a purported conspiracy "to weave a false narrative" that Plaintiff "was colluding with a hostile foreign sovereignty." (*Id.*, ¶ 1). Plaintiff alleges Orbis' role in said alleged conspiracy was its creation of "a fraudulent and incriminating dossier," (*see id.*, ¶ 70), which "disseminate[d] patently false and injurious information" about Plaintiff and his campaign, (*see id.*, ¶ 9). Plaintiff ultimately alleges that another individual leaked copies of the dossier to the internet and other media outlets, (*id.*, ¶ 292), and that those internet and other media outlets published the material, (*id.*, ¶ 294).

As a threshold matter, Plaintiff's "generalized and conclusory allegations," which are unsupported by any actual evidence or facts, cannot allege personal jurisdiction based on Florida's long-arm statute, regardless of the theory asserted. *See, e.g.*, *RG Martin Invs., LLC v. Virtual Tech. Licensing, LLC*, No. 17-cv-80338-BLOOM/Valle, 2017 U.S. Dist. LEXIS 231300, at *9-10 (S.D.

Fla. July 7, 2017) (conclusory allegation that defendants conducted business in Florida not a basis for personal jurisdiction); *Castillo v. Allegro Resort Mktg.*, 603 F. App'x 913, 916 (11th Cir. 2015) (*per curiam*) (no personal jurisdiction where plaintiff alleged defendant had contacts with Florida 24/7 and 365 days a year, but "made no specific factual allegations of these contacts"); *Leon v. Cont'l AG*, 301 F. Supp. 3d 1203, 1216 (S.D. Fla. 2017) (no personal jurisdiction because general allegations that defendant "conduct[ed] substantial business in this District" unsupported by facts); *R & R Games, Inc. v. Fundex Games, Ltd.*, No. 8:12-cv-01957-JDW-TBM, 2013 U.S. Dist. LEXIS 97621, at *15 (M.D. Fla. July 12, 2013) ("A conclusory allegation cannot serve as the basis for personal jurisdiction.").

Nor are Plaintiff's conclusory allegations that Orbis was part of a purported conspiracy sufficient. *See Snow*, 450 F.3d at 1318 (finding "conclusory allegations" that defendant "conspired" with parties that "committed tortious acts in Florida" "insufficient to establish a prima facie case of personal jurisdiction"); *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1217-18 (11th Cir. 1999) (per curiam) (finding a plaintiff's vague allegations of a conspiracy insufficient to establish personal jurisdiction); *Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d at 1142 ("Relying on *Snow*, courts in the Eleventh Circuit have repeatedly declined to exercise specific jurisdiction over a nonresident defendant on the basis of generalized and conclusory allegations."); *RoFx.net*, 2022 U.S. Dist. LEXIS 94981, *3 ("Conclusory allegations concerning the existence of a conspiracy are 'insufficient to establish a prima facie case of personal jurisdiction.'"); *see also Walden v. Fiore*, 571 U.S. 277, 291 (2014) ("[I]t is the *defendant*, not the plaintiff or third parties, who must create contacts with the forum State." (emphasis added)).

Even beyond these glaring deficiencies, the Amended Complaint fails to allege any specific facts which would bring Orbis within Florida's long-arm statute. Indeed, Plaintiff has not—and

11

cannot—allege any act on the part of Orbis whereby it purposefully availed itself of the privilege of conducting activities within Florida. Plaintiff fails to allege any facts which would suggest— and in fact his pleadings demonstrate otherwise—that any aspect of the dossier was created, formed, drafted, discussed, or otherwise prepared in Florida. And, critically, Plaintiff alleges that Orbis had no involvement whatsoever in the alleged dissemination of the dossier at all. Rather, Plaintiff alleges that other individuals leaked the information and third-party media outlets published the information. (AC, ¶¶ 292, 294).

Moreover, while the dossier may have been accessible to the general public in Florida once publicized, the Amended Complaint makes clear that it was passively accessible to anyone— whether in Florida, Canada, Europe or otherwise—with Internet access who was interested in viewing its contents. Florida law is clear that passive website information "that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction." *Foreign Imported Prods. & Publ'g, Inc.*, 2008 U.S. Dist. LEXIS 108705, at *21 ("[T]he exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site." (*quoting Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997))); *see also Goforit Entm't LLC*, 513 F. Supp. 2d at 1330 ("[F]act that Defendants' websites are equally accessible everywhere does not establish targeting of Florida."); *Miller v. Berman*, 289 F. Supp. 2d 1327 (M. D. Fla. 2003) (holding that website that posted information and allowed users to email company representatives is passive and does not confer general jurisdiction on defendant); *Westwind Limousine, Inc. v. Shorter*, 932 So. 2d 571, 571 (Fla. 5th DCA 2006 (holding that website that merely provided company background was passive)). There is simply no basis for the exercise of

jurisdiction over Orbis under Florida's long-arm statute.

C.      *Federal due process considerations require dismissal.*

Because Plaintiff fails to plead personal jurisdiction under Florida's long-arm statute, *a fortiori* he fails to satisfy the more stringent requirements of the Due Process Clause. *Auf v. Howard Univ. et al.*, No. 19-cv-22065, 2020 U.S. Dist. LEXIS 53226, at *28 (S.D. Fla. Mar. 25, 2020) ("[T]he Due Process Clause imposes a more restrictive requirement than does Florida's Long-Arm Statute."). Plaintiff has thus failed to meet his *prima facie* burden of pleading personal jurisdiction over Orbis. Therefore, the Amended Complaint must be dismissed as to Orbis. *See, e.g.*, *Carmouche v. Carnival Corp.*, 36 F. Supp. 3d 1335, 1338 (S.D. Fla. 2014) (the burden does not "shift[] to the defendant to challenge plaintiff's allegations by affidavits or other pleadings" unless "the plaintiff pleads sufficient material facts to form a basis for in personam jurisdiction"), *aff'd*, 789 F.3d 1201 (11th Cir. 2015); *Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d at 1156 (granting dismissal based on a finding "that Plaintiffs' allegations fail to establish a *prima facie* case of specific jurisdiction" despite "none of the parties submitt[ing] affidavits . . . in opposition to[] the exercise of personal jurisdiction").

II.     **The Amended Complaint Should Be Dismissed As Against Orbis For Insufficient Process and Service of Process.**

As a foreign corporation defendant based out of England, Orbis was required to be served under the Convention. Plaintiff has not only failed to properly serve Orbis under the Convention, but has also failed to seek assistance from the Court in connection with same, despite having ample time and resources to do so. Accordingly, the Amended Complaint should be dismissed as against Orbis for insufficient process and service of process.

A.      *Plaintiff must show that service was properly effected against Orbis under the Convention.*

The permissible methods of service vary depending on the identity and location of the

defendant. *See* Fed. R. Civ. P. 4. As an England-based entity, Orbis must be served pursuant to Federal Rule of Civil Procedure 4(h). Fed. R. Civ. P. 4(h) (service on foreign corporations). Rule 4(h), by reference to Rule 4(f), requires that service upon a foreign entity shall be effected "by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents." Fed. R. Civ. P. 4(f)(1); *see also McGregor v. In Tune Music Group*, No. 15-62044-CIV-ZLOCH, 2016 U.S. Dist. LEXIS 190586, *6 (S.D. Fla. Feb. 10, 2016). "The primary means of service under the Hague Convention is through a receiving country's 'central authority,' which receives requests for service, arranges for service, and returns proofs of service." *Flexsteel Pipeline Techs., Inc. v. Bin Chen & Changchun Gaoxiang Special Pipe Co.*, No. 5:16cv239-MCR/GRJ, 2018 U.S. Dist. LEXIS 245865, * (N.D. Fla. Feb. 27, 2018); *see also McGregor* 2016 U.S. Dist. LEXIS 190586 at *6. Where service is to be made in a country that is a signatory to the Convention, compliance with the requirements of the Convention are mandatory. *Glen v. Club Mediterranee, S.A.*, 359 F. Supp. 2d 1352, 1356 (S.D. Fla. 2005); *see also Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 699, 108 S. Ct. 2104 (1988); *Turi v. Stacey*, No: 5:13-cv-248-Oc-22PRL, 2014 U.S. Dist. LEXIS 202401, at *2 (M.D. Fla. 2014).

England is part of the United Kingdom, which is a signatory to the Convention. *See Turi*, 2014 U.S. Dist. LEXIS 202401, at *2 ("The United Kingdom is a signatory to the Hague Convention."). Orbis is based in England, with all of its offices, operations, officers, and employees located in England. Consequently, to demonstrate Orbis was properly served, Plaintiff must show that the service he effected complies with the Convention, and thus with Rule 4(f)(1).

**B.**     **_Orbis should be dismissed from this action, with prejudice, due to insufficient process and service of process._**

Here, there is no evidence that Plaintiff has complied with any method of service authorized

by the Convention with respect to Orbis. The documents that were dropped at Orbis' accounting office on July 19, 2022 consisted only of a two-page, undated document titled "SUMMARY OF THE DOCUMENT TO BE SERVED" that lists the "requesting authority" as "Crowe Foreign Services" of Portland, Oregon, along with a copy of the summons to Orbis filed with this Court and the originally filed Complaint. *See* **Exhibit B** (the purported "service documents"). There is no evidence that Plaintiff provided this documentation to England's central authority designated for service, no certificate of service establishing that service was effected in England, no date or time stamp on the documentation indicating when it was served, and certainly no signature of a representative of Orbis or person authorized to receive or accept service on behalf of Orbis. Moreover, despite having filed affidavits of service of process on numerous other defendants in this action, Plaintiff has not filed such an affidavit or other proof of service with respect to Orbis. *See* Fed. R. Civ. Pro. 4(l)(1) ("Unless service is waived, proof of service must be made to the court. Except for service by a United States marshal or deputy marshal, proof must be by the server's affidavit."). Orbis has not waived service in this case. *McGregor*, 2016 U.S. Dist. LEXIS 190586 at *6 ("[S]ince service was never waived, Plaintiff is not exempt from his duty to establish proof of service to this Court.").

None of this exists—and none of the above has occurred—because, simply put, Orbis has not been properly served. Accordingly, Plaintiff's claims, as against Orbis, require dismissal.

### C.    *Any further service attempts as to Orbis should be rejected.*

Plaintiff should also not be afforded additional time to properly serve Orbis. There is no meaningful explanation for Plaintiff's failure to make a reasonable, good faith effort to effect proper service upon Orbis since commencing this lawsuit on March 24, 2022. Indeed, Plaintiff has been represented at all times by counsel who, as described above, has filed proofs of service

concerning various other parties to this lawsuit. *McGregor*, 2016 U.S. Dist. LEXIS 190586 at *9 (considering the plaintiff's *pro se* status when determining whether plaintiff deserves an extension of the service period). Plaintiff has made no such effort with respect to Orbis.

Moreover, Plaintiff has neither questioned Orbis' silence in this action nor sought the intervention or assistance of the Court with respect to same, notwithstanding having informed the Court that it needed more time for trial based, in part, on service not being perfected on defendants in the United Kingdom. [*See* DE 233]. Plaintiff has been content to proceed for more than four months without Orbis' participation and has paid no attention to its absence. Plaintiff's ignorance of, or indifference to, its burdens cannot be excused or condoned by permitting him additional time to attempt proper serve upon Orbis, particularly where his own delay, and confusing and improper attempt at "service"—to the extent it can even be referred to as such—has already caused Orbis prejudice insofar as it received significantly less notice and time to prepare the instant response to the Amended Complaint than other parties. The Court should, therefore, dismiss the claims in this action as against Orbis, with prejudice. *Steinberg v. Barclay's Nominees (Braches), Ltd.,* No: 04-60897-CIV-MARRA/JOHNSON, 2008 U.S. Dist. LEXIS 123948, at *19-20 (S.D. Fla. Sept. 30, 20) (recognizing that it is purely within the Court's discretion to extend, or not extend, the time for service of process).

## III.    The Amended Complaint Is Procedurally And Substantively Deficient As Against Orbis.

The foregoing arguments for dismissal concerning insufficient process and service of process, and lack of personal jurisdiction, are unique to Orbis and fully dispose of all of Plaintiff's claims against Orbis. However, even if Plaintiff could establish proper service and personal jurisdiction, which he cannot, Plaintiff's lawsuit should be dismissed in its entirety for six additional reasons jointly applicable to the other Defendants in this lawsuit. These six grounds are

set forth in detail in the Joint Motion to Dismiss and Incorporated Memorandum of Law, [*see* DE 226], and the Joint Reply in Support of the Motion to Dismiss, [*see* DE 250], filed by the Defendants in this action on July 14, 2022 and August 11, 2022, respectively. Rather than repeat those arguments in similar detail here, Orbis expressly joins in and adopts each of those grounds for dismissal as if fully set forth herein, and summarizes them as follows:

*First*, this case should be dismissed because Plaintiff's claims are time-barred. *La Grasta v. First Union Sec., Inc.,* 358 F.3d 840, 845-46 (11th Cir. 2004) ("[A] Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate ... if it is apparent from the face of the complaint that the claim is time-barred.") The statute of limitations for civil conspiracy to commit RICO violations (Count II) is four years, and begins running when the injury was or should have been discovered. *See Lehman v. Lucom,* 727 F.3d 1326, 1330 (11th Cir. 2013); *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.,* 483 U.S. 143 (1987). The statute of limitations for conspiracy to commit injurious falsehood (Count IV) is also four years from the date of injury. *Davis v. Monahan,* 832 So. 2d 708, 709 (Fla. 2002); *Wilder v. JP. Morgan Chase Bank, N.A.,* No. 18-cv-20820, 2018 U.S. Dist. LEXIS 186778, at *7 (S.D. Fla. Oct. 30, 2018); *see also* Fla. Stat.§ 95.1l(p). Plaintiff's own statements and allegations make clear he was aware of not only his alleged injury, but also the purported conspiracy and the Defendants' alleged role in it no later than October 29, 2017. Plaintiff's claims are therefore untimely.

*Second*, Plaintiff's conclusory allegations of conspiracy "unsupported by actual allegations of fact" do not plausibly alleged a RICO conspiracy. *Super Vision Int'l v. Mega Int'l Com. Bank,* 534 F. Supp. 2d 1326, 1343 (S.D. Fla. 2008); *see also Micro v. Shabanets,* No. 15-cv-80999, 2015 WL 11438937, at *8 (S.D. Fla. Dec. 4, 2015) (Middlebrooks, J.) (holding that conspiracy claim should be dismissed where "the underlying claims are not supported by factual allegations to state

a RICO violation"). Critically, Plaintiff has also not alleged a predicate act of racketeering or any injury from such an act, which is fatal to Plaintiff's RICO conspiracy claim. *Beck v. Prupis,* 529 U.S. 494, 495- 96 (2000).

*Third*, Plaintiff's claim against Orbis for conspiracy to commit injurious falsehood fails because the underlying tort claim asserted—at Count III for injurious falsehood—fails and because the conspiracy is inadequately pleaded.

*Fourth*, Plaintiff's claim against Orbis on a respondeat superior theory should be dismissed because "[it] is not an independent cause of action." *Colite Int 'l Inc. v. Robert L. Lipton, Inc.,* No. 05-cv-60046, 2006 WL 8431505, at* 12 (S.D. Fla. Jan. 20, 2006); *see also Barabe v. Apax Partners Eur. Managers, Ltd.,* 359 F. App'x 82, 84 (11th Cir. 2009) *(per curiam)* (holding that plaintiff's agency claim was not an "independent cause[] of action"). Because the underlying substantive claims against Orbis each fail on the merits, Plaintiff cannot maintain standalone claims for respondeat superior or vicarious liability. *See, e.g., Wilder,* 2018 U.S. Dist. LEXIS 186778, at *14.

*Fifth*, Plaintiff's factual allegations as to Orbis are insufficient. The allegations regarding Orbis are conclusory and vague, which are the type of pleadings properly rejected by this Court under *Twombly* and *Iqbal. Twombly,* 550 U.S. at 555; *Iqbal,* 556 U.S. at 678.

*Sixth*, the Amended Complaint is an improper "shotgun pleading" that warrants dismissal with prejudice. *Barmapov v. Amuial,* 986 F .3d 1321,1325-26 (11th Cir. 2021). Plaintiff has already had an opportunity to correct this deficiency and failed to do so. *Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1358 (11th Cir. 2018) ("[W]hat matters is function, not form: the key is whether the plaintiff had fair notice of the defects and a meaningful chance to fix them. If that chance is afforded and the plaintiff fails to remedy the defects, the district court does not abuse its

discretion in dismissing the case with prejudice on shotgun pleading grounds."). Therefore, any further amendment to the Amended Complaint would be futile. *See Corsello v. Lincare, Inc.,* 428 F.3d 1008, 1014 (11th Cir. 2005).

## CONCLUSION

For each of the foregoing independent reasons—lack of personal jurisdiction, insufficient process and service of process, and for failure to state a claim upon which relief can be granted—the Amended Complaint should be dismissed, in its entirety and with prejudice, as to Defendant Orbis Business Intelligence Ltd.

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b), Orbis respectfully requests a hearing on its motion to dismiss because a hearing would benefit the parties and this Court in light of the length of the Amended Complaint, the bases for seeking dismissal, and the number of claims and defendants. Orbis estimates that a hearing on issues relating to it would last one hour.

Dated: August 18, 2022                Respectfully submitted,

*/s/ Enjoliqué Aytch Lett*
ENJOLIQUÉ AYTCH LETT, Esq.
Florida Bar No. 0104881
Email: lette@gtlaw.com
AKIESHA GILCRIST SAINVIL, Esq.
Florida Bar No. 1003260
Email: sainvila@gtlaw.com
**GREENBERG TRAURIG, P.A.**
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717

*Counsel for Defendant*
*Orbis Business Intelligence Ltd.*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on August 18, 2022, I electronically filed the foregoing document with the Clerk of Court using CM/ECF, which will send a Notice of Electronic Filing to counsel of record or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

> */s/ Enjoliqué Aytch Lett*
> ENJOLIQUÉ AYTCH LETT, ESQ.
> Florida Bar No. 0104881
> Email: lette@gtlaw.com

20

260-1

Exhibit A to Orbis Motion to Dismiss:  Declaration of Christopher
Burrows in Support of Defendant Orbis Business Intelligence Ltd.'s
Motion to Dismiss for Insufficient Service of Process and Lack of
Personal Jurisdiction (Aug. 18, 2022)

# **EXHIBIT A**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 2:22-CIV-14102-DMM

DONALD J. TRUMP,

     Plaintiff,

v.

HILLARY R. CLINTON, et al.,

     Defendants.

_____/

**DECLARATION OF CHRISTOPHER BURROWS IN SUPPORT OF DEFENDANT**
**ORBIS BUSINESS INTELLIGENCE LTD.'S MOTION TO DISMISS FOR**
**INSUFFICIENT SERVICE OF PROCESS AND LACK OF PERSONAL JURISDICTION**

I, Christopher Burrows, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am a Director and Joint Founder of Orbis Business Intelligence Ltd. ("Orbis"), a Defendant named in the Amended Complaint filed in the above-referenced action. I have personal knowledge of the matters set forth below, and if called as a witness, could and would competently testify with respect thereto. I make this Declaration in support of Orbis' motion to dismiss this action for insufficient service of process and lack of personal jurisdiction.

2.     I understand that Plaintiff filed a Complaint in this action on March 24, 2022 in the United States District Court for the Southern District of Florida naming Orbis as a defendant to the action. I also understand Plaintiff filed the Amended Complaint thereafter on June 21, 2022.

3.     On July 19 2022, an unidentified individual arrived at Orbis' registered office located at Hopper, Williams and Bell (HWB), Highland House, Mayflower Close, Chandlers Ford, Eastleigh, Hampshire SO53 4AR, UK, and indicated that he wanted to serve some documents. The individual was greeted by an office receptionist. The individual did not indicate what the documents pertained to.

CASE NO. 2:22-CIV-14102-DMM

4.      The receptionist informed the individual that she was not authorized to accept service of any documents, and that the persons authorized to accept service—Richard Hurst and Christopher Wignall, were unavailable.

5.      The individual dropped the documents on the floor of Orbis' registered office and exited the premises.

6.      To date, the documents in question were never served on those registered and authorized to accept service for Orbis.

7.      I understand that the Amended Complaint filed in this action alleges that Orbis was involved in the creation and production of a series of reports, referred to in the Amended Complaint as the "Steele Dossier." According to the Amended Complaint, such alleged conduct "arise[s] out of or relate[s] to [Orbis'] conduct in and/or affecting, among other jurisdictions, Florida." [*See* DE 177, ¶ 32].

8.      However, no acts involving or relating to the creation of the dossier occurred in Florida.

9.      Orbis has no offices, no employees, and no business representatives in Florida. Orbis does not conduct, engage in, or carry on any business or business venture in Florida, and it is not authorized or registered to carry on any business in Florida. Orbis pays no taxes in Florida.

10.      Orbis is a private limited company formed under the laws of England that specializes in corporate intelligence consultancy. Orbis was incorporated on March 16, 2009 in London, England. Orbis' sole place of business is in London, England.

11.      Orbis' business is generated by personal contacts and referrals, which takes place in the United Kingdom—not in the United States.

CASE NO. 2:22-CIV-14102-DMM

12.    Orbis owns no real or other property in Florida nor leases any real property in Florida.

13.    Orbis does not have a mailing address, telephone number, or bank account in Florida.

14.    Orbis does not advertise or conduct marketing in Florida, nor does it target Florida in any way with respect to any advertising or marketing, whether online or otherwise.

15.    Orbis does not provide any services in or to Florida, and does not derive any revenue or otherwise receive any income or proceeds from any services in or to Florida.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on this 18th day of August, 2022, in London, England.

_____

Christopher Burrows

260-2

Exhibit B to Orbis Motion to Dismiss:  Summons in a Civil Action
(Aug. 18, 2022)

# EXHIBIT B

# SUMMARY OF THE DOCUMENT TO BE SERVED
## ÉLÉMENTS ESSENTIELS DE L'ACTE

**Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, signed at The Hague, the 15th of November 1965 (Article 5, fourth paragraph).**

Convention relative à la signification et à la notification à l'étranger des actes judiciaires ou extrajudiciaires en matière civile ou commerciale, signée à La Haye le 15 novembre 1965 (article 5, alinéa 4).

| | |
|---|---|
| **Name and address of the requesting authority:** <br> Nom et adresse de l'autorité requérante : | L. Celeste Ingalls <br> Crowe Foreign Services <br> 733 SW Vista Avenue <br> Portland, Oregon 97205 <br> USA |
| **Particulars of the parties\*:** <br> Identité des parties\* : | PLAINTIFF: Donald J. Trump, 45th President of the United States <br> DEFENDANTS: Hillary R. Clinton, et al <br> **Case No. 22cv14102-DMM** |

\* If appropriate, identity and address of the person interested in the transmission of the document
S'il y a lieu, identité et adresse de la personne intéressée à la transmission de l'acte

☒ **JUDICIAL DOCUMENT\*\***
   **ACTE JUDICIAIRE\*\***

| | |
|---|---|
| **Nature and purpose of the document:** <br> Nature et objet de l'acte : | To give notice to Orbis Business Intelligence Limited of a claim for civil damages |
| **Nature and purpose of the proceedings and, when appropriate, the amount in dispute:** <br> Nature et objet de l'instance, le cas échéant, le montant du litige : | Claims include that the defendants' actions are violations of the RICO Act, Injurious falsehoods and malicious prosecution. Plaintiff seeks damages in an amount to be determined |
| **Date and Place for entering appearance\*\*:** <br> Date et lieu de la comparution\*\* : | Paul G. Rogers Federal Building/US Courthouse <br> 701 Clematis Street, Room 257 <br> West Palm Beach, Florida 33401 (see below) |
| **Court which has given judgment\*\*:** <br> Juridiction qui a rendu la décision\*\* : | N/A |
| **Date of judgment\*\*:** <br> Date de la décision\*\* : | N/A |
| **Time limits stated in the document\*\*:** <br> Indication des délais figurant dans l'acte\*\* : | Defendant is required to serve an ANSWER upon Plaintiff's attorney and file same with the Court within 21 days after receipt of summons |

\*\* if appropriate / s'il y a lieu

☐ **EXTRAJUDICIAL DOCUMENT\*\***
   **ACTE EXTRAJUDICIAIRE\*\***

| | |
|---|---|
| **Nature and purpose of the document:** <br> Nature et objet de l'acte : | N/A |
| **Time-limits stated in the document\*\*:** <br> Indication des délais figurant dans l'acte\*\* : | N/A |

\*\* if appropriate / s'il y a lieu

# WARNING
## AVERTISSEMENT

**Identity and address of the addressee**
Identité et adresse du destinataire
Orbis Business Intelligence Limited
Hwb Highland House Mayflower Close
Chandlers Ford
Eastleigh, Hampshire SO53 4AR

Case No.  22cv14102-DMM

### IMPORTANT

THE ENCLOSED DOCUMENT IS OF A LEGAL NATURE AND MAY AFFECT YOUR RIGHTS AND
OBLIGATIONS. THE 'SUMMARY OF THE DOCUMENT TO BE SERVED' WILL GIVE YOU SOME
INFORMATION ABOUT ITS NATURE AND PURPOSE. YOU SHOULD HOWEVER READ THE
DOCUMENT ITSELF CAREFULLY. IT MAY BE NECESSARY TO SEEK LEGAL ADVICE.

IF YOUR FINANCIAL RESOURCES ARE INSUFFICIENT YOU SHOULD SEEK INFORMATION ON
THE POSSIBILITY OF OBTAINING LEGAL AID OR ADVICE EITHER IN THE COUNTRY WHERE
YOU LIVE OR IN THE COUNTRY WHERE THE DOCUMENT WAS ISSUED.

ENQUIRIES ABOUT THE AVAILABILITY OF LEGAL AID OR ADVICE IN THE COUNTRY WHERE
THE DOCUMENT WAS ISSUED MAY BE DIRECTED TO:

### TRÈS IMPORTANT

LE DOCUMENT CI-JOINT EST DE NATURE JURIDIQUE ET PEUT AFFECTER VOS DROITS ET OBLIGATIONS.
LES « ÉLÉMENTS ESSENTIELS DE L'ACTE » VOUS DONNENT QUELQUES INFORMATIONS SUR SA NATURE
ET SON OBJET. IL EST TOUTEFOIS INDISPENSABLE DE LIRE ATTENTIVEMENT LE TEXTE MÊME DU
DOCUMENT. IL PEUT ÊTRE NÉCESSAIRE DE DEMANDER UN AVIS JURIDIQUE.

SI VOS RESSOURCES SONT INSUFFISANTES, RENSEIGNEZ-VOUS SUR LA POSSIBILITÉ D'OBTENIR
L'ASSISTANCE JUDICIAIRE ET LA CONSULTATION JURIDIQUE, SOIT DANS VOTRE PAYS, SOIT DANS LE
PAYS D'ORIGINE DU DOCUMENT.

LES DEMANDES DE RENSEIGNEMENTS SUR LES POSSIBILITÉS D'OBTENIR L'ASSISTANCE JUDICIAIRE OU
LA CONSULTATION JURIDIQUE DANS LE PAYS D'ORIGINE DU DOCUMENT PEUVENT ÊTRE ADRESSÉES À :

Dade County Bar Association - Lawyer Referral Service
123 NW 1st Avenue
Miami, FL 33128

Telephone: (305) 371-2220

It is recommended that the standard terms in the notice be written in English and French and
where appropriate also in the official language, or in one of the official languages of the State in
which the document originated. The blanks could be completed either in the language of the
State to which the document is to be sent, or in English or French.

Il est recommandé que les mentions imprimées dans cette note soient rédigées en langue française et en langue
anglaise et le cas échéant, en outre, dans la langue ou l'une des langues officielles de l'État d'origine de l'acte. Les
blancs pourraient être remplis, soit dans la langue de l'État où le document doit être adressé, soit en langue
française, soit en langue anglaise.

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

DONALD J. TRUMP, 45th PRESIDENT
OF THE UNITED STATES

)
)
)
)
)
*Plaintiff(s)*   )
v.   )      Civil Action No. 22cv14102-DMM
HILLARY R. CLINTON, et al.,   )
)
)
)
)
*Defendant(s)*   )

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* ORBIS BUSINESS INTELLIGANCE, LTD
Palm Hall Cl,
Winchester SO23, United Kingdom

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Peter Ticktin, Esquire
The Ticktin Law Group
270 SW Natura Avenue
Deerfield Beach, Florida 33441

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date: _____ Mar 24, 2022 _____

*Select Courthouse*



**SUMMONS**

s/ Ahlai Israel

Deputy Clerk
U.S. District Courts

Angela E. Noble
Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.

DONALD J. TRUMP,

Plaintiff,

v.

HILLARY R. CLINTON, HFACC, INC.,
DEMOCRATIC NATIONAL COMMITTEE,
DNC SERVICES CORPORATION, PERKINS
COIE, LLC, MICHAEL SUSSMANN, MARC
ELIAS, DEBBIE WASSERMAN SCHULTZ,
CHARLES HALLIDAY DOLAN, JR., JAKE
SULLIVAN, JOHN PODESTA, ROBERT E.
MOOK, PHILLIPE REINES, FUSION GPS,
GLENN SIMPSON, PETER FRITSCH,
NELLIE OHR, BRUCE OHR, ORBIS
BUSINESS INTELLIGENCE, LTD.,
CHRISTOPHER STEELE, IGOR DANCHENKO,
NEUSTAR, INC., RODNEY JOFFE, JAMES
COMEY, PETER STRZOK, LISA PAGE,
KEVIN CLINESMITH, ANDREW MCCABE,
JOHN DOES 1 THROUGH 10 (said names
being fictious and unknown persons), and
ABC CORPORATIONS 1 THROUGH 10 (said
names being fictitious and unknown entities),

Defendants.
_____/

## COMPLAINT FOR DAMAGES AND DEMAND FOR TRIAL BY JURY

The Plaintiff, Donald J. Trump, by and through his undersigned counsel, hereby serves his

suit against the Defendants, Hillary R. Clinton, HFACC, Inc., the Democratic National Committee,

DNC Services Corporation, Perkins Coie, LLC, Michael Sussmann, Marc Elias, Debbie

Wasserman Schultz, Charles Halliday Dolan, Jr., Jake Sullivan, John Podesta, Robert E. Mook,

1

Phillipe Reines, Fusion GPS, Glenn Simpson, Peter Fritsch, Nellie Ohr, Bruce Ohr, Orbis Business

Intelligence, Ltd., Christopher Steele, Igor Danchenko, Neustar, Inc., Rodney Joffe, James Comey,

Peter Strzok, Lisa Page, Kevin Clinesmith, Andrew McCabe, John Does 1 through 10 (said names

being fictious and unknown persons), and ABC Corporations 1 through 10 (said names being

fictitious and unknown entities) and alleges as follows:

**Introduction**

1.      In the run-up to the 2016 Presidential Election, Hillary Clinton and her cohorts

orchestrated an unthinkable plot – one that shocks the conscience and is an affront to this nation's

democracy.  Acting in concert, the Defendants maliciously conspired to weave a false narrative

that their Republican opponent, Donald J. Trump, was colluding with a hostile foreign sovereignty.

The actions taken in furtherance of their scheme—falsifying evidence, deceiving law enforcement,

and exploiting access to highly-sensitive data sources - are so outrageous, subversive and

incendiary that even the events of Watergate pale in comparison.

2.      Under the guise of 'opposition research,' 'data analytics,' and other political

stratagems, the Defendants nefariously sought to sway the public's trust.  They worked together

with a single, self-serving purpose: to vilify Donald J. Trump.  Indeed, their far-reaching

conspiracy was designed to cripple Trump's bid for presidency by fabricating a scandal that would

be used to trigger an unfounded federal investigation and ignite a media frenzy.

3.      The scheme was conceived, coordinated and carried out by top-level officials at the

Clinton Campaign and the DNC—including 'the candidate' herself—who attempted to shield her

involvement behind a wall of third parties.[1]  To start, the Clinton Campaign and the DNC enlisted

the assistance of their shared counsel, Perkins Coie, a law firm with deep Democrat ties, in the

---

[1] U.S. Dep't of Justice, Office of the Inspector General, Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation at 96 (2019) (hereinafter "IG Report").

2

hopes of obscuring their actions under the veil of attorney-client privilege.  Perkins Coie was tasked with spearheading the scheme to find—or fabricate—proof of a sinister link between Donald J. Trump and Russia.  To do so, Perkins Coie launched parallel operations: on one front, Perkins Coie partner Marc Elias led an effort to produce spurious 'opposition research' claiming to reveal illicit ties between the Trump Campaign and Russian operatives; on a separate front, Perkins Coie partner Michael Sussmann headed a campaign to develop misleading evidence of a bogus 'back channel' connection between e-mail servers at Trump Tower and a Russian-owned bank.

4.      Marc Elias, in his mission to obtain derogatory anti-Trump 'opposition research,' commissioned Fusion GPS, an investigative firm, and its co-founders, Peter Fritsch and Glenn Simpson, and directed them to dredge up evidence—actual or otherwise—of collusion between Trump and Russia.  Fritsch and Simpson, in turn, enlisted the assistance of Orbis Ltd. and its owner, Christopher Steele, to produce a series of reports purporting to contain proof of the supposed collusion.  Of course, the now fully debunked collection of reports, known as the "Steele Dossier," was riddled with misstatements, misrepresentations and, most of all, flat out lies.  In truth, the Steele Dossier was largely based upon information provided to Steele by his primary sub-source, Igor Danchenko, who was subsequently indicted for falsifying his claims.  Even more damning, Danchenko had close ties to senior Clinton Campaign official, Charles Halliday Dolan, Jr., who knowingly provided false information to Danchenko, who relayed it to Steele, who reported it in the Steele Dossier and eagerly fed the deceptions to both the media and the FBI.  This duplicitous arrangement existed for a singular self-serving purpose – to discredit Donald J. Trump and his campaign.

5.      At the same time, Michael Sussmann, in his hunt for damaging intel against the

Trump Campaign, turned to Neustar, Inc., an information technology company, and one of its top executives, Rodney Joffe, a fervent anti-Trumper who had recently been promised a high-ranking position with the Clinton Administration, to exploit their access to non-public data in search of a secret "back channel" connection between Trump Tower and Alfa Bank.  When it was discovered that no such channel existed, the Defendants resorted to truly subversive measures – hacking servers at Trump Tower, Trump's private apartment, and, most alarmingly, the *White House*.  This ill-gotten data was then manipulated to create a misleading "inference" and submitted to law enforcement in an effort to falsely implicate Donald J. Trump and his campaign.[2]  All of these acts were carried out in coordination with the Clinton Campaign and the DNC, at the behest of certain Democratic "VIPs."[3]

6.     While their multi-pronged attack was underway, the Defendants seized on the opportunity to publicly malign Donald J. Trump by instigating a full-blown media frenzy.  Indeed, the Clinton Campaign and DNC—admittedly on a "mission" to "raise the alarm" about their contrived Trump-Russia link[4]—repeatedly fed disinformation to the media and shamelessly promoted their false narratives.  All the while, Hillary Clinton, Jake Sullivan, Debbie Wasserman Schultz, and others did their best to proliferate the spread of those dubious and false claims through press releases, social media, and other public statements.

7.     The fallout from the Defendants' actions was not limited to the public denigration of Trump and his campaign.   The Federal Bureau of Investigation (FBI)—relying on the Defendants' fraudulent evidence—commenced a large-scale investigation and expended precious

---

[2] Indictment at ¶ 23 (ECF Doc. No. 1), *United States v. Sussmannn*, case no. 1:21-cr-00582-CRC, District of Columbia (Sept. 16, 2021) (hereinafter the "Sussmann Indictment").

[3] *Id.* ¶ 10.

[4] Jennifer Palmieri (former Clinton Campaign Communications Director), *The Clinton campaign warned you about Russia. But nobody listened to us.*, The Washington Post, March 24, 2017.

4

time, resources and taxpayer dollars looking into the spurious allegation that the Trump Campaign had colluded with the Russian Government to interfere in the 2016 presidential election. The effects of this unfounded investigation were prolonged and exacerbated by the presence of a small faction of Clinton loyalists who were well-positioned within the Department of Justice and the FBI – James Comey, Andrew McCabe, Peter Strzok, Lisa Page, Kevin Clinesmith, and Bruce Ohr. These government officials were willing to abuse their positions of public trust to advance the baseless probe to new levels, including obtaining an extrajudicial FISA warrant and instigating the commencement of an oversight investigation headed by Special Counsel Robert Mueller. As a result, Donald J. Trump and his campaign were forced to expend tens of millions of dollars in legal fees to defend against these contrived and unwarranted proceedings. Justice would ultimately prevail – following a two-year investigation, Special Counsel Mueller went on to exonerate Donald J. Trump and his campaign with his finding that there was no evidence of collusion with Russia.

8.      The full extent of the Defendants' wrongdoing has been steadily and gradually exposed by Special Counsel John Durham, who has been heading a DOJ investigation into the origins of the Trump-Russia conspiracy. To date, he has already issued indictments to Sussmann and Danchenko, among others, for proffering false statements to law enforcement officials. As outlined below, these 'speaking' indictments not only implicate many of the Defendants named herein but also provide a great deal of insight into the inner-workings of the Defendants' conspiratorial enterprise. Based on recent developments and the overall direction of Durham's investigation, it seems all but certain that additional indictments are forthcoming.

9.      In short, the Defendants, blinded by political ambition, orchestrated a malicious conspiracy to disseminate patently false and injurious information about Donald J. Trump and his campaign, all in the hopes of destroying his life, his political career and rigging the 2016

Case 2:22-cv-14102-DMM   Document 260-2   Entered on FLSD Docket 08/18/2022   Page 10 of
114
Case 2:22-cv-14102-XXXX   Document 1   Entered on FLSD Docket 03/24/2022   Page 6 of 108

Presidential Election in favor of Hillary Clinton. When their gambit failed, and Donald J. Trump

was elected, the Defendants' efforts continued unabated, merely shifting their focus to

undermining his presidential administration. Worse still, the Defendants continue to spread their

vicious lies to this day as they unabashedly publicize their thoroughly debunked falsehoods in an

effort to ensure that he will never be elected again. The deception, malice, and treachery

perpetrated by the Defendants has caused significant harm to the American people, and to the

Plaintiff, Donald J. Trump, and they must be held accountable for their heinous acts.

## Jurisdiction and Venue

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that

claims which arise under the laws of the United States, and this court has supplemental jurisdiction

of the additional claims pursuant to 28 U.S.C. § 1367(a) as they all are so related to the federal

questions that they form part of the same case or controversy.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because at least

one Defendant and the Plaintiff reside in this District and a substantial part of the events or

omissions giving rise to the Plaintiffs' claims occurred in this District. In this regard, the

publications of injurious falsehoods were intended to occur in the Southern District of Florida, and

they did occur in the Southern District of Florida.

## The Parties

12.     The Plaintiff, Donald J. Trump, the 45th President of the United States of America,

is a private citizen who is *sui juris* and he resides in the State of Florida in the Southern District of

Florida.

13.     The Defendant, Hillary R. Clinton (hereinafter "Clinton"), is a resident of the State

of New York and is *sui juris.* She was the Democratic nominee for the 2016 Presidential Election.

Clinton's acts and omissions as identified in this lawsuit arise out of or relate to her conduct in

6

Case 2:22-cv-14102-DMM   Document 260-2   Entered on FLSD Docket 08/18/2022   Page 11 of
114
Case 2:22-cv-14102-XXXX   Document 1   Entered on FLSD Docket 03/24/2022   Page 7 of 108

and/or affecting, among other jurisdictions, Florida.

14.     The Defendant, HFACC, Inc. (hereinafter the "Clinton Campaign"), is a corporation with its principal place of business in New York and doing business all over the United States, including in the Southern District of Florida. The Clinton Campaign's acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida.

15.     The Defendant, the Democratic National Committee is a national committee, as defined by 52 U.S.C. § 30101, with its principal place of business in Washington, D.C. The Democratic National Committee is registered with the FEC as the DNC Services Corp./Dem. Services Corp, and it operates through the Defendant, the DNC Services Corporation. In turn, the DNC Services Corporation is a District of Columbia not-for-profit corporation, with its principal place of business in Washington, D.C. The Democratic National Committee undertakes most of its business and financial activities through the DNC Services Corporation (hereinafter, the Democratic National Committee and the DNC Services Corporation are collectively referred to as the "DNC"). The DNC operates and conducts substantial and continuous business in the State of Florida. The DNC's acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida.

16.     The Defendant, Perkins Coie, LLP (hereinafter "Perkins Coie"), is an international law firm with its headquarters in Seattle, Washington. Perkins Coie has a registered agent in Tallahassee, Florida, and does substantial, continuous business in Florida generally and in the Southern District of Florida specifically. Perkins Coie's acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida.

17.     The Defendant, Michael Sussmann (hereinafter "Sussmann"), is a resident of

7

Case 2:22-cv-14102-DMM   Document 260-2   Entered on FLSD Docket 08/18/2022   Page 12 of
114
Case 2:22-cv-14102-XXXX   Document 1   Entered on FLSD Docket 03/24/2022   Page 8 of 108

United States, and is *sui juris*. He is an attorney and a former agent and/or employee of Perkins

Coie and, at all relevant times herein, was acting within the scope of his employment with Perkins

Coie. Sussmann's acts and omissions as identified in this lawsuit arise out of or relate to his

conduct in and/or affecting, among other jurisdictions, Florida.

18.   The Defendant, Debbie Wasserman Schultz (hereinafter "Schultz") is a resident of

the State of Florida and is *sui juris*. She served as Chairperson of the DNC from May 2011 until

the date of her resignation on July 28, 2016. Schultz's acts and omissions as identified in this

lawsuit arise out of or relate to her conduct in and/or affecting, among other jurisdictions, Florida.

19.   The Defendant, Charles Halliday Dolan, Jr. (hereinafter "Dolan"), is a resident of

the United States, and is *sui juris*. With respect to the 2016 Clinton Campaign, Dolan actively

campaigned and participated in calls and events as a volunteer on behalf of Hillary Clinton.

Dolan's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or

affecting, among other jurisdictions, Florida.

20.   The Defendant, Jake Sullivan (hereinafter "Sullivan"), is a resident of the United

States, and is *sui juris*. He was Chief Foreign Policy Advisory for the 2016 Clinton Campaign

and, at all relevant times herein, was acting within the scope of his employment with the Clinton

Campaign. Currently, Sullivan is serving as National Security Advisor for the Biden

Administration. Sullivan's acts and omissions as identified in this lawsuit arise out of or relate to

his conduct in and/or affecting, among other jurisdictions, Florida.

21.   The Defendant, John Podesta (hereinafter "Podesta"), is a resident of the United

States, and is *sui juris*. He was Chairman for the 2016 Clinton Campaign and, at all relevant times

herein, was acting within the scope of his employment with the Clinton Campaign. Podesta's acts

and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting,

8

among other jurisdictions, Florida.

22.     The Defendant, Robert E. Mook (hereinafter "Mook"), is a resident of the United States and served as the campaign manager for the 2016 Clinton Campaign. At all relevant times herein, was acting within the scope of his employment with the Clinton Campaign. Mook's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting among other jurisdictions, Florida.

23.     The Defendant, Phillipe Reines (hereinafter "Reines"), is a resident of the United States, and is *sui juris*. He served as a long-time former communications advisor to Hillary Clinton and, at all relevant times herein, was acting within the scope of his employment with the Clinton Campaign. Reines' acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting among other jurisdictions, Florida.

24.     The Defendant, Marc Elias (hereinafter "Elias"), is a resident of Washington D.C. and is *sui juris*. He is an attorney and a former employee and/or agent of Perkins Coie, the DNC and the Clinton Campaign and, at all relevant times herein, was acting within the scope of his employment and/or agency of Perkins Coie. Elias's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

25.     The Defendant, Fusion GPS, is a Delaware limited liability company which represents that it provides research, strategic intelligence, and due diligence services to corporations, law firms, and investors worldwide, and is headquartered in Washington D.C. Fusion GPS's acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida.

26.     The Defendant, Glenn Simpson (hereinafter "Simpson"), is a principal and co-founder of Fusion GPS, is a resident of the United States, and is *sui juris*. Simpson's acts and

Case 2:22-cv-14102-DMM   Document 260-2   Entered on FLSD Docket 08/18/2022   Page 14 of
114
Case 2:22-cv-14102-XXXX   Document 1   Entered on FLSD Docket 03/24/2022   Page 10 of 108

omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

27.     The Defendant, Peter Fritsch (hereinafter "Fritsch"), is a principal and co-founder of Fusion GPS, is a resident of Florida, and is *sui juris*. Fritsch's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

28.     The Defendant, Nellie Ohr (hereinafter "Mrs. Ohr"), is a resident of the United States, and is *sui juris*. At all relevant times, she was an employee of Fusion GPS and was acting within the scope of her employment with Fusion GPS. Mrs. Ohr's acts and omissions as identified in this lawsuit arise out of or relate to her conduct in and/or affecting, among other jurisdictions, Florida.

29.     The Defendant, Bruce Ohr (hereinafter "Mr. Ohr"), is a resident of the United States, and is *sui juris*. At all relevant times, Bruce Ohr was a United States Department of Justice official. Mr. Ohr's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

30.     The Defendant, Orbis Business Intelligence Ltd. (hereinafter "Orbis Ltd."), is a London, England-based intelligence consultancy firm. Orbis Ltd.'s acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida.

31.     The Defendant, Christopher Steele (hereinafter "Steele"), is a principal and founder of Orbis Ltd., a resident of the United Kingdom, and is *sui juris*. Steele's acts and omissions as identified in this lawsuit were all done in the scope of his employment with Orbis, Ltd., and arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

10

32.     The Defendant, Igor Danchenko (hereinafter "Danchenko"), at all times relevant to this Complaint, was a citizen of the Russian Federation and was lawfully in the United States. Danchenko resided in Washington, D.C. and Virginia and is *sui juris*. At all relevant times, Danchenko was a contractor for Orbis Ltd. and was acting within the scope of his agency with Orbis Ltd. Danchenko's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

33.     The Defendant, Neustar, Inc. (hereinafter "Neustar"), is an information technology company with its headquarters in Sterling, Virginia. Neustar's acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida.

34.     The Defendant, Rodney Joffe (hereinafter "Joffe"), is a resident of the United States, and is *sui juris*. Joffe is a former executive of Neustar and, at all relevant times herein, was acting within the scope of his employment with Neustar. Joffe's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

35.     The Defendant, James Comey (hereinafter "Comey"), is a resident of the United States, and is *sui juris*. Comey was the 7th Director of the Federal Bureau of Investigation from 2013 to May 2017. Comey's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

36.     The Defendant, Peter Strzok (hereinafter "Strzok"), is a resident of the United States, and is *sui juris*. At all relevant times, Strzok was an agent of the Federal Bureau of Investigation. Strzok's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida .

11

Case 2:22-cv-14102-DMM   Document 260-2   Entered on FLSD Docket 08/18/2022   Page 16 of
114
Case 2:22-cv-14102-XXXX   Document 1   Entered on FLSD Docket 03/24/2022   Page 12 of 108

37.     The Defendant, Lisa Page (hereinafter "Mrs. Page"), is a resident of the United States, and is *sui juris.* At all relevant times Mrs. Page was an attorney for the Federal Bureau of Investigation.  Mrs. Page's acts and omissions as identified in this lawsuit arise out of or relate to her conduct in and/or affecting, among other jurisdictions, Florida .

38.     The Defendant, Kevin Clinesmith (hereinafter "Clinesmith"), is a resident of the United States, and is *sui juris.* At all relevant times, Clinesmith was an attorney for the Federal Bureau of Investigation. Clinesmith's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida .

39.     The Defendant, Andrew McCabe (hereinafter, "McCabe"), is a resident of the United States, and is *sui juris.* McCabe was the Deputy Director of the Federal Bureau of Investigation from 2016 to March of 2018.  McCabe's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida

40.     The Defendants, John Does 1 through 10, are individuals whose identities are presently unknown to the Plaintiff, including, but not limited to, journalists, publishers, editors, investigators, state or federal officials, co-conspirators, officers, employees, agents, managers, owners, principals and/or other duly authorized individuals who caused or contributed to the incident or incidents for which the Plaintiff seeks damages, and/or are vicariously and/or otherwise liable for the acts, commissions, or other culpable conduct of those who did cause or contribute to the incidents alleged.

41.     The Defendants, ABC Corporations 1 through 10, are corporate entities presently unidentifiable to the Plaintiff, including, but not limited to, media companies, publication companies, editorial companies, municipalities, state or federal agencies, law enforcement authorities, investigative agencies, political organizations, political affiliates, private firms and/or

12

Case 2:22-cv-14102-DMM   Document 260-2   Entered on FLSD Docket 08/18/2022   Page 17 of
114
Case 2:22-cv-14102-XXXX   Document 1   Entered on FLSD Docket 03/24/2022   Page 13 of 108

other duly authorized corporate or governmental entities who caused or contributed to the incident

or incidents for which the Plaintiff seeks damages, and/or are vicariously and/or otherwise liable

for the acts, commissions, or other culpable conduct of those who did cause or contribute to the

incidents alleged.

### **Statement of Facts**

**The DNC and the Clinton Campaign
Become One**

42.     On April 12, 2015, Clinton declared her candidacy for President of the United

States.  Clinton sought the nomination of the Democratic Party.

43.     Shortly thereafter, in April 2015, the Clinton Campaign retained Perkins Coie, a

law firm with longstanding ties to the Democratic Party, as its general counsel.[5]

44.     It was clear from the early days of the Democratic primaries that the DNC—which

according to its own rules, is required to "maintain impartiality and evenhandedness" during the

Democratic Primary nominating process—was backing Clinton and favored her as the preferred

Democratic nominee.[6]

45.     For example, in a confidential, inter-office DNC memorandum dated May 26, 2015

(the "DNC Memo"), which only came to light after the DNC servers were hacked by an individual

using the name "Guccifer 2.0," it was noted that the DNC sought to "provide a contrast between

the GOP field and HRC" and that it would "[u]se specific hits to muddy the waters around ethics,

transparency and campaign finance attacks on HRC."[7]

46.     Notably, the DNC Memo also stated that, in order to "muddy the waters" around

---

[5] Indictment at ¶ 10.
[6] DNC Charter and Bylaws, Art.  5 § 4.
[7] Complaint, Ex.  A (ECF Doc.  No. 8), *Wilding v.  DNC Services Corp., et al.*, case no.  0:16-cv-61511-WJZ,
Southern District of Florida (July 13, 2016).

Clinton's perceived vulnerabilities as a candidate, the DNC had outlined a plan to "damage Republican presidential candidates' credibility with voters by looking for targeted opportunities to undermine their specific messaging." The DNC Memo also discussed "opposition research" and a strategy to "utilize the research to place highly targeted hits" against Republican candidates.[8]

47.     Around that same time, as later disclosed through a WikiLeaks release of confidential DNC documents, Schultz, the head of the DNC, stated in an e-mail that Clinton's Democratic competitor, Bernie Sanders, "isn't going to be president."

48.     Furthermore, Donna Brazile, then vice-chair of the DNC, said in criticism of Schultz: "She hadn't been very interested in controlling the party – she let Clinton's headquarters in Brooklyn do as it desired so she didn't have to inform the party officers how bad the situation was."

49.     In or around mid-2015, in an effort to foster greater coordination and cohesion with Clinton and the Clinton Campaign, the DNC retained the same law firm, Perkins Coie, to serve as its general counsel.

50.     Two of Perkins Coie's senior partners, Elias and Sussmann, were largely responsible for handling the firm's representation of the DNC and the Clinton Campaign in their legal, political, and other affairs. Elias, in particular, was designated as "General Counsel" for both the DNC and the Clinton Campaign.

51.     In or around August 2015, Elias and Sussmann negotiated a Joint Fund-Raising Agreement between their two clients, the DNC and the Clinton Campaign.

52.     The Joint Fund-Raising Agreement was nothing more than a thinly veiled effort to align the interests and operations of the DNC and the Clinton Campaign by giving the Clinton

---

[8] *Id.*

Case 2:22-cv-14102-DMM   Document 260-2   Entered on FLSD Docket 08/18/2022   Page 19 of
114
Case 2:22-cv-14102-XXXX   Document 1   Entered on FLSD Docket 03/24/2022   Page 15 of 108

Campaign control over the DNC, an organization that was supposed to remain impartial.

53.     Specifically, the Joint Fund-Raising Agreement—which was entered into months before Clinton won the Democratic nomination—specified that, in exchange for raising money and investing in the DNC, the Clinton Campaign would control the DNC's finances, strategy, and all the money raised.   Her campaign had the right of refusal on who would be the party communications director, and it would make final decisions on all the other staff.   The DNC also was required to consult with the campaign about all other staffing, budgeting, data, analytics, and mailings.[9]

54.     Given the intimate ties between the DNC and the Clinton Campaign, and the amount of control that Clinton exerted over both, it was clear that the organizations' interests were aligned and they shared a common purpose: get Clinton elected President by any means necessary.

**The Clinton Campaign and DNC Conspire**
**With Their Attorneys, Perkins Coie, to Frame**
**Republican Candidate Donald J. Trump**

55.     On June 16, 2015, Donald J. Trump announced his candidacy for President and sought the Republican nomination.

56.     Seeking to thwart Trump's campaign and to diminish the likelihood of him winning the election, the Clinton Campaign and the DNC devised a nefarious scheme to discredit, delegitimize and defame him by proliferating a false narrative that Donald J. Trump and his campaign were actively colluding with Russia to interfere in the 2016 Presidential Election.

57.     This plot was conceived and funded by Clinton, the Clinton Campaign, and DNC and would require the participation, cooperation and assistance of many individuals and entities acting in concert with one another to willfully carry out numerous tortious and criminal acts.   The

---

[9] Donna Brazile, *Hacks: The Inside Story of the Break-ins and Breakdowns that Put Donald Trump in the White House*, November 7, 2017.

Defendants had a meeting of minds and a common objective: to irreparably harm Trump's ability to get elected and to end his political career.

58.     To start, the Clinton Campaign and the DNC enlisted the assistance of their joint attorneys, Perkins Coie.

59.     The Clinton Campaign and the DNC chose Perkins Coie to oversee and coordinate their plan for a specific purpose – they anticipated that conspiring with their legal counsel would help conceal their dealings under the shroud of attorney-client privilege.  However, attorney-client privilege is wholly inapplicable to the pertinent discussions between these parties – not only were the communications between the DNC/Clinton Campaign and Perkins Coie non-legal in nature, they were also in furtherance of criminal and fraudulent wrongdoing.

60.     Specifically, the Clinton Campaign and the DNC directed Perkins Coie to coordinate a two-pronged plan to publicly and falsely denigrate Donald J. Trump, with Elias and Sussmann each leading parallel operations to wrongly implicate him as colluding with Russia.

61.     On one front, Elias would work with Fusion GPS and a host of others to develop a dossier, based on lies and misinformation purporting to show an incriminating link between Trump and Russia, which would be used to mislead law enforcement officials and ignite a media frenzy.

62.     On a separate front, Sussmann would commission the information technology company, Neustar, to brazenly hack servers from highly-sensitive locations—including Donald J. Trump's private residence, Trump Tower, and, most shockingly, the White House—to uncover proprietary data that could then be manipulated to give the impression that Trump was engaged in illegitimate business with a Russian bank, Alfa Bank.

**Elias Recruits Fusion GPS and Others
to Manufacture a Falsified Set of
Reports Known as the Steele Dossier**

63.     To effectuate the first phase of the Defendants' conspiracy—involving the creation

of an incriminating dossier—the DNC and the Clinton Campaign would require the services of an

investigative firm to dredge up derogatory 'opposition research' on Donald J. Trump and, to the

extent there was none, to manufacture it.

64.     At all relevant times, Fusion GPS was a private investigative firm specializing in

politics.  It was founded in 2011 by former *Wall Street Journal* employees Glenn Simpson and

Peter Fritsch.[10]

65.     On March 1, 2016, Fritsch sent an e-mail to a "senior figure in the Democratic

Party" and conveyed his belief that Trump "had to be stopped." The Democratic contact responded

by stating "Yes.  Let's talk."[11]

66.     The "senior figure in the Democratic Party" arranged for Fritsch and Simpson to

meet with Elias.  The meeting took place on April 20, 2016, in Washington D.C.[12]

67.     In or around April 2016, on behalf of and at the direction of the Clinton Campaign

and the DNC, Elias and Perkins Coie retained Fusion GPS.

68.     In particular, Fusion GPS was hired to perform 'opposition research' for the Clinton

Campaign and the DNC.

69.     The Clinton Campaign and the DNC were well aware that Fusion GPS had a well-

documented history of employing a 'scorched earth' strategy wherein the company would produce

---

[10] See generally Glenn Simpson and Peter Fritsch, *Crime in Progress: Inside the Steele Dossier and the Fusion GPS Investigation of Donald Trump* (hereinafter "*Crime in Progress*").
[11] Glenn Simpson and Peter Fritsch, *Crime in Progress: Inside the Steele Dossier and the Fusion GPS Investigation of Donald Trump* ("*Crime in Progress*"), p. 55.
[12] *Id.* at 56.

17

Case 2:22-cv-14102-DMM   Document 260-2   Entered on FLSD Docket 08/18/2022   Page 22 of
114
Case 2:22-cv-14102-XXXX   Document 1   Entered on FLSD Docket 03/24/2022   Page 18 of 108

false and/or misleading dossiers to be spread through the media to damage his opportunity to win an election.

70.     The Clinton Campaign, the DNC, Perkins Coie and Fusion GPS each understood that Fusion GPS's true task was to prepare a fraudulent "dossier" that could be used to falsely implicate Donald J. Trump to derail his campaign, ruining his opportunity to be elected and if elected to then interfere with his ability to properly serve as President of the United States by inducing criminal investigations of Donald J. Trump.

71.     The Clinton Campaign and the DNC funneled funds through Perkins Coie to finance Fusion GPS's research.  Fusion GPS would then report to the Perkins Coie attorney, Elias, the results of its "investigation."[13]

72.     In fact, Simpson and Fritsch reported *only* to Elias and did "not have any contact with the campaign brass." [14]

73.     As Fritsch and Simpson recounted in their book, the relationship was set up that way for a specific reason; per Elias, Fusion GPS was walled-off from the Clinton Campaign and the DNC for "legal reasons: If Fusion's communications were with a lawyer, they could be considered privileged and kept confidential."[15]

74.     At or around that time, Nellie Ohr was an employee of Fusion GPS, where her role was to conduct extensive opposition research on Donald J. Trump's family members and campaign aides.

75.     Mrs. Ohr's husband, Bruce Ohr, was an Associate Deputy Attorney General with the DOJ. Mrs. Ohr had also been previously employed with the DOJ.

---

[13] *Id.* at 57.
[14] *Id.*
[15] *Id.*

18

76.     The Clinton Campaign, the DNC, Perkins Coie, and Fusion GPS knew that this close relationship with a high-ranking DOJ official would be of great value in effectuating their plot – they understood that Mr. Ohr would be instrumental in lending credibility to the Steele Dossier by having Mr. Ohr serve as a seemingly trustworthy intermediary to disseminate it through government channels such as the FBI and the DOJ.

77.     To develop the dossier, the Clinton Campaign, the DNC, Perkins Coie and Fusion GPS turned to Orbis Ltd., a private intelligence firm, and its owner, Christopher Steele, a former British intelligence officer.

78.     Orbis Ltd. was chosen to partake in the scheme based on the ties between one of its analysts, Danchenko, and an individual with intimate ties to the Clinton Campaign and one its close associates, Dolan.

   a.   Danchenko, a Russian citizen, had been working as a contractor/analyst with Orbis Ltd. Since 2011, focusing primarily on Russian and Eurasian geo-political matters.[16]

   b.   Dolan, then an employee of public relations firm, Kglobal, was a longtime participant in Democratic politics, having previously served as chairman of the DNC, state chairman of former President Bill Clinton's 1992 and 1996 presidential campaigns, adviser to Clinton's 2008 presidential campaign, and having been appointed by Clinton to two four-year terms on an advisory commission at the U.S. State Department.  With respect to the 2016 Clinton campaign, Dolan actively campaigned and participated in calls and events as a volunteer on behalf of the Clinton Campaign.[17]

---

[16] Danchenko Indictment ¶ 16.
[17] *Id.* ¶ 19.

19

Case 2:22-cv-14102-DMM   Document 260-2   Entered on FLSD Docket 08/18/2022   Page 24 of
114
Case 2:22-cv-14102-XXXX   Document 1   Entered on FLSD Docket 03/24/2022   Page 20 of 108

79.     In late April 2016, Danchenko began having discussions with Dolan about a
potential business collaboration between Orbis Ltd. and Kglobal to create a "dossier" to smear
Donald J. Trump and to disseminate the false accusations to the media. Those discussions reflected
that Danchenko and Dolan had exchanged information regarding each other's backgrounds and
professional activities, including Danchenko's work for Orbis Ltd, and Steele:[18]

    c.   On or about April 29, 2016, Danchenko sent an email to Dolan indicating that
Danchenko had passed a letter to Steele on behalf of Dolan and intended to set up
a meeting between the two.[19]

    d.   That same day, Danchenko sent an email to Dolan outlining certain work that
Danchenko was conducting with Orbis Ltd. The email attached an Orbis Ltd.
Report titled "Intelligence Briefing Note, 'Kompromat' and 'Nadzor' in the
Russian Banking Sector."[20]

    e.   On or about June 10, 2016, Dolan sent an email to a U.S.-based acquaintance
which reflected that Dolan and Danchenko had become colleagues and were
exchanging information. In describing Danchenko, Dolan stated: "He is too young
for KGB. But I think he worked for FSB.[21] Since he told me he spent two years
in Iran. And when I first met him he knew more about me than I did. [winking
emoticon]."

80.     In about June 2016, Fusion GPS officially retained Orbis Ltd. and Steele to find
"links between Russia and the then Republican candidate. . . Donald J. Trump." When no such

---

[18] *Id.* ¶ 23.
[19] Danchenko Indictment ¶ 24.
[20] *Id.* ¶ 25.
[21] The Federal Security Service of the Russian Federation, commonly referred to as the "FSB," is the principal security
agency of Russia and the principal successor agency to the KGB.

20

evidence was found, the directive shifted to manipulating the truth and developing a false narrative that Donald J. Trump was colluding with Russia.[22]

   a.  In taking on this assignment, Steele was aware that "Democratic Party associates" were paying for his and Fusion GPS's "research," and that "the ultimate client" was "the leadership of the Clinton presidential campaign."[23]

   b.  Critically, Steele has testified that "the candidate"—Hillary Clinton—was "aware of [his] reporting."[24]

   c.  Furthermore, Steele shared the common goal of the Defendants' overarching conspiracy: he "was desperate that Donald Trump not get elected" and he "was passionate about [Donald J. Trump] not being president."[25]

81.     Soon thereafter—at the direction of Clinton, the Clinton Campaign, the DNC, Perkins Coie, and Fusion GPS—Orbis Ltd. and Steele, with the assistance of Mook, Nellie Ohr, Danchenko Dolan, and others, began preparing approximately seventeen anti-Trump memoranda known collectively as the "Steele Dossier" or simply the "Dossier."

82.     Just after the Dossier was published, Podesta met Simpson to compare notes on Russia meddling in the election.[26]

83.     Robby Mook, manager of the Clinton Campaign, has denied having knowledge of who funded the Dossier.  However, Elias testified he sent the bills from Fusion GPS to Mook.[27]

---

[22] *Id.*
[23] IG Report at 96; *see also* Tr. of Christopher Steele Deposition at 162-163 (Mar. 18, 2020), *Aven v. Orbis* (2020) EWHC 1812 (QB) ("Q: . . . in early July . . . who did you think the ultimate client was? A: I thought it was the campaign . . . Q: You knew it was the leadership of the Clinton presidential campaign, didn't you? A: I believed it was the campaign, yes. Q: The leadership of the Clinton campaign? A: Fine, the leadership of the campaign.")
[24] FBI Notes at 96; *see also* Tr. of Steele Dep. at 163 (emphasis added).
[25] Bruce Ohr Transcribed Interview 124, Aug. 28, 2918.
[26] https://www.shiftfrequency.com/podesta-illegal-spying-on-trump/
[27] https://townhall.com/tipsheet/mattvespa/2020/05/12/did-hillary-clintons-campaign-manager-know-about-trump-dossier-dem-lawyer-says-he-sent-receipts-n2568625

21

84.     The Dossier was intended to not only harm Trump's candidacy, but more importantly, it was fabricated to induce the FBI to commence an investigation into alleged ties between Russia and Donald J. Trump, the Trump Campaign, and the Trump Organization.

85.     In drafting the Dossier, Steele purported to rely upon numerous sources who contributed information and prevarications to him.

86.     Several of the alleged sources named in the Dossier have refuted, under oath, that they provided any of the purported information contained in the Dossier to Steele:

> d.   Olga Galkina, a Russian citizen who was referenced as "sub-source 3" in the Dossier, stated that she was never a source or sub-source to Steele, and, in fact, never even met him.[28]
>
> e.   Alexey Dundich, a Russian citizen who was referenced as "sub-source 4" in the Dossier, stated that he never was a source of information, and never even met Steele.[29]
>
> f.   Petr Avan, a Russian citizen who was referenced in the Dossier, denies the allegations contained in the Dossier and states that its contents are false.[30]

87.     The primary source for the information provided in the Dossier was Steele's analyst, Danchenko.

88.     From May 2016 through December 2016, Danchenko assembled and provided to Steele purported information that Steele would, in turn, rely upon to draft the Dossier.

89.     During that same time, Danchenko had numerous meetings, communications and

---

[28] Declaration of Olga Aleksandrovna Galkina dated June 8, 2021 (ECF Doc. No. 153-8), *Fridman, et al.  v.  Bean LLC a/k/a Fusion GPS, et al.*, case no. 17-2041-RJL, District of Columbia (June 21, 2021).
[29] Declaration of Alexey Sergeyevich Dundich dated May 13, 2021 (ECF Doc. No. 153-4), *Fridman, et al.  v. Bean LLC a/k/a Fusion GPS, et al.*, case no. 17-2041-RJL, District of Columbia (June 21, 2021).
[30] Witness Statement of Petr Aven dated October 2, 2020, *Aven v. Orbis* (2020) EWHC 1812 (QB).

Case 2:22-cv-14102-DMM   Document 260-2   Entered on FLSD Docket 08/18/2022   Page 27 of
114
Case 2:22-cv-14102-XXXX   Document 1   Entered on FLSD Docket 03/24/2022   Page 23 of 108

interactions with Dolan.

90.     Certain information contained in the Dossier, which Danchenko provided to Steele,

mirrors and/or reflects information that Dolan had conveyed to Danchenko.

91.     For example, an allegation contained in Report 80 of the Dossier, claiming that

Donald J. Trump had previously engaged in "salacious sexual activity" in the Presidential Suite at

a Moscow hotel, was derived from Dolan:

g.  Dolan had stayed at the Moscow hotel in June 2016, and, during that trip, he
    participated in, among other things: 1) a meeting with the general manager of the
    Moscow hotel and a female hotel staff member, (2) a lunch with a Staff Member
    and other members of the Moscow hotel staff and (3) a tour of the Moscow hotel,
    including the Presidential Suite.

h.  Thereafter, Dolan told Danchenko that he learned from a hotel staffer that Trump
    had stayed in the Presidential Suite and engaged in "salacious sexual activity."

i.  References to the Moscow hotel, the Presidential Suite, and a hotel manager and
    other staff would all later appear in the Dossier, which included absurd allegations
    that Trump participated in "sexual or salacious activity."

j.  Dolan ultimately admitted that no one at the hotel mentioned anything to him about
    Trump's supposed "sexual or salacious" activity.

92.     Another allegation, contained in Report 111 of the Dossier, claiming that the

Russian government withdrew a Russian from his job at the Russian Embassy in Washington, D.C.

due to fears relating to the diplomat's purported role in meddling in the U.S. Presidential Election,

had clearly originated from Dolan:

[S]peaking separately to [a] compatriot, a senior Russian [Ministry
of Foreign Affairs] official reported that as a prophylactic measure,

23

> a leading Russia diplomat, [Russian Diplomat-1), had been
> withdrawn from Washington on short notice because Moscow
> feared his heavy involvement in the US presidential election
> operation, including the so-called veterans' pensions ruse (reported
> previously), would be exposed in the media there. His replacement,
> [Russian Diplomat-2] however was clean in this regard.

93.     This allegation bore substantial similarities to information that Dolan received

during the 2016 time period.

94.     Moreover, Dolan was undoubtedly a source for an allegation in the Dossier

regarding Paul Manafort's departure from the Trump Campaign:

> S/he said it was true that the Ukraine corruption revelations had
> played a part in this, but also, several senior players close to
> TRUMP had wanted [Paul Manafort] out, primarily to loosen his
> control on strategy and policy formulation.   Of particular
> importance in this regard was Paul Manafort's] predecessor as
> campaign manager, [Campaign Staff Member-1-], who hated [Paul
> Manafort] personally and remained close to TRUMP with whom
> he discussed the presidential campaign on a regular basis.

95.     The above allegation contained information that Dolan provided to Danchenko is

in response to a specific request. In particular, on August 19, 2016, Danchenko emailed Dolan to

inquire as to any "thought, rumor, or allegation" about Paul Manafort.

96.     Thereinafter, on August 20, 2016, Dolan emailed Danchenko the following:

> I had a drink with a GOP friend of mine who knows some of the
> players and got some of what is in this article, which provides even
> more detail.   She also told me that [Campaign Staff Member-1],
> who hates [Paul Manafort] and still speaks to Trump regularly
> played a role.   He is said to be doing a happy dance over it.

97.     Later that same day, Danchenko replied to Dolan, expressing his appreciation for

the information, adding that their "goals clearly coincided" with respect to gathering derogatory

information about Trump.

98.     Moreover, an allegation contained in an undated Dossier report described a "well-

developed conspiracy of cooperation" between Donald J. Trump, the Trump Campaign, and senior

Russian officials, claiming:

> Speaking in confidence to a compatriot in late July 2016, [Source E], an ethnic Russian close associate of Republican US presidential candidate Donald Trump, admitted that there was a well-developed conspiracy of co-operation between them and the Russian leadership. This was managed on the Trump side by the Republican candidate's Campaign manager, [Paul Manafort], who was using foreign policy advisor, [Carter Page], and others as intermediaries. The two sides had a mutual interest in defeating Democratic presidential candidate Hillary Clinton, whom President PUTIN apparently both hated and feared.

99.     This allegation would ultimately be offered in support of four FISA applications

targeting former Trump Campaign associate Carter Page.

100.    An additional allegation contained in the Dossier indicated that Russian diplomatic

staff in Washington, D.C., New York, and Miami were paying U.S.-based cyber actors to conduct

operations against the Democratic Party and Clinton.

**Sussmann Recruits Neustar to Lead a
Cyberattack Against the Trump Campaign**

101.    While Elias was conspiring with Fusion GPS, Orbis, Steele and others to create the

Dossier, Sussmann—at the direction of the Clinton Campaign and the DNC—was heading another

aspect of the Defendants' conspiracy: a plot to exploit sensitive data sources and falsify evidence

to manufacture ties between Donald J. Trump and a Russian bank.

102.    To put this plan in motion, the Clinton Campaign, DNC, and Perkins Coie required

the assistance of a technology company with the expertise and access to sensitive non-public data

which could be exploited for their nefarious purposes.

103.    At all relevant times, Neustar was an information technology company founded in

1998, which offers various internet-related information, data and analytics services, including

Domain Name System ("DNS") resolution services, to its customers.[31]

104.    Far from apolitical, Neustar and its employees have long been aligned with the Democratic Party.   In 2016 alone, 100% of congressional campaign donations from Neustar employees went to Democrats.

105.    At all relevant times, Joffe was an executive of Neustar and had an ownership interest in at least two additional technology companies, Dissect Cyber Inc.  ("Dissect Cyber") and Zetalytics LLC ("Zetalytics").[32]

106.    Joffe was in communication with high-ranking officials of the Clinton Campaign and/or the DNC in the lead-up to the 2016 Presidential Election.

107.    During that time, Joffe was "tentatively offered the top [cybersecurity] job by the Democrats" in the event Clinton won the presidency.  He stated that he "definitely would not take the job under Trump."[33]

108.    Perkins Coie and Sussmann, in particular, frequently served as outside counsel for Neustar; in this regard, Neustar was a significant source of revenue for Perkins Coie.[34]

109.    In or around July 2016, Perkins Coie and Sussmann, acting on behalf of the Clinton Campaign and the DNC, tasked Neustar, under the direction of its executive, Joffe, to exploit its information gathering services and their access to non-public data to dredge up any information, data or records that could show any wrongdoing by Donald J. Trump, the Trump Campaign or the Trump Organization.

110.    Thereafter, Neustar, led by Joffe, initiated a search for proof of a secret "back

---

[31] Sussmann Indictment ¶ 12.
[32] *Id.; see also* Charlie Savage and Adam Goldman, *Trump Server Myster Produces Fresh Conflict*, The New York Times, September 30, 2021, https://www.nytimes.com/2021/10/01/us/politics/trump-alfa-bank-indictment.html.
[33] *Id.* ¶ 15.
[34] Sussmann Indictment ¶ 14.

26

channel" between Donald J. Trump or the Trump Organization and Alfa Bank; when it became clear that no such back channel existed, Neustar and Joffe shifted their focus to fabricating evidence to invent proof of the supposed "back channel."

111.   On or about August 20, 2016, Joffe and his researchers manipulated a sales form on two different websites, faking the other's email address to make them "appear to communicate with each other. . ."

112.   Joffe believed that this fake "inference" was believable enough that "Hillary's opposition research and whatever professional gov[ernments] and investigative journalists are also digging [would] come up with the same things[.]"

113.   On or about the same date, Joffe clarified in an email that the "task" he had been "given" by Perkins Coie, the Clinton Campaign, and the DNC was "indeed broad" and further stated, in part:

> Being able to provide evidence of *anything* that shows an attempt to behave badly in relation to this, the VIPs would be happy. They're looking for a true story that could be used as the basis for closer examination.

114.   On or about August 21, 2016, Joffe emailed his team of researchers, urging them to push forward with their anti-Trump research, which he claimed would "give the base of a very useful narrative."

115.   In that same e-mail, Joffe admitted that the connection between Trump and Alfa Bank was merely a "red herring" with no factual basis that should be "ignored."

116.   Despite this knowledge, Sussmann and Joffe began to draft, review, and revise a "White Paper" summarizing the allegations—which they knew to be false—of a tie between Donald J. Trump and Alfa Bank.

117.   All the time Sussmann spent drafting his 'white papers,' as with all his time spent

27

working with Neustar, Fusion GPS, and all of his acts in furtherance of the Defendants' conspiracy, were billed to the Clinton Campaign.

118.   On or about August 27, 2016, Joffe sent the white paper, on which Sussmann had been working, to his team with the following comment:

> Please read as if you had no prior knowledge or involvement, and you were handed this document as a security expert (NOT a DNS expert) and were asked: Is this plausible as an explanation?' NOT to be able to say that this is, without doubt, fact, but to merely be plausible.  Do NOT spend more than a short while on this (If you spend more than an hour you have failed the assignment).  Hopefully less.  :)

119.   On or about the same date, one of Joffe's researchers replied, stating that the white paper achieved Joffe's objective, but noting that the paper "smartly" avoided discussing weaknesses or "holes" in the paper's hypothesis.

120.   On or about September 15, 2016, one of the recipients of the question responded to Joffe, stating, in part, that the "paper's conclusion was plausible" in the "narrow scope" defined by Joffe.

121.   On or about September 16, 2016, one of Joffe's team confirmed that Sussmann would convey the false information to the FBI regarding the supposed connection between Donald J. Trump and Alfa Bank, with the plan to deceive.

122.   In addition, in furtherance of his efforts with Sussmann and Elias to disseminate false allegations regarding Trump, Joffe also exploited his access—which he had through multiple companies, including Neustar, Dissect Cyber, and Zetalytics—to unlawfully search, gather and mine internet data, including non-public and proprietary data, to obtain derogatory information on

Donald J. Trump.[35]

    a.   The purpose of obtaining such data was to create an "inference" and "narrative" regarding Trump's purported ties to Russia.[36]

    b.   Those actions were directed by and/or done at the behest of certain "VIPs" of the Clinton Campaign and Perkins Coie.[37]

    c.   Those "VIPs" include Clinton, Sullivan, Elias and/or Sussmann.

123.    Among other things, Neustar, Joffe and their associates—at the direction of Clinton, the Clinton Campaign and the DNC — exploited access to non-public and proprietary internet data, including without limitation, domain name system (DNS) internet traffic, of: (i) a healthcare provider; (ii) Trump Tower; (iii) Donald Trump's private apartment in Central Park West, and (iv) the Executive Office of the President of the United States (EOP).[38]

    k.   In doing so, Joffe and Neustar intentionally accessed, without authorization or in excess of any authorization, the computers, servers, and/or other sensitive data sources at the above-stated facilities.

    l.   Furthermore, Joffe and Neustar stole trade secrets, in the form of proprietary, sensitive and confidential data, information, and knowledge, from the above-stated facilities.

124.    With regard to the EOP, Joffe and Neustar had come to access and maintain dedicated servers for the EOP as part of a highly sensitive arrangement whereby Neustar provided DNS resolution services to the EOP.[39]

---

[35] Sussmann Indictment ¶¶ 21-23; *see also* Motion to Inquire into Potential Conflicts of Interest ¶ 4 (ECF Doc. No. 35), *United States v. Sussmann*, case no. 1:21-cr-00582-CRC, District of Columbia (Feb. 11, 2022) (hereinafter "Sussmann Conflict Motion").

[36] Sussmann Indictment ¶ 23.

[37] *Id.* ¶ 22-23; *see also* Sussmann Conflict Motion ¶¶ 4-5.

[38] *Id.*

[39] *Id.*

125.   Joffe and Neustar exploited this arrangement by, among other things, mining the EOP's DNS traffic and other data for the purpose of gathering derogatory information about Donald J. Trump.

126.   In addition, Joffe, Neustar, and their associates queried their holdings of non-public internet data against a lengthy list of more than 9,000 IP addresses, 3,000 internet domains, and 60 e-mail addresses and domains that related to Donald J. Trump, the Trump Organization, and numerous Trump associates, in their search for derogatory information.

**As the Presidential Race Takes Form,
The Steele Dossier Is Used To
Mislead Federal Law Enforcement**

127.   The Republican National Committee ("RNC") held its presidential nominating convention from July 18 through July 21, 2016, wherein Donald J. Trump was nominated as the Republican Nominee for President of the United States in the 2016 election.

128.   On July 26, 2016, Clinton won the nomination of the Democratic Party to be its presidential candidate for the 2016 Presidential Election.

129.   That very same day, a briefing from the U.S. intelligence community warned that it had intercepted communications concerning the "alleged approval by Hillary Clinton. . . of a proposal from one of her foreign policy advisors to vilify Donald Trump by stirring up a scandal claiming interference by Russian security services."[40]

130.   With the stage set and the election cycle underway, the Defendants put their plan into action.

131.   Specifically, the Defendants began feeding false information to federal law

---

[40] Letter from John Ratcliffe, Dir. of Nat'l Intelligence, to Sen. Lindsey Graham, Chairman, S. Comm. on the Judiciary (Sept. 29, 2020), https://www.judiciary.senate.gov/imo/media/doc/09-29-20_Letter%20to%20Sen.%20 Graham_Declassification%20of%20FBI's%20Crossfire%20Hurricane%20Investigations_20-00912_U_SIGNEDFINAL.pdf.

enforcement authorities, while simultaneously spreading those same lies through the media.  All in an effort to cast malicious aspersions on Donald J. Trump, the Trump Campaign, and the Trump Organization

132.    The opening salvo occurred in early-to-mid July 2016, when Steele—a paid FBI informant—began sending his dossier memoranda to the FBI, knowing that they contained false information on Donald J. Trump purporting to show compromising ties to Russia.[41]

133.    On the morning of July 31, 2016, Steele met with Nellie Ohr and Bruce Ohr, at which time Steele discussed his work on the Steele Dossier. Bruce Ohr was already aware at that time that Steele was "sharing his information with the Clinton campaign."[42]

134.    On that same day, the FBI opened a Foreign Agents Registration Act ("FARA") investigation, known as Operation Crossfire Hurricane ("Crossfire Hurricane"), into whether individuals associated with the Trump Campaign were witting of and/or coordinating activities with the Russian government.

135.    Among others at the FBI, Crossfire Hurricane was led by FBI Deputy Assistant Director Peter Strzok, FBI Director James Comey, and FBI Deputy Director, Andrew McCabe, with involvement and assistance from, among others, FBI Special Counsel Lisa Page and FBI attorney Kevin Clinesmith.

    a.    Text messages between Strzok and FBI Special Counsel Lisa Page, who were engaged in an illicit affair during that time, reveal that both of them had an utter disdain for the subject of their investigation, Donald J. Trump, and were determined to ensure that Hillary Clinton won the 2016 presidential election.

    b.    For example, on August 8, 2016, Page texted Strzok, "[Trump's] not ever going

---

[41] *Id.* at ¶ 2; *see also* IG Report.
[42] S. REP. NO. 116-290, vol. 5, at 909–10.

31

to become president right? Right?!." Strzoke replied, "No. No he's not. We'll stop it."

c.  The text messages also contained reference to an "insurance policy" that was being cultivated by Strzok, Page, McCabe, Comey and others at the FBI, in the event that Trump were to win the election:

d.  For instance, on August 15, 2016, Strzok texted Page: I want to believe the path you threw out for consideration in Andy's (Andrew McCabe, Deputy Director of the FBI) office that there's no way Trump gets elected—but I'm afraid we can't take that risk. It's like an insurance policy in the unlikely event you die before you're 40 … "

e.  This reference to an "insurance policy" reveals that Strzok and Page intended to ensure that, if Donald. J. Trump did indeed win the presidential election, that he would be quickly removed from office or, at a minimum, unable to effectively govern.

136.    By August 16, 2016, the FBI had opened individual cases under the Crossfire Hurricane umbrella as to four United States individuals, Carter Page, George Papadopoulos, Paul Manafort, and Michael Flynn.

137.    Three of these individuals, Page, Papadopoulous, and Manafort, were associated with the Trump Campaign.

138.    The focus of Crossfire Hurricane quickly became to obtain a FISA warrant, authorizing the spying and electronic surveillance of Carter Page, a foreign policy advisor with the Trump Campaign.

139.    To surveil an American citizen, the FISA requires that there be probable cause that

the target is an "agent of a foreign power" who is "knowingly engag[ing]…in clandestine intelligence activities." In short, to legitimately obtain a FISA warrant against Carter Page, the FBI had to demonstrate that he was a Russian agent who was knowingly engaging in intelligence activities on behalf of Russia.

140.    In August 2016, Bruce Ohr met with Andrew McCabe and Lisa Page and briefed them on the false accusation contained in the Steele Dossier, particularly those concerning Carter Page.

141.    On September 19, 2016, Steele provided reports from the Steele Dossier to the FBI, which contained false information regarding Carter Page and his purported ties to Russia.

142.    Thereafter, the FBI applied for four (4) separate FISA warrants as to Carter Page.

143.    In doing so, the FBI relied substantially on the Dossier as a means of establishing probable cause that Carter Page was a witting agent of the Russian Federation.

144.    Indeed, McCabe would later testify before Congress, behind closed doors, in December 2017, that, if not for the Steele Dossier, no FISA warrant would have been issued.[43]

145.    Each of the FISA applications set forth the FBI's assessment that Carter Page was a knowing agent of Russia and further alleged—in reliance on the Dossier—that Carter Page was part of a "well-coordinated conspiracy of co-operation between the Trump Campaign and the Russian government."

146.    The FBI ultimately obtained a total of four court approved FISA applications targeting Carter Page, which authorized intrusive electronic surveillance of him from in or about October 2016 through in or about September 2017.

147.    The first application was approved on October 21, 2016 ("FISA #1"), and three

---

[43] 120919-examination.pdf (justice.gov) at fn. 264.

Case 2:22-cv-14102-DMM   Document 260-2   Entered on FLSD Docket 08/18/2022   Page 38 of
114
Case 2:22-cv-14102-XXXX   Document 1   Entered on FLSD Docket 03/24/2022   Page 34 of 108

renewal applications were approved on January 12, 2017 ("FISA # 2"), April 7, 2017 ("FISA # 3"),
and June 29, 2017 ("FISA # 4").

148.    The FISA applications were reviewed by numerous FBI agents, FBI attorneys, and
National Security Division (NSD) attorneys and, as required by law, was ultimately certified by
then FBI Director James Comey and approved by then Deputy Attorney General Sally Yates.[44]

149.    In fact, no probable cause existed and there was no truth to any of the allegations
against Carter Page, Donald J. Trump, or the Trump Campaign.

150.    Strzok was directly involved in the decision to open Crossfire Hurricane and the
four FISA applications.  Additionally, "the documentation opening each of the four individual
investigations was approved by Strzok."[45]

151.    Furthermore, Comey and Sally Yates approved the first renewal application.
Comey and then Acting Attorney General Dana Boente approved the second renewal.  Acting FBI
Director Andrew McCabe and then Deputy Attorney General (DAG) Rod Rosenstein approved
the third renewal.[46]

152.    McCabe received regular briefings on the progress of Crossfire Hurricane and
discussed the investigation with Comey at regular briefings.[47]

153.    Clinesmith was assigned to provide legal support to FBI personnel working on
Crossfire Hurricane. Clinesmith worked with the National Security Division of the United States
Department of Justice to prepare the FISA applications to obtain authority from the United States
Foreign Intelligence Surveillance Court.[48]

---

[44] *Id.* (Page 6)
[45] *Id* at 349
[46]  *Id.* at 7
[47]  120919-examination.pdf (justice.gov) (Page 69)
[48] *See generally* Indictment, *United States v.  Clinesmith*, case no.  1:20-cr-00165-JEB, District of Columbia (Aug.
14, 2020) (hereinafter, "Clinesmith Indictment").

34

154.    While 'assisting' the FBI, Clinesmith doctored an email with the Central Intelligence Agency. Clinesmith communicated with the CIA regarding whether Carter Page was a source. [49]

155.    Clinesmith took the email he received and added the words "not a source" and provided the doctored email to the FBI.[50]

156.    Ohr had regular contact with the Crossfire Hurricane team and provided them with information that appeared in the FBI interview Report Form (FD-302).

157.    James Comey was the Director of the FBI and his actions in this capacity allowed the false Trump-Russia collusion narrative to continue to thrive.

158.    Comey personally signed three FISA applications to spy on Carter Page, with the Dossier serving as part of the basis for the warrant requests.

159.    Comey was aware, or should have been aware, that there was no evidentiary basis for the FISA applications and that the Steele Dossier was not a credible source:

   a.   *The Washington Times* reported that it had obtained a three page highly classified memo from September 2016, in which the CIA informed then FBI Director James Comey, that the Clinton Campaign was planning to blame "collusion" between Trump and the Russian government.  The memo shows that Comey was advised by the CIA of what the Clinton campaign had been doing.  Comey was advised of the fact that the Clinton campaign was setting up Donald J. Trump, weeks after the FBI had opened the Crossfire Hurricane investigation into alleged collusion. That information was a red flag to the FBI and it was ignored, as Comey was aligned with the Clinton Campaign.

---

[49] *Id.*
[50] *Id.*

b.  Comey admitted in December, 2018, during his testimony before the House Judiciary Committee, that prior to signing the FISA application to obtain the warrant to conduct surveillance on Carter Page, that he was aware that the fake Dossier, authored by Steele, was financed by the Clinton Campaign and the DNC, or as he referred to them, "political actors, who opposed Donald J. Trump." Yet, none of that information was disclosed in the FISA applications in October, 2016, or on any of the renewals.

c.  Moreover, Comey during his testimony before the House Judiciary Committee disclosed that when he met with Donald J, Trump in January 2017, in Trump Tower, to brief him on the Dossier, that he failed to inform the incoming President, about who financed the document, despite, the fact that Comey was well aware that it was financed by Hillary Clinton via the DNC and the Clinton Campaign through Perkins Coie.

d.  Comey intentionally withheld that information from Donald J. Trump, as well as in the FISA applications, themselves. Comey not only withheld that information from Donald J. Trump and the FISA Court, so that the scheme could be hidden, but he also pushed back, on behalf of the FBI, requests from Donald J, Trump to investigate the origins of the "salacious material" i.e.: the Dossier. As such, Comey confirmed that he did not tell Donald J. Trump, during his briefing that the Dossier had been paid for by his political opponents, mainly Hillary Clinton, the Clinton Campaign, and the DNC, via the Perkins Coie law firm.

160.   Comey utilized the Steele Dossier as purported evidence to sign FISA documents to conduct surveillance on Carter Page, when he knew that the Dossier was discredited, and failed

36

to advise the FISA court.

161.   Comey failed to tell the FISA court that the Dossier was reportedly funded by the Clinton Campaign and the DNC and compiled by Fusion GPS.

162.   Comey failed to tell the FISA court that the Dossier he relied upon to request a warrant to monitor Carter Page was a product of the Fusion GPS

163.   Comey relied on the Dossier to monitor Carter Page, even though months later he called the information in the Dossier salacious and unverified.

164.   Comey relied on the Dossier, even though the FBI determined the document was only minimally corroborated.

**The Defendants Spread Their False Narrative Through the Media While Sussmann Makes False Statements to Law Enforcement**

165.   At the same time that the FBI's unfounded investigation was underway, the Defendants were also spreading disinformation through the media in their effort of igniting a media frenzy.

166.   Their coordinated efforts at or around that time included, without limitation, the following acts:

   a. On September 1, 2016, Sussmann met with a reporter to discuss the false Trump-Alfa Bank connection; the reporter would later write an article about the topic.

   b. On September 12, 2016, Sussmann spoke with Elias, via phone, regarding Sussmann's efforts to communicate with one newspaper on the allegations about Alfa Bank; Sussmann and Elias.  Each billed the call to the Clinton Campaign.

   c. On September 21, 2016, Steele, Fritsch, and Simpson met with numerous members of the media in Washington D.C., including reporters from *The New York Times*,

37

*The Washington Post*, *New Yorker*, *Yahoo News*, and *CNN*, to discuss their investigative findings of an alleged "sinister relationship" between Donald J. Trump and Russia, including the "possible coordination of members of Donald J. Trump's campaign team and Russian government officials."[51]

d. In mid-October 2016, Steele again met with reporters of *The New York Times*, *The Washington Post*, and *Yahoo News* and provided additional briefings of his supposed findings concerning a Trump-Russia connection.[52]

167.     The next phase of the plan involved Sussmann meeting with the FBI to provide false evidence and information and to continue their efforts to intentionally mislead federal law enforcement authorities.

168.     In the lead-up to Sussmann's meeting with the FBI, there were numerous meetings between Sussmann and Elias, Neustar, and/or Fusion GPS, all of which were billed to the Clinton Campaign and/or the DNC, including, but not limited to the following:

a. On or about July 29, 2016, Sussmann and Elias met with personnel from Fusion GPS in Elias' office; Sussmann billed his time for this meeting to the Clinton Campaign under the category "General Political Advice"[53] with the billing description "meeting with Elias, others regarding [] confidential project."

b. In early August 2016, Sussmann met with Steele to advise him of a potential connection between Trump Tower and the Russian Alfa Bank; his time was billed to the Clinton Campaign.[54]

---

[51] *Crime in Progress* at 110; *see also* IG report at 105.
[52] *Id.* at 117.
[53] For all of Sussmann's other billing entries cited herein that he billed to the Clinton Campaign, he similarly billed his time to the Clinton Campaign under the category "General Political Advice."
[54] Tr. of Interview at 74–75, H. Permanent Select Comm. on Intelligence Interview of Michael Sussmann (Dec. 18, 2017), https://www.dni.gov/files/HPSCI_Transcripts/2020-05-04-Michael_Sussmann-MTR_Redacted.pdf; Tr. of Steele Dep. at 1–2.

    c.   On about August 12, 2016, Sussmann met with Elias and Joffe in Elias' office; the meeting was billed to the Clinton Campaign with the billing description "confidential meetings with Elias, others."

    d.   On or about August 17, 2016, Sussmann had a conference call with Elias and Joffe; his time was billed to the Clinton Campaign with the billing description "telephone conference with Joffe."

    e.   On or about August 19, 2016, Sussmann had another meeting with Elias and Joffe; Sussmann billed his time to the Clinton Campaign with the billing description stating, in part, "confidential meeting with Elias, others[.]"

    f.   On or about August 20, 2016, Sussmann met with a representative of Fusion GPS and communicated with the media; he billed his time to the Clinton Campaign with the billing description, "Meeting with consultant and Elias; revisions to White Paper; meeting with expert; meeting with expert and reporter; follow up meeting with reporter; conversations with Elias."

169.    On or about September 15, 2016, just four days before Sussmann's meeting with the FBI, Elias exchanged emails with Sullivan, as well as the Clinton Campaign's manager and communications director, concerning the plot to falsely connect Donald J. Trump to the Russian bank, Alfa Bank, by disseminating the lies to the media.[55]

170.    On or about September 19, 2016, Sussmann met with the FBI General Counsel at FBI Headquarters in Washington D.C. to convey his allegations of the connection between Donald J. Trump and the Russian bank.

171.    During this meeting, the following, in substance and in part, took place:

---

[55] Sussmann Indictment ¶ 25.

Case 2:22-cv-14102-DMM   Document 260-2   Entered on FLSD Docket 08/18/2022   Page 44 of
114
Case 2:22-cv-14102-XXXX   Document 1   Entered on FLSD Docket 03/24/2022   Page 40 of 108

a.  Sussmann stated falsely that he was not acting on behalf of any client, which led
the FBI General Counsel to understand that Sussmann was conveying the
allegations as a good citizen and not as an advocate for any client.

b.  Sussmann stated that he had been approached by multiple cyber experts
concerning the Russian bank connections allegations; Sussmann provided the
names of three cyber experts, but did not name or mention Neustar, Joffe, the
Clinton Campaign, or any other person or company referenced above.

c.  Sussmann described the allegations of a secret Trump Organization server that was
in communication with the Russian bank, including that the Russian bank had used
a TOR exit node located at a healthcare company to communicate with the Trump
Organization.

d.  Sussmann stated that media outlets were in possession of information about the
Trump Organization's secret server, and that a story would be published on Friday
of that week.

e.  Sussmann provided to the FBI General Counsel two thumb drives and hard copy
papers, which contained and comprised the following: (i) the aforementioned
white paper that Sussmann had assisted in drafting, entitled *White Paper #1
AuditableV3*, which contained no date or author's name; (ii) a white paper drafted
by a researcher, which was entitled, *White Paper Comments: Time Series Analysis
of Recursive Queries*, dated September 19, 2016, and contained no author's name;
(iii) white paper drafted by Fusion GPS regarding the Russian Bank and its parent
company, which contained no date or author's name; and (iv) eight files containing
the Russian Bank data and other purported data and information relating to the

40

Case 2:22-cv-14102-DMM   Document 260-2   Entered on FLSD Docket 08/18/2022   Page 45 of
114
Case 2:22-cv-14102-XXXX   Document 1   Entered on FLSD Docket 03/24/2022   Page 41 of 108

mail.trump-email.com domain.

172.    Sussmann reported the Trump-Alfa Bank connection, as though it was real, and lied
to the FBI General Counsel, by falsely stating that he was not acting on behalf of any client, when
he was specifically there at the behest of Clinton, the Clinton Campaign, and the DNC.  In fact, he
billed the Clinton Campaign for his efforts, as he had with all of his actions taken in furtherance
of the Defendants' conspiracy.

173.    Sussmann's statement to the FBI General Counsel that he was not acting on behalf
of any client was knowingly and intentionally false.  In truth, and as Sussmann well knew, he and
his firm, Perkins Coie, had been acting on behalf of and in coordination with four specific clients,
*i.e.,* Neustar, Clinton, the Clinton Campaign, and the DNC in assembling and conveying his
allegations.

174.    Sussmann billed his meeting with the FBI General Counsel to the Clinton
Campaign with the billing description, "work and communications regarding confidential project."

175.    Sussmann concealed and failed to disclose, among other things, that, (i) he had
spent time drafting one of the white papers he provided to the FBI General Counsel and billed that
time to the Clinton Campaign, and (ii) Fusion GPS, which at the time was also acting as a paid
agent of the Clinton Campaign and the DNC, drafted another of those white papers.

176.    Sussmann's lies and omissions were material because, among other reasons, they
misled the FBI General Counsel and other FBI personnel concerning the political nature of his
work and deprived the FBI of information that might have permitted it more fully to assess and
uncover the origins of the relevant data and technical analysis, including the identities and
motivations of Sussmann's clients.

177.    Had the FBI uncovered the origins of the relevant data and analysis, it would have

Case 2:22-cv-14102-DMM   Document 260-2   Entered on FLSD Docket 08/18/2022   Page 46 of
114
Case 2:22-cv-14102-XXXX   Document 1   Entered on FLSD Docket 03/24/2022   Page 42 of 108

learned, among other things, that (i) in compiling and analyzing the Alfa Bank allegations, Joffe had exploited his access to non-public data at multiple internet companies to conduct opposition research concerning Donald J. Trump; (ii) in furtherance of these efforts, Joffe had enlisted, and was continuing to enlist, the assistance of researchers at a U.S.-based university who were receiving and analyzing internet data in connection with a pending federal government cybersecurity research contract; and (iii) Sussmann, Elias, Perkins Coie, Joffe, and Neustar had coordinated, and were continuing to coordinate with representatives and agents of the Clinton Campaign and the DNC, with regard to the data and written materials that Sussmann gave to the FBI and the media.

178.   Immediately, after the aforementioned September 19, 2016, meeting, the FBI General Counsel spoke with the Assistant Director of the FBI's Counterintelligence Division. During their conversation, the FBI General Counsel conveyed the substance of his meeting with Sussmann.   The Assistant Director took contemporaneous handwritten notes which reflect, in substance, the above-referenced statements by Sussmann and stated, among other things: "Michael Sussmann – Atty: Perkins Coie, LLP not doing this for any client."

179.   In the days following Sussmann's meeting with the FBI General Counsel, and as a result of that meeting, the FBI opened an investigation of the Trump-Alfa Bank allegations.

180.   The FBI's investigation of these allegations nevertheless concluded that there was insufficient evidence to support the allegations of a secret communications channel with the Russian bank.  In particular, and among other things, the FBI's investigation revealed that the email server at issue was not owned or operated by the Trump Organization but rather, had been administered by a mass marketing email company that sent advertisements for Trump hotels and hundreds of other clients.

181.    Moreover, demonstrating that Sussmann carried out the aforementioned work on behalf of his clients, Sussmann continued in the weeks following this meeting to coordinate with Joffe, Elias, and Fusion GPS, to disseminate the Russian bank allegations to the media.

182.    For example, on or about October 10, 2016, Sussmann emailed a reporter a link to an opinion article which asserted, in substance and in part, that investigative reporters had not published as many stories regarding Donald J. Trump as other media outlets.

183.    In or about late October 2016, approximately one week before the 2016 U.S. Presidential Election, multiple media outlets reported that U.S. government authorities had received and were investigating allegations concerning a purported secret channel of communications between the Trump Organization and a particular Russian bank, Alfa Bank.

184.    One of these articles, published by the *New Yorker* on October 8, 2016, stated:

> Examining records for the Trump domain, Max's group discovered D.N.S. lookups from a pair of servers owned by Alfa Bank, one of the largest banks in Russia. Alfa Bank's computers were looking up the address of the Trump server nearly every day. There were dozens of lookups on some days and far fewer on others, but the total number was notable: between May and September, Alfa Bank looked up the Trump Organization's domain more than two thousand times. "We were watching this happen in real time—it was like watching an airplane fly by," Max said. "And we thought, Why the hell is a Russian bank communicating with a server that belongs to the Trump Organization, and at such a rate?"

185.    On or about October 31, 2016, eight days before the 2016 Presidential Election, Sullivan put out a written campaign statement that claimed that Trump and the Russians had set up a "secret hotline" through Alfa Bank and that "federal authorities" were investigating "this direct connection between Trump and Russia." He portrayed the shocking discovery as the work of independent experts—"computer scientists"—without disclosing their attachment to Hillary Clinton or the Clinton Campaign. The full statement was as follows:

43

> [T]his could be the most direct link yet between Donald Trump and Moscow. Computer scientists have apparently uncovered a covert server linking the Trump Organization to a Russian-based bank. This secret hotline may be the key to unlocking the mystery of Trump's ties to Russia. It certainly seems the Trump Organization felt it had something to hide, given that it apparently took steps to conceal the link when it was discovered by journalists. This line of communication may help explain Trump's bizarre adoration of Vladimir Putin and endorsement of so many pro-Kremlin positions throughout this campaign. It raises even more troubling questions in light of Russia's masterminding of hacking efforts that are clearly intended to hurt Hillary Clinton's campaign. We can only assume that federal authorities will now explore this direct connection between Trump and Russia as part of their existing probe into Russia's meddling in our elections.

186.    Sullivan was acting in the scope and authority of his employment with the Clinton Campaign when he made this false statement, which was made with the intention of harming Trump and his campaign.

187.    Elias, acting in the scope and authority of the Clinton Campaign, assisted Sullivan with the statement, as evidenced by his billing entries submitted to the Clinton Campaign.

188.    On the same day, Clinton published the same false and damaging statements to the public through her Twitter account, wherein she included a photograph of Sullivan's statement along with her own commentary: "Computer scientists have apparently uncovered a covert server linking the Trump Organization to a Russian-based bank."[56]

189.    A second tweet from Clinton on that same day said that it was "time for Trump to answer serious questions about his ties to Russia." It also included a graphic stating the following:

> 1. Donald Trump has a secret server. (Yes, Donald Trump.) 2. It was set up to communicate privately with a Putin-tied Russian bank called Alfa Bank. 3. When a reporter asked about it, they shut it down. 4. One week later, they created a new server with a different

---

[56] Hillary Clinton (@HillaryClinton), Twitter (Oct. 31, 2016, 8:36 PM), https://twitter.com/hillaryclinton/status/793250312119263233?lang=en.

44

name for the same purpose.[57]

190.    Clinton made these statements despite her awareness that they were patently false and that neither Donald J. Trump nor the Trump Organization had any ties to Alfa-bank. She was driven by a pathological need to stop Trump from ever entering the White House irrespective of the damage and national discord it would cause.

191.    The Defendant, John D. Podesta, Hillary Clinton's campaign chairman, also pushed the false Trump-Russia allegations. After Wikileaks released internal Clinton campaign emails, Podesta told reporters on October 11, 2016, that "I've been involved in politics for nearly five decades. This definitely is the first campaign that I've been involved in which I've had to tangle with Russian intelligence agencies who seem to be doing everything they can on behalf of our opponent."

192.    He then stated, without even a shred of evidence that "I think it is a reasonable assumption to, or at least a reasonable conclusion, that Mr. Stone had advance warning, and the Trump campaign had advance warning about what Assange was going to do."[58]

193.    On November 9, 2016, in spite the Defendants' collective efforts, Trump won the 2016 Presidential Election.

194.    Despite his victory, the Defendants' efforts continued unabated.

195.    In mid-November 2016, Glenn Simpson met personally with Bruce Ohr, at his request, to discuss Fusion GPS's findings regarding Russia and the election.

196.    Mr. Ohr concealed this meeting from the Department of Justice; he was later

---

[57] Hillary Clinton (@HillaryClinton), Twitter (Oct. 31, 2016, 7:32 PM),
https://twitter.com/HillaryClinton/status/793234169576947712?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed
%7Ctwterm%5E793234169576947712%7Ctwgr%5E%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fthenationalde
sk.com%2Fnews%2Famericas-news-now%2Ftweets-by-hillary-clinton-allegedly-support-accusations-her-
campaign-paid-to-spy-on-trump-donald-president-emails-russia-john-durham-michael-susmann
[58] https://time.com/4528049/hillary-clinton-john-podesta-emails-hackers-russia/

reprimanded and demoted for doing so.

197.    On December 10, 2016, Glenn Simpson provided a thumb drive to Bruce Ohr containing most of the reports comprising the Steele Dossier. Ohr, in turn, provided the thumb drive to the FBI.

198.    Ten days later, on December 20, 2016, Bruce Ohr provided a second thumb drive to the FBI, containing anti-Trump "opposition research" reports prepared by his wife, Nellie Ohr, in her capacity as a Fusion GPS employee.

199.    Over time, the FBI attempted to investigate, vet, and analyze the Dossier, but ultimately was not able to confirm or corroborate most of their substantive allegations.

200.    In the context of those efforts, the FBI learned that Danchenko, a Russian analyst, had served as a central source of information contained in the Dossier.

201.    From January 2017 through November 2017, the FBI conducted numerous interviews with Danchenko (collectively the "Interviews") concerning, among other things, the information that Danchenko had provided to Steele for the Dossier.

202.    During the course of these Interviews, Danchenko plainly admitted that he had "zero" corroboration for the key allegations that he had contributed to the Dossier.

203.    In addition, as alleged in further detail below, Danchenko repeatedly lied to FBI agents during his Interviews.

204.    First, Danchenko falsely stated that he never communicated with Charles Halliday Dolan, Jr, a claim which was patently false.

205.    In fact, Danchenko and Dolan had been in frequent communication since at least April 2016, had gone on a trip together, and had attended numerous meetings and conferences together.

206.    The disclosure of Danchenko's relationship with Dolan would have been incredibly relevant to the FBI's understanding of the contents of the Dossier:

  a.  At all relevant times, Dolan has long held deep ties to the Democratic Party operative and has been a close associate of and adviser to Hillary Clinton.

  b.  As a result, Dolan frequently interacted with senior Russian Federation leadership whose names would later appear in the Dossier, such as Putin spokesman Dmitry Peskov and then-Russian ambassador to the US Sergey Kislyak.

  c.  Also, in 2006, the Kremlin signed a deal with Ketchum, the PR firm where Dolan served as vice president for public affairs.  As part of that agreement, Ketchum was to handle global public relations for the Russian government as well as the state-owned energy company Gazprom.

207.    In fact, as detailed above, many of the allegations contained in the Dossier came *directly from* Dolan, who had conveyed them to Danchenko who, in turn, reported them to Steele.

208.    Dolan 's role as a contributor of information to the Dossier was highly relevant and material to the FBI's evaluation of those reports because:

  a.  Dolan maintained pre-existing and ongoing relationships with numerous persons named or described in the Dossier, including one of Danchenko's Russian sub-sources,

  b.  Dolan maintained historical and ongoing involvement in Democratic politics, which bore upon Dolan's reliability, motivations, and potential bias as a source of information for the Dossier, and

  c.  Danchenko gathered some of the information contained in the Dossier at events in Moscow organized by Dolan and others that Danchenko attended at Dolan's

47

invitation.   Certain allegations that Danchenko provided to Steele, and which

appeared in the Dossier, mirrored and/or reflected information that Dolan himself

also had received through his own interactions with Russian nationals.

209.    On or about January 13, 2017, Dolan replied to an email sent by a U.S.-based person

discussing a recent news article regarding the Dossier, wherein Dolan stated:

> [] I've been interviewed by the Washington Post and the London
> Times -three times over the last two days over the Steele Dossier on
> Trump and I know the Russian agent who made the report (He used
> to work for me).  My client in [Foreign Country] [Business] has been
> accused of being the party that organized the hacking.  Presently
> speaking with the barrister in London who is filing a brief against
> Steele has been unmasked as the man behind an explosive dossier
> about US president-elect Donald Trump.  Also in conversation with
> former British Ambassador who knows Steele.  Quite right -Oh what
> a boring life.

210.    At that time, Danchenko was not publicly known to be a source for Steele.

211.    On March 16, 2017, Danchenko informed the FBI that he believed the source in the

above-referenced allegations referred, at least in part, to the Chamber President.  He repeated these

claims in subsequent interviews on or about March 16, 2017, May 18, 2017, October 24, 2017,

and November 2, 2017.

212.    Meanwhile, Sussmann and Joffe continued to play their part in the Defendants'

grand conspiracy.

213.    Through late 2016 and early 2017, Joffe and a researcher continued to compile

additional information and data regarding the Alfa Bank allegations and gathered other purported

data allegedly involving Donald J. Trump's related computer networks which they claimed tied

him to Russia.

214.    Around that time, Sussmann began arranging a meeting with the Central

Intelligence Agency (CIA) to continue spreading his lies.

48

215.    On or about February 9, 2017, Sussmann met with two CIA employees at a location outside the District of Columbia.

216.    At the meeting, the following, in substance and in part, occurred:

a.  Sussmann stated falsely – as he previously had stated to the FBI General Counsel that he was "not representing a particular client." In truth and in fact, and as Sussmann had acknowledged to the Former Employee just days earlier, Sussmann was indeed representing a client.

b.  Sussmann disclosed that Perkins Coie, was active in representing several Democratic Party causes and officer-holders, including both the DNC and Clinton. Sussmann stated, however, that such work was unrelated to his reasons for contacting the CIA.

c.  Sussmann discussed and described the updated allegations, including new details concerning the Russian Bank allegations that he had not provided to the FBI General Counsel.

d.  Sussmann provided to the CIA employees (i) several white papers, and (ii) multiple data files containing purported DNS data, ranging from 2016 through early 2017.

217.    As he had done in his prior meeting with the FBI, Sussmann—acting on behalf of the Clinton Campaign and the DNC—again lied to and intentionally mislead federal law enforcement officials in furtherance of the Defendants' scheme.

218.    That Sussmann was acting on behalf of, and in coordination with, the Clinton Campaign and the DNC when he made his false statements to the FBI and the CIA was confirmed in December 2017, when Sussmann testified under the penalty of perjury before the House

Case 2:22-cv-14102-DMM   Document 260-2   Entered on FLSD Docket 08/18/2022   Page 54 of
114
Case 2:22-cv-14102-XXXX   Document 1   Entered on FLSD Docket 03/24/2022   Page 50 of 108

Permanent Select Committee on Intelligence:

> Q: [] When you decided to engage the two principals, one, [the FBI General Counsel] in September, and the general counsel of [Agency-2] in December, you were doing that **on your own volition,** based on information another client provided you. Is that correct?
>
> [Sussman]: No.
>
> Q: So what was – so did your client direct you to have those conversations?
>
> [Sussman]: Yes.
>
> Q: Okay. And your client also was witting of you going to [the CIA] in February to disclose the information that individual had provided you?
>
> [Sussman]: **Yes**
>
> [ . .. ]
>
> Q: Okay. I want to ask you, so you mentioned that **your client directed you** to have these engagements with the FBI and [redacted] and to disseminate the information that client provided you. Is that correct?
>
> [Sussmann]: [] [W]e had a conversation, as lawyers do with their clients, about client needs and objectives and the best course to take for a client. And so it may have been a decision that we came to together. I mean, I don't want to imply that I was sort of directed to do something against my better judgment, or that we were in any sort of conflict, but this was -- I think it's most accurate to say it was done on behalf of my client.

219.    Meanwhile, the Defendants' continued their campaign of spreading disinformation through the media.

220.    On March 7, 2017, Mook acknowledged during a Fox & Friends appearance, that there was a wiretap of Russian officials in contact with associates of President Trump, and that surveillance may have been conducted on Trump computers as well.

221.    In October of 2017, Podesta went on Twitter and accused Donald J. Trump of

50

Case 2:22-cv-14102-DMM   Document 260-2   Entered on FLSD Docket 08/18/2022   Page 55 of
114
Case 2:22-cv-14102-XXXX   Document 1   Entered on FLSD Docket 03/24/2022   Page 51 of 108

"running a "big lie campaign" centered on the investigation into Russian meddling in the U.S. election."[59]

**A String of Federal Investigations**
**Clear Donald J. Trump and**
**Uncover the Defendants' Illicit Conspiracy**

222.    On May 9, 2017, Comey was fired from his position of Director of the FBI.

223.    Shortly thereafter, in the wake of his firing, Comey took retaliatory action against Donald J. Trump.

224.    During his time with the FBI, Comey had documented several of his interactions with Donald J. Trump in a series of memos. After he was no longer an employee of the FBI, Comey intentionally shared these memos with one of his lawyer friends, who he directed to leak to a *New York Times* reporter who had been reporting on the Russia conspiracy theory.

225.    The leak was investigated by the Office of the Inspector General (IG) which, in an August 2019 report, faulted Comey for the "unauthorized disclosure of sensitive investigative information, obtained during the course of FBI employment, in order to achieve a personally desired outcome."[60]

226.    The outcome that Comey desired—per his own admission to Congress—was to "prompt" the appointment of a special counsel to investigate Donald J, Trump' alleged conspiracy with the Russian movement.

227.    The IG's report noted that Comey had "set a dangerous example" by "release[ing] sensitive information" to "create public pressure for official action."

228.    Comey was successful in getting the special master appointed, due to his unlawful

---

[59] https://www.yahoo.com/news/trump-behind-apos-big-lie-164719959.html
[60] Report of Investigation of Former Federal Bureau of Investigation Director James Comey's Disclosure of Sensitive information and Handling of Certain Memoranda, Office of the Inspector General, Oversight and Review Division 19-02, August 2019, https://oig.justice.gov/reports/2019/o1902.pdf (hereinafter, the "IG Report (Aug. 2019).

51

leaking of information, even though Comey didn't have enough evidence to pursue it in his own official capacity.

229.    In May 2017, Robert Mueller was appointed as Special Counsel to "oversee the previously-confirmed FBI investigation of Russian government efforts to influence to 2016 Presidential Election and related matters."[61]

230.    Strzok, the leader of the Russia probe, texted Lisa Page in May 2017 that he was reluctant to join Mueller's probe and leave his senior FBI post because he feared "there's no big there, there."[62]

231.    In addition, in May 2017, Page told Representative John Ratcliffe "it still existed in the scope of possibility that there would be literally nothing" to connect Trump and Russia, no matter what Mueller or the FBI did."

232.    On March 22, 2019, Special Counsel Robert Mueller concluded his 22-month investigation and submitted his confidential report entitled "Report on the Investigation into Russian Interference in the 2016 Presidential Election" (the "Mueller Report") to Attorney General William Barr.

233.    The Mueller Report demonstrated that, after a two-year long investigation coming on the heels of a year-long FBI investigation, the Special Counsel found no evidence that Donald J. Trump or his campaign ever colluded with the Russian government to undermine the 2016 election.

234.    Specifically, Special Counsel Mueller "did not find that the Trump campaign, or anyone associated with it, conspired or coordinated with the Russian government in these efforts,

---

[61] Appoint of Special Counsel (press release), US Department of Justice, May 17, 2017, https://www.justice.gov/opa/pr/appointment-special-counsel.
[62] Lisa Page bombshell: FBI couldn't prove Trump-Russia collusion before Mueller appointment | The Hill

despite multiple efforts from Russian-affiliated individuals to assist the Trump campaign."[63]

235.    In March of 2019, shortly after the Muller Report determined there was no evidence of collusion, Reines went on Fox News and continued to accuse Donald J. Trump falsely.

236.    Reines debated with Mollie Hemingway who told Reines that the conspiracy was over and Reines responded: "You saying it on FOX doesn't make it so.  He's under investigation by 17 other entities including the Southern District of New York."[64]

237.    Starting in or around 2019, two additional probes were launched to investigate the origins of the FBI's Crossfire Hurricane.

238.    First, the Office of the Inspector General performed a review to determine whether the Crossfire Hurricane investigation was adequately predicated and whether the FBI had acted on false and misleading information.

239.    Through this investigation, the IG uncovered numerous deficiencies with the FBI's conduct.

240.    In a report dated December 9, 2019, the IG identified "at least 17 significant errors or omissions in the Carter Page FISA applications, and many additional errors in the Woods Procedure."[65]

241.    Thereafter, on January 23, 2020, the DOJ formally admitted to the FISC that, with respect to at least the last two warrant applications, "if not earlier, there was insufficient predication to establish probable cause to believe that [Dr.] Page was acting as an agent of a foreign power."

242.    The FISC has also issued several rulings finding that FISA warrants contained material omissions and misstatements, lacked candor, and/or that the warrants were not lawfully

---

[63] Letter from AG William Barr, March 24, 2019.
[64] https://www.realclearpolitics.com/video/2019/03/24/mollie_hemingway_vs_philippe_reines_on_mueller_its_important_to_understand_philippe_its_over.html#!
[65] IG Report (12/19).

Case 2:22-cv-14102-DMM   Document 260-2   Entered on FLSD Docket 08/18/2022   Page 58 of
114
Case 2:22-cv-14102-XXXX   Document 1   Entered on FLSD Docket 03/24/2022   Page 54 of 108

obtained:

    a.   In an Order dated December 17, 2019, the FISC stated: "The frequency with which

           representations made by FBI personnel turned out to be unsupported or

           contradicted by information in their possession, and with which they withheld

           information detrimental to their case, calls into question whether information

           contained in other FBI applications is reliable."

    b.   In an Order dated January 7, 2020, the FISC stated: "The Court understands the

           government to have concluded, in view of the material misstatements and

           omissions, that the Court's authorizations were not valid.

    c.   In an Order dated March 5, 2020, the FISC stated: "There is thus little doubt that

           the government breached its duty of candor to the Court with respect to those

           applications [involving Carter Page]."

    d.   In an Order dated June 25, 2020, the FISC stated: "The government acknowledges

           that there were material omissions, and the Court has found violations of the

           government's duty of candor, in all four applications [regarding Carter Page]."

    243.    In light of these admissions, as well as the obvious questions about the legitimacy

of Crossfire Hurricane, Attorney General William Barr assigned John Durham, the United States

Attorney for the District of Connecticut, to lead an investigation on behalf of the Department of

Justice into Crossfire Hurricane.

    244.    Thereafter, on October 19, 2020, Barr officially appointed Durham to serve as

Special Counsel and to continue his investigation into the origins of Crossfire Hurricane.

    245.    On September 16, 2021, less than a year into his investigation, Durham indicted

Sussmann for one count of making a false statement to a federal law enforcement in violation of

18 U.S.C. § 1001(a)(2) for, on September 19, 2016, "stat[ing] to the General Counsel of the FBI that Sussmann was not acting on behalf of any client in conveying the particular allegations concerning [Donald J. Trump], when in truth, and in fact, and as [Sussmann] well knew, he was acting on behalf of specific clients, namely, [Joffe] and the Clinton Campaign."[66]

246.    On November 3, 2021, Durham indicted Danchenko for five separate counts of violating 18 U.S.C. § 1001(a)(2) for making false statements to a law enforcement officials:[67]

e.  Count One alleges that Danchenko violated 18 U.S.C. § 1001(a)(2) on June 15, 2017 when he "denied to agents of the FBI that he had spoken with [Dolan] about any material contained in the [Steele Dossier], when in truth and in fact, and as the defendant well knew, [Dolan] was the source for an allegation contained in the [Steele Dossier] dated August 22, 2016 and was otherwise involved in the events and information described in the reports."[68]

f.  Count Two alleges that Danchenko violated 18 U.S.C. § 1001(a)(2) on March 16, 2017 when he "stated to agents of the FBI that he received a late July 2016 telephone call from an individual who Danchenko believed was 'probably' Chamber President-1, when in truth and in fact, and as [Danchenko] well knew, Chamber President-1 never called Danchenko."[69]

g.  Count Three alleges that Danchenko violated 18 U.S.C. § 1001(a)(2) on May 18, 2017 when he "stated to agents of the FBI that he 'was under the impression' that a late July 2016 telephone call that he received was from Chamber President-I,

---

[66] Indictment at 27, *United States v. Sussmann*, case no. 1:21-cr-00582-CRC, District of Columbia (Sept. 16, 2021) (hereinafter, "Sussmann Indictment").
[67] *See generally* Indictment, *United States v. Danchenko*, case no. 1:21-cr-00245-AJT, Eastern District of Virginia (Nov. 3, 2021) (hereinafter, Danchenko Indictment")
[68] *Id.* at 37.
[69] *Id.*

55

Case 2:22-cv-14102-DMM   Document 260-2   Entered on FLSD Docket 08/18/2022   Page 60 of
114
Case 2:22-cv-14102-XXXX   Document 1   Entered on FLSD Docket 03/24/2022   Page 56 of 108

when in truth and in fact, and as the defendant well knew, Chamber President-I never called Danchenko."[70]

h.   Count Four alleges that Danchenko violated 18 U.S.C. § 1001(a)(2) on October 24, 2017 when he "stated to agents of the FBI that he believed that he spoke to Chamber President-I on the telephone on more than one occasion, when in truth and in fact, and as the defendant well knew, Danchenko never spoke to Chamber President-I."[71]

i.   Count Five alleges that Danchenko violated 18 U.S.C. § 1001(a)(2) on November 16, 2017 when he "stated to agents of the FBI that he believed that he had spoken to Chamber President-I on the telephone, when in truth and in fact, and as the defendant well knew, Danchenko never spoke to Chamber President-I."[72]

247.   On December 17, 2021, Durham filed a motion to inquire into potential conflicts of interests in Danchenko's criminal case, notifying the court to a potential conflict of interest since Danchenko's defense counsel also represents the Clinton Campaign, noting that "the interests of the Clinton Campaign and [Danchenko] could potentially diverge in connection with any plea discussions, pre-trial proceedings, hearings, trial, and sentencing proceedings."

248.   In the motion, Durham also confirms that his office is actively investigating the Clinton Campaign for its role in the subject matter of this action, stating that "[a]reas of inquiry that may become relevant . . . include topics such as (1) the Clinton Campaign's knowledge or lack of knowledge concerning the veracity of information in the Company Reports sourced by the defendant, (2) the Clinton Campaign's awareness or lack of awareness of the defendant's

---

[70] *Id.* at 38.
[71] *Id.*
[72] *Id.*

collection methods and sub-sources, (3) meetings or communications between and among the Clinton Campaign, U.S. Investigative Firm-1, and/or U.K. Person-1 regarding or involving the defendant, (4) the defendant's knowledge or lack of knowledge regarding the Clinton Campaign's role in and activities surrounding the Company Reports, and (5) the extent to which the Clinton Campaign and/or its representatives directed, solicited, or controlled the defendant's activities." He further noted that "the Clinton Campaign and [Danchenko] each might have an incentive to shift blame and/or responsibility to the other party for any allegedly false information that was contained within the Company Reports and/or provided to the FBI."[73]

249.    On January 25, 2022, in a discovery-related motion in the Sussmann criminal case, it was revealed that Durham has already questioned a "former employee of the Clinton Campaign" and has served document requests and/or subpoenas on the Clinton Campaign and a "political organization" – likely the DNC.[74]

250.    On February 11, 2022, Durham filed a motion to inquire into potential conflicts of interest in the Sussmann case.  Notably, in reference to Neustar and Joffe's exploitation of non-public data in connection with the Defendants' conspiracy, Durham states that "among the Internet data [Joffe] and his associates exploited was domain name system ("DNS")  Internet traffic pertaining to (i) a particular healthcare provider, (ii) Trump Tower, (iii) Donald Trump's Central Park West apartment building, and (iv) the Executive Office of the President of the United States ("EOP")," and specifically notes that "[Joffe] and his associates exploited [a sensitive] arrangement [with the EOP] by mining the EOP's DNS traffic and other data for the purpose of

---

[73] *See generally* Motion to Inquire into Potential Conflicts of Interest (ECF Doc. No.35), *United States v. Danchenko*, case no. 1:21-cr-00245-AJT, Eastern District of Virginia (Dec. 17, 2021).
[74] *See* Government's Discovery Update and Request for Additional Time to Produce Residual Discovery Materials, *United States v. Sussmann*, case no. 1:21-cr-00582-CRC, District of Columbia (Jan. 25, 2022).

gathering derogatory information about Donald Trump."[75]

**The Defendants' Malicious Conspiracy
Remains Active to This Day**

251.    The Defendants' collective effort to falsely implicate and publicly denigrate Donald
J. Trump has not ceased and, in fact, the Defendants continue to proliferate the injurious falsehood
that Donald J. Trump colluded with Russia to this very day.

252.    Fusion GPS, Simpson, Fritsch, and Steele continued their collective mission to
fabricate evidence and disparage Donald J. Trump with it, well after Trump won the 2016 election.

253.    Since 2017, The Democracy Integrity Project ("TDIP") has paid Fusion GPS,
Steele and their associates more than $3.8 million to continue their 'opposition research' against
Donald J. Trump and to continue pushing the false Trump-Russia narrative.

254.    In particular, TDIP has paid $3.3 million to Fusion GPS; $250,000 to "Walsingham
Partners Ltd.," a London-based firm owned by Steele and his partner, Christopher Burrows; nearly
$130,000 to "Edward Austin Ltd." a London-based intelligence consultancy operated by Edward
Baumgartner, a Fusion GPS contractor; and $148,000 to the law firm Zuckerman Spaeder, which
has represented Fusion GPS in a variety of Dossier-related legal matters.

255.    Philippe Reines has continued to insist that Donald J. Trump colluded with
Russia.

256.    On, April 16, 2018, Reines tweeted "yes collusion, yes collusion, yes collusion"
in response to an article titled: 'Breaking: Trump puts the brake on new Russian sanctions,
reversing Haley's announcement.'

257.    Debbie Wasserman Schultz has also continued to maintain that Donald J. Trump

---

[75] *See generally* Motion to Inquire into Potential Conflicts of Interest (ECF Doc. No.35), *United States v. Sussmann*,
case no. 1:21-cr-00582-CRC, District of Columbia (Feb. 11, 2022).

colluded with Russia.

258.    For instance, on May 10, 2019, Schultz appeared on MSNBC and boldly announced

that there were "clear indications" that Donald J. Trump colluded with Russia.  She went on to

state:

> You know, what's so disturbing is that Donald Trump is so lacking
> in confidence about his ability to actually get elected without the
> help of a foreign power, and particularly a foreign adversary, that
> they will go to any lengths and that he will instruct and allow his
> colleagues and allies to go to any lengths to be able to secure his
> success in an election.[76]

259.    Likewise, Clinton has continued to drum up the false Trump-Russia narrative in the

hopes of damaging Trump's political career.

260.    For example, on June 16, 2021, Clinton appeared on MSNBC's *Morning Joe* show

and again attempted to reinforce the debunked Trump-Russia story—of which she led the effort to

manufacture and is no doubt aware is false—when she stated to MSNBC's audience, which

included the general public of the State of Florida and the rest of the United States: "We don't

have Trump as spokesperson for Putin, anymore."  "After disastrous Trump presidency, in which

he gave Putin a green light to do whatever he wanted to do, once Trump was elected, of course..."

261.    On February 16, 2022, in response to media reports concerning the filing of

Durham's February 11, 2022 motion, Clinton tweeted that "Trump & Fox are desperately spinning

up a fake scandal to distract from his real ones.  So it's a day that ends in Y.  The more his misdeeds

are exposed, the more they lie.  For those interested in reality, here's a good debunking of their

latest nonsense."[77]

262.    These are but a few of the recent examples of the Defendants' ongoing efforts to

---

[76] https://www.realclearpolitics.com/video/2019/05/11/wasserman_schultz_trump_clearly_colluded_with_russia_and_engaged_in_obstructed_justice_to_cover_it_up.html
[77] https://twitter.com/HillaryClinton/status/1494036101572575232.

maintain their conspiracy to spread injurious falsehoods against Donald J. Trump.

263.     As a direct and proximate cause of the Defendants' actions, Trump has sustained significant injuries and damages including, but not limited to, expenses in the form of defense costs, legal fees and related expenses incurred in connection with his efforts to defend against the Defendants' tortious actions, false accusation, and overall fraudulent scheme to discredit and delegitimize him, the Trump Campaign and Administration, and the Trump Organization and the various federal investigations and official proceedings that arose therefrom, which to date is in an amount no less than twenty-four million dollars ($24,000,000) and continuing to accrue, as well as the loss of existing and future business opportunities.[78]

264.     It was a goal of the Defendants' conspiracy, and indeed a foreseeable and natural consequence of the same, that this substantial economic harm would befall Trump.  The Plaintiff does not claim nor seek any compensation for damage to his reputation, but rather, he seeks damages for the cost of dealing with the legal issues and political issues, which he was required to spend to redress the injurious falsities which were propounded by the Defendants, and all other losses incurred due to the tortious conduct of the Defendants.

265.     All precedent acts and requirements have been done or have been waived by the Defendants.

266.     The Plaintiff was required to retain the attorneys named below to bring this action and to pay them reasonable attorneys' fees.

**Count I**
**RICO**
**(18 U.S.C. § 1962(C))**
*(Against Clinton, Clinton Campaign, DNC, Perkins Coie, Elias, and Sussmann)*

---

[78] The different opportunities which evaporated are too many to list, but as an example, Donald J. Trump has been banned from different social media platforms, including Twitter.  Most of this was due to the misinformation campaign waged by Hillary Clinton, whereby truth was deemed false and lies were deemed to be truth.

267.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

268.    The Defendants, Clinton, the Clinton Campaign, the DNC, Perkins Coie, Elias, and Sussmann (collectively, the "RICO Defendants") are all "persons" within the meaning of 18 U.S.C. § 1961(3).

### The RICO Enterprise

269.    At all relevant times, the RICO Defendants, Clinton, the Clinton Campaign, the DNC, Perkins Coie, Elias, and Sussmann, constituted an association in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. § 1961(4).

270.    The members of the Enterprise are a group of persons associated together for the common purpose of carrying on an ongoing enterprise; specifically, the Enterprise had a common, unlawful goal of dismantling the Plaintiff's political career and/or impeding his ability to effectively govern through fraudulent, deceptive, and criminal means, including, but not limited to, falsely implicating the Plaintiff, the Trump Campaign, and the Trump Administration as colluding with Russia.

271.    By virtue of the RICO Defendants' professional relationships and frequent business collaborations, the Enterprise had an existence and legitimate business and political purpose separate and apart from the racketeering activity itself.

272.    Since the Enterprise's activities had a significant effect on the 2016 presidential race, and affected fundraising and electoral spending, the Enterprise affected interstate and foreign commerce.

273.    The Enterprise was formed as early as April 2015 and remains ongoing and continuing to the present day.

274.    Considering the nature of the RICO Defendants' longstanding political and

professional relationship, the continuing nature of Clinton's political career, her ever-present political rivalry with Plaintiff, and the nature of the Enterprise's goals, the longevity of the Enterprise is sufficient to permit the RICO Defendants to pursue the Enterprise's ongoing goal of damaging the Plaintiffs' political career with the continuing proliferation, and/or threat of proliferation, of disinformation, obstruction of justice, and other unlawful tactics intended to damage the Plaintiff's political career and to impede his ability to effectively govern.

275.    The members of the Enterprise have longstanding inter-relationships rooted in their political and professional connections, in addition to common control, ongoing business dealings, and mutual interest and participation in common activities and dealings.

276.    The Enterprise has, or at all relevant times had, an organized, clearly delineated, ongoing organizational framework and command structure for carrying out its objectives: the Clinton Campaign and the DNC were at all relevant times mutually controlled by Clinton, who worked in tandem with their joint counsel, Perkins Coie, whose partners, Sussmann, and Elias, simultaneously served as general counsel for the Clinton Campaign and the DNC.

277.    No RICO Defendant has withdrawn, or otherwise dissociated itself, from the Enterprise.

## Predicate Acts

278.    Section 1961(1) of RICO also provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1832 (relating to theft of trade secrets) and 18 U.S.C. §§ 1503 and/or 1512 (obstruction of justice).  As set forth herein, in furtherance of the scheme to defraud the Plaintiff, the RICO Defendants engaged in numerous acts in violation of 18 U.S.C. § 1832 and 18 U.S.C. § 1503 and/or 1512, including, without limitation, as set forth herein.

279.    Each RICO Defendant has conducted and participated in, directly or indirectly, the

management, conduct and/or operation of the Enterprise and its affairs through a pattern of racketeering activity including acts indictable under 18 U.S.C. § 1832 (theft of trade secrets) and 18 U.S.C. § 1503, and/or 1512 (obstruction of justice).

280. The RICO Defendants have consistently and regularly committed acts of racketeering activity spanning from at least April 2015. These multiple acts shared a common or related purpose, goal, result, participants, victims, and methods of commission.

281. Beginning in or around April 2015, the RICO Defendants engaged in wide-ranging and fraudulent scheme to concoct a false narrative that the Plaintiff and his campaign were colluding with Russia to undermine the 2016 Presidential Election.

282. The RICO Defendants, through their deceptive and fraudulent conduct intended to mislead law enforcement, the media, and the public at large and to impede, obstruct and falsely provoke federal investigations against the Plaintiff, the Trump Campaign, and the Trump Administration.

283. In furtherance of this scheme, the Defendants committed multiple related acts, each of which constitutes an act of racketeering activity, and which, collectively, constitute a pattern of racketeering activity.

### *Theft of Trade Secrets (18 U.S.C. § 1832)*

284. In violation of 18 U.S.C. § 1832(a)(5), the RICO Defendants conspired with Neustar and Joffe, on at least two occasions, abused and exploited access to non-public and highly sensitive data sources and/or servers, and acquired obtained in excess of authorization and/or stole proprietary, sensitive and confidential internet data, records and/or information, including without limitation, DNS internet traffic data pertaining to Plaintiff, including data originating from his servers located at his private New York residence and those located at Trump Tower and used in

63

connection with his business, The Trump Organization LLC, a company involved in interstate commerce, and stole trade secrets in violation of 18 U.S.C. § 1832 (theft of trade secrets).

285.    DNS internet traffic data houses highly proprietary, sensitive and confidential data. For example, among other things, an analysis of raw DNS data could reveal a comprehensive view into an individual or a company's website traffic, e-mail traffic, webmail traffic, chat messaging, in addition to the types of technology, hardware, software, programs, securities and processes being utilized by the servers.

286.    The RICO Defendants conspired with Neustar and Joffe to exploit access to non-public data sources and/or servers and unlawfully acquire, steal and exploit sensitive, proprietary and confidential internet data, including without limitation, DNS information, traffic, and/or data originating from computers and/or servers (i)  located at Plaintiff's private apartment in Central Park West in New York and belonging to the Plaintiff; and (ii) located at Trump Tower and belonging to The Trump Organization, in which Plaintiff has an ownership interest (collectively, with the computers and/or servers house in Plaintiff's private apartment, "Plaintiff's Servers).

287.    By conspiring to illegally access the above-mentioned information and data, the RICO Defendants, through Neustar and Joffe, were able to obtain proprietary, sensitive, and/or confidential information and data including, among other things, the number and frequency of e-mail communications between the Plaintiff's Servers and other third party servers, the number and frequency of website visits to third party websites by the Plaintiff's Servers, the number and frequency of webmail interactions between the Plaintiff's Servers and other third party servers, and the number and frequency of chat messaging interactions between the Plaintiff's Servers and other third party servers, as well as information pertaining to the types of technology, hardware, software, programs, securities and processes being utilized by Plaintiff's Servers.

64

288.   This information and data revealed highly proprietary, sensitive, and confidential knowledge, including insight into Plaintiff's and The Trump Organization's business dealings, financial dealings, communications, future and current plans, techniques, patterns, methods, processes, and procedures, as well as identification of their corporate partners, political associates, clients, and vendors.

289.   This proprietary, sensitive and confidential information, data and/or knowledge constitutes trade secrets within the meaning of 18 U.S.C. § 1839(3) where they constitute business and/or political methods, techniques, processes, procedures and programs that are both protected from disclosure by the Plaintiff and derive significant economic value from not generally being known to or ascertainable by others, including the RICO Defendants, who can obtain economic value from disclosure or use of such information.

290.   The Plaintiff and The Trump Organization restricts access to their proprietary, sensitive and confidential information and data, including DNS data,  even within their own personnel and prevents unauthorized access to such records by digital or electronic means.

291.   The Plaintiff and The Trump Organization further protects against theft and disclosure of such information by third parties by the requirement of executed non-disclosure agreements prior to providing any such access.

292.   The Plaintiff's confidential records were misappropriated by Defendants within the meaning of 18 U.S.C. § 1839(5), where the Plaintiff's records were acquired by the RICO Defendants, through their conspiracy with Neustar and Joffe, without the Plaintiff's authorization and through Defendants' acts of espionage or other improper means conducted by electronic or other means.

293.   The RICO Defendants conspired to violate the Defend Trade Secrets Act, 18 U.S.C.

§ 1832(a)(1), by assisting, aiding, and abetting Neustar and Joffe in obtaining Plaintiff's proprietary, sensitive and confidential information and data by fraud, artifice, and deception and, thereafter, stealing, appropriating, taking, carrying away, and concealing the theft of Plaintiff's confidential records with intent to convert Plaintiff's confidential records, which are related to products sold in interstate and foreign commerce, to Defendants' own benefit, while knowing and intending that such misappropriation would injure the Plaintiff.

294.     Each of the RICO Defendants were aware of, and active participants in, the conspiracy for Neustar and Joffe's to violate the Defend Trade Secrets Act, 18 U.S.C. § 1832, and each of the RICO Defendants committed at least one act in furtherance of this goal.

295.     The RICO Defendants' actions constitute a conspiracy to steal trade secrets in violation of 18 U.S.C. § 1832(a)(5).

### *Obstruction of Justice (18 U.S.C. §§ 1503, 1512)*

296.     The RICO Defendants, through and using the Enterprise, engaged in, and continues to engage in, a coordinated effort to destroy the Plaintiff's political career and impede his ability to effectively govern as President of the United States.  This coordinated effort amounts to a set of related predicate acts with similar purposes, results, and methods, which included acts in violation of 18 U.S.C. § 1503 and/or 1512 (obstruction of justice).

297.     On one or more occasions, the RICO Defendants, knowingly and deliberately provided falsified, altered and misleading records, including the White Papers and the Dossier, to law enforcement officials and made false statements to law enforcement officials, including the FBI and CIA, with the intention of obstructing, impeding, influencing and/or impairing their investigations into alleged Russian collusion, and/or conspired with others to carry out these acts.

298.     On September 19, 2016, Sussmann met with FBI officials in Washington D.C., at

66

Case 2:22-cv-14102-DMM   Document 260-2   Entered on FLSD Docket 08/18/2022   Page 71 of
114
Case 2:22-cv-14102-XXXX   Document 1   Entered on FLSD Docket 03/24/2022   Page 67 of 108

which time he, among other things: (i) made false statements to FBI officers, including that he was

acting on behalf of any client; (ii) provided falsified, altered and/or misleading records, including

the White Papers, to FBI officials; (iii) withheld and/or concealed pertinent information, including

without limitation the true nature of the White Papers, his work with Neustar and Joffe, the falsity

of the purported link between Trump Tower and Alfa Bank, and the existence of the Enterprise

and its overarching conspiracy to create a false narrative of Trump-Russia collusion.

299.    On September 19, 2016, Sussmann met with FBI officials in Washington D.C., at

which time he, among other things: (i) made false statements to FBI officials, including that he

was not acting on behalf of any client; (ii) provided falsified, altered and/or misleading records,

including (1) *White Paper #1 AuditableV3,* (2) *White Paper Comments: Time Series Analysis of

Recursive Queries,* (3) a white paper drafted by Fusion GPS regarding a purported Trump-Alfa

Bank connection, and (4) eight files containing falsified, altered, and/or curated data and

information relating to Alfa Bank, Trump Tower, and the mail.trump-email.com domain, to FBI

officials; (iii) withheld and/or concealed pertinent information, including, without limitation, that

he was acting on behalf of his clients, Clinton, the Clinton Campaign, the DNC, and in furtherance

of the Enterprise, the falsified and/or misleading nature of the White Papers and the other

documents that he was handing over, the true nature of his work with Neustar and Joffe, the falsity

of the purported link between Trump Tower and Alfa Bank, and the existence of the Enterprise

and its overarching conspiracy to create a false narrative of Trump-Russia collusion.

300.    Sussmann's conduct in connection with his September 19, 2016 meeting with the

FBI corruptly obstructed, influenced, and impeded and/or endeavored to obstruct, influence or

impede the due administration of justice and/or one or more official proceeding(s), namely

Crossfire Hurricane and/or other ongoing investigations by the FBI, the DOJ, the CIA, and/or the

IG, and therefore constituted a violation of 18 U.S.C. §§ 1503 and/or 1512.

301. On February 9, 2017, Sussmann met with CIA officials at a location outside of Washington D.C., at which time he, among other things: (i) made false statements to CIA officials, including that he was not representing a particular client; (ii) provided falsified, altered and/or misleading records, including the White Papers and multiple data files containing purported DNS data, ranging from 2016 through early 2017, to CIA officials; (iii) withheld and/or concealed pertinent information, including, without limitation, that he was acting on behalf of his clients, Clinton, the Clinton Campaign, the DNC, and in furtherance of the Enterprise, the falsified and/or misleading nature of the White Papers and the other documents that he was handing over, the true nature of his work with Neustar and Joffe, the falsity of the purported link between Trump Tower and Alfa Bank, and the existence of the Enterprise and its overarching conspiracy to create a false narrative of Trump-Russia collusion.

302. Sussmann's actions on February 9, 2017 corruptly obstructed, influenced, and impeded and/or endeavored to obstruct, influence or impede the due administration of justice, and/or one or more official proceedings, namely, ongoing investigations by the CIA, the FBI, the IG, and/or the DOJ and therefore constituted a violation of 18 U.S.C. §§ 1503 and/or 1512.

303. The other RICO Defendants, Clinton, Clinton Campaign, DNC, Perkins Coie, and Elias, had a meeting of the minds, common intent, were aware of, and conspired with Sussmann in the commission of the above-mentioned violations of 18 U.S.C. § 1512, including, without limitation, his conduct in connection with his meeting with the FBI on September 19, 2016 and his meeting with the CIA on February 9, 2017, and each of the other RICO Defendants committed an overt act in furtherance of said violation(s), and the RICO Defendants conspired to commit the above-named acts in furtherance of the overarching conspiracy to denigrate the Plaintiff and to

68

Case 2:22-cv-14102-DMM   Document 260-2   Entered on FLSD Docket 08/18/2022   Page 73 of
114
Case 2:22-cv-14102-XXXX   Document 1   Entered on FLSD Docket 03/24/2022   Page 69 of 108

derail his political career.

304.   Therefore, the actions of the RICO Defendants, Clinton, Clinton Campaign, DNC, Perkins Coie, and Elias, constituted a conspiracy to obstruct justice in violation of 18 U.S.C. § 1512(k).

305.   By virtue of the foregoing, Sussmann, and the other RICO Defendants, willfully, knowingly, deliberately and corruptly obstructed, influenced, and impeded and/or endeavored to obstruct, influence or impede the due administration of justice, and/or one or more official proceedings, including, but not limited to, Crossfire Hurricane and/or other investigations by the FBI, the CIA, the IG, and the DOJ.

306.   In addition, the RICO Defendants conspired with Fusion GPS, Fritsch, Simpson, Orbis Ltd., Steele, and Danchenko to produce the Steele Dossier, which contained falsified, misleading and inaccurate representations about the alleged Trump-Russia connection, and which they knew would be provided to law enforcement, including without limitation the FBI, the DOJ and the CIA, for the purpose of corruptly obstructing, influenced, and impeding and/or endeavoring to obstruct, influence or impede one or more official proceedings, including, but not limited to, Crossfire Hurricane and/or other investigations by the FBI, the CIA, the IG, and the DOJ, in violation of 18 U.S.C. § 1512.

307.   In addition, the RICO Defendants conspired with Danchenko in connection with his conduct in making various false statements and misrepresentations to the FBI in violation of 18 U.S.C. § 1512, including, but not limited to:

   a.   On June 15, 2017, Danchenko stated, at the direction of and in coordination with the RICO Defendants, that he had not spoken with Dolan about any material contained in the Dossier. This statement was patently false, as Danchenko used

69

the information provided by Dolan as a source for allegations made in the Dossier.

    b.   On March 16, 2017, May 18, 2017, October 24, 2017, and November 16, 2017, Danchenko, at the direction of and in coordination with the RICO Defendants, directly lied about the sources relied upon in compiling the Dossier.

308.   The RICO Defendants had a meeting of the minds, common intent, were aware of, and conspired with Fusion GPS, Fritsch, Simpson, Orbis Ltd., Steele, and Danchenko in connection with the commission of the above-mentioned violations of 18 U.S.C. § 1512, including, without limitation, the scheme to produce and fraudulently disseminate the Steele Dossier and Danchenko's various false statements to law enforcement, and each of the other RICO Defendants committed an overt act in furtherance of said violations, and the RICO Defendants conspired to commit the above-named acts in furtherance of the overarching conspiracy to denigrate the Plaintiff and to derail his political career.

309.   Therefore, the actions of the RICO Defendants constituted a conspiracy to obstruct justice in violation of 18 U.S.C. § 1512(k).

310.   Based on the foregoing, the RICO Defendants' actions constituted at least two separate violations of 18 U.S.C. §§ 1503 and/or 1512.

311.   All of Defendants' actions in violation of 18 U.S.C. § 1832 occurred after May 11, 2016 and, therefore, qualify as predicate acts pursuant to the 2016 amendment federal RICO statute.

**Damages**

312.   The Plaintiff has been injured in his business and property as a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(c).

313.   As a direct and proximate result of Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory,

70

special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.

314.   Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' actions and the various federal investigations and/or official proceedings which arose therefrom, in addition to the loss of existing and future business opportunities for himself, the Trump Campaign, and the Trump Organization LLC.

315.   All of these injuries were sustained within, and were the result of conduct occurring within the United States.

316.   The Plaintiff is entitled to recover, pursuant to Title 18 United States Code § 1964(c), treble damages in the amount to be determined by offer of proof at time of trial.  The Plaintiff is also entitled to recover attorneys' fees and costs of this litigation, as well as damages arising from lost profits and/or lost business opportunities attributable to the activities engaged in by defendants committed in furtherance of the Enterprise.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Hillary Clinton, HFACC, Inc., the Democratic National Committee, Perkins Coie, LLP, Michael Sussmann, and Marc Elias for damages, including Compensatory and Treble damages, costs, attorneys' fees, and such further and other relief as this honorable Court may deem just and proper.

**Count II**
**RICO Conspiracy**
**(18 U.S.C. § 1962(D))**
*(Against Clinton, Clinton Campaign, DNC, Perkins Coie, Sussmann, Dolan, Sullivan, Podesta,*
*Mook, Reines, Elias, Fusion GPS, Simpson, Fritsch, Nellie Ohr, Bruce Ohr, Orbis Ltd., Steele,*
*Danchenko, Neustar, and Joffe)*

317.     The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

318.     Defendants, Clinton, the Clinton Campaign, DNC, Perkins Coie, Sussmann, Dolan, Sullivan, Podesta, Mook, Reines, Elias, Fusion GPS, Simpson, Fritsch, Nellie Ohr, Bruce Ohr, Orbis Ltd., Steele, Danchenko, Neustar, and Joffe (the "RICO Conspiracy Defendants"), are all "persons" within the meaning of 18 U.S.C. § 1961(3).

319.     The RICO Conspiracy Defendants conspired with each other to violate 18 U.S.C. § 1962(C) and knowingly agreed, conspired and acted in concert for the express purpose of injuring the Plaintiff's political career and/or impeding his ability to effectively govern through a pattern of racketeering activity.

320.     The RICO Conspiracy Defendants knew that they were engaged in a conspiracy to commit the predicate acts, including theft of trade secrets (18 U.S.C. § 1832) and obstruction of justice (18 U.S.C. §§ 1503 and/or 1512), and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern racketeering activity.  This conduct constitutes conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

321.     Each of the RICO Conspiracy Defendants knew about and agreed to facilitate the Enterprise's scheme to fraudulently concoct a scheme to damage the Plaintiff's political career and undermine his ability to effectively govern as the President of the United States through the wrongful acts identified herein.  It was part of the conspiracy that the RICO Conspiracy Defendants

72

would commit a pattern of racketeering activity in the conduct of the affairs of the enterprise, including the acts of racketeering as set forth herein.

322.   No RICO Conspiracy Defendant has withdrawn, or otherwise dissociated itself, from the conspiracy at issue or the other conspirators.

323.   As a direct and proximate result of RICO Conspiracy Defendants' actions, the Plaintiff has been injured in his business and property has suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.

324.   Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' actions and the various federal investigations and/or official proceedings arose therefrom.

325.   The Plaintiff is entitled to recover, pursuant to Title 18 United States Code § 1964(c), treble damages in the amount to be determined by offer of proof at time of trial.  The Plaintiff is also entitled to recover attorneys' fees and costs of this litigation, as well as damages arising from lost profits and/or lost business opportunities attributable to the activities engaged in by defendants committed in furtherance of the Enterprise.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Michael Sussmann, Perkins Coie, LLP, Hillary R.  Clinton, HFACC, Inc., the Democratic National Committee, the DNC Services Corporation, Charles Halliday Dolan, Jr., Jake Sullivan, John Podesta, Perkins Coie, LLP, Marc Elias, Fusion GPS, Glenn Simpson, Peter Fritsch, Nellie Ohr, Bruce Ohr, Orbis Business

Intelligence, Ltd., Christopher Steele, Igor Danchenko, Neustar, Inc., Rodney Joffe, Robert Mook,

Philippe Reines, James Comey, Peter Strzok, Lisa Page, Kevin Clinesmith, Andrew McCabe, John

Does 1 through 10, said names being fictious and unknown persons, and ABC Corporations 1

through 10, said names being fictitious and unknown entities, for damages, including

compensatory and treble damages, costs, attorneys' fees, and such further and other relief as this

Court may deem just and proper.

### Count III
### Injurious Falsehood
### (18 U.S.C. § 2701-12)
*(Against Clinton, Sullivan, Schultz, Danchenko, Sussmann, and Steele)*

326.   The Plaintiff avers the allegations contained in the preceding paragraphs and

incorporates them in this count, as if set forth at length herein.

327.   As detailed at length herein, on multiple occasions the Defendants, Clinton, Joffe,

Sussmann, Steele, Sullivan, and Schultz, made, disseminated and/or published false and damaging

statements concerning the Plaintiff, specifically that he was colluding with Russia and its President

Vladimir Putin.

328.   At all relevant times, the Defendants acted with actual malice, as they knew that

the Plaintiff was not colluding with Russia or, at a minimum, acted with reckless abandon as to

the truth of whether the Plaintiff had colluded with Russia; despite said knowledge, the Defendants

conspired to disseminate false information and spread a false narrative in an attempt to ruin the

Plaintiff.

329.   These individual Defendants, Clinton, Sullivan, Schultz, Danchenko, Sussmann,

and Steele, made, disseminated, and/or published the false and damaging statements to third

parties, including, but not limited to, government authorities, media outlets, and the general public.

330.   Clinton, Sullivan, and Schultz, among other things, falsely and deliberately

published false and damaging statements about the Plaintiff and his purported ties with Russia and promoted their false allegations through the media.

331.    In turn, the media heavily reported their allegations story as true, making it appear as if the Plaintiff had colluded with the Russian government, despite the falsity of their claims.

332.    Sullivan, among other things, issued a press release on October 31, 2016, on behalf of Clinton and the Clinton Campaign, in made false and damaging claims about the Plaintiff:

> [T]his could be the most direct link yet between Donald Trump and Moscow.  Computer scientists have apparently uncovered a covert server linking the Trump Organization to a Russian-based bank. This secret hotline may be the key to unlocking the mystery of Trump's ties to Russia.  It certainly seems the Trump Organization felt it had something to hide, given that it apparently took steps to conceal the link when it was discovered by journalists.  This line of communication may help explain Trump's bizarre adoration of Vladimir Putin and endorsement of so many pro-Kremlin positions throughout this campaign.  It raises even more troubling questions in light of Russia's masterminding of hacking efforts that are clearly intended to hurt Hillary Clinton's campaign.  We can only assume that federal authorities will now explore this direct connection between Trump and Russia as part of their existing probe into Russia's meddling in our elections.

333.    Clinton, personally, also published the same false and damaging statements to the public, through her Twitter account on October 31, 2016, and to media outlets.

334.    Clinton continues to publish the false and damaging allegations to media outlets.

335.    For example, on June 16, 2021, Hillary Clinton appeared on the Morning Joe show on MSNBC and stated to the general public of the State of Florida, and the rest of the United States: "We don't have Trump as spokesperson for Putin, anymore."  "After disastrous Trump presidency, in which he gave Putin a green light to do whatever he wanted to do, once Trump was elected, of course."

336.    Schultz has also published numerous false and damaging statements about the

Plaintiff and his alleged collusion with Russia.

337.    For example, she told CNN's Erin Burnett on "OutFront", that reported contacts between President Donald J. Trump's campaign aides and Russia amounted to collusion.   Schultz told the reporter, "[W]ith every passing day, it gets more and more disturbing, and more and more evidence that there was collusion." "Donald Trump should be the first person asking for one, but since I think he likely was part of it, it's not surprising that hasn't happened."

338.    Danchenko, among other things, submitted falsified evidence to the FBI and published false and damaging statements orally to the FBI.

339.    Sussmann, among other things, submitted falsified evidence to the FBI, DOJ and CIA and published false and damaging statements orally to the FBI.

340.    Steele, among other things knowingly maintained and published to third parties, including, but not limited to the FBI, the false series of reports referred to as the "Steele Dossier."

341.    The individual Defendants knew that the statements were false at the time they made then and also knew or should have known that said statements would damage the Plaintiff's lawful property interests.

342.    As a direct and proximate result of the individual Defendants' unlawful conduct, the Plaintiff has suffered and will continue to suffer economic losses and irreparable injuries.

343.    As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.

344.    Among other things, the Plaintiff was forced to incur expenses Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be

in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom.

345.    The Plaintiff does not claim nor seek any compensation for damage to his reputation, but rather, he seeks damages for the cost of dealing with the legal issues and political issues, which he was required to spend to redress the injurious falsities which were propounded by the Defendants, and all other losses incurred due to the tortious conduct of the Defendants.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Hillary Clinton, Jake Sullivan, Debbie Wasserman Schultz, Michael Sussmann, Christopher Steele, and Igor Danchenko, and for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

## Count IV
### Conspiracy to Commit Injurious Falsehood
*(Against Clinton, Clinton Campaign, DNC, Perkins Coie, Sussmann, Dolan, Sullivan, Podesta, Schultz, Mook, Reines, Elias, Fusion GPS, Simpson, Fritsch, Nellie Ohr, Bruce Ohr, Orbis Ltd., Steele, Danchenko, Neustar, and Joffe)*

346.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

347.    The Defendants had a meeting of minds to harm the Plaintiff by making false and damaging statements regarding the Plaintiff's alleged collusion with the Russian government, and its President Vladimir Putin, and then disseminating the false and damaging statements by publishing them to third parties, including, but not limited to, government authorities, media outlets, and the general public, in an attempt to cause harm to the Plaintiff.

77

348.    As such, the Defendants conspired to commit unlawful acts by unlawful means. They had different roles, where some actors, such as Danchenko, Dolan, Steele, and Joffe, were involved in the fabrication of supposed facts to put into the Dossier, and later helped to foist it upon the FBI, while others were more involved with the publishing of the allegations to the media and general public, and still others were more involved in feeding false information federal authorities.

349.    Each of the Defendants executed one or more acts in furtherance of the conspiracy, as detailed in this Complaint, and committed overt acts to harm the Plaintiff in furtherance of the conspiracy.

350.    In this regard, the Defendants conspired to create a false narrative that that the Plaintiff was colluding with Russia through their dissemination of false and damaging statements.

351.    At all relevant times, the Defendants acted with actual malice, as they knew that the Plaintiff was not colluding with Russia or, at a minimum, acted with reckless abandon as to the truth of whether the Plaintiff had colluded with Russia; despite said knowledge, the Defendants conspired to disseminate false information and spread a false narrative in an attempt to ruin the Plaintiff.

352.    Despite this knowledge, that no evidence existed of the collusion, the Defendants further conspired to publish the false information to third parties, such as the FBI, other governmental agencies, the news-media outlets, and the U.S. population, in an attempt to smear the Plaintiff's to harm his chance of being elected and properly administrating his office of President of the United States.

353.    As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damage, including but not limited to, actual,

Case 2:22-cv-14102-DMM   Document 260-2   Entered on FLSD Docket 08/18/2022   Page 83 of
114
Case 2:22-cv-14102-XXXX   Document 1   Entered on FLSD Docket 03/24/2022   Page 79 of 108

compensatory, special, incidental, and consequential damage in addition to costs of defense and
attorneys' fees.

354.   Among other things, the Plaintiff was forced to incur expenses in an amount to be
determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and
continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in
connection with his effort to defend against the Defendants' false accusations and the various
federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing
and future business opportunities.

355.   The Plaintiff does not claim nor seek any compensation for damage to his
reputation, but rather, he seeks damages for the cost of dealing with the legal issues and political
issues, which he was required to spend to redress the injurious falsities which were propounded by
the Defendants, and all other losses incurred due to the tortious conduct of the Defendants.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter
a Judgment for Donald J. Trump and against the Defendants, Michael Sussmann, Perkins Coie,
LLP, Hillary R. Clinton, HFACC, Inc., the Democratic National Committee, the DNC Services
Corporation, Debbie Wasserman Schultz, Charles Halliday Dolan, Jr., Jake Sullivan, John Podesta,
Perkins Coie, LLP, Marc Elias, Fusion GPS, Glenn Simpson, Peter Fritsch, Bruce Ohr, Nellie Ohr,
Orbis Business Intelligence, Ltd., Christopher Steele, Igor Danchenko, Neustar, Inc., Rodney
Joffe, Robert Mook, Philippe Reines, John Does 1 through 10, said names being fictious and
unknown persons, and ABC Corporations 1 through 10, said names being fictitious and unknown
entities, for damages, including Punitive damages, costs, and such further and other relief as this
Court may deem just and proper.

Case 2:22-cv-14102-DMM   Document 260-2   Entered on FLSD Docket 08/18/2022   Page 84 of
114
Case 2:22-cv-14102-XXXX   Document 1   Entered on FLSD Docket 03/24/2022   Page 80 of 108

**Count V**
**Malicious Prosecution**
*(Against Sussmann, Elias, Danchenko, Fritsch, Simpson, Nellie Ohr, Steele, Joffe, Comey,*
*McCabe, Strzok, Page, and Clinesmith)*

356.    The Plaintiff avers the allegations contained in the preceding paragraphs and

incorporates them in this count, as if set forth at length herein.

357.    The Defendants, Sussmann, Elias, Danchenko, Fritsch, Simpson, Nellie Ohr, Steele

and Joffe, willfully and knowingly misled FBI and DOJ officials with the intention of inducing the

FBI to commence an investigation of the Plaintiff and his alleged collusion with Russia.

358.    The Defendants, Sussmann, Elias, Danchenko, Fritsch, Simpson, Nellie Ohr, Steele

and Joffe, concocted a scheme to denigrate the Plaintiff and by so doing, to cause harm to his

campaign, and, in the course of carrying out this scheme, conspired to feed false and/or misleading

information to the FBI and the DOJ, which prompted the FBI to commence an investigation.

359.    The Defendants, Sussmann, Elias, Danchenko, Fritsch, Simpson, Nellie Ohr, Steele

and Joffe, were the legal cause of the commencement of the FBI's investigation into the Plaintiff

in that they, among other things, engaged in efforts to falsify information, documents, and/or

evidence, such as the Dossier and the white papers, provided said false information, documents

and/or evidence to the FBI and the DOJ, made false and/or misleading statements to the FBI and

the DOJ concerning, among other things, the facts and circumstances of the development of the

Dossier and the white papers, the credibility of their evidence and sources, the individuals and

entities behind the Dossier and white papers, and other facts relevant to the Defendants' plot to

falsely implicate the Plaintiff.

360.    As a direct and proximate results of the Defendants' efforts, on July 31, 2016, the

FBI launched a Foreign Agents Registration Act ("FARA") investigation, known as Crossfire

Hurricane, to determine whether individual(s) associated with the Plaintiff and his campaign were

witting of and/or coordinating activities with the Russian government.

361.   In acting to bring forth the false information to commence the investigation by the FBI for the express purpose of harming the Plaintiff, the Defendants acted with malicious intent.

362.   The Defendants, Sussmann, Elias, Danchenko, Fritsch, Simpson, Nellie Ohr, Steele and Joffe, acted with actual malice, as they knew that the Plaintiff was not colluding with Russia or, at a minimum, acted with reckless abandon as to the truth of whether the Plaintiff had colluded with Russia; despite said knowledge, the Defendants conspired to disseminate false information and spread a false narrative in an attempt to ruin the Plaintiff.

363.   Subsequent to the commencement of Crossfire Hurricane, additional Defendants who were well-position within the FBI, Comey, McCabe, Strzok, Page, and Clinesmith, were the legal cause of the continuation of the FBI's investigation and the commencement of extrajudicial FISA surveillance of the Plaintiff and his administration in that they, among other things, engaged in efforts to falsify evidence, information and/or documents, such as an e-mail correspondence regarding Carter Page that was submitted in furtherance of FISA application(s); relied upon knowingly false information including, without limitation, the White Papers and the Steele Dossier, which the Defendants were aware was not credible and was funded by the Clinton Campaign and the DNC; withheld pertinent and material information from FISA applications and in submissions, communications, and correspondences with judges, law enforcement officials, supervisors, superiors, and other government officials; made false and/or misleading statements to the FISC, Congress, and/or the Plaintiff, who at the time was sitting President of the United States; and otherwise misled as to the credibility of the evidence supporting their investigation, the individuals and entities behind the Dossier and white papers, and other facts relevant to the evidentiary basis for Crossfire Hurricane, the FISA applications, the Mueller investigation, and

other related investigations regarding the alleged Trump-Russia connection.

364.    In acting to falsely maintain and continue the investigation(s) by the FBI and the DOJ for the express purpose of harming the Plaintiff, the Defendants, Comey, McCabe, Strzok, Page, and Clinesmith, acted with malicious intent.

365.    The Defendants, Comey, McCabe, Strzok, Page, and Clinesmith, acted with actual malice, as they knew that the Plaintiff was not colluding with Russia or, at a minimum, acted with reckless abandon as to the truth of whether the Plaintiff had colluded with Russia, and they knew that Crossfire Hurricane lacked a legitimate evidentiary basis and was based on a false and contrived premise; despite said knowledge, the Defendants conspired to continue the baseless investigations, to obtain FISA warrants in excess of their lawful authority, and to proliferate the spread of the Defendants' false narrative.

366.    As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.

367.    Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities for himself, the Trump Campaign, and the Trump Organization LLC.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter

Case 2:22-cv-14102-DMM   Document 260-2   Entered on FLSD Docket 08/18/2022   Page 87 of
114
Case 2:22-cv-14102-XXXX   Document 1   Entered on FLSD Docket 03/24/2022   Page 83 of 108

a Judgment for Donald J. Trump and against the Defendants, Michael Sussmann, Peter Fritsch, Glenn Simpson, Christopher Steele, Nellie Ohr, Igor Danchenko, Rodney Joffe, James Comey, Andrew McCabe, Peter Strzok, Lisa Page, and Kevin Clinesmith for compensatory damages, Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

### Count VI
### Conspiracy to Commit Malicious Prosecution
*(Against Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson, Fritsch, Steele, Ohr, Danchenko, Joffe, Podesta, Mook, Reines, Comey, McCabe, Strzok, Page, and Clinesmith)*

368.   The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

369.   The Defendants, Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson, Fritsch, Steele, Ohr, Danchenko, and Joffe, had a meeting of minds and a common plan to induce the FBI and/or the Department of Justice through deceptive means into commencing an unfounded investigation into the Plaintiff's alleged collusion with the Russian government, Vladimir Putin, and other government officials.

370.   The Defendants, Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson, Fritsch, Steele, Ohr, Danchenko, and Joffe, conspired to cause the FBI's investigation to be commenced, and continue forward, by, among other things, falsifying information, documents, and evidence, such as the Dossier and the white papers, providing said falsified information, documents, and evidence to the FBI and the DOJ, and making false and/or misleading statements to the FBI and the DOJ concerning, among other things, the facts and circumstances of the development of the Dossier and the white papers, the credibility of their evidence and sources, the individuals and entities behind the Dossier and White Papers, and other facts relevant to the Defendants' plot to falsely implicate the Plaintiff.

371.   The Defendants, Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson,

Fritsch, Steele, Ohr, Danchenko, and Joffe, concocted a scheme to denigrate the Plaintiff and

tarnish his harm his chance of becoming elected and then to properly and effectively administrate

his office of President of the United States.  In the course of carrying out this scheme, they

conspired to feed false and/or misleading information to the FBI and the DOJ which prompted the

FBI to commence an investigation.

372.    The Defendants, Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson,

Fritsch, Steele, Ohr, Danchenko, and Joffe, conspired to do an unlawful act by unlawful means.

373.    The Defendants, Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson,

Fritsch, Steele, Ohr, Danchenko, and Joffe, acted with actual malice, as they knew that the Plaintiff

was not colluding with Russia or, at a minimum, acted with reckless abandon as to the truth of

whether the Plaintiff had colluded with Russia; despite said knowledge, the Defendants conspired

to disseminate false information and spread a false narrative in an attempt to ruin the Plaintiff.

374.    Moreover, in conspiring to bring forth the false information to commence the

investigation by the FBI for the express purpose of harming the Plaintiff, the Defendants, Clinton,

Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson, Fritsch, Steele, Ohr, Danchenko, and Joffe,

acted with malicious intent.

375.    Subsequent to the commencement of Crossfire Hurricane, additional Defendants

who were well-positioned within the FBI, Comey, McCabe, Strzok, Page, and Clinesmith,

conspired to continue the FBI's investigation and to commence an extrajudicial FISA surveillance

of the Plaintiff and his administration in that they, among other things, conspired to falsify

evidence, information and/or documents, such as an e-mail correspondence regarding Carter Page

that was submitted in furtherance of FISA application(s); conspired to rely upon knowingly false

information including, without limitation, the White Papers and the Steele Dossier, which the

Defendants were aware was not credible and was funded by the Clinton Campaign and the DNC; conspired to withhold pertinent and material information from FISA applications and in submissions, communications, and correspondences with judges, law enforcement officials, supervisors, superiors, and other government officials; conspired to make false and/or misleading statements to the FISC, Congress, and/or the Plaintiff, who at the time was sitting President of the United States; and otherwise conspired to mislead as to the credibility of the evidence supporting their investigation, the individuals and entities behind the Dossier and white papers, and other facts relevant to the evidentiary basis for Crossfire Hurricane, the FISA applications, the Mueller investigation, and other related investigations regarding the alleged Trump-Russia connection.

376.    In conspiring to falsely maintain and continue the investigation(s) by the FBI and the DOJ for the express purpose of harming the Plaintiff, the Defendants, Comey, McCabe, Strzok, Page, and Clinesmith, acted with malicious intent.

377.    The Defendants, Comey, McCabe, Strzok, Page, and Clinesmith, acted with actual malice, as they knew that the Plaintiff was not colluding with Russia or, at a minimum, acted with reckless abandon as to the truth of whether the Plaintiff had colluded with Russia, and they knew that Crossfire Hurricane lacked a legitimate evidentiary basis and was based on a false and contrived premise; despite said knowledge, the Defendants conspired to continue the baseless investigations, to obtain FISA warrants in excess of their lawful authority, and to proliferate the spread of the Defendants' false narrative.

378.    Each of the above-named Defendants executed several acts in furtherance of the conspiracy, as detailed at length in this Complaint, and committed overt acts to harm the Plaintiff in the furtherance of the conspiracy.

379.    As a direct and proximate result of the Defendants' actions, the Plaintiff has

suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.

380.   As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damage, including but not limited to, actual, compensatory, special, incidental, and consequential damage in addition to costs of defense and attorneys' fees.

381.   Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Hillary Clinton, Michael Sussmann, Debbie Wasserman Schultz, Charles Halliday Dolan, Jr., Jake Sullivan, Marc Elias, Glenn Simpson, Peter Fritsch, Christopher Steele, Nellie Ohr, Igor Danchenko, and Rodney Joffe, John Podesta, Robert Mook, Philippe Reines, James Comey, Andrew McCabe, Peter Strzok, Lisa Page, and Kevin Clinesmith for compensatory damages, Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

## Count VII
### Computer Fraud and Abuse Act
### (18 U.S.C. § 1030)
*(Against Neustar, Joffe, DNC, Clinton Campaign, Clinton, Perkins Coie, Sussmann)*

382.   The Plaintiff avers the allegations contained in the preceding paragraphs and

incorporates them in this count, as if set forth at length herein.

383.    The computers belonging to the Executive Office of the President of the United States are non-public, belonging to a department or agency of the United States, are exclusively for the use of the United States Government and are involved in interstate and foreign commerce and communications.

384.    The computers belonging to the Trump Organization LLC, located at Trump Tower, are involved in interstate and foreign commerce and communication and, therefore, are protected computers under 18 U.S.C. § 1030(e)(2).

385.    The Defendants' conduct as alleged herein violated 18 U.S.C. §§ 1030(a)(2), 1030(a)(3), 1030(a)(4), and/or 1030(a)(6).

386.    The Defendants, Neustar and Joffe, knowingly, intentionally and unlawfully accessed and/or exceeded their authority to access the computers at the Executive Office of the President of the United States and thereby obtained and used valuable, sensitive and/or proprietary information and data from those computers in violation of 18 U.S.C. § 1030(a)(2)(B), 1030(a)(2)(C), and 1030(a)(3).

387.    Such information and data include, but are not limited to, non-public, sensitive, confidential, classified and/or proprietary internet data, DNS records, techniques, processes, procedures and programs.

388.    Neustar and Joffe also knowingly, intentionally, and unlawfully accessed and/or exceeded their authority to access computers belonging to the Trump Organization LLC, located at the Trump Tower, and thereby obtained and used valuable, sensitive and/or proprietary information and data from those computers in violation of 18 U.S.C. § 1030(a)(2)(C).

389.    Such information and data include, but are not limited to, non-public, sensitive,

Case 2:22-cv-14102-DMM   Document 260-2   Entered on FLSD Docket 08/18/2022   Page 92 of
114
Case 2:22-cv-14102-XXXX   Document 1   Entered on FLSD Docket 03/24/2022   Page 88 of 108

confidential and/or proprietary internet data, DNS records, business methods, techniques, processes, procedures and programs.

390.    As detailed at length herein, the Defendants, the DNC, the Clinton Campaign, Clinton, Perkins Coie, and Sussmann conspired with Neustar and Joffe in their commission of the above-stated acts, in violation of 18 § U.S.C. 1030(b).

391.    As a direct and proximate result of the DNC, the Clinton Campaign, Clinton, Perkins Coie, Sussmann, Neustar, and Joffe's violations of 18 U.S.C. § 1030, the Plaintiff has been injured and has sustained a loss in excess of $5,000.

392.    Among other things, the Defendants obtained valuable, sensitive, proprietary and confidential data and information pertaining to the Plaintiff, which they manipulated, falsified and altered for nefarious purposes, and, in addition, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' actions and the various federal investigations and/or official proceedings arose therefrom

393.    The acts of the above-mentioned Defendants which violated 18 U.S.C. § 1030 were not discoverable until September 16, 2021, upon the disclosure of said acts described in the indictment of Michael Sussmann in *United States v. Sussmann*, case no. 1:21-cr-00582-CRC, United States District Court, District for Columbia.

394.    As a direct and proximate result of the Defendant's actions, the Plaintiff has suffered, and continues to suffer, significant damage, including but not limited to, actual, compensatory, special, incidental, and consequential damage, including, among other things, the cost of investigating and responding to the unauthorized access, defending himself against federal

investigations, harm to his business, and loss of trade secrets and/or other proprietary, sensitive or valuable information and data, entitling the Plaintiff to compensatory relief under 18 U.S.C. § 1030(g).

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Neustar, Inc., Rodney Joffe, Perkins Coie, LLP, Michael Sussmann, HFACC, Inc., the Democratic National Committee, the DNC Services Corporation, and Hillary Clinton for compensatory damages, Punitive damages, costs, attorneys' fees, and such further and other relief as this honorable Court may deem just and proper.

**Count VIII**
**Theft of Trade Secrets**
**(18 U.S.C. § 1830-32)**
*(Against Neustar, Joffe, Perkins Coie, Sussmann, Clinton Campaign, DNC, and Clinton)*

395.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

396.    The Plaintiff owns and possesses certain non-public, proprietary, sensitive and confidential information and data, including without limitation, DNS data.

397.    DNS internet traffic data houses highly proprietary, sensitive and confidential data. For example, among other things, an analysis of raw DNS data could reveal a comprehensive view into an individual or a company's website traffic, e-mail traffic, webmail traffic, chat messaging, in addition to the types of technology, hardware, software, programs, securities and processes being utilized by the servers.

398.    Neustar and Joffe, at the direction of Perkins Coie, Sussmann, Clinton Campaign, DNC, and Clinton, exploited access to non-public data sources and/or servers, and unlawfully acquired, stole and exploited sensitive, proprietary and confidential internet data, including without limitation, DNS information, traffic, and/or data originating from computers and/or

89

servers: (i)located at Plaintiff's private apartment in Central Park West in New York and belonging to the Plaintiff; and (ii) located at Trump Tower and belonging to The Trump Organization, in which Plaintiff has an ownership interest (collectively, with the computers and/or servers house in Plaintiff's private apartment, "Plaintiff's Servers").

399.   Joffe and Neustar exploited their access to non-public data to, among other things, mine DNS traffic and other data from Plaintiff's Servers for the purpose of gathering derogatory information about the Plaintiff.

400.   In doing so, Joffe and Neustar intentionally accessed, without authorization, Plaintiff's Servers.

401.   By illegally accessing the above-mentioned information and data, the Neustar and Joffe, were able to obtain proprietary, sensitive, and/or confidential information and data including, among other things, the number and frequency of e-mail communications between the Plaintiff's Servers and other third party servers, the number and frequency of website visits to third party websites by the Plaintiff's Servers, the number and frequency of webmail interactions between the Plaintiff's Servers and other third party servers, and the number and frequency of chat messaging interactions between the Plaintiff's Servers and other third party servers, as well as information pertaining to the types of software, programs, securities and processes being utilized by Plaintiff's Servers.

402.   This information and data revealed highly proprietary, sensitive, and confidential knowledge, including insight into Plaintiff's and The Trump Organization's business dealings, financial dealings, communications, future and current plans, techniques, patterns, methods, processes, and procedures, as well as identification of their corporate partners, political associates, clients, and vendors.

403.    This proprietary, sensitive and confidential information, data and/or knowledge constitutes trade secrets within the meaning of 18 U.S.C. § 1839(3) where they constitute business and/or political methods, techniques, processes, procedures and programs that are both protected from disclosure by the Plaintiff and derive significant economic value from not generally being known to or ascertainable by others, including the Defendants, who can obtain economic value from disclosure or use of such information.

404.    The Plaintiff and The Trump Organization restricts access to their proprietary, sensitive and confidential information and data, including DNS data, even within their own personnel and prevents unauthorized access to such records by digital or electronic means.

405.    The Plaintiff and The Trump Organization further protects against theft and disclosure of such information by third parties by the requirement of executed non-disclosure agreements prior to providing any such access.

406.    Defendants, Neustar and Joffe, violated the Defend Trade Secrets Act, 18 U.S.C. § 1832(a)(1), by knowingly obtaining the Plaintiff's confidential records by fraud, artifice, and deception and, thereafter, stealing, appropriating, taking, carrying away, and concealing the theft of the Plaintiff's confidential records with intent to convert the Plaintiff's confidential records, which are related to products sold in interstate and foreign commerce, to the Defendants' own benefit, while knowing and intending that such misappropriation would injure the Plaintiff.

407.    Defendants, Perkins Coie, Sussmann, Clinton Campaign, DNC, and Clinton, conspired with Neustar and Joffe to commit the above-named acts in furtherance of the overarching conspiracy to denigrate and spread injurious falsehoods to harm the Plaintiff's political career and to impede his ability to effectively govern.

408.    Defendants, Perkins Coie, Sussmann, Clinton Campaign, DNC, and Clinton,

conspired with Neustar and Joffe to violate the Defend Trade Secrets Act, 18 U.S.C. § 1832(a)(1), by assisting, aiding, and abetting Neustar and Joffe in obtaining Plaintiff's proprietary, sensitive and confidential information and data by fraud, artifice, and deception and, thereafter, stealing, appropriating, taking, carrying away, and concealing the theft of Plaintiff's confidential records with intent to convert Plaintiff's confidential records, which are related to products sold in interstate and foreign commerce, to Defendants' own benefit, while knowing and intending that such misappropriation would injure the Plaintiff

409.   Each of the Defendants, Perkins Coie, Sussmann, Clinton Campaign, DNC, and Clinton, were aware of, and active participants in, the conspiracy for Neustar and Joffe's to violate the Defend Trade Secrets Act, 18 U.S.C. § 1832, and each of the RICO Defendants committed at least one act in furtherance of this goal.

410.   The Plaintiff's confidential records were misappropriated by Defendants within the meaning of 18 U.S.C. § 1839(5), where the Plaintiff's records were acquired by the Defendants, through unlawful and deceptive acts, without the Plaintiff's authorization and through Defendants' acts of espionage or other improper means conducted by electronic or other means.

411.   The theft of the protected trade secrets has damaged the Plaintiff.

412.   The actions of Defendants, Neustar and Joffe, constitute theft of trade secrets in violation of 18 U.S.C. § 1832(a)(1).

413.   The actions of Defendants, Perkins Coie, Sussmann, Clinton Campaign, DNC, and Clinton, constitute a conspiracy to steal trade secrets in violation of 18 U.S.C. § 1832(a)(5).

414.   As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damage, including but not limited to, actual, compensatory, special, incidental, and consequential damage in addition to costs of defense and

attorneys' fees.

415.    Among other things, the Plaintiff was forced to incur, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' actions and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Neustar, Inc., Rodney Joffe, Perkins Coie, LLP, Michael Sussmann, HFACC, Inc., the Democratic National Committee, the DNC Services Corporation, and Hillary Clinton, for compensatory damages, Punitive damages, costs, attorneys' fees, and such further and other relief as this Court may deem just and proper.

### Count IX
### Stored Communications Act
### (18 U.S.C. 2701-12)
*(Against Neustar and Joffe)*

416.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

417.    The Defendants, Neustar and Joffee, on one or more occasions willfully and intentionally accessed, without authorization or in excess of any authorization, facilities through which an electronic communication is provided.

418.    Neustar and Joffee obtained unauthorized access to or, at a minimum, exceeded their authorization to access, numerous facilities through which an electronic communication is provided, including, but not limited to: (i) the computers, networks and/or servers of the Plaintiff's private New York residence; (ii) the computers, networks and/or servers of the Executive Office

93

Case 2:22-cv-14102-DMM   Document 260-2   Entered on FLSD Docket 08/18/2022   Page 98 of
114
Case 2:22-cv-14102-XXXX   Document 1   Entered on FLSD Docket 03/24/2022   Page 94 of 108

of the President of the United States; and (iii) the computers, networks and/or servers of the Trump

Organization LLC, specifically located at Trump Tower (collectively, the "Computers").

419.   Neustar and Joffee obtained wire or electronic communications from the

Computers that were in electronic storage in such systems.

420.    The Plaintiff was aggrieved as a direct and proximate result of Neustar and Joffe's

actions, and was caused to suffer significant damage, entitling him to an award for monetary relief

under 18 U.S.C. § 2707(c).

421.   The violations of Neustar and Joffe were willful and intentional, thereby warranting

an award of punitive damages under 18 U.S.C. § 2707(c).

422.   Moreover, in conspiring to bring forth the false information to commence the

investigation by the FBI for the express purpose of harming the Plaintiff, the Defendants, Clinton,

Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson, Fritsch, Steele, Ohr, Danchenko, and Joffe,

acted with malicious intent.

423.   The Plaintiff also seeks an award for attorneys' fees and costs as permitted pursuant

to 18 U.S.C. § 2707(c)

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter

a Judgment for Donald J. Trump and against the Defendants, Neustar, Inc. and Rodney Joffe, for

compensatory damages, punitive damages, costs, attorneys' fees, and such further and other relief

as this Court may deem just and proper.

## Count X
### Agency
*(Against Clinton)*

424.   The Plaintiff avers the allegations contained in the preceding paragraphs and

incorporates them in this count, as if set forth at length herein.

425.     Clinton, acting as a principal, used the law firm, Perkins Coie, and the Clinton Campaign as her agents to act on her behalf to carry out the plot against Trump to assure that he would be falsely implicated as colluding with a hostile foreign sovereignty.

426.     Specifically, the Clinton Campaign and the DNC under Clinton's direction put into place a scheme to hire dishonest operatives to put together a collection of lies and innuendo about the Plaintiff and shop it to the FBI.  The statements that were disseminated were knowingly false and damaging.

427.     Clinton directed the DNC and the Clinton Campaign to also retain Perkins Coie, LLP to find proof of a sinister link between Trump and Russia in the lead-up to the 2016 Presidential Election.

428.     The Clinton Campaign and the DNC, under the direction of Hillary Clinton, directed its law firm, Perkins Coie, to hire an outside intelligence firm, Fusion GPS to dig up dirt on the Plaintiff's alleged connections with Russia in 2016.  They paid Fusion GPS approximately $10 million to produce and propagate a false narrative that the Plaintiff had colluded with the Russians.

429.     Clinton attempted to shield her involvement through a barricade of agents working on her behalf.

430.     Once retained Perkins Coie, was tasked with spearheading the mission to find or fabricate proof of a sinister link between Trump and Russia in the lead-up to the 2016 Presidential Election.

431.     The Clinton Campaign also secured Joffe and his company Neustar, Inc.  to help Clinton achieve her goal.

432.     During the lead-up to the 2016 Presidential Election, the Clinton Campaign retained Perkins Coie to perform "opposition research" on the Trump Campaign.

433.    Perkins Coie did not provide legal services to the Defendants, but instead, was commissioned to dig up whatever dirt they could on the Plaintiff, and to the extent there was none, to manufacture it.

434.    Perkins Coie, acting with the knowledge and direction of the Clinton Campaign, then proceeded to proliferate a false narrative that the Trump Campaign was actively colluding with Russian operatives to subvert the 2016 Presidential Election.

435.    Sussmann and Elias, while working for Perkins Coie, and working on behalf of the Clinton Campaign, worked with Joffe and attempted to find any such wrongdoing by the Plaintiff.

436.    Sussmann advised the media and others, falsely and knowingly claiming to demonstrate the existence of a secret communications channel between the Trump Organization and Alfa Bank.  In this regard, Sussmann invoiced the Clinton Campaign for his communications with Joffe and Elias.

437.    Sussmann was also advising the Clinton Campaign in connection with cybersecurity issues, and Perkins Coie, acted as the Clinton Campaign's General Counsel.

438.    Joffe used his access at multiple organizations to gather and mine public and non-public Internet data regarding Trump and his associates, with the goal of creating a "narrative" regarding the candidate's ties to Russia."

439.    Joffe later shared certain results of those data searches and analysis with Sussmann so that Sussmann, in turn, could provide them to the media and the FBI.

440.    Clinton was fully aware of the plan and hired and instructed the necessary parties to make it happen.

441.    Moreover, employees of Perkins Coie, Elias and Sussmann had multiple conferences regarding their work and billed the Clinton Campaign for these meetings.

442.    All of the abovementioned acts were committed by Perkins Coie under the instruction and for the benefit of Hillary Clinton and the Clinton Campaign.

443.    The agents, the Clinton Campaign and Perkins, Coie, LLP, were not acting outside of the instructions of the principal when committing the above-mentioned acts because they were hired for the sole purpose of digging up or manufacturing information on the Plaintiff.

444.    Sussmann, and his firm, Perkins Coie were always acting on behalf of and in coordination with the Clinton Campaign, in assembling and conveying Sussmann's allegations.

445.    Additionally, all of Sussmann's recorded time and work relating to the Russian Bank were billed to the Clinton Campaign.

446.    Clinton is liable as a principal for all of the acts her agents committed against the Plaintiff at her request and for her benefit.

447.    As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damage, including but not limited to, actual, compensatory, special, incidental, and consequential damage in addition to costs of defense and attorneys' fees.

448.    Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities.

449.    The Plaintiff does not claim nor seek any compensation for damage to his reputation, but rather, he seeks damages for the cost of dealing with the legal issues and political

issues, which he was required to spend to redress the injurious falsities which were propounded by the Defendants, and all other losses incurred due to the tortious conduct of the Defendants.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, Hillary Clinton, for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

### Count XI
### Respondeat Superior/Vicarious Liability
*(Against Perkins Coie)*

450.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

451.    Under the doctrine of respondeat superior, the Defendant, Perkins Coie, is vicariously responsible for the torturous conduct of its agents, servants, representatives, employees and/or contractors.

452.    Specifically, under the doctrine of respondeat superior, Perkins Coie is responsible for the tortious actions that its employees, Sussmann and Elias, committed.

453.    Elias and Sussmann were two of Perkins Coie's senior partners responsible for representing the DNC.  The senior partners negotiated the Joint Fund-Raising Agreement between the DNC and the Clinton Campaign in which Hillary Clinton would be permitted to control the party's finances, strategy, and utilize the money that the DNC raised.

454.    Sussmann and Joffe engaged in efforts with Elias and individuals acting on behalf of the Clinton Campaign to manufacture evidence of wrongdoing by the Plaintiff and the existence of a secret communications channel between the Trump Organization and Alfa Bank.

455.    Sussmann reported the Alfa Bank connection as though it was real and lied to the

98

FBI General Counsel in that he falsely stated that he was not acting on behalf of any client, when he was specifically there at the behest of Clinton, the Clinton Campaign, and the DNC.  In fact, he invoiced the Clinton Campaign for his efforts.

456.    From in or about late July through in or about mid-August 2016, Sussmann, Joffe, and Elias coordinated and communicated about the Plaintiff's involvement with Alfa Bank. Sussmann and Perkins Coie invoiced the Clinton Campaign for that conspiratorial meeting.

457.    Elias and Sussmann perpetrated lies about the Plaintiff and falsified evidence.  Elias and Sussmann committing these egregious acts while working for a client of their firm.  The DNC and the Clinton Campaign hired Perkins Coie and Sussmann and Elias to complete the work as a part of their job.

458.    At all material times, the above-named employees were all acting within the scope of their employment, performing work for their employer at the time of the tortious conduct, and therefore are responsible for the actions of their employees.

459.    As a direct and proximate result of the torturous actions by agents, servants, representatives, employees and/or contractors, as alleged above, Perkins Coie is vicariously liable to the Plaintiff, as he suffered losses due to the actions of the employees who were working within the scope of their employment.

460.    As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damage, including but not limited to, actual, compensatory, special, incidental, and consequential damage in addition to costs of defense and attorneys' fees.

461.    Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and

continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities for himself, the Trump Campaign, and the Trump Organization LLC.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, Perkins Coie, LLP, for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

### Count XII
### Respondeat Superior/Vicarious Liability
*(Against the DNC)*

462.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

463.    Under the doctrine of respondeat superior, the Defendant, the DNC, is vicariously responsible for the torturous conduct of its agents, servants, representatives, employees and/or contractors.

464.    Specifically, under the doctrine of respondeat superior, the DNC is responsible for the tortious actions committed by its chairperson, Schultz, and other members and employees.

465.    At all material times, the above-named employees were all acting within the scope of their employment, performing work for their employer at the time of the tortious conduct, and therefore are responsible for the actions of their employees.

466.    As a direct and proximate result of the torturous actions by agents, servants, representatives, employees and/or contractors, as alleged above, the DNC is vicariously liable to

100

the Plaintiff, as he suffered losses due to the actions of the employees who were working within the scope of their employment.

467.    Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, the Democratic National Committee, the DNC Services Corporation, for Compensatory damages, Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

### Count XIII
### Respondeat Superior/Vicarious Liability
*(Against the Clinton Campaign)*

468.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

469.    Under the doctrine of respondeat superior, the Defendant, the Clinton Campaign, vicariously responsible for the torturous conduct of its agents, servants, representatives, employees and/or contractors.

470.    Specifically, under the doctrine of respondeat superior, the Clinton Campaign is responsible for the tortious actions committed by its campaign manager, communications director, and foreign policy advisor.

471.    On or about September 15, 2016, Elias exchanged emails with the Clinton

101

Campaign's campaign manager, communications director, and foreign policy advisor concerning the plot to falsely connect Donald J. Trump to a Russian bank.

472.   At all material times, the above-named employees were all acting within the scope of their employment, performing work for their employer at the time of the tortious conduct, and therefore are responsible for the actions of their employees.

473.   As a direct and proximate result of the torturous actions by agents, servants, representatives, employees and/or contractors, as alleged above, the Clinton Campaign is vicariously liable to the Plaintiff, as he suffered losses due to the actions of the employees who were working within the scope of their employment.

474.   Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, HFACC Inc., for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

## Count XIV
### Respondeat Superior/Vicarious Liability
#### (Against Fusion GPS)

475.   The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

476.   Under the doctrine of respondeat superior, the Defendant, Fusion GPS is vicariously

responsible for the torturous conduct of its agents, servants, representatives, employees and/or contractors.

477.   Specifically, under the doctrine of respondeat superior, Fusion GPS is responsible for the tortious actions committed by its employees, Fritsch and Simpson.

478.   Elias, in his mission to obtain derogatory anti-Trump 'opposition research,' commissioned Fusion GPS, and its co-founders, Fritsch and Simpson, and directed them to dredge up evidence—legitimate or otherwise, true or otherwise, of collusion between the Plaintiff and Russia.

479.   Fritsch and Simpson, in turn, enlisted the assistance of Orbis Ltd and its owner, Steele, to produce a series of reports setting forth damning evidence of the supposed collusion between the Plaintiff and Russia.

480.   Moreover, the efforts of Ohr to pass the knowingly false Dossier through her husband to the Department of Justice, while she was in the full-time employment of Fusion GPS also leads to the liability of Fusion GPS.

481.   The now-debunked collection of reports, known as the "Steele Dossier" or simply the "Dossier," was riddled with misstatements, misrepresentations and flat out lies.  As it turns out, the Dossier was largely based upon information provided to Steele by his primary sub-source, Danchenko, who admittedly fabricated his claims.

482.   Danchenko had close ties to senior Clinton Campaign official Dolan, who knowingly provided false information to Danchenko, who relayed it to Steele, who reported it in his Dossier and fed it to the FBI and the media.

483.   Fritsch and Simpson were hired and working for their company Fusion GPS when they fabricated research and evidence.

484.   At all material times, the above-named employees were all acting within the scope of their employment, performing work for their employer at the time of the tortious conduct, and therefore are responsible for the actions of their employees.

485.   As a direct and proximate result of the torturous actions by agents, servants, representatives, employees and/or contractors, as alleged above, Fusion GPS is vicariously liable to the Plaintiff, as he suffered losses due to the actions of the employees who were working within the scope of their employment.

486.   Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, Fusion GPS, for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

## Count XV
### Respondeat Superior/Vicarious Liability
*(Against Orbis Business Intelligence Ltd)*

487.   The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

488.   Under the doctrine of respondeat superior, the Defendant, Orbis, vicariously responsible for the torturous conduct of its agents, servants, representatives, employees and/or contractors.

104

489.   Specifically, under the doctrine of respondeat superior, Orbis is responsible for the tortious actions committed by its employee, Steele.

490.   Fritsch and Simpson enlisted the assistance of Orbis Ltd and its owner, Steele, to produce a series of reports setting forth damning evidence of the supposed collusion between the Plaintiff and Russia.

491.   The now-debunked collection of reports, known as the "Steele Dossier" or simply the "Dossier," was riddled with misstatements, misrepresentations and flat out lies. As it turns out, the Dossier was largely based upon information provided to Steele by his primary sub-source, Danchenko, who admittedly fabricated his claims.

492.   Danchenko had close ties to senior Clinton Campaign official, Dolan, who knowingly provided false information to Danchenko, who relayed it to Steele, who reported it in his Dossier and fed it all the way back up the chain.

493.   Fusion GPS was hired to create the fabricated Dossier and Steele was working for the company when he created it.

494.   At all material times, the above-named employees were all acting within the scope of their employment, performing work for their employer at the time of the tortious conduct, and therefore are responsible for the actions of their employees.

495.   As a direct and proximate result of the tortious actions by agents, servants, representatives, employees and/or contractors, as alleged above, Orbis is vicariously liable to the Plaintiff, as he suffered losses due to the actions of the employees who were working within the scope of their employment.

496.   As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damage, including but not limited to, actual,

compensatory, special, incidental, and consequential damage in addition to costs of defense and attorneys' fees.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, Orbis Business Intelligence Ltd., for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

**Count XVI**
**Respondeat Superior/Vicarious Liability**
*(Against Neustar)*

497.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

498.    Under the doctrine of respondeat superior, the Defendant, Neustar vicariously responsible for the torturous conduct of its agents, servants, representatives, employees and/or contractors.

499.    Specifically, under the doctrine of respondeat superior, Neustar is responsible for the tortious actions committed by its employee, Joffe.

500.    The Clinton Campaign secured Neustar, Inc. which is run by Joffe, to help Hillary Clinton achieve her goal.

501.    Sussmann and Elias, while working for Perkins Coie, LLP, and working on behalf of the Clinton Campaign, worked with Joffe and attempted to find wrongdoing by the Plaintiff or the Trump Organization.

502.    Sussmann advised the media and others, falsely and knowingly claiming to demonstrate the existence of a secret communications channel between the Trump Organization and Alfa Bank. In this regard, Sussmann invoiced the Clinton Campaign for his Communications

106

with Joffe and Elias.

503.   Sussmann was also advising the Clinton Campaign in connection with cybersecurity issues, and Perkins Coie, acted as the Clinton Campaign's General Counsel.

504.   Joffe used his access at multiple organizations to gather and mine public and non-public Internet data regarding Trump and his associates, with the goal of creating a "narrative" regarding the candidate's ties to Russia."

505.   Joffe later shared certain results of those data searches and analysis with Sussmann so that Sussmann, in turn, could provide them to the media and the FBI.

506.   Joffe was working and acting on behalf of Neustar when he attempted to find wrongdoing and fabricated facts and evidence.

507.   At all material times, the above-named employees were all acting within the scope of their employment, performing work for their employer at the time of the tortious conduct, and therefore are responsible for the actions of their employees.

508.   As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damage, including but not limited to, actual, compensatory, special, incidental, and consequential damage in addition to costs of defense and attorneys' fees.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, Neustar, Inc., for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

### **Jury Demand**

The Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: March 24, 2022

Respectfully submitted by:

**THE TICKTIN LAW GROUP**
270 SW Natura Avenue
Deerfield Beach, Florida 33441
Telephone: (561) 232-2222


 /s/ Peter Ticktin
PETER TICKTIN, ESQUIRE
Florida Bar No. 887935
JAMIE ALAN SASSON, ESQUIRE
Florida Bar No. 10802
SHAINA VANMEHREN, ESQUIRE
Florida Bar No. 1025180
Our Matter No.: 22-0062

and

**HABBA MADAIO & ASSOCIATES LLP**
1430 US Highway 206
Suite 240
Bedminster, New Jersey 07921
ALINA HABBA, ESQUIRE **(Upon Anticipated Admission *Pro Hac Vice*)**
New Jersey Bar No. 018592010
MICHAEL T. MADAIO, ESQUIRE **(Upon Anticipated Admission *Pro Hac Vice*)**
New Jersey Bar No. 070752013

Case 2:22-cv-14102-XXXX   Document 1-20   Entered on FLSD Docket 03/24/2022   Page 1 of 2

JS 44 (Rev. 10/20) FLSD Revised 02/12/2021

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)* **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

**I. (a) PLAINTIFFS**

DONALD J. TRUMP, 45th PRESIDENT OF TI

**DEFENDANTS**

HILLARY R. CLINTON, et al.,

**(b)** County of Residence of First Listed Plaintiff  Palm Beach
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

The Ticktin Law Group, 270 SW Natura Avenue, Deerfield Beach, FL

Attorneys *(If Known)*

**(d)** Check County Where Action Arose:  ☐ MIAMI- DADE  ☐ MONROE  ☐ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☒ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE  ☐ HIGHLANDS

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question *(U.S. Government Not a Party)*

☐ 2 U.S. Government Defendant

☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*   Click here for: Nature of Suit Code Descriptions

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729 (a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | ☐ 340 Marine | | | ☐ 835 Patent – Abbreviated New Drug Application | ☐ 460 Deportation |
| Student Loans | ☐ 345 Marine Product Liability | | **LABOR** | ☐ 840 Trademark | ☒ 470 Racketeer Influenced and Corrupt Organizations |
| (Excl. Veterans) | | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 720 Labor/Mgmt. Relations | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act (TCPA) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Med. Malpractice | ☐ 385 Property Damage Product Liability | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | **Other:** | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 530 General | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 535 Death Penalty | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee – Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Re-filed *(See VI below)*  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district *(specify)*  ☐ 6 Multidistrict Litigation Transfer  ☐ 7 Appeal to District Judge from Magistrate Judgment  ☐ 8 Multidistrict Litigation – Direct File  ☐ 9 Remanded from Appellate Court

**VI. RELATED/ RE-FILED CASE(S)**  *(See instructions):* a) Re-filed Case ☐YES ☐NO  b) Related Cases ☐YES ☐NO

JUDGE:   DOCKET NUMBER:

**VII. CAUSE OF ACTION**  Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S. Code § 1962 RICO
LENGTH OF TRIAL via _____ days estimated for both sides to try entire case)

**VIII. REQUESTED IN COMPLAINT:**  ☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23  DEMAND $ 21,000,000.00  CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

**ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE**

DATE  March 24, 2022   SIGNATURE OF ATTORNEY OF RECORD  /s/ Peter Ticktin

FOR OFFICE USE ONLY : RECEIPT #   AMOUNT   IFP   JUDGE   MAG JUDGE

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.        (a) Plaintiffs-Defendants.  Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence.  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys.  Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.       Jurisdiction.  The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked. Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III.      Residence (citizenship) of Principal Parties.  This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.       Nature of Suit.  Nature of Suit. Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

V.        Origin.  Place an "X" in one of the seven boxes.

Original Proceedings.  (1) Cases which originate in the United States district courts.

Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Refiled (3) Attach copy of Order for Dismissal of Previous case. Also complete VI.

Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment.  (7) Check this box for an appeal from a magistrate judge's decision.

Remanded from Appellate Court. (8) Check this box if remanded from Appellate Court.

VI.       Related/Refiled Cases.  This section of the JS 44 is used to reference related pending cases or re-filed cases. Insert the docket numbers and the corresponding judges name for such cases.

VII.      Cause of Action.  Report the civil statute directly related to the cause of action and give a brief description of the cause. Do not cite jurisdictional statutes unless diversity.  Example: U.S. Civil Statute: 47 USC 553
                        Brief Description: Unauthorized reception of cable service

VIII.     Requested in Complaint.  Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand.  In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

Date and Attorney Signature.  Date and sign the civil cover sheet.

262

Plaintiff's Memorandum of Law in Opposition to Defendant [Orbis]
Business Intelligence Ltd.'s Motion to Dismiss and in Support of Cross-
Motion for Alternate Service (Sept. 1, 2022)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 2:22-cv-14102-DMM

DONALD J. TRUMP,

Plaintiff,

v.

HILLARY R. CLINTON, HFACC, INC.,
DEMOCRATIC NATIONAL COMMITTEE,
DNC SERVICES CORPORATION, PERKINS
COIE, LLC, MICHAEL SUSSMANN, MARC
ELIAS, DEBBIE WASSERMAN SCHULTZ,
CHARLES HALLIDAY DOLAN, JR., JAKE
SULLIVAN, ADAM SCHIFF, JOHN PODESTA,
ROBERT E. MOOK, PHILLIPE REINES,
FUSION GPS, GLENN SIMPSON, PETER
FRITSCH, NELLIE OHR, BRUCE OHR, DEFENDANT
BUSINESS INTELLIGENCE, LTD.,
CHRISTOPHER STEELE, IGOR DANCHENKO,
NEUSTAR, INC., NEUSTAR SECURITY SERVICES,
RODNEY JOFFE, JAMES COMEY, PETER STRZOK,
LISA PAGE, KEVIN CLINESMITH, ANDREW MCCABE,
ROD ROSENSTEIN, JOHN DOES 1 THROUGH 10
(said names being fictitious and unknown persons),
and ABC CORPORATIONS 1 THROUGH 10 (said
names being fictitious and unknown entities),

Defendants.

_____

**PLAINITFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT
BUSINESS INTELLIGENCE LTD.'S MOTION TO DISMISS AND IN SUPPORT OF
CROSS-MOTION FOR ALTERNATE SERVICE**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ii, iv, v

PRELIMINARY STATEMENT ................................................... **Error! Bookmark not defined.**

LEGAL ARGUMENT ................................................................................. 1

I.     DEFENDANT IS SUBJECT TO PERSONAL JURISDICTION IN THE
STATE OF FLORIDA........................................................ **Error! Bookmark not defined.**

A. Defendant Has Sufficient Contacts With the United States Under Federal Law.......... 1

B. Florida's Long-Arm Statute Provides for Jurisdiction Over Defendant ....................... 4

II.    SERVICE OF PROCESS HAS BEEN PROPERLY EFFECTUATED UPON
DEFENDANT ......................................................................................... 7

A. The Complaint Was Properly Served Upon Defendant Pursuant to the Haque
Convention.............................................................................................. 7

B. Plaintiff Should Be Granted Leave to Serve the Amended Complaint by a More
Practical, Alternative Method...................................................................... 10

III.   PLAINTIFF HAS ASSERTED VALID AND COGNIZABLE CLAIMS AGAINST
DEFENDANT ……………………………………………………………….........12

CONCLUSION................................................................................... 16

# TABLE OF AUTHORITIES

*Access Telecom, Inc. v. MCI Telecomm. Corp.*
   197 F.3d 694, 718 (5th Cir. 1999), cert. denied, 531 U.S. 917 (2000).......................................2

*ADA v. Cigna Corp.*,
   605 F.3d 1283, 1293 (11th Cir. 2010) .....................................................................................12

*Azalp LLC v. Silverstein*,
   14-10079, 2015 WL 12711232, at *4 (S.D. Fla. Aug. 14, 2015) ................................................2

*BankAtlantic v. Coast to Coast Contractors*,
   947 F. Supp at 484)...................................................................................................................1

*Belivacqua v. U.S. Bank, NA*,
   194 So.3d 461, 464 (Fla. 3rd DCA 2016) .................................................................................8

*Betty K Agencies, Ltd. v. MV/MONADA*,
   432 F.3d 1333, 1341 (11th Cir. 2005) .....................................................................................8

*Boudloche v. Conoco Oil Corp.*,
   615 F.2d 687, 688-89 (5th Cir.1980) ......................................................................................9

*Brookshire Brothers Ltd. v. Chiquita Brands Int'l, Inc.*,
   No. 05-cv-21962, 2007 WL 1577771, at *1 (S.D. Fla. May 31, 2007) ....................................10

*Diversified Mgmt. Sols., Inc. v. Control Sys. Research, Inc.*,
   No. 15-81062, 2016 WL 4256916, at *15 (S.D. Fla. May 16, 2016).........................................5

*Elandia Int'l, Inc. v. Ah Koy*,
   690 F. Supp. 2d 1317, 1330 (S.D. Fla. 2010.............................................................................4

*Hertz Corp. v. Alamo Rent-A-Car, Inc.*,
   16 F.3d 1126, 1133 (11th Cir.1994) .........................................................................................9

*Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A.*,,
   421 F.3d 1162, 1168 (11th Cir. 2005). ......................................................................................4

*In re Auto. Refinishing Paint Antitrust Litigation*,
   358 F.3d 288, 299 (3d Cir. 2004) .............................................................................................2

*In re Chase & Sanborn Corp.*,
   835 F.2d 1341, 1344 (11th Cir. 1988) ......................................................................................9

*In re S1 Corp. Securities Litigation*,
   173 F. Supp. 2d 1334, 1345 (N.D. Ga. 2001)...........................................................................2

*J&M Assocs., Inc. v. Romero*,
  88 F. App'x 373, 375–76 (11th Cir. 2012) ................................................................. 5

*Koechli v. BIP Intern., Inc.*,
  861 So.2d 501, 503 (Fla. 1st DCA 2003) ................................................................... 8

*Leon v. Continental AG*,
  176 F.Supp. 1315 (S.D. Fla. 2016) ............................................................................ 11

*Mullane v. Central Hanover Bank & Trust Co.*,
  339 U.S. 306, 314 (1950) ............................................................................................ 11

*NHB Advisors, Inc. v. Czyzyk*,
  95 So. 3d 444, 448 (Fla. Dist. Ct. App. 2013) ........................................................... 4

*Night Owl SP, LLC v Dongguan Auhua Elecs. Co., Ltd.*,
  2:19-CV-109-FTM-38NPM, 2020 WL 8768259, at *3 (M.D. Fla., Sept. 9, 2020) ............... 8

*Northrup King Co. v. Compania Productora Semillas Algoneras Selectas S.A.*,
  51 F.3d 1383, 1389 (8th Cir. 1995) ............................................................................ 8

*Prewitt Enterprises, Inc. v. Organization of Petroleum Exporting Countries*,
  353 F.3d 916, 921, 927 (11th Cir. 2003). .................................................................. 10

*Republic of Pan. v. BCCI Holdings (Luxembourg) S.A.*,
  119 F.3d at 941 ........................................................................................................... 2

*Rio Properties, Inc. v. Rio Int'l*,
  284 F.3d 1007, 1015 (9th Cir. 2002) .......................................................................... 10

*Seaboard Marine Ltd., Inc. v. Magnum Freight Corp.*,
  17- 21815-CV, 2017 WL 7796153 (S.D. Fla., Sept. 21, 2017) ................................. 11

*Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*
  366 F. Supp. 3d 516, 563 (S.D.N.Y. 2018) ............................................................... 3

*Strax Americas, Inc. v. Tech 21 Licensing Ltd.*,
  16-cv-25369, 2017 WL5953117 (S.D. Fla., Mar. 23, 2017) ..................................... 11

*Swift Indus., Inc. v. Husqvarna AB*
  Case No. 07-4631, 2008 WL 11366182, *3 (E.D. Penn. Aug. 4, 2008) ................... 2

*Tavakoli v. Doronin.*,
  No. 18-21592, 2019 WL 1242669, at *11 (S.D. Fla. Mar. 18, 2019). .................... 5, 6

iii

*Tracfone Wireless, Inc. v. Bitton,*
   278 F.R.D. 687, 692 (S.D. Fla. 2012)...................................................................... 10

*Tracfone Wireless Inc. v. Distelec Distribuciones Electronicas, S.A. de DV,*
   268 F.R.D. 687, 691 (S.D. Fla. 2010)...................................................................... 11

*Tracfone Wireless, Inc. v. Hernandez,*
   126 F. Supp. 3d 1357, 1359 (S.D. Fla. 2015). ................................................... 10, 11

*TracFone Wireless, Inc. v. Unlimited PCS Inc.,*
   279 F.R.D. 626, 631 (S.D. Fla. 2012)...................................................................... 11

*Tyco Fire & SEC., LLC v. Alcocer,*
   No. 04-23127, 2005 U.S. Dist. LEXIS 46324, at *14 (S.D. Fla Oct. 6. 2005) .......... 6

*Unite Nat'l Ret. Fund v. Ariela, Inc.,*
   643 F. Supp. 2d 328, 334 (S.D.N.Y. 2008) .............................................................. 8

*United States v. Sylvestri,*
   409 F.3d 1311, 1328 (11th Cir. 2005) .................................................................... 12

*United States Securities and Exchange Commission v. Carillo,*
   115 F.3d 1540, 1544 (11th Cir. 1997) ...................................................................... 2

*United Techs. Corp. v. Mazer,*
   556 F.3d 1260, 1281 (11th Cir. 2009). .................................................................... 4

*Volkswagenwerk Aktiengesellschaft v. Schlunk,*
   486 U.S. 694, 699 (1988) ......................................................................................... 7

*Walters v. Blankenship,*
   931 So. 2d 137, 140 (Fla. Dist. Ct. App. 2006)...................................................... 14

*Water Splash, Inc. v. Menon,*
   137 S. Ct. 1504, 1507 (2017) ................................................................................... 7

*Wilcox v. Stout,*
   637 So. 2d 335, 337 (Fla. Dist. Ct. App. 1994) ....................................................... 4

## PRELIMINARY STATEMENT

The plaintiff, Donald J. Trump ("Plaintiff")[1], respectfully submits this memorandum of law in opposition to the motion to dismiss (the "Motion") the Amended Complaint filed by the defendant, Orbis Business Intelligence Ltd. ("Defendant"), and in support of Plaintiff's cross-motion to authorize alternative service pursuant to Rules 4(h)(2) and 4(f)(3) of the Federal Rules of Civil Procedure. For the reasons set forth herein, Defendant's motion must be denied in its entirety and Plaintiff's cross-motion must be granted.

## LEGAL ARGUMENT

**I.  DEFENDANT IS SUBJECT TO PERSONAL JURISDICTION IN THE STATE OF FLORIDA**

As set forth below, Plaintiff properly alleges that this Court maintains personal jurisdiction over Defendant under both the RICO act and Florida's long-arm statute. As such, Defendant's Motion must be denied because the requirements for exercising personal jurisdiction are satisfied here.

### A.  Defendant Has Sufficient Contacts with the United States Under Federal Law

As an initial matter, Defendant incorrectly contends that it cannot be subject to personal jurisdiction in the state of Florida because it is a foreign corporation based outside of the United States and, therefore, not subject to Florida's long arm statute. Contrary to Defendant's contention, the relevant analysis is not whether its conduct falls within Florida's long arm statute, but rather, whether Defendant has sufficient contacts with the United States under federal law. Properly framed, Defendant's jurisdictional attack cannot succeed, because it has more than enough contacts with the United States to satisfy these constitutional requirements.

---

[1] All capitalized terms herein shall have the same meaning and shall be defined in the same manner and context as they appear and are pleaded in the Amended Complaint.

It is well established that "if a federal statute provides for service of process, then the court must use the federal statutory provision rather than a state long-arm statute." *BankAtlantic v. Coast to Coast Contractors*, 947 F. Supp at 484; *see also* Fed. R. Civ. P. 4(e); *In re Chase & Sanborn Corp.*, 835 F.2d 1341, 1344 (11th Cir. 1988) (rev'd on other grounds). Relevant here is 18 U.S.C. § 1965, which provides that nationwide service of process is permitted in actions brought pursuant to RICO. Specifically, § 1965(d), "Venue and Process," states that "all other process in any action or proceeding under this chapter . . . may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(d). Since Plaintiff has asserted a claim against Defendant under the civil RICO statute, 18 U.S.C.  §§ 1961-1968, service must be done in accordance with this federal statute and, therefore, the question of jurisdiction must be analyzed under federal law as opposed to Florida's long arm statute.

When the personal jurisdiction of a federal court is invoked based upon a federal statute providing for nationwide or worldwide service, the relevant inquiry turns to "whether the respondent has had sufficient minimum contacts with the United States." *In re S1 Corp. Securities Litigation*, 173 F. Supp. 2d 1334, 1345 (N.D. Ga. 2001); *see also United States Securities and Exchange Commission v. Carillo*, 115 F.3d 1540, 1544 (11th Cir. 1997) ("We agree with the rule applied by the other circuits and hereby hold that the applicable forum for minimum contacts purposes is the United States in cases where, as here, the court's personal jurisdiction is invoked based on a federal statute authorizing nationwide or worldwide service of process."); *Republic of Pan. v. BCCI Holdings (Luxembourg) S.A.,* 119 F.3d 935, 942 (11th Cir. 1997) ("When a federal statute provides for nationwide service of process, it becomes the statutory basis for personal jurisdiction."); *Access Telecom, Inc. v. MCI Telecomm. Corp.*, 197 F.3d 694, 718 (5th Cir. 1999), cert. denied, 531 U.S. 917 (2000); *In re Auto. Refinishing Paint Antitrust Litigation*, 358 F.3d 288, 299 (3d Cir. 2004)

("We hold that personal jurisdiction in federal antitrust litigation is assessed on the basis of a defendant's aggregate contacts with the United States as a whole."); *Azalp LLC v. Silverstein*, 14-10079, 2015 WL 12711232, at *4 (S.D. Fla. Aug. 14, 2015) ("Finding that 18 U.S.C. § 1965 permits service, the Court must now determine whether the Fifth Amendment's Due Process Clause constrains [the] federal court's power to exercise personal jurisdiction via nationwide service of process.") (analyzing RICO statute's comparable nationwide service of process provision) (citation and internal marks omitted); *Swift Indus., Inc. v. Husqvarna AB*, Case No. 07-4631, 2008 WL 11366182, *3 (E.D. Penn. Aug. 4, 2008) ("When a claim is based on a federal statute authorizing nationwide service of process, personal jurisdiction may be assessed on the basis of the defendant's national contacts."). "The rationale underlying this national contacts approach is that when the national sovereign is applying national law, the relevant contacts are the contacts between the defendant and the sovereign's nation." *Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 563 (S.D.N.Y. 2018).

Here, there is no question that the Amended Complaint alleges that Defendant has sufficient minimum contacts with the United States. This case is primarily focused on the RICO enterprise established by several defendants who engaged in a concerted plot to undermine the 2016 Election and, subsequently, Plaintiff's presidential administration, and to otherwise sabotage Plaintiff's political career through fraudulent and illicit means. The Amended Complaint thoroughly establishes the significant contacts between Defendant (and its agents, including Steele) and the United States. For instance, the Amended Complaint details how Defendant was retained by a United States presidential candidate, Clinton, her campaign, the Clinton Campaign, and their prominent associates, the DNC, Perkins Coie, and Fusion GPS, to develop seventeen fraudulent anti-Trump memoranda known as the "Steele Dossier." Am. Compl. ¶ 81. The Amended Complaint

3

further details how Defendant, and its co-founder, Steele, shared the overarching goal of the Defendant's conspiracy, *id.* ¶ 80, and committed numerous acts in coordination with these US-based co-defendants, including, but not limited to: the development of the fraudulent Dossier which was replete with false information, misrepresentations, and blatant lies and was designed to malign Plaintiff, a U.S. presidential candidate and, eventually, sitting President, *id.* ¶ 70; the dissemination of the Dossier to mislead numerous federal law enforcement agencies, including the FBI and the Department of State, which provoked several unfounded national investigations, *id.* ¶¶ 84-100; and the distribution of the Dossier to major U.S. media outlet—such as *The New York Times*, *The Washington Post*, *CNN*, *Yahoo News*, and *Mother Jones*—in an effort to spark a nationwide media frenzy, *id.* ¶¶ 166, 272-275.

Given that Defendant's conduct was targeted at many high-level U.S. based actors—including a presidential candidate and eventual sitting president, top-ranking federal law enforcement officials, and major U.S. media outlets—coupled with the pervasive, negative impact that Defendant's actions had upon the country as a whole, there is simply no question that the Amended Complaint sufficiently alleges that Defendant has made sufficient contacts with the United States. Therefore, personal jurisdictional has been properly established over Defendant.

### B. *Florida's Long-Arm Statute Provides for Jurisdiction Over Defendant*

Even assuming *arguendo* that the Court's analysis were to turn on application of Florida's long arm statute, Fla. Stat. § 48.193(1)(a)(2), personal jurisdiction has been adequately established over Defendant all the same. Indeed, as a separate and independently sufficient basis for jurisdiction, this Court has personal jurisdiction over Defendant in accordance with the 'co-conspirator' theory.

It is well established that the "tortfeasor's physical presence in Florida is not required . . . jurisdiction may be found in certain instances where an out-of-state defendant commits a tort that

produces an injury in Florida." *Horizon Aggressive Growth, L.P. v. Rothstein-Kass*, P.A., 421 F.3d 1162, 1168 (11th Cir. 2005). With regard to inchoate offenses such as conspiracy, the Eleventh Circuit has explained:

> Florida courts have held that the state's long-arm statute can support personal jurisdiction over any alleged conspirator where any other co-conspirator commits an act in Florida in furtherance of the conspiracy, **even if the defendant over whom personal jurisdiction is sought individually committed no act in, or had no relevant contact with, Florida**.

*United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1281 (11th Cir. 2009). (emphasis added).

It follows that, if a plaintiff successfully states a cause of action for conspiracy to commit a tortious act and alleges that any member of the conspiracy committed the tortious act in Florida in furtherance of the conspiracy, then all of the conspirators are subject to jurisdiction. *NHB Advisors, Inc. v. Czyzyk*, 95 So. 3d 444, 448 (Fla. Dist. Ct. App. 2013) ("if a plaintiff has successfully alleged a cause of action for conspiracy among the defendants to commit tortious acts toward the plaintiff, and if the plaintiff has successfully alleged that any member of that conspiracy committed tortious acts in Florida in furtherance of that conspiracy, then all of the conspirators are subject to the jurisdiction of Florida through its long-arm statute."); *see Wilcox v. Stout*, 637 So. 2d 335, 337 (Fla. Dist. Ct. App. 1994) (finding that all co-conspirators are subject to the jurisdiction of the state of Florida through its long arm statute).

As described in the Amended Complaint and the within memoranda of law, Plaintiff sufficiently pleads that Defendant participated in a RICO conspiracy with other co-conspirators that caused harm in the state of Florida. While the harm perpetrated by the RICO conspiracy impacted the nation as a whole, it has also been alleged that certain co-conspirators produced an injury within State of Florida. In particular, the DNC and Perkins Coie both maintain a continuous presence in the state of Florida, and these two entities commissioned the creation of the Dossier. *See generally* Am. Compl. The DNC operations and conducts substantial and continuous business in the State of

Florida, and Perkins Coie maintains a registered agent in Tallahasee Florida. *Id.* ¶¶ 15-16. As such, Plaintiff adequately demonstrates that Defendant must be subject to personal jurisdiction in the state of Florida.

Defendant argues that the Court's jurisdiction over him would not comport with due process owing to his purported lack of Florida contacts. However, this argument is misguided since Defendant fails to acknowledge that there are instances where a court can impose jurisdiction over a foreign defendant under a conspiracy-liability theory. Indeed, the acts of a conspiracy in the forum may be imputed to non-resident defendants to establish minimum contacts. *Tavakoli v. Doronin*, No. 18-21592, 2019 WL 1242669, at *11 (S.D. Fla. Mar. 18, 2019).

In *Tavakoli*, the Court considered whether jurisdiction over a non-resident defendant was appropriate based on its involvement in a civil conspiracy, despite the non-resident defendant's lack of direct forum contacts. *See id*. In analyzing whether jurisdiction over the non-resident defendant would comport with due process, the Court first explained that the plaintiff had sufficiently alleged a civil conspiracy between the non-resident defendants and other co-conspirators who committed substantial acts in furtherance of the conspiracy in Florida. *See id*. The Court then concluded that "[t]he acts of the conspiracy in Florida may be imputed to [the non-resident defendant] to establish minimum contacts." *Id.* (*citing J&M Assocs., Inc. v. Romero*, 488 F. App'x 373, 375–76 (11th Cir. 2012); *Diversified Mgmt. Sols., Inc. v. Control Sys. Research, Inc.*, No. 15-81062, 2016 WL 4256916, at *15 (S.D. Fla. May 16, 2016); other citations omitted). Finally, the Court determined that exercising jurisdiction over the non-resident was consistent with traditional notions of fair play and substantial justice because the non-resident defendant did not establish that defending the suit in Florida would unduly burden it, and because Florida had a significant interest in resolving the dispute due to the tortious conduct occurring in the forum. *Tavakoli*, 2019 WL 1242669, at *12.

Here, it is irrefutable that Defendant has had minimum contacts with the United States; thus, its conduct satisfies the minimum contacts requirement under RICO's nationwide service of process provision. The burden shifts to the Defendant to prove that litigation in the Southern District of Florida would be so gravely difficult and inconvenient that they will suffer a severe disadvantage in comparison to Plaintiff, an argument which Defendant has failed to even raise in its motion papers. *See Tyco Fire & SEC., LLC v. Alcocer*, No. 04-23127, 2005 U.S. Dist. LEXIS 46324, at *14 (S.D. Fla Oct. 6. 2005) (noting "that it is only in highly unusual cases that inconvenience will rise to a level of constitutional concern… the burden is on the defendant to demonstrate that the assertion of jurisdiction in the forum will 'make litigation so gravely difficult and inconvenient' that [the defendant] unfairly is at severe disadvantage in comparison to his opponent.").

Based on the foregoing, Florida's long arm statute serves as a separate and independent basis for this Court to maintain personal jurisdiction over Defendant.

## II.   SERVICE OF PROCESS HAS BEEN PROPERLY EFFECTUATED UPON DEFENDANT

### A.   *The Complaint Was Properly Served Upon Defendant Pursuant to the Hague Convention*

Defendant spends a significant portion of its motion arguing that the Amended Complaint should be dismissed—with prejudice no less—due to purported "insufficient" service. In putting forth this argument, Defendant is either wholly misinformed as to facts surrounding Plaintiff's method of service or is blatantly misleading the Court as to circumstances of same. Simply stated, Plaintiff has properly effectuated service upon Defendant through the United Kingdom's Central Authority, in full compliance with the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents (the "Hauge Convention") and the Federal Rules of Civil Procedure.

In its motion, Defendant correctly notes that service upon a foreign corporation defendant

must be done in accordance with Fed. R. Civ. P. 4(h), which incorporates by reference Fed. R. Civ. P. 4(f). FRCP 4(f) states, in relevant part, that a foreign defendant "may be served at a place not within any judicial district of the United States: (1) by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention[.]" Fed. R. Civ. P. 4(f)(1).

The Hague Convention established rules for when "there is occasion to transmit a judicial or extrajudicial document for service abroad." *Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 699 (1988) (citation omitted). These rules "simplify, standardize, and generally improve the process of serving documents abroad." *Water Splash, Inc. v. Menon,* 137 S. Ct. 1504, 1507 (2017) (citations omitted). Article 2 of the Hague Convention mandates that each contracting country "designate a Central Authority which [] undertake[s] to receive requests for service coming from other" countries to the agreement. *Id.* art. 2. Once a Central Authority receives a request, it should serve documents "by a method prescribed by [its] internal law[s]." *Volkswagenwerk,* 486 U.S. at 699. After the Central Authority serves the person named in the request, it must "complete a certificate . . . that the document has been served." Hague Convention art 6., 20 U.S.T. 361.

Here, as required under the Hague Convention, Plaintiff, by and through an authorized vendor (Crowe Foreign Services), submitted a request to the Central Authority of the United Kingdom[2] on April 19, 2022, requesting service upon Defendant of the following documents: (i) Hague "Summary" with Warning Page; (ii) Summons in a Civil Action; (iii) Complaint for Damages; and (iv) Civil Cover Sheet. *See generally* Declaration of Alina Habba, Esq., **Exhibit A**. Thereafter, on July 19, 2022, an authorized official with the Senior Court of England and Wales, Foreign Process Section, served the documents upon Defendant at its registered business. *Id.* The

---

[2] The request was submitted to The Senior Master, Royal Courts of Justice, LONDON WC2A 2LL, which is the designated Central Authority for the United Kingdom. *See* https://bit.ly/3e3sHMa.

8

Central Authority subsequently provided a certification of service dated August 12, 2022, confirming that service was effectuated upon Defendant. *Id.* The certification was filed by Plaintiff in the instant action on September 1, 2022, thereby completing service upon Defendant. *See* Habba Dec., **Ex. A**; *see also* ECF Doc. No. 261.

Significantly, the "return of the central authority's completed certificate of service is prima facie evidence of service by the central authority." *Belivacqua v. U.S. Bank, NA*, 194 So.3d 461, 464 (Fla. 3rd DCA 2016) (quoting *Koechli v. BIP Intern., Inc.,* 861 So.2d 501, 503 (Fla. 1st DCA 2003)); *see also Northrup King Co. v. Compania Productora Semillas Algoneras Selectas S.A.,* 51 F.3d 1383, 1389 (8th Cir. 1995) (Noting that the "return of a completed certificate of service is prima facie evidence that the [Central] Authority's service on [a defendant] was made in compliance with the [Hague] Convention."); *Night Owl SP, LLC v Dongguan Auhua Elecs. Co., Ltd.*, 2:19-CV-109-FTM-38NPM, 2020 WL 8768259, at *3 (M.D. Fla., Sept. 9, 2020) ("[A] certificate of service from China's central authority would have been conclusive."); *Unite Nat'l Ret. Fund v. Ariela, Inc.,* 643 F. Supp. 2d 328, 334 (S.D.N.Y. 2008) ("It is well settled that the return of a completed certificate of service by a Central Authority establishes prima facie evidence that the Central Authority's service on Defendants was made in compliance with the convention.").

Defendant has not offered any evidence to rebut the prima facie showing of proper service. Indeed, if anything, Defendant's proofs confirm that the Complaint was properly served at Defendant's "registered office" on July 19, 2022, while further demonstrating that Christopher Burrows, the Director and Joint Founder of Defendant, has actual notice of the instant action.

Based on the foregoing, there is no question that Plaintiff has properly effectuated service of the Complaint upon Defendant in accordance with the Hague Convention and the Federal Rules of Civil Procedure. Accordingly, Defendant has been joined as a party to this action and has no basis

for arguing ineffectual service of process.

As an aside, Defendant's request that the Amended Complaint be dismissed with prejudice is patently improper. Even if Plaintiff's service of the Complaint was defective—which it was not— it is well-established that a dismissal for improper service may only be done *without prejudice*. *See* Fed. R. Civ. P. 4(m) ("If service of the summons and complaint is not made upon a defendant within 120 days . . . [the court] shall dismiss the action *without prejudice* as to that defendant or direct that service be effected.") (emphasis added); *Betty K Agencies, Ltd. v. MV/MONADA*, 432 F.3d 1333, 1341 (11th Cir. 2005) ("[W]e remain unable to discern how failure to serve the [defendant] under the peculiar circumstances of this case could warrant a dismissal with prejudice . . . if the district court actually lacked jurisdiction over the [defendant], the court would have lacked the power to dismiss [the plaintiff's] claims against the [defendant] *with prejudice*."); *see also Hertz Corp. v. Alamo Rent-A-Car, Inc.,* 16 F.3d 1126, 1133 (11th Cir.1994) (holding that a district court's order of dismissal with prejudice was a nullity because the court lacked jurisdiction); *Boudloche v. Conoco Oil Corp.,* 615 F.2d 687, 688-89 (5th Cir.1980) ("Since the court lacked jurisdiction over the action, it had no power to render a judgment on the merits.").

### B. *Plaintiff Should Be Granted Leave to Serve the Amended Complaint by a More Practical, Alternative Method*

While Defendant has been properly served with the Complaint, service of the Amended Complaint has yet to be effectuated. This process remains underway, but—given that Defendant has already entered an appearance in this action and has confirmed that it has actual notice of the filing of the Amended Complaint—Plaintiff respectfully requests leave to effect service of process of the Amended Complaint upon Defendant via alternative methods pursuant to Rules 4(h)(2) and 4(f)(3). Particularly, Plaintiff seeks to serve Defendant via international courier.

Service upon a foreign corporation must be done in accordance with Rule 4(h), which

provides for service "in any manner prescribed by Rule 4(f) for serving an individual, except personal delivery under (f)(2)(C)(i)." Fed. R. Civ. P. 4(h). Rule 4(f), in turn, "provides three methods for serving an individual in a foreign country: (1) by internationally agreed means, such as those authorized by the Hague Convention on Service of Process; (2) by a method that is reasonably calculated to give notice; or (3) by other means committed to a court's discretion that are not prohibited by international agreement." *Tracfone Wireless, Inc. v. Hernandez*, 126 F. Supp. 3d 1357, 1359 (S.D. Fla. 2015). Importantly, "[t]he plain language of [Rule 4(f)] does not indicate any hierarchy among the several acceptable methods." *Tracfone Wireless, Inc. v. Bitton*, 278 F.R.D. 687, 692 (S.D. Fla. 2012); *see also Brookshire Brothers Ltd. v. Chiquita Brands Int'l, Inc.*, No. 05-cv-21962, 2007 WL 1577771, at *1 (S.D. Fla. May 31, 2007) (citing *Rio Properties, Inc. v. Rio Int'l*, 284 F.3d 1007, 1015 (9th Cir. 2002) ("Rule 4(f)(3) is not subsumed within or in any way dominated by Rule 4(f)'s other subsections; it stands independently, on equal footing.").

A court has "broad discretion" to direct alternative means of service under Fed. R. Civ. P. 4(f)(3) when the requested method of service is consistent with due process and not prohibited by international agreement. *Prewitt Enterprises, Inc. v. Organization of Petroleum Exporting Countries*, 353 F.3d 916, 921, 927 (11th Cir. 2003). To comply with due process, the method of service employed must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). Further, "[t]he notice must . . . reasonably . . . convey the required information, and it must afford a reasonable time for those interested to make their appearance." *Id.*

Courts have consistently deemed international courier, such as FedEx, an acceptable method of service that complies with the requirements of due process and is otherwise permissible under

Rule 4(f)(3). *See, e.g., Tracfone Wireless Inc. v. Distelec Distribuciones Electronicas, S.A. de DV,* 268 F.R.D. 687, 691 (S.D. Fla. 2010); *Seaboard Marine Ltd., Inc. v. Magnum Freight Corp.*, 17-21815-CV, 2017 WL 7796153 (S.D. Fla., Sept. 21, 2017); *Strax Americas, Inc. v. Tech 21 Licensing Ltd.*, 16-cv-25369, 2017 WL5953117 (S.D. Fla., Mar. 23, 2017); *Tracfone Wireless v. Hernandez,* 126 F. Supp. 3d 1357, 1362 (S.D. Fla. 2015); *Leon v. Continental AG*, 176 F.Supp. 1315 (S.D. Fla. 2016); *TracFone Wireless, Inc. v. Unlimited PCS Inc.,* 279 F.R.D. 626, 631 (S.D. Fla. 2012). Further, since the United Kingdom has not objected to Article 10(a) of the Hague Convention, this method of service of not prohibited by international agreement.[3]

Here, service by international courier is especially appropriate in light of the fact that Defendant has actual notice of the instant action, has already been joined as a party, and is well aware of the allegations contained in the Amended Complaint. Further, considering the extraordinary number of defendants in this action and the immense amount of discovery that will need to be completed in a limited amount of time, judicial economy weighs heavily in favor of permitting Plaintiff to serve Defendant with the Amended Complaint by a more expeditious method of process—such as international courier—as opposed to delaying the prosecution of this action while Plaintiff awaits service to be effectuated upon Defendant by the United Kingdom's Central Authority.

For the foregoing reasons, Plaintiff respectfully seeks leave to serve Defendant by international courier, namely FedEx, in accordance with Rules 4(h)(2) and 4(f)(3).

### III.   PLAINTIFF HAS ASSERTED VALID AND COGNIZABLE CLAIMS AGAINST DEFENDANT

In arguing that the Amended Complaint fails to state a viable cause of action, Defendant

---

[3] *See Table Reflecting Applicability of Articles 8(2), 10(a)(a) and (c), 15(2) and 16(3) of the Hague Service Convention*, https://bit.ly/3AwLxmr.

largely relies upon the arguments set forth in his co-defendants' Consolidated Motion to Dismiss dated July 24, 2022 (ECF Doc. No. 226). Plaintiff, in turn, will rely upon the corresponding counter-arguments set forth in his Memorandum of Law in Opposition to Defendant's Motion to Dismiss the Complaint dated August 4, 2022 (ECF Doc. No. 237), which is hereby incorporated by reference.

Moreover, as previously explained, there is simply no question that Plaintiff has pleaded valid and cognizable claims against Defendant. With respect to Count II (RICO conspiracy), Plaintiff undoubtedly puts forth a cognizable claim against Defendant. "A plaintiff can establish a RICO conspiracy claim in one of two ways: (1) by showing that Defendant agreed to the overall objective of the conspiracy; or (2) by showing that Defendant agreed to commit two predicate acts." *American Dental Assn.*, 605 F.3d at 1293 (citation omitted). Such a claim may be shown through circumstantial evidence, including "inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *United States v. Sylvestri*, 409 F.3d 1311, 1328 (11th Cir. 2005); *see also ADA v. Cigna Corp.,* 605 F.3d 1283, 1293 (11th Cir. 2010)*,* 605 F.3d at 1293 (noting that a plaintiff need not offer direct evidence of a RICO agreement; existence of a conspiracy "may be inferred from the conduct of the participants.").

Here, Defendant baselessly claims that the RICO Conspiracy allegations asserted against it in the Amended Complaint are "conclusory." Def. Mem. at 18. This characterization is simply disingenuous. Indeed, the Amended Complaint sets forth a vast number of facts which extensively demonstrate that Steele—who, at all relevant times, was acting within the scope of his employment with Defendant and in service of same—both agreed to the agreed to the overall objective of the conspiracy *and* agreed to commit two predicate acts.

First, with regard to Steele's agreement with the overall objective of the conspiracy, the Amended Complaint provides that "Defendant Ltd. was chosen to partake in the scheme because

13

Steele's interests were aligned with the Defendants' overarching conspiracy," Am. Compl. ¶ 95, including, but not limited to, the allegations that: Steele was 'desperate that Donald Trump not get elected' and "was passionate about [Donald J. Trump] not being president," *id.*; in accepting his assignment to collect intelligence regarding a purported Trump-Russia connection, Steele was aware that "Democratic Party Associates" were paying for his and Fusion GPS's "research" and that the "ultimate client" was "the leadership of the Clinton Presidential Campaign," *id.* ¶ 99; Steele testified that "the purpose of [his] work was to prevent [Plaintiff] from becoming president," *id.* ¶ 105; Steele admitted that the FBI was an "intended audience" of his reporting, *id.*; Steele confirmed that he shared the DNC and Clinton Campaign's goal of having the information "come to light" prior to election day, *id.* ¶ 239; Steele acknowledged that he met with a journalist from *Mother Jones* on October 31, 2016 because he "wanted [Corn] to publish that the US Government was investigating Trump" and was "aware that Mr. Corn was likely to be publishing an article after the interview." *id.* ¶¶ 272-273.

Second, it can also be inferred from Steele's conduct that he agreed to commit numerous predicate acts, including obstruction of justice and wire fraud. This much can be gleaned from the contents of the Amended Complaint, including the allegations that: Steele drafted the fraudulent Dossier which was "intended to not only harm Trump's political career and candidacy, but more importantly, it was fabricated to induce the FBI to commence an investigation into alleged ties between Russia and [Plaintiff]," *id.* ¶ 106; Steele met with numerous major media outlets to discuss his falsified reporting concerning the alleged Trump-Russia collusion, *id.* ¶ 227; Steele repeatedly disseminated copies of his Dossier reports to the FBI, *id.* ¶¶ 158, 226, 651; Steele met with the FBI's Crossfire Hurricane team and failed to disclose the identities of his client, thereby furthering the RICO conspiracy, *id.* ¶ 233; and Steele met with David Kramer, an affiliate of Senator John McCain,

and showed him the Dossier in the hopes that McCain would share his findings with his "colleagues on the various committees in the Senate," including "his committees in Congress, the Homeland Security Committee and the Intelligence Committee," as well as "other agencies", *id.* ¶ 291.

Taken as a whole, the operative facts outlined above far surpass the minimum standard necessary to plead a cognizable claim under 18 U.S.C. § 1962(d). Further, these same facts also support the validity of Plaintiff's claim for Conspiracy to Commit Injurious Falsehood since the Amended Complaint thoroughly establishes that Steele conspired with several other defendants to sabotage Plaintiff's political career through fraudulent and unlawful means, and that he committed numerous overt acts in furtherance of this goal. *See Walters v. Blankenship*, 931 So. 2d 137, 140 (Fla. Dist. Ct. App. 2006) ("The elements of a civil conspiracy are: (a) a conspiracy between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts performed pursuant to the conspiracy.").

Based on the foregoing, Plaintiff's has adequately pleaded claims of RICO Conspiracy and Conspiracy to Commit Injurious Falsehood against Defendant.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's motion in its entirety.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed this 1st day of September, 2022, with the Clerk of Court using CM/ECF, which will send a notice of electronic filing to all Parties listed on the Service List.


**THE TICKTIN LAW GROUP**
270 SW Natura Avenue
Deerfield Beach, Florida 33441
Telephone: (561) 232-2222


_/s/ Pete*r Ticktin*_____
PETER TICKTIN, ESQUIRE
Florida Bar No. 887935
JAMIE ALAN SASSON, ESQUIRE
Florida Bar No. 10802
Our Matter No.: 22-0062


and

**HABBA MADAIO & ASSOCIATES LLP**
1430 US Highway 206
Suite 240
Bedminster, New Jersey 07921
ALINA HABBA, ESQUIRE (*Pro Hac Vice*)
New Jersey Bar No. 018592010
MICHAEL T. MADAIO, ESQUIRE (*Pro Hac Vice*)
New Jersey Bar No. 070752013
Our Matter No.: 4500-74

262-1

Exhibit to Plaintiff's Memorandum:  Certification of Service Abroad of
Judicial or Extrajudicial Document (Sept. 1, 2022)

F.P ref:  **QF-2022-004867**

T.A Ref:  Orbis Business Intelligence

Limited

## CERTIFICATE - ATTESTATION

**The undersigned authority has the honour to certify, in conformity with article 6 of the Convention**

**L'autorite soussignee a l'honneur d'attester conforment a l'article 6 de ladite Convention.**

**That the documents listed and attached to the Hague Request Form date 19-04-2022**

**1) that the document has been served the (date) 19-07-2022**

**que le demande a ete executee          le (date)**

   **-at (place, street, number)   Orbis Business Intelligence Limited**

   **-a (localite, rue, numero)   Hwb Highland House Mayflower Close, Chandlers Ford, Eastleigh,, Hampshire SO53 4AR**

- in one of the following methods authorised by article 5:

-dans une des formes suivantes prevues a l'article 5:

a) in accordance with the provisions of sub-paragraph (a) of the first paragraph of article 5 of the convention

selon les formes legales (article 5, alinea premier, lettre a)

b) in accordance with the following particular method
selon la forme particuliere suivante

c) by delivery to the addressee, who accepted it voluntarily

par remise simple

**The documents referred to in the request have been delivered to:   Receptionist**

**Les documents mentionnes dans la demande ont ete remis a:**

**- (identity and description of person)                    Unknown**

**- (identite et qualite de la personne)**

- relationship to the addressee (family, **business** or other)

- liens de parente de subordination ou autres avec

le desinataire de l'acts

F.P ref:  **QF-2022-004867**

T.A Ref:  Orbis Business Intelligence

Limited

2) that the document has not been served, by reason of the following facts:

que la demande n'a pas ete executee, en raison des faits suivants:

in conformity with the second paragraph of article 12 of the Convention, the applicant is requested to pay the expenses details in the attached statement.

Conformement a l'article 12, alinea 2 de ladite Convention, le requerant est prie de payer ou de rembourser les frais dont le detail figure au memoire ci-joint

Annexes

Documents returned

Pieces renvoyees

Done at London

fait a

the **12-08-2022**

in appropriate cases, documents

establishing the service:

le cas echeant, les documents

justicatifs de l'execution:

Signature and/or stamp:

Signature et/ou cachet:

USCA11 Case: 23-10387   Document: 116-2   Date Filed: 06/10/2024   Page: 301 of 811

USCA11 Case: 23-10387   Document: 116-2   Date Filed: 06/10/2024   Page: 302 of 811

# REQUEST
## FOR SERVICE ABROAD OF JUDICIAL OR EXTRAJUDICIAL DOCUMENTS
### DEMANDE AUX FINS DE SIGNIFICATION OU DE NOTIFICATION À L'ÉTRANGER D'UN ACTE JUDICIAIRE OU EXTRAJUDICIAIRE

**Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, signed at The Hague, the 15th of November 1965.**

Convention relative à la signification et à la notification à l'étranger des actes judiciaires ou extrajudiciaires en matière civile ou commerciale, signée à La Haye le 15 novembre 1965.

| Identity and address of the applicant | Address of receiving authority |
|---|---|
| Identité et adresse du requérant | Adresse de l'autorité destinataire |
| L. Celeste Ingalls | The Senior Master, Royal Courts of Justice |
| Crowe Foreign Services | For the attention of the Foreign Process Section |
| 733 SW Vista Avenue | Room E16 |
| Portland, Oregon 97205 | Royal Courts of Justice |
| USA | Strand |
| Email: Lci@foreignservices.com | LONDON WC2A 2LL |

**The undersigned applicant has the honour to transmit – in duplicate – the documents listed below and, in conformity with Article 5 of the above-mentioned Convention, requests prompt service of one copy thereof on the addressee, i.e.:**

Le requérant soussigné a l'honneur de faire parvenir – en double exemplaire – à l'autorité destinataire les documents ci-dessous énumérés, en la priant, conformément à l'article 5 de la Convention précitée, d'en faire remettre sans retard un exemplaire au destinataire, à savoir :

| (identity and address) |
|---|
| (identité et adresse) |
| Orbis Business Intelligence Limited |
| Hwb Highland House Mayflower Close |
| Chandlers Ford |
| Eastleigh, Hampshire SO53 4AR |

| | | |
|---|---|---|
| ☒ | a) | **in accordance with the provisions of sub-paragraph a) of the first paragraph of Article 5 of the Convention\*** <br> selon les formes légales (article 5, alinéa premier, lettre a))\* |
| ☐ | b) | **in accordance with the following particular method (sub-paragraph b) of the first paragraph of Article 5)\*:** <br> selon la forme particulière suivante (article 5, alinéa premier, lettre b)\* : |
| ☐ | c) | **by delivery to the addressee, if he accepts it voluntarily (second paragraph of Article 5)\*** <br> le cas échéant, par remise simple (article 5, alinéa 2)\* |

**The authority is requested to return or to have returned to the applicant a copy of the documents - and of the annexes\* - with the attached certificate.**

Cette autorité est priée de renvoyer ou de faire renvoyer au requérant un exemplaire de l'acte - et de ses annexes\* - avec l'attestation ci-jointe.

*List of documents / Énumération des pièces*

| |
|---|
| • Hague "Summary" with Warning Page |
| • Summons in a Civil Action |
| • Complaint for Damages |
| • Civil Cover Sheet |
| • |
| • Case No. 22cv14102-DMM |

\* if appropriate / s'il y a lieu

| **Done at** / Fait à Portland, Oregon USA, | **Signature and/or stamp** |
|---|---|
| **The** / le   *April 19, 2022* | Signature et / ou cachet |

OFFICIAL STAMP
**LYLE CELESTE INGALLS**
NOTARY PUBLIC - OREGON
COMMISSION NO. 1021981
MY COMMISSION EXPIRES FEB. 21, 2026

266

Defendant Orbis Business Intelligence Ltd.'s Reply in Support of the
Motion to Dismiss the Amended Complaint (Sept. 8, 2022)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 2:22-CV-14102-DMM

DONALD J. TRUMP,

      Plaintiff,

v.

HILLARY R. CLINTON, et al.,

      Defendants.

_____/

**DEFENDANT ORBIS BUSINESS INTELLIGENCE LTD.'S REPLY**
**IN SUPPORT OF THE MOTION TO DISMISS THE AMENDED COMPLAINT**

ENJOLIQUÉ AYTCH LETT, ESQ.
Florida Bar No. 0104881
Email: lette@gtlaw.com
AKIESHA GILCRIST SAINVIL, ESQ.
Florida Bar No. 1003260
Email: sainvila@gtlaw.com
**GREENBERG TRAURIG, P.A.**
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717

*Attorneys for Defendant*
*Orbis Business Intelligence Ltd.*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................1

ARGUMENT .........................................................................................................1

    I.     The Amended Complaint Should Be Dismissed As To Orbis For Lack of
Personal Jurisdiction. ..................................................................................1

          A.     No personal jurisdiction exists over Orbis under the federal RICO
statute. .............................................................................................2

          B.     No jurisdiction exists over Orbis under Florida's long-arm statute............3

    II.    The Amended Complaint Should Be Dismissed As Against Orbis For
Insufficient Process and Service of Process.................................................7

          A.     Plaintiff has not carried his initial burden of proving valid service
of process because the return of service is defective on its face.................7

          B.     Plaintiff's request for alternative service should be rejected. .....................9

    III.   The Amended Complaint Is Procedurally And Substantively Deficient As
Against Orbis. ............................................................................................10

CONCLUSION......................................................................................................10

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Ahern v. Pac. Gulf Marine, Inc.*,
No. 8:06-CV-2068-T-27MSS, 2008 U.S. Dist. LEXIS 20078 (M.D. Fla. Mar. 13, 2008) ....................................................................................................................3

*Birmingham v. RoFx.net*,
No. 21-23472-Civ, 2022 U.S. Dist. LEXIS 94981 (S.D. Fla. May 26, 2022) .................5, 6, 7

*Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*,
230 F.3d 934 (7th Cir. 2000) ............................................................................................2

*Courboin v. Scott*,
596 F. App'x 729 (11th Cir. 2014) ......................................................................................3

*De Gazelle Grp., Inc. v. Tamaz Trading Establishment*,
817 F.3d 747 (11th Cir. 2016) ........................................................................................10

*Don't Look Media Ltd. Liab. Co. v. Fly Victor Ltd.*,
999 F.3d 1284 (11th Cir. 2021) .....................................................................................2, 3

*Foreign Imported Prods. & Publ'g, Inc. v. Grupo Indus. Hotelero, S.A.*,
No. 07-22066-CIV, 2008 U.S. Dist. LEXIS 108705 (S.D. Fla. Oct. 24, 2008) .......................5

*International Designs Corp., LLC v. Qingdao SeaForest Hair Prod. Co.*,
No. 17-60431-CIV-MORENO, 2018 U.S. Dist. LEXIS 3038 (S.D. Fla. Jan. 4, 2018) ...........................................................................................................................9, 10

*Iraheta v. Linebarger, Goggan, Blair & Sampson, LLP*,
No. 5:14-cv-413 (CAR), 2015 U.S. Dist. LEXIS 102246 (M.D. Ga. Aug. 5, 2015) ...........................................................................................................................3

*Posner v. Essex Ins. Co.*,
178 F.3d 1209 (11th Cir. 1999) (per curiam) .........................................................................5

*Republic of Pan. v. BCCI Holdings (Luxembourg) S.A.*,
119 F.3d 935 (11th Cir. 1997) ...........................................................................................3

*Sale v. Jumbleberry Enters. United States*,
No. 20-20716-Civ-WILLIAMS/TORRES, 2021 U.S. Dist. LEXIS 32491 (S.D. Fla. Feb. 19, 2021) ...................................................................................................9

*Snow v. DirecTV, Inc.*,
450 F.3d 1314 (11th Cir. 2006) .........................................................................................4

*Tavakoli v. Doronin*,
No. 18-CV-21592-CIV-ALTONAGA/Goodman, 2019 U.S. Dist. LEXIS 43188 (S.D. Fla. Mar. 18, 2019) ...............................................................................5, 6

*Verdejo v. HP Inc.*,
No. 21-20431-Civ, 2021 U.S. Dist. LEXIS 215726 (S.D. Fla. Nov. 7, 2021) ...................2, 4

*Walden v. Fiore*,
   571 U.S. 277 (2014)...................................................................................................5

*Winston v. Walsh*,
   No. 5:19-cv-00070-TES, 2020 U.S. Dist. LEXIS 54377 (M.D. Ga. Mar. 27,
   2020) ........................................................................................................................8

**State Cases**

*Re-Employment Servs. v. Nat'l Loan Acquisitions Co.*,
   969 So. 2d 467 (Fla. Dist. Ct. App. 2007) ..............................................................8

**Federal Statutes**

18 U.S.C. § 1965.................................................................................................................1, 3

**State Statutes**

Fla. Stat. § 48.193 ...............................................................................................................1

Defendant Orbis Business Intelligence Ltd. ("Orbis"), by and through its undersigned counsel, respectfully submits this Reply in Support of its Motion to Dismiss the Amended Complaint for Damages filed by Plaintiff Donald J. Trump, as against Orbis. In support thereof, Orbis states as follows:

## INTRODUCTION

In its Motion to Dismiss the Amended Complaint (the "Motion") [DE No. 260], Orbis demonstrates that Plaintiff's Amended Complaint for Damages [DE No. 177] (the "Amended Complaint" or "AC") warrants dismissal as against it because (1) Plaintiff failed to carry his burden of pleading sufficient material facts to establish a *prima facie* case of personal jurisdiction under Florida's long-arm statute and the Due Process clause, which is the only manner by which personal jurisdiction may be gained over Orbis on these facts; (2) Plaintiff failed to perfect service of correct process as to Orbis; and (3) the Amended Complaint is otherwise procedurally and substantively deficient. Plaintiff's Memorandum of Law in Opposition (the "Opposition") [DE No. 262] does not overcome these deficiencies as the arguments it proffers are legally unsound when tested against the facts as pled and the evidence offered in this case, and the Opposition suffers from the same fatal flaw as the Amended Complaint – it is riddled with conclusory and unsubstantiated statements. For the reasons previously briefed and as further explained herein, Plaintiff's Amended Complaint should be dismissed.

## ARGUMENT

**I.    The Amended Complaint Should Be Dismissed As To Orbis For Lack of Personal Jurisdiction.**

Plaintiff argues that his burden to demonstrate this Court's personal jurisdiction over Orbis is satisfied via the federal RICO statute, 18 U.S.C. § 1965, and in the alternative, jurisdiction is nevertheless conferred under Florida's long-arm statute, Fla. Stat. § 48.193. However, neither can

1

serve as a basis for the exercise of jurisdiction over Orbis and, therefore, the Amended Complaint must be dismissed due to lack of personal jurisdiction.

### A.   *No personal jurisdiction exists over Orbis under the federal RICO statute.*

Plaintiff's argument for personal jurisdiction under the federal RICO statute is incorrect and any reliance Plaintiff places in the federal RICO statute is mistaken. Indeed, Plaintiff's entire argument suffers a fatal flaw—***Plaintiff never served Orbis according to RICO's nationwide service of process provision***. *See Don't Look Media Ltd. Liab. Co. v. Fly Victor Ltd.*, 999 F.3d 1284, 1292 (11th Cir. 2021) ("The problem in this case is that RICO does not provide for personal jurisdiction because [the plaintiff] did not serve any party 'according to' RICO's nationwide service of process provision."). The federal RICO statute only authorizes ***nationwide*** service of process. *Id.* at 1293 (quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 941 (7th Cir. 2000)) ("The RICO service of process provision states that service may be made in any judicial district, which indicates that Congress authorized service only in the judicial districts of the United States and not worldwide."). It "does not authorize international service of process and, as such, cannot be the basis for the assertion of personal jurisdiction over a corporation or individual served abroad." *Verdejo v. HP Inc.*, No. 21-20431-Civ, 2021 U.S. Dist. LEXIS 215726, at *11 (S.D. Fla. Nov. 7, 2021); *see also Don't Look Media Ltd. Liab. Co.*, 999 F.3d at 1293 ("Section 1965(d)'s authorization of service in any judicial district plainly does not authorize service outside the United States.").

Here, Plaintiff does not dispute that Orbis is an England-based entity. Nor does he dispute any of the facts set forth in Orbis' Motion concerning Orbis' place and nature of its business, (*see* Motion at 2-3), or allege that he has found and/or served Orbis, or any registered agent of Orbis, within a judicial district of the United States. (*See generally* Pl.'s Opp'n). In fact, in the Opposition,

Plaintiff explicitly states that service was attempted via The Hague in London, England, not in the United States. (*See* Pl.'s Opp'n at 7-9). Accordingly, "the nationwide service of process provision in RICO cannot provide for personal jurisdiction in this case." *Don't Look Media Ltd. Liab. Co.*, 999 F.3d at 1293.[1]

Moreover, "[d]espite the fact that RICO contains a nationwide service-of-process provision, [a plaintiff] is entitled to take advantage of it only if his 'asserted federal claim is not wholly immaterial or insubstantial.'" *Courboin v. Scott*, 596 F. App'x 729, 730 (11th Cir. 2014) (*quoting Republic of Pan. v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997)). "In other words, whether a basis exists for exercising personal jurisdiction under RICO depends on whether [a plaintiff] has stated a 'colorable' RICO claim." *Id.* As previously set forth in detail in Orbis' Motion, Plaintiff ***does not*** have a colorable RICO claim against Orbis, (*see* DE 260 at 16-19), providing yet another basis for rejecting Plaintiff's attempts to confer jurisdiction over Orbis utilizing the federal RICO statute.

### B.   *No jurisdiction exists over Orbis under Florida's long-arm statute.*

Where, as here, Plaintiff cannot attain personal jurisdiction over a defendant utilizing a federal statute, it must rely on the forum state's long-arm statute. *See Iraheta v. Linebarger, Goggan, Blair & Sampson, LLP*, No. 5:14-cv-413 (CAR), 2015 U.S. Dist. LEXIS 102246, at *10 (M.D. Ga. Aug. 5, 2015) ("Jurisdiction over a non-resident defendant may be based upon a federal statute or a state long-arm statute.") (citing *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997)); *Ahern v. Pac. Gulf Marine, Inc.*, No. 8:06-CV-2068-T-

---

[1] As noted by the *Don't Look Media Ltd. Liab. Co.* Court, Plaintiff's assertion of personal jurisdiction over Orbis based on 18 U.S.C. § 1965 additionally fails because Orbis is neither at home, nor has an agent, in any United States judicial district. Further it does not transact its affairs in any United States judicial district. *See Don't Look Media Ltd. Liab. Co.*, 999 F.3d at 1294 ("Even setting aside that no defendant was served in the United States, § 1965(d)'s remaining terms do not apply. None of the Individual Defendants resides or has an agent in any United States judicial district. Nor do they "transact [their] affairs" in any such district.").

27MSS, 2008 U.S. Dist. LEXIS 20078, at *4-5 (M.D. Fla. Mar. 13, 2008) ("A federal district court employs a two-part analysis to determine whether it has personal jurisdiction over a nonresident defendant. First, the Court determines whether the exercise of jurisdiction … is appropriate under a federal statute or Florida's long-arm statute.") (citations omitted); *Verdejo*, 2021 U.S. Dist. LEXIS 215726, at *11-12 ("The individual Defendants, including Campos and Blanco, are residents of Argentina, and it is not apparent that they were served in *any* district within the United States. Thus, the Plaintiffs must rely on Florida's long-arm statute to establish personal jurisdiction over Campos and Blanco."). In the Motion, Orbis establishes why there is no personal jurisdiction over it via Florida's long-arm statute, and in doing so identifies numerous glaring deficiencies in the Amended Complaint concerning Orbis's lack of contacts with the state of Florida. (*See* Motion at 9-12). Plaintiff wholly ignores and fails to counter these arguments and has thus tacitly conceded this point. (*See* Pl.'s Opp'n at 4-7). Instead, Plaintiff chooses to construct an argument that personal jurisdiction can somehow be conferred over Orbis through his insufficiently pleaded RICO and conspiracy claims, and third parties. (*Id.* at 4-5). Plaintiff's attempt at doing so serves only to highlight the flaws in his argument.

Plaintiff asserts that he has sufficiently pleaded Orbis' participation in a RICO conspiracy with other co-conspirators that caused harm in the state of Florida. (*Id.* at 10). However, like the Amended Complaint, he makes no effort at all to substantiate this statement for purposes of Florida's long-arm statute, whether for purposes of demonstrating the sufficiency of his pleadings or to demonstrate that Orbis purposefully availed itself of the privilege of conducting activities within Florida. *See Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1318 (11th Cir. 2006) (finding "conclusory allegations" that defendant "conspired" with parties that "committed tortious acts in

4

Florida" "insufficient to establish a prima facie case of personal jurisdiction"); *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1217-18 (11th Cir. 1999) (per curiam) (finding a plaintiff's vague allegations of a conspiracy insufficient to establish personal jurisdiction); *Birmingham v. RoFx.net*, No. 21-23472-Civ, 2022 U.S. Dist. LEXIS 94981, at *3 (S.D. Fla. May 26, 2022) ("Conclusory allegations concerning the existence of a conspiracy are 'insufficient to establish a prima facie case of personal jurisdiction.'"); *see also Walden v. Fiore*, 571 U.S. 277, 291 (2014) ("[I]t is the *defendant*, not the plaintiff or third parties, who must create contacts with the forum State." (emphasis added)). He does not do so because he cannot. The Amended Complaint speaks for itself—Plaintiff has baselessly accused Orbis of participating in some purported conspiracy, from England, with no alleged conduct or other activity on the part of Orbis ***actually occurring*** in Florida. (AC, ¶¶ 1, 9, 32, 70, 292, 294). Plaintiff also affirmatively alleges Orbis played no role in the alleged dissemination of the Dossier. (*Id.*, ¶¶ 292, 294); *see also Foreign Imported Prods. & Publ'g, Inc. v. Grupo Indus. Hotelero, S.A.*, No. 07-22066-CIV, 2008 U.S. Dist. LEXIS 108705, at *21 (S.D. Fla. Oct. 24, 2008) (passive information "that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction"). These allegations are insufficient to confer jurisdiction under any standard and cannot serve as the basis for jurisdiction over Orbis.

Plaintiff goes on to argue that, in addition to his nationwide conspiracy argument, he has also "alleged that certain [of Orbis' alleged] co-conspirators produced an injury within [*sic*] State of Florida," which is sufficient to confer jurisdiction over Orbis. (Pl.'s Opp'n at 5-6). To this end, Plaintiff asserts that because the DNC and Perkins Coie "maintain a continuous presence in the state of Florida, and these two entities commissioned the creation of the Dossier," Orbis "must be subject to personal jurisdiction in the state of Florida." (*Id.*) Plaintiff relies heavily on *Tavakoli v.*

*Doronin*, No. 18-CV-21592-CIV-ALTONAGA/Goodman, 2019 U.S. Dist. LEXIS 43188 (S.D. Fla. Mar. 18, 2019) in support of this argument. However, *Tavakoli* undermines Plaintiff's argument, and instead underscores the allegations necessary to adequately allege a conspiracy that are entirely lacking here.

In *Tavakoli*, the plaintiff specifically "describe[d] the existence of an agreement" between a nonresident defendant and a Florida resident with a specific purpose of which the nonresident defendant was aware: "to remove Plaintiff from [a joint venture entity] and tortiously interfere with Plaintiff's contracts." 2019 U.S. Dist. LEXIS 43188, at *22. Here, by contrast, Plaintiff fails to even allege, much less "describe" any agreement between Orbis and any other Defendant sufficient to adequately allege a conspiracy. Moreover, the defendants' conduct in *Tavakoli* at a significant board meeting ***in Florida*** constituted a tortious act in and of itself. 2019 U.S. Dist. LEXIS 43188, 2019 WL 1242669 at *28-29 ("Eliasch traveled to Miami for the April 22, 2014 Board meeting, stayed with Doronin at his Miami residence for three to four days around the date of the meeting, had dinner with Doronin in Miami to discuss matters related to Aman Resorts prior to the meeting, and then participated in the PHRGL Board meeting in Miami."). Plaintiff does not (and cannot) allege any concrete events involving Orbis that took place in Florida in furtherance of any purported conspiracy. *RoFx.net*, 2022 U.S. Dist. LEXIS 94981, at *9 ("[In *Tavakoli*], unlike here, the plaintiffs pled the relevant defendant's participation in concrete events that took place in Florida to further a conspiracy."). Finally, while the *Tavakoli* court imputed a third-party defendant's Florida contacts onto a foreign co-defendant corporate entity with no Florida contacts of its own, "there was an immediate connection between the corporate entity and the defendant with the Florida contacts—he owned 100% of it." *Rofx.net*, 2022 U.S. Dist. LEXIS 94981, at *10. There are no allegations in Plaintiff's Amended Complaint that allege the existence of Florida

contacts undertaken by Orbis to allow for the sort of imputed contacts found in *Tavakoli*.

Because Plaintiff has failed to adequately allege that Orbis took part in any conspiracy, the alleged acts of other purported conspirators cannot be "imputed" to Orbis, as Plaintiff argues. (DE 262 at 5-6). More critically, there are simply no allegations connecting Orbis to Florida. Both Florida's long-arm statute and the Due Process Clause are thus unsatisfied as a matter of law. *RoFx.net*, 2022 U.S. Dist. LEXIS 94981, at *9.

## II.     The Amended Complaint Should Be Dismissed As Against Orbis For Insufficient Process and Service of Process.

### A.     *Plaintiff has not carried his initial burden of proving valid service of process because the return of service is defective on its face.*

Plaintiff does not respond in any manner whatsoever to Orbis's extensive argument that Plaintiff's service attempt on July 19, 2022 was defective. (Motion at 3-4, 19-21). Instead, Plaintiff argues that his late-filed (and curiously timed) "certification" of service, [*see* DE 261-1], is prima facie evidence of service by England's central authority and, therefore, he must have obtained proper service of process upon Orbis. (Pl.'s Opp'n at 13-14). Plaintiff even goes a step further to conclude that Orbis' "proofs" to the contrary actually demonstrate proper service. (Pl.'s Opp'n at 14). Unfortunately, Plaintiff's certificate highlights a glaring discrepancy in what is authorized under the Convention and what actually occurred.

The certificate states, in pertinent part, that service of process can be obtained "by delivery to the addressee, who accepted it voluntarily," and then indicates that "[t]he documents referred to in the request have been delivered to: Receptionist." (*See* Certificate at 1.) As set forth in Orbis' Motion, the process documents were not delivered to Orbis' registered agents, let alone voluntarily accepted by them, or accepted voluntarily by anyone at all. To the contrary, the receptionist in question informed the unidentified individual that she was not authorized to accept service of any documents and that the persons authorized to accept service were unavailable. (*See* DE 260-1 at ¶

7

4, *Declaration of Christopher Burrows in Support of Defendant Orbis' Motion to Dismiss* ("Burrows Decl.")). The unidentified individual then simply dropped the documents on the floor and exited the premises. (*Id.* at ¶ 5). The documents were not delivered "to" anyone, and the receptionist definitively stated she was not authorized to accept the documents, whether voluntarily or otherwise. This is not proper service, according to the very certificate filed by Plaintiff. Moreover, the certificate lists the "identity and description of [the] person" served as "Unknown," even further corroborating the events described in Orbis' Motion. (*Compare* DE 261-1 *with* Motion at 3-4, 19-21).

The certificate also appears to be missing any information regarding the date and time the process came into hand and the time it was executed, both of which are statutory requirements of a proper return of execution of process. (*See* DE 261-1); *see also Re-Employment Servs. v. Nat'l Loan Acquisitions Co.*, 969 So. 2d 467, 471 (Fla. Dist. Ct. App. 2007) ("The affidavit of service filed on October 1, 1987[,] failed to note the time when the process came into hand and the time it was executed. Both are statutory requirements of a proper return of execution of process. Failure to state the times invalidates the service."). This is hardly proper service and Plaintiff's purported "prima facie evidence" of such service must be rejected. *Winston v. Walsh*, No. 5:19-cv-00070-TES, 2020 U.S. Dist. LEXIS 54377, at *13-14 (M.D. Ga. Mar. 27, 2020) ("[G]iven the nature of Walsh's arguments—that Plaintiffs used the wrong address to serve him—the Court must 'look behind' the Article 6 Certificate."); *Re-Employment Servs.*, 969 So. 2d at 471 ("When there is an error or omission in the return of service, personal jurisdiction is suspended and it lies dormant until proper proof of valid service is submitted." (internal quotation marks omitted)). In the end, the fact remains that Orbis has not been properly served. This case must be dismissed as against Orbis.

**B.**     _Plaintiff's request for alternative service should be rejected._

Plaintiff has not properly served Orbis with the Complaint, as described above and despite his arguments to this contrary, and concedes that service of the Amended Complaint has also yet to be effectuated. (Pl.'s Opp'n at 15). Nevertheless, under the false premise that he has properly served the Complaint, which he has not, he argues that he should be able to circumvent the Hague Convention by serving the Amended Complaint utilizing an international courier "in light of the fact that [Orbis] has actual notice of the instant action, has already been joined as a party, and is well aware of the allegations contained in the Amended Complaint." (Pl.'s Opp'n at 17). He further argues that such alternative service is proper given the "extraordinary number of defendants in this action and the immense amount of discovery that will need to be completed in a limited amount of time." (_Id._) Service through such means would be wholly improper given Plaintiff's dilatory attempt at service, (_see_ Motion at 15-16), and these are not the considerations courts usually weigh when permitting alternative service on a foreign defendant outside of the Hague Convention.  _See Sale v. Jumbleberry Enters. United States_, No. 20-20716-Civ-WILLIAMS/TORRES, 2021 U.S. Dist. LEXIS 32491, at *10 (S.D. Fla. Feb. 19, 2021). Plaintiff's request should be rejected.

"[C]ourts are reluctant to use their discretion to authorize alternate service when Hague Convention service is available" as courts believe "Plaintiffs should make an effort to effect Hague Convention service before seeking alternate service." _International Designs Corp., LLC v. Qingdao SeaForest Hair Prod. Co._, No. 17-60431-CIV-MORENO, 2018 U.S. Dist. LEXIS 3038, at *6, 7 (S.D. Fla. Jan. 4, 2018). "Thus, before permitting alternate service, 'a district court, in exercising the discretionary power permitted by Rule 4(f)(3), may require the plaintiff to show that they have 'reasonably attempted to effectuate service on defendant and that the circumstances are such that the district court's intervention is necessary to obviate the need to undertake methods of service that are unduly burdensome or that are untried but likely futile.'" _Id._ at *8. Given this,

"courts permit such alternate service only where the defendant's foreign address is unknown; the defendant has successfully evaded service; failure to permit alternate service will result in unduly long delays in litigation; or where attempted Hague Convention service has failed." *Id.* Here, Plaintiff has made no showing that service under the Hague Convention is unduly burdensome or futile. Plaintiff has simply failed to comply with its directives. Accordingly, Plaintiff's request for alternative service should be denied.[2]

### III. The Amended Complaint Is Procedurally And Substantively Deficient As Against Orbis.

As set forth in the Motion, Orbis' arguments for dismissal concerning insufficient process and insufficient service of process, and lack of personal jurisdiction, are unique to Orbis and fully dispose of all of Plaintiff's claims against Orbis. Even still, Plaintiff's lawsuit should be dismissed, in its entirety, for the additional and independent reasons already set forth in detail in the Joint Defendants' Motion to Dismiss and Incorporated Memorandum of Law, [*see* DE 226], and the Joint Defendants' Reply in Support of the Motion to Dismiss, [*see* DE 250]. Orbis expressly joins in and adopts each of the grounds therein for dismissal as if fully set forth herein.

### CONCLUSION

For each of the foregoing independent reasons and those stated in Orbis' initial Motion—lack of personal jurisdiction, insufficient process and service of process, and for failure to state a claim upon which relief can be granted—the Amended Complaint should be dismissed, in its entirety and with prejudice, as to Defendant Orbis Business Intelligence Ltd.

---

[2] Moreover, it is of no consequence that Orbis has actual notice of the Amended Complaint as the Eleventh Circuit has stressed the need for formal service of process despite actual notice of an action by a defendant. *See De Gazelle Grp., Inc. v. Tamaz Trading Establishment*, 817 F.3d 747 (11th Cir. 2016).

Dated: September 8, 2022        Respectfully submitted,

*/s/ Enjoliqué Aytch Lett*
ENJOLIQUÉ AYTCH LETT, Esq.
Florida Bar No. 0104881
Email: lette@gtlaw.com
AKIESHA GILCRIST SAINVIL, Esq.
Florida Bar No. 1003260
Email: sainvila@gtlaw.com
**GREENBERG TRAURIG, P.A.**
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717

*Counsel for Defendant*
*Orbis Business Intelligence Ltd.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 8, 2022, I electronically filed the foregoing document with the Clerk of Court using CM/ECF, which will send a Notice of Electronic Filing to counsel of record or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ Enjoliqué Aytch Lett*
ENJOLIQUÉ AYTCH LETT, ESQ.
Florida Bar No. 0104881
Email: lette@gtlaw.com

12

268

Charles Dolan's Memorandum in Support of His Motion for Sanctions
Pursuant to Fed. R. Civ. P. 11 (Sept. 21, 2022)

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF FLORIDA

———————————————————————

DONALD J. TRUMP,                    )
                                    )
Plaintiff,                          )
                                    )
v.                                  )
                                    )          Case No. 2:22-cv-14102-DMM
                                    )
HILLARY R. CLINTON, ET AL.,         )
                                    )
                                    )
Defendants.                         )
———————————————————————)

## CHARLES DOLAN'S MEMORANDUM IN SUPPORT OF HIS MOTION FOR SANCTIONS PURSUANT TO FED. R. CIV. P. 11

Defendant Charles Halliday Dolan, Jr hereby moves this Court, by and through counsel, for entry of an Order of sanctions against the Plaintiff, Donald Trump pursuant to Fed. R. Civ. P. 11(b), and in support thereof, states as follows:

### I.      INTRODUCTION

Defendant Charles Halliday Dolan, Jr has been dragged into this lawsuit via speculation, rumor and innuendo.  Large and small matters are falsely and cavalierly presented in Plaintiff's pleadings; any one of these false statements is grounds for sanction.

The original complaint falsely presented Mr. Dolan as a former Chairman of the DNC. Complaint, ¶96.  Undersigned counsel sent a Rule 11 letter to Plaintiff's counsel noting, among other things, that statement was false.  See Exhibit A.  The Amended Complaint now describes Mr. Dolan as the former Chairman of a "national democratic political organization."  Amended Complaint, ¶96.  That does not fix the problem, as Mr. Dolan was never the Chairman of any such organization.  Mr. Dolan's resume is available online and could have been easily checked.

1

The new, Amended Complaint further complicates its prior error by now identifying Mr. Dolan for the first time as a citizen and resident of New York, Amended Complaint, ¶20.  This is a new allegation that is not true at all, and again could have been easily checked.  Mr. Dolan lives and has lived for most of his adult life in Virginia.  Mr. Dolan already submitted a declaration identifying himself as an Arlington, Virginia resident.

Mr. Dolan is alleged to be the ultimate source of a rumor that Mr. Trump engaged in salacious sexual activity at a Moscow hotel.  This is also not true, and there is no basis for this rumor.  It is true that Mr. Dolan stayed in a Moscow hotel, and relayed information based on public sources, including the publication Politico and Fox News, about Paul Manafort's resignation none of which were related to the Plaintiff and are considered accurate by most media reports, but that does not make him the source of any rumor as to the Plaintiff's sexual activities. Plaintiff depicts Mr. Dolan as intimately involved in the 2016 Clinton campaign.   Actually, Mr. Dolan's involvement was limited to knocking on doors in New Hampshire as a volunteer.  See Declaration at Exhibit B. There is no evidence or allegation that he talked to any other defendant, during this period except Mr. Danchenko.  In fact, in the indictment of Mr. Danchenko, the Special Prosecutor specifically stated that "according to PR Executive-I, individuals affiliated with the Clinton Campaign did not direct, and were not aware of, the aforementioned meetings and activities with **DANCHENKO** and other Russian nationals."

Given this limited involvement, there is no basis to think that Mr. Dolan knew about any plot to bring false information to the FBI, even assuming that action might conceivably lead to a cognizable cause of action.  Again, in the indictment of Mr. Danchenko, the Special Prosecutor stated that "According to PR Executive- I, he (PR Executive- I) was not aware at the time of the specifics of **DANCHENKO's** "project against Trump," or that **DANCHENKO's** reporting would

be provided to the FBI." If a plaintiff wants to file a large complaint dragging parties in from all over the world, Plaintiff needs to undertake at least minimal diligence to confirm its alternative facts.

Essentially, Plaintiff's lawsuit seeks to settle political scores via the judicial system. Plaintiff's 193-page Amended Complaint alleges a flurry of claims that rely on conjecture and speculation to concoct various causes of actions, which Plaintiff asserts injured his presidency. But Plaintiff admits that his injury was political, e.g. "[Plaintiff] seeks damages for the cost of dealing with legal issues and **political issues**…" Amended Complaint at ¶118 (Emphasis added).  Dealing with political issues is part and parcel of running for President and being President in the United States.  Plaintiff does not get to sue for the rigors of a job he campaigned for.

 Plaintiff fails to allege a particular agreement between Mr. Dolan and any of the Defendants tortiously to injure him or his presidency. Rather, he relies on an indictment of Mr. Danchenko that relays certain conversations and then fills in the gaps with conjecture and speculation, despite objective investigations and publicity that disprove Plaintiff's claims.

## II.      LEGAL STANDARD

Rule 11 allows a court to impose sanctions on a party who has presented a pleading, motion, or other paper to the court with facts that lack evidentiary support or for "any improper purpose." *See* Fed. R. Civ. P. 11(b). Specifically, all factual contentions must have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. *Id*. "The purpose of Rule 11 is to deter frivolous and baseless filings in district court and thus streamline the administration and procedure of federal courts." *Peer v. Lewis*, 606 F.3d 1306, 1311 (11th Cir. 2010). "When an attorney files a pleading in federal court, the attorney signs the pleading to certify that, among other things, (1) the pleading is not being presented for an

improper purpose; (2) the legal contentions are warranted by existing law or a nonfrivolous argument to change existing law; and (3) the factual contentions have evidentiary support or will likely have evidentiary support after discovery." *Peer*, 606 F.3d at 1311 (citing Fed. R. Civ. P. 11(b)).

Initially, there is no way Plaintiff will ever show that Mr. Dolan is a New York resident or former chairman of a national political organization.  Plaintiff apparently did not bother with an internet search or background check.

In assessing the propriety of Rule 11 sanctions for allegations lacking a factual basis, this Court asks whether the party's claims lacked a factual basis, and whether the lawyer should have been aware that the claims were frivolous. *Latele Prods. v. Tv Azteca*, No. 16-CV-25347-MORE, 2021 U.S. Dist. LEXIS 23431, at \*32 (S.D. Fla. Feb. 5, 2021); *Latele Prods. v. Tv Azteca*, No. 16-CV-25347-MORE, 2021 U.S. Dist. LEXIS 23431, at \*32 (S.D. Fla. Feb. 5, 2021). Under the test established by Eleventh Circuit law, the court must now consider whether, despite facts that lack a reasonable basis, Plaintiff's counsel conducted a reasonable inquiry to determine the propriety of the claim. *Jones v. Int'l Riding Helmets, Ltd.*, 145 F.R.D. 120, 124 (N.D. Ga. 1992), aff'd 49 F.3d 692 (11th Cir. 1995). If Plaintiff's attorney failed to make a reasonable inquiry as to whether Plaintiff's claims were objectively frivolous, then the Court must impose sanctions despite the attorney's good faith belief that the claims were sound. *Worldwide Primates v. McGreal*, 87 F.3d 1252, 1254 (11th Cir. 1996) at 1254.

## III.   ARGUMENT

### A.  Plaintiff and His Attorneys Should Be Sanctioned for the Obvious Factual Errors and Unfounded Accusations as to Mr. Dolan

There was no factual basis to allege that Mr. Dolan was ever Chairman of the DNC, or former Chairman of any national democratic political organization, and no basis to allege he has

4

ever been a resident of New York.  There apparently was not a scintilla of due diligence on the part of the plaintiff's attorneys.  These false statements alone merit sanction, especially since undersigned counsel warned Plaintiff's counsel of a potential Rule 11 motion via letter.  These false facts are indicative of a lack of reasonable diligence generally.

      **B.  <u>Plaintiff Does Not Allege an Agreement, and Therefore There is No Conspiracy</u>**

      **1.  <u>Plaintiff Exaggerates Mr. Dolan's Credentials</u>**

Plaintiff's claims are utterly deficient because they do not allege an agreement concerning Mr. Dolan, and therefore are without merit, and this lawsuit is for the improper legal purpose of settling political scores. All of Mr. Trump's claims against Mr. Dolan are based on unfounded speculation and appear to be supported because they wrongly thought Mr. Dolan was a former Chairman of the DNC and was "intimately" involved with the Clinton campaign (which he was not), therefore, he must have spread a rumor knowing that this rumor would make its way into a report that was destined for the FBI.  There is just no basis for that fallacious leap of logic.

      **2.  The Danchenko Indictment Does Not Allege That Dolan Was the Source of Any Salacious Sexual Activity Rumor**

The other issue is that Mr. Dolan is identified as the source of an allegation regarding Mr. Trump engaging in salacious sexual activity in a Moscow hotel.  The Complaint and Amended Complaint seem to rely on the Danchenko Indictment for that allegation, but nowhere does that document identify Mr. Dolan as the source of such allegation.  Mr. Dolan is identified as the source of rumors about Mr. Manafort's resignation, but that political analysis, though recounted in the Amended Complaint, is not relevant to any defamation of the Plaintiff or conspiracy to have Plaintiff investigated.

### 3. <u>There Is No Agreement Alleged to Concoct a Report to Take to the FBI</u>

Plaintiff's allegations rely on extrapolation and unfounded speculation to concoct a cause of action against Mr. Dolan. Plaintiff fails to allege an agreement by Mr. Dolan with any other Defendant to fabricate information to induce the FBI to investigate.  This is an issue as to lack of factual basis for a claim, but also the lack of legal basis.  Throughout Plaintiff's 193-page Amended Complaint, Plaintiff does not allege any agreement with any Defendant, however all of his claims against Mr. Dolan are based on conspiracy theories: Count II (RICO Conspiracy); Count IV (Conspiracy to Commit Injurious Falsehood); Count IV (Conspiracy to commit Malicious Prosecution).

For a civil conspiracy to exist, there must be some specific, concrete allegation of an agreement between two or more parties to act unlawfully. *EMI Sun Village, Inc. v. Catledge*, 779 Fed. Appx. 627, 637 (11th Cir. 2019) ("A civil conspiracy requires: (1) an agreement between two or more parties; (2) to do an unlawful act or to do a lawful act by unlawful means; (3) the doing of some overt act in pursuance of the conspiracy; and (4) damage to plaintiff as a result of the acts done under the conspiracy.") Here, there are no allegations tying Mr. Dolan to any other Defendant besides Mr. Danchenko, and no allegation that Mr. Dolan and Mr. Danchenko entered into an agreement to do anything unlawful.

Plaintiff's counsel has verbally cited the Danchenko Indictment, referenced throughout the Amended Complaint, as a source of their allegations as to Mr. Dolan, but neither the Amended Complaint nor the Indictment allege that there was an agreement between Mr. Dolan and any Defendants to instigate criminal proceedings against Plaintiff.  For example, the Amended Complaint states that Mr. Dolan sought to create a "dossier to smear Donald J. Trump" but that allegation relies and cites the Danchenko Indictment, which states that Mr. Dolan engaged Mr.

Danchenko "in discussions regarding potential business collaboration…on issues relating to Russia…" in addition to their generally trying to develop business together and staying at the same hotel in Moscow.  There is no mention of a dossier, report, memorandum or any other document, nor any particular allegation, throughout the indictment nor the Amended Complaint, that Mr. Dolan participated in an agreement with other Defendants to smear Plaintiff and start criminal proceedings. Plaintiff makes no reference or allegation to any agreement between Mr. Dolan and Mr. Danchenko to implicate Plaintiff in criminal proceedings.

As noted previously, and in an effort to save judicial economy and unwarranted costs, counsel for Mr. Dolan advised Plaintiff's counsel of these deficiencies and put Plaintiff's counsel on notice that Plaintiff's frivolous conduct warrants rule 11 sanctions. *See* Exhibit A ("Rule 11 letter").  As part of that communication, Mr. Dolan also provided Plaintiff's counsel with an investigative media report noting that Mr. Dolan himself considered the allegations of the Steele Dossier "fake news."  See news report attached to Exhibit A.

### C. <u>Plaintiff's Complaint's Sloppiness Confirms a Lack of Reasonable Diligence</u>

Plaintiff makes other allegations confirming that Plaintiff failed to make a reasonable inquiry as required by Fed. R. Civ. P. 11(b). For example, Plaintiff alleges that Mr. Dolan is a resident of New York. Amended Complaint at ¶20. However, a simple Google search would reveal that Mr. Dolan is based in Arlington, Virginia. Mr. Dolan's residency is further emphasized in this lawsuit, where Mr. Dolan readily declared that he is a resident of the Commonwealth of Virginia. *See* Exhibit 1 of Docket entry 163 at ¶1.

### IV.   CONCLUSION

As a preliminary matter, Plaintiff's Complaint against Mr. Dolan should be dismissed with prejudice.  However, sanctions are also warranted, and the Court should grant this motion and

assess legal fees to be determined based on undersigned's time records against both Plaintiff and counsel.

Respectfully submitted,

/s/ George R. A. Doumar
George R.A. Doumar
*Admitted Pro Hac Vice*
Jonathan E. Levine, Esquire
Florida Bar No. 937711
Mahdavi Bacon Halfhill & Young, PLLC
11350 Random Hills Road, Suite 700
Fairfax, Virginia, 22030
Tel: (703) 352-1300
Fax: (703) 352-1301
Email: gdoumar@doumarmartin.com

Attorneys for Charles H. Dolan

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2022, I electronically served the foregoing on counsel of record for the Plaintiff.

Respectfully submitted,

/s/ George R. A. Doumar
George R.A. Doumar
*Admitted Pro Hac Vice*
Jonathan E. Levine, Esquire
Florida Bar No. 937711
Mahdavi Bacon Halfhill & Young, PLLC
11350 Random Hills Road, Suite 700
Fairfax, Virginia, 22030
Tel: (703) 352-1300
Fax: (703) 352-1301
Email: gdoumar@doumarmartin.com

Attorneys for Charles H. Dolan

268-1

Exhibit A to Dolan Memorandum:  Rule 11 Letter to Plaintiff's Counsel
(Sept. 21, 2022)

# EXHIBIT A

**DM Doumar Martin** PLLC
LAW OFFICES

May 31, 2022

<u>**VIA EMAIL AND MAIL**</u>

Peter Ticktin, Esq.
Jamie Sasson, Esq.
The Ticktin Law Group
270 SW Natura Avenue
Deerfield Beach, Florida 33441

Alina Habba, Esq.
Michael Madaio, Esq.
HABBA MADAIO & ASSOCIATES LLP
1430 US Highway 206
Suite 240
Bedminster, New Jersey 07921

> Re:    <u>**Trump v. Clinton, et al., 2:22-cv-14102-DMM**</u>

Dear Counsel:

Our firm represents Defendant Charles Dolan in the above referenced matter. We write this letter to confirm that our client, Mr. Dolan, had no role in any conspiracy related to the *Steele Dossier*. As is clear from the attached Wall Street Journal article of May 9, Mr. Dolan was as surprised and shocked as anyone when the Dossier was publicized in early 2017, and himself derided its contents as fake news. *See* attached article. This article reflects the Wall Street Journal's extensive review of investigatory materials as well as interviews.

Unfounded rumors have ricocheted around the internet that somehow Mr Dolan was a source of an allegation as to sexual activity, but there is no factual or evidentiary support for this rumor. Mr. Dolan stayed in a Moscow hotel, and got a tour of the hotel, and Mr. Danchenko stayed in the same hotel, but that's it. The FBI grilled Mr. Dolan on multiple occasions, and the Danchenko Indictment details his contacts with Mr. Danchenko, but again there are no facts therein to the effect that Mr. Dolan discussed any sexual rumors with Mr. Danchenko -- because he did not. The Indictment and news reports suggest that Mr. Danchenko heard sexual rumors directly from hotel staff.

Mr. Dolan also had no contact with any defendant besides Mr. Danchenko during the relevant period. Hillary Clinton is on record through a spokesperson as stating she has no recollection at all of Chuck Dolan. His contacts with Mr. Danchenko involved possible mutual business interests and help for a conference in Moscow. There is no indication, allegation, or inference that Mr. Dolan knew that any information was to be passed to the FBI or any other law enforcement.

It appears that the Durham investigation has unearthed evidence that Hillary Clinton, John Podesta, Robby Mook, Marc Elias, Fusion, GPS, and Mr. Steele may have had some agreement amongst themselves to craft memos that would be presented to the FBI, and there is some evidence that some FBI agents were, at least among themselves, determined to get President Trump. There is no dispute that Mr. Dolan was not part of any of these agreements.  There is not a sufficient factual basis to name him in the Complaint.  Hillary Clinton is on record through a spokesperson as stating she has no recollection at all of Chuck Dolan.

In sum, you do not have any evidence, or inference, sufficient for Mr. Dolan to be named in any Count of the Complaint, and we request that Mr. Dolan be dismissed from the Complaint. In addition, given the paltry facts, your counts against Mr. Dolan have no basis in law either.

Your allegations as to Mr. Dolan being part of the Clinton conspiracy is entirely based on conjecture and speculation, as opposed to fact --- the same kind of frivolous speculation that you claim is part and parcel of the *Steele Dossier*.  In addition to being "frivolous" under Rule 11, your Complaint erroneously identifies Mr. Dolan as a former "Chairman of the DNC" in Paragraph 78(b), which he never was and could have been easily checked. This misrepresentation confirms that allegations as to Mr Dolan were not checked and lack a factual basis. It only confirms the frivolous nature of your slanderous Complaint as to Mr. Dolan.

Accordingly, we request that in any Amended Complaint, presumably to be filed on June 20, that Mr. Dolan not be named as a defendant.

If he is named as a defendant, or if he is not dropped from the existing Complaint, we will seek Rule 11 sanctions.

We request a response by June 10, 2022.

Please do not hesitate to contact us with any questions.

Sincerely,

George R.A. Doumar

2

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/the-surprising-backstory-of-how-the-steele-dossier-was-created-11652103582

# Three Friends Chatting: How the Steele Dossier Was Created

Report that rattled the political world often echoed talk among three acquaintances, including the main investigator and an old schoolmate

*By Alan Cullison*        *and Aruna Viswanatha*
May 9, 2022 9:39 am ET

Hours after the publication in early 2017 of a dossier claiming President-elect Donald Trump conspired with Russia to steer the U.S. election, a public relations executive in Washington tapped out an email to a client whose company was cited in the document, cast as a villain.

"I'm hoping that this is exposed as fake news," Charles Dolan Jr. wrote. "I will check with some folks in the intel world to see if they know who produced this." The dossier, published by BuzzFeed News, used code names to conceal its sources. Some were close to Kremlin corridors of power, it said.

The dossier proceeded to rivet the U.S. political class, win credibility within the Federal Bureau of Investigation, cast a shadow over the first two years of the Trump presidency and cost millions of dollars for investigations and lawsuits, only to eventually be mostly discredited. One reason was where much of the dossier's information came from—anything but Kremlin insiders.

Instead, a Wall Street Journal review found, many of the dossier's key details originated with a few people gossiping after they had been brought together over a minor corporate publicity contract.

The dossier's author, former British spy Christopher Steele, relied mainly on a Washington researcher to gather information. According to FBI notes of an interview with that researcher, Igor Danchenko, he said he wasn't comfortable with the assignment and some of his sources were old friends—one a former schoolmate—whose information Mr. Steele exaggerated.

It wasn't until last November that prosecutors identified a man they pinpoint as one of Mr. Danchenko's most important sources. Based on an indictment of Mr. Danchenko for lying to the FBI about whom he'd talked to, one of his key sources was none other than Mr. Dolan, the PR executive who tried to reassure a client.

The indictment says Mr. Danchenko relied on "PR Executive-1" for what became a dossier note about upheaval on Mr. Trump's campaign staff. The indictment also suggests that Mr. Danchenko drew on PR Executive-1—since confirmed to be Mr. Dolan—for part of the dossier's most lurid allegation, that Russian agents once secretly videotaped prostitutes cavorting in Mr. Trump's Moscow hotel room.

Mr. Trump has denied that ever happened, and denied other allegations in the dossier as well. Special Counsel Robert Mueller included no evidence of such a hotel episode in the lengthy report of his investigation of Russian election meddling.



Mr. Danchenko has pleaded not guilty to lying to the FBI, and his attorney didn't respond to requests for comment. Mr. Dolan declined to comment, saying through an attorney it would be inappropriate to speak as long as Mr. Danchenko faces charges. Mr. Steele, who has said the dossier was meant as raw intelligence and never intended for public consumption, didn't respond to a request for comment.

How someone like a Washington PR operative could be conflated with a Trump or Kremlin insider goes to the heart of the story behind the dossier. It is one that can be told in greater detail today thanks to particulars of the Danchenko indictment and documents associated with Mr. Dolan's work, as well as to interviews with acquaintances of Mr. Dolan and Mr. Danchenko, which provided the basis for the reporting.

Couched in the language of conspiracy and professional spycraft, the dossier quickly became the lexicon of opposition to Mr. Trump, and was devoured by a country hungry for information about a Kremlin effort to influence elections that was real. But the dossier was wrong in nearly all its salient details, and the way it was compiled was far more random, haphazard and amateurish than anyone knew.

U.S. government investigations found some evidence that the Trump campaign held furtive meetings with Russians involved in influencing the elections. Mr. Mueller charged dozens of Russian entities and individuals with engaging in a two-pronged attack of disinformation and hacked computers, and described in his report repeated contacts between Russia-linked entities and Trump campaign advisers that happened at around the same time.

But Mr. Mueller reported no evidence that the campaign conspired with Russia's military intelligence apparatus as it hacked into the email of the Democratic National Committee. The dossier took real events, such as the visit of a Trump adviser to Moscow, and expounded on them by describing meetings with high-level Kremlin officials for which no corroborating evidence surfaced.

While investigations and court battles have peeled back many origins of the dossier's claims, any trial of Mr. Danchenko could provide further insight. The special counsel looking into the FBI's handling of the Russia probe, John Durham, continues to investigate. One remaining riddle is whether the dossier's misinformation was purely careless or might have included disinformation sown by the Kremlin itself.

By spring 2016, Mr. Danchenko and Mr. Dolan moved in the same social and business circles in Washington, where both worked as consultants. As the presidential campaign gathered steam, they and a third friend overseas, Olga Galkina, spent hours trading the sort of gossip and purported inside knowledge that greases the skids of commercial deals and social interactions in political circles.

Mr. Danchenko passed some of this chatter on to his boss, Mr. Steele. In short order, versions of it appeared in the dossier, which Mr. Steele filed in a series of dated memos through the rest of 2016.



Mr. Danchenko told the FBI of other people he also spoke to in gathering information for Mr. Steele. Many of his details, however, came through this route, the Journal's review shows.

What brought Mr. Danchenko, Mr. Dolan and Ms. Galkina together was a marketing campaign —funded by the Dolan PR client whose company was cited in the dossier.

He was Aleksej Gubarev, a Russian internet entrepreneur living in Cyprus, who decided in early 2016 to launch a U.S. marketing campaign to burnish the image of his cloud server company.

A computer-science prodigy from the Siberian city of Ust-Ilimsk, Mr. Gubarev founded his first company at age 24 and a decade later formed a new one, Servers.com, which he hoped would leapfrog competitors with state-of-the-art hardware and a global VPN system.

He hired Ms. Galkina, also Russian-born, as his press secretary and in early 2016 sent her to Washington to seek someone to promote his business in the U.S. In D.C. Ms. Galkina sought help from Mr. Danchenko, with whom she once attended an elite school in the Russian city of Perm.

Mr. Danchenko had spent most of his professional life in the U.S., including several years as a researcher for the Brookings Institution. By 2016 he was doing research for Mr. Steele.

When Ms. Galkina asked him to suggest a publicist for her employer, Mr. Danchenko emailed his former boss at Brookings, Fiona Hill. "I have an URGENT small favour to ask you," Mr. Danchenko wrote, relaying that a "very good old friend of 25 years" was seeking help from a public relations firm with Russia experience and would be in Washington the following week.

Ms. Hill, who later became a top National Security Council Russia expert—and later still a witness at Mr. Trump's first impeachment hearings—forwarded the email to Mr. Dolan, the PR executive. After Ms. Galkina arrived in Washington, Mr. Danchenko took her shopping and to a restaurant, say FBI notes of a later interview with the researcher.

Mr. Dolan, who goes by Chuck, had spent much of his career in Democratic politics, as a Virginia state chairman in former President Bill Clinton's two presidential campaigns and an adviser on Hillary Clinton's 2008 primary campaign in Iowa and New Hampshire. By 2016 he was working for KGlobal, a communications firm with Republican ties that was trying to develop its international business.

It hired him in part for his Russia expertise, say former colleagues. In a previous job, Mr. Dolan represented the Kremlin in a publicity push, including organizing meetings between President Vladimir Putin and Western journalists and experts, giving him access to some high Russian officials. Former colleagues at KGlobal, which didn't respond to requests for comment, said he regaled them with tales of his doings in Russia, such as getting through a police stop by showing a badge indicating he was in the country at Kremlin invitation.

Mr. Dolan and Ms. Galkina discussed a marketing campaign for her employer. "I was very impressed with the level of your professionalism and skills," Ms. Galkina emailed Mr. Dolan after she returned to Cyprus. "For me it was like a 3rd grader from the math school to see the professor from MIT."

Mr. Gubarev's company flew Mr. Dolan and two KGlobal colleagues to Cyprus in July 2016 and put them up at the Four Seasons hotel so they could deliver a sales pitch, Mr. Gubarev said. With Mr. Trump clinching the Republican nomination in the U.S., the talk in Cyprus wandered into politics. The Danchenko indictment says Mr. Dolan brought Ms. Galina a book by Mrs. Clinton he inscribed "To my good friend Olga, A Great Democrat." Mr. Dolan signed a three-month contract to help Servers.com with "message development" and outreach in the U.S. for $25,000 a month.

Mr. Danchenko's work for Mr. Steele, which had mostly involved business intelligence, also took a turn toward politics. Mr. Steele, a former agent in Russia for the British intelligence agency MI-6, asked Mr. Danchenko to work on a new assignment Mr. Steele had accepted: to look for compromising material on Mr. Trump in Russia.

The assignment came from Fusion GPS, a Washington firm that does investigations for private clients. Republicans opposed to Mr. Trump's bid for the GOP nomination initially

hired Fusion, but by this time it was employed by Perkins Coie, a law firm representing Mrs. Clinton's primary campaign and the Democratic National Committee.



A lawyer for the firm, which was founded by former Wall Street Journal reporters, didn't respond to a request for comment. Executives of Fusion have said in the past they retained Mr. Steele based on his Moscow experience and blue-chip Russian source network.

Mr. Danchenko, interviewed by the FBI in 2017 after his role became known to investigators, expressed surprise at how specific and conclusive some of the information he gave Mr. Steele looked later in the dossier, according to a report by the Justice Department's inspector general's office. He said some of the dossier's assertions were based on "word of mouth and hearsay" or "conversation that he had with friends over beers," the IG said an FBI agent told it.

Mr. Danchenko also told the FBI that Mr. Steele had told him it was a security risk to take notes, so he kept none, other than "scribbles" or "chicken scratch notes here and there." He said he gave "verbal debriefs" to Mr. Steele, who he said didn't press him on who his sources were.

One of Mr. Danchenko's chats with Mr. Dolan appeared to figure in the dossier's most inflammatory entry.

Mr. Dolan was helping to organize a fall 2016 conference in Moscow to drum up foreign investment. While in Moscow in June to lay the groundwork, he stayed at the Ritz-Carlton, a few hundred yards from the Kremlin. He met with the hotel's general manager and got a tour of the hotel, including the presidential suite, according to the indictment of Mr. Danchenko. It says he also met with Mr. Danchenko, who was in town.

Less than a week later, Mr. Steele's first dossier chapter alleged that a "Source D," described as a close associate of Mr. Trump, had said Mr. Trump once hired prostitutes to urinate on the bed when he stayed in the Ritz-Carlton's presidential suite, because former President Barack Obama, whom the dossier said Mr. Trump detested, had stayed there.

The dossier said the Kremlin had video and was holding it as *kompromat*, or compromising material. It said the episode had been confirmed by a senior member of the hotel staff and a female hotel staffer.

Prosecutors noted that the dossier reflected some details Mr. Dolan had learned on the hotel tour, such as that Mr. Trump had stayed at the hotel's presidential suite.

Mr. Danchenko told the FBI he had gotten the prostitute story from a friend. He said that he heard it told in jest and that he described it to Mr. Steele as rumor and speculation, the Justice Department inspector general's office said it was told by an FBI agent.

Mr. Danchenko said he inquired about the story with hotel managers, who laughed it off and said that all kinds of things happen at the hotel, which he took to be not a denial, according to an FBI agent's notes of an interview with Mr. Danchenko.

A Washington lawyer who accompanied Mr. Dolan on the hotel tour has told investigators the hotel staff didn't say anything about prostitutes, according to the indictment of Mr. Danchenko. The lawyer, identifiable from the description as Stephen Kupka, declined to comment.

In late July 2016, WikiLeaks started releasing emails stolen from the Democratic National Committee. On July 31, the FBI opened an investigation into whether there were any ties between the Trump campaign and Russian election meddling. These events were separate from the dossier, but would soon become linked.

Throughout the summer, Mr. Dolan, Mr. Danchenko and Ms. Galkina traded gossip, speaking frequently, according to interviews and email messages reviewed by the Journal.

Whether Mr. Dolan knew the conversations were being adapted for the dossier is unclear. He later told the FBI he wasn't aware of the specifics of Mr. Danchenko's project, according to the indictment of Mr. Danchenko. Some associates of Mr. Dolan say he appeared shocked by the dossier's contents when they were published.



Notes of an FBI interview with Mr. Danchenko say he related how one day when he was at a swimming pool, Ms. Galkina told him by phone that a Trump campaign adviser named Carter Page had secretly met with a senior Kremlin official.

That notion soon appeared in a dossier memo. The FBI included the reference when it sought and gained a warrant to surveil Mr. Page as part of its probe of Russian election interference. The Justice Department's inspector general later criticized the FBI for taking the dossier reference at face value.

Mr. Danchenko said he didn't ask Ms. Galkina for her source because he had no reason to doubt her, according to FBI interview notes.

Ms. Galkina couldn't be reached for comment. In a statement filed in a related civil lawsuit in Washington last June, she said she talked to Mr. Danchenko over the years but never gave him permission to disclose their discussions. After The Wall Street Journal revealed her role as a dossier source in October 2020, Russia's state-owned RIA Novosti news agency quoted her as saying that was "not true."

The indictment also states that in August 2016, "PR Executive-1"—Mr. Dolan—told Mr. Danchenko he'd "had a drink with a GOP friend of mine" who said Paul Manafort was forced out as Mr. Trump's campaign manager after alienating others on the team. The indictment refers to Mr. Manafort as "Campaign Manager-1."

A dossier chapter two days later stated: "Several senior players close to TRUMP had wanted MANAFORT out, primarily to loosen his control on strategy and policy formulation." The dossier attributed this to an "American political figure associated with Donald TRUMP."

Mr. Dolan later told the FBI he hadn't met with any GOP friend but got his information from public news sources, according to the indictment.

As Mr. Dolan prepared for the fall investment conference in Moscow, he was in touch with the chief of the Russian Embassy's economic section in Washington, Mikhail Kalugin. In an Aug. 19 email to Mr. Dolan that is described in the Danchenko indictment, Mr. Kalugin told Mr. Dolan he was returning to Russia and would be replaced.

In a dossier report dated Sept. 14, 2016, which was one day after Mr. Dolan called Mr. Danchenko, according to prosecutors, Mr. Steele wrote that Mr. Kalugin was being withdrawn at short notice because of his alleged involvement in the Kremlin's election-interference operation and would be replaced.

The Russian embassy in Washington said Mr. Kalugin's departure was part of a regular diplomatic rotation and had "no connection with the alleged election interference operation whatsoever."

In October, Messrs. Dolan and Danchenko flew to Moscow for the investment conference, dubbed "Inside the Kremlin," which featured a prominent Russian legislator, Russian diplomats, a foreign business delegation and a lecture by Mr. Dolan on the U.S. presidential race.

By October, bits of the dossier were being leaked to reporters and government officials in Washington, where one news article said that Mr. Page's supposed meetings made him a possible back channel to the Kremlin. Mr. Page called this "complete garbage" and denied he met with senior Kremlin officials.



In October, Ms. Galkina gave Mr. Danchenko a new story, he told the FBI—that the Kremlin had reshuffled its secret channels with the Trump campaign to cover its tracks. She said Mr. Page had been replaced as intermediary by Michael Cohen, then a Trump lawyer, and Mr. Cohen had met with Kremlin officials somewhere in Europe and discussed ways to minimize the appearance of contacts between Trump aides and Russia.

The dossier later cited this supposed meeting in two reports. On Oct. 20, it said: "Speaking to a compatriot and friend on 19 October 2016, a Kremlin insider provided further details of reported clandestine meeting / s between Republican presidential candidate, Donald TRUMP's lawyer Michael COHEN and Kremlin representatives in August 2016." It added that the Kremlin insider said the meeting was in Prague because plans for a Moscow rendezvous were "judged too compromising."

Mr. Cohen has denied he ever was in Prague. The FBI later determined the allegations about his traveling to Prague weren't true.

The last chapter of the dossier gave further details of the putative Prague meeting, alleging that Mr. Cohen not only cooperated with the Russians in their hacking of the Democrats but also helped pay the hackers on behalf of the Trump campaign team. According to Mr. Danchenko's interviews with the FBI, Ms. Galkina was the main source for this bit, which Mr. Cohen has also denied.

By this time, Ms. Galkina's relationship with her employer in Cyprus, Mr. Gubarev, had soured, and she had resigned. Her former supervisor filed a report with police, seen by the Journal, saying she chronically appeared at work late, sometimes drunk, and alleging that a friend of Ms. Galkina's tried to extort him for money.

Mr. Danchenko also approached Mr. Gubarev's business for money—payment for the service of introducing Ms. Galkina to Mr. Dolan in Washington.

"We never got a chance to communicate, but I have heard many great things about you while I facilitated the meetings," Mr. Danchenko wrote in a Dec. 1 email. He attached an invoice for $1,159, which Mr. Gubarev said his business promptly paid.

The final memo of the Steele dossier, dated Dec. 13, called Mr. Gubarev one of those involved in Russia's election interference.

In this memo, Mr. Steele wrote that Mr. Gubarev's companies had used "botnets and porn traffic" to steal data and conduct "altering operations" against Democratic Party leadership.

The report said Mr. Gubarev was a significant player in this operation after being "recruited under duress by the FSB," the Russian security agency.

Mr. Gubarev denied any connection to Russian hacking or Russian security services.

The dossier said another significant player in the hacking was Seva Kapsugovich. The allegation originated with Ms. Galkina, Mr. Danchenko told the FBI, according to its notes of an interview with him. The name didn't appear in a search of Russian names, but a Seva Kaptsugovich, spelled with a "T," was a notorious convicted child molester in Perm, the Russian home city of Mr. Danchenko and Ms. Galkina as well as of her former supervisor in Cyprus. Seva Kaptsugovich, imprisoned in 2013, couldn't be reached.

As portions of the dossier spread around Washington, it set off alarm bells. At a late-2016 security conference in Halifax, Nova Scotia, a Steele associate approached a senior director of the McCain Institute—named for the late Arizona Sen. John McCain—and said Mr. Steele had a report detailing collusion between Russia and the Trump campaign.

The McCain Institute official, David Kramer, described the approach in a lawsuit deposition in London and said he flew to London and met with Mr. Steele. On his return to Washington, Mr. Kramer met with Glenn Simpson, one of the founders of Fusion GPS, who handed over two paper copies of the Steele memos to deliver to Mr. McCain, according to Mr. Kramer's deposition.



Mr. McCain gave the FBI's then-director James Comey 16 of the dossier's memos, five of which the FBI hadn't previously seen, according to the Justice Department inspector general.

National security officials debated whether to include the material in the intelligence community's formal assessment of Russian interference in the 2016 election. Central

Intelligence Agency officials argued against, describing it as internet rumor. Mr. Comey argued for, saying that while the FBI couldn't vouch for the material, Mr. Steele appeared to be credible.

At Trump Tower in Manhattan, Mr. Comey and other intelligence officials briefed the incoming president and his team on the intelligence assessment, mentioning an assertion by Mr. Steele that Russia had files of derogatory information on both 2016 candidates.

Mr. Comey then stayed behind to brief Mr. Trump on the allegations involving prostitutes, telling him the FBI didn't know whether the allegations were true and wasn't investigating them, Mr. Comey later told the inspector general's office.

Mr. Comey suggested tweaking a planned statement from the Director of National Intelligence to cite the dossier and say that intelligence officials hadn't made any judgment about whether it was reliable. "Much of what he reports in the current document is consistent with and corroborative of other reporting," Mr. Comey wrote in an email at the time, according to the inspector general's report. The statement wasn't changed.

On Jan. 10, 2017, less than two weeks before the presidential inauguration, BuzzFeed News published the full dossier.



Mr. Gubarev said he learned about the report when a friend sent him a link to the BuzzFeed article. Mr. Gubarev said that at first he didn't take it seriously, writing an email to Mr. Dolan with a smiling emoticon in the subject line and saying "need to found out who is make this stupid report."

Mr. Dolan told him he thought the report might get traction in public. "It will have some legs with the sex allegations," he wrote

Mr. Gubarev had declined to renew the publicity campaign for which he hired Mr. Dolan, saying he expected more for the $75,000 his company spent. But after the dossier's publication, Mr. Gubarev hired Mr. Dolan again, this time to fight off the bad press, as Western banks were moving to cut his credit lines.

Mr. Gubarev said Mr. Dolan told him that Mr. Danchenko likely had compiled the dossier for Mr. Steele.

Mr. Gubarev sued BuzzFeed and Mr. Steele, lodging defamation claims in Florida and at the High Court in London.

According to a filings in his suit against BuzzFeed, that organization's law firm paid $4 million to hire Anthony Ferrante, a former director for cyber-incident response for the U.S. National Security Council.

Mr. Ferrante wrote in a May 2018 report that an examination of "technical evidence" suggested Russian cyber espionage groups had used Mr. Gubarev's company "to support malicious spear phishing campaigns against the Democratic Party leadership which resulted" in the theft of Clinton campaign-related emails.

The Mueller investigation didn't link the breach to Mr. Gubarev's companies, saying only that Russian military intelligence leased servers from third-party providers around the world.

Mr. Ferrante didn't respond to requests for comment. BuzzFeed declined to comment.

A judge in Florida ruled against Mr. Gubarev, saying BuzzFeed couldn't be held liable for publishing a document that was the subject of official government conduct. A judge in London said Mr. Steele couldn't be held liable either, as he wasn't involved in the decision to make the dossier public. Mr. Gubarev said he isn't appealing the rulings because the court process was expensive and giving him "bad karma."

In May 2019, then-Attorney General William Barr assigned Mr. Durham, then U.S. Attorney for Connecticut, to investigate the Justice Department's handling of the dossier and related issues. Just before the 2020 election, Mr. Barr made Mr. Durham a special counsel, ensuring his investigation would continue no matter who won.

Mr. Durham brought the indictment of Mr. Danchenko in early November. A trial is scheduled for October, six years after Mr. Danchenko met Mr. Dolan and reunited with his school pal Ms. Galkina.



Mr. Gubarev said he was shocked that the indictment pointed to Mr. Dolan as an important source for the dossier. He said Mr. Dolan did a good job helping him fight to clear his name. "He is a nice guy, he did his best," Mr. Gubarev said. "Washington is a strange place that I don't understand."

Mr. Gubarev said he resigned from Servers.com in 2018 because he believed his presence there was creating problems with banks worried about the allegation he was tied to election hacking. Lately he has been investing in artificial-intelligence-enabled mobile phone applications from his home in Cyprus.

Mr. Danchenko recently posted a lament on Twitter, without specifying to whom it was addressed:

"So, what is it that you wanted to do? You unveiled my identity, ridiculed me, made sure I can't work or travel... as I spend all of my and my family money to the penny... And what's your endgame? (Asking for a friend course).

"I am weary. And it's a drag for others. May I not play this stupid game any more?"

### Corrections & Amplifications
The name of law firm Perkins Coie was misspelled as Perkins Cole in an earlier version of this article. (Corrected on May 9)

Write to Alan Cullison at alan.cullison@wsj.com and Aruna Viswanatha at Aruna.Viswanatha@wsj.com

*Appeared in the May 10, 2022, print edition as 'Three Friends' Chats Fed the Steele Dossier'.*

268-2

Exhibit B to Dolan Memorandum:  Second Declaration of Charles Dolan
(Sept. 21, 2022)

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

DONALD J. TRUMP,                                )
                                                )
Plaintiff,                                      )
                                                )
v.                                              )
                                                )   Case No. 2:22-cv-14102-DMM
                                                )
HILLARY R. CLINTON, ET AL.,                     )
                                                )
                                                )
Defendants.                                     )

### SECOND DECLARATION OF CHARLES DOLAN

I, Charles H. Dolan, declare and affirm as follows pursuant to 28 U.S.C §1746:

1.  My name is Charles H. Dolan. I reside in the Commonwealth of Virginia, in Arlington. I have lived in Virginia since 1986.

2.  I do not own any property in New York, and never have. I have never resided in New York.

3.  I do not have any business or offices in New York, nor have I provided any services in New York. Nor have I solicited business in New York, as least not in the last ten years.

4.  I do not vacation regularly in New York.

5.  I was previously identified in the initial complaint as a former Chairman of the DNC. That was utterly false and just plain uninformed. The Amended Complaint now identifies me as the former Chairman of a national Democratic political organization. That is also not true. I am also identified in the Amended Complaint as a senior Hillary Clinton for President campaign official. That is utterly false and just plain uninformed by the plaintiff and his attorneys. The fact of the matter is that my involvement in the 2016 campaign was as a volunteer knocking on doors in New Hampshire for the last week of the campaign.

6.  I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed on July 14, 2022.

Arlington, Virginia.

Charles Halliday Dolan, Jr.

268-3

Proposed Order on Defendant Mr. Dolan's Motion for Rule 11 Sanctions
(Sept. 21, 2022)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Donald J. Trump,

　　　　　　Plaintiff,

　　v.

Hillary R. Clinton *et al.*,

　　　　　　Defendants.

Civil Action No. 2:22-14102-DMM

## **ORDER**

On this ___ day of _____ 2022 came the Parties, on Defendant Mr. Dolan's Motion for Rule 11 sanctions, and upon the parties' briefing and arguments, it is

ORDERED that the Defendant Dolan's Rule 11 Motion is GRANTED. Plaintiff Donald J. Trump and the Ticktin Law Group PA, Habba Madaio & Associates LLP, Jamie Alan Sasson, Alina Habba, Michael T. Madaio, and Peter David Ticktin in their individual capacities and through their business entities, are liable to Mr. Dolan, jointly and severally, in the amount of $16,274.23.

Entered this ___ day of _____ 2022.

_____
The Honorable Judge Middlebrooks
United States District Judge

cc: All counsel of record

# 269
Praecipe (Sept. 21, 2022)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Donald J. Trump,

          Plaintiff,

    v.

Hillary R. Clinton *et al.*,

          Defendants.

Civil Action No. 2:22-14102-DMM

## **PRAECIPE**

      Defendant Charles Halliday Dolan ("Mr. Dolan") files this praecipe in connection with his Rule 11 motion ("Motion") against both Plaintiff and his counsel, jointly and severally.

      Defendant Dolan through counsel has advised Plaintiff and his attorneys of Mr. Dolan's intent to move for sanctions initially via a letter sent to Plaintiff's attorneys on May 31, 2022. Plaintiff's counsel refused to withdraw the Complaint against Mr. Dolan. On July 15, 2022 the Rule 11 Motion was served on Plaintiff's attorneys. Plaintiff's attorneys still declined to withdraw their allegations. On September 18, 2022, Defendant Dolan through counsel proposed a compromise amount to resolve this matter, and has still not heard back. Defendant Dolan also intends to seek sanctions under 28 U.S.C. §1927, but the Rule 11 motion was served on July 15 and is ripe for filing and decision now. Mr. Dolan reserves his right to join other defendants in their motions for sanctions under 28 U.S.C. §1927 as appropriate, provided fees and costs are collected under the Motion.

      Indeed, the Amended Complaint made new false allegations as to Dolan, such as that he was a resident of New York, which reflects a complete lack of any reasonable inquiry or due diligence. Defendant Dolan has now incurred $16,274.23 in attorneys' fees, and has paid $2,045 toward that balance, leaving a total outstanding of $14,229.10. Invoices attached. More than 21

days have elapsed since service of the Rule 11 motion, which is now filed in the same form in which it was served, but now with a cover praecipe.

In accordance with Local Rule 7.3, Defendant Dolan files its Motion within 60 days of the Court's final ruling of September 8, 2022 as prescribed by Local Rule 7.3(a)(1).

As an aside, Mr. Dolan believes that the filing of this lawsuit and related adverse publicity has prevented Mr. Dolan from obtaining credit, and also led to a significant loss of consulting business.

In accordance with Local Rule 7.3(a)(5), attorneys for Mr. Dolan state the following:

Counsel who worked on this matter for Defendant Dolan included attorneys George Doumar, Jonathan Levine, Mamoun Mahayni, Daniel Hernandez, and Robert Cimmino, most of whom billed minimal time on discrete areas. Most of the time was billed at a discounted, "low bono" rate of $100 per hour, both as a favor to Mr. Dolan and in recognition that the lawsuit against him was unmerited.

Attorney Doumar has over 35 years litigating and trying cases. He was a member of the Virginia Law Review Editorial Board and Order of the Coif. Attorney Levine served as Florida counsel and has been practicing for 22 years. Attorneys Mamoun Mahayni and Robert Cimmino both graduated law school in 2019, and are recent members of the Virginia and New York bar respectively. Attorney Hernandez was licensed to practice law in 2020. Each of these junior attorneys were limited to discrete tasks.

Mr. Dolan seeks sanctions awarding him a total of $16,274.23 in attorneys' fees and costs. To avoid any dispute over particular time entries, and resolve this quickly, Mr. Dolan is happy for the Court to deduct any time entries deemed duplicative, but strongly believes the overall amount is reasonable.

### Certification of Attempt to Resolve

Counsel for Mr. Dolan has communicated with Plaintiff's counsel repeatedly to resolve

this issue, including before serving the Rule 11 motion, and then before filing the Rule 11 motion.

Respectfully submitted,

/s/ George R. A. Doumar
George R.A. Doumar
*Pro Hac Vice*
Jonathan E. Levine, Esquire
Florida Bar No. 937711
Mahdavi Bacon Halfhill & Young, PLLC
11350 Random Hills Road, Suite 700
Fairfax, Virginia, 22030
Tel: (703) 352-1300
Fax: (703) 352-1301
Email: gdoumar@doumarmartin.com

Counsel for Charles H. Dolan

### **VERIFICATION**

I hereby verify that the fees claimed have been incurred, that bills have been sent monthly

to Mr. Dolan, and that the facts set forth above are true to the best of my knowledge.

George R. A Doumar

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of September, 2022, I caused a copy of the foregoing

Defendants' Motion for Sanctions to be served on all counsel of record via CM/ECF.  All parties

required to be served have been served.

/s/ George R. A. Doumar
George R.A. Doumar
*Pro Hac Vice*
Jonathan E. Levine, Esquire
Florida Bar No. 937711
Mahdavi Bacon Halfhill & Young, PLLC
11350 Random Hills Road, Suite 700
Fairfax, Virginia, 22030
Tel: (703) 352-1300
Fax: (703) 352-1301
Email: gdoumar@doumarmartin.com

Counsel for Charles H. Dolan

# Doumar Martin PLLC

# INVOICE

11350 Random Hills Road, Suite 700
Fairfax, VA 22030

Invoice # 651
Date: 06/24/2022
Due Upon Receipt

### 2861

## Charles Dolan

### Services

| Date | Attorney | Notes | Quantity | Rate | Total |
|------|----------|-------|----------|------|-------|
| 05/02/2022 | GRD | Updated filings in court, issues for potential briefing | 0.40 | $100.00 | $40.00 |
| 05/03/2022 | GRD | Review new filings | 0.20 | $100.00 | $20.00 |
| 05/04/2022 | GRD | Review cases re personal jurisdiction | 0.50 | $100.00 | $50.00 |
| 05/06/2022 | GRD | Review filings in Trump case re arguments for dismissal | 0.40 | $100.00 | $40.00 |
| 05/09/2022 | MM | Legal research | 1.00 | $100.00 | $100.00 |
| 05/09/2022 | GRD | Review briefs from Florida counsel, telcon re same, | 0.70 | $100.00 | $70.00 |
| 05/10/2022 | MM | Draft motion to dismiss | 2.30 | $100.00 | $230.00 |
| 05/10/2022 | GRD | Draft affidavit for Chuck/revise | 0.50 | $100.00 | $50.00 |
| 05/11/2022 | MM | Further draft motion | 0.40 | $100.00 | $40.00 |
| 05/11/2022 | GRD | Review current draft of brief | 0.50 | $100.00 | $50.00 |
| 05/11/2022 | RC | Telcon with GRD to receive instructions and case background {HH} | 0.30 | $100.00 | $30.00 |
| 05/12/2022 | MM | Continue drafting motion | 4.50 | $100.00 | $450.00 |
| 05/12/2022 | GRD | Review current draft of brief | 0.50 | $100.00 | $50.00 |
| 05/13/2022 | MM | Modify motion | 0.60 | $100.00 | $60.00 |
| 05/13/2022 | GRD | Brief changes, revisions, cases re extension, issues re extension | 1.50 | $100.00 | $150.00 |
| 05/13/2022 | RC | Review draft motion to dismiss; telcon with GRD {HH} | 1.00 | $100.00 | $100.00 |

| 05/16/2022 | GRD | Review new filings for dismissal in Trump case | 0.70 | $100.00 | $70.00 |
|---|---|---|---|---|---|
| 05/17/2022 | GRD | Review Danchenko indictment for issues | 0.90 | $100.00 | $90.00 |
| 05/17/2022 | RC | Edit motion to dismiss; review GRD e-mails and telcon re same {HH} | 1.30 | $100.00 | $130.00 |
| 05/18/2022 | MM | Develop 12(b)(6) portion of motion | 1.30 | $100.00 | $130.00 |
| 05/18/2022 | GRD | Update draft | 0.80 | $100.00 | $80.00 |
| 05/18/2022 | GRD | Review new filings | 0.20 | $100.00 | $20.00 |
| 05/18/2022 | RC | Review complaint and edit motion to dismiss; legal research on ; draft e-mail to GRD {HH} | 2.50 | $100.00 | $250.00 |
| 05/19/2022 | MM | Review motion | 2.10 | $100.00 | $210.00 |
| 05/19/2022 | MM | Review indictment; confer with GRD | 1.00 | $100.00 | $100.00 |
| 05/20/2022 | MM | Draft motion | 4.30 | $100.00 | $430.00 |
| 05/20/2022 | GRD | Affidavit and brief changes | 0.80 | $100.00 | $80.00 |
| 05/21/2022 | GRD | Rewrite brief | 3.00 | $100.00 | $300.00 |
| 05/21/2022 | RC | Edit motion to dismiss and e-mail GRD re same {HH} | 0.70 | $100.00 | $70.00 |
| 05/23/2022 | MM | Modify and review motion; review local rules for filing; generate tables of content and authorities; finalize exhibits; draft proposed order | 5.80 | $100.00 | $580.00 |
| 05/23/2022 | GRD | Final changes, ready brief for filing | 1.50 | $100.00 | $150.00 |
| 05/25/2022 | GRD | Further filings re motions | 0.20 | $100.00 | $20.00 |
| 05/27/2022 | MM | Draft Rule 11 letter | 2.30 | $100.00 | $230.00 |
| 05/27/2022 | GRD | Rule 11 letter draft | 0.40 | $100.00 | $40.00 |
| 05/28/2022 | GRD | Light edits to Chuck edits, e-mail | 0.30 | $100.00 | $30.00 |
| 05/31/2022 | GRD | Review court filings re attempt to move status call date | 0.30 | $100.00 | $30.00 |
| 05/31/2022 | MM | Prepare Rule 11 notice letter for send out | 1.90 | $100.00 | $190.00 |
| 05/31/2022 | GRD | Finalizing and edit Rule 11 letter | 0.60 | $100.00 | $60.00 |

Services Subtotal     $4,820.00

## Expenses

| Date | Notes | Quantity | Rate | Total |
|---|---|---|---|---|
| 05/31/2022 | Lexis Nexis | 1.00 | $111.53 | $111.53 |
| 05/31/2022 | Consultant: Florida Counsel - Mahdavi Bacon Halfhill & Young, | 8.10 | $300.00 | $2,430.00 |

PLLC - May Invoice - Jon Levine

| | |
|---|---|
| **Expenses Subtotal** | **$2,541.53** |
| **Subtotal** | **$7,361.53** |
| **Invoice Discount** | **$70.00** |
| **Total** | **$7,291.53** |

## Detailed Statement of Account

### Other Invoices

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 745 | 07/12/2022 | $2,594.08 | $0.00 | $2,594.08 |
| 852 | 08/10/2022 | $1,643.49 | $0.00 | $1,643.49 |
| 966 | 09/08/2022 | $2,700.00 | $0.00 | $2,700.00 |

### Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 651 | 06/24/2022 | $7,291.53 | $0.00 | $7,291.53 |
| | | | **Outstanding Balance** | **$14,229.10** |
| | | | **Total Amount Outstanding** | **$14,229.10** |

### IOLTA

| Date | Type | Notes | Matter | Receipts | Payments | Balance |
|---|---|---|---|---|---|---|
| 04/26/2022 | | Payment for trust request: #545 | 2861 | | $1,000.00 | $1,000.00 |
| | | | **IOLTA Balance** | | **$0.00** | |

Please make all amounts payable to: Doumar Martin PLLC

Payment is due upon receipt.

# Doumar Martin PLLC

# INVOICE

11350 Random Hills Road, Suite 700
Fairfax, VA 22030

Invoice # 745
Date: 07/12/2022
Due Upon Receipt

## 2861

## Charles Dolan

### Services

| Date | Attorney | Notes | Quantity | Rate | Total |
|---|---|---|---|---|---|
| 06/01/2022 | GRD | Update review of filings, telcon Chuck re Rule 11 letter | 0.50 | $100.00 | $50.00 |
| 06/02/2022 | MM | Contact SD Florida to get link for status call | 0.20 | $100.00 | $20.00 |
| 06/02/2022 | GRD | Updates re filings | 0.50 | $100.00 | $50.00 |
| 06/02/2022 | GRD | Court hearing | 0.50 | $100.00 | $50.00 |
| 06/03/2022 | GRD | Follow-up with other defense counsel re status of hearing, defense counsel meeting | 0.50 | $100.00 | $50.00 |
| 06/09/2022 | GRD | Follow-up re Rule 11 letter, send to Trump's attorneys | 0.60 | $100.00 | $60.00 |
| 06/09/2022 | GRD | Telcon Chuck | 0.30 | $100.00 | $30.00 |
| 06/10/2022 | GRD | Court docket issues, filings | 0.30 | $100.00 | $30.00 |
| 06/13/2022 | GRD | Review new court filings | 0.20 | $100.00 | $20.00 |
| 06/14/2022 | MM | Meet and confer with GRD; research Steele dossier | 1.30 | $100.00 | $130.00 |
| 06/14/2022 | GRD | Follow-up telcon Chuck/filings | 0.40 | $100.00 | $40.00 |
| 06/14/2022 | GRD | Steele dossier issues and review | 0.40 | $100.00 | $40.00 |
| 06/16/2022 | GRD | Brief follow-up of talking points | 0.40 | $100.00 | $40.00 |
| 06/16/2022 | GRD | Follow-up Chuck | 0.30 | $100.00 | $30.00 |
| 06/22/2022 | MM | Review amended complaint | 1.70 | $100.00 | $170.00 |
| 06/22/2022 | GRD | Check court filings | 0.20 | $100.00 | $20.00 |
| 06/23/2022 | MM | Further review amended complaint | 2.40 | $100.00 | $240.00 |

Invoice # 745 - 07/12/2022

| 06/23/2022 | GRD | Review court updates | 0.20 | $100.00 | $20.00 |
| 06/24/2022 | MM | Continue amended complaint review | 0.50 | $100.00 | $50.00 |
| 06/27/2022 | MM | Amended complaint review | 2.00 | $100.00 | $200.00 |
| 06/27/2022 | GRD | Filings re possible extension | 0.30 | $100.00 | $30.00 |
| 06/28/2022 | MM | Review complaint; begin drafting Rule 11 motion | 1.90 | $100.00 | $190.00 |
| 06/28/2022 | GRD | Follow-up re extensions, review prior motion to dismiss | 0.30 | $100.00 | $30.00 |
| 06/29/2022 | MM | Legal research; further draft Rule 11 motion | 2.50 | $100.00 | $250.00 |
| 06/30/2022 | MM | Conduct legal research and continue drafting Rule 11 motion | 5.00 | $100.00 | $500.00 |
| 06/30/2022 | GRD | Make edits to Rule 11 motion, declaration | 1.50 | $100.00 | $150.00 |
| 06/30/2022 | GRD | Order and ancillary document drafting | 0.50 | $100.00 | $50.00 |

**Services Subtotal**     **$2,540.00**

## Expenses

| Date | Notes | Quantity | Rate | Total |
|------|-------|----------|------|-------|
| 06/30/2022 | Lexis Nexis | 1.00 | $104.08 | $104.08 |
| 06/30/2022 | Consultant: Florida Counsel - Mahdavi Bacon Halfhill & Young, PLLC - June Invoice - Jon Levine | 1.00 | $450.00 | $450.00 |

**Expenses Subtotal**     **$554.08**

**Subtotal**     **$3,094.08**

**Invoice Discount**     **$500.00**

**Total**     **$2,594.08**

# Detailed Statement of Account

## Other Invoices

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|----------------|--------|------------|-------------------|-------------|
| 651 | 06/24/2022 | $7,291.53 | $0.00 | $7,291.53 |
| 852 | 08/10/2022 | $1,643.49 | $0.00 | $1,643.49 |
| 966 | 09/08/2022 | $2,700.00 | $0.00 | $2,700.00 |

## Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 745 | 07/12/2022 | $2,594.08 | $0.00 | $2,594.08 |
| | | | **Outstanding Balance** | **$14,229.10** |
| | | | **Total Amount Outstanding** | **$14,229.10** |

## IOLTA

| Date | Type | Notes | Matter | Receipts | Payments | Balance |
|---|---|---|---|---|---|---|
| 04/26/2022 | | Payment for trust request: #545 | 2861 | | $1,000.00 | $1,000.00 |
| | | | | **IOLTA Balance** | **$0.00** | |

Please make all amounts payable to: Doumar Martin PLLC

Payment is due upon receipt.

# Doumar Martin PLLC

# INVOICE

11350 Random Hills Road, Suite 700
Fairfax, VA 22030

Invoice # 852
Date: 08/10/2022
Due Upon Receipt

Charles Dolan

## 2861

## Charles Dolan

### Services

| Date | Attorney | Notes | Quantity | Rate | Total |
|------|----------|-------|----------|------|-------|
| 07/01/2022 | MM | Draft motion to dismiss; declaration; review amended complaint and initial complaint | 3.00 | $100.00 | $300.00 |
| 07/01/2022 | GRD | Review filings, motions, e-mails, and draft motion to dismiss to be filed | 1.20 | $100.00 | $120.00 |
| 07/05/2022 | GRD | Further review of filings | 0.30 | $100.00 | $30.00 |
| 07/07/2022 | GRD | Follow-up re Danchenko counsel, matters | 0.30 | $100.00 | $30.00 |
| 07/08/2022 | MM | Review Rule 11 motion | 1.20 | $100.00 | $120.00 |
| 07/08/2022 | MM | Check federal rules for Rule 11 sanctions procedure | 0.20 | $100.00 | $20.00 |
| 07/08/2022 | GRD | Telcon Danchenko counsel | 0.50 | $100.00 | $50.00 |
| 07/10/2022 | MM | Review Rule 11 motion | 0.60 | $100.00 | $60.00 |
| 07/10/2022 | GRD | Briefing issues, e-mails | 0.40 | $100.00 | $40.00 |
| 07/11/2022 | GRD | Issues re updated motions filing | 0.60 | $100.00 | $60.00 |
| 07/12/2022 | GRD | E-mail follow-up, many lawyers | 0.30 | $100.00 | $30.00 |
| 07/13/2022 | GRD | E-mails re dispositive filings | 0.40 | $100.00 | $40.00 |
| 07/14/2022 | DH | Review and revise Rule 11 motion and motion to dismiss | 0.90 | $250.00 | $225.00 |
| 07/14/2022 | GRD | Finalize supplemental filing, Rule 11 motion | 2.50 | $100.00 | $250.00 |
| 07/15/2022 | DH | Review and revise Rule 11 motion | 1.00 | $250.00 | $250.00 |
| 07/15/2022 | GRD | Issues re Rule 11 filing, changes from Chuck/defense counsel call report | 0.50 | $100.00 | $50.00 |

| 07/16/2022 | GRD | Follow-up and forward Rule 11 | 0.40 | $100.00 | $40.00 |
| 07/21/2022 | GRD | Status call with defense attorneys | 0.50 | $100.00 | $50.00 |
| 07/26/2022 | GRD | Report on defense call | 0.30 | $100.00 | $30.00 |

|  |  |  | **Services Subtotal** | | **$1,795.00** |

### Expenses

| Date | Notes | Quantity | Rate | Total |
|---|---|---|---|---|
| 07/31/2022 | Lexis Nexis | 1.00 | $18.49 | $18.49 |
| 07/31/2022 | Consultant: Florida Counsel - Mahdavi Bacon Halfhill & Young, PLLC - July Invoice - Jon Levine | 1.00 | $330.00 | $330.00 |

|  |  | **Expenses Subtotal** | **$348.49** |
|  |  | **Subtotal** | **$2,143.49** |
|  |  | **Invoice Discount** | **$500.00** |
|  |  | **Total** | **$1,643.49** |

## Detailed Statement of Account

### Other Invoices

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 651 | 06/24/2022 | $7,291.53 | $0.00 | $7,291.53 |
| 745 | 07/12/2022 | $2,594.08 | $0.00 | $2,594.08 |
| 966 | 09/08/2022 | $2,700.00 | $0.00 | $2,700.00 |

### Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 852 | 08/10/2022 | $1,643.49 | $0.00 | $1,643.49 |

|  |  |  | **Outstanding Balance** | **$14,229.10** |
|  |  |  | **Total Amount Outstanding** | **$14,229.10** |

Invoice # 852 - 08/10/2022

**IOLTA**

| Date | Type | Notes | Matter | Receipts | Payments | Balance |
|------|------|-------|--------|----------|----------|---------|
| 04/26/2022 | | Payment for trust request: #545 | 2861 | | $1,000.00 | $1,000.00 |

**IOLTA Balance**      **$0.00**

Please make all amounts payable to: Doumar Martin PLLC

Payment is due upon receipt.

# Doumar Martin PLLC

# INVOICE

11350 Random Hills Road, Suite 700
Fairfax, VA 22030

Invoice # 966
Date: 09/08/2022
Due Upon Receipt

### 2861

## Charles Dolan

#### Services

| Date | Attorney | Notes | Quantity | Rate | Total |
|------|----------|-------|----------|------|-------|
| 08/01/2022 | GRD | Counsel e-mails | 0.20 | $100.00 | $20.00 |
| 08/05/2022 | RC | Downloading all responsive filings on Pacer | 0.20 | $100.00 | $20.00 |
| 08/05/2022 | RC | Meet and confer with GRD on reply brief | 0.60 | $100.00 | $60.00 |
| 08/05/2022 | RC | Call with defense counsels re reply to plaintiff's response to motion to dismiss | 1.10 | $100.00 | $110.00 |
| 08/05/2022 | RC | Draft reply to plaintiff's opposition to Dolan's motion to dismiss | 0.70 | $100.00 | $70.00 |
| 08/05/2022 | GRD | Update re defense counsel meeting, filings, and reply drafting | 0.80 | $100.00 | $80.00 |
| 08/08/2022 | RC | Further draft reply to plaintiff's opposition to Dolan's motion to dismiss | 6.70 | $100.00 | $670.00 |
| 08/08/2022 | GRD | Various e-mails, motion for longer brief, telcon Chuck re mysterious Jan 17 e-mails | 0.80 | $100.00 | $80.00 |
| 08/09/2022 | RC | Continue drafting reply to plaintiff's opposition to motion to dismiss | 1.20 | $100.00 | $120.00 |
| 08/09/2022 | RC | Discuss motion edits with GRD | 0.30 | $100.00 | $30.00 |
| 08/09/2022 | GRD | Separate brief edits, review omnibus brief | 1.20 | $100.00 | $120.00 |
| 08/10/2022 | RC | Review joint reply | 0.60 | $100.00 | $60.00 |
| 08/10/2022 | GRD | E-mails re reply, review draft reply and edit for Chuck | 0.80 | $100.00 | $80.00 |
| 08/11/2022 | RP | Revise reply re motion to dismiss amended complaint | 1.40 | $100.00 | $140.00 |
| 08/11/2022 | RC | Draft and file reply | 5.50 | $100.00 | $550.00 |

| 08/11/2022 | GRD | Review briefing issues, filing | 0.80 | $100.00 | $80.00 |
| 08/12/2022 | RC | Research on timeliness of Rule 11 motions | 0.50 | $100.00 | $50.00 |
| 08/12/2022 | RP | Review RC e-mail re timeliness of Rule 11 motion | 0.20 | $100.00 | $20.00 |
| 08/16/2022 | GRD | Review filings | 0.40 | $100.00 | $40.00 |
| 08/18/2022 | GRD | Updated review of pleadings, motion to dismiss Neustar | 0.60 | $100.00 | $60.00 |

|  |  |  | **Services Subtotal** | | **$2,460.00** |

## Expenses

| Date | Notes | Quantity | Rate | Total |
|---|---|---|---|---|
| 08/31/2022 | Consultant: Florida Counsel - Mahdavi Bacon Halfhill & Young, PLLC - August Invoice - Jon Levine | 0.80 | $300.00 | $240.00 |

|  | **Expenses Subtotal** | | | **$240.00** |
|  | **Subtotal** | | | **$2,700.00** |
|  | **Total** | | | **$2,700.00** |

# Detailed Statement of Account

## Other Invoices

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 651 | 06/24/2022 | $7,291.53 | $0.00 | $7,291.53 |
| 745 | 07/12/2022 | $2,594.08 | $0.00 | $2,594.08 |
| 852 | 08/10/2022 | $1,643.49 | $0.00 | $1,643.49 |

## Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 966 | 09/08/2022 | $2,700.00 | $0.00 | $2,700.00 |

|  |  |  | **Outstanding Balance** | **$14,229.10** |
|  |  |  | **Total Amount Outstanding** | **$14,229.10** |

Invoice # 966 - 09/08/2022

**IOLTA**

| Date | Type | Notes | Matter | Receipts | Payments | Balance |
|------|------|-------|--------|----------|----------|---------|
| 04/26/2022 | | Payment for trust request: #545 | 2861 | | $1,000.00 | $1,000.00 |

| | | | | IOLTA Balance | $0.00 | |

Please make all amounts payable to: Doumar Martin PLLC

Payment is due upon receipt.

270

Plaintiff's Response to Defendant, Charles Halliday Dolan Jr.'s Motion
for Sanctions Pursuant to Fed. R. Civ. P. 11 (Oct. 5, 2022)

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA


CASE NUMBER: 2:22-cv-14102-DMM



DONALD J. TRUMP,

       Plaintiff,

v.

HILLARY R. CLINTON, et al.,

       Defendant.

_____/


**PLAINTIFFS' RESPONSE TO DEFENDANT, CHARLES HALLIDAY DOLAN JR.'S**
**MOTION FOR SANCTIONS PURSUANT TO FED. R. CIV. P. 11**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .........................................................................................iii, iv

INTRODUCTION ........................................................................ **Error! Bookmark not defined.**

LEGAL STANDARD...................................................................................................2

LEGAL ARGUMENT ................................................................................................ 4

    I.   Plaintiff's Counsel Engaged in a Diligent Pre-Filing Inquiry. ...........
       4

    II.  Plaintiff's Claims Against Defendant Are Non-Frivolous................................................... 11

CONCLUSION.......................................................................................................... 14

# TABLE OF AUTHORITIES

*American Dental Ass'n v. Cigna Corp.*,
   605 F.3d 1283, 1293 (11th Cir.) ................................................................. 12

*Andre v. CCB Credit Services, Inc.*,
   2010 WL 3222500, at *2 (S.D. Fla. July 21, 2010) ...................................... 12

*Cabrera v. The Goodyear Tire & Rubber Co.*,
   2011 U.S. Dist. LEXIS 16655, 2011 WL 535103 at *2 (S.D. Fla., Feb. 8, 2011) ................... 15

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690, 699 (1962) ............................................................................ 13

*Davis v. Carl*,
   906 F.2d 533, 538 (11th Cir. 1990) ............................................................. 2

*Delaware Valley Floral Group, Inc. v. Shaw Rose Nets, LLC*,
   2008 WL 11333071, at * 1 (S.D. Fla. Dec. 19, 2008) .................................. 2

*Elie v. Pac. Land Ltd.*,
   2012 WL 13005814, at *3 (S.D. Fla. July 5, 2012) ...................................... 12

*Great Lakes Reinsurance (UK) PLC v. Blue Sea, LLC*,
   2006 WL 2471522, at *3 (M.D. Fla. Aug. 24, 2006) .................................... 5

*Hillsborough County v. A & E Road Oiling Service, Inc.*,
   160 F.R.D. 655, 658-659 (M.D. Fla. 1995) ................................................. 15

*Indus. Risk Insurers v. M.A.N. Gutehoffriungshutte GmbH*,
   141 F.3d 1434, 1448 (11th Cir. 1998) ......................................................... 3

*Jones v. Int'l Riding Helmets, Ltd.*,
   49 F.3d 692, 694 (11th Cir. 1995) ............................................................... 1

*Leach v. Northern Telecom, Inc.*,
   141 F.R.D. 420, 429 (E.D.N.C. 1991) ........................................................ 2

*Manhattan Const. Co. v. Place Props. LP*,
   559 Fed. Appx. 856, 858 (11th Cir. 2014) .................................................. 1

*Massengale v. Ray*,
   267 F.3d 1298, 1302 (11th Cir. 2001) ......................................................... 11

*McMahan Sec. Co. L.P. v. FB Foods, Inc.*,
  2006 WL 2092643 at *2 (M.D. Fla. July 27, 2006) ................................................ 2

*O'Bryan v. Joe Taylor Restoration, Inc.*,
  No. 20-cv-80993, 2021 U.S. Dist. LEXIS 1710, at *5 (S.D. Fla. Jan. 6, 2021) ................. 10, 11

*Operating Ena'rs Pension Trust v. A-C Co.*,
  859 F.2d 1336, 1344 (9th Cir. 1988) ........................................................... 1

*Pannonia Farms, Inc. v. USA Cable*,
  426 F.3d 650, 652 (2d Cir. 2005) ............................................................. 2

*Pharma Supply, Inc. v. Stein*,
  2015 WL 11439276, at *1 (S.D. Fla. May 27, 2015) ......................................... 2, 3

*Risk Insurers v. M.A.N. Gutehoffriungshutte GmbH*,
  141 F.3d 1434, 1448 (11th Cir. 1998) ......................................................... 2

*Royal Surplus Lines Ins. Co. v. Coachmen Indus., Inc.*,
  229 F.R.D. 695, 696 (M.D. Fla. 2005) ...................................................... 3, 4

*Schlaifer Nance & Co. v. Estate of Warhol*,
  194 F.3d 323, 334 (2d Cir. 1999) ............................................................. 2

*Walker v. Hallmark Bank & Tr., LTD.*,
  2010 WL 3257993, at *2 (S.D. Fla. Aug. 17, 2010) ............................................ 1

*White v. Verizon Florida, LLC*,
  2011 WL 806713, *5 (M.D.Fla. 2011) ......................................................... 15

*Thompson v. RelationServe Media, Inc.*,
  510 F.3d 628 (2010) ......................................................................... 8

*United States v. Sylvestri*,
  409 F.3d 1311, 1328 (11th Cir. 2005) ........................................................ 13

*Walters v. Blankenship*,
  931 So. 2d 137, 140 (Fla. Dist. Ct. App. 2006) ............................................... 13

*White v. Verizon Florida, LLC*,
  2011 WL 806713, *5 (M.D.Fla. 2011) .......................................................... 8

*Worldwide Primates, Inc. v. McGreal*,
  87 F.3d 1252, 1254 (11th Cir. 1996) .......................................................... 2

**<u>RULES</u>**

Fed. R. Civ. P. 11(b)(3)...................................................................................................... 1

The Plaintiff, Donald J. Trump, (hereinafter referred to as "Plaintiff"), by and through his undersigned attorneys hereby submits this Response to Defendant, Charles Halliday Dolan, Jr.'s (hereinafter referred to as "Defendant") Motion for Sanctions, and in support, state as follows:

## **INTRODUCTION**

Without any basis in fact or law, Defendant moves before this Court to sanction Plaintiff pursuant to Rule 11, arguing that the claims asserted against him are premised upon "speculation, rumor, and innuendo." (DE 268 at 1). Defendant's stance is disingenuous and without merit. Most importantly, it is provably false. Indeed, the Amended Complaint was methodically compiled in reliance on official government documents and other authoritative sources. As demonstrated below, the vast majority of Plaintiff's allegations against Defendant were sourced directly from Special Counsel John Durham and, more specifically, his criminal indictment against Igor Danchenko. The indictment—which is the culmination of a large-scale, years-long investigation by a highly-qualified federal agency—is rife with actionable allegations against Defendant and provides ample support for the claims asserted Defendant in this civil action. In addition, Plaintiff's counsel has undertaken significant, diligent, and good-faith steps to assure that the Amended Complaint has a legitimate evidentiary and stands by the adequacy of those efforts.

In short, Defendant's motion is entirely without merit; it lacks specificity, is devoid of factual and evidentiary support, and is comprised of nothing more than thread-bare legal analysis. Plaintiff's claims are rooted in evidentiary support, based on viable legal theories, and present actionable claims against Defendant for his role in furthering the false narrative that Plaintiff colluded with the Russian government to undermine the 2016 Presidential Election. For these reasons, which are set forth at length below, the Motion must be denied.

## **LEGAL STANDARD**

Rule 11 of the Federal Rules of Civil Procedure provide, in pertinent part, that in "presenting to the court a pleading, written motion, or other paper . . . an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery[.]" Fed. R. Civ. P. 11(b)(3). Rule 11 "should not be employed as a discovery device or to test the legal sufficiency of allegations in the pleadings . . . . Nor should Rule 11 motions be prepared to emphasize the merits of a party's position, . . . to intimidate an adversary into withdrawing contentions that are fairly debatable, [or] to increase the costs of litigation . . . ." Fed. R. Civ. P. 11, advisory committee notes to 1993 amendment. Further, "the filing of a [Rule 11] motion for sanctions is itself subject to the requirements of the rule and can lead to sanctions," and "the court may award to the person who prevails on a motion under Rule 11—whether the movant or the target of the motion—reasonable expenses, including attorney's fees, incurred in presenting or opposing the motion." *Id*.; *see* Fed. R. Civ. P. 11(c)(2).

"Rule 11 sanctions are proper (1) when a party files a pleading that has no reasonable factual basis; (2) when the party files a pleading that is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law; and (3) when the party files a pleading in bad faith for an improper purpose." *Manhattan Const. Co. v. Place Props. LP*, 559 Fed. Appx. 856, 858 (11th Cir. 2014) (citing *Jones v. Int'l Riding Helmets, Ltd.*, 49 F.3d 692, 694 (11th Cir. 1995)). "'Rule 11 is an extraordinary remedy, one to be exercised with extreme caution.'" *Walker v. Hallmark Bank & Tr., LTD.*, 2010

WL 3257993, at *2 (S.D. Fla. Aug. 17, 2010) (quoting *OperatingEna'rs Pension Trust v. A-C Co.*, 859 F.2d 1336, 1344 (9th Cir. 1988)). Indeed, the Second Circuit has expressly cautioned:

> "Rule 11 sanctions are a coercive mechanism, available to trial court judges, to enforce ethical standards upon attorneys appearing before them, while being careful not to rein in zealous advocacy. Although the imposition of sanctions is within the province of the district court, "any such decision [should be] made with restraint and discretion."

*Pannonia Farms, Inc. v. USA Cable*, 426 F.3d 650, 652 (2d Cir. 2005) (quoting *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 334 (2d Cir. 1999)).

In order for sanctions to be appropriate, "the filing for which sanctions are imposed must be frivolous, that is, it must enjoy no factual and legal support in the record." *Indus. Risk Insurers v. M.A.N. Gutehoffriungshutte GmbH*, 141 F.3d 1434, 1448 (11th Cir. 1998); *see also Davis v. Carl*, 906 F.2d 533, 538 (11th Cir. 1990) ("Rule 11 is intended to deter claims with *no* factual or legal basis at all; creative claims, coupled even with ambiguous or inconsequential facts, may merit dismissal, but not punishment.") (emphasis in original)). "In deciding the propriety of Rule 11 sanctions, a court first determine whether the party's claims are objectively frivolous and then, if so, whether the signatory to the pleading should have been aware that they were frivolous-whether he would have been aware of the frivolousness if he had made a reasonable inquiry." *Delaware Valley Floral Group, Inc. v. Shaw Rose Nets, LLC*, 2008 WL 11333071, at * 1 (S.D. Fla. Dec. 19, 2008) (citing *Worldwide Primates, Inc. v. McGreal*, 87 F.3d 1252, 1254 (11th Cir. 1996)).

The party requesting sanctions "bears a heavy burden of demonstrating that sanctions are warranted, with all doubts resolved in the non-movant's favor." *Pharma Supply, Inc. v. Stein*, 2015 WL 11439276, at *1 (S.D. Fla. May 27, 2015) (citing *McMahan Sec. Co. L.P. v. FB Foods, Inc.*, 2006 WL 2092643 at *2 (M.D. Fla. July 27, 2006)). "[I]n Rule 11 context, 'party moving for sanctions must demonstrate' underlying facts supporting penalty." *Royal Surplus Lines Ins. Co. v.*

*Coachmen Indus., Inc.*, 229 F.R.D. 695, 696 (M.D. Fla. 2005) (quoting in parenthetical *Leach v. Northern Telecom, Inc.*, 141 F.R.D. 420, 429 (E.D.N.C. 1991)). *See also, Emergency Recovery, Inc. v. Hufnagle,* No. 8:19-cv-329-T-24JSS, 2019 WL 9089594, at * (M.D. Fla. June 12, 2019) ("All doubts regarding whether Rule 11 has been violated should be resolved in favor of the signer of the paper. Thus, the burden of proof as to whether the signer [h]as violated Rule 11 is on the Rule 11 movant.") (quoting Georgene M. Vairo, Rule 11 Sanctions: Case Law, Preventative Measures, 223 (Richard G. Johnson ed., ABA, 3d ed. 2004))).

In applying the above standard to the case *sub judice*, it is readily apparent that Defendant does not come close to satisfying his "heavy burden of demonstrating that sanctions are warranted*." Pharma Supply, Inc.*, 2015 WL 11439276, at *1. Indeed, contrary to Defendant's assertion, Plaintiff diligently and sufficiently established the facts underlying his claim against Defendant and otherwise pleaded an adequate cause of action against Defendant for civil conspiracy.

## LEGAL ARGUMENT

### I.     *Plaintiff's Counsel Engaged in a Diligent Pre-Filing Inquiry.*

Upon examination of the Complaint, it is plainly apparent that Plaintiff set forth ample evidentiary support for the factual allegations raised against Defendant. In arguing otherwise, Defendant points to supposed "false statements" contained in the Amended Complaint which, he claims, show that there was "not a scintilla of due diligence on the part of the plaintiff's attorneys." (DE 268 at 5). For the reasons set forth below, this position is demonstrably false.

*First*, Defendant incredulously claims that there is "no factual basis" to support Plaintiff's assertion that he had "previously served as the chairman of a national democratic political organization." Am. Compl. ¶ 96. Despite Defendant's belief, this statement was not merely

surmised as "unfounded speculation" on the part of Plaintiff's attorneys. (DE 268 at 6). Instead, it was directly sourced—and cited ***word-for-word***—from an official government pleading drafted by Special Counsel John Durham, who had been appointed by then-Attorney General, William Barr, to commence an investigation into "whether any federal officer, employee, or [] other person or entity violated the law in connection with the intelligence, counter-intelligence, or law-enforcement activates directed at the 2016 presidential campaigns, individuals associated with those campaigns, and individuals associated with the administration of President Donald J. Trump."[1] Namely, Plaintiff relied upon the indictment of Igor Danchenko filed on November 3, 2021 in the criminal matter of *United States v. Danchenko* (the "Indictment"). *See* Declaration of Alina Habba, Esq., **Exhibit A**; *see also United States v. Danchenko,* case no. 1:21-cr-00245-AJT, Eastern District of Virginia (ECF No. 1). The Indictment, which was filed more than one year into a large-scale government investigation and pursuant to grand jury proceedings, stated precisely that Defendant[2] "had served as [] ***chairman of a national Democratic political organization***." *Id.* at ¶ 19 (emphasis added). The Indictment goes on to describe Defendant's "intimate ties" to the Clintons and the Democratic parties, stating that he also served as "state chairman of former President Clinton's 1992 and 1996 presidential campaigns, and [] an advisor to Hillary Clinton's 2008 Presidential campaign" and elaborating that "President Clinton appointed [Defendant] to two four-year terms on an advisory commission at the U.S. State Department" and that Defendant

---

[1] *See* Attorney General Order No. 4878-2020, "appointment of Special Counsel to Investigate Matters Related to Intelligence Activities and investigations Arising Out of the 2016 Presidential Campaigns," October 19, 2020, https://int.nyt.com/data/documenttools/durham-special-counsel/7ff8599351b63336/full.pdf.

[2] The Indictment refers to Defendant as "PR Executive-1"; in his motion papers, Defendant does not contest that "PR Executive-1" is in fact a reference to him.

"actively campaigned and participated in calls and events as a volunteer on behalf of Hillary Clinton." *Id.*

Indeed, like the above-referenced statements (which were taken word-for-word from the Indictment) nearly *all* of the allegations pertaining to Defendant were sourced directly from the Indictment. By way of example, the Amended Complaint contains the following allegations pertaining to Defendant that were sourced directly from the Indictment:

- "With respect to the 2016 Clinton Campaign, Dolan actively campaigned and participated in calls and events as a volunteer on behalf of Hillary Clinton." Am. Compl. at ¶ 20; *compare to* Indictment at ¶ 19 ("With respect to the 2016 Clinton Campaign, [Dolan] actively campaigned and participated in calls and events as a volunteer on behalf of Hillary Clinton."

- "Dolan, then an employee of public relations firm, Kglobal, was a longtime participant in Democratic politics[.]" Am. Compl. at ¶ 96(b); *compare to* Indictment at ¶ 10 "[Dolan] was a long-time participant in Democratic Party politics and was then a executive at a U.S. public relations firm[.]"

- "In late April 2016, Danchenko began having discussions with Dolan about a potential business collaboration between Orbis Ltd. and Kglobal to create a "dossier" to smear Donald J. Trump and to disseminate the false accusations to the media. Those discussions reflected that Danchenko and Dolan had exchanged information regarding each other's backgrounds and professional activities, including Danchenko's work for Orbis Ltd, and Steele." Am. Compl. at ¶ 96(c); *compare to* Indictment at ¶ 23 "In or about late April 2016, DANCHENKO and [Dolan] engaged in discussions regarding potential business collaboration between PR Firm- I and U .K. Investigative Firm-I on issues relating to Russia. These discussions reflected that DANCHENKO and [Dolan] had exchanged information regarding each other's backgrounds and professional activities, including DANCHENKO's work for U.K. Investigative Firm-I and U.K. Person-I.

- "That same day, Danchenko sent an e-mail to Dolan outlining certain work that Danchenko was conducting with Orbis Ltd. The e-mail attached an Orbis Ltd. Report titled "Intelligence Briefing Note, 'Kompromat' and 'Nadzor' in the Russian Banking Sector."" Am. Compl. at ¶ 96(e); *compare to* Indictment at ¶ 25 "That same day, DANCHENKO sent an email to PR Executive-I outlining certain work that DANCHENKO was conducting with U.K. Investigative Firm-I. The email attached a U.K Investigative Finn-I report titled "Intelligence Briefing Note, 'Kompromat' and 'Nadzor' in the Russian Banking Sector."

- "Another allegation, contained in Report 111 of the Dossier, claiming that the Russian government withdrew a Russian from his job at the Russian Embassy in Washington, D.C.

due to fears relating to the diplomat's purported role in meddling in the U.S. Presidential Election, had clearly originated from Dolan." Am. Compl. at ¶ 115; *compare to* Indictment at ¶ 66 "Another allegation in the Company Reports that demonstrated the materiality of DANCHENKO's lies regarding PR Executive-I was dated September 14, 2016 and claimed that the Russian government withdrew Russian Diplomat- I from his job at the Russian Embassy in Washington, D.C. due to fears relating to the diplomat's purported role in meddling in the U.S. presidential election."

- "Certain information contained in the Dossier, which Danchenko provided to Steele, mirrors and/or reflects information that Dolan had conveyed to Danchenko." Am. Compl. ¶ 113; *compare to* Indictment at ¶ 11 "Indeed, and as alleged below, certain allegations that DANCHENKO provided to U.K. Person-I, and which appeared in the Company mirrored and/or reflected information that [Dolan] himself also had received through his own interactions with Russian nationals.

- "Moreover, Dolan was undoubtedly a source for an allegation in the Dossier regarding Paul Manafort's departure from the Trump Campaign." Am. Compl. at ¶ 117; *compare to* Indictment at ¶ 45 "At least one allegation contained in a Company Report dated August 22, 2016, reflected information that DANCHENKO collected directly from PR Executive- I. In particular, that Company Report detailed the August 2016 resignation of Trump's Campaign Manager ("Campaign Manager-I") and his allegedly strained relationship with another campaign staff member ("Campaign Staff Member- I").

- "[O]n August 20, 2016, Dolan e-mailed Danchenko the following: I had a drink with a GOP friend of mine who knows some of the players and got some of what is in this article, which provides even more detail. She also told me that [Campaign Staff Member-1], who hates [Paul Manafort] and still speaks to Trump regularly played a role. He is said to be doing a happy dance over it." Am. Compl. at ¶ 119; *identical to* Indictment at ¶ 48.

- "Later that same day, Danchenko replied to Dolan, expressing his appreciation for the information, adding that their "goals clearly coincide[d]" with respect to gathering derogatory information about Trump. Dolan responded, stating "Thanks! I'll let you know if I hear anything else."" Am. Compl. at ¶ 120 *identical to* Indictment at 49, 50.

It cannot be seriously argued that Plaintiff lacked a reasonable evidentiary basis for the allegations put forth in the Amended Complaint since said allegations were made in reliance upon, and in deference to, official government pleadings filed by the Office of Special Counsel (OSC). The OSC is a highly-qualified federal agency that wields immense investigatory authority has access to state-of-the-art resources in carrying out its investigations. As such, the OSC is

undoubtedly in a better position than Plaintiff's counsel to substantiate the veracity of such a claim, particularly at this initial stage of litigation, when Plaintiff is operating without the benefit of discovery. Defendant's claim that Plaintiff's counsel should have viewed Defendant's online "resume," (DE 268 at 1), as a more credible source than the Indictment which culminated from the OSC's years-long investigation flies in the face of reason and is inconsistent with the relevant Rule 11 standard. *See, e.g.*, *Thompson v. RelationServe Media, Inc.*, 510 F.3d 628 (2010) ("A factual claim is frivolous if no reasonably competent attorney could conclude that it has a reasonable evidentiary basis.") (citing *Davis v. Carl*, 906 F.2d 533, 535-37 (11th Cir. 1990));

*Second*, Defendant takes issue with the allegation in the Amended Complaint that he was the source of the "salacious sexual activity" rumor contained in the Dossier and argues that "nowhere does [the Indictment] identify [Defendant] as the source of such allegation." In doing so, Defendant fails to recognize that the Indictment specifically identifies him as a "source of information for the [Dossier]" and further claims that "certain allegations that Danchenko provided to [Steele], and which appeared in the [Dossier], mirrored and/or reflected information that [Defendant] himself also had received through his own interactions with Russian nationals." Indictment at ¶ 57. When discussing the report of the "salacious sexual activity" contained in the Dossier—which, per the Dossier, were sourced from staff members of a Moscow Hotel—the Indictment recounts that this allegation "reflected facts that [Defendant] and Organizer-1 [] learned during" his stay at a Moscow Hotel, including that, at such time, Defendant had "received a tour of the Moscow Hotel Presidential Suite; [] met with the general manager and other staff of the Moscow Hotel" and that a Moscow Hotel staff member told Defendant that Plaintiff "had stayed in the Presidential Suite." *Id.* at ¶¶ 58-61. While Defendant points out that the Indictment states that Defendant told investigators that "the staff member did not mention any sexual or salacious

8

activity," this statement was expressly referenced in the Amended Complaint, *see* Am. Compl. ¶ 114(d) ("Dolan ultimately admitted that no one at the hotel mentioned anything to him about Trump's supposed 'sexual or salacious' activity."), and, regardless, such a self-interest statement does nothing to dimmish the likelihood that Defendant *himself* was the one who concocted the "salacious sexual activity" rumor, particularly in light of the fact that he has admitted to providing other "fabricated" information to Danchenko. *Id.* at ¶ 52.

Indeed, the theory that Defendant was the source of the "salacious sexual activity" rumors was explicitly raised by the OSC in the Indictment when it claimed that Dolan received allegations regarding the rumor during the 2016 time period. *See* Indictment at 67 "This allegation - like the allegation concerning the Presidential Suite of the Moscow Hotel - bore substantial similarities to information that [Dolan] received during the 2016 time period." The Indictment further states that, had the FBI known about Defendant's relationship with Dolan, it likely would have interviewed him about whether he "spoke with Danchenko about Trump's stay and alleged activity in the Presidential Suite of the Moscow Hotel." *Id*. at ¶ 65. This theory remains relevant in the Special Counsel's case against Danchenko to date. For instance, as recently as September 16, 2022, in discussing the materiality of the relationship between Dolan and Danchenko, the OSC noted that "Dolan was present with [Danchenko] in June 2016 at the Ritz Carlton Moscow when the defendant allegedly personally gathered information on Donald Trump's purported salacious sexual activity at th[at] hotel" and argues that "had the FBI known that Dolan was a source for the Steele Reports – in addition to his ties to some of the key protagonists – the FBI logically would have interviewed Dolan." *See* Habba Dec., **Ex. B** at 14, Government's Opposition to Defendant's Motion to Dismiss the Indictment, *United States v. Danchenko,* case no. 1:21-cr-00245-AJT, Eastern District of Virginia (Sept. 16, 2022) (ECF No. 83). Therefore, Plaintiff's allegation that

Defendant was the source of the "salacious sexual activity" rumor has a legitimate factual basis and is based upon a well-reasoned theory that may well be proven correct during the OSC's upcoming trial of Danchenko.

*Finally*, beyond questioning the veracity of statements that were expressly set forth in the Indictment, Defendant's only remaining gripe is that the Amended Complaint purportedly misstates his state of residence, claiming that he is a resident of Virginia, not New York. Nonetheless, Plaintiff's counsel did indeed exercise diligence prior to making this assertion. Initially, it must be noted that Charles Dolan is an incredibly common name, and Plaintiff counsel's traditional search methods identified countless individuals with said name across the country, many of whom reside in New York. To narrow the field, Plaintiff's counsel looked towards other sources and ultimately relied upon several news articles which claimed that Defendant currently works for Ketchum, Inc., a public relations firm headquartered in New York.[3] Thus, Plaintiff's counsel made a reasonable inquiry into the state of Defendant's residence and had a good faith basis for believing that Defendant was a resident of New York. Even to the extent this assertion was inaccurate, it was merely the result of inadvertence or mistake, after reasonable inquiry, and Defendant has failed to show how he was prejudiced by this purported error, nor how this statement alone could serve as a basis to issue sanctions against Plaintiff. *See O'Bryan v. Joe Taylor Restoration, Inc.*, No. 20-cv-80993, 2021 U.S. Dist. LEXIS 1710, at *5 (S.D. Fla. Jan. 6, 2021)

---

[3] Isaac Stanley-Becker, *A spin doctor with ties to Russia allegedly fed the Steele dossier before fighting to discredit it*, Washington Post, November 6, 2021, https://wapo.st/3rBmv1z ("According to the indictment, Dolan, who helped handle global public relations for the Russian Federation for eight years ending in 2014, fed the dossier before he fought against it. And his contacts and credibility in both instances rested on his extensive work for Russia, much of which he performed when he was affiliated with Ketchum, *a public relations firm headquartered in New York*." (emphasis added); *See also* Josh Gerstein, Kyle Cheney And Betsy Woodruff Swan, *Steele dossier source arrested in Durham probe*, Politico, November 4, 2021, https://politi.co/3Cy7ZOe ("Dolan, a former congressional staffer, worked more recently as a senior vice president at the public affairs firms Ketchum, Prism and kglobal.")

("Far from frivolous, the mistaken citation in the initial Complaint is a hyper-technical violation that is not cognizable under Rule 11. Clearly, Rule 11 is not a "gotcha rule." Instead, it was designed to sanction lawyers who sign and file patently frivolous pleadings or motions."); *see also*, *Massengale v. Ray*, 267 F.3d 1298, 1302 (11th Cir. 2001) ("[Rule 11] sanctions are reserved as punishment for those litigants who blatantly abuse the Court's resources — they will not be imposed lightly against every failing litigant.").

Based on the foregoing, it is overwhelmingly clear that Plaintiff conducted a reasonable and diligent inquiry and relied upon legitimate and authoritative sources in verifying the factual basis for his claims against Defendant.

## II. *Plaintiff's Claims Against Defendant Are Non-Frivolous*

Defendant has not submitted any substantial, competent evident to support his contention that Plaintiff's claims are "utterly deficient" and based upon "unfounded speculation." (DE 268 at 6). Instead, Defendant sees fit to make sweeping accusations such as "there is no basis for that fallacious leap of logic" and "[t]his is an issue as to lack of factual basis for a claim, but also the lack of legal basis." For the reasons set forth herein, Defendant's arguments are entirely without merit.

To start, Defendant merely submits a one-page affidavit to rebuff Plaintiff's claims. Yet, the affidavit does nothing to disprove any of the substantive facts contained in the Amended Complaint but, rather, only disputes the state of Defendant's residency and his purported employment credentials, which, as explained above, were sourced both from independent fact gathering and authoritative third-party sources such as the Indictment. (DE 268-2). Thus, the affidavit does nothing to undercut the veracity of Plaintiff's allegations and, on its own, is insufficient to support Defendant's request for sanctions under Rule 11. *See Royal Surplus Lines*

*Ins. Co.*, 229 F.R.D. at 696 (quoting *Leach*, 141 F.R.D. at 429) ("[I]n Rule 11 context, 'party moving for sanctions must demonstrate' underlying facts supporting penalty."); *see, e.g., Andre v. CCB Credit Services, Inc.*, 2010 WL 3222500, at *2 (S.D. Fla. July 21, 2010) ("The record is devoid of any evidence to establish that plaintiff's counsel was aware that this claim was frivolous at the time he signed the complaint."); *Great Lakes Reinsurance (UK) PLC v. Blue Sea, LLC*, 2006 WL 2471522, at *3 (M.D. Fla. Aug. 24, 2006) ("Blue Sea submitted no information or evidence with its initial motion to support its contention that 'Plaintiff and its attorneys knew or, through a reasonable inquiry, should have known, that none of the asserted grounds upon which Plaintiffs seeks declaratory relief have any basis in fact.'"). Even if Defendant's assertions were factual and on point—which they are not—such conclusory statements lack the requisite specificity required under Rule 11. *See, e.g., Elie v. Pac. Land Ltd*., 2012 WL 13005814, at *3 (S.D. Fla. July 5, 2012) ("The conclusory statements contained in the District's Motion fall short of the requirement specifically enunciated in Rule 11 that a motion for sanctions 'describe the specific conduct that allegedly violates rule 11(b).'"). Accordingly, Defendant's barebones affidavit is clearly insufficient to support a ruling for sanctions.

Moreover, Defendant's argument that the Amended Complaint fails to effectively plead Dolan's participation in a conspiracy is flawed on several levels. First, Defendant acknowledges that there are three conspiracy-related causes of action asserted against him, but he fails to delineate between the elements of each claim. For example, a RICO conspiracy has an entirely different standard than a civil conspiracy claim and can be established by "showing that Defendant agreed to the overall objective of the conspiracy; or [] by showing that Defendant agreed to commit two predicate acts," *American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1293 (11th Cir.), and can be based on "circumstantial evidence, including 'inferences from the conduct of the alleged

participants or from circumstantial evidence of a scheme.'" *United States v. Sylvestri*, 409 F.3d 1311, 1328 (11th Cir. 2005) (citation omitted). Since Defendant does not contest the validity of Plaintiff's RICO Conspiracy claim, only the civil conspiracy claims of injurious falsehood malicious prosecution, the RICO Conspiracy cause of action is not at issue.

Civil conspiracy requires a showing of "(a) a conspiracy between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts performed pursuant to the conspiracy. *Walters v. Blankenship*, 931 So. 2d 137, 140 (Fla. Dist. Ct. App. 2006). Critically, the "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

Here, woven into the large-scale conspiracy alleged between many of the Defendants, Plaintiff adequately pleaded the existence of a civil conspiracy between Defendant and, at a minimum, Danchenko, Clinton, and the Clinton Campaign. To briefly summarize, the Amended Complaint recounts that Defendant and Danchenko were in frequent communication since April 2016, had gone on a trip together, and attended numerous meetings and conferences together, Am. Compl. ¶ 335, and that they agreed that their "*goals clearly coincided*" with respect to gathering derogatory information about Trump, *id.* ¶ 120 (emphasis added). It also states that Defendant has "long held deep ties to the Democratic Party" and has been a "close associate and advisor to Hillary Clinton." *Id.* at ¶ 336. The Amended Complaint further details that Defendant was in regular communication with one of Danchenko's other sources for the Dossier, Olga Galinka, and that they frequently discussed their support for their Democratic party and, more particularly, Hillary Clinton. It goes on to state that Dolan was a "contributor of information to the Dossier," *id.* and

alleges that Defendant "knowingly provided false information to Danchenko, who relayed it to Steele, who reported it in the Steele Dossier and eagerly fed the deceptions to both the media and the FBI." Am. Compl. at ¶ 4. The Amended Complaint alleges that Defendant had a "meeting of the minds" with the other defendants and emphasizes that many of the allegations contained within the dossier came directly from Defendant, who, among other things, played a highly relevant role as a contributor of information to the Dossier because he maintained pre-existing and ongoing relationships with numerous individuals named or described within the Dossier, maintained historical and ongoing involvement in Democratic politics, and allowed Danchenko to gather information contained in the Dossier at events in Moscow organized by Defendant and others that Danchenko attended at Dolan's invitation. *Id.* at 111-120, 334-340. Indeed, it is established that much of the information contained in the Dossier mirrored information that Defendant received through his interactions with Russian nationals and, more damning, information that he had intentionally "fabricated." Indictment at ¶ 52. Per the Amended Complaint, this false information was provided in accordance with Defendant's "understanding regarding the true nature of the Dossier – it would contain unverified, falsified, and fraudulent information which would be fed to law enforcement to perpetuate a false narrative that Donald J. Trump was colluding with Russia." Am. Compl. ¶ 104.

Ultimately, Plaintiff alleges sufficient facts to demonstrate that Defendant was a part of the several different types of conspiracies to bring false accusations against the Plaintiff and attempts to claim his minimal or nominal role in the conspiracy are inherently misleading[4]. It is not enough

---

[4] It is important to note that, while this Court's Order dismissed Plaintiff's Complaint as to all Defendants, it did not specifically analyze the claims against Defendant, and limited its analysis to Plaintiff's argument that Defendant is subject to this Court's personal jurisdiction.

that Defendant disagrees with Plaintiff's interpretation of the relevant facts. *See Cabrera v. The Goodyear Tire & Rubber Co.*, 2011 U.S. Dist. LEXIS 16655, 2011 WL 535103 at *2 (S.D. Fla., Feb. 8, 2011) (finding the parties conflicting accounts of what happened demonstrated factual disputes that did not justify Rule 11 sanctions); *see also Hillsborough County v. A & E Road Oiling Service, Inc.*, 160 F.R.D. 655, 658-659 (M.D. Fla. 1995) (finding a factual dispute does not warrant Rule 11 sanctions).  Indeed, the mere fact that the claims against Defendant were dismissed does not serve, on its own, as an appropriate basis to award sanctions. *See White v. Verizon Florida, LLC*, 2011 WL 806713, *5 (M.D.Fla. 2011) (finding that even a conspiracy claim that was "weak and subject to doubt" was "not objectively frivolous" and did not curtail "conduct by counsel so egregious as to be tantamount to bad faith.").

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant's Motion must be dismissed in its entirety.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically

filed this 5th day of October, 2022, with the Clerk of Court using CM/ECF, which will send a

notice of electronic filing to all Parties listed on the Service List.


____/s/ *Peter Ticktin*____

**THE TICKTIN LAW GROUP**
Peter Ticktin, Esquire
Florida Bar No.: 887935
Serv512@LegalBrains.com
Jamie Alan Sasson, Esquire
Florida Bar No.: 10802
Serv513@LegalBrains.com
270 SW Natura Avenue
Deerfield Beach, Florida 33441-1610
Telephone: (954) 570-6757
*Attorneys for the Plaintiff*

**HABBA MADAIO & ASSOCIATES**
Alina Habba, Esquire
ahabba@habbalaw.com
Michael T. Madaio, Esquire
mmadaio@habbalaw.com
1430 US Highway 206 Suite 240
Bedminster, New Jersey 07921
Telephone: (908) 869-1188
*Attorneys for the Plaintiff*

## SERVICE LIST

Anthony Erickson-Pogorzelski, Esquire
Fla. Bar No. 619884
Anthony.Pogorzelski@usdoj.gov
**Assistant U.S. Attorney**
99 N.E. 4th Street, Suite 300
Miami, Florida 33132
Telephone: 305- 961-9296
*Attorneys for Defendant*
*United States of America*

David E. Kendall, Esquire
dkendall@wc.com
**Williams & Connolly, LLP**
725 12th Street NW
Washington, DC 20005-3901
Telephone: 202-434-5000
*PRO HAC VICE*
*Attorney for the Defendant*
*Hillary R. Clinton*

David Oscar Markus, Esquire
dmarkus@markuslaw.com

**Markus/Moss, LLP**
40 N.W. Third Street
Penthouse 1
Miami, Florida 33128
Telephone: 305-379-6667
*Attorneys for the Defendant*
*Hillary R. Clinton*

Katherine M. Turner, Esquire
kturner@wc.com
**Williams & Connolly, LLP**
725 12th Street NW
Washington, DC 20005-3901
Telephone: 202-434-5000
*PRO HAC VICE*
*Attorney for the Defendant*
*Hillary R. Clinton*

Michael J. Mestitz, Esquire
mmestitz@wc.com

**Williams & Connolly, LLP**
725 12th Street NW
Washington, DC 20005-3901
Telephone: 202-434-5000
*PRO HAC VICE*
*Attorney for the Defendant*
*Hillary R. Clinton*

Jonathan Edward Levine, Esquire
Jonathan.levine@levinepllc.com
**Levine & Associates, PLLC**
5311 Lee Highway
Arlington, Virginia 22207
Telephone: 703-525-2668
*Attorney for Defendant*
*Charles Halliday Dolan, Jr.*

George R.A. Doumar, Esquire
gdoumar@doumarmartin.com
**Mahdavi, Bacon, Halfhill & Young, PLLC**
11350 Random Hills Road, Suite 700
Fairfax, Virginia 22030
Telephone: 703-352-1300
*PRO HAC VICE*
*Attorney for Defendant*
*Charles Halliday Dolan, Jr*

Franklin G. Monsour, Jr., Esquire
fmonsour@orrick.com
**Orrick, Herrington & Stcliffe, LLP**
51 West 52nd Street
New York, New York 10019
Telephone: 202-339-8533
*PRO HAC VICE*
*Attorney for Defendant*
*Igor Danchenko*

Diana Marie Fassbender, Esquire
dszego@orrick.com
**Orrick, Herrington & Stcliffe, LLP**
1152 15th Street NW
Washington, D.C. 20005
*PRO HAC VICE*
*Attorney for Defendant*

*Igor Danchenko*

Jennifer Olmedo-Rodriguez, Esquire
Florida Bar No.: 605158
Jennifer.olmedo@bipc.com
**Buchanan Ingersoll & Rooney, P.C.**
2 South Biscayne Boulevard, Suite 1500
Miami, Florida 33131
Telephone: 305-347-4080
*Attorney for the Defendant*
*Neustar, Inc.*

Samantha L. Southall, Esquire
Samantha.southall@bipc.com
**Buchanan Ingersoll & Rooney, P.C.**
50 South 16th Street, Suite 3200
Two Liberty Place
Philadelphia, PA 19102
Telephone: 215-665-3884
*PRO HAC VICE*
*Attorney for the Defendant*
*Neustar, Inc*

Adam Seth Fels, Esquire
afels@ffslawfirm.com
Florida Bar No.: 0114917
**Fridman Fels & Soto, PLLC**
2525 Ponce de Leon Blvd., Ste 750
Coral Gables, FL 33134
Telephone: 305-569-7701
*Attorney for the Defendant*
*Bruce Ohr and Nellie Ohr*
*Fusion GPS*
*Glenn Simpson*
*Peter Fritsch*

Kevin P. Crenny, Esquire
kcrenny@levyfirestone.com
**Levy Firestone Muse, LLP**
900 17th Street NW, Suite 1200
Washington, D.C., 20006
Telephone: 202-845-3215
*PRO HAC VICE*
*Attorney for the Defendant*

*Fusion GPS*
*Glenn Simpson*
*Peter Fritsch*

Joshua Levy, Esquire
jal@levyfirestone.com
**Levy Firestone Muse, LLP**
900 17th Street NW, Suite 1200
Washington, D.C., 20006
Telephone: 202-845-3215
*PRO HAC VICE*
*Attorney for the Defendant*
*Fusion GPS*
*Glenn Simpson*
*Peter Fritsch*

Rachel Clattenburg, Esquire
rmc@levyfirestone.com
**Levy Firestone Muse, LLP**
900 17th Street NW, Suite 1200
Washington, D.C., 20006
Telephone: 202-845-3215
*PRO HAC VICE*
*Attorney for the Defendant*
*Fusion GPS*
*Glenn Simpson*
*Peter Fritsch*

Joshua Berman, Esquire
Joshua.Berman@cliffordChance.com
**Clifford Chance US, LLP**
2011 K. Street, NW
Washington, D.C., 20006-1001
Telephone: 202-912-5000
*PRO HAC VICE*
*Attorney for Defendants*
*Nellie Ohr and Bruce Ohr*

Benjamin Peacock, Esquire
Benjamin.Peacock@cliffordChance.com
**Clifford Chance US, LLP**
2011 K. Street, NW
Washington, D.C., 20006-1001
Telephone: 202-912-5000
*PRO HAC VICE*

*Attorney for Defendants*
*Nellie Ohr and Bruce Ohr*

Eugene K. Pettis, Esquire
cmarr@hpslegal.com
Service@hpslegal.com
**Haliczer Pettis & Schwamm P.A.**
100 SE 3rd Avenue, 7th Floor
Fort Lauderdale, FL 33394
Telephone: 954-523-9922
*Attorneys for Defendant*
*Marc Elias*

Debra P. Klauber, Esquire
dklauber@hpslegal.com
Service@hpslegal.com
**Haliczer Pettis & Schwamm P.A.**
100 SE 3rd Avenue, 7th Floor
Fort Lauderdale, FL 33394
Telephone: 954-523-9922
*Attorneys for Defendant*
*Marc Elias*

April A. Otterberg, Esquire
aotterberg@jenner.com
**Jenner & Block, LLP**
353 N. Clark Street
Chicago, Il 60654-3454
Telephone: 312-222-9350
*PRO HAC VICE*
*Attorney for the Defendant*
*Marc Elias*

Reid J. Schar, Esquire
rschar@jenner.com
**Jenner & Block, LLP**
353 N. Clark Street
Chicago, Il 60654-3454
Telephone: 312-222-9350
*PRO HAC VICE*
*Attorney for the Defendant*
*Marc Elias*

Roberto Martinez, Esquire
Bob@colson.com
becky@colson.com
Florida Bar No.: 305596
**Colson Hicks Eidson, P.A.,**
255 Alhambra Circle, Penthouse
Coral Gables, Florida 33134
Telephone: 305-476-7400
*Attorney for the Defendant*
*Michael Sussmann*

Zachary Lipshultz, Esquire
zach@colson.com
Florida Bar No.: 123594
**Colson Hicks Eidson, P.A.,**
255 Alhambra Circle, Penthouse
Coral Gables, Florida 33134
Telephone: 305-476-7400
*Attorney for the Defendant*
*Michael Sussmann*

Michael S. Bosworth, Esquire
Michael.Bosworth@lw.com
**Latham & Watkins, LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: 212-916-1221
*PRO HAC VICE*
*Attorney for the Defendant*
*Michael Sussmann*

Michael F. Houlihan, Esquire
Michael.Houlihan@lw.com
**Lathem & Watkins, LLP**
200 Clarendon Street
Boston, MA 02116
Telephone: 617-880-4642
*PRO HAC VICE*
*Attorney for the Defendant*
*Michael Sussmann*

Sean M. Berkowitz, Esquire
Sean.Berkowitz@lw.com
**Latham & Watkins, LLP**
330 North Wabash Avenue, Suite 2800

Chicago, IL 60611
Telephone: 312-876-7700
*PRO HAC VICE*
*Attorney for the Defendant*
*Michael Sussmann*

Stephen P. Barry, Esquire
Stephen.Barry@lw.com
**Latham & Watkins, LLP**
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004
Telephone: 202-637-2200
*PRO HAC VICE*
*Attorney for the Defendant*
*Michael Sussmann*

Eleni Kastrenakes Howard, Esquire
Eleni.kastrenakeshoward@akerman.com
Florida Bar No.: 73073
**Akerman, LLP**
777 S. Flagler Drive, Suite 1100, West
Tower
West Palm Beach, Florida 33401
Telephone: 561-653-5000
*Attorney for the Defendant*
*Perkins Coie, LLP*

Howard Jay Harrington, Esquire
Jay.harrington@akerman.com
Florida Bar No.: 0118719
**Akerman, LLP**
777 S. Flagler Drive, Suite 1100, West
Tower
West Palm Beach, Florida 33401
Telephone: 561-653-5000
*Attorney for the Defendant*
*Perkins Coie, LLP*

F. Joseph Warin, Esquire
fwarin@gibsondunn.com
**Gibson Dunn & Crutcher, LLP**
1050 Connecticut Avenue NW
Washington, D.C., 20036-5306
Telephone: 202-887-3609
*PRO HAC VICE*

*Attorney for the Defendant*
*Perkins Coie, LLP*

Geoffrey M. Sigler, Esquire
gsigler@gibsondunn.com
**Gibson Dunn & Crutcher, LLP**
1050 Connecticut Avenue NW
Washington, D.C., 20036-5306
Telephone: 202-887-3609
*PRO HAC VICE*
*Attorney for the Defendant*
*Perkins Coie, LLP*

Katherine M. Meeks, Esquire
kmeeks@gibsondunn.com
**Gibson Dunn & Crutcher, LLP**
1050 Connecticut Avenue NW
Washington, D.C., 20036-5306
Telephone: 202-887-3609
*PRO HAC VICE*
*Attorney for the Defendant*
*Perkins Coie, LLP*

Nancy E. Hart, Esquire
nhart@gibsondunn.com
**Gibson Dunn & Crutcher, LLP**
1050 Connecticut Avenue NW
Washington, D.C., 20036-5306
Telephone: 202-887-3609
*PRO HAC VICE*
*Attorney for the Defendant*
*Perkins Coie, LLP*

Gerald E. Greenberg, Esquire
ggreenberg@gsgpa.com
Florida Bar No.: 440094
**Gelber Schachther & Greenberg, P.A.**
One South East Third Avenue, Suite 2600
SunTrust International Center
Miami, Florida 33131
Telephone: 305-728-0950
*Attorney for the Defendant*
*Democratic National Committee*
*DNC Services Corporation*

*Debbie Wasserman Schultz*

Shawn G. Crowley, Esquire
scrowley@kaplanhecker.com
**Kaplan Hecker & Fink, LLP**
350 5th Avenue, 63rd Floor
New York, New York 10118
Telephone: 212-763-0883
*PRO HAC VICE*
*Attorney for the Defendants*
*Democratic National Committee*
*DNC Services Corporation*

Maximillian Feldman, Esquire
mfeldman@kaplanhecker.com
**Kaplan Hecker & Fink, LLP**
350 5th Avenue, 63rd Floor
New York, New York 10118
Telephone: 212-763-0883
*PRO HAC VICE*
*Attorney for the Defendants*
*Democratic National Committee*
*DNC Services Corporation*

Roberta A. Kaplan, Esquire
rkaplan@kaplanhecker.com
**Kaplan Hecker & Fink, LLP**
350 5th Avenue, 63rd Floor
New York, New York 10118
Telephone: 212-763-0883
*PRO HAC VICE*
*Attorney for the Defendants*
*Democratic National Committee*
*DNC Services Corporation*

Edward Soto, Esquire
Edward.soto@weil.com
Florida Bar No.: 0265144
**Weil Gotshal & Manges, LLP**
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone: 305-577-3100
*PRO HAC VICE*
*Attorney for the Defendant*
*Rodney Dolane*

Steven Tyreell, Esquire
Steven.tyrrell@weil.com
**Weil, Gotshal & Manges, LLP**
2001 M St. NW, Suite 600
Washington, D.C. 20063
Telephone:
*PRO HAC VICE*
*Attorney for the Defendant*
*Rodney Dolane*

Noah Brozinsky, Esquire
nbrozinsky@kaiserDillon.com
Florida Bar No.: 010470
**KaiserDillon, PLLC**
1099 14th Street NW, 8th Floor West
Washington, D.C. 20005
*Attorney for the Defendant*
*Kevin E. Clinesmith*

Christopher Muha, Esquire
CMuha@kaiserdillon.com
**KaiserDillon, PLLC**
1099 14th Street NW, 8th Floor West
Washington, D.C. 20005
Telephone: 202-640-2850
*PRO HAC VICE*
*Attorney for the Defendant*
*Kevin E. Clinesmith*

William Pittard, Esquire
Wpittard@kaiserdillon.com
**KaiserDillon, PLLC**
1099 14th Street NW, 8th Floor West
Washington, D.C. 20005
Telephone: 202-640-2850
*PRO HAC VICE*
*Attorney for the Defendant*
*Kevin E. Clinesmith*

Paola Pinto, Esquire
ppinto@schertlerlaw.com
Florida Bar No.: 1013933
**Schertler Onorato Mead & Sears**
555 13th Street, N.W.

Suite 500 West
Washington, D.C. 20004
Telephone: 202-628-4155
*Attorney for the Defendants*
*John Podesta*
*HFACC, Inc.*

Robert P. Trout, Esquire
Rtrout@schertlerlaw.com
**Schertler Onorato Mead & Sears**
555 13th Street, N.W.
Suite 500 West
Washington, D.C. 20004
Telephone: 202-628-4155
*PRO HAC VICE*
*Attorney for the Defendants*
*John Podesta*
*HFACC, Inc.*

William R. Barzee, Esquire
williambarzee@barzeeflores.com
**Barzee Flores**
Courthouse Center, Penthouse One
40 NW Third Street
Miami, Florida 33128
Telephone: 3025-374-3998
*Counsel for the Defendants*
*Robert E. Mook*
*Jack Sullivan*

Andrew J. Ceresney, Esquire
aceresney@debevoise.com
**Debevoise & Plimpton, LLP**
919 Third Avenue
New York, NY 10022
Telephone: 212-909-6000
*PRO HAC VICE*
*Attorney for the Defendant*
*Robert E. Mook*

Isabela M. Garcez, Esquire
imgarcez@debevoise.com
**Debevoise & Plimpton, LLP**
919 Third Avenue
New York, NY 10022

Telephone: 212-909-6000
*PRO HAC VICE*
*Attorney for the Defendant*
*Robert E. Mook*

Wendy B. Reilly, Esquire
wbreilly@debevoise.com
**Debevoise & Plimpton, LLP**
919 Third Avenue
New York, NY 10022
Telephone: 212-909-6000
*PRO HAC VICE*
*Attorney for the Defendant*
*Robert E. Mook*

Brian L. Stekloff, Esquire
bstekloff@wilkinsonstekloff.com
**Wilkinson Stekloff, LLP**
2001 M. Street NW, 10th Floor
Washington, D.C. 20036
Telephone: 202-847-4030
*PRO HAC VICE*
*Attorney for the Defendant*
*Jake Sullivan*

Sarah E. Neuman, Esquire
sneuman@wilkinsonstekloff.com
**Wilkinson Stekloff, LLP**
2001 M. Street NW, 10th Floor
Washington, D.C. 20036
Telephone: 202-847-4030
*PRO HAC VICE*
*Attorney for the Defendant*
*Jake Sullivan*

James E. Gillenwater, Esquire
gillenwaterj@gtlaw.com,
**Greenberg Traurig, P.A.**
333 SE 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: 305-579-0500
*Attorney for the Defendant*
*Neustar Security Services*

Allison S. Eisen, Esquire

aeisen@wc.com
**Williams & Connolly, LLP**
380 Maine Avenue, SW
Washington, D.C. 20024
Telephone: 202-434-5000
*PRO HAC VICE*
*Attorney for the Defendant*
*Neustar Security Services*

Kathryn E. Garza, Esquire
kgarza@wc.com
**Williams & Connolly, LLP**
380 Maine Avenue, SW
Washington, D.C. 20024
Telephone: 202-434-5000
*PRO HAC VICE*
*Attorney for the Defendant*
*Neustar Security Services*

John M. McNichols, Esquire
jmcnichols@wc.com
**Williams & Connolly, LLP**
380 Maine Avenue, SW
Washington, D.C. 20024
Telephone: 202-434-5000
*PRO HAC VICE*
*Attorney for the Defendant*
*Neustar Security Services*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| DONALD J. TRUMP | Case No.: 2:22-cv-14102-DMM |
| Plaintiff, | |
| v. | |
| HILLARY R. CLINTON, HFACC, INC., DEMOCRATIC NATIONAL COMMITTEE, DNC SERVICES CORPORATION, PERKINS COIE, LLC, MICHAEL SUSSMANN, MARC ELIAS, DEBBIE WASSERMAN SCHULTZ, CHARLES HALLIDAY DOLAN, JR., JAKE SULLIVAN, JOHN PODESTA, ROBERT E. MOOK, PHILLIPE REINES, FUSION GPS, GLENN SIMPSON, PETER FRITSCH, NELLIE OHR, BRUCE OHR, ORBIS BUSINESS INTELLIGENCE, LTD., CHRISTOPHER STEELE, IGOR DANCHENKO, NEUSTAR, INC., RODNEY JOFFE, JAMES COMEY, PETER STRZOK, LISA PAGE, KEVIN CLINESMITH, ANDREW MCCABE, JOHN DOES 1 THROUGH 10 (said names being fictious and unknown persons), and ABC CORPORATIONS 1 THROUGH 10 (said names being fictitious and unknown entities), | **DECLARATION OF ALINA HABBA, ESQ.** |
| Defendants. | |

I, Alina Habba, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am managing partner of the firm of Habba Madaio & Associates LLP, counsel for Donald J. Trump ("Plaintiff") in the above-captioned matter (the "Action").

2.      I submit this declaration pursuant to Federal Rule of Civil Procedure 65 and Local Rule 7.1, in support of Plaintiffs' Memorandum of Law in Opposition to the Motion for Sanctions filed by the defendant, Charles Halliday Dolan. The facts herein are true and correct and, unless otherwise stated, are within my personal knowledge.

1

3.      As counsel for Plaintiff, I have reviewed pleadings, and other documents related to the Action, and I am familiar with the facts and circumstances of this case.

4.      Attached hereto as **Exhibit A** is a true and accurate copy of the Indictment dated November 3, 2021 in the matter of *United States v. Danchenko*, case no. 1:21-cr-00245-AJT, Eastern District of Virginia.

5.      Attached hereto as **Exhibit B** is a true and accurate copy of the Government's Opposition to Defendant's Motion to Dismiss the Indictment dated September 16, 2022 in the matter of *United States v. Danchenko*, case no. 1:21-cr-00245-AJT, Eastern District of Virginia.

Dated: October 5, 2022                         By:

Alina Habba, Esq.
**HABBA MADAIO & ASSOCIATES LLP**
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
-and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Plaintiff,*
*Donald J. Trump*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

FILED
IN OPEN COURT

NOV - 3 2021

CLERK U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES OF AMERICA          :          **UNDER SEAL**
                                  :
          v.                      :          CR No. 1:21-CR-245 (AJT)
                                  :
IGOR Y. DANCHENKO,                :          COUNTS ONE – FIVE
                                  :          18 U.S.C. § 1001(a)(2)
          Defendant.              :          False Statements
                                  :

INDICTMENT

The Grand Jury Charges that:

I.    Introduction and Overview

        1.      On or about July 31, 2016, the Federal Bureau of Investigation ("FBI") opened an

investigation known as "Crossfire Hurricane" into whether individuals associated with the Donald

J. Trump presidential campaign (the "Trump Campaign") were coordinating activities with the

Russian government.

        2.      Beginning in or about July 2016 and continuing through December 2016, the FBI

began receiving a series of reports from a former British government employee ("U.K. Person-1")

that contained derogatory information on then-candidate Donald J. Trump ("Trump") concerning

Trump's purported ties to Russia (the "Company Reports").

        3.      Earlier that year, a U.S.-based international law firm ("Law Firm-1"), acting as

counsel to the Hillary Clinton Presidential campaign (the "Clinton Campaign"), had retained a

U.S.-based investigative firm ("U.S. Investigative Firm-1") to conduct research on Trump and his

associates.   In or about June 2016, U.S. Investigative Firm-1, in turn, retained U.K. Person-1, a

former officer in a friendly foreign intelligence service ("Foreign Intelligence Service-1"), and his

U.K.-based firm ("U.K Investigative Firm-1"), to investigate Trump's purported ties to Russia.

4.      During the U.S. presidential election season and afterwards, U.K. Person-1 and

employees of U.S. Investigative Firm-1 provided the Company Reports to multiple media outlets

and to U.S. government personnel.

5.      The Company Reports played an important role in applications that FBI personnel

prepared and submitted to obtain warrants pursuant to the Foreign Intelligence Surveillance Act

("FISA") targeting a United States citizen who had been an advisor to then-candidate Trump

("Advisor-1").   In connection with the FBI's Crossfire Hurricane investigation and the later

investigation by Special Counsel Robert S. Mueller III, the FBI relied substantially on the

Company Reports in these FISA applications to assert probable cause that Advisor-1 was a witting

agent of the Russian Federation.

6.      The FBI obtained a total of four court-approved FISA applications targeting

Advisor-1, which authorized intrusive electronic surveillance of Advisor-1 from in or about

October 2016 through in or about September 2017.   Each of the FISA applications set forth the

FBI's assessment that Advisor-1 was a knowing agent of Russia and further alleged – based on the

Company Reports – that Advisor-1 was part of a "well-coordinated conspiracy of co-operation"

between Trump's campaign and the Russian government.

7.      Over time, the FBI attempted to investigate, vet, and analyze the Company Reports

but ultimately was not able to confirm or corroborate most of their substantive allegations.

8.      In the context of these efforts, the FBI learned that U.K. Person-1 relied primarily

on a U.S.-based Russian national, **IGOR DANCHENKO ("DANCHENKO")**, the defendant

herein, to collect the information that ultimately formed the core of the allegations found in the

Company Reports.   From in or about January 2017 through in or about November 2017, and as part of its efforts to determine the truth or falsity of specific information in the Company Reports, the FBI conducted several interviews of **DANCHENKO** regarding, among other things, the information that **DANCHENKO** had provided to U.K. Person-1 (collectively, the "Interviews").

9.      As alleged in further detail below, **DANCHENKO** lied to FBI agents during these Interviews.

10.     First, **DANCHENKO** stated falsely that he had never communicated with a particular U.S.-based individual – who was a long-time participant in Democratic Party politics and was then an executive at a U.S. public relations firm ("PR Executive-1") – about any allegations contained in the Company Reports.  In truth and in fact, and as **DANCHENKO** well knew, **DANCHENKO** sourced one or more specific allegations in the Company Reports anonymously to PR Executive-1.

11.     PR Executive-1's role as a contributor of information to the Company Reports was highly relevant and material to the FBI's evaluation of those reports because (a) PR Executive-1 maintained pre-existing and ongoing relationships with numerous persons named or described in the Company Reports, including one of **DANCHENKO's** Russian sub-sources (detailed below), (b) PR Executive-1 maintained historical and ongoing involvement in Democratic politics, which bore upon PR Executive-1's reliability, motivations, and potential bias as a source of information for the Company Reports, and (c) **DANCHENKO** gathered some of the information contained in the Company Reports at events in Moscow organized by PR Executive-1 and others that **DANCHENKO** attended at PR Executive-1's invitation.  Indeed, and as alleged below, certain allegations that **DANCHENKO** provided to U.K. Person-1, and which appeared in the Company

3

Reports, mirrored and/or reflected information that PR Executive-1 himself also had received through his own interactions with Russian nationals.

12.      Second, **DANCHENKO** stated falsely during the Interviews, that, in or about late July 2016, he received an anonymous phone call from an individual who **DANCHENKO** believed to be a particular U.S. citizen and who was then president of the Russian-American Chamber of Commerce ("Chamber President-1"). **DANCHENKO** also falsely stated that, during this phone call, (i) the person he believed to be Chamber President-1 informed him, in part, about information that the Company Reports later described as demonstrating a well-developed "conspiracy of cooperation" between the Trump Campaign and Russian officials, and (ii) **DANCHENKO** and the aforementioned person agreed to meet in New York. In truth and fact, and as **DANCHENKO** well knew, **DANCHENKO** never received such a phone call or such information from any person he believed to be Chamber President-1, and **DANCEHNKO** never made any arrangements to meet Chamber President-1 in New York. Rather, **DANCHENKO** fabricated these facts regarding Chamber President-1.

13.      As alleged in further detail below, all of **DANCHENKO's** lies were material to the FBI because, among other reasons, (1) the FBI's investigation of the Trump Campaign relied in large part on the Company Reports to obtain FISA warrants on Advisor-1, (2) the FBI ultimately devoted substantial resources attempting to investigate and corroborate the allegations contained in the Company Reports, including the reliability of **DANCHENKO's** sub-sources; and (3) the Company Reports, as well as information collected for the Reports by **DANCHENKO**, played a role in the FBI's investigative decisions and in sworn representations that the FBI made to the Foreign Intelligence Surveillance Court throughout the relevant time period.

4

A.  The Defendant

14.    At all times relevant to this Indictment, **DANCHENKO** was a citizen of the Russian Federation and was lawfully in the United States. **DANCHENKO** resided in Washington, D.C. and Virginia.

15.    From in or about 2005 through in or about 2010, **DANCHENKO** worked as an analyst at a Washington, D.C.-based think tank ("Think Tank-1") where he focused primarily on Russian and Eurasian geo-political matters.

16.    In or about 2010, an employee of Think Tank-1 ("Think Tank Employee-1") introduced **DANCHENKO** to U.K. Person-1.  In or about 2011, U.K. Person-1 retained **DANCHENKO** as a contractor at U.K. Investigative Firm-1.  In his work for U.K. Investigative Firm-1, **DANCHENKO** focused primarily on Russian and Eurasian business risk assessment and geopolitical analysis.

B.  U.K. Investigative Firm-1 and Its Role in the 2016 Presidential Election Campaign

17.    U.K. Investigative Firm-1 was at all times relevant to this Indictment a U.K.-based business intelligence firm.  Beginning in or around June 2016, U.K. Person-1 – using information provided primarily by **DANCHENKO** – began to compile and draft the Company Reports containing purported evidence of illicit ties between Trump and the Russian government.   On or about July 5, 2016, U.K. Person-1 provided the first of the Company Reports to an FBI agent overseas.

C.  PR Executive-1

18.    At all times relevant to this indictment, PR Executive-1 was a Virginia-based public relations professional employed by a Washington, D.C.-based public relations firm ("PR Firm-1").  In or about February 2016, Think Tank Employee-1 – the aforementioned individual who

introduced **DANCHENKO** to U.K. Person-1 in 2010 – introduced **DANCHENKO** to PR Executive-1 in connection with potential business opportunities.

19.     In addition to his work as a public relations professional, PR Executive-1 had served as (1) chairman of a national Democratic political organization, (2) state chairman of former President Clinton's 1992 and 1996 presidential campaigns, and (3) an advisor to Hillary Clinton's 2008 Presidential campaign.  Moreover, beginning in or about 1997, President Clinton appointed PR Executive-1 to two four-year terms on an advisory commission at the U.S. State Department. With respect to the 2016 Clinton Campaign, PR Executive-1 actively campaigned and participated in calls and events as a volunteer on behalf of Hillary Clinton.

20.     In his role as a public relations professional, PR Executive-1 spent much of his career interacting with Eurasian clients with a particular focus on Russia.  For example, from in or about 2006 through in or about 2014, the Russian Federation retained PR Executive-1 and his then-employer to handle global public relations for the Russian government and a state-owned energy company. PR Executive-1 served as a lead consultant during that project and frequently interacted with senior Russian Federation leadership whose names would later appear in the Company Reports, including the Press Secretary of the Russian Presidential Administration ("Russian Press Secretary-1"), the Deputy Press Secretary ("Russian Deputy Press Secretary-1"), and others in the Russian Presidential Press Department.   Additionally, PR Executive-1 maintained relationships with the then-Russian Ambassador to the United States ("Russian Ambassador-1") and the head of the Russian Embassy's Economic Section in Washington, D.C. ("Russian Diplomat-1"), both of whom also would later appear by name in the Company Reports.

21.     Beginning in or about early 2015, an acquaintance of PR Executive-1 ("Organizer-1") was planning a business conference that Organizer-1 and others would host in October 2016

(the "October Conference") at a Moscow hotel that would later appear in the Company Reports (the "Moscow Hotel"). Organizer-1 planned the October Conference on behalf of a group of senior international business people who were seeking to explore potential business investments in Russia. To that end, the October Conference included individuals who could provide insight into the economic, political, diplomatic and cultural aspects of the Russian Federation. Organizer-1 enlisted PR Executive-1 to participate in the October Conference because of PR Executive-1's ability to set up meetings with senior Russian government officials and provide analysis of the 2016 U.S. Democratic presidential primary at the October Conference.

22.    In preparation for the October Conference, Organizer-1 and PR Executive-1 planned and carried out a trip to Moscow in or about June 2016 (the "June 2016 Planning Trip").

D.  DANCHENKO's Relationship with PR Executive-1

23.    In or about late April 2016, **DANCHENKO** and PR Executive-1 engaged in discussions regarding potential business collaboration between PR Firm-1 and U.K. Investigative Firm-1 on issues relating to Russia. These discussions reflected that **DANCHENKO** and PR Executive-1 had exchanged information regarding each other's backgrounds and professional activities, including **DANCHENKO's** work for U.K. Investigative Firm-1 and U.K. Person-1.

24.    For example, on or about April 29, 2016, **DANCHENKO** sent an email to PR Executive-1 indicating that **DANCHENKO** had passed a letter to U.K. Person-1 on behalf of PR Executive-1. Specifically, the email stated that **DANCHENKO** had "forwarded your letter" to [U.K. Person-1] and his business partner. "I'll make sure you gentlemen meet when they are in Washington or when you are in London."

25.    That same day, **DANCHENKO** sent an email to PR Executive-1 outlining certain work that **DANCHENKO** was conducting with U.K. Investigative Firm-1. The email attached a

U.K Investigative Firm-1 report titled "Intelligence Briefing Note, 'Kompromat' and 'Nadzor' in the Russian Banking Sector."

26.     Shortly thereafter, PR Executive-1 asked **DANCHENKO** to assist PR Executive-1 and Organizer-1 with the October Conference, which **DANCHENKO** agreed to do.  PR Executive-1 subsequently asked and received permission from Organizer-1 to enlist **DANCHENKO** to assist with logistics, provide translation services, and present on various relevant topics at the October Conference.

27.     On or about June 10, 2016, and prior to the June 2016 Planning Trip, PR Executive-1 sent an email to a U.S.-based acquaintance which reflected that PR Executive-1 and **DANCHENKO** had become colleagues and were exchanging information.  In describing **DANCHENKO,** PR Executive-1 stated: "He is too young for KGB.  But I think he worked for FSB.  Since he told me he spent two years in Iran.  And when I first met him he knew more about me than I did. [winking emoticon]."  (The Federal Security Service of the Russian Federation, or "FSB," is the principal security agency of Russia and the principal successor agency to the KGB.)

28.     In or about May, August, and September 2016, in preparation for the October Conference, PR Executive-1 and Organizer-1 attended at least three meetings at the Russian Embassy in Washington, D.C., and communicated with Russian Embassy staff, including Russian Ambassador-1 and Russian Diplomat-1 (both of whom, as described above and in further detail below, appeared in the Company Reports).   PR Executive-1 and Organizer-1 also attended a meeting at the Russian Embassy on or about September 14, 2016.  **DANCHENKO** did not attend any of these meetings.

29.  In anticipation of the June 2016 Planning Trip to Moscow, PR Executive-1 also communicated with Russian Press Secretary-1 and Russian Deputy Press Secretary-1, both of whom worked in the Kremlin and, as noted above, also appeared in the Company Reports.

30.  On or about June 13, 2016, PR Executive-1 and Organizer-1 traveled to Moscow for the June 2016 Planning Trip.  PR Executive-1 and Organizer-1 stayed at the Moscow Hotel. On or about June 14, 2016, **DANCHENKO**, who, at the time was already present in Russia working on behalf of U.K. Investigative Firm-1, met with PR Executive-1 and Organizer-1 in Moscow. **DANCHENKO** did not stay at the Moscow Hotel during the June 2016 Planning Trip.

31.  During the June 2016 Planning Trip at the Moscow Hotel, PR Executive-1 and Organizer-1 participated in, among other things, (1) a meeting with the general manager of the Moscow Hotel ("General Manager-1") and a female hotel staff member ("Staff Member-1") to discuss the October Conference, (2) a lunch on or about June 15, 2016 with Staff Member-1 and other members of the Moscow Hotel staff who assisted in the preparations for the October Conference, and (3) a tour of the Moscow Hotel, including the Presidential Suite.

32.  In addition, and as described in further detail below, references to the Moscow Hotel, the Presidential Suite, and a Moscow Hotel manager and other staff would all later appear in the Company Reports.

33.  On or about June 14, 2016, **DANCHENKO** visited PR Executive-1 and others at the Moscow Hotel, and posted a picture on social media of himself and PR Executive-1 with Red Square appearing in the background.

34.  On or about June 17, 2016, **DANCHENKO** flew from Moscow to London.  While in London, **DANCHENKO** met with U.K. Person-1 to provide him with information that would later appear in the Company Reports.

35.     On or about October 4, 2016, PR Executive-1, Organizer-1, and **DANCHENKO** traveled to Moscow for the October Conference. The October Conference featured several Russian government officials including (i) a prominent member of the Duma (Russian Parliament) ("Duma Member-1") and (ii) members of the Russian Ministry of Foreign Affairs, including, as discussed above, Russian Diplomat-1 and another Russian diplomat ("Russian Diplomat-2"). As part of the October Conference, participants also attended meetings in the Kremlin with the Russian Ministry of Foreign Affairs and the Russian Presidential Press Department.

36.     According to PR Executive-1, individuals affiliated with the Clinton Campaign did not direct, and were not aware of, the aforementioned meetings and activities with **DANCHENKO** and other Russian nationals.

E.  (U) <u>Russian Sub-Source-1</u>

37.     At all times relevant to this Indictment, **DANCHENKO** maintained communications with a Russian national ("Russian Sub-Source-1") based in a foreign country ("Country-1") who, according to **DANCHENKO**, acted as one of **DANCHENKO's** primary sources of information for allegations contained in the Company Reports. **DANCHENKO** and Russian Sub-Source-1 had initially met as children in Russia, and remained friends thereafter.

38.     In or about early 2016, Russian Sub-Source-1 began working at a business based in Country-1 ("Business-1") that was owned by a Russian national and would later appear in the Company Reports. Russian Sub-Source-1 conducted public relations and communications work for Business-1.

F.  <u>DANCHENKO Introduces Russian Sub-Source-1 to PR Executive-1</u>

39.     In or about March 2016, and prior to the June 2016 Planning Trip, **DANCHENKO** learned from Russian Sub-Source-1 that Business-1 was interested in retaining a U.S.-based public

relations firm to assist with Business-1's entry into the U.S. market. **DANCHENKO** brokered a meeting between PR Executive-1 and Russian Sub-Source-1 to discuss a potential business relationship. Thereafter, PR Firm-1 and Business-1 entered a contractual relationship.

40.     In or around the same time period, **DANCHENKO**, PR Executive-1, and Russian Sub-Source-1 communicated about, among other things, the business relationship between Business-1 and PR Firm-1.

41.     During the same time period, Russian Sub-Source-1 and PR Executive-1 communicated regularly via social media, telephone, and other means. In these communications and others, Russian Subsource-1 and PR Executive-1 discussed their political views and their support for Hillary Clinton.

a.     For example, during July 2016 meetings in Country-1, PR Executive-1 gifted to Russian Sub-Source-1 an autobiography of Hillary Clinton, which he signed and inscribed with the handwritten message, "To my good friend [first name of Russian Sub-Source-1], A Great Democrat."

b.     Additionally, on or about July 13, 2016, Russian Sub-Source-1 sent a message to a Russia-based associate and stated that PR Executive-1 had written a letter to Russian Press Secretary-1 in support of Russian-Sub-Source-1's candidacy for a position in the Russian Presidential Administration.

c.     On or about July 22, 2016, PR Executive-1 sent an email to Russian Sub-Source-1 and informed Russian Sub-Source-1 that he would be attending a reception for Hillary Clinton. Shortly thereafter, Russian Sub-Source-1 responded: "[T]ell her please she [Clinton] has a big fan in [Country-1]. Can I please ask you to sign for me her (anything)."

d.    In or about August 2016, Russian Sub-Source-1 sent a message to a Russia-based associate describing PR Executive-1 as an "advisor" to Hillary Clinton.  Russian Sub-Source-1 further commented regarding what might happen if Clinton were to win the election, stating in Russian, "[W]hen [PR Executive-1 and others] take me off to the State Department [to handle] issues of the former USSR, then we'll see who is looking good and who is not."

e.    In or about September 2016, Russian Sub-Source-1 made a similar comment in a message to the same associate, stating in Russian that PR Executive-1 would "take me to the State Department if Hillary wins."

f.    On or about November 7, 2016 (the day before the 2016 U.S. Presidential election), Russian Sub-Source-1 emailed PR Executive-1 in English and stated, in part:

> [] I am preparing you some information on former USSR/UIC countries, Igor [**DANCHENKO**] possibly told you about that. . . . . Tomorrow your country is having a great day, so, as a big Hillary fan, I wish her and all her supporters to have a Victory day.  Hope, that someday her book will have one more autograph on it)
>
> Thank you for your help and support,
>
> Best regards,
> [First Name of Russian Sub-Source-1]

G.  Chamber President-1

42.    At all times relevant to this Indictment, Chamber President-1 was a New York-based real estate broker.  Chamber President-1 previously served as president of the Russian-American Chamber of Commerce from 2006 to 2016.  In the course of his employment, Chamber President-1 had occasion to work on real estate projects with Trump and staff at the Trump Organization, which at all times relevant to this Indictment was owned by Trump.

43.     As discussed more fully below, **DANCHENKO** claimed to have sourced several allegations contained in the Company Reports to Chamber President-1, including allegations of purported ongoing communications between the Trump campaign and Russian officials.

H. DANCHENKO's U.S. Election Reporting

44.     As alleged above and in further detail below, from in or about May 2016 through in or about December 2016, during the same time period as the events set forth above involving PR Executive-1 and Organizer-1 (including the June 2016 Planning Trip and the October Conference), **DANCHENKO** assembled and provided to U.K. Person-1 purported information that U.K. Person-1 would, in turn, use to draft the Company Reports. **DANCHENKO** gathered some of this purported information during the June 2016 Planning Trip and the October Conference. Indeed, and as alleged below, certain allegations that **DANCHENKO** provided to U.K. Person-1, and which appeared in the Company Reports, mirrored and/or reflected information that PR Executive-1 himself also had received through his own interactions with Russian nationals.

II. DANCHENKO's False Statements Involving PR Executive-1

A. PR Executive-1 Provides Information Regarding Campaign Manager-1

45.     At least one allegation contained in a Company Report dated August 22, 2016, reflected information that **DANCHENKO** collected directly from PR Executive-1. In particular, that Company Report detailed the August 2016 resignation of Trump's Campaign Manager ("Campaign Manager-1") and his allegedly strained relationship with another campaign staff member ("Campaign Staff Member-1"). The allegation in the Company Report stated:

> Close associate of TRUMP explains **reasoning behind [Campaign Manager-1's] recent resignation.** Ukraine revelations played part but others wanted [Campaign Manager-1] out for various reasons, especially [Campaign Staff Member-1] who remains influential . . .

Speaking separately, also in late August 2016, **an American political figure associated with Donald TRUMP** and his campaign outlined the reasons behind [Campaign Manager-1's] recent demise. S/he said it was true that the Ukraine corruption revelations had played a part in this, but also, **several senior players close to TRUMP had wanted [Campaign Manager-1] out**, primarily to loosen his control on strategy and policy formulation. Of particular importance in this regard was [Campaign Manager-1's] **predecessor as campaign manager, [Campaign Staff Member-1], who hated [Campaign Manager-1] personally and remained close to TRUMP** with whom he discussed the presidential campaign on a regular basis.

(emphasis added) (capitalization in original).

46.     This Company Report contained information that **DANCHENKO** had gathered directly from PR Executive-1 in response to a specific request. In particular, on or about August 19, 2016, **DANCHENKO** emailed PR Executive-1 to solicit any "thought, rumor, or allegation" about Campaign Manager-1. In the email, **DANCHENKO** also informed PR Executive-1 that he (**DANCHENKO**) was working on a "project against Trump":

Could you please ask someone to comment on [Campaign Manager-1's] resignation and anything on Trump campaign? Off the record of course! **Any thought, rumor, allegation. I am working on a related project against Trump.** I asked [PR Executive-1's acquaintance] three months ago but he didn't say much although shared a couple of valuable insights.

Thanks a lot!

Best,
Igor

(emphasis added)

47.     Later that day, PR Executive-1 replied to **DANCHENKO**, stating in part:

Let me dig around on [Campaign Manager-1]. Pretty sure the new team wanted him gone asap and used today's NYT story to drive a stake in his heart.

48.     On or about August 20, 2016, PR Executive-1 emailed **DANCHENKO** the following:

> Hi Igor:
>
> I had a drink with **a GOP friend of mine** who knows some of the players and got some of what is in this article, which provides even more detail.  **She also told me that [Campaign Staff Member-1], who hates [Campaign Manager-1] and still speaks to Trump regularly played a role.  He is said to be doing a happy dance over it.**
>
> **I think the bottom line is that in addition to the Ukraine revelations, a number of people wanted Campaign Manager-1 gone.  It is a very sharp elbows crowd.**

(emphasis added).   PR Executive-1 attached to the email a link to an internet news article that discussed Campaign Manager-1's resignation as Trump Campaign manager.

49.     Later that day, **DANCHENKO** replied to PR Executive-1, expressing his appreciation for the information, and stating that their "goals clearly coincide[d]" with regard to **DANCHENKO's** efforts to gather derogatory information about Trump:

> Dear [PR Executive-1],
>
> Thank you for this.   Any additional insights will be much appreciated.
>
> **It is an important project for me, and our goals clearly coincide.** I've been following the Russia trail in Trump's campaign.  It is there so what you read in the news is hardly an exaggeration.  Some things are less dramatic while others are more than they seem.

(emphasis added).

50.     PR Executive-1 replied to **DANCHENKO** with the following: "Thanks!  I'll let you know if I hear anything else."

51.     PR Executive-1 provided this information regarding Campaign Manager-1 to **DANCHENKO** two days before it appeared in the August 22, 2016 Company Report.   As

reflected above, the information provided by PR Executive-1 was substantially the same as the information contained in the Company Report.  In particular:

a. PR Executive-1 claimed to have received the information from a "GOP friend," whom the above-referenced Company Report describes as a "close associate of Trump."

b. In his email, PR Executive-1 referred to "Ukraine revelations" about Campaign Manager-1, which the Company Report also refers to as the "Ukraine corruption revelations."

c. PR Executive-1's email stated a **"number of people wanted [Campaign Manager-1] gone."**  The Company Report similarly stated that **"several senior players close to TRUMP had wanted [Campaign Manager-1] out**." (emphasis added).

d. PR Executive-1's email stated that "[Campaign Staff Member-1], who **hates [Campaign Manager-1]** and **still speaks to Trump** regularly played a role" in Campaign Manager-1's departure. (emphasis added).  The Company Report similarly states that Campaign Manager-1's departure was due to "[Campaign Staff Member-1], who **hated [Campaign Manager-1]** personally and **remained close to TRUMP**." (emphasis added).

52.     PR Executive-1 later acknowledged to the FBI that he never met with a "GOP friend" in relation to this information that he passed to **DANCHENKO**, but, rather, fabricated the fact of the meeting in his communications with **DANCHENKO**.  PR Executive-1 instead obtained the information about Campaign Manager-1 from public news sources.  According to PR Executive-1, he (PR Executive-1) was not aware at the time of the specifics of **DANCHENKO's** "project against Trump," or that **DANCHENKO's** reporting would be provided to the FBI.

B.  DANCHENKO's Statements to the FBI Regarding PR Executive-1

53.    On or about June 15, 2017, the FBI interviewed **DANCHENKO** in the Eastern
District of Virginia regarding the Company Reports.  FBI agents recorded the June Interview
without **DANCHENKO'S** knowledge.

54.    During the interview, the FBI asked **DANCHENKO**, among other things, if he had
talked to PR Executive-1 regarding any allegations contained in the Company Reports.
**DANCHENKO** denied that PR Executive-1 provided any specific information related to the
Company Reports.  In particular, when an FBI agent ("Agent-1") mentioned PR Executive-1's
name during a conversation about individuals who may have contributed to the Company Reports,
the following exchange, in part, occurred:

| | |
|---|---|
| FBI AGENT-1: | Um, because obviously I don't think you're the only . . . |
| **DANCHENKO:** | Mm-hmm. |
| FBI AGENT-1: | Person that has been contributing.  You may have said one – and this is the other thing we are trying to figure out. |
| | [. . .] |
| FBI AGENT-1: | Do you know a [PR Executive-1]? |
| **DANCHENKO:** | Do I know [PR Executive-1]? Yeah. |
| FBI AGENT-1: | How long have you known him? [laughing]<br><br>[pause] |
| **DANCHENKO:** | I've known [PR-Executive-1] for [pause] I don't know, a couple years maybe. |
| FBI AGENT-1: | Couple years? |
| **DANCHENKO:** | But but but but but but but I've known of him for like 12 years. |

17

[. . .]

| | |
|---|---|
| **DANCHENKO:** | Yeah. Yeah he likes Russia. **I don't think he is, uh, – would be any way be involved.** But—but—uh—b—but he's uh [UI] what I would think would be easily played. Maybe. Uh, he's a bit naïve in his, um liking of Russia. |
| FBI AGENT-1: | Okay, so you've had . . . was there any . . . but you had **never talked to [PR Executive-1] about anything that showed up in the dossier [Company Reports] right?** |
| **DANCHENKO:** | **No.** |
| FBI AGENT-1: | You don't think so? |
| **DANCHENKO:** | **No. We talked about, you know, related issues perhaps but no, no, no, nothing specific.** |

(emphasis added).

55.     In a later part of the conversation, **DANCHENKO** stated, in substance and in part, that PR Executive-1 had traveled on the October "delegation" to Moscow; that PR Executive-1 conducted business with Business-1 and Russian Sub-source-1; and that PR Executive-1 had a professional relationship with Russian Press Secretary-1.

56.     **DANCHENKO's** June 15, 2017 statements that (i) he never talked to [PR Executive-1] about "anything [specific] that showed up" in the Company Reports, and that (ii) he did not think PR Executive-1 was "involved in any way" in those reports, were knowingly and intentionally false. In truth and in fact, and as **DANCHENKO** well knew, **DANCHENKO** had gathered specific information from PR Executive-1 that appeared in the August 22, 2016 Company Report concerning Campaign Manager-1's resignation.

III. The Materiality of DANCHENKO's Lies Regarding PR Executive-1

57.    **DANCHENKO's** lies denying PR Executive-1's role in specific information referenced in the Company Reports were material to the FBI because, among other reasons, they deprived FBI agents and analysts of probative information concerning PR Executive-1 that would have, among other things, assisted them in evaluating the credibility, reliability, and veracity of the Company Reports, including **DANCHENKO's** sub-sources.  In particular, PR Executive-1 maintained connections to numerous people and events described in several other reports, and **DANCHENKO** gathered information that appeared in the Company Reports during the June Planning Trip and the October Conference.  In addition, and as alleged below, certain allegations that **DANCHENKO** provided to U.K. Person-1, and which appeared in other Company Reports, mirrored and/or reflected information that PR Executive-1 himself also had received through his own interactions with Russian nationals.   As alleged below, all of these facts rendered **DANCHENKO's** lies regarding PR Executive-1's role as a source of information for the Company Reports highly material to the FBI's ongoing investigation.

A.  DANCHENKO's Allegations Regarding Trump's Salacious Sexual Activity

58.    For example, an allegation in a Company Report dated June 20, 2016 indicated that Trump had previously engaged in salacious sexual activity while a guest at the Moscow Hotel. The allegation stated, in part:

> According to Source D, where s/he had been present, TRUMP's (perverted) conduct in Moscow included hiring the presidential suite of the [Moscow Hotel], where he knew President and Mrs OBAMA (whom he hated) had stayed on one of their official trips to Russia, and [engaged in sexual activity]. The hotel was known to be under FSB control with microphones and concealed cameras in all the main rooms to record anything they wanted to.

> The [Moscow Hotel] episode involving TRUMP reported above was **confirmed by Source E, a senior (western) member of staff at**

**the hotel**, who said that s/he and several of the staff were aware of it at the time and subsequently. S/he believed it had happened in 2013. Source E provided an introduction for a company ethnic Russian operative to **Source F, a female staffer** at the hotel when TRUMP had stayed there, who also confirmed the story.

(emphasis added) (capitalization in original).

*PR Executive-1 and Organizer-1 Receive a Tour of the Moscow Hotel's Presidential Suite*

59.    Certain of the information in the June 20, 2016 Company Report reflected facts that PR Executive-1 and Organizer-1 also learned during the June 2016 Planning Trip to Moscow.

60.    For example, and as alleged above, during the June 2016 Planning Trip, both PR Executive-1 and Organizer-1 stayed at the Moscow Hotel.    While at the Moscow Hotel, PR Executive-1 and Organizer-1 (i) received a tour of the Moscow Hotel's Presidential Suite (ii) met with the general manager ("General Manager-1") and other staff of the Moscow Hotel, and (iii) attended meetings – to include with **DANCHENKO** – at various Russian government ministries. Further, PR Executive-1 had lunch with **DANCHENKO** during the June 2016 Planning Trip.

61.    According to Organizer-1, during the aforementioned tour of the Presidential Suite, a Moscow Hotel staff member told the participants, including PR Executive-1, that Trump had stayed in the Presidential Suite.  According to both Organizer-1 and PR Executive-1, the staff member did not mention any sexual or salacious activity.

*DANCHENKO's Statements to the FBI Regarding the Moscow Hotel*

62.    During the Interviews in or about 2017 in which he was asked about this Company Report, **DANCHENKO** initially claimed to have stayed at the Moscow Hotel in June 2016. **DANCHENKO** later acknowledged in a subsequent interview, however, that he did not stay at the Moscow Hotel until the October Conference.

63.     During the Interviews, **DANCHENKO** claimed to have collected information concerning Trump's purported activities at the Moscow Hotel from various sources, including but not limited to General Manager-1 and other Moscow Hotel staff.

64.     **DANCHENKO** further claimed that he characterized Trump's alleged activity to U.K. Person-1 as "rumor and speculation," and that **DANCHENKO** had been unable to confirm the veracity of the story.

65.     Based on the foregoing, **DANCHENKO's** lies to the FBI denying that he had communicated with PR Executive-1 regarding information in the Company Reports were highly material. Had **DANCHENKO** accurately disclosed to FBI agents that PR Executive-1 was a source for specific information in the aforementioned Company Reports regarding Campaign Manager-1's departure from the Trump campaign, *see* Paragraphs 45-57, *supra*, the FBI might have taken further investigative steps to, among other things, interview PR Executive-1 about (i) the June 2016 Planning Trip, (ii) whether PR Executive-1 spoke with **DANCHENKO** about Trump's stay and alleged activity in the Presidential Suite of the Moscow Hotel, and (iii) PR Executive-1's interactions with General Manager-1 and other Moscow Hotel staff. In sum, given that PR Executive-1 was present at places and events where **DANCHENKO** collected information for the Company Reports, **DANCHENKO's** subsequent lie about PR Executive-1's connection to the Company Reports was highly material to the FBI's investigation of these matters.

B.  DANCHENKO's Allegations Regarding Russian Diplomat-1

66.     Another allegation in the Company Reports that demonstrated the materiality of **DANCHENKO's** lies regarding PR Executive-1 was dated September 14, 2016 and claimed that the Russian government withdrew Russian Diplomat-1 from his job at the Russian Embassy in

Washington, D.C. due to fears relating to the diplomat's purported role in meddling in the U.S. presidential election. Specifically, the allegation in the Company Report stated:

> [S]peaking [] to [a] compatriot, a senior Russian [Ministry of Foreign Affairs] official reported that as a prophylactic measure, a leading Russia diplomat, **[Russian Diplomat-1], had been withdrawn from Washington on short notice because Moscow feared his heavy involvement in the US presidential election operation,** including the so-called veterans' pensions ruse (reported previously), would be exposed in the media there. **His replacement, [Russian Diplomat-2] however was clean in this regard.**

*PR Executive-1 Receives Information Regarding Russian Diplomat-1*

67.   This allegation – like the allegation concerning the Presidential Suite of the Moscow Hotel – bore substantial similarities to information that PR Executive-1 received during the 2016 time period.

68.   For example, and as discussed above, in or about May, August, and September 2016, and in preparation for the October Conference, PR Executive-1 and Organizer-1 had attended meetings with staff of the Russian Embassy in Washington, D.C., including Russian Diplomat-1. **DANCHENKO** was not present at these meetings.

69.   After one of these meetings on or about May 31, 2016, a member of the Russian Embassy staff informed PR Executive-1 and Organizer-1 in an email that Russian Diplomat-1 would be recalled back to Russia in September 2016 and replaced by Russian Diplomat-2. **DANCHENKO** was not a recipient of this email.

70.   On or about August 2, 2016, PR Executive-1 and Organizer-1 attended another meeting with Russian Diplomat-1 at the Russian Embassy in Washington, D.C. **DANCHENKO** was not present at this meeting.

71.   On or about August 19, 2016, Russian Diplomat-1 sent an email to PR Executive-1 and others. The email stated, in substance and part, that Russian Diplomat-1 was returning to

Russia and was being replaced by Russian Diplomat-2. Russian Diplomat-1 further stated: "[Russian Diplomat-2] **is a talented diplomat and economist with impressive experience in American studies**." (emphasis added).

72.    On or about September 13, 2016 – the day prior to the date of the Company Report containing the allegation regarding Russian Diplomat-1 – PR Executive-1 called **DANCHENKO**. At the time of the call, **DANCHENKO** was in Russia.

*DANCHENKO's Statements to the FBI Regarding Russian Diplomat-1*

73.    When interviewed separately by the FBI in or about 2017, **DANCHENKO** and U.K. Person-1 provided differing information about the purported source(s) of these allegations regarding Russian Diplomat-1:

    a.    In particular, on or about January 25, 2017, **DANCHENKO** stated to FBI agents that he learned of the information about Russian Diplomat-1's departure from Russian Diplomat-1 himself while Russian Diplomat-1 was helping **DANCHENKO** obtain a new Russian passport. **DANCHENKO** further stated that Russian Diplomat-1 described his replacement, Russian Diplomat-2, as a **"bright young guy"** – similar to the statement contained in the aforementioned August 2016 email from Russian Diplomat-1 to PR Executive-1. **DANCHENKO** also stated to the FBI that his conversation with Russian Diplomat-1 occurred in late spring 2016 – in or around the same time that PR Executive-1 and Organizer-1 first learned of Russian Diplomat-1's impending return to Russia.    **DANCHENKO** denied speaking with Russian Diplomat-1 at the October Conference in Moscow.

74.    However, when interviewed by the FBI on or about September 18 and 19, 2017, U.K. Person-1 stated that **DANCHENKO** learned of the aforementioned allegation in Moscow

after bumping into Russian Diplomat-1 on the street in August 2016. In fact, **DANCHENKO** was located in the United States in August 2016.

75.    Based on the foregoing, **DANCHENKO's** lies to the FBI denying that he had communicated with PR Executive-1 regarding information in the Company Reports were highly material. Had **DANCHENKO** accurately disclosed to FBI agents that PR Executive-1 was a source for specific information in the Company Reports regarding Campaign Manager-1's departure from the Trump campaign, *see* Paragraphs 45-57, *supra*, the FBI might also have taken further investigative steps to, among other things, interview PR Executive-1 regarding his potential knowledge of Russian Diplomat-1's departure from the United States. Such investigative steps might have assisted the FBI in resolving the above-described discrepancy between **DANCHENKO** and U.K. Person-1 regarding the sourcing of the allegation concerning Russian Diplomat-1.

C. DANCHENKO's Allegation Regarding Russian Chief of Staff-1

76.    A final allegation in a Company Report that demonstrated the materiality of **DANCHENKO's** false statements denying PR Executive-1's role as a source for information in the Company Reports was dated September 14, 2016, and contained information related to the firing of the chief of staff of the Russian Presidential Administration ("Russian Chief of Staff-1"). The allegation stated:

> PUTIN had been receiving conflicting advice on interfering from three separate and expert groups. On one side had been the Russian ambassador to the US, [Russian Ambassador-1], and the Ministry of Foreign Affairs, together with an independent and informal network run by presidential foreign policy advisor, [Former Russian Ambassador to the U.S.] who had urged caution and the potential negative impact on Russia from the operation/s. On the other side was former [Russian Chief of Staff-1], backed by Russian Foreign Intelligence (SVR), who had advised PUTIN that the pro-TRUMP, anti-CLINTON operation/s would be both effective and plausibly

deniable with little blowback. **The first group/s had been proven right and this had been the catalyst in PUTIN's decision to sack [Russian Chief of Staff-1] (unexpectedly) as PA Head in August. His successor, [name of Russian Official], had been selected for the job partly because he had not been involved in the US presidential election operation/s.**

(emphasis added) (capitalization in original).

*PR Executive-1 Receives Information Regarding Chief of Staff-1*

77. This allegation coincided with information that PR Executive-1 had received regarding changes in the Russian Presidential Administration in the weeks prior to the issuance of the Company Report.

78. In particular, on or about August 12, 2016, the same day that Russian Chief of Staff-1 was reportedly fired, Russian Sub-Source-1 sent a message to PR Executive-1 on social media and stated, "Russian presidential administration is making significant changes right now." **DANCHENKO** was not copied on this message.

79. Minutes later, PR Executive-1 and Russian Sub-Source-1 spoke for approximately 10 minutes.

80. On or about September 13, 2016 – the day prior to the date of the Company Report containing the allegation regarding Russian Chief of Staff-1 – PR Executive-1 called **DANCHENKO**. At the time of the call, **DANCHENKO** was in Russia.

*DANCHENKO's Statements to the FBI Regarding Chief of Staff-1*

81. In the aforementioned January 25, 2017 interview, the FBI asked **DANCHENKO** about the sourcing of this allegation. **DANCHENKO** stated to the FBI that he learned about the allegation involving Russian Chief of Staff-1 from Russian Sub-Source-1 and "two other friends." **DANCHENKO** did not identify the two other "friends," nor did he mention PR Executive-1 in connection with the allegation.

82.     Based on the foregoing, **DANCHENKO's** lie to the FBI about PR Executive-1 not providing information contained in the Company Reports was highly material. Had **DANCHENKO** accurately disclosed to FBI agents that PR Executive-1 was a source for specific information in the aforementioned Company Reports regarding Campaign Manager-1's departure from the Trump campaign, *see* Paragraphs 45-57, *supra*, the FBI might have taken further investigative steps to, among other things, interview PR Executive-1 regarding his potential knowledge of additional allegations in the Company Reports regarding Russian Chief of Staff-1. Such investigative steps might have, among other things, assisted the FBI in determining whether PR Executive-1 was one of **DANCHENKO's** "other friends" who provided the aforementioned information regarding Putin's firing of Russian Chief of Staff-1.

## IV.   DANCHENKO's False Statement Regarding Disclosure of his Relationship with U.K. Person-1 and U.K. Investigative Firm-1

83.     In another interview conducted by the FBI on or about January 24, 2017 in the District of Columbia, **DANCHENKO** made another intentionally false statement that involved his activities with PR Executive-1, among others. In particular, the FBI questioned **DANCHENKO** during this interview about, among other things, his relationship with U.K. Person-1 and U.K. Investigative Firm-1. FBI agents asked **DANCHENKO** whether his friends, associates, and/or sub-sources were aware that he (**DANCHENKO**) worked for U.K. Person-1 and U.K. Investigative Firm-1.

84.     In response, **DANCHENKO** falsely stated, in sum and substance, that while certain friends were aware that **DANCHENKO** worked generally in due diligence and business intelligence, **DANCHENKO** never mentioned that he worked for U.K. Person-1 or U.K. Investigative Firm-1 to his friends or associates. **DANCHENKO** further stated, "you [the FBI] are the first people" he had told. **DANCHENKO** added that the reason he never told associates

about his relationship with U.K. Person-1 and U.K. Investigative Firm-1 was the existence of a

non-disclosure agreement he signed with U.K. Person-1 and U.K. Investigative Firm-1.

85.     **DANCHENKO's** statements asserting that he had not informed friends and

associates of his relationship with U.K. Person-1 and the U.K. Investigative Firm were knowingly

and intentionally false.  On numerous occasions, and as **DANCHENKO** well knew, he had

informed PR Executive-1, Russian Sub-Source-1, and others about his relationship with U.K.

Person-1 and U.K. Investigative Firm-1.  For example, and as alleged above, **DANCHENKO**

attempted to broker business between PR Executive-1 and U.K. Person-1 as early as in or about

April 2016. *See* Paragraphs 23-25, *supra*.  Moreover, in the context of these efforts and afterwards,

PR Executive-1 exhibited specific awareness of **DANCHENKO's** relationships with U.K. Person-

1 and U.K. Investigative Firm-1.  For example, on or about June 10, 2016, PR Executive-1, while

in Country-1 with Russian Sub-Source-1, emailed a U.S.-based acquaintance regarding efforts to

assist **DANCHENKO** in obtaining a U.S. visa:

> Monday night I fly to Moscow and will meet with a Russian guy
> who is working with me on a couple of projects.  He also **works for
> a group of former [allied foreign intelligence service] guys in
> London who do intelligence for business** . . . . [H]e owes me as his
> Visa is being held up and I am having a word with the Ambassador.

(emphasis added).

86.     Approximately seven months later, on or about January 13, 2017, PR Executive-1

replied to an email sent by a U.S.-based person discussing a recent news article regarding the

Company Reports, including the allegations concerning Business-1.  In the email, PR Executive-

1 again demonstrated his knowledge of **DANCHENKO's** relationship with U.K. Investigative

Firm-1 and the Company Reports:

> [] I've been interviewed by the Washington Post and the London
> Times – three times over the last two days over the **[Foreign**

**Intelligence Service-1] Dossier on Trump and I know the Russian agent who made the report (He used to work for me).** My client in [Country-1] [Business-1] has been accused of being the party that organized the hacking.   Presently speaking with the barrister in London who is filing a brief against **Former British [Government Employee] [U.K. Person-1] has been unmasked** as the man behind an explosive dossier about US president-elect Donald Trump.   Also in conversation with former British Ambassador who knows [U.K. Person-1].   Quite right – Oh what a boring life.

(bold emphasis added) (underline in original).

87.    At this time, **DANCHENKO** was not publicly known to be a source for U.K. Person-1.

88.    Further demonstrating the falsity of **DANCHENKO's** statements to the FBI, **DANCHENKO's** email and social media communications reflect that he also previously had disclosed his relationship with U.K. Investigative Firm-1 to at least five other individuals, including Russian Sub-Source-1 and acquaintances based in the United States, the United Kingdom, and Russia.  For example, on or about July 28, 2016, **DANCHENKO** sent a message to an acquaintance and stated "Thanks to my reporting in the past 36 hours, [U.K. Person-1] and [U.K. Investigative Firm-1 Employee] are flying in tomorrow for a few days so I might be busy . . . ."  In addition, on or about September 18, 2016, **DANCHENKO** sent a message to the same acquaintance stating that **DANCHENKO** had "[w]ork to do for [U.K. Person-1] who's probably coming to DC on Wednesday."  U.K. Person-1 did, in fact, travel to Washington. D.C. on or about September 21, 2016.

89.    Accordingly, **DANCHENKO's** January 24, 2017 statements (i) that he never mentioned U.K. Person-1 or U.K. Investigative Firm-1 to his friends or associates and (ii) that "you [the FBI] are the first people he's told," were knowingly and intentionally false.  In truth and in fact, and as **DANCHENKO** well knew, **DANCHENKO** had informed a number of individuals

about his relationship with U.K. Person-1 and U.K. Investigative Firm-1. Such lies were material

to the FBI's ongoing investigation because, among other reasons, it was important for the FBI to

understand how discreet or open **DANCHENKO** had been with his friends and associates about

his status as an employee of U.K. Investigative Firm-1, since his practices in this regard could, in

turn, affect the likelihood that other individuals – including hostile foreign intelligence services –

would learn of and attempt to influence **DANCHENKO's** reporting for U.K. Investigative Firm-

1.

## V.  DANCHENKO's False Statements Regarding
Allegations Sourced to Chamber President-1

90.     In addition to making the aforementioned intentionally false statements to the FBI

during the Interviews, **DANCHENKO** also lied to the FBI regarding a call that he purportedly

received from someone he claimed to believe was Chamber President-1 (referenced in Paragraphs

42-43, *supra*) in or about July of 2016. Information that **DANCHENKO** attributed to that

purported call served as a basis for allegations that appeared in the Company Reports.

91.     In particular, an allegation contained in an undated Company Report described a

"well-developed conspiracy of cooperation" between Donald Trump, the Trump Campaign, and

senior Russian officials. This allegation would ultimately underpin the four FISA applications

targeting Advisor-1. Specifically, the allegation stated:

> Speaking in confidence to a compatriot **in late July 2016, Source
> E, an ethnic Russian close associate of Republican US
> presidential candidate Donald TRUMP,** admitted that there was a
> well-developed conspiracy of co-operation between them and the
> Russian leadership. This was managed on the TRUMP side by the
> Republican candidate's campaign manager, [Campaign Manager-
> 1], who was using foreign policy advisor, [Advisor-1], and others as
> intermediaries. The two sides had a mutual interest in defeating
> Democratic presidential candidate Hillary CLINTON, whom
> President PUTIN apparently both hated and feared. (capitalization
> in original).

(emphasis added). An additional allegation contained in this same Company Report indicated that Russian diplomatic staff in Washington, D.C., New York, and Miami were paying U.S.-based cyber actors to conduct operations against the Democratic Party and Hillary Clinton.

A. <u>DANCHENKO's Alleged Phone Call with Chamber President-1</u>

92.     During several interviews, including on or about March 16, 2017, May 18, 2017, October 24, 2017, and November 2, 2017, **DANCHENKO** informed the FBI that he believed "Source E" in the above-referenced allegations referred, at least in part, to Chamber President-1.

93.     As described in further detail below, **DANCHENKO** falsely stated to the FBI during the Interviews that in or around the summer of 2016, he received a phone call from an anonymous Russian male who did not identify himself to **DANCHENKO** but who **DANCHENKO** claimed to believe was Chamber President-1.

B. DANCHENKO's False Statement Regarding
   <u>his Alleged Phone Call with Chamber President-1</u>

94.     On or about January 24, 2017 and January 25, 2017, the FBI interviewed **DANCHENKO** at an FBI office in Washington, D.C. about, among other things, his relationship with Chamber President-1. During this interview, **DANCHENKO** falsely stated that, in or around July 2016, he received a phone call from an unidentified individual who he believed to be Chamber President-1.

95.     In particular, **DANCHENKO** stated, in part:

a.     In or about June or July 2016, **DANCHENKO** communicated with a U.S.-based Russian journalist ("Russian Journalist-1") who worked for a Russian state-run media outlet ("Russian Media Company-1") about reaching out to Chamber President-1. Russian Journalist-1 indicated that his colleague ("Russian Journalist-2") had a relationship with Chamber President-1.

b. Thereafter, **DANCHENKO** reached out to Chamber President-1 via email twice.

c. In or about July 2016, **DANCHENKO** received a call from an unidentified Russian male who **DANCHENKO** believed – and claimed to still believe at the time of the Interviews – to be Chamber President-1.

d. **DANCHENKO** and the anonymous caller he believed to be Chamber President-1 spoke for approximately 10 to 15 minutes, during which **DANCHENKO** mentioned Advisor-1 and Campaign Manager-1. On the same call, the anonymous caller stated, among other things, that there was communication between the Trump campaign and Russian officials, but that there was "nothing bad about it." **DANCHENKO** claimed that the anonymous caller also indicated on the call that the Kremlin might be of help to get Trump elected.

e. **DANCHENKO** claimed that, on the call, he and the anonymous caller he believed to be Chamber President-1 made arrangements to meet in New York.

96.    When interviewed by the FBI on or about September 18 and 19, 2017, U.K. Person-1 contradicted **DANCHENKO's** account. In particular, U.K. Person-1 stated that **DANCHENKO** had met in-person with Chamber President-1 on two or three separate occasions – at least once in New York City and perhaps once in Charleston, South Carolina.

97.    U.K. Person-1 further stated that **DANCHENKO** sourced the aforementioned allegation regarding Trump's purported salacious sexual activity, in part, to Chamber President-1. Specifically, U.K. Person-1 stated that "Source D" in the Company Report dated June 20, 2016 was Chamber President-1.

98.    **DANCHENKO's** January 24, 2017 and January 25, 2017 statements claiming that he spoke with an individual that he believed to be Chamber President-1 and arranged to meet him in New York, were knowingly and intentionally false. In truth and in fact, and as reflected in

31

contemporaneous communications, **DANCHENKO** did not receive such a call from Chamber President-1, and did not agree to meet Chamber President-1 in New York. In particular, the above-referenced statements were knowingly and intentionally false for the following reasons, among others:

a.   On or about July 21, 2016 – the same time period as the purported "late July" information referenced in the aforementioned, undated Company Report – **DANCHENKO** emailed Chamber President-1, stating, in part:

> Colleagues from [Russian Media Company-1] gave me your contact information. You spoke to [Russian Journalist-2] about Donald Trump and his trips to Russia. I wanted to ask you: what projects was he looking into or were these just image-building trips for beauty contests? There has been a lot of speculation for months now on this topic. It would be interesting to chat about this topic. The question is from a construction company from Switzerland. I think a political component exists, but it can be counterbalanced. Russian-Chinese cooperation is also of great interest, the sanctions aspect included. There are projects in Russia which are looking for investors and equipment suppliers. Like many others in Russia, they are looking at Asia – China and Hong Kong – but they don't know how to approach. It's confidential of course – I don't have any relationship to the media, though of course I do have acquaintances here. In any case, it would be interesting if and when possible to chat with you by phone or meet for coffee/beer in Washington or in New York where I will be next week. I myself am in Washington. It is also possible by e-mail in Russian or in English. I sent you a request to LinkedIn – there my work is clearer.

b.   From on about July 26, 2016 through July 28, 2016, **DANCHENKO** traveled to New York with a family member. On or about July 28, 2016, **DANCHENKO** visited, among other places, the Bronx Zoo with the family member. During this trip, **DANCHENKO** did not meet or communicate with Chamber President-1.

c. Also on or about July 28, 2016, **DANCHENKO** messaged an acquaintance the following: "Another meeting tonight. Thanks to my reporting in the past 36 hours, [U.K. Person-1] and [U.K. Investigative Firm Employee] are flying in tomorrow [i.e., July 29, 2016] for a few days so I might be busy – don't know when but in Downtown D.C."

d. On or about August 18, 2016 – more than two weeks *after* **DANCHENKO** purportedly received the aforementioned anonymous call and allegedly agreed to meet with Chamber President-1 in New York – **DANCHENKO** emailed Chamber President-1 and stated, in part: "Hello [Chamber President-1], I wrote to you a few weeks ago. We are contacts on Linkedin." **DANCHENKO** then described to Chamber President-1 a potential real estate investment in Russia. **DANCHENKO** continued: "If there is opportunity and interest, let's meet and chat about this and other projects . . . . Write, call. My contact information is below."

e. **DANCHENKO's** August 18, 2016 email to Chamber President-1 – which post-dated the purported "late July" information from the aforementioned Company Report – reflected that **DANCHENKO** had not, in fact, spoken with Chamber President-1 in "late July." Specifically, **DANCHENKO's** email did not mention a possible call from Chamber President-1 in or about late July, did not discuss plans to meet in New York, did not ask why Chamber President-1 did not show up to the alleged meeting in New York, and did not refer to any other exchanges or interactions between **DANCHENKO** and Chamber President-1. Rather, and as **DANCHENKO's** email made clear, **DANCHENKO** had not received any response from Chamber President-1 ("I wrote you several weeks ago"), and was still hoping to arrange an in-person meeting ("If there is opportunity and interest, let's meet and chat[.]").

f. Moreover, in a message dated on or about August 24, 2016 – which **DANCHENKO** provided to the FBI – **DANCHENKO** emailed Russian Journalist-2 and stated, in part:

> Good Afternoon, [first name of Russian Journalist-2],
>
> [Russian Journalist-1] recommended that I get in touch with [Chamber President-1]. I've read your interviews with him. **But for some reason [Chamber President-1] doesn't respond.** I already both asked him about TRUMP (capitalization in original) and also proposed a project in Russia. What is your relationship with him like? **Would you be able to ask him to reply to me? I could call or write on LinkedIn, but until he responds I would not like to pester him.**

(emphasis added). This August 24, 2016 email to Russian Journalist-2 again reflected that **DANCHENKO** had not, in fact, spoken with Chamber President-1 in "late July." Specifically, **DANCHENKO's** email did not mention a possible call from Chamber President-1, did not discuss plans to meet in New York with Chamber President-1, and did not inform Russian Journalist-2 that Chamber President-1 did not show up to the alleged meeting in New York.

g. Chamber President-1 has claimed in public statements and on social media that he never responded to **DANCHEKNO's** emails, and that he and **DANCHENKO** never met or communicated.

99.    On or about March 16, May 18, October 24, and November 16, 2017, the FBI conducted additional interviews of **DANCHENKO** in the Eastern District of Virginia. In these Interviews, **DANCHENKO** repeated, in substance, his prior false statements regarding a purported anonymous call and a planned meeting in New York. In particular:

a. In the March 16, 2017 interview, which the FBI recorded without **DANCHENKO's** knowledge, **DANCHENKO** confirmed, in substance, his claim that he had received an anonymous call from someone he believed was "probably" Chamber President-1,

stating, in part, "I have to talk to guys with [Russian Media Company-1] . . . [a]nd see what what's he really about . . . [w]hether he was the person who contacted me[,] [w]here he is now and **and I probably spoke** with him, but I don't know.  Anyway.  Strange character." (emphasis added)

      b.  In the interview conducted on or about May 18, 2017, which the FBI also recorded without **DANCHENKO's** knowledge, **DANCHENKO** repeated, in substance, the same claim. Specifically, an FBI agent reminded **DANCHENKO** that he had previously told the FBI that he "got the call from the guy up in uh, New York [] [t]hat you thought was [Chamber President-1]," to which **DANCHENKO** responded, "yes."  Thereafter, **DANCHENKO** stated, in part, "I'm not sure if I, he called, but . . . I just don't remember.  But I, I was at the time **I was under the impression it was him,** because I talked to [] [Russian Media Company-1] [t]o [Russian Journalist-2]. . . and **I assumed it would have been him** . . . He never showed up.  He never showed up in New York." (emphasis added).

      c.  In a subsequent interview with the FBI on or about October 24, 2017, **DANCHENKO** denied meeting in-person with Chamber President-1 in New York and Charleston, South Carolina (which, as noted above, is what U.K. Person-1 told the FBI had occurred).

      d.  In that same interview, **DANCHENKO** stated, "**I believe I spoke to [Chamber President-1] on the phone a couple of times,** at least someone who I thought was him," thus confirming his earlier false assertions regarding an anonymous call and contradicting his earlier statements that he had only spoken to the person he believed to be Chamber President-1 on one occasion. (emphasis added).

      e.  During the same interview, **DANCHENKO** also told FBI agents that "I scheduled a meet time and place in New York [and] [Chamber President-1] never showed."

100.    In a subsequent November 16, 2017 interview, **DANCHENKO** repeated his false claims to the FBI regarding Chamber President-1. Specifically, **DANCHENKO** stated, in substance and in part, the following:

a.    U.K. Person-1 believed that **DANCHENKO** had direct contact (*i.e.*, meetings) with Chamber President-1, and **DANCHENKO** never corrected U.K. Person-1 about that erroneous belief.

b.    **DANCHENKO** received a phone call from an individual who **DANCHENKO** believed to be Chamber President-1. **DANCHENKO** based this belief on the fact that he (**DANCHENKO**) had listened to online videos of Chamber President-1 speaking, and the individual on the call "sounded like" the same person. The call lasted approximately 15 minutes.

c.    **DANCHENKO** and the person he purportedly believed to be Chamber President-1 attempted to meet face-to-face in a midtown bar in New York City. Chamber President-1 never showed up for the meeting.

VI. The Materiality of DANCHENKO's Lies Regarding Chamber President-1

101.    Based on the foregoing, **DANCHENKO's** lies to the FBI claiming to have received a late July 2016 anonymous phone call from an individual that **DANCHENKO** believed to be Chamber President-1 were highly material to the FBI because, among other reasons, the allegations sourced to Chamber President-1 by **DANCHENKO** formed the basis of a Company Report that, in turn, underpinned the aforementioned four FISA applications targeting a U.S. citizen (Advisor-1). Indeed, the allegations sourced to Chamber President-1 played a key role in the FBI's investigative decisions and in sworn representations that the FBI made to the Foreign Intelligence Surveillance Court throughout the relevant time period. Further, at all times relevant to this

Indictment, the FBI continued its attempts to analyze, vet, and corroborate the information in the Company Reports.

## COUNT ONE

102.    Paragraphs 1 to 101 are incorporated by reference.

103.    On or about June 15, 2017, within the Eastern District of Virginia, **IGOR DANCHENKO**, the defendant, did willfully and knowingly make a materially false, fictitious, and fraudulent statement or representation in a matter before the jurisdiction of the executive branch of the Government of the United States, to wit, on or about June 15, 2017, the defendant denied to agents of the FBI that he had spoken with PR Executive-1 about any material contained in the Company Reports, when in truth and in fact, and as the defendant well knew, PR Executive-1 was the source for an allegation contained in a Company Report dated August 22, 2016 and was otherwise involved in the events and information described in the reports.

(In violation of Title 18, United States Code, Sections 1001(a)(2))

## COUNT TWO

104.    Paragraphs 1 to 101 are incorporated by reference.

105.    On or about March 16, 2017, within the Eastern District of Virginia, **IGOR DANCHENKO**, the defendant, did willfully and knowingly make a materially false, fictitious, and fraudulent statement or representation in a matter before the jurisdiction of the executive branch of the Government of the United States, to wit, on or about March 16, 2017, the defendant stated to agents of the FBI that he received a late July 2016 telephone call from an individual who **DANCHENKO** believed was "probably" Chamber President-1, when in truth and in fact, and as the defendant well knew, Chamber President-1 never called **DANCHENKO**.

(In violation of Title 18, United States Code, Sections 1001(a)(2))

## COUNT THREE

106.    Paragraphs 1 to 101 are incorporated by reference.

107.    On or about May 18, 2017, within the Eastern District of Virginia, **IGOR DANCHENKO**, the defendant, did willfully and knowingly make a materially false, fictitious, and fraudulent statement or representation in a matter before the jurisdiction of the executive branch of the Government of the United States, to wit, on or about May 18, 2017, the defendant stated to agents of the FBI that he "was under the impression" that a late July 2016 telephone call that he received was from Chamber President-1, when in truth and in fact, and as the defendant well knew, Chamber President-1 never called **DANCHENKO**.

(In violation of Title 18, United States Code, Sections 1001(a)(2))

## COUNT FOUR

108.    Paragraphs 1 to 101 are incorporated by reference.

109.    On or about October 24, 2017, within the Eastern District of Virginia, **IGOR DANCHENKO**, the defendant, did willfully and knowingly make a materially false, fictitious, and fraudulent statement or representation in a matter before the jurisdiction of the executive branch of the Government of the United States, to wit, on or about October 24, 2017, the defendant stated to agents of the FBI that he believed that he spoke to Chamber President-1 on the telephone on more than one occasion, when in truth and in fact, and as the defendant well knew, **DANCHENKO** never spoke to Chamber President-1.

(In violation of Title 18, United States Code, Sections 1001(a)(2))

38

**COUNT FIVE**

110.    Paragraphs 1 to 101 are incorporated by reference.

111.    On or about November 16, 2017, within the Eastern District of Virginia, **IGOR DANCHENKO**, the defendant, did willfully and knowingly make a materially false, fictitious, and fraudulent statement or representation in a matter before the jurisdiction of the executive branch of the Government of the United States, to wit, on or about November 16, 2017, the defendant stated to agents of the FBI that he believed that he had spoken to Chamber President-1 on the telephone, when in truth and in fact, and as the defendant well knew, **DANCHENKO** never spoke to Chamber President-1.

(In violation of Title 18, United States Code, Sections 1001(a)(2))

JOHN H. DURHAM
Special Counsel
U.S. Department of Justice

A TRUE BILL:

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

_____
Foreperson
Date: November 3, 2021

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Criminal Case No. 1:21-CR-245 (AJT)** |
| | **:** | |
| **IGOR Y. DANCHENKO,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S
## MOTION TO DISMISS THE INDICTMENT

The United States of America, by and through its attorney, Special Counsel John H. Durham, respectfully submits this opposition to the defendant's Motion to Dismiss the Indictment for Failure to State an Offense (Docket No. 79, hereinafter "Def. Mot."). For reasons stated below, the Government submits that the motion should be denied.

## FACTUAL BACKGROUND

The defendant is charged in a five-count indictment ("Indictment") with making materially false statements to FBI agents in violation of Title 18, United States Code, Section 1001. The Government assumes the Court's familiarity with the facts contained in the Indictment and in its prior filings.

## **LEGAL STANDARD**

In a criminal case, a motion to dismiss tests not the sufficiency of the evidence supporting the indictment but rather whether the indictment sufficiently charges the offense set forth against the defendant. *See United States v. Lewis*, 387 F. Supp. 2d 573, 577 (E.D. Va. 2005). Accordingly, an indictment need only contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). This requirement is satisfied when the indictment contains the elements of the offense charged, fairly informs the defendant of the charge (so that he may prepare his defense), and enables the defendant to plead double jeopardy as a defense to future prosecutions for the same offense. *See United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007); *see also United States v. Brandon*, 150 F. Supp. 2d 883, 884 (E.D. Va. 2001) ("In general, if an indictment sets forth the essential elements of [an] offense in sufficient detail so as fairly to inform the defendant of the nature of the charge, then it is immune from attack on a motion to dismiss." (footnote omitted)). "[T]to give a defendant sufficient notice of the charges against him, the indictment need only track the language of the statute at issue." *United States v. Lindh*, 212 F. Supp. 2d 541, 575 (E.D. Va. 2002).

Where, as here, a motion has been filed to dismiss an indictment containing multiple counts, "each count is viewed as a separate indictment for purposes of determining its sufficiency." *United States v. Smith*, 44 F.3d 1259, 1264 (4th Cir. 1995). "Yet, while each count must stand on its own, incorporated and realleged paragraphs from another count must be considered." *United States v. Le*, 310 F. Supp. 2d 763, 772 n.5 (E.D. Va. 2004). Ultimately, to warrant dismissal of an indictment, the defendant must demonstrate that the allegations in the

indictment, even if true, would not state an offense.  *See United States v. Thomas*, 367 F.3d 194, 197 (4th Cir. 2004).  "It is elementary that a motion to dismiss an indictment implicates only the legal sufficiency of its allegations, not the proof offered by the Government."  *United States v. Terry*, 257 F.3d 366, 371 (4th Cir. 2001) (King, J., concurring).

## ARGUMENT

The defendant asks this Court to dismiss the Indictment arguing that the FBI's questions to the defendant were "fundamentally ambiguous and/or that the defendant's responses were either "literally true, non-responsive or ambiguous."  *See* Def. Mot. at 10.  The defendant alternatively argues that the defendant's statements were not material to any function or decision of the FBI.  *Id.*  As addressed below, the arguments set forth by the defendant are plainly questions of fact within the purview of a jury.  As such, the Government respectfully submits the Court should deny the defendant's motion to dismiss the Indictment.

### I.    The Questions Posed by the FBI Were Not Fundamentally Ambiguous Nor Were the Defendant's Answers Literally True

#### A.    Legal Standard

The defendant exhausts the majority of his 25-page motion attempting to shoehorn the valid false statement counts at issue here into two extremely narrow and rarely-sustained defenses to false statement charges: literal truth and fundamental ambiguity.  *See United States v. Bronston*, 409 U.S. 352, 354 (1973) (reversing perjury conviction where statement was literally true but not responsive to the question posed); *United States v. Sarwari*, 699 F.3d 401, 407 (4th Cir. 2012) (noting that "the answer to a fundamentally ambiguous question may not, as a matter of law, form the basis for a false statement").  As an initial matter, whether any of the counts in the Indictment lend themselves

to such a defense is plainly a factual issue that must be decided by the jury based on all of the evidence in this case. Under controlling Fourth Circuit law, the Court must only look to the face of the Indictment to resolve a motion to dismiss, and here, the Indictment properly alleges false statements.

The *Bronston* literal truth defense is exceptionally narrow and only applies where a defendant's alleged false statements are "undisputedly literally true." *Sarwari*, 669 F.3d at 407; *see also United States v. Chujoy*, 207 F. Supp. 3d 626, 655 (W.D. Va. 2016) ("*Bronston* addresses answers that are both non-responsive and literally true and is inapplicable to answers that are responsive or not indisputably true"). A question is fundamentally ambiguous only when it "is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony." *Sarwari*, 699 F.3d at 407 (quoting *United States v. Lighte*, 782 F.2d 367, 374 (2d Cir. 1985)). But a defendant cannot establish that questions are "fundamentally ambiguous" by isolating them from their context or by showing that words used in a question are amenable to multiple meanings, or that an answer "might generate a number of different interpretations." *Lighte*, 782 F.2d at 375; *see also United States v. Strohm*, 671 F.3d 1173, 1178 (10th Cir. 2011) ("Simply plumbing a question for *post hoc* ambiguity will not defeat a perjury conviction where the evidence demonstrates the defendant understood the question in context and gave a knowingly false answer."). Where a question is merely susceptible to multiple interpretations, and a defendant's answer is true under one understanding of the question but false under another, there is no fundamental ambiguity as a matter of law and the *jury determines* whether the defendant knew his statement was false. *Sarwari,* 669 F.3d at 407-408 (stating that "[w]here a

4

question is only arguably ambiguous, the issue of the defendant's guilt is properly one for the jury"). Even statements that "could be literally true in isolation" can support a false statements conviction if they are "materially untrue" in "the context in which the statements were made." *Id.* (citing *United States v. Schafrick*, 871 F.2d 300, 304 (2d Cir. 1989)).

## B.    Discussion

The charged statements here fall squarely within the realm of properly-alleged false statements.  On June 15, 2017, the defendant was interviewed by the FBI.  During this interview, which was recorded, the FBI agent's question to the defendant about Charles "Chuck" Dolan (anonymized in the Indictment as "PR Executive-1") was not fundamentally ambiguous, or even arguably ambiguous.   To the contrary, the agent's question was decidedly straightforward:

> FBI AGENT-1:        Okay, so you've had . . . was there any . . . but you had never talked to Chuck Dolan about anything that showed up in the dossier [Steele Reports] right?
>
> THE DEFENDANT: No.
>
> FBI AGENT-1:        You don't think so?
>
> THE DEFENDANT: No.  We talked about, you know, related issues perhaps but no, no, no, nothing specific.

The defendant argues that the "reasonable reading of this question is whether Mr. Danchenko and [Dolan] ***talked*** about the Company Reports themselves ***after they were published***."  Def. Mot. at 14 (emphasis in original).   As an initial matter, the question must be viewed in context.   And given the context discussed below, the defendant's reading is entirely unreasonable.  Indeed, the central focus of this interview was to uncover the defendant's sub-sources who provided the information that would later appear in the Steele Reports.   The defendant had previously met

5

with the FBI on *multiple* occasions over the course of *six* months to the same end and made it expressly clear to them that he had communicated with his sub-sources during the 2016 time period in order to collect information that Steele would later include in the dossier. Whether the defendant had communicated with Dolan – or anyone for that matter – about the information in the Steele Reports *after* they were published would be of little, if any, moment to the FBI, which was endeavoring to uncover the defendant's sources who provided the information *underlying* the dossier. Further, the question immediately preceding the question at issue was whether Mr. Steele and Danchenko had other sources beside the defendant for the dossier reports.[1] Thus, viewed in the proper context of the extensive interview and the multiple prior interviews, the question was clearly directed at learning whether the defendant had communicated with Dolan about information that later appeared in the Steele Reports. *See United States v. Graves*, 593 F. App'x 164, 167 (4th Cir. 2014) (in discussing the inapplicability of the literal truth and fundamental ambiguity defense, the court noted that "the jury had the opportunity to gauge for itself, in the context of the full conversation, whether the [defendant] had made a false statement"). Even assuming, *arguendo*, that the question was "arguably ambiguous," the issue of a defendant's guilt is properly one for the jury. *Sarwari*, 669 F.3d at 408.

The defendant next seizes on the fact that the question posed by the agent used the word "talked" rather than a broader term such as "communicated" or a more specific term liked

---

[1] The defendant spends significant time arguing about the ambiguity of the agent's question regarding whether Charles Dolan was an additional source for Christopher Steele. This question, however, does not form the basis of the false statement charged in Count One. Rather, the charged false statement relates to whether the defendant spoke to Mr. Dolan about any material contained in the Steele Reports. *See* Indictment ¶ 103.

6

"emailed."  *See* Def. Mot. at 14.  Courts have repeatedly held, however, that a defendant cannot

establish that a question is "fundamentally ambiguous" by isolating it from its context or by

showing that words used in a question are amenable to multiple meanings, or that an answer

might generate several different interpretations.  *See Sarwari*, 669 F.3d at 407 (citing *Lighte*, 782

F.2d at 375); *see also United States v. Strohm*, 671 F.3d 1173, 1178 (10th Cir. 2011) (stating that

"given the nature of language, in hindsight, many questions could be susceptible to differing

interpretations.  Simply plumbing a question for *post hoc* ambiguity" does not establish

fundamental ambiguity where the evidence demonstrates the defendant understood the question in

context and gave a knowingly false answer).  Indeed, such a rigid standard would completely

override the purpose of Section 1001.  In this case, the defendant made clear to the FBI in

numerous meetings that he had communicated with his sub-sources through a variety of methods,

including email, phone, social media messages, and in-person.  It therefore would be nonsensical

for the FBI to have intentionally limited the scope of its questions to phone calls and in-person

meetings with Dolan, but not other forms of communication.  Under the defendant's reading, in

order to elicit truthful answers, the FBI would have been forced to inquire specifically if the

defendant used any number of methods to communicate with Dolan – email, landline phone,

cellular telephone, encrypted application, carrier pigeon, etc.  Plainly, the law does not

contemplate such particularity requirements in cases where the defendant (and any reasonable

listener) clearly would understand the context of the question.  Importantly, the Government's

evidence will demonstrate that the defendant plainly understood that the word "talked" was

directed at all forms of communications with Charles Dolan.   In fact, the defendant himself

demonstrated an understanding that his email communications were relevant to the FBI's inquiry,

because he chose to provide them with selective emails and social media postings on multiple occasions over the course of his relationship with the FBI.   Accordingly, the agent's question was not fundamentally ambiguous.

In the same vein, the defendant argues that his answer to the agent's question was "literally true" because the defendant did not "talk" with Mr. Dolan, but rather exchanged emails. *See* Def. Mot. at 14-15.  This argument is equally unavailing.  "When a question is not 'fundamentally ambiguous,' but merely susceptible to multiple interpretations, and a defendant's answer is true under one understanding of the question but false under another, *the fact finder* determines whether the defendant knew his statement was false." *Sarwari*, 669 F.3d 401 (emphasis added); *United States v. Purpera*, 844 F. App'x 614, 632 (4th Cir. 2021) ("[the literal truth defense] does not  apply to an answer [that] would be true on one construction of an arguably ambiguous question but false on another"); *see also United States v. Thomas*, 612 F.3d 1107, 1114-18 (9th Cir. 2010) (same).   As discussed above, the question posed by the agent was not "fundamentally ambiguous," and thus, it is for the jury to decide whether the defendant's statement was knowingly false.

The defendant next argues that the "distinction between talking about 'anything' or 'related issues' and something 'specific' is at best vague and open to subjective interpretation, and consequently cannot support a false statement charge under § 1001." Def. Mot. at 15.  To the contrary, there is nothing vague about the defendant's answer, *e.g.*, that he did not speak with Charles Dolan about any specific information that appeared in the Steele Reports.  The defendant's answer "no, no, no, nothing specific," could not be more responsive.  And the purported information that Danchenko obtained from Dolan concerning Manafort (and which

8

appeared in the Steele Reports) was not a "related issue[];" it was *the issue* being discussed in the

relevant report. "An answer that is responsive and false on its face does not come within [a]

literal truth analysis simply because the defendant can postulate unstated premises of the question

that would make his answer literally true." *United States v. Bollin*, 264 F.3d 391, 411 (4th Cir.

2001), overruled on other grounds by *United States v. Chamberlin*, 868 F.3d 290 (4th Cir. 2017).

In any event, the evidence at trial will demonstrate that, in fact, Dolan and the defendant did

discuss very specific allegations regarding the Trump Campaign – allegations that appeared in a

Steele Report a mere two days after the defendant received the information from Dolan.

   The defendant's attempts to claim "literal truth" with respect to his statements

concerning Sergei Millian are equally unavailing. As noted above, the *Bronston* literal truth

defense applies where a defendant's answers are *both* non-responsive and literally true but "is

inapplicable to answers that are responsive or not indisputably true." *Chujoy*, 207 F.Supp.3d 626,

655 (W.D.Va. 2016) (quoting *Strohm*, 671 F.3d at 1185). Here, defendant does not dispute that

his statements were responsive to questions posed by the FBI about contacts with Mr. Millian.

On that basis alone, the literal truth defense is unavailable to the defendant. In addition to this

fatal deficiency, the defendant's self-serving and conclusory assertions as to the literal truth of his

statements to the FBI concerning his contacts with Millian cannot satisfy the literal truth defense.

In fact, the defendant did not provide the FBI with the two emails he sent to Millian that *on their*

*face* directly contradict his claim that he believed he spoke to Millian on the phone. The conflict

between the emails – which make no mention of a call or missed meeting in New York – and his

own statements, create an issue of fact for the jury, and not an issue of law that can be resolved by

the Court prior to trial. Further undermining these arguments is the fact that the defendant stated

9

that information contained in a June 2016 Steele Report might have come from Sergei Millian, notwithstanding the fact that his first attempt to contact Millian by email was not until July 21, 2016 – an email that he conveniently withheld from the FBI.   The Government also plans to introduce evidence which reflects that *every* phone call received by the defendant from July 21, 2016[2] through August 2016 on the *phone number that he provided* to Sergei Millian was from individuals other than Millian who were known to the defendant (either from his contacts list or through other means), and thus, the defendant's contention about an "anonymous caller" is not supported by the evidence.[3]    Presented with all these facts, a jury could reasonably conclude that the defendant fabricated the alleged call with Millian.  Again, the defendant's statements concerning Millian cannot be viewed in isolation, but must be viewed in the context and scope of his previous interviews with the FBI, including the January 2017 interviews.  In that context, there are ample facts set forth in the Indictment alone by which a jury could reasonably determine that defendant's statements regarding his alleged communication with Millian were false.

## II.    The Indictment Sufficiently Alleges that the Defendant's False Statements to the FBI Were Material

### A.    Legal Standard

The defendant's arguments based on materiality are similarly unavailing.   As a preliminary matter, these arguments are premature.  The Supreme Court in *United States v. Gaudin*

---

[2] The evidence at trial will establish that the defendant first reached out to Mr. Millian by email on July 21, 2016.

[3] The contention that the defendant may have received an "anonymous call" from someone he believed to be Millian on an internet-based application is also not supported by the evidence. Indeed, at no time did the defendant inform Millian that he could be contacted on an internet-based application, to say nothing of the particular application Millian should utilize.

held that materiality is an essential element of Section 1001 that must be resolved by a jury. 515 U.S. 506, 509 (1995). Whether the Government has proved facts beyond a reasonable doubt illustrating that a false statement is material to an agency decision is a mixed question of fact and law typically resolved by a properly instructed jury. *See id.; see also United States v. Garcia-Ochoa,* 607 F.3d 371, 376 (4th Cir. 2010) ("Materiality, [as an element of 18 U.S.C. 1001], is a question of fact (or at the very least a mixed question of law and fact) to be resolved by the *fact finder* ") (emphasis added); *United States v. David,* 83 F.3d 638, 646 (4th Cir. 1996) ("[I]t is obvious error today not to submit the question of materiality to the jury in a false statements prosecution.").

Although Section 1001 does not define "materially," the Supreme Court has held that a materially false statement has "a natural tendency to influence, or [be] capable of influencing, the decision of the decision-making body to which it was addressed." *Kungys v. United States*, 485 U.S. 759, 770 (1988). But as the Supreme Court explained in *Gaudin*, a statement need not actually influence an agency for it to be material; it need only have "a natural tendency to influence, or [be] capable of influencing" an agency function or decision. 515 U.S. at 509. Thus, materiality is not dependent upon whether a particular government agency was actually influenced by a defendant's false statements. *See United States v. Arch Trading Co.*, 987 F.2d 1087, 1095 (4th Cir. 1993) (affirming false statements conviction where defendant's misrepresentations did not prompt any official action); *United States v. Friedhaber*, 856 F.2d 640, 642 (4th Cir. 1988). Indeed, whether the false statement in fact influenced an agency's action is irrelevant. *United States v. Hamilton,* 699 F.3d 356, 362 (4th Cir. 2012); *see also United States v. Raza*, 876 F.3d 604, 616-617 (4th Cir. 2017) (collecting cases). This proposition is well-settled throughout the Circuits. *See e.g., United*

*States v. Moore*, 612 F.3d 698, 701–02 (D.C. Cir. 2010) (a false statement is material if it has the

capability to influence a "discrete decision" or "any other function of the agency."); *United States*

*v. White,* 270 F.3d 356, 365 (6th Cir. 2001) ("'materiality' is a fairly low bar . . . . [T]he government

must present at least some evidence showing how the false statement in question was capable of

influencing federal functioning."); *United States v. Moore,* 446 F.3d 671, 681 (7th Cir.

2006) (statement is material if it "has a natural tendency to influence, or . . . is capable of affecting,

a government function"); *United States v. Calhoon,* 97 F.3d 518, 530 (11th Cir. 1996) ("it is enough

if the statements had a natural tendency to influence [ ] or [were] capable of affecting or influencing

a government function") (internal quotation marks deleted); *United States v. Alemany Rivera,* 781

F.2d 229, 235 (1st Cir. 1985) ("test for materiality under 18 U.S.C. § 1001 is . . . whether [the

statement] had the capacity to influence a government function"); *United States v. Lichenstein,* 610

F.2d 1272, 1278 (5th Cir. 1980) ("false statement must simply have the capacity to impair or pervert

the functioning of a government agency").

   Moreover, the capacity of a false statement to influence a government agency or

function must be measured at the point in time that the statement was uttered. *See United States v.*

*Sarihifard*, 155 F.3d 301, 207 (4th Cir. 1998) (citation omitted). Finally, "materiality is not

dependent upon the believability of the false statement. *Id.* (affirming conviction for false

statements even where United States Attorney immediately recognized defendant's statements were

false). It is black letter law that materiality does not turn on the actual knowledge of investigators

at the time of the false statement. Indeed, as Justice Scalia stated in *Brogan v. United States*:

    It could be argued, perhaps, that a disbelieved falsehood does not
    pervert an investigation. But making the existence of this crime turn
    upon the credulousness of the federal investigator (or the

persuasiveness of the liar) would be exceedingly strange; such a
defense to the analogous crime of perjury is certainly unheard of.

522 U.S. 398, 402 (1998). In fact, a statement can be material even if the decision-maker has

already arrived at a conclusion before the statement is made. *See United States v. Safavian*, 649

F.3d 688 (D.C. Cir. 2011); *see also Moore*, 612 F.3d at 701-702. To that end, "[w]hen statements

are aimed at misdirecting agents and their investigation, even if they miss spectacularly or stand

absolutely no chance of succeeding, they satisfy the materiality requirement of [Section] 1001."

*United States v. Lupton*, 620 F.3d 790, 806-807 (7th Cir. 2010). As the Fifth Circuit has opined:

> "Con[] men often succeed in persuading the gate keeper to allow
> them to enter. Agency protocol is not always followed and those
> familiar with protocol are not always on duty. The test is whether
> the statement tests these protocols, or has the natural tendency to
> influence or be capable of influencing the decision maker, not
> whether it actually influenced the decision on this one occasion.

*United States v. Abrahem*, 678 F.3d 370, 374 (5th Cir. 2012).

**B.     Discussion**

Here, the defendant's false statement with respect to Charles Dolan's role as a source

for the Steele Reports was plainly material. The defendant's sole argument appears to be that Mr.

Dolan provided the defendant with information from public news sources and thus his false

statement could not be material. *See* Def. Mot. at 16-17. As an initial matter, this assertion is

simply incorrect. Mr. Dolan's August 20, 2016 email to the defendant clearly states that he

received information from a "GOP friend of mine" who provided information both contained in the

Politico article Dolan attached *and* additional information not contained in the article. Indeed, the

email states "she [the purported GOP friend] also told me that Corey Lewandowski, who hates

Manafort and still speaks to Trump regularly played a role. He is said to be doing a happy dance

over it."   This information is not contained in the article.   Thus, it is only reasonable that the

defendant would assume this information (and other information) contained in the email was from

a non-public source.   It also is of no help to the defendant that – as will become clear through

Dolan's testimony at trial – Dolan fabricated the genesis of this information.   Indeed, Dolan's

fabrication makes the defendant's false statement all the more material, because it underscores that

had the FBI *known* Dolan was the source of these allegations, it might have interviewed him and

determined that it was not, in fact, reliably sourced.

Moreover, the defendant misunderstands the Government's theory of materiality.   The

defendant's lie was material because, as the Indictment plainly lays out, had the FBI known that

Charles Dolan was a source for the Steele Reports, it is more likely that they would have (or should

have) also interviewed Dolan, given Dolan's (1) relationship to several key players who appear in

the Steele Reports and (2) proximity to the defendant at the time the defendant was allegedly

gathering information that would later appear in the Steele Reports.   Indeed, Dolan had relationships

with several Russian government officials, including, but not limited to, Dimitry Peskov

(anonymized in the Indictment as "Russian Press Secretary-1"), Mikhail Kalugin (anonymized in

the Indictment as "Russian Diplomat-1") and Sergei Kislyak (anonymized in the Indictment as

"Russian Ambassador-1").   Further, Dolan was present with the defendant in June 2016 at the Ritz

Carlton Moscow when the defendant allegedly personally gathered information on Donald Trump's

purported salacious sexual activity at that hotel.   Again, had the FBI known that Dolan was a source

for the Steele Reports – in addition to his ties to some of the key protagonists – the FBI logically

would have interviewed Dolan.   The fact that the FBI was aware that Dolan maintained some of

these relationships and failed to interview Dolan is of no moment. *See Arch Trading Co.*, 987 F.2d

14

at 1095 (holding that a material fact is one that has "a natural tendency to influence agency action *or is capable of influencing agency action* . . . . [W]hile it may be a fact that [defendant's] misrepresentations did not prompt any official action, the prompting of such action is not an element of a § 1001 offense.") (emphasis added). *See Abrahem*, 678 F.3d at 374.

   The defendant's false statements with respect to Sergei Millian are also plainly material. The defendant argues that the false statements could not be material because "none of these statements could have impacted the government's decision to obtain its first or second FISA warrants against Advisor-1 [Carter Page], which were issued on or about October 21, 2016, and January 12, 2017, because Mr. Danchenko's statements were made months later, with the first charged statement occurring on March 16, 2017." *See* Def. Mot. at 23. Further, the defendant argues that the defendant's false statements made on October 24, 2017 and November 16, 2017 should be dismissed "because they occurred after the government obtained its last FISA warrant against Advisor-1 on or about June 29, 2017 . . . and, therefore, could not have impacted the government's decision to obtain *any* of the FISA warrants." *Id.* (emphasis in original). The defendant fundamentally misunderstands the government's obligations to the Foreign Intelligence Surveillance Court ("FISC"). As an initial matter, two of the defendant's false statements (March 16, 2017 and May 18, 2017) were made during the pendency of the FISA surveillance against Carter Page. Notwithstanding when the false statements were made, had the defendant been truthful about his purported interactions with Sergei Millian, the FBI and DOJ would have been under an affirmative obligation to inform the FISC – at any time during the pendency of the surveillance of Page or thereafter – about information that would have undermined the statements it had made in

its four FISA applications regarding the information allegedly provided by Millian.  Indeed, FISC

Rules of Procedure dictate that:

> If the government discovers that a submission to the Court contained a misstatement or omission of material fact, the government, in writing, must immediately inform the Judge to whom the submission was made of:
>
> (1) the misstatement or omission;
> (2) any necessary correction;
> (3) the facts and circumstances relevant to the misstatement or omission;
> (4) any modification the government had made or proposes to make in how it will implement any authority or approval granted by the Court; and
> (5) how the government proposes to dispose of or treat any information obtained as a result of the misstatement or omission.

*See* United States Foreign Intelligence Surveillance Court Rules of Procedure 13. Thus, the FBI

and DOJ would be required to inform the FISC about the misrepresentations made in *each* of the

applications it provided to the FISC.   Had the FISC known of these misrepresentations, it could

have terminated the surveillance of Carter Page and/or ordered the FBI and DOJ to destroy the

information it had already collected.

   The defendant next argues that his false statements regarding Millian are not

material because he provided the FBI with the email that "the indictment now alleges is the

smoking gun that proves Mr. Danchenko did not in fact believe he spoke with Chamber

President-1 [Millian]."  Def. Mot. at 24.   The defendant, however, conveniently omits pertinent

and inculpatory facts from his argument.   Indeed, in his January 2017 interview with the FBI, the

defendant stated, in sum, that he emailed Millian twice and received no response back.  The

defendant further stated, that following his second email to Millian, he received a telephone call

in late July 2016 from an "anonymous" caller he believed to be Millian.  He further stated that during this purported call, the defendant and the "anonymous" individual he believed to be Millian agreed to meet in New York City at the end of July.   During the January 2017 interviews, the defendant did in fact provide the FBI with a Russian-language email to Dimitry Zlodorev (anonymized in the Indictment as "Russian Journalist-2") dated August 24, 2016, which stated that Millian had not responded to his emails.   But as discussed above, the defendant did *not* provide the FBI with the two additional emails that he sent to Millian , including an August 18, 2016 email which made clear that Danchenko had not, in fact, heard back from him by that date – thus making a late July phone call and planned meeting in New York an impossibility.   Put another way, the defendant wanted the FBI to believe that he emailed Millian twice in July 2016, received no response, but received a phone call from someone he believed to be Millian in late-July.

The Government will argue at trial that the defendant provided the FBI with the August 24, 2016 email to Zlodorev in an effort to show that he had, in fact, asked Zlodorev for Millian's contact information.  However, reflecting the fact that the defendant could not keep his lies straight, he provided the August 24, 2016 email not realizing it would demonstrate that he had not, in fact, spoken to the "anonymous" caller he told the FBI he believed was Millian by late August 2016.  That the defendant slipped up by providing the FBI with an email that contradicted his own prior lies is of no moment.  The defendant cites no law – nor could he –  stating that a defendant's unintentional exposure of his own prior misstatements undermines their falsity or their materiality.  To the contrary, such evidence only underscores the defendant's intent to deceive the FBI.  And the fact that the FBI apparently did not identify or address these

17

inconsistencies which the Special Counsel's evidence at trial will show is, again, of no moment when evaluating falsity or materiality.  *See Arch Trading Co.*, 987 F.2d at 1095; *Abrahem*, 678 F.3d at 374.

## CONCLUSION

For the foregoing reasons, the Court should deny the defendant's Motion to Dismiss the Indictment.

Respectfully submitted,

JOHN H. DURHAM
Special Counsel

By:

  /s/
Michael T. Keilty
Assistant Special Counsel
michael.keilty@usdoj.gov

Brittain Shaw
Assistant Special Counsel
brittain.shaw@usdoj.gov

**Certificate of Service**

I hereby certify that on the 16th day of September, 2022, I electronically filed a copy of

the foregoing with the Clerk of the Court using the CM/ECF system, which will send a

notification of such filing (NEF) to all counsel of record.

By:

/s/
Michael T. Keilty
Assistant Special Counsel
michael.keilty@usdoj.gov

280

Hillary Clinton's, HFACC, Inc.'s, John Podesta's, Robert Mook's, DNC's, DNC Services Corporation's, Debbie Wasserman Schultz's, Charles Halliday Dolan, Jr.'s, Fusion GPS's, Glenn Simpson's, Peter Fritsch's, Nellie Ohr's, Bruce Ohr's, Igor Danchenko's, Rodney Joffe's, Neustar Security Services's, Neustar Inc.'s, and Orbis Business Intelligence Ltd.'s Joint Motion for Sanctions (Oct. 31, 2022)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Donald J. Trump,

               Plaintiff,

    v.

Hillary R. Clinton *et al.*,

               Defendants.

Civil Action No. 2:22-14102-DMM

**HILLARY CLINTON'S, HFACC, INC.'S, JOHN PODESTA'S, ROBERT MOOK'S, DNC'S, DNC SERVICES CORPORATION'S, DEBBIE WASSERMAN SCHULTZ'S, CHARLES HALLIDAY DOLAN, JR.'S, FUSION GPS'S, GLENN SIMPSON'S, PETER FRITSCH'S, NELLIE OHR'S, BRUCE OHR'S, IGOR DANCHENKO'S, RODNEY JOFFE'S, NEUSTAR SECURITY SERVICES'S, NEUSTAR INC.'S, AND ORBIS BUSINESS INTELLIGENCE LTD.'S JOINT MOTION FOR SANCTIONS**

## TABLE OF CONTENTS

Page

INTRODUCTION .......................................................................................................1

BACKGROUND .......................................................................................................2

ARGUMENT ............................................................................................................4

I.      DEFENDANTS ARE ENTITLED TO COSTS AND FEES UNDER 28 U.S.C.
        § 1927 FOR MOVING TO DISMISS THE AMENDED COMPLAINT. ..........................4

        A.      Plaintiff's counsel engaged in unreasonable and vexatious conduct by
                pursuing and persisting with an untimely, factually unsupported, and
                legally unwarranted suit. ...........................................................................5

        B.      Plaintiff's counsel unreasonably and vexatiously multiplied the
                proceedings by their conduct. .................................................................11

        C.      This Court should award costs and fees associated with moving to dismiss
                the Amended Complaint and moving for sanctions. ................................12

II.     THE COURT SHOULD IMPOSE SANCTIONS UNDER ITS INHERENT
        AUTHORITY. ..................................................................................................12

III.    THE COURT SHOULD IMPOSE SANCTIONS UNDER THE DEFEND
        TRADE SECRETS ACT. ...................................................................................17

IV.     DEFENDANTS' ATTORNEYS' FEES WERE REASONABLE..................................19

CONCLUSION........................................................................................................20

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Amlong & Amlong, P.A. v. Denny's Inc.*, 500 F.3d 1230 (11th Cir. 2007) ...............................4, 5

*Barash v. Kates*, 585 F. Supp. 2d 1368 (S.D. Fla. 2008) ................................................................16

*Barmapov v. Amuial*, 986 F.3d 1321 (11th Cir. 2021) ...................................................................10

*Barnes v. Dalton*, 158 F.3d 1212 (11th Cir. 1998) ....................................................................8, 13

*Bettis v. Toys R Us*, 646 F. Supp. 2d 1273 (S.D. Fla. 2009) .........................................................16

*Bivins v. Wrap It Up Inc.*, 548 F.3d 1348 (11th Cir. 2008) ...........................................................19

*B.K.B. v. Maui Police Dep't*, 276 F.3d 1091 (9th Cir. 2002) .......................................................13

*Calder v. Jones*, 465 U.S. 783 (1984) .............................................................................................6

*Celsius Holdings, Inc. v. A SHOC Beverage, LLC*, No. 21-80740-CV, 2022 WL 3568042
(S.D. Fla. July 19, 2022) ......................................................................................6, 8, 19, 20

*Chambers v. NASCO*, 501 U.S. 32 (1991) ...............................................................................12, 13

*Cramer v. State of Fla.*, 117 F.3d 1258 (11th Cir. 1997) ..............................................................11

*Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955 (11th Cir. 2008) ...................................11

*Dude v. Cong. Plaza, LLC*, No. 17-80522-CIV, 2018 WL 3432714 (S.D. Fla. July 16,
2018) ...........................................................................................................................16

*Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101 (2017) ....................................................16

*Greenberg Farrow Architecture, Inc. v. Perkins Eastman Architects, P.C.*, 1:12-CV-
1435, 2014 WL 12694260 (N.D. Ga. July 2, 2014) ....................................................18

*In re Evergreen Sec., Ltd.*, 570 F.3d 1257 (11th Cir. 2009) ...................................................13, 16

*Johnson Matthey Process Techs., Inc. v. G.W. Aru LLC*, No. CV420-322, 2022 WL
987945 (S.D. Ga. Mar. 31, 2022) ...............................................................................18

*Jones v. Campbell Univ.*, 322 F. Supp. 3d 106 (D.D.C. 2018) .....................................................10

*Macort v. Prem, Inc.*, 208 F. App'x 781 (11th Cir. 2006) .......................................................4, 12

*Mallory v. Harkness*, 923 F. Supp. 1546 (S.D. Fla. 1996), *aff'd*, 109 F.3d 771 (11th Cir.
1997) ...........................................................................................................................19

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Mar. Mgmt., Inc. v. United States*, 242 F.3d 1326 (11th Cir. 2001)...............................................18

*Norelus v. Denny's, Inc.*, 628 F.3d 1270 (11th Cir. 2010)...............................................5, 8, 12, 15

*Norman v. Housing Auth. of City of Montgomery*, 836 F.2d 1292 (11th Cir. 1988) ....................20

*O'Rourke v. Dominion Voting Sys. Inc.*, No. 20-CV-03747-NRN, 2021 WL 3400671 (D. Colo. Aug. 3, 2021)...............................................10

*Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218 (11th Cir. 2017) ...................13

*Sciaretta v. Lincoln Nat'l Life Ins. Co.*, No. 9:11-CV-80427-DMM, 2013 WL 11317858 (S.D. Fla. May 6, 2013), *aff'd*, 778 F.3d 1205 (11th Cir. 2015)...............................................16

*Temurian v. Piccolo*, No. 18-CV-62737, 2021 WL 1520588 (S.D. Fla. Mar. 3, 2021), *report and recommendation adopted in part*, No. 18-62737-CIV, 2021 WL 1121003 (S.D. Fla. Mar. 24, 2021) ...............................................17, 18

*TransPerfect Glob., Inc. v. Lionbridge Techs., Inc.*, No. 19CV3283 (DLC), 2022 WL 2119344 (S.D.N.Y. May 31, 2022)...............................................18

*Wallace v. Kato*, 549 U.S. 384 (2007) ...............................................6

*Worldwide Primates, Inc. v. McGreal*, 87 F.3d 1252 (11th Cir. 1996) ...............................................8

## STATUTES

18 U.S.C. § 1515(a) ...............................................6

18 U.S.C. § 1836(b)(3)(D)...............................................17

28 U.S.C. § 1927...............................................*passim*

## OTHER CITATIONS

"Biden Again Slams Republicans," Transcript from FOX: Hannity, Sept. 10, 2022 (attached hereto as Exhibit 1) ...............................................15

*Trump Sues Clinton, Steele for 'False Narrative' About Russia Collusion*, Habba Madaio & Associates LLP – News (March 25, 2022), https://habbalaw.com/news/trump-sues-clinton-steele-for-false-narrative-about-russian-collusion/...............................................14

*Trump Suing Hillary Clinton Over Russia Hoax*, Habba Madaio & Associates LLP – News (March 31, 2022), https://habbalaw.com/news/trump-suing-hillary-clinton-over-russia-hoax/...............................................14

**TABLE OF AUTHORITIES**
(continued)

Page(s)

Twitter, *Permanent suspension of @realDonaldTrump* (8 Jan. 2021),
  https://blog.twitter.com/en_us/topics/company/2020/suspension ...........................................10

## INTRODUCTION

After dismissing Plaintiff's suit in a thorough opinion, this Court retained jurisdiction to determine issues related to sanctions.  The exercise of that jurisdiction is appropriate here: Plaintiff's suit was unwarranted on the facts, unsupported by the law, and imposed substantial burdens both on Defendants and this Court.  Despite being alerted to the many deficiencies in the initial Complaint by one round of motions to dismiss, Plaintiff and his counsel pressed forward on an Amended Complaint that fixed none of the problems, and instead simply added more invective and irrelevant factual allegations to what was already a "shotgun" pleading.  The Court should not countenance the abuse of its resources—or allow significant burdens to be imposed on Defendants, many of them individuals who have devoted their careers to public service—in service of Plaintiff's political stunt.

Under these circumstances, sanctions against both Plaintiff and his counsel are appropriate.  Under 28 U.S.C. § 1927, this Court may order Plaintiff's counsel to reimburse Defendants for the fees and costs associated with their motions to dismiss the Amended Complaint and the instant motion for sanctions.  Under the Court's inherent authority as well as the Defend Trade Secrets Act, the Court may impose sanctions on Plaintiff himself and require Plaintiff to reimburse Defendants for all the fees and costs incurred as a result of his suit, including those associated with responding to the initial Complaint and Amended Complaint, and with the instant motion for sanctions.[1]

---

[1] Defendants believe the objectively unreasonable conduct of Plaintiff and his counsel as described below would also support Rule 11 sanctions.  However, Defendants, with the exception of Charles Halladay Dolan, Jr. did not previously serve Plaintiff with a sanctions motion under Rule 11.  Thus, Defendants are not moving for Rule 11 sanctions, although such sanctions might be imposed on the Court's own initiative.  Dolan has filed his previously served motion (DE 268).

## BACKGROUND

Plaintiff's pleadings and theories were obviously and fatally defective from the very inception of this action. Plaintiff's initial Complaint spanned 108 pages and 508 paragraphs. DE 1 (March 24, 2022). It named 28 individual defendants, as well as 10 John Does and 10 ABC Corporations. *Id.*

Less than a month after the Complaint was filed, Hillary Clinton moved to dismiss it with prejudice. DE 52 (Apr. 20, 2022). Defendant Clinton's motion identified many of the fundamental factual deficiencies and legal flaws that would ultimately lead this Court to dismiss the Amended Complaint: namely, (1) that Plaintiff's claims were untimely on their face, DE 52 at 1–5; (2) that Plaintiff's own tweets confirmed his knowledge of his supposed claims no later than October 2017, DE 52 at 2–3; (3) that Plaintiff's Complaint was replete with inadequate and conclusory allegations, DE 52 at 6; (4) that Plaintiff failed to allege a RICO enterprise, DE 52 at 7; (5) that Plaintiff failed to allege the predicate act of theft of trade secrets based on DNS information, DE 52 at 8–9; (6) that Plaintiff failed to allege the predicate act of obstruction of justice in part because he identified no "official proceeding," DE 52 at 9–10; (7) that Plaintiff failed to allege a pattern of racketeering activity, DE 52 at 11–12; (8) that Plaintiff failed to adequately allege RICO standing because his supposed injuries were almost entirely undescribed, DE 52 at 12–14; (9) that Plaintiff's injurious falsehood claim was barred by the First Amendment, DE 52 at 15–17; (10) that Plaintiff failed to allege almost every necessary element of injurious falsehood under Florida law, DE 52 at 17–18; (11) that Plaintiff failed to allege a malicious prosecution claim as to any official proceeding and, in particular, as to the properly predicated Crossfire Hurricane investigation, DE 52 at 19–20; and (12) that Plaintiff failed to allege a claim for "agency" because it is not an independent cause of action under Florida law.

In response, Plaintiff's counsel indicated that they planned to amend the Complaint. DE 66 (Apr. 21, 2022). Defendant Clinton did not oppose counsel's request for an extension of time in which to amend. *See, e.g.*, DE 102 (Apr. 27, 2022). In the intervening period, other Defendants joined Clinton's motion to dismiss and filed their own motions alerting Plaintiff and his counsel to additional fatal defects in the Complaint. *See* DE 124 (John Podesta), 139 (Peter Fritsch, Fusion GPS, Glenn Simpson); 141 (DNC Services Corporation, Democratic National Committee, Debbie Wasserman Schultz); 143 (Perkins Coie); 144 (Nellie Ohr); 145 (Robby Mook); 146 (Michael Sussmann); 147 (Marc Elias); 149 (HFACC); 157 (Rodney Joffe); 159 (Igor Danchenko); 160 (Neustar, Inc.); 162 & 163 (Charles Halliday Dolan, Jr.); 165 (Jake Sullivan). With respect to each motion, Plaintiff's counsel indicated that they planned to amend in response to the motions, and Defendants did not oppose extensions of time to allow them to do so. *See* DE 153 (May 17, 2022).[2]

Plaintiff's counsel filed the Amended Complaint approximately two months after receiving Defendant Clinton's motion to dismiss and with the benefit of Defendants' additional motions in the interim. DE 177 (June 21, 2022). "But despite this briefing, Plaintiff's Amended Complaint failed to cure any of the deficiencies." DE 267 at 63–64 (Sept. 8, 2022) ("Op."). "Instead, Plaintiff added eighty new pages of largely irrelevant allegations that did nothing to salvage the legal sufficiency of his claims." Op. at 64. The Amended Complaint is "193 pages in length, with 819 numbered paragraphs," and "contains 14 counts, names 31 defendants, 10 'John Does' described as fictitious and unknown persons, and 10 'ABC Corporations' identified as fictitious and unknown entities." Op. at 4.

---

[2] In addition to challenging the sufficiency of Plaintiff's allegations to state substantive claims, three defendants—Charles Halliday Dolan, Jr., Rodney Joffe, and Orbis Business Intelligence, Ltd.—challenged the Court's exercise of personal jurisdiction over them.

## ARGUMENT

I.    **DEFENDANTS ARE ENTITLED TO COSTS AND FEES UNDER 28 U.S.C. § 1927 FOR MOVING TO DISMISS THE AMENDED COMPLAINT.**

Title 28, Section 1927 provides that any attorney who "multiplies court proceedings unreasonably and vexatiously" may be required by the court to satisfy personally the excess costs, expenses, and reasonable attorneys' fees imposed by their conduct. Sanctions under Section 1927 are warranted where an attorney "knowingly or recklessly pursue[s] a frivolous claim," or where their "conduct is so egregious that it is tantamount to bad faith." *Amlong & Amlong, P.A. v. Denny's Inc.*, 500 F.3d 1230, 1241–42 (11th Cir. 2007).

To impose sanctions under Section 1927, "three essential requirements" must be satisfied. "First, the attorney must engage in unreasonable and vexatious conduct." *Amlong*, 500 F.3d at 1239. "Second, that unreasonable and vexatious conduct must be conduct that multiplies the proceedings." *Id.* "Finally, the dollar amount of the sanction must bear a financial nexus to the excess proceedings, i.e., the sanction may not exceed the costs, expenses, and attorneys' fees reasonably incurred because of such conduct." *Id.*

Each requirement is satisfied here, and an award under Section 1927 is appropriate. An unpublished opinion of the Eleventh Circuit concluded that Section 1927 "only applies to unnecessary filings after the lawsuit has begun." *Macort v. Prem, Inc.*, 208 F. App'x 781, 786 (11th Cir. 2006). Thus, this Court should award costs and fees taxed against Plaintiff's counsel to compensate Defendants for responding to the Amended Complaint and bringing this motion.

**A.      Plaintiff's counsel engaged in unreasonable and vexatious conduct by pursuing and persisting with an untimely, factually unsupported, and legally unwarranted suit.**

Plaintiff's counsel engaged in unreasonable and vexatious conduct first by filing, and then by amending, a factually and legally defective suit.  An award of costs and fees under Section 1927 is appropriate when an attorney's conduct is so egregious that it is "tantamount to bad faith." *Amlong*, 500 F.3d at 1241–42.  "[F]or purposes of § 1927, bad faith turns not on the attorney's subjective intent, but on the attorney's objective conduct."  *Norelus v. Denny's, Inc.*, 628 F.3d 1270, 1284 (11th Cir. 2010).  "[O]bjectively reckless conduct is enough to warrant sanctions even if the attorney does not act knowingly and malevolently."  *Id.* (quoting *Amlong*, 500 F.3d at 1241). Under this standard, the Court "compare[s] the conduct at issue with how a reasonable attorney would have acted under the circumstances."  *Id.*

A reasonable attorney would never have filed this suit, let alone continued to prosecute it after multiple Defendants' motions to dismiss highlighted its fundamental and incurable defects. As this Court recognized in dismissing the Amended Complaint, "[a]t its core, the problem with Plaintiff's Amended Complaint is that Plaintiff is not attempting to seek redress for any legal harm; instead, he is seeking to flaunt a two-hundred-page political manifesto outlining his grievances against those that have opposed him, and this Court is not the appropriate forum."  Op. at 64.  "It is not simply that" the Amended Complaint "is 'inadequate in any respect'; it is inadequate in nearly *every* respect."  *Id.* at 63 (emphasis in original).

1.  For one, as this Court held, "the claims presented in the Amended Complaint are not warranted under existing law.  In fact, they are foreclosed by existing precedent, including decisions of the Supreme Court."  Op. at 4.  This is not a case where counsel presented a good-faith argument for the expansion of existing precedent.  Instead, they recklessly advanced claims that "clearly contravene binding case law," *id.*, which the most basic legal research would have

revealed.  Moreover, even after Defendants' motions to dismiss identified the many deficiencies in the Complaint, Plaintiff's counsel persisted in pursuing these defective allegations by filing an Amended Complaint that repeated the same errors, and an Opposition defending it.

In the preface to its dismissal on the merits, the Court identified two examples of how Plaintiff's claims are clearly foreclosed by governing law, and noted "[t]here are many others." Op. at 4.  These include that Plaintiff's theory of personal jurisdiction, based on the allegation that certain Defendants "knew that Florida is a state in the United States which was an important one," contravenes the Supreme Court's binding "effects" test in *Calder v. Jones*, 465 U.S. 783, 789 (1984).  *Cf.* Op. at 19–20.  Plaintiff's argument that his claims did not accrue until he incurred the majority of his damages contravenes the Supreme Court's binding decision in *Wallace v. Kato* that a "cause of action accrues even though the full extent of the injury is not then known or predictable."  549 U.S. 384, 391 (2007); Op. at 30.  Plaintiff's argument that Defendants impeded an "official proceeding" contravenes the statutory definition, which limits the term to federal judicial cases or proceedings before Congress or a federal agency.  18 U.S.C. § 1515(a); Op. at 32. "[M]any of the statements that Plaintiff characterizes as injurious falsehoods qualify as speech plainly protected by the First Amendment."  Op. at 49.  Plaintiff's Computer Fraud and Abuse Act theory "is squarely foreclosed by *Van Buren*."  Op. at 55.  And Plaintiff's seven counts for "Agency" or "Respondeat Superior" are foreclosed by binding Florida precedent holding that neither are independent causes of action.  Op. at 62.  The list goes on.

2. Even had Plaintiff's counsel not recognized the deficiencies in their legal theories *before* filing the Complaint—which would itself be unreasonable, and a violation of their duties to investigate the legal bases for their claims—"[t]he fatal flaws in Plaintiff's case should have been apparent at least from the date on which Defendants filed their motion to dismiss."  *Celsius*

*Holdings, Inc. v. A SHOC Beverage, LLC*, No. 21-80740-CV, 2022 WL 3568042, at *3 (S.D. Fla. July 19, 2022) (Middlebrooks, J.) (awarding fees under Section 1927).   Upon receiving Defendants' initial motions to dismiss, a reasonable attorney would have determined whether there was any way to cure the legal deficiencies and, finding none, withdrawn the suit.

That, at great cost to the Court and Defendants, is not what happened here.   Plaintiff's counsel clung to the deficient allegations and theories in the Amended Complaint, even as to points upon which no reasonable attorneys could disagree.   Indeed, the Amended Complaint not only failed to fix the deficiencies identified by the first round of motions to dismiss, but also compounded the problem by adding additional irrelevant and frivolous allegations.   And Plaintiff's counsel also compounded their unreasonable approach in their Opposition to Defendants' renewed motions to dismiss the Amended Complaint, where Plaintiff's counsel failed to reasonably and forthrightly address Defendants' factual and legal arguments and failed to acknowledge binding precedent on point and either explain why it did not apply or argue for its expansion.

Moreover, the Opposition was replete with misleading citations to the case law it *did* discuss.   *See* Op. at 27 ("*Clinton v. Jones* . . . arrived at the opposite conclusion than that which Plaintiff urges."); *id.* at 32 ("Plaintiff cites *United States v. Grubb* as supporting the contrary position . . . .   But that case doesn't say so, and it actually hurts Plaintiff's position."); *id.* at 54 n.20 ("Plaintiff puzzlingly cites to *Sewell* with respect to his statute of limitations argument for the SCA, despite that *Sewell* contradicts his argument with respect to his CFAA claim.").

3. The Complaint, Amended Complaint, and Opposition are also replete with misleading citations of fact.   These, too, render Plaintiff's counsel's conduct objectively unreasonable.   "Attorneys are charged with knowing more about their case, about their client's various stories, about the contradictions in their client's testimony, and about the testimony of all the potential

witnesses than a busy district court judge with a heavy docket can be expected to know." *Norelus*, 628 F.3d at 1287.  As such, they may not "relentlessly" pursue claims while "blind[ing] themselves to as much of the contradictory evidence as they could," nor "stubbornly ignore[]" the gaps in their factual theories.  *Id.* at 1283.  Sanctions are appropriate where counsel either fails to make a reasonable inquiry into the facts on which the claim is based, or where materials incorporated by reference flatly contradict plaintiff's factual assertions.  *See Celsius*, 2022 WL 3568042, at *3 (granting sanctions); *Worldwide Primates, Inc. v. McGreal*, 87 F.3d 1252, 1254 (11th Cir. 1996) (affirming sanctions); *see also Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998) (same).

Here, Plaintiff "annotated the Amended Complaint with 293 footnotes containing references to various public reports and findings."  Op. at 5.  "[I]f a party chooses to include such references, it is expected that they be presented in good faith and with evidentiary support. Unfortunately, that is not the case here." *Id.*  As the Court observed, Plaintiff's counsel selectively cited portions of the sources they invoked, or ignored their conclusions outright.  For example, they "misrepresent[ed]" and "misconstrue[d]" the Inspector General Report regarding Crossfire Hurricane.  Op. at 6, 51.  Similarly, they falsely asserted that "Special Counsel Mueller went on to exonerate Donald J. Trump and his campaign with his finding that there was no evidence of collusion with Russia."  DE 177 (Am. Compl.) ¶ 7; *cf.* Op. at 52.  Despite the fact that Defendants pointed out these inaccurate assertions in their initial motions to dismiss, counsel reiterated them in the Amended Complaint—and added new and additional misleading statements.  For example, although Plaintiff's counsel repeatedly cited unproven allegations from Special Counsel Durham's indictment of Michael Sussmann, they omitted that Sussmann was acquitted or that many of those allegations were never the subject of an offer of proof at trial.  Op. at 32 n.9.

Plaintiff's Opposition reiterated many of these misleading factual claims, despite the fact that Defendants pointed out that they were unwarranted interpretations of the cited materials.  *See, e.g.*, Trump Opp'n at 16 (alleging that Defendants were "ultimately successful in . . . provoking the commencement of the FBI's Crossfire Hurricane investigation, and by extension, the Mueller Investigation"); *id.* at 51 (asserting that "[i]n the Mueller Report, Special Counsel Mueller found that there was no evidence that either Plaintiff or his campaign colluded with the Russian Government to undermine the 2016 presidential election.").[3]

4.   In addition to Plaintiff's misleading citations to public documents, counsel also unreasonably larded the Complaint, Amended Complaint, and Opposition with outright false, unsupported, and inflammatory assertions.  As this Court already noted, "[m]any of the Amended Complaint's characterizations of events are implausible because they lack any specific allegations which might provide factual support for the conclusions reached."  Op. at 5.  "What the Amended Complaint lacks in substance and legal support it seeks to substitute with length, hyperbole, and the settling of scores and grievances."  Op. at 6.

For example, as part of his damages claim, Plaintiff alleged that "[t]he different [business] opportunities which evaporated are too many to list, but as an example, Donald J. Trump has been banned from different social media platforms, including Twitter."   Am. Compl. 524 n.277.  According to the Amended Complaint, "[m]ost of this was due to the misinformation campaign waged by Hillary Clinton, whereby truth was deemed false and lies were deemed to be truth."  *Id.* Setting aside counsel's failure to allege *any* concrete business harm—contrary to the requirements of *Twombly*, *Iqbal*, RICO, and Federal Rule of Civil Procedure 9(g) regarding special damages—

---

[3] After citing extensively from the Sussmann indictment, Plaintiff does admit, in a footnote in his Opposition, that Sussmann was acquitted.  Trump Opp'n 12 n.5.  This makes the omission of that fact from the Amended Complaint all the more striking.

this assertion is demonstrably false. Plaintiff was permanently suspended from Twitter not in connection with anything Clinton did, nor with any alleged Russia connection, but because Twitter concluded Plaintiff violated its ban of "Glorification of Violence" after the riot at the U.S. Capitol on January 6, 2021. *See* Twitter, *Permanent suspension of @realDonaldTrump* (8 Jan. 2021), https://blog.twitter.com/en_us/topics/company/2020/suspension.

5. In addition to the lack of legal merit to the substantive claims, sanctions are warranted because—absent a viable RICO claim—there was no legal basis to argue for personal jurisdiction over certain defendants. As this Court recognized, "Plaintiff has not alleged that Defendants 'aimed' any conduct at Florida" and indeed, Plaintiff "was a resident of New York at the time of the occurrences giving rise to Plaintiff's claims." Op. at 20. Plaintiff's argument cannot be reconciled with governing law. And courts routinely impose sanctions where, as here, the plaintiff "continu[es] pressing [a] frivolous assertion of jurisdiction" without a good faith basis to do so. *Jones v. Campbell Univ.*, 322 F. Supp. 3d 106, 109 (D.D.C. 2018); *see also O'Rourke v. Dominion Voting Sys. Inc.*, No. 20-CV-03747-NRN, 2021 WL 3400671 (D. Colo. Aug. 3, 2021) (same).

6. Finally, the form of the Complaint and Amended Complaint are as defective as their substance. Both the original and amended complaints are "quintessential shotgun pleadings" of the type the Eleventh Circuit has consistently rejected. Op. at 7. "Besides violating the rules, shotgun pleadings also 'waste scarce judicial resources . . . and undermine the public's respect for the courts.'" *Barmapov v. Amuial*, 986 F.3d 1321, 1324 (11th Cir. 2021).

As particularly relevant here, shotgun pleadings shift the burden of untangling a plaintiff's allegations and legal theories onto the defendants and the Court. As a result of the prolix Complaint and Amended Complaint, Defendants have *twice* been forced to comb through the complaints to try to parse what Plaintiff was attempting to plead and to ensure that each allegation

was adequately addressed in their motions to the Court.  Here, too, Plaintiff's decision to ignore the issues raised in the first round of motion to dismiss briefing is particularly unreasonable, because it required Defendants to bear the costs of beginning the whole process anew.

Plaintiff's shotgun pleadings have also required this Court to devote significant time and attention to resolving this case—as evidenced by the Court's lengthy opinion.  Indeed, in addition to causing "undue expense" to Defendants, shotgun complaints like these "lessen the time and resources the court has available to reach and dispose of the cases and litigants waiting to be heard." *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 982 (11th Cir. 2008).  By putting the Court to the burden of piecing together allegations and scrutinizing the chaos for cognizable claims, "[s]hotgun pleadings . . . exact an intolerable toll on the trial court's docket . . . and impose unwarranted expense on the litigants, the court and the court's parajudicial personnel and resources." *Cramer v. State of Fla.*, 117 F.3d 1258, 1263 (11th Cir. 1997).

### B.   Plaintiff's counsel unreasonably and vexatiously multiplied the proceedings by their conduct.

This Complaint should never have been filed—and certainly, after the initial round of motions to dismiss, Plaintiff was on notice that his claims were deficient in several fundamental and independent respects.  Plaintiff nevertheless filed a shotgun Amended Complaint that repeated the same deficiencies at greater length—necessitating a second round of motion briefing—and then opposed the motion to dismiss in a prolix Opposition that wrongly contended the Amended Complaint stated a viable claim, while repeating the same factual misrepresentations and unfounded legal theories.  This conduct required Defendants, and this Court, to expend additional and unnecessary time and resources in untangling and responding to Plaintiff's allegations.

**C.** **This Court should award costs and fees associated with moving to dismiss the Amended Complaint and moving for sanctions.**

The award of costs and fees under Section 1927 cannot exceed those incurred as a result of counsel's vexatious conduct due to "unnecessary filings after the lawsuit has begun." *Macort*, 208 F. App'x at 786. Thus, although the Court's inherent powers as well as the DTSA can authorize sanctions as to the filing of the initial Complaint, Section 1927 cannot. *Id.*

In light of this, this Court should enter an order awarding Defendants their attorneys' fees and costs incurred in responding to the Amended Complaint, as well as the costs and fees associated with seeking the instant sanctions, to be paid by Plaintiff's counsel. "Because the costs arising from the sanctions proceedings were 'occasioned by the objectionable conduct,' a district court may include costs arising from the sanctions proceedings in the sanctions award." *Norelus*, 628 F.3d at 1298. The appropriate measure of fees and costs is described below and in Appendix A. *See infra*, pp. 19–20 & App'x A.

## II.   THE COURT SHOULD IMPOSE SANCTIONS UNDER ITS INHERENT AUTHORITY.

Because of the particularly vexatious and frivolous nature of the Complaint and Amended Complaint in this case, the Court should use its inherent authority to go beyond Section 1927, and impose sanctions on Plaintiff himself for the filing of both the original and amended Complaints. Under its inherent authority, the Court may order Plaintiff to pay Defendants' costs and fees associated with the defense of the entire action, which would not have been incurred absent Plaintiff's bad-faith pursuit of these frivolous claims.

In *Chambers v. NASCO*, 501 U.S. 32, 43–45 (1991), the Supreme Court stated that "tampering with the administration of justice . . . involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public." *Id.* Thus, the Supreme Court acknowledged that district courts have the inherent powers to assess sanctions,

without an explicit grant of statutory authority against both parties and their attorneys.  *Id.* at 46.
A court may exercise this power "to sanction the willful disobedience of a court order, and to sanction a party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017).

In the Eleventh Circuit, the "key to unlocking a court's inherent power is a finding of bad faith." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998).  "[I]n the absence of direct evidence of subjective bad faith, this standard can be met if an attorney's conduct is so egregious that it could only be committed in bad faith." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1224–25 (11th Cir. 2017).  "[R]ecklessness plus a frivolous argument suffice" to make this showing. *Id.* at 1225.  In addition, "a finding of bad faith 'does not require that the legal and factual basis for the action prove totally frivolous; where a litigant is substantially motivated by vindictiveness, obduracy, or mala fides, the assertion of a colorable claim will not bar the assessment of attorney's fees.'" *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1108 (9th Cir. 2002).

Here, the same conduct described above supports a finding not only of recklessness, but of subjective bad faith. *See supra*, pp. 5–11.  "A finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent." *In re Evergreen Sec., Ltd.*, 570 F.3d 1257, 1273 (11th Cir. 2009).  "If particularly egregious, the pursuit of a claim without reasonable inquiry into the underlying facts can be the basis for a finding of bad faith." *Id.*

1. The totality of the problems with the Complaint, Amended Complaint, and Opposition are so significant that this Court can infer the suit was filed and prosecuted in bad faith.  Indeed, the Court has already noted "serious doubts" as to whether this case was brought for a proper purpose, was warranted under existing law, and had evidentiary support. *See* Op. at 6–7.

2.   Particularly important here is the evidence that this case was brought for an improper purpose:  namely, "'as a fundraising tool, a press release, or a list of political grievances.'"  Op. at 3.  "At its core, the problem with Plaintiff's Amended Complaint is that Plaintiff is not attempting to seek redress for any legal harm; instead, he is seeking to flaunt a two-hundred-page political manifesto outlining his grievances against those that have opposed him, and this Court is not the appropriate forum."  Op. at 64.

Counsel's own statements make clear that this suit was filed as a political tool and in order to fight back at Plaintiff's perceived political enemies.  After the initial Complaint, counsel for Plaintiff went on a media tour to discuss the suit.  According to video clips hosted on her own firm's website, Alina Habba stated to Newsmax:  "What the real goal [of the suit] is, is democracy.  Is continuing to make sure that our elections, continuing to make sure our justice system is not obstructed by political enemies.  That cannot happen.  And that's exactly what happened.  They obstructed justice, they continued the false narrative. . . .  This grand scheme, that you literally could not make up, to take down an opponent.  That is un-American."[4]  To Fox News's Sean Hannity, she explained:  "You can't make this up.  You literally cannot make a story like this up. . . .  And President Trump is just not going to take it anymore.  If you are going to make up lies, if you are going to try to take him down, he is going to fight you back.  And that is what this is, this is the beginning of all that."[5]  In both clips, counsel emphasizes the same misleading statements present in the Complaint, Amended Complaint, and Opposition, suggesting that the

_____

[4]  Video at 0:35–1:21, *Trump Suing Hillary Clinton Over Russia Hoax*, Habba Madaio & Associates LLP – News (March 31, 2022), https://habbalaw.com/news/trump-suing-hillary-clinton-over-russia-hoax/.

[5]  Video at 1:55–2:13, *Trump Sues Clinton, Steele for 'False Narrative' About Russia Collusion*, Habba Madaio & Associates LLP – News (March 25, 2022), https://habbalaw.com/news/trump-sues-clinton-steele-for-false-narrative-about-russian-collusion/.

claims are factually supported by Robert Mueller's investigation, the Inspector General's Report, and the Durham investigation.

Counsel continued her comments after this Court dismissed the suit. In a September 10, 2022 interview with Sean Hannity, the host asked her "Why isn't [Hillary Clinton] being held accountable for what she did?" Counsel's response is illuminating for its reiteration, after extensive briefing, of the many misrepresentations on which the suit was based: [6]

> ALINA HABBA, ATTORNEY FOR FORMER PRESIDENT DONALD TRUMP:
> Because when you have a Clinton judge as we did here, Judge Middlebrooks who I had asked to recuse himself but insisted that he didn't need to, he was going to be impartial, and then he proceeds to write a 65-page scathing order where he basically ignored every factual basis which was backed up by indictments, by investigations, the Mueller report, et cetera, et cetera, et cetera, not to mention Durham, and all the testimony we heard there, we get dismissed. Not only do we get dismissed, he says that this is not the proper place for recourse for Donald Trump. He has no legal ramifications. Where what is the proper place for him? Because the FBI won't help when you can do anything, obstruct justice, blatantly lie to the FBI, Sussmann's out, he gets acquitted, where do you go? That's the concern for me. Where do you get that -- that recourse?[7]

She also indicated that, while Plaintiff himself doubted whether the suit would succeed, she nevertheless "fought" to pursue it:

> HABBA: You know, I have to share with you a story, Sean, that I have not shared with anybody. The recourse that I have at this point is obviously to appeal this to the 11th Circuit as Gregg said. But when I brought this case and we were assigned, you know, this judge and we went through the recusal process, we lost five magistrates, including Rinehart [sic] who's dealing with the boxes as we know. The former president looked at me and he told me, you know what, Alina. You're not going to win. You can't win, just get rid of it, don't do the case. And I said, no, we have to fight. It's not right what happened. And you know, he was right, and it's a sad day for me personally because I fought him on and I should have listened, but I don't want to lose hope in our system. I don't. So, you know, I'm

---

[6] Although the Court need not find subjective bad faith on the part of counsel to impose sanctions under Section 1927, *supra*, p. 5, the evidence of bad faith here may aid in the determination of whether counsel was *objectively* reckless. Counsel's subjective state of mind is therefore "relevant" "to some extent" under Section 1927, because "conduct is more likely to be 'unreasonable and vexatious' if it is done with a malicious purpose." *Norelus*, 628 F.3d at 1284.

[7] *See* Exhibit 1 at 12–13 ("Biden Again Slams Republicans," Transcript from FOX: Hannity, Sept. 10, 2022).

deciding whether we're going to appeal it.  But I got to tell you, Sean, it's hard when you're looking at what's happening in these in this justice system.[8]

3.  The record reflects further evidence of bad faith based on unfair conduct "calculated to gain a tactical advantage and protect its interest in the instant litigation."  *Sciaretta v. Lincoln Nat'l Life Ins. Co.*, No. 9:11-CV-80427-DMM, 2013 WL 11317858, at *8 (S.D. Fla. May 6, 2013) (Middlebrooks, J.), *aff'd*, 778 F.3d 1205 (11th Cir. 2015).  Some of Plaintiff's strategies in prosecuting this case appear to involve this form of gamesmanship.

For example, early in this suit, Plaintiff frivolously moved to disqualify the Court for supposed bias.  When a recusal motion is frivolous, and without support in existing law or fact, it can support a finding of bad faith.  *See In re Evergreen Sec., Ltd.*, 570 F.3d 1257, 1273–77 (11th Cir. 2009) (finding bad faith in connection with frivolous recusal motion); *Bettis v. Toys R Us*, 646 F. Supp. 2d 1273, 1332–41 (S.D. Fla. 2009) (same).  Plaintiff's counsel also unreasonably multiplied proceedings by moving this Court to enter a scheduling order and postpone the trial date while the motions to dismiss were pending—despite having previously agreed during a status conference to postpone discovery and the scheduling order pending resolution of the motions.  Plaintiff's vexatious motion necessitated a meet and confer call with 41 attorneys.  DE 233, at 2.

Under its inherent power, this Court has substantial flexibility to craft an appropriate remedy against a party and its attorneys.  The amount of any monetary sanctions based on attorneys' fees must be reasonable.  But where a plaintiff initiates a case in bad faith, so that every cost of defense is attributable only to sanctioned behavior, the court may reasonably award *all* costs and fees incurred in defending the action.  *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101 (2017); *see also Barash v. Kates*, 585 F. Supp. 2d 1368, 1374 (S.D. Fla. 2008).  These costs

---

[8] *Id.* at 13.

and fees may be taxed against client, attorney, or both. *Dude v. Cong. Plaza, LLC*, No. 17-80522-CIV, 2018 WL 3432714, at *5 (S.D. Fla. July 16, 2018).

Under its inherent authority, this Court should enter an order awarding sanctions, to be paid by Plaintiff himself, for the Defendants' full measure of attorneys' fees and costs incurred in defending this action from its inception through its dismissal, and to the conclusion of these sanctions proceedings. At the very least, Defendants are entitled to fees and costs from the Amended Complaint onward, at which point Plaintiff and his counsel were indisputably on notice of the myriad deficiencies in their claims. The appropriate measure of fees and costs is described below and in Appendix A. *See infra*, pp. 19–20 & App'x A.

## III. THE COURT SHOULD IMPOSE SANCTIONS UNDER THE DEFEND TRADE SECRETS ACT.

Here, one of Plaintiff's claims for relief was for the supposed theft of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. §§ 1830–32, in Count VIII against Defendants Neustar Inc., Neustar Security Services, Joffe, DNC, Clinton Campaign, Hillary Clinton, Perkins Coie and Sussmann (hereinafter "DTSA Defendants"). Under that statute, "if a claim of . . . misappropriation [of a trade secret] is made in bad faith, which may be established by circumstantial evidence, . . . [a court may] award reasonable attorney's fees to the prevailing party." 18 U.S.C. § 1836(b)(3)(D).

"Although the Eleventh Circuit has [also] not addressed what constitutes 'bad faith' for purposes of the DTSA, there is ample precedent as to what constitutes 'bad faith' warranting the award of attorneys' fees." *Temurian v. Piccolo*, No. 18-CV-62737, 2021 WL 1520588, at *5 (S.D. Fla. Mar. 3, 2021), *report and recommendation adopted in part*, No. 18-62737-CIV, 2021 WL

1121003 (S.D. Fla. Mar. 24, 2021).[9]  "In determining the propriety of a bad faith fee award, 'the inquiry will focus primarily on the conduct and motive of a party, rather than on the validity of the case.'"  *Temurian*, 2021 WL 1121003, at *6 (quoting *Mar. Mgmt., Inc. v. United States*, 242 F.3d 1326, 1333 (11th Cir. 2001)).  "For there to be a finding of bad faith, a plaintiff's conduct must be objectively specious or frivolous and there must be evidence of subjective misconduct."  *Id.*

"A prevailing party can establish that the claim against it was objectively specious by demonstrating 'that there was no misappropriation or threatened misappropriation or that the opposing party could not have suffered any economic harm.'"  *Johnson Matthey Process Techs., Inc. v. G.W. Aru LLC*, No. CV420-322, 2022 WL 987945, at *3 (S.D. Ga. Mar. 31, 2022) (citation omitted).  "Objective speciousness exists where 'there is a complete lack of evidence as to every element of a misappropriation of trade secrets claim.'"  *Id.* (citation omitted).  In sum, "[w]hile feelings may provide a reason to investigate a claim, they do not provide a good faith basis for filing an action."  *TransPerfect Glob., Inc. v. Lionbridge Techs., Inc.*, No. 19CV3283 (DLC), 2022 WL 2119344, at *2 (S.D.N.Y. May 31, 2022).

Plainly, DTSA Defendants are "prevailing part[ies]" here.  And for the reasons explained in their motions to dismiss the Amended Complaint, Plaintiff failed to allege every single element of his trade secret claim.  *See* DE 226 at 9–11.  Most fundamentally, as this Court found, he failed even to allege the existence of a trade secret.  Op. at 33–37.

"[S]ubjective misconduct is found to exist 'where a plaintiff knows or is reckless in not knowing that its claim for trade secret misappropriation has no merit,' and may be proven by direct evidence of actual knowledge or may be inferred from the speciousness of plaintiff's trade secret

---

[9] *Temurian* and other authorities cited declined to award the full measure of requested fees and costs, but there is only a small body of precedent regarding sanctions under the DTSA, which was enacted in 2016.  *See Temurian*, 2021 WL 1121003 (declining to award fees under the DTSA "because of Plaintiffs' inability to properly plead their claim").

claim and its conduct during litigation." *Temurian*, 2021 WL 1520588, at *5; *see also Greenberg Farrow Architecture, Inc. v. Perkins Eastman Architects, P.C.*, 1:12-CV-1435, 2014 WL 12694260, at *6 (N.D. Ga. July 2, 2014). For the reasons above, the Court can also conclude that Plaintiff acted in bad faith in bringing and prosecuting this suit. *See supra*, pp. 5–11, 13–16. Indeed, Plaintiff was amply warned of the deficiencies with his DTSA claim in DTSA Defendants' initial motions to dismiss, but nevertheless renewed the same claim in the Amended Complaint.

Under the DTSA, this Court should enter an order awarding sanctions, to be paid by Plaintiff himself, for the DTSA Defendants' full measure of attorneys' fees and costs incurred in defending this action from its inception through its dismissal, and to the conclusion of these sanctions proceedings. At the very least, the DTSA Defendants are entitled to fees from the Amended Complaint onward, at which point Plaintiff and his counsel were indisputably on notice of the myriad deficiencies in their claims. The appropriate measure of fees and costs is described below and in Appendix A. *See infra*, pp. 19–20 & App'x A.

## IV. DEFENDANTS' ATTORNEYS' FEES WERE REASONABLE.

Whether under Section 1927, its inherent authority, the Defend Trade Secrets Act, or another source of authority, this Court may impose an award of fees and costs. Depending on the Court's source of authority, it may tax these sanctions against Plaintiff and/or his attorneys.

"The starting point for determining the amount of a 'reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.'" *Celsius Holdings*, 2022 WL 3568042, at *4 (quoting *Bivins v. Wrap It Up Inc.*, 548 F.3d 1348, 1350 (11th Cir. 2008)). "That 'lodestar' may be adjusted after considering other factors." *Id.* "Under this method, the Court must determine whether the fee applicant has satisfied the burden of establishing that the requested hourly rate is reasonable." *Id.* In determining the prevailing market rates, the Court

should consider several factors, including "the attorneys' customary fee, the skill required to perform the legal services, [and] the attorneys' experience, reputation and ability." *Mallory v. Harkness*, 923 F. Supp. 1546, 1555 (S.D. Fla. 1996), *aff'd*, 109 F.3d 771 (11th Cir. 1997). "Evidence of rates may be adduced through direct evidence of charges by lawyers under similar circumstances or by opinion evidence." *Celsius Holdings*, 2022 WL 3568042, at *4. Furthermore, the Court may make a fee award based on its own experience. *Norman v. Housing Auth. of City of Montgomery*, 836 F.2d 1292, 1303 (11th Cir. 1988).

Mindful that the Court might structure the fee award differently depending on the source of sanctions authority and its findings about the appropriateness of sanctions, Defendants identify in Appendix A the attorneys' fees incurred by each Defendant that correspond to three phases of the case: (1) the period from the filing of the initial Complaint to the filing of Defendants' initial motions to dismiss; (2) the period after the filing of Defendants' initial motions to dismiss to the Court's dismissal of the Amended Complaint; and (3) the period related to this sanctions motion. Each request for fees is supported by further facts set forth in the declarations identified in Appendix A. Some Defendants have also sought certain costs incurred; those costs are identified in Appendix A and supported by the referenced declarations.

Defendants served this request for fees on Plaintiff consistent with Local Rule 7.3, but were unable to resolve the issues here despite meeting and conferring in good faith by video twice, on October 13 and October 26, 2022. A certification of compliance and verification is included after Appendix A.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court impose sanctions against Plaintiff and his counsel for attorneys' fees, costs, and other relief the Court finds just.

Dated:  October 31, 2022                                Respectfully submitted,


/s/ David Oscar Markus                          /s/ David E. Kendall
David Oscar Markus                              David E. Kendall (pro hac vice)
MARKUS/MOSS PLLC                                Katherine M. Turner (pro hac vice)
40 NW 3rd Street, PH 1                          Michael J. Mestitz (pro hac vice)
Miami, FL 33128                                 WILLIAMS & CONNOLLY LLP
Tel:  (305) 379-6667                            680 Maine Avenue, S.W.
                                                Washington, DC 20024
                                                Tel:  (202) 434-5000
                                                Fax:  (202) 434-5029
                                                dkendall@wc.com

*Attorneys for Defendant Hillary Rodham Clinton*


/s/ Robert P. Trout
Robert P. Trout (pro hac vice)
Paola Pinto (Florida Bar Number 1013933)
SCHERTLER ONORATO MEAD & SEARS
555 13th Street, N.W.
Suite 500 West
Washington, D.C. 20004
Phone:  (202) 628-4155
rtrout@schertlerlaw.com
ppinto@schertlerlaw.com

*Attorneys for Defendants HFACC, Inc. and John Podesta*


/s/ Gerald Edward Greenberg                     /s/ Roberta A. Kaplan
Gerald Edward Greenberg                         Roberta A. Kaplan (pro hac vice)
GELBER SCHACHTER & GREENBERG PA                 Shawn G. Crowley (pro hac vice)
One Southeast Third Avenue                       Maximillian L. Feldman (pro hac vice)
Suite 2600                                      KAPLAN HECKER & FINK LLP
Miami, FL 33131-1715                            350 Fifth Avenue, 63rd Floor
(305) 728-0950                                  New York, NY 10118
ggreenberg@gsgpa.com                            212.763.0883
                                                rkaplan@kaplanhecker.com
                                                scrowley@kaplanhecker.com
                                                mfeldman@kaplanhecker.com


*Attorneys for Defendants Democratic National Committee, DNC Services Corporation, and
Debbie Wasserman Schultz*

21

/s/ Jonathan Edward Levine
Jonathan Edward Levine (FBN 937711)
Levine & Associates, PLLC
5311 Lee Highway
Arlington, VA 22207
Tel. (703) 525-2669

/s/ George R.A. Doumar
George R.A. Doumar (pro hac vice)
Mahdavi, Bacon, Halfhill & Young PLLC
11350 Random Hills Road, Suite 700
Fairfax, VA 22030
Tel. (703) 352-1300

*Attorneys for Charles Halliday Dolan, Jr.*

/s/ Andrew J. Ceresney
DEBEVOISE & PLIMPTON LLP
Andrew J. Ceresney (pro hac vice)
Wendy B. Reilly (pro hac vice)
Isabela M. Garcez (pro hac vice)
919 Third Avenue
New York, NY 10022
Tel:  (212) 909-6000
aceresney@debevoise.com
wbreilly@debevoise.com
imgarcez@debevoise.com

/s/ William R. Barzee
William R. Barzee (Florida Bar No. 158720)
BARZEE FLORES
Courthouse Center, Penthouse One
40 NW Third Street
Miami, FL 33128
Tel:  (305) 374–3998
williambarzee@barzeeflores.com

*Attorneys for Defendant Robert E. Mook*

/s/ Adam S. Fels
Adam S. Fels
FRIDMAN FELS & SOTO PLLC
2525 Ponce de Leon Blvd., Suite 750
Coral Gables, FL 33134
Tel:  305-569-7701
afels@ffslawfirm.com

/s/ Joshua A. Levy
Joshua A. Levy (pro hac vice)
Rachel Clattenburg (pro hac vice)
Kevin P. Crenny (pro hac vice)
LEVY FIRESTONE MUSE LLP
900 17th St. NW, Suite 1200
Washington, D.C. 20006
Tel:  202-845-3215
Fax:  202-595-8253
jal@levyfirestone.com
rmc@levyfirestone.com
kcrenny@levyfirestone.com

*Attorneys for Defendants Fusion GPS, Peter Fritsch, and Glenn Simpson*

/s/ Joshua Berman
Joshua Berman
CLIFFORD CHANCE US LLP
2011 K Street, NW
Washington, D.C.  20006
Tel. (202) 912-5000
Fax (202) 912-6000
Joshua.Berman@CliffordChance.com

/s/ Adam Fels
Adam Fels (Florida Bar No. 0114917)
FRIDMAN FELS & SOTO, PLLC
2525 Ponce de Leon Blvd., Suite 750
Coral Gables, FL  33134
Tel. (305) 569-7701
Afels@ffslawfirm.com

/s/ Benjamin Peacock
Benjamin Peacock

CLIFFORD CHANCE US LLP
New York, New York 10019
Tel. (212) 878-8000
Fax (212) 878-8375
Benjamin.Peacock@CliffordChance.com

*Attorneys for Bruce Ohr and Nellie Ohr*


/s/ Franklin Monsour Jr.
Franklin Monsour Jr. (pro hac vice)
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
Tel:  (212) 506-3512
Fax:  (212) 506-5151
fmonsour@orrick.com

/s/ Diana Marie Fassbender
Diana Marie Fassbender (Fla Bar ID #17095)
ORRICK, HERRINGTON & SUTCLIFFE LLP
1152 15th Street N.W.
Washington, DC  20005-1706
Tel:  (202) 339-88533
Fax:  (202) 339-8500
dszego@orrick.com

*Attorneys for Igor Danchenko*


/s/ Samantha L. Southall
Samantha L. Southall (pro hac vice)
Pennsylvania Bar No. 80709
BUCHANAN INGERSOLL & ROONEY PC
50 S. 16th Street, Suite 3200
Philadelphia, PA 19102
Tel:  (215) 665 8700
Fax (215) 667 8760
samantha.southall@bipc.com

/s/ Jennifer Olmedo Rodriguez
Jennifer Olmedo Rodriguez (Florida Bar No. 605158)
BUCHANAN INGERSOLL & ROONEY PC
2 South Biscayne Blvd., Suite 1500
Miami, Florida 33131
Tel:  (305) 347 4080
Fax:  (305) 347 4089
jennifer.olmedo-rodriguez@bipc.com

*Attorneys for Defendant Neustar, Inc.*


/s/ John M. McNichols
John M. McNichols (pro hac vice)
Allison S. Eisen (pro hac vice)
Kathryn E. Garza (pro hac vice)
WILLIAMS & CONNOLLY LLP
680 Maine Ave, S.W.
Washington, D.C. 20024
Telephone:  (202) 434-5000
Fax:  (202) 434-5029
jmcnichols@wc.com

/s/ James E. Gillenwater
James E. Gillenwater (Bar No. 1013518)
GREENBERG TRAURIG P.A.
333 SE 2nd Ave., Suite 4400
Miami, FL 33131
Telephone:  (305) 579-0500
Fax:  (305) 579-0717
gillenwaterj@gtlaw.com

*Attorneys for Neustar Security Services*


/s/ Edward Soto
Edward Soto (FBN 0265144)
WEIL GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200

/s/ Steven A. Tyrrell
Steven A. Tyrrell (pro hac vice)
WEIL GOTSHAL & MANGES LLP
2001 M Street, N.W., Suite 600

Miami, FL 33131
Telephone:  (305) 577-3100
Facsimile:  (305) 374-7159

Washington, D.C. 20036
Telephone:  (202) 682-7000
Facsimile:  (202) 857-0940

*Attorneys for Rodney Joffe*

/s/ Enjoliqué A. Lett
Enjoliqué A. Lett (FBN 0104881)
GREENBERG TRAURIG P.A.
333 S.E. 2nd Ave., Suite 4400
Miami, FL 33131
Telephone: (305) 579-0500
Fax: (305) 579-0717
enjolique.lett@gtlaw.com

/s/ Akiesha G. Sainvil
Akiesha G. Sainvil (FBN 1003260)
GREENBERG TRAURIG P.A.
333 S.E. 2nd Ave., Suite 4400
Miami, FL 33131
Telephone: (305) 579-0500
Fax: (305) 579-0717
akiesha.sainvil@gtlaw.com

*Attorneys for Orbis Business Intelligence Ltd.*

**Appendix A – Fee Requests and Supporting Evidence**

| Defendant(s) | Fees sought to be recovered from Complaint to initial MTD | Fees sought to be recovered from initial MTD to dismissal | Fees sought to be recovered to date on the sanctions motion | Costs sought to be recovered | Supporting declaration |
|---|---|---|---|---|---|
| Hillary Clinton | $44,975 | $99,725 | $27,515 | $4,197.31 | Ex. 2 (Kendall Decl.) |
| HFACC and John Podesta | $2,343 | $13,406 | $4,600 | $0 | Ex. 3 (Trout Decl.) |
| DNC, DNC Services Corporation, and Debbie Wasserman Schultz | $137,412.50 | $32,780 | $15,632.50 | $2,176.69 | Ex. 4 (Crowley Decl.) |
| Robert Mook | $36,312.50 | $24,192.50 | $9,105 | $597.08 | Ex. 5 (Reilly Decl.) |
| Fusion GPS, Peter Fritsch, and Glenn Simpson | $31,550 | $18,690 | $5,580 | $0 | Ex. 6 (Levy Decl.) |
| Bruce and Nellie Ohr | $25,760 | $26,820 | $6,330 | $400 | Ex. 7 (Berman Decl.) |
| Igor Danchenko | $5,600 | $10,220 | $1,540 | $6,389 | Ex. 8 (Monsour Decl.) |
| Neustar Inc. | $67,944.50 | $57,569 | $8,630 | $0 | Ex. 9 (Southall Decl.) |
| Neustar Security Services | $0 | $50,950 | $2,620 | $327.98 | Ex. 10 (McNichols Decl.) |
| Rodney Joffe | $81,734.85 | $118,568.90 | $25,434.90 | $604.33 | Ex. 11 (Tyrrell Decl.) |
| Orbis Business Intelligence Ltd. | $0 | $40,675 | $9,375 | $0 | Ex. 12 (Lett Decl.) |
| Charles Halliday Dolan, Jr. | Mr. Dolan's request for $16,274 in attorneys' fees is supported by the materials filed in connection with his motion at DE 269. | | | | |

**CERTIFICATE OF COMPLIANCE WITH RULE 7.3 AND VERIFICATION**

Consistent with Local Rule 7.3, I served the draft sanctions motion on Plaintiff's counsel by email on October 5, 2022.  That same day, my colleague provided counsel with a link to download the draft supporting declarations via Secure File Transfer (SFT).  Defendants met and conferred in good faith with Plaintiff's counsel by Microsoft Teams twice, on October 13 and October 26, 2022, but were unable to reach any agreement as to either the Defendants' entitlement to or the amount of fees and expenses not taxable under 28 U.S.C. §1920 that are recoverable from Plaintiff and/or his counsel.

Consistent with the requirements of Rule 7.3, I verify under penalty of perjury that the statements made in this Motion and Memorandum are true and correct to the best of my knowledge, and are based either on my personal knowledge or on the information provided to me in the appended Declarations.

  */s/ David E. Kendall*
  David E. Kendall

Dated:  October 31, 2022

**CERTIFICATE OF SERVICE**

I hereby certify that on this 31st day of October, 2022, I caused a copy of the foregoing

Defendants' Motion for Sanctions to be served on all counsel of record via CM/ECF.  All parties

required to be served have been served.


$\phantom{xxxxxxxxxxxxxxx}$ */s/ David Oscar Markus* $\phantom{xx}$
$\phantom{xxxxxxxxxxxxxxx}$ David Oscar Markus

# EXHIBIT 1

*Document By* **WESTLAW**

**NewsRoom**

9/10/22 FOX: Hannity (Pg. Unavail. Online)
2022 WLNR 28709447

FOX: Hannity
Copyright (c) 2022 Fox News Network, Inc.

September 10, 2022

Biden Again Slams Republicans

SEAN HANNITY, FOX NEWS HOST: And welcome to HANNITY this busy Friday news night.

Now, tonight, as heartfelt tributes pour in for the late Queen Elizabeth, woke, classless Democrats, they're spitting on her legacy. Now, that includes one professor at Carnegie Mellon wishing her an excruciating death. We're going to bring you the worst of the worst. That's coming up tonight.

Plus, we will outline a new far left plan to abolish law and order and empower violent criminals when -- just when you thought it couldn't get worse. But first, we are only 0 days away from the midterm elections and Democrats have nothing zero positive to run on.

After two years of majority, the economy is in a recession, inflation is at a 40-year high, gas prices have more than doubled, the supply chain is still a disaster, the housing market is in a huge tailspin violent crime on the rise in small towns and big cities all across the country, California, they can't even keep the lights on.

Meanwhile abroad, Europe is at war. China is threatening to blow us up and reunify with our ally Taiwan. And Afghanistan is once again a safe haven for the terrorists who perpetrated 9/11.

Now, naturally, according to Joe Biden and his fellow Democrats, MAGA Republicans are the greatest threat to America. That's their primary campaign message. Take a look.

(BEGIN VIDEO CLIP)

JOE BIDEN, PRESIDENT OF THE UNITED STATES: We got a little help from Republicans but not a lot but enough to get it passed. But the truth is, there are a lot more Republicans taking credit for that building we actually voted for it. I see them out there, and now, we're going to build this new bridge here, we're all for it. And by the way, this new road, and we're going to have an internet that's going to be always. I love them, man.

They ain't got no shame. They don't have any shame.

Republicans awaken the powerful force in this nation, women. W-O-W -- no, I'm not joking. I'm not joking.

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

(END VIDEO CLIP)

HANNITY: Quote: They ain't got no shame.

This coming from the guy that used his own crack addicted son as a bag man basically, a guy who cheated his way through law school and plagiarized his way through the Senate, a guy that lied about being a civil rights activist, a guy that worked with segregationists to stop integration of our public schools. He didn't want them to become racial jungles, his words.

A guy that checked his watch several times, remember that, during the ceremony for the 13 fallen U.S. service members that were killed because of his botched withdrawal in Afghanistan.

Joe Biden has no shame. Joe Biden has no class. He has no honor. He has no dignity. He has no morals. I don't think he has any clue what day it is and now he has a barely functioning brain.

Hillary Rodham Clinton meanwhile is just desperate for attention. Does anybody really care what she has to say? Yesterday, she declared that certain Republicans have got to be purged much like a disease. She actually said it. Take a look.

(BEGIN VIDEO CLIP)

HILLARY CLINTON, FORMER SECRETARY OF STATE: For reasons that are really hard to fully understand there is one of our political parties our major political parties and the people who support it and who they support seemingly at odds with democracy. The best thing that could happen for the country and frankly for what's left of the Republican Party is to defeat as many candidates that they have running now at all levels, national, state and local, and force them to purge their party of the disease that has unfortunately spread.

(END VIDEO CLIP)

HANNITY: Purge irredeemable, deplorables, bitter Americans that cling to god, their guns, their bibles, their religion, smelly Trump Walmart shoppers, or in this case, MAGA Republicans. And then Hillary echoing Joe Biden now wants to purge MAGA Republicans.

Now, let's be clear almost no one on earth actually likes or respects Hillary Clinton and she's never going to be president, but her remarks perfectly encapsulate what is the Democratic Party's midterm message. They want you to turn a blind eye to all the violent crime, the failing schools, all the economic suffering of their insane COVID policies their climate cultism and just focus on hating MAGA Republicans. In other words, focus on hating half the country.

Oh and they're also in the process of renaming now federal lands with words that don't offend them, 650 renamings apparently.

Now, don't let them gaslight you. We need this country back on track. That is what is at stake in 60 short days. I'll have more of my monologue in a minute.

But here with reaction, former White House chief of staff Reince Priebus, FOX News contributor Charlie Hurt.

Reince, let's get your reaction. This is all they have. There's nothing positive they can run on, not a single thing.

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Now the question is, will this strategy of slander, smear, besmirchment, character assassination, will that work?

REINCE PRIEBUS, FORMER WHITE HOUSE CHIEF OF STAFF: I don't think it's going to work at all because I do think that the American people see that our economy is in the tank and gas is up, the border's not secure. But this is what they've got, and they have decided that since they have nothing, they've got ridicule. And as Alinsky -- I've been following this thing for since Obama -- Alinsky has always, when he wrote his rules for radicals, he said that ridicule is man's best weapon. And that's what they're doing.

They are targeting people. They are polarizing people. They're personalizing it and they're going after Republicans with these insane attacks.

And when you talk about fascism, put aside the fascism of Joe Biden through executive order shutting Keystone pipeline, shutting down the market, doing all the things he's done, when you talk about purging a party of disease -- that sounds like fascist language to me.

And you have these candidates out there, you talk about fascism, Mandela Barnes in Wisconsin running against Ron Johnson's talking about releasing of the state's prisoners, Fetterman, your buddy in Pennsylvania, Sean, is talking about releasing 30 percent of the state's prisoners. It doesn't get any more wild than that.

And finally, when Joe Biden comes to Wisconsin and Pennsylvania, as nuts as that platform sounds, those two candidates didn't want to go by Joe Biden. You know why? Because he's unpopular, the economy is in the tank and people know it.

HANNITY: Now, Charlie, if this election becomes about record high inflation, record high gas prices, record high prices for everything you buy in every store you go to, if it becomes about law and order and safety and security, if it's about education of our kids, if it's about all of these things and not about the ad hominem attacks and the name calling and the demonization of any conservative or Republican, I say Republicans win if that's what they run on.

Now, the question is -- which side is going to win the narrative?

CHARLIE HURT, FOX NEWS CONTRIBUTOR: Yeah, no, I think you're exactly right about that and I think that is exactly why you have Democrats maligning and insulting half of the country every time they talk. And, of course, there's nothing in the world that's more fascist than having a president calling half of the people he works for fascist or semi-fascist or having the former first lady talk about how our voters in this country -- her political opponents who don't support her are somehow a disease in this country. This is really sick language this kind of effort to dehumanize people is what fascists do. So the only fascists here are Hillary Clinton and Joe Biden.

But you're exactly right. They have absolutely nothing to run on. They control every lever of power in Washington, both chambers of Congress and the White House. They can -- they could run the tables. They could do whatever they want, and what they have done so far has been to destroy the country, and you've gone through all of those important things, whether it's skyrocketing crime, gas prices, inflation, open border, misery around the world, terrorism taking a new route in places like Afghanistan.

So they have nothing else to run on, but I think you're exactly right, Sean. I think, you know, these things -- people -- it's not just conservatives and Republicans who want their families to be safe or want to be able to afford gasoline, Democrat voters want that too. And as long as Republicans remain laser focused on that and talk about the ideas that we all spot -- you know, believe in and that Donald Trump talked about, then Republicans are going to walk away with this thing in two years and Republicans are going to walk away even bigger or, you know, next month they're going to walk away with it and then walk away even bigger I think in two years.

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Biden Again Slams Republicans, 2022 WLNR 28709447

HANNITY: All right. So, Reince, you had great success as the RNC chair. What do you tell people running for the House, running for the Senate? My understanding is next week that Kevin McCarthy will lay out his version of a Contract with America commitments to America.

I like that idea. I like the idea that every candidate signs their name and makes a pledge to do certain things before they run. I would like the Senate candidates to do the same.

What do Republicans need to do to keep the focus where it belongs?

PRIEBUS: Well, I agree with you too, I think number one, you got to tell people what you're for. I think a Contract with America or a new contract whatever he's going to call it is brilliant, number one. Number two, you cannot let these candidates like Mandela Barnes and Fetterman and these folks get away with portraying themselves as something that they're not.

They're on TV every minute telling people that they're mainstream while at the same time they're talking about releasing prisoners, they're talking about defunding the police and they're on the record talking about cashless bail, that people who commit violent crimes should not have to pay a cash bail in order to get out of prison. This is what the record is.

So I think Republicans have to be relentless in what they're for, relentless on pointing out what their opponent is for, and then they need to tell their own story about their own lives and their own families, and their own sacrifices. I think all of that together is important.

Last thing, you got to focus on the ground game and the grassroots. You got to focus on absentee ballot, request forms, targeting people, turning out voters and just obviously like Lincoln said, you know, have more ballots in the box than the other guy.

Do you feel the Republican Party has that technology? Are they prepared to compete with the Democrats on that level in terms of getting out the vote?

PRIEBUS: Yeah. I do, Sean, and I think that we've also learned a lesson about voting and election integrity and not waiting until after the election to do something about it and I think that's one of the things that's changed over the last couple years.

HANNITY: Charlie, we'll give you the last word.

HURT: Yeah, the most important thing they have to focus on personal security crime and the economy and the border. And if Republicans focus on those three things and hit these people as hard as they can about the fact that they have been for open borders, no bail, lawlessness, they've supported the riots for two years, you --as long as Republicans stay on that, I think that they're going to have a good day in November.

HANNITY: All right. Charlie, thank you. Reince, thank you.

Now, also tonight, Memphis, Tennessee, they are still reeling after a week of unthinkable violence. Remember the kindergarten teacher murdered by a career criminal in cold blood. She was only out for a jog, four others murdered after a mass shooting from another career criminal and now new fears after two young men filmed themselves threatening to kill white people in the city at random.

---

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

The violent felons let out of jail because of what, liberal prosecutors, liberal judges and lawmakers are wreaking havoc on communities all across the country. The media mob, they don't seem to care. The primetime shows on fake news CNN, MSDNC totally ignoring the breaking news about the mass shooting that took place in Memphis. Why is that? What is -- is it because oh it wasn't a MAGA Republican pulling the trigger?

Similarly they all but ignored the horrific story out of Nevada where an elected Democrat murdered a journalist who was investigating him. ABC, CBS, NBC, MSDNC, they all failed to mention that the murder suspect was a Democratic official. Well, would they would they ignore it if it was a MAGA Republican? Why bother if it's not a MAGA Republican?

The media mob is so dedicated to attacking conservatives, protecting Democrats that they are turning a blind eye to a deadly problem in America in small towns and big cities. And as we speak, violent criminals are now roaming free all over the country, thanks to these far left policies. And by the way, in the state of Illinois, it is about to get even worse. You couldn't think possible. Take a look.

(BEGIN VIDEO CLIP)

UNIDENTIFIED MALE: As of January 1st, 2023, the following things will go into effect and people need to be aware of this. It abolishes cash bail for almost every offense. This includes but isn't limited to kidnapping, armed robbery, second-degree murder, drug-induced homicide, aggravated DUI, threatening a public official and aggravated fleeing and eluding.

Offenders released on electronic monitoring have to be in violation for 24 hours before law enforcement can act. They could almost drive to Alaska before we can even look for them. It denies victims their constitutional rights -- and keep this in mind, businesses and homeowners, officers will no longer be able to remove trespassers from your residence or your businesses.

(END VIDEO CLIP)

HANNITY: Is that not madness? Ask yourself, do you think that law and order is a good idea? Because every Democrat running in this upcoming election supports some version of that type of policy. Now, they also all support illegal immigration, sanctuary cities, sanctuary states. That is until those illegal immigrants start showing up in their cities.

In 2019, one Washington D.C. city councilwoman tweeted, quote: the district is a sanctuary city. That means our law enforcement does not cooperate with ICE. As a council member, I have called for an abolition of ICE and wrote D.C.'s law to establish a permanent immigrant legal services fund.

But after the latest busload of migrants from Texas courtesy of Governor Abbott, the councilwoman is now singing a much different tune. Pretty interesting. Take a look.

(BEGIN VIDEO CLIP)

DC CITY COUNCIL MEMBER: It's been said but it's worth reiterating that the governors of Texas and Arizona have created this crisis, and the federal government has not stepped up to assist the District of Columbia. So we, along with our regional partners, will do what we've always done. We'll rise to the occasion.

We've learned from border towns like El Paso and Brownsville, and in many ways, the governors of Texas and Arizona have turned us into a border town.

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Biden Again Slams Republicans, 2022 WLNR 28709447

(END VIDEO CLIP)

HANNITY: And Chicago Mayor Lori Lightweight was also panic-stricken after a few busloads of migrants showed up in the Windy City and she decided to transport them out of her city and send them to the suburbs.

Now, keep in mind, around 8,000 migrants have been bused to Chicago and D.C., while over 1.1 million migrants have entered the state of Texas alone this year, never mind last year.

Here now with more, former Florida Attorney General Pam Bondi, FOX News contributor Tammy Bruce.

Pam, let me start with you. As a former prosecutor, you just heard the mayor, pretty much you can commit any violent crime, kidnapping, second- degree murder, no bail laws. And police can't do their job.

Now, how is that going to end? I don't think you need to be a fortune teller to figure it out.

HANNITY: Yeah, you don't have to be a prosecutor or a cop to figure it out. It's going to end in much more violence. You know, Sean, when I was a prosecutor, nobody recognized what political party you were. It was about protecting citizens, protecting kids so they could play in the park, protecting people so they could go to work, to make our communities safe.

People loved the police and these progressives and these socialists have turned our country into something so frightening and they're not stopping. And as we always say, that's why it's so important when you're hearing these politicians, you've got to start at your local level. You've got to support your tough sheriffs like Chad Chronister who we have in Florida, in my county. You have to support the great law enforcement elsewhere. You have to support tough prosecutors and get rid of the bad ones. You have to vote them out of office.

And these mayors and these state reps who want to create these crazy laws for cashless bail and after 48 hours, you still can't violate someone on house arrest, it's absurd. And that we're going to see so much more violence. And we see it's working great in the red states where we have law and order -- Texas, Florida, all the red states where we want to protect our citizens and keep people safe. And it's just not happening and it breaks my heart really for the people of this country who have to live in those other states.

HANNITY: You know, Tammy, we haven't talked about in a while, but decades ago, you were more left and less conservative than you are today. This new modern Democratic Party, this movement, you know, defund, dismantle, no bail laws, this radicalism that's taken over the Democratic Party, do you recognize any of this from the time that maybe you had some agreement with Democrats?

TAMMY BRUCE, FOX NEWS CONTRIBUTOR: You know, not, not really. I mean this is what's very interesting here, like my -- a lot of my work was about domestic violence and that work relied on having relationships with police departments, changing laws so that batterers could be arrested. Even if the victim did not want to press charges, it was about working with the justice system to make sure that the bad guys, the people who are beating up women, the people who are committing the crimes actually were going to be held to account.

And that really fostered good relationships within the work that I was doing with -- and there was universal agreement. It was, you know, not a feminist issue. It was a humanist issue and what we relied on was a justice system and police departments and sheriff departments that understood this, and that they were on our side because it is women and families.

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

When we see these mass shootings when we see the dynamic of what goes on, and women are out at the grocery store, women are jogging, women are with their families at you know in the public arena ,and when there is a local arena shooter, if you will, those women and those children are equally at risk. We see it at the border. It's children that are being used.

So when they've destroyed the relationship between community and the police and what we're seeing here is the result of what it tells young people especially, is that not only are there no repercussions, but the people in this community don't care about their own lives because even the bad guys know that the police matter and that people who care about the future rely on them. So, if you're -- if you're denigrating the police like all the blue cities and the blue states do, that flows over into a mentality that crime is okay and in fact maybe the people who are wanting saying defund the police, maybe it's because they want to be hurt.

And this is what we've got to stop now because that is a lie, and only conservatives, concerned Democrats, independents, concerned patriots, members of the community have got to step up and know you're being lied to that this is partisan. We know that it does not work. It makes lives worse because we have example after example in these blue cities.

HANNITY: It's unbelievable.

You know all the law-abiding, tax-paying, hard-working Americans now, they can't even walk down the street. It's gotten that bad in many parts of the country.

Tammy, thank you. Pam Bondi, as always, thank you.

Coming up, you won't believe how some on the left are now trashing the late Queen Elizabeth II. We have incredible low lights that you probably wouldn't believe, straight ahead.

(COMMERCIAL BREAK)

(NEWSBREAK)

HANNITY: All right. So, today, King Charles III gave his first address to the UK as monarch, following the passing of Queen Elizabeth, stressing the need for unity, thanking the British people for their love, their support and vowing to continue to rule with loyalty.

Sadly, the unhinged, woke left, they cannot help themselves and they're using the queen's death to launch baseless smear campaigns against the entire royal family, including this tweet from a professor at Carnegie Mellon. Quote, I heard the chief monarch of a thieving raping genocidal empire is finally dying. May her pain be excruciating.

Now, Twitter even took the tweet down saying it violated their terms of use. But the professor then double doubled down on this posting saying: If anyone expects me to express anything but disdain for the monarch who supervised a government that sponsored the genocide that massacred and displaced half my family, well, you can keep wishing across the star.

And, of course, the mob and the media, they're using the queen's death to spew even more hate against the royal family. Take a look.

(BEGIN VIDEO CLIP)

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

UNIDENTIFIED MALE: You played a clip of her speaking in Cape Town in 1947 in South Africa. That's the year apartheid took effect in South Africa. They -- that was something British colonialism ushered in. British colonialism which she presided over for all these years was had a terrible effect on much of the world. It's something that people uh revolt from.

I think it's something -- there's a weakness in the American character that still yearns for that era of hereditary privilege, which is the very thing that that we escaped from.

UNIDENTIFIED FEMALE: There is now an understanding of how much money the royal family may have made from slavery um their involvement in sort of colonialism and there are calls for reparations, right?

UNIDENTIFIED FEMALE: Because if you really think about what the monarchy um was built on, it was built on the backs of Black and Brown people. She wore a crown with pillaged stones from India and Africa.

(END VIDEO CLIP)

HANNITY: All right. Here with reaction, author and FOX News contributor Douglas Murray is with us, along with FOX News contributor, the guy that needs his own media show right here on FOX, Joe Concha.

By the way, he will be co-hosting the big Saturday show this weekend right here on FOX, which I'm glad to see.

Joe, let's start with you.

Even in death, a woman that served 70 years, the longest reigning monarch, she took the throne at the age of 25. What is it specifically that that brings out all of this hatred of the left towards her?

JOE CONCHA, FOX NEWS CONTRIBUTOR: No class and no shame I think to start, Sean. And look, you go -- you look at Queen Elizabeth, she took to the throne when Harry S. Truman was president of the United States and Winston Churchill was prime minister of Great Britain. So this is how long we're talking about here, and she's only carried herself a class in dignity.

But to go back to that Carnegie Mellon professor where you just read those tweets which are completely vile, I'm old enough to remember the year 2020, Sean, when the same Carnegie Mellon completely freaked out over Richard Grenell, formerly the Trump administration, acting director national intelligence, he was named a senior fellow at the university and something like almost faculty and staff signed an open letter pleading with the university to rescind the appointment.

And now, after one of their professors tweeted what that -- what she did about Queen Elizabeth II not long after she passed away, these same faculty and staff members are silent and the university doesn't appear that it's going to reprimand this person in any way. So, it just seems like nothing is sacred anymore, right?

I mean, do you remember when Nancy Reagan passed away in 2016, here was "The Washington Post" and their obituary of the former first lady. Quote: Nancy Reagan had an undeniable knack for inviting controversy. There were her extravagant spending habits at a time of double-digit employment, a chaotic relationship with their children and step children that could rival a soap opera plot, unquote.

This is a friggin' obituary. Again, no class, no shame, even moments after somebody so revered passes away at the age of 96, Sean.

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Biden Again Slams Republicans, 2022 WLNR 28709447

HANNITY: Douglas, when you go back to "may her pain be excruciating", you know, there are people I don't particularly like on this earth, I can't imagine ever, ever saying something like that upon the death of anybody. Where does that come from?

DOUGLAS MURRAY, FOX NEWS CONTRIBUTOR: No, I mean, it shows nothing except the extraordinary ignorance and the extraordinary evil of these people. The ignorance of what you've just read out from various of these non-entities. They know nothing about colonialism. They clearly know nothing about the decolonization process. They know nothing about the late queen's extraordinary work with the commonwealth countries.

If the queen would preside over this, was it a genocidal empire? Unbelievable. There'd be nobody alive if it had been a genocidal empire. And they smear her with his total lack of knowledge.

If she'd been the person they're talking about, why would all the heads of all of the commonwealth countries have all been in mourning in the last 24 hours?

You know, what we see here is a very vile, evil type of person who's very ignorant and luxuriates in their ignorance, and nothing though I think could stand in greater contrast to that than the life of service and dignity that Queen Elizabeth had and demonstrated. She was an extraordinary monarch, an extraordinary woman, a great mother, grandmother, a mother to the nation, and somebody who had a store of wisdom and knowledge and decency and service including sacrifice, of a kind that many people still admire but too few people still have.

You know, we live in an age where everybody moans and everyone thinks it's about them, and they throw out these ignorant opinions. They have no idea of what it -- what it is like to actually serve your country and to do what the queen said she would do when she was a girl and to give her whole life to the service of others. That's what we should remember.

And I hope these chattering figures never detract from the life of service of the late queen.

HANNITY: No class, period, end of sentence, at all whatsoever.

Anyway, thank you very much, Douglas. Joe, great to have you.

And coming up, Democrats running for the Senate could not be any more radical, it's only 60 days from the midterms. Their positions on key issues are downright scary. We'll tell you everything, every position that they're taking, what they are, so you are an informed voter come November.

(COMMERCIAL BREAK)

[21:37:49]

HANNITY: All right. The midterm race is now 60 days away. One thing is now more clear than ever, Democrats are running the most extreme, the most far left, the most radical candidates of any election cycle I've ever covered. And by the way, especially swing states like Pennsylvania, Georgia, Wisconsin, you have far left candidates doubling down on their pro-crime open borders green new deal socialism agenda.

For example, in Wisconsin, Mandela Barnes says that he wants to release half the prisoners across the state of Wisconsin. He wants to give illegal immigrants driver's licenses and in-state tuition. He wants to abolish the filibuster, even wants to let prisoners vote.

© 2022 Thomson Reuters. No claim to original U.S. Government Works. 9

Biden Again Slams Republicans, 2022 WLNR 28709447

Down in Georgia, Raphael Warnock, well, he has a history of far-left radicalism, repeatedly attacking the police as thugs and even worse, comparing them to thugs and gangsters, supports CRT in schools, offers kind words for the likes of Fidel Castro, praises Louis Farrakhan, a virulent anti-Semite and racist, even defending the radical hate America pastor, GD America Jeremiah Wright, among many other bizarre positions, and he wants to pack the courts.

In the great state of Pennsylvania -- well, phony, spoiled, never had a job, trust fund brat in a hoodie and tattoos, John Fetterman, never had a job in his life. He wants to, what, legalized drug dens, supports amnesty, wants to reduce Pennsylvania's prison population by at least a third, wants to eliminate put a moratorium on fracking and phase it out, doesn't support American energy independence. He continues to suffer following a stroke back in May and he won't answer a single question about his health.

His opponent, Dr. Mehmet Oz, is making it clear debates need to take place before any votes are cast and that needs to happen in all of these states.

Joining us now is Dr. Oz, along with former South Carolina Governor Nikki Haley, who is joining Dr. Oz on the campaign trail.

Nikki, why don't we start with you? All these extra extreme positions and John Fetterman has campaigned a whopping 20 minutes in total since the -- since the primary. That's it.

Now voting begins in 10 days. How do the people in the commonwealth of Pennsylvania vote when the guy hasn't answered one question on all of these radical positions?

NIKKI HALEY, FORMER SOUTH CAROLINA GOVERNOR: Well, thanks, Sean.

You know, first of all, I'll tell you, it's just total arrogance on the part of Fetterman. He thinks he doesn't have to show up/. He thinks he doesn't have to answer a question. But this -- if this guy gets elected, this should send a chill up every person's spine, not just in Pennsylvania but across the country.

The idea that he wants to go and take away law enforcement's ability to defend themselves or defend communities, this is a guy who said sanctuary cities make us all safer, not less safer. This is a guy who wants to take away life sentences for murders, a guy who wants to release a third of prisoners.

And I'll tell you, Dr. Oz and I did a couple of different events, the energy for him is great because they're so scared of what Fetterman's going to do. But we need everybody in the country to pay attention to this Pennsylvania race, because this guy makes the left look conservative compared to where he is. It would be a disaster.

HANNITY: He's to the left of Bernie Sanders. He endorsed Bernie Sanders.

Dr. Oz, I mean, you have not had an opportunity to hear him answer a single question. He's talking about a debate in, what, mid-October, late October? By that time, probably half the vote will be in the commonwealth of Pennsylvania. That by any measure is not fair to the people of Pennsylvania. How come that is being allowed to happen?

DR. MEHMET OZ (R), PENNSYLVANIA SENATE CANDIDATE: But, Sean, frankly he hasn't actually even offered a debate. Debates have to be held at a specific time, in a specific place, on TV stations, with hosts. We don't have any of these details.

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Biden Again Slams Republicans, 2022 WLNR 28709447

So all I know is that I've agreed to six specific debates, three this month, three next month for the reason you stated, so the early folks can also get some information about where I stand. And democracy lives on asking questions of each other. I will do whatever I can to serve the people of Pennsylvania.

When John Fetterman agrees to zero debates, one was supposed to be right now as I speak to you, it shows he doesn't have the interest at heart of voters. And he is dodging the debates because he doesn't want the debate. He cannot defend the far left radical positions that you just articulated and to put some facts on what happens when you have those radical positions.

Where I am right now, Philadelphia, the highest homicide rate we have ever had, we also are number three as a state in fentanyl deaths because of his position on the border.

So I say, if you're worried about this, go to droz.com and please support my campaign because here's the truth, the reason he's getting money is because the liberals in California and New York don't know how radical he is. I can't imagine they would with good conscience support him. What they want is the 51st seat.

HANNITY: But here's the problem --

OZ: They're just trying to get a placeholder.

HANNITY: -- the people in New York and California probably would, that's the problem, and that's where the money's coming from.

It's -- and to the people of Pennsylvania, the hard-working people, first of all, he wants to eliminate fracking and end energy independence. That's an $81 billion industry in the commonwealth of Pennsylvania. That would destroy the economy of Pennsylvania. He's never answered a single question, Dr. Oz.

Why is it the media are allowing this guy to get away with this? Why are they not insisting on answers?

OZ: I -- it's just they're being duplicitous. They're manufacturing a candidate, literally a hologram. This fictional person that they want for their readership to adore and that's what they're trying to achieve. It's not working because the people of Pennsylvania are too smart for that.

But let me get back to the root issue here. Nikki Haley, Ambassador Haley and I, were campaigning yesterday and talking about the fact we're both the kids of immigrants. We both believe as do most viewers on the American dream, that if you work hard, respect each other, right, serve each other, then the country actually makes you an American.

Well, John Fetterman never had that life experience. He doesn't respect the American dream. That's why he says he's these bizarre things, and that's why I say, folks, if you don't want someone like John Fetterman in there, go to droz.com and support me because this fellow and people like him will destroy the nation.

HANNITY: Governor, look at the last two presidential elections. You had a dirty, bought and paid for Russian disinformation dossier fed to the media. None of it was true, but they reported it as gospel truth. Then you -- then you go and then it was used as a weapon to apply for FISA warrants, they got four of them, and none of it was true.

Then, in 2020, all of a sudden, weeks before the election, a laptop comes out from Hunter Biden that implicates Joe Biden repeatedly and yet the media in one voice says, oh, that's likely Russian disinformation. Well, it turns out it was all true.

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

So the impact of the media on all of these races is very real. How is it that the media will give this guy, with the most radical positions of any candidate I've ever seen, a free pass for this election?

HALEY: Look, I have said it for too long, Sean, Republicans are too nice, because all they do is whine and complain and we don't get out there and fight. We have an opportunity to fight.

I was today helping Herschel Walker is going against Warnock. I was yesterday with Dr. Oz helping him go against Fetterman. These are dangerous individuals that if they walk the halls of the Senate, we are going to have much bigger problems than anything the Squad could ever give us.

So if we really want to see change, we need to go to droz.com, give him money. We need to get our people out to vote and we need to make a change in the Senate. We can do this. We got to keep the faith.

HANNITY: All right. Governor, I'm glad you're out there with Dr. Oz. We've got to follow -- we've got to smoke this guy out. The people of Pennsylvania, whether you agree with me or disagree with me, you deserve answers to these very radical positions. Thank you both for being with us.

Up next, our two-tiered system of justice, it is alive and well. We have the latest example, it involves Hillary Clinton. We'll check in with Gregg Jarrett and the president's attorney, that's President Trump, Alina Habba, straight ahead.

(COMMERCIAL BREAK)

HANNITY: Now, just like we've been telling you, the two-tiered system of justice in this country is now undermining faith in our most important institutions. Now, this dual justice system is shredding our Constitution. We now have a politicized FBI and a DOJ that is weaponized.

Earlier today, Donald Trump's suit against Hillary Clinton over the Russia hoax that was dismissed, with the judge claiming that the 45th president wasn't seeking redress for any legal harm, all based on Hillary Clinton's bought and paid for dirty misinformation Russian dossier.

And meanwhile, today was the deadline for the Trump team and the Biden DOJ to submit their list of potential candidates to serve as an independent special master to review the documents that were seized at Mar-a-Lago.

Here to break it all down, FOX News legal analyst Greg Jarrett, along with Trump attorney Alina Habba.

Alina, start with you. What frustrates me is Hillary Clinton, they took this dossier, they never verified it, they fed it to the media, they lied about Donald Trump, the media ran with it then the FBI used it, applied for FISA applications four times, says on the top of that application "verified", it was unverifiable. And they all got away with it.

Why isn't she being held accountable for what she did?

ALINA HABBA, ATTORNEY FOR FORMER PRESIDENT DONALD TRUMP: Because when you have a Clinton judge as we did here, Judge Middlebrooks who I had asked to recuse himself but insisted that he didn't need to, he was going to be impartial, and then he proceeds to write a 65-page scathing order where he basically ignored every factual basis which was backed up by indictments, by investigations, the Mueller report, et cetera, et cetera,

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Biden Again Slams Republicans, 2022 WLNR 28709447

et cetera, not to mention Durham, and all the testimony we heard there, we get dismissed. Not only do we get dismissed, he says that this is not the proper place for recourse for Donald Trump. He has no legal ramifications.

Where what is the proper place for him? Because the FBI won't help when you can do anything, obstruct justice, blatantly lie to the FBI, Sussmann's out, he gets acquitted, where do you go? That's the concern for me. Where do you get that -- that recourse?

HANNITY: Yeah, the famous line of Ray Donovan, where do I go to get my good name back?

Gregg, you wrote two number one best-selling books about this very topic. Very few people, next to nobody, was held accountable. The top people involved in this big lie, they never got held accountable, and Hillary -- you know, she just that now mocks the idea that she herself had top secret and classified emails on her servers and just acts like it never happened.

GREGG JARRETT, FOX NEWS LEGAL ANALYST: Yeah, and at the same time, she's now hawking hats that say "but her emails". Sort of laughing at everyone and how she got away with it, thanks to her husband, Loretta Lynch and, of course, James Comey.

Look, it's always an uphill battle when a citizen brings a case against federal government and federal employees because federal judges frown upon those things, and it appears to me here that this judge in Florida wanted to be both judge and jury. He wanted to be the trier of the fact here. And he simply states and declares that Trump hasn't stated a cognizable claim under the law.

Well, I think he has. There is a plethora of evidence here of corruption and abuse of power by the FBI, their employees, working in concert with Hillary Clinton and her acolytes. Lawless search warrants and spying on the Trump campaign, using knowingly a phony bogus information in the Steele dossier and launching investigations, criminal investigations of the president United States, knowing full well there was no predicate evidence to begin with.

So I think there's going to be a different opinion by the 11th Circuit Court of Appeal on review. They may well decide to reinstate this case because I do think there are valid causes of action.

HANNITY: Alina, what are other avenues of remedy that you might have?

HABBA: You know, I have to share with you a story, Sean, that I have not shared with anybody. The recourse that I have at this point is obviously to appeal this to the 11th Circuit as Gregg said.

But when I brought this case and we were assigned, you know, this judge and we went through the recusal process, we lost five magistrates, including Rinehart who's dealing with the boxes as we know. The former president looked at me and he told me, you know what, Alina. You're not going to win. You can't win, just get rid of it, don't do the case.

And I said, no, we have to fight. It's not right what happened. And you know, he was right, and it's a sad day for me personally because I fought him on and I should have listened, but I don't want to lose hope in our system. I don't.

So, you know, I'm deciding whether we're going to appeal it. But I got to tell you, Sean, it's hard when you're looking at what's happening in these in this justice system.

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Biden Again Slams Republicans, 2022 WLNR 28709447

HANNITY: America better start paying attention. We don't have equal justice or application of our laws, and if we allow it to continue, it's only going to get worse. These people are now more emboldened than ever.

Alina, thank you. Gregg Jarrett, thank you.

More HANNITY straight ahead.

(COMMERCIAL BREAK)

HANNITY: All right. Unfortunately, that is all the time we have the left this Friday evening. As always, thank you for being with us. Thank you for making this show possible.

Please set your DVR so you never, ever, ever miss an episode of HANNITY. You can get news anytime at foxnews.com or hannity.com.

In the meantime, let not your heart be troubled, "THE INGRAHAM ANGLE", Laura Ingraham is up next. I hope you have a great weekend.

END

[Copy: Content and Programming Copyright 2022 Fox News Network, LLC. ALL RIGHTS RESERVED. Copyright 2022 VIQ Media Transcription, Inc. All materials herein are protected by United States copyright law and may not be reproduced, distributed, transmitted, displayed, published or broadcast without the prior written permission of VIQ Media Transcription, Inc. You may not alter or remove any trademark, copyright or other notice from copies of the content.]

---- **Index References** ----

Company: Former Co., Ltd.; Federal Bureau of Investigation; VIQ MEDIA TRANSCRIPTION INC.; FOX NEWS NETWORK, LLC; Carnegie Mellon University College of Fine Arts; WALMART INC.; TWITTER, INC.; U.S. Immigration and Customs Enforcement

News Subject: (Campaigns & Elections (1CA25); Commonwealth (1CO30); Emerging Market Countries (1EM65); Global Politics (1GL73); Government (1GO80); Minority & Ethnic Groups (1MI43); Political Parties (1PO73); Public Affairs (1PU31); Race Relations (1RA49); Social Issues (1SO05); World Elections (1WO93); World Organizations (1IN77))

Region: (Afghanistan (1AF45); Africa (1AF90); Americas (1AM92); Asia (1AS61); California (1CA98); Florida (1FL79); Illinois (1IL01); North America (1NO39); Pennsylvania (1PE71); South Africa (1SO81); South Carolina (1SO63); Southern Africa (1SO66); Southern Asia (1SO52); Tennessee (1TE37); Texas (1TE14); U.S. Mid-Atlantic Region (1MI18); U.S. Midwest Region (1MI19); U.S. Southeast Region (1SO88); U.S. Southwest Region (1SO89); U.S. West Region (1WE46); USA (1US73); Western Asia (1WE54); Wisconsin (1WI54))

Language: EN

Other Indexing: (Republicans; Democrats; China; Taiwan; MAGA; PENNSYLVANIA SENATE; Republican Party; Democratic Party; White House; Congress; Democrat; RNC; GD America; Mandela Barnes and Fetterman; CNN; MSDNC; ABC; CBS; NBC; droz.com; Arizona; Trump administration; CRT; Semite; Biden DOJ; FISA; 11th Circuit Court of Appeal; FORMER; FBI; VIQ Media Transcription, Inc.; Fox News Network, LLC; Carnegie

Biden Again Slams Republicans, 2022 WLNR 28709447

Mellon; Walmart; Twitter; ICE) (SEAN HANNITY; Queen Elizabeth; Joe Biden; JOE BIDEN; Hillary Rodham
Clinton; HILLARY CLINTON; Americans; Hillary Clinton; Reince Priebus; Charlie Hurt; REINCE PRIEBUS;
STAFF; Alinsky; Obama; Mandela Barnes; Ron Johnson; Ron B. Johnson; John Fetterman; CHARLIE HURT;
Donald Trump; Donald John Trump; Kevin McCarthy; John Kevin Mccarthy; Lincoln; Lori Lightweight; Pam
Bondi; Tammy Bruce; Chad Chronister; TAMMY BRUCE; Queen Elizabeth II.; King Charles III; Douglas
Murray; Douglas Murray; Joe Concha; JOE CONCHA; Harry S. Truman; Winston Churchill; Winston J.
Churchill; Mellon; Richard Grenell; Queen Elizabeth II; Nancy Reagan; DOUGLAS MURRAY; Douglas Murray;
Raphael Warnock; Fidel Castro; Louis Farrakhan; Jeremiah Wright; Jerry Wright; Mehmet Oz; Mehmet Oz;
Nikki Haley; NIKKI HALEY; Bernie Sanders; MEHMET OZ; Mehmet Oz; Ambassador; Hunter Biden; Herschel
Walker; Herschel J. Walker; Gregg Jarrett; Alina Habba; Greg Jarrett; Greg Jarrett; ALINA HABBA; DONALD
TRUMP; Donald John Trump; Middlebrooks; Durham; Sussmann; Ray Donovan; GREGG JARRETT; Loretta
Lynch; Loretta Lynch-Reichert; James Comey; James Brien Comey; Steele; Rinehart; Laura Ingraham)

Word Count: 7336

---

**End of Document**                                        © 2022 Thomson Reuters. No claim to original U.S. Government Works.



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Donald J. Trump,

          Plaintiff,

   v.

Hillary R. Clinton *et al.*,

          Defendants.

Civil Action No. 2:22-14102-DMM

**EXHIBITS 2 THROUGH 12:**
**DECLARATIONS IN SUPPORT OF MOTION FOR SANCTIONS**

## INDEX

Declaration of David E. Kendall
    in support of Clinton's request for sanctions .................................................................Exhibit 2

Declaration of Robert P. Trout
    in support of HFACC's and Podesta's request for sanctions.......................................Exhibit 3

Declaration of Shawn G. Crowley
    in support of DNC's, DNC Services Corp.'s, and Wasserman Schulz's request for
    sanctions...............................................................................................................................Exhibit 4

Declaration of Wendy B. Reilly
    in support of Mook's request for sanctions.................................................................Exhibit 5

Declaration of Joshua A. Levy
    in support of Fusion GPS's, Simpson's, and Fritsch's request for sanctions ..............Exhibit 6

Declaration of Joshua Berman
    in support of Bruce and Nellie Ohr's request for sanctions.........................................Exhibit 7

Declaration of Franklin Monsour Jr.
    in support of Danchenko's request for sanctions.........................................................Exhibit 8

Declaration of Samantha L. Southall
    in support of Neustrar Inc.'s request for sanctions .....................................................Exhibit 9

Declaration of John M. McNichols
    in support of Neustrar Security Services's request for sanctions ..............................Exhibit 10

Declaration of Stephen A. Tyrrell
    in support of Joffe's request for sanctions .................................................................Exhibit 11

Declaration of Enjoliqué A. Lett
    in support of Orbis Business Intelligence's request for sanctions .............................Exhibit 12

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| Donald J. Trump, | |
| Plaintiff, | |
| v. | Civil Action No. 2:22-14102-DMM |
| Hillary R. Clinton *et al.*, | |
| Defendants. | |

**DECLARATION OF DAVID E. KENDALL IN SUPPORT OF**
**DEFENDANT HILLARY R. CLINTON'S MOTION FOR SANCTIONS AND FEES**

I, David E. Kendall, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.     I am Senior Counsel at Williams & Connolly LLP and counsel of record for Defendant Hillary R. Clinton in the above captioned matter.

2.     Attached as Exhibit A are the law firm website biographies of the attorneys at this firm (David E. Kendall, Katherine M. Turner, Michael J. Mestitz) and at the firm of our local counsel, David Oscar Markus, for whom Defendant Clinton seeks attorneys' fees.  The biographies reflect the professional qualifications of those attorneys.

3.     Williams & Connolly LLP entered into a retention agreement with Defendant Clinton which covers representation in the present litigation.  Defendant Clinton agreed to pay the firm's costs, fees, and expenses incurred in connection with the present suit, and agreed to pay the firm's customary hourly rates.

4.     Attached as Exhibit B is a true and correct copy of the hours worked by counsel for Defendant Clinton in this case.  Counsel are not seeking reimbursement for the attorneys' customary hourly rates charged to the client.  Instead, counsel seek fees at the following discounted hourly rates:  for David E. Kendall and Katherine M. Turner at $700, for Michael J. Mestitz at

$450, and for David Oscar Markus at $625.  These discounted hourly rates represent discounts of 45%, 44%, 30% and 28% from rates actually billed and are consistent with the rates this Court concluded were reasonable in *Celsius Holdings, Inc v. A SHOC Beverage, LLC*, No. 21-cv-80740, 2022 WL 3568042 (July 19, 2022).  Exhibit B provides an accurate statement of the work billed or that will be billed by these attorneys on this case from March 24 to September 30, 2022, during the period for which discounted fees are sought.

5.      Consistent with the discussion in the Memorandum in Support of Sanctions and the information provided in Exhibit B, I summarize below in Charts A, B, and C the fees associated with the three different phases of the case.

6.      First, reflected in Chart A, the discounted fees incurred by Defendant Clinton from the filing of the initial complaint to the filing of Defendant Clinton's initial motion to dismiss total $44,975.

**Chart A:  Fees incurred from Complaint to initial MTD**

| Timekeeper | Discounted Hourly Fee | Hours | Fees |
|---|---|---|---|
| David E. Kendall | $700 | 21 | $14,700 |
| Katherine M. Turner | $700 | 8 | $5,600 |
| Michael J. Mestitz | $450 | 34 | $15,300 |
| David Oscar Markus | $625 | 15 | $9,375 |

7.      Second, as reflected in Chart B, the discounted fees incurred by Defendant Clinton from the filing of Defendant Clinton's initial motion to dismiss to this Court's dismissal of the suit total $99,725.  During this period, the undersigned acted as coordinating counsel to facilitate the filing of a single joint motion to dismiss the Amended Complaint.

2

**Chart B:  Fees incurred from initial MTD to Court's dismissal of Amended Complaint**

| Timekeeper | Discounted Hourly Fee | Hours | Fees |
|---|---|---|---|
| David E. Kendall | $700 | 54.1 | $37,870 |
| Katherine M. Turner | $700 | 23.4 | $16,380 |
| Michael J. Mestitz | $450 | 58 | $26,100 |
| David Oscar Markus | $625 | 31 | $19,375 |

8.      Finally, as reflected in Chart C, the discounted fees incurred by Defendant Clinton in connection with the motion for sanctions, from the Court's dismissal of the suit to October 1, 2022, total $27,515.  During this period, the undersigned acted as coordinating counsel to facilitate the filing of a single joint Defendants' motion for sanctions.

**Chart C:  Fees incurred to date on sanctions motion**

| Timekeeper | Discounted Hourly Fee | Hours | Fees |
|---|---|---|---|
| David E. Kendall | $700 | 14.7 | $10,290 |
| Katherine M. Turner | $700 | 4.2 | $2,940 |
| Michael J. Mestitz | $450 | 24.8 | $11,160 |
| David Oscar Markus | $625 | 5 | $3,125 |

9.      I believe that the discounted rates claimed are reasonable given the professional qualifications of the billers as evidenced in Exhibit A for the Southern District of Florida market and given the rates approved by this Court in *Celsius*.

10.     In connection with this case, counsel incurred certain necessary costs for electronic legal research.  I understand that courts in this Circuit have held that legal research costs are not

ordinarily taxable as costs under 28 U.S.C. § 1920, but are properly considered a component of attorneys' fees. *Springer v. Convergy's Corp.*, No. 3:03-CV-302-J-99MCR, 2006 WL 8439203, at *2 (M.D. Fla. July 7, 2006). As such, in addition to the discounted fees set out above, Clinton requests an award of $4,197.31 incurred for electronic legal research.

11.     Consistent with Local Rule 7.3, counsel sent the draft sanctions motion and draft supporting declarations to Plaintiff's counsel on October 5, 2022. Defendants met and conferred in good faith with Plaintiff's counsel by Microsoft Teams twice, on October 13 and October 26, 2022, but were unable to reach any agreement as to either the Defendants' entitlement to or the amount of fees and expenses not taxable under 28 U.S.C. §1920 that are recoverable from Plaintiff and/or his counsel.

/s/ David E. Kendall
David E. Kendall

Dated: October 31, 2022

4

# EXHIBIT A



# David E. Kendall

Senior Counsel
dkendall@wc.com
202-434-5145

**Education**

- Yale Law School, J.D., 1971; Note and Comment Editor, *Yale Law Journal*

- University of Oxford, M.A., 1968; Rhodes Scholarship

- Wabash College, B.A., *summa cum laude*, 1966; Phi Beta Kappa

**Recognitions**

- Received top rankings in general commercial litigation (2007-2018) and media and entertainment law (2004-2016) in *Chambers USA: America's Leading Lawyers for Business*

- Recognized as one of *The Best Lawyers in America ®* for over 25 years

- "Washington, D.C. Bet-The-Company Litigation Lawyer of the Year," *The Best Lawyers in America ®*, 2015

- "Washington, D.C. First Amendment Lawyer of the Year," *The Best Lawyers in America ®*, 2012

David Kendall has had a checkered legal career. His acquaintance with the legal process began when he was arrested several times (but convicted only once) in Mississippi during the summer of 1964 while attempting to register voters.

After studying at Oxford as a Rhodes Scholar, graduating from Yale Law School, and clerking for Justice Byron R. White, he spent five years as associate counsel at the NAACP Legal Defense & Educational Fund, Inc., litigating a variety of civil rights cases and defending a large number of death penalty cases. He represented clients at trial, before state supreme courts, in the Supreme Court of the United States, and in state and federal post-conviction proceedings. He argued *Coker v. Georgia*, 433 U.S. 584 (1977), in which the Supreme Court declared the death penalty unconstitutional for rape. He represented Florida Death Row inmate John Spenkelink in extensive appellate and post-conviction proceedings and represented Utah inmate Gary Gilmore's mother in seeking a stay of execution from the Supreme Court. *Gilmore v. Utah*, 429 U.S. 1012 (1976). He devised a legal challenge to lethal injection. *Chaney v. Heckler*, 718 F.2d 1174 (D.C. Cir. 1983), *rev'd* 470 U.S. 821 (1985).

At Williams & Connolly since 1978, and a partner from 1981 to 2014, Mr. Kendall continues his practice as Senior Counsel to the firm. He has litigated a variety of civil and criminal cases at the trial and appellate level and has had jury trials in the District of Columbia, Indiana, Maryland, Pennsylvania, Georgia, Alabama, and Minnesota. He has appeared in trial courts in 23 states and has argued appeals in six federal courts of appeal, seven state supreme courts, and the Supreme Court of the United States. David Kendall is highlighted in the 2014 edition of *The Legal 500* for his "diverse practice" which "sees him representing clients across the country from Maryland to Minnesota."

Mr. Kendall has represented a wide variety of criminal defendants who have been charged with such "white collar" offenses as conspiracy, bribery, mail fraud, wire fraud, and obscenity at trial and on appeal. He has represented numerous clients before state and federal grand juries in agency investigations and in corporate internal investigations (many of these representations are, thankfully, unknown to the general public). He represented Bechtel

Infrastructure in various criminal and civil investigations relating to the "Big Dig" in Boston.

In civil litigation, he has represented accounting firms in a number of different matters, including Arthur Andersen in the University Savings case in Houston. He has represented McGladrey & Pullen in the A.H. Robins bankruptcy proceedings arising out of the Dalkon Shield litigation, and other matters. He has represented another Big Four accounting firm in proceedings related to the firm's investment and tax strategies. He has represented clients in commercial arbitration, winning for the Baltimore Orioles $10 million and naming rights to the Camden Yards ballpark in 2001.

Mr. Kendall has represented lawyers and law firms in professional liability matters. He represented a number of clients during the savings and loan crisis of the 1980s and early 1990s, including accountants, lawyers, and S&L executives, in civil, criminal, and administrative proceedings. He began representing President and Mrs. Clinton in November 1993, in what was ostensibly a small savings and loan matter involving Whitewater Development Company, Inc. He went on to represent the Clintons in a variety of matters, including Independent Counsel, Senate, House of Representatives, FDIC, RTC, and bar counsel investigations, civil litigation, and the 1998-99 impeachment proceedings, and currently represents them in miscellaneous civil matters.

He has represented a number of individual and corporate media clients over the years, defending libel, privacy invasion, and copyright suits, fighting subpoenas to news gatherers, and prosecuting FOIA actions (arguing *Department of State v. Washington Post Co.*, 456 U.S. 595 (1982) in the Supreme Court). His clients have included The Washington Post, Newsweek, National Enquirer (where he supervised prepublication copy review for over a decade and a half), Playboy, Discovery Communications, U.S. Medicine, National Review, local television stations, and individual writers and journalists. He represented The Post at trial and on appeal in a marathon libel suit brought by the President of Mobil Oil and his son. *Tavoulareas v. Washington Post Co. et al.*, 817 F.2d 762 (D.C. Cir. 1987) (en banc). In a libel suit arising out of the motion picture *Missing*, he successfully defended its director, Constantin Costa-Gavras, and Universal City Studios, *Davis v. Costa-Gavras*, 654 F. Supp. 653 (S.D.N.Y. 1987), in a case that established First Amendment protections for "docudramas."

Over the years, Mr. Kendall has advised the Motion Picture Association of America, the Recording Industry Association of America, and several member companies of both organizations on a variety of First Amendment, copyright, and other legal issues at trial, in Congressional and administrative agency investigations, and with

respect to proposed legislation. He has represented a number of copyright holders in anti-piracy suits against various Napster-like Internet services, such as Scour, Aimster, Morpheus, KaZaA, and Grokster. He represented the motion picture studios in their 9-0 anti-piracy victory in the Supreme Court, *MGM et al. v. Grokster, et al.*, 545 U.S. 913 (2005). He has also represented content providers in litigation against satellite, cable, and over-the-air copyright piracy. He has represented AOL in a number of Internet matters and has advised various clients on issues arising out of the Digital Millennium Copyright Act.

He is the author of several articles on constitutional, media, and criminal law and has taught constitutional and media law courses as an Adjunct Professor at Columbia Law School and Georgetown University Law Center. He was a member of the five-person ABA Task Force that drafted the *ABA Standards for Criminal Justice: Fair Trial and Free Press* released in 1991. He is on the Board of Directors of the NAACP Legal Defense & Educational Fund, Inc.



# Katherine M. Turner

**Partner**
kturner@wc.com
202-434-5487

Katherine Turner is Co-Chair of Williams & Connolly's Accountant Liability and Congressional Investigations practice groups and is a member of the Firm's Executive Committee.  She has extensive experience in defending accounting firms in professional liability litigation and regulatory matters, including work for three of the Big Four firms and a prominent national accounting firm.  Her practice also encompasses complex litigation in several other substantive areas, including securities litigation and commercial contract disputes.  She has represented corporations, professional firms, and individuals in a range of federal and state cases, at both the trial and appellate levels, and in arbitration before AAA, CPR, JAMS, and FINRA.

Katherine also has significant experience in representing clients in congressional investigations, including representation of Secretary Hillary Rodham Clinton before the House Select Committee on Benghazi and a recent representation of a government official in a matter before the House Committee on Oversight and Reform.

*Benchmark Litigation* has recognized Katherine as a "Litigation Star" in the areas of commercial litigation and white-collar criminal defense, 2017 – 2023, and among the "Top 250 Women in Litigation" for the last seven years.

Katherine was born and raised near Philadelphia, Pennsylvania and graduated from Georgetown University, *summa cum laude*, in 2001.  She received her J.D., *cum laude*, from Harvard Law School, where she was an editor of the *Harvard Law Review.*  She joined Williams & Connolly in 2005, after serving as a law clerk to the Honorable Bruce Marshall Selya of the United States Court of Appeals for the First Circuit.

Katherine co-founded the Firm's Women's Initiative and previously served as its Co-Chair.  She has also served as Chair of the Firm's Intake Committee and a member of its Hiring Committee.

## Representative Experience

Though all cases vary and none is predictive, Katherine's experience includes:

- Current representation of Big Four accounting firm in arbitration related to audits of investment funds.

**Education**

- Harvard Law School, J.D., *cum laude*, 2004; Primary Editing Chair, *Harvard Law Review*

- Georgetown University, B.A., *summa cum laude*, 2001; Phi Beta Kappa

**Recognitions**

- "Local Litigation Star," *Benchmark Litigation*, 2017 – 2023

- "Top 250 Women in Litigation," *Benchmark Litigation*, 2016 – 2022

- "40 & Under Hot List", *Benchmark Litigation*, 2017 – 2020

- Selected to Washington, D.C. "Rising Stars" list, *Super Lawyers*, 2014 – 2019

- Current representation of national accounting firm in professional liability litigation concerning audits of investment funds.

- Current representation of national accounting firm and two foreign Big Four firms in PCAOB investigations.

- Current representation of national accounting firm in an SEC investigation.

- Successful defense of individual in Title IX hearing, resulting in a finding of not responsible.

- Ongoing representation of Fortune 50 technology company in pre-litigation analyses of commercial contract and employee disputes.

- Successful representation of Big Four accounting firm in a two-year PCAOB investigation related to audits of a lending company, resulting in no action taken against firm or its auditors.

- Representation of national accounting firm in successful resolution of professional liability cases involving audits of a health insurance company and an employee benefit plan.

- Successful representation of national accounting firm in defense of professional liability claims arising from audits of funds invested in the Petters Ponzi scheme, including prevailing at summary judgment against ~$1 billion claim brought by funds' bankruptcy trustee and defeating two investor suits at the motion-to-dismiss stage.

- Representation of Secretary Hillary Rodham Clinton before the House Select Committee on Benghazi and in connection with matters concerning her e-mail use.

- Representation of high-profile non-profit organization in internal investigation of board member's personal conduct.

- Representation of Fortune 50 healthcare company in successful resolution of securities class action litigation involving ~$900M in alleged damages.

- Successful defense of several interdealer brokers in disputes with their former employer in series of FINRA arbitrations.

- Successful defense of technology company in JAMS arbitration involving alleged violations of trademark agreement, resulting in judgment in favor of client on all claims and an award of attorney's fees, following full merits trial.

- Successful representation of Big Four accounting firm in appeal of trial verdict in which the jury had found liability to a non-client arising from an audit.



# Michael J. Mestitz

Associate
mmestitz@wc.com
202-434-5085

Michael Mestitz focuses his practice on complex civil matters and appellate litigation.  He has represented individual and corporate clients in high-stakes appeals in the U.S. Supreme Court, as well as federal and state appellate courts around the country.  Michael has experience in a broad range of substantive areas, including federal statutory interpretation, contract law, securities class actions, and financial-services regulation.  He has represented several Fortune 10 companies in appeals, trial courts, and government investigations.  His pro bono practice focuses on representing criminal defendants and amici curiae in state and federal appellate courts.  He is the co-chair of Williams & Connolly's LGBTQ+ affinity group.

Michael grew up in Minnesota and graduated from Vassar College with general honors, as well as departmental honors in each of his three majors.  He received his Juris Doctor from Stanford Law School, where he served as the President of the Stanford Law Review.  While at Stanford, he also participated in the Supreme Court Litigation Clinic, the Community Law Clinic, and the Kirkwood Moot Court Competition.  He clerked for Judge Raymond C. Fisher of the United States Court of Appeals for the Ninth Circuit before joining Williams & Connolly in 2016.

## Education

- Stanford Law School, J.D., 2015; President, *Stanford Law Review*
- Vassar College, B.A., 2012; general and departmental honors, 2012; Phi Beta Kappa, Phi Beta Kappa Prize; Agnes Jackson Reynolds Prize; Vernon Venable Prize

## Recognitions

- *Super Lawyers* Rising Star, 2020
- Named one of *The Best Lawyers in America® Ones to Watch* for Appellate Practice, 2021

## Representative Experience

Though all cases vary and none is predictive, Michael's experience includes:

- Successful representation of the respondent in *Obduskey v. McCarthy & Holthus LLP*, 139 S. Ct. 1029 (2019), resulting in an unanimous Supreme Court ruling that state nonjudicial foreclosure proceedings are not governed by the Fair Debt Collection Practices Act.

- Representation of petitioners in *Sanchez v. Mayorkas* in the U.S. Supreme Court, presenting the question whether eligible recipients of Temporary Protected Status may adjust to lawful-permanent-resident status.

- Representation of former Secretary of State Hillary Clinton in successful motions to dismiss in various federal district courts and a successful motion for summary affirmance in the D.C. Circuit.

- Representation and argument as appointed counsel on behalf of a criminal appellant in the Maryland Court of Special Appeals.

- Successfully obtained affirmance of judgment as a matter of law in favor of firm clients in a fraud case in the U.S. Court of Appeals for the Fifth Circuit.

- Representation of a Fortune 10 corporation in an investigation by the Federal Trade Commission.

- Representation of a major multinational company in arbitration proceedings regarding a multibillion dollar contract claim.

- Representation of organizations representing tens of thousands of businesses nationwide as amici before the U.S. Supreme Court urging the Court to hold that Title VII of the Civil Rights Act prohibits discrimination based on sexual orientation and gender identity in *Altitude Express, Inc. v. Zarda*, *Bostock v. Clayton County, Georgia*, and *R.G. & G.R. Harris Funeral Homes v. EEOC*.

- Representation of civil-rights organizations across the ideological spectrum as amici curiae before the U.S. Supreme Court in *Uzuegbunam v. Preczewski*, arguing that a live claim for nominal damages prevents a case from being moot.

# MARKUS / MOSS PLLC

M/M
40 NW 3rd Street, PH 1
Miami, FL 33128
305 379-6667

Home Page    Firm Profile    Attorney Profiles ⌄    Case Summaries    News and Articles    Blog    Contact Us

# David Oscar Markus

**David Oscar Markus** is one of few lawyers that can do it all.  He actually tries cases and argues appeals all around the country.  He teaches at the University of Miami School of Law and also to lawyers at legal education events.  He runs the well-known Southern District of Florida blog.  He also hosts a successful podcast, For the Defense.  And he frequently advocates for criminal justice reform in opinion pieces.





David is a *magna cum laude* graduate of Harvard Law School. He is known for his creative and unrelenting approach to cases, which leads to wins in trials and appeals. David focuses on high-stakes criminal litigation for both white collar and traditional criminal matters.  You can access his resume here. (PDF)



Best Lawyers named David "Lawyer of the Year" for White Collar Criminal Law in 2020 and for General Criminal Defense in both 2022 and 2017.  And the Dade County Bar Association awarded him the "Legal Luminary" award for criminal defense, an honor voted on by members of the legal community. In 2015, the National Law Journal selected him as one of the Trailblazers for White Collar Criminal Defense in the entire country.  Back when he was 29 years old (in 2002), the National Law Journal

## Education

- J.D., *magna cum laude*, Harvard Law School, 1997

- B.A., Emory University, 1994 (Phi Beta Kappa)

## Bar Admissions

- United States Supreme Court

- State of Florida

- Southern and Middle Districts of Florida

- Eleventh Circuit Court of Appeals

- Federal Court of Claims

- admitted *pro hac vice* to various trial and appellate courts

## Awards

- Lawyer of the Year, General Criminal Defense, 2022 & 2017

selected him as a 2017 Litigator of the Year among *criminal defense attorneys 40 years old*, and it has recognized one of his federal trial victories as one of the top ten defense verdicts in the country that year.  He is also a fellow in the American College of Trial Lawyers.

In one trial victory, David not only beat all 141 counts in federal court for a doctor, but then won attorneys' fees and costs of over $600,000 for his client in a first-of-its-kind victory. Based on that case, he was awarded the highest honor — the Rodney Thaxton "against all odds" award — by the Florida Association of Criminal Defense Lawyers. Although the 11th Circuit reversed the fee award in a number of controversial opinions, the court referred to Markus as an "elite" and "superb" attorney. (See page 9 of the opinion here). In another case, David challenged the way the federal court system in Miami selected jurors (alphabetically by last name) and won, which changed the jury selection process in the District (click here). After obtaining a fair jury, Markus' client was found not guilty.  He never stops fighting for his clients.



David Oscar Markus, attorney for Carnival Corporation, leaves the U.S. Federal Courthouse in Miami after the cruise ship company pleaded guilty to six environmental probation violations on June 3, 2019. MICHAEL LAUGHLIN | SOUTH FLORIDA SUN SENTINEL

GALLERY

David Oscar Markus leaving the Federal Courthouse in Miami after a hearing in which he represented Carnival Corporation.

Based on this type of creative and unique lawyering, in 2010, David was one of eight finalists in the country for best white-collar criminal lawyer in the country by Chambers & Partners, which quoted market sources saying that David is *"the whole package,"* and *"a creative, courageous and tenacious courtroom advocate."* And he was named to that very prestigious short list of 8 best white-collar criminal defense lawyers again in 2011 (he was the only lawyer listed who was not from a large firm). The 2012 Chambers said this: "David Markus received strong praise from peers and clients alike, who describe him as 'a legal genius and brilliant strategist with a great demeanor.'" A recent Chambers & Partners described David as a "wickedly smart and a terrific trial lawyer. ... Clients say that he is 'thrilling' to watch in court and that 'his passion appreciation and enjoyment for his work are contagious." And in 2014, that publication identified David as "one of the best trial lawyers around: very smart, highly respected and thoroughly prepared." In 2016, Chambers said: "David Markus is one of the most talented criminal defense lawyers in Florida. He has a wealth of litigation experience and is regularly sought after for his counsel in high-stakes tax and criminal antitrust cases. Sources also describe him as an 'extremely creative thinker and a great oral advocate' who gets 'tremendous results.'" Chambers has also explained: "David Markus is amazing, not only because of the strength and genius of his arguments and motions, but also because of his brilliant and astonishing performances during the hearings. Additionally, he radiates so much confidence, and that in itself soothes the usual anguish and anxiety that you endure during these types of situations. Last but not least, he is such a great human being." In 2020, that publication said that David *"is an exceptional trial lawyer," "an incredible oral advocate"* and that *"he's pretty fearless in terms of dealing with the government."*

Since 2010, David has been listed as one of the top 100 lawyers in Miami and in all of Florida by SuperLawyers. He is one of the few criminal defense lawyers to received such an honor.   He is frequently named as one of the top lawyers in the Best Lawyers in America, South Florida Legal Guide, Florida Trend Magazine, Chambers & Partners, and the South Florida Business Journal. He was one of 20 lawyers named a key partner by the South Florida Business Journal in 2011 and again in 2012. The Daily Business Review named him a finalist for Most Effective Lawyer in Criminal Justice (one of three lawyers in Miami) in 2006, 2009, 2011, 2012, and 2015. He won the award in 2018. The district judges in the Southern District of Florida presented him with the Eugene Spellman Criminal Justice Act Award in 2013.

While at Harvard, David argued in front of Supreme Court Justice Anthony Kennedy who named him best oralist. (The argument, which was carried on C-Span, can be viewed here. David's argument begins at 57:42). David was mentored by Alan Dershowitz while in law school (click here for a picture of them together at Harvard). After graduating from Harvard, David served as law clerk to the Honorable Edward B. Davis, then-Chief United States District Judge, Southern District of Florida. Following his clerkship, David

(Best Lawyers)

- Lawyer of the Year, White Collar Criminal Defense, 2020 (Best Lawyers)

- Most Effective Criminal Lawyers, 2018 (Daily Business Review)

- Trailblazer, White Collar Criminal Law, 2015 (National Law Journal)

- Top 40 litigator under 40 years old, 2002 (National Law Journal)

- Top Lawyer, White Collar Criminal Defense and non-White Collar Criminal Defense, 2007-present (Best Lawyers in America by U.S. News)

- Listed as Most Influential Lawyers in Miami, 2012 (Poder Hispanic Magazine)

- Band 1, Chambers & Partners, 2015-present

- Top Miami Criminal Lawyer, 2002-present (South Florida Legal Guide)

- Top 100 SuperLawyer in Miami, 2010-present (SuperLawyers)

- South Florida Business Journal Key Partners Award, 2011, 2012

- AV Rated (Martindale Hubbell)

- Top Lawyer, 2007-present (Chambers & Partners)

- Finalist, Best White Collar Attorney in the United States 2010, 2011 (Chambers & Partners)

- Finalist, Most Effective Criminal Defense Lawyer, 2015, 2012, 2011, 2009, 2006 (Daily Business Review)

worked as an associate, including a trial defense matters involving Williams & Connolly in Washington, D.C., and then practiced as an Assistant Federal Public Defender in Miami.



David Oscar Markus teaches future lawyers at Harvard Law School

David is a past-president of the Florida Association of Criminal Defense Lawyers – Miami Chapter and past-president of the Federal Bar Association, South Florida Chapter, 2007-08. He served for ten years as the Southern District of Florida's national representative for the Criminal Justice Act Panel, and is the vice-chair of the National Association of Criminal Defense Lawyer's amicus committee. David also has co-authored the Fourth Amendment Forum, published in NACDL's The Champion. He is frequently asked to serve on committees for the Southern District of Florida.

David frequently lectures on different aspects of the criminal trial and appeal. He currently teaches a White Collar Law seminar at the University of Miami School of Law and previously taught legal writing there. David also has taught Advanced Criminal Procedure and White Collar Law at Florida International University College of Law. He often speaks to other criminal defense lawyers on ethics and zealously representing criminal defendants charged with serious crimes. His lengthy list of lectures can be found on his resume.

David has also teamed with rakontur in the new podcast, For the Defense, which is about true criminal trial lawyers. In the podcast, he interviews other well-known criminal defense lawyers about their most interesting trials. You can listen to it here.



David speaking to criminal defense lawyers at NACDL's annual conference about how to win "pill-mill" cases.

David is often quoted in publications around the country, including The Miami Herald, The Sun-Sentinel, The Palm Beach Post, the Daily Business Review, USA Today, The New York Times, The Wall Street Journal, The Boston Globe, Law.com, and CNN.com. He has written opinion pieces for numerous publications, and is the author of the popular Southern District of Florida blog, which has been described by the New Times as "the definitive source on South Florida's federal court system." He recently wrote a chapter in a book for lawyers; his chapter was titled "*Battling Goliath, Trying to Win in the Court of Appeals.*"

David is a frequent opinion contributor, arguing for criminal justice reform and for individual rights. He has written pieces in the Washington Post, USA Today, Miami Herald, New York Daily News, law.com Newsmax, and others. In this recent op-ed, co-authored with Mona Markus, he explains how the government frequently and unjustly prosecutes doctors. In another, he argues that cameras should be permitted in federal courtrooms as a check on prosecutors and judges.

He is also a regular contributor for The Hill:

Chauvin verdict: Don't hate his lawyer
Social media is mightier than Gov. DeSantis's guns
Bannon and Maxwell cases display DOJ press strategy chutzpah
Federal judge rightly upset over wrongful jailing of Michael Cohen
Cellphones haven't stopped cops from lying — only courts can do that
Former prosecutors outraged at decision to dismiss the Flynn case should focus on the real problems
Lori Loughlin case should be dismissed if the prosecutors cheated
Let's use Roger Stone's case to fix our broken justice system
Michael Avenatti should not be in solitary confinement
We're addicted to jail

Felicity Huffman's 14-day sentence ample punishment in college fraud case (cnn.com)

Justice Gorsuch channels his inner-Scalia, and that's good for criminal defendants

Kim Kardashian is the hero that criminal justice reform needs

Federal prosecutors are trying to bully 'Aunt Becky' into pleading guilty

#MeToo has lost its way: In defense of Joe Biden

Barr and Rosenstein likely made correct legal decision on obstruction

Four years for Paul Manafort is the right sentence

A small next step for criminal justice reform: Fix good time credit

Paul Manafort should not be sentenced to 20 years in prison

OPR should investigate real prosecutorial misconduct, not Secretary of Labor Alex Acosta

Special counsel's office wrong to arrest Roger Stone instead of letting him self-surrender

Absolutely nothing wrong with Manafort's lawyers talking to Trump's lawyers

Mueller should not get to decide whether Manafort is lying

Brett Kavanaugh would not have been treated fairly had he been a defendant

Should Kavanaugh be confirmed if we don't know who is telling the truth

Five simple rules for judging Kavanaugh and his accusers

Kavanaugh won't be charged

David is committed to zealously representing each and every one of his clients. He has built a reputation for winning the most difficult cases with creative strategies. David takes each case personally and does not like to lose.

You can email David Markus at dmarkus@markuslaw.com

---

## Contact Us

Markus/Moss focuses on criminal defense representation at the trial and appellate level.

**Email David Markus:**
dmarkus@markuslaw.com

40 NW Third Street, Penthouse One
Miami, FL 33128
305 379-6667

## Office Location

Get Directions



---

Home Page | Firm Profile | Attorney Profiles | News and Articles | Case Summaries | Blog | Contact Us

Copyright © 2005-2014 Markus/Moss Disclaimer: Material presented on this website is intended for information purposes only. It is not intended as professional or legal advice and should not be construed as such.

Websites for Law Firms: Law Firm Design

# EXHIBIT B

| Date | Timekeeper | Discounted Rate | Billed Hours | Amount Claimed | Description |
|---|---|---|---|---|---|
| 3/24/2022 | MESTITZ, MICHAEL J. | $450 | 1.5 | $675 | Review complaint and outline responses re: Trump v. Clinton lawsuit. |
| 3/24/2022 | KENDALL, DAVID E. | $700 | 2 | $1,400 | Review Trump v. Clinton et al. complaint; teleconferences and emails; file review. |
| 3/25/2022 | MESTITZ, MICHAEL J. | $450 | 0.6 | $270 | Research Anti-SLAPP law. |
| 3/25/2022 | KENDALL, DAVID E. | $700 | 1 | $700 | Research on new Trump complaint; teleconferences. |
| 3/25/2022 | MESTITZ, MICHAEL J. | $450 | 1.1 | $495 | Outline responses to complaint. |
| 3/27/2022 | KENDALL, DAVID E. | $700 | 2 | $1,400 | Legal research on Trump lawsuit; review state law; research statute of limitations; emails and clips. |
| 3/28/2022 | TURNER, KATHERINE M. | $700 | 1 | $700 | Review Trump complaint in Trump v. Clinton lawsuit; team meeting re: same; call with ▇▇▇▇ re: same. |
| 3/28/2022 | MESTITZ, MICHAEL J. | $450 | 1.3 | $585 | Prepare for and meet re: case strategy; follow-up research. |
| 3/28/2022 | KENDALL, DAVID E. | $700 | 1.5 | $1,050 | Emails and teleconferences; meet with in-house team to discuss motion to dismiss; conference call with ▇▇▇▇; legal research. |
| 3/29/2022 | TURNER, KATHERINE M. | $700 | 0.1 | $70 | Review conflict disclosure. |
| 3/29/2022 | KENDALL, DAVID E. | $700 | 1 | $700 | Teleconferences and emails; debrief call with ▇▇▇▇. |
| 3/30/2022 | KENDALL, DAVID E. | $700 | 0.7 | $490 | File review; research; teleconference with ▇▇▇▇. |
| 4/1/2022 | MARKUS, DAVID O. | $625 | 15 | $9,375 | April 2022:  Confer and strategize via email and telephone with counsel regarding case, initial appearances, local rules, and complaint; review complaint; review draft motion to dismiss; draft and file pro hac motions; review and file response to motion to expedite. |
| 4/2/2022 | MESTITZ, MICHAEL J. | $450 | 2 | $900 | Reviewing RICO complaint and drafting motion. |
| 4/4/2022 | KENDALL, DAVID E. | $700 | 0.8 | $560 | File review and status report to client/ review plaintiff's motion to revise TJ. |
| 4/5/2022 | MESTITZ, MICHAEL J. | $450 | 5.1 | $2,295 | Researching and drafting MTD. |
| 4/6/2022 | TURNER, KATHERINE M. | $700 | 0.2 | $140 | Emails w/ team re local counsel for Trump suit. |
| 4/6/2022 | MESTITZ, MICHAEL J. | $450 | 2 | $900 | Researching and drafting MTD. |
| 4/7/2022 | MESTITZ, MICHAEL J. | $450 | 0.5 | $225 | Call with joint defense group. |
| 4/7/2022 | TURNER, KATHERINE M. | $700 | 0.7 | $490 | Joint defense call re Trump MTD; call w/ DEK re the same. |
| 4/7/2022 | KENDALL, DAVID E. | $700 | 1.5 | $1,050 | Teleconference re: local counsel; research on motion to dismiss; conference call with ▇▇▇▇ teleconference with counsel for ▇▇▇▇ and other defendants. |
| 4/7/2022 | MESTITZ, MICHAEL J. | $450 | 1.8 | $810 | Revising draft MTD. |
| 4/8/2022 | MESTITZ, MICHAEL J. | $450 | 1.3 | $585 | Call with counsel. |
| 4/8/2022 | KENDALL, DAVID E. | $700 | 1.5 | $1,050 | Teleconferences and emails; edit draft motion to dismiss; legal research; conference call with team; conference call with ▇▇ |
| 4/8/2022 | TURNER, KATHERINE M. | $700 | 3.5 | $2,450 | Reviewing, editing MTD Trump suit; JD calls w/ counsel for HFA re the same; call w/ team re the same. |
| 4/9/2022 | MESTITZ, MICHAEL J. | $450 | 2.6 | $1,170 | Revising draft per team comments. |
| 4/11/2022 | KENDALL, DAVID E. | $700 | 0.5 | $350 | Edit and revise draft motion to dismiss; emails with local counsel. |
| 4/12/2022 | KENDALL, DAVID E. | $700 | 0.5 | $350 | Emails and teleconferences ▇▇▇▇ and others; review third draft of motion to dismiss. |
| 4/12/2022 | MESTITZ, MICHAEL J. | $450 | 1.1 | $495 | Revising draft MTD. |
| 4/12/2022 | MESTITZ, MICHAEL J. | $450 | 1.2 | $540 | Research and email re anti-SLAPP procedure. |
| 4/13/2022 | MESTITZ, MICHAEL J. | $450 | 0.3 | $135 | Call with counsel. |
| 4/13/2022 | MESTITZ, MICHAEL J. | $450 | 0.4 | $180 | Revising draft MTD. |
| 4/13/2022 | MESTITZ, MICHAEL J. | $450 | 0.5 | $225 | Call with counsel. |
| 4/13/2022 | TURNER, KATHERINE M. | $700 | 1 | $700 | Joint defense calls re Trump MTD. |

| Date | Name | Rate | Hours | Amount | Description |
|---|---|---|---|---|---|
| 4/13/2022 | KENDALL, DAVID E. | $700 | 1.5 | $1,050 | Conference call with counsel for client; other calls and emails; revisit and edit draft to circulate; call with local counsel. |
| 4/14/2022 | TURNER, KATHERINE M. | $700 | 0.5 | $350 | Reviewing pro hac motion and local rules; emails w/ D. Kendall re ▮. |
| 4/14/2022 | KENDALL, DAVID E. | $700 | 2 | $1,400 | Teleconferences and emails with counsel for co-defendants; teleconference with Trump lawyers; file appearance; teleconference with local counsel; draft pro hac vice motion; revise our motion to dismiss; circulate to other counsel. |
| 4/15/2022 | KENDALL, DAVID E. | $700 | 1.5 | $1,050 | Teleconference with ▮; email re: interview; file review; work at revising Trump motion to dismiss. |
| 4/18/2022 | MESTITZ, MICHAEL J. | $450 | 0.5 | $225 | Call with counsel. |
| 4/18/2022 | TURNER, KATHERINE M. | $700 | 1 | $700 | Emails re Trump MTD; call w/ M. Mestitz re the same; call w/ A. Otterberg and M. Mestitz re MTD; reviewing ▮. |
| 4/18/2022 | MESTITZ, MICHAEL J. | $450 | 5.4 | $2,430 | Revising draft MTD. |
| 4/19/2022 | KENDALL, DAVID E. | $700 | 1.2 | $840 | Teleconferences with counsel for co-defendants in Trump suit; emails; review and revise draft motion to dismiss. |
| 4/19/2022 | MESTITZ, MICHAEL J. | $450 | 2.2 | $990 | Revising draft MTD and preparing tables. |
| 4/20/2022 | MESTITZ, MICHAEL J. | $450 | 0.6 | $270 | Call with counsel. |
| 4/20/2022 | MESTITZ, MICHAEL J. | $450 | 0.9 | $405 | Tracking MTD coverage. |
| 4/20/2022 | MESTITZ, MICHAEL J. | $450 | 1.1 | $495 | Finalizing MTD for filing. |
| 4/20/2022 | KENDALL, DAVID E. | $700 | 1.8 | $1,260 | Conference call with defense counsel; call with individual lawyers; finalize motion to dismiss; file. |
| 4/21/2022 | KENDALL, DAVID E. | $700 | 1 | $700 | Teleconferences and emails; review motions and other pleadings; calls with counsel for other defendants. |
| 4/22/2022 | KENDALL, DAVID E. | $700 | 1.2 | $840 | Conference call with ▮; review Trump motion and research; teleconferences and emails. |
| 4/22/2022 | MESTITZ, MICHAEL J. | $450 | 1.6 | $720 | Research re amendment of complaints and SOL. |
| 4/25/2022 | MESTITZ, MICHAEL J. | $450 | 0.5 | $225 | Emailing re docket materials. |
| 4/25/2022 | MESTITZ, MICHAEL J. | $450 | 1.5 | $675 | Assembling codefendant feedback. |
| 4/27/2022 | MESTITZ, MICHAEL J. | $450 | 0.5 | $225 | Emailing re docket materials. |
| 4/29/2022 | KENDALL, DAVID E. | $700 | 1 | $700 | Briefing call with ▮; telecons and emails; conf call with ▮. |
| 5/1/2022 | MARKUS, DAVID O. | $625 | 10 | $6,250 | May 2022: Confer and strategize via email and telephone with counsel and co-defendants' counsel regarding case, motion to dismiss, discovery and other issues; review numerous filings, including court orders and filings from co-defendants including motion to dismiss; prepare and send email to counsel regarding stipulation and order and file same. |
| 5/9/2022 | MESTITZ, MICHAEL J. | $450 | 0.7 | $315 | Reviewing ▮ draft MTD. |
| 5/18/2022 | KENDALL, DAVID E. | $700 | 0.5 | $350 | Conference call with defense counsel in Trump v. Clinton. |
| 5/20/2022 | KENDALL, DAVID E. | $700 | 0.7 | $490 | Respond to Questions re ▮; file review; report to client. |
| 5/23/2022 | KENDALL, DAVID E. | $700 | 1 | $700 | Telecons with ▮; clips check; review ▮; report to client. |
| 5/30/2022 | MESTITZ, MICHAEL J. | $450 | 0.8 | $360 | Drafting and emailing stipulation/stipulated motion. |
| 5/31/2022 | TURNER, KATHERINE M. | $700 | 0.5 | $350 | Reviewing, editing editorial; email to DEK re the same. |
| 5/31/2022 | MESTITZ, MICHAEL J. | $450 | 0.6 | $270 | Drafting and emailing stipulation/stipulated motion. |

| Date | Name | Rate | Hours | Amount | Description |
|---|---|---|---|---|---|
| 6/1/2022 | MARKUS, DAVID O. | $625 | 8 | $5,000 | June 2022: Confer and strategize via email and telephone with counsel and co-defendants' counsel regarding hearing before the magistrate judge, new motions to dismiss, discovery and other issues; review numerous filings, including court orders, amended complaint; review drafts of motions to dismiss; review and file proposed joint stipulation. |
| 6/1/2022 | MESTITZ, MICHAEL J. | $450 | 0.4 | $180 | Emailing re status conference. |
| 6/2/2022 | MESTITZ, MICHAEL J. | $450 | 0.4 | $180 | Preparing inventory of counsel. |
| 6/2/2022 | MESTITZ, MICHAEL J. | $450 | 0.5 | $225 | Strategy meeting. |
| 6/2/2022 | MESTITZ, MICHAEL J. | $450 | 1.3 | $585 | Status conference; follow up re same. |
| 6/2/2022 | KENDALL, DAVID E. | $700 | 1.5 | $1,050 | Telecons and emails; status conference (Zoom) before Judge Reinhart; follow-up. |
| 6/2/2022 | TURNER, KATHERINE M. | $700 | 1.5 | $1,050 | Team mtg re amended complaint; prepare for, attend status conference. |
| 6/10/2022 | KENDALL, DAVID E. | $700 | 1 | $700 | Research viability of ▮ investigations of ▮ data; email to Trump lawyers; review June 2 transcript; report to client. |
| 6/14/2022 | KENDALL, DAVID E. | $700 | 1.2 | $840 | Review S/L cases and cases on amended pleadings; telecons with ▮ counsel and ▮ lawyer; meet with researcher. |
| 6/15/2022 | KENDALL, DAVID E. | $700 | 1 | $700 | Conference call with all defense counsel in Trump v. Clinton et al; file review; meet with in-house team. |
| 6/16/2022 | TURNER, KATHERINE M. | $700 | 0.5 | $350 | Reviewing statute of limitations research; mtg w/ J. Asabor re the same. |
| 6/17/2022 | TURNER, KATHERINE M. | $700 | 0.3 | $210 | Reviewing, editing MTD work plan; phone call w/ D. Kendall re same. |
| 6/17/2022 | KENDALL, DAVID E. | $700 | 1 | $700 | Review pleadings; review file and emails and draft plan for all defendants to create consolidated Motion to Dismiss; telecons. |
| 6/21/2022 | TURNER, KATHERINE M. | $700 | 0.5 | $350 | Reviewing legal research re statute of limitations. |
| 6/21/2022 | KENDALL, DAVID E. | $700 | 2 | $1,400 | Telecons and emails; report to client re ▮; file review and begin drafting "battle plan" for MTD of Amended Complaint. |
| 6/22/2022 | KENDALL, DAVID E. | $700 | 3 | $2,100 | Review Trump amended complaint (193 pages); compare to original complaint; draft battle plan for defense counsel to file consolidated MTD; telecons and emails. |
| 6/23/2022 | TURNER, KATHERINE M. | $700 | 0.2 | $140 | Reviewing court order; emails w/ team re the same. |
| 6/23/2022 | TURNER, KATHERINE M. | $700 | 0.5 | $350 | Joint defense call re amended complaint. |
| 6/23/2022 | KENDALL, DAVID E. | $700 | 3.5 | $2,450 | Conference call with defense counsel re Trump amended complaint; post-call action memo; compare to complaint; begin drafting Statute of Limitations portion of MTD; telecons and emails. |
| 6/27/2022 | TURNER, KATHERINE M. | $700 | 0.1 | $70 | Reviewing case correspondence; emails to team. |
| 6/27/2022 | KENDALL, DAVID E. | $700 | 3 | $2,100 | Draft revised "Battle Plan" for consolidated MTD & send to defense counsel; telecons with Trump lawyer; telecons with ▮ and others. |
| 6/28/2022 | KENDALL, DAVID E. | $700 | 2 | $1,400 | Emails & phone calls; research & begin drafting revised statute-of-limitations arguments for consolidated MTD. |
| 6/28/2022 | MESTITZ, MICHAEL J. | $450 | 2.5 | $1,125 | Researching RICO tolling law. |
| 6/29/2022 | KENDALL, DAVID E. | $700 | 1.7 | $1,190 | Legal research; review pleadings & continue drafting SOL argument for new MTD; emails. |
| 6/30/2022 | TURNER, KATHERINE M. | $700 | 0.2 | $140 | Reviewing docket and case correspondence. |
| 6/30/2022 | KENDALL, DAVID E. | $700 | 2 | $1,400 | Calls with Trump lawyers to negotiate schedule; draft joint stipulation motion and file; continue research on S/L; begin drafting Clinton campaign Defendants' part of MTD; conferences with counsel for ▮ re ▮. |

| Date | Name | Rate | Hours | Amount | Description |
|---|---|---|---|---|---|
| 7/1/2022 | MARKUS, DAVID O. | $625 | 6 | $3,750 | July 2022:  Review court order re scheduling and other filings; confer and strategize with counsel re upcoming deadlines, motion practice, and other issues; review and offer comments re draft motions; file motion for extension of time. |
| 7/1/2022 | TURNER, KATHERINE M. | $700 | 0.3 | $210 | Reviewing court order; emails re the same. |
| 7/1/2022 | KENDALL, DAVID E. | $700 | 4.2 | $2,940 | Draft, circulate and file extension of time motion; two conf. calls with defense counsel; contact Trump counsel and SD Fla. Clerk's office; legal research on time limits; draft agenda for July 5; five calls with other defense counsel. |
| 7/5/2022 | TURNER, KATHERINE M. | $700 | 0.5 | $350 | Joint defense call re Trump MTD; follow-up emails re the same. |
| 7/5/2022 | KENDALL, DAVID E. | $700 | 1.7 | $1,190 | Conf. call with other defense counsel re new filing date and procedures for preparing consolidated motion; telecons and emails; work on our section of MTD. |
| 7/6/2022 | KENDALL, DAVID E. | $700 | 1.2 | $840 | Memo re possible procedure for MTD; telecon re filing motion for more pages; work on our section of MTD; review ▮▮▮ section. |
| 7/7/2022 | KENDALL, DAVID E. | $700 | 1.7 | $1,190 | Revise our SOL section of MTD - circulate; emails and conf. calls; report to client; ▮▮▮▮▮▮. |
| 7/7/2022 | TURNER, KATHERINE M. | $700 | 5.5 | $3,850 | Reviewing amended complaint; reviewing, editing draft brief. |
| 7/8/2022 | KENDALL, DAVID E. | $700 | 1 | $700 | Calls, emails, work on MTD and more-pages motion. |
| 7/8/2022 | TURNER, KATHERINE M. | $700 | 1 | $700 | Reviewing, editing HRC/other HRC defendants' insert for brief. |
| 7/10/2022 | MESTITZ, MICHAEL J. | $450 | 2.3 | $1,035 | Review material. |
| 7/11/2022 | KENDALL, DAVID E. | $700 | 1.2 | $840 | Work on consolidated MTD; phone call with counsel; emails; drafting MTD. |
| 7/11/2022 | MESTITZ, MICHAEL J. | $450 | 4.5 | $2,025 | Integrating codefendants' edits and sections into MTD; revising same. |
| 7/12/2022 | KENDALL, DAVID E. | $700 | 1.5 | $1,050 | Work on MTD; edit second draft; draft sections for ▮▮▮▮▮▮; phone calls and emails. |
| 7/12/2022 | MESTITZ, MICHAEL J. | $450 | 1.6 | $720 | Editing defendant-specific sections of MTD. |
| 7/13/2022 | MESTITZ, MICHAEL J. | $450 | 1.6 | $720 | Editing MTD draft; compiling codefendants' edits. |
| 7/13/2022 | KENDALL, DAVID E. | $700 | 2.2 | $1,540 | Re-draft sections of MTD; proofread; communication with Plaintiff's counsel; coordinate with other defense counsel; changes to MTD and fill-in section. |
| 7/13/2022 | TURNER, KATHERINE M. | $700 | 4.8 | $3,360 | Reviewing, editing MTD Trump amended complaint. |
| 7/14/2022 | KENDALL, DAVID E. | $700 | 2 | $1,400 | Analyze and coordinate many emails re final edits; communicate with Plaintiff's counsel; finalizing and file MTD. |
| 7/14/2022 | MESTITZ, MICHAEL J. | $450 | 7.9 | $3,555 | Proofing, cite-checking, editing, and inputting and checking tables; finalizing and filing MTD. |
| 7/15/2022 | MESTITZ, MICHAEL J. | $450 | 1 | $450 | Meet and confer call; follow-up re same; checking press coverage of MTD. |
| 7/15/2022 | KENDALL, DAVID E. | $700 | 1.2 | $840 | Video conference with Trump lawyers; review other Defendant's filings; telecons and emails. |
| 7/21/2022 | TURNER, KATHERINE M. | $700 | 0.2 | $140 | Call w/ D. Kendall and M. Mestitz re Trump reply brief. |
| 7/21/2022 | MESTITZ, MICHAEL J. | $450 | 0.7 | $315 | Call re Trump motion for extension and strategy; follow up re same. |
| 7/21/2022 | KENDALL, DAVID E. | $700 | 1 | $700 | Review recent Trump filings; draft opposition and set up phone call with other defense counsel; emails and telecons. |
| 7/22/2022 | MESTITZ, MICHAEL J. | $450 | 1.1 | $495 | Drafting opposition to motion re scheduling order. |
| 7/26/2022 | TURNER, KATHERINE M. | $700 | 0.1 | $70 | Call w/ D. Kendall re Trump reply brief. |
| 7/26/2022 | MESTITZ, MICHAEL J. | $450 | 0.9 | $405 | Call and follow-up re Reply planning. |

| Date | Name | Rate | Hours | Amount | Description |
|---|---|---|---|---|---|
| 7/26/2022 | KENDALL, DAVID E. | $700 | 1 | $700 | Zoom call with 18 defense counsel re replies to Trump opposition to MTD; follow up emails and telecons. |
| 8/1/2022 | MARKUS, DAVID O. | $625 | 7 | $4,375 | August 2022:  Review and offer comments on opposition to motion to dismiss; review and email local rule regarding spacing; review and offer comments on reply memo; review and file unopposed motion for leave to file excess page limits; file reply; review other defendants' replies; confer with counsel. |
| 8/4/2022 | MESTITZ, MICHAEL J. | $450 | 0.6 | $270 | Reviewing Trump opposition. |
| 8/5/2022 | KENDALL, DAVID E. | $700 | 2.2 | $1,540 | Review Trump opposition to our MTD; memo to team re response. |
| 8/5/2022 | TURNER, KATHERINE M. | $700 | 1.2 | $840 | Reviewing proposed briefing plan; emails and phone calls w/ M. Mestitz re the same; joint defense call; update to D. Kendall re the same; reviewing, editing draft extension motion. |
| 8/5/2022 | MESTITZ, MICHAEL J. | $450 | 0.3 | $135 | Joint Defense call. |
| 8/5/2022 | MESTITZ, MICHAEL J. | $450 | 5.4 | $2,430 | Reviewing and analyzing Trump filings; preparing Reply. |
| 8/6/2022 | KENDALL, DAVID E. | $700 | 1.2 | $840 | Review other Trump responses; begin drafting SOL response; emails. |
| 8/6/2022 | MESTITZ, MICHAEL J. | $450 | 4.8 | $2,160 | Drafting Reply sections. |
| 8/8/2022 | MESTITZ, MICHAEL J. | $450 | 2.3 | $1,035 | Revising draft Reply sections. |
| 8/9/2022 | TURNER, KATHERINE M. | $700 | 4 | $2,800 | Reviewing, editing reply brief in support of MTD Trump complaint. |
| 8/9/2022 | MESTITZ, MICHAEL J. | $450 | 4.2 | $1,890 | Combining draft sections; revising draft Reply. |
| 8/10/2022 | KENDALL, DAVID E. | $700 | 1.5 | $1,050 | Review and edit consolidated reply motion to Trump opposition; emails and telecons. |
| 8/10/2022 | TURNER, KATHERINE M. | $700 | 0.5 | $350 | Joint defense call re reply brief; emails re reply brief. |
| 8/10/2022 | MESTITZ, MICHAEL J. | $450 | 0.3 | $135 | Joint defense call. |
| 8/10/2022 | MESTITZ, MICHAEL J. | $450 | 4 | $1,800 | Proofing, cite-checking, and revising Reply; integrating edits from defense group. |
| 8/11/2022 | KENDALL, DAVID E. | $700 | 1 | $700 | Final review of reply, edits and proof; emails. |
| 8/11/2022 | TURNER, KATHERINE M. | $700 | 1 | $700 | Reviewing, editing reply brief in support of MTD Trump complaint. |
| 8/11/2022 | MESTITZ, MICHAEL J. | $450 | 3.2 | $1,440 | Finalizing and filing reply brief. |
| 9/1/2022 | MARKUS, DAVID O. | $625 | 5 | $3,125 | September 2022:  Review numerous pleadings, including government response and plaintiff's opposition; review court order dismissing case; research sanctions issues. |
| 9/9/2022 | KENDALL, DAVID E. | $700 | 1.5 | $1,050 | Emails & telecons; analyze Judge Middlebrooks' 65 page opinion; begin organizing defense counsel for sanctions motion. |
| 9/9/2022 | MESTITZ, MICHAEL J. | $450 | 1.2 | $540 | Reviewing opinion and emailing re same; legal research. |
| 9/10/2022 | MESTITZ, MICHAEL J. | $450 | 1.5 | $675 | Legal research and motion outline. |
| 9/11/2022 | MESTITZ, MICHAEL J. | $450 | 2 | $900 | Legal research and motion outline. |
| 9/12/2022 | KENDALL, DAVID E. | $700 | 0.7 | $490 | Telecons and emails review decision; draft and circulate agenda for defense counsel call on sanctions. |
| 9/12/2022 | MESTITZ, MICHAEL J. | $450 | 0.4 | $180 | Call with DEK and follow-up tasks. |
| 9/12/2022 | MESTITZ, MICHAEL J. | $450 | 3.4 | $1,530 | Drafting sanctions motion. |
| 9/13/2022 | KENDALL, DAVID E. | $700 | 2 | $1,400 | Begin drafting sanctions motion; legal research; telecons & emails; conf call with 25 defense counsel. |
| 9/13/2022 | MESTITZ, MICHAEL J. | $450 | 0.6 | $270 | Joint defense call and follow-up notes. |
| 9/13/2022 | TURNER, KATHERINE M. | $700 | 0.5 | $350 | Prepare for, participate in joint defense call re motion for sanctions. |
| 9/15/2022 | KENDALL, DAVID E. | $700 | 1 | $700 | Telecons & emails; research on sanctions motion. |
| 9/16/2022 | KENDALL, DAVID E. | $700 | 1 | $700 | Research and begin drafting sanctions motion in Trump v. Clinton et al. |
| 9/18/2022 | MESTITZ, MICHAEL J. | $450 | 7.4 | $3,330 | Joint defense call and follow-up notes. |

| Date | Name | Rate | Hours | Amount | Description |
|------|------|------|-------|--------|-------------|
| 9/19/2022 | KENDALL, DAVID E. | $700 | 2.2 | $1,540 | Review and revise 1st draft of sanctions motion; edit; check records; research on SD Florida local rules; circulate draft and cover email to Defendants counsel group. |
| 9/19/2022 | TURNER, KATHERINE M. | $700 | 2 | $1,400 | Reviewing, editing motion for sanctions; emails w/ team re the same. |
| 9/20/2022 | KENDALL, DAVID E. | $700 | 0.7 | $490 | Edit motion for sanctions; legal research; telecons re motion. |
| 9/21/2022 | KENDALL, DAVID E. | $700 | 1 | $700 | Review and incorporate defense counsel's suggestions to master sanctions motion. |
| 9/21/2022 | MESTITZ, MICHAEL J. | $450 | 0.5 | $225 | Team call and follow-up. |
| 9/21/2022 | TURNER, KATHERINE M. | $700 | 0.2 | $140 | Call w/ D. Kendall and M. Mestitz re motion for sanctions. |
| 9/22/2022 | MESTITZ, MICHAEL J. | $450 | 3.6 | $1,620 | Revising draft sanctions motion. |
| 9/22/2022 | TURNER, KATHERINE M. | $700 | 1 | $700 | Reviewing, editing motion for sanctions. |
| 9/23/2022 | MESTITZ, MICHAEL J. | $450 | 1 | $450 | Revising draft sanctions motion; emailing re same. |
| 9/26/2022 | KENDALL, DAVID E. | $700 | 0.7 | $490 | Work on sanctions motion and legal research. |
| 9/26/2022 | MESTITZ, MICHAEL J. | $450 | 1.1 | $495 | Research and drafting re sanctions declaration. |
| 9/27/2022 | KENDALL, DAVID E. | $700 | 1.5 | $1,050 | Work on sanctions template declaration from defense counsel; legal research; draft memo to other defense counsel and agenda for conference call. |
| 9/27/2022 | TURNER, KATHERINE M. | $700 | 0.1 | $70 | Reviewing draft email to joint defense group re motion for sanctions. |
| 9/27/2022 | MESTITZ, MICHAEL J. | $450 | 1.6 | $720 | Prep; call with DEK; follow-up re declaration and costs. |
| 9/28/2022 | KENDALL, DAVID E. | $700 | 1 | $700 | Zoom call with about 25 other defense lawyers re sanctions motion; telecons, emails and follow-up. |
| 9/28/2022 | TURNER, KATHERINE M. | $700 | 0.3 | $210 | Joint defense call re motion for sanctions. |
| 9/28/2022 | MESTITZ, MICHAEL J. | $450 | 0.5 | $225 | Joint call and prep re same; follow-up. |
| 9/29/2022 | KENDALL, DAVID E. | $700 | 0.7 | $490 | Research and work on DEK fees affidavit; telecons with other defendants' counsel. |
| 9/29/2022 | TURNER, KATHERINE M. | $700 | 0.1 | $70 | Emails w/ team re motion for sanctions. |
| 9/30/2022 | KENDALL, DAVID E. | $700 | 0.7 | $490 | Revise & redraft DEK declaration re fees & costs sought; memo to client. |

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Donald J. Trump,

        Plaintiff,

   v.

Hillary R. Clinton *et al.*,

        Defendants.

Civil Action No. 2:22-14102-DMM

## DECLARATION OF ROBERT P. TROUT IN SUPPORT OF DEFENDANTS' MOTION FOR SANCTIONS AND FEES

I, Robert P. Trout, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.     I am a Of Counsel at Schertler Onorato Mead & Sears, LLP, counsel of record for HFACC, Inc. and John Podesta in the above captioned matter. Prior to joining my current firm in March 2021, I was a partner in my own firm, Trout Cacheris & Solomon, which I founded in 1996 upon leaving the DC office of Holland & Knight, where I was a partner. I have been engaged in the practice of law since 1973.

2.     Attached as Exhibit A are the law firm website biographies of the attorneys at Schertler Onorato Mead & Sears, LLP for whom HFACC, Inc. and John Podesta seek attorneys fees. The biographies reflect the professional qualifications of those attorneys.

3.     Schertler Onorato Mead & Sears, LLP entered into retention agreements with HFACC, Inc. and John Podesta covering the present litigation. HFACC, Inc. and John Podesta agreed to pay all of Schertler Onorato Mead & Sears, LLP's costs, fees, and expenses incurred in connection with the present suit, and agreed to pay the firm's customary rates, which for this matter are $1,000 per hour for partners, $600 per hour for associates, and $150 per hour for paralegals.

4.     Attached as Exhibit B is a true and correct copy of the hours worked by counsel for

HFACC, Inc. and John Podesta.  HFACC, Inc. and John Podesta are not seeking reimbursement for the attorneys' customary hourly rates described in Paragraph 3.  Instead, HFACC, Inc. and John Podesta seek fees at discounted hourly rate for the attorneys as described in Exhibit B and below.  These discounted hourly rates are consistent with the rates this Court concluded were reasonable in *Celsius Holdings, Inc v. A SHOC Beverage, LLC*, No. 21-cv-80740, 2022 WL 3568042 (July 19, 2022).  Exhibit B also provides an accurate statement of the work provided by Schertler Onorato Mead & Sears, LLP, during the periods for which discounted fees are sought.

5.      Consistent with the discussion in the Memorandum in Support of Sanctions and the information provided in Exhibit B, I summarize below in Charts A, B, and C the fees associated with three different phases of the case:  the fees incurred from the filing of the initial complaint to the filing of HFACC, Inc.'s and John Podesta's initial motions to dismiss; the fees incurred between the filing of HFACC, Inc.'s and John Podesta's motions to dismiss to the Court's order dismissing the suit; and the fees incurred to date in connection with the motion for sanctions.[1]

6.      As reflected in Chart A, the discounted fees incurred by HFACC, Inc. and John Podesta from the filing of the initial complaint to the filing of HFACC, Inc.'s and John Podesta's initial motions to dismiss total $2,343.

7.      As reflected in Chart B, the discounted fees incurred by HFACC, Inc. and John Podesta from the filing of HFACC, Inc.'s and John Podesta's initial motions to dismiss to this Court's dismissal of the suit total $13,406.

8.      As reflected in Chart C, the discounted fees incurred by HFACC, Inc. and John Podesta in connection with the motion for sanctions, to date, total $4,600.

---

[1] The fees reflected in Exhibit B and summarized in charts A, B, and C do not include fees incurred in this matter that are reflected in block billing entries that include activities for other matters for which my firm was engaged to represent HFACC, Inc.

**Chart A:  Fees incurred from Complaint to initial MTD**

| Timekeeper | Discounted Fee | Hours | Fees |
|---|---|---|---|
| Robert P. Trout (Partner) | $700 | 0 | 0 |
| Paola Pinto (Associate) | $450 | 4.7 | $2,115 |
| Sarah Wilson (Paralegal) | $120 | 1.9 | $228 |

**Chart B:  Fees incurred initial MTD to dismissal**

| Timekeeper | Discounted Fee | Hours | Fees |
|---|---|---|---|
| Robert P. Trout (Partner) | $700 | 14 | $9,800 |
| Paola Pinto (Associate) | $450 | 6.6 | $2,970 |
| Natalie Henriquez (Paralegal) | $120 | 5.3 | $636 |

**Chart C:  Fees incurred to date on sanctions motion**

| Timekeeper | Discounted Fee | Hours | Fees |
|---|---|---|---|
| Robert P. Trout (Partner) | $700 | 2.2 | $1,540 |
| Paola Pinto (Associate) | $450 | 6.8 | $3,060 |

9.      I believe that the discounted rates claimed are reasonable given the professional qualifications of the billers as evidenced in Exhibit A for the Southern District of Florida market and given the rates approved by this Court in *Celsius*.

10.     Consistent with local Rule 7.3, counsel sent the motion papers and exhibits to Plaintiff's counsel on to Plaintiff's counsel on October 5, 2022.  Defendants met and conferred in good faith with Plaintiff's counsel by Microsoft Teams twice, on October 13 and October 26, 2022, but were unable to reach any agreement as to either the Defendants' entitlement to or the amount of fees and expenses not taxable under 28 U.S.C. §1920 that are recoverable from Plaintiff and/or

his counsel,

/s/

Robert P. Trout

Dated October 28, 2022

# Exhibit A



CONTACT US

# ROBERT P. TROUT



## ROBERT P. TROUT
### OF COUNSEL

✉ rtrout@schertlerlaw.com
☎ (202) 628-4199
👤 Vcard
in Linkedin

**EDUCATION:**
University of Virginia School of Law
Washington & Lee University

**BAR ADMISSIONS:**
District of Columbia
Maryland
Virginia

**PRACTICE FOCUS:**

› White-Collar Criminal Defense & Government Investigations

› Securities Litigation & Enforcement

› Civil Litigation

› Antitrust Litigation and Enforcement





---

## OVERVIEW —

Robert P. Trout has over 40 years' experience in civil and criminal litigation. His practice has concentrated primarily on complex commercial litigation and white-collar criminal defense, as well as the defense of administrative agency enforcement actions. He began his legal career at the Department of Justice, where he served for two years in the Criminal Division, followed by four years as an Assistant United States Attorney in

2021.

---

## EXPERIENCE ⊖

Representative matters:

Representation of individuals in investigations by Special Counsel Mueller and by Senate and House Intelligence Committees.

Representation of a Member of Congress in Constitutional challenge to the first ever FBI search of a Congressional office.

Defense of former Congressman, in eight-week jury trial, in major public corruption case involving allegations of bribery, honest services fraud and FCPA violations. After the Supreme Court decision in United States v. McDonnell, we brought a Section 2255 motion that resulted in the vacation of most counts of conviction and a substantial reduction in sentence.

Successful defense, in a two-week jury trial, of the CEO of a government contracting firm against charges of bribery of a public official and honest services wire fraud.

Representation of Special Committee of the Board of Directors regarding Department of Justice investigation of a company's alleged distribution of adulterated food products.

Representation of former CIA agent in criminal prosecution for leaking classified information.

Representation of BP employee in criminal investigation stemming from Deepwater Horizon explosion.

Defense of Merrill Lynch investment banker in Congressional investigation, criminal investigation, SEC suit, NYSE investigation, and civil suits arising from collapse of Enron.

Representation of major law firm in defense of legal malpractice suits.

Served as Special Counsel to the Council of the District of Columbia investigating allegations of cronyism and irregularities in the contracting practices of the D.C. Department of Parks and Recreation.

Defense of a former Fannie Mae employee in a DOJ civil False Claims Act investigation into transactions involving multi-million dollar apartment complexes.

Defense of large construction company and its principal in civil and criminal false claims investigations.

Defense of mortgage broker in criminal fraud prosecution.

Defense of individuals in criminal pharmaceutical case involving misbranded drugs.

Representation of individuals in major antitrust investigations, including those alleged to be involved in international price-fixing cartels.

Representation of a major manufacturer in antitrust civil suits concerning alleged price-fixing in urethanes chemicals and in the foam industry.

Representation of companies and individuals in suits alleging that departing employees misappropriated trade secrets and proprietary information and tortiously interfered with contracts.

---

## BACKGROUND                                                                    −

One of the original members of the Steering Committee of the Litigation Section of the District of Columbia Bar, Mr. Trout served as Chair of the Litigation Section in 1984-85. He previously served for six years, including one year as Chair, on the Attorney Grievance Committee of the United States District Court for the District of Columbia. He recently served as a member of the American Bar Association Standing Committee on the Federal Judiciary, which conducts evaluations of the professional qualifications of nominees to the federal bench. He has been active in the DC Bar's efforts to promote alternative dispute resolution ("ADR") and he has served as a volunteer mediator for both the United States District Court and the District of Columbia Superior Court. Mr. Trout is a member of the bars of the District of Columbia, Virginia, and Maryland, and he is admitted to practice before a number of federal courts, including the U.S. Supreme Court, the U.S. Court of Appeals for the D.C. Circuit, the Fourth Circuit, the Third Circuit, the Seventh Circuit, the Ninth Circuit, the Tenth Circuit, and the Federal Circuit, as well as the U.S. Tax Court.

---

## RECOGNITION                                                                   −

Mr. Trout is a Fellow of the American College of Trial Lawyers, and he has served as Chair of the College's State Committee for the District of Columbia. He is listed in The Best Lawyers in America in four categories (White Collar Criminal Defense, Bet-the-Company Litigation, Commercial Litigation, and Securities Litigation), and he is also listed in Super Lawyers, Chambers USA Guide America's Leading Lawyers for Business, and Washingtonian Magazine's Top Lawyers.

---



CONTACT US

# PAOLA PINTO



## PAOLA PINTO
### ASSOCIATE

✉ ppinto@schertlerlaw.com
📞 (202) 628-4199
📇 Vcard
in Linkedin

**EDUCATION:**
Georgetown University Law Center
The George Washington University

**BAR ADMISSIONS:**
Florida
District of Columbia

**PRACTICE FOCUS:**

› White-Collar Criminal Defense
& Government Investigations

› Criminal Defense

› Civil Litigation

## OVERVIEW ─

Paola Pinto joined Schertler & Onorato, LLP in 2019 as an associate. Before joining the firm, Ms. Pinto clerked for the Honorable Mathew J. Fader, Chief Judge of the Maryland Court of Special Appeals. Ms. Pinto is a native Spanish speaker and is proficient in French.

## EXPERIENCE ─

Representative Matters:

- Represented employees of an international pharmaceutical company in an investigation by the Department of Justice.

- Represented former employee of multinational food and beverage corporation in an investigation by the Securities and Exchange Commission.

- Represented students in Title IX investigations by various Universities.

- Represented advertising agency as a defendant in multiple civil lawsuits.

## BACKGROUND —

Ms. Pinto is a 2018 cum laude graduate of Georgetown University Law Center, where she was a member of the Appellate Litigation Clinic. She received her undergraduate degree, cum laude, in Political Science from The George Washington University.

Ms. Pinto's prior experience includes a clerkship with the Maryland Court of Special Appeals, as well as appellate work before a United States Court of Appeals and Board of Immigration Appeals. During law school, she completed legal externships in the Mexico City office of a global law firm and in the general counsel's office of a multinational company. In both roles, she regularly worked on legal matters in English and in Spanish.

# ATTORNEYS

The attorneys of Schertler Onorato Mead & Sears bring deep experience, practical judgment, and vigorous advocacy to the matters we handle. Our lawyers include former federal prosecutors, former members of the Antitrust and Tax Divisions of the Department of Justice, and a former Assistant to the Solicitor General. We have tried cases large and small, have briefed and argued numerous appeals, and also have the skill and acumen to negotiate resolutions of matters when it is in the best interests of our clients.  More detailed biographies of our attorneys are accessible below.

### PARTNERS

David Schertler
Danny C. Onorato
Christopher B. Mead
Stuart A. Sears
Amy Conway-Hatcher
David H. Dickieson
Habib F. Ilahi
Lisa Manning

### OF COUNSEL

Lisa H. Schertler
Tara N. Tighe
Robert P. Trout

### ASSOCIATES

Noah J. Cherry
Paola Pinto



EXPERIENCE.

JUDGMENT.

RESULTS.

To learn more about Schertler Onorato Mead & Sears

CONTACT US

# Exhibit B

SCHERTLER ONORATO MEAD & SEARS – Hillary for America (HFACC) Billing Entries[1]

| Date | Timekeeper | Discounted Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| 4/29/2022 | Pinto, Paola | $450 | 0.5 | $225 | Drafting Motion to appear pro hac vice. |
| 5/2/2022 | Pinto, Paola | $450 | 2.5 | $1,125 | Drafting motion to dismiss. |
| 5/10/2022 | Wilson, Sarah | $120 | 1.3 | $156 | Reviewing Trump civil suit on behalf of Ms. Pinto. |
| 5/11/2022 | Wilson, Sarah | $120 | 0.6 | $72 | Compiling list of accusations related to HFA in Trump's civil complaint on behalf of Ms. Pinto. |
| 5/12/2022 | Pinto, Paola | $450 | 1.7 | $765 | Revising and editing motion to dismiss Trump suit; reviewing other filings in civil litigation; communications with Mr. Trout. |
| 6/2/2022 | Pinto, Paola | $450 | 0.5 | $225 | Hearing on Trump lawsuit. |
| 6/2/2022 | Trout, Robert P. | $700 | 0.5 | $350 | Participate in status conference for Trump civil suit. |
| 6/14/2022 | Trout, Robert P. | $700 | 0.1 | $70 | Review and respond to correspondence among joint defense group regarding Trump lawsuit. |
| 6/27/2022 | Trout, Robert P. | $700 | 0.6 | $420 | Review correspondence from Kendall relating to response to amended complaint; telephone conference with Pinto; telephone conference with Kendall. |
| 7/1/2022 | Trout, Robert P. | $700 | 0.4 | $280 | Zoom conference with common interest group. |
| 7/5/2022 | Pinto, Paola | $450 | 0.2 | $90 | Telephone conference with counsel for other defendants in Trump lawsuit. |
| 7/8/2022 | Trout, Robert P. | $700 | 0.3 | $210 | Review of correspondence and drafts of motion for additional pages. |
| 7/9/2022 | Trout, Robert P. | $700 | 1.5 | $1,050 | Review and edit draft of motion to dismiss; review correspondence and draft from Debevoise regarding Mook; correspondence with Kendall. |
| 7/10/2022 | Trout, Robert P. | $700 | 0.8 | $560 | Review correspondence and draft re Sullivan; correspondence with Kendall and Pinto; correspondence with Podesta. |

[1] Not including fees incurred in this matter that are reflected in block billing entries that include activities for other matters for which Schertler Onorato Mead & Sears was engaged to represent HFACC, Inc.

| Date | Timekeeper | Discounted Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| 7/11/2022 | Henriquez, Natalie | $120 | 1.5 | $180 | Preparing document for allegations against Mr. Podesta. |
| 7/11/2022 | Pinto, Paola | $450 | 2.5 | $1,125 | Telephone conference with other counsel regarding motion to dismiss; legal research regarding First Amendment; reviewing amended complaint |
| 7/11/2022 | Trout, Robert P. | $700 | 2.3 | $1,610 | Conference call with Kendall and counsel for Mook and Sullivan; legal research; review motion for more pages; telephone conference with Pinto regarding motion to dismiss correspondence with Pinto; telephone conference with Podesta; work on motion dismiss. |
| 7/12/2022 | Henriquez, Natalie | $120 | 3.8 | $456 | Preparing notes on RICO Conspiracy and protections afforded to political speech for Mr. Podesta. |
| 7/12/2022 | Trout, Robert P. | $700 | 3.2 | $2,240 | Work on motion to dismiss; correspondence with Pinto; correspondence with Kendall; correspondence with Baker and Podesta. |
| 7/13/2022 | Pinto, Paola | $450 | 0.9 | $405 | Communications with Mr. Trout; reviewing draft motion to dismiss complaint in Trump lawsuit. |
| 7/13/2022 | Trout, Robert P. | $700 | 0.8 | $560 | Telephone conference with Kendall; correspondence with Pinto; review draft motion to dismiss; correspondence with Baker and Podesta. |
| 7/21/2022 | Trout, Robert P. | $700 | 0.1 | $70 | Correspondence with Kendall. |
| 7/26/2022 | Pinto, Paola | $450 | 0.7 | $315 | Joint defense conference regarding Trump suit; drafting memorandum of the same; discussions with Mr. Trout. |
| 7/26/2022 | Trout, Robert P. | $700 | 0.2 | $140 | Conference and correspondence with Pinto; review correspondence from Pinto; review correspondence from Mestiz. |
| 8/5/2022 | Pinto, Paola | $450 | 1.5 | $675 | Review opposition to motion to dismiss; joint defense conference call regarding Trump suit. |
| 8/9/2022 | Trout, Robert P. | $700 | 2 | $1,400 | Review of draft reply; correspondence with Williams & Connolly with suggested edits; correspondence with clients. |
| 8/10/2022 | Pinto, Paola | $450 | 0.3 | $135 | Joint defense conference on Trump suit; reviewing draft reply. |

| Date | Timekeeper | Discounted Rate | Time | Amount Claimed | Description |
|------|------------|-----------------|------|----------------|-------------|
| 8/10/2022 | Trout, Robert P. | $700 | 0.3 | $210 | Prepare for and participate in joint defense call. |
| 8/11/2022 | Trout, Robert P. | $700 | 0.8 | $560 | Review of revised draft of reply; correspondence with clients. |
| 8/15/2022 | Trout, Robert P. | $700 | 0.1 | $70 | Correspondence to client. |
| 9/13/2022 | Pinto, Paola | $450 | 0.8 | $360 | Joint defense zoom conference on Trump suit. |
| 9/13/2022 | Trout, Robert P. | $700 | 0.5 | $350 | Conference call regarding sanctions. |
| 9/15/2022 | Trout, Robert P. | $700 | 0.2 | $140 | Telephone conference with Kendall. |
| 9/19/2022 | Pinto, Paola | $450 | 0.3 | $135 | Reviewing sanctions motion. |
| 9/23/2022 | Trout, Robert P. | $700 | 0.3 | $210 | Correspondence with Kendall regarding sanctions motion; review and respond to correspondence from Kendall regarding sanctions motion. |
| 9/28/2022 | Pinto, Paola | $450 | 0.3 | $135 | Telephone conference with Joint Defense group on Trump Lawsuit. |
| 9/28/2022 | Trout, Robert P. | $700 | 0.8 | $560 | Telephone conference with Kendall. Prepare for conference call and review of draft declaration; legal research; conference call with common interest group; telephone conference with Kendall. |
| 9/28/2022 | Pinto, Paola | $450 | 5.4 | $2,430 | Drafting declaration in support of sanctions motion in Trump Lawsuit; reviewing March through August billing entries regarding Trump Lawsuit to support sanctions declaration; drafting exhibits to sanctions declaration; communications with Mr. Trout. |
| 10/2/2022 | Trout, Robert P. | $700 | 0.4 | $280 | Review and revise draft declaration on fees. |

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Donald J. Trump,

          Plaintiff,

    v.

Hillary R. Clinton *et al.*,

          Defendants.

Civil Action No. 2:22-14102-DMM

## DECLARATION OF SHAWN G. CROWLEY IN SUPPORT OF DEFENDANTS' MOTION FOR SANCTIONS AND FEES

I, Shawn G. Crowley, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.     I am a partner at Kaplan Hecker & Fink LLP ("KHF"), counsel of record for the Democratic National Committee and DNC Services Corporation (together, the "DNC") and Congresswoman Debbie Wasserman Schultz in the above captioned matter.

2.     Attached as Exhibit A are the law firm website biographies of the attorneys and staff at KHF for whom the DNC and Congresswoman Wasserman Schultz seek attorneys fees.[1]  The biographies reflect the professional qualifications of those attorneys and staff.

3.     KHF entered into a retention agreement with the DNC and Congresswoman Wasserman Schultz in connection with the present litigation.  The DNC agreed to pay all of KHF's costs, fees, and expenses incurred in connection with the present suit. [2]

4.     Attached as Exhibit B is a true and correct copy of the hours worked by counsel at

---

[1] Attorney Maggie Turner left KHF on June 3, 2022, to begin a federal district court clerkship. Her biographical information is included in Exhibit A, but no website biography is included for her.

[2] The DNC has agreed to pay the fees incurred by Congresswoman Wasserman Schultz in this matter.

KHF for the DNC and Congresswoman Wasserman Schultz. The DNC and Congresswoman Wasserman Schultz seek fees at discounted hourly rates for the attorneys and staff as described in Exhibit B and below. These discounted hourly rates are consistent with the rates this Court concluded were reasonable in *Celsius Holdings, Inc v. A SHOC Beverage, LLC*, No. 21 Civ. 80740, 2022 WL 3568042 (July 19, 2022). Exhibit B also provides an accurate statement of the work provided by KHF during the periods for which discounted fees are sought.

5. The DNC and Congresswoman Wasserman Schultz also retained the law firm of Gelber Schachter & Greenberg, P.A. ("GSG") to serve as local co-counsel for KHF.

6. Attached as Exhibit C are the law firm website biographies of the attorneys at GSG for whom the DNC and Congresswoman Wasserman Schultz seek attorneys fees. The biographies reflect the professional qualifications of those attorneys.

7. GSG entered into a retention agreement with the DNC and Congresswoman Wasserman Schultz in connection with the present litigation. The DNC agreed to pay all of GSG's costs, fees, and expenses incurred in connection with the present suit, and agreed to pay the firm's customary rates with a 25 percent discount.

8. Attached as Exhibit D is a true and correct copy of the hours worked by counsel at GSG for the DNC and Congresswoman Wasserman Schultz. The DNC and Congresswoman Wasserman Schultz seek fees at the hourly rate for the attorneys as described in Paragraph 7 and Exhibit D. These hourly rates are consistent with the rates this Court concluded were reasonable in *Celsius Holdings, Inc v. A SHOC Beverage, LLC*, No. 21 Civ. 80740, 2022 WL 3568042 (July 19, 2022). Exhibit D also provides an accurate statement of the work provided by GSG during the periods for which discounted fees are sought.

9. Consistent with the discussion in the Memorandum in Support of Sanctions and the

information provided in Exhibits B and D, I summarize below in Charts A, B, and C the fees associated with three different phases of the case: the fees incurred from the filing of the initial complaint to the filing of the DNC and Congresswoman Wasserman Schultz's initial motion to dismiss; the fees incurred between the filing of the DNC and Congresswoman Wasserman Schultz's motion to dismiss to the Court's order dismissing the suit; and the fees incurred to date in connection with the motion for sanctions.

10.     As reflected in Chart A, the discounted fees incurred by the DNC and Congresswoman Wasserman Schultz from the filing of the initial complaint to the filing of the DNC and Congresswoman Wasserman Schultz's initial motion to dismiss total $137,412.50.

11.     As reflected in Chart B, the discounted fees incurred by the DNC and Congresswoman Wasserman Schultz from the filing of the DNC and Congresswoman Wasserman Schultz's initial motion to dismiss total to this Court's dismissal of the suit total $32,780.00.

12.     As reflected in Chart C, the discounted fees incurred by the DNC and Congresswoman Wasserman Schultz in connection with the motion for sanctions, to date, total $15,632.50.

**Chart A: Fees incurred from Complaint to initial MTD**

| Timekeeper | Discounted Fee | Hours | Fees |
|---|---|---|---|
| Roberta Kaplan | $700 | 16.2 | $11,340.00 |
| Shawn Crowley | $700 | 22.9 | $16,030.00 |
| Joshua Matz | $700 | 42.4 | $29,680.00 |
| Maximillian Feldman | $450 | 63.8 | $28,710.00 |
| Anna Collins Peterson | $375 | 74.0 | $27,750.00 |
| Maggie Turner | $375 | 48.1 | $18,037.50 |
| James Blum | $375 | 2.3 | $862.50 |
| Kelsey Dietrich | $150 | 10.6 | $1,590.00 |
| Gerald Greenberg | $525 | 5.0 | $2,625.00 |
| Christopher Sundby | $262.50 | 3.0 | $787.50 |
| **Total** | | **288.3** | **$137,412.50** |

**Chart B: Fees incurred initial MTD to dismissal**

| Timekeeper | Discounted Fee | Hours | Fees |
|---|---|---|---|
| Roberta Kaplan | $700 | 4.5 | $3,150.00 |
| Shawn Crowley | $700 | 8.6 | $6,020.00 |
| Joshua Matz | $700 | 0.4 | $ 280.00 |
| Carmen Iguina Gonzalez | $500 | 4.3 | $2,150.00 |
| Maximillian Feldman | $450 | 25.3 | $11,385.00 |
| Anna Collins Peterson | $375 | 18.8 | $7,050.00 |
| Kelsey Dietrich | $150 | 3.4 | $ 510.00 |
| Gerald Greenberg | $525 | 2.9 | $1,522.50 |
| Natalie McGinn | $375 | 1.9 | $ 712.50 |
| **Total** | | **70.1** | **$32,780.00** |

**Chart C: Fees incurred to date on sanctions motion**

| Timekeeper | Discounted Fee | Hours | Fees |
|---|---|---|---|
| Roberta Kaplan | $700 | 3.6 | $2,520.00 |
| Shawn Crowley | $700 | 4.4 | $3,080.00 |
| Carmen Iguina Gonzalez | $500 | 5.5 | $2,750.00 |
| Maximillian Feldman | $450 | 9.9 | $4,455.00 |
| Anna Collins Peterson | $375 | 5.3 | $1,987.50 |
| Gerald Greenberg | $525 | 1.6 | $ 840.00 |
| **Total** | | **30.3** | **$15,632.50** |

13.     I believe that the discounted rates claimed are reasonable given the professional

qualifications of the billers as evidenced in Exhibits A and D for the Southern District of Florida

market and given the rates approved by this Court in *Celsius*.

14.     In connection with this case, counsel incurred necessary costs for electronic legal

research.  I understand that courts in this Circuit have held that legal research costs are not

ordinarily taxable as costs under 28 U.S.C. § 1920, but are properly considered a component of

attorneys' fees.  *Springer v. Convergy's Corp.*, No. 3:03-CV-302-J-99MCR, 2006 WL 8439203,

at *2 (M.D. Fla. July 7, 2006).  As such, in addition to the discounted fees set out above, the DNC

and Congresswoman Wasserman Schultz requests an award of $2,176.69 incurred for electronic

legal research.

15.     Consistent with local Rule 7.3, counsel sent the draft sanctions motion and draft supporting declarations to Plaintiff's counsel on October 5, 2022.  Defendants met and conferred in good faith with Plaintiff's counsel by Microsoft Teams twice, on October 13 and October 26, 2022, but were unable to reach any agreement as to either the Defendants' entitlement to or the amount of fees and expenses not taxable under 28 U.S.C. §1920 that are recoverable from Plaintiff and/or his counsel.

Dated: October 27, 2022                              /s/ *Shawn G. Crowley*
                                                  Shawn G. Crowley

# EXHIBIT A

# Roberta A. Kaplan

**Partner**

T: (212) 763-0885
E: rkaplan@kaplanhecker.com

[ + VCARD ]



Roberta ("Robbie") Kaplan is the founding partner of Kaplan Hecker & Fink LLP. In July 2017, Robbie left Paul, Weiss, Rifkind, Wharton & Garrison LLP after 25 years to found Kaplan Hecker & Fink, seeking to build what she calls a "new fashioned, old fashioned" law firm that combines a cutting-edge civil and criminal litigation practice with a groundbreaking commitment to using the courts to serve the public interest.

A renowned litigator with decades of experience in commercial, higher education, and civil rights litigation, *Chambers* observed that Robbie "defines a modern-day legal giant. A towering intellect and a genius in court, with the instincts of a street fighter." Sharon Nelles, head of litigation at Sullivan & Cromwell, is quoted in a profile of Robbie in the *New York Law Journal* explaining that Robbie "just sees things from a thousand different angles all at once, it's hard to keep up with her thought processes. She knows her law cold, she knows the Constitution cold and she's not afraid, if she sees a problem, to go figure out some law that's going to allow her to fix it. She'll find it." "The consensus in the New York legal community is that [Robbie] is a powerhouse," Stephen Gillers, a legal ethics professor at New York University School of Law, told *Bloomberg Law* for a profile. "She's a lawyer that you don't want to see opposing you."

The *Washington Post* has described Robbie as "a brash and original strategist, with neither a gift for patience nor silence, a crusader for underdogs who has won almost every legal accolade imaginable." Among the numerous honors and recognitions Robbie has received, she has been recognized as the 2020 "Attorney of the Year" by the *New York Law Journal*, received a Lifetime Achievement Award from the *New York Law Journal*, and has been honored as "Litigator of the Year" by *The American Lawyer*, "Lawyer of the Year" by *Above the Law*, and "Most Innovative Lawyer of the Year" by *The Financial Times*. *The Financial Times* noted that "the judges had little trouble picking just one of them to win the award for most innovative individual – itself an innovation for the report this year. Robbie Kaplan has been involved in some of the most important legal developments of recent years." Robbie has consistently been listed as one of the top litigators and top women litigators in the country, as well as one of the top lawyers in New York.

## Commercial Litigation

Among Robbie's clients are a wide range of clients in the tech, financial services, and other sectors, including Airbnb, Riot Games, various hedge and private equity funds, Uber, Natixis, Goldman Sachs, and Fitch Ratings, who she represents in their most complex legal challenges, delivering a consistent track record of compelling advocacy, creative arguments, and impressive results.

Robbie has represented a number of companies in tech and the sharing economy. On behalf of Airbnb, she succeeded in obtaining a preliminary injunction on Fourth Amendment grounds blocking a New York City ordinance that would have required Airbnb to turn over massive amounts of data, a prospect that posed significant privacy concerns. See *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467 (S.D.N.Y. 2019) (Engelmayer, J.). Robbie ultimately secured a favorable settlement in that case

**EDUCATION**

B.A., Harvard University, 1988
*magna cum laude and Phi Beta Kappa*

J.D., Columbia University, 1991

**CLERKSHIPS**

Hon. Mark L. Wolf, U.S. District
Court for the District of Massachusetts

Hon. Judith S. Kaye, New York Court
of Appeals

**FELLOWSHIPS, LEADERSHIP &
RECOGNITION**

Leading Corporate Employment
Lawyers, *Lawdragon 500*, 2023

Top 10 Women in Litigation,
*Benchmark Litigation*

Leading Plaintiff Employment & Civil
Rights Lawyers, *Lawdragon 500*, 2021
and 2022

Litigation: General Commercial - New
York, *Chambers*, USA Guide, 2020 -
2022

Trailblazer: Plaintiff's Attorney, *The
National Law Journal*, 2022

Charles B. Stover Award, University
Settlement

Attorney of the Year, *New York Law
Journal*

Gotham Great Award, Citizens Union

Legends of 2020, *Lawdragon 500*

Lifetime Achievement Award, *Corporate
Counsel's* Women, Influence & Power in
Law Awards, 2019

Top 100 Trial Lawyers, *Benchmark
Litigation*

*2020 Best Lawyers in America*,
Commercial Litigation

addressing those issues. She has also represented Uber in several cases involving significant business and privacy concerns posed by government regulation.

Given that she is a proud New Yorker, Robbie has handled a wide variety of cases representing clients on Wall Street and in the financial services sector, including matters involving stock analysts' recommendations, market timing in mutual funds, reinsurance transactions, and structured finance transactions. In the wake of the financial crisis in 2007, Robbie represented Fitch Ratings for several years in dozens of regulatory investigations and civil litigations in both state and federal court relating to Fitch's credit ratings of RMBS, CDO, and municipal bond transactions. As a result of these and other matters, Robbie has decades of experience dealing with the complex interplay between regulatory investigations and the civil lawsuits that almost inevitably follow. She is currently defending Natixis in a RMBS "repurchase" action in which the complaint seeks more than $500 million in damages.

## Higher Education

Robbie has earned a reputation for helping top universities navigate their most pressing legal challenges. She has represented Columbia University for almost a decade in a number of cases related to Title IX and alleged gender-based misconduct, winning multiple motions to dismiss. See, e.g., *Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353 (S.D.N.Y. 2016) and *Roskin-Frazee v. Columbia Univ.*, 474 F. Supp. 3d 618 (S.D.N.Y. 2019). Robbie recently secured the dismissal of breach of contract claims in an ongoing litigation against Columbia University seeking hundreds of millions of dollars in tuition refunds related to the COVID-19 pandemic. See *In re Columbia Tuition Refund Action*, No. 20-CV-3208 (JMF), 2021 WL 790638 (S.D.N.Y. Feb. 26, 2021)(Furman, J.). In January 2021, Robbie defeated a motion for a preliminary injunction in federal district court seeking to require Brown University to restore its men's and women's squash teams to varsity status. Robbie similarly secured a favorable settlement for Brown in high-profile litigation related to gender proportionality requirements in its athletics programs. Most recently, Robbie was chosen by the NCAA to conduct an independent investigation into gender equity issues involving the NCAA, including the NCAA women's basketball championships.

## Gender Equity

Robbie has represented a number of women, both as plaintiffs and defendants, who have suffered from domestic abuse, sexual harassment, discrimination, or assault, including the actress Amber Heard in a $50 million defamation lawsuit filed by her ex-husband Johnny Depp, E. Jean Carroll, who sued Donald Trump for defamation in connection with a sexual assault that occurred in the mid-1990s, and "victim #1" in the Southern District of New York indictment of Jeffrey Epstein.

## Public Interest

Throughout her career, Robbie has had a deep-seated commitment to using the law to advance the public interest – she founded Kaplan Hecker in order to put that mission where it deserves to be – at the center of the firm's practice. She is perhaps best known for successfully arguing before the United States Supreme Court on behalf of her client Edith Windsor in *United States v. Windsor*, the landmark case in which the Supreme Court ruled that a key provision of the Defense of Marriage Act (DOMA) violated the U.S. Constitution by barring legally married same-sex couples from enjoying the wide-ranging benefits of marriage. The consequences of the *Windsor* decision were both rapid and profound. Professor Laurence Tribe of Harvard Law School has observed that he could not "think of any Supreme Court decision in history that has ever created so rapid and broad a lower-court groundswell in a single direction as *Windsor*." Following her victory in *Windsor*, Robbie successfully litigated several LGBTQ rights cases in Mississippi, including successfully challenging the City of Starkville's denial of a permit for its first ever LGBTQ pride parade.

One of the very first cases filed by Kaplan Hecker was a high-stakes lawsuit under the Ku Klux Klan Act of 1871 against twenty-four neo-Nazi and white supremacist leaders responsible for organizing the racial- and religious-based violence in Charlottesville in August 2017. See *Sines v. Kessler*, 324 F. Supp. 3d 765 (W.D. Va. 2018). In that case, Robbie and her team won a landmark decision assuring that white nationalists who

Law Power 50 and 2020 Law Power 100, *City & State New York*, 2019

Pride Power 100, *City & State New York*

Top Hollywood Attorney, *The Hollywood Reporter*

Leading Lawyers in America, *Lawdragon 500*, 2017-2022

New York Super Lawyers

Gold Medal Award. New York State Bar Association, 2018

Lifetime Achievement Award, *New York Law Journal*

Inspiration Award, WNBA, 2018

Eleanor Roosevelt Medal of Honor, 2018

Honoree, Alliance for Justice, 2018

Human Relations Award, Anti Defamation League, 2018

Litigator of the Year, American Lawyer, 2013

The 100 Most Influential Lawyers in the U.S., *The National Law Journal*

Lawyer of the Year, *Above The Law*, 2013

Most Innovative Lawyer of The Year, *The Financial Times*, 2014

Medal of Excellence, Columbia Law School

National Equality Award, Human Rights Campaign

Social Action Award, National Council of Jewish Women

Honorary Doctor of Laws, Jewish Theological Seminary

Honorary Doctorate in Humane Letters, Johns Hopkins University

Honorary Doctor of Laws, Millsaps College

**BAR AND COURT ADMISSIONS**

U.S. Supreme Court

U.S. Court of Appeals for the First, Second, Third, Fifth, Sixth, Ninth, Tenth, and Eleventh Circuits

U.S. District Court for the Southern District of New York, Eastern District of New York, and Northern District of New York

U.S. District Court for the District of Colorado

New York

Massachusetts

plotted racially motivated violence in 2017 will be held accountable. Robbie has likewise worked to hold Donald Trump accountable for fraudulent conduct in his business activities through her representations of Mary Trump as well as a class of victims of Trump's fraudulent promotion of a multi-level marketing company. As the *Washington Post* noted, "a hallmark of Kaplan Hecker & Fink is crafting complaints in layman's language that packs a wallop. The Mary Trump brief is a doozy…" Mary Trump herself went further when describing Robbie to *Bloomberg Law:* "She's brilliant, she's unrelenting, she can't be intimidated and she's not going to back down. She eats bullies… for lunch."

\*\*\*

Robbie is the author of the book *Then Comes Marriage: United States v. Windsor and the Defeat of DOMA* (W.W. Norton), chosen by the *L.A. Times* as one of the top 10 books of 2015. President Bill Clinton noted that "*United States v. Windsor* was a landmark ruling and the case's architect, Roberta Kaplan, emerged as a true American hero. *Then Comes Marriage* is a riveting account of a watershed moment in our history, and the strategy, ingenuity, and humanity that made it happen." Rachel Maddow similarly noted that Robbie's book "will forever change the understanding of this landmark case—its genesis, its outside-the-box strategy, and its tactical brilliance."

In addition to an A.B. from Harvard College *magna cum laude* and a J.D. from Columbia Law School (where she teaches a seminar on advanced civil procedure), Robbie holds an Honorary Doctorate of Humane Letters from Johns Hopkins University and an Honorary Doctorate of Laws from the Jewish Theological Seminary, among others.

## Areas of Specialty

Appellate Litigation   Commercial Litigation

Education

Employment, Discrimination, and Sexual Misconduct

Investigations and Crisis Management

Public Interest Litigation

Regulatory Enforcement and Litigation   Trials

## Read about Roberta A. Kaplan in our Newsroom



Published on: **SEPTEMBER 19, 2022**

### Roberta Kaplan Featured on "Amicus with Dahlia Lithwick: Lady Justice and Charlottesville Nazis"

Kaplan Hecker founding partner Roberta ("Robbie") Kaplan joined her dear friend, journalist Dahlia Lithwick on the podcast "Amicus

KAPLAN HECKER & FINK LLP

ABOUT US    OUR TALENT    OUR WORK    NEWSROOM    CONTACT US    CAREERS    SEARCH

# Joshua Matz

**Partner**

T: (212) 763-0885
E: jmatz@kaplanhecker.com

**+ VCARD**



Joshua Matz is a partner at Kaplan Hecker & Fink LLP, resident in the DC office.

Joshua's practice includes complex commercial disputes, constitutional and civil rights law, and Supreme Court and appellate litigation. He litigates a wide array of commercial cases, ranging from contract, fraud, and misappropriation disputes to consumer protection and sex discrimination matters. He advises individuals and companies on their response to congressional and state attorney general inquiries, participates in sensitive internal investigations, and supports clients seeking to navigate complex legal questions. Along with several of his colleagues at Kaplan Hecker, Joshua has represented Brown and Columbia Universities in Title IX litigation.

Joshua maintains a substantial civil rights and constitutional practice. His cases have ranged across LGBTQ rights, religious liberty, reproductive rights, freedom of speech, privacy, firearm regulation, the right to counsel, due process, and the scope of constitutional remedies. He has represented individual clients, civil rights organizations, non-profits, companies, current and former government officials, cities, states, and congressional committees. While many of these representations have involved litigation, he also provides practical counsel to clients who seek to assess their options and risk profile in areas of legal uncertainty.

Joshua's list of current and recent representations in this field include:

- The Governors of Wisconsin and Pennsylvania in defending their states' congressional districting maps against challenges at the U.S. Supreme Court

- Two New York State legislators in a lawsuit against the NYPD for police misconduct during the May 2020 Black Lives Matter protests

- The Commonwealth of Pennsylvania in defending its certification of the results of the 2020 presidential election at the U.S. Supreme Court

- Victims of consumer fraud in a federal class action lawsuit against Donald J. Trump, his adult children, and the Trump Organization

- Students, parents, teachers, and LGBTQ rights groups in challenging Florida H.B. 1557 (the "Don't Say Gay" law)

- Governor Andy Beshear of Kentucky in defending the constitutionality of his COVID-19 public health orders at the U.S. Supreme Court

- The Federal Defenders of New York in a statutory and constitutional challenge to attorney access policies at the Metropolitan Detention Center

- The SEIU in opposing a petition for certiorari seeking U.S. Supreme Court review of the constitutionality of a state access to information law

- Former Judge John Gleeson as court-appointed amicus in proceedings before Judge Emmett Sullivan in *United States v. Michael T. Flynn*

- The House Judiciary Committee in litigation seeking to compel testimony by former White House Counsel Don McGahn

- The City of Philadelphia in *Fulton v. Philadelphia*—a U.S. Supreme Court merits case involving a First Amendment challenge to the City's contractual non-discrimination requirements for foster care providers.

Joshua is also an experienced defamation litigator. His current and recent defamation representations include:

- representing E. Jean Carroll in a case against Donald J. Trump for defamatory statements Trump made in response to Ms. Carroll's public revelation that he had

**EDUCATION**

B.A., University of Pennsylvania, 2008 *magna cum laude*

M.S.T., Oxford University, 2009 *with distinction*

J.D., Harvard University, 2012 *magna cum laude*

**CLERKSHIPS**

Hon. Anthony M. Kennedy, Supreme Court of the United States

Hon. Stephen Reinhardt, U.S. Court of Appeals for the Ninth Circuit

Hon. J. Paul Oetken, U.S. District Court for the Southern District of New York

**FELLOWSHIPS, LEADERSHIPS & RECOGNITION**

40 & Under Hot List, *Benchmark Litigation*, 2020 - 2022

Rising Star of the Courtroom, *Business Insider*, 2022

Appellate Rising Star, *Law360*, 2022

Young Lawyer of the Year, *The American Lawyer*, 2021

Leading Plaintiff Employment & Civil Rights Lawyers, *Lawdragon 500*, 2021 and 2022

List of Most Influential People in Washington, *Washingtonian Magazine*, 2021 and 2022

Kentucky Colonel, Commonwealth of Kentucky

Future Star, *Benchmark Litigation*

Elite Trial Lawyers List, Rising Star, *The National Law Journal*, 2021

D.C. Rising Star, *The National Law Journal*, 2020

"30 under 30" Law & Policy List, *Forbes Magazine*, 2014

Articles & Book Reviews Chair, *Harvard Law Review*

**BAR AND COURT ADMISSIONS**

U.S. Supreme Court

sexually assaulted her

- successfully obtaining the dismissal of two state court defamation cases brought by Rep. Devin Nunes against Liz Mair for her political criticism.

- representing Stanford Medical School faculty who were threatened with a defamation suit for scientific criticism of policies advocated by former White House Coronavirus Advisor Dr. Scott Atlas.

Joshua has also filed amicus briefs on behalf of legal scholars, civil rights organizations, public officials, and medical experts. These briefs have addressed issues including:

- The denial of service to same-sex couples based on religious objections

- The legality of emergency public health measures issued amid the pandemic

- Protecting students against sectarian religious coercion by school personnel

- The history of self-defense law and its implications for firearms regulation

- The availability of compassionate release in light of the First Step Act

- Judicial power to release ICE detainees facing a substantial risk of harm

- The application of Title VII to anti-LGBT discrimination

- The addition of a citizenship question to the census

- The exclusion of transgender persons from the military

- The need for due process limits on suggestive in-court eyewitness identifications

- The illegality of denying Medicaid coverage for gender-affirming surgeries

- The lawfulness of election administration grant programs.

In February 2021, Joshua took a leave of absence from the firm to serve as Impeachment Counsel to the House Judiciary Committee for the second Senate trial of President Trump; he previously served among counsel to the House Judiciary Committee for the first impeachment and trial of President Trump.

Alongside his litigation experience, Joshua has written for diverse audiences about legal issues. His articles have appeared in *The Washington Post*, *The Wall Street Journal*, *The Harvard Law Review Forum*, *The University of Chicago Law Review*, *The Fordham Law Review*, *The Daily Journal*, *The Guardian*, *The Atlantic*, and *Wired*, and he has been invited to speak at Harvard Law School, the 92nd Street Y, the ABA LGBT+ Forum, the National Constitution Center, and Politics & Prose. Joshua also serves as an Adjunct Professor at Georgetown University, where he co-teaches "Constitutional Litigation and the Executive Branch." Additionally, Joshua serves on the Board of Directors for Citizens for Responsibility and Ethics in Washington (CREW).

In March 2012, Joshua and Larry Tribe of Harvard Law School published "The Constitutional Inevitability of Same-Sex Marriage," 71 Md. L. Rev. 471 (2012). In June 2014, they published an award-winning book, *Uncertain Justice: The Roberts Court and the Constitution* (Henry Holt). In May 2018, they published their second book together, *To End a Presidency: The Power of Impeachment* (Basic Books). *The Economist* proclaimed this book "the definitive treatment of a vital subject."

Following law school, Joshua clerked for Judge J. Paul Oetken of the Southern District of New York, Judge Stephen Reinhardt of the Ninth Circuit Court of Appeals, and Justice Anthony M. Kennedy of the United States Supreme Court.

Joshua has received widespread acclaim for his work. In 2021, he was recognized by *The American Lawyer* as a "Young Lawyer of the Year"; more recently, *Law360* named him an "Appellate Rising Star" and *Business Insider* described him as a "Rising Star of the Courtroom." He has also been named to *Washingtonian Magazine's* List of Most Influential People in Washington in both 2021 and 2022. In January 2021, Joshua was commissioned by Governor Andy Beshear as a Kentucky Colonel for successfully defending the Governor's COVID-19 public health measures at the Supreme Court. In 2014, *Forbes* named Joshua to its "30 under 30" Law & Policy List—and in 2016 it named him an "Alumni All-Star" of past honorees.

Joshua received his JD, *magna cum laude*, from Harvard Law School. While in law school, he interned at the Public Citizen Litigation Group and the Federal Defenders of New York. He also served as Articles & Book Reviews Chair of the Harvard Law Review. Joshua received his MSt, with distinction, from Oxford University, and his BA, *magna cum laude*, from the University of Pennsylvania.

U.S. Courts of Appeals for the District of Columbia, Second, Third, Fourth, Fifth, Seventh, Ninth, and Tenth Circuits

U.S. District Court for the Southern District of New York and Eastern District of New York

U.S. District Court for the District of Columbia

U.S. District Court for the District of Colorado

U.S. District Court for the Western District of Michigan

U.S. District Court for the Eastern District of Wisconsin

New York

District of Columbia

## Areas of Specialty



Appellate Litigation   Commercial Litigation

Congressional Investigations   Education

Employment, Discrimination, and Sexual Misconduct

Investigations and Crisis Management

Public Interest Litigation

KAPLAN HECKER & FINK LLP

ABOUT US    OUR TALENT    OUR WORK    NEWSROOM    CONTACT US    CAREERS    SEARCH

## Shawn G. Crowley

**Partner**

T: (212) 763-0883
E: scrowley@kaplanhecker.com

[+ VCARD]



Shawn G. Crowley is a partner at Kaplan Hecker & Fink LLP, resident in the New York office.

A highly accomplished former federal prosecutor with a successful track record in high-profile criminal and commercial matters, Shawn helps corporate and individual clients to navigate and resolve complex internal and government-led investigations, and to implement effective compliance and remediation programs.

Shawn has a diverse white-collar practice, representing companies and individuals in connection with white-collar criminal defense and investigations by the Department of Justice, the Securities and Exchange Commission, the Treasury Department's Office of Foreign Asset Control, the Commodities Futures Trading Commission, and state and local enforcement agencies. These matters and investigations have included, among other things, alleged insider trading, securities and wire fraud, sanctions evasion, money laundering, and diversion of controlled substances. Shawn also maintains a broad civil practice, including advising clients in matters concerning allegations of harassment and discrimination, as well as contractual and labor and employment disputes.

Shawn has briefed and argued numerous appeals before the U.S. Court of Appeals for the Second Circuit. Her contributions to public service have been recognized with the Director's Award for Superior Performance by a Litigative Team and the U.S. Department of Justice Assistant Attorney General's Award.

Shawn's current and recent representations include:

- Representing employees of a major financial services institution in connection with DOJ and SEC investigations into block trading

- Representing the former CEO of a global technology company in a state attorney general criminal investigation of insider trading

- Representing employees of a Wall Street bank in connection with an SEC inquiry into the bank's preservation of off-channel communications

- Representing various individuals in separate federal criminal investigations into insider trading

- Representing the former founder and head of a crypto-currency hedge fund who was prosecuted by the U.S. Attorney's Office of the Southern District of New York for fraud

- Representing the principal of a financial services firm in connection with DOJ and SEC investigations into short trading and market manipulation

- Representing a witness in a criminal investigation into a real estate company for potential wrongdoing

- Representing the Democratic National Committee in connection with a criminal investigation relating to the 2016 presidential election, as well as a defamation and civil RICO suit brought by former president Donald J. Trump

- Representing an employee of New York-based non-profit in DOJ investigation into potential kickback scheme

- Representing professional athletes with claims of harassment

- Representing a financial services firm in an SEC investigation related to SPACs

- Representing a former officer of a fortune-500 company in connection with a DOJ/SEC accounting fraud investigation

**EDUCATION**

B.A., Northwestern University, 2006

J.D., Columbia Law School, 2011

**CLERKSHIPS**

Hon. Lewis A. Kaplan, U.S. District Court for the Southern District of New York

**FELLOWSHIPS, LEADERSHIP & RECOGNITION**

Best Lawyers: One to Watch, Litigation - Securities, *Best Lawyers*, 2023

40 & Under Hot List, *Benchmark Litigation*, 2022

Leading Plaintiff Employment & Civil Rights Lawyers, *Lawdragon 500*, 2022

Director's Award for Superior Performance by a Litigative Team, 2019

U.S. Department of Justice Assistant Attorney General's Award, 2019

James Kent Scholar, Columbia Law School

Harlan Fisk Stone Scholar, Columbia Law School

Editor-in-Chief, *Columbia Journal of Environmental Law*

Alfred S. Forsyth Prize for Excellence in Environmental Law, Columbia Law School

**BAR AND COURT ADMISSIONS**

U.S. Court of Appeals for the Second Circuit

U.S. District Court for the Southern District of New York

New York

## Areas of Specialty

[Appellate Litigation]   [Cryptocurrency]

- Representing an individual in connection with a Commodity Futures Trading Commission investigation into swaps trading at a large commercial bank

- Representing an employee of a major transport-solutions company in connection with a DOJ investigation into the company's compliance measures

- Representing a non-profit homeless services provider in connection with state and federal criminal investigation into its former CEO relating to embezzlement and kickbacks

Shawn joined the firm after serving for more than six years as an Assistant United States Attorney in the United States Attorney's Office for the Southern District of New York, during which time she investigated, supervised, and prosecuted a variety of cases, including matters involving terrorism and national security offenses, sanctions violations, money laundering, cyber-terrorism, opioid diversion, and international narcotics trafficking. Shawn was Co-Chief of both the Narcotics Unit and Terrorism and International Narcotics Unit, supervising dozens of Assistant U.S. Attorneys, investigators, and other personnel in investigations, prosecutions, and trials involving a wide range of national security, drug trafficking, and white-collar offenses.

Notable cases that Shawn supervised include the first-ever felony charges against an opioid distributor, Rochester Drug Co-Operative, and its former chief executive officer and chief compliance officer, in 2019, which resulted in a trial conviction, deferred prosecution agreement, imposition of a monitorship and $20 million fine, and guilty pleas; sanctions evasion, money laundering, and fraud charges against Türkiye Halk Bankasi A.Ş. or "Halkbank," for its alleged participation in a multi-billion-collar Iranian sanctions-evasion scheme; the capital prosecution of Sayfullo Saipov for the alleged 2017 truck attack in Tribeca; and the coordinated narcotics-trafficking charges against five doctors and two other health care professionals for oxycodone diversion in 2018. Shawn also supervised the 2020 prosecution of the sitting president of Venezuela, Nicolás Maduro, and other high-level Venezuelan officials, on charges of narco-terrorism and weapons offenses.

Shawn has tried numerous cases as a prosecutor, including those involving terrorism offenses, money laundering, opioid diversion, racketeering, murder, and narcotics trafficking. These included the trial and conviction of the so-called "Chelsea Bomber," Ahmad Khan Rahimi, for perpetrating a terrorist attack bombing in the Chelsea neighborhood of Manhattan in October 2016, and the trial and conviction of Akayed Ullah for his attempted suicide bombing in the Times Square subway station in 2017. Shawn previously served as a Lecturer-in-Law at Columbia Law School, where she supervised externships for law students within the Southern District of New York. She began her career as an associate at Cravath, Swaine & Moore LLP where she maintained a broad commercial litigation practice with a focus on matters involving violations of federal securities and antitrust laws, and served as a law clerk to the Honorable Lewis A. Kaplan of the United States District Court for the Southern District of New York.

Shawn received her JD from Columbia Law School, where she was a James Kent Scholar, a Harlan Fiske Stone Scholar, the editor-in-chief of the *Columbia Journal of Environmental Law*, and a recipient of the Alfred S. Forsyth Prize for Excellence in Environmental Law. She received her BA from Northwestern University.

| | |
|---|---|
| Cybersecurity and Data Privacy | |
| Employment, Discrimination, and Sexual Misconduct | |
| FCPA and Anti-Corruption | |
| Investigations and Crisis Management | |
| Public Interest Litigation | |
| Regulatory Enforcement and Litigation | |
| Securities Enforcement and Litigation | Trials |
| White Collar Criminal Defense | |

## Read about Shawn G. Crowley in our Newsroom



Published on: JULY 27, 2022

### Several Partners Named to Benchmark Litigation's 2022 40 & Under Hot List

Kaplan Hecker & Fink LLP is proud to announce partners Shawn Crowley, Joshua Matz, John Quinn, and Ray Tolentino have been named to Benchmark Litigation's 2022... READ MORE



Published on: JUNE 16, 2022

### Kaplan Hecker & Fink Attorneys Named to 2022 Lawdragon 500 Leading Plaintiff Employment & Civil Rights Lawyers Guide

NEW YORK, NY, June 16, 2022 – Kaplan Hecker & Fink LLP is pleased to announce that 10 of its lawyers have been named to the 2022 Lawdragon 500 Leading... READ MORE



Published on: MAY 24, 2022

### New York's Adult Survivors Act (A648/S66)

On May 24, Governor Hochul signed into law the Adult Survivors Act (A648/S66) (the "Act"). The Act amends New York's Civil Practice Law and Rules ("CPLR") to... READ MORE

# Carmen Iguina González

**Counsel**

T: (212) 763-0885
E: ciguinagonzalez@kaplanhecker.com

**+ VCARD**



Carmen Iguina González is counsel at Kaplan Hecker & Fink, resident in the DC office. She joined the firm in 2022.

Carmen specializes in appellate and complex civil litigation and has substantial experience representing clients in matters related to administrative, constitutional, and civil rights law. She is a nationally renowned civil rights litigator whose work has advanced the rights of immigrants and people of color, including litigation concerning the right to legal representation, basic fairness in removal proceedings, and critical protections against arbitrary detention. She has won path-breaking court rulings, advocated for the rights of asylum seekers, unaccompanied immigrant children, families, and other immigrants seeking refuge in the United States, and has worked with federal, state, and local governments to enact policies aimed at protecting immigrant communities. In addition to her legal work, Carmen advocates for immigrants' rights and has frequently written on related topics, including California immigration legislation, injustices in the asylum-seeking process, and the mistreatment of immigrants with serious mental disabilities in immigration detention centers.

Carmen is a member of the Hispanic Bar Association of the District of Columbia, the Hispanic National Bar Association, and the DC Circuit Standing Committee on Pro Bono Legal Services. She also serves as a mentor to young lawyers through The Appellate Project, NYU Birnbaum Women's Leadership Network Fellows Program, and the NYU Law Alumni of Color Association. In 2022, Carmen was recognized by the Hispanic National Bar Association among their "Top Attorneys Under 40." She has also been recognized in 2018 as a "40 Under 40 Rising Star" by the NYU Law Alumni of Color Association, in 2016 as a California Attorney of the Year (Immigration), and in 2014 as the recipient of the American Immigration Lawyers Association, Jack Wasserman Memorial Award.

Carmen joined the firm from the ACLU Immigrants' Rights Project, where she worked as a Senior Staff Attorney. At the ACLU, Carmen developed and led complex civil rights litigation and engaged in advocacy to protect the rights of immigrant communities, including constitutional, statutory, and administrative law challenges to detention practices, restrictions on asylum, and immigration enforcement abuses. She represented immigrant detainees in challenges concerning the adequacy of procedures afforded at initial bond hearings. Carmen also served as counsel for plaintiffs in litigation challenging the practice of forcibly separating children from their parents at the US border. She also represented asylum seekers and organizational plaintiffs before the US Supreme Court and federal district court in challenges to the "Remain in Mexico" immigration policy.

Carmen has served as a law clerk at every level of the federal judiciary, having clerked for the Hon. Sonia Sotomayor of the Supreme Court of the United States, the Hon. Stephen R. Reinhardt of the United States Court of Appeals for the Ninth Circuit, and the Hon. Kiyo A. Matsumoto of the United States District Court for the Eastern District of New York.

**EDUCATION**

AB, Harvard University, 2005
*magna cum laude*

JD, New York University School of Law, 2010
*magna cum laude*

Root Tilden Kern Scholar

**CLERKSHIPS**

Hon. Sonia Sotomayor, US Supreme Court of the United States

Hon. Stephen R. Reinhardt, US Court of Appeals for the Ninth Circuit

Hon. Kiyo A. Matsumoto US District Court for the Eastern District of New York

**FELLOWSHIPS, LEADERSHIP & RECOGNITION**

Top Attorneys Under 40, Hispanic National Bar Association, 2022

40 Under 40 Rising Star, NYU Law Alumni of Color Association, 2018

California Attorney of the Year (Immigration), 2016

American Immigration Lawyers Association, Jack Wasserman Memorial Award, 2014

Prior to joining the ACLU as Senior Staff Attorney, Carmen was an associate for Jones Day, where she represented clients in complex civil, criminal, and administrative matters as an attorney in the Issues and Appeals practice group. She also maintained an active pro bono docket, including the Laredo Project, which has provided legal counsel, as well as legal education, to over 10,000 asylum seekers who have been detained by the US government. Carmen also represented asylum seekers pro bono in proceedings before the Immigration Court and Board of Immigration Appeals.

From 2012 to 2017, Carmen was an Equal Justice Works Fellow and then a Staff Attorney at the ACLU of Southern California, where her work included acting as counsel in the first case that established a right to appointed legal representation for any group of immigrants facing deportation. This case, *Franco v. Holder*, requires the federal government to provide legal representation to immigrants with serious mental disabilities. She was also counsel in *J.E.F.M. v. Holder*, a nationwide class action lawsuit seeking to require the government to provide children with legal representation in their deportation hearings, and in *Alfaro Garcia v. Holder*, a nationwide class action lawsuit filed on behalf of thousands of immigrants fleeing persecution who had faced months of detention while awaiting reasonable fear determinations.

Beyond her work pertaining to immigrant rights, Carmen has done critical work related to criminal justice. Carmen worked alongside a legal team in *Youth Justice Coalition v. City of Los Angeles*, a class action lawsuit on behalf of thousands of Angelenos against the Los Angeles police and prosecutors who unfairly subjected the plaintiffs to restrictive "gang injunctions" without due process. These "gang injunctions" included court orders that turn common behavior into crimes, such as possessing cell phones, drinking alcohol on your own front porch, and associating with people the police claim are also gang members. Carmen helped develop that litigation, working alongside community organizations to gather facts and interview affected community members, develop the legal claims, and brief key pleadings in the case. The team ultimately settled the case with the City of Los Angeles, ensuring that no resident is subjected to "gang injunctions" without fair warning and process.

Carmen was also lead counsel in *Bridges v. United States*, a criminal habeas appeal before the US Court of Appeals for the Seventh Circuit concerning the right to effective assistance of counsel at sentencing proceedings. *Bridges v. United States* established hugely important precedent in the circuit holding that defense counsel must develop and raise claims that have been foreshadowed in the case law, even when there was no binding in-circuit precedent on that exact issue. Carmen developed the arguments and argued the case before the court of appeals, ultimately securing this important victory for criminal defendants in the circuit.

Carmen received her JD, *magna cum laude*, from New York University School of Law, where she was a Root Tilden Kern Scholar and recipient of the Maurice Goodman Memorial Prize, awarded for outstanding scholarship and character, and the Ann Petluck Poses Memorial Prize, awarded for outstanding work in a clinical course requiring student practice. Carmen also served as an Articles Editor at the *New York University Law Review*. She received her AB, *magna cum laude*, from Harvard University, where she graduated with highest honors in her field and was awarded the Gordon W. Allport Prize for Distinguished Senior Thesis.

---

Read about Carmen Iguina González in our Newsroom

# Max Feldman

**Senior Associate**

T: (212) 763-0885
E: mfeldman@kaplanhecker.com



**+ VCARD**

Max Feldman is a senior associate at Kaplan Hecker & Fink LLP.

Max was previously counsel at the Brennan Center for Justice at NYU School of Law, where he litigated high-profile voting rights cases in state and federal courts at both the trial and appellate level. Among his most significant matters were a challenge to Texas Governor Greg Abbott's restrictions on absentee ballot drop-off locations ahead of the 2020 election, a challenge to the security of Georgia's voter registration system that resulted in new provisions of state law, and a lawsuit that prevented Texas from turning over voter data to President Trump's "voter fraud" commission. Max also provided legal and policy advice to policymakers and advocates on election issues, including providing assistance with legislative drafting. Max wrote a number of reports on election administration that have been cited extensively in the media, including by the *New York Times*, the *Washington Post*, the *New Yorker*, and *Vox*. A plan to protect the 2020 election from the coronavirus that he co-authored was widely endorsed by civil rights groups and political scientists.

Prior to his time at the Brennan Center, Max was a litigation associate at Munger, Tolles & Olson LLP. There, he maintained a complex commercial litigation practice, representing clients in a range of industries, including financial services and energy. A significant part of his practice focused on representing major financial institutions in litigation related to mortgages and mortgage-backed securities. In addition, he maintained a *pro bono* practice focused on immigration proceedings. Max also clerked for the Honorable Bruce M. Selya of the U.S. Court of Appeals for the First Circuit.

Max received his J.D. *magna cum laude* from the New York University School of Law, where he was elected to the Order of the Coif and served as an articles editor of the *NYU Law Review*.

Prior to law school, Max worked as a speechwriter, including as the head speechwriter for Governor David Paterson of New York. He graduated from Harvard College with an A.B. in Philosophy.

**EDUCATION**

A.B., Harvard College, 2007

J.D., NYU School of Law, 2013
*magna cum laude*

**CLERKSHIPS**

Hon. Bruce M. Selya, U.S. Court of Appeals for the First Circuit

**FELLOWSHIPS, LEADERSHIP & RECOGNITION**

Order of the Coif, NYU School of Law

Florence Allen Scholar, NYU School of Law

Guarini Scholar, NYU School of Law

Staff Editor, *NYU Law Review*

Articles Editor, *NYU Law Review*

**BAR AND COURT ADMISSIONS**

U.S. Court of Appeals for the Ninth Circuit

U.S. District Court for the Southern District of California

U.S. District Court for the Western District of Michigan

New York

---

Read about Max Feldman in our Newsroom

KAPLAN HECKER & FINK LLP

ABOUT US    OUR TALENT    OUR WORK    NEWSROOM    CONTACT US    CAREERS    SEARCH

# Anna Collins Peterson

**Associate**

T: (212) 763-0883
E: apeterson@kaplanhecker.com

**+ VCARD**



Anna Collins Peterson is an associate at Kaplan Hecker & Fink LLP.

She joined the firm after completing clerkships for the Honorable James A. Wynn, Jr. of the United States Court of Appeals for the Fourth Circuit and the Honorable Rebecca Goodgame Ebinger of the United States District Court for the Southern District of Iowa.

Anna graduated *summa cum laude* from the University of Wisconsin Law School, where she was first in her class. While in law school, she served as the Senior Articles Editor for the *Wisconsin Law Review*. She was inducted into the Order of the Coif and received awards including the Bruce Beilfuss Memorial Award for Service to the Law School, the Gwynette Smalley Law Review Prize, the Mathys Memorial Award for Achievement in Moot Court Competitions, and several Best Performance in Class awards. She also worked on campaign finance and election law as a research assistant to Professor Robert Yablon, provided post-conviction legal assistance to people in Wisconsin state prisons as a student attorney at the Frank J. Remington Center, and took part in the New York City Bar National Moot Court Competition.

Prior to law school, Anna worked as the traveling exhibits coordinator for the Wisconsin Veterans Museum, as a corporate trainer at a software company, and interned in the curator's office of the Supreme Court of the United States. She graduated Phi Beta Kappa from the University of North Carolina at Chapel Hill.

**EDUCATION**

B.A., University of North Carolina at Chapel Hill, 2012

*Phi Beta Kappa*

J.D., University of Wisconsin Law School, 2018

*summa cum laude*

**CLERKSHIPS**

Hon. James A. Wynn, Jr., U.S. Court of Appeals for the Fourth Circuit

Hon. Rebecca Goodgame Ebinger, U.S. District Court for the Southern District of Iowa

**FELLOWSHIPS, LEADERSHIP & RECOGNITION**

Order of the Coif, University of Wisconsin Law School

Bruce Beilfuss Memorial Scholarship for Service to the Law School, University of Wisconsin Law School

Gwynette Smalley Law Review Prize, University of Wisconsin Law School

Mathys Memorial Award for Achievement in Moot Court Competitions, University of Wisconsin Law School

Sonnet Schmidt Edmonds Award for Excellence in Energy Law, University of Wisconsin Law School

Senior Articles Editor, *Wisconsin Law Review*

Rath Foundation Scholarship, University of Wisconsin Law School

**BAR AND COURT ADMISSIONS**

U.S. Court of Appeals for the Fourth Circuit

U.S. District Court for the Western District of Wisconsin

Wisconsin

District of Columbia

New York

Maggie Turner Biography
March 2022

Margaret "Maggie" Turner is an associate at Kaplan Hecker & Fink LLP.

Maggie joined the firm after completing a clerkship with the Honorable Ronald M. Gould of the U.S. Court of Appeals for the Ninth Circuit. Prior to clerking, Maggie was a summer associate at Kellogg, Hansen, Todd, Figel & Frederick PLLC. In 2022, Maggie will clerk for the Honorable Carol Bagley Amon of the U.S. District Court for the Eastern District of New York.

Maggie graduated *magna cum laude* from the University of Michigan Law School, where she was inducted into the Order of the Coif. She served as a Notes Editor for the *Michigan Law Review* and as Co-President of the American Constitution Society. At Michigan, Maggie was a finalist in the Henry M. Campbell Moot Court Competition and later served on the competition's executive board. She also competed on the mock trial team and was a finalist at the John L. Costello National Criminal Mock Trial Competition in Washington, D.C. As a student attorney in Michigan's Federal Appellate Litigation Clinic, Maggie represented indigent criminal defendants in the Sixth Circuit. As a 3L, she briefed and argued a successful habeas petition that resulted in a published opinion. During law school, Maggie interned in the Public Integrity Section of the United States Department of Justice, where she focused on public corruption and election law.

Maggie began her career as an English literature teaching fellow at Millfield Senior School in Glastonbury, United Kingdom. She earned her B.A. in political philosophy, policy and law from the University of Virginia in 2014, graduating with distinction.

**EDUCATION**
- B.A., University of Virginia, 2014
  - *with Distinction*
- J.D., University of Michigan, 2020
  - *magna cum laude*

**CLERKSHIPS**
- Hon. Ronald M. Gould, U.S. Court of Appeals for the Ninth Circuit

**FELLOWSHIPS, LEADERSHIP & RECOGNITION**
- Order of the Coif, Michigan Law School
- Notes Editor, *Michigan Law Review*
- Second Place, Henry M. Campbell Moot Court Competition, Michigan Law School
- Problem Chair, Henry M. Campbell Moot Court Competition Board, Michigan Law School
- Co-President, American Constitution Society, Michigan Law School

**BAR AND COURT ADMISSIONS**
- New York

1

# James Blum

Associate

T: (212) 763-0885
E: jblum@kaplanhecker.com

**+ VCARD**



James Blum is an associate at Kaplan Hecker & Fink LLP.

Prior to joining Kaplan Hecker, James worked as a student advocate for the NAACP where he wrote memoranda for use in post-conviction cases.  He also assisted in the preparation for a state post-conviction evidentiary hearing and researched an amicus brief contesting the constitutionality of the death penalty under state law.  Previously, James served as a civil rights intern for the Surveillance Technology Oversight Project where he helped draft bills proposed in the New York Senate and conducted research, drafted testimony, and white papers relating to technologies and procedures threatening New Yorkers' privacy.

James graduated New York University School of Law where he was a Marden Moot Court Competition semifinalist and a staff editor for *Review of Law & Social Change*. He also worked as a research and teaching assistant.  He earned a B.A. from the University of Michigan in Economics.

**EDUCATION**

B.A., University of Michigan, 2013

J.D., New York University School of Law, 2020

**FELLOWSHIPS, LEADERSHIP & RECOGNITION**

Semifinalist, Marden Moot Court Competition

Staff Editor, *Review of Law & Social Change*

**BAR AND COURT ADMISSIONS**

New York

About Us    Our Talent    Our Work    Newsroom    Contact Us    Careers    Search

© Kaplan Hecker & Fink LLP. This web site contains attorney advertising. Prior results do not guarantee a similar outcome. Privacy Policy and Terms of Use.

KAPLAN HECKER & FINK LLP

ABOUT US     OUR TALENT     OUR WORK     NEWSROOM     CONTACT US     CAREERS     SEARCH

# Kelsey Dietrich

**Senior Case Manager**

T: (212) 763-0883
E: kdietrich@kaplanhecker.com

**+ VCARD**



Kelsey Dietrich is a senior case manager at Kaplan Hecker & Fink LLP.

Kelsey joins the firm after serving as a litigation paralegal at Vedder Price P.C, where she supported teams of attorneys in complex litigations up to and through the trial phase and in responding to DOJ and SEC investigations. She previously worked as a legal secretary and legal assistant at other Chicago-based law firms.

Kelsey also has an extensive background in political volunteering, including work helping to lead volunteer teams in national campaigns. She has similarly served as a public benefits enrollment volunteer for Legal Aid Chicago, assisting applicants for cash assistance and other public benefits to navigate complex government processes.

Kelsey is a *cum laude* graduate of Loyola University Chicago where she majored in International Studies and minored in Spanish and Marketing. She likewise received a Certificate in Paralegal Studies from the University's Institute of Paralegal Studies.

**EDUCATION**

B.A., Loyola University Chicago
*cum laude*



About Us     Our Talent     Our Work     Newsroom     Contact Us     Careers     Search

© Kaplan Hecker & Fink LLP. This web site contains attorney advertising. Prior results do not guarantee a similar outcome. Privacy Policy and Terms of Use.

# EXHIBIT B

Fees

| Date | Timekeeper | Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| 3/24/2022 | Anna Peterson | $375.00 | 2.9 | | Review media coverage of complaint filed against client; review complaint and draft summary for client and team of the same; correspond with team about the same. |
| 3/24/2022 | Roberta Kaplan | $700.00 | 1.2 | $1,087.50 | Analysis of Trump complaint. |
| 3/24/2022 | Shawn Crowley | $700.00 | 0.8 | $560.00 | Correspondence with client; review civil complaint and internal correspondence re same; call with client re ■ |
| 3/25/2022 | Roberta Kaplan | $700.00 | 1.2 | $840.00 | E-mails re: defenses, motion to dismiss. |
| 3/29/2022 | Shawn Crowley | $700.00 | 0.6 | $420.00 | Review complaint. |
| 4/3/2022 | Joshua Matz | $700.00 | 0.7 | $490.00 | Prepare for and participate in call with Shawn + continue review of case. |
| 4/3/2022 | Shawn Crowley | $700.00 | 0.9 | $630.00 | Conference with J. Matz re strategy. |
| 4/4/2022 | Joshua Matz | $700.00 | 0.2 | $140.00 | Email potential local counsel. |
| 4/4/2022 | Maximillian Feldman | $450.00 | 0.4 | $180.00 | Telephone conference with A. Peterson regarding case status; review docket; review motion to disqualify judge. |
| 4/4/2022 | Roberta Kaplan | $700.00 | 0.5 | $350.00 | E-mails re: local counsel; recusal motion. |
| 4/4/2022 | Shawn Crowley | $700.00 | 0.1 | $70.00 | Correspondence re local counsel. |
| 4/5/2022 | Joshua Matz | $700.00 | 1.3 | $910.00 | Conversation with Monica + conversation with potential local counsel + ■ |
| 4/5/2022 | Maximillian Feldman | $450.00 | 1.0 | $450.00 | Correspondence with J. Matz and S. Crowley regarding recusal motion; draft litigation hold notice. |
| 4/5/2022 | Shawn Crowley | $700.00 | 2.0 | $1,400.00 | Call with J. Matz and local counsel; review complaint; calls with client. |
| 4/6/2022 | Anna Peterson | $375.00 | 1.8 | $675.00 | Review ■ and make edits to the same; call with prior counsel to discuss ■ and take notes on the same. |
| 4/6/2022 | Joshua Matz | $700.00 | 4.5 | $3,150.00 | Review complaint and continue revisions to ■ |
| 4/6/2022 | Kelsey Dietrich | $150.00 | 0.1 | $15.00 | Add deadline for DNC response in Trump v. Clinton to docketing calendar. |

Fees

| Date | Timekeeper | Rate | Time | Amount Claimed | Description |
|------|-----------|------|------|----------------|-------------|
| 4/6/2022 | Maximillian Feldman | $450.00 | 1.4 | $630.00 | Revise ▮ and email correspondence with A. Peterson regarding same; circulate ▮ to KHF team; email correspondence with M. Guardiola and G. Wilson regarding ▮; telephone conference with G. Wilson, M. Parnell, and KHF team regarding ▮ |
| 4/6/2022 | Shawn Crowley | $700.00 | 0.6 | $420.00 | Call with Graham Wilson re ▮ |
| 4/7/2022 | Anna Peterson | $375.00 | 5.4 | $2,025.00 | Review order denying motion to recuse; call with J. Matz, S. Crowley, and M. Feldman to discuss ▮ take notes on the same; follow up call with M. Feldman to discuss research needed for ▮ and other outstanding tasks; review case law and treatises addressing legal claims against client; analyze in light of complaint; draft document summarizing legal claims and allegations for purposes of ▮ |
| 4/7/2022 | Joshua Matz | $700.00 | 2.8 | $1,960.00 | Continue review of Complaint + study Court's recusal order + email client update ▮ + call w counsel to Gibson Dunn. |
| 4/7/2022 | Kelsey Dietrich | $150.00 | 0.3 | $45.00 | Set docket updates for Trump v. Clinton matter to be distributed to team; attention to file management. |

Fees

| Date | Timekeeper | Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| 4/7/2022 | Maximillian Feldman | $450.00 | 2.5 | $1,125.00 | Telephone conference with J. Matz, S. Crowley, A. Peterson regarding █████; analysis regarding ████ and draft email to client regarding same; review A. Peterson analysis of claims in connection with █████; email correspondence with J. Matz concerning ████. |
| 4/7/2022 | Shawn Crowley | $700.00 | 1.2 | $840.00 | Common interest call with counsel for Perkins Coie re strategy. |
| 4/11/2022 | Joshua Matz | $700.00 | 0.5 | $350.00 | Call w Levy Firestone counsel re: case strategy. |
| 4/11/2022 | Joshua Matz | $700.00 | 1.4 | $980.00 | Client call re: ██. |
| 4/11/2022 | Shawn Crowley | $700.00 | 1.1 | $770.00 | Common interest call with counsel for Fusion and discussion with J. Matz re same; call with client re ████. |
| 4/12/2022 | Anna Peterson | $375.00 | 0.1 | $37.50 | Review documents showing service sent by J. Matz and coordinate with case manager for workspace organization. |
| 4/12/2022 | Joshua Matz | $700.00 | 0.4 | $280.00 | Further outreach re: potential local counsel. |
| 4/12/2022 | Joshua Matz | $700.00 | 0.1 | $70.00 | Correspond w client re: ██. |
| 4/12/2022 | Joshua Matz | $700.00 | 0.3 | $210.00 | Send Monica an email ████. |
| 4/12/2022 | Joshua Matz | $700.00 | 0.7 | $490.00 | Call with Graham Wilson + follow up. |
| 4/12/2022 | Kelsey Dietrich | $150.00 | 0.5 | $75.00 | Attention to file management of received summonses. |
| 4/13/2022 | Anna Peterson | $375.00 | 0.2 | $75.00 | Review notes from call with common interest group and email S. Crowley about the same. |
| 4/13/2022 | Joshua Matz | $700.00 | 0.4 | $280.00 | Review email summary of common interest call earlier in day re: litigation strategy. |
| 4/13/2022 | Joshua Matz | $700.00 | 2.0 | $1,400.00 | Revise and send client draft ████. |
| 4/13/2022 | Joshua Matz | $700.00 | 0.7 | $490.00 | Calls and emails re: obtaining local counsel. |
| 4/13/2022 | Shawn Crowley | $700.00 | 0.7 | $490.00 | Common interest call; discussion with J. Matz re strategy. |

Fees

| Date | Timekeeper | Rate | Time | Amount Claimed | Description |
|------|-----------|------|------|----------------|-------------|
| 4/14/2022 | Anna Peterson | $375.00 | 0.5 | $187.50 | Call with S. Crowley to discuss case status and needed research; review previous research on claims in complaint. |
| 4/14/2022 | Shawn Crowley | $700.00 | 0.3 | $210.00 | Conference with Anna Collins Peterson re strategy. |
| 4/15/2022 | Anna Peterson | $375.00 | 2.7 | $1,012.50 | Research claims in complaint and potential defenses; take notes on the same. |
| 4/15/2022 | Joshua Matz | $700.00 | 0.4 | $280.00 | Call re: local counsel representation. |
| 4/15/2022 | Kelsey Dietrich | $150.00 | 0.7 | $105.00 | Compile recent court filings in Trump v. Clinton. |
| 4/15/2022 | Shawn Crowley | $700.00 | 1.0 | $700.00 | Call with potential local counsel Wilfredo Ferrer. |
| 4/16/2022 | Maximillian Feldman | $450.00 | 0.1 | $45.00 | Review docket updates. |
| 4/17/2022 | Maximillian Feldman | $450.00 | 0.4 | $180.00 | Review Court order concerning trial date and email correspondence with KHF team regarding same; review Williams & Connolly draft motion to dismiss. |
| 4/18/2022 | Anna Peterson | $375.00 | 2.2 | $825.00 | Research ▮▮▮▮▮▮▮; analyze the same in light of allegations in complaint; take notes on the same; draft email to M. Feldman summarizing the same. |
| 4/18/2022 | Joshua Matz | $700.00 | 0.9 | $630.00 | Correspondence re: declination by potential local counsel and follow up with Monica re: next steps ▮▮▮▮▮▮. |
| 4/18/2022 | Maximillian Feldman | $450.00 | 0.7 | $315.00 | Telephone conference with A. Peterson regarding case status; correspondence with S. Crowley regarding claims; email correspondence with A. Peterson regarding research and review research. |
| 4/19/2022 | Anna Peterson | $375.00 | 0.8 | $300.00 | Call with team to discuss status and plan for filings; review docket alerts and brief sent by common interest counsel. |
| 4/19/2022 | Joshua Matz | $700.00 | 0.5 | $350.00 | Prepare for and participate in call with Shawn, Max, and Anna re: latest developments and next steps in MTD practice. |
| 4/19/2022 | Joshua Matz | $700.00 | 0.7 | $490.00 | Prepare for, participate in, and debrief call with potential local counsel. |

Fees

| Date | Timekeeper | Rate | Time | Amount Claimed | Description |
|------|-----------|------|------|----------------|-------------|
| 4/19/2022 | Maximillian Feldman | $450.00 | 2.4 | $1,080.00 | Telephone conference with J. Matz, S. Crowley, and A. Peterson regarding motion to dismiss; review complaint and legal research regarding same. |
| 4/19/2022 | Shawn Crowley | $700.00 | 0.6 | $420.00 | Team conference re strategy; correspondence with client. |
| 4/19/2022 | Joshua Matz | $700.00 | 0.2 | $140.00 | Correspond w/ DWS staff re: |
| 4/20/2022 | Anna Peterson | $375.00 | 5.2 | $1,950.00 | Take notes on allegations in complaint specific to client; review case law and treatises addressing ____ analyze the same in light of allegations in complaint; take notes on the same. |
| 4/20/2022 | Joshua Matz | $700.00 | 1.3 | $910.00 | Prepare for, participate in, and update client on joint defense call re: motion to dismiss strategy. |
| 4/20/2022 | Kelsey Dietrich | $150.00 | 0.7 | $105.00 | Prepare binder for S. Crowley of briefs in Trump v. Clinton matter. |
| 4/20/2022 | Maximillian Feldman | $450.00 | 0.2 | $90.00 | Draft motion to dismiss outline. |
| 4/20/2022 | Joshua Matz | $700.00 | 0.3 | $210.00 | Correspond with David Damron re: scheduling call and |
| 4/21/2022 | Anna Peterson | $375.00 | 5.3 | $1,987.50 | Call with M. Turner to discuss matter and research needs; review motion to dismiss filed by other defendant to identify arguments to incorporate; call with M. Feldman to discuss arguments, additional research, and plan for outlining brief. |
| 4/21/2022 | Joshua Matz | $700.00 | 0.8 | $560.00 | Participate in and follow up on call with Monica. |
| 4/21/2022 | Joshua Matz | $700.00 | 0.2 | $140.00 | Email update to Monica re: |
| 4/21/2022 | Joshua Matz | $700.00 | 0.2 | $140.00 | Correspond with KHF team about timing on drafting MTD. |
| 4/21/2022 | Joshua Matz | $700.00 | 0.7 | $490.00 | Review draft MTD circulated by HRC counsel. |
| 4/21/2022 | Joshua Matz | $700.00 | 0.2 | $140.00 | Further update to Monica re: |
| 4/21/2022 | Joshua Matz | $700.00 | 1.5 | $1,050.00 | Correspondence w counsel to HRC + additional legal research into structure of draft MTD. |

Fees

| Date | Timekeeper | Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| 4/21/2022 | Maggie Turner | $375.00 | 4.5 | $1,687.50 | Met with J. Matz and A. Peterson to discuss new matter; reviewed and analyzed background materials (complaint, Clinton motion to dismiss, research documents) and began research into elements of claims. |
| 4/21/2022 | Maximillian Feldman | $450.00 | 1.0 | $450.00 | Telephone conference with A. Peterson regarding outline of brief and research; review A. Peterson research. |
| 4/21/2022 | Shawn Crowley | $700.00 | 0.8 | $560.00 | Call with DWS staff re ▮ |
| 4/21/2022 | Joshua Matz | $700.00 | 0.8 | $560.00 | Prepare for and participate in call with David, Tracie, and Steve about ▮ |
| 4/21/2022 | Joshua Matz | $700.00 | 0.2 | $140.00 | Correspond with local counsel about ▮ |
| 4/22/2022 | Anna Peterson | $375.00 | 3.3 | $1,237.50 | Draft outline of arguments for motion to dismis: regarding ▮; review briefs addressing similar claims, analyze in light of allegations in complaint, and take notes on the same. |
| 4/22/2022 | Joshua Matz | $700.00 | 0.3 | $210.00 | Correspond with Monica re: ▮ |
| 4/22/2022 | Joshua Matz | $700.00 | 0.3 | $210.00 | Review email received from Gibson Dunn re: proposed motion for extension of time to respond to answer, and follow up urgently with Monica re: ▮ |
| 4/22/2022 | Joshua Matz | $700.00 | 1.2 | $840.00 | Correspond with local counsel about ▮ + follow up correspondence w local counsel. |
| 4/22/2022 | Kelsey Dietrich | $150.00 | 0.3 | $45.00 | Internal correspondence re pro hac vice appearance for S. Crowley; attention to file management. |

Page 6 of 26

Fees

| Date | Timekeeper | Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| 4/22/2022 | Maximillian Feldman | $450.00 | 3.0 | $1,350.00 | Analysis regarding complaint and Clinton brief; telephone conference with A. Peterson regarding motion to dismiss brief; draft outline of ▮ of motion to dismiss brief. |
| 4/22/2022 | Shawn Crowley | $700.00 | 0.2 | $140.00 | Discussion with J. Matz re strategy. |
| 4/22/2022 | Joshua Matz | $700.00 | 1.3 | $910.00 | Emails about ▮ + connecting to local counsel and w Shawn Crowley + calls with Gibson Dunn re: status updates |
| 4/23/2022 | Anna Peterson | $375.00 | 0.6 | $225.00 | Review and circulate filings; draft outline of arguments for motion to dismiss regarding ▮; review briefs addressing similar claims, analyze in light of allegations in complaint. |
| 4/23/2022 | Maximillian Feldman | $450.00 | 1.5 | $675.00 | Draft outline of ▮ of motion to dismiss brief. |
| 4/23/2022 | Shawn Crowley | $700.00 | 0.6 | $420.00 | Call with client re ▮; correspondence with local counsel re motion for extension; review motion for extension. |
| 4/24/2022 | Joshua Matz | $700.00 | 0.4 | $280.00 | Review correspondence and drafts re: ▮ + filings over Saturday. |
| 4/24/2022 | Joshua Matz | $700.00 | 0.2 | $140.00 | Correspond w DNC insurer. |
| 4/24/2022 | Joshua Matz | $700.00 | 2.3 | $1,610.00 | Further review of the complaint with eye to potential separate legal arguments and MTD strategy. |
| 4/25/2022 | Anna Peterson | $375.00 | 4.3 | $1,612.50 | Correspond with M. Turner regarding additional research for motion to dismiss; draft outline of arguments for motion to dismiss regarding ▮ review briefs addressing similar claims, analyze in light of allegations in complaint; review docket entries and update filing deadlines based on the same; review cases addressing ▮ and email M. Feldman about the same. |

Fees

| Date | Timekeeper | Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| 4/25/2022 | Kelsey Dietrich | $150.00 | 1.8 | $270.00 | Attention to file management; management of Bloomberg alerts for Trump v. Clinton. |
| 4/25/2022 | Maggie Turner | $375.00 | 3.5 | $1,312.50 | Researched ▮ |
| 4/25/2022 | Maximillian Feldman | $450.00 | 5.4 | $2,430.00 | Email correspondence with team regarding court order on expedited briefing of Trump motion for extension of time; draft section of motion to dismiss brief concerning ▮; legal research iso motion to dismiss brief; correspondence with A. Peterson and M. Turner regarding legal research; email correspondence with J. Quinn concerning ▮ legal analysis. |
| 4/25/2022 | Shawn Crowley | $700.00 | 0.2 | $140.00 | Correspondence with local counsel re pro hac vice motion. |
| 4/25/2022 | Joshua Matz | $700.00 | 0.2 | $140.00 | Send client update on Court granting extension motions |
| 4/26/2022 | Anna Peterson | $375.00 | 2.5 | $937.50 | Call with M. Feldman and M. Turner to discuss edits and revisions to motion to dismiss outline; make edits to outline to reflect the same. |
| 4/26/2022 | Joshua Matz | $700.00 | 0.6 | $420.00 | Correspondence re: litigation schedule + legal research re: potential MTD issues. |
| 4/26/2022 | Maggie Turner | $375.00 | 2.4 | $900.00 | Researched ▮ reviewed and analyzed MTD outline by cross-referencing HRC brief; met with associate team to discuss substantive issues and any research holes in outline. |
| 4/26/2022 | Maximillian Feldman | $450.00 | 4.3 | $1,935.00 | Legal research iso motion to dismiss; revise outline of motion to dismiss; telephone conference with A. Peterson and M. Turner regarding motion to dismiss; review docket updates; revise PHV application. |

Fees

| Date | Timekeeper | Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| 4/26/2022 | Shawn Crowley | $700.00 | 0.7 | $490.00 | Correspondence with local counsel re pro hac vice motion; call with local counsel ▉ |
| 4/27/2022 | Anna Peterson | $375.00 | 3.0 | $1,125.00 | Review edits and comments on outline from M. Feldman; revise outline to respond to the same. |
| 4/27/2022 | Kelsey Dietrich | $150.00 | 1.6 | $240.00 | Draft shell for Motion to Dismiss; update internal files with recent court filings. |
| 4/27/2022 | Maggie Turner | $375.00 | 0.6 | $225.00 | Reviewed and analyzed MTD outline to determine any research holes or edits in preparation to send to J. Matz. |
| 4/27/2022 | Maximillian Feldman | $450.00 | 0.8 | $360.00 | Revise outline of motion to dismiss; correspondence with A. Peterson regarding motion to dismiss; attention to PHV application. |
| 4/28/2022 | Anna Peterson | $375.00 | 3.6 | $1,350.00 | Call with J. Matz, S. Crowley, M. Feldman, and M. Turner to discuss outline for motion to dismiss and additional areas of research; follow up call with M. Feldman and M. Turner regarding the same; review ▉ and take notes on the same; begin drafting brief in support of motion to dismiss. |
| 4/28/2022 | Joshua Matz | $700.00 | 1.8 | $1,260.00 | Carefully review draft outline for MTD papers + call with KHF team to share feedback for full draft. |
| 4/28/2022 | Joshua Matz | $700.00 | 0.2 | $140.00 | Review and discuss client inquiry re: local representation. |
| 4/28/2022 | Maggie Turner | $375.00 | 3.7 | $1,387.50 | Met with J. Matz and S. Crowley to discuss MTD outline; met with associate team to discuss game plan for additional research and drafting; researched ▉ |
| 4/28/2022 | Maximillian Feldman | $450.00 | 1.0 | $450.00 | Telephone conference with KHF team regarding outline of brief; telephone conference with A. Peterson and M. Turner regarding planning for brief. |

Fees

| Date | Timekeeper | Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| 4/28/2022 | Shawn Crowley | $700.00 | 1.1 | $770.00 | Correspondence with client; review outline of motion to dismiss and team conference re same. |
| 4/29/2022 | Anna Peterson | $375.00 | 6.3 | $2,362.50 | Review research sent by M. Turner; review cases addressing [redacted] analyze in light of allegations in complaint; draft arguments in brief in support of motion to dismiss. |
| 4/29/2022 | Maggie Turner | $375.00 | 5.2 | $1,950.00 | Researched [redacted] as result of discussions about MTD outline; researched [redacted] |
| 4/29/2022 | Maximillian Feldman | $450.00 | 1.1 | $495.00 | Draft [redacted] and circulate to team; correspondence with A. Peterson regarding motion to dismiss brief; review M. Turner research concerning [redacted] |
| 4/30/2022 | Anna Peterson | $375.00 | 1.0 | $375.00 | Revise draft of motion to dismiss and draft email to M. Feldman about the same. |
| 5/1/2022 | Maximillian Feldman | $450.00 | 0.1 | $45.00 | Review draft of motion to dismiss brief. |
| 5/2/2022 | Joshua Matz | $700.00 | 0.6 | $420.00 | Correspondence re strategy for briefs |
| 5/2/2022 | Maggie Turner | $375.00 | 3.4 | $1,275.00 | Researched Eleventh Circuit pleading standards; researched comparison cases in Eleventh Circuit [redacted] |
| 5/2/2022 | Maximillian Feldman | $450.00 | 4.5 | $2,025.00 | Draft motion to dismiss brief; email correspondence with M. Turner regarding research; email correspondence with J. Matz and S. Crowley regarding brief; legal research iso motion to dismiss brief. |
| 5/2/2022 | Shawn Crowley | $700.00 | 0.1 | $70.00 | Correspondence with client. |
| 5/3/2022 | Joshua Matz | $700.00 | 0.8 | $560.00 | Review latest district court filings and several relevant cases ([redacted]) |
| 5/3/2022 | Maggie Turner | $375.00 | 5.0 | $1,875.00 | Researched [redacted] |
| 5/3/2022 | Maximillian Feldman | $450.00 | 4.0 | $1,800.00 | Draft motion to dismiss brief; legal research iso motion to dismiss brief. |

Fees

| Date | Timekeeper | Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| 5/3/2022 | Maximillian Feldman | $450.00 | 4.4 | $1,980.00 | Draft motion to dismiss brief; legal research iso motion to dismiss brief. |
| 5/4/2022 | Anna Peterson | $375.00 | 3.0 | $1,125.00 | Review draft motion to dismiss and make edits to the same; correspond with M. Feldman and M. Turner about the same. |
| 5/4/2022 | Kelsey Dietrich | $150.00 | 0.4 | $60.00 | Circulate to team J. Podesta's Motion to Dismiss; add date for status conference to firm docket and circulate same to team. |
| 5/4/2022 | Maggie Turner | $375.00 | 4.8 | $1,800.00 | Edited draft brief; drafted research email based on notes from J. Matz call summarizing research done on brief. |
| 5/4/2022 | Maximillian Feldman | $450.00 | 6.2 | $2,790.00 | Draft motion to dismiss brief; legal research iso motion to dismiss brief; email correspondence with A. Peterson and M. Turner regarding brief and related research; email correspondence with J. Matz and S. Crowley regarding brief; email correspondence with J. Matz and S. Crowley regarding ███. |
| 5/4/2022 | Roberta Kaplan | $700.00 | 0.5 | $350.00 | Attention to PHV; scheduling conf. |
| 5/4/2022 | Shawn Crowley | $700.00 | 0.2 | $140.00 | Correspondence with client re updates. |
| 5/5/2022 | Anna Peterson | $375.00 | 1.2 | $450.00 | Review draft and research in advance of call; call with J. Matz, S. Crowley, M. Feldman, and M. Turner to discuss edits to motion to dismiss; take notes on the same; begin making edits in light of the same. |
| 5/5/2022 | Joshua Matz | $700.00 | 0.4 | $280.00 | Review detailed analysis from Max, Maggie, and Anna re: research questions for MTD briefing |
| 5/5/2022 | Joshua Matz | $700.00 | 1.2 | $840.00 | Prepare for and participate in call re: draft MTD brief |
| 5/5/2022 | Maggie Turner | $375.00 | 2.2 | $825.00 | Researched ███; researched ███; met with J. Matz to discuss motion to dismiss draft. |

Fees

| Date | Timekeeper | Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| 5/5/2022 | Maximillian Feldman | $450.00 | 3.0 | $1,350.00 | Telephone conference with KHF team regarding brief; review ████ legal research iso motion to dismiss brief. |
| 5/5/2022 | Shawn Crowley | $700.00 | 2.3 | $1,610.00 | Review motion to dismiss; correspondence with client; team call re motion to dismiss. |
| 5/6/2022 | Anna Peterson | $375.00 | 2.8 | $1,050.00 | Make edits to motion to dismiss; call with M. Feldman and M. Turner to discuss the same; draft email explaining edits regarding the same. |
| 5/6/2022 | Joshua Matz | $700.00 | 2.3 | $1,610.00 | Review draft DNC motion to dismiss brief and share with RAK for final review |
| 5/6/2022 | Maggie Turner | $375.00 | 3.1 | $1,162.50 | Researched ████ ; edited brief draft per J. Matz comments. |
| 5/6/2022 | Maximillian Feldman | $450.00 | 2.9 | $1,305.00 | Telephone conference with A. Peterson and M. Turner regarding brief; legal research iso motion to dismiss brief; revise motion to dismiss brief. |
| 5/6/2022 | Roberta Kaplan | $700.00 | 0.7 | $490.00 | E-mails re: opp to motion to dismiss. |
| 5/6/2022 | Shawn Crowley | $700.00 | 0.4 | $280.00 | Correspondence with client; conference with J. Matz re motion to dismiss |
| 5/7/2022 | Maximillian Feldman | $450.00 | 0.6 | $270.00 | Attention to R. Kaplan edits to brief and internal correspondence regarding same. |
| 5/7/2022 | Roberta Kaplan | $700.00 | 2.7 | $1,890.00 | Edits to motion to dismiss. |
| 5/8/2022 | Anna Peterson | $375.00 | 1.0 | $375.00 | Review edits from R. Kaplan to motion to dismiss and review draft incorporating the same; email with M. Feldman and M. Turner regarding ████ in response to question from R. Kaplan. |
| 5/8/2022 | Joshua Matz | $700.00 | 0.5 | $350.00 | Begin ████ review. |
| 5/8/2022 | Joshua Matz | $700.00 | 1.7 | $1,190.00 | Review revised draft and share feedback |
| 5/8/2022 | Joshua Matz | $700.00 | 0.5 | $350.00 | Review revised |
| 5/8/2022 | Joshua Matz | $700.00 | 0.2 | $140.00 | Address question from Max F re: MTD brief |
| 5/8/2022 | Maggie Turner | $375.00 | 2.7 | $1,012.50 | Incorporated R. Kaplan edits into brief draft; researched ████ to add to draft. |
| 5/8/2022 | Maximillian Feldman | $450.00 | 0.4 | $180.00 | Review complaint and motion to dismiss brief. |
| 5/8/2022 | Roberta Kaplan | $700.00 | 2.3 | $1,610.00 | Final edits to motion to dismiss. |

Fees

| Date | Timekeeper | Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| 5/9/2022 | Anna Peterson | $375.00 | 1.3 | $487.50 | Confer with M. Feldman regarding information on argument by other defense counsel; review edits from local counsel; email M. Feldman and M. Turner regarding local rules for signatures. |
| 5/9/2022 | James Blum | $375.00 | 2.3 | $862.50 | DNC cite check. |
| 5/9/2022 | Kelsey Dietrich | $150.00 | 0.3 | $45.00 | Create shell for corporate disclosure statement. |
| 5/9/2022 | Maggie Turner | $375.00 | 1.4 | $525.00 | Coordinated cite-check of brief; researched ▬▬▬; drafted corporate disclosure statement with help from case manager. |
| 5/9/2022 | Maximillian Feldman | $450.00 | 1.9 | $855.00 | Attention to correspondence with clients and local counsel ▬▬▬; correspondence with team regarding corporate disclosure certificate; review draft corporate disclosure certificate and circulate to J. Matz and S. Crowley; telephone conference with counsel for Neustar regarding briefs; correspondence with A. Peterson regarding ▬▬▬; legal research regard ▬▬▬. |
| 5/9/2022 | Shawn Crowley | $700.00 | 1.3 | $910.00 | Review motion to dismiss draft; correspondence with client re draft; correspondence with counsel for Neustar; call with counsel for Neustar. |
| 5/10/2022 | Anna Peterson | $375.00 | 2.2 | $825.00 | Draft section of motion to dismiss addressing ▬▬▬ review recent filing. |
| 5/10/2022 | Joshua Matz | $700.00 | 0.5 | $350.00 | Review further edits to MTD brief |
| 5/10/2022 | Kelsey Dietrich | $150.00 | 0.7 | $105.00 | Revise and format Motion to Dismiss; add extension of time for plaintiff's response to firm docket. |
| 5/10/2022 | Maggie Turner | $375.00 | 1.7 | $637.50 | Incorporated cite-check and local counsel edits. |
| 5/10/2022 | Maximillian Feldman | $450.00 | 2.2 | $990.00 | Revise and finalize brief iso motion to dismiss; correspondence with team regarding motion to dismiss; correspondence concerning corporate disclosure statement and ▬▬▬ |
| 5/10/2022 | Shawn Crowley | $700.00 | 0.2 | $140.00 | Correspondence with client re ▬▬▬ |

Fees

| Date | Timekeeper | Rate | Time | Amount Claimed | Description |
|------|-----------|------|------|----------------|-------------|
| 5/11/2022 | Anna Peterson | $375.00 | 1.6 | $600.00 | Review brief filed by other defendants; review motion to dismiss and other documents for filing. |
| 5/11/2022 | Kelsey Dietrich | $150.00 | 1.0 | $150.00 | Format Motion to Dismiss for filing; save other defendants' Motions to Dismiss filed today to internal case file. |
| 5/11/2022 | Maggie Turner | $375.00 | 0.8 | $300.00 | Reviewed and analyzed filed Fusion brief; assisted with coordinating final proofing of brief. |
| 5/11/2022 | Maximillian Feldman | $450.00 | 0.6 | $270.00 | Attention to finalizing brief for filing. |
| 5/11/2022 | Roberta Kaplan | $700.00 | 0.8 | $560.00 | Attention to motion to dismiss. |
| 5/11/2022 | Shawn Crowley | $700.00 | 1.0 | $700.00 | Review Fusion motion to dismiss; correspondence with local counsel re filing; file MTD. |
| 5/11/2022 | Shawn Crowley | $700.00 | 0.3 | $210.00 | Correspondence with client re ▆ |
| 5/12/2022 | Anna Peterson | $375.00 | 3.2 | $1,200.00 | Review motions to dismiss filed by other defendants; draft summaries of the same; coordinate hard copy set of filings for R. Kaplan. |
| 5/12/2022 | Kelsey Dietrich | $150.00 | 0.3 | $45.00 | Save other defendants' Motions to Dismiss filed today to internal case file. |
| 5/12/2022 | Maggie Turner | $375.00 | 1.4 | $525.00 | Reviewed and summarized for team and client the other MTDs filed in the case. |
| 5/12/2022 | Maximillian Feldman | $450.00 | 0.1 | $45.00 | Review summary of parties' briefs. |
| 5/12/2022 | Roberta Kaplan | $700.00 | 0.6 | $420.00 | E-mails re: various motions; etc. |
| 5/12/2022 | Shawn Crowley | $700.00 | 0.1 | $70.00 | Correspondence with client re ▆ |
| 5/13/2022 | Maximillian Feldman | $450.00 | 0.2 | $90.00 | Attention to request from opposing counsel concerning extension and correspondence with S. Crowley regarding same. |
| 5/13/2022 | Roberta Kaplan | $700.00 | 0.8 | $560.00 | Emails with team re: filings and strategy. |
| 5/13/2022 | Shawn Crowley | $700.00 | 0.3 | $210.00 | Correspondence re defendant's request for extension of time. |
| 5/13/2022 | Maximillian Feldman | $450.00 | 0.1 | $45.00 | Coordinate call regarding ▆ |
| 5/13/2022 | Shawn Crowley | $700.00 | 0.1 | $70.00 | Correspondence with client re ▆ |
| 5/14/2022 | Roberta Kaplan | $700.00 | 0.6 | $420.00 | Emails re: status conf. |
| 5/16/2022 | Anna Peterson | $375.00 | 0.3 | $112.50 | Review motion to dismiss filed by other defendant. |

Page 14 of 26

Fees

| Date | Timekeeper | Rate | Time | Amount Claimed | Description |
|------|-----------|------|------|----------------|-------------|
| 5/16/2022 | Kelsey Dietrich | $150.00 | 0.1 | $15.00 | Circulate to team Hillary For America's motion to dismiss. |
| 5/16/2022 | Maximillian Feldman | $450.00 | 0.1 | $45.00 | Review brief filed on behalf of HFA. |
| 5/16/2022 | Maximillian Feldman | $450.00 | 0.9 | $405.00 | Telephone conferences with S. Crowley regarding ▮; telephone conference with client staff regarding ▮ |
| 5/16/2022 | Shawn Crowley | $700.00 | 0.8 | $560.00 | Review ▮; conference with M. Feldman re ▮ and call with client re same. |
| 5/17/2022 | Maximillian Feldman | $450.00 | 0.1 | $45.00 | Clean up notes of client call concerning ▮. |
| 5/18/2022 | Maximillian Feldman | $450.00 | 0.5 | $225.00 | Prep for joint defense group call regarding scheduling conference; joint defense group call regarding scheduling conference. |
| 5/18/2022 | Roberta Kaplan | $700.00 | 0.7 | $490.00 | Call w/defense counsel re: strategy; e-mails w/D. Kendall re: same. |
| 5/18/2022 | Shawn Crowley | $700.00 | 0.7 | $490.00 | Joint defense call and discussion with R. Kaplan re same. |
| 5/18/2022 | Anna Peterson | $375.00 | 4.7 | $1,762.50 | Review secondary sources and case law addressing ▮; take notes and confer with M. Turner about the same; draft email to M. Feldman summarizing the same; follow up research about the ▮. Researched ▮ |
| 5/18/2022 | Maggie Turner | $375.00 | 1.7 | $637.50 | Correspondence with A. Peterson and M. Turner regarding ▮ research; analyze ▮ research. |
| 5/18/2022 | Maximillian Feldman | $450.00 | 0.4 | $180.00 | ▮ research. |
| 5/19/2022 | Maximillian Feldman | $450.00 | 0.6 | $270.00 | Review research regarding ▮; draft correspondence to client concerning ▮; correspondence with S. Crowley ▮ regarding ▮. |

Fees

| Date | Timekeeper | Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| 5/19/2022 | Shawn Crowley | $700.00 | 0.2 | $140.00 | Correspondence with client re [redacted] and review research re same. |
| 5/20/2022 | Kelsey Dietrich | $150.00 | 0.4 | $60.00 | Save and circulate to team Joffe's, Danchenko's, and Neustar's Motions to Dismiss. |
| 5/20/2022 | Maximillian Feldman | $450.00 | 0.1 | $45.00 | Attention to correspondence from client concerning [redacted] |
| 5/20/2022 | Shawn Crowley | $700.00 | 0.1 | $70.00 | Correspondence with client. |
| 5/24/2022 | Kelsey Dietrich | $150.00 | 0.9 | $135.00 | Pull and circulate Dolan MTD; compile recent briefs for R. Kaplan review. |
| 5/24/2022 | Maximillian Feldman | $450.00 | 0.1 | $45.00 | Review additional motions to dismiss. |
| 5/26/2022 | Shawn Crowley | $700.00 | 0.1 | $70.00 | Joint defense correspondence. |
| 5/27/2022 | Kelsey Dietrich | $150.00 | 0.1 | $15.00 | Save and circulate Sullivan MTD. |
| 5/27/2022 | Maximillian Feldman | $450.00 | 0.1 | $45.00 | Review Jake Sullivan motion to dismiss brief. |
| 5/27/2022 | Roberta Kaplan | $700.00 | 0.8 | $560.00 | Attention to latest filings. |
| 5/31/2022 | Maximillian Feldman | $450.00 | 0.1 | $45.00 | Internal team correspondence regarding upcoming court conference. |
| 5/31/2022 | Roberta Kaplan | $700.00 | 0.4 | $280.00 | E-mails re: latest filing. |
| 5/31/2022 | Shawn Crowley | $700.00 | 0.2 | $140.00 | Correspondence with client; correspondence with local counsel. |
| 5/31/2022 | Shawn Crowley | $700.00 | 0.1 | $70.00 | Correspondence with client. |
| 6/1/2022 | Roberta Kaplan | $700.00 | 0.7 | $490.00 | E-mails re: status conf. |
| 6/2/2022 | Anna Peterson | $375.00 | 1.0 | $375.00 | Call in to court status conference; take and circulate notes on the same. |
| 6/2/2022 | Maximillian Feldman | $450.00 | 0.1 | $45.00 | Review notes of court conference |
| 6/2/2022 | Shawn Crowley | $700.00 | 0.8 | $560.00 | Call with local counsel re status conference; status conference |
| 6/3/2022 | Kelsey Dietrich | $150.00 | 0.1 | $15.00 | Attention to file management of court filings. |
| 6/3/2022 | Roberta Kaplan | $700.00 | 0.4 | $280.00 | E-mails w/counsel re: scheduling. |
| 6/6/2022 | Maximillian Feldman | $450.00 | 0.1 | $45.00 | Correspondence with K. Dietrich regarding case planning |
| 6/7/2022 | Maximillian Feldman | $450.00 | 0.2 | $90.00 | Correspondence with S. Crowley and J. Matz regarding planning |
| 6/10/2022 | Maximillian Feldman | $450.00 | 0.1 | $45.00 | Correspondence with A. Peterson regarding case planning |
| 6/14/2022 | Kelsey Dietrich | $150.00 | 0.3 | $45.00 | Add 7/6/22 status conference to firm calendar. |

Fees

| Date | Timekeeper | Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| 6/14/2022 | Roberta Kaplan | $700.00 | 0.4 | $280.00 | E-mails re: upcoming call. |
| 6/15/2022 | Maximillian Feldman | $450.00 | 0.6 | $270.00 | Joint defense group call regarding briefing; clean up notes of JDG call; email correspondence with S. Crowley and J. Matz regarding joint defense call |
| 6/15/2022 | Roberta Kaplan | $700.00 | 0.9 | $630.00 | Joint defense call re: scheduling etc.; follow-up. |
| 6/15/2022 | Shawn Crowley | $700.00 | 0.1 | $70.00 | Review notes of joint defense call |
| 6/21/2022 | Maximillian Feldman | $450.00 | 1.3 | $585.00 | Analysis regarding amended complaint |
| 6/22/2022 | Anna Peterson | $375.00 | 1.2 | $450.00 | Review amended complaint and email from M. Feldman regarding the same. |
| 6/22/2022 | Kelsey Dietrich | $150.00 | 0.6 | $90.00 | Attention to file management of recent court filings. |
| 6/22/2022 | Maximillian Feldman | $450.00 | 0.8 | $360.00 | Analysis regarding amended complaint; email correspondence with team regarding amended complaint; email correspondence with team regarding recusal of magistrate judge; email correspondence with team regarding JDG plan for briefing |
| 6/22/2022 | Shawn Crowley | $700.00 | 0.4 | $280.00 | Review amended complaint; conference with J. Matz re strategy for motion to dismiss |
| 6/23/2022 | Maximillian Feldman | $450.00 | 0.9 | $405.00 | Telephone conference with joint defense group regarding briefing; analysis regarding ▮ |
| 6/23/2022 | Roberta Kaplan | $700.00 | 0.6 | $420.00 | Joint defense e-mails. |
| 6/23/2022 | Shawn Crowley | $700.00 | 0.7 | $490.00 | Joint defense call re amended complaint |
| 6/24/2022 | Maximillian Feldman | $450.00 | 1.6 | $720.00 | Analysis regarding ▮ |
| 6/27/2022 | Anna Peterson | $375.00 | 0.7 | $262.50 | Review notes from recent calls and emails regarding motion to dismiss; confer with M. Feldman about status of the same; review prior briefing and research on ▮ |
| 6/27/2022 | Maximillian Feldman | $450.00 | 0.4 | $180.00 | Research and analysis regarding ▮ claims |
| 6/28/2022 | Anna Peterson | $375.00 | 0.7 | $262.50 | Review prior briefing on ▮; review cases cited by other defendants. |
| 6/28/2022 | Maximillian Feldman | $450.00 | 0.6 | $270.00 | Research and analysis regarding ▮ claims; review docket |

Fees

| Date | Timekeeper | Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| 6/28/2022 | Shawn Crowley | $700.00 | 0.2 | $140.00 | Correspondence with client re █████ |
| 6/28/2022 | Shawn Crowley | $700.00 | 0.2 | $140.00 | correspondence with local counsel re same |
| 6/28/2022 | Shawn Crowley | $700.00 | 0.2 | $140.00 | Correspondence with client re ████ |
| 6/29/2022 | Anna Peterson | $375.00 | 1.7 | $637.50 | Review case law and Florida treatises addressing ████████; summarize the same and send to M. Feldman; review docket. |
| 6/29/2022 | Maximillian Feldman | $450.00 | 2.7 | $1,215.00 | Draft summary of section on ████████ argument and email |
| 6/30/2022 | Anna Peterson | $375.00 | 0.2 | $75.00 | Review outline of ██ M. Feldman comments on the same. |
| 6/30/2022 | Maximillian Feldman | $450.00 | 0.5 | $225.00 | Draft outline of ████ |
| 6/30/2022 | Shawn Crowley | $700.00 | 0.2 | $140.00 | Attention to outline of motion to dismiss; joint defense correspondence |
| 7/1/2022 | Anna Peterson | $375.00 | 1.7 | $637.50 | Identify new allegations in amended complaint to address in motion to dismiss; take notes on the same; review docket for order on extension request. |
| 7/1/2022 | Roberta Kaplan | $700.00 | 0.5 | $350.00 | E-mails w/SC re: schedule, etc. |
| 7/1/2022 | Shawn Crowley | $700.00 | 1.2 | $840.00 | Joint defense correspondence; review outline of motion to dismiss; review amended complaint; joint defense call |
| 7/4/2022 | Maximillian Feldman | $450.00 | 0.4 | $180.00 | Analysis regarding arguments to be included in motion to dismiss brief; email correspondence with team regarding motion to dismiss briefing |
| 7/4/2022 | Roberta Kaplan | $700.00 | 0.3 | $210.00 | E-mails w/Crowley re: status. |
| 7/5/2022 | Anna Peterson | $375.00 | 2.3 | $862.50 | Review and respond to emails from team regarding extension and deadlines for motion to dismiss; draft ███████ section of motion to dismiss; review case law related to the same; review amended complaint in light of the same. |
| 7/5/2022 | Kelsey Dietrich | $150.00 | 0.4 | $60.00 | Update firm docket with extended deadline for defendants' MTD and due date for DNC portion of same; provide signature blocks to S. Crowley for Gibson Dunn use in final motion. |

Fees

| Date | Timekeeper | Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| 7/5/2022 | Maximillian Feldman | $450.00 | 0.5 | $225.00 | Review A. Peterson draft of motion to dismiss ███ section; legal research regarding ███ |
| 7/5/2022 | Roberta Kaplan | $700.00 | 1.2 | $840.00 | Joint defense call; attention to court order. |
| 7/5/2022 | Shawn Crowley | $700.00 | 1.0 | $700.00 | Prepare for joint defense call; joint defense call; discussion with R. Kaplan re MTD |
| 7/6/2022 | Anna Peterson | $375.00 | 0.4 | $150.00 | Review draft brief section on ███ and provide edits on the same. |
| 7/6/2022 | Maximillian Feldman | $450.00 | 2.0 | $900.00 | Draft ███ section of brief; legal research iso ███ section; correspondence with A. Peterson regarding ███ regarding brief |
| 7/6/2022 | Shawn Crowley | $700.00 | 0.3 | $210.00 | Review draft motion to dismiss |
| 7/7/2022 | Joshua Matz | $700.00 | 0.4 | $280.00 | Review brief |
| 7/7/2022 | Maximillian Feldman | $450.00 | 0.5 | $225.00 | Revise ███ section; legal research iso motion to dismiss brief; review additional sections of motion to dismiss brief |
| 7/7/2022 | Shawn Crowley | $700.00 | 0.5 | $350.00 | Review motion to dismiss drafts; joint defense correspondence |
| 7/8/2022 | Anna Peterson | $375.00 | 0.4 | $150.00 | Review brief excerpts from other defendants; correspond with team about the same. |
| 7/8/2022 | Maximillian Feldman | $450.00 | 0.9 | $405.00 | Review and comment on drafts of various sections of motion to dismiss brief; email correspondence with KHF team regarding motion to dismiss brief; review Plaintiff filing |
| 7/8/2022 | Shawn Crowley | $700.00 | 1.0 | $700.00 | Joint defense correspondence; review drafts of MTD |
| 7/9/2022 | Anna Peterson | $375.00 | 2.7 | $1,012.50 | Review draft motion to dismiss sections from other defendants; insert brief sections and additional arguments ███ review case law and filings related to the same; email M. Feldman about the same. |
| 7/10/2022 | Anna Peterson | $375.00 | 0.7 | $262.50 | Review additional motion to dismiss sections circulated by other defendants; provide edits and suggestion for review by M. Feldman to the same. |

Page 19 of 26

Fees

| Date | Timekeeper | Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| 7/10/2022 | Maximillian Feldman | $450.00 | 3.2 | $1,440.00 | Review draft sections of brief from others JDG members; revise sections of brief and circulate to team; email correspondence with A. Peterson regarding brief; email correspondence with J. Matz regarding brief and updates to clients |
| 7/11/2022 | Anna Peterson | $375.00 | 2.0 | $750.00 | Review proposed edits to motion to dismiss and section addressing ▇▇▇ arguments; send edits to the same to M. Feldman; call with M. Feldman to discuss the same. |
| 7/11/2022 | Maximillian Feldman | $450.00 | 1.1 | $495.00 | Telephone conference and email correspondence with A. Peterson regarding brief; revise brief and circulate to J. Matz |
| 7/12/2022 | Anna Peterson | $375.00 | 0.9 | $337.50 | Review draft of motion to dismiss circulated by joint defense group; provide edits on and correspond with M. Feldman regarding the same. |
| 7/12/2022 | Maximillian Feldman | $450.00 | 1.8 | $810.00 | Analysis regarding ▇▇▇ issue raised by Gibson Dunn; email correspondence with J. Matz regarding same; revise brief and circulate to team |
| 7/13/2022 | Anna Peterson | $375.00 | 0.2 | $75.00 | Review revised motion to dismiss sent by joint defense group. |
| 7/13/2022 | Maximillian Feldman | $450.00 | 0.2 | $90.00 | Review revised joint defense group brief; email correspondence with team regarding same |
| 7/13/2022 | Shawn Crowley | $700.00 | 1.0 | $700.00 | Review motion to dismiss; joint defense correspondence |
| 7/14/2022 | Kelsey Dietrich | $150.00 | 0.5 | $75.00 | Update internal files with recent court filings. |
| 7/14/2022 | Maximillian Feldman | $450.00 | 0.1 | $45.00 | Review correspondence concerning scheduling |
| 7/15/2022 | Anna Peterson | $375.00 | 0.1 | $37.50 | Review email from joint defense counsel summarizing call with opposing counsel. |
| 7/15/2022 | Kelsey Dietrich | $150.00 | 0.2 | $30.00 | File management of correspondence with counsel for defendants re joint defense. |
| 7/15/2022 | Maximillian Feldman | $450.00 | 0.2 | $90.00 | Dial into meet-and-confer regarding scheduling and review summary of same |
| 7/15/2022 | Shawn Crowley | $700.00 | 0.2 | $140.00 | Joint defense correspondence |
| 7/21/2022 | Anna Peterson | $375.00 | 0.3 | $112.50 | Review extension and request proposed scheduling order filed by plaintiff. |

Fees

| Date | Timekeeper | Rate | Time | Amount Claimed | Description |
|------|-----------|------|------|----------------|-------------|
| 7/21/2022 | Kelsey Dietrich | $150.00 | 0.1 | $15.00 | Update firm docket with extended deadline for plaintiff's response to motions to dismiss. |
| 7/21/2022 | Maximillian Feldman | $450.00 | 0.3 | $135.00 | Review documents filed by Plaintiff regarding scheduling; attention to correspondence from joint defense group regarding call on reply brief |
| 7/21/2022 | Shawn Crowley | $700.00 | 0.3 | $210.00 | Review court orders re scheduling and internal correspondence re same |
| 7/26/2022 | Maximillian Feldman | $450.00 | 0.6 | $270.00 | Telephone conference with JDG regarding reply brief; email correspondence with C. Gonzalez regarding case background |
| 7/26/2022 | Shawn Crowley | $700.00 | 0.4 | $280.00 | Joint defense call re motion to dismiss |
| 8/4/2022 | Carmen Iguina Gonzalez | $500.00 | 2.2 | $1,100.00 | Review amended complaint and consolidated motion to dismiss in anticipation of plaintiff's opposition filing. |
| 8/4/2022 | Maximillian Feldman | $450.00 | 0.8 | $360.00 | Review Trump opposition brief; circulate initial analysis on Trump opposition brief to team |
| 8/5/2022 | Anna Peterson | $375.00 | 1.1 | $412.50 | Review plaintiff's opposition to defendants' motion to dismiss; review and respond to correspondence from team about the same; review email from joint defense group call regarding plan for reply brief. |
| 8/5/2022 | Carmen Iguina Gonzalez | $500.00 | 1.3 | $650.00 | Review plaintiff's opposition to motion to dismiss; prepare for and participate in defense counsel call to discuss plaintiff's opposition and plans for reply. |
| 8/5/2022 | Maximillian Feldman | $450.00 | 1.6 | $720.00 | Analysis regarding Plaintiff's opposition to motion to dismiss; email correspondence with KHF team regarding same; telephone conference with joint defense group regarding opposition to motion to dismiss |
| 8/5/2022 | Shawn Crowley | $700.00 | 0.5 | $350.00 | Joint defense call re MTD reply and internal correspondence re same |
| 8/8/2022 | Anna Peterson | $375.00 | 1.4 | $525.00 | Locate authorities addressing ███████████ for inclusion in reply brief; email M. Feldman about the same. |

Page 21 of 26

Fees

| Date | Timekeeper | Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| 8/8/2022 | Carmen Iguina Gonzalez | $500.00 | 0.3 | $150.00 | Review and revise language to add to reply brief re: ██████. |
| 8/8/2022 | Maximillian Feldman | $450.00 | 1.1 | $495.00 | Correspondence with A. Peterson regarding research on ██; review A. Peterson research; draft section of defendants' reply brief; email correspondence with KHF team regarding same; email correspondence with Williams & Connolly regarding reply brief |
| 8/9/2022 | Carmen Iguina Gonzalez | $500.00 | 0.4 | $200.00 | Review draft of reply in support of consolidated motion to dismiss. |
| 8/9/2022 | Maximillian Feldman | $450.00 | 0.8 | $360.00 | Review reply brief; email correspondence with KHF team regarding same |
| 8/10/2022 | Carmen Iguina Gonzalez | $500.00 | 0.1 | $50.00 | Emails with M. Feldman, A. Collins Peterson and S. Crowley re: notes of call with joint defense counsel re: reply brief. |
| 8/10/2022 | Maximillian Feldman | $450.00 | 0.3 | $135.00 | Telephone conference with joint defense group; email correspondence with KHF team regarding joint defense call |
| 8/11/2022 | Anna Peterson | $375.00 | 0.1 | $37.50 | Review edits to reply brief and correspondence about the same. |
| 8/11/2022 | Maximillian Feldman | $450.00 | 0.5 | $225.00 | Correspondence with S. Crowley regarding motion to dismiss brief; correspondence with clients ██████. |
| 8/12/2022 | Kelsey Dietrich | $150.00 | 1.1 | $165.00 | Review and pull recent court filings and update internal files with same. |
| 8/15/2022 | Kelsey Dietrich | $150.00 | 0.5 | $75.00 | Update internal files with recent filings in case; email to M. Feldman re same. |
| 8/15/2022 | Maximillian Feldman | $450.00 | 0.1 | $45.00 | Email clients as-filed version of brief |
| 9/1/2022 | Maximillian Feldman | $450.00 | 0.2 | $90.00 | Review Plaintiff filings |
| 9/8/2022 | Maximillian Feldman | $450.00 | 0.6 | $270.00 | Review decision dismissing complaint and correspondence with team regarding same |
| 9/8/2022 | Roberta Kaplan | $700.00 | 1.9 | $1,330.00 | Attention to decision on motion to dismiss; emails with team and client. |

Fees

| Date | Timekeeper | Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| 9/8/2022 | Shawn Crowley | $700.00 | 0.5 | $350.00 | Review MTD opinion and correspondence with client |
| 9/9/2022 | Anna Peterson | $375.00 | 1.7 | $637.50 | Review opinion on motion to dismiss and draft summary for client of the same; review correspondence from client and joint defense group regarding |
| 9/9/2022 | Carmen Iguina Gonzalez | $500.00 | 0.4 | $200.00 | Review MTD decision; emails with joint defense team re: next steps. |
| 9/9/2022 | Maximillian Feldman | $450.00 | 0.1 | $45.00 | Review A. Peterson summary of decision for client |
| 9/9/2022 | Roberta Kaplan | $700.00 | 1.4 | $980.00 | Attention to dismissal decision; emails re: same. |
| 9/9/2022 | Shawn Crowley | $700.00 | 0.2 | $140.00 | Correspondence with clients re |
| 9/10/2022 | Roberta Kaplan | $700.00 | 0.7 | $490.00 | Emails with D. Kendall re: |
| 9/12/2022 | Carmen Iguina Gonzalez | $500.00 | 0.1 | $50.00 | Review proposed agenda for joint defense call re: |
| 9/12/2022 | Roberta Kaplan | $700.00 | 0.6 | $420.00 | Emails re: possible sanctions. |
| 9/13/2022 | Carmen Iguina Gonzalez | $500.00 | 0.6 | $300.00 | Prepare for and participate in joint defense call re: |
| 9/13/2022 | Maximillian Feldman | $450.00 | 0.7 | $315.00 | Joint defense call |
| 9/13/2022 | Shawn Crowley | $700.00 | 0.7 | $490.00 | Joint defense call re |
| 9/14/2022 | Maximillian Feldman | $450.00 | 0.1 | $45.00 | Review client correspondence |
| 9/14/2022 | Shawn Crowley | $700.00 | 0.2 | $140.00 | Correspondence with clients re |
| 9/14/2022 | Shawn Crowley | $700.00 | 0.2 | $140.00 | Correspondence with clients re |
| 9/16/2022 | Maximillian Feldman | $450.00 | 0.3 | $135.00 | Telephone conference with DWS staff regarding |
| 9/16/2022 | Shawn Crowley | $700.00 | 0.4 | $280.00 | Call with clients re |
| 9/19/2022 | Carmen Iguina Gonzalez | $500.00 | 0.2 | $100.00 | Quick review of draft of sanctions motion; email KHF team re: review of draft. |
| 9/19/2022 | Maximillian Feldman | $450.00 | 0.6 | $270.00 | Review draft sanctions motion |
| 9/19/2022 | Shawn Crowley | $700.00 | 0.3 | $210.00 | Review draft sanctions motion |
| 9/20/2022 | Carmen Iguina Gonzalez | $500.00 | 2.0 | $1,000.00 | Review and provide comments on draft motion for sanctions; emails with R. Kaplan, S. Crowley, M. Feldman and A. Collins Peterson re: same. |

Fees

| Date | Timekeeper | Rate | Time | Amount Claimed | Description |
|------|-----------|------|------|----------------|-------------|
| 9/20/2022 | Maximillian Feldman | $450.00 | 2.0 | $900.00 | Email correspondence with team regarding draft sanction motion; work on declaration and supporting materials in connection with potential sanctions motion; review comments on sanctions motion |
| 9/20/2022 | Shawn Crowley | $700.00 | 0.4 | $280.00 | Attention to sanctions motion and internal correspondence re same |
| 9/21/2022 | Carmen Iguina Gonzalez | $500.00 | 0.6 | $300.00 | Draft paragraphs concerning experience as counsel in support of fees application for sanctions motion; email with S. Crowley re: draft; share KHF comments on draft of sanctions motion with joint defense counsel. |
| 9/21/2022 | Maximillian Feldman | $450.00 | 2.2 | $990.00 | Work on declaration and supporting materials in connection with potential sanctions motion and email correspondence with team regarding same |
| 9/21/2022 | Shawn Crowley | $700.00 | 0.3 | $210.00 | Correspondence and discussion re sanctions motion |
| 9/22/2022 | Maximillian Feldman | $450.00 | 1.1 | $495.00 | Work on declaration and supporting materials in connection with potential sanctions motion; email correspondence with team regarding same |
| 9/22/2022 | Roberta Kaplan | $700.00 | 0.9 | $630.00 | Attention to affidavit re: fees. |
| 9/22/2022 | Shawn Crowley | $700.00 | 0.7 | $490.00 | Attention to fees affidavit and internal discussion re same |
| 9/23/2022 | Maximillian Feldman | $450.00 | 0.3 | $135.00 | Work on supporting materials in connection with potential sanctions motion; email correspondence with team regarding same |
| 9/26/2022 | Carmen Iguina Gonzalez | $500.00 | 1.2 | $600.00 | Review revised draft of sanctions motion, research █████████ and proposed additional revisions to draft; review joint defense counsel's email re: questions concerning motion for sanctions; email with S. Crowley, M. Feldman, and A. Collins Peterson re: same. |
| 9/26/2022 | Maximillian Feldman | $450.00 | 0.1 | $45.00 | Review correspondence from C. Iguina Gonzalez regarding sanctions motion |

Page 24 of 26

Fees

| Date | Timekeeper | Rate | Time | Amount Claimed | Description |
|------|-----------|------|------|----------------|-------------|
| 9/27/2022 | Anna Peterson | $375.00 | 2.2 | $825.00 | Review example declaration sent by M. Feldman; search for relevant case law addressing ███████████; take notes on the same; email C. Iguina Gonzalez about the same; review local rules and other procedural guidance regarding filing procedure and email C. Iguina Gonzalez about the same. |
| 9/27/2022 | Maximillian Feldman | $450.00 | 0.6 | $270.00 | Correspondence with team regarding sanctions and attorney fees issues; correspondence with A. Peterson regarding legal research; review materials related to attorneys fees and declaration |
| 9/28/2022 | Carmen Iguina Gonzalez | $500.00 | 0.3 | $150.00 | Prepare for and participate in call with joint defense counsel re: motion for sanctions and request for fees. |
| 9/28/2022 | Maximillian Feldman | $450.00 | 0.1 | $45.00 | Correspondence with S. Crowley regarding attorney fees |
| 9/28/2022 | Shawn Crowley | $700.00 | 0.6 | $420.00 | Joint defense call re sanctions motion; correspondence with local counsel re same |
| 9/29/2022 | Anna Peterson | $375.00 | 1.1 | $412.50 | Revise declaration in support of fees motion to conform to joint defense group; email M. Feldman and case manager about the same. |
| 9/29/2022 | Carmen Iguina Gonzalez | $500.00 | 0.1 | $50.00 | Emails with S. Crowley, M. Feldman, and A. Collins Peterson re: motion for sanctions and supporting affidavits. |
| 9/29/2022 | Maximillian Feldman | $450.00 | 1.4 | $630.00 | Work on materials related to attorney fees in connection with sanctions motion |
| 9/29/2022 | Shawn Crowley | $700.00 | 0.1 | $70.00 | Attention to fees affidavit and correspondence re same |
| 9/30/2022 | Anna Peterson | $375.00 | 0.3 | $112.50 | Review correspondence with finance staff regarding billing for sanctions motion and update declaration in light of the same. |
| 9/30/2022 | Maximillian Feldman | $450.00 | 0.3 | $135.00 | Email correspondence with finance staff regarding billing for sanctions motion |
| 9/30/2022 | Shawn Crowley | $700.00 | 0.3 | $210.00 | Correspondence re sanctions motion; call with local counsel re same |

Fees

| Date | Timekeeper | Rate | Time | Amount Claimed | Description |
|------|-----------|------|------|----------------|-------------|
|      |           |      | 374.3 | $179,337.50 |             |

# EXHIBIT C



## ASSOCIATE

### CONTACT INFORMATION

**Email:** csundby@gsgpa.com

**Phone:** 305-728-0965

**Fax:** 305-728-0951

**Address:**

One Southeast Third Avenue

Suite 2600

Miami, Florida 33131-1715

Download V-card

### EDUCATION

Vanderbilt Law School, J.D., Order of the Coif

Vanderbilt Brain Institute, Ph.D., Neuroscience

Oberlin College, B.A., High Honors

### CLERKSHIPS

Honorable Adalberto Jordan, United States Court of Appeals for the Eleventh Circuit

### STATE BAR ADMISSIONS

Florida

# CHRISTOPHER SUNDBY

Christopher Sundby joined Gelber Schachter & Greenberg, P.A. after serving as a law clerk to Judge Adalberto Jordan on the United States Court of Appeals for the Eleventh Circuit.

Chris became only the second student to receive both a law degree and a PhD in neuroscience through Vanderbilt University's joint law and neuroscience program. Chris graduated Order of the Coif and served as Senior Articles Editor on the *Vanderbilt Law Review* and worked in the Vanderbilt Appellate Litigation Clinic. He also served as a teaching assistant for Evidence Law and gave guest lectures in the Law and Neuroscience and Introduction to Psychology courses. While at Vanderbilt he received the Scholastic Excellence award for earning the top grade in Contracts Law, Patent Law, and Law and Neuroscience. He was also awarded the Best Oralist Award for the mock trial competition.

Chris was a National Institute of Justice Graduate Research Fellow and his research focused on the psychological underpinnings of the Federal Rules of Evidence and the formation and retrieval of memory. He has published in a range of journals serving different audiences including *the Texas Law Review*, *The SciTech Lawyer*, and *Memory and Cognition*, and he has presented his research at several national conferences.

Chris lives with his fiancé and dog in Coconut Grove.

**Gerald Greenberg Recognized as White Collar Criminal Defense Lawyer of the Year by Best Lawyers**

Gelber Schachter & Greenberg congratulates our partner Gerald Greenberg for being honored as White Collar Criminal Defense Lawyer of the [...]

MORE NEWS →

Navigate

Contact

Sitemap

Legal Disclaimer

E-Mail: info@gsgpa.com

©2022 Gelber Schachter & Greenberg, P.A. All rights reserved.

Created by South Florida Web Des



# GERALD GREENBERG

*"I treat each client the way I hope a family member would be treated – with respect, diligence, and total responsiveness."*

Gerald Greenberg has received wide acclaim as one of a small group of attorneys in South Florida with extensive experience in both white collar criminal matters and high-stakes commercial litigation. Deeply familiar with both federal and state courts due to his work as a federal prosecutor and private lawyer, Jerry combines passionate courtroom advocacy with patient and careful review of legal issues, strong writing skills, and compassion for his clients.

Jerry has been honored for multiple years as one the "Top 100" lawyers in Miami by *Super Lawyers*, and he is among the few local attorneys recognized for both commercial litigation and criminal defense in *Best Lawyers*, which named him White Collar Criminal Defense lawyer of the year in its 2021 edition. The prestigious *Chambers and Partners* has recognized him as one of South Florida's leading attorneys for White-Collar Crime and Government Investigations, describing him as "an incredibly bright, well-rounded lawyer," and praising him as "easy to work with, thorough and always prepared."

After receiving Bachelors and Masters Degrees in History at the University of Pennsylvania and a law degree at Yale Law School, where he was a member of the *Yale Law Journal*, Jerry worked as a law clerk to Judge Stanley Marcus on the United States Court of Appeals for the Eleventh Circuit and Judge Allyne Ross on the United States District Court for the Eastern District of New York.

Following his clerkships, Jerry served as an Assistant United States Attorney in the Southern District of Florida, prosecuting cases involving narcotics, fraud, money laundering, violent crime and gangs, firearm violations, immigration crimes, and domestic terrorism. He also argued multiple cases before the Eleventh Circuit Court of Appeals. After leaving the United States Attorney's Office, Jerry was a shareholder at one of Florida's most respected law firms before becoming one of the founders of Gelber Schachter & Greenberg, PA in 2012.

On the criminal side, Jerry represents both companies and individuals in a wide variety of matters, including internal investigations, grand jury inquiries, and indicted cases. Representative recent cases have involved allegations of health care fraud, anti-kickback violations, tax crimes, securities fraud, wire fraud, antitrust offenses, importation offenses and a variety of other financial crimes. In addition to representing defendants and investigated parties, Jerry also has an extensive practice representing witnesses and victims in federal investigations. Moreover, as a member of the Criminal Justice Act panel of attorneys for the Southern District of Florida, Jerry has represented defendants in cases

## PARTNER



**Gerald Greenberg**

### CONTACT INFORMATION

**Email:** ggreenberg@gsgpa.com
**Phone:** 305-728-0953
**Fax:** 305-728-0951
**Address:**
One Southeast Third Avenue
Suite 2600
Miami, Florida 33131-1715
Download V-card

### EDUCATION

Yale Law School, J.D.

University of Pennsylvania, M.A., History

University of Pennsylvania, B.A., *summa cum laude*

### CLERKSHIPS

Honorable Stanley Marcus, United States Court of Appeals for the Eleventh Circuit

Honorable Allyne Ross, United States District Court for the Eastern District of New York

### STATE BAR ADMISSIONS

Florida

involving narcotics violations, firearms matters, and other offenses. In all of his cases, Jerry works closely with his clients and their families to help navigate the legal, personal, economic, and emotional challenges inherent in the criminal justice system while striving to achieve the best outcomes possible that allow all involved to move on with their lives.

On the civil side, Jerry has represented plaintiffs and defendants in a variety of important matters before federal and state courts as well as domestic and international arbitration tribunals. His clients have included companies, individuals, and local governments. Jerry's civil matters often overlap with his criminal practice, including a number of qui tam and other cases involving health care fraud, anti-kickback claims, antitrust violations, and other quasi-criminal activity. He has also represented clients in commercial matters, employment and restrictive covenant cases, contract disputes, defamation claims, product liability matters, international business controversies, health care billing questions, and purchase-and-sale disagreements. While Jerry always assists his clients in finding the most efficient resolutions possible, he recognizes that not all cases can be settled and has achieved significant successes for his clients at trial.

Jerry has also played an active role in pro bono and public interest matters, representing individuals and organizations in trials, appeals, and administrative proceedings regarding voting rights, public safety, civil rights, due process, inmate rights, immigration, fair housing, and education law issues. For example, Jerry and his partners represented civic groups and individuals in the groundbreaking constitutional challenge to Florida's improperly-drawn congressional and state legislative districts, which resulted in the court-ordered creation of new, legal maps under Florida's Fair Districts Amendments. In addition, Jerry represented various children's health and physicians' organizations as amici curiae in a successful federal First Amendment challenge to a Florida law prohibiting doctors from inquiring about the presence of firearms in their patients' homes.

Aside from the practice of law, Jerry is active in a wide range of community activities.  Along with his wife, Jerry operates the Thanksgiving Baskets Fund, which collects donations and prepares holiday meals for hundreds of South Florida families every year.  He also serves on the  Zoning Board for the Village of Pinecrest, the Advisory Board of the Education Fund, and the Board of the Indian & Forest Acres Scholarship Foundation.  Previously, Jerry has been on the Board of the Trustees for the Southern Florida Chapter of the Leukemia & Lymphoma Society, the Board of Directors of Big Brothers Big Sisters of Miami, and the Board of the Bet Shira Congregation. He has also served as a "Big Brother" for twenty years, taught as an adjunct professor at the Florida International University School of Law, served as Vice-Chairman of a Florida Bar Grievance Committee, and run multiple marathons to raise money for blood cancer research and patient support.

A native Miamian, Jerry lives with his wife and three children in Pinecrest.



# NATALIE BEDOYA MCGINN

Natalie Bedoya McGinn is a partner at Gelber Schachter & Greenberg, P.A.

Natalie's practice includes a variety of criminal, civil, and appellate matters.  In her criminal work, Natalie represents companies and individuals in white-collar matters involving allegations of health care fraud, Foreign Corrupt Practices Act violations, money laundering, and various other offenses. Natalie also represents witnesses in federal investigations and clients in connection with internal investigations.  In her civil work, Natalie represents plaintiffs and defendants in commercial matters, contract disputes, and cases involving such claims as fraud, defamation, and breach of fiduciary duty.

Natalie received her Bachelor of Arts degree from Harvard College and her law degree from Duke University School of Law.  At Duke, she served as the Editor-in-Chief of the *Duke Law Journal* and as a teaching assistant for both Legal Writing and Constitutional Law.  She also received the Faculty Award for Constitutional Law and Civil Rights, the James S. Bidlake Memorial Award for Superior Achievement in Legal Analysis, Research & Writing, and the Justin Miller Award for Intellectual Curiosity.

After graduating, Natalie served as a law clerk to Judge Stanley Marcus on the United States Court of Appeals for the Eleventh Circuit and Judge Edward R. Korman on the United States District Court for the Eastern District of New York.  Natalie then joined a prominent national law firm in New York City as a litigation associate, focusing on white-collar investigations and complex commercial litigation. Following her time at the firm, Natalie re-entered public service by joining the Appeals Division of the New York County District Attorney's Office, where she gained extensive experience writing briefs and arguing appeals before New York appellate courts.

In 2019, Natalie was selected as one of the 40 outstanding South Florida lawyers under the age of 40 by the Cystic Fibrosis Foundation.

A native Floridian and fluent Spanish speaker, Natalie lives with her husband and three children in Coral Gables.

## PARTNER

### CONTACT INFORMATION

**Email:** nmcginn@gsgpa.com
**Phone:** 305-728-0964
**Fax:** 305-728-0951
**Address:**
One Southeast Third Avenue
Suite 2600
Miami, Florida 33131-1715
Download V-card

### EDUCATION

Duke University School of Law, J.D.

Harvard College, B.A.

### CLERKSHIPS

Honorable Stanley Marcus, United States Court of Appeals for the Eleventh Circuit

Honorable Edward R. Korman, United States District Court for the Eastern District of New York

### STATE BAR ADMISSIONS

Florida

New York

# **EXHIBIT D**

| Date | Timekeeper | Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| 4/19/2022 | Gerald E. Greenberg | $525.00 | 0.5 | $262.50 | initial conference and review of materials |
| 4/23/2022 | Gerald E. Greenberg | $525.00 | 0.8 | $420.00 | preparation of Wasserman Schultz extension papers; related correspondence |
| 4/25/2022 | Gerald E. Greenberg | $525.00 | 0.5 | $262.50 | review of orders and filings; preparation of pro hac vice motion and corporate statement |
| 4/26/2022 | Gerald E. Greenberg | $525.00 | 0.4 | $210.00 | conferences re: position on motion; review of filings |
| 4/28/2022 | Gerald E. Greenberg | $525.00 | 0.3 | $157.50 | review of order and filings |
| 4/29/2022 | Gerald E. Greenberg | $525.00 | 0.2 | $105.00 | review of filings |
| 5/3/2022 | Gerald E. Greenberg | $525.00 | 0.3 | $157.50 | review of filings |
| 5/4/2022 | Gerald E. Greenberg | $525.00 | 0.3 | $157.50 | review of co-defendant motion and case filings |
| 5/9/2022 | Gerald E. Greenberg | $525.00 | 1 | $525.00 | review and revision of motion to dismiss |
| 5/9/2022 | Christopher S. Sundby | $262.50 | 2.4 | $630.00 | reviewed proposed motion to dismiss |
| 5/11/2022 | Gerald E. Greenberg | $525.00 | 0.7 | $367.50 | review of filings; coordination re: motion to dismiss |
| 5/11/2022 | Christopher S. Sundby | $262.50 | 0.6 | $157.50 | review filings |
| 6/2/2022 | Gerald E. Greenberg | $525.00 | 0.8 | $420.00 | status hearing; preparation call |
| 6/27/2022 | Gerald E. Greenberg | $525.00 | 0.3 | $157.50 | review of amended complaint |
| 6/28/2022 | Gerald E. Greenberg | $525.00 | 0.6 | $315.00 | review of amended complaint |
| 7/14/2022 | Gerald E. Greenberg | $525.00 | 0.4 | $210.00 | review of motion to dismiss |
| 7/14/2022 | Natalie B. McGinn | $375.00 | 1 | $375.00 | review amended complaint and motion to dismiss amended complaint; |
| 7/15/2022 | Natalie B. McGinn | $375.00 | 0.3 | $112.50 | review motion to dismiss amended complaint; |
| 8/18/2022 | Natalie B. McGinn | $375.00 | 0.6 | $225.00 | review joint motion to dismiss |
| 9/9/2022 | Gerald E. Greenberg | $525.00 | 0.8 | $420.00 | review of dismissal order; call with co-counsel |
| 9/28/2022 | Gerald E. Greenberg | $525.00 | 0.3 | $157.50 | preparation of sanctions declaration |
| 9/29/2022 | Gerald E. Greenberg | $525.00 | 0.3 | $157.50 | preparation of sanctions declaration |
| 9/30/2022 | Gerald E. Greenberg | $525.00 | 1 | $525.00 | preparation and organization of materials for fee motion; call with co-counsel |
| | | | 14.4 | $6,487.50 | |

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Donald J. Trump,

        Plaintiff,

   v.

Hillary R. Clinton *et al.*,

        Defendants.

Civil Action No. 2:22-14102-DMM

## DECLARATION OF WENDY B. REILLY IN SUPPORT OF DEFENDANTS' MOTION FOR SANCTIONS AND FEES

I, Wendy B. Reilly, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am a counsel at Debevoise & Plimpton LLP ("Debevoise"), counsel of record for Robert Mook in the above-captioned matter.

2.      Mr. Mook retained Debevoise to represent him in connection with the present litigation. Attached as Exhibit A are the law firm website biographies of the attorneys at Debevoise for whom Mr. Mook seeks attorneys' fees: partner Andrew J. Ceresney, counsel Wendy B. Reilly, senior associate Isabela Garcez, and associate Alexa Busser Lopez. The biographies reflect the professional qualifications of these attorneys.

3.      Attached as Exhibit B is a true and correct copy of the hours worked by counsel for Mr. Mook for whom he seeks attorneys' fees. Mr. Mook is not seeking reimbursement for the aforementioned attorneys' customary hourly rates. Instead, Mr. Mook seeks fees at discounted hourly rates, as described in Exhibit B and below. These discounted hourly rates are consistent with the rates this Court concluded were reasonable in *Celsius Holdings, Inc v. A SHOC Beverage, LLC*, No. 21-cv-80740, 2022 WL 3568042 (July 19, 2022). Exhibit B also provides an accurate statement of the work provided by Debevoise during the periods for which fees are sought.

1

4.      Consistent with the discussion in the Memorandum in Support of Sanctions and the

information provided in Exhibit B, I summarize below in Charts A, B, and C the fees associated

with three different phases of the case:  the fees incurred from the filing of the initial complaint to

the filing of Mr. Mook's initial motion to dismiss; the fees incurred between the filing of Mr.

Mook's initial motion to dismiss to the Court's order dismissing the suit; and the fees incurred as

of September 30, 2022 in connection with the motion for sanctions.

5.      As reflected in Chart A, the discounted fees incurred from the filing of the initial

complaint to the filing of Mr. Mook's initial motion to dismiss total $36,312.50.

6.      As reflected in Chart B, the discounted fees incurred from the filing of Mr. Mook's

initial motion to dismiss to this Court's dismissal of the suit total $24,192.50.

7.      As reflected in Chart C, the discounted fees incurred in connection with the motion

for sanctions, as of September 30, 2022, total $9,105.

### Chart A:  Discounted Fees Incurred from Complaint to Initial MTD

| Timekeeper | Discounted Fee | Hours | Fees |
|---|---|---|---|
| Andrew J. Ceresney | $700 | 2.2 hours | $1,540.00 |
| Wendy B. Reilly | $550 | 20.8 hours | $11,440.00 |
| Isabela Garcez | $450 | 35.6 hours | $16,020.00 |
| Alexa Busser Lopez | $375 | 19.5 hours | $7,312.50 |

### Chart B:  Discounted Fees Incurred from Initial MTD to Dismissal

| Timekeeper | Discounted Fee | Hours | Fees |
|---|---|---|---|
| Wendy B. Reilly | $550 | 26.0 hours | $14,300.00 |
| Isabela Garcez | $450 | 8.9 hours | $4,005.00 |
| Alexa Busser Lopez | $375 | 15.7 hours | $5,887.50 |

**Chart C:  Discounted Fees Incurred as of September 30, 2022 on Sanctions Motion**

| Timekeeper | Discounted Fee | Hours | Fees |
|---|---|---|---|
| Wendy B. Reilly | $550 | 11.4 hours | $6,270.00 |
| Isabela Garcez | $450 | 2.3 hours | $1,035.00 |
| Alexa Busser Lopez | $375 | 4.8 hours | $1,800.00 |

8.      I believe that the discounted rates claimed are reasonable for the Southern District of Florida market given the professional qualifications of the billers as evidenced in Exhibit A and given the rates approved by this Court in *Celsius*.  These rates reflect 57%-66% discounts from these attorneys' customary rates.

9.      In connection with this case, counsel also incurred necessary costs for electronic legal research.  I understand that courts in this Circuit have held that legal research costs are not ordinarily taxable as costs under 28 U.S.C. § 1920, but are properly considered a component of attorneys' fees.  *Springer v. Convergy's Corp.*, No. 3:03-CV-302-J-99MCR, 2006 WL 8439203, at *2 (M.D. Fla. July 7, 2006).  As such, in addition to the discounted fees set out above, Mr. Mook requests an award of $597.08 incurred for electronic legal research.

10.      Consistent with local Rule 7.3, Defendants' counsel sent the motion papers and exhibits to Plaintiff's counsel on October 5, 2022.  Defendants' counsel met and conferred in good faith with Plaintiff's counsel by video conference on October 13 and October 26, 2022, but were unable to reach agreement as to either the Defendants' entitlement to or the amount of fees and expenses not taxable under 28 U.S.C. § 1920 that are recoverable from Plaintiff and/or his counsel.

_____
Wendy B. Reilly
October 27, 2022

# EXHIBIT A

**Debevoise
&Plimpton**

Andrew J. Ceresney
Partner, New York

aceresney@debevoise.com
+1 212 909 6947



# Andrew J. Ceresney
# Partner

Andrew J. Ceresney is a partner in the New York office and Co-Chair of the Litigation Department.

Mr. Ceresney represents public companies, financial institutions, asset management firms, accounting firms, boards of directors, and individuals in federal and state government investigations and contested litigation in federal and state courts. Mr. Ceresney has many years of experience prosecuting and defending a wide range of white collar criminal and civil cases, having served in senior law enforcement roles at both the United States Securities and Exchange Commission and the U.S. Attorney's Office for the Southern District of New York. Mr. Ceresney also has tried and supervised many jury and non-jury trials and argued numerous appeals before federal and state courts of appeal.

Mr. Ceresney is ranked in the top band for Securities Enforcement by *Chambers USA* (2022), where he is lauded by fellow practitioners and clients as "incredibly smart," "the real deal," with "the right temperament to handle tough situations." He is said to be "very revered, very smart and well credentialed," and "at the top of his game." He has been described as "knock-your-socks-off impressive," "incredibly strategic," and has received further praise for being a "marquee name" in the market with a "compendious knowledge of the facts" and an "extraordinary memory." Mr. Ceresney was named to *Securities Docket's* 2020 "Enforcement 40," their list of the 40 best securities enforcement defense lawyers in the business. He receives further recognition from *Chambers USA* (2022) as a leading practitioner in White Collar Crime and Criminal Defense,

**Debevoise
&Plimpton**

Andrew J. Ceresney
Partner, New York

aceresney@debevoise.com
+1 212 909 6947

where clients have noted that he is "brilliant, strategic, thorough and thoughtful" and declare that "there is no better lawyer to have by your side." Sources have also credited his "unparalleled industry experience" and his "ability to bring insights and strategic advice." Mr. Ceresney is also recommended as a Leading Lawyer by *The Legal 500 US* (2022).

Prior to rejoining Debevoise in 2017, Mr. Ceresney served for nearly four years as the Director of Enforcement at the SEC under Chair Mary Jo White. In that role, he oversaw approximately 1,400 SEC personnel, supervising law enforcement efforts in 12 offices throughout the country, including matters related to financial reporting and accounting, asset management, insider trading, market structure, and the Foreign Corrupt Practices Act (FCPA). Under his leadership, the Division brought a record number of cases, including pathbreaking and significant cases across the entire spectrum of the securities industry. Mr. Ceresney also helped broaden the use of the SEC's analytical tools to detect and investigate financial misconduct, while enhancing the Enforcement Division's litigation capacity and improving morale. As Director of Enforcement, Mr. Ceresney worked closely with the high-level leadership of other regulators, including the Department of Justice, many U.S. Attorney's offices, CFTC, New York Attorney General, New York Department of Financial Services, FINRA and CFPB.

Prior to joining the SEC in 2013, Mr. Ceresney Co-Chaired the White Collar & Regulatory Defense Group at Debevoise. During that time, he represented various financial institutions, accounting firms, companies and individuals, including a major financial institution in investigations and litigation relating to origination, securitization and servicing of mortgages. Mr. Ceresney played an integral role in negotiating the historic $25 billion national mortgage settlement between the federal government, 49 state attorneys general and some of the country's largest banks. His practice focused on a wide range of issues, including securities-related and money laundering for financial institutions, and investigations and civil matters relating to accounting fraud, FCPA, valuation issues, complex financial instruments, insider trading and disclosure issues. He also handled matters involving the pharmaceutical industry, including government investigations of promotional practices and class action litigation.

Prior to joining Debevoise in 2003, Mr. Ceresney served as a Deputy Chief Appellate Attorney in the U.S. Attorney's Office for the Southern District of New York. During his tenure at the U.S. Attorney's Office, Mr. Ceresney was a member of the Securities and Commodities Fraud Task Force and the Major Crimes Unit and handled numerous white collar criminal investigations, trials and appeals, including matters relating to securities fraud, mail fraud, money

**Debevoise**
**&Plimpton**

**Andrew J. Ceresney**
Partner, New York

aceresney@debevoise.com
+1 212 909 6947

laundering, public corruption and obstruction of justice.

Mr. Ceresney served as a law clerk to the Hon. Dennis Jacobs, formerly Chief Judge of the U.S. Court of Appeals for the Second Circuit from 1997 to 1998; and the Hon. Michael B. Mukasey, formerly Chief Judge of the U.S. District Court for the Southern District of New York, from 1996 to 1997. Mr. Ceresney received his J.D. in 1996, from Yale Law School, where he was essays editor of the *Yale Law Journal*. He obtained his B.A. *summa cum laude* Phi Beta Kappa, from Columbia University in 1993.

Mr. Ceresney is a member of the Board of Advisors of the Yale Law School Center for the Study of Corporate Law.

**Debevoise & Plimpton**

Andrew J. Ceresney
Partner, New York

aceresney@debevoise.com
+1 212 909 6947

## ANDREW J. CERESNEY'S SELECT REPRESENTATIONS

### Financial Institutions

A large financial services institution in an SEC investigation focused on its share class selection and revenue sharing arrangements that resulted in a declination by the government.

JPMorgan Chase & Co. in federal and state investigations of mortgage servicing, foreclosure, and origination related issues, including in connection with $25 billion settlement with DOJ, State Attorneys General and other federal authorities.

A major insurer in SEC and DFS investigations related to financial reporting and internal controls issues.

A clearing firm and its subsidiaries in various SEC examination and enforcement matters.

A high-profile financial information content provider in an SEC investigation.

A large global hedge fund in an SEC investigation related to alleged Rule 105 violations.

A large hedge fund in an SEC investigation related to trading.

Robinhood in its SEC and FINRA settlements relating to best execution practices and payment for order flow.

A major financial institution in DOJ Mortgage Fraud Task Force, SEC and AG investigations of mortgage-backed securitizations.

JPMorgan Chase in investigations by several State Attorneys General and a federal regulator into credit card collections and debt sale practices.

UBS in federal and state regulatory investigations relating to auction-rate securities.

A leading financial institution in a Department of Justice investigation relating to alleged money laundering and Bank Secrecy Act violations.

A major investment bank in an internal investigation relating to mispricing of subprime securities and representation in follow-up government investigations.

A major accounting firm in a Public Company Accounting Oversight Board inquiry.

A national accounting firm in U.S. Attorney's Office and SEC investigations relating to collateralized debt obligations.

Major financial institutions on Anti-Money Laundering and Bank Secrecy Act compliance issues, including a review of Bank Secrecy Act compliance for these institutions.

JPMorgan Chase Bank, N.A. in civil lawsuits filed by the Massachusetts and New York attorneys general alleging consumer protection violations based upon the bank's use of the Mortgage Electronic Registration System and allegations that the banks foreclosed without proper standing.

### Technology, Media & Telecommunications

SolarWinds Corporation, a software developer, in its investigation of the December 2020 high profile cyber attack.

A global technology company in an SEC investigation involving revenue recognition and other accounting issues.

A real estate company in an SEC investigation and other regulatory inquiries.

A technology company in an SEC investigation related to key performance indicators.

A private equity firm in an SEC investigation focused on technology investments.

Time Warner Book Group and New York Times editor Timothy O'Brien in a libel action brought by Donald J. Trump relating to the publication of Mr. O'Brien's book "TrumpNation," which was dismissed on motion for summary judgment for failure to demonstrate actual malice.

A large media company in U.S. Attorney's Office investigation of alleged improper subscription practices.

### Cryptocurrency

Tether, Bitfinex and related entities in a putative class action relating to the sufficiency of reserves for Tether tokens.

Tether, Bitfinex and related entities in a putative class action asserting Commodities Exchange Act, antitrust and fraud claims based on alleged manipulation of the price of cryptocommodities.

A digital currency exchange in an NYAG inquiry.

Ripple with ongoing civil litigation in the Southern District of New York against the Securities and Exchange Commission regarding the legal and regulatory status of XRP.

A public company engaged in Bitcoin mining operations and blockchain investments in an SEC investigation.

### Healthcare

A pharmaceutical company in an SEC investigation of investor disclosures relating to FDA communications that resulted in a declination by the government.

A global pharmaceutical company in an SEC investigation.

Forest Laboratories in multi-district litigation class action suits arising from the marketing and promotion of Celexa and Lexapro.

Forest Laboratories and Forest Pharmaceuticals in the settlement of civil and criminal investigations led by the United States Department of Justice and the United States Attorney's Office for the District of Massachusetts, and related civil qui tam litigation, regarding marketing, promotional and other activities for its products Celexa, Lexapro and Levothroid.

A large hospital corporation in an insider trading investigation conducted by the U.S. Attorney's Office and SEC.

### Conglomerates

A global shoe and apparel company in a federal corruption investigation.

A Brazilian industrial company in an FCPA investigation.

A major international conglomerate in conducting FCPA due diligence on numerous M&A transactions.

An internal review for the Audit Committee of BG Group relating to issues arising in an investigation by Italian authorities into allegations of corruption in a project in Brindisi, Italy.

# Debevoise & Plimpton

**Andrew J. Ceresney**

Partner, New York

aceresney@debevoise.com

+1 212 909 6947

A large, multinational company on compliance with the Foreign Corrupt Practices Act in connection with various foreign business ventures.

A Special Committee of the Board of Tommy Hilfiger in an internal investigation and United States Attorney's Office investigation of tax accounting issues related to offshore subsidiaries.

## Individual Representations

Kenneth D. Lewis, former CEO of Bank of America, in regulatory matters relating to the Merrill Lynch acquisition, including defense against civil claims brought by the New York Attorney General and various civil securities and derivative cases.

A former senior manager at AIG in an investigation of valuation of credit default swaps.

The former officer of a public company in a filed SEC action in the United States District Court for the Southern District of New York alleging accounting fraud and revenue recognition violations.

**Debevoise**
**&Plimpton**

**Wendy B. Reilly**
Counsel, New York

wbreilly@debevoise.com
+1 212 909 6316



## <u>Wendy B. Reilly</u>
Counsel

Ms. Reilly is a counsel in the firm's Litigation Department. Her practice focuses on complex commercial litigation, including contract disputes and bankruptcy-related litigation and advice, particularly on behalf of investment banking, financial advisory and asset management clients. She also has significant experience with white collar criminal defense and SEC investigations and enforcement actions. Ms. Reilly maintains an active pro bono practice as well, and she received the 2005 inMotion "Commitment to Justice" award, the 2015 *New York Law Journal* "Lawyers Who Lead by Example" Pro Bono award, the 2016 Chambers Diversity "Pro Bono Lawyer of the Year" award and the 2019 Sanctuary for Families' "Above & Beyond Pro Bono Achievement Award."

Ms. Reilly joined the firm in 2001. From 2000 to 2001 she clerked for Justice James H. Coleman, Jr. of the New Jersey Supreme Court. Ms. Reilly received a J.D. with honors from Rutgers Law School in Newark in 2000, where she was a Marsha Wenk fellow, a managing editor of the *Rutgers Law Review* and a

**Debevoise**
**&Plimpton**

Wendy B. Reilly

Counsel, New York

wbreilly@debevoise.com
+1 212 909 6316

recipient of the Alumni Senior Prize. She received her undergraduate degree *magna cum laude* from Douglass College, Rutgers University in 1997.

Ms. Reilly is a member of the Bars of New York and New Jersey and is admitted to practice before the Southern and Eastern Districts of New York, the District of New Jersey and the Second and Third Circuit Courts of Appeals.

**Debevoise & Plimpton**

**Wendy B. Reilly**
Counsel, New York

wbreilly@debevoise.com
+1 212 909 6316

## WENDY B. REILLY'S SELECT REPRESENTATIONS

<u>YPF S.A.</u>, as a co-defendant with the Argentine Republic, in litigation brought by Petersen Energía and Eton Park in the S.D.N.Y. arising from the Republic's 2012 intervention in YPF, temporary occupation of 51% of YPF's capital stock held by Repsol S.A., and subsequent expropriation of that capital stock.

<u>GlaxoSmithKline</u>, in obtaining a seven-figure verdict, after a jury trial, in a commercial dispute with a contractual counter-party; and in obtaining an eight-figure arbitration award, following trial, with another contractual counterparty.

<u>The D. E. Shaw Group and Madison Dearborn Partners</u> in their $327 million litigation win against TerraForm for breach of contract arising from the plaintiffs' sale of First Wind Holdings, LLC to TerraForm and SunEdison Inc.

<u>CHC Group</u>, one of the largest global commercial helicopter service companies in the world, as aircraft counsel in its Chapter 11 proceedings in the U.S. Bankruptcy Court for the Northern District of Texas, in which CHC successfully restructured more than $2 billion in indebtedness. Debevoise was named joint winners of "Restructuring Deal of the Year (Over $1 B to $5 B)" at the 12th Annual M&A Advisor Turnaround Awards for this representation.

<u>American Airlines</u> in litigation arising out of the September 11, 2001 terrorist attacks.

<u>JC Flowers</u> in litigation brought by the MF Global bankruptcy trustee seeking to recover dividends paid in connection with preferred stock.

<u>A class of minority sheet metal workers</u> in winning a contempt judgment against their union, after a three-day trial, based on the union's discriminatory practices and non-compliance with affirmative action orders. Debevoise handled this matter pro bono.

<u>GoldenTree Asset Management</u> in employment/ERISA litigation arising out of the bankruptcy of Source Home Entertainment.

<u>The former General Counsel of Computer Associates</u> in Department of Justice and SEC investigations of accounting irregularities.

<u>The former President of North America sales for Lucent</u> in litigation with the Company and the SEC.

A high-profile financial information content provider in an SEC investigation.

Isabela Garcez

Associate, New York

imgarcez@debevoise.com
+1 212 909 6636

**Debevoise
&Plimpton**



# Isabela Garcez
# Associate

### Isabela Garcez is an associate in the Litigation Department.

Ms. Garcez joined Debevoise in 2016. From 2018 to 2019, she clerked for the Hon. Raymond J. Dearie of the United States District Court for the Eastern District of New York. Ms. Garcez received a J.D. from New York University Law School in 2016, where she was an executive editor of the *NYU Journal of Law and Business*. Ms. Garcez received her B.A. from the University of Pennsylvania in 2011. Ms. Garcez is fluent in Portuguese.

**Debevoise**
**&Plimpton**

**Isabela Garcez**
Associate, New York

imgarcez@debevoise.com
+1 212 909 6636

ISABELA GARCEZ'S SELECT REPRESENTATIONS

A securities brokerage platform in an internal investigation into recent outage issues and responding to related regulatory inquiries.

The Alavi Foundation in a civil forfeiture action, resulting in the successful reversal of adverse jury verdicts by the U.S. Court of Appeals for the Second Circuit.

A Special Committee of the Board of Trustees of the University of Rochester in an independent investigation of all claims alleged in EEOC and federal complaints filed by eight current and former University faculty members and students.

Capital One in a resolution with FinCEN regarding its AML program, without criminal charges being filed.

**Alexa Busser Lopez**
Associate, New York

ablopez@debevoise.com
+1 212 909 6415



# Alexa Busser Lopez
## Associate

Alexa Busser Lopez is an associate in the Litigation Department.

Ms. Lopez joined Debevoise in 2020. Ms. Lopez received a J.D. from Columbia Law School and an LL.M. from the University of Amsterdam in 2020. At Columbia, she was a Harlan Fiske Stone Scholar, a notes editor of the *Journal of Transnational Law*, and a coach for the Immigration Moot Court. Ms. Lopez received a B.A. from Colby College in 2017.

**Debevoise**
**&Plimpton**

**Alexa Busser Lopez**
Associate, New York

ablopez@debevoise.com
+1 212 909 6415

## ALEXA BUSSER LOPEZ'S SELECT REPRESENTATIONS

Robinhood Markets and affiliates in multiple putative
class action lawsuits arising from outages on
Robinhood's trading platform.

| Date | Timekeeper Name | Discounted Rate | Time | Amount Claimed | Narrative |
|---|---|---|---|---|---|
| 3/24/2022 | Ceresney, Andrew J. | $700.00 | 0.3 | $ 210.00 | Review Trump complaint. Emails with Robby. |
| 4/5/2022 | Ceresney, Andrew J. | $700.00 | 0.1 | $ 70.00 | Emails with Robby. |
| 4/5/2022 | Reilly, Wendy B. | $550.00 | 0.6 | $ 330.00 | Emails to & from R. Mook, A. Ceresney, I. Garcez re: Trump lawsuit; emails to & from R. Trout re: Trump lawsuit; emails to & from D. Kendall re: Trump lawsuit |
| 4/7/2022 | Reilly, Wendy B. | $550.00 | 0.1 | $ 55.00 | Emails to & from R. Trout, A. Ceresney, I. Garcez re: Trump lawsuit |
| 4/8/2022 | Garcez, Isabela | $450.00 | 1.2 | $ 540.00 | Reviewing Trump complaint to identify relevant sections for client; participating in call w/ common interest counsel |
| 4/8/2022 | Reilly, Wendy B. | $550.00 | 1.4 | $ 770.00 | Call with defense counsel re: Trump lawsuit; call with I. Garcez re: Trump lawsuit ; review summary re: Trump lawsuit |
| 4/11/2022 | Garcez, Isabela | $450.00 | 0.8 | $ 360.00 | Participating in call w/ common interest counsel; correspondence w/ W. Reilly re personal jurisdiction question; conducting research into personal jurisdiction question |
| 4/12/2022 | Garcez, Isabela | $450.00 | 0.2 | $ 90.00 | Call w/ A. Lopez re Trump lawsuit research |
| 4/13/2022 | Ceresney, Andrew J. | $700.00 | 0.4 | $ 280.00 | Call with JDA group |
| 4/13/2022 | Garcez, Isabela | $450.00 | 1.5 | $ 675.00 | Participating in joint defense call re Trump lawsuit; drafting update of call for W. Reilly and A. Ceresney |
| 4/14/2022 | Ceresney, Andrew J. | $700.00 | 0.3 | $ 210.00 | Review call summary. Review brief. |
| 4/17/2022 | Ceresney, Andrew J. | $700.00 | 0.6 | $ 420.00 | Review Clinton brief. Email to team re Mook brief (0.6). |
| 4/17/2022 | Reilly, Wendy B. | $550.00 | 0.1 | $ 55.00 | Emails to & from A. Ceresney, I. Garcez re: Trump lawsuit |
| 4/18/2022 | Ceresney, Andrew J. | $700.00 | 0.1 | $ 70.00 | Review comments on brief. |
| 4/18/2022 | Garcez, Isabela | $450.00 | 0.5 | $ 225.00 | Correspondence re brief |
| 4/18/2022 | Reilly, Wendy B. | $550.00 | 0.4 | $ 220.00 | Emails to & from A. Ceresney, I. Garcez re: H. Clinton motion to dismiss Trump lawsuit. |
| 4/19/2022 | Ceresney, Andrew J. | $700.00 | 0.1 | $ 70.00 | Review edits to brief. |
| 4/19/2022 | Reilly, Wendy B. | $550.00 | 0.5 | $ 275.00 | Review H. Clinton draft motion to dismiss Trump lawsuit |
| 4/20/2022 | Garcez, Isabela | $450.00 | 0.5 | $ 225.00 | Correspondence w/ W. Reilly and library re article in Trump lawsuit complaint |
| 4/20/2022 | Reilly, Wendy B. | $550.00 | 2.0 | $1,100.00 | Review H. Clinton draft motion to dismiss; call with defense counsel re: Trump lawsuit |
| 4/21/2022 | Garcez, Isabela | $450.00 | 3.8 | $1,710.00 | Drafting brief for MTD; meeting w/ W. Reilly re Trump lawsuit |

| Date | Name | Rate | Hours | Amount | Description |
|---|---|---|---|---|---|
| 4/21/2022 | Reilly, Wendy B. | $550.00 | 1.0 | $ 550.00 | Mtg. w/ I. Garcez re: Trump litigation; emails to & from Gibson re: extension request; review & revise extension motion |
| 4/22/2022 | Garcez, Isabela | $450.00 | 2.8 | $1,260.00 | Correspondence w/ W. Reilly, A. Ceresney and R. Mook re local counsel; calls w/ B. Stekloff re local counsel; call w/ B. Barzee re representation; drafting NOA for B. Barzee; correspondence w/ Gibson re local counsel; drafting brief |
| 4/22/2022 | Reilly, Wendy B. | $550.00 | 1.5 | $ 825.00 | Emails to & from R. Mook, Gibson Dunn, A. Ceresney, I. Garcez re: extension request in Trump lawsuit; emails to & from W. Barzee, A. Ceresney, I. Garcez re: local counsel notice of appearance in Trump lawsuit; review & revise draft notice of appearance for local counsel in Trump lawsuit |
| 4/25/2022 | Reilly, Wendy B. | $550.00 | 0.2 | $ 110.00 | Emails to & from Gibson re: extension motions |
| 4/26/2022 | Reilly, Wendy B. | $550.00 | 0.3 | $ 165.00 | Emails from Gibson re: Trump lawsuit; docket updates re: Trump lawsuit |
| 4/27/2022 | Garcez, Isabela | $450.00 | 1.6 | $ 720.00 | Correspondence w/ B. Barzee re PHV motions and engagement letter; drafting PHV for SD FL |
| 4/28/2022 | Lopez, Alexa Busser | $375.00 | 0.6 | $ 225.00 | Call with I. Garcez re motion to dismiss brief. |
| 4/28/2022 | Garcez, Isabela | $450.00 | 4.5 | $2,025.00 | Finalizing Ceresney PHV motion; drafting engagement letter for B. Barzee; correspondence and meeting w/ W. Reilly re Trump lawsuit; call w/ A. Lopez re Trump lawsuit; revising list of lawsuit defendant counsel; correspondence w/ A. Lopez re trump lawsuit brief |
| 4/28/2022 | Reilly, Wendy B. | $550.00 | 1.5 | $ 825.00 | Review & revise local counsel engagement letter & pro hac vice motion papers re: Trump lawsuit; emails to & from I. Garcez re: Trump lawsuit; mtg. w/ I. Garcez re: Trump lawsuit |
| 4/29/2022 | Garcez, Isabela | $450.00 | 4.1 | $1,845.00 | Finalizing PHV motions; correspondence w/ W. Barzee and R. Mook re engagement letter; calls and correspondence w/ A. Lopez re Trump lawsuit brief; drafting MTD brief for trump lawsuit. |
| 4/29/2022 | Lopez, Alexa Busser | $375.00 | 2.6 | $ 975.00 | Review Trump complaint and H. Clinton MTD discuss MTD with I. Garcez. |
| 5/2/2022 | Lopez, Alexa Busser | $375.00 | 0.9 | $ 337.50 | Draft portions of MTD brief. |
| 5/2/2022 | Garcez, Isabela | $450.00 | 4.0 | $1,800.00 | Drafting brief for MTD in Trump Lawsuit; correspondence w/ W. Reilly re PHV filing in Trump lawsuit; correspondence w/ local counsel re engagement letter |

2

| 5/3/2022 | Garcez, Isabela | $450.00 | 2.3 | $1,035.00 | Correspondence w/ W. Reilly re NOA; call w/ A. Lopez re edits to MTD brief; revising MTD brief; correspondence w/ A. Lopez re MTD edits |
| 5/3/2022 | Lopez, Alexa Busser | $375.00 | 3.0 | $1,125.00 | Research RICO conspiracy standing, revise RICO conspiracy section of MTD brief. |
| 5/4/2022 | Lopez, Alexa Busser | $375.00 | 4.1 | $1,537.50 | Revise MTD and discuss with I. Garcez re same. |
| 5/4/2022 | Reilly, Wendy B. | $550.00 | 2.9 | $1,595.00 | Review & revise motion to dismiss brief re: Trump lawsuit; emails to & from I. Garcez, A. Lopez re: same |
| 5/4/2022 | Garcez, Isabela | $450.00 | 2.0 | $ 900.00 | Revising draft of MTD brief; correspondence w/ A. Lopez, W. Reilly and re same. |
| 5/5/2022 | Lopez, Alexa Busser | $375.00 | 1.0 | $ 375.00 | Revise motion to dismiss. |
| 5/5/2022 | Reilly, Wendy B. | $550.00 | 1.3 | $ 715.00 | Review & revise motion to dismiss brief re: Trump lawsuit; emails to & from I. Garcez, A. Lopez re: same; call with R. Mook, I. Garcez re: draft motion to dismiss brief re: Trump lawsuit |
| 5/5/2022 | Garcez, Isabela | $450.00 | 1.4 | $ 630.00 | Revising MTD for Trump lawsuit |
| 5/6/2022 | Lopez, Alexa Busser | $375.00 | 2.0 | $ 750.00 | Revise brief, cite check brief. |
| 5/6/2022 | Reilly, Wendy B. | $550.00 | 2.0 | $1,100.00 | Review & revise motion to dismiss brief re: Trump lawsuit; emails to & from A. Ceresney, I. Garcez, A. Lopez re: motion to dismiss brief |
| 5/6/2022 | Garcez, Isabela | $450.00 | 0.7 | $ 315.00 | Revising MTD for Trump lawsuit |
| 5/7/2022 | Ceresney, Andrew J. | $700.00 | 0.3 | $ 210.00 | Review MTD brief. |
| 5/7/2022 | Reilly, Wendy B. | $550.00 | 0.1 | $ 55.00 | Emails to & from A. Ceresney, I. Garcez re: draft motion to dismiss brief |
| 5/8/2022 | Garcez, Isabela | $450.00 | 0.3 | $ 135.00 | Sending draft of MTD brief to client |
| 5/9/2022 | Lopez, Alexa Busser | $375.00 | 0.9 | $ 337.50 | Revise MTD. |
| 5/9/2022 | Reilly, Wendy B. | $550.00 | 1.1 | $ 605.00 | Emails to & from A. Ceresney, I. Garcez, A. Lopez re: motion to dismiss brief; call with I. Garcez re: motion to dismiss brief re: Trump lawsuit |
| 5/9/2022 | Garcez, Isabela | $450.00 | 2.0 | $ 900.00 | Revising MTD for Trump lawsuit |
| 5/10/2022 | Lopez, Alexa Busser | $375.00 | 3.4 | $1,275.00 | Call with W. Reilly and I. Garcez, review other Trump complaints, revise MTD and prepare table of contents and table of authorities. |
| 5/10/2022 | Reilly, Wendy B. | $550.00 | 2.0 | $1,100.00 | Emails to & from A. Ceresney, I. Garcez, A. Lopez re: motion to dismiss brief; review & revise motion to dismiss brief; video call with I. Garcez, A. Lopez re: motion to dismiss brief |

3

| Date | Name | Rate | Hours | Amount | Description |
|---|---|---|---|---|---|
| 5/10/2022 | Garcez, Isabela | $450.00 | 1.0 | $ 450.00 | Call w/ W. Reilly and A. Lopez re motion filing; correspondence w/ local counsel re MTD filing |
| 5/11/2022 | Lopez, Alexa Busser | $375.00 | 1.0 | $ 375.00 | Revise MTD and prepare for filing. |
| 5/11/2022 | Reilly, Wendy B. | $550.00 | 1.8 | $ 990.00 | Review & revise motion to dismiss brief; emails to & from R. Mook, A. Ceresney, I. Garcez, A. Lopez re: motion to dismiss brief |
| 5/11/2022 | Garcez, Isabela | $450.00 | 0.4 | $ 180.00 | Correspondence w/ local counsel re motion filing |
| 5/14/2022 | Reilly, Wendy B. | $550.00 | 0.1 | $ 55.00 | Emails to & from K. Meeks re: Trump/Florida lawsuit |
| 5/16/2022 | Reilly, Wendy B. | $550.00 | 0.1 | $ 55.00 | Review docket updates re: Trump lawsuit |
| 5/18/2022 | Lopez, Alexa Busser | $375.00 | 0.4 | $ 150.00 | Attend call with joint defense group |
| 5/18/2022 | Reilly, Wendy B. | $550.00 | 0.4 | $ 220.00 | Defense call re: Trump/Florida lawsuit |
| 5/18/2022 | Garcez, Isabela | $450.00 | 0.5 | $ 225.00 | Correspondence w/ W. Reilly re Trump lawsuit conference |
| 5/27/2022 | Reilly, Wendy B. | $550.00 | 0.2 | $ 110.00 | Emails to & from Williams & Connolly, Gibson re: stipulation in Trump/Florida lawsuit |
| 5/31/2022 | Reilly, Wendy B. | $550.00 | 0.1 | $ 55.00 | Review magistrate judge's order re: conference in Trump/Florida lawsuit |
| 5/31/2022 | Garcez, Isabela | $450.00 | 0.1 | $ 45.00 | Correspondence re Trump v. Clinton conference |
| 6/1/2022 | Garcez, Isabela | $450.00 | 0.2 | $ 90.00 | Correspondence w/ W. Reilly and local counsel re conference |
| 6/1/2022 | Reilly, Wendy B. | $550.00 | 0.1 | $ 55.00 | Emails to & from Gibson, William & Connolly, Debevoise re: preparation for court conference in Trump/Florida lawsuit |
| 6/2/2022 | Garcez, Isabela | $450.00 | 1.4 | $ 630.00 | Correspondence w/ team re plaintiff filing in Trump lawsuit; participating in status conference in Trump lawsuit |
| 6/2/2022 | Lopez, Alexa Busser | $375.00 | 1.6 | $ 600.00 | Attend status conference and discuss next steps with team. |
| 6/2/2022 | Reilly, Wendy B. | $550.00 | 1.5 | $ 825.00 | Attend virtual Court conference re: Trump/Florida lawsuit; emails to & from A. Ceresney, I. Garcez, A. Lopez re: Trump/Florida lawsuit |
| 6/3/2022 | Garcez, Isabela | $450.00 | 0.6 | $ 270.00 | Correspondence w/ W. Reilly and JD counsel re availability for Trump lawsuit conference |
| 6/3/2022 | Reilly, Wendy B. | $550.00 | 0.3 | $ 165.00 | Emails to & from defense counsel, Debevoise team re: Trump lawsuit |
| 6/14/2022 | Reilly, Wendy B. | $550.00 | 0.3 | $ 165.00 | Joint defense emails re: Trump lawsuit |
| 6/15/2022 | Garcez, Isabela | $450.00 | 0.2 | $ 90.00 | Participating in call w/ JDC; correspondence w/ team re same |
| 6/15/2022 | Reilly, Wendy B. | $550.00 | 0.6 | $ 330.00 | Video call with defense counsel re: Trump lawsuit |
| 6/21/2022 | Lopez, Alexa Busser | $375.00 | 0.3 | $ 112.50 | Review amended complaint. |
| 6/21/2022 | Reilly, Wendy B. | $550.00 | 0.1 | $ 55.00 | Emails to & from A. Lopez re: Trump's amended complaint |
| 6/22/2022 | Lopez, Alexa Busser | $375.00 | 1.4 | $ 525.00 | Review amended complaint and prepare redline. |

4

| Date | Name | Rate | Hours | Amount | Description |
|---|---|---|---|---|---|
| 6/22/2022 | Reilly, Wendy B. | $550.00 | 0.7 | $ 385.00 | Review allegations re: R. Mook in Trump's amended complaint; review proposed work plan from D. Kendall; emails to & from A. Ceresney, A. Lopez re: same |
| 6/23/2022 | Lopez, Alexa Busser | $375.00 | 1.0 | $ 375.00 | Meet with joint defense group and draft summary re meeting. |
| 6/23/2022 | Reilly, Wendy B. | $550.00 | 1.0 | $ 550.00 | Video call with defense counsel re: Trump lawsuit |
| 6/27/2022 | Garcez, Isabela | $450.00 | 0.2 | $ 90.00 | Reviewing correspondence from JDC |
| 6/27/2022 | Reilly, Wendy B. | $550.00 | 0.1 | $ 55.00 | Emails from defense counsel re: Trump lawsuit |
| 6/28/2022 | Lopez, Alexa Busser | $375.00 | 0.1 | $ 37.50 | Review new filings. |
| 6/28/2022 | Reilly, Wendy B. | $550.00 | 0.1 | $ 55.00 | Review docket updates from Trump lawsuit |
| 6/30/2022 | Reilly, Wendy B. | $550.00 | 0.2 | $ 110.00 | Review docket updates in Trump lawsuit; review joint stipulation to extend deadlines for motions to dismiss; emails to & from defense counsel, Debevoise re: same |
| 6/30/2022 | Lopez, Alexa Busser | $375.00 | 0.1 | $ 37.50 | Review filings in Trump v. Clinton. |
| 7/1/2022 | Reilly, Wendy B. | $550.00 | 0.7 | $ 385.00 | Video call with defense counsel re: Trump lawsuit; review revised extension request; review docket updates; review Court order re: second extension request in Trump lawsuit |
| 7/1/2022 | Lopez, Alexa Busser | $375.00 | 3.8 | $1,425.00 | Attend joint defense group call, draft motion to dismiss. |
| 7/5/2022 | Lopez, Alexa Busser | $375.00 | 1.9 | $ 712.50 | Call with W. Reilly and I. Garcez, revise MTD brief. |
| 7/5/2022 | Reilly, Wendy B. | $550.00 | 1.2 | $ 660.00 | Video call with defense counsel in Trump lawsuit re: motion to dismiss briefing; video call with I. Garcez, A. Lopez re: motion to dismiss briefing; emails to & from D. Kendall re: draft rider for motion to dismiss brief |
| 7/5/2022 | Garcez, Isabela | $450.00 | 0.7 | $ 315.00 | Reviewing redline of trump complaint; call w/ W. Reilly and A. Lopez re response to complaint |
| 7/6/2022 | Lopez, Alexa Busser | $375.00 | 1.0 | $ 375.00 | Draft Mook section of motion to dismiss. |
| 7/6/2022 | Reilly, Wendy B. | $550.00 | 0.1 | $ 55.00 | Emails to & from D. Kendall, K. Meeks re: motion to dismiss briefing |
| 7/6/2022 | Garcez, Isabela | $450.00 | 2.0 | $ 900.00 | Revising draft of response to Trump Complaint |
| 7/7/2022 | Lopez, Alexa Busser | $375.00 | 0.4 | $ 150.00 | Revise motion to dismiss section. |
| 7/7/2022 | Reilly, Wendy B. | $550.00 | 2.3 | $1,265.00 | Review & revise draft rider for motion to dismiss brief (Trump lawsuit); emails to & from D. Kendall, A. Ceresney, I. Garcez, A. Lopez re: same |
| 7/7/2022 | Garcez, Isabela | $450.00 | 0.1 | $ 45.00 | Correspondence w/ joint defense counsel re response to Trump complaint |

| Date | Timekeeper | Rate | Hours | Amount | Description |
|---|---|---|---|---|---|
| 7/8/2022 | Reilly, Wendy B. | $550.00 | 1.5 | $825.00 | Review & revise rider to motion to dismiss Trump lawsuit; emails to & from A. Ceresney, I. Garcez, A. Lopez re: same |
| 7/11/2022 | Lopez, Alexa Busser | $375.00 | 0.4 | $150.00 | Attend call with defense subgroup. |
| 7/11/2022 | Reilly, Wendy B. | $550.00 | 1.4 | $770.00 | Call with defense counsel re: motion to dismiss; review & revise draft motion to dismiss; emails to & from defense counsel re: motion to dismiss |
| 7/12/2022 | Lopez, Alexa Busser | $375.00 | 0.1 | $37.50 | Update W. Reilly on defense group call. |
| 7/12/2022 | Reilly, Wendy B. | $550.00 | 0.8 | $440.00 | Review & revise draft motion to dismiss; emails to & from defense counsel re: same |
| 7/13/2022 | Lopez, Alexa Busser | $375.00 | 0.4 | $150.00 | Attend call with joint defense group. |
| 7/13/2022 | Reilly, Wendy B. | $550.00 | 2.3 | $1,265.00 | Review & revise draft motion to dismiss Trump's lawsuit; emails to & from defense counsel, Debevoise re: same |
| 7/14/2022 | Lopez, Alexa Busser | $375.00 | 0.3 | $112.50 | Share MTD with client. |
| 7/14/2022 | Garcez, Isabela | $450.00 | 0.2 | $90.00 | Reviewing filed motion; correspondence w/ A. Lopez re same |
| 7/14/2022 | Reilly, Wendy B. | $550.00 | 3.2 | $1,760.00 | Review & revise draft motion to dismiss Trump's lawsuit; emails to & from defense counsel, R. Mook, Debevoise re: same |
| 7/15/2022 | Lopez, Alexa Busser | $375.00 | 0.1 | $37.50 | Review correspondence with joint defense group. |
| 7/21/2022 | Lopez, Alexa Busser | $375.00 | 0.2 | $75.00 | Review and send case filings. |
| 7/21/2022 | Reilly, Wendy B. | $550.00 | 0.1 | $55.00 | Emails re: motion to dismiss briefing |
| 7/22/2022 | Lopez, Alexa Busser | $375.00 | 0.2 | $75.00 | Review and send case filings. |
| 7/22/2022 | Reilly, Wendy B. | $550.00 | 0.2 | $110.00 | Review docket updates; emails to & from A. Lopez re: same |
| 7/26/2022 | Lopez, Alexa Busser | $375.00 | 0.1 | $37.50 | Coordinate reply drafting. |
| 7/26/2022 | Reilly, Wendy B. | $550.00 | 0.7 | $385.00 | Video call with defense counsel re: motion to dismiss briefing; emails to & from M. Mestitz, I. Garcez, A. Lopez re: same |
| 7/26/2022 | Garcez, Isabela | $450.00 | 0.5 | $225.00 | Correspondence w/ W. Reilly re FL rules on reply; correspondence re joint defense call follow up |
| 8/4/2022 | Lopez, Alexa Busser | $375.00 | 0.4 | $150.00 | Review opposition to MTD. |
| 8/4/2022 | Reilly, Wendy B. | $550.00 | 0.1 | $55.00 | Emails to & from A. Lopez re: Trump's opposition brief |
| 8/5/2022 | Lopez, Alexa Busser | $375.00 | 0.6 | $225.00 | Attend joint defense group meeting. |
| 8/5/2022 | Reilly, Wendy B. | $550.00 | 0.9 | $495.00 | Emails to & from R. Mook, A. Lopez re: Trump's opposition brief; review Trump's opposition brief |
| 8/5/2022 | Garcez, Isabela | $450.00 | 0.5 | $225.00 | Participating in JDG call; updating team re same |
| 8/9/2022 | Lopez, Alexa Busser | $375.00 | 0.6 | $225.00 | Review draft reply brief. |

| Date | Name | Rate | Hours | Amount | Description |
|---|---|---|---|---|---|
| 8/9/2022 | Reilly, Wendy B. | $550.00 | 0.3 | $ 165.00 | Emails to & from I. Garcez, A. Lopez re: defendants' reply brief |
| 8/9/2022 | Garcez, Isabela | $450.00 | 0.5 | $ 225.00 | Reviewing draft reply brief; correspondence w/ team re same |
| 8/10/2022 | Reilly, Wendy B. | $550.00 | 3.9 | $2,145.00 | Review & revise defendants' draft reply brief; review Trump's opposition brief; emails re: draft reply brief |
| 8/10/2022 | Garcez, Isabela | $450.00 | 0.5 | $ 225.00 | Participating in JDG call re reply brief; circulating reply brief to client; correspondence w/ team re JDG call |
| 8/11/2022 | Lopez, Alexa Busser | $375.00 | 0.2 | $ 75.00 | Review revisions to reply brief. |
| 8/11/2022 | Reilly, Wendy B. | $550.00 | 0.1 | $ 55.00 | Emails re: defendants' reply brief |
| 8/11/2022 | Garcez, Isabela | $450.00 | 0.5 | $ 225.00 | Reviewing final version of reply brief |
| 8/12/2022 | Reilly, Wendy B. | $550.00 | 0.1 | $ 55.00 | Emails to & from A. Lopez re: defendants' reply brief |
| 8/12/2022 | Garcez, Isabela | $450.00 | 0.2 | $ 90.00 | Correspondence w/ A. Lopez re sending filed reply brief to client |
| 8/23/2022 | Reilly, Wendy B. | $550.00 | 0.1 | $ 55.00 | Review docket entries for new court filings |
| 9/6/2022 | Reilly, Wendy B. | $550.00 | 0.1 | $ 55.00 | Emails to & from A. Lopez re: new court filing by D. Trump |
| 9/6/2022 | Lopez, Alexa Busser | $375.00 | 0.1 | $ 37.50 | Review docket updates. |
| 9/8/2022 | Lopez, Alexa Busser | $375.00 | 0.2 | $ 75.00 | Review order granting MTD. |
| 9/8/2022 | Reilly, Wendy B. | $550.00 | 0.2 | $ 110.00 | Emails to & from A. Ceresney, A. Lopez re: Court decision granting defendants' motion to dismiss D. Trump's Florida lawsuit |
| 9/9/2022 | Reilly, Wendy B. | $550.00 | 1.4 | $ 770.00 | Review Court's decision on motion to dismiss; emails to & from R. Mook, A. Ceresney, I. Garcez, A. Lopez re: same; emails from defense counsel re: same |
| 9/12/2022 | Garcez, Isabela | $450.00 | 0.1 | $ 45.00 | Correspondence w/ W. Reilly re JDG call |
| 9/12/2022 | Reilly, Wendy B. | $550.00 | 1.8 | $ 990.00 | Review Court order on motions to dismiss; review Court's prior opinion on sanctions; review transcript of Trump's counsel commenting on Court's order; emails to & from D. Kendall, I. Garcez re: agenda for defense counsel call |
| 9/13/2022 | Garcez, Isabela | $450.00 | 1.3 | $ 585.00 | Participating in JDG call re sanctions motion in Trump v. Clinton lawsuit; discussions with A. Lopez re JDG call; drafting summary of JDG call for A. Ceresney |
| 9/13/2022 | Reilly, Wendy B. | $550.00 | 0.8 | $ 440.00 | Video call with defense counsel re: motion to dismiss decision & potential sanctions motion; emails to & from I. Garcez re: same |
| 9/14/2022 | Lopez, Alexa Busser | $375.00 | 0.6 | $ 225.00 | Review timesheets. |
| 9/14/2022 | Reilly, Wendy B. | $550.00 | 0.3 | $ 165.00 | Emails to & from I. Garcez, A. Lopez re: draft sanctions motion |
| 9/14/2022 | Garcez, Isabela | $450.00 | 0.3 | $ 135.00 | Drafting summary of JDG call for team |

| 9/19/2022 | Reilly, Wendy B. | $550.00 | 0.2 | $ 110.00 | Review draft sanctions motion; review email from D. Kendall re: same |
| 9/20/2022 | Reilly, Wendy B. | $550.00 | 0.5 | $ 275.00 | Review draft sanctions motion |
| 9/21/2022 | Lopez, Alexa Busser | $375.00 | 0.4 | $ 150.00 | Review draft sanctions motion. |
| 9/21/2022 | Reilly, Wendy B. | $550.00 | 1.1 | $ 605.00 | Review & revise draft sanctions motion; emails to & from A. Lopez re: same |
| 9/22/2022 | Reilly, Wendy B. | $550.00 | 0.8 | $ 440.00 | Review & revise sanctions motion; emails to & from Williams & Connolly, A. Lopez re: same |
| 9/23/2022 | Lopez, Alexa Busser | $375.00 | 1.4 | $ 525.00 | Review bills for sanctions motion. |
| 9/23/2022 | Reilly, Wendy B. | $550.00 | 1.1 | $ 605.00 | Emails to & from D. Kendall re: draft sanctions motion; emails to & from A. Lopez re: draft sanctions motion; review & revise draft sanctions motion |
| 9/28/2022 | Lopez, Alexa Busser | $375.00 | 1.3 | $ 487.50 | Attend joint defense call, draft declaration. |
| 9/28/2022 | Garcez, Isabela | $450.00 | 0.3 | $ 135.00 | Discussion w/ A. Lopez re JDG call and sanctions motion affidavit |
| 9/28/2022 | Reilly, Wendy B. | $550.00 | 0.7 | $ 385.00 | Video call with defense counsel group re: sanctions motion; emails to & from I. Garcez, A. Lopez re: sanctions motion; review draft declaration re: sanctions motion |
| 9/30/2022 | Garcez, Isabela | $450.00 | 0.3 | $ 135.00 | Correspondence re sanctions motion affidavit for Trump lawsuit |
| 9/30/2022 | Lopez, Alexa Busser | $375.00 | 0.9 | $ 337.50 | Draft declaration for sanctions. |
| 9/30/2022 | Reilly, Wendy B. | $550.00 | 2.5 | $1,375.00 | Review & revise exhibits to declaration in support of sanctions motion; email to Williams & Connolly re: sanctions motion; emails to & from R. Mook, A. Ceresney, I. Garcez, A. Lopez re: sanctions motion |

8

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Donald J. Trump,

        Plaintiff,

    v.

Hillary R. Clinton *et al.*,

        Defendants.

Civil Action No. 2:22-14102-DMM

## DECLARATION OF JOSHUA A. LEVY IN SUPPORT OF DEFENDANTS' MOTION FOR SANCTIONS AND FEES

I, Joshua A. Levy, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am a partner at Levy Firestone Muse LLP, counsel of record for Fusion GPS, Glenn Simpson, and Peter Fritsch in the above captioned matter.

2.      Attached as Exhibit A are the law firm website biographies of the attorneys at Levy Firestone Muse LLP for whom Fusion GPS, Glenn Simpson, and Peter Fritsch seek attorneys fees. The biographies reflect the professional qualifications of those attorneys.

3.      Levy Firestone Muse LLP entered into a retention agreement with Fusion GPS, Glenn Simpson, and Peter Fritsch covering the present litigation. Fusion GPS, Glenn Simpson, and Peter Fritsch agreed to pay all of Levy Firestone Muse LLP's costs, fees, and expenses incurred in connection with the present suit, and agreed to pay discounted hourly rates from the firm's customary rates.

4.      Attached as Exhibit B is a true and correct copy of the hours worked by counsel for Fusion GPS, Glenn Simpson, and Peter Fritsch. Fusion GPS, Glenn Simpson, and Peter Fritsch are not seeking reimbursement for the attorneys' already discounted hourly rates described in Paragraph 3. Instead, Fusion GPS, Glenn Simpson, and Peter Fritsch seek fees at an additionally

1

discounted hourly rate for the attorneys as described in Exhibit B and below.  Specifically, Fusion

GPS, Glenn Simpson, and Peter Fritsch are seeking reimbursement at the following additionally

discounted hourly rates: $700/hr for Joshua A. Levy (partner); $600/hr for Rachel Clattenburg

(partner); $300/hr for Kevin Crenny (associate); and $300/hr for E. Andrew Sharp (associate).

These additionally discounted hourly rates are consistent with the rates this Court concluded were

reasonable in *Celsius Holdings, Inc v. A SHOC Beverage, LLC*, No. 21-cv-80740, 2022 WL

3568042 (July 19, 2022).  Exhibit B also provides an accurate statement of the work provided by

Levy Firestone Muse during the periods for which discounted fees are sought.

> 5.      Attached as Exhibit C is the law firm website biography of Adam S. Fels, an attorney

at Fridman Fels & Soto, PLLC for whom Defendants Fusion GPS, Peter Fritsch, and Glenn Simpson seek

attorneys fees.  The biography reflects his professional qualifications.

> 6.      Fridman Fels & Soto, PLLC entered into a retention agreement with Defendants

Fridman Fels & Soto, PLLC in connection with the present litigation.  Defendants Fusion GPS, Peter

Fritsch, and Glenn Simpson agreed to pay all of Fridman Fels & Soto, PLLC's costs, fees, and

expenses incurred in connection with the present suit, and agreed to pay a discounted rate from the

firm's customary rate.  Fridman Fels & Soto, PLLC are charging Defendants Fusion GPS, Peter

Fritsch, and Glenn Simpson $600 per hour.

> 7.      Attached as Exhibit D is a true and correct copy of the hours worked by Adam S.

Fels at Fridman Fels & Soto, PLLC for Defendants Fusion GPS, Peter Fritsch, and Glenn Simpson.

Defendants Fusion GPS, Peter Fritsch, and Glenn Simpson seek fees at the already discounted hourly

rate for Mr. Fels as described in Exhibit B and below.  These discounted hourly rates are consistent

with the rates this Court concluded were reasonable in *Celsius Holdings, Inc v. A SHOC Beverage,*

*LLC*, No. 21-cv-80740, 2022 WL 3568042 (July 19, 2022).  Exhibit D also provides an accurate

statement of the work provided by Fridman Fels & Soto, PLLC during the periods for which discounted fees are sought.

8.      Consistent with the discussion in the Memorandum in Support of Sanctions and the information provided in Exhibits B & D, I summarize below in Charts A, B, and C the fees associated with three different phases of the case:  the fees incurred from the filing of the initial complaint to the filing of the initial motion to dismiss by Fusion GPS, Glenn Simpson, and Peter Fritsch; the fees incurred between the filing of Fusion GPS's, Glenn Simpson's, and Peter Fritsch's motion to dismiss to the Court's order dismissing the suit; and the fees incurred to date in connection with the motion for sanctions.

9.      As reflected in Chart A, the discounted fees incurred by Fusion GPS, Glenn Simpson, and Peter Fritsch from the filing of the initial complaint to the filing of Fusion GPS's, Glenn Simpson's, and Peter Fritsch's initial motion to dismiss total $31,550.00.

10.      As reflected in Chart B, the discounted fees incurred by Fusion GPS, Glenn Simpson, and Peter Fritsch from the filing of Fusion GPS's, Glenn Simpson's, and Peter Fritsch's initial motion to dismiss to this Court's dismissal of the suit total $18,690.00.

11.      As reflected in Chart C, the discounted fees incurred by Fusion GPS, Glenn Simpson, and Peter Fritsch in connection with the motion for sanctions, to date, total $5,580.

**Chart A:  Fees incurred from Complaint to initial MTD**

| Timekeeper | Discounted Fee | Hours | Fees |
|---|---|---|---|
| Joshua A. Levy | $700/hr | 0.5 | $350.00 |
| Rachel Clattenburg | $600/hr | 27.0 | $16,200.00 |
| Kevin P. Crenny | $300/hr | 41.5 | $12,450.00 |
| E. Andrew Sharp | $300/hr | 2.5 | $750.00 |
| Adam S. Fels | $600/hr | 3.0 | $1,800.00 |

**Chart B:  Fees incurred initial MTD to dismissal**

| Timekeeper | Discounted Fee | Hours | Fees |
|---|---|---|---|
| Rachel Clattenburg | $600/hr | 14.7 | $8,820.00 |
| Kevin Crenny | $300/hr | 26.9 | $8,070.00 |
| Adam S. Fels | $600/hr | 3.0 | $1,800.00 |

**Chart C:  Fees incurred to date on sanctions motion**

| Timekeeper | Discounted Fee | Hours | Fees |
|---|---|---|---|
| Rachel Clattenburg | $600/hr | 5.4 | $3,240.00 |
| Kevin Crenny | $300/hr | 3.4 | $1,020.00 |
| Adam S. Fels | $600/hr | 2.2 | $1,320.00 |

12.      I believe that the discounted rates claimed are reasonable for the Southern District of Florida market given the professional qualifications of the billers as evidenced in Exhibits A and C and given the rates approved by this Court in *Celsius*.

13.      Consistent with local Rule 7.3, counsel sent the draft sanctions motion and draft supporting declarations to Plaintiff's counsel on October 5, 2022.  Defendants met and conferred

in good faith with Plaintiff's counsel by Microsoft Teams twice, on October 13 and October 26, 2022, but were unable to reach any agreement as to either the Defendants' entitlement to or the amount of fees and expenses not taxable under 28 U.S.C. §1920 that are recoverable from Plaintiff and/or his counsel.

Date: October 27, 2022                                   /s/ Joshua A. Levy

                                                        Joshua A. Levy

# EXHIBIT A

# Levy | Firestone | Muse

PRACTICES      LAWYERS      NEWS      CONTACT



# Joshua A. Levy

PARTNER

Mr. Levy's practice encompasses commercial litigation and complex white collar matters with a specialty in the representation of clients under investigation by the Justice Department, grand juries, Congress, government enforcement agencies, inspector generals, and internal corporate inquiries.

Mr. Levy's specialized services and guidance have proven invaluable for clients caught in the middle of parallel proceedings for over two decades.  He has created strategic defenses for high-profile, high-stakes matters by managing legal, professional, political and reputational threats to achieve successful outcomes.

A former counsel to the U.S. Senate Committee on Homeland Security and Government Affairs (investigating government failures in Hurricane Katrina) and, prior to that, U.S. Senator Charles E. Schumer of New York, Mr. Levy has been a member of the Georgetown Law adjunct faculty for over 15 years.

While in private practice, Mr. Levy has helped conduct large scale investigations on behalf of clients.  Representative matters include:

Joshua A. Levy | Levy Firestone Muse LLP

Case 2:22-cv-14102-DMM   Document 280-2   Entered on FLSD Docket 10/31/2022   Page 132 of
304
USCA11 Case: 23-10387   Document: 11-5   Date Filed: 06/10/2024   Page: 638 of 811

On behalf of the Government of Rwanda, he played an investigative role for

the French government in connection with the Genocide against the Tutsi, in Rwanda, resulting in

a 600-page report.

On behalf of the Major League Baseball Players Association, Mr. Levy co-led an investigation into

the conduct of certain agents arising out of the Biogenesis scandal.

Mr. Levy has also represented companies, non-profits and individuals under investigation.  For

example:

Mr. Levy has represented dozens of other companies and individuals in congressional

investigations, including inquiries into the January 6, 2021 attack on the US Capitol, the Covid-19

pandemic, Russia's interference in the 2016 US election, Benghazi, Operation Fast & Furious,

private security contracting in Afghanistan, and many other subject matters. Since 2007, Mr. Levy

has co-taught a seminar on "Congressional Investigations" at Georgetown Law.

He represented Paula Broadwell, biographer to General David Petraeus, in Justice Department

criminal investigations that resulted in no charges for her.

He represented Ray Curry, President of the United Auto Workers (UAW), in Justice Department

criminal investigations that resulted in no charges for him. The UAW Ethics Ombudsman also

cleared President Curry of any ethics violations.

He has represented several hospital, pharmaceutical and medical device company executives in

Justice Department criminal investigations resulting in no charges for those clients.

A specialist in healthcare fraud law, Mr. Levy teaches "Healthcare Fraud and Abuse" at

Georgetown Law.  He has been involved in matters relating to pharmaceutical and medical device

claims, hospital over-billing claims, Anti-Kickback Statute violations and Stark Law abuses.  Mr.

Levy's experience with healthcare fraud matters have included complex negotiations with U.S.

Attorneys Offices, the Department of Justice, the Department of Health and Human Services

Office of Inspector General, and state agencies, and as well as the FDA and foreign regulatory

agencies.  For example, he worked with a team of attorneys on behalf of Dinesh Thakur, in his

landmark False Claims Act case against Ranbaxy, producing the largest drug safety settlement

Joshua A. Levy | Levy Firestone Muse LLP

Case 2:22-cv-14102-DMM   Document 280-2   Entered on FLSD Docket 10/31/2022   Page 133 of
304
USCA11 Case: 23-10387   Document: 116-2   Date Filed: 06/10/2024   Page: 639 of 811

against a generic drug company, in U.S. history.

As a litigator, Mr. Levy represented Fusion GPS and its principals in four RICO suits filed against them, all of which the courts have dismissed.  *See Trump v. Clinton,* Case No. 22-cv-14102-DMM (SDFL Order on Motions to Dismiss Sept. 8, 2022); *Nunes v. Fusion GPS,* Case No. 1:19-cv-01148-RDA-TCB (EDVA Order of Dismissal with Prejudice Mar. 31, 2021); *Nunes v. Fusion GPS*, Case No. 1:19-cv-1148-LO-TCB (E.D.VA. Order of Dismissal Feb. 21, 2020); *Halvorssen v. Simpson*, Case No. 2:18-cv-2684 (ENV) (RLM) (E.D.N.Y. Order of Dismissal with Prejudice Aug. 26, 2019), affirmed by the U.S. Court of Appeals for the Second Circuit (Mar. 18, 2020).

Mr. Levy also represented Fusion GPS and one of its principals, Glenn Simpson, in a defamation case filed against them by Russian oligarchs, Mikhail Fridman, Petr Aven and German Khan. That case is dismissed. *Fridman v. Bean LLC*, Case No. 1:17-cv-2041-RJL (D.D.C. Stipulation of Dismissal with Prejudice Mar. 18, 2022).

In a civil action alleging violations of the Federal Advisory Committee Act, Mr. Levy successfully moved to quash subpoenas served by a Canadian mining consortium on its political rivals, who fought for the protection of the Bristol Bay, Alaska watershed (home to the world's largest wild sockeye salmon fishery) and against the "Pebble Mine" that would destroy it.  *See, e.g.,* Pebble Limited Partnership v. EPA, 310 F.R.D. 575 (D.Alaska  2015).

Mr. Levy has expertise in the False Claims Act, the Foreign Corrupt Practices Act and the UK Bribery Act.  He has conducted dozens of internal investigations, created compliance programs, trained employees and helped perform due diligence with regard to a company's potential exposure under these statutes.

Before co-founding Levy Firestone Muse LLP in 2014, Mr. Levy practiced in the litigation and white collar defense groups at Arnold & Porter LLP and Stein, Mitchell & Muse LLP. He has been named a *Super Lawyer for White Collar* in Washington, DC, 2013-2022. Prior to practicing law, he served as a judicial law clerk to the Honorable Joan A. Lenard, U.S. District Court for the Southern District of Florida (1999-2001).

For nearly two decades, Mr. Levy has practiced innovative law in complex matters to the

Joshua A. Levy | Levy Firestone Muse LLP

Case 2:22-cv-14102-DMM   Document 280-2   Entered on FLSD Docket 10/31/2022   Page 134 of 304
USCA11 Case: 23-10837   Document: 14-2   Date Filed: 06/16/2024   Page: 640 of 811

satisfaction. His clients are public companies, high-level government officials, US companies, US non-profits and global entities facing US inquiries and US litigation.

✉ jal@levyfirestone.com

📞 (202) 261-6564   OFFICE

📞 (202) 360-0677   CELL

★ Practice Areas

Litigation

White Collar

Congressional Investigations

Healthcare Fraud

Whistleblowers

Personal Injury/Medical Malpractice

🎓 Education

University of Michigan Law School
J.D. 1999

Columbia University
MASTERS OF INTERNATIONAL AFFAIRS 1999

Columbia University
B.A. 1994

💼 Professional Associations

Georgetown University Law Center Adjunct Professor
2007–PRESENT

Washington Lawyer's Committee on Civil Rights and Urban Affairs, Board
2019-PRESENT

Tzedek DC, Advisory Committee
2019-PRESENT

D.C. Bar Litigation Section, Steering Committee
2009–2012

ABA Standing Committee on Law & National Security
2001–2005

Young National Security Lawyers Group

2001–2005

## 🌐 Admissions

District of Columbia

New York

---

# Contact

✉ info@levyfirestone.com

🌐 900 17th Street NW
Suite 1200
Washington, DC 20006

🌐 575 Fifth Avenue
14th Floor
New York, NY 10017

📞 (202) 845-3215   MAIN

🖨 (202) 595-8253   FAX

© 2022 Levy Firestone Muse LLP   Legal Notices   This website is attorney advertising.



# Levy | Firestone | Muse

PRACTICES    LAWYERS    NEWS    CONTACT



# Rachel Clattenburg

## PARTNER

Ms. Clattenburg is a member of the firm's litigation and investigations practice groups. She has represented clients in high profile, high stakes investigations and litigation.

Ms. Clattenburg has represented clients in business litigation, RICO cases, defamation cases, personal injury, whistleblower actions, Freedom of Information Act (FOIA) litigation, and in response to third party subpoenas in civil litigation.  She has also represented clients in response to grand jury subpoenas and other inquiries from federal enforcement agencies and congressional committees. Prior to joining Levy Firestone Muse LLP, she worked as an attorney for the public interest law firm Public Citizen Litigation Group where she litigated numerous FOIA cases. Ms. Clattenburg has experience in both federal district and appellate courts.

Representative matters include:

- Represented Fusion GPS and its principals in four RICO suits filed against them, all of which the courts have dismissed.  *See Trump v. Clinton,* Case No. 22-cv-14102-DMM (SDFL Order on Motions to Dismiss Sept. 8, 2022); *Nunes v. Fusion GPS,* Case No. 1:19-cv-01148-RDA-TCB (EDVA Order of Dismissal with Prejudice Mar. 31, 2021); Nunes *v. Fusion GPS*, Case No. 1:19-cv-1148-LO-TCB (E.D.VA. Order of Dismissal Feb. 21, 2020); *Halvorssen v. Simpson*, Case

Rachel Clattenburg | Levy Firestone Muse LLP

Case 2:22-cv-14102-DMM   Document 280-2   Entered on FLSD Docket 10/31/2022   Page 137 of
No. 23-1245, Case: 23-1087, E.D. Document 1 of 1, Date Filed: 06/20/2024, Page: 643 of 811
304

affirmed by the U.S. Court of Appeals for the Second Circuit ([Mar. 18, 2020](#)).

- Represented Fusion GPS and one of its principals, Glenn Simpson, in a defamation case filed against them by Russian oligarchs, Mikhail Fridman, Petr Aven and German Khan. That case is [dismissed](#). *Fridman v. Bean LLC*, Case No. 1:17-cv-2041-RJL (D.D.C. Stipulation of Dismissal with Prejudice Mar. 18, 2022).

- Co-represented Dr. Dennis Burke, in a [whistleblower lawsuit](#) against Massachusetts General Hospital, resulting in a $13 million settlement.

- Represented Fusion GPS and its principals Glenn Simpson, Peter Fritsch and Tom Catan before multiple congressional committees during their inquiries into the Russian government's interference in the 2016 US presidential elections.

- On behalf of the Rwandan government, Ms. Clattenburg has been part of the team at Levy Firestone Muse LLP that has been investigating the role of the French government in connection with the 1994 Genocide against the Tutsi.

She is a member of the New York and District of Columbia Bars and is admitted to practice in the U.S. District Court for the District of Columbia, the U.S. District Court for the District of Maryland, and the Second, Third and Ninth Circuits.

Ms. Clattenburg served as a law clerk to the Honorable S. Martin Teel, Jr., U.S. Bankruptcy Court for the District of Columbia. During law school, she worked for the Honorable Roger J. Miner of the Second Circuit Court of Appeals. Ms. Clattenburg graduated first in her class, *summa cum laude*, from Albany Law School and Phi Beta Kappa from Princeton University.

✉ [rmc@levyfirestone.com](mailto:rmc@levyfirestone.com)

📞 [202.845.3215](tel:2028453215)   OFFICE

⭐ Practice Areas

[Litigation](#)

[White Collar](#)

[Congressional Investigations](#)

Rachel Clattenburg | Levy Firestone Muse LLP

Case 2:22-cv-14102-DMM   Document 280-2   Entered on FLSD Docket 10/31/2022   Page 138 of
USCA11 Case: 23-10387   Document: 116-2   Date Filed: 06/10/2024   Page: 644 of 811
304

Whistleblowers

Personal Injury/Medical Malpractice

## Education

Albany Law School
summa cum laude
Order of the Coif
J.D. 2010

Princeton University
Phi Beta Kappa
B.A. 2007

## Admissions

District of Columbia

New York

---

# Contact

✉ info@levyfirestone.com

🌐 900 17th Street NW
Suite 1200
Washington, DC 20006

🌐 575 Fifth Avenue
14th Floor
New York, NY 10017

📞 (202) 845-3215    MAIN

📠 (202) 595-8253    FAX

Kevin P. Crenny | Levy Firestone Muse LLP

Case 2:22-cv-14102-DMM   Document 280-2   Entered on FLSD Docket 10/31/2022   Page 139 of
304
USCA11 Case: 23-10387   Document: 116-2   Date Filed: 06/10/2024   Page: 645 of 811

# Levy | Firestone | Muse

PRACTICES     LAWYERS     NEWS     CONTACT



# Kevin P. Crenny

ASSOCIATE

Kevin P. Crenny is an associate with Levy Firestone Muse.

Before joining the firm, he clerked for Judge Stanley Marcus of the U.S. Court of Appeals for the Eleventh Circuit, Judge Rudolph Contreras of the U.S. District Court for the District of Columbia, and Judge John D. Bates of the U.S. District Court for the District of Columbia, in his capacity as Chair of the Judicial Conference Standing Committee on the Rules of Practice and Procedure. Mr. Crenny graduated *cum laude* from Harvard Law School, where he served as an Executive Editor on the *Harvard Law Review*.

He is a member of the District of Columbia and Michigan bars.

Representative matters include:

- Represented Fusion GPS and one of its principals, Glenn Simpson, in a defamation case filed against them by Russian oligarchs, Mikhail Fridman, Petr Aven and German Khan. That case is [dismissed]. *Fridman v. Bean LLC*, Case No. 1:17-cv-2041-RJL (D.D.C. Stipulation of Dismissal with Prejudice Mar. 18, 2022).

- Represented Fusion GPS and its principals in a RICO suit filed by former President Donald J. Trump. The Court dismissed the case. *See Trump v. Clinton,* Case No. 22-cv-14102-DMM (SDFL

Kevin P. Crenny | Levy Firestone Muse LLP

Case 2:22-cv-14102-DMM   Document 280-2   Entered on FLSD Docket 10/31/2022   Page 140 of
304
Order on Motion to Dismiss Dept. 8 2022
USCA11 Case: 23-13397   Document: 116-3   Date Filed: 06/10/2024   Page: 646 of 811

✉ kcrenny@levyfirestone.com

⭐ Practice Areas

Litigation

White Collar

Congressional Investigations

Healthcare Fraud

Whistleblowers

Personal Injury/Medical Malpractice

📖 Education

Harvard Law School
cum laude
J.D. 2018

Fordham University
summa cum laude
B.A. 2011

🌐 Admissions

District of Columbia

Michigan

# Contact

✉ info@levyfirestone.com

🌐 900 17th Street NW
Suite 1200
Washington, DC 20006

🌐 575 Fifth Avenue
14th Floor



# Levy | Firestone | Muse

PRACTICES    LAWYERS    NEWS    CONTACT

# E. Andrew Sharp

ASSOCIATE

Mr. Sharp joined Levy Firestone Muse LLP after graduating from Georgetown University Law Center in 2019.

Mr. Sharp has represented individuals and companies under investigation and in litigation. His representative matters include:

- Representation of an individual investigated for his alleged involvement in a government contracting kickback scheme, resulting in no criminal charges.

- Representation of Fusion GPS and its principals in litigation filed against them by three Russian billionaires, who collectively own a majority of Alfa Bank, Russia's largest commercial bank.

- On behalf of the Rwandan government, Mr. Sharp has been part of the team that has been investigating the role of the French government in connection with the 1994 Genocide against the Tutsi, in Rwanda.

Prior to joining the firm, Mr. Sharp was a journalist covering NBA basketball at ESPN and Sports

E. Andrew Sharp | Levy Firestone Muse LLP

Case 2:22-cv-14102-DMM   Document 280-2   Entered on FLSD Docket 10/31/2022   Page 142 of
Illustrated With Cases 23-10087  Document 11-3  Date Filed: 06/10/2024  Page: 648 of 811

Mr. Sharp resides in Washington D.C. and is a member of the District of Columbia bar.

✉ eas@levyfirestone.com

📞 (202) 819-2720   OFFICE

⭐ Practice Areas

Litigation

White Collar

Congressional Investigations

Healthcare Fraud

Whistleblowers

Personal Injury/Medical Malpractice

📖 Education

Georgetown University Law Center
J.D. 2019

Boston College
B.A. 2009

🌐 Admissions

District of Columbia

## Contact

✉ info@levyfirestone.com

🌐 1701 K Street NW
Suite 350
Washington, DC 20006

📞

# EXHIBIT B

**EXHIBIT B to Decl. of Joshua A. Levy**
**In Support of Defs.' Mot. for Sanctions & Fees**

| Date (DD/MM/YYYY) | Timekeeper | Discounted Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| 06/04/2022 | Rachel M. Clattenburg | $600.00 | 1.2 | $720.00 | Reviewing Trump v. Clinton lawsuit and legal research |
| 07/04/2022 | Joshua A. Levy | $700.00 | 0.5 | $350.00 | Telecons with co-counsel |
| 07/04/2022 | Rachel M. Clattenburg | $600.00 | 2.7 | $1,620.00 | Analysis: legal research re motion to dismiss |
| 07/04/2022 | Kevin P. Crenny | $300.00 | 3.5 | $1,050.00 | Call with R. Clattenburg; legal research for Motion to Dismiss. |
| 08/04/2022 | Rachel M. Clattenburg | $600.00 | 0.5 | $300.00 | Legal Research re motion to dismiss; confer with K. Crenny re research |
| 08/04/2022 | Kevin P. Crenny | $300.00 | 5.4 | $1,620.00 | Calls with R. Clattenburg; legal research re motion to dismiss |
| 11/04/2022 | Rachel M. Clattenburg | $600.00 | 2.3 | $1,380.00 | Common interest call re motion to dismiss; call with Kevin re motion to dismiss; legal research and drafting motion to dismiss. |
| 11/04/2022 | Kevin P. Crenny | $300.00 | 4.2 | $1,260.00 | Analyze Complaint; calls and  with R. Clattenburg and co-counsel; assemble and analyze alleged timeline of allegations |
| 12/04/2022 | Rachel M. Clattenburg | $600.00 | 3.1 | $1,860.00 | Legal research and drafting motion to dismiss; |
| 12/04/2022 | Kevin P. Crenny | $300.00 | 5.2 | $1,560.00 | Continue research and drafting motion to dismiss all claims, including calls and conversations with R. Clattenburg. |
| 13/04/2022 | Rachel M. Clattenburg | $600.00 | 2.5 | $1,500.00 | Common Interest call with counsel for defendants re motions to dismiss; legal research and drafting motion to dismiss; |
| 13/04/2022 | Kevin P. Crenny | $300.00 | 0.8 | $240.00 | Call with codefendants and follow-up call with R. Clattenburg |
| 14/04/2022 | Rachel M. Clattenburg | $600.00 | 3.1 | $1,860.00 | Confer with team re motion to dismiss (0.5); editing motion (0.5); review Trump v. Clinton draft and confer with Kevin (0.8); legal research and drafting motion to dismiss (1.3) |
| 14/04/2022 | Kevin P. Crenny | $300.00 | 4.4 | $1,320.00 | Review draft brief from co-counsel; draft Motion to Dismiss background section; |

**EXHIBIT B to Decl. of Joshua A. Levy**
**In Support of Defs.' Mot. for Sanctions & Fees**

| Date (DD/MM/YYYY) | Timekeeper | Discounted Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| | | | | | legal research and drafting Motion to Dismiss |
| 15/04/2022 | Rachel M. Clattenburg | $600.00 | 0.5 | $300.00 | Reviewing brief from counsel for co-defendant (0.4); call with Kevin re drafting brief (0.1) |
| 15/04/2022 | Kevin P. Crenny | $300.00 | 4.1 | $1,230.00 | Complete research and first draft of motion to dismiss. |
| 17/04/2022 | Rachel M. Clattenburg | $600.00 | 1.0 | $600.00 | Review draft motion to dismiss |
| 18/04/2022 | Rachel M. Clattenburg | $600.00 | 1.8 | $1,080.00 | Drafting motion to dismiss and email to HRC counsel re motion to dismiss (1.5); confer with Kevin re legal research (0.3) |
| 18/04/2022 | Kevin P. Crenny | $300.00 | 1.4 | $420.00 | Review co-Defendant brief and draft feedback email; review R. Clattenburg comments on Fusion Motion to Dismiss brief and make edits. |
| 19/04/2022 | Rachel M. Clattenburg | $600.00 | 0.4 | $240.00 | Review revised Trump v. Clinton motion to dismiss by HRC; confer with Kevin re our brief and plan for revising |
| 19/04/2022 | Kevin P. Crenny | $300.00 | 0.3 | $90.00 | Review new draft of co-defendant's motion and discuss edits to Fusion's motion with R. Clattenburg. |
| 20/04/2022 | Rachel M. Clattenburg | $600.00 | 2.3 | $1,380.00 | Joint defense call re motions to dismiss; confer with Kevin on phone re revising brief based on case re incorporation; drafting new section on RICO standing for MTD; confer with Kevin re motion; draft pro hac motions. |
| 20/04/2022 | Kevin P. Crenny | $300.00 | 4.6 | $1,380.00 | Call with co-defendants' counsel; research re Fla. briefing procedure; review and finalize pro hac vice motion and certification; expand on arguments in motion to dismiss to avoid incorporating co-defendant briefing. |
| 21/04/2022 | Rachel M. Clattenburg | $600.00 | 0.5 | $300.00 | Reviewing draft motion for extension; call with Kevin re motion for extension and Trump request for extension |

**EXHIBIT B to Decl. of Joshua A. Levy**
**In Support of Defs.' Mot. for Sanctions & Fees**

| Date (DD/MM/YYYY) | Timekeeper | Discounted Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| | | | | | to amend complaint; common interest email re our recommendation |
| 21/04/2022 | Kevin P. Crenny | $300.00 | 0.7 | $210.00 | Call to S.D. Fl. Clerk's office re filing pro hac vice motions; conversations with R. Clattenburg re motions for extension of time, including review of draft motion and review of Trump proposal. |
| 22/04/2022 | Rachel M. Clattenburg | $600.00 | 2.0 | $1,200.00 | drafting motion to dismiss and legal research |
| 22/04/2022 | Kevin P. Crenny | $300.00 | 0.3 | $90.00 | Review R. Clattenburg edits to Motion to Dismiss; review Trump motion for extension of time and discuss with R. Clattenburg and J. Levy. |
| 25/04/2022 | Rachel M. Clattenburg | $600.00 | 0.3 | $180.00 | Review motion to dismiss |
| 25/04/2022 | Kevin P. Crenny | $300.00 | 1.2 | $360.00 | Implement R. Clattenburg edits to Motion to Dismiss and make additional edits. |
| 26/04/2022 | Kevin P. Crenny | $300.00 | 0.2 | $60.00 | Review and implement J. Levy edits to Motion to Dismiss. |
| 02/05/2022 | Rachel M. Clattenburg | $600.00 | 0.5 | $300.00 | Revising motion to dismiss; confer with Kevin re legal arguments |
| 02/05/2022 | Kevin P. Crenny | $300.00 | 1.4 | $420.00 | Review counsel for codefendants' suggestions re draft and make related edits to draft motion to dismiss; incorporate J. Levy and R. Clattenburg edits to motion to dismiss, including correspondence. |
| 04/05/2022 | Rachel M. Clattenburg | $600.00 | 0.9 | $540.00 | Confer with K. Crenny on edits to our motion; review Trump Twitter archive; review revised motion to dismiss; confer with K. Crenny on the minute order re status conference and review the local rules |
| 04/05/2022 | Kevin P. Crenny | $300.00 | 1.3 | $390.00 | Review court order and related rules re upcoming hearing; review Podesta motion to dismiss; revise draft motion to dismiss to incorporate additional discussion of tweets and |

**EXHIBIT B to Decl. of Joshua A. Levy**
**In Support of Defs.' Mot. for Sanctions & Fees**

| Date (DD/MM/YYYY) | Timekeeper | Discounted Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| | | | | | circulate draft to client for review. |
| 05/05/2022 | Rachel M. Clattenburg | $600.00 | 0.4 | $240.00 | confer with K. Crenny re corporate disclosure |
| 05/05/2022 | Kevin P. Crenny | $300.00 | 0.6 | $180.00 | Prepare corporate disclosure statement for filing with Motion to Dismiss. |
| 09/05/2022 | E. Andrew Sharp | $300.00 | 2.5 | $750.00 | Editing and cite checking Trump Motion to Dismiss |
| 10/05/2022 | Rachel M. Clattenburg | $600.00 | 0.5 | $300.00 | Reviewing and editing final draft of brief and 7.1 statement |
| 10/05/2022 | Kevin P. Crenny | $300.00 | 1.0 | $300.00 | Finalize Motion to Dismiss and Rule 7.1 disclosure statement for filing. |
| 11/05/2022 | Rachel M. Clattenburg | $600.00 | 0.5 | $300.00 | confer with local counsel re motion to dismiss; confer with Kevin re same |
| 11/05/2022 | Kevin P. Crenny | $300.00 | 0.9 | $270.00 | Add material on sufficiency of attorneys fees as RICO injury to motion to dismiss and research speculative damages argument. |
| 18/05/2022 | Rachel M. Clattenburg | $600.00 | 0.3 | $180.00 | Joint defense call regarding June 2 conference set by the Court |
| 18/05/2022 | Kevin P. Crenny | $300.00 | 0.4 | $120.00 | Call with counsel for codefendants re upcoming hearing. |
| 31/05/2022 | Rachel M. Clattenburg | $600.00 | 0.3 | $180.00 | Legal research re re motion to stay discovery pending motion to dismiss |
| 01/06/2022 | Rachel M. Clattenburg | $600.00 | 1.0 | $600.00 | Confer with Adam Fels re hearing tomorrow and strategy for Rule 16 scheduling (0.4); review docket in preparation for hearing and draft email to joint defense group re hearing (0.6) |
| 02/06/2022 | Rachel M. Clattenburg | $600.00 | 0.6 | $360.00 | Status hearing before Judge Reinhart (0.5); call with A. Fels re hearing (0.1) |
| 02/06/2022 | Kevin P. Crenny | $300.00 | 0.6 | $180.00 | Attend status conference by Zoom. |
| 15/06/2022 | Rachel M. Clattenburg | $600.00 | 0.5 | $300.00 | Joint defense call re strategy for briefing second round of Motion to Dismiss |
| 15/06/2022 | Kevin P. Crenny | $300.00 | 0.6 | $180.00 | Joint defense group call (0.5); conversations re case deadlines (0.1) |

4

**EXHIBIT B to Decl. of Joshua A. Levy**
**In Support of Defs.' Mot. for Sanctions & Fees**

| Date (DD/MM/YYYY) | Timekeeper | Discounted Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| 21/06/2022 | Kevin P. Crenny | $300.00 | 0.6 | $180.00 | Research procedural rules re filing deadlines and holidays (0.4); initial review of amended complaint (0.2). |
| 22/06/2022 | Kevin P. Crenny | $300.00 | 2.5 | $750.00 | Review Amended Complaint for substantive changes and new allegations concerning. clients. |
| 23/06/2022 | Rachel M. Clattenburg | $600.00 | 0.7 | $420.00 | Joint defense call re strategy for responding to Amended Complaint |
| 23/06/2022 | Kevin P. Crenny | $300.00 | 0.9 | $270.00 | Joint defense group call. |
| 24/06/2022 | Kevin P. Crenny | $300.00 | 2.7 | $810.00 | Draft motion to dismiss section on Malicious prosecution. |
| 27/06/2022 | Rachel M. Clattenburg | $600.00 | 0.8 | $480.00 | revise section on malicious prosecution for second motion to dismiss |
| 27/06/2022 | Kevin P. Crenny | $300.00 | 0.2 | $60.00 | Coordinate review of amended complaint for allegations of conduct in 2017 for statute of limitations defense. |
| 29/06/2022 | Rachel M. Clattenburg | $600.00 | 2.2 | $1,320.00 | Research and drafting malicious prosecution section |
| 29/06/2022 | Kevin P. Crenny | $300.00 | 2.1 | $630.00 | Edits to draft motion to dismiss section on malicious prosecution claims. |
| 01/07/2022 | Rachel M. Clattenburg | $600.00 | 2.3 | $1,380.00 | Reviewing amended complaint for new allegations; drafting start of motion to dismiss (2.0); joint defense call re deadlines and coordinating (0.3) |
| 01/07/2022 | Kevin P. Crenny | $300.00 | 1.6 | $480.00 | Call and correspondence with R. Clattenburg, J. Levy, and co-counsel re Motion to Dismiss and extension (1.0); Edit abbreviated version of Motion to Dismiss section re malicious prosecution (0.6). |
| 05/07/2022 | Rachel M. Clattenburg | $600.00 | 0.7 | $420.00 | Joint defense call re drafting (0.2); editing the malicious prosecution section (0.5) |
| 05/07/2022 | Kevin P. Crenny | $300.00 | 0.6 | $180.00 | Call with co-defendants (0.4); follow up edits on section of motion to dismiss (0.2). |
| 07/07/2022 | Kevin P. Crenny | $300.00 | 4.0 | $1,200.00 | Draft Fusion-specific material for joint Motion to |

**EXHIBIT B to Decl. of Joshua A. Levy
In Support of Defs.' Mot. for Sanctions & Fees**

| Date (DD/MM/YYYY) | Timekeeper | Discounted Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| | | | | | Dismiss, including additional review of Amended Complaint (3.7); review draft brief sections from other firms (0.3). |
| 08/07/2022 | Rachel M. Clattenburg | $600.00 | 0.6 | $360.00 | Revising draft insert specific to Fusion Defendants (0.3); reviewing draft sections of brief from joint defense group (0.3) |
| 08/07/2022 | Kevin P. Crenny | $300.00 | 0.6 | $180.00 | Review draft brief sections by other firms. |
| 10/07/2022 | Rachel M. Clattenburg | $600.00 | 0.7 | $420.00 | Editing Fusion section of brief (0.2); reviewing amended complaint (consolidated) (0.5) |
| 10/07/2022 | Kevin P. Crenny | $300.00 | 0.2 | $60.00 | Assemble latest draft of Fusion-specific section of Motion to Dismiss. |
| 11/07/2022 | Rachel M. Clattenburg | $600.00 | 0.1 | $60.00 | Joint defense call with Ben Peacock (Ohr's counsel) re section of brief specific to our defendants |
| 11/07/2022 | Kevin P. Crenny | $300.00 | 1.0 | $300.00 | Review draft materials from other firms and coordinate with counsel for N. Ohr. |
| 12/07/2022 | Rachel M. Clattenburg | $600.00 | 0.4 | $240.00 | Reviewing consolidated brief and email Ben Peacock re individual section |
| 12/07/2022 | Kevin P. Crenny | $300.00 | 0.2 | $60.00 | Correspondence with counsel for co-defendants re motion to dismiss and Plaintiff's scheduling motion. |
| 13/07/2022 | Rachel M. Clattenburg | $600.00 | 0.5 | $300.00 | review final brief and send edits to Williams & Connolly |
| 13/07/2022 | Kevin P. Crenny | $300.00 | 0.3 | $90.00 | Review latest draft of Motion to Dismiss and correspondence with co-counsel re same. |
| 15/07/2022 | Kevin P. Crenny | $300.00 | 0.6 | $180.00 | Call with opposing counsel (0.4); file management re court records (0.2). |
| 21/07/2022 | Kevin P. Crenny | $300.00 | 0.3 | $90.00 | Review filings by plaintiff and court orders, |
| 26/07/2022 | Rachel M. Clattenburg | $600.00 | 0.4 | $240.00 | Joint defense call - strategy for reply brief |
| 26/07/2022 | Kevin P. Crenny | $300.00 | 0.4 | $120.00 | Call with co-defendants re reply in support of motion to dismiss. |
| 05/08/2022 | Rachel M. Clattenburg | $600.00 | 1.0 | $600.00 | Joint defense call re reply brief (0.4); review |

**EXHIBIT B to Decl. of Joshua A. Levy
In Support of Defs.' Mot. for Sanctions & Fees**

| Date<br>(DD/MM/YYYY) | Timekeeper | Discounted Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| | | | | | Opposition brief from Trump (0.6) |
| 05/08/2022 | Kevin P. Crenny | $300.00 | 4.7 | $1,410.00 | Call with other counsel for co-defendants re motion to dismiss reply (0.5); review opposition to motion to dismiss, research and draft reply section re malicious prosecution (4.2). |
| 08/08/2022 | Kevin P. Crenny | $300.00 | 0.6 | $180.00 | Finalize draft of material re malicious prosecution for consolidated reply brief. |
| 09/08/2022 | Rachel M. Clattenburg | $600.00 | 0.4 | $240.00 | Review and edit reply brief |
| 10/08/2022 | Rachel M. Clattenburg | $600.00 | 1.2 | $720.00 | Review and edit reply brief (1.0); joint defense call re reply brief (0.2). |
| 10/08/2022 | Kevin P. Crenny | $300.00 | 1.0 | $300.00 | Review and offer edits on draft of consolidated Reply re Motion to Dismiss (0.8); call with counsel for co-defendants re Motion to Dismiss Reply (0.2). |
| 11/08/2022 | Kevin P. Crenny | $300.00 | 0.2 | $60.00 | Review final draft of consolidated Reply re Motion to Dismiss. |
| 12/09/2022 | Rachel M. Clattenburg | $600.00 | 0.5 | $300.00 | Reviewing case law on fees |
| 12/09/2022 | Kevin P. Crenny | $300.00 | 0.2 | $60.00 | Strategize re possible motion for sanctions. |
| 13/09/2022 | Rachel M. Clattenburg | $600.00 | 0.2 | $120.00 | Call with Adam Fels re fees motion |
| 13/09/2022 | Kevin P. Crenny | $300.00 | 0.8 | $240.00 | Call with counsel for co defendants (0.7); review material re fees (0.1). |
| 15/09/2022 | Kevin P. Crenny | $300.00 | 0.2 | $60.00 | Review material re motion for sanctions and/or fees. |
| 19/09/2022 | Rachel M. Clattenburg | $600.00 | 0.6 | $360.00 | Review draft motion for sanctions |
| 19/09/2022 | Kevin P. Crenny | $300.00 | 0.7 | $210.00 | Review and perform additional research for draft consolidated motion for sanctions. |
| 20/09/2022 | Kevin P. Crenny | $300.00 | 0.5 | $150.00 | Additional research for draft consolidated motion for sanctions. |
| 21/09/2022 | Rachel M. Clattenburg | $600.00 | 0.3 | $180.00 | Edit motion for sanctions |
| 28/09/2022 | Rachel M. Clattenburg | $600.00 | 0.2 | $120.00 | Joint Defense call re motion for sanctions |

**EXHIBIT B to Decl. of Joshua A. Levy**
**In Support of Defs.' Mot. for Sanctions & Fees**

| Date (DD/MM/YYYY) | Timekeeper | Discounted Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| 28/09/2022 | Rachel M. Clattenburg | $600.00 | 1.1 | $660.00 | Drafting declaration and exhibits for Motion for Sanctions |
| 28/09/2022 | Kevin P. Crenny | $300.00 | 0.5 | $150.00 | Call with counsel for co defendants re motion for fees. |
| 29/09/2022 | Rachel M. Clattenburg | $600.00 | 1 | $600.00 | Draft affidavit in support of motion for sanctions, and supporting exhibits |
| 30/09/2022 | Rachel M. Clattenburg | $600.00 | 1.5 | $900.00 | Draft affidavit in support of motion for sanctions, and supporting exhibits |
| 30/09/2022 | Kevin P. Crenny | $300.00 | 0.5 | $150.00 | Review affidavit and supporting exhibits |

# EXHIBIT C

≡ Menu





*Partner*

📞 +1 305 569 7746

in www.linkedin.com/in/adam-fels-819621195/

✉️ afels@ffslawfirm.com

🪪 Download vCard

**Adam S. Fels** is a founding partner of Fridman Fels & Soto, PLLC.  His practice focuses on international money laundering cases, white-collar criminal defense, and complex internal investigations.



the prosecution team, including Mr. Fels, were honored with the 2019 U.S. Department of Justice Attorney General's Award for Exceptional Service, the Department's highest award for employee performance.

Throughout his thirteen-year career as a federal prosecutor, Mr. Fels successfully managed and directed a wide array of criminal investigations and cases in district court, and successfully argued several cases in federal courts of appeal. Mr. Fels also handled some of the Miami U.S. Attorney's Office's highest profile cases, including a variety of counterterrorism prosecutions, and the prosecution of some of the most prominent Colombian drug cartel leaders of the time. He has developed expertise in several areas of federal criminal practice, including Title III wiretaps, classified information litigation, money laundering and other financial investigations, mortgage fraud, and customs enforcement. He was cleared for top secret information and granted access to sensitive compartmented information.

Mr. Fels has lectured extensively to various audiences, including domestic and foreign law enforcement personnel and university students. His seminars and guest lectures have addressed international criminal procedure, money laundering, terrorist financing, and psychology of the courtroom. He has participated on state-sponsored money laundering panels on three continents.

Prior to his tenure as a federal prosecutor in Miami, Mr. Fels served as a Senior Trial Attorney with the Department of Justice's Office of Special Investigations in Washington, DC, where he worked to denaturalize and deport several World War II concentration camp guards who had unlawfully entered the United States after the war.  For his role in bringing Nazi camp guards to justice, Mr. Fels was recognized alongside other OSI attorneys with the first U.S. Department of Justice Assistant Attorney General Award for Human Rights Law Enforcement.

☰ Menu



> "Duped" and "egged on": Capitol rioters use Trump as excuse in court," CBS News, February 16, 2021, available at https://www.cbsnews.com/news/capitol-riot-suspects-trump-blame-court/

> "DBR Recognizes Most Effective Lawyers for 2019," Daily Business Review, November 15, 2019, available at https://www.law.com/dailybusinessreview/2019/11/15/dbr-recognizes-most-effective-lawyers-for-2019/?slreturn=20191015145223

> "Opinion: Will El Chapo's Trial Change Organized Crime Forever?" The New York Times, February 14, 2019, available at https://www.nytimes.com/2019/02/14/opinion/el-chapo-trial-witnesses.html

> "Notorious Drug Lord Joaquin "El Chapo" Guzman Convicted," CBS Miami, February 12, 2019, available at https://miami.cbslocal.com/2019/02/12/notorious-drug-lord-joaquin-el-chapo-guzman-convicted/

> "Joaquín 'El Chapo' Guzmán's trial: From shocking to bizarre," BBC.com, February 4, 2019, available at https://www.bbc.com/news/world-us-canada-46282173

> "'El Chapo' trial jurors heard the accused Mexican drug lord's voice — or did they?" USA Today, December 19, 2018, available at https://www.usatoday.com/story/news/2018/12/19/did-el-chapo-drug-trial-jurors-hear-accused-mexican-drug-lord-voice-secret-tape/2360588002/

> "El Chapo Trial Updates," Newsweek, December 13, 2018, available at "https://www.newsweek.com/joaquin-el-chapo-guzman-loera-sinaloa-cartel-brooklyn-jorge-milton-cifuentes-1258241

> "Las leyendas de El Chapo, a juicio," El Pais, November 18, 2018, available at https://elpais.com/internacional/2018/11/16/actualidad/1542382504_906964.html

> "Main witness against 'El Chapo' will be 'El Chapo,' prosecutor says," NBC News, November 14, 2018, available at https://www.nbcnews.com/news/crime-courts/el-chapo-opening-arguments-delayed-because-anxious-juror-n935761

> "As El Chapo trial opens, attorneys offer contrasting portraits of 'mythological' drug lord," Washington Post, November 13, 2018, available at

☰ Menu



Years In Prison," Sun-Sentinel, November 26, 2016, available at https://www.sun-sentinel.com/local/palm-beach/fl-palm-hoax-bomb-threat-sentencing-20161129-story.html

❯ "Man touted as one of biggest drug dealers ever gets 35 years," AP News, July 25, 2016, available at https://apnews.com/b67b14c742334f0cb07a35513cf92162

❯ "South Florida brothers sentenced to long prison terms for terrorist plot in New York," Miami Herald, June 10, 2015, available at https://www.miamiherald.com/news/local/crime/article23669335.html

❯ "Los detalles de la detención en Aruba del general venezolano Hugo Carvajal," Infobae, July 25, 2014, available at https://www.infobae.com/2014/07/25/1583091-los-detalles-la-detencion-aruba-del-general-venezolano-hugo-carvajal/

❯ "Individual Who Provided False Statements Regarding Attempted Support Of Extremist Group Pleads Guilty And Is Sentenced," U.S. Dept. of Justice, July 24, 2014, available at https://www.justice.gov/usao-sdfl/pr/individual-who-provided-false-statements-regarding-attempted-support-extremist-group

❯ "United States Attorney for the Southern District of Florida Announces Guilty Plea of Colombian Narcotics Kingpin," FBI, January 24, 2014, available at https://archives.fbi.gov/archives/miami/press-releases/2014/united-states-attorney-for-the-southern-district-of-florida-announces-guilty-plea-of-colombian-narcotics-kingpin

❯ "Manhattan, Brooklyn, And Miami U.S. Attorneys Announce Extradition Of Colombian Narcotics Kingpin," U.S. Dept. of Justice, July 9, 2013, available at https://www.justice.gov/usao-edny/pr/manhattan-brooklyn-and-miami-us-attorneys-announce-extradition-colombian-narcotics

❯ "Miami Jury Convicts Guatemalan Drug Kingpin of Distributing Cocaine Knowing it Would be Imported into the United States," U.S. Dept. of Justice, May 8, 2012, available at https://www.justice.gov/archive/usao/fls/PressReleases/2012/120508-01.html

❯ "High-Level Colombian BACRIM Narco-Trafficker Indicted on Cocaine Conspiracy Charges," FBI, February 9, 2011, available at https://archives.fbi.gov/archives/miami/press-releases/2011/mm020911a.htm

Menu



- Recipient of Attorney General's David Margolis Award for Exceptional Service, 2019
- "Most Effective Lawyer" for Criminal Law, Daily Business Review, 2019
- Recipient of Federal Law Enforcement Foundation Award, 2019
- Recipient of Timothy Evans Award for Outstanding Assistant United States Attorney, 2012
- Recipient of Assistant Attorney General Award for Human Rights Law Enforcement, 2008



≡ Menu



in www.linkedin.com/in/adam-fels-819621195/

✉ afels@ffslawfirm.com

▤ Download vCard

# Education

> J.D., University of Chicago Law School

> A.B., Columbia University

# Bar Admissions

> Florida Bar

> District of Columbia Bar

> US Court of Appeals for the Eleventh Circuit

> US District Court for the Southern District of Florida

> US District Court for the Middle District of Florida

CONTACT US TODAY

# EXHIBIT D

**EXHIBIT D to Decl. of Joshua A. Levy**
**In Support of Defs.' Mot. for Sanctions & Fees**

| Date (DD/MM/YYYY) | Timekeeper | Discounted Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| 22/04/2022 | Adam S Fels | 600 | 0.6 | $360.00 | Exchange emails with co-counsel regarding joint motion for extension; review pro hac filings, prepare notice of appearance, pay pro hac fees; file notice of appearance and pro hac motions. |
| 28/04/2022 | Adam S Fels | 600 | 0.1 | $60.00 | Review docket; send co-counsel orders granting pro hac motions. |
| 11/05/2022 | Adam S Fels | 600 | 2.3 | $1,380.00 | Review complaint (split with co-defendants); review draft motion to dismiss; research legal issues relating to legal fees as injury under RICO; exchange emails with co-counsel; file motion to dismiss. |
| 01/06/2022 | Adam S Fels | 600 | 1 | $600.00 | Calls with co-counsel to discuss upcoming status conference hearing; research local rules re: Rule 26 conference; review docket for entries relating to scheduling order |
| 02/06/2022 | Adam S Fels | 600 | 0.7 | $420.00 | Attend status conf (split with co-defendants); T/C with co-counsel |
| 01/07/2022 | Adam S Fels | 600 | 0.9 | $540.00 | Review portion of Amended Complaint (split with co-defendants); research, review and edit malicious prosecution section (split with co-defendants) |
| 05/07/2022 | Adam S Fels | 600 | 0.2 | $120.00 | Review of revised malicious prosecution section (split with co-defendants) |
| 15/07/2022 | Adam S Fels | 600 | 0.2 | $120.00 | Participate on status call with Plaintiffs & Defendants (split with co-defendant) |
| 13/09/2022 | Adam S Fels | 600 | 0.8 | $480.00 | Review Court's order dismissing case; research Rule 11 rulings by J. Middlebrooks; participate in call with counsel to discuss same (all split with co-defendants). |
| 22/09/2022 | Adam S Fels | 600 | 0.3 | $180.00 | Review of draft sanctions motion (split with co-defendants); T/C with co-counsel re: same. |
| 28/09/2022 | Adam S Fels | 600 | 1.1 | $660.00 | Appear at teleconference to discuss fees; T/C with Rachel Clattenburg to discuss fees; |

**EXHIBIT D to Decl. of Joshua A. Levy**
**In Support of Defs.' Mot. for Sanctions & Fees**

| | | | | | prepare chart breaking down fees. |
|---|---|---|---|---|---|

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Donald J. Trump,

          Plaintiff,

   v.

Hillary R. Clinton *et al.*,

          Defendants.

Civil Action No. 2:22-14102-DMM

## DECLARATION OF JOSHUA BERMAN IN SUPPORT OF DEFENDANTS' MOTION FOR SANCTIONS AND FEES

I, Joshua Berman, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am a partner at Clifford Chance US LLP ("Clifford Chance"), counsel of record for Bruce and Nellie Ohr in the above captioned matter.

2. Attached as Exhibit A are biographies of the attorneys at Clifford Chance for whom Bruce and Nellie Ohr seek attorneys' fees. The biographies reflect the professional qualifications of those attorneys.

3. Clifford Chance entered into a retention agreement with Mr. and Mrs. Ohr covering the present litigation. Mr. Ohr has a modest insurance policy that covers certain fees related to the present litigation, but only covers attorneys' fees up to $300 per hour. Mr. and Mrs. Ohr agreed to pay all of Clifford Chance's costs, fees, and expenses incurred in connection with the present suit that are not covered by this insurance policy, and agreed to pay discounted rates, which for this matter are $800 per hour for my time, and $500 per hour for associate Benjamin Peacock. These rates represent a nearly 40 percent discount from standard Clifford Chance rates.

4. Attached as Exhibit B is a true and correct copy of the hours worked by counsel for Defendants Bruce and Nellie Ohr. Defendants Bruce and Nellie Ohr seek fees at the already discounted

1

hourly rate for the attorneys as described in Exhibit B and below.  These significantly discounted hourly rates are consistent with the rates this Court concluded were reasonable in *Celsius Holdings, Inc v. A SHOC Beverage, LLC*, No. 21-cv-80740, 2022 WL 3568042 (July 19, 2022).  Exhibit B also provides an accurate statement of the work provided by Clifford Chance during the periods for which discounted fees are sought.

5.      Attached as Exhibit C is the law firm website biography of the attorney at Fridman Fels & Soto, PLLC ("Fridman Fels") for whom Defendants Bruce and Nellie Ohr seek attorneys' fees.  The biography reflects the professional qualifications of this attorney.

6.      Fridman Fels & Soto, PLLC entered into a retention agreement with Defendants Bruce and Nellie Ohr in connection with the present litigation.  Bruce and Nellie Ohr agreed to pay all of Fridman Fels's costs, fees, and expenses incurred in connection with the present suit, and agreed to pay a discounted rate from the firm's customary rate.  Fridman Fels is charging Defendants Bruce and Nellie Ohr $500 per hour.

7.      Attached as Exhibit D is a true and correct copy of the hours worked by Fridman Fels for Defendants Bruce and Nellie Ohr.  Defendants Bruce and Nellie Ohr seek fees at the already discounted hourly rate for the attorneys as described in Exhibit D and below.  These discounted hourly rates are consistent with the rates this Court concluded were reasonable in *Celsius Holdings, Inc v. A SHOC Beverage, LLC*, No. 21-cv-80740, 2022 WL 3568042 (July 19, 2022).  Exhibit D also provides an accurate statement of the work provided by Fridman Fels during the periods for which discounted fees are sought.

8.      Consistent with the discussion in the Memorandum in Support of Sanctions and the information provided in Exhibit B and Exhibit D, I summarize below in Charts A, B, and C the fees associated with three different phases of the case: (A) the fees incurred from the filing of the

initial complaint to the filing of Mrs. Ohr's initial motion to dismiss; (B) the fees incurred between the filing of Mrs. Ohr's initial motion to dismiss and the Court's order dismissing the suit; and (C) the fees incurred to date in connection with the motion for sanctions.

9.      As reflected in Chart A, the discounted fees incurred by Mr. and Mrs. Ohr from the filing of the initial complaint to the filing of initial motion to dismiss total $25,760.

10.     As reflected in Chart B, the discounted fees incurred by Mr. and Mrs. Ohr from the filing of the initial motion to dismiss to this Court's dismissal of the suit total $26,820.

11.     As reflected in Chart C, the discounted fees incurred by Mr. and Mrs. Ohr in connection with the motion for sanctions, to date, total $6,330.

**Chart A:  Fees incurred from Complaint to initial MTD**

| Timekeeper | Discounted Fee | Hours | Fees |
|---|---|---|---|
| Joshua Berman | $800 / hour | 4.2 hours | $3,360 |
| Benjamin Peacock | $500 / hour | 40.3 hours | $20,150 |
| Adam Fels | $500 / hour | 4.3 hours | $2,150 |
| Victoria Pantin | $125 / hour | 0.8 hours | $100 |

**Chart B:  Fees incurred initial MTD to dismissal**

| Timekeeper | Discounted Fee | Hours | Fees |
|---|---|---|---|
| Joshua Berman | $800 / hour | 1.9  hours | $1,520 |
| Benjamin Peacock | $500 / hour | 47.6 hours | $23,800 |
| Adam Fels | $500 / hour | 3 hours | $1,500 |

**Chart C:  Fees incurred to date on sanctions motion**

| Timekeeper | Discounted Fee | Hours | Fees |
|---|---|---|---|
| Joshua Berman | $800 / hour | 0.6 hours | $480 |
| Benjamin Peacock | $500 / hour | 10.6 hours | $5,300 |
| Adam Fels | $500 / hour | 1.1 hours | $550 |

12.     I believe that the discounted rates claimed are reasonable given the professional qualifications of the billers as evidenced in Exhibit A and Exhibit C for the Southern District of Florida market and given the rates approved by this Court in *Celsius*.

13.     In connection with this case, counsel also incurred necessary costs in the amount of $400 for admission to this court *pro hac vice*.  As such in addition to the costs and fees set out above, Mr. and Mrs. Ohr request and award of $400 for these fees.

14.     Consistent with local Rule 7.3, counsel sent the motion papers and exhibits to Plaintiff's counsel on October 5, 2022.  Counsel for Mr. and Mrs. Ohr, together with counsel for other defendants, met and conferred with Plaintiff's counsel on October 26, 2022, but were unable to reach an agreement regarding defendants' entitlement to fees and expenses or the amount of such fees and expenses.

 /s/

Joshua Berman
October 31, 2022

4

# EXHIBIT A

# CLIFFORD

# CHANCE

Partner



Joshua Berman, a seasoned trial and appellate lawyer, has over twenty years of experience handling white collar and government investigations matters both in the private sector and in government. Josh represents and provides counsel to corporate clients, Boards of Directors and individuals in government, Congressional and internal investigations, civil litigation, information security, and securities enforcement proceedings. Josh has expertise in developing global compliance and training programs for companies, and handling due diligence in connection with anti-corruption and other potential fraud matters.

Prior to joining Clifford Chance, Josh served as Deputy General Counsel for the U.S. Department of Commerce. There, he was responsible for a wide array of substantive matters, including: CFIUS, international export sanctions, cybersecurity, ethics guidance, data privacy, international anti-corruption efforts, Congressional investigations and oversight, Treasury tax regulations, ECPA reform, counter-terrorism efforts, FirstNet, telecommunications and intellectual property matters.

From 1997 to 2001, Josh served as an Assistant U.S. Attorney for the Southern District of New York, where he supervised, investigated, prosecuted and tried cases relating to securities fraud, white collar crime, terrorism, espionage, health care fraud, public corruption, obstruction of justice, bank fraud, immigration fraud, anti-piracy and copyright infringement, money laundering, racketeering, cybercrime, and organized and violent crime. Josh served on team of counter-terrorism prosecutors who investigated and prosecuted al Qaeda members and associates overseas and within the U.S. From 2001-2002, Josh served as Associate Investigative Counsel on the high profile Webster Commission for the Review of FBI Security Matters where he led a large multi-agency team of intelligence agents examining lapses in FBI national security in the wake of Robert Hanssen's espionage. From 2002-2004, Josh was a senior Trial Counsel for the U.S. Department of Justice, Criminal Division, Public Integrity Section, where he supervised, investigated and prosecuted investigations and prosecutions of high profile corruption, FEC and campaign finance cases.

Josh is a member of our global Corruption Risk team.



## Contact details

Clifford Chance, Washington D.C.

+12029125174

Email me

Follow me on LinkedIn

Practice area Litigation, dispute resolution & risk management

## Career and qualifications

○ Cornell University (BA, Government) 1991

○ University of Michigan Law School (JD Law) 1994

○ Assistant U.S. Attorney (SDNY), U.S. Department of Justice 1997

○ Associate Investigative Counsel, Webster Commission for the Review of FBI Security Programs, U.S. Department of Justice 2001

○ Senior Trial Attorney, Criminal Division, Public Integrity Section, U.S. Department of Justice 2002

○ Partner, SNR Denton 2004

○ Partner, Katten Muchin Rosenman 2010

○ Deputy General Counsel, U.S. Department of Commerce 2016

○ Joined Clifford Chance as Partner 2017

Relevant experience    Publications and insights

## News and client work

Clifford Chance advises Japan Bank for International Cooperation on acquiring US$110 million equity in NuScale to advance clean energy

New York/Tokyo: Leading international law firm Clifford Chance has advised Japan Bank for International Cooperation (JBIC) on acquiring US$110 million of prefe...

**26 April 2022**

# BENJAMIN PEACOCK
## NEW YORK



**BENJAMIN PEACOCK**
**Associate**

**T** +1 212 878 8051
**E** benjamin.peacock@
cliffordchance.com

Benjamin Peacock is a senior associate in Clifford Chance's Litigation & Dispute Resolution practice in New York. He represents clients in cross-border criminal and regulatory investigations and complex commercial litigation and arbitration.

Prior to joining Clifford Chance, Benjamin interned at the New England Legal Foundation, where he assisted in authoring briefs for the United States Court of Appeals for the First Circuit and the Supreme Courts of Massachusetts, New Hampshire and Maine.

Benjamin received a JD from the New York University School of Law and a BA in philosophy from the University of Georgia. He is admitted to practice in New York.

**Representative matters include representing:**

- A major financial institution in regulatory investigations alleging manipulation of LIBOR, and in subsequent implementation of settlement undertakings

- A joint venture in connection with investigations by CFTC and NYAG of spoofing and other foreign exchange market-related misconduct.

- A large international financial institution in connection with a spoofing investigation by the CME

- A major Asian financial institution in connection with CME investigations into trading of energy and agricultural futures

- A vertically integrated energy company in connection with a review of policies and risk assessment of its global commodities-trading operations.

- A major US financial institution in connection with remediation of its foreign exchange trading practices

- A hedge fund in connection with a review of policies and risk assessment of its global commodities- and securities-trading operations.

- A digital assets company in connection with an SEC investigation into its offering of digital tokens

- A cryptocurrency exchange in connection with a joint DOJ and CFTC investigation of trading practices on one exchange

- A digital assets company in connection with U.S. regulatory issues

- Defeated all DOJ FCPA charges against Lawrence Hoskins at trial, with remaining money laundering counts resulting in a 15-month sentence that is currently under appeal

CLIFFORD CHANCE        |    1

# EXHIBIT B

Exhibit B - Clifford Chance fee chart(24004627221.1)

| Date | Attorney | Discounted Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| 4/13/2022 | Joshua Berman | 800 | 0.5 | $ 400.00 | Communications with joint-defense team; review complaint and analyze next steps. |
| 4/14/2022 | Joshua Berman | 800 | 0.5 | $ 400.00 | Further communcations with joint defense team and with client re next steps. |
| 4/15/2022 | Benjamin Peacock | 500 | 1.5 | $ 750.00 | Analyze complaint and potential legal defenses. |
| 4/18/2022 | Joshua Berman | 800 | 1.2 | $ 960.00 | Communication with joint-defense team and plaintiff's counsel; analyze complaint and potential legal defenses. |
| 4/18/2022 | Benjamin Peacock | 500 | 5 | $ 2,500.00 | Legal research for motion to dismiss; outline potential defenses. |
| 4/19/2022 | Joshua Berman | 800 | 0.5 | $ 400.00 | Review docket; telephone conference with B. Peacock re next steps. |
| 4/19/2022 | Benjamin Peacock | 500 | 3.5 | $ 1,750.00 | Legal research for motion to dismiss; outline potential defenses; telephone conference with J. Berman re same. |
| 4/20/2022 | Joshua Berman | 800 | 0.7 | $ 560.00 | Joint-defense call; attention to selection of local counsel. |
| 4/20/2022 | Benjamin Peacock | 500 | 4.5 | $ 2,250.00 | Joint-defense call; telephone conference with Adam Fels re engagement; draft motion for extension of time; e-mails with plaintiff's counsel re same; draft *pro hac vice* motions. |
| 4/21/2022 | Joshua Berman | 800 | 0.1 | $ 80.00 | Finalize filings; communications with joint-defense counsel re same. |
| 4/21/2022 | Benjamin Peacock | 500 | 4.7 | $ 2,350.00 | Review draft Fridman Fels and Soto engagement letter; communications with client re same; outline arguments for motion to dismiss. |
| 4/22/2022 | Joshua Berman | 800 | 0.1 | $ 80.00 | Resolve local counsel and filing issues re extension of time. |
| 4/22/2022 | Benjamin Peacock | 500 | 1.7 | $ 850.00 | Finalize motion for extension of time and *pro hac vice* motions; e-mail and telephone conferences with local counsel re filing; e-mail Bruce and Nellie Ohr re status and next steps. |
| 4/25/2022 | Joshua Berman | 800 | 0.2 | $ 160.00 | Attention to plaintiff question re motion to amend complaint; communications with joint-defense counsel. |
| 4/27/2022 | Joshua Berman | 800 | 0.2 | $ 160.00 | Review draft client letter to DOJ re Westfall representation. |
| 4/28/2022 | Benjamin Peacock | 500 | 0.5 | $ 250.00 | Edit draft client Westfall letter; e-mail J. Berman re same. |
| 5/4/2022 | Benjamin Peacock | 500 | 6.5 | $ 3,250.00 | Legal research in connection with motion to dismiss; draft same. |
| 5/5/2022 | Benjamin Peacock | 500 | 4.5 | $ 2,250.00 | Legal research in connection with motion to dismiss; draft same. |
| 5/6/2022 | Benjamin Peacock | 500 | 3.5 | $ 1,750.00 | Legal research in connection with motion to dismiss; draft same. |
| 5/10/2022 | Joshua Berman | 800 | 0.2 | $ 160.00 | Review draft motion to dismiss. |
| 5/10/2022 | Benjamin Peacock | 500 | 1.2 | $ 600.00 | Revise draft motion to dismiss; e-mail clients re same; e-mails with J. Berman and A. Fels re same. |
| 5/11/2022 | Benjamin Peacock | 500 | 3.2 | $ 1,600.00 | Final edits to draft motion to dismiss; multiple telephone conferences and e-mails with A. Fels re same. |
| 5/13/2022 | Benjamin Peacock | 500 | 0.3 | $ 150.00 | Attention to request for extension of time from plaintiff's counsel. |
| 5/18/2022 | Benjamin Peacock | 500 | 1 | $ 500.00 | Attend joint-defense call; e-mails with J. Berman re status and next steps. |
| 5/25/2022 | Benjamin Peacock | 500 | 0.2 | $ 100.00 | E-mail Bruce Ohr re status. |
| 5/26/2022 | Benjamin Peacock | 500 | 0.5 | $ 250.00 | Review proposed stipulation; e-mail counsel for H. Clinton re same. |

Exhibit B - Clifford Chance fee chart(24004627221.1)

| Date | Name | Rate | Hours | | $ | Description |
|---|---|---|---|---|---|---|
| 5/26/2022 | Benjamin Peacock | 500 | 0.4 | $ | 200.00 | Attend meeting with summer intern to introduce matter and discuss next steps. |
| 6/2/2022 | Joshua Berman | 800 | 0.2 | $ | 160.00 | Telephone conference with B. Peacock re strategy and next steps. |
| 6/2/2022 | Benjamin Peacock | 500 | 2.5 | $ | 1,250.00 | Court conference; follow-up telephone conferences with J. Berman and A. Fels re same; e-mail Bruce and Nellie Ohr re same. |
| 15-Jun | Benjamin Peacock | 500 | 1 | $ | 500.00 | Joint-defense call. |
| 21-Jun | Benjamin Peacock | 500 | 3.4 | $ | 1,700.00 | Analyze amended complaint and evaluate defenses. |
| 22-Jun | Joshua Berman | 800 | 0.2 | $ | 160.00 | Analyze amended complaint. |
| 22-Jun | Benjamin Peacock | 500 | 1.7 | $ | 850.00 | Further analysis of amended complaint; legal research in connection with same. |
| 23-Jun | Joshua Berman | 800 | 0.5 | $ | 400.00 | Joint-defense call. |
| 23-Jun | Benjamin Peacock | 500 | 3.4 | $ | 1,700.00 | Joint-defense call; telephone conference with DOJ re Westfall issues; legal research in connection with same. |
| 24-Jun | Joshua Berman | 800 | 0.3 | $ | 240.00 | Analyze arguments for renewed motion to dismiss. |
| 24-Jun | Benjamin Peacock | 500 | 5.5 | $ | 2,750.00 | Further analysis of Westfall issues; further analysis of amended complaint and related legal research. |
| 29-Jun | Benjamin Peacock | 500 | 1.9 | $ | 950.00 | Review and revise draft malicious-prosecution section of renewed motion to dismiss; joint-defense communications in connection with same. |
| 1-Jul | Joshua Berman | 800 | 0.2 | $ | 160.00 | Joint-defense call. |
| 1-Jul | Benjamin Peacock | 500 | 4.5 | $ | 2,250.00 | Joint-defense call; revise malicious-prosecution section of renewed motion to dismiss; joint-defense communications re same; telephone conference with DOJ re Westfall issues; follow-up e-mails with I. Berman re same. |
| 5-Jul | Benjamin Peacock | 500 | 2.9 | $ | 1,450.00 | Further communication with DOJ re Westfall issues; revise draft motion to dismiss; joint-defense communications re same. |
| 11-Jul | Benjamin Peacock | 500 | 0.7 | $ | 350.00 | Revise draft motion to dismiss; multiple joint-defense communications re same. |
| 12-Jul | Benjamin Peacock | 500 | 2.5 | $ | 1,250.00 | Revise draft motion to dismiss; joint-defense communications re same. |
| 13-Jul | Benjamin Peacock | 500 | 2.2 | $ | 1,100.00 | Further analysis of issues related to renewed motion to dismiss; e-mails with A. Fels re same. |
| 14-Jul | Benjamin Peacock | 500 | 0.6 | $ | 300.00 | Review filed opposition to motion to dismiss. |
| 15-Jul | Joshua Berman | 800 | 0.5 | $ | 400.00 | Meet-and-confer with plaintiff's counsel and joint-defense team. |
| 15-Jul | Benjamin Peacock | 500 | 0.7 | $ | 350.00 | Meet-and-confer with plaintiff's counsel and joint-defense team; e-mail Bruce and Nellie Ohr re same. |
| 26-Jul | Benjamin Peacock | 500 | 0.5 | $ | 250.00 | Joint-defense call. |
| 4-Aug | Benjamin Peacock | 500 | 2.5 | $ | 1,250.00 | Analyze plaintiff's opposition to motion to dismiss. |
| 5-Aug | Benjamin Peacock | 500 | 1.7 | $ | 850.00 | Further analysis of opposition to motion to dismiss; e-mail clients re same; outline points for opposition. |
| 8-Aug | Benjamin Peacock | 500 | 1.3 | $ | 650.00 | Draft and revise "malicious prosecution" argument for reply brief. |
| 10-Aug | Benjamin Peacock | 500 | 3.2 | $ | 1,600.00 | Review reply brief; e-mails with Bruce and Nellie Ohr re same; joint-defense call. |
| 11-Aug | Benjamin Peacock | 500 | 2.5 | $ | 1,250.00 | Final review of reply brief in preparation for filing; e-mails with clients re same. |
| 8-Sep | Benjamin Peacock | 500 | 2.7 | $ | 1,350.00 | Review Order Granting Motion to Dismiss; e-mail J. Berman re same. |

Exhibit B - Clifford Chance fee chart(24004627221.1)

Page 3

| Date | Name | Hours | | Amount | Description |
|---|---|---|---|---|---|
| 9-Sep | Joshua Berman | 800 | 0.3 | $ 240.00 | Review Order Granting Motion to Dismiss; preliminary consideration of sanctions issues. |
| 9-Sep | Benjamin Peacock | 500 | 1.7 | $ 850.00 | Analysis of next steps including sanctions; e-mail Bruce and Nellie Ohr re Order and related issues. |
| 12-Sep | Joshua Berman | 800 | 0.3 | $ 240.00 | Address issue re sanctions. |
| 13-Sep | Benjamin Peacock | 500 | 0.5 | $ 250.00 | Legal research re legal standard for sanctions; telephone conference with A. Fels re same. |
| 23-Sep | Benjamin Peacock | 500 | 1.9 | $ 950.00 | Review draft motion for sanctions; legal research in connection with same. |
| 28-Sep | Benjamin Peacock | 500 | 0.3 | $ 150.00 | Review materials provided by A. Fels in connection with motion for sanctions; telephone conference with A. Fels re same. |
| 10/2/2022 | Benjamin Peacock | 500 | 1.5 | $ 750.00 | Draft declaration to accompany motion for sanctions and prepare exhibits to same. |
| 3-Oct | Benjamin Peacock | 500 | 2 | $ 1,000.00 | Revise declaration to accompany motion for sanctions and prepare exhibits to same; e-mail Bruce and Nellie Ohr re same. |
| | | | 105.2 | $ 54,610.00 | |

# EXHIBIT C

Menu





*Partner*

+1 305 569 7746





Before forming Fridman Fels & Soto, PLLC, Mr. Fels served as an Assistant United States Attorney in the Southern District of Florida for thirteen years, specializing in international money laundering, counternarcotics, and counterterrorism prosecutions. He also served as a Special Assistant United States Attorney in both the Southern District of New York and the Eastern District of New York. Mr. Fels was one of the lead prosecutors and delivered the opening statement in the Government's successful prosecution of Joaquin "El Chapo" Guzmán, one of the largest drug kingpins ever tried in the United States. The members of the prosecution team, including Mr. Fels, were honored with the 2019 U.S. Department of Justice Attorney General's Award for Exceptional Service, the Department's highest award for employee performance.

Throughout his thirteen-year career as a federal prosecutor, Mr. Fels successfully managed and directed a wide array of criminal investigations and cases in district court, and successfully argued several cases in federal courts of appeal. Mr. Fels also handled some of the Miami U.S. Attorney's Office's highest profile cases, including a variety of counterterrorism prosecutions, and the prosecution of some of the most prominent Colombian drug cartel leaders of the time. He has developed expertise in several areas of federal criminal practice, including Title III wiretaps, classified information litigation, money laundering and other financial investigations, mortgage fraud, and customs enforcement. He was cleared for top secret information and granted access to sensitive compartmented information.



concentration camp guards who had unlawfully entered the United States after the war. For his role in bringing Nazi camp guards to justice, Mr. Fels was recognized alongside other OSI attorneys with the first U.S. Department of Justice Assistant Attorney General Award for Human Rights Law Enforcement.

Before joining the Department of Justice, Mr. Fels spent four years as a commercial litigation and appellate associate in the Washington, D.C. office of Latham & Watkins LLP, participating in several trials and developing expertise in internal investigations. Mr. Fels began his legal career by clerking for United States District Judge Donald M. Middlebrooks in the Southern District of Florida.

# News Reports and Media Accounts

> "Duped" and "egged on": Capitol rioters use Trump as excuse in court," CBS News, February 16, 2021, available at https://www.cbsnews.com/news/capitol-riot-suspects-trump-blame-court/

> "DBR Recognizes Most Effective Lawyers for 2019," Daily Business Review, November 15, 2019, available at https://www.law.com/dailybusinessreview/2019/11/15/dbr-recognizes-most-effective-lawyers-for-2019/?slreturn=20191015145223

> "Opinion: Will El Chapo's Trial Change Organized Crime Forever?" The New York Times, February 14, 2019, available at https://www.nytimes.com/2019/02/14/opinion/el-chapo-trial-witnesses.html



∧ "El Chapo Trial Updates," Newsweek, December 13, 2018, available at "https://www.newsweek.com/joaquin-el-chapo-guzman-loera-sinaloa-cartel-brooklyn-jorge-milton-cifuentes-1258241

∧ "Las leyendas de El Chapo, a juicio," El País, November 18, 2018, available at https://elpais.com/internacional/2018/11/16/actualidad/1542382504_906964.html

∧ "Main witness against 'El Chapo' will be 'El Chapo,' prosecutor says," NBC News, November 14, 2018, available at https://www.nbcnews.com/news/crime-courts/el-chapo-opening-arguments-delayed-because-anxious-juror-n935761

∧ "As El Chapo trial opens, attorneys offer contrasting portraits of 'mythological' drug lord," Washington Post, November 13, 2018, available at https://www.washingtonpost.com/world/national-security/el-chapo-trial-begins-drug-kingpin-faces-life-in-prison/2018/11/12/5284f62a-e466-11e8-b759-3d88a5cce9e19_story.html

∧ "Miami judge orders ex-Panamanian president sent home to face criminal charges," Miami Herald, August 31, 2017, available at "https://www.miamiherald.com/news/nation-world/article170521432.html

∧ "Man Who Made Bomb Threats to Palm Beach County Schools Sentenced to More Than 3 Years In Prison," Sun-Sentinel, November 26, 2016, available at https://www.sun-sentinel.com/local/palm-beach/fl-palm-hoax-bomb-threat-sentencing-20161129-story.html

∧ "Man touted as one of biggest drug dealers ever gets 35 years," AP News, July 25, 2016, available at https://apnews.com/b67b14c742334f0cb07a35513cf92162

∧ "South Florida brothers sentenced to long prison terms for terrorist plot in New York," Miami Herald, June 10, 2015, available at https://www.miamiherald.com/news/local/crime/article23669335.html

≡ Menu



southern-district-of-florida-announces-guilty-plea-of-colombian-narcotics-kingpin

› "Manhattan, Brooklyn, And Miami U.S. Attorneys Announce Extradition Of Colombian Narcotics Kingpin," U.S. Dept. of Justice, July 9, 2013, available at https://www.justice.gov/usao-edny/pr/manhattan-brooklyn-and-miami-us-attorneys-announce-extradition-colombian-narcotics

› "Miami Jury Convicts Guatemalan Drug Kingpin of Distributing Cocaine Knowing it Would be Imported into the United States," U.S. Dept. of Justice, May 8, 2012, available at https://www.justice.gov/archive/usao/fls/PressReleases/2012/120508-01.html

› "High-Level Colombian BACRIM Narco-Trafficker Indicted on Cocaine Conspiracy Charges," FBI, February 9, 2011, available at https://archives.fbi.gov/archives/miami/press-releases/2011/mm020911a.htm

## Publications

› "OSI's Prosecution of World War II Persecutor Cases," United States Attorneys Bulletin, January 2006

## Awards and Recognition

› Recipient of Attorney General's David Margolis Award for Exceptional Service, 2019





Menu





305 569 7746

www.linkedin.com/in/adam-fels-819621195/

afels@ffslawfirm.com

Download vCard

# Education

≡ Menu



CONTACT US TODAY

## Bar Admissions

> Florida Bar

> District of Columbia Bar

> US Court of Appeals for the Eleventh Circuit

> US District Court for the Southern District of Florida

> US District Court for the Middle District of Florida

Menu



# EXHIBIT D

Exhibit D - Fridman Fels Fee Chart

| Date | Timekeeper | Discounted Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| 4/21/2022 | Adam S Fels | 500 | 1.2 | $ 600.00 | Review and edit pro hac motions, certifications and proposed orders; review and edit motion for extension of time and draft proposed order; draft notice of appearance; initial filings; exchange emails with co-counsel re: initial filings. |
| 4/22/2022 | Victoria Pantin | 125 | 0.8 | $ 100.00 | Collection of previous CM/ECF filings and save into client's folder. |
| 5/10/2022 | Adam S Fels | 500 | 2.1 | $ 1,050.00 | Review Complaint (split with co-defendants); Review motion to dismiss; research legal issues in 11th Cir/SDFL relating to cognizable RICO injuries; defamatory statements re: political candidates; existence of proceeding in context of malicious prosecution case; annotate draft brief. |
| 5/11/2022 | Adam S Fels | 500 | 1 | $ 500.00 | Additional review of motion to dismiss; T/C with co-counsel re: same; file motion. |
| 6/1/2022 | Adam S Fels | 500 | 0.4 | $ 200.00 | Call with co-counsel to discuss upcoming status conference hearing. |
| 6/2/2022 | Adam S Fels | 500 | 0.7 | $ 350.00 | Attend status conf (split with co-defendants); T/C with co-counsel |
| 7/1/2022 | Adam S Fels | 500 | 0.9 | $ 450.00 | Review portion of Amended Complaint (split with co-defendants); research, review and edit malicious prosecution section (split with co-defendants) |
| 7/5/2022 | Adam S Fels | 500 | 0.2 | $ 100.00 | Review of revised malicious prosecution section (split with co-defendants) |
| 7/13/2022 | Adam S Fels | 500 | 0.6 | $ 300.00 | Review issue in draft motion to dismiss re: "federal defendants" in malicious prosecution section; exchange emails with co-counsel re: same. |
| 7/15/2022 | Adam S Fels | 500 | 0.2 | $ 100.00 | Participate on status call with Plaintiffs & Defendants (split with co-defendant) |
| 9/13/2022 | Adam S Fels | 500 | 0.8 | $ 400.00 | Review Court's order dismissing case; research Rule 11 rulings by J. Middlebrooks; participate in call with counsel to discuss same (all split with co-defendants). |
| 9/22/2022 | Adam S Fels | 500 | 0.2 | $ 100.00 | Review of draft sanctions motion (split with co-defendants). |
| 9/28/2022 | Adam S Fels | 500 | 0.9 | $ 450.00 | Appear at teleconference to discuss fees; T/C with co-counsel to discuss fees; prepare chart breaking down fees. |
| 4/21/2022 | | | | $ 400.00 | Pro hac vice fees paid for co-counsel |
| **TOTAL** | | | | **$5,100.00** | |

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Donald J. Trump,

          Plaintiff,

     v.

Hillary R. Clinton *et al.*,

          Defendants.

Civil Action No. 2:22-14102-DMM

## DECLARATION OF FRANKLIN MONSOUR JR. IN SUPPORT OF DEFENDANTS' MOTION FOR SANCTIONS AND FEES

I, Franklin Monsour Jr., declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.     I am a partner at Orrick Herrington & Sutcliffe LLP ("Orrick"), counsel of record for Igor Danchenko in the above captioned matter.

2.     Attached as Exhibit A is my firm website biography demonstrating my professional qualifications, as the attorney for whom Mr. Danchenko seeks attorneys fees.

3.     Orrick entered into a retention agreement with Mr. Danchenko in connection with the present litigation.  Mr. Danchenko agreed to pay all of Orrick's costs, fees, and expenses incurred in connection with the present suit, and agreed to pay the firm's customary rates.

4.     Attached as Exhibit B is a true and correct copy of the hours worked by counsel for Mr. Danchenko.  Mr. Danchenko is not seeking reimbursement for the customary hourly rates mentioned in Paragraph 3.  Instead, Mr. Danchenko seeks fees at a discounted hourly rate for the attorneys as describe in Exhibit B and below.  These discounted hourly rates are consistent with the rates this Court concluded were reasonable in *Celsius Holdings, Inc v. A SHOC Beverage, LLC*, No. 21-cv-80740, 2022 WL 3568042 (July 19, 2022).  Exhibit B also provides an accurate statement of the work provided by Orrick during the periods for which discounted fees are sought.

1

5.     Consistent with the discussion in the Memorandum in Support of Sanctions and the information provided in Exhibit B, I summarize below in Charts A, B, and C the fees associated with three different phases of the case:  the fees incurred from the filing of the initial complaint to the filing of Mr. Danchenko's initial motion to dismiss; the fees incurred between the filing of Mr. Danchenko's motion to dismiss to the Court's order dismissing the suit; and the fees incurred to date in connection with the motion for sanctions.

6.     As reflected in Chart A, the discounted fees incurred by Mr. Danchenko from the filing of the initial complaint to the filing of Mr. Danchneko's initial motion to dismiss total $5,600.

7.     As reflected in Chart B, the discounted fees incurred by Mr. Danchenko from the filing of Mr. Danchenko's initial motion to dismiss total to this Court's dismissal of the suit total $10,220.

8.     As reflected in Chart C, the discounted fees incurred by Mr. Danchenko in connection with the motion for sanctions, to date, total $1,540.

**Chart A:  Fees incurred from Complaint to initial MTD**

| Timekeeper | Discounted Fee | Hours | Fees |
|---|---|---|---|
| Franklin Monsour Jr. | $700 per hour | 8 | $5,600 |

**Chart B:  Fees incurred initial MTD to dismissal**

| Timekeeper | Discounted Fee | Hours | Fees |
|---|---|---|---|
| Franklin Monsour Jr. | $700 per hour | 14.6 | $10,220 |

**Chart C:  Fees incurred to date on sanctions motion**

| Timekeeper | Discounted Fee | Hours | Fees |
|---|---|---|---|
| Franklin Monsour Jr. | $700 per hour | 2.2 | $1,540 |

9.    I believe that the discounted rates claimed are reasonable given the professional qualifications of the billers as evidenced in Exhibit A for the Southern District of Florida market and given the rates approved by this Court in *Celsius*.

10.    In connection with this case, counsel incurred necessary costs for electronic legal research.  I understand that courts in this Circuit have held that legal research costs are not ordinarily taxable as costs under 28 U.S.C. § 1920, but are properly considered a component of attorneys' fees.  *Springer v. Convergy's Corp.*, No. 3:03-CV-302-J-99MCR, 2006 WL 8439203, at *2 (M.D. Fla. July 7, 2006).  As such, in addition to the discounted fees set out above, Mr. Danchenko requests an award of $6,389 incurred for electronic legal research.  Attached as Exhibit C is a true and correct copy of the amount of incurred for electronic legal research.

11.    Consistent with local Rule 7.3, counsel sent the draft sanctions motion and draft supporting declarations to Plaintiff's counsel on October 5, 2022.  Defendants met and conferred in good faith with Plaintiff's counsel by Microsoft Teams twice, on October 13 and October 26, 2022, but were unable to reach any agreement as to either the Defendants' entitlement to or the amount of fees and expenses not taxable under 28 U.S.C. §1920 that are recoverable from Plaintiff and/or his counsel.

  */s/ Franklin Monsour Jr.*
Franklin Monsour Jr.

Date: October 27, 2022

# EXHIBIT A



# Franklin Monsour, Jr.

**Partner**
New York

**T**  +1 212 506 3512
**E**  fmonsour@orrick.com



## Honors

- B.B. Allen Award, 2013

- Commendation by the Defense Criminal Investigative Service (DCIS), 2017

- Patriotic Service Medal by the US Army, 2017

- Commendation by the Drug Enforcement Administration (DEA), 2013

## Education

- J.D., Benjamin N. Cardozo School of Law, 2003, Dean's Merit Scholar, *Moot Court* editorial board member, *Jacob Burns Medal* recipient for moot court performance, Best Writing Award for Criminal Justice

- B.A., Virginia Commonwealth University, 1999, *cum laude*

Franklin Monsour is a white collar and investigations partner who defends clients in criminal and civil government actions and complex commercial litigation.

As a former federal prosecutor for the Southern District of Florida, in Miami, Franklin was lead counsel in negotiating multiple record settlements totaling over $100 million in False Claims Act, Anti-Kickback Statute, healthcare fraud and civil penalty recoveries. He also prosecuted numerous criminal cases including the largest compounding pharmacy fraud case to go to trial.

Franklin frequently represents clients in the life sciences and healthcare industries in both criminal and civil investigations brought by the Department of Justice and other regulatory agencies such as the DEA and FDA. He also represents clients in FCPA, securities and fraud-related civil cases, including civil RICO actions. In doing so, Franklin relies on his prior experience as an Assistant US Attorney in Miami where he prosecuted numerous criminal and civil regulatory cases. He was lead counsel on multiple False Claims Act, Anti-Kickback Statute cases resulting in record resolutions. He was also lead counsel in a DEA drug diversion case against one of the largest pharmacy chains resulting in the record civil penalty under the Controlled Substances Act. That case developed the template for DEA actions against drug distribution centers alleged to distribute suspiciously large amounts of prescription narcotics.

Franklin prosecuted numerous criminal cases involving fraud, narcotics and violent crimes. He has successfully tried a variety of criminal and civil cases to verdict, including a five-week federal trial convicting a pharmacist and a co-conspirator of conspiracy to commit healthcare fraud, pay kickbacks and money laundering. That case is the largest compounding pharmacy fraud case to go to trial, involving numerous co-conspirators in billing well over $30 million to the US military's health insurance program.

In addition to litigation, Franklin applies his Government experience in helping clients develop sophisticated compliance programs to preempt and resolve Anti-Kickback Statute and broader anti-corruption and FCPA enforcement issues.

orrick

Franklin understands what factors motivate investigations, actions, and litigation, and what factors conclude them. He builds strong relationships with clients to navigate difficult situations, developing defenses and strategies to resolve cases successfully, from negotiation through trial.

## Admissions

- New York

# EXHIBIT B

| Date | Timekeeper | Discounted Rate | Time | Amount Claimed | Description | |
|---|---|---|---|---|---|---|
| 5/6/2022 | Monsour, Franklin | $700 | 2.00 | $1,400.00 | Research and outline thereto for MTD. | |
| 5/12/2022 | Monsour, Franklin | $700 | 1.00 | $700.00 | Research and draft MTD. | |
| 5/13/2022 | Monsour, Franklin | $700 | 1.00 | $700.00 | Draft MTD and research thereto. | |
| 5/18/2022 | Monsour, Franklin | $700 | 2.00 | $1,400.00 | Draft and revise MTD brief. | |
| 5/20/2022 | Monsour, Franklin | $700 | 2.00 | $1,400.00 | Draft and revise MTD brief. | |
| 6/2/2022 | Monsour, Franklin | $700 | 1.20 | $840.00 | Prepare for and attend status conference. | |
| 6/15/2022 | Monsour, Franklin | $700 | 0.50 | $350.00 | Joint defense zoom conference. | |
| 6/23/2022 | Monsour, Franklin | $700 | 0.50 | $350.00 | Call with codefendant counsel. | |
| 6/30/2022 | Monsour, Franklin | $700 | 0.20 | $140.00 | Review case filings and correspondence. | |
| 7/1/2022 | Monsour, Franklin | $700 | 0.50 | $350.00 | Meet and confer and correspondence on motion for extension. | |
| 7/5/2022 | Monsour, Franklin | $700 | 0.50 | $350.00 | Joint defense call. | |
| 7/12/2022 | Monsour, Franklin | $700 | 2.00 | $1,400.00 | Work on draft motion. | |
| 7/13/2022 | Monsour, Franklin | $700 | 2.00 | $1,400.00 | Review draft motion and make edits thereto. | |
| 8/5/2022 | Monsour, Franklin | $700 | 0.50 | $350.00 | Call with Defense group to plan reply brief. | |
| 8/5/2022 | Monsour, Franklin | $700 | 2.50 | $1,750.00 | Review prior briefs and exhibits and confer thereto. | |
| 8/10/2022 | Monsour, Franklin | $700 | 2.00 | $1,400.00 | Review draft reply and revise and confer with client thereto. | |
| 8/11/2022 | Monsour, Franklin | $700 | 2.20 | $1,540.00 | Review revised reply brief and make edits thereto; confer with co-defense counsel. | |
| 9/13/2022 | Monsour, Franklin | $700 | 0.50 | $350.00 | Joint defense strategy call. | not billed yet |
| 9/28/2022 | Monsour, Franklin | $700 | 0.50 | $350.00 | Call with co-defendant counsel to discuss sanctions motion. | not billed yet |
| 9/30/2022 | Monsour, Franklin | $700 | 1.20 | $840.00 | Review sanctions motion and revise affidavit. | not billed yet |

# EXHIBIT C

## DISBURSEMENTS

| Date | Tkpr. | Description | | Quantity | Bill Amt | Check No. | Print On Bill? | Disb ID |
|---|---|---|---|---|---|---|---|---|
| 05/05/22 | FM | Lexis Research ; ; ; *Inv No.* | Entry employee: 16673 | | 1,637.00 | | Y | 40083841 |
| 05/06/22 | FM | Lexis Research ; ; ; *Inv No.* | Entry employee: 16673 | | 594.00 | | Y | 40083842 |
| 05/08/22 | FM | Lexis Research ; ; ; *Inv No.* | Entry employee: 16673 | | 396.00 | | Y | 40089027 |
| 05/12/22 | FM | Lexis Research ; ; ; *Inv No.* | Entry employee: 16673 | | 198.00 | | Y | 40089028 |
| 05/13/22 | FM | Lexis Research ; ; ; *Inv No.* | Entry employee: 16673 | | 1,683.00 | | Y | 40089029 |
| 05/15/22 | FM | Lexis Research ; ; ; *Inv No.* | Entry employee: 16673 | | 198.00 | | Y | 40095211 |
| 05/16/22 | FM | Lexis Research ; ; ; *Inv No.* | Entry employee: 16673 | | 1,287.00 | | Y | 40095212 |
| 07/12/22 | FM | Lexis Research ; ; ; *Inv No.* | Entry employee: 16673 | | 297.00 | | Y | 40138354 |
| 07/13/22 | FM | Lexis Research ; ; ; *Inv No.* | Entry employee: 16673 | | 99.00 | | Y | 40138355 |
| **Disbursement Total** | | | | | **$6,389.00** | | | |

# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Donald J. Trump,

        Plaintiff,

    v.

Hillary R. Clinton *et al.*,

        Defendants.

Civil Action No. 2:22-14102-DMM

**DECLARATION OF SAMANTHA L. SOUTHALL IN SUPPORT OF
DEFENDANTS' MOTION FOR SANCTIONS AND FEES**

I, Samantha L. Southall, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am a shareholder of Buchanan Ingersoll & Rooney PC ("Buchanan"), counsel of record for Defendant Neustar, Inc. ("Neustar") in the above captioned matter.

2.      Attached as Exhibit A are the law firm website biographies of the attorneys at Buchanan for whom Neustar seeks attorneys' fees. The biographies reflect the professional qualifications of those attorneys.

3.      Buchanan entered into a retention agreement with Neustar in connection with the above-captioned litigation. Neustar agreed to pay Buchanan's discounted, negotiated rates as well as its costs, fees, and expenses incurred in connection with this action.

4.      Attached as Exhibit B is a true and correct copy of the hours worked by counsel for Neustar. These hourly rates are consistent with the rates this Court concluded were reasonable in *Celsius Holdings, Inc v. A SHOC Beverage, LLC*, No. 21-cv-80740, 2022 WL 3568042 (July 19, 2022). Exhibit B also provides an accurate statement of the work provided by Buchanan during the periods for which discounted fees are sought.

5.      Consistent with the discussion in the Memorandum in Support of Sanctions and the

1

information provided in Exhibit B, I summarize below in Charts A, B, and C the fees associated with three different phases of the case: the fees incurred from the filing of the initial complaint to the filing of Neustar's initial motion to dismiss; the fees incurred between the filing of Neustar's motion to dismiss to the Court's order dismissing the suit; and the fees incurred to date in connection with the motion for sanctions.

6.      As reflected in Chart A, the fees incurred by Neustar from the filing of the initial complaint to the filing of Neustar's initial motion to dismiss total $67,944.50.

7.      As reflected in Chart B, the fees incurred by Neustar from the filing of Neustar's initial motion to dismiss total to this Court's dismissal of the suit total $57,569.00.

8.      As reflected in Chart C, the discounted fees incurred by Neustar in connection with the motion for sanctions, to date, total $8,630.00.

**Chart A:  Fees incurred from Complaint to initial MTD**

| Timekeeper | Discounted Fee | Hours | Fees |
|---|---|---|---|
| Samantha L. Southall | $560 | 56.1 | $31,416.00 |
| Jennifer Olmedo-Rodriguez | $560 | 14.2 | $7,952.00 |
| Patrick Doran | $475 | 19.2 | $9,120.00 |
| Anna Sanders | $255 | 76.3 | $19,456.50 |

**Chart B:  Fees incurred initial MTD to dismissal**

| Timekeeper | Discounted Fee | Hours | Fees |
|---|---|---|---|
| Samantha L. Southall | $560 | 60.2 | $33,712.00 |
| Jennifer Olmedo-Rodriguez | $560 | 11.9 | $6,664.00 |
| Patrick Doran | $475 | 4.2 | $1,995.00 |

| Timekeeper | Discounted Fee | Hours | Fees |
|---|---|---|---|
| Anna Sanders | $255 | 59.6 | $15,198.00 |

**Chart C:  Fees incurred to date on sanctions motion**

| Timekeeper | Discounted Fee | Hours | Fees |
|---|---|---|---|
| Samantha L. Southall | $560 | 12.6 | $7,056.00 |
| Jennifer Olmedo-Rodriguez | $560 | 1.9 | $1,064.00 |
| Anna Sanders | $255 | 2 | $510.00 |

9.      I believe that the rates claimed are reasonable given the professional qualifications of the billers as evidenced in Exhibit A for the Southern District of Florida market and given the rates approved by this Court in *Celsius*.

10.      Consistent with local Rule 7.3, counsel sent the motion papers and exhibits to Plaintiff's counsel on October 5, 2022.  Defendants met and conferred in good faith with Plaintiff's counsel by Microsoft Teams twice, on October 13 and October 26, 2022, but were unable to reach any agreement as to either the Defendants' entitlement to or the amount of fees and expenses not taxable under 28 U.S.C. §1920 that are recoverable from Plaintiff and/or his counsel.

Dated: October 27, 2022
         Philadelphia, Pennsylvania

                                         /s/ Samantha L. Southall
                                        Samantha L. Southall

# EXHIBIT A



# Buchanan Experience



Buchanan Ingersoll & Rooney PC | ©2022
https://www.bipc.com/





# Samantha L. Southall

Shareholder

Email: samantha.southall@bipc.com

p: 215 665 3884      Philadelphia, PA

p: 302 552 4249      Wilmington, DE

Samantha has a diverse practice litigating complex commercial and environmental disputes in jurisdictions throughout the United States. She has significant experience representing clients in litigation involving business disputes, consumer fraud and protection, complicated contractual claims and environmental matters.

Drawing on her extensive work defending clients faced with private litigation, class actions, and enforcement actions for alleged violations of the Telephone Consumer Protection Act, Fair Credit Reporting Act, and other consumer protection laws, Samantha proactively counsels clients on the rapidly evolving standards of care for safeguarding confidential information and the expanding legal requirements and consumer expectations for protecting personal information.

Her thorough preparation, ability to develop innovative and creative arguments in complex litigation and effective advocacy helps her clients pragmatically resolve disputes and has led her to play a leading role in the defense and overall strategy for many key clients. Samantha's clients operate in a wide range of industries, from consumer products, financial products and software, and insurers to retail, technology and medical devices and supplies.

Samantha has more than two decades of experience in defending public and private companies in class actions and other high stakes litigation. She also has represented corporations and individuals investigated by the Department of Justice, Antitrust Division, the Federal Trade Commission and various State Attorneys General. She has conducted internal investigations for corporate clients. Samantha also regularly counsels clients on consumer fraud and protection issues.

Samantha was named to the 2019 "Best of the Bar" list by the *Philadelphia Business Journal*.

Samantha is a co-chair of the firm's Pro Bono Committee.

## Proof Points

- Obtained dismissal of a nationwide putative class action alleging that a market research firm violated the Telephone Consumer Protection Act, *Katz v. Focus Forward*, LLC, 532 F. Supp.3d 170 (S.D.N.Y. 2021), *aff'd*, 22 F. 4th 368 (2d Cir. 2022).

- Successfully defended a consumer reporting agency in a case brought on behalf of a nationwide class alleging that the agency violated the Fair Credit Reporting Act when it misreported information relating to a furnisher.

- Successfully defended a consumer reporting agency in a case brought on behalf of a nationwide class alleging that the agency violated the Racketeer Influenced and Corrupt Organizations Act when it provided consumer reports to tribal lenders, with the consent of those consumers.

- Successfully defended a nationally recognized market research firm in a case brought on behalf of a nationwide class alleging that the firm violated the Telephone Consumer Protection Act when it recruited physicians to participate in market research studies.

- Obtained dismissal of a putative class action alleging that a retailer improperly collected sales tax on masks during the COVID-19 pandemic in violation of Pennsylvania's unfair trade practices and consumer protection law. *James v. ALDI, Inc*., 2021 WL 289637 (W.D. Pa. July 9, 2021).

- Obtained dismissal of a putative class action accusing a transportation authority of violating the Fair Credit Reporting Act by not providing job applicants with proper notice that it was using consumer reports for background checks.

- Serve as common counsel in multi-party Superfund matters, including negotiating consent decrees, resolving natural resource damages claims and past clean-up cost claims.

- Pursued cost recovery claims on behalf of performing party groups against non-performing potentially responsible parties.

- Served as litigation counsel for transporter groups in environmental litigation involving the Calais Road site in New Jersey.

- Defended a transporter in a cost recovery claim involving the Pennsauken Landfill in Camden County, New Jersey.

- Obtained summary judgment for our client in a $20 million toxic tort action after prevailing in *Daubert* motions excluding the plaintiff's causation experts. *Johnson v. Arkema, Inc.*, 685 F.3d 452 (5th Cir. 2012).

- Represented a public agency in its response to a cybersecurity incident, analyzing the scope of the incident, advising on public communications, and complying with breach notification laws.

- Counsel a wide range of clients about satisfying their obligations under privacy laws, such as the California Consumer Privacy Act, including retail, real estate developers and technology companies.

- Successfully defended a distributor of dental products in *In re Dental Supplies Antitrust Litig*. (E.D.N.Y.), a nationwide multidistrict litigation brought on behalf of a nationwide class of 200,000 dentists, alleging a conspiracy among the leading dental supply distributors to fix prices, boycott manufacturers and others, and to allocate customers and employees through no poaching agreements.

- Obtained dismissal of a putative class of indirect purchasers of dental case in Illinois who alleged that they were overcharged as a result of a purported price fixing conspiracy. *Hatchett v. Henry Schein*, 2020 WL 73384 (S.D. Ill. Feb. 23, 2020).

- Successfully defended a distributor of dental products in *Source Once Dental, Inc. v. Patterson Companies, Inc.*, et al. (E.D.N.Y.) in a litigation brought by a competitor alleging a conspiracy among the leading dental supply distributors to fix prices, boycott manufacturers and others.

- Successfully defended an egg producer in *In re Processed Egg Products* class action antitrust litigation (E.D. Pa.), a nationwide multi district litigation alleging an industry-wide supply restriction scheme to fix the prices of eggs and egg products sold in the United States during an eight-year period.

- Successfully defended a bodybuilding league accused of illegally monopolizing the business of competitive bodybuilding in the United States.

- Obtained dismissal of a putative class action on summary judgment, affirmed on appeal, of a claim for $1.3 billion against a nonprofit insurer accused of violating Pennsylvania's Nonprofit Corporation Law.

- Obtained a petition to strike and vacate an improperly entered foreign judgment under the Uniform Foreign Money Judgment Recognition Act and Uniform Enforcement of Foreign Judgments Act. *Louis Dreyfus Commodities Suisse SA v. Financial Software Systems, Inc.*, 99 A.3d 79 Pa. Super. 2014).

## Related Services & Industries

**LITIGATION**

**ANTITRUST & TRADE REGULATION**

**CLASS ACTIONS**

**CONSUMER DEFENSE**

**CORPORATE COMPLIANCE**

**CRIMINAL DEFENSE & GOVERNMENT ENFORCEMENT**

**CYBERSECURITY & DATA PRIVACY**

**ENVIRONMENTAL**

**INTERNAL INVESTIGATIONS**

## Education

The George Washington University Law School, J.D., with honors

University of Miami, B.A., magna cum laude, International & Comparative Studies, Economics, and Political Science

## Courts & Admissions

New York

Pennsylvania

U.S. Court of Appeals for the Second Circuit

U.S. Court of Appeals for the Sixth Circuit

U.S. Court of Appeals for the Third Circuit

U.S. District Court for the Eastern District of Michigan

U.S. District Court for the Eastern District of New York

U.S. District Court for the Eastern District of Pennsylvania

U.S. District Court for the Northern District of New York

U.S. District Court for the Southern District of New York

U.S. District Court for the Western District of New York

U.S. District Court for the Western District of Pennsylvania

## Affiliations

Philadelphia Bar Association

Former Board of Directors Member, Philadelphia Volunteers for the Indigent Program

## Related Keywords

**FAIR CREDIT REPORTING ACT (FCRA)**

**FAIR DEBT COLLECTION PRACTICES ACT (FDCPA)**

**TELEPHONE CONSUMER PROTECTION ACT (TCPA)**





# Jennifer Olmedo-Rodriguez

Shareholder
Head of the Miami Office

Email: jennifer.olmedo-rodriguez@bipc.com

p: 305 347 5900       Miami, FL

Jennifer Olmedo-Rodriguez is the Managing Shareholder of the firm's Miami office. She focuses her practice on complex commercial litigation, class action defense litigation and civil appellate litigation while utilizing the firm's full-service national platform to counsel her clients. By coordinating and implementing a centralized and unified legal strategy, Jennifer meets her clients' legal needs across diverse practice areas. In this manner, her clients find Jennifer to be a valued counselor who uses her experience as a litigator to help businesses avoid the pitfalls that oftentimes result in costly and extenuated litigation.

Jennifer has litigated a variety of commercial litigation disputes involving banking, UCC issues and construction-defect matters, as well as a variety of contractual disputes, including partnership disputes, non-compete agreements, employment agreements, franchising disputes, and real property disputes in state and federal courts, including commercial and land-lord tenant disputes. She also has experience litigating claims arising under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") and defending class actions, including claims brought under the Telephone Consumer Protection Act ("TCPA"). Jennifer also handles all aspects of civil appeals and appellate proceedings in a wide variety of matters, including real property disputes, commercial contractual matters and business torts.

Her combined experience at the trial and appellate levels allows Jennifer to provide clients with the benefits of continuous representation throughout the entire trajectory of their case. Her appellate experience allows her to protect the record and properly prepare a case for appeal as it travels through the trial court. When handling appeals in cases she managed at the trial court level, Jennifer's clients benefit from her intimate, first-hand knowledge of the record. On cases where she solely serves as appellate counsel, Jennifer partners with trial counsel and relies upon her experience to either protect a ruling favorable to her client or pursue reversal of a lower court's legally flawed ruling. Jennifer's appellate experience is further enhanced by the fact that she was appointed to serve on the Appellate Court Rules Committee of the Florida Bar from 2015 to 2018. As a member of this prestigious Committee, Jennifer will use her experience in the industry to help carry out mandates concerning the proposal of new rules of appellate procedure and changes to existing appellate rules.

In 2016, following the change in U.S. Cuba relations, Jennifer traveled to Cuba as part of the historic

Florida Bar International Law Section's delegation to meet Cuban lawyers and journalists to learn about the Cuban legal system and how foreign companies transact business and invest in Cuba. Upon her return from Cuba, Jennifer used that valuable experience to advise clients and fellow lawyers.  She was interviewed on WLRN Channel 10's "This Week in South Florida" with Michael Putney and other media outlets and co-authored several articles about her experience and what she learned.

Jennifer's skills and effectiveness as an advocate are self-evident given her achievements on behalf of her clients. Jennifer was recognized as a "Top Up and Comer" in 2015 and 2016 and as a "Top Lawyer" in 2020 and 2017 by the *South Florida Legal Guide* based on peer nominations intended to recognize attorneys who are well-regarded in the legal profession, have years of experience and a distinguished record of achievement. In 2016, Jennifer received an AV® Preeminent™ Peer Review rating, the highest available mark for professional excellence from Martindale-Hubbell's Peer Review Ratings. In addition, the *Daily Business Review* named Jennifer to its "On the Rise" 2015 class, thereby recognizing her as one of 40 South Florida attorneys under the age of 40 "selected not only for what they've achieved thus far, but for what we believe they're likely to accomplish for the legal profession and for their respective communities in the future. In 2020, Jennifer was named a Hispanic Woman of Distinction by *Latina Style Magazine*, in partnership with Sylvester Comprehensive Cancer Center and *Latin Biz Today*. In 2021, Jennifer received the South Florida Legal Award from the South Florida Hispanic Chamber of Commerce, after being nominated by her alma mater, Florida International University. Jennifer has been named to the Florida *Super Lawyers* list since 2018 and has been selected for inclusion in *The Best Lawyers in America©* editions since 2020 in the Commercial Litigation category; and since 2023 in the Appellate Practice category. Additionally, she has been recognized in *Florida Trend's* Legal Elite each year since 2021. Most recently, Jennifer was named a Prestigious Women Award honoree by *South Florida Business & Wealth*.

She is also a member of a well-seasoned four-attorney team recently honored as the 2014 South Florida Litigation Department of the Year for Real Estate by the *Daily Business Review*. The DBR recognized Jennifer and her colleagues in the Miami office for, among other things, overcoming two motions for summary judgment in the case of *DEC v. The Aragon Group and Summersport Enter., LLC*, Case No. 11-29313, in the 17th Circuit Court, Broward County, Fla., where due to their efforts, the client saved its vision and contract for the purchase of the historic Dania Jai-Alai. Additionally, by devising and implementing aggressive, yet tactical, litigation strategies, Jennifer and her colleagues in the Miami office achieved resolution of multi-billion dollars' worth of commercial loans during the commercial foreclosure crisis that crippled South Florida real estate development resulting in the era dubbed the Great Recession.

Jennifer has also notably:

- Represented a company that offers resource services and products support for patients seeking services to address hair loss concerns in a matter involving the Lanham Act, the Ohio Trade Practices Act and common law and injunctive relief to enjoin unfair competition and false or misleading

advertising activity as well as libelous communications and tortious interference with business relationships.

- Represented an investment realty firm in a matter involving defamation, injurious falsehood, and tortious interference with contract.

- Represented an individual in a case alleging defamation per se predicated upon statements relating to grand theft, fraud and perjury.

- Obtained a dismissal with prejudice from the United States District Court for the Middle District of Florida on behalf of a national quick-service restaurant in a case that received national media attention where the plaintiffs filed a putative nationwide class action asserting claims for Sherman Act violations and unfair trade practices based upon alleged unfair pricing practices for quarter-pound hamburgers sold with and without cheese.

- Developed and implemented innovative legal strategies that resulted in the resolution of claims under the TCPA. *Fridman v. My Cosmetic Surgery, Inc.,* Case No. 16-15399 CA 20, 11th Judicial Circuit Court, Miami-Dade County, Florida

- Obtained dismissal of appeal in a heavily litigated case within approximately 60 days from the date the appeal was filed. *Bregman v. Pearce*, 2014 WL 1975178 (Fla. 3d DCA, Apr. 8, 2014).

- Defeated two motions for summary judgment in a case against the clients' former employee after filing a complaint alleging claims for anticipatory breach of an asset purchase agreement, misappropriation of trade secrets, tortious interference and unfair trade practices, among other claims. *Kresse & Asso., LLC et al. v. Thomas J. Kresse, et al.*, Case No. 13-28745, 11th Circuit Court, Miami-Dade County, Florida.

- Obtained precedent setting opinion from the Third District Court of Appeal reversing the trial court's entry of a final judgment enforcing a settlement agreement prior to payment of the statutory documentary stamp taxes and clarifying that promissory notes are unenforceable in Florida courts unless and until the statutory documentary stamp taxes are paid. *Solis v. Lacayo,* 86 So. 3d 1147 (Fla. 3d DCA 2012).

- Defeated a motion for temporary restraining order and preliminary injunction involving several restrictive covenants, including a non-compete agreement, and claims of misappropriation of trade secrets and unfair trade practices, thereby paving the way for settlement of the dispute without the need or expense of additional litigation. *Bankers Ins. Group, Inc. et al. v. Michael Whalen, AIA Holdings, Inc. et al.,* Case No. 11-5867, in the 6th Judicial Circuit Court, Pinella County, Florida.

- Developed and implemented legal strategies that resulted in the resolution of a case involving myriad issues under the Uniform Commercial Code and claims for damages of millions of dollars resulting from allegedly unauthorized transactions in a bank account. *Gilson v. TD Bank, N.A. et al.,* Case No. 10-cv-20535, United States District Court, Southern District of Florida.

- Developed and implemented legal strategies that resulted in the resolution of claims between banks and the United States government resulting from certain transactions involved in the Rothstein ponzi scheme. *TD Bank, N.A. v. United States of America; Regions Bank, et al.,* Case No. 10-cv-60044, United States District Court, Southern District of Florida.

- Won summary judgment on behalf of Seneca Insurance Company, Inc. in an action that arose from an allegedly unconstitutional search of the plaintiffs' residence by bail enforcement agents and subsequent attempts to apprehend a fugitive. *Tirreno v. Mott*, 453 F. Supp. 2d 562 (D. Conn. 2006)

In the Litigation-Real Estate category for U.S. News & World Report—Best Lawyers, a client stated that Jennifer is an "extremely professional and knowledgeable attorney to have as representation."

In addition to her work as a commercial litigator and appellate counsel, Jennifer also holds leadership positions and serves on several committees within the firm, including the Diversity Committee, the Credit Allocation Committee and the Associates Committee. Jennifer has also served as an Adjunct Professor of Constitutional Law in the Department of Politics and International Relations at Florida International University. Immediately prior to rejoining Buchanan in 2005, Jennifer worked with a boutique firm's Miami office representing and counseling the consumer finance division of a Fortune 100 company with respect to its Hispanic-language private label retail consumer and commercial credit card programs for compliance with various federal laws and regulations and provided legal review of Spanish language private label consumer and commercial credit card disclosures. After graduating with honors from law school, Jennifer secured one of two prestigious positions as a law clerk for the Hon. James Lawrence King of the United States District Court, Southern District of Florida. While in law school, she served on the Florida Law Review, was a judicial intern with Judge King and worked as a summer associate with Buchanan's Miami office.

Jennifer is fluent in Spanish.

## Related Services & Industries

**LITIGATION**
**APPELLATE**
**CONSUMER DEFENSE**
**FINANCE**
**INTERNATIONAL SERVICES**

## Education

University of Florida Levin College of Law, J.D., 2002, with honors, Florida Law Review

Florida International University, B.A., 1999, Dean's List; Pi Sigma Alpha: The National Political Science Honor Society; Certificate: Law, Ethics & Society, Political Science with Minors in International Relations and Criminal Justice

## Courts & Admissions

Florida

U.S. Court of Appeals for the Eleventh Circuit

U.S. District Court for the Middle District of Florida

U.S. District Court for the Northern District of Florida

U.S. District Court for the Southern District of Florida

## Affiliations

Appellate Court Rules Committee, The Florida Bar, Appointee

Third District Court of Appeal Historical Society, Board of Directors & Vice President

Rosemary Barkett Appellate American Inn of Court, Vice President

Florida Association for Women Lawyers -Miami Dade Chapter, Corporate Council Committee Member

Cuban American Bar Association, Member

Latin Builders Association, Member

Leadership Council on Legal Diversity, Fellow (2019)

Hispanic National Bar Association, Former Member

Women's Law Network, Former Member

Brazilian-American Chamber of Commerce of Florida, Former Member

TerraLex Worldwide Network of Independent Law Firms, Member

## Civic & Charitable

The Florida Bar Foundation, Fellow

Sylvester Comprehensive Cancer Center, University of Miami, Founding Member and Former
Executive Board Member and Communications Chair, Young Philanthropists for Sylvester

President's Council, Florida International University, Chair Elect for the Worlds Ahead Faculty Award
Committee, Executive Board and Member of the First Generation Scholarship Task Force

Sunset Elementary School, International Program, Volunteer

Saint Louis Catholic Church, Humanities Ministry & Camillus Casserole Ministry

Branches Thanksgiving Program, Volunteer

Habitat for Humanity, Volunteer

Our Lady of Lourdes Catholic High School, Volunteer

## Languages

Spanish

## Related Keywords

**DIVERSITY & INCLUSION COUNCIL**

**TELEPHONE CONSUMER PROTECTION ACT (TCPA)**





# Patrick D. Doran

Counsel

Email: patrick.doran@bipc.com

p: 215 665 3802      Philadelphia, PA

## How Patrick Helps Clients

Patrick Doran handles a variety of consumer defense, contract and intellectual property litigation. Patrick primarily practices in the state and federal courts of Pennsylvania and New Jersey but has experience in federal courts across the nation. He has significant experience defending lawsuits against banks, mortgage lenders and servicers and auto finance companies. These include claims under the Telephone Consumer Protection Act (TCPA), Fair Debt Collection Practices Act (FDCPA) and Fair Credit Reporting Act (FCRA), as well as state unfair trade practices laws and lender liability claims.

Patrick also handles various intellectual property matters involving patent and trademark infringement, as well as commercial contract and lease disputes.

In addition, Patrick has prepared firm opinions on various issues, obtained positive results for prisoners in Section 1983 actions and has argued matters in multiple orphans courts of the Commonwealth on behalf of clients seeking legal guardianships.

Prior to joining Buchanan, Patrick completed a number of legal internships and assistantships while in law school, including an internship with the Philadelphia District Attorney's office where he prosecuted cases in the Municipal Court. He was also a legal intern in the compliance division of the Philadelphia Commission on Human Relations.

## What Clients Can Expect

Patrick conducts a careful examination of his clients' legal needs and desires, provides a thoughtful, thorough and honest assessment of the issues, and works closely with them on implementing an effective strategy to achieve their objectives. Patrick adheres to the principle of respectful discourse with his adversaries even to the most contentious negotiations but advocates in the courtroom with the steadiness, courage and zeal that his clients expect and deserve.

## Outside the Office

Born and raised by two passionate educators in the working-class community of Conshohocken, Pa.,

Patrick and his wife are raising three young, bright, rambunctious kids that keep him on his toes. Before coming to the law, Patrick received an undergraduate degree in Biology and spent nearly a decade as a stage actor. Patrick is passionate about theatre and the artists who sacrifice so much to create the stories that feed the soul and challenge our perspective on the world.

> As a former stage actor, I understand the essential tasks at the heart of preparing for the various roles we play: zealous advocate, shrewd negotiator and embodiment of our client in the eyes of the Court.

## Proof Points

- Defeated a request for an injunction in New Hampshire federal court on plaintiff's patent infringement claim against client in the sporting goods industry, and assisted in negotiating positive resolution of the matter.

- Obtained summary judgment for bank client in New Jersey state court, defeating Plaintiff's consumer fraud act claims, and obtaining a victory on client's counterclaim.

- Obtained dismissal of various securities and RICO claims against developer client in New Jersey federal court.

- Managed and resolving more than 20 lender liability and FCRA matters on behalf of bank client.

- Managed a nationwide campaign to enforce a newly-issued patent relating to sporting goods through demand letters and patent infringement actions that to date has caused more than 120 competitors to cease all sales of infringing products, while recovering significant royalties for our client.

- Obtained dismissal of TCPA class action based on allegedly illegal fax communications

- Named to the Pennsylvania *Super Lawyers* list in 2019 and 2020.

## Related Services & Industries

**LITIGATION**

**CONSUMER DEFENSE**

**FINANCE**

## Education

Drexel University Thomas R. Kline School of Law, J.D., 2010, magna cum laude; Senior Articles Editor, Drexel Law Review; Member of the Drexel Environmental Law Society; Member of the Drexel International Law Society

LaSalle University, B.A., 2000, summa cum laude, Biology

## Courts & Admissions

New Jersey

Pennsylvania

U.S. Court of Appeals for the Third Circuit

U.S. District Court for the District of New Jersey

U.S. District Court for the Eastern District of Pennsylvania

## Civic & Charitable

Executive Committee Member of Board of Directors at InterAct Theatre Company

Philadelphia VIP

EDPA Prisoner Civil Rights Pro Bono Panel

Whitemarsh Township Planning Commissioner

## Languages

Spanish

## Related Keywords

**FAIR CREDIT REPORTING ACT (FCRA)**

**FAIR DEBT COLLECTION PRACTICES ACT (FDCPA)**

**TELEPHONE CONSUMER PROTECTION ACT (TCPA)**





# Anna E. Sanders

Associate

Email: anna.sanders@bipc.com

p: 215 665 3957        Philadelphia, PA

## How Anna Helps Clients

Anna focuses her practice on complex commercial litigation matters. Her diverse experience has involved non-compete agreements, theories of alter ego liability, estate litigation, and COVID-19 service disruptions.

Following law school, Anna served as a judicial law clerk to the Honorable Denis P. Cohen in the Philadelphia County Court of Common Pleas. Prior to joining Buchanan, she defended clients in a wide range of civil lawsuits including premises liability, healthcare providers involving catastrophic losses with significant financial exposures, and general liability matters.

During her tenure at Boston College Law School, Anna served as a legal intern at the Middlesex County District Attorney's Office in the Appeals and Training Bureau, where she wrote two appellate briefs which were both filed with the Massachusetts Court of Appeals. One of the matters was granted oral arguments, which she successfully argued. She served as a judicial extern to the Honorable David T. Donnelly in the Boston Municipal Court, Brighton Division.

## What Clients Can Expect

Anna is committed to developing comprehensive and effective defense strategies throughout all stages of litigation. Clients can expect Anna to be a responsive, amicable, and diligent associate who prioritizes clients' goals throughout her work.

## Outside the Office

Anna lives in Philadelphia with her husband, Wellington. When not in the office, Anna enjoys exploring Philadelphia with friends and family.

# Related Services & Industries

**LITIGATION**

**HEALTHCARE LITIGATION**

## Education

Boston College Law School, J.D., 2018

Northeastern University, B.A., 2011, magna cum laude, Communication Studies

## Courts & Admissions

Massachusetts

New Jersey

Pennsylvania

U.S. District Court for the Eastern District of Pennsylvania

## Affiliations

Member of the Executive Committee and Former Corresponding Secretary, Louis D. Brandeis Law
Society

Philadelphia Bar Association

# EXHIBIT B

| Work Date | Name of Timekeeper | Discounted Rate | Hours | Amount Claimed | Narrative |
|---|---|---|---|---|---|
| 4/26/2022 | Southall, S. | 560.00 | 1.00 | 560.00 | Review and analyze background documentation. |
| 4/29/2022 | Doran, P. | 475.00 | 1.80 | 855.00 | Review complaint and background materials from client. |
| 4/29/2022 | Olmedo-Rodriguez, J. | 560.00 | 2.70 | 1,512.00 | Review of Complaint and docket in anticipation of initial meeting with clients and video conference with J. Centeno, S. Southall, L. Rang, J. Bologna and A. Chen to discuss preliminary factual background and procedural posture of case |
| 4/29/2022 | Southall, S. | 560.00 | 2.10 | 1,176.00 | Review and analyze background documentation to prepare strategy. |
| 4/29/2022 | Southall, S. | 560.00 | 1.20 | 672.00 | Confer with L. Rang, A. Chen, J. Centeno, J. Olmedo-Rodriguez and J. Bologna regarding background and status. |
| 4/30/2022 | Olmedo-Rodriguez, J. | 560.00 | 0.50 | 280.00 | Review overview of task list and next steps to advance preparation of response to Complaint, confirmation of upcoming deadlines, review Judge Middlebrooks' orders/specific procedures as well as the same information for paired Magistrate Judge and provide response to inquiries and recommendations on same (0.5). |
| 4/30/2022 | Southall, S. | 560.00 | 1.90 | 1,064.00 | Develop strategy for defense of case, including review of background documentation and docket entries. |
| 5/2/2022 | Doran, P. | 475.00 | 3.00 | 1,425.00 | Review MTD by Clinton, continue to review claims against Neustar and grounds for motions to dismiss, addressing strategy |
| 5/2/2022 | Sanders A. E. | 255.00 | 0.70 | 178.50 | Review and analyze pleadings to date |
| 5/2/2022 | Sanders A. E. | 255.00 | 1.10 | 280.50 | Review and analyze complaint to identify allegations and claims against Neustar to prepare response thereto |
| 5/2/2022 | Southall, S. | 560.00 | 1.70 | 952.00 | Review and analyze transactional documentation regarding NSS |
| 5/2/2022 | Southall, S. | 560.00 | 0.50 | 280.00 | Review and analyze orders entered by Court to ascertain applicable deadlines |
| 5/2/2022 | Southall, S. | 560.00 | 2.50 | 1,400.00 | Review and analyze complaint to evaluate potential motion to dismiss |
| 5/3/2022 | Doran, P. | 475.00 | 1.30 | 617.50 | Addressing indemnification issues and lit hold |
| 5/3/2022 | Olmedo-Rodriguez, J. | 560.00 | 1.00 | 560.00 | Team call with A. Chen, L. Rang, S. Southall, J. Bologna, and J. Centeno |
| 5/3/2022 | Sanders A. E. | 255.00 | 2.10 | 535.50 | Review and analyze relevant case law re pleading requirements of conspiracy claims in the 11th circuit |
| 5/3/2022 | Southall, S. | 560.00 | 0.50 | 280.00 | Analyze potential indemnification issues |
| 5/3/2022 | Southall, S. | 560.00 | 0.50 | 280.00 | Email communications with L. Rang and A. Chen regarding additional background documents and strategy |
| 5/3/2022 | Southall, S. | 560.00 | 0.30 | 168.00 | Confer with L. Rang regarding document retention issues |
| 5/3/2022 | Southall, S. | 560.00 | 1.10 | 616.00 | Confer with A. Chen, L. Rang, J. Olmedo-Rodriguez and J. Bologna regarding strategy and status |
| 5/4/2022 | Doran, P. | 475.00 | 2.00 | 950.00 | Review and analyze Complaint, draft and revise litigation hold for client |
| 5/4/2022 | Olmedo-Rodriguez, J. | 560.00 | 0.20 | 112.00 | Review order setting status conference and advance matters relating to attendance in person vs. over zoom and filing of pro hac vice papers (0.2) |
| 5/4/2022 | Sanders A. E. | 255.00 | 3.40 | 867.00 | Review and analyze relevant case law re RICO conspiracy claims in the 11th circuit |
| 5/4/2022 | Southall, S. | 560.00 | 0.80 | 448.00 | Revise and edit litigation hold |
| 5/4/2022 | Southall, S. | 560.00 | 0.20 | 112.00 | Review and analyze order entered by court scheduling conference |
| 5/4/2022 | Southall, S. | 560.00 | 1.30 | 728.00 | Communications with L. Rang, L. Lu and A. Chen regarding strategy and status |
| 5/4/2022 | Southall, S. | 560.00 | 1.10 | 616.00 | Review and analyze Transition Services Agreement, conferring with L. Rang regarding same |
| 5/5/2022 | Doran, P. | 475.00 | 1.00 | 475.00 | Review legal issues for motion to dismiss, litigation hold, and overlap with criminal investigation |

| Date | Name | Rate | Hours | Amount | Description |
|---|---|---|---|---|---|
| 5/5/2022 | Olmedo-Rodriguez, J. | 560.00 | 0.90 | 504.00 | Strategy call with S. Southall, P. Doran, A. Chen and J. Bologna |
| 5/5/2022 | Sanders A. E. | 255.00 | 4.40 | 1,122.00 | Review and analyze relevant case law re theft of trade secrets to assist in preparing motion to dismiss |
| 5/5/2022 | Southall, S. | 560.00 | 0.40 | 224.00 | Communications with L. Lu, A. Chen and L. Rang regarding status and strategy |
| 5/5/2022 | Southall, S. | 560.00 | 1.20 | 672.00 | Develop strategy for motion to dismiss and defense of litigation |
| 5/6/2022 | Sanders A. E. | 255.00 | 4.90 | 1,249.50 | Review and analyze relevant case law re pleading standards for alleged violations of Stored Communications Act to prepare motion to dismiss |
| 5/6/2022 | Sanders A. E. | 255.00 | 2.30 | 586.50 | Review and analyze relevant case law re determining whether domain name system (DNS) is communication or of value pursuant to claims in complaint |
| 5/6/2022 | Southall, S. | 560.00 | 1.60 | 896.00 | Develop strategy for motion to dismiss |
| 5/6/2022 | Southall, S. | 560.00 | 1.00 | 560.00 | Confer with L. Lu and J. McNichols regarding background |
| 5/6/2022 | Southall, S. | 560.00 | 0.80 | 448.00 | Communications with L. Lu and L. Rang regarding status and strategy |
| 5/8/2022 | Sanders A. E. | 255.00 | 0.80 | 204.00 | Further review and analyze of Stored Communications Act allegations to prepare motion to dismiss |
| 5/9/2022 | Doran, P. | 475.00 | 0.80 | 380.00 | Address strategy for moving to dismiss RICO conspiracy claim against Neustar |
| 5/9/2022 | Sanders A. E. | 255.00 | 4.90 | 1,249.50 | Draft memorandum of law in support of motion to dismiss |
| 5/9/2022 | Sanders A. E. | 255.00 | 3.70 | 943.50 | Review and analyze relevant case law re adequately pleading conspiracy to violate RICO where the predicate acts are insufficiently alleged |
| 5/9/2022 | Southall, S. | 560.00 | 0.80 | 448.00 | Review and analyze relevant case law regarding specific personal jurisdiction in Florida |
| 5/9/2022 | Southall, S. | 560.00 | 2.60 | 1,456.00 | Review and analyze securities purchase agreement and unit purchase agreement to evaluate potential claims for breach of representations and warranties against NSS/Golden Gate |
| 5/9/2022 | Southall, S. | 560.00 | 0.50 | 280.00 | Draft and revise letter to NSS regarding litigation hold issues stemming from transfer of information and data |
| 5/9/2022 | Southall, S. | 560.00 | 0.90 | 504.00 | Review and analyze transition services agreement to provide required notice to NSS of litigation hold issues |
| 5/9/2022 | Southall, S. | 560.00 | 0.30 | 168.00 | Communications with A. Chen regarding litigation hold issues |
| 5/9/2022 | Southall, S. | 560.00 | 0.50 | 280.00 | Confer with L. Lu, A. Chen and L. Rang regarding strategy |
| 5/10/2022 | Doran, P. | 475.00 | 1.50 | 712.50 | Revise brief in support of motion to dismiss the Complaint |
| 5/10/2022 | Olmedo-Rodriguez, J. | 560.00 | 0.80 | 448.00 | Review personal jurisdiction allegations over Neustar and assess impact upon lack of personal jurisdiction analysis |
| 5/10/2022 | Sanders A. E. | 255.00 | 7.70 | 1,963.50 | Draft memorandum of law in support of motion to dismiss |
| 5/10/2022 | Sanders A. E. | 255.00 | 0.10 | 25.50 | Review and analyze Plaintiff's motion for extension of time |
| 5/10/2022 | Southall, S. | 560.00 | 0.80 | 448.00 | Communications with client regarding Florida contacts to evaluate potential motion to dismiss |
| 5/11/2022 | Doran, P. | 475.00 | 1.20 | 570.00 | Address motion to dismiss brief and specific responses to cyber torts, conferring with A. Sanders re personal jurisdictional issues |
| 5/11/2022 | Doran, P. | 475.00 | 1.00 | 475.00 | Review communications with client regarding cooperation with NSS, review contractual language and provide edits for proposed agreement |
| 5/11/2022 | Sanders A. E. | 255.00 | 3.40 | 867.00 | Draft jurisdictional arguments in motion to dismiss re lack of minimum contacts with Florida |
| 5/11/2022 | Sanders A. E. | 255.00 | 5.20 | 1,326.00 | Review and analyze relevant case law to determine inclusion of jurisdictional arguments in motion to dismiss |
| 5/11/2022 | Sanders A. E. | 255.00 | 0.30 | 76.50 | Draft motion to substitute appearance |

| Date | Name | Hours | Rate | Amount | Description |
|---|---|---|---|---|---|
| 5/11/2022 | Sanders A. E. | 0.40 | 255.00 | 102.00 | Review and analyze defendants Fusion GPS, G. Simpson, and P. Fritsch's motion to dismiss |
| 5/11/2022 | Sanders A. E. | 0.40 | 255.00 | 102.00 | Review and analyze correspondence from client to evaluate inclusion of jurisdictional arguments in motion to dismiss |
| 5/11/2022 | Southall, S. | 1.50 | 560.00 | 840.00 | Review and analyze motions to dismiss filed by additional defendants |
| 5/11/2022 | Southall, S. | 2.20 | 560.00 | 1,232.00 | Review, analyze, revise and edit draft cooperation agreement, communicating with L. Lu regarding same |
| 5/11/2022 | Southall, S. | 0.90 | 560.00 | 504.00 | Communications with client regarding quantum of Florida contexts for analysis of potential personal jurisdiction argument |
| 5/11/2022 | Southall, S. | 0.30 | 560.00 | 168.00 | Communications regarding joint defense group meeting |
| 5/12/2022 | Sanders A. E. | 0.90 | 255.00 | 229.50 | Review and analyze relevant case law re court taking judicial notice of SEC filings at motion to dismiss stage of litigation |
| 5/12/2022 | Sanders A. E. | 0.60 | 255.00 | 153.00 | Review and analyze Transunion's SEC filings related to Neustar acquisition to include in motion to dismiss |
| 5/12/2022 | Sanders A. E. | 3.60 | 255.00 | 918.00 | Revise motion to dismiss |
| 5/12/2022 | Sanders A. E. | 0.60 | 255.00 | 153.00 | Review and analyze relevant case law re granting motion to dismiss due to vicarious liability not being a cause of action |
| 5/12/2022 | Southall, S. | 4.20 | 560.00 | 2,352.00 | Revise and edit motion to dismiss complaint |
| 5/12/2022 | Southall, S. | 0.80 | 560.00 | 448.00 | Draft and revise email to A. Chen and L. Rang regarding viability of personal jurisdiction defense |
| 5/12/2022 | Southall, S. | 0.40 | 560.00 | 224.00 | Confer with L. King and L. Rang regarding document retention issues |
| 5/12/2022 | Southall, S. | 0.60 | 560.00 | 336.00 | Confer with J. Martin and L. Rang regarding document retention issues |
| 5/13/2022 | Doran, P. | 1.50 | 475.00 | 712.50 | Revise Motion to Dismiss |
| 5/13/2022 | Sanders A. E. | 2.90 | 255.00 | 739.50 | Revise motion to dismiss |
| 5/13/2022 | Sanders A. E. | 0.40 | 255.00 | 102.00 | Review and analyze opinions by Judge Middlebrooks re granting motions to dismiss pursuant to failing to meet the heightened pleading standard for fraud |
| 5/13/2022 | Sanders A. E. | 1.10 | 255.00 | 280.50 | Review and analyze Judge Middlebrooks' opinions related to granting motion to dismiss pursuant to improperly named defendant |
| 5/13/2022 | Sanders A. E. | 0.20 | 255.00 | 51.00 | Review and analyze Transunion's SEC filings post-Neustar acquisition to include in motion to dismiss |
| 5/13/2022 | Southall, S. | 5.90 | 560.00 | 3,304.00 | Revise and edit motion to dismiss |
| 5/15/2022 | Sanders A. E. | 0.90 | 255.00 | 229.50 | Review and analyze relevant case law re determining whether IP addresses rise to "electronic communications" pursuant to Stored Communications Act |
| 5/16/2022 | Sanders A. E. | 3.30 | 255.00 | 841.50 | Analyze case law cited in memorandum of law in support of motion to dismiss to identify any supplemental sources of authority |
| 5/16/2022 | Sanders A. E. | 0.90 | 255.00 | 229.50 | Review and analyze relevant case law and Judge Middlebrooks' opinions re dismissing complaints due to improper "shotgun" pleadings |
| 5/16/2022 | Southall, S. | 1.20 | 560.00 | 672.00 | Revise and edit motion to dismiss |
| 5/17/2022 | Olmedo-Rodriguez, J. | 0.40 | 560.00 | 224.00 | Emails with A. Sanders re status of comments from client (0.2); review email from L. Lu and confer with S. Southall re same (0.2) |
| 5/17/2022 | Southall, S. | 0.30 | 560.00 | 168.00 | Communications with L. Lu and L. Rang regarding motion to dismiss |
| 5/18/2022 | Sanders A. E. | 0.50 | 255.00 | 127.50 | Review and analyze R. Joffe's draft motion to dismiss |
| 5/18/2022 | Sanders A. E. | 1.40 | 255.00 | 357.00 | Review and analyze relevant case law re court sua sponte dismissing improperly named defendant pursuant to Federal Rule of Civil Procedure 21 |
| 5/18/2022 | Southall, S. | 0.20 | 560.00 | 112.00 | Revise and edit motion for pro hac vice admission |

| Date | Name | Rate | Hours | Amount | Description |
|---|---|---|---|---|---|
| 5/18/2022 | Southall, S. | 560.00 | 0.40 | 224.00 | Review and analyze draft motion to dismiss by Joffe |
| 5/18/2022 | Southall, S. | 560.00 | 0.30 | 168.00 | Revise and edit motion to substitute |
| 5/18/2022 | Southall, S. | 560.00 | 0.30 | 168.00 | Revise and edit cooperation agreement |
| 5/18/2022 | Southall, S. | 560.00 | 2.10 | 1,176.00 | Revise and edit motion to dismiss |
| 5/18/2022 | Southall, S. | 560.00 | 0.40 | 224.00 | Participate in joint defense call regarding June 2 status conference |
| 5/18/2022 | Southall, S. | 560.00 | 0.40 | 224.00 | Confer with counsel for R. Joffe regarding motion to dismiss |
| 5/18/2022 | Southall, S. | 560.00 | 0.20 | 112.00 | Confer with L. Lu regarding cooperation agreement |
| 5/18/2022 | Southall, S. | 560.00 | 0.40 | 224.00 | Communications with J. Martin regarding litigation hold and availability of email |
| 5/19/2022 | Doran, P. | 475.00 | 1.40 | 665.00 | Address revisions to motion to dismiss and cooperation agreement |
| 5/19/2022 | Olmedo-Rodriguez, J. | 560.00 | 4.10 | 2,296.00 | Review and revise draft MTD |
| 5/19/2022 | Sanders A. E. | 255.00 | 2.60 | 663.00 | Review and analyze cited authority to ensure compliance with local rules of civil procedure and style guidelines |
| 5/19/2022 | Sanders A. E. | 255.00 | 1.90 | 484.50 | Revise Stored Communications Act arguments in memorandum of law in support of motion to dismiss |
| 5/19/2022 | Southall, S. | 560.00 | 0.20 | 112.00 | Email communications with Joffe's counsel regarding draft brief |
| 5/19/2022 | Southall, S. | 560.00 | 0.90 | 504.00 | Draft and revise joint defense and common interest agreement |
| 5/19/2022 | Southall, S. | 560.00 | 0.20 | 112.00 | Email communications with L. Lu regarding cooperation agreement |
| 5/19/2022 | Southall, S. | 560.00 | 1.30 | 728.00 | Revise and edit motion to dismiss |
| 5/19/2022 | Southall, S. | 560.00 | 0.30 | 168.00 | Confer with J. McNichols regarding common interest agreement and cooperation agreement |
| 5/20/2022 | Sanders A. E. | 255.00 | 2.10 | 535.50 | Finalize memorandum of law in support of motion to dismiss |
| 5/20/2022 | Southall, S. | 560.00 | 0.80 | 448.00 | Revise and edit litigation hold |
| 5/20/2022 | Southall, S. | 560.00 | 0.20 | 112.00 | Revise and edit cooperation agreement |
| 5/20/2022 | Southall, S. | 560.00 | 1.10 | 616.00 | Revise and finalize motion to dismiss |
| 5/24/2022 | Southall, S. | 560.00 | 0.20 | 112.00 | Communications with A. Chen regarding litigation hold |
| 5/26/2022 | Southall, S. | 560.00 | 0.30 | 168.00 | Communications with Joint Defense Group and A. Chen regarding proposed stipulation to adjourn FRCP 16 conference |
| 5/31/2022 | Southall, S. | 560.00 | 0.20 | 112.00 | Review and analyze order denying joint motion requesting to adjourn conference |
| 6/1/2022 | Olmedo-Rodriguez, J. | 560.00 | 0.60 | 336.00 | Attend Court-ordered Status Conference |
| 6/1/2022 | Southall, S. | 560.00 | 0.40 | 224.00 | Revise, edit and finalize letter to NSS regarding litigation hold issues |
| 6/1/2022 | Southall, S. | 560.00 | 0.40 | 224.00 | Confer with client regarding litigation hold |
| 6/2/2022 | Southall, S. | 560.00 | 0.80 | 448.00 | Prepare for and attend status conference |
| 6/3/2022 | Sanders A. E. | 255.00 | 0.50 | 127.50 | Revise litigation hold letter directed to Neustar Security Services per A. Chen's request |
| 6/6/2022 | Southall, S. | 560.00 | 1.10 | 616.00 | Revise and edit litigation hold for former Neustar employees |
| 6/13/2022 | Southall, S. | 560.00 | 0.30 | 168.00 | Communications with Joint Defense Group regarding status conference |
| 6/15/2022 | Southall, S. | 560.00 | 0.50 | 280.00 | Participate in joint defense call regarding consolidated briefing and proposed amended complaint |
| 6/21/2022 | Olmedo-Rodriguez, J. | 560.00 | 0.20 | 112.00 | Review overview and outline/breakdown of tasks and MTD arguments circulated by co-defendants' counsel and weigh in on page limits and topics set out for our client |
| 6/22/2022 | Sanders A. E. | 255.00 | 2.10 | 535.50 | Review and analyze first amended complaint to prepare response in opposition to same |
| 6/22/2022 | Sanders A. E. | 255.00 | 0.10 | 25.50 | Review order re: recusal of magistrate judge |
| 6/22/2022 | Sanders A. E. | 255.00 | 0.10 | 25.50 | Review court order re: scheduling conference |
| 6/22/2022 | Southall, S. | 560.00 | 2.10 | 1,176.00 | Review and analyze amended complaint to develop strategy for response |

| Date | Name | Rate | Hours | Amount | Description |
|---|---|---|---|---|---|
| 6/23/2022 | Sanders A. E. | 255.00 | 1.80 | 459.00 | Review and analyze relevant case law re: dismissing an action with prejudice where an amended pleading fails to delineate allegations against multiple defendants |
| 6/23/2022 | Sanders A. E. | 255.00 | 0.10 | 25.50 | Review two orders re: motions to dismiss the original complaint |
| 6/23/2022 | Sanders A. E. | 255.00 | 0.10 | 25.50 | Correspond with counsel for Neustar Security Services re: strategy for motion to dismiss |
| 6/23/2022 | Sanders A. E. | 255.00 | 0.40 | 102.00 | Conference with counsel for Neustar Security Services and R. Joffe re: motion to dismiss strategy |
| 6/23/2022 | Southall, S. | 560.00 | 0.90 | 504.00 | Numerous communications with NSS and Joffe's counsel regarding motion to dismiss |
| 6/23/2022 | Southall, S. | 560.00 | 0.50 | 280.00 | Draft and revise email to A. Chen regarding status and strategy |
| 6/23/2022 | Southall, S. | 560.00 | 1.00 | 560.00 | Participate in joint defense call regarding motion to dismiss amended complaint |
| 6/24/2022 | Sanders A. E. | 255.00 | 2.30 | 586.50 | Draft section of omnibus motion to dismiss re: improperly pleading Neustar Inc. and Neustar Security Services are "Neustar" and therefore failing to separate allegations as to each distinct entity |
| 6/24/2022 | Southall, S. | 560.00 | 1.30 | 728.00 | Review and analyze summaries of motions to dismiss prepared by Clinton/Perkins Coie for use in motion to dismiss amended complaint |
| 6/27/2022 | Doran, P. | 475.00 | 0.50 | 237.50 | Address shotgun pleading as basis for dismissal |
| 6/27/2022 | Sanders A. E. | 255.00 | 0.80 | 204.00 | Review and analyze relevant case law re: identify cases where the court dismissed improper shotgun pleadings authored by counsel for plaintiff |
| 6/27/2022 | Sanders A. E. | 255.00 | 1.40 | 357.00 | Review and analyze relevant case law re: decisions authored by newly appointed magistrate judge that granted motions to dismiss shotgun pleadings to incorporate in omnibus motion to dismiss |
| 6/27/2022 | Sanders A. E. | 255.00 | 1.70 | 433.50 | Draft section of omnibus motion to dismiss re: improperly pleading Neustar Inc. and Neustar Security Services are "Neustar" and therefore failing to separate allegations as to each distinct entity |
| 6/27/2022 | Southall, S. | 560.00 | 0.40 | 224.00 | Communications with JDG regarding briefing schedule and anticipated motion to dismiss |
| 6/28/2022 | Olmedo-Rodriguez, J. | 560.00 | 0.30 | 168.00 | Review court filings/order on status conference and status of docket |
| 6/29/2022 | Sanders A. E. | 255.00 | 0.20 | 51.00 | Revise section of omnibus motion to dismiss re: improperly pleading Neustar Inc. and Neustar Security Services are "Neustar" and therefore failing to separate allegations as to each distinct entity |
| 6/29/2022 | Sanders A. E. | 255.00 | 0.80 | 204.00 | Review and analyze counsel for NSS's draft section of the omnibus motion to dismiss |
| 6/30/2022 | Olmedo-Rodriguez, J. | 560.00 | 0.70 | 392.00 | Review and revise draft of Neustar argument for joint MTD and overview comments provided by A. Sanders |
| 6/30/2022 | Southall, S. | 560.00 | 0.40 | 224.00 | Communications with JDG regarding strategy |
| 6/30/2022 | Southall, S. | 560.00 | 2.30 | 1,288.00 | Revise and edit motion to dismiss amended complaint |
| 7/1/2022 | Olmedo-Rodriguez, J. | 560.00 | 0.80 | 448.00 | Review timing on motion for extension of time and asses next steps (0.3); Participate in defense counsel call to discuss strategy on MTD and motion for reconsideration of motion for extension of time (0.3); further strategy to assess next steps and status of filing if reconsideration is denied (0.2) |
| 7/1/2022 | Sanders A. E. | 255.00 | 0.10 | 25.50 | Review and analyze court mandated plaintiff's status report |
| 7/1/2022 | Sanders A. E. | 255.00 | 3.70 | 943.50 | Draft motion to dismiss amended complaint pursuant to court order denying proposed stipulation for extension |
| 7/1/2022 | Sanders A. E. | 255.00 | 0.70 | 178.50 | Review and analyze relevant case law to support dismissing Neustar pursuant to Fed. R. Civ. P. 23 as an improper party, where NSS as the proper party has been joined |
| 7/1/2022 | Sanders A. E. | 255.00 | 0.10 | 25.50 | Review and analyze court order denying the parties proposed joint stipulation re: response time to amended complaint |

| Date | Name | | Hours | Amount | Description |
|---|---|---|---|---|---|
| 7/1/2022 | Southall, S. | 560.00 | 3.90 | 2,184.00 | Draft and revise motion to dismiss Amended Complaint |
| 7/1/2022 | Southall, S. | 560.00 | 0.40 | 224.00 | Email communications with A. Chen regarding court orders and proposed strategy |
| 7/1/2022 | Southall, S. | 560.00 | 0.40 | 224.00 | Communications with JDG regarding second request for extension of time to file motion to dismiss |
| 7/1/2022 | Southall, S. | 560.00 | 0.20 | 112.00 | Review and analyze court order denying request for extension |
| 7/1/2022 | Southall, S. | 560.00 | 0.60 | 336.00 | Confer with JDG regarding court order denying request for extension |
| 7/5/2022 | Olmedo-Rodriguez, J. | 560.00 | 0.70 | 392.00 | Review and revise Neustar's portion of the Joint MTD (0.4); review and assess recusal order of additional magistrate judge (0.1); review emails from various co-defendants' counsel re timing/strategy for joint motion to dismiss (0.2) |
| 7/5/2022 | Sanders A. E. | 255.00 | 2.30 | 586.50 | Revise draft section of omnibus motion to dismiss for "Neustar Defendants" |
| 7/5/2022 | Southall, S. | 560.00 | 0.30 | 168.00 | Communications with JDG regarding motion to file oversized brief |
| 7/5/2022 | Southall, S. | 560.00 | 0.50 | 280.00 | Communications with J. McNichols regarding NSS/Neustar brief |
| 7/5/2022 | Southall, S. | 560.00 | 0.60 | 336.00 | Revise and edit portion of brief regarding shotgun pleadings |
| 7/5/2022 | Southall, S. | 560.00 | 0.80 | 448.00 | Revise and edit portion of motion to dismiss amended complaint relating to CFAA, DTSA and SCA |
| 7/5/2022 | Southall, S. | 560.00 | 0.40 | 224.00 | Confer with JDG regarding briefing |
| 7/6/2022 | Sanders A. E. | 255.00 | 1.60 | 408.00 | Draft motion to dismiss on issues relevant to Neustar, including being an improperly named defendant and shotgun pleadings |
| 7/6/2022 | Southall, S. | 560.00 | 0.80 | 448.00 | Revise and edit insert for motion to dismiss prepared by Neustar group |
| 7/7/2022 | Sanders A. E. | 255.00 | 0.20 | 51.00 | Review revised "Neustar defendants" section of omnibus motion to dismiss as received from Williams & Connolly LLP to ensure suggested comments were incorporated |
| 7/7/2022 | Sanders A. E. | 255.00 | 1.20 | 306.00 | Revise motion to dismiss on behalf of Neustar, including being an improperly named defendant and shotgun pleadings |
| 7/7/2022 | Southall, S. | 560.00 | 1.90 | 1,064.00 | Revise and edit independent motion to dismiss amended complaint |
| 7/7/2022 | Southall, S. | 560.00 | 1.40 | 784.00 | Review and analyze draft sections of joint motion to dismiss |
| 7/8/2022 | Olmedo-Rodriguez, J. | 560.00 | 0.20 | 112.00 | Strategize re filing motion for leave to file short separate MTD given arguments adverse to NSS and NSS's counsel's push back to joining brief with argument that NSS is the proper defendant |
| 7/8/2022 | Sanders A. E. | 255.00 | 0.10 | 25.50 | Review and analyze co-defendants' omnibus draft motion for leave to exceed page limit in defendants' omnibus motion to dismiss first amended complaint |
| 7/8/2022 | Southall, S. | 560.00 | 1.10 | 616.00 | Review, analyze and revise sections of omnibus motion to dismiss amended complaint |
| 7/8/2022 | Southall, S. | 560.00 | 1.50 | 840.00 | Numerous communications regarding motion to file oversized brief and ability to include Neustar request in it, including revising motion |
| 7/9/2022 | Southall, S. | 560.00 | 1.90 | 1,064.00 | Revise, analyze and revise omnibus motion to dismiss amended complaint |
| 7/11/2022 | Doran, P. | 475.00 | 0.70 | 332.50 | Review Neustar and NSS sections for MTD and discussions among common interest counsel |
| 7/11/2022 | Sanders A. E. | 255.00 | 1.10 | 280.50 | Per client request review and analyze relevant case law re: potential claims against NSS for failure to disclose all liabilities |
| 7/11/2022 | Southall, S. | 560.00 | 0.60 | 336.00 | Revise and edit Neustar specific section of Omnibus brief |
| 7/11/2022 | Southall, S. | 560.00 | 0.40 | 224.00 | Confer with J. McNichols regarding motion to dismiss |
| 7/11/2022 | Southall, S. | 560.00 | 1.40 | 784.00 | Review, analyze and revise draft omnibus brief |
| 7/12/2022 | Sanders A. E. | 255.00 | 2.90 | 739.50 | Review and analyze relevant case law re: asserting claim against NSS |
| 7/12/2022 | Southall, S. | 560.00 | 2.20 | 1,232.00 | Revise and edit omnibus brief to dismiss |
| 7/12/2022 | Southall, S. | 560.00 | 0.50 | 280.00 | Confer with Joint Defense Group regarding whether DNS data is publicly available |

| Date | Name | Rate | Hours | Amount | Description |
|---|---|---|---|---|---|
| 7/13/2022 | Olmedo-Rodriguez, J. | 560.00 | 0.20 | 112.00 | Review communication from plaintiff's counsel proposing continuance of trial and other asks to be requested from court and assess impact of same on client's interests |
| 7/13/2022 | Southall, S. | 560.00 | 1.80 | 1,008.00 | Revise and edit briefs in support of motion to dismiss, both Omnibus and individualized supplemental brief |
| 7/13/2022 | Southall, S. | 560.00 | 0.20 | 112.00 | Email communications with plaintiff's counsel regarding case schedule |
| 7/13/2022 | Southall, S. | 560.00 | 0.30 | 168.00 | Confer with D. Kendall regarding oral argument on motion to dismiss |
| 7/13/2022 | Southall, S. | 560.00 | 0.50 | 280.00 | Confer with J. McNichols regarding litigation hold issues |
| 7/13/2022 | Southall, S. | 560.00 | 0.40 | 224.00 | Research various issues related to litigation hold, drafting email to client regarding same |
| 7/14/2022 | Olmedo-Rodriguez, J. | 560.00 | 0.80 | 448.00 | Strategize re comments on draft supp. MTD, timeline for filings and next steps |
| 7/14/2022 | Olmedo-Rodriguez, J. | 560.00 | 0.30 | 168.00 | Review/revise draft Suppl. MTD and provide comments on same |
| 7/14/2022 | Sanders A. E. | 255.00 | 0.20 | 51.00 | Review and analyze government defendants' motion to substitute party and motion to dismiss |
| 7/14/2022 | Sanders A. E. | 255.00 | 0.20 | 51.00 | Finalize individual motion to dismiss on issues relevant to Neustar |
| 7/14/2022 | Southall, S. | 560.00 | 1.20 | 672.00 | Revise, edit and finalize motion to dismiss amended complaint |
| 7/15/2022 | Olmedo-Rodriguez, J. | 560.00 | 0.80 | 448.00 | Attend and participate in R. 16 scheduling conference with all counsel (0.4); post R. 16 Scheduling Conference strategy session to assess impact of same on Neustar (0.2); confer with S. Southall re background info on new Magistrate Judge P. Hunt (0.2) |
| 7/15/2022 | Sanders A. E. | 255.00 | 1.90 | 484.50 | Review and analyze relevant case law re: asserting claim against NSS for contractual indemnity in Delaware |
| 7/15/2022 | Sanders A. E. | 255.00 | 3.20 | 816.00 | Review and analyze relevant case law re: choice of law for asserting claim against NSS |
| 7/15/2022 | Southall, S. | 560.00 | 0.30 | 168.00 | Draft and revise email to A. Chen regarding status and strategy |
| 7/15/2022 | Southall, S. | 560.00 | 0.40 | 224.00 | Participate in meet and confer with plaintiff's counsel regarding schedule |
| 7/16/2022 | Sanders A. E. | 255.00 | 4.80 | 1,224.00 | Review and analyze relevant case law re: asserting common law claim against NSS under Delaware law |
| 7/18/2022 | Sanders A. E. | 255.00 | 0.80 | 204.00 | Analysis of evidence required to prove indemnity claim against NSS |
| 7/19/2022 | Southall, S. | 560.00 | 0.40 | 224.00 | Analyze indemnification issues |
| 7/20/2022 | Sanders A. E. | 255.00 | 1.10 | 280.50 | Review and analyze relevant case law to determine if a conspiracy claim may form the basis for common law indemnification in Delaware |
| 7/20/2022 | Sanders A. E. | 255.00 | 1.20 | 306.00 | Review and analyze relevant case law to determine if a claim asserting violation of Computer Fraud and Abuse Act may form the basis for common law indemnification in Delaware |
| 7/20/2022 | Sanders A. E. | 255.00 | 1.40 | 357.00 | Review and analyze relevant case law to determine if a claim asserting violation of Stored Communications Act may form the basis for common law indemnification in Delaware |
| 7/21/2022 | Doran, P. | 475.00 | 0.50 | 237.50 | Review case orders and motions regarding motion to dismiss response |
| 7/21/2022 | Olmedo-Rodriguez, J. | 560.00 | 0.20 | 112.00 | Review joint defense communications from HRC's counsel re opposition to motion for continuance and reply in support of MTD and confer with S. Southall re Neustar's position on same |
| 7/21/2022 | Sanders A. E. | 255.00 | 0.10 | 25.50 | Review and analyze Plaintiff's motion to extend trial date |
| 7/21/2022 | Sanders A. E. | 255.00 | 0.10 | 25.50 | Review and analyze Plaintiff's motion for extension of time to file response to motions to dismiss |
| 7/21/2022 | Southall, S. | 560.00 | 0.30 | 168.00 | Confer with A. Chen regarding status and strategy |
| 7/21/2022 | Southall, S. | 560.00 | 0.20 | 112.00 | Review and analyze motion for extension of time to answer motion to dismiss and motion to adjourn trial filed by plaintiff as well as court order regarding motion for extension of time to answer motion to dismiss |

| Date | Name | Rate | Hours | Amount | Description |
|---|---|---|---|---|---|
| 7/22/2022 | Sanders A. E. | 255.00 | 0.10 | 25.50 | Review court order denying plaintiff's motion to continue trial |
| 7/26/2022 | Olmedo-Rodriguez, J. | 560.00 | 0.40 | 224.00 | Participate in Joint Defense Call with all defense counsel to strategize and plan for joint reply in support of the MTD (0.3); follow up call with A. Sanders to discuss Neustar's independent reply and coordinating review/analysis of NeuStar's contributions to joint reply given tight time line set out by Joint Defense Team (0.1) |
| 7/26/2022 | Sanders A. E. | 255.00 | 0.30 | 76.50 | Strategic joint defense conference re: coordinate reply to Plaintiff's opposition to pending motion to dismiss |
| 8/4/2022 | Sanders A. E. | 255.00 | 0.90 | 229.50 | Review and analyze Plaintiff's response in opposition to Defendants' joint motion to dismiss. |
| 8/4/2022 | Sanders A. E. | 255.00 | 0.20 | 51.00 | Review and analyze Plaintiff's response in opposition to motion to dismiss of Neustar, Inc. |
| 8/5/2022 | Sanders A. E. | 255.00 | 0.40 | 102.00 | Strategic defense conference with counsel for non-government defendants to prepare reply in support of joint motion to dismiss. |
| 8/5/2022 | Sanders A. E. | 255.00 | 1.60 | 408.00 | Review and analyze opinions authored by Judge Middlebrooks related to DNS and/or IP addresses to assist in replying to Plaintiff's opposition to joint motion to dismiss. |
| 8/5/2022 | Southall, S. | 560.00 | 0.80 | 448.00 | Multiple communications with counsel for NSS and Joffe regarding reply brief. |
| 8/5/2022 | Southall, S. | 560.00 | 0.80 | 448.00 | Draft and revise outline of reply regarding CFAA and SCA issues for omnibus brief. |
| 8/5/2022 | Southall, S. | 560.00 | 0.20 | 112.00 | Review, analyze and edit draft motion to file oversized reply brief. |
| 8/5/2022 | Southall, S. | 560.00 | 0.40 | 224.00 | Participate in JDG meeting regarding reply papers. |
| 8/5/2022 | Southall, S. | 560.00 | 2.80 | 1,568.00 | Review and analyze opposition papers to defendants' motions to dismiss. |
| 8/6/2022 | Sanders A. E. | 255.00 | 4.90 | 1,249.50 | Draft Stored Communications Act and Computer Fraud and Abuse Act sections of joint reply to Plaintiff's opposition to joint motion to dismiss. |
| 8/6/2022 | Sanders A. E. | 255.00 | 1.30 | 331.50 | Review and analyze case law cited in Plaintiff's opposition to joint motion to dismiss to prepare reply to same. |
| 8/6/2022 | Sanders A. E. | 255.00 | 1.60 | 408.00 | Further review and analyze of Plaintiff's opposition to joint motion to dismiss in support of claim for violation of computer fraud and abuse act. |
| 8/8/2022 | Sanders A. E. | 255.00 | 3.90 | 994.50 | Draft reply in support of Neustar, Inc.'s individual motion to dismiss. |
| 8/8/2022 | Southall, S. | 560.00 | 1.30 | 728.00 | Revise and edit individual reply brief. |
| 8/8/2022 | Southall, S. | 560.00 | 1.70 | 952.00 | Revise and edit section on CFAA and SCA for omnibus brief. |
| 8/8/2022 | Southall, S. | 560.00 | 0.50 | 280.00 | Revise and edit section on DNS data for omnibus brief. |
| 8/9/2022 | Sanders A. E. | 255.00 | 0.90 | 229.50 | Revise joint reply in support of omnibus motion to dismiss as received from counsel for H. Clinton. |
| 8/9/2022 | Sanders A. E. | 255.00 | 0.50 | 127.50 | Revise draft individual reply in support of motion to dismiss to incorporate A. Chen's comments. |
| 8/9/2022 | Southall, S. | 560.00 | 0.60 | 336.00 | Revise and edit insert for omnibus reply brief. |
| 8/9/2022 | Southall, S. | 560.00 | 1.70 | 952.00 | Revise and edit individual reply in further support of motion to dismiss. |
| 8/10/2022 | Olmedo-Rodriguez, J. | 560.00 | 1.80 | 1,008.00 | Review Trump's Opposition to the Joint MTD |
| 8/10/2022 | Olmedo-Rodriguez, J. | 560.00 | 0.70 | 392.00 | Review opposition to Neustar's individual MTD |
| 8/10/2022 | Southall, S. | 560.00 | 0.50 | 280.00 | Revise and edit individual reply. |
| 8/10/2022 | Southall, S. | 560.00 | 2.10 | 1,176.00 | Revise and edit omnibus reply. |
| 8/11/2022 | Olmedo-Rodriguez, J. | 560.00 | 0.70 | 392.00 | Review final draft joint reply ISO joint MTD circulated by HRC's counsel and advance same for filing. |
| 8/11/2022 | Olmedo-Rodriguez, J. | 560.00 | 0.30 | 168.00 | Review final draft individual reply ISO individual MTD and advance same for filing. |

| Date | Name | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 8/11/2022 | Sanders A. E. | Review and analyze updated joint reply in support of omnibus motion to dismiss as received from counsel for H. Clinton prior to filing. | 0.40 | 255.00 | 102.00 |
| 8/11/2022 | Southall, S. | Revise, edit and finalize individual reply. | 0.30 | 560.00 | 168.00 |
| 8/11/2022 | Southall, S. | Revise and edit omnibus reply. | 1.10 | 560.00 | 616.00 |
| 8/15/2022 | Olmedo-Rodriguez, J. | Review communications with OC and assess need to file corrected individual reply on MTD. | 0.20 | 560.00 | 112.00 |
| 8/16/2022 | Olmedo-Rodriguez, J. | Revise Corrected Reply on MTD and confer with S. Southall re same and advance same for filing | 0.40 | 560.00 | 224.00 |
| 8/23/2022 | Sanders A. E. | Review pleadings to identify potential timeline for ruling on defendants' joint motion to dismiss. | 0.50 | 255.00 | 127.50 |
| 8/23/2022 | Southall, S. | Email communications with A. Chen regarding status of various motions to dismiss. | 0.20 | 560.00 | 112.00 |
| 9/2/2022 | Olmedo-Rodriguez, J. | Preliminary review indemnification demand from R. Joffe. | 0.30 | 560.00 | 168.00 |
| 9/2/2022 | Southall, S. | Review and analyze demand for indemnification from R. Joffe. | 0.30 | 560.00 | 168.00 |
| 9/6/2022 | Southall, S. | Draft and revise email to A. Chen regarding R. Joffe demand for advancement. | 0.30 | 560.00 | 168.00 |
| 9/6/2022 | Southall, S. | Confer with J. McNichols regarding demand for advancement from R. Joffe. | 0.50 | 560.00 | 280.00 |
| 9/8/2022 | Olmedo-Rodriguez, J. | Review Order Granting Motion to Dismiss. | 0.70 | 560.00 | 392.00 |
| 9/8/2022 | Southall, S. | Analyze issues related to Joffe's demand for indemnification and advancement, including communications with client, review of pertinent documents and communications with NSS counsel. | 3.20 | 560.00 | 1,792.00 |
| 9/9/2022 | Sanders A. E. | Strategic analysis to determine plaintiff's right to appeal order dismissing claims with prejudice where claims against some defendants were dismissed without prejudice. | 0.30 | 255.00 | 76.50 |
| 9/9/2022 | Sanders A. E. | Review correspondence received from co-defendants' counsel re: potential motion for sanctions. | 0.10 | 255.00 | 25.50 |
| 9/9/2022 | Sanders A. E. | Review and analyze court order granting joint motion to dismiss with prejudice. | 1.10 | 255.00 | 280.50 |
| 9/9/2022 | Southall, S. | Address issues related to Joffe demand for indemnification and advancement, including review of draft letter, communications with NSS counsel and communications with client. | 1.90 | 560.00 | 1,064.00 |
| 9/9/2022 | Southall, S. | Review and analyze opinion granting motions to dismiss. | 1.10 | 560.00 | 616.00 |
| 9/12/2022 | Sanders A. E. | Review and analyze correspondence and documents received from counsel for H. Clinton prior to joint defense call re: motion for sanctions. | 0.30 | 255.00 | 76.50 |
| 9/12/2022 | Southall, S. | Communications regarding potential sanctions motion. | 0.60 | 560.00 | 336.00 |
| 9/12/2022 | Southall, S. | Confer with client regarding Joffe demand for advancement and investment. | 0.50 | 560.00 | 280.00 |
| 9/12/2022 | Southall, S. | Confer with J. McNichols regarding Joffe demand for indemnification. | 0.50 | 560.00 | 280.00 |
| 9/13/2022 | Olmedo-Rodriguez, J. | Review correspondence from D. Kendall re next steps and potential basis for sanctions motion. | 0.30 | 560.00 | 168.00 |
| 9/13/2022 | Olmedo-Rodriguez, J. | Communicate with S. Southall to develop recommendation to client on motion for sanctions | 0.30 | 560.00 | 168.00 |
| 9/13/2022 | Southall, S. | Joint defense group meeting regarding potential sanctions motion. | 0.80 | 560.00 | 448.00 |
| 9/14/2022 | Southall, S. | Confer with J. McNichols regarding Joffe indemnification issues. | 0.90 | 560.00 | 504.00 |
| 9/15/2022 | Southall, S. | Draft and revise letter responding to demand for advancement from R. Joffe. | 0.50 | 560.00 | 280.00 |
| 9/16/2022 | Southall, S. | Revise, edit and finalize letter regarding advancement demand. | 0.40 | 560.00 | 224.00 |
| 9/20/2022 | Southall, S. | Communications with A. Chen regarding request for reimbursement from NSS. | 0.30 | 560.00 | 168.00 |
| 9/20/2022 | Southall, S. | Review, analyze and revise draft sanctions motion. | 1.20 | 560.00 | 672.00 |
| 9/21/2022 | Sanders A. E. | Review and analyze motion for sanctions filed by C. Dolan. | 0.20 | 255.00 | 51.00 |
| 9/21/2022 | Southall, S. | Confer with A. Chen regarding reimbursement of fees from NSS. | 0.30 | 560.00 | 168.00 |

| 9/21/2022 | Southall, S. | 560.00 | 1.10 | 616.00 | Review, analyze and revise draft sanctions motion. |
| 9/27/2022 | Southall, S. | 560.00 | 0.40 | 224.00 | Review and analyze recent J. Middlebrooks decision regarding appropriateness of rates. |
| 9/27/2022 | Southall, S. | 560.00 | 1.20 | 672.00 | Review, analyze and revise draft sanctions brief. |
| 9/28/2022 | Olmedo-Rodriguez, J. | 560.00 | 1.30 | 728.00 | Review draft Motion for Sanctions, Declaration |
| 9/28/2022 | Southall, S. | 560.00 | 0.40 | 224.00 | Draft and revise email to client regarding sanctions motion. |
| 9/28/2022 | Southall, S. | 560.00 | 0.50 | 280.00 | Participate in joint defense group meeting regarding sanctions. |

# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Donald J. Trump,

                    Plaintiff,

          v.                                               Civil Action No. 2:22-14102-DMM

Hillary R. Clinton *et al.*,

                    Defendants.

**DECLARATION OF JOHN M. MCNICHOLS IN SUPPORT OF
DEFENDANTS' MOTION FOR SANCTIONS AND FEES**

I, John M. McNichols, declare under penalty of perjury pursuant to 28 U.S.C. § 1746,

that the following is true and correct:

1.       I am a partner at Williams & Connolly LLP ("W&C), counsel of record for

Security Services LLC, d/b/a Neustar Security Services ("NSS"), a Defendant in the above

captioned matter.

2.       W&C entered into a retention agreement with NSS in connection with the present

litigation to serve as lead counsel.  NSS agreed to pay all of W&C's costs, fees, and expenses

incurred in connection with the present suit, and agreed to pay the firm's customary rates.

3.       Attached as Exhibit A are the law firm website biographies of the attorneys at W&C for

whom NSS seeks attorneys' fees.  The biographies reflect the professional qualifications of those

attorneys.

4.       Attached as Exhibit B is a true and correct copy of the hours worked by counsel for

NSS.  NSS is not seeking reimbursement for the attorneys' customary hourly rates.  Instead, NSS

seeks fees at discounted hourly rate for the attorneys as described in Exhibit B and below.  These

discounted hourly rates are consistent with the rates this Court concluded were reasonable in

*Celsius Holdings, Inc v. A SHOC Beverage, LLC*, No. 21-cv-80740, 2022 WL 3568042 (July 19,

2022). Exhibit B also provides an accurate statement of the work provided by Greenberg Traurig during the periods for which discounted fees are sought.

5.      Attached as Exhibit C is the law firm website biography of the attorney at Greenberg Traurig for whom NSS seeks attorneys' fees. The biography reflects the professional qualifications of that attorney.

6.      Greenberg Traurig also entered into a retention agreement with NSS in connection with the present litigation to serve as local counsel. NSS agreed to pay all of Greenberg Traurig costs, fees, and expenses incurred in connection with the present suit, and agreed to pay the firm's customary rates.

7.      Consistent with the discussion in the Memorandum in Support of Sanctions and the information provided in Exhibit B, I summarize below in Charts A, B, and C the fees associated with three different phases of the case: the fees incurred from the filing of the initial complaint to the filing of NSS's initial motion to dismiss; the fees incurred between the filing of NSS's motion to dismiss to the Court's order dismissing the suit; and the fees incurred to date in connection with the motion for sanctions.

8.      As reflected in Chart A, NSS incurred no fees during the first phase of the case. NSS was not named a defendant until filing of the amended complaint and therefore incurred no fees.

**Chart A: Fees incurred from Complaint to initial MTD**

| Timekeeper | Discounted Fee | Hours | Fees |
|---|---|---|---|
| John M. McNichols | $700 | 0 | $0 |
| Kathryn E. Garza | $300 | 0 | $0 |
| Allison S. Eisen | $300 | 0 | $0 |
| James E. Gillenwater | $700 | 0 | $0 |

9.      As reflected in Chart B, the discounted fees incurred by NSS from the filing of

NSS's initial motion to dismiss to this Court's dismissal of the suit total $50,950.

**Chart B:  Fees incurred initial MTD to dismissal**

| Timekeeper | Discounted Fee | Hours | Fees |
|---|---|---|---|
| John M. McNichols | $700 | 37.2 | $26,040 |
| Kathryn E. Garza | $300 | 43.2 | $12,960 |
| Allison S. Eisen | $300 | 20 | $6,000 |
| James E. Gillenwater | $700 | 8.5 | $5,950 |

10.      As reflected in Chart C, the discounted fees incurred by NSS in connection with

the motion for sanctions, to date, total $2,270.

**Chart C:  Fees incurred to date on sanctions motion**

| Timekeeper | Discounted Fee | Hours | Fees |
|---|---|---|---|
| John M. McNichols | $700 | 2.6 | $1,820 |
| Kathryn E. Garza | $300 | 0 | $0 |
| Allison S. Eisen | $300 | 1.5 | $450 |
| James E. Gillenwater | $700 | | |

11.      I believe that the discounted rates claimed are reasonable given the professional

qualifications of the billers as evidenced in Exhibit A and Exhibit C for the Southern District of

Florida market and given the rates approved by this Court in *Celsius*.

12.      In connection with this case, counsel incurred necessary costs for electronic legal

research.  I understand that courts in this Circuit have held that legal research costs are not

ordinarily taxable as costs under 28 U.S.C. § 1920, but are properly considered a component of

attorneys' fees.  *Springer v. Convergy's Corp.*, No. 3:03-CV-302-J-99MCR, 2006 WL 8439203,

at *2 (M.D. Fla. July 7, 2006).  As such, in addition to the discounted fees set out above, NSS

requests an award of $327.98 incurred for electronic legal research.

13.     Consistent with local Rule 7.3, counsel sent the draft sanctions motion and draft supporting declarations to Plaintiff's counsel on October 5, 2022.  Defendants met and conferred in good faith with Plaintiff's counsel by Microsoft Teams twice, on October 13 and October 26, 2022, but were unable to reach any agreement as to either the Defendants' entitlement to or the amount of fees and expenses not taxable under 28 U.S.C. §1920 that are recoverable from Plaintiff and/or his counsel.

 /s/ *John M. McNichols*
John M. McNichols
October 27, 2022

# EXHIBIT A



# John McNichols

Partner
jmcnichols@wc.com
D 202-434-5043

**Education**

- University of Michigan Law School, J.D., cum laude, 2003: Executive Note Editor, Michigan Law Review; Semifinalist, Campbell Moot Court Competition
- Yale University, B.A., 2000

**Practice Focus**

- Civil Litigation and Trial Practice
- Commercial Litigation
- Criminal Defense and Government Investigations
- Unfair Competition, Trade Secrets and Restrictive Covenants

**Recognitions**

- AV Preeminent Peer Review Rated by Martindale-Hubbell

**Admissions**

- Virginia
- District of Columbia
- Maryland
- United States Supreme Court
- United States Court of Appeals for the District of Columbia, First, Third, Fourth, Ninth, and Federal Circuits
- United States District Court for the Eastern District of Virginia, District of Maryland, District of Columbia, and District of Colorado
- United States Court of Federal Claims

John McNichols focuses his practice in trial litigation, with emphasis in trade secret disputes involving technology companies. John has multiple clients in the Dulles Technology Corridor, including Appian Corporation and Neustar Security Services.  He has tried multiple civil cases in both state and federal court, representing both plaintiffs and defendants.  Outside of his civil trial practice, John has also represented criminal defendants in multiple matters, including a recent conspiracy trial in federal court in Maryland resulting in a jury acquittal.

John is an Adjunct Professor of Evidence at the Antonin Scalia Law School at George Mason University, and an Associate Editor of *Litigation News*, where he writes the quarterly column on technology and the law.  Before joining Williams & Connolly in 2005, he clerked for a year for Judge T. S. Ellis III of the U.S. District Court for the Eastern District of Virginia.  John is also a former noncommissioned officer of the U.S. Army Special Forces.

## Representative Experience

Though all cases vary and none is predictive, John's experience includes:

- A three-week securities fraud bench trial in federal court in Delaware

- A one-week federal criminal trial on behalf of an insurance agent accused of fraud and money laundering

- A one-week federal criminal conspiracy trial premised on identity theft and automobile theft

- A one-week federal criminal conspiracy trial based on alleged fraudulent payroll claims against an insurance company

- A one-week civil trial in Virginia state court defending a military contractor against claims of unlawful termination

- A one-week commercial arbitration between an international lodging company and one of its franchisees

- A one-week commercial arbitration concerning a residential building contract

- Two commercial arbitrations between an international media company and its exclusive trademark licensee

## Resources

**Publications**

- *How Do You Cross-Examine Siri If You Think She's Lying?*, March 2022

- *John McNichols Authors Article Explaining New Notice Standard for FLSA Collective Actions*, November 2021

- *John McNichols Authors Article Discussing Non-Fungible Tokens ("NFTs")*, November 2021

- *John McNichols Authors Article "Cryptocurrency: The Coin of the Future?"*, August 2021

- *Keeping One's Public Face Private*, June 2021

- *New Ethics Advice on Working from Home in a Pandemic*, June 2021

- *John McNichols Authors ABA's Litigation News Article: "Evidence of Juror Dishonesty Requires Evidentiary Hearing"*, January 2021

- *John McNichols Authors Article for ABA's Litigation News:  "Law Firm Not Liable to Adverse Party for Groundless Suit"*, December 2020

- *Delaware's Daubert Standards for Toxic Tort Cases: An Issue of Nationwide Importance* , July 2020

- *John McNichols Authors Article on New Notice Standard Established in FLSA Collective Actions*, July 2020

- *New Ethics Advice on Working from Home in Pandemic*, July 2020

- *Best Practices in Veteran Hiring: Balancing Employer Risks and Goals with Applicant Rights*, May 2020

- *John McNichols Authors Article on Heightened Pleading Standards for Anonymous Online Activity*, April 2020

- *John McNichols Authors "First Amendment Bars Non-disparagement Clause in Settlement"*, December 2019

- *Transforming Veteran Hiring: The Legal Implications of the Defense Department's "Skillbridge" Program*, October 2019

- *John McNichols and Joshua Tully Co-Author "Tips for Using the Foundational Voir Dire"*, May 2019

**Presentations**

- *Extraterritorial Application of U.S. Law under the Defend Trade Secrets Act*, September 2016

- *John McNichols and Chris Geyer Speak on Panel Hosted by the Federal Circuit Bar Association*, September 2016

- *Current Issues in D&O Liability & Insurance 2016*, May 2016



# Kathryn E. Garza

Associate
kgarza@wc.com
D 404-343-5722

Kathryn received her Juris Doctor from the University of Texas School of Law, graduating with honors. After law school, Kathryn clerked for Judge Randy Crane of the United States District Court for the Southern District of Texas. Prior to law school, she spent three sessions working at the Texas House of Representatives. Kathryn is passionate about mentorship and serves on the board of Law Clerks for Diversity.

## Publications:

(Note) *Qui Tam Tension: The Appropriate Standard of Review in Government-Requested FCA Dismissals, Texas Law Review*

**Education**

- The University of Texas School of Law, J.D., with honors, 2020: Texas Law Review, Member
- The University of Texas, B.A., 2015

**Admissions**

- District of Columbia



# Allison Eisen

Associate
aeisen@wc.com
D 202-434-5354

**Education & Honors**

· New York University School of Law, J.D., *cum laude*, 2018;
  AnBryce Scholar; Articles Editor, *New York University Law Review*

· Duke University, B.A., 2015

**Bar & Court Admissions**

· New York

· United States District Court for the Southern District of New York
  and for the Eastern District of New York

**Government Experience**

· Law Clerk, Judge Ann M. Donnelly, United States District Court for
  the Eastern District of New York, 2020-2021

**Limitations**

Admitted in New York. Practice in the District of Columbia supervised
by members of the D.C. Bar as required by D.C. App. R. 49(c)(8).

# EXHIBIT B

| Date | Timekeeper | Discount Rate | Time | Amount Claimed | Description |
|------|-----------|---------------|------|----------------|-------------|
| 06/06/22 | GARZA, KATHRYN E. | $300.00 | 0.50 | $150.00 | Call with M. Mestitz (Clinton Counsel) re: Trump v. Clinton update; attend weekly meeting. |
| 06/15/22 | GARZA, KATHRYN E. | $300.00 | 0.50 | $150.00 | Attend Trump v. Clinton common interest call. |
| 06/21/22 | GARZA, KATHRYN E. | $300.00 | 0.50 | $150.00 | Review amended complaint in Trump v. Clinton; circulate to client. |
| 06/22/22 | GARZA, KATHRYN E. | $300.00 | 3.40 | $1,020.00 | Review Trump v. Clinton amended complaint; prepare for weekly huddle; attend weekly huddle; perform follow up assignments. |
| 06/23/22 | GARZA, KATHRYN E. | $300.00 | 3.60 | $1,080.00 | Circulate summary of amended complaint; correspond re: Trump v. Clinton motion to dismiss organization; participate in joint defense group call; prepare for and participate in call with Neustar defendants to coordinate motion to dismiss drafting. |
| 06/24/22 | GARZA, KATHRYN E. | $300.00 | 2.90 | $870.00 | Draft motion to dismiss portions assigned to Neustar defendants. |
| 06/26/22 | GARZA, KATHRYN E. | $300.00 | 1.00 | $300.00 | Draft section of motion to dismiss for Trump v. Clinton case. |
| 06/27/22 | EISEN, ALLISON S. | $300.00 | 2.30 | $690.00 | Edit motion to dismiss section; draft language for insurer; attend call with K. Hughes and J. McNichols. |
| 06/27/22 | GARZA, KATHRYN E. | $300.00 | 1.20 | $360.00 | Revise motion to dismiss section. |
| 06/28/22 | EISEN, ALLISON S. | $300.00 | 2.50 | $750.00 | Draft motion to dismiss and discuss with team. |
| 06/28/22 | GARZA, KATHRYN E. | $300.00 | 2.80 | $840.00 | Discuss motion to dismiss draft with A. Eisen; meeting with A. Eisen and J. McNichols to discuss draft motion. |
| 06/28/22 | MCNICHOLS, JOHN M. | $700.00 | 5.00 | $3,500.00 | Review Trump amended complaint; review previous motions practice; review draft portion of motion to dismiss Trump amended complaint; discussion with A. Eisen re: draft motion to dismiss. |
| 06/29/22 | EISEN, ALLISON S. | $300.00 | 3.00 | $900.00 | Draft motion to dismiss and discuss with team; attend team huddle. |
| 06/29/22 | GARZA, KATHRYN E. | $300.00 | 1.70 | $510.00 | Revise motion to dismiss section; attend team meeting; participate in weekly huddle. |
| 06/29/22 | MCNICHOLS, JOHN M. | $700.00 | 3.80 | $2,660.00 | Review Trump amended complaint; revise motion to dismiss; review previous motions practice; legal research on federal statutory claims; attend status teleconference with comms team. |
| 06/30/22 | GARZA, KATHRYN E. | $300.00 | 1.80 | $540.00 | Revise motion to dismiss section; meeting with J. McNichols to review edits to motion to dismiss. |
| 06/30/22 | MCNICHOLS, JOHN M. | $700.00 | 3.30 | $2,310.00 | Revise draft motion to dismiss; discussion with K. Garza re: same; discussion to D. Kendall (Clinton Counsel) re: arguments about DNS data; emails with S. Southall (TransUnion counsel) re: Trump amended complaint and motion to dismiss; review comments on draft. |
| 07/01/2022 | EISEN, ALLISON S. | $300.00 | 2.00 | $600.00 | Edit motion to dismiss section and discuss with W&C team. |
| 07/01/2022 | GARZA, KATHRYN E. | $300.00 | 6.30 | $1,890.00 | Revise motion to dismiss section. |
| 07/01/2022 | GARZA, KATHRYN E. | $300.00 | 0.50 | $150.00 | Participate in joint defense call. |
| 07/01/2022 | MCNICHOLS, JOHN M. | $700.00 | 1.60 | $1,120.00 | Emails and Zoom call with defense group re: extension request; teleconference with A. Eisen and K. Garza re: next steps; revise draft motion to dismiss; emails with D. Kendall re: arguments about DNS data; emails with R. Joffe counsel and TransUnion counsel re: motion to dismiss. |
| 07/05/2022 | EISEN, ALLISON S. | $300.00 | 1.00 | $300.00 | Edit motion to dismiss section and discuss with W&C team. |
| 07/05/2022 | GARZA, KATHRYN E. | $300.00 | 3.00 | $900.00 | Participate in joint defense group call; revise motion to dismiss section. |

1 of 4

| Date | Timekeeper | Discount Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| 07/05/2022 | MCNICHOLS, JOHN M. | $700.00 | 0.90 | $630.00 | Teleconference with defense group; emails with Clinton counsel re: draft of section on statutory claims; calls with K. Garza and A. Eisen re: drafting of motion to dismiss; emails with J. Gillenwater (Greenberg Traurig) re: local counsel representation in Southern District of Florida; emails with Neustar counsel (S. Southall) re: Neustar v. NSS as proper defendant and argument in common brief. |
| 07/06/2022 | EISEN, ALLISON S. | $300.00 | 2.2 | $660.00 | Send draft motion to dismiss to client; draft and send signature block to joint defense group; attend team huddle; further edit draft motion to dismiss. |
| 07/06/2022 | GARZA, KATHRYN E. | $300.00 | 1.8 | $540.00 | Attend weekly huddle; revise motion to dismiss to incorporate S. Southall's edits. |
| 07/06/2022 | MCNICHOLS, JOHN M. | $700.00 | 0.40 | $280.00 | Teleconference with comms group re: status of Trump v Clinton lawsuit; review draft motion briefing and edits from TransUnion counsel and Joffe counsel; emails with K. Hughes re: same; emails with K. Garza re: edits to motion briefing. |
| 7/7/2022 | EISEN, ALLISON S. | $300.00 | 1 | $300.00 | Edit NSS portion of motion to dismiss. |
| 7/7/2022 | GARZA, KATHRYN E. | $300.00 | 2.8 | $840.00 | Revise motion to dismiss section; correspond with JDG counsel. |
| 7/7/2022 | MCNICHOLS, JOHN M. | $700.00 | 2.8 | $1,960.00 | Emails and discussions K. Garza re: motion briefing; review and revise draft section of motion to dismiss; emails with Neustar defendants' group re: same. |
| 7/8/2022 | MCNICHOLS, JOHN M. | $700.00 | 1.3 | $910.00 | Emails regarding motion to enlarge page limit on motion to dismiss; review draft motion to enlarge; call with S. Southall re: Neustar v. NSS and common briefing; emails with Perkins Coie counsel (N. Hart) re: common briefing. |
| 7/9/2022 | MCNICHOLS, JOHN M. | $700.00 | 0.9 | $630.00 | Review entire draft motion to dismiss prepared by Perkins counsel; emails with Kate Moran (Gibson Dunn) re: same. |
| 7/11/2022 | EISEN, ALLISON S. | $300.00 | 1.5 | $450.00 | Edit motion to dismiss section and discuss with W&C team. |
| 7/11/2022 | GARZA, KATHRYN E. | $300.00 | 3.6 | $1,080.00 | Review motion to dismiss draft; revise defendant-specific motion to dismiss section; correspond re the same; circulate the same to K. Meeks. |
| 7/11/2022 | MCNICHOLS, JOHN M. | $700.00 | 1 | $700.00 | Review revised draft motion to dismiss; emails with Kate Moran (Gibson Dunn) re: sames; emails and teleconference with K. Garza and A. Eisen re: edits to draft motion; call with S. Southall re: Neustar section on motion to dismiss; emails regarding pro hac vice applications. |
| 7/12/2022 | EISEN, ALLISON S. | $300.00 | 0.30 | $90.00 | Review DNS statements in joint motion to dismiss. |
| 7/12/2022 | GARZA, KATHRYN E. | $300.00 | 1.00 | $300.00 | Review motion to dismiss draft; circulate thoughts and edits. |
| 7/12/2022 | MCNICHOLS, JOHN M. | $700.00 | 0.80 | $560.00 | Emails with Kate Moran (Gibson Dunn) and K. Garza re: revisions to draft motion to dismiss and "shotgun pleading" argument; emails with J. Gillenwater re: pro hac vice applications; email with paralegal (A. McDonough) re: new filings in Trump matter; emails with K. Hughes re: attorneys' fee issue; emails with Joffe team and A. Eisen re: DNS data being publicly available in response to K. Moran inquiry; emails with Trump counsel P. Ticktin re: pre-trial schedule. |
| 7/13/2022 | EISEN, ALLISON S. | $300.00 | 0.50 | $150.00 | Attend team huddle. |
| 7/13/2022 | GARZA, KATHRYN E. | $300.00 | 0.60 | $180.00 | Attend weekly team huddle. |
| 7/13/2022 | GARZA, KATHRYN E. | $300.00 | 0.20 | $60.00 | Circulate invite for meet and confer re: scheduling report. |
| 7/13/2022 | MCNICHOLS, JOHN M. | $700.00 | 1.10 | $770.00 | Emails with K. Garza and Joffe team re: public availability of DNS data; emails with Clinton counsel and Trump counsel re: scheduling order; weekly teleconference with comms team re: developments in case; call with S. Southall (TU counsel) re: litigation hold; emails with K. Hughes re: same. |

| Date | Timekeeper | Discount Rate | Time | Amount Claimed | Description |
|---|---|---|---|---|---|
| 7/14/2022 | GARZA, KATHRYN E. | $300.00 | 2.30 | $690.00 | Review motion to dismiss for grammatical errors. |
| 7/14/2022 | MCNICHOLS, JOHN M. | $700.00 | 0.10 | $70.00 | Emails with Clinton counsel re: meet and confer with Trump counsel. |
| 7/15/2022 | EISEN, ALLISON S. | $300.00 | 0.50 | $150.00 | Prepare for and attend meet and confer with Trump counsel. |
| 7/15/2022 | GARZA, KATHRYN E. | $300.00 | 0.50 | $150.00 | Attend meet and confer re: scheduling report. |
| 7/15/2022 | MCNICHOLS, JOHN M. | $700.00 | 0.50 | $350.00 | Discussion with K. Garza re: meet and confer with Trump counsel re: moving trial date |
| 7/20/2022 | EISEN, ALLISON S. | $300.00 | 0.1 | $30.00 | Attend team huddle. |
| 7/21/2022 | MCNICHOLS, JOHN M. | $700.00 | 0.2 | $140.00 | Emails regarding Trump motion for extension of time and order by Judge Middlebrooks; emails regarding Trump filing of motion to continue; email from court resetting deadlines on pending motions. |
| 7/22/2022 | MCNICHOLS, JOHN M. | $700.00 | 0.1 | $70.00 | Emails regarding order on motion to substitute parties by United States of America. |
| 7/25/2022 | MCNICHOLS, JOHN M. | $700.00 | 0.1 | $70.00 | Call with J. Gillenwater re: representation of Christopher Steele; emails with K. Hughes re: same. |
| 7/26/2022 | GARZA, KATHRYN E. | $300.00 | 0.3 | $90.00 | Attend joint defense group meeting; circulate summary to team. |
| 7/26/2022 | MCNICHOLS, JOHN M. | $700.00 | 0.3 | $210.00 | Attend defense group teleconference; emails regarding defense group plan for reply brief. |
| 08/05/2022 | GARZA, KATHRYN E. | $300.00 | 0.40 | $120.00 | Attend joint defense group call. |
| 08/05/2022 | MCNICHOLS, JOHN M. | $700.00 | 3.70 | $2,590.00 | Review Trump opposition to motion to dismiss; emails with K. Hughes and M. Rodkin re: same; draft summary; emails and telephone call with TransUnion counsel re: same; defense group teleconference re: reply brief; emails with Clinton counsel re: same; review draft motion for page limit extension; draft reply brief; review motion for extension of time by USA. |
| 08/06/2022 | MCNICHOLS, JOHN M. | $700.00 | 4.30 | $3,010.00 | Review order on government request for extension of time; draft reply brief on DNS data; review case law cited in Trump opposition. |
| 08/08/2022 | MCNICHOLS, JOHN M. | $700.00 | 0.10 | $70.00 | Emails regarding draft reply brief. |
| 08/09/2022 | MCNICHOLS, JOHN M. | $700.00 | 1.80 | $1,260.00 | Review draft of DNS data section of reply brief in support of motion to dismiss; emails regarding draft reply brief; review complete draft reply brief; emails with Clinton counsel re: same; review order granting page limit extension; emails with K. Hughes and M. Rodman re: draft reply brief; review Judge Middlebrooks' order on Orbis Business Intelligence's request for an extension of time to answer. |
| 08/10/2022 | EISEN, ALLISON S. | $300.00 | 0.50 | $150.00 | Review of reply brief; attend joint defense call. |
| 08/10/2022 | MCNICHOLS, JOHN M. | $700.00 | 0.30 | $210.00 | Conference call with defense group re: draft reply brief; review draft reply brief; emails with J. Gillenwater re: potential authorities for argument on trade secret claim; emails with K. Hughes re: entity name in briefing. |
| 08/11/2022 | EISEN, ALLISON S. | $300.00 | 1.20 | $360.00 | Proofread and finalized reply brief. |
| 08/11/2022 | MCNICHOLS, JOHN M. | $700.00 | 1.10 | $770.00 | Review proposed final draft of reply brief in support of motion to dismiss Trump lawsuit; review new filings by co-defendants. |
| 08/18/2022 | MCNICHOLS, JOHN M. | $700.00 | 0.10 | $70.00 | Review motion to substitute party; review order from Judge Middlebrooks granting motion in part. |
| 08/22/2022 | MCNICHOLS, JOHN M. | $700.00 | 0.10 | $70.00 | Emails with K. Hughes re: status of case and forthcoming rulings. |
| 08/26/2022 | EISEN, ALLISON S. | $300.00 | 0.70 | $210.00 | Draft update on lawsuit for insurer. |
| 08/26/2022 | MCNICHOLS, JOHN M. | $700.00 | 0.70 | $490.00 | Emails with Kevin on Trump lawsuit; review summary of lawsuit by A. Eisen. |
| 08/27/2022 | EISEN, ALLISON S. | $300.00 | 0.70 | $210.00 | Edit update on lawsuit for insurer. |

3 of 4

| Date | Timekeeper | Discount Rate | Time | Amount Claimed | Description |
|------|-----------|---------------|------|----------------|-------------|
| 08/27/2022 | MCNICHOLS, JOHN M. | $700.00 | 0.80 | $560.00 | Revise summary of Trump lawsuit; emails with Allie re: same. |
| 9/9/2022 | EISEN, ALLISON S. | $300.00 | 0.60 | $180.00 | Read decision in Trump v. Clinton. |
| 9/12/2022 | MCNICHOLS, JOHN M. | $700.00 | 0.40 | $280.00 | Emails with Clinton counsel re: potential motion for sanctions against Trump; emails with K. Hughes re: same. |
| 9/13/2022 | EISEN, ALLISON S. | $300.00 | 0.80 | $240.00 | Attended JDG call to discuss sanctions. |
| 9/13/2022 | EISEN, ALLISON S. | $300.00 | 0.10 | $30.00 | Discussed sanctions briefing with HRC counsel. |
| 9/13/2022 | MCNICHOLS, JOHN M. | $700.00 | 0.80 | $560.00 | Emails with Sard Verbinnen re: media coverage of Trump lawsuit; teleconference with joint defense group re: sanctions motion |
| 9/14/2022 | MCNICHOLS, JOHN M. | $700.00 | 1.40 | $980.00 | Call with K. Hughes and M. Rodkin re: potential sanctions motion in Trump litigation. |
| 7/5/2022 | GILLENWATER, JAMES E. | $700.00 | 0.60 | $420.00 | Reviewed amended complaint and correspondence with team re: motion to dismiss. |
| 7/8/2022 | GILLENWATER, JAMES E. | $700.00 | 0.20 | $140.00 | Filed notice of appearance. |
| 7/11/2022 | GILLENWATER, JAMES E. | $700.00 | 0.70 | $490.00 | Prepared pro hac vice motions and correspondence with W &C re: same. |
| 7/12/2022 | GILLENWATER, JAMES E. | $700.00 | 1.10 | $770.00 | Prepared and filed pro hac vice motions and proposed orders and correspondence with court re: same; reviewed draft motion to dismiss. |
| 7/13/2022 | GILLENWATER, JAMES E. | $700.00 | 1.90 | $1,330.00 | Reviewed draft motion to dismiss and correspondence with W &C re: same. |
| 7/26/2022 | GILLENWATER, JAMES E. | $700.00 | 0.30 | $210.00 | Team call to discuss reply in support of motion to dismiss. |
| 8/5/2022 | GILLENWATER, JAMES E. | $700.00 | 1.20 | $840.00 | Reviewed Plaintiffs opposition to motion to dismiss and call with team to discuss reply. |
| 8/9/2022 | GILLENWATER, JAMES E. | $700.00 | 0.60 | $420.00 | Reviewed opposition to motion to dismiss and reviewed reply issues. |
| 8/10/2022 | GILLENWATER, JAMES E. | $700.00 | 1.50 | $1,050.00 | Reviewed draft reply and provided comments re: same. |
| 8/11/2022 | GILLENWATER, JAMES E. | $700.00 | 0.40 | $280.00 | Reviewed final draft reply. |

TOTAL TIME: 113.00

TOTAL AMOUNT CLAIMED: $53,220.00

EXHIBIT C

![GT GreenbergTraurig]



# James E. Gillenwater

SHAREHOLDER
gillenwaterj@gtlaw.com

MIAMI
D +1 305.579.0767
T +1 305.579.0500

James Gillenwater has represented clients such as Fortune 500 companies, world leaders, and Olympians in high-stakes international disputes, including trials and arbitrations. His litigation experience spans commercial and securities class actions, business disputes, intellectual property matters, and products liability cases. James has also handled complex white collar investigations and regulatory matters such as OFAC delistings and INTERPOL red notice cancellations. James's international representations focus on Latin America, and have involved Argentina, Bolivia, China, Colombia, the Dominican Republic, Guatemala, Haiti, Mexico, Panama, Spain, South Korea, Switzerland, Turkey, the United Kingdom, and Venezuela.

James has wide-ranging motion practice experience and has authored briefs for the U.S. Supreme Court, federal appellate and district courts, state courts, and a variety of government agencies. He has tried cases in both federal and state court and argued before courts across the country, including the U.S. Court of Appeals for the D.C. Circuit.

## Capabilities

Litigation  |  Class Action Litigation  |  Commercial Litigation  |  International Arbitration & Litigation  |  Intellectual Property Litigation  |  Equine Industry Group

## Experience

### Representative Matters

- Won dismissal of civil RICO and theft of trade secrets lawsuit filed by former U.S. President on behalf of an American tech company. *See* Law360, Trump's RICO Suit Against Clinton Dismissed As 'Manifesto'; Law.com, Judge Trashes Trump's RICO Lawsuit Against Hillary Clinton, Perkins Coie.

- Won dismissal of a $75 million putative fraud class action on behalf of a U.K. digital payment company. *See* Law360, UK Payments Co. Escapes Claims It Aided $75M Forex Fraud.

- Argued and won summary judgment on behalf of a Chinese circuit board manufacturer in a multimillion-dollar international trademark infringement lawsuit. *See Shenzhen Kinwong Elec. Co. v. Kukreja*, 574 F. Supp. 3d 1191, 1195 (S.D. Fla. 2021).

**GT GreenbergTraurig**                                    James E. Gillenwater

- Secured suspension of INTERPOL Red Notice and release of client wrongfully imprisoned in Turkey in connection with the assassination of Haitian president. *See* Greenberg Traurig Secures Samir Handal's Release from Turkish Prison and His Return to United States.

- Represented a Chinese tech company in a two-week breach of contract trial, precluding the plaintiff from recovering more than 99% of the damages sought, for which James's trial team was named 2019's most effective international litigators by the *Daily Business Review*. *See also* Law360, *11th Circ. Won't Touch Damages In Electronics Sale Suit.*

- Obtained dismissal of a federal securities fraud action against a national health care administration company. *See* Law360, "'Boilerplate' Mednax Stock Drop Suit Dismissed," and "Mednax Wins Ax Of Investors' Securities Suit."

- Secured dismissal of a consumer class action against an international resort operator on *forum non conveniens. See* Law360, "Suit Over Sandals' Fake Local Taxes Dismissed By Fla. Court."

- Argued and won numerous dispositive motions on behalf of a major transportation network company.

- Represented the former president and defense minister of a Latin American country in a month-long federal trial.°

- Obtained a seven-figure settlement in a federal breach of contract lawsuit on behalf of a Spanish agrochemical company.

- Represented professional soccer and rugby teams and athletes in antitrust actions, anti-doping cases, and disciplinary hearings before federal courts, judicial officers, and arbitral bodies, including the Court of Arbitration for Sport.

- Won dismissal of civil RICO and tort claims against a Latin American bank and its directors.°

- Achieved resolution of a series of mass tort cases for an international energy company.°

- Obtained dismissal of a federal securities fraud action against a major telecommunications company.°

- Navigated a DOJ Swiss bank investigation, ensuring the non-prosecution of a former executive.°

- Secured multiple OFAC sanctions delistings.°

*°The above representations were handled by Mr. Gillenwater prior to his joining Greenberg Traurig, P.A.*

## Recognition & Leadership

### Awards & Accolades

- Listed, *The Best Lawyers in America*, "Ones to Watch," Litigation - Securities, 2021-2022

- Listed, *Benchmark Litigation*, "40 & Under Hot List," 2022

- Listed, U.S. District Court for the Southern District of Florida, "Pro Bono Honor Roll," 2021

- *Law360*, "Legal Lion," 2020

- *Daily Business Review*, member of "Most Effective," International Litigation team, 2019

GT GreenbergTraurig                                                    **James E. Gillenwater**

- _Law360,_ "Legal Lion," 2018

- Capital Pro Bono High Honor Roll, 2015

### Professional & Community Involvement

- World Rugby Judicial Panelist, 2017-2018

- Athlete Representative, United States Olympic Committee Athletes' Advisory Council, 2010-2016

- United States National Rugby 7s Team

    - Player, 2006-2009; Captain, 2009

- Co-Founder, United States Rugby Players Association, 2016

- Albert Schweitzer Fellow, Durham, North Carolina, 2010-2011

- Fulbright Scholar, English Teaching Assistant, La Universidad Nacional de la Pampa, Santa Rosa, Argentina, 2007

## Credentials

### Education

- J.D., _magna cum laude_, Duke University School of Law, 2012

    - Order of the Coif

    - Note Editor, _Duke Law Journal_

    - Justin Miller Award for Citizenship

- B.S., _summa cum laude_, Vanderbilt University, 2005

### Clerkships

- U.S. District Court for the District of Connecticut

### Admissions

- Florida

- New York

- District of Columbia

- U.S. District Court for the Southern District of Florida

- U.S. District Court for the Eastern District of New York

- U.S. Court of Appeals for the District of Columbia Circuit

- U.S. Court of Appeals for the Eleventh Circuit

## GT GreenbergTraurig

## Languages

- Spanish, Fluent

- French, Fluent

## News, Insights & Events

August 05, 2022   PRESS RELEASE

**Greenberg Traurig Secures Samir Handal's Release from Turkish Prison
and His Return to United States**

# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Donald J. Trump,

                    Plaintiff,

        v.

Hillary R. Clinton, *et al.*,                    Civil Action No. 2:22-14102-DMM

                    Defendants.

### DECLARATION OF STEVEN A. TYRRELL IN SUPPORT OF DEFENDANTS' MOTION FOR SANCTIONS AND FEES

I, Steven A. Tyrrell, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.       I am a partner at Weil Gotshal & Manges LLP ("Weil"), counsel of record for Rodney Joffe in the above-captioned matter.

2.       Prior to Plaintiff's filing of the above-captioned action in this District, I represented Joffe in other matters related to the same factual scenario that form the basis of Plaintiff's claims in this case.  These include *United States of America v. Michael A. Sussmann*, Case No. 21-cr-582 (CRC) (D.D.C.), and *AO Alfa-Bank v. John Doe, et al.*, Civil Action No. 2021-10014165 (Fairfax Cnty. Cir. Ct.), which were pending in the District of Columbia and Virginia, respectively.  Over the course of my representation of Joffe, which consisted of a substantial amount of work, I developed a detailed factual understanding of the underlying events, including highly-technical aspects of cyber security and DNS data.  This knowledge was useful in developing responses to Plaintiff's claims in this matter, and allowed me to do so in an efficient matter.

3.       After Plaintiff filed his case in this District, I obtained the assistance of other Weil attorneys to assist in responding to the complaint and amended complaint.  Attached as <u>Exhibit A</u>

1

are the law firm website biographies of the attorneys at Weil for whom Joffe seeks attorneys' fees. The biographies reflect the professional qualifications of those attorneys. We were also assisted by a Senior Litigation Paralegal at Weil, Ann Merlin.

4.      Weil entered into a retention agreement with Joffe in connection with the present litigation. Joffe agreed to pay all of Weil's costs, fees, and expenses incurred in connection with the present suit, and agreed to pay the firm's customary rates[1] (less a 10% discount), which for this matter are $1,435.50, $1,080, and $756 per hour for attorneys, respectively, and $387 for senior paralegals.[2]

5.      Attached as <u>Exhibit B</u> is a true and correct copy of the hours worked by counsel for Joffe. Joffe is seeking reimbursement for the attorneys' customary hourly rates described in Paragraph 3. <u>Exhibit B</u> also provides an accurate statement of the work provided by Weil during the periods for which fees are sought.

6.      Consistent with the discussion in the Memorandum in Support of Sanctions and the

---

[1] Joffe requests reimbursement at his counsel's ordinary non-local rates. Courts within this District and the Eleventh Circuit have recognized that out-of-market rates are appropriate where "use of an attorney from a higher-rate market who had extensive prior experience with a particular factual situation could be justified because of efficiencies resulting from that prior experience." *Achva Vahava, LLC v. Anglo Irish Bank Corp. PLC*, No. 10-80649-CIV, 2012 WL 13015034, at *3 (S.D. Fla. Aug. 2, 2012) (quoting *Am. Civil Liberties v. Barnes*, 168 F.3d 423, 438 (11th Cir. 1999)). This is precisely that case. As explained in this declaration, Mr. Tyrrell has represented Joffe in multiple other matters regarding the same factual situation that forms the basis of Plaintiff's claims. As such, non-local rates are warranted given counsel's experience with the particular factual situation and that it "represented the same client[ ] in other related litigation." *Rogers v. Nacchio*, 2007 WL 1064314, at *6 (S.D. Fla. Apr. 6, 2007). To do otherwise, particularly where Joffe had a meritorious personal jurisdiction defense, would "force [Joffe] to abandon [his] usual counsel, or require counsel to reduce their customary fees, simply because the lawsuit was filed in the Southern District of Florida." *Id.* at *8; *see also Tiara Condo. Ass'n, Inc. v. Marsh USA, Inc.*, 697 F. Supp. 2d 1349, 1363 (S.D. Fla. 2010) (awarding "New York City rates" given firm's prior representation of client and "amount of time and work the firm had already invested"). Further, the requested rates are reasonable because counsel exercised billing judgment and completed work in an efficient manner, leveraging Mr. Tyrrell's prior experience. *See* <u>Exhibit B</u>. Weil's rates are typical of those charged by large New York-based law firms. *See, e.g., Angelo, Gordon & Co., L.P. v. MTE Holdings, LLC*, No. 20 MISC. 23, 2021 WL 1353756, at *3 (S.D.N.Y. Apr. 12, 2021).

[2] Note that annual class year changes for Weil associates are effective as of the first of September. Thus, as of September 1, 2022, the associate rate for Leah Saiontz rose to $882.

2

information provided in <u>Exhibit B</u>, I summarize below in Charts A, B, and C the fees associated with three different phases of the case:  the fees incurred from the filing of the initial complaint up to the filing of Joffe's initial motion to dismiss; the fees incurred between the filing of Joffe's motion to dismiss up to the Court's order dismissing the suit; and the fees incurred to date in connection with the motion for sanctions.

7.      As reflected in Chart A, the fees incurred by Joffe from the filing of the initial complaint up to the filing of Joffe's initial motion to dismiss total $81,734.85.

8.      As reflected in Chart B, the fees incurred by Joffe from the filing of Joffe's initial motion to dismiss up to this Court's dismissal of the suit total $118,568.90.

9.      As reflected in Chart C, the fees incurred by Joffe in connection with the motion for sanctions, to date, total $25,434.90.

### Chart A:  Fees incurred from Complaint to initial MTD

| Timekeeper | Hours | Fees |
|---|---|---|
| Steven A. Tyrrell | 15.9 | $22,824.45 |
| Edward Soto | 1 | $1,435.50 |
| Brian Liegel | 27.3 | $29,484.00 |
| Leah Saiontz | 33.8 | $25,552.80 |
| Ann Merlin (Senior Paralegal) | 6.3 | $2,438.10 |

**Chart B:  Fees incurred initial MTD to dismissal**

| Timekeeper | Hours | Fees |
|---|---|---|
| Steven A. Tyrrell | 53.4 | $76,655.70 |
| Ed Soto | 0.5 | $717.50 |
| Brian Liegel | 16.4 | $17,712.00 |
| Leah Saiontz | 30.5 | $23,058.00 |
| Ann Merlin | 1.1 | $425.70 |

**Chart C:  Fees incurred to date on sanctions motion**

| Timekeeper | Hours | Fees |
|---|---|---|
| Steven A. Tyrrell | 8.2 | $11,771.10 |
| Brian Liegel | 6.2 | $6,696.00 |
| Leah Saiontz | 7.9 | $6,967.80 |

10.     Further, in connection with responding to Plaintiff's complaint, Joffe incurred costs

of $200.  An itemized copy of this expense, which represents the *pro hac vice* filing fee in this

District, is attached hereto as Exhibit C.

11.     I believe that the rates claimed are reasonable given the professional qualifications

of the billers as evidenced in Exhibit A and that non-local rates are appropriate given my prior

representation of Joffe in related matters which allowed for efficient representation in this matter.

12.     In connection with this case, counsel incurred necessary costs for electronic legal

research.  I understand that courts in this Circuit have held that legal research costs are not

ordinarily taxable as costs under 28 U.S.C. § 1920, but are properly considered a component of

attorneys' fees.  *Springer v. Convergy's Corp.*, No. 3:03-CV-302-J-99MCR, 2006 WL 8439203,

4

at *2 (M.D. Fla. July 7, 2006).  As such, in addition to the fees set out above, Joffe requests an award of $604.33 incurred for electronic legal research.  Attached as <u>Exhibit D</u> is a true and correct copy of the amount incurred for electronic legal research.

13.     Consistent with local Rule 7.3, counsel sent the draft sanctions motion and draft supporting declarations to Plaintiff's counsel on October 5, 2022.  Defendants met and conferred in good faith with Plaintiff's counsel by Microsoft Teams twice, on October 13 and October 26, 2022, but were unable to reach any agreement as to either the Defendants' entitlement to or the amount of fees and expenses not taxable under 28 U.S.C. §1920 that are recoverable from Plaintiff and/or his counsel.


 */s/ Steven A. Tyrrell*
Steven A. Tyrrell, *admitted pro hac vice*
**WEIL GOTSHAL & MANGES LLP**
2001 M Street, N.W., Suite 600
Washington, D.C. 20036
Telephone: (202) 682-7000

*Counsel for Rodney Joffe*

DATE: October 26, 2022

5

# EXHIBIT A

WEIL:\98875010\1\54613.0004

Printed: October 04, 2022



# Steven A. Tyrrell

**Partner** **Washington, D.C.**    +1 202 682 7213    steven.tyrrell@weil.com



**Steve Tyrrell serves as Managing Partner of the Firm's DC office and Co-Head of Weil's global White Collar Defense, Regulatory and Investigations practice. His practice focuses on white collar criminal defense, regulatory enforcement matters, and internal investigations.**

Steve previously served as Chief of the U.S. Department of Justice's Fraud Section from 2006 through 2009. In that capacity, he led the investigation, prosecution, and coordination of a broad range of sophisticated economic crime matters and enforcement initiatives, including matters involving the Foreign Corrupt Practices Act, corporate, securities, commodities and investment fraud, health care fraud, procurement fraud, stimulus and rescue fraud, mortgage fraud, consumer fraud, and identity theft. He also played a key role advising Department leadership on white collar crime-related legislation, crime prevention, public education and the Department's Financial Fraud Enforcement Task Force.

Prior to Steve's appointment as Chief of the Fraud Section in 2006, he served as Deputy Chief of the Counterterrorism Section of the Criminal Division, where he supervised a team of attorneys in connection with the investigation, prosecution, and coordination of a variety of international terrorism and terrorist financing matters. Steve also led a number of high-profile national security investigations and trained federal prosecutors and agents on relevant national security statutes, policies and practices.

Steve also served as an Assistant US Attorney in the US Attorney's Offices in the Southern District of Florida and the Northern District of New York. During his more than fifteen years as an Assistant US Attorney, Steve investigated and prosecuted a variety of criminal cases, with an emphasis on white collar matters, including but not limited to securities

## Practice Areas

› White Collar Defense, Regulatory and Investigations
› Securities Litigation

## Sectors

› Financial Services
› Healthcare and Life Sciences

## Admissions

› US Court of Appeals 10th Cir.
› District of Columbia
› US Bank Court-Dist of Columbia
› US Dist Court for DC
› Eastern District New York
› New York State
› Southern District New York

## Education

› SUNY Oneonta (B.A., 1980)
› New York Law School (J.D., cum laude, 1983)

fraud, tax fraud, FDA fraud, and public corruption, as well as related money laundering and asset forfeiture work. He also was lead counsel for the United States in nearly forty criminal jury trials.

In 2021, Steve was recognized among the Top 30 FCPA Practitioners in the United States by Global Investigations Review, which called him a "a sophisticated and nuanced lawyer who knows the ins and outs of the FCPA" and noted that he "has a declination record that few lawyers can match." Steve is currently recognized in Chambers Global and Chambers USA as one of the leading lawyers nationally and in Washington, D.C. for white collar crime, government investigations, and FCPA expertise. Chambers notes that he "offers impressive experience handling big-ticket investigations" and has quoted sources calling him "incredibly smart and strategic," "fantastic," "calm and levelheaded," with "a ton of experience and insight" and "impeccable integrity." In 2015, The National Law Journal recognized Steve as one of its inaugural "Trailblazers" nationwide for his distinguished career in the white collar crime area, and in 2020 the same publication honored him as one of its "Trailblazers" in Washington, D.C., noting that he has long been "at the forefront of … the investigation, prosecution, and defense of allegations of corporate crime." Since 2013, Steve also has been recognized as a recommended lawyer for Corporate Investigations and White-Collar Criminal Defense by Legal 500 US, in which clients have praised him as, among other things, "patient and collaborative." He is a recognized expert and frequent speaker on a host of white collar topics, including FCPA enforcement, securities fraud, corporate charging decisions, use of deferred and non-prosecution agreements, and monitors.

Early in his career, Steve served as Law Clerk to the Honorable Thomas J. McAvoy, United States District Court Judge for the Northern District of New York.

Steve is a graduate of New York Law School where he was the Research Editor of the Law Review.

### Key Representations

- Representing Vantage Drilling in connection with a DOJ and SEC investigation into alleged violations of the FCPA arising from the company's dealings with Petrobras.
- Representing and conducting an internal investigation for Sanofi in a joint DOJ and SEC investigation of alleged FCPA violations in various countries in emerging markets.

- Represented a former employee of a major financial institution in connection with a DOJ criminal investigation into alleged manipulation of LIBOR.
- Represented HMT LLC in connection with a DOJ investigation into potential violations of the FCPA in Asia and South America, which resulted in a declination of prosecution under the DOJ's recently announced FCPA Pilot Program.
- Represented Innodata Inc. in connection with its disclosure to the DOJ and SEC of potential improper payments by employees of one of its foreign subsidiaries in Asia.
- Represented an India-based manufacturer of mining equipment in a joint DOJ and SEC investigation of alleged FCPA violations.
- Representing a senior executive of a global operator of retail department stores in a joint DOJ and SEC investigation of alleged FCPA violations in Central America and Asia.
- Representing two former employees of a multi-national spirits company in a joint DOJ and SEC investigation of alleged FCPA violations in Russia.
- Representing two senior executives of a global oil services industry company in a DOJ investigation of alleged violations of US export controls and sanctions laws.
- Conducted an internal investigation for a financial services company regarding allegations of improper payments in connection with its Nigerian operations.
- Represented a UK-based, global specialty chemicals company in a DOJ investigation of alleged violations of US export controls and sanctions laws.
- Designed and assisted in the implementation of anti-bribery and corruption policies and procedures for a UK-based, global specialty chemicals company.
- Designed and assisted in the implementation of anti-bribery and corruption policies and procedures for a multi-national telecommunications company.
- Designed and assisted in the implementation of anti-bribery and corruption policies and procedures for a multi-national financial services company.
- Designed and assisted in the implementation of anti-bribery and corruption policies and procedures for a global tax-free shopping and related financial services company.
- Designed anti-bribery and corruption policies and procedures for a multi-national family dining and entertainment company.
- Lead outside counsel for FCPA due diligence on Intel's acquisition of Altera Corp.
- Lead outside counsel for FCPA due diligence on Norwegian Cruise Line Holdings' acquisition of Prestige Cruises International.
- Lead outside counsel for FCPA due diligence on General Electric Co's. acquisition of Lufkin Industries.
- Lead outside counsel for FCPA due diligence on Oracle Corporation's acquisition of Acme Packet.
- Designed anti-bribery and corruption policies and procedures for a multi-national telecommunications equipment manufacturer.
- Lead outside counsel for FCPA due diligence on publicly traded, multi-national health care company's acquisition of the Eastern European operations of a competitor.

Provided FCPA training to the Board of Directors of a global
clothing manufacturer and retailer.

- Advising a global commercial aircraft leasing company on various
  anti-bribery and corruption compliance matters.
- Obtained dismissal of federal civil RICO action and related state
  claims brought by Greenpeace against The Dow Chemical
  Company.

## Awards and Recognition

› **Steven Tyrrell Named a Top FCPA Practitioner in the United States**
Award Brief — Global Investigations Review 2021

› **Steven Tyrrell Named a Leading Lawyer for FCPA: Nationwide**
Award Brief — Chambers USA

› **Steven Tyrrell Named a Leading Lawyer for White Collar Crime and Government Investigations: District of
Columbia**
Award Brief — Chambers USA

› **Steven Tyrrell Named a Leading Lawyer for FCPA in the United States**
Award Brief — Chambers Global

› **Steven Tyrrell Named a "Recommended" Lawyer for Corporate Investigations and White-Collar Criminal
Defense in the US**
Award Brief — Legal 500 US

## Speaking Engagements

› **General Counsel Interview**
Speaker(s): Steven A. Tyrrell

December 1, 2021 — National Harbor, MD — White Collar practice co-head Steven Tyrrell appeared
at ACI's 38th Annual International Conference on the FCPA to interview a panel of general counsel
from leading multinationals on their outlook for the year ahead on enforcement, compliance,
whistleblowing, and other risks to address.

## Latest Thinking

› **Litigation Trends 2022**
Publication — By Weil's Litigation Department — Spring 2022

› **Litigation Trends 2021**
Publication — By Weil's Litigation Department — March 2021

› **How to build a data driven compliance programme**
Publication — Global Investigations Review — By Steven A. Tyrrell — December 10, 2020

## Firm News & Announcements

› **Weil Secures Dismissal for Computer Tech Executive Named in Trump Lawsuit**
Litigation Win — September 15, 2022

› **Weil's 2022 Litigation Trends Report**
Firm Announcement — April 06, 2022

Firm Announcement — November 12, 2021

Copyright © 2022 Weil, Gotshal & Manges LLP, All Rights Reserved. The contents of this website may contain attorney advertising under the laws of various states. Prior results do not guarantee a similar outcome. Weil, Gotshal & Manges LLP is headquartered in New York and has office locations in Beijing, Boston, Brussels, Dallas, Frankfurt, Hong Kong, Houston, London, Miami, Munich, New York, Paris, Princeton, Shanghai, Silicon Valley and Washington, D.C.

**Printed: October 04, 2022**



# Edward Soto

**Partner** Miami            +1 305 577 3177            edward.soto@weil.com



Ed Soto is Managing Partner of Weil's Miami office, and recently concluded serving for many years as Co-Head of the Firm's national Complex Commercial Litigation practice.

**A senior trial partner, Ed concentrates his practice on the trial and supervision of complex commercial civil litigation, and has substantial experience in cases involving: antitrust, business torts, class actions, contracts, employment, fraud, insurance coverage, lender liability, products liability, professional liability, and securities litigation. He has also handled numerous internal investigations in these areas.**

During more than 35 years of trial practice, Ed has established a consistent record of successful results in major complex cases in both state and federal courts and before arbitration panels. He has achieved successful outcomes for his clients at every phase of the litigation process – through case dispositive motions, trials, appeals, and settlements. During the past few years, he has achieved significant victories on behalf of American Airlines, Inc., Citicorp Services, Inc., ESPN, Inc., ExxonMobil, Financial Guaranty Insurance Corp., Fiserv, Inc., General Electric Company, Lehman Brothers Holdings Inc., Procter & Gamble, Repsol, and UnitedHealth Group.

Ed's notable representations include:

- Serving as lead counsel to Procter & Gamble in the high-profile multi-district litigation, *In re Denture Cream Products Liability Litigation*, in which more than 150 plaintiffs alleged that they were injured through their use of the popular denture cream, Fixodent. In this action, Ed successfully won three separate motions to exclude plaintiffs' general causation experts, including an affirmation on appeal to the U.S. Court of Appeals for the Eleventh Circuit in the lead case, which led to all of the plaintiffs stipulating to a dismissal with prejudice.

- Successfully defending Dometic Corp., a leading manufacturer of gas absorption refrigerators, in two putative class actions in the Southern District of Florida alleging that the cooling units in several models of the company's refrigerators purportedly contained a latent defect. Won an order granting summary judgment dismissing

## Practice Areas

- Complex Commercial Litigation
- International Arbitration
- Appeals and Strategic Counseling

## Areas of Focus

- Pro Bono

## Sectors

- Retail & Consumer Products
- Technology
- Transportation and Automotive

## Admissions

- US Court of Appeals 11th Cir.
- US Court of Appeals 3rd Cir.
- US Court of Appeals 5th Cir.
- State of Florida
- Middle District Florida
- Northern District Florida
- New York State
- Southern District Florida
- US Supreme Court
- DC Court of Appeals

## Education

- Florida State University (B.A., 1974)
- Columbia Law School (J.D., 1978)

motion for class certification and dismissal of the second lawsuit in
its entirety as well.

- Successfully representing Nortek Global HVAC, LLC, a leading
  manufacturer of heating, ventilation and air conditioning equipment,
  in several putative class actions in Florida and Tennessee federal
  courts alleging that Nortek failed to disclose defects in its air
  conditioning equipment. Obtained denial of plaintiffs' motion for
  class certification in the Florida case, as well as the dismissal of all
  claims, with prejudice, in the Tennessee case.

- Serving as co-lead trial counsel to Financial Guaranty Insurance
  Corp. in connection with a six-week, contested trial in the chapter 9
  bankruptcy case filed by the City of Detroit regarding the City's
  proposed plan of adjustment.

- Serving as lead trial counsel for global energy company Repsol in
  environmental litigation involving claims of "alter ego" and
  fraudulent conveyance. The Weil team secured a victory on all
  claims involving over $1 billion in damages while also succeeding
  on Repsol's $65 million counterclaim.

- Leading a team of trial lawyers to victory on behalf of Fiserv/Texas
  Data Control in a litigation brought by the Justice Department in a
  matter that was selected by the *National Law Journal* as the "Top
  Defense Victory of the Year."

- Serving as lead counsel for UnitedHealth Group in the successful
  defense of multi-billion dollar RICO and related conspiracy claims
  brought by a nationwide class of 700,000 doctors.

- Representing ExxonMobil in the successful defense of a putative
  nationwide class action brought by dealers alleging violations of the
  UCC and breach of contract with respect to gasoline pricing.

- Securing summary judgment for ESPN, Inc. in a litigation brought
  by boxing promoter Don King in connection with a documentary
  television program for which Mr. King sought $2.5 billion in
  damages.

Ed has received numerous accolades throughout his career.
He is regularly recognized in Chambers USA as a Band 1
lawyer for Commercial Litigation in Florida, where clients have
praised him as an "amazing lawyer who has the rare
combination of being able to keep focused on the big picture
of a case while also mastering all of the underlying details,"
"great at handling large teams and is extremely passionate on
behalf of his clients," "an outstanding strategic attorney [who]
is very persuasive in court and is great at managing complex
cases," and for "always thinking several steps ahead of the
opponent." They also note his "impeccable instincts,"
"unlimited capacity for absorbing details" and "creative
approach to legal issues," and described him as a "gifted
advocate," "a first-rate lawyer" and "a top, top litigator." In
addition, he has been recognized by Legal 500 as one of the
Leading Lawyers nationwide for Commercial Litigation, with
commentators calling him an "experienced partner" and "one
of the most renowned trial lawyers in Florida." He has also

Star" in Florida by Benchmark Litigation, as well as a "Best Lawyer" for Bet-the-Company Litigation, Commercial Litigation, and International Arbitration - Commercial by Best Lawyers in America. In 2020, Ed was recognized by South Florida's Daily Business Review as a "Florida Trailblazer" who has been an "agent of change" during his career as a trial lawyer. In 2017, Ed was recognized by Law360 as an MVP for Class Action. Since 2006, Ed has been recognized as a Florida Super Lawyer, most recently in the areas of Securities Litigation and Civil Defense Litigation.

He also serves in leadership roles of various public service organizations. He is on the Executive Committee of the Lawyers' Committee for Civil Rights Under Law, the Board of Directors of the Human Services Coalition, and the Chairman of the Board of Directors of Catalyst Miami. Ed has also served as a member of the Board of Trustees of the Ransom Everglades School, a member of the Board of Directors of Child Hope, Inc., and the Chairman of the Board of Directors of the Zoological Society of Florida. In 2022, in recognition of his significant pro bono work and contributions to these and other organizations over the years, Ed was honored by Chambers USA as its Pro Bono Lawyer of the Year in the publication's annual Diversity & Inclusion Awards.

Ed is currently a member of the Firm's Diversity Committee, Recruiting Committee, National Litigation Steering Committee, Computer Litigation Committee, National Associates Training Committee and E-Discovery Task Force.

Ed received a J.D. from Columbia Law School in 1978, and a B.A. from Florida State University in 1974.

## Awards and Recognition

› **Edward Soto Named 2022 Pro Bono Lawyer of the Year**
Award Brief — Chambers USA

› **Edward Soto Named Daily Business Review "Florida Trailblazer"**
Award Brief — Daily Business Review 2020

› **Edward Soto Profiled as a 2017 Class Action MVP**
Award Brief — Law360 2017

› **Edward Soto Ranked Band 1 for Litigation: General Commercial, Florida**
Award Brief — Chambers USA

› **Edward Soto Named a "Recommended" Lawyer for Commercial Litigation in the U.S.**
Award Brief — Legal 500 US

**Latest Thinking**

> **Ruhlen and Recent Trends in Favor of Remand**
> Alert — Class Action Monitor — By Edward Soto, Pravin R. Patel, Mark Pinkert and Katie Black — PDF — April 05, 2022

> **Full Daubert: Fifth Circuit Mandates Complete Evaluation of Expert Opinions at Class Certification**
> Alert — Class Action Monitor — By Edward Soto, Pravin R. Patel and Daniel P. Guernsey — PDF — Q3 2021

> **Supreme Court Clarifies Injury-in-Fact Requirements for Intangible Harms**
> Publication — Bloomberg Law Professional Perspectives — By Edward Soto, Pravin R. Patel and Corey Brady — PDF — August 2021

> **Eleventh Circuit Holds that a Statutory Violation is Insufficient for Standing and Settlement**
> Alert — Class Action Monitor — By Edward Soto, Pravin R. Patel and Alli G. Katzen — PDF — June 04, 2021

> **Litigation Trends 2021**
> Publication — By Weil's Litigation Department — March 2021

## Firm News & Announcements

> **Weil Secures Dismissal for Computer Tech Executive Named in Trump Lawsuit**
> Litigation Win — September 15, 2022

> **Edward Soto Named Pro Bono: Lawyer of the Year at Chambers Diversity & Inclusion: North America Awards 2022**
> Firm Announcement — June 13, 2022

Copyright © 2022 Weil, Gotshal & Manges LLP, All Rights Reserved. The contents of this website may contain attorney advertising under the laws of various states. Prior results do not guarantee a similar outcome. Weil, Gotshal & Manges LLP is headquartered in New York and has office locations in Beijing, Boston, Brussels, Dallas, Frankfurt, Hong Kong, Houston, London, Miami, Munich, New York, Paris, Princeton, Shanghai, Silicon Valley and Washington, D.C.

Printed: October 04, 2022



# Brian Liegel

| **Associate** Miami | +1 305 577 3180 | brian.liegel@weil.com |



**Brian Liegel is an associate in Weil's Complex Commercial Litigation and Appeals and Strategic Counseling practices.**

Brian has substantial litigation experience across a broad range of disputes involving areas of law such as business torts, antitrust, fraud, product liability, regulatory investigations, environmental litigation, bankruptcy, and appeals.

Some of his recent notable experiences includes serving on Weil teams representing:

- Pilgrim's Pride in a series of federal class actions across the country brought by direct and indirect purchasers alleging the major chicken producers reduced output to raise the price of broiler chickens.
- National Public Finance Guarantee Corporation in connection with the Commonwealth of Puerto Rico's bankruptcy proceedings.
- Dometic, a major manufacturer of gas absorption refrigerators, in securing summary judgment and defeating class certification, as well as transfer and consolidation victories prior to those case dispositive rulings, in numerous putative nationwide consumer class actions in Florida and California federal courts alleging that the cooling units in several models of Dometic's refrigerators purportedly contained a latent defect.
- Nortek, a global manufacturer of HVAC systems, in multiple putative class actions in Florida and Tennessee federal courts alleging that Nortek failed to disclose defects in its air conditioning equipment. Brian and the Weil team obtained the denial of plaintiffs' motion for class certification in the Florida case, as well as the dismissal of all claims, with prejudice, in the Tennessee case

As a member of the Firm's Appeals and Strategic Counseling practice, Brian has represented clients in the United States Supreme Court, United States Courts of Appeals for the Second, Eleventh, and D.C. Circuits, and the Colorado Supreme Court.

## Practice Areas

- › Complex Commercial Litigation
- › Appeals and Strategic Counseling

### Appeals and Strategic Counseling

PRECISION | CREATIVITY | JUDGMENT

### Admissions

- › State of Florida
- › Middle District Florida
- › Northern District Florida
- › Southern District Florida
- › US Court of Appeals 11th Cir.
- › US Dist Court No. Illinois
- › US Ct App Federal Circuit

### Education

- › University of Miami (B.A., 2012)
- › Georgetown University Law Center (J.D., 2015)

Lawyers: Ones to Watch for commercial litigation, and
selected as a member of the Florida Board of Bar Examiner's
Practice Analysis Panel, which will evaluate the knowledge,
skills, and abilities that all newly licensed Florida lawyers
should have to be admitted to the bar.

Brian also is an active participant in the Firm's pro bono
initiatives. Most recently, Brian was appointed by the United
States Court of Appeals for the Eleventh Circuit to represent
an indigent individual on appeal and successfully overturned
the denial of social security benefits. Brian has also worked
with the Innocence Project, seeking to obtain post-conviction
relief for a client based on new scientific evidence, and as part
of a team of Weil attorneys which represented a victim of
human trafficking, successfully allowing the client to have her
criminal record expunged and vacated.

From September 2017 through September 2018, Brian served
as a judicial clerk for the Honorable Adalberto Jordan of the
United States Court of Appeals for the Eleventh Circuit.

## Awards and Recognition

› **Brian Liegel Recognized as Best Lawyers: One to Watch Honoree**
Award Brief — Best Lawyers 2020-2023

## Latest Thinking

› **Third Circuit Cements Three-Way Split on Issue Classes**
Publication | Class Action Monitor — By Drew Tulumello, Pravin R. Patel and Brian Liegel — PDF — January 19, 2022

› **Supreme Court Holds That "But-For" Causation Is Not Required For Specific Jurisdiction**
Publication — By Zack Tripp, Pravin R. Patel, Brian Liegel and Elaina Aquila — April 08, 2021

› **Supreme Court Holds That "But-For" Causation Is Not Required For Specific Jurisdiction**
Alert — Class Action Monitor — By Zack Tripp, Pravin R. Patel, Brian Liegel and Elaina Aquila — PDF — March 26, 2021

› **Avoiding Unreviewable Surprises in Arbitration Agreements**
Alert — Class Action Monitor — By Gregory Silbert, Brian Liegel and Nathalie A. Sosa — PDF — March 2020

## Firm News & Announcements

› **Weil Secures Dismissal for Computer Tech Executive Named in Trump Lawsuit**
Litigation Win — September 15, 2022

› **Weil Wins Appeal for Illumina Protecting Cutting-Edge DNA Sequencing Technology**
Litigation Win — February 02, 2021

USCA11 Case: 23-10387   Document: 16-294   Date Filed: 06/10/2024   Page: 574 of 811

contain attorney advertising under the laws of various states. Prior results do not guarantee a similar outcome. Weil, Gotshal & Manges LLP is headquartered in New York and has office locations in Beijing, Boston, Brussels, Dallas, Frankfurt, Hong Kong, Houston, London, Miami, Munich, New York, Paris, Princeton, Shanghai, Silicon Valley and Washington, D.C.

Printed: October 04, 2022



# Leah Saiontz

**Associate Miami**                              +1 305 577 3134         leah.saiontz@weil.com

Leah Saiontz is an associate in Weil's Complex Commercial Litigation practice, based in the Firm's Miami office. Prior to joining the Litigation Department, Leah was an associate in Weil's Restructuring Department. She has substantial experience across a broad range of disputes, involving areas of law such as antitrust, fraud, and bankruptcy (particularly domestic and cross-border corporate restructuring, distressed financing, and distressed M&A).

Leah's notable recent experience includes representing, among others:

- **Brooks Brothers Group, Inc.** and its affiliates, the oldest apparel company in the United States, in their chapter 11 cases, Canadian proceeding under the Companies' Creditors Arrangement Act, and going-concern sale of their international businesses.
- **Topgolf International, Inc.** in connection with its out-of-court equity recapitalization and credit agreement amendment.
- **EP Energy Corporation**, and its affiliated debtors, a public oil and natural gas exploration and production company, in their chapter 11 cases involving approximately $4.9 billion in funded debt obligations.
- The DIP Lender and Senior Secured Lender in the chapter 11 case of **George Washington Bridge Bus Station Development Venture.**
- Spanish energy company **Repsol** in connection with its complex environmental and bankruptcy litigation.

Leah received her B.A., magna cum laude, from Harvard College and received her J.D. from Harvard Law School.

## Practice Areas

› Complex Commercial Litigation

## Admissions

› New York State
› State of Florida

## Education

› Harvard College (B.A., 2016)
› Harvard Law School (J.D., 2019)

## Firm News & Announcements

› **Weil Secures Dismissal for Computer Tech Executive Named in Trump Lawsuit**
Litigation Win — September 15, 2022

Copyright © 2022 Weil, Gotshal & Manges LLP, All Rights Reserved. The contents of this website may contain attorney advertising under the laws of various states. Prior results do not guarantee a similar outcome. Weil, Gotshal & Manges LLP is headquartered in New York and has office locations in Beijing,

Beijing, Brussels, Frankfurt, Hong Kong, London, Moscow, New York, Paris,
Princeton, Shanghai, Silicon Valley and Washington, D.C.

# EXHIBIT B

Time Entry Detail

| Date | Timekeeper | Rate | Time | Description |
|------|-----------|------|------|-------------|
| 4/13/2022 | Brian Liegel | $1,080.00 | 2.3 | Review and analyze RICO jurisdiction arguments in the Complaint |
| 4/20/2022 | Brian Liegel | $1,080.00 | .8 | Participate in joint defense call |
| 4/21/2022 | Brian Liegel | $1,080.00 | .7 | Review and analyze the S.D. FLA filing requirements and confer with S. Tyrrell re: extension to response to the Complaint |
| 4/22/2022 | Brian Liegel | $1,080.00 | 1.1 | Draft motion for extension of time |
| 4/25/2022 | Steven Tyrrell | $1,435.50 | .9 | Communications with client and counsel for other defendants regarding case status; review and analyze related materials |
| 4/25/2022 | Brian Liegel | $1,080.00 | .3 | Review and analyze Court order on Plaintiff's request for extension to amend |
| 4/26/2022 | Steven Tyrrell | $1,435.50 | .9 | Review and revise draft motion for extension of time, motion for admission *pro hac vice* and related filings; communications regarding status of case and related matters |
| 4/26/2022 | Ann    Merlin (Paralegal) | $387.00 | 1.1 | Review, revise, electronically file and download and distribute *pro hac vice* motion, motion for extension of time, notice of appearance, email correspondence with judge forwarding proposed orders |
| 4/26/2022 | Brian Liegel | $1,080.00 | 1.4 | Revise motion for extension of time, *pro hac vice* motion and proposed order; file same |
| 4/27/2022 | Steven Tyrrell | $1,435.50 | .4 | Review and analyze miscellaneous filings in the case |
| 4/28/2022 | Steven Tyrrell | $1,435.50 | .4 | Review and analyze miscellaneous filings in the case |
| 4/29/2022 | Steven Tyrrell | $1,435.50 | .3 | Review and analyze miscellaneous filings in the case |
| 5/02/2022 | Steven Tyrrell | $1,435.50 | .3 | Review and analyze miscellaneous filings in the case |
| 5/03/2022 | Steven Tyrrell | $1,435.50 | .4 | Communications regarding preparation of motion to dismiss; Review and analyze miscellaneous filings in the case |
| 5/04/2022 | Steven Tyrrell | $1,435.50 | .3 | Communications regarding preparation of motion to dismiss and scheduling order; Review and analyze miscellaneous filings in the case |
| 5/04/2022 | Brian Liegel | $1,080.00 | 2.7 | Review other defendants' motions to dismiss to identify arguments to adopt |
| 5/04/2022 | Leah Saiontz | $756.00 | 3.7 | Review other defendants' motions to dismiss to identify arguments to adopt; conference with B. Liegel re: same |
| 5/05/2022 | Steven Tyrrell | $1,435.50 | .3 | Communications regarding preparation of motion to dismiss; Review and analyze miscellaneous filings in the case |
| 5/05/2022 | Brian Liegel | $1,080.00 | 2.1 | Draft outline of arguments for motion to dismiss |
| 5/05/2022 | Leah Saiontz | $756.00 | 4.2 | Draft outline of arguments for motion to dismiss; conference with B. Liegel re: same |
| 5/06/2022 | Steven Tyrrell | $1,435.50 | .5 | Communications regarding preparation of motion to dismiss; Review and analyze miscellaneous filings in the case |
| 5/06/2022 | Brian Liegel | $1,080.00 | .2 | Confer with S. Tyrrell regarding coordination with co-defendants |
| 5/06/2022 | Leah Saiontz | $756.00 | 2.0 | Draft outline of arguments for motion to dismiss |
| 5/07/2022 | Steven Tyrrell | $1,435.50 | .2 | Communications regarding preparation of motion to dismiss; Review and analyze miscellaneous filings in the case |
| 5/09/2022 | Steven Tyrrell | $1,435.50 | .6 | Review and analyze draft outline of arguments for motion to dismiss; review and analyze recent filings; miscellaneous communications re: same |
| 5/09/2022 | Brian Liegel | $1,080.00 | .8 | Draft outline of arguments for motion to dismiss |

| 5/09/2022 | Leah Saiontz | $756.00 | 4.1 | Draft outline of arguments for motion to dismiss |
|---|---|---|---|---|
| 5/10/2022 | Steven Tyrrell | $1,435.50 | .4 | Communications regarding preparation of motion to dismiss; Review and analyze miscellaneous filings in the case |
| 5/10/2022 | Leah Saiontz | $756.00 | 3.5 | Draft motion to dismiss |
| 5/11/2022 | Steven Tyrrell | $1,435.50 | .2 | Review and analyze miscellaneous filings in the case |
| 5/11/2022 | Brian Liegel | $1,080.00 | 1.1 | Review and analyze co-defendant motions to dismiss to evaluate adoption of arguments |
| 5/11/2022 | Leah Saiontz | $756.00 | 4.2 | Draft motion to dismiss |
| 5/12/2022 | Brian Liegel | $1,080.00 | 2 | Revise draft of motion to dismiss |
| 5/13/2022 | Steven Tyrrell | $1,435.50 | .3 | Review and analyze recent filings |
| 5/13/2022 | Brian Liegel | $1,080.00 | 1.5 | Revise motion to dismiss |
| 5/13/2022 | Leah Saiontz | $756.00 | 7.2 | Revise motion to dismiss |
| 5/15/2022 | Brian Liegel | $1,080.00 | 3.1 | Revise motion to dismiss |
| 5/16/2022 | Steven Tyrrell | $1,435.50 | .5 | Communications regarding preparation of motion to dismiss; Review and analyze miscellaneous filings in the case |
| 5/16/2022 | Brian Liegel | $1,080.00 | 2 | Complete first draft of motion to dismiss |
| 5/17/2022 | Steven Tyrrell | $1,435.50 | .4 | Communications regarding preparation of motion to dismiss; Review and analyze miscellaneous filings in the case |
| 5/17/2022 | Brian Liegel | $1,080.00 | .2 | Correspond with S. Tyrrell re: status hearing |
| 5/18/2022 | Ed Soto | $1,435.50 | 1 | Review and comment on motion to dismiss; review of other related motions to dismiss in connection with same; correspondence re: same |
| 5/18/2022 | Steven Tyrrell | $1,435.50 | 3.8 | Review and revise draft motion to dismiss; related legal research; miscellaneous communications including with counsel to co-defendants re: same |
| 5/18/2022 | Brian Liegel | $1,080.00 | 1.9 | Participate in joint defense call re: upcoming status hearing; revise brief and confer with S. Tyrrell re: same |
| 5/18/2022 | Leah Saiontz | $756.00 | 1.5 | Revise motion to dismiss |
| 5/19/2022 | Steven Tyrrell | $1,435.50 | 1 | Miscellaneous communications regarding coordination with co-defendants on motion to dismiss arguments; review and analyze materials re: same; review and analyze recent filings |
| 5/19/2022 | Ann Merlin | $387.00 | 5.2 | Conduct citation check of motion to dismiss |
| 5/19/2022 | Brian Liegel | $1,080.00 | 1.9 | Revise motion to dismiss |
| 5/19/2022 | Leah Saiontz | $756.00 | 2.4 | Revise motion to dismiss |
| 5/20/2022 | Steven Tyrrell | $1,435.50 | 2.7 | Review, revise, and finalize motion to dismiss; review and analyze related materials and filings; miscellaneous communications re: same |
| 5/20/2022 | Brian Liegel | $1,080.00 | 1.2 | Revise and prepare motion to dismiss for filing |
| 5/20/2022 | Leah Saiontz | $756.00 | 1 | Finalize motion to dismiss for filing |
| 5/23/2022 | Steven Tyrrell | $1,435.50 | .3 | Review and analyze miscellaneous recent filings |
| 5/25/2022 | Steven Tyrrell | $1,435.50 | .2 | Review and analyze miscellaneous recent filings |
| 5/26/2022 | Steven Tyrrell | $1,435.50 | .2 | Review and analyze miscellaneous recent filings |
| 5/31/2022 | Steven Tyrrell | $1,435.50 | .4 | Review and analyze miscellaneous recent filings |
| 6/01/2022 | Steven Tyrrell | $1,435.50 | .2 | Miscellaneous communications regarding upcoming status conference |
| 6/02/2022 | Steven Tyrrell | $1,435.50 | .8 | Attend status conference by Zoom; miscellaneous communications re: same |
| 6/03/2022 | Steven Tyrrell | $1,435.50 | .5 | Miscellaneous communications regarding scheduling next status conference, potential briefing schedule for renewed motions to dismiss, status of matter, and recent filings; review and analyze documents relating to same |
| 6/06/2022 | Steven Tyrrell | $1,435.50 | .2 | Review and analyze recent filings |
| 6/13/2022 | Steven Tyrrell | $1,435.50 | .2 | Miscellaneous communications with counsel for co-defendant |

| 6/14/2022 | Steven Tyrrell | $1,435.50 | .4 | Miscellaneous communications with joint defense group regarding upcoming status conference and coordination of motions to dismiss anticipated amended complaint |
| 6/15/2022 | Steven Tyrrell | $1,435.50 | .8 | Miscellaneous communications, including conference call with joint defense group, regarding upcoming status conference and coordination of motions to dismiss anticipated amended complaint |
| 6/21/2022 | Steven Tyrrell | $1,435.50 | .4 | Review and analyze miscellaneous recent filings; communications re: same |
| 6/22/2022 | Steven Tyrrell | $1,435.50 | 3.9 | Review and analyze amended complaint; review and analyze related recent filings; miscellaneous communications with counsel for other defendants and others re: same |
| 6/22/2022 | Leah Saiontz | $756.00 | 3.2 | Review and analyze amended complaint with focus on new/amended arguments relevant to client |
| 6/23/2022 | Steven Tyrrell | $1,435.50 | 1.7 | Misc. Communications with client and other defense counsel regarding preparation of motion to dismiss amended complaint; review and analyze recent filings |
| 6/23/2022 | Brian Liegel | $1,080.00 | 1.3 | Participate in joint defense discussion re: briefing and analysis of amended complaint |
| 6/23/2022 | Leah Saiontz | $756.00 | 1.2 | Discuss response to amended complaint with counsel to co-defendants |
| 6/24/2022 | Brian Liegel | $1,080.00 | .3 | Review and analyze co-defendants' outline for motion to dismiss brief |
| 6/27/2022 | Steven Tyrrell | $1,435.50 | 1.1 | Miscellaneous communications, including with other defense counsel, regarding preparation of motion to dismiss amended complaint; review and analyze recent filings |
| 6/27/2022 | Leah Saiontz | $756.00 | 2.1 | Draft motion to dismiss amended complaint |
| 6/28/2022 | Steven Tyrrell | $1,435.50 | .7 | Miscellaneous communications including with client and other defense counsel, regarding preparation of motion to dismiss amended complaint; review and analyze recent filings |
| 6/28/2022 | Leah Saiontz | $756.00 | .4 | Draft motion to dismiss amended complaint |
| 6/29/2022 | Steven Tyrrell | $1,435.50 | .6 | Miscellaneous communications regarding preparation of motion to dismiss amended complaint; review and analyze recent filings |
| 6/30/2022 | Steven Tyrrell | $1,435.50 | 1 | Miscellaneous communications regarding request for extension of time to file motion to dismiss amended complaint and related matters; review draft stipulation re: same; review and analyze recent filings |
| 6/30/2022 | Brian Liegel | $1,080.00 | .5 | Revise brief insert for co-defendant |
| 6/30/2022 | Leah Saiontz | $756.00 | 2.8 | Draft motion to dismiss amended complaint |
| 7/01/2022 | Steven Tyrrell | $1,435.50 | 1.7 | Miscellaneous communications regarding request for extension of time to file motion to dismiss amended complaint, draft of sections of motion to dismiss, and related matters; Review and analyze related materials and recent filings |
| 7/01/2022 | Brian Liegel | $1,080.00 | 1.8 | Revise individual motion and joint motion and participate in joint defense call re: same |
| 7/01/2022 | Leah Saiontz | $756.00 | 5.5 | Draft motion to dismiss amended complaint; participate in joint defense call re: same |
| 7/05/2022 | Steven Tyrrell | $1,435.50 | 3.4 | Miscellaneous communications, including conference call with defense counsel, regarding draft consolidated motion to dismiss, motion to increase page limit, and related matters; Review and analyze related materials; conduct legal research |
| 7/05/2022 | Brian Liegel | $1,080.00 | .3 | Participate in joint defense call re: briefing |

| 7/05/2022 | Leah Saiontz | $756.00 | .8 | Participate in joint defense call re: briefing; Review co-defendant draft of section of motion to dismiss |
| 7/06/2022 | Steven Tyrrell | $1,435.50 | 3.1 | Miscellaneous communications including with other defense counsel, regarding draft consolidated motion to dismiss and related matters; review and revise draft section of motion to dismiss; conduct legal research |
| 7/06/2022 | Brian Liegel | $1,080.00 | .8 | Revise draft motion to dismiss |
| 7/06/2022 | Leah Saiontz | $756.00 | .5 | Review co-defendant draft section of motion to dismiss |
| 7/07/2022 | Steven Tyrrell | $1,435.50 | 2.6 | Miscellaneous communications, including with other defense counsel, regarding draft consolidated motion to dismiss and related matters; review and revise draft section of motion to dismiss; miscellaneous legal research re: same; review motion for enlargement of page limit for motion to dismiss |
| 7/07/2022 | Brian Liegel | $1,080.00 | 1.2 | Revise motion to dismiss on personal jurisdiction and co-defendant's section of the joint motion |
| 7/08/2022 | Steven Tyrrell | $1,435.50 | 3.8 | Miscellaneous communications, including with other defense counsel, regarding draft consolidated motion to dismiss, motion for enlargement of page limit, and related matters; review and analyze related materials, including draft sections of motion to dismiss; conduct miscellaneous legal research re: same |
| 7/08/2022 | Ann Merlin | $387.00 | 1.1 | Cite check motion to dismiss for lack of personal jurisdiction |
| 7/09/2022 | Brian Liegel | $1,080.00 | 1.4 | Draft individual insert for motion to dismiss |
| 7/11/2022 | Brian Liegel | $1,080.00 | 1.3 | Revise individual section of motion to dismiss and coordinate with group on edits |
| 7/12/2022 | Steven Tyrrell | $1,435.50 | 1.2 | Review and provide additional edits to the joint motion to dismiss the amended complaint; Miscellaneous communications re: same |
| 7/12/2022 | Brian Liegel | $1,080.00 | 1.3 | Review and analyze revised motion to dismiss and respond to questions from counsel to co-defendant |
| 7/13/2022 | Ed Soto | $1,435.50 | .5 | Review and comment on issues related to the proposed draft motion to dismiss; review and comment on correspondence related to same |
| 7/13/2022 | Steven Tyrrell | $1,435.50 | .6 | Review and provide additional edits to the supplemental motion to dismiss the amended complaint; communications re: same |
| 7/13/2022 | Leah Saiontz | $756.00 | .2 | Finalize motion to dismiss on personal jurisdiction |
| 7/14/2022 | Brian Liegel | $1,080.00 | .7 | Revise brief and file motion to dismiss on personal jurisdiction |
| 7/18/2022 | Steven Tyrrell | $1,435.50 | 1.4 | Miscellaneous communications, including with client, regarding motion to dismiss and related matters; review and analyze recent filings |
| 7/19/2022 | Steven Tyrrell | $1,435.50 | 1.4 | Miscellaneous communications, including with client and other counsel, regarding status of matter, ongoing coordination, and related matters; review and analyze materials re: same |
| 7/21/2022 | Steven Tyrrell | $1,435.50 | .7 | Miscellaneous communications, including with other defense counsel, regarding status of matter, ongoing coordination on preparation of reply in support of motion to dismiss, and related matters; and analyze recent filings |
| 7/22/2022 | Steven Tyrrell | $1,435.50 | .7 | Miscellaneous communications, including with client, regarding status of case and related matters; review and analyze recent filings |
| 7/25/2022 | Steven Tyrrell | $1,435.50 | .2 | Review recent filings |

| 7/26/2022 | Steven Tyrrell | $1,435.50 | .5 | Miscellaneous communications, including call with other defense counsel, regarding coordination on preparation of reply in support of motion to dismiss and related matters |
|-----------|----------------|-----------|-----|----------------------------------------------------------------|
| 7/28/2022 | Steven Tyrrell | $1,435.50 | .2 | Miscellaneous communications regarding preparation of reply in support of motion to dismiss amended complaint |
| 7/29/2022 | Steven Tyrrell | $1,435.50 | .4 | Miscellaneous communications regarding preparation of reply in support of motion to dismiss amended complaint and related matters |
| 7/29/2022 | Leah Saiontz | $756.00 | 1 | Draft reply in support of motion to dismiss based on lack of personal jurisdiction |
| 8/05/2022 | Steven Tyrrell | $1,435.50 | 4.7 | Miscellaneous communications, including Zoom conferences with joint defense group and specific co-defendants, regarding filings in opposition to motions to dismiss, preparation of reply in support of joint motion, and related issues; review and analyze filings and related materials |
| 8/05/2022 | Leah Saiontz | $756.00 | 4.1 | Draft response to reply re: personal jurisdiction |
| 8/08/2022 | Steven Tyrrell | $1,435.50 | 3.3 | Review, analyze and revise sections of reply in support of joint motion to dismiss; review and analyze draft reply in support of individual motion to dismiss for lack of personal jurisdiction; review and analyze related materials; review recent filings |
| 8/08/2022 | Brian Liegel | $1,080.00 | 4.3 | Draft reply in support of motion to dismiss |
| 8/08/2022 | Leah Saiontz | $756.00 | 3.1 | Draft reply in support of motion to dismiss; correspondence re: same |
| 8/09/2022 | Steven Tyrrell | $1,435.50 | 2.7 | Review and revise draft reply in support of individual motion to dismiss for lack of personal jurisdiction; review and analyze related materials; review recent filings; miscellaneous communications re: same |
| 8/09/2022 | Leah Saiontz | $756.00 | 2.8 | Draft response to reply re: personal jurisdiction; correspondence re: same |
| 8/10/2022 | Steven Tyrrell | $1,435.50 | 3.4 | Review and revise joint reply in support of motion to dismiss; review and revise reply in support of motion to dismiss on personal jurisdiction grounds; review and analyze related materials; miscellaneous communications, including Zoom conference with all defense counsel, re: same and related matters; review recent filings |
| 8/10/2022 | Leah Saiontz | $756.00 | 1.7 | Draft response to reply re: personal jurisdiction; correspondence re: same |
| 8/11/2022 | Steven Tyrrell | $1,435.50 | 2.6 | Review and provide final comments and edits for joint reply in support of motion to dismiss; review revise reply in support of motion to dismiss on personal jurisdiction grounds; review and analyze related materials; miscellaneous communications re: same and related matters; review recent filings |
| 8/11/2022 | Brian Liegel | $1,080.00 | 1.2 | Revise briefs on reply on motion to dismiss |
| 8/11/2022 | Leah Saiontz | $756.00 | 1.1 | Finalize and file motion to dismiss |
| 8/12/2022 | Steven Tyrrell | $1,435.50 | .6 | Review recent filings |
| 8/15/2022 | Steven Tyrrell | $1,435.50 | .5 | Review recent filings; misc. Communications re: same |
| 8/16/2022 | Steven Tyrrell | $1,435.50 | .4 | Review recent filings |
| 8/17/2022 | Steven Tyrrell | $1,435.50 | .3 | Review recent filings |
| 8/18/2022 | Steven Tyrrell | $1,435.50 | .5 | Review recent filings |
| 9/01/2022 | Steven Tyrrell | $1,435.50 | .2 | Review recent filings |
| 9/06/2022 | Steven Tyrrell | $1,435.50 | .2 | Review recent filings |
| 9/07/2022 | Steven Tyrrell | $1,435.50 | .2 | Review recent filings |

| 9/08/2022 | Steven Tyrrell | $1,435.50 | .6 | Review recent filings; Miscellaneous communications, including with client, regarding order granting motion to dismiss |
| 9/09/2022 | Steven Tyrrell | $1,435.50 | 1.8 | Review order granting motions to dismiss; review and revise draft summary of order and next steps for client; Communications re: same; Communications with joint defense group regarding potential motion for sanctions |
| 9/09/2022 | Brian Liegel | $1,080.00 | 1.9 | Analyze court ruling and draft summary of same and appeal prospects |
| 9/09/2022 | Leah Saiontz | $882.00 | .9 | Analyze court ruling and draft summary of same |
| 9/12/2022 | Steven Tyrrell | $1,435.50 | .6 | Miscellaneous communications, including with joint defense group, regarding potential motion for sanctions; review and analyze related materials |
| 9/13/2022 | Steven Tyrrell | $1,435.50 | 1.0 | Miscellaneous communications, including with joint defense group, regarding potential motion for sanctions; review and analyze related materials |
| 9/13/2022 | Brian Liegel | $1,080.00 | .6 | Participate in group discussion re sanctions motion |
| 9/14/2022 | Leah Saiontz | $882.00 | 1.4 | draft insert for sanctions motion |
| 9/16/2022 | Steven Tyrrell | $1,435.50 | .4 | Communications regarding potential motion for sanctions |
| 9/20/2022 | Leah Saiontz | $882.00 | .8 | Draft insert for sanctions motion |
| 9/21/2022 | Steven Tyrrell | $1,435.50 | 1.7 | Review draft motion for sanctions; communications re: same; review and analyze related materials |
| 9/21/2022 | Brian Liegel | $1,080.00 | .9 | Revise sanctions motion |
| 9/23/2022 | Steven Tyrrell | $1,435.50 | .8 | Review and analyze revised draft motion for sanctions; communications, including with client, re: same. |
| 9/28/2022 | Steven Tyrrell | $1,435.50 | .7 | Communications with counsel for other defendants regarding sanctions motions; review and analyze revised draft motion and related materials |
| 9/28/2022 | Brian Liegel | $1,080.00 | .4 | Participate in conversation with joint defense group re sanctions |
| 9/29/2022 | Leah Saiontz | $882.00 | 4.8 | Draft declaration in support of fee request |
| 9/30/2022 | Brian Liegel | $1,080.00 | 2.4 | Draft declaration in support of fee request and confer with S. Tyrrell re: same; revise motion for sanctions |

# EXHIBIT C



-----Original Message-----
From: do_not_reply@psc.uscourts.gov <do_not_reply@psc.uscourts.gov>
Sent: Tuesday, April 26, 2022 12:44 PM
To: Merlin, Ann <Ann.Merlin@weil.com>
Subject: Pay.gov Payment Confirmation: FLORIDA SOUTHERN DISTRICT COURT

Your payment has been successfully processed and the details are below. If you have any questions or you wish to cancel this payment, please contact: Financial Section at 305-523-5050.

  Account Number: 4283419
  Court: FLORIDA SOUTHERN DISTRICT COURT
  Amount: $200.00
  Tracking Id: AFLSDC-15589786
  Approval Code: 145485
  Card Number: ************
  Date/Time: 04/26/2022 12:43:29 ET

  NOTE: This is an automated message. Please do not reply

# EXHIBIT D

ID:           54613.0004                                          PROFORMA #   12690315
CLIENT:       RODNEY JOFFE                                        BILL #
MATTER:       TRUMP CIVIL RICO CASE

**ITEMIZED DISBURSEMENTS- 54613.0004 - TRUMP CIVIL RICO CASE**

**NAME**

| DATE | DESCRIPTION | DISB TYPE | DISB ID# | AMOUNT |
|------|-------------|-----------|----------|--------|
| 09/20/22 | Saiontz, Leah | S061 | 41137121 | $552.29 |
| | ELECTRONIC RESEARCH | | | |
| | NY LEXIS - SAIONTZ, LEAH 08/05/2022 ACCOUNT 424YN6CXS | | | |
| 09/23/22 | Muller, Michael | S061 | 41151218 | $39.00 |
| | ELECTRONIC RESEARCH | | | |
| | PACER USAGE REPORT - NEW YORK OFFICE - AUGUST 2022 | | | |
| 09/26/22 | Merlin, Ann | S061 | 41139782 | $13.04 |
| | ELECTRONIC RESEARCH | | | |
| | MIAMI WESTLAW - MERLIN,ANN 08/08/2022 TRANSACTIONS: 15 | | | |

                                    **TOTAL DISBURSEMENTS**                    **$604.33**

# EXHIBIT 12

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Donald J. Trump,

        Plaintiff,

    v.

Hillary R. Clinton *et al.*,

        Defendants.

Civil Action No. 2:22-14102-DMM

**DECLARATION OF ENJOLIQUÉ A. LETT IN SUPPORT OF
DEFENDANTS' MOTION FOR SANCTIONS AND FEES**

I, Enjoliqué A. Lett, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am a shareholder at Greenberg Traurig, P.A., counsel of record for Orbis Business Intelligence Ltd. in the above captioned matter.

2.      Attached as Exhibit A are the law firm website biographies of the attorneys at Greenberg Traurig, P.A. for whom Orbis Business Intelligence Ltd. seeks attorneys' fees. The biographies reflect the professional qualifications of those attorneys.

3.      Greenberg Traurig, P.A. entered into a retention agreement with Orbis Business Intelligence, Ltd. in connection with the present litigation. Orbis Business Intelligence Ltd. agreed to pay all of Greenberg Traurig, P.A.'s costs, fees, and expenses incurred in connection with the present suit.

4.      Attached as Exhibit B is a true and correct copy of the hours worked by counsel for Orbis Business Intelligence Ltd. Orbis Business Intelligence Ltd. is not seeking reimbursement for the attorneys' customary hourly rates. Instead, Orbis Business Intelligence Ltd. seeks fees at discounted hourly rates for the attorneys as described in Exhibit B and below. These discounted hourly rates are consistent with the rates this Court concluded were reasonable in *Celsius Holdings,*

1

*Inc v. A SHOC Beverage, LLC*, No. 21-cv-80740, 2022 WL 3568042 (July 19, 2022). Exhibit B also provides an accurate statement of the work provided by Greenberg Traurig, P.A. during the periods for which discounted fees are sought.

5. Consistent with the discussion in the Memorandum in Support of Sanctions and the information provided in Exhibit B, I summarize below in Charts B and C the fees associated with two different phases of the case as applicable to Orbis Business Intelligence Ltd.: the fees incurred between the filing of Orbis Business Intelligence Ltd.'s motion to dismiss to the Court's order dismissing the suit, and the fees incurred to date in connection with the motion for sanctions.

6. As reflected in Chart B, the discounted fees incurred by Orbis Business Intelligence Ltd. from the filing of Orbis Business Intelligence Ltd.'s motion to dismiss to this Court's dismissal of the suit total $40,675.

7. As reflected in Chart C, the discounted fees incurred by Orbis Business Intelligence Ltd. in connection with the motion for sanctions, to date, total $9375.

**Chart A: Fees incurred from Complaint to initial MTD[1]**

| Timekeeper | Discounted Fee | Hours | Fees |
|---|---|---|---|
| Enjoliqué A. Lett | $700 | 0 | $0 |
| Akiesha G. Sainvil | $450 | 0 | $0 |

[1] Defendant Orbis Business Intelligence Ltd. was not purportedly served with process until after Plaintiff's filing of his Amended Complaint, therefore Defendant Orbis Business Intelligence Ltd. filed its Motion to Dismiss as to Plaintiff's Amended Complaint. Accordingly, Defendant Orbis Business Intelligence Ltd. did not incur any fees from the original Complaint to co-defendants' initial Motions to Dismiss.

**Chart B:  Fees incurred initial MTD to dismissal**

| Timekeeper | Discounted Fee | Hours | Fees |
|---|---|---|---|
| Enjoliqué A. Lett | $700 | 23.2 | $16,240 |
| Akiesha G. Sainvil | $450 | 54.3 | $24,435 |

**Chart C:  Fees incurred to date on sanctions motion**

| Timekeeper | Discounted Fee | Hours | Fees |
|---|---|---|---|
| Enjoliqué A. Lett | $700 | 12.3 | $8,610 |
| Akiesha G. Sainvil | $450 | 1.7 | $765 |

8.      I believe that the discounted rates claimed are reasonable given the professional qualifications of the billers as evidenced in Exhibit A for the Southern District of Florida market and given the rates approved by this Court in *Celsius*.

9.      Consistent with local Rule 7.3, counsel sent the draft sanctions motion and draft supporting declarations to Plaintiff's counsel on October 5, 2022.  Defendants met and conferred in good faith with Plaintiff's counsel by Microsoft Teams twice, on October 13 and October 26, 2022, but were unable to reach any agreement as to either the Defendants' entitlement to or the amount of fees and expenses not taxable under 28 U.S.C. §1920 that are recoverable from Plaintiff and/or his counsel.

 /s/ *Enjoliqué A. Lett*
Enjoliqué A. Lett

Dated: October 27, 2022

3

# EXHIBIT

# "A"

**GT** GreenbergTraurig



# Enjoliqué Aytch Lett

SHAREHOLDER

Enjolique.Lett@gtlaw.com

**MIAMI**
333 SE 2nd Avenue
Suite 4400
Miami, FL 33131
+1 305.579.0640

in https://www.linkedin.com/in/enjoliqu%C3%A9-lett-0364641/

## Litigation | Products Liability & Mass Torts | Pharmaceutical, Medical Device & Health Care Litigation | Commercial Litigation | Pharmaceutical, Medical Device & Health Care

Enjoliqué Aytch Lett leads bet-the-company litigation on behalf of drug and medical device manufacturers. She has worked as lead counsel in all aspects of mass tort and multi-district litigation, and has substantial experience and background defending high-profile clients in complex commercial litigation.

Enjoliqué is passionate about service and devotes her time and efforts to professional organizations and to the community as a whole. She serves as Pro Bono Chair for the South Florida Chapter of the Federal Bar Association and the DRI Products Liability Committee, and mentors students at the University of Miami and Florida International University. She also mentors a former prisoner returning to society through a partnership with the Southern District of Florida's Court Assisted Reentry (C.A.R.E.) Program.

## Concentrations

- Litigation
- Products liability
- Pharmaceutical, medical device, and health care litigation
- Medical malpractice
- Commercial litigation

## Experience

### Representative Matters

- Won dismissal of lawsuit alleging civil RICO conspiracy and respondeat superior/vicarious liability claims filed by former U.S. President on behalf of British intelligence agency. *See* Law360, Trump's RICO Suit Against Clinton Dismissed As 'Manifesto'; Law.com, Judge Trashes Trump's RICO Lawsuit Against Hillary Clinton, Perkins Coie.
- Represents manufacturer of Chinese drywall in mass tort actions in the state and federal courts of Florida.

© 2022 Greenberg Traurig, LLP

**GT** GreenbergTraurig

- Lead defense counsel for a hernia mesh medical device manufacturer in a high-profile MDL centralized in the District of New Hampshire against claims of strict product liability, negligence, breach of warranty, and other causes of action.°

- Lead a 20+ lawyer team representing a hernia mesh manufacturer in related state mass tort actions alleging strict product liability, negligence, breach of warranty, and other causes of action.°

- Represented sportswear giant, Under Armour, against a declaration judgment action where opponent attempted to show that its trademarks did not infringe on Under Armour's trademarks, and seeking the cancellation of Under Armour registered trademarks; prosecuted Under Armour's claims for trademark infringement, trademark dilution, unfair compensation, and cybersquatting under the Lanham Act, 15 U.S.C. § 1051, et seq.°

  °*The above representations were handled by Ms. Lett prior to her joining Greenberg Traurig, P.A.*

## Recognition & Leadership

### Awards & Accolades

- Listed, *Florida Trend* magazine, "Legal Elite — Commercial Litigation," 2022
  - "Up and Comer," 2022
- Team Member, a *Law360* "Product Liability Practice Group of the Year," 2021
- Listed, *Legal 500 United States,* 2021-2022
  - Dispute Resolution - Product Liability, Mass Tort and Class Action - Defense: Pharmaceuticals and Medical Devices, 2021-2022
  - Dispute Resolution - Product Liability, Mass Tort and Class Action - Defense: Consumer Products (Including Tobacco), 2021
- Listed, The National Black Lawyers, "Top 40 Under 40," 2015-2020
- Listed, Cystic Fibrosis Foundation, "40 Under 40 Outstanding Lawyers of South Florida," 2018
- Listed, *Super Lawyers* magazine, *Florida Super Lawyers*, "Rising Stars," 2019-2021
- Recognized, *Daily Business Review*, Professional Excellence Awards, "Young Lawyer on the Rise," 2017
- Listed, *Legacy Miami* magazine, "Miami-Dade County's 40 Under 40 Black Leaders of Today and Tomorrow," 2014
- Listed, *Super Lawyers* magazine, *Georgia Super Lawyers, "Rising Stars," 2011*

### Professional & Community Involvement

- Member, Editorial Board, *The Atlanta Lawyer*, 2010-2016
- Member, The Atlanta Bar Association, 2007-2016
- Chair, DRI Product Liability Diversity Committee, 2016-2019
  - Chair, DRI Product Liability Philanthropic Activities, 2019-Present
- Board Member, Federal Bar Association, South Florida Chapter, 2016-Present
  - Chair, Pro Bono Committee, Federal Bar Association, South Florida Chapter, 2016-Present
- Member, Gate City Bar Association, 2007-2016
- Member, Georgia Association for Women Lawyers (GAWL), 2007-2014

**GT** GreenbergTraurig

- Member, Georgia Association of Black Women Attorneys (GABWA), 2004-Present
- Member, The Lawyers' Committee for Civil Rights Under Law's Election Protection, 2008-2012
- Miami City Lead, Leadership Council on Legal Diversity, 2018-Present
    - Fellow, Leadership Council on Legal Diversity, 2017
- Member, Wilkie D. Ferguson, Jr. Bar Association, 2012-Present
- Young Lawyers Division Leadership Academy, State Bar of Georgia, 2010

## Credentials

### Education

- J.D., *cum laude*, University of Georgia School of Law, 2007
    - Editor-in-Chief, *Georgia Journal of International & Comparative Law*
    - Regional Best Brief, Frederick Douglass Moot Court Competition
- B.A., American University, 2003

### Clerkship

- Hon. Marcia G. Cooke, U.S. District Court for the Southern District of Florida, 2012-2014

### Admissions

- Florida
- Georgia
- U.S. District Court for the Northern District of Florida
- U.S. District Court for the Middle District of Florida
- U.S. District Court for the Southern District of Florida
- U.S. District Court for the Northern District of Georgia
- U.S. District Court for the Middle District of Georgia

## News, Insights & Presentations

### News

| | |
|---|---|
| 09.09.22 | Read the Doc: Judge Trashes Trump's RICO Lawsuit Against Hillary Clinton, Perkins Coie, *National Law Journal* |
| 09.09.22 | Trump Vows to Appeal Dismissal of RICO Lawsuit Against Hillary Clinton, Perkins Coie, *National Law Journal* |
| 09.09.22 | Trump's RICO Suit Against Clinton Dismissed As 'Manifesto', *Law360 Pulse* |
| 04.21.21 | Greenberg Traurig Hires Holland & Knight Litigator Amid Miami Expansion, *Daily Business Review* |
| 01.11.21 | Greenberg Traurig Sees Fast Growth in Products Liability Practice, *Daily Business Review* |
| 11.20.20 | Akerman Mass Tort Litigator Jumps to Greenberg Traurig, *Daily Business Review* |

**GT** GreenbergTraurig

### Insights

**05.27.21**   Diversity, Equity, and Inclusion in Law Firms and Corporate Legal Departments, *Diversity Insider* | Published Article

**05.21.21**   Businesses Must Prepare to Defend Against Covid-19 Lawsuits Despite Shields, *Bloomberg Law Daily Labor Report* | Published Article

### Presentations

**10.30.22**   Product Liability in the 21st Century, International Bar Association (IBA) Annual Conference

**06.17.22**   Speaker, Opening Remarks- AS/COA Women's Hemispheric Network Forum – Miami 2022, AS/COA Women's Hemispheric Network Forum – Miami

**03.11.22**   Panelist, 6th Annual Miami Law Class Action & Complex Litigation Forum

**09.21.18**   MDL – To Centralize or Not to Centralize, That is the Question, Trial Network, Minneapolis Products Liability SuperCourse

© 2022 Greenberg Traurig, LLP

**GT** GreenbergTraurig



# Akiesha Gilcrist Sainvil

ASSOCIATE

Akiesha.Sainvil@gtlaw.com

**MIAMI**
333 SE 2nd Avenue
Suite 4400
Miami, FL 33131
+1 305.579.0642

## Litigation | Pharmaceutical, Medical Device & Health Care Litigation | Products Liability & Mass Torts | Pharmaceutical, Medical Device & Health Care

Akiesha Gilcrist Sainvil focuses her practice on defending medical device, pharmaceutical, and consumer products manufacturers in high-stakes complex products liability and mass torts litigation. She handles and manages all aspects of litigation, ranging from pre-suit matters through trial, and onwards through appeal. Akiesha understands that there are often nationwide or global business implications for clients in all litigation and works to strategically align her representation of clients with those needs.

Akiesha brings a broad range of industry experience to her practice, having also defended major retailers, automotive and transportation companies, financial and health care institutions, and insurance providers in complex commercial litigation matters throughout the country in federal and state courts (including appellate courts) and in arbitration. Akiesha also clerked for Judge D. Michael Fisher of the United States Court of Appeals for the Third Circuit. In drawing upon this experience, she is able to quickly adapt to ever-changing business needs and develop creative litigation strategies.

Akiesha is also active in her community. She devotes herself to the advancement and promotion of diversity in the legal profession through her service as a mentor and advocate for young and aspiring lawyers. She currently serves as Miami City Lead for the Leadership Council on Legal Diversity's Success in Law School Mentoring Program. She also devotes time to pro bono efforts and actively supports the Miami Children's Museum.

## Concentrations

- Pharmaceutical, medical device, and health care litigation
- Products Liability
- Multidistrict litigation
- Class and mass action litigation

## Experience

### Representative Matters

- Won dismissal of lawsuit alleging civil RICO conspiracy and respondeat superior/vicarious liability claims filed by former U.S. President on behalf of British intelligence agency. *See* Law360, Trump's RICO Suit

© 2022 Greenberg Traurig, LLP

**GT** GreenbergTraurig

Against Clinton Dismissed As 'Manifesto'; Law.com, Judge Trashes Trump's RICO Lawsuit Against Hillary Clinton, Perkins Coie.

- Argued and won dismissal of a breach of warranty claim on behalf of medical device manufacturer of flush devices in state court product liability lawsuit.

- Key member of trial team that obtained a complete defense verdict following a two-week trial in July 2021 in a multimillion-dollar action involving cardiovascular intravascular device against our client, a medical device manufacturer of numerous life-saving devices and products.

- Represent manufacturer of flush medical devices against wrongful death suit involving product liability claims in state court.

- Defend medical device manufacturer of vascular devices against product liability claims in federal courts across the country.

- Served as National Coordinating Counsel for Fortune 50 Transportation Company.°

- Represented and defended manufacturers of various products, including HVAC systems, fire extinguishers, engines, and pharmaceutical drugs, against product liability actions in state and federal courts around the country.°

- Obtained summary judgment on behalf of a multinational retailing corporation in contract dispute in federal court.°

- Obtained dismissal on behalf of international banking and financial services institution in vehicle repossession class action in federal court.°

  °The above representations were handled by Akiesha Gilcrist Sainvil prior to her joining Greenberg Traurig, P.A.

## Internships

- Judicial Intern, Honorable David S. Cercone, U.S. District Court for the Western District of Pennsylvania

- Certified Legal Intern, Immigration Clinic, University of Pittsburgh School of Law

---

# Recognition & Leadership

## Awards & Accolades

- Listed, "*The Best Lawyers in America: Ones to Watch*," 2021-2023
  - Product Liability Litigation - Defendants, 2023
  - Mass Tort Litigation / Class Actions - Defendants, 2023
  - Commercial Litigation, 2021-2023
  - Alternative Dispute Resolution, 2021-2023
- Recognized, The National Black Lawyers, "Top 40 Under 40" Attorney in Florida, 2020-2022
- Recognized, *Daily Business Review*, Florida Legal Awards, "Diversity & Inclusion Honoree," 2022
- Listed, *Super Lawyers* magazine, *Florida Super Lawyers*, "Rising Stars," 2021-2022
- Team Member, a *Law360* "Product Liability Practice Group of the Year," 2021
- Recognized, Palm Beach Media Group's *Aventura Magazine*, "Top Lawyer," 2021-2022
- Recognized, *Legacy* Magazine, "40 Under 40: Black Leaders of Today and Tomorrow," 2020
- Selected, Leadership Council on Legal Diversity Program, "Pathfinder," 2017

**GT** GreenbergTraurig

## Professional & Community Involvement

- Leadership Council on Legal Diversity (LCLD)
  - City Lead - Miami, Success in Law School Mentoring Program, 2020–Present
  - City Lead – Miami, Alumni Group, 2020
  - LCLD Pathfinder Program Participant, 2017
- The Florida Bar
  - Member, Diversity & Inclusion Committee, 2022-2023
  - Fellow, Wm. Reece Smith, Jr. (WRS) Leadership Academy, Class IX, 2021-2022
- Dade County Bar Association
  - Member, Diversity & Inclusion Committee
  - Member, Federal Court Committee
- Playmakers Young Professionals Support Group, Miami Children's Museum, 2019–Present
- Federal Bar Association
  - Member, South Florida Chapter
  - Member, Young Lawyers Division
- Museum Ambassadors, Children's Museum of Pittsburgh
- Alumna, International Association of Defense Counsel Trial Academy, 2016
- Allegheny County Bar Association
  - Council Member, Homer S. Brown Division, 2014–2017
  - Diversity Committee Co-Chair, Young Lawyer's Division, 2014–2015

# Credentials

## Education

- J.D., University of Pittsburgh School of Law, 2013
  - Senior Topics Editor, *Law Review*
- B.A., *cum laude*, University of Pittsburgh, 2010

## Admissions

- Florida
- Pennsylvania
- U.S. District Court for the Northern District of Florida
- U.S. District Court for the Southern District of Florida
- U.S. District Court for the Middle District of Florida
- U.S. District Court for the Eastern District of Pennsylvania
- U.S. District Court for the Western District of Pennsylvania
- U.S. Court of Appeals for the Third Circuit

**GT** GreenbergTraurig

### Clerkship

- Hon. D. Michael Fisher, U.S. Court of Appeals for
  the Third Circuit, 2013-2014

## News, Insights & Presentations

### News

| | |
|---|---|
| 09.09.22 | Read the Doc: Judge Trashes Trump's RICO Lawsuit Against Hillary Clinton, Perkins Coie, *National Law Journal* |
| 09.09.22 | Trump Vows to Appeal Dismissal of RICO Lawsuit Against Hillary Clinton, Perkins Coie, *National Law Journal* |
| 09.09.22 | Trump's RICO Suit Against Clinton Dismissed As 'Manifesto', *Law360 Pulse* |
| 06.22.22 | The Florida Bar Wm. Reece Smith, Jr., Leadership Academy, Class IX, Year in Review, *Florida Bar News* |
| 05.16.22 | Diversity: DEI Needs Attention At All Times, 'Not Just When People Are Watching,' Says Greenberg's Akiesha Sainvil, *Daily Business Review* |
| 11.20.20 | Akerman Mass Tort Litigator Jumps to Greenberg Traurig, *Daily Business Review* |

### Insights

| | |
|---|---|
| 01.18.22 | 5 Trends to Watch in 2022 Pharmaceutical, Medical Device & Health Care Litigation | Published Article |
| 05.27.21 | Diversity, Equity, and Inclusion in Law Firms and Corporate Legal Departments, *Diversity Insider* | Published Article |
| 05.21.21 | Businesses Must Prepare to Defend Against Covid-19 Lawsuits Despite Shields, *Bloomberg Law Daily Labor Report* | Published Article |
| 01.01.13 | Undocumented Immigrants: Lack of Equal Protection and Its Impact on Public Health, *Journal of Legal Medicine* | Published Article |

### Presentations

| | |
|---|---|
| 05.19.22 | Honoree, Diversity and Inclusion: Individual, Daily Business Review (DBR) - Florida Legal Awards 2022 |

© 2022 Greenberg Traurig, LLP

# EXHIBIT

# "B"



Invoice No. :   1000083200
File No.      :   210459.010100
Bill Date    :   September 14, 2022

Orbis Business Intelligence

# INVOICE

Re:   Orbis/Trump v. Clinton

Legal Services through August 31, 2022:

|  |  |
|---|---|
| Total Fees: | $ |
| **Current Invoice**: | **$** |

EAL:EC

| | | | | Page 1 |
|---|---|---|---|---|
| Invoice No.: | 1000083200 | | | |
| Re: | Orbis/Trump v. Clinton | | | |
| Matter No.: | 210459.010100 | | | |

Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS | AMOUNT |
|---|---|---|---|---|
| 08/01/22 | Enjolique A. Lett | Prepare for and confer with client concerning defense strategy. | 1.00 | |
| 08/01/22 | Akiesha G. Sainvil | Strategy and introduction call with client concerning status of pending litigation, pertinent facts for motion to dismiss, and action plan for preparation of motion to dismiss | 0.40 | |
| 08/03/22 | Enjolique A. Lett | Review and analyze service documents to Orbis. | 0.20 | |
| 08/04/22 | Enjolique A. Lett | Correspond with client concerning questions regarding service. | 0.10 | |
| 08/04/22 | Akiesha G. Sainvil | Analyze status of matter in furtherance of development of strategy for and preparation of motion to dismiss, including review and attention to procedural posture of case based upon previous filings by other parties and reviewing and analyzing amended complaint | 1.80 | |
| 08/05/22 | Enjolique A. Lett | Contact Plaintiff's counsel to discuss an agreed upon response deadline for Orbis. | 0.10 | |
| 08/05/22 | Enjolique A. Lett | Further analyze service and waiver issues and correspond with client concerning same. | 0.80 | |
| 08/08/22 | Enjolique A. Lett | Attempted contact and correspond with Plaintiff's counsel concerning agreed upon deadline for the response to Plaintiff's Amended Complaint. | 0.30 | |
| 08/09/22 | Enjolique A. Lett | Revise Defendant Orbis' Unopposed Motion to Set Response Deadline and Proposed Order. Review Order Granting In Part Defendant Orbis Business Intelligence Ltd.'s Motion to Set | 0.40 | |
| 08/09/22 | Enjolique A. Lett | Response Deadline to Plaintiff's Amended Complaint. | 0.10 | |
| 08/09/22 | Enjolique A. Lett | Correspond with Plaintiff's counsel securing agreed upon response date. Review correspondence concerning agreed | 0.10 | |
| 08/09/22 | Akiesha G. Sainvil | deadline for response to Amended Complaint and drafting, reviewing, and revising unopposed motion and proposed order regarding same; Review and attention to prior pleadings of parties and continued review and analysis of amended complaint and party motions | 2.60 | |
| 08/10/22 | Akiesha G. Sainvil | Reviewing and assessing pleadings and attention to motion to dismiss strategy; correspondence with client concerning court order regarding motion to dismiss deadline and coordination for preparation of motion and declaration in support | 2.40 | |
| 08/11/22 | Akiesha G. Sainvil | Reviewing and assessing pleadings and attention to motion to dismiss strategy; | 1.60 | |

Invoice No.:    1000083200                                             Page  2

Re:              Orbis/Trump v. Clinton

Matter No.:     210459.010100

| Date | Timekeeper | Description | Hours |
|------|-----------|-------------|-------|
| | | coordination with client regarding declaration in support | |
| 08/12/22 | Akiesha G. Sainvil | Drafting, reviewing, and revising motion to dismiss; Reviewing and analyzing case law in support of arguments for motion to dismiss; Reviewing and assessing pleadings in furtherance of preparation of facts for motion to dismiss and declaration in support | 5.60 |
| 08/13/22 | Akiesha G. Sainvil | Drafting, reviewing, and revising motion to dismiss; reviewing and analyzing case law in support of arguments for motion to dismiss; continue reviewing and assessing pleadings in furtherance of preparation of motion to dismiss and declaration in support | 2.90 |
| 08/14/22 | Akiesha G. Sainvil | Drafting, reviewing, and revising declaration in support of motion to dismiss; Drafting, reviewing, and revising motion to dismiss; Reviewing and analyzing case law in support of arguments for motion to dismiss; Reviewing and assessing case pleadings in furtherance of preparation of motion to dismiss and declaration in support; Attention to local rules and procedure to ensure conformity in preparation for finalization and filing | 4.30 |
| 08/15/22 | Enjolique A. Lett | Revise Motion to Dismiss. | 1.10 |
| 08/15/22 | Enjolique A. Lett | Revise Declaration in support of the Motion to Dismiss. | 0.30 |
| 08/15/22 | Akiesha G. Sainvil | Prepare for and attend meeting with client concerning status of motion to dismiss and declaration in support; Drafting, reviewing, and revising motion to dismiss and declaration in support | 4.70 |
| 08/16/22 | Enjolique A. Lett | Multiple revisions of the Declaration of Chris Burrows in Support of Motion to Dismiss for Insufficiency of Service of Process and Lack of Personal Jurisdiction. | 1.30 |
| 08/16/22 | Enjolique A. Lett | Review correspondence from client concerning details of attempted service on Orbis. | 0.10 |
| 08/16/22 | Enjolique A. Lett | Draft Orbis Business Intelligence LTD's Corporate Disclosure Statement. | 0.40 |
| 08/16/22 | Akiesha G. Sainvil | Attention to, including drafting, reviewing, and revising, motion to dismiss, disclosure statement, and exhibits to motion to dismiss; Correspondence with client regarding service of process issue | 5.40 |
| 08/17/22 | Enjolique A. Lett | Multiple revisions of Orbis Motion to Dismiss Plaintiff's Amended Complaint. | 4.00 |
| 08/17/22 | Enjolique A. Lett | Research correct process and service of process under The Hague Convention. | 0.60 |
| 08/17/22 | Akiesha G. Sainvil | Correspondence with client concerning declaration in support of the motion to dismiss; Review and attention to motion to dismiss, including cite checks, proofreading, and finalizing document in preparation for transmittal to client | 3.70 |
| 08/18/22 | Enjolique A. Lett | Revise and finalize the Orbis Business Intelligence Ltd.'s Motion to Dismiss. | 0.90 |

Invoice No.:  1000083200                   Page  3
Re:     Orbis/Trump v. Clinton
Matter No.:  210459.010100

| | | | |
|---|---|---|---|
| 08/18/22 | Enjolique A. Lett | Revise and finalize the Corporate Disclosure Statement for Orbis Business Intelligence Ltd. | 0.20 |
| 08/18/22 | Akiesha G. Sainvil | Finalizing motion to dismiss, corporate disclosure statement, and exhibits to motion to dismiss in preparation for filing; Correspondence with client concerning filings | 3.80 |
| 08/19/22 | Enjolique A. Lett | Review and respond to correspondence from the client. | 0.30 |

Total Time:  51.50
Total Fees:    $



Invoice No. :   1000095573
File No.      :   210459.010100
Bill Date     :   October 3, 2022

Orbis Business Intelligence

# INVOICE

Re:   Orbis/Trump v. Clinton

<u>Legal Services through October 3, 2022</u>:

|  | Total Fees: | $ |
|---|---|---|
|  | **Current Invoice**: | **$** |

EAL:EC

Invoice No.:   1000095573                                                    Page 1
Re:            Orbis/Trump v. Clinton
Matter No.:    210459.010100

Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS | AMOUNT |
|------|-----------|-------------|-------|--------|
| 09/02/22 | Enjolique A. Lett | Review and analyze Plaintiff's Response in Opposition to Defendant Orbis' Motion to Dismiss and related exhibits, and correspond with Attorney Sainvil concerning strategy for reply. | 0.90 | |
| 09/02/22 | Akiesha G. Sainvil | Reviewing and assessing pleadings, blocking out strategy for Reply in Support of Motion to Dismiss, and preparing email to client summarizing pleadings and setting forth strategy for Reply Brief | 1.40 | |
| 09/06/22 | Enjolique A. Lett | Confer with Attorney Sainvil concerning arguments to address in the Reply Brief in Support of Orbis Business Intelligence's Motion to Dismiss. | 0.40 | |
| 09/06/22 | Enjolique A. Lett | Review case law regarding RICO's Nationwide Service-of-Process Rule conferring personal jurisdiction when the defendant is not served in the United States in preparation for Orbis Business Intelligence's Reply in Support of Its Motion to Dismiss. | 0.60 | |
| 09/06/22 | Akiesha G. Sainvil | Drafting, reviewing, and revising Reply in Support of Motion to Dismiss, including attention to Plaintiff's response brief and assessing case law essential to reply brief arguments | 10.90 | |
| 09/07/22 | Enjolique A. Lett | Draft and revise Orbis Business Intelligence's Reply in Support of the Motion to Dismiss. | 5.30 | |
| 09/07/22 | Akiesha G. Sainvil | Drafting, reviewing, and revising Reply in Support of Motion to Dismiss, including attention to Plaintiff's response brief and assessing case law essential to reply brief arguments | 2.80 | |
| 09/08/22 | Enjolique A. Lett | Review and analyze Order Granting Defendants' Motions to Dismiss and draft correspondence to client concerning same. | 3.40 | |
| 09/08/22 | Enjolique A. Lett | Revise and finalize Orbis Business Intelligence's Reply in Support of the Motion to Dismiss. | 0.30 | |
| 09/12/22 | Enjolique A. Lett | Confer with co-defendants' counsel concerning potential sanctions against Plaintiff. | 0.30 | |
| 09/12/22 | Enjolique A. Lett | Review decision of this Court imposing §1927 sanctions and a transcript of an interview of Plaintiff's counsel, Alina Habba in preparation for joint defense call on possible sanctions motions. | 0.60 | |
| 09/13/22 | Enjolique A. Lett | Attend joint defense meeting concerning potential sanctions motions in the Trump v. Clinton case. | 0.70 | |

Invoice No.:   1000095573                                                          Page 2
Re:            Orbis/Trump v. Clinton
Matter No.:    210459.010100

| | | | |
|---|---|---|---|
| 09/13/22 | Enjolique A. Lett | Draft correspondence to client summarizing joint defense meeting and plan of action concerning potential sanctions motions. | 1.20 |
| 09/13/22 | Akiesha G. Sainvil | Prepare for and attend joint defense call concerning motion for sanctions. | 0.60 |
| 09/21/22 | Enjolique A. Lett | Review initial draft of Defendants' Joint Motion for Sanctions. | 1.90 |
| 09/22/22 | Enjolique A. Lett | Correspond with counsel for co-defendants concerning the Defendants' Joint Motion for Sanctions. | 0.30 |
| 09/27/22 | Akiesha G. Sainvil | Reviewing and assessing motion for sanctions and coordinated strategy regarding same among defendants | 0.40 |
| 09/28/22 | Akiesha G. Sainvil | Attend joint defense call regarding sanctions motion and preparation of notes regarding same | 0.20 |
| 09/30/22 | Enjolique A. Lett | Review and revise final draft of Defendants' Joint Motion for Sanctions. | 1.00 |
| 09/30/22 | Enjolique A. Lett | Begin preparation of Declaration in Support of Defendants' Motion for Sanctions and Fees. | 1.70 |

<u>Total Time</u>:   34.90

<u>Total Fees</u>:          $



|                | Invoice No. : | 1000124165 |
|----------------|---------------|------------|
|                | File No.   :  | 210459.010100 |
|                | Bill Date  :  | October 27, 2022 |

Orbis Business Intelligence

## <u>INVOICE</u>

Re:   Orbis/Trump v. Clinton

<u>Legal Services through October 27, 2022</u>:

|                      |              |
|----------------------|--------------|
| Total Fees:          | $            |
| **Current Invoice**: | **$**        |

EAL:EC

Greenberg Traurig, P.A.
333 S.E. 2nd Avenue | Suite 4400 | Miami, Florida 33131
Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

Invoice No.:   1000124165                                                          Page 1
Re:              Orbis/Trump v. Clinton
Matter No.:    210459.010100

Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS | AMOUNT |
|------|------------|-------------|-------|--------|
| 10/03/22 | Enjolique A. Lett | Further finalization of Declaration and exhibits. | 1.70 | |
| 10/05/22 | Enjolique A. Lett | Correspond with co-Defendants' counsel concerning revised Declaration in Support of Motion for Sanctions. | 0.20 | |
| 10/05/22 | Enjolique A. Lett | Revise and finalize Declaration in Support of Motion for Attorney's Fees. | 0.20 | |
| 10/06/22 | Enjolique A. Lett | Correspond with clients concerning Defendants' Joint Sanctions Motion. | 0.30 | |
| 10/12/22 | Enjolique A. Lett | Attend Joint Defense Call in preparation for meet and confer with Plaintiff's counsel concerning the Joint Motions for Sanctions. | 0.30 | |
| 10/13/22 | Enjolique A. Lett | Meet and confer with Plaintiff's counsel concerning Motion for Sanctions. | 0.30 | |
| 10/13/22 | Akiesha G. Sainvil | Attend meet and confer call with counsel for Trump and other defense counsel concerning defendants' motion for sanctions, and prepare correspondence to client concerning same. | 0.50 | |
| 10/17/22 | Enjolique A. Lett | Finalize Declaration of Enjolique Lett in support of Motion for Sanctions in light of Rule 7.3 meet and confer. | 0.30 | |
| 10/25/22 | Enjolique A. Lett | Joint Defense Call regarding Plaintiff's objections to Sanctions Motion. | 0.40 | |
| 10/25/22 | Enjolique A. Lett | Review and analyze Plaintiff's Opposition to Defendants' Motion for Sanctions and exhibits. | 0.30 | |
| 10/26/22 | Enjolique A. Lett | Draft correspondence to the client regarding Plaintiff's Objections to Defendants' Motion for Sanctions, the parties subsequent meet and confer, and Plaintiff's counteroffer to seek the client's desired course of action concerning the Motion for Sanctions. | 0.60 | |

|  |  | Total Time: | 5.10 | |
|  |  | Total Fees: | | |

## CERTIFICATE OF SERVICE

I, David Oscar Markus, counsel for appellees and a member of the Bar of this Court, certify that on June 10, 2024, a copy of the attached Supplemental Appendix was filed with the Clerk through the Court's electronic filing system.  I further certify that all parties required to be served have been served.

/s/ *David Oscar Markus*
DAVID OSCAR MARKUS
*Counsel for Appellees*

JUNE 10, 2024